

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| VICTOR G. REILING ASSOCIATES and DESIGN INNOVATION, INC., <br><br> Plaintiffs, <br><br> - against - <br><br> FISHER-PRICE, INC., <br><br> Defendant. | Index No.: 3:03 CV 222 (JBA) <br><br><br> March 4, 2004 |

### DECLARATION OF JAMES M. KIPLING IN SUPPORT OF MOTION TO AMEND COMPLAINT

I, JAMES M. KIPLING, pursuant to the requirements of 28 U.S.C. §1746, declare that the following is true and correct:

### Qualifications

1. I have been retained by Plaintiffs to be an expert witness in this case. I am familiar with the facts set forth herein and I make this declaration upon personal knowledge. I submit this declaration in support of Plaintiffs' Motion to Amend Complaint.

2. As indicated in my Expert Report, I have practiced in the area of Intellectual Property since being admitted to the Bar in 1972. Between 1968 and 1974, I was employed by the General Electric Company and worked in the company's Patent Law Department in its Alexandria, Virginia and Cincinnati, Ohio offices. In 1974, I became House Counsel with the Kenner Toy Company, then a subsidiary of General Mills, Inc. In 1980, I became Vice President

CinLibrary/1375816.4

Law with the Kenner Products Division of CPG Products Corporation, and later with Kenner-Parker Toys, Inc. From 1987 through 1990, the latter entity was a subsidiary of Tonka Corporation. In 1991, Tonka was acquired by Hasbro, Inc. and I was Vice President and Managing Attorney with Hasbro until 2001. Thereafter, I joined Frost Brown Todd LLC as Of Counsel to the Intellectual Property Law Department based in Cincinnati, Ohio. A principal focus of my practice since 1974 has been the process by which toy and game concepts are created, developed and marketed, as well as the various intellectual property law protections for such concepts and products. A true and correct copy of my Expert Report in this matter is attached hereto as Exhibit A.

### The Nature of Independent Toy Inventors

3.    In my current practice, I represent a number of independent toy inventors and designers, some highly successful and others less so. Without exception, these individuals and entities are extremely cautious to avoid creating any impediments in their access to and relationships with toy manufacturers. Despite my prodding, they seemingly will sign any paper put in front of them in order to gain and maintain this access. Particularly at the point of making concept presentations to the executives of toy companies, in my experience, independent toy inventors and designers are loathe to raise any issue that might cause the toy executives to reverse a favorable result. The "Holy Grail" of favorable results is to have the executives express a desire to have the submission taken into the toy company for further efforts toward developing marketable executions of the concept after a presentation has been concluded.

4.    In my experience, toy designers and inventors are primarily visual communicators, and have a preference for intuitive, non-verbal expression. Written documents,

if unavoidable, are disposed of as quickly as possible, and legal terminology and interpretations seem to be a source of discomfort if not physical pain.

## Two Types of Play

5. The play pattern of children when they use action figures is primarily that of "pretending" – that is they imagine that they are, or are assisted by, the heroic figures who usually are the centerpieces of action figure product lines. For example, a young boy playing with a "Batman" figure will usually role-play being Batman, flying the "Batplane" and defeating the "Joker". The "Rescue Heroes" product line is based upon these play patterns, which are generally termed "aspirational" – that is, the child aspires to be the hero character or to participate with the hero and to achieve heroic accomplishments.

6. In contrast, children also play with toys like rubber balls and "Hula Hoops" that involve mainly mechanical or physical play patterns, and these toys may be termed "perspirational", for obvious reasons. In the case of the latter kinds of toys, the specific mechanical executions of the toys can have a significant impact. For example, when one toy company created the first foam football with a finned tail, the flying performance and accuracy of which was greatly enhanced in comparison with prior foam footballs, a large percentage of sales of prior foam footballs were diverted to that company. Similarly, when the "Hula Hoop" itself was improved by placing ball bearings inside the plastic tubing for making sound and enhancing the twirling action, significant sales were enjoyed by the "new" version. In each case, the specific design of the mechanical modification to the respective toy was essential to enhanced performance, hence to play enjoyment, hence to sales.

7. Since action figure play is more driven by "pretending", the means by which the pertinent role-playing scenario is triggered is more intuitive (i.e. relating to what the child imagines rather than to how the laws of physics affect <u>performance</u> of a particular design or a device), and the structural details of the means for suggesting such a scenario more subject to variation <u>without departing from the essence of the concept</u>.

### Plaintiffs' Concept

8. Based on 30 years' experience in the toy industry, in my opinion, one accurate articulation of Plaintiffs' concept would be:

"A device associated with a Rescue Heroes figure (for example, as part of a backpack) for visually communicating to the mind of a child a cue or prompt for role-playing in which the child would use the Rescue Heroes figure and imagine accomplishing a mission assignment, resolving a dangerous situation, performing a rescue or engaging in some other adventurous pretend scenario."

As there are surely other ways to describe Plaintiffs' concept in words, there are surely many ways in which it can be developed into marketable executions, as exemplified by the wide variety of executions which Fisher-Price has so successfully (and so profitably) marketed.

9. The above definition is primarily devoid of mechanical specifics and details. By contrast, a proper definition of the "improved" version of the Hula Hoop or foam football described above would include mechanical particularity because the "performance" and hence the marketable execution of those toys depend upon such mechanical specifics.

10. The "performance" of the Plaintiffs' concept can be fulfilled by achieving the described visual communication in any of a multiplicity of forms: a battery-powered film viewer

4

embodied in the backpack of the Rescue Heroes figure for viewing one or more impending dangerous events, a backpack-mounted film viewer that uses ambient rather than electric lighting and a hand-crank rather than a motor to advance the film, a backpack-mounted slot for disposition of cards bearing a variety of "still" pictures of an impending dangerous event, a backpack-mounted viewer for holding and advancing a flat disc on which are disposed a series of various individually viewable "still" pictures of similar dangerous events, a lenticular lens carried by a Rescue Heroes figure that provides the illusion of "moving" pictures of dangerous events, a handheld fisheye lens "pretend" camera carried by a Rescue Heroes figure that uses a light-pipe to convey the scene picked up by the fisheye lens to a "viewer" carried by the backpack of the Rescue Heroes figure, and doubtless many more. These conceptually interchangeable executions describe certain categories of Rescue Heroes products as well as certain specific versions of Plaintiffs' concept as submitted to Fisher-Price by Plaintiffs, and none of these various executions departs from Plaintiffs' concept. Unfortunately for Plaintiffs, at some point in the process of developing marketable executions of Plaintiffs' concept, Fisher-Price appears to have made the decision to use any means possible to attempt to avoid making appropriate payments to Plaintiffs -- payments that not only are, in my opinion, required by the custom and practice of the toy industry but also, I believe, are mandated by law. Also to Plaintiffs' misfortune, they were not aware of the legalistic importance or patent unfairness with which Fisher-Price intended to treat their every expression (and every failure in expression) during their concept submission process.

### Fisher-Price Misuses the Submission Process

CinLibrary/1375816.4

11. In its various papers, Fisher-Price repeatedly denies that it has "used" the concept submitted by Plaintiffs in any of its products, denies that any of its products is "based on" the Plaintiffs' concept and denies that any of Fisher-Price's products has been "influenced by" Plaintiffs' concept. Fisher-Price does not, however, deny that it entered with Plaintiffs an Option Agreement for the concept for the purpose of preventing Plaintiffs from disclosing the concept or licensing the concept " ... or any similar idea, product or concept . ." to any competitor while Fisher-Price studied and worked with the concept for the purpose of attempting to develop marketable executions of the concept. Fisher-Price does not deny that the Option Agreement was twice extended to give it more time for these developments or that it held Plaintiffs' original prototype and other submission materials for this purpose from the October 1998 initial disclosure meeting and concept presentation through March 1999, or that during that 5-month period it sent a letter to Plaintiffs in which it expressed "genuine excitement" for the Plaintiffs' concept

12. Rather, the denials by Fisher-Price that it should be required to pay Plaintiffs for their concept have been based on hypertechnical reading of the results of Plaintiffs' hasty effort to adequately describe this concept in handwriting, in an unlined space 9/16" x 4" on the Fisher-Price "Concept Submission Form" during their meeting with Fisher-Price executives for the presentation of this and five (5) other separate concepts. Fisher-Price emphasizes that the form includes the following statement, "The description of the submitted idea and/or technology incorporated must be carefully defined in the description/unique features area below." There is no indication, however, that Fisher-Price emphasized to Plaintiffs while they were scribbling the

description, or at any other time, that its content would later determine whether or not Fisher-Price would pay them for the concept.

Alternatively, Fisher-Price relies on the restrictive and convoluted description drafted by Fisher-Price's own attorneys as part of the Option Agreement. In each case, it is evident that the resulting description was of the prototype submitted by Plaintiffs, not the concept represented by the prototype. The *argument* of Fisher-Price is that neither of these written descriptions is broad enough to cover the Fisher-Price marketable execution of the Plaintiffs' concept, and *ipso facto*, sales of those executions have created no obligation to Plaintiffs. The *fact* is that a fair interpretation of the concept submitted, as at Paragraph 8 above, encompasses each marketable execution developed by Fisher-Price to date.

13. More recently, having had the opportunity to depose Plaintiffs' principals, Fisher-Price now uses as additional ammunition the inability of those primarily visual-communicators to avoid being ensnared in the verbal webs created by Fisher-Price's Counsel, Mr. Lane, during lengthy depositions. Counsel quotes carefully selected and obviously befuddled verbal responses to hypothetical questions posed by Mr. Lane in order to fabricate a defense against Plaintiffs.

### Modifications to Submitted Concepts Typical

14. Toy concepts are typically submitted to toy companies in the form of "kit-bash" models that may use pieces of existing toy and non-toy products assembled by the submitter to demonstrate the structure and/or function of the proposed toy concept. In this instance, Plaintiffs' submission indeed included a kit-bash prototype that was used to demonstrate the

function of the Plaintiffs' concept – i.e. the visual communication to the child as described at Paragraph 8 above. In response to feedback from Fisher-Price, regarding the supposed shortcomings of the concept in which it previously had expressed such "genuine excitement", Plaintiffs made additional submissions of two suggested alternative executions of their concept, each of which bears striking resemblance to one of the marketable executions developed and marketed by Fisher-Price. Fisher-Price has argued that none of its products "uses" the Plaintiffs' concept, because none of them replicates Plaintiffs' original prototype, which they describe in grinding detail – "A Rescue Heroes firefighter character with a backpack... the backpack contained a battery operated film reel which could be viewed by a child placing one eye up to a magnifying lens and looking into the interior of the backpack." Repeatedly throughout their papers, Fisher-Price engages in "pretending" of their own – i.e., that "use" would only occur if each and every detail of the prototype were replicated, as though the "function" could not be achieved in other ways. In fact, the numerous products that have been marketed through Fisher-Price's efforts in developing marketable executions of Plaintiffs' concept are examples of their error.

15. As previously stated in my Expert Report dated January 5, 2004, it is typical, if not unavoidable, that the toy company will "... expend substantial company resources..." in developing such marketable executions of a submitter's concept – i.e. finished products. The fact that those Fisher-Price products which are subject to this proposed Amended Complaint are not themselves replications of Plaintiffs' prototype represents neither a defense for Fisher-Price nor a departure from the typical situation, as described above.

16. In fact, on several occasions while we were colleagues at another toy company, Fisher-Price's expert in this case, Mr. Bollinger, complained to me that he and the people he supervised had taken a concept received from an outside submitter in an unmarketable form and had transformed it substantially to create a marketable execution. To paraphrase Mr. Bollinger, "I made the real invention. The submitter gets the royalty; I get a pat on the back." Whether or not these feelings are prevalent within Fisher-Price and might lead its employees to wish they could deny royalties to the Plaintiffs, the fact is that custom and practice in the toy industry rewards the submitter with royalties despite the fact that marketable executions of submitted concepts developed internally by the toy company are frequently quite different from the forms of prototypes in which those concepts are submitted. In this case, those <u>differences are markedly less substantial</u>, and particularly with respect to Plaintiffs' second and third submissions of their concept, than in many other cases. Further, the very nature of the Plaintiffs' action figure "pretending" concept, as described above, is more readily variable in execution, unlike modified Hula Hoops and foam footballs.

### **Products Subject to Royalty Obligation**

17. In my experience, products that fall within any of three levels of connection to the Plaintiffs' concept will bear royalty, and should be subject to payment by Fisher-Price in the current case:

(a) Category 1 includes those Fisher-Price products that use, embody, are based on, derived from or influenced by the Plaintiffs' concept. That these products are appropriately subject to the royalty obligation of Fisher-Price to Plaintiffs goes without saying. Products of Fisher-Price within Category 1 include, but may not be limited to, "Mission

9

Command Rescue Heroes", "Mission Select Rescue Heroes", "Voice Tech Video Mission Rescue Heroes", at least the "Telly Photo" figure and accessories in the "Optic Force Rescue Heroes" product line, and any other current or future product that meets the criteria of this Category 1.

(b) Category 2 includes those products which are sold together with or are marketed by Fisher-Price specifically for use with any of the Category 1 products (commonly referenced in the toy industry as "accessories"). In the present case, such products include, but may not be limited to, the "Mission Select Police Cruiser", the "Mission Select Firetruck", the "Mission Select Mountain Action Command Center", the "Voice Tech Video Mission Rescue Firetruck", the "Voice Tech Video Mission Rescue Jet", the "Voice Tech Video Mission Police Cruiser", the "Voice Tech Video Mission Aquatic Rescue Command Center".

(c) Category 3 includes those products and services marketed or licensed by Fisher-Price that arise out of the images, trademarks or other elements of the popularity and goodwill created by Category 1 or Category 2 products but which are not themselves within either said category.

Revenues enjoyed by Fisher-Price as the result of these Category 3 products and services exist only as the result of the popularity of the Plaintiffs' concept as executed, distributed and promoted in the marketplace. Examples of this category typically include kids' lunch boxes, apparel, video games and other products and services that use the images, names, etc. which are specific to the Category 1 and/or Category 2 products. In this case, they would include such Fisher-Price products as videos, DVDs and video games that specifically depict or are sold together with "Mission Select" or "Voice Tech Video Mission" Rescue Heroes figures or

accessories and any other products and services that currently or in the future are marketed by Fisher-Price which fulfill the criteria of Category 3. It should be noted in this regard that participation of the outside concept submitter (e.g. Plaintiffs) in revenues arising from Category 3 products and services are typically a subject of negotiation in the license agreement by which the concept is originally licensed to the toy company, but the obligation in this case is appropriate because the actions of Fisher-Price have deprived Plaintiffs of the opportunity to participate in that negotiation.

<u>"Novelty"</u>

18. The next of Fisher-Price's defenses for not paying Plaintiffs for their concept is grounded in the alleged lack of "novelty" of the concept. Regardless what may be the requirement of "novelty" applicable to concept submissions in other industries, in the toy industry it is not a significant consideration, with two exceptions: (a) a concept submitted to a company that is currently developing executions of an internally created (i.e., "home-grown") and substantially similar concept can be declined without prejudice to the company's position with respect to its own concept; and (b) a concept that is the substantially similar to one submitted to the company (and which is under current development) by a third-party outside inventor (who owes no obligation to the current submitter) can be declined without prejudice to the company's position with respect to the third-party concept. A caveat is necessary, however: the custom and practice of the toy industry is that the ongoing development of a similar concept is typically disclosed to the submitter. Other than in these situations, the "novelty" of a submitted concept is not a material consideration in the toy industry.

19. Perhaps the most graphic example of this principal of which I am aware involved a product originally marketed by Kenner Products in the late 1970's and early 1980's called "Stretch Armstrong". At some time during the early 1990's, an independent inventor submitted to another toy company the concept that was simply "It is a good time to re-introduce Stretch Armstrong." The company liked the idea, entered a license agreement with the inventor and paid the inventor a royalty on its sales of "Stretch Armstrong". I became aware of this in connection with the acquisition by Hasbro, Inc. of the licensee toy company, and reviewed the license agreement.

20. Mr. Bollinger has sought to aid Fisher-Price by doing elaborate research to unearth piles of "prior art" that are argued to show one or another characteristics of Plaintiffs' concept as it has been re-re-redefined by the efforts of Fisher-Price into a verbal goo that bears little resemblance to the actual concept as described hereinabove. Mr. Bollinger's "Expert Report" embodies literally hundreds of pages of pictures and descriptions of products that are alleged to bear one or two physical similarities to Plaintiffs' original prototype. Evidently, the theory is that if all of the physical elements of all of these products are broken down into parts, one might be able to kit-bash a prototype that resembles Plaintiffs' prototype. Evidently the fact that this reverse-engineering of Plaintiffs' prototype has no reason for being and no relevance but for the efforts of Fisher-Price to avoid paying Plaintiffs what they are due is lost on Fisher-Price. This fact alone renders the exercise of no significance to the determination of this case.

21. In his Declaration In Opposition To Plaintiffs' Motion To Amend, Mr. Bollinger cites a patent that issued eight (8) years ago on a product that apparently ceased to be sold even before that, as evidence of "lack of novelty", as though he were offering evidence against

validity of a later – issued patent. Once again, the efforts of Fisher-Price to obfuscate are off the mark.

22. The true relevance of all of the vast store of materials dredged up by Fisher-Price is simply this: none of this material had <u>anything</u> to do with Fisher-Price's development of the various products at issue. Have they even alleged that their designers made reference to any of these vast stores of documents in developing marketable executions of the concept that underlies the products at issue? Did they receive outside submissions of any of these materials that they used to develop the products at issue – even a single one of them? In both cases, the answer is "No".

23. In the obvious absence of some nexus between these materials and Fisher-Price's products at issue -- that is, a direct causal relationship whereby those materials prompted them to create the products at issue- their producing all of this material and information has the same apparent purpose as their other efforts – to create a fog that will distract the observer and camouflage the facts.

24. Finally, tough nothing further is necessary to put the spurious "novelty" issue into proper perspective, perhaps Fisher-Price might explain the fact that they paid an option fee for a concept that is now characterized as "not novel at the time of submission." If any of the materials assembled by Mr. Bollinger during his extensive research was relevant to Fisher-Price's evaluation of Plaintiffs' concept, why was not that material cited at the time of submission in October 1998, or later at the time of executing the Option Agreement, or still later at either of the points at which the option was reviewed? If any of that material was relevant to Fisher-Price's development of marketable executions, why was the reason given Plaintiffs for

13

return of their prototype stated in terms of flaws in the concept and cost of manufacture rather than "lack of novelty?" Clearly the answer is that "lack of novelty" is an afterthought, of importance to Fisher-Price only as a contrived defense in this litigation. If the presence or absence of novelty were an issue relevant to Fisher-Price prior to this litigation, it certainly would have been raised prior to this litigation.

### Conclusion

25.     One sentence in the Fisher-Price disclosure agreement[1] which outside toy submitters are required to sign states "We assure you that we intend to deal fairly with you in connection with your disclosure." Apparently, since that sentence was drafted, the philosophy of Fisher-Price has changed markedly. In the current case, at some point after Fisher-Price expressed "genuine excitement" for Plaintiffs' concept, and after it had obtained from Plaintiffs an exclusive option that it *twice* renewed, Fisher-Price decided not to pay Plaintiffs. Fisher-Price now hopes to exculpate itself in a fog of verbiage and technical arguments, that, when seen for what they are, dissipate before the eye into a fetid but transparent mist that no longer hides the truth: Fisher-Price has abandoned its trumpeted fairness and instead masses its great resources against Plaintiffs in attempts to camouflage actions which are in clear conflict with the custom and practice of the toy industry, as well as in violation of its obligations to Plaintiffs.

---

[1] Title: "Fisher-Price Inc Policy and Agreement Concerning Ideas Submitted by Persons Outside of Fisher-Price, Inc."

26. No excuse proposed by Fisher-Price for partial or total exclusion of the products added by the Amended Complaint should be permitted to exempt any those products from Plaintiffs' justified remedy.

I hereby declare that the foregoing is true and correct under penalty of perjury.

Dated: March 4, 2004

*James M. Kipling* (signature)