UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT



| | |
|---|---|
| VICTOR G. REILING ASSOCIATES and DESIGN INNOVATION, INC., <br><br> Plaintiffs, <br><br> - against - <br><br> FISHER-PRICE, INC., <br><br> Defendant. | Index No.: 3:03 CV 222 (JBA) <br><br> **REPLY DECLARATION OF <br> BRUCE P. POPEK** |

I, BRUCE P. POPEK, pursuant to the requirements of 28 U.S.C. §1746, declare that the following is true and correct under the penalties of perjury:

1.   I am a principal of Design Innovation, Inc. ("DI"), a plaintiff in the above captioned action. I have personal knowledge of all facts stated herein. I make this declaration based upon personal knowledge and a review of documents relevant to this proceeding. I submit this reply declaration in further support of plaintiffs' Motion for Leave to File a Second Amended Complaint and in opposition to Defendant's Motion to Strike certain allegations contained in the proposed Second Amended Complaint.

Background

2.   DI, based in Avon, Connecticut, is an industrial design firm that employs a team of designers using advanced tools and equipment to develop prototypes and working models of toys, games and other products for manufacturers and marketing groups. I, along with my partners Bruce Benedetto and Doug Melville, Jr., oversee all aspects of the company's business.

3. I have a degree in industrial design and have worked in the field since 1980. From 1980 through 1987, I was the Director of Design of Preschool Play and Learn, and Outdoor Products at Coleco Industries. In that capacity I supervised an in-house staff of designers and outside resources. During that time I was the designer responsible for Colecovision and the Adam computer system. I also developed internal concepts and those of outside inventors As director of Preschool Products, I was involved in product selection and development of concepts from Tomy Japan as well as the creation of the Cabbage Patch Baby infant line.

4. In 1988, I along with my partners founded DI and I have served as the President of the company since that time. During the last 16 years, my partners and I have created a premier design development group that has created and developed hundreds of products for the toy and juvenile products industry. We have also created concepts which have resulted in option agreements and/or the payment of advance monies at least 56 times. DI has an international client base and has worked with more than 100 leading companies including Hasbro, Fisher Price, Spin Master Toys, Little Tykes, Parker Brothers, Gerber, The First Years, Safety 1st and Kolcraft. We work with and for leading inventors in the toy industry, including our co-plaintiff, Victor G. Reiling Associates.

Definition of the Concept, "Use" by Fisher-Price and Novelty

5. I have reviewed the declaration of Victor G. Reiling, dated March 4, 2004 ("Reiling Dec.") and the exhibits thereto and the declaration of James Kipling, dated March 4, 2004 and the exhibits thereto. I adopt and incorporate by reference herein all of the factual assertions and opinions contained in paragraphs 4 through 8 and 12 through 21 of Mr. Reiling's

declaration. I do so for purposes of brevity because I have personal knowledge of Mr. Reiling's assertions and I agree with all of them.

6. In addition, I can specifically confirm that based on my company's own past experience Fisher-Price will pay a royalty to an outside toy inventor for a product concept submission even though the finished product deviates significantly from the original submission. As an example, in 1994 we submitted to Fisher-Price the concept for a large, egg-shaped head toy with replaceable parts on its face, known as "Silly Sounds." Each nose piece would initiate a unique animal sound. The novelty was in the electronic sounds; otherwise the product was essentially a knockoff of the famous "Mr. Potato Head" toy. Fisher-Price optioned the product and then acquired it. When it was brought to market as "Egg-A-Saurs," Fisher-Price removed the electronic sounds. Essentially, Fisher-Price removed the only novel aspect of the concept besides the aesthetic aspects, brought it to market and we were still paid a full royalty on the product.

Plaintiffs' Discovery of Fisher-Price's Repeated and Blatant
Unauthorized Use of Their Concept in the "Rescue Heroes" Line in Late 2003

7. My partners and I did not discover Fisher-Price's misappropriation with respect to the additional products referenced in the Second Amended Complaint, namely the "Mission Select Rescue Heroes" line, the "Mission Command Rescue Heroes" line, the "Telly Photo" character from the "Optic Force Rescue Heroes" line and the vehicles and line extensions related thereto, until late 2003. Fisher-Price claims that I should have known about these products sooner (even though several important ones did not come out until 2003) because of my work in the toy industry. (*See* Defendant's Memorandum in Opposition to Plaintiffs' Motion for Leave to Amend ("Def. Mem.") at 20-21). In response, while it is true that Fisher-Price has given us a

significant amount of work in the past, including some work on various aspects of the "Rescue Heroes" line, we have done very little work on the "Rescue Heroes" line in the past few years. Moreover, the work that we have done has related only to ancillary products like vehicles, not to the core action figure line. In addition, we are typically given very finite and specific design tasks that may only encompass one small portion of the overall toy. Hence, we have no idea what the actual finished product will look like or what engineering mechanisms it may utilize. Finally, as Mr. Reiling so aptly stated, we are far too busy trying to earn a living to spend time policing the marketplace for new toys that may be covered by our concept.

Hardship if DI is Forced to Pay for Fisher-Price's Additional Discovery

8.   DI is also a small company with limited resources and it certainly pales in comparison to Fisher-Price, a subsidiary of the world's largest toy company whose products are sold worldwide. Having to pay for Fisher-Price's discovery would cause undue hardship on DI, particularly since the company is in financial peril at present due to the fact that Fisher-Price stopped doing business with us last December.

Fisher-Price's Termination of Our Business

9.   As I indicated, Fisher-Price used to be a significant part of DI's business. At times the Fisher-Price account represented 40% of our business. We had worked with them for over 15 years and always enjoyed an excellent working relationship. Last fall Fisher-Price attempted to get us to drop our lawsuit against them. Thereafter, they informed us that they would no longer give work to us because of the pending lawsuit (See E-mail message from Stan Clutton attached hereto at Tab A) Fisher-Price claimed that the decision was made by its corporate parent, Mattel, Inc. Fisher-Price also told us that we would not be able to work for

4

them in the future until we convinced our co-plaintiff, Mr. Reiling, to also withdraw his lawsuit. We have no control over Mr. Reiling and, nevertheless, we would not ask him to drop his suit which he feels so strongly about.

10. In sum, Fisher-Price used our concept submission without our consent and refused to pay us a royalty, tantamount to stealing our novel idea. Then, when we had the audacity to challenge them on it, they fired us. And to add insult to injury, they now have blackballed us for all future work until we drop the suit and convince Mr. Reiling to do so.

I declare that the foregoing is true and correct under the penalty of perjury.

_____
Bruce P. Popek

Dated: Avon, Connecticut
       March 4, 2004

5