UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT



| | |
|---|---|
| VICTOR G. REILING ASSOCIATES and DESIGN INNOVATION, INC., <br><br> Plaintiffs, <br><br> - against - <br><br> FISHER-PRICE, INC., <br><br> Defendant | Index No.: 3:03 CV 222 (JBA) <br><br> **REPLY DECLARATION OF <br> VICTOR G. REILING** |

I, VICTOR G. REILING, pursuant to the requirements of 28 U.S.C. §1746, declare that the following is true and correct under the penalties of perjury:

1. I am the principal of Victor G. Reiling Associates ("VGRA"), a plaintiff in the above captioned action. I have personal knowledge of all facts stated herein. I make this declaration based upon personal knowledge and a review of documents relevant to this proceeding. I submit this reply declaration in further support of plaintiffs' Motion for Leave to File a Second Amended Complaint in this action and specifically to rebut the erroneous assertions contained in Fisher-Price's opposition papers.

Background

2. VGRA, based in Kent, Connecticut, is a small, entrepreneurial toy development company. I am the principal of the company and I oversee all aspects of the business. Presently, I am the only employee.

3. I am a graduate of the United States Naval Academy in Annapolis, Maryland and served in the U.S. Navy from 1962 to 1970. After I left the Navy, I immediately began my

career in the toy industry, a career that has continued to this day. From 1970 through 1974, I was a design group manager with defendant, Fisher-Price, Inc. ("Fisher-Price"). From 1974 through 1977, I was the Director of Research & Development for two divisions of Milton Bradley, another major toy company. Since 1977, I have been an independent toy developer, creating concepts that are offered to various toy manufacturers. My company does not manufacture and market toys, but rather works with toy manufacturers to develop new toys based on our product concepts. Including toys created while at Fisher-Price, I have created more than twelve toys and games that have sold over one million units. Based on my experience, when a toy manufacturer adopts one of our product concepts, in accordance with the long-established custom and practice in the toy industry, we are remunerated by being paid a royalty based on the sales of toys incorporating the concept and any line extensions thereto.

Plaintiffs' Submissions to Fisher-Price and Definition of the "Concept"

4. In 1998, VGRA and plaintiff Design Innovation, Inc. ("DI") devised a novel concept for adding an image component to the backpack of each "Rescue Heroes" action figure that enhanced role play for the child by depicting the mission of that particular "Rescue Heroes" character, which concept could be expanded into accessories and line extensions relating to the "Rescue Heroes" line pursuant to industry custom and practice. Plaintiffs submitted their novel concept to Fisher-Price in three different variations.

5. Plaintiffs' initial submission, on or about October 29, 1998, consisted of a written description, drawings and a prototype which envisioned an interchangeable battery-operated animated image player that would be placed on the "Rescue Heroes" characters in the form of a backpack. (True and correct copies of Fisher-Price's Concept Submission Form, my written description of the concept and DI's drawings are attached hereto at Tab A). The backpack

allowed children to view animated images. As part of the initial submission, plaintiffs also presented Fisher-Price with the idea for an action-adventure reporter/photographer character to be part of the "Rescue Heroes" line. This character, dubbed "Fillmore Schotz," was drawn with a distinctive look and feel and was presented holding a camera with an optical device in one hand and microphone in the other hand. (True and correct copies of storyboard artwork of the "Fillmore Schotz" character and the accompanying camera submitted to Fisher-Price are attached hereto at Tab B). Plaintiffs specifically referenced that this character could be used with line extensions such as vehicles. (See Tab A).

6.     On February 16, 1999, the parties finalized and signed an Option Agreement for plaintiffs' concept, which granted to Fisher-Price an exclusive three-month option to either acquire plaintiffs' rights in the concept or to license the concept, in exchange for the monetary payment of $7,500. On March 23, 1999, Fisher-Price returned the prototypes and drawings of the concept to plaintiffs, allegedly due to prohibitive production costs. In the letter from Henry Schmidt of Fisher-Price declining the option, he stated that the concept had been given "very careful consideration and evaluation from design, costing, engineering and marketing perspectives," thereby confirming that the concept had been considered by many different departments within Fisher-Price. Accordingly, the Option Agreement expired by its very terms on May 1, 1999.

7.     Despite Fisher-Price's initial rejection of the concept for reasons that "boiled down to cost," VGRA and DI continued our efforts toward gaining Fisher-Price's acceptance of the concept by focusing on cost reductions. We submitted a revised execution of the concept to Paul Snyder at Fisher-Price on May 22, 1999. (Attached hereto at Tab C is a true and correct copy of my May 22, 1999 letter to Fisher-Price, with an attached revised drawing). Seeking to

address Fisher-Price's concerns regarding cost, we eliminated the motor, batteries and several other parts from the original submission and instead focused on adding approximately eight still, printed images mounted on a wheel or drum to the backpack of each "Rescue Heroes" action figure that enabled children to view still images through a viewing mechanism. The images related to the mission of each "Rescue Heroes" character and were designed to enhance role play for the child. Fisher-Price rejected this submission as well in or about July 1999.

8.      Thereafter, VGRA and DI submitted another revised execution of the concept on December 7, 2000 to Peter Pook, Fisher-Price's Vice President of Product Development at that time. (Attached hereto at Tab D is a true and correct copy of my letter to Peter Pook, with revised drawings attached). The December 2000 submission depicted the still images on a round disc instead of on a wheel or drum device. Again, while the concept envisioned depicting images in the backpacks of the "Rescue Heroes" action figures, the concept was also designed to be incorporated into accessories, such as vehicles and play sets, and line extensions relating to "Rescue Heroes" pursuant to industry custom and practice. Fisher-Price returned our final submission on January 5, 2001 with the explanation that the concept remained too expensive to develop and that it did not fit the current Rescue Heroes theme.

Plaintiffs' Discovery of Fisher-Price's Repeated and Blatant
Unauthorized Use of Their Concept in the "Rescue Heroes" Line in Late 2003

9.      As stated in my February 4, 2004 declaration submitted in connection with plaintiffs' motion, I did not discover Fisher-Price's misappropriation with respect to the additional products referenced in the Second Amended Complaint, namely the "Mission Select Rescue Heroes" line, the "Mission Command Rescue Heroes" line, the "Telly Photo" character from the "Optic Force Rescue Heroes" line and the vehicles and line extensions related thereto, until late 2003. I am aware that defendant claims that I should have known about certain of these

4

products earlier because of my work in the toy industry and because some of these products actually came out several years ago (while I note that the most blatant of them, the "Mission Select" line and the "Telly Photo" Optic Force character came out in early 2003 and October, 2003, respectively). (See Defendant's Memorandum in Opposition to Plaintiffs' Motion for Leave to Amend ("Def. Mem.") at 20-21). Essentially, Fisher-Price claims that I have not provided a satisfactory reason for the delay in raising claims to the new action figures.

10. First, with respect to why I didn't discover sooner that Fisher-Price had released certain of the products at issue, prior to 1999 I had routinely received Fisher-Price's annual product catalogues and was invited to visit Fisher-Price's showroom at the American International Toy Fair in New York City ("Toy Fair") each year. In 1999 or thereabouts, however, Fisher-Price changed its policy and stopped inviting outside inventors to its Toy Fair showroom and stopped giving its product catalogues to outside inventors (this was part and parcel of a demonstrable negative change in attitude by Fisher-Price and its corporate parent, Mattel, Inc., towards outside inventors). As a result, since 1999 I have not been privy to Fisher-Price's new products prior to their launch. Moreover, while Fisher-Price would have the Court believe that I should spend my time and energy continually policing the marketplace for any possible unauthorized use of my concepts, the truth is that my efforts are concentrated on the development of new concepts and ideas so that I can continue to earn a living. Fisher-Price is simply trying to hold me to an inappropriate and inherently unfair standard of conduct.

11. With respect to the reasoning for the delay in having my legal counsel seek to amend this lawsuit once I discovered the new products at issue (a delay of only a few months I might add), I sincerely believed and expected that this case was going to settle during this time period. In fact, I expected the matter to be resolved at the formal court-ordered Settlement

Conference that took place in late January 2004. When it appeared at the conference that the parties were far apart and that the case would not settle, however, it became apparent that a further amendment of the Complaint was in order. I am aware that plaintiffs' counsel promptly raised the issue at the February 2, 2004 Status Conference before the Court.

The "Rescue Heroes" Characters, Accessories and Line Extensions
Referenced in the Second Amended Complaint are Covered by Plaintiffs' Concept

12.    In his declaration, defendant's expert, Howard Bollinger, concludes that "Fisher-Price never used the concepts reflected in any of the three submissions submitted by Plaintiffs" based on his assertions that Fisher-Price did not specifically incorporate "a film loop," "drum with still frames" or "Viewmaster-style film discs" into the backpacks of its "Rescue Heroes" characters. (Declaration of Howard Bollinger, dated February 17, 2004 ("Bollinger Dec."), ¶ 8) I strongly disagree with Mr. Bollinger's ultimate conclusion and the assumptions that he made to reach that conclusion.

13.    As a threshold matter, I note that Mr. Bollinger claims that it is somehow "important" for the Court to understand that "plaintiffs' submissions did not propose or conceive of a new product," (Bollinger Dec. ¶ 5), thereby implying that Fisher-Price would only be obligated to remunerate plaintiffs if they had conceived of a new product. That is utter nonsense and it flies in the face of the longstanding practice of the toy industry, in general, and Fisher-Price, in particular. Based on my prior work at Fisher-Price and my dealings with them as a private inventor, I know that Fisher-Price routinely seeks concept submissions from private toy developers in an effort to create extensions and modifications to existing toy lines. And I am also aware that Fisher-Price will pay a royalty if the concept is incorporated into the existing toy line. Indeed, attached hereto at Tab E are true and correct copies of Fisher-Price's May 2001 and February 2002 "Wish Lists," which Fisher-Price sends to outside toy inventors for the purpose of

soliciting new product concept submissions from them. Both documents specifically reference the "Rescue Heroes" line and state that Fisher-Price continually looks for "ways to bring these characters to life, and expand the play." As such, any implication that Fisher-Price is not obligated to pay a royalty to plaintiffs because their concept involved a modification to an existing toy line, rather than the creation of a brand new line, is simply erroneous

14     Importantly, Mr. Bollinger's conclusion is based on the application of an erroneous standard, namely that in order for Fisher-Price to owe a royalty to plaintiffs they would have had to have used the exact same engineering mechanism described in plaintiffs' concept in the exact same manner in connection with the "Rescue Heroes" figures. Put another way, Mr. Bollinger's approach, if taken to its logical conclusion, is that Fisher-Price would not owe a royalty unless the precise mechanism used by Fisher-Price is disclosed within the four-corners of plaintiffs' concept submission. This runs afoul of longstanding custom and practice in the toy industry and is simply not the correct standard to be applied. First, plaintiffs are not claiming that the specific type of engineering mechanism used, standing alone, was novel in and of itself. Rather, plaintiffs' definition of the concept involved, as stated in paragraph 4 above, is broader and consists of the application of the image on the backpack as it relates to the particular character's mission. The novelty of the concept may also include a particular combination of engineering mechanisms as they relate to the overall concept. But the failure of Fisher-Price to use the precise engineering mechanism in the same exact way would not alleviate its obligation to pay a royalty in this case. To this end, I note that Mr. Bollinger tried to hold plaintiffs to the definition of the concept as listed on Fisher-Price's submission form (attached hereto at Tab A). But that is ludicrous. That form leaves very little room to describe the product concept with any degree of precision and, in my experience, is not controlling for purposes of defining the

concept. As I recall I filled it out just prior to meeting with Paul Snyder of Fisher-Price to submit the original concept, and my experience is that these forms are not given much thought by the inventor or the toy company – they are purely administrative forms.

15. Rather, the correct standard to be applied in determining whether toy companies are obligated to pay for products based on outside inventor submissions is contained in the declaration of plaintiffs' expert, James Kipling. Mr. Kipling, himself a toy industry veteran on the company side, contradicts Mr. Bollinger's view that "use" by Fisher-Price would occur only if each and every detail of the concept were replicated. Based on his own experiences working for a toy company, Mr. Kipling confirms that (1) concepts submitted by outside inventors are typically broadly construed; (2) the performance of the concept by Fisher-Price could be achieved in many different ways and Fisher-Price would still owe a royalty regardless of the particular device used; and (3) the concept may ultimately be changed because the toy company has expended substantial resources to refine and embellish the concept into a "finished" licensed product, but a royalty would still be owed nonetheless. (*See* Declaration of James Kipling, dated March 4, 2004 ("Kipling Dec."), ¶¶ 9-10, 16, Exh. A).

16. Mr. Kipling's view is consistent with my own experience in dealing with concept submissions from several different toy manufacturers, including Fisher-Price. In or about 1988, I submitted a novel toy concept to Fisher-Price known as "Slam Jammers." The concept that I presented to Fisher-Price involved a battery-powered car with two vertical wheels and one horizontal wheel that could guide the car around a rail or fence. The toy was approximately 3" by 5" inches and was intended for the preschool motif (2 to 4 years of age). Fisher-Price optioned the concept and then purchased it. Fisher-Price then took 18 months to bring the final product to market. During this time I asked Paul Snyder, Fisher-Price's head of inventor

relations, whether or not they needed any additional input from me. He replied: "No, we are taking a different approach, but you will be really pleased when you see the finished product." When it came to market under a different name, "Crash Zone," Fisher-Price had changed the toy to such an extent that it was unrecognizable from my initial submission and was essentially a different toy both in design and function. The car was much smaller and more realistic – it had 4 normal wheels, no horizontal wheels and had a front bumper that was rounded to withstand the effect of bouncing the car off of a wall. The age demographic had also changed and the toy was now directed to an older demographic (5+). Indeed, the toy had a small driver which ejected when the car hit something that was so small that it would never have passed the choking parameters for a pre-school toy. Fisher-Price also introduced both a large car-crusher and a large launcher accessory to go along with the toy. Despite the significant change in the toy from initial submission to finished product, Fisher-Price still satisfied its monetary obligations to me pursuant to the option agreement. Ultimately VGRA received an advance of $125,000 in exchange for a lower royalty than provided for in the contract. Importantly, the contracts of Fisher-Price's parent corporation, Mattel, Inc., confirm that the company will still pay a royalty notwithstanding its right to "produce and sell" the concept in a "new form." (*See* License Agreement ¶ 8, attached hereto at Tab F).

17    A comparison of plaintiffs' definition of the concept at issue as set forth in paragraph 4 above with each of Fisher-Price's "Rescue Heroes" products at issue reveals that these products do "embody" (Def. Mem. at 13) essential elements of plaintiffs' concept because, in particular, the action figures in the "Mission Select" and "Mission Command" lines each depict an image in the backpack of the figure that enhances role play for the child by depicting the mission of that particular character. I also note the following specific similarities:

      (a)    <u>"Mission Select" Line</u>: Still images appear on a disc that is embedded in the backpack. (See Declaration of Christopher Pardi, dated February 18, 2004 ("Pardi Dec."), Exh. J). The child can turn the disc until the image they want to see appears in the viewing mechanism. The disc used is about 2" in diameter and has six images. Plaintiffs' third submission, dated December 2000, incorporated a disc of essentially the same parameters with the same size images. (*See* Tab D hereto). Image sizes are virtually the same without use of a magnifying or "Viewmaster" type lens.

      (b)    <u>"Telly Photo" "Optic Force" Character</u>:

Fisher-Price has produced the very same reporter/photographer action figure, with a virtually identical look, feel and play pattern that plaintiffs presented to Fisher-Price in 1998. (*Compare*, Declaration of Robert J. Lane, Jr., dated February 19, 2004 ("Lane Dec."), Exh. G; *with*, Tab A attached hereto). The characters share the same features, namely red hair and facial hair, baseball cap, vest, press pass and an optical camera in one hand and a microphone in the other. I note that Fisher-Price does not attempt to deny that its "Telly Photo" character embodies the essential elements of plaintiffs' concept submission, and instead attempts to argue that "the concept had no novelty at the time submitted by plaintiffs." (Def. Mem. at 14, n. 12). I will address the novelty issue below.

      (c)    <u>"Mission Command" Line</u>

Each figure in this line came with a mission card depicting a still, printed image of a mission adventure (fire, tornado, etc.) that the child could insert into the figure's backpack. (*See* Pardi Dec., Exh E). The mission cards could be transferred among figures. That is exactly what plaintiffs had in mind when we proposed: (1) in the first submission that the film reels be

10

interchangeable (Tab A); (2) in the second submission that the drums be interchangeable (Tab C); and (3) in the third submission that the discs be interchangeable (Tab D).

    (d)    <u>Accessories and Line Extensions</u>

The various accessories (vehicles, playsets) and line extensions (videos, DVDs) that compliment the "Voice Tech Video Mission" line (at issue in the First Amended Complaint) and the additional lines referenced above are also covered by plaintiffs' concept because, in my experience, outside inventors are typically paid a royalty for any accessories or line extensions that derive from the concept submission. Mr. Kipling confirms this as well, (Kipling Dec. ¶ 17(b)), as do the contracts of defendant Fisher-Price. (*See* License Agreement ¶ 1(b)-(d), attached hereto at Tab G). With respect to the specific similarity of the accessories, they are covered by plaintiffs' concept for the same reason that the action figures and action figure lines mentioned above are covered. For example, the "Aquatic Rescue Command Center" is covered because it uses the same interchangeable mission card as the action figure (Pardi Dec., Exh. G). Similarly, the "Mission Select" Fire Truck, Police Cruiser and Mountain Action Command Center are covered because they use the same rotating dial depicting still images as the "Mission Select" action figures. (Pardi Dec., Exh. I).

<u>Plaintiffs' Concept was Novel When We Submitted it to Fisher-Price</u>

    18.    I am aware that Mr. Bollinger claims that plaintiffs' concept was not in fact novel at the time plaintiffs first submitted it to Fisher-Price in late 1998 because of the existence of two different toy products: (1) an "Image Projective Toy" produced by Toy Biz from 1993 to 1995 (Bollinger Dec., Exh. B); and (2) a camera produced by Fisher-Price in the 1970s (Pardi Dec., Exh. K).

    19.    As a threshold matter, I wholeheartedly agree with Mr. Kipling's testimony that

11

Fisher-Price's purported "evidence" of novelty, consisting of two obscure references, is nothing more than an after-the-fact attempt to undermine plaintiffs' concept and flies in the face of longstanding toy industry custom and practice providing that such evidence is typically disclosed to the inventor during the submission process. (Kipling Dec. ¶¶ 18-24). Moreover, my experience has been, both inside Fisher-Price and in dealing with companies as an outside inventor, that Fisher-Price's execution of an option agreement with plaintiffs is dispositive of the issue of novelty. Toy companies simply do not option a concept if there is an issue about its novelty. This certainly makes intuitive sense, as toy companies are not in the business of handing out money willy-nilly.

20. Nevertheless, Fisher-Price's purported evidence of prior use of allegedly similar products (i.e. prior art) does not detract from the novelty of plaintiffs' concept. First, with respect to the Toy Biz projection action figure, that toy is not covered by plaintiffs' concept because: (1) the toy projects an image from its chest, rather than from a backpack; and (2) the toy projects an image out onto a wall or screen, while plaintiffs' concept envisions a view-in device allowing the child to view the image in the backpack itself, not on a wall. Essentially, it is an entirely different toy. The letter from Toy Biz rejecting our submission to them in 2002 submitted by defendant (Lane Dec., Exh. H), confirms that the toy projected images "onto a wall or similar surface." Moreover, Toy Biz also states that while it had worked on prototypes of an animation projection toy internally, such toys were never actually produced

21. Fisher-Price claims that its own camera from the 1970s (Pardi Dec., Exh. K) detracts from the novelty of plaintiffs' concept for the "Fillmore Schotz" character, but that camera is not at all relevant. First, while Fisher-Price's optical camera from the 1970s and its current optical camera used in conjunction with the "Telly Photo Optic Force" figure are similar,

as I said above plaintiffs are not seeking to claim novelty for the type of camera mechanism used. Rather, plaintiffs claim novelty for the look and feel of the cameraman figure, including the fact that he was holding an optical camera (which enhanced mobile play value) in one hand and a microphone in the other. Moreover, the 1970s product was certainly not an action figure, it is more fairly characterized as a doll. It was a small, free-standing reporter and studio-type camera apparatus that bears no resemblance to plaintiffs' concept, which involved an attempt to draw an association between the action figure and the figure's mission. Finally, I am aware that Fisher-Price is paying a royalty on the Telly Photo optical camera technology to a company known as "Bang Zoom," even though Fisher-Price developed what they consider to be the very same product in the 1970s. This begs the question, how can Fisher-Price pay a royalty to one company for development of the camera on the one hand, and then claim to assert that the same product is relevant to the issue of novelty here on the other hand?

Hardship if VGRA is Forced to Pay for Fisher-Price's Additional Discovery

22. Fisher-Price has requested that plaintiffs be required to pay for the costs and legal fees of its lawyers to take further discovery of plaintiffs related to the new products at issue in the event plaintiffs' motion to amend is granted. VGRA is a small company (I am the only employee) with modest annual revenues. VGRA certainly pales in comparison to Fisher-Price, a subsidiary of the world's largest toy company whose products are sold worldwide. Having to pay for Fisher-Price's discovery would cause undue hardship on VGRA and, if Fisher-Price's legal bills are too large, it could force VGRA to file for bankruptcy protection. Moreover, as set forth in the accompanying Declaration of Russell Dize, Fisher-Price has already asked me at length about many of these new products at my earlier deposition in this case. I should not have to pay for Fisher-Price's legal counsel to ask me the same questions again.

I hereby declare that the foregoing is true and correct under penalty of perjury.

Dated: March 4, 2004

_____
Victor G. Reiling