## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

VICTOR G. REILING ASSOCIATES and    :
DESIGN INNOVATION, INC.,    :
    :
      Plaintiffs,    :    Civil No. 303CV222 (JBA)
v.    :
    :
FISHER-PRICE, INC.,    :
    :
      Defendant.    :    March 26, 2004

### DECLARATION IN OPPOSITION TO PLAINTIFFS'
### MOTION TO COMPEL DISCOVERY

        STAN CLUTTON, under penalty of perjury and pursuant to 28 U.S.C. § 1746,

declares the following is true and correct:

        1.     I am the Senior Vice-President of Inventor Relations for Fisher-Price, Inc.

("Fisher-Price"), defendant in this action.  I make this declaration in opposition to the motion to

compel discovery brought by Victor G. Reiling Associates ("Reiling") and Design Innovation,

Inc. ("Design Innovation").  Reiling and Design Innovation seek to compel discovery of

documents related to outside inventor submissions made to Fisher-Price between 1996 and 2000

that have resulted in or have been incorporated into commercialized products.

        2.     Reiling and Design Innovation claim that documents related to outside

inventor submissions will demonstrate "the custom and practice in the industry...to compensate

inventors and designers for the underlying concept in its various product line manifestations

regardless of revisions, enhancements and changes..."  Plaintiffs also claim that these documents

will show "the extent to which Fisher-Price has considered past products offered for sale by the

company to use, be based on or influenced by concept submissions from outside toy inventors."

*See* Declaration of James M. Kipling in Support of Plaintiffs' Motion to Compel Discovery, dated March 2, 2004 ("Kipling Declaration"), ¶ 4.

3.    Contrary to plaintiffs' arguments, these documents will not demonstrate any custom or practice in the toy industry.

4.    Fisher-Price has an internal design staff which designs toys and juvenile products. Fisher-Price also accepts submissions from some outside, independent inventors. On an annual basis, Fisher-Price reviews thousands of submissions from outside inventors. These submissions are typically reviewed within Fisher-Price, first by the Inventor Relations Department and then (if warranted) by the appropriate design team. Sometimes the submission is rejected; sometimes it is evaluated further. On some occasions, further review of outside submissions is facilitated by a negotiated option agreement under which Fisher-Price pays the outside inventor for the exclusive right to review the submission for a specific period of time and to option the submission if so desired.

5.    When an outside submission is selected for further development and, potentially, manufacture and eventual sale, Fisher-Price negotiates a license agreement with the outside inventor. The license agreement governs payment terms and all of the attendant rights and obligations of Fisher-Price and the outside inventor.

6.    All of Fisher-Price's products which are based on submissions by outside inventors and which eventually make it to market for sale are the subject of *formal license agreements* between the outside inventor and Fisher-Price. License agreements are the subject

of negotiations on a case-by-case basis between each outside inventor and Fisher-Price. The negotiations can be protracted as each party attempts to address issues of importance to it and advocates for inclusion of terms into the license agreement.

7.    Fisher-Price's payments to outside inventors are made under the *specific terms* of the license agreement governing each product. Accordingly, when payment is made to an outside inventor, or a payment claimed to be due, Fisher-Price interprets its obligations according to the specific terms of each and every license agreement. And, while I am involved in making decisions on whether to pay a royalty to an outside inventor under the inventor's license agreement, I often also solicit the input of designers, legal personnel, and others within Fisher-Price. It is inconceivable that these individualized determinations will reflect "custom" or any "practice" in the toy industry.

8.    It is especially difficult to understand how these highly individualized determinations made under these unique license agreements to which neither plaintiff is a party could relate to plaintiffs' claim at all. Neither Reiling nor Design Innovation have entered into license agreement with Fisher-Price governing the "Reel Heroes" concept or their 1998, 1999 and 2000 submissions. Discovery of documents relating to inventor submissions that resulted in formal license agreements cannot be relevant to the issues in this case, which (as I understand it) involves plaintiffs' claim that they should be paid a royalty with respect to submissions that were never the subject of a license agreement. Similarly, the facts surrounding Fisher-Price's payment of royalties pursuant to formal license agreements with inventors other than plaintiffs involving products not at issue in here cannot be relevant to plaintiffs' claim that there is an unidentified

- 3 -

"custom and practice" that entitles them to some sort of royalty in the absence of a license agreement.

        9.    It would pose an undue burden upon Fisher-Price to produce the documents sought by plaintiffs. Fisher-Price's files relating to agreements with outside inventors comprise approximately twenty file drawers which are organized alphabetically by inventor. Contained within these files are not only option agreements and license agreements, but also other development or payment related agreements. Review of these files to determine which of the agreements relate to a product which was ultimately sold by Fisher-Price during the relevant time frame would require a manual review of the files. The reviewer would be required to determine whether the product idea or submission, which was the subject of each agreement, actually resulted in a product manufactured and sold by Fisher-Price. This would require a review of accounting department documents to ascertain which of the agreements resulted in royalty payments to the outside inventor. Finally, once the reviewer collected documents related to products which were actually manufactured by Fisher-Price, the reviewer would then have to collect the inventor's submission documents (which could include written descriptions, drawings, and photographs of prototypes) and concept disclosure forms from the Inventor Relations department files. Fisher-Price would also be obligated to determine whether the documents sought were confidential in nature. In total, I estimate that this review would take several people about two weeks of work. The burden upon Fisher-Price cannot be justified, especially because the documents sought by plaintiffs do not relate to their submissions, the products at issue in this case, or the claims made in this lawsuit.

Dated:  March 26, 2004

_____
Stan Clutton

BFLODOCS 909453v1  (JHQL011.DOC)

2.

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

VICTOR G. REILING ASSOCIATES and
DESIGN INNOVATION, INC.,

           Plaintiffs,

v.

FISHER-PRICE, INC.,

           Defendant.

:
:
:
:
:
:
:
:
:
:
:

Civil No. 303CV222 (JBA)


March 25, 2004

## DECLARATION IN OPPOSITION TO
## PLAINTIFFS' MOTION TO COMPEL DISCOVERY

HOWARD N. BOLLINGER, under penalty of perjury and pursuant to 28 U.S.C. § 1746, declares that the following is true and correct:

1.      I have been retained by defendant Fisher-Price, Inc. ("Fisher-Price") to provide my independent expert opinion on certain issues in this case. My qualifications and background are summarized on the resume attached as **Exhibit A**. My expert report is attached as **Exhibit B**.[1]

2.      I have been advised by counsel for Fisher-Price that plaintiffs have moved to compel discovery from Fisher-Price. In particular, plaintiffs have sought to compel disclosure of documents relating to outside inventor submissions made to Fisher-Price from 1996 through 2000 that have resulted in or have been incorporated into commercialized products including:

---

[1]    The report attached hereto does not include Exhibits A through D which comprise well over one hundred pages.

submission-related documents; corresponding concept disclosure forms; option agreements or license agreements relating thereto; and a sample of the final product.

3.     I have reviewed Fisher-Price's Rescue Hero figures and other Rescue Heroes toys, plaintiffs' submissions, and all of the deposition testimony given in this case thus far. I have concluded that Fisher-Price never used plaintiffs' concept or submissions. *See* Declaration of Howard Bollinger in Opposition to Plaintiffs Motion to Amend, dated February 17, 2004, ¶¶ 7-9. *See also* Exhibit B at 10-13.

4.     Contrary to plaintiffs' argument on this motion, I have never given the opinion that Fisher-Price's products were not "close enough" to plaintiffs' submissions to warrant payment. *See* Plaintiffs' Memo. at 6. Rather, I have concluded that ***no use was made*** of the claimed novel features of plaintiffs' submissions.[2]

5.     Compensation to outside inventors for submissions which are eventually commercialized and sold is governed by the specific terms of the license agreement entered into by the outside inventor and the toy company. Determinations of whether to compensate an inventor are accordingly made on a case-by-case basis.

6.     There is no "custom" or "practice" in the toy industry which can be applied to every situation (or even to most situations) in which an outside inventor seeks

---

[2]     I have also concluded that the concept, as plaintiffs define it, was not novel. *See* Declaration of Howard Bollinger in Opposition to Plaintiffs' Motion to Amend, dated February 17, 2004, ¶¶ 10-15, 17. *See also* Exhibit B at 14.

payment of a royalty. If an outside inventor's submission is changed during the process of development and manufacture, the factors considered in making the determination whether to compensate the outside inventor include: (a) whether there is an unbroken chain of development between the inventor's submission (if any) and the final product; and (b) whether the novel features of the inventor's submission are used in the final product. These factors are considered in the context of the specific provisions of the applicable license agreement to arrive at a decision about whether a royalty is owing.

7.      These determinations are highly fact intensive and must be made on a case-by-case basis. The decision made with respect to one inventor's submission does not govern or inform the decision made regarding another, independent submission.

Dated:      March 25, 2004

Howard N. Bollinger

BFLODOCS 909469v1 (JHR101!.DOC)

- 3 -

*A.*

# Howard N. Bollinger

1332 Landfall Drive                    Wilmington, NC 28405                    910-509-0565

- Bachelor of Science, Industrial Design - University of Cincinnati

- 10 years as VP of Product Design & Engineering responsible for all Kenner product development in the US & the Orient.  Supervision of a staff of 80-100 designers, engineers, and sculptors.  Internal corporate liaison between marketing, sales, and operations. Projects included:

  Six Million Dollar Man  ($70 million)        Baby Alive  ($100 million)
  Star Wars (over $1 billion)                  Stretch Armstrong ($55 million)
  Strawberry Shortcake ($320 million)          Care Bears ($275 million)
  Ghostbusters ($280 million)                  Batman  ($600 million)

- 22 years - Senior VP of Product Concept, Hasbro, Inc. - responsible for identifying all creative product from outside inventors and licensors.  Also supervised a staff of 70 in the Design Group and an internal Advanced Concepts Group generating innovative product concepts for all Kenner and Hasbro categories.  Projects included:

  MASK vehicle line  ($215 million)           Crashback RC ($30 million)
  Littlest Pet Shop  ($140 million)           Skydriver RC
  Ricochet RC ($80 million)                    McDonaldland Doll
  Jurassic Park  (over $150 million)           Nerf Airjet Blasters
  Baby All Gone  ($45 million)                 Star Wars Commtech System

  This position involved a significant role in the defense of company positions on legal matters pertaining to inventors and intellectual property issues, working with outside counsel and the corporate legal department to establish factual substantiation of origin and ownership of intellectual property.  I was actively involved with legal counsel in preparation of documents, depositions, and trial testimony on numerous legal cases as both plaintiff and defendant.  Parties to litigation includes inventors, entertainment entities and competitive toy manufacturers across all toy categories.

  Responsibilities in the last 5 years of my tenure, expanded to include Strategic New Business Development with a focus on seeking out new technologies for toy innovation.

- Currently, CEO of Bollinger Associates, my own product development company.

B.

VICTOR G. REILING ASSOCIATES & DESIGN INNOVATION, INC.

V.

FISHER-PRICE, INC.

EXPERT REPORT OF HOWARD N. BOLLINGER
ON BEHALF OF FISHER-PRICE, INC.

I.      SUBJECTS FOR EXPERT TESTIMONY

A.      I intend to testify about the process of designing toys as it relates to North American toy companies.

B.      I intend to testify about the process of how concepts are generated and then developed into commercially produced toy products.

C.      I intend to testify about the process of how outside inventors submit product concepts to toy companies and the process by which those submissions are considered, accepted, or rejected.

D.      I intend to testify about licensing and royalty arrangements in the toy industry.

E.      I intend to testify about Plaintiffs' submissions that are at issue in this case, the scope of those submissions, whether those submissions were used by Fisher-Price, Inc. ("Fisher-Price") and the novelty / lack of novelty of the concepts Plaintiffs claim to have submitted.

F.      I intend to testify about other issues relevant to this case that support my analyses and conclusions.

II.      THE OUTSIDE INVENTOR SUBMISSION
PROCESS IN THE TOY INDUSTRY

A.      Overview

Scores of people continually come up with what they think will make the next great invention or idea, whether it be for an electronic product, a toy, a game, a movie plot or a hit song lyric. Certain industries do seek ideas for products from those outside of their own corporate concept teams, relying on independent professional inventors. Many companies in the toy industry seek outside submissions from professional inventors in addition to having their own internal creative groups.

Companies want to keep the flow of outside ideas coming to expand the pool of products from which to choose. Therefore, responsible companies recognize the need for respecting intellectual property rights and standards, and accordingly require and retain records of outside inventor submissions. An outside inventor who submits an idea to a toy company expects that if the company accepts the idea for review that the inventor is protected from the company using the novel features, if any, of the idea without reaching an agreement for compensation. This protection does not, however, extend to all aspects of the inventor's submission.

Most submissions from outside inventors are comprised of novel and non-novel features, if they are well-conceived enough to have any novelty at all. The expectation is that the toy company will not utilize the novel feature of the submission or the novel combination of features of the submission without a compensation agreement.

In determining the scope of protection accorded an outside inventor with respect to any part of the submission, it is important to define exactly what the inventor believes are the novel features,

or the novel combination of features, of the submission. This does not mean these features are agreed to be novel by the toy company; only that the inventor believes they are. Toy companies have developed regular procedures and practices for documenting an inventor's definitions of submitted concepts.

It helps to visualize for a moment the converging flow of product ideas for a toy company. Ideas come from multiple sources at any given point in time, which often include but are not limited to:

- an outside inventor submits an idea for a toy, whether it be for a stand-alone toy or for an existing brand;

- a movie or entertainment entity submits an idea for a film/TV related toy;

- the internal creative team in the company submits its idea for a toy;

- the company does a renewed or optimized version of an earlier toy in its line.

It's not hard to imagine that a toy company might have already thought of an idea that an inventor submits. It happens frequently. It's not hard to imagine that one inventor shows a toy company the same idea that another inventor has already shown the company. This happens frequently. It's not hard to imagine that an inventor might show a toy company an idea the company has not thought of. This happens frequently – that these ideas turn out to be not just new, but also cost effective and viable as a product, happens less frequently. Nevertheless, all of this "idea traffic" requires rules and documentation for navigation of who, if anyone, is owed financial remuneration for what.

**B.    The Product Submission Process**

The customary practice at major toy companies is to document the outside inventor submissions that they review and then reject or accept. In general, the industry norm for the documentation and review process proceeds as follows:

1.    Signing of the confidential agreement between the parties – once the company representative has done the appropriate checking as to the professional qualifications of the inventor, this document is signed.

2.    A meeting (or another venue for submission of the idea via visual media) is arranged, which may occur at the inventor's location, at the company or at a central city where the company representative is scheduled to see multiple inventors. Toy company executives make regular visits or "inventor swings" as they are often called to key cities and meet with inventors in back-to-back meetings, lasting usually 30-90 minutes, over varied numbers of days.

3.    In a face-to-face meeting, a document recording the concepts shown is signed by the company representative and the inventor at the conclusion of the meeting. (Deposition Exhibit 205.) This document is normally in multiple form and the original is retained by the company, with a copy given to the inventor. The document has a section where the disposition of each item viewed in the meeting is recorded as to whether it is rejected, or is to be accepted for further review by the company.

4.    In addition to showing the disposition notation for each concept reviewed, this document includes a written description of the concepts reviewed. Thus, the inventor has the opportunity to sign off in agreement on the description of the features of each concept submitted. If the inventor does not bring a written description, either the inventor writes in the description at the meeting or the company representative will fill out the description during the meeting and the inventor will then review and sign in agreement, and then be given a copy. This process ensures that the understanding of what exactly was shown – no more and no less – is recorded representing the inventor's submission. This process also

ensures that the inventor describes the unique or novel aspect(s) or features of his submission, i.e., why it is new and different from what is or has been already present in the marketplace.

5.      The inventor may supply drawings, renderings, or three dimensional models in addition to the written description that is part of the review document. The drawings normally have visual depictions of the features outlined in the written description and may also depict the appearance and style of elements so as to more fully define the idea. A three dimensional model may accompany these elements to further demonstrate the concept. This prototype model is often created by the inventor when there is a mechanical or technical concept that has to be proven to work within the parameters of the concept.

6.      An examination of the process of deciding to accept a concept for review or not during this meeting is helpful here. As noted previously, on the review form, a disposition for each idea is recorded with the choices being: accepted for further review, or rejected. Here's a thumbnail of what issues most often go into that determination:

a.      Accepted for preliminary review – at the company reviewer's first glance, the idea appears to fall within targeted company categories, has a minimum of play value elements, could possibly be cost-effective, and most importantly, it does not appear to be something that the reviewer is aware is or has been in the marketplace. This acceptance for further review is truly a preliminary step. The company representative, in this short meeting, has no access to detailed written records and histories of ideas tracked within the company's documentation system. The reviewer alone may have looked at thousands of inventor concepts within a year's time. Additionally, the representative cannot be expected to know all the ideas that may be under discussion within the company at the time of this meeting.

This is why the first acceptance for review stage is only a preliminary acceptance for a more thorough review of all the issues regarding the concept in terms of viability as a product, and in terms of whether the idea is already under consideration internally.

b.      Rejected for preliminary review – based on the reviewer's experience in the industry, a determination is made that the item isn't appropriate for further review and the reasons can be multiple, but would most often include one or more of the reasons below:

- it is obvious it won't come close to meeting cost requirements;

- there is or has been something like it already in the marketplace;

- does not fit into the company's line or positioning;

- does not have adequate play value;

- the company has already had the idea internally;

- the company is working on something inside that is too similar;

- the reviewer recollects seeing the same idea from another inventor;

- the company's current marketing slot for that type product is filled.

7.      After a disposition has been documented for each item shown by the inventor to the company representative, the accepted products are then sent in to the company for internal review. The submission materials the inventor sends in are photographed and logged in. The submission materials can be directed by the inventor liaison personnel to a product team that may have an interest in

the submission, or it may be shown at an outside inventor concept review meeting. If the consensus at that meeting is that the idea has merit, it is assigned to a product team for further review steps.

8.      After the inventor's idea is assigned to a product team, it is given further scrutiny in terms of cost, play value, engineering, safety, viability, how it fits into the line, brand positioning, marketing, packaging etc.

9.      A huge majority of products accepted for company review are ultimately rejected and returned to the inventor. Just as toy companies have established procedures for accepting ideas to review, they also have procedures for returning products after the internal review.

Therefore, at the next stage, the item can be eliminated from further review if any of the requirements fall short. If some, but not all requirements are met, then a decision can be made to option the item for an additional period of review in order to answer remaining concerns and questions about the product. Market research or product testing can occur at varied stages of the review, and can be one reason to obtain an option period. Sometimes companies will do an option based on not having had enough time to review the item, due to extenuating seasonal demands, such as Toy Fair or holiday/vacations. Options are given generally for these reasons, but even at that, most optioned ideas do not eventually go to contract and in fact, are never produced. To put this in context: as an inventor, getting your toy in a major company's product line can be viewed on a competitive scale with getting a part in a Broadway show or in a feature film. There are very few openings and a great number of submissions vying for the spots.

When a product submission is rejected, the inventor may get a call or email from the inventor review personnel, or a follow-up letter explaining the reasons for the rejection of the submission.

For those few product ideas in which all requirements are met, the company may decide to go to contract negotiations for licensing the product from the inventor.

10.      Licensing contracts cover many details. Generally, the contract allows the toy company to produce and market the toy item. The company usually receives the right to determine the details of the product appearance, the price, the name, the packaging, and the advertising. In return, the inventor typically receives royalties with rates that can vary based on a variety of factors such as, being part of an established line, being tied to a third party license such as a film, etc. Normally the inventor will receive an advance against royalties and any option funds paid may be deducted from the advance amount. Many other details, too numerous to list here, are covered in the licensing agreement, and the specific terms vary from contract to contract.

In summary, the normal practice at major toy companies is to document the outside inventor submission process. One of the reasons for doing this is to avoid the situation in which Fisher-Price now finds itself: an outside inventor has submitted an idea; Fisher-Price has not used the idea as submitted; and the inventor has redefined, broadened, and expanded the definition of the submitted idea after the fact in an effort to claim that a royalty is due.

III.     **DETAILED ANALYSIS OF THE PLAINTIFFS' SUBMISSION**

A.     **Defining the Submitted Concept**

1.      **Submission Content**

Between October and December 1998, the Plaintiffs, inventors Victor G. Reiling Associates and Design Innovation, Inc. submitted their toy concept, "Reel Heroes" to Fisher-Price. They defined the concept first with their Concept Submission Form and then with a written description, drawings and illustrations, and a working prototype model.

The submission elements of the "Reel Heroes" concept described, illustrated, and, specifically demonstrated a battery driven film reel inside a backpack on a Fisher-Price Rescue Heroes figure. The inventor drawings showed the child playing with the toy by placing his eye up to a magnifying lens to view the film in the backpack. The illustrations also showed a pretend TV camera, held in the hand of the Rescue Hero, that incorporated a pop-up viewer for the child to periscopically view, through a fish-eye lens, the room in which the child was playing. (Deposition Exhibit 201.)

The Concept Submission Form instructed Mr. Reiling to "[p]lease help us to distinguish your concepts by fully describing each and indicating its unique features." The heading under which Mr. Reiling wrote his description was "Description and Unique Feature(s)/Technology" which stated, "The description of the submitted idea and/or technology incorporated must be carefully defined in the description/unique feature(s) area below." In that meeting, Mr. Reiling presented, in his own handwriting, the description of the concept on the Fisher-Price submission form. Specifically, he wrote that the submission was: "Batt[ery] op[erated] film strip units for each Rescue Hero and dedicated 'TV' and adventure photog[rapher]/reporter. Can be expanded to include TV projection truck. Hand held camera has shutter opened by child and look-in viewer." (Deposition Exhibit 205.) Upon review, Fisher-Price accepted the product idea to be sent in for further review. The Plaintiffs then supplied a type-written description of the submission. (Deposition Exhibit 200.)

Fisher-Price reviewed the submission internally. The prototype was then handed over to the company's product team responsible for Rescue Heroes products who had the prototype costed by the appropriate engineering personnel.

### 2.    Option Agreement

In early 1999, Fisher-Price agreed to option the submitted concept from the Plaintiffs. Fisher-Price and the Plaintiffs executed an option under which Fisher-Price paid a fee in return for the exclusive right to review the Plaintiffs' Submission further. (Deposition Exhibit 212.)

The Option Agreement contained a definition of the submission:

> Submitted concept extends cartoon to action figures play pattern. The concept is a battery operated film reel that is activated when the child pushes a button on the backpack of the action figure. The child may then look through the viewer on the backpack to see the film . . . the unique aspect of the concept is the combination of existing action figures with film for play pattern.

Mr. Kipling, in his expert witness report, states that the existence of an option agreement between the parties make it " . . .clear . . ." that ". . . Fisher-Price recognized the commercial significance and advantages of the Plaintiffs' concept . . ." To the contrary, the execution of an option agreement, in my experience of granting scores and scores of them, is to basically give the company more time to review the concept in order to ascertain IF it has commercial significance, not to state THAT it "clearly does."

Executing a licensing agreement is what clearly recognizes the commercial significance and advantages of an inventor's concept.

Indeed, the majority of option agreements done by major toy companies are permitted to expire, and do not result in either a license agreement or in any usage by the toy company of the submission. That is what happened here.

3.    **Prototype**

The prototype included as part of the 1998 submission is essential in defining the product concept. As Mr. Kipling stated in his expert witness report, "Prototypes or models are used to demonstrate structure and/or function of a proposed toy concept." Here, the prototype submitted by Plaintiffs worked and demonstrated the technical performance of the concept. The prototype demonstrated that the scope of the concept was limited to a film loop inside the backpack which could be viewed by a child placing one eye up to a lens. (Deposition Exhibit 202.)

\*          \*          \*          \*

Because the Plaintiffs' prototype utilized an existing Fisher-Price Rescue Heroes figure, which the Plaintiffs modified by adding certain elements, discussion of their prototype must disregard the shared features, for example, each has a shared removable backpack and each has a Fisher-Price Rescue Heroes figure. In determining whether or not Fisher-Price used any part of the Plaintiffs' submission, these elements must be referred to as "pre-existing features."

Plaintiffs did not invent action figures. They did not invent action figures with backpacks. And they did not invent action figures with backpacks that have images. These combinations have been used widely before in the marketplace. The clear and obvious invention of the Plaintiffs' submission was this: a demonstration of a battery powered interchangeable film reel, that could be viewed by a child by placing one eye up to a magnifying lens to view the film inside the backpack.

In sum, the examination of the components of Plaintiffs' submission offers the court a clear and objective set of facts. Relying on my twenty five plus years of experience in reviewing, analyzing, and accepting and rejecting thousands and thousands of inventor submissions, I conclude from those facts that the Plaintiffs <u>did</u> present a submission that, by industry standards, was a very clear and demonstrable, <u>specifically defined</u> toy invention. As disclosed to Fisher-Price in the Concept Submission Form, drawings, written letter description and prototype, the concept was limited to an action figure with a backpack containing a battery powered interchangeable film reel, that could be viewed by a child placing one eye up to a magnifying lens to view the film inside the backpack. Fisher-Price did not use that invention.

4.    **Return of the First Submission**

On March 23, 1999, Fisher-Price returned the submission to the Plaintiffs, with a letter rejecting the concept and citing the reasons as: 1) the film was "too expensive" and the cost for the film reel was "way out of proportion to the ultimate payoff;" and 2) "there is no repeat play value. Unless film was sold in multiple packs it is a one trick pony, and multiple packs would be even further out of our price range." (Deposition Exhibit 211.)

5.    **Second Submission**

On May 22, 1999, Plaintiffs submitted a modification in drawing and written form only which replaced the film reel with a drum and hand crank, which was rejected by Fisher-Price and returned to the Plaintiffs. (Deposition Exhibit 212.)

6.    **Third Submission**

On December 7, 2000, Plaintiffs submitted a modification in drawing and written form replacing the drum and hand crank only with a View Master type of disc and optics. (Deposition Exhibit 228.)

7.    **Return of Third Submission**

On January 5, 2001, Fisher-Price returned the third submission to Plaintiffs, having rejected it for cost reasons and because it had limited applicability and use. (Deposition Exhibit 229.)

8.    **Summary of Submission Content**

Based on the written, drawn and illustrated, and prototype model materials of the three submissions by Plaintiffs, I conclude that the Plaintiffs' submissions should be defined as follows:

a.    The 1998 submission was an action figure with a backpack which contained a battery operated thirty second interchangeable film reel. The film reel was located inside the backpack and could be viewed only by placing one eye up to a magnifying lens and looking into the interior of the backpack to view the image. In one version, the figure also held a pretend TV camera containing a fish eye lens periscopically in line with a pop-up lens providing a view of the room in which the child was playing.

b.    The second submission of 5/99 was an action figure with a backpack shaped viewer with a tinted housing containing a drum with up to twenty still action frames around its outer surface. The frames, located on the drum inside the backpack, were viewed only by placing one eye up to a magnifying lens and looking inside the backpack. The frames were advanced sequentially by a hand crank.

c.    The third submission of 12/00 was an action figure with a backpack and a digital camera device containing a View Master style disc about two inches in diameter, with six or more images. The images were located inside the backpack or camera and could be viewed by placing into one eye up to a magnifying lens and looking into the interior of the backpack or into the digital camera device. The images were advanced sequentially by pushing a lever. There into was an optional projector feature in the form of a laptop with a film loop.

In all instances, the mechanical submissions by Plaintiffs consisted of multiple small images inside a backpack which could be viewed by a child with one eye up to a magnifying lens to view the images inside a housing.

The three submissions of 1998, May, 1999, and December, 2000, and the product description contained in the February, 1999 option agreement signed by the Plaintiffs stand as the entire basis for the definition of the Plaintiffs' concept. All the descriptive materials (written, drawn or illustrated and prototype models) that are included in the above three submissions were generated by and/or agreed to, as in the case of the option description, by the Plaintiffs. These submissions, so created, would have reasonably led Fisher-Price to believe and understand that this was a full and complete representation of Plaintiffs' concept.

Neither the concept nor the mechanisms, features, structures, or executions submitted by the Plaintiffs were ever utilized by Fisher-Price.

B.    **Plaintiff's Testified Definition of the "Reel Heroes"**
      **Concept in This Dispute is Inappropriate**

1.    **A Broadened Definition By the Plaintiffs**

The Plaintiffs' "Reel Heroes" concept as defined in Plaintiffs' testimony is simply not accurate or novel. The Plaintiffs have now re-defined the concept by broadening and expanding the original submission's definition to the extent that there are none of the key features of the original submission remaining.

An examination of the Plaintiffs' testimony displays the extent to which Plaintiffs have strayed from the definition of the submitted concept, broadening and expanding it. Plaintiffs have abandoned their submission-stage definition which, as I stated in Section III A. (3) of this report, was very clear, specific and definitively demonstrated by the prototype.

To begin, Mr. Benedetto changes his definition of the concept three times. First he says that the concept is an image "with . . . action figures . . . to enhance role play." (Benedetto Testimony at 126.) Next he says the unique part of the concept "was a backpack with an image" and "images to enhance role play for the Rescue Heroes." (Benedetto Testimony at 127-28.) Then he expanded the definition for a fourth time as a "logo image on a backpack." (Benedetto Testimony at 174.) Obviously, Mr. Benedetto felt the need to stretch the submission to ensure that the Fisher-Price "Voice Tech Video Mission" figures fell within the scope of his new definition.

Mr. Popek also redefines the concept in his testimony. Mr. Popek says the concept was, "putting an image on the backpack to create a better role playing experience for the child." (Popek Testimony at 42.) Next, Mr. Popek says the concept was "images on or in a backpack that [were viewed] by a child to enhance role play." (Popek Testimony at 54.) Mr. Popek then states: "[t]he novelty of our submission was using an image on a backpack to increase the role play." (Popek Testimony at 126.) Mr. Popek is also questioned about his definition of "image" since this word seems to have become the "linch pin" of these new definitions created by Plaintiffs' submission of "Reel Heroes." Mr. Popek defines "image" in possibly its most expansive way: "An image is a visual reference to a place, thing, person that can be anything from a printed label, to painted picture, to a piece of in-mold plastic, a piece of film . . ." "words or letters" and "gauges or dials." (Popek Testimony at 152-53.) The scope of his definition of "image" covers scores of action figures with images in or on backpacks that existed already in the marketplace before the submission of the Plaintiffs' concept in 1998. The discussion in Section IV. of this report substantiates this fact.

In Mr. Reiling's testimony, where again, the Plaintiffs expanded and broadened the definition of their submission, struggling to encompass the scope of Fisher-Price "Video Mission Rescue Hero" figures. Mr. Reiling claims the novelty of the concept was "to be able to bring these images into the line and give a child a chance to really get involved with play patterns and how much it would enhance the play value of the rest of the heroes." (Reiling Testimony at 42.) Mr. Reiling then states, "[o]ur concept is to enhance the play value of the individual . . . the Rescue Heroes or Reel Heroes, Rescue Heroes, to enhance the play value and to allow the child to role play and to suggest role play." (Reiling Testimony at 212.) Mr. Reiling defines "image" as "it's a picture . . . a photographic figure, a cartoon figure or an illustrated figure . . . could be [a decal]" and could "be etched into the plastic that comprises the action figure" or could "be molded into plastic." (Reiling Testimony at 187-89.) His definition is the broadest and most expansive contained within the testimony of all three of the Plaintiffs. Mr. Reiling represents that Plaintiffs' proprietary element is the act of enhancing the play value of individual Rescue Heroes to allow children to role play with the figures. This is a huge leap to suggest that Fisher-Price would owe Plaintiffs for such a broad definition of Plaintiffs' "Reel Heroes." Everything about the Rescue Heroes enhances play value and role playing with the figures, and this has been the case since the origin of Rescue Heroes.

As shown in the following chart, Plaintiffs struggle to define their "Reel Heroes" concept with enough generality so that it will, in their view, cover Fisher-Price products. The chart shows how, with different descriptions, the Plaintiffs could or have re-defined and expanded the definition, in descending order starting with A. as the original and proper definition submitted initially by Plaintiffs and on down to E. as the broadest definition:

| DEFINITION | ANALYSIS |
|---|---|
| **A.**<br><br>An action figure with a backpack containing a battery powered film reel which can be viewed by looking through the magnifying lens with one eye to view the image inside. | **A.**<br><br>Plaintiffs have avoided this most accurate, original description of their submission because none of the Fisher-Price Rescue Heroes fall within its scope. |
| **B.**<br><br>An action figure with a backpack with multiple images inside the backpack for viewing by the child. | **B.**<br><br>None of the Fisher-Price Rescue Heroes have multiple images for viewing inside the backpack. This definition is less specific than the original submission, but is more specific than the definition Plaintiffs have now put forth. Products fitting this definition existed in the marketplace prior to Plaintiffs' submission of October 29, 1998. For example: Kenner-Hardy Boys Frank Hardy and G.I. Joe Zartan/Destro |
| **C.**<br><br>An action figure with a backpack with images associated with the backpack that enhance the child's play pattern. | **C.**<br><br>Some of the Plaintiffs' testimony can be interpreted as advocating this as the definition of their concept. Products fitting this description have existed in the marketplace prior to the Plaintiffs' submission of October 29, 1998. For example: Fisher-Price Adventure People and Fisher-Price Rescue Heroes. |
| **D.**<br><br>An action figure with a backpack. | **D.**<br><br>This description is even more general than that put forth by Plaintiffs. Products fitting this description existed in the marketplace prior to the Plaintiffs' October 29, 1998 submission. For example: Hasbro-G.I. Joe Hall of Fame Figures. |
| **E.**<br><br>An action figure with related images that enhance the child's play pattern. | **E.**<br><br>This is the definition advocated by most of the Plaintiffs' testimony. This definition eliminates the backpack, therefore it is even further removed from the Plaintiffs' definition in their submissions to Fisher-Price. Products fitting this description have existed in the marketplace prior to the Plaintiffs' October 29, 1998 submission. For example: Marvel-Projectors and Tonka-Supernaturals. |

Plaintiffs' testified definition of their concept "Reel Heroes" is inappropriate because it eliminates consideration of the specific features, mechanisms and structures reflected in their 1998 submission. Instead, Plaintiffs' definition now focuses on a generalization or abstraction of their submissions, which was neither presented to, nor discussed with Fisher-Price. If any inventor submitted a concept defined as action figures with images that enhance the play value or role playing associated with the figure (Popek Testimony at 50), it would be rejected as too general and not proposing any particular toy idea, feature, mechanism, or structure that could be evaluated or that would have any value to a toy company. Toy companies seek and will accept for review from outside inventors only proposals for specific toy features, mechanisms or structures and not ill-defined, general concepts.

In my experience, if an inventor had submitted a product defined as generally as the Plaintiffs seek here, it would have been rejected on the spot. The product as thus defined is not substantial or unique in any way.

**C.    Fisher-Price Did Not Make Use
of Plaintiffs' Submission**

I have reviewed all of the materials Plaintiffs submitted to Fisher-Price in connection with their Reel Heroes product concept. Fisher-Price has not utilized plaintiffs' Reel Heroes submissions or product idea in its Rescue Heroes products. In reaching this conclusion, I have compared the design features of the Rescue Heroes products with the design features disclosed in Plaintiffs' submissions. I have also reviewed deposition testimony and interrogatory answers detailing the alleged novel features of their submissions. These also make clear that Fisher-Price does not utilize Plaintiffs' submissions. The following chart lists the submission features from Plaintiffs' submissions and compares these features with Voice Tech Video Mission Rescue Hero figures. This comparison demonstrates that Fisher-Price did not make use of Plaintiffs' submission.

| Date of Plaintiffs' Submission | Statement of Features of Plaintiffs' Submissions | Is Feature Used in "Voice Tech Video Mission Rescue Heroes?" |
|---|---|---|
| A. 1998 | 1. Detachable backpack style TV monitor | No |
| | 2. Battery operated video equipment | No |
| | 3. Film/video w/30 second filmstrip | No |
| | 4. Child must press button to view moving image | No |
| | 5. Viewing screen closes when trigger is released | No |
| | 6. Film strip included in backpack can be removed and interchanged | No |
| | 7. Action clips are specifically tailored to each character's role | No |
| | 8. Film image is inside figure's backpack | No |
| | 9. Viewed by placing one eye up to lens to view images inside backpack | No |
| | 10. Magnifying lens | No |
| | 11. Film reel powered by motors and batteries | No |
| | 12. Projection capability | No |

| Date of Plaintiffs' Submission | Statement of Features of Plaintiffs' Submissions | Is Feature Used in "Voice Tech Video Mission Rescue Heroes?" |
|---|---|---|
| B. 5/22/99 | 1. Detachable backpack styled as viewing device | No |
| | 2. Uses ambient light through tinted housing to facilitate easy viewing of still images | No |
| | 3. Backpack device holds up to 20 still action frames | No |
| | 4. Images are on a drum | No |
| | 5. Tinted device to facilitate viewing of still frames while admitting ambient light | No |
| | 6. Still frames are advanced by hand crank rotation | No |
| | 7. Magnifying lens for viewing frames | No |
| | 8. Still frames provide specifically tailored images of each character in action | No |
| | 9. Located inside the figure's backpack | No |
| | 10. Viewed by placing one eye up to lens to view images inside backpack | No |

| Date of Plaintiffs' Submission | Statement of Features of Plaintiffs' Submissions | Is Feature Used in "Voice Tech Video Mission Rescue Heroes?" |
|---|---|---|
| C. 12/07/00 | 1. Detachable backpack styled as viewing device | No |
| | 2. Clear View Master-type disc about 2 inches in diameter with 6 or more still changes | No |
| | 3. Discs are viewed when inserted into "digital camera" or backpack device | No |
| | 4. Clear disc is advances and viewed with one eye using View Master technology | No |
| | 5. Disc would include images relating to each character's role | No |
| | 6. Viewed by placing one eye up to lens to view images inside backpack or "digital camera" | No |
| | 7. Images are advanced by a push button | No |
| | 8. Projection feature included images of each character in action | No |

-13-

IV.    PLAINTIFFS' "REEL HEROES" CONCEPT AS
DEFINED BY PLAINTIFFS IS NOT NOVEL

It is the custom and practice in the toy industry to require written and executed definitions of concepts submitted by outside inventors.

It is also the custom and practice in the toy industry that inventors are bound by the description of their submission whether it be in the written, drawn, or model form, and that inventors have no claim to product ideas that do not satisfy such descriptions.

It is important that a company receives from an outside inventor a submission that is not broad in its definition eg. (a plush doll with speech and motion), but instead a concept that defines specific novel features, structures, and elements.

The reason for this is simple. There is no value in broad, undefined toy concepts. When there is a loosely defined concept, it has little or no value to a toy company. The value in a well defined, well thought-out concept with unique features in the mechanism, structure, or execution is that it can be developed with relatively minimum modification into a commercially viable product.

As demonstrated with the number of products on the market before October 29, 1998 that utilize "an action figure with a backpack with multiple images inside the backpack for viewing by the child," one can only come to one conclusion: that Plaintiffs' "Reel Heroes" submission as defined by their testimony is not specific or novel.

There are several categories of products that existed in the marketplace prior to the Plaintiffs' October 29, 1998 submission which demonstrate that Plaintiffs' "Reel Heroes" concept is not novel:

- An action figure with a backpack with multiple images inside the backpack for viewing by the child (Exhibit A);

- An action figure with a backpack with images associated with the backpack which enhance play pattern (Exhibit B);

- An action figure with a backpack (Exhibit C);

- An action figure with related images which enhance play pattern (Exhibit D).

A narrative description of these products that existed in the marketplace prior to October 29, 1998, along with catalog pages depicting those products, are attached as Exhibits A-D.

## V.    CUSTOMARY PRACTICES IN THE TOY INDUSTRY
## REGARDING ACCOMMODATION APPLIED TO THIS CASE

**A.    An Accommodation in This Case Does Not Apply**

Mr. Kipling, in his expert witness report, states that it would be consistent with the custom and practice in the toy industry for Fisher-Price to have "reached an accommodation" with the Plaintiffs with respect to the claim that Fisher-Price utilized Plaintiffs' "Reel Heroes" product submission. I respectfully disagree with this statement and will point out its inaccuracy.

There is no custom and practice in the toy industry that requires a toy company to reach an accommodation with an inventor when the toy company did not use the novel or proprietary features, mechanism, structures, etc. of the inventor's submission. If the toy industry were to follow Mr. Kipling's suggestion, toy companies would find themselves in the ridiculous position of making accommodations to every inventor who showed them a submission bearing any similarity to a product the company may produce, even if the product had no unique or novel element submitted by the inventor. Additionally, the fact that Fisher-Price is paying a royalty to another independent inventor strongly supports the position that Plaintiffs should have received no royalty.

## VI.    LINE EXTENSIONS AND ACCESSORIES

Mr. Kipling argues that the Plaintiffs are entitled to royalties on any line extension or accessory. This is not accurate for three reasons:

First, there is no particular custom or practice in the toy industry about whether an inventor is granted royalties on line extensions or accessories. The entitlement to royalties on line extensions or accessories is a matter of the specific contract or agreement between the parties. Where there is no contract or agreement, there is no customary practice granting a right to royalties on line extensions or accessories that do not utilize the novel features, mechanism, or structures of the outside inventor's submission. In this case, there was no such agreement.

Secondly, it would be a rare case indeed for an inventor to be granted royalties on line extensions or accessories where they pre-date the inventor's submission. In fact, I have never heard of such a situation in all my years in the toy industry. Here, Fisher-Price had already marketed vehicles and play sets with Rescue Heroes prior to Plaintiffs' 10/29/98 submission.

Thirdly, since Fisher-Price did not license the concept from the Plaintiffs, there are no Fisher-Price line extensions or accessories that are derivative of Plaintiffs' concept. If Fisher-Price had licensed the concept, then the Plaintiffs and Fisher-Price would still have had to negotiate the specific royalty terms regarding derivative line extensions and accessories that used the concept.

## VII.    MATERIALS REVIEWED

In conjunction with the preparation of this report, I reviewed and may use in connection with my testimony the following materials:

**Depositions**

- Deposition Testimony of V. Reiling, B. Popek, S. Benedetto, D. Ciganko, T. Berkheiser, C. Pardi, H. Schmidt along with all associated deposition exhibits. I intend to review the testimony of Mr. Melville and Mr. McDonald when the transcripts are available.

**Expert Witness Report Of J. Kipling - 01/5/04**

**Case Documents**

- Summons and Complaint 2/3/03
- Fisher-Price Answer to Complaint 3/12/03
- First Amended Complaint 5/1/03
- Fisher-Price Answer & Affirmative Defenses to Amended Complaint 5/15/03
- Plaintiff Reiling's Responses & Objections to Defendant's First Set of Interrogatories 9/30/03
- Plaintiff Design Innovation's Responses & Objections to Defendant's First Set of Interrogatories 10/28/03

**Documents Produced and to be Produced In Discovery By Fisher-Price Related To Prior Art**

**Documents Produced In Discovery By Fisher-Price Related To Carterbench**

**Articles Reviewed**

- "Toy Licenses Are Different," by J. Kipling, The Licensing Book, February '03
- "Toy Licenses Are Different, (Part II)," by J. Kipling, The Licensing Book, March '03

**Catalog Review**

- Kenner and Hasbro Toy Catalogs from 1969 through 1998

**Case Law**

- Nadel v. Play-by-Play

## VIII.    COMPENSATION AND EXPERIENCE

My compensation for the study and testimony related to this matter is $400 per hour. I have not testified as an expert at trial or by deposition within the preceding four years. My qualifications and professional experience are set forth in Exhibit E.

Signed _____
Howard N. Bollinger
February 3, 2004

-16-

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

VICTOR G. REILING ASSOCIATES and　　　　:
DESIGN INNOVATION, INC.,　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Plaintiffs,　　　　　　:　　　　**Civil No. 303 CV 222 (JBA)**
　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　v.　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　:
FISHER-PRICE, INC.,　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Defendant.　　　　　　:

## CERTIFICATE OF SERVICE

I certify that on February 3, 2004 I caused a copy of the Expert Report of Howard N. Bollinger on Behalf of Fisher-Price, Inc. to be served via U.S. Mail upon:

> Russell D. Dize, Esq.
> Grimes & Battersby, LLP
> 488 Main Avenue, Third Floor
> Norwalk, CT 06851-1008

Susan Pratts