UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

VICTOR G. REILING ASSOCIATES and
DESIGN INNOVATION, INC.,

Index No.: 3:03 CV 222 (JBA)

Plaintiffs,

- against -

FISHER-PRICE, INC.,

April 12, 2004

Defendant.

## REPLY MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFFS' MOTION TO COMPEL DISCOVERY

Plaintiffs, Victor G. Reiling Associates ("Reiling") and Design Innovation, Inc. ("DI") (collectively, "Plaintiffs"), respectfully submit this Reply Memorandum in Further Support of their Motion to Compel Discovery. Plaintiffs have requested documents that refer or relate to outside inventor submissions made to Fisher-Price from 1996 through 2000 that have resulted in commercialized products, including: (1) the documents submitted by the inventor; (2) any option agreements or license agreements relating to the submission; and (3) a sample of the ultimate product commercialized by Fisher-Price (or a catalog page depicting that product). Contrary to Defendant's assertions, the documents requested by Plaintiffs are highly relevant to the issues in dispute in this action.

Plaintiffs' position in this case is that they are owed a royalty because they brought Fisher-Price a novel concept for a new product related to its existing Rescue Heroes line of toys. Pursuant to long-standing industry custom and practice, Plaintiffs maintain that they are owed a

royalty for the use of their overall concept even though Defendant changed the execution of the concept in the final versions of the products it commercialized.

In its opposition brief, Defendant emphasizes that the requested documents are irrelevant because they are "negotiated agreements Fisher-Price entered into with inventors who are not parties to this action regarding submissions and concepts which are unrelated to plaintiffs' submissions." (Fisher-Price's Memorandum in Opposition to Plaintiffs' Motion to Compel Discovery ("Def. Opp") at 1). However, contrary to Defendant's assertions, the negotiated agreements are only one of three categories of documents that Plaintiffs have requested. The most important documents from Plaintiffs' point of view are those that show the inventor concepts as submitted to Fisher-Price and the samples showing the ultimate commercialized product. Plaintiffs seek the option and license agreements only to confirm that the products covered by the agreements are products on which a royalty was paid. This is because Plaintiffs are only interested in documents related to inventor submissions on which a royalty was ultimately paid.

Plaintiffs do not seek these agreements to prove the level of compensation to which they are entitled, to prove the existence of a contract or to explain the terms of a contract with Fisher-Price. What Plaintiffs do seek through this motion are documents related to each inventor submission during the requested period on which a royalty was ultimately paid and samples or depictions of the resulting products. The actual negotiated terms of the option and license agreements are inconsequential. Accordingly, as a compromise, Plaintiffs would be prepared to accept the requested agreements with the financial terms redacted. Should the Court determine that Plaintiffs are not entitled to the requested agreements, Plaintiffs request that Defendant at

least provide written assurances that the documents produced relate to outside inventor submissions on which a royalty was paid by Fisher-Price.

The requested documents are essential to Plaintiffs' case because they will demonstrate that the custom and practice in the toy industry, as well as the custom and practice of Fisher-Price, has been to compensate inventors and designers for the underlying concept in its various product line manifestations regardless of revisions, enhancements and changes made by the toy company subsequent to submission. While Defendant argues that complying with Plaintiffs' request would be unduly burdensome, Fisher-Price is owned by Mattel, one of the world's largest toy companies. It is hard to image how Plaintiffs' narrowly tailored document request could be overly burdensome for Defendant, particularly since Fisher-Price has given no indication as to the number of outside inventor submissions at issue. As such, Fisher-Price's objections on burdensomeness grounds are not credible and should be rejected.

I.    **THE DOCUMENTS REQUESTED ARE RELEVANT TO PLAINTIFFS' CLAIMS**

As discussed above, the documents that Plaintiffs have requested are relevant because Plaintiffs seek to demonstrate that Fisher-Price, as a matter of standard practice, compensates inventors for concepts as opposed to finished products, consistent with the custom and practice of the toy industry. To demonstrate this, Plaintiffs seek documents that relate to inventor submissions made to Fisher-Price from 1996 through 2000 on which a royalty was ultimately paid, as well as documents that show the final products that were commercialized by Fisher-Price. As discussed previously, the option and licensee agreements have been requested to confirm that a royalty was paid for the submissions. However, the actual financial terms are not

material because Plaintiffs seek production of the agreements merely to confirm that a royalty was paid.

While Defendant cites several cases for the proposition that agreements with non-parties are not discoverable (Def. Opp. at 3-5), those cases are not applicable here. For example, in *Zohar v. Hair Club for Men, Ltd.* (Def. Opp. at 4-5), the party requesting the agreements sought disclosure of the amount of consideration paid to the third-parties. Here, Plaintiff does not seek disclosure of the specific financial terms of the third-party agreements. Moreover, unlike the situation in *World Wrestling Federation Entertainment, Inc. v. William Morris Agency, Inc.* (Def. Opp. at 3-4), Plaintiffs do not seek production of the third-party agreements to prove how they should have been treated in their business dealings with Fisher-Price. For example, they do not seek the agreements to obtain the royalty rates that Fisher-Price has paid to others and then to argue they should have received a similar royalty rate. Plaintiffs concede that the compensation provided to a given party is subject to negotiation and would vary according to the circumstances.

To reiterate, Plaintiffs do not seek disclosure of the specific financial terms of the option and/or license agreements. They also admit that they never entered into a formal license agreement with Fisher-Price, and therefore they are not seeking the third-party agreements to explain the terms of their agreement   Plaintiffs seek production of the documents not to show how they should be treated, but rather, as evidence of how Fisher-Price typically operates in relation to inventor submissions and especially to rebut Fisher-Price's defense that no royalty is owed because the ultimate product produced was too different from the concept submitted (*i.e.*, Fisher-Price's products do not "embody" Plaintiffs' concept)   While the compensation levels provided to other inventors may not be relevant, the fact that Fisher-Price, as a matter of standard

4

practice, pays inventors for concepts, rather than finished products, is highly relevant to Plaintiffs' claims

Fisher-Price argues that the requested license agreements "will require concomitant discovery from Fisher-Price witnesses (and possibly non-party outside inventors), and require mini-trials about the circumstances relating to each non-party's product." (Def. Opp. at 5). This is simply not the case, especially considering that Plaintiffs are not seeking to use the agreements to prove the level of compensation to which they are entitled, to explain a contract or to fill in the terms of an existing contract.    Plaintiffs merely seek documents reflecting the inventor submissions that came in and the final products that were commercialized.  Therefore, the information to be provided in response to Plaintiffs' requests consists of plain facts that do not need to be explained with testimony by third parties.   Accordingly, mini-trials will not be required.

Defendant attempts to argue that "regardless of how 'different' a final, commercialized Fisher-Price product may be from the outside inventor's original submission, this evidence would not show anything about an alleged custom and practice in the toy industry." (Def. Opp. at 9).   This is simply not the case.   Plaintiffs submit that if, as suspected, the requested documents reveal that the final, commercialized Fisher-Price products *always* differ from the original inventor submissions, it will demonstrate exactly the custom and practice in the industry generally, and the custom and practice at Fisher-Price in particular, that Plaintiffs are attempting to prove in this case.

Defendant argues that the proper way to demonstrate custom and practice is through expert testimony. (Def. Opp. at 10). Plaintiffs' expert has already submitted testimony on this point. (Declaration of James M. Kipling in Support of Plaintiffs' Motion to Compel Discovery,

dated March 2, 2004 ("Kipling Dec.") ¶ 4).  In contradiction, Defendant's expert has testified

that "Toy companies seek and will accept for review from outside inventors only proposals for

specific toy features, mechanisms or structures and not ill-defined, general concepts."  (Expert

Report of Howard N. Bollinger on Behalf of Fisher-Price, attached hereto as Exhibit A ("Def.

Expert Report") at 10).  The denial by Defendant's expert that toy companies seek concepts as

opposed to finished mechanisms or structures places this issue squarely in dispute in this action.

## II.    THE DOCUMENTS REQUESTED ARE RELEVANT TO DEFENDANT'S DEFENSES

While Defendant denies that it has raised a defense that Plaintiffs' concept is "not close

enough" to the ultimate products produced by Fisher-Price (Def. Opp. at 5-6), Defendant's

expert appears to disagree.  In his expert report, Defendant's expert testifies as follows:

> I have reviewed all of the materials Plaintiffs submitted to Fisher-Price in
> connection with their Reel Heroes product concept.  Fisher-Price has not utilized
> plaintiffs' Reel Heroes submissions or product idea in its Rescue Heroes products.
> In reaching this conclusion, I have compared the design features of the Rescue
> Heroes products with the design features disclosed in Plaintiffs' submissions . . .
> This comparison demonstrates that Fisher-Price did not make use of Plaintiffs'
> submission.

(Def. Expert Report at 10).  Since Defendant's own expert has compared Plaintiffs' inventor

submissions to Fisher-Price with the products ultimately commercialized in determining that

Fisher-Price did not make use of Plaintiffs' submission, it appears that Defendant is in fact

raising a defense that the products it commercialized are "not close enough" to Plaintiffs'

submissions, despite Defendant's assertions to the contrary.

Moreover, Fisher-Price has argued in documents submitted to this Court that "even a

cursory examination of [Fisher-Price's] figures makes clear that they do not *embody or make use

of* the features in plaintiffs' submissions."  (Fisher-Price's Memorandum in Opposition to

Plaintiffs' Motion to Amend and in Support of its Motion to Strike, dated February 20, 2004, at

13) (emphasis added). Defendant has also argued that "Fisher-Price has never made or sold a

Rescue Heroes figure *embodying the essential elements* of plaintiffs' 1998 Submission . . ." (*Id.*)

(emphasis added). In view of the foregoing, it appears that Fisher-Price has engaged in

semantics by arguing that its defense in this action is "non-use" as opposed to "not close

enough."

## III.    THE BURDEN ON DEFENDANT DOES NOT OUTWEIGH PROBATIVE VALUE

While Fisher-Price argues that it would be unduly burdensome to produce the requested

documents (Def Opp. at 6-7), this assertion is not credible. Fisher-Price is owned by Mattel, one

of the largest toy companies in the world. While Fisher-Price argues that it will have to devote

over two weeks just to locate responsive documents (Def Opp. at 7), it is worth noting that

Fisher-Price has made its own discovery request of Plaintiff Design Innovation that would

require a similar time commitment. Specifically, Defendant's request would require Design

Innovation to search all of its project files since January 1997 (approximately 3,475 projects) to

identify projects that it worked on for Fisher-Price. (Declaration of Bruce P. Popek in

Opposition to Defendant's Motion to Compel Discovery, dated March 24, 2004 ("Popek Dec.")

¶ 6). Design Innovation would then have to review each file to make a determination as to

whether the component was ultimately used or intended by Fisher-Price for use on Rescue

Heroes action figures or related products. (*Id.*) Since Fisher-Price has made this request of

Design Innovation, a company that pales in comparison in terms of size, its claim of undue

burden seems to be disingenuous.

Moreover, Plaintiffs' requests are narrowly tailored in that they are limited only to products that were actually commercialized (*i.e.*, offered for sale) by Defendant, and they are further limited to outside inventor submissions made to Defendant during a specific five year period of time. (Declaration of Russell D. Dize in Support of Plaintiffs' Motion to Compel Discovery, dated March 3, 2004 ("Dize Dec.") ¶ 7). According to Plaintiffs' expert witness, during his career at Kenner Products and Hasbro, Inc., of the hundreds of concepts that were submitted by outside inventors for consideration by the company, on average only about ten of the company's products offered for sale each year were subject to license agreements with outside inventors. (Kipling Dec. ¶ 9). Accordingly, Plaintiffs' request would not result in a document production that would be unduly burdensome.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion to Compel Discovery and that Defendant be ordered to produce documents in accordance with Plaintiffs' consolidated request for production.

Dated: Norwalk, Connecticut
     March 12, 2004

Respectfully Submitted,

GRIMES & BATTERSBY, LLP

By: _____
    Gregory J. Battersby (Bar No. 7386)
    Edmund J. Ferdinand, III (Bar No. 21287)
    Russell D. Dize (Bar No. 23064)
    Jessica L. Elliott (Bar No. 24871)
    488 Main Avenue, Third Floor
    Norwalk, Connecticut 06851-1008
    (p) (203) 849-8300
    (f) (203) 849-9300

    Attorneys for Plaintiffs Victor G. Reiling
    Associates and Design Innovation, Inc.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Reply Memorandum in Further Support of Plaintiffs' Motion to Compel Discovery has been served upon defendant Fisher-Price, Inc., on this 12th day of April 2004, via U S. Mail, First Class, postage prepaid, to:

Bradford S. Babbitt, Esq.
Michael J. Kolosky, Esq.
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103-3597

Robert J. Lane, Jr., Esq.
Jodyann Galvin, Esq.
HODGSON RUSS LLP
One M&T Plaza, Suite 2000
Buffalo, New York 14203-2391

Russell D. Dize

# EXHIBIT A

VICTOR G. REILING ASSOCIATES & DESIGN INNOVATION, INC.

V.

FISHER-PRICE, INC.

EXPERT REPORT OF HOWARD N. BOLLINGER
ON BEHALF OF FISHER-PRICE, INC.

I.     SUBJECTS FOR EXPERT TESTIMONY

A.     I intend to testify about the process of designing toys as it relates to North American toy companies

B.     I intend to testify about the process of how concepts are generated and then developed into commercially produced toy products.

C.     I intend to testify about the process of how outside inventors submit product concepts to toy companies and the process by which those submissions are considered, accepted, or rejected

D.     I intend to testify about licensing and royalty arrangements in the toy industry

E.     I intend to testify about Plaintiffs' submissions that are at issue in this case, the scope of those submissions, whether those submissions were used by Fisher-Price, Inc. ("Fisher-Price") and the novelty / lack of novelty of the concepts Plaintiffs claim to have submitted

F.     I intend to testify about other issues relevant to this case that support my analyses and conclusions.

II.     THE OUTSIDE INVENTOR SUBMISSION
PROCESS IN THE TOY INDUSTRY

A.     Overview

Scores of people continually come up with what they think will make the next great invention or idea, whether it be for an electronic product, a toy, a game, a movie plot or a hit song lyric. Certain industries do seek ideas for products from those outside of their own corporate concept teams, relying on independent professional inventors. Many companies in the toy industry seek outside submissions from professional inventors in addition to having their own internal creative groups

Companies want to keep the flow of outside ideas coming to expand the pool of products from which to choose. Therefore, responsible companies recognize the need for respecting intellectual property rights and standards, and accordingly require and retain records of outside inventor submissions. An outside inventor who submits an idea to a toy company expects that if the company accepts the idea for review that the inventor is protected from the company using the novel features, if any, of the idea without reaching an agreement for compensation. This protection does not however, extend to all aspects of the inventor's submission.

Most submissions from outside inventors are comprised of novel and non-novel features, if they are well-conceived enough to have any novelty at all. The expectation is that the toy company will not utilize the novel feature of the submission or the novel combination of features of the submission without a compensation agreement.

In determining the scope of protection accorded an outside inventor with respect to any part of the submission, it is important to define exactly what the inventor believes are the novel features.

or the novel combination of features, of the submission. This does not mean these features are agreed to be novel by the toy company; only that the inventor believes they are. Toy companies have developed regular procedures and practices for documenting an inventor's definitions of submitted concepts

It helps to visualize for a moment the converging flow of product ideas for a toy company. Ideas come from multiple sources at any given point in time, which often include but are not limited to:

- an outside inventor submits an idea for a toy whether it be for a stand-alone toy or for an existing brand

- a movie or entertainment entity submits an idea for a film/TV related toy;

- the internal creative team in the company submits its idea for a toy;

- the company does a renewed or optimized version of an earlier toy in its line

It's not hard to imagine that a toy company might have already thought of an idea that an inventor submits. It happens frequently. It's not hard to imagine that one inventor shows a toy company the same idea that another inventor has already shown the company. This happens frequently. It's not hard to imagine that an inventor might show a toy company an idea the company has not thought of. This happens frequently — that these ideas turn out to be not just new, but also cost effective and viable as a product, happens less frequently. Nevertheless, all of this "idea traffic" requires rules and documentation for navigation of who, if anyone, is owed financial remuneration for what.

## B.    The Product Submission Process

The customary practice at major toy companies is to document the outside inventor submissions that they review and then reject or accept. In general, the industry norm for the documentation and review process proceeds as follows:

1.    Signing of the confidential agreement between the parties — once the company representative has done the appropriate checking as to the professional qualifications of the inventor, this document is signed.

2.    A meeting (or another venue for submission of the idea via visual media) is arranged, which may occur at the inventor's location, at the company or at a central city where the company representative is scheduled to see multiple inventors. Toy company executives make regular visits or "inventor swings" as they are often called to key cities and meet with inventors in back-to-back meetings, lasting usually 30-90 minutes over varied numbers of days.

3.    In a face-to-face meeting, a document recording the concepts shown is signed by the company representative and the inventor at the conclusion of the meeting. (Deposition Exhibit 205.) This document is normally in multiple form and the original is retained by the company, with a copy given to the inventor. The document has a section where the disposition of each item viewed in the meeting is recorded as to whether it is rejected, or is to be accepted for further review by the company.

4.    In addition to showing the disposition notation for each concept reviewed, this document includes a written description of the concepts reviewed Thus, the inventor has the opportunity to sign off in agreement on the description of the features of each concept submitted. If the inventor does not bring a written description, either the inventor writes in the description at the meeting or the company representative will fill out the description during the meeting and the inventor will then review and sign in agreement, and then be given a copy. This process ensures that the understanding of what exactly was shown — no more and no less — is recorded representing the inventor's submission. This process also

-2-

ensures that the inventor describes the unique or novel aspect(s) or features of his submission, i e , why it is new and different from what is or has been already present in the marketplace.

     5.     The inventor may supply drawings, renderings, or three dimensional models in addition to the written description that is part of the review document. The drawings normally have visual depictions of the features outlined in the written description and may also depict the appearance and style of elements so as to more fully define the idea. A three dimensional model may accompany these elements to further demonstrate the concept. This prototype model is often created by the inventor when there is a mechanical or technical concept that has to be proven to work within the parameters of the concept.

     6.     An examination of the process of deciding to accept a concept for review or not during this meeting is helpful here. As noted previously, on the review form, a disposition for each idea is recorded with the choices being:  accepted for further review, or rejected  Here's a thumbnail of what issues most often go into that determination:

     a.     Accepted for preliminary review – at the company reviewer's first glance, the idea appears to fall within targeted company categories, has a minimum of play value elements, could possibly be cost-effective, and most importantly, it does not appear to be something that the reviewer is aware is or has been in the marketplace. This acceptance for further review is truly a preliminary step. The company representative, in this short meeting, has no access to detailed written records and histories of ideas tracked within the company's documentation system. The reviewer alone may have looked at thousands of inventor concepts within a year's time. Additionally, the representative cannot be expected to know all the ideas that may be under discussion within the company at the time of this meeting.

     This is why the first acceptance for review stage is only a preliminary acceptance for a more thorough review of all the issues regarding the concept in terms of viability as a product, and in terms of whether the idea is already under consideration internally.

     b.     Rejected for preliminary review – based on the reviewer's experience in the industry, a determination is made that the item isn't appropriate for further review and the reasons can be multiple, but would most often include one or more of the reasons below:

- it is obvious it won't come close to meeting cost requirements;

- there is or has been something like it already in the marketplace;

- does not fit into the company's line or positioning;

- does not have adequate play value;

- the company has already had the idea internally;

- the company is working on something inside that is too similar;

- the reviewer recollects seeing the same idea from another inventor;

- the company's current marketing slot for that type product is filled.

     7.     After a disposition has been documented for each item shown by the inventor to the company representative, the accepted products are then sent in to the company for internal review. The submission materials the inventor sends in are photographed and logged in. The submission materials can be directed by the inventor liaison personnel to a product team that may have an interest in

-3-

the submission, or it may be shown at an outside inventor concept review meeting. If the consensus at that meeting is that the idea has merit, it is assigned to a product team for further review steps.

       8.     After the inventor's idea is assigned to a product team, it is given further scrutiny in terms of cost, play value, engineering, safety viability, how it fits into the line, brand positioning, marketing, packaging etc.

       9.     A huge majority of products accepted for company review are ultimately rejected and returned to the inventor. Just as toy companies have established procedures for accepting ideas to review they also have procedures for returning products after the internal review

       Therefore, at the next stage, the item can be eliminated from further review if any of the requirements fall short. If some, but not all requirements are met, then a decision can be made to option the item for an additional period of review in order to answer remaining concerns and questions about the product. Market research or product testing can occur at varied stages of the review, and can be one reason to obtain an option period. Sometimes companies will do an option based on not having had enough time to review the item, due to extenuating seasonal demands, such as Toy Fair or holiday/vacations. Options are given generally for these reasons, but even at that, most optioned ideas do not eventually go to contract and in fact, are never produced. To put this in context: as an inventor, getting your toy in a major company's product line can be viewed on a competitive scale with getting a part in a Broadway show or in a feature film. There are very few openings and a great number of submissions vying for the spots.

       When a product submission is rejected, the inventor may get a call or email from the inventor review personnel, or a follow-up letter explaining the reasons for the rejection of the submission

       For those few product ideas in which all requirements are met, the company may decide to go to contract negotiations for licensing the product from the inventor.

       10.     Licensing contracts cover many details. Generally, the contract allows the toy company to produce and market the toy item. The company usually receives the right to determine the details of the product appearance, the price, the name, the packaging, and the advertising. In return, the inventor typically receives royalties with rates that can vary based on a variety of factors such as, being part of an established line, being tied to a third party license such as a film, etc. Normally the inventor will receive an advance against royalties and any option funds paid may be deducted from the advance amount. Many other details, too numerous to list here, are covered in the licensing agreement, and the specific terms vary from contract to contract

       In summary, the normal practice at major toy companies is to document the outside inventor submission process. One of the reasons for doing this is to avoid the situation in which Fisher-Price now finds itself: an outside inventor has submitted an idea; Fisher-Price has not used the idea as submitted; and the inventor has redefined, broadened, and expanded the definition of the submitted idea after the fact in an effort to claim that a royalty is due.

       III.     **DETAILED ANALYSIS OF THE PLAINTIFFS' SUBMISSION**

A.     **Defining the Submitted Concept**

       1     **Submission Content**

       Between October and December 1998, the Plaintiffs, inventors Victor G. Reiling Associates and Design Innovation, Inc. submitted their toy concept, "Reel Heroes" to Fisher-Price They defined the concept first with their Concept Submission Form and then with a written description, drawings and illustrations, and a working prototype model.

-4-

The submission elements of the "Reel Heroes" concept described, illustrated, and, specifically demonstrated a battery driven film reel inside a backpack on a Fisher-Price Rescue Heroes figure. The inventor drawings showed the child playing with the toy by placing his eye up to a magnifying lens to view the film in the backpack. The illustrations also showed a pretend TV camera, held in the hand of the Rescue Hero, that incorporated a pop-up viewer for the child to periscopically view, through a fish-eye lens, the room in which the child was playing. (Deposition Exhibit 201.)

The Concept Submission Form instructed Mr. Reiling to "[p]lease help us to distinguish your concepts by fully describing each and indicating its unique features." The heading under which Mr. Reiling wrote his description was "Description and Unique Feature(s)/Technology" which stated, "The description of the submitted idea and/or technology incorporated must be carefully defined in the description/unique feature(s) area below." In that meeting, Mr. Reiling presented, in his own handwriting, the description of the concept on the Fisher-Price submission form. Specifically, he wrote that the submission was: "Batt[ery] op[erated] film strip units for each Rescue Hero and dedicated 'TV' and adventure photog[rapher]/reporter. Can be expanded to include TV projection truck. Hand held camera has shutter opened by child and look-in viewer." (Deposition Exhibit 205.) Upon review, Fisher-Price accepted the product idea to be sent in for further review. The Plaintiffs then supplied a type-written description of the submission. (Deposition Exhibit 200.)

Fisher-Price reviewed the submission internally. The prototype was then handed over to the company's product team responsible for Rescue Heroes products who had the prototype costed by the appropriate engineering personnel.

2.    **Option Agreement**

In early 1999, Fisher-Price agreed to option the submitted concept from the Plaintiffs. Fisher-Price and the Plaintiffs executed an option under which Fisher-Price paid a fee in return for the exclusive right to review the Plaintiffs' Submission further. (Deposition Exhibit 212.)

The Option Agreement contained a definition of the submission:

> Submitted concept extends cartoon to action figures play pattern. The concept is a battery operated film reel that is activated when the child pushes a button on the backpack of the action figure. The child may then look through the viewer on the backpack to see the film . . . the unique aspect of the concept is the combination of existing action figures with film for play pattern

Mr. Kipling, in his expert witness report, states that the existence of an option agreement between the parties make it " . . . clear . . " that ". . . Fisher-Price recognized the commercial significance and advantages of the Plaintiffs' concept . . ." To the contrary, the execution of an option agreement, in my experience of granting scores and scores of them, is to basically give the company more time to review the concept in order to ascertain IF it has commercial significance, not to state THAT it "clearly does."

Executing a licensing agreement is what clearly recognizes the commercial significance and advantages of an inventor's concept.

Indeed, the majority of option agreements done by major toy companies are permitted to expire, and do not result in either a license agreement or in any usage by the toy company of the submission. That is what happened here

-5-

### 3    Prototype

The prototype included as part of the 1998 submission is essential in defining the product concept. As Mr. Kipling stated in his expert witness report, "Prototypes or models are used to demonstrate structure and/or function of a proposed toy concept." Here, the prototype submitted by Plaintiffs worked and demonstrated the technical performance of the concept. The prototype demonstrated that the scope of the concept was limited to a film loop inside the backpack which could be viewed by a child placing one eye up to a lens. (Deposition Exhibit 202.)

\*        \*        \*        \*

Because the Plaintiffs' prototype utilized an existing Fisher-Price Rescue Heroes figure, which the Plaintiffs modified by adding certain elements, discussion of their prototype must disregard the shared features, for example, each has a shared removable backpack and each has a Fisher-Price Rescue Heroes figure. In determining whether or not Fisher-Price used any part of the Plaintiffs' submission, these elements must be referred to as "pre-existing features."

Plaintiffs did not invent action figures. They did not invent action figures with backpacks. And they did not invent action figures with backpacks that have images. These combinations have been used widely before in the marketplace. The clear and obvious invention of the Plaintiffs' submission was this: a demonstration of a battery powered interchangeable film reel, that could be viewed by a child by placing one eye up to a magnifying lens to view the film inside the backpack.

In sum, the examination of the components of Plaintiffs' submission offers the court a clear and objective set of facts. Relying on my twenty five plus years of experience in reviewing, analyzing, and accepting and rejecting thousands and thousands of inventor submissions, I conclude from those facts that the Plaintiffs did present a submission that, by industry standards, was a very clear and demonstrable, specifically defined toy invention. As disclosed to Fisher-Price in the Concept Submission Form, drawings, written letter description and prototype, the concept was limited to an action figure with a backpack containing a battery powered interchangeable film reel, that could be viewed by a child placing one eye up to a magnifying lens to view the film inside the backpack. Fisher-Price did not use that invention.

### 4.    Return of the First Submission

On March 23, 1999, Fisher-Price returned the submission to the Plaintiffs, with a letter rejecting the concept and citing the reasons as: 1) the film was "too expensive" and the cost for the film reel was "way out of proportion to the ultimate payoff;" and 2) "there is no repeat play value. Unless film was sold in multiple packs it is a one trick pony, and multiple packs would be even further out of our price range." (Deposition Exhibit 211.)

### 5.    Second Submission

On May 22, 1999, Plaintiffs submitted a modification in drawing and written form only which replaced the film reel with a drum and hand crank which was rejected by Fisher-Price and returned to the Plaintiffs. (Deposition Exhibit 212.)

### 6.    Third Submission

On December 7, 2000, Plaintiffs submitted a modification in drawing and written form replacing the drum and hand crank only with a View Master type of disc and optics. (Deposition Exhibit 228.)

7    Return of Third Submission

On January 5, 2001, Fisher-Price returned the third submission to Plaintiffs, having rejected it for cost reasons and because it had limited applicability and use  {Deposition Exhibit 229 }

8    Summary of Submission Content

· Based on the written, drawn and illustrated, and prototype model materials of the three submissions by Plaintiffs  I conclude that the Plaintiffs' submissions should be defined as follows:

a.    The 1998 submission was an action figure with a backpack which contained a battery operated thirty second interchangeable film reel.  The film reel was located inside the backpack and could be viewed only by placing one eye up to a magnifying lens and looking into the interior of the backpack to view the image.  In one version, the figure also held a pretend TV camera containing a fish eye lens periscopically in line with a pop-up lens providing a view of the room in which the child was playing

b.    The second submission of 5/99 was an action figure with a backpack shaped viewer with a tinted housing containing a drum with up to twenty still action frames around its outer surface.  The frames, located on the drum inside the backpack, were viewed only by placing one eye up to a magnifying lens and looking inside the backpack  The frames were advanced sequentially by a hand crank.

c.    The third submission of 12/00 was an action figure with a backpack and a digital camera device containing a View Master style disc about two inches in diameter, with six or more images.  The images were located inside the backpack or camera and could be viewed only by placing into one eye up to a magnifying lens and looking into the interior of the backpack or into the digital camera device.  The images were advanced sequentially by pushing a lever.  There into was an optional projector feature in the form of a laptop with a film loop.

In all instances, the mechanical submissions by Plaintiffs consisted of multiple small images inside a backpack which could be viewed by a child with one eye up to a magnifying lens to view the images inside a housing

The three submissions of 1998, May, 1999, and December, 2000, and the product description contained in the February, 1999 option agreement signed by the Plaintiffs stand as the entire basis for the definition of the Plaintiffs' concept.  All the descriptive materials (written, drawn or illustrated and prototype models) that are included in the above three submissions were generated by and/or agreed to, as in the case of the option description, by the Plaintiffs..  These submissions, so created, would have reasonably led Fisher-Price to believe and understand that this was a full and complete representation of Plaintiffs' concept..

·    Neither the concept nor the mechanisms, features, structures, or executions submitted by the Plaintiffs were ever utilized by Fisher-Price.

B..    **Plaintiff's Testified Definition of the "Reel Heroes" Concept in This Dispute is Inappropriate**

1    **A Broadened Definition By the Plaintiffs**

The Plaintiffs' "Reel Heroes" concept as defined in Plaintiffs' testimony is simply not accurate or novel.  The Plaintiffs have now re-defined the concept by broadening and expanding the original submission's definition to the extent that there are none of the key features of the original submission remaining.

-7-

An examination of the Plaintiffs' testimony displays the extent to which Plaintiffs have strayed from the definition of the submitted concept, broadening and expanding it. Plaintiffs have abandoned their submission-stage definition which, as I stated in Section III A. (3) of this report, was very clear, specific and definitively demonstrated by the prototype

To begin, Mr. Benedetto changes his definition of the concept three times. First he says that the concept is an image "with . . . action figures . . . to enhance role play." (Benedetto Testimony at 126.) Next he says the unique part of the concept "was a backpack with an image" and "images to enhance role play for the Rescue Heroes." (Benedetto Testimony at 127-28.) Then he expanded the definition for a fourth time as a "logo image on a backpack." (Benedetto Testimony at 174.) Obviously, Mr. Benedetto felt the need to stretch the submission to ensure that the Fisher-Price "Voice Tech Video Mission" figures fell within the scope of his new definition.

Mr. Popek also redefines the concept in his testimony. Mr. Popek says the concept was "putting an image on the backpack to create a better role playing experience for the child." (Popek Testimony at 42.) Next, Mr. Popek says the concept was "images on or in a backpack that [were viewed] by a child to enhance role play." (Popek Testimony at 54.) Mr. Popek then states: "[t]he novelty of our submission was using an image on a backpack to increase the role play." (Popek Testimony at 126.) Mr. Popek is also questioned about his definition of "image" since this word seems to have become the "linch pin" of these new definitions created by Plaintiffs' submission of "Reel Heroes." Mr. Popek defines "image" in possibly its most expansive way: "An image is a visual reference to a place, thing, person that can be anything from a printed label, to painted picture, to a piece of in-mold plastic, a piece of film . . ." "words or letters" and "gauges or dials." (Popek Testimony at 152-53.) The scope of his definition of "image" covers scores of action figures with images in or on backpacks that existed already in the marketplace before the submission of the Plaintiffs' concept in 1998. The discussion in Section IV. of this report substantiates this fact.

In Mr. Reiling's testimony, where again, the Plaintiffs expanded and broadened the definition of their submission, struggling to encompass the scope of Fisher-Price "Video Mission Rescue Hero" figures. Mr. Reiling claims the novelty of the concept was "to be able to bring these images into the line and give a child a chance to really get involved with play patterns and how much it would enhance the play value of the rest of the heroes." (Reiling Testimony at 42.) Mr Reiling then states, "[o]ur concept is to enhance the play value of the individual . . . the Rescue Heroes or Reel Heroes, Rescue Heroes, to enhance the play value and to allow the child to role play and to suggest role play." (Reiling Testimony at 212.) Mr. Reiling defines "image" as "it's a picture . . . a photographic figure, a cartoon figure or an illustrated figure . . . could be [a decal]" and could "be etched into the plastic that comprises the action figure" or could "be molded into plastic." (Reiling Testimony at 187-89.) His definition is the broadest and most expansive contained within the testimony of all three of the Plaintiffs. Mr. Reiling represents that Plaintiffs' proprietary element is the act of enhancing the play value of individual Rescue Heroes to allow children to role play with the figures. This is a huge leap to suggest that Fisher-Price would owe Plaintiffs for such a broad definition of Plaintiffs' "Reel Heroes." Everything about the Rescue Heroes enhances play value and role playing with the figures, and this has been the case since the origin of Rescue Heroes.

As shown in the following chart, Plaintiffs struggle to define their "Reel Heroes" concept with enough generality so that it will, in their view, cover Fisher-Price products. The chart shows how, with different descriptions, the Plaintiffs could or have re-defined and expanded the definition, in descending order starting with A. as the original and proper definition submitted initially by Plaintiffs and on down to E. as the broadest definition:

| DEFINITION | ANALYSIS |
|---|---|
| **A.** | **A.** |
| An action figure with a backpack containing a battery powered film reel which can be viewed by looking through the magnifying lens with one eye to view the image inside. | Plaintiffs have avoided this most accurate, original description of their submission because none of the Fisher-Price Rescue Heroes fall within its scope |
| **B.** | **B.** |
| An action figure with a backpack with multiple images inside the backpack for viewing by the child | None of the Fisher-Price Rescue Heroes have multiple images for viewing inside the backpack. This definition is less specific than the original submission, but is more specific than the definition Plaintiffs have now put forth. Products fitting this definition existed in the marketplace prior to Plaintiffs' submission of October 29, 1998. For example: Kenner-Hardy Boys Frank Hardy and G.I. Joe Zartan/Destro |
| **C.** | **C.** |
| An action figure with a backpack with images associated with the backpack that enhance the child's play pattern | Some of the Plaintiffs' testimony can be interpreted as advocating this as the definition of their concept. Products fitting this description have existed in the marketplace prior to the Plaintiffs' submission of October 29, 1998. For example: Fisher-Price Adventure People and Fisher-Price Rescue Heroes. |
| **D.** | **D** |
| An action figure with a backpack. | This description is even more general than that put forth by Plaintiffs. Products fitting this description existed in the marketplace prior to the Plaintiffs' October 29, 1998 submission. For example: Hasbro-G.I. Joe Hall of Fame Figures. |
| **E.** | **E.** |
| An action figure with related images that enhance the child's play pattern. | This is the definition advocated by most of the Plaintiffs' testimony. This definition eliminates the backpack, therefore it is even further removed from the Plaintiffs' definition in their submissions to Fisher-Price. Products fitting this description have existed in the marketplace prior to the Plaintiffs' October 29, 1998 submission. For example: Marvel-Projectors and Tonka-Supernaturals |

Plaintiffs' testified definition of their concept "Reel Heroes" is inappropriate because it eliminates consideration of the specific features, mechanisms and structures reflected in their 1998 submission. Instead, Plaintiffs' definition now focuses on a generalization or abstraction of their submissions, which was neither presented to, nor discussed with Fisher-Price. If any inventor submitted a concept defined as action figures with images that enhance the play value or role playing associated with the figure (Popek Testimony at 50), it would be rejected as too general and not proposing any particular toy idea, feature, mechanism, or structure that could be evaluated or that would have any value to a toy company. Toy companies seek and will accept for review from outside inventors only proposals for specific toy features, mechanisms or structures and not ill-defined, general concepts.

In my experience, if an inventor had submitted a product defined as generally as the Plaintiffs seek here, it would have been rejected on the spot. The product as thus defined is not substantial or unique in any way.

C.  **Fisher-Price Did Not Make Use**
    **of Plaintiffs' Submission**

I have reviewed all of the materials Plaintiffs submitted to Fisher-Price in connection with their Reel Heroes product concept. Fisher-Price has not utilized plaintiffs' Reel Heroes submissions or product idea in its Rescue Heroes products. In reaching this conclusion, I have compared the design features of the Rescue Heroes products with the design features disclosed in Plaintiffs' submissions. I have also reviewed deposition testimony and interrogatory answers detailing the alleged novel features of their submissions. These also make clear that Fisher-Price does not utilize Plaintiffs' submissions. The following chart lists the submission features from Plaintiffs' submissions and compares these features with Voice Tech Video Mission Rescue Hero figures. This comparison demonstrates that Fisher-Price did not make use of Plaintiffs' submission.

-10-

| Date of Plaintiffs' Submission | Statement of Features of Plaintiffs' Submissions | Is Feature Used in "Voice Tech Video Mission Rescue Heroes?" |
|---|---|---|
| A. 1998 | 1. Detachable backpack style TV monitor | No |
| | 2. Battery operated video equipment | No |
| | 3. Film/video w/30 second filmstrip | No |
| | 4. Child must press button to view moving image | No |
| | 5. Viewing screen closes when trigger is released | No |
| | 6. Film strip included in backpack can be removed and interchanged | No |
| | 7. Action clips are specifically tailored to each character's role | No |
| | 8. Film image is inside figure's backpack | No |
| | 9. Viewed by placing one eye up to lens to view images inside backpack | No |
| | 10. Magnifying lens | No |
| | 11. Film reel powered by motors and batteries | No |
| | 12. Projection capability | No |

| Date of Plaintiffs' Submission | Statement of Features of Plaintiffs' Submissions | Is Feature Used in "Voice Tech Video Mission Rescue Heroes?" |
|---|---|---|
| B  5/22/99 | 1  Detachable backpack styled as viewing device | No |
| | 2  Uses ambient light through tinted housing to facilitate easy viewing of still images | No |
| | 3  Backpack device holds up to 20 still action frames | No |
| | 4. Images are on a drum | No |
| | 5. Tinted device to facilitate viewing of still frames while admitting ambient light | No |
| | 6. Still frames are advanced by hand crank rotation | No |
| | 7. Magnifying lens for viewing frames | No |
| | 8. Still frames provide specifically tailored images of each character in action | No |
| | 9. Located inside the figure's backpack | No |
| | 10. Viewed by placing one eye up to lens to view images inside backpack | No |

-12-

| Date of Plaintiffs' Submission | Statement of Features of Plaintiffs' Submissions | Is Feature Used in "Voice Tech Video Mission Rescue Heroes?" |
|---|---|---|
| C  12/07/00 | 1. Detachable backpack styled as viewing device | No |
| | 2. Clear View Master-type disc about 2 inches in diameter with 6 or more still changes | No |
| | 3 Discs are viewed when inserted into "digital camera" or backpack device | No |
| | 4. Clear disc is advances and viewed with one eye using View Master technology | No |
| | 5. Disc would include images relating to each character's role | No |
| | 6 Viewed by placing one eye up to lens to view images inside backpack or "digital camera" | No |
| | 7. Images are advanced by a push button | No |
| | 8. Projection feature included images of each character in action | No |

## IV.    PLAINTIFFS' "REEL HEROES" CONCEPT AS DEFINED BY PLAINTIFFS IS NOT NOVEL

It is the custom and practice in the toy industry to require written and executed definitions of concepts submitted by outside inventors.

It is also the custom and practice in the toy industry that inventors are bound by the description of their submission whether it be in the written, drawn, or model form, and that inventors have no claim to product ideas that do not satisfy such descriptions

It is important that a company receives from an outside inventor a submission that is not broad in its definition eg. (a plush doll with speech and motion), but instead a concept that defines specific novel features  structures, and elements.

The reason for this is simple.  There is no value in broad, undefined toy concepts.  When there is a loosely defined concept, it has little or no value to a toy company   The value in a well defined, well thought-out concept with unique features in the mechanism, structure, or execution is that it can be developed with relatively minimum modification into a commercially viable product.

As demonstrated with the number of products on the market before October 29, 1998 that utilize "an action figure with a backpack with multiple images inside the backpack for viewing by the child," one can only come to one conclusion: that Plaintiffs' 'Reel Heroes' submission as defined by their testimony is not specific or novel.

There are several categories of products that existed in the marketplace prior to the Plaintiffs' October 29, 1998 submission which demonstrate that Plaintiffs' "Reel Heroes" concept is not novel·

- An action figure with a backpack with multiple images inside the backpack for viewing by the child (Exhibit A);

- An action figure with a backpack with images associated with the backpack which enhance play pattern (Exhibit B);

- An action figure with a backpack (Exhibit C);

- An action figure with related images which enhance play pattern (Exhibit D).

A narrative description of these products that existed in the marketplace prior to October 29, 1998, along with catalog pages depicting those products, are attached as Exhibits A-D.

-14-

## V.    CUSTOMARY PRACTICES IN THE TOY INDUSTRY
## REGARDING ACCOMMODATION APPLIED TO THIS CASE

### A.    An Accommodation in This Case Does Not Apply

Mr. Kipling, in his expert witness report, states that it would be consistent with the custom and practice in the toy industry for Fisher-Price to have "reached an accommodation" with the Plaintiffs with respect to the claim that Fisher-Price utilized Plaintiffs' "Reel Heroes" product submission    I respectfully disagree with this statement and will point out its inaccuracy.

There is no custom and practice in the toy industry that requires a toy company to reach an accommodation with an inventor when the toy company did not use the novel or proprietary features, mechanism, structures, etc. of the inventor's submission. If the toy industry were to follow Mr. Kipling's suggestion, toy companies would find themselves in the ridiculous position of making accommodations to every inventor who showed them a submission bearing any similarity to a product the company may produce, even if the product had no unique or novel element submitted by the inventor. Additionally, the fact that Fisher-Price is paying a royalty to another independent inventor strongly supports the position that Plaintiffs should have received no royalty.

## VI.    LINE EXTENSIONS AND ACCESSORIES

Mr. Kipling argues that the Plaintiffs are entitled to royalties on any line extension or accessory    This is not accurate for three reasons·

First, there is no particular custom or practice in the toy industry about whether an inventor is granted royalties on line extensions or accessories. The entitlement to royalties on line extensions or accessories is a matter of the specific contract or agreement between the parties. Where there is no contract or agreement, there is no customary practice granting a right to royalties on line extensions or accessories that do not utilize the novel features, mechanism, or structures of the outside inventor's submission. In this case, there was no such agreement.

Secondly, it would be a rare case indeed for an inventor to be granted royalties on line extensions or accessories where they pre-date the inventor's submission. In fact, I have never heard of such a situation in all my years in the toy industry. Here, Fisher-Price had already marketed vehicles and play sets with Rescue Heroes prior to Plaintiffs' 10/29/98 submission.

Thirdly, since Fisher-Price did not license the concept from the Plaintiffs, there are no Fisher-Price line extensions or accessories that are derivative of Plaintiffs' concept. If Fisher-Price had licensed the concept, then the Plaintiffs and Fisher-Price would still have had to negotiate the specific royalty terms regarding derivative line extensions and accessories that used the concept.

## VII.    MATERIALS REVIEWED

In conjunction with the preparation of this report, I reviewed and may use in connection with my testimony the following materials:

**Depositions**

- Deposition Testimony of V. Reiling, B. Popek, S. Benedetto, D. Ciganko, T. Berkheiser, C. Pardi, H. Schmidt along with all associated deposition exhibits. I intend to review the testimony of Mr. Melville and Mr. McDonald when the transcripts are available.

**Expert Witness Report Of J. Kipling - 01/5/04**

**Case Documents**

- Summons and Complaint 2/3/03
- Fisher-Price Answer to Complaint 3/12/03
- First Amended Complaint 5/1/03
- Fisher-Price Answer & Affirmative Defenses to Amended Complaint 5/15/03
- Plaintiff Reiling's Responses & Objections to Defendant's First Set of Interrogatories 9/30/03
- Plaintiff Design Innovation's Responses & Objections to Defendant's First Set of Interrogatories 10/28/03

**Documents Produced and to be Produced in Discovery By Fisher-Price Related To Prior Art**

**Documents Produced in Discovery By Fisher-Price Related To Carterbench**

**Articles Reviewed**

- "Toy Licenses Are Different," by J. Kipling, The Licensing Book, February '03
- "Toy Licenses Are Different, (Part II)," by J. Kipling, The Licensing Book, March '03

**Catalog Review**

- Kenner and Hasbro Toy Catalogs from 1969 through 1998

**Case Law**

- Nadel v. Play-by-Play

## VIII.    COMPENSATION AND EXPERIENCE

My compensation for the study and testimony related to this matter is $400 per hour. I have not testified as an expert at trial or by deposition within the preceding four years. My qualifications and professional experience are set forth in Exhibit E.

Signed: _Howard Bofinger_
Howard N. Bofinger
February 3, 2004

-16-