Moreover, *Nadel* does not provide that industry custom and practice may be demonstrated by examination of a single industry participant's individually negotiated agreements with other non-parties, as plaintiffs argue here. Plaintiffs have provided no authority which supports their assertion that Fisher-Price's individually negotiated licenses with other inventors could demonstrate industry custom and practice — or are anything other than unique, *sui generis* examples of license agreements negotiated under specific circumstances. (*See* Clutton Decl. ¶¶ 6-8; 9/28 Ruling at 7.) Caselaw is clear, as discussed more fully below, that the conduct of one industry participant, like Fisher-Price, is not probative to demonstrate industry custom. *See British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A.*, 342 F.3d 78, 84 (2d Cir. 2003).

Instead of showing that the Magistrate Judge's 9/28 Ruling is clearly erroneous or contrary to law, plaintiffs simply reiterate to the District Judge the very same arguments made before the Magistrate Judge and in their prior objections to the Magistrate Judge's 4/27 Ruling. As discussed above, such arguments cannot show "clear error" in the Magistrate Judge's Rulings. Plaintiffs are simply not entitled to have these arguments reheard *de novo* by the District Court in the hope that they find a more approving audience on appeal.

## II. THE DOCUMENT REQUESTS AT ISSUE ARE IRRELEVANT, OVERBROAD AND UNDULY BURDENSOME

### A. Fisher-Price's Agreements With Other Inventors Are Not Relevant to Plaintiffs' Claims

Plaintiffs' request for documents relating to submissions by other outside inventors and related license agreements is overbroad and seeks patently irrelevant information. As recognized

- 10 -

by Magistrate Judge Margolis, plaintiffs cite no caselaw supporting their argument that they are entitled to discovery of information relating to other, non-party outside inventors. 9/28 Ruling at 5 ("Notwithstanding plaintiffs' current reliance on the *Nadel* case, plaintiffs have offered no support that this conclusion is clearly erroneous or contrary to law").

Courts considering similar requests have also ruled that a company's agreements with non-parties and how the company dealt with those parties are not discoverable. In *World Wrestling Federation Entertainment, Inc. v. William Morris Agency, Inc.*, 204 F.R.D. 263 (S.D.N.Y. 2001), a former client of a talent agency sought documents relating to the agency's other clients. The court ruled that the documents were not relevant:

> How is what happened to [defendant's other clients] relevant? Ordinarily, what is relevant in a breach of contract claim is the transaction between the parties to the contract. Ordinarily, contractual agreements between one of the contracting parties and third parties is irrelevant. . . . [T]he relevance standard for discovery is not unlimited. . . . [T]he treatment of one contracting party in the entertainment field does not really illuminate or is not really relevant to how another party in the entertainment field is treated. . . .

204 F.R.D. at 265 (quoting Magistrate Judge's decision).

Numerous other courts have also held that discovery of contracts with third parties should not be permitted. In *Seltel, Inc. v. Channel Communications, Inc.*, 122 A.D.2d 628, 505 N.Y.S.2d 628 (1st Dep't 1986), the defendant alleged that it was excused from performance under a contract by plaintiff's failure to perform. Defendant sought disclosure of "other purportedly similar contracts" to demonstrate plaintiff's failure to perform under other contracts. The appellate court rejected this request as overbroad because it "call[ed] for concomitant disclosures respecting plaintiff's performance under other contracts with other clients, which disclosures are neither material nor necessary." *Id.* at 630, 505 N.Y.S.2d 630.

- 11 -

Similarly, in *Zohar v. Hair Club for Men, Ltd.*, 200 A.D.2d 453, 607 N.Y.S.2d 5 (1st Dep't 1994), the plaintiff alleged fraud and violation of the Civil Rights Law based on the unauthorized use of his image in a television commercial. Plaintiff sought "documents and information concerning other individuals who appeared in the program promoting the defendant's hair replacement products . . . including ***the amount of 'consideration, if any, they received*** . . . and whether these individuals 'signed releases for their appearance. . . .'" *Id.* at 453, 607 N.Y.S.2d at 6 (emphasis added). The court struck the interrogatories as "irrelevant and overbroad," reasoning that:

> The disclosure sought therein, regarding other purportedly similar contracts between the defendant and other individuals who are not parties to the underlying action, has no bearing on the validity of the particular release executed by the plaintiff herein and ***improperly requires concomitant disclosure respecting the defendant's performance under other contracts with other clients, which disclosures are neither material nor necessary, nor have the effect of sharpening the issues of trial.***

*Id.* at 453-54, 607 N.Y.S. at 6 (citations omitted and emphasis added).

Here, it cannot be disputed that the requested license agreements and associated documents have no bearing on plaintiffs' claims. As discussed above, individually negotiated, express written agreements cannot provide relevant proof with respect to a claim that an agreement should be implied in the absence of a written, express contract. Rather, the requested disclosures would require unnecessary documents, would require a substantial expansion of discovery from Fisher-Price witnesses (and possibly non-party outside inventors), and (as discussed below) would require mini-trials about the circumstances relating to each non-party's submission.

- 12 -

**B.     The Documents Sought by Plaintiffs Will
        Not Demonstrate Custom in the Industry**

Plaintiffs argue they are seeking information related to outside inventor submissions to show "custom and practice" in the toy industry, (Objection at 7-9), and that the "custom and practice" has been for a toy company to "compensate inventors and designers for the underlying concept in its various product line manifestations regardless of revisions, enhancements and changes made by the toy company subsequent to submission." (Kipling Decl. ¶ 8.) Plaintiffs also contend that they will use the requested documents to "demonstrate the extent to which Fisher-Price has considered past products offered for sale by the company to use, be based on or influenced by concept submissions from outside toy inventors." (Kipling Decl. ¶ 9.) As discussed above, how Fisher-Price has treated other parties with whom it contracted in the past is legally irrelevant.

"The general function of usage and custom is definition, explanation, and elucidation of the meaning of contracts." 21A AM.JUR.2D *Customs and Usages* § 22. To make use of "custom and practice" evidence to explain or define a contract, a plaintiff must demonstrate that the alleged custom "is a definite, uniform and known practice." *Anglo-Saxon Petroleum Co., Ltd., v. United States*, 222 F.2d 75, 77 (2d Cir. 1955) (finding no custom where witnesses did not testify about how prevalent practice was); *see also* 21A AM.JUR.2D *Customs and Usages* § 8 ("a custom or usage must be certain, continuous, and uniform"). And, even if a custom may be applicable (which it is not here), parties may contract to deviate from the custom. *See Encyclopaedia Britannica, Inc. v. SS Hong Kong Producer*, 422 F.2d 7, 17-18 n.10 (2d Cir. 1969) (noting custom, even if established, does not override stipulation of parties).

- 13 -

Here, plaintiffs' attempted invocation of "custom and practice" is entirely inappropriate and contrary to the purposes for which custom and practice evidence may be offered. Plaintiffs do not seek to define, explain or elucidate a contract; nor are they attempting to supply a missing contract term. Rather, plaintiffs seek to support generalized, conclusory opinions about the practices of toy companies in accepting and developing submissions from outside inventors. This is not a proper use of custom evidence.

In any event, the documents plaintiffs seek could not show custom and practice in the toy industry as a whole, because they are unique and specific to individualized contracts Fisher-Price negotiated with particular inventors. Finally, permitting discovery of this evidence would substantially increase the scope of discovery in this case and would lead to the presentation of voluminous, non-probative evidence at trial.

### 1. Fisher-Price's royalty obligations to other outside inventors are governed by particular license agreements.

Fisher-Price products which are based on outside inventor submissions are always the subject of formal license agreements, negotiated on a case-by-case basis. (*See* Clutton Decl. ¶ 6.) Fisher-Price's payments to outside inventors are governed by the specific terms of each license agreement. (*See id.* ¶ 7; *see also* Declaration of Howard Bollinger in Opposition to Plaintiffs' Motion to Compel Discovery, dated March 25, 2004 ("Bollinger Decl.") ¶ 5.) Thus, regardless of how "different" a final, commercialized Fisher-Price product may be from the outside inventor's original submission, this evidence would not show anything about an alleged "custom and practice" in the toy industry. Rather, this evidence would show (at most) Fisher-Price's interpretation of its obligations under specific license agreements and its fulfillment of

- 14 -

those obligations. In any event, assuming that there was an industry "custom and practice" (which there is not), the existence of individualized licensed agreements overrides that "custom and practice" because the parties to an agreement may contract to deviate from industry custom. *See Encyclopaedia Britannica*, 422 F.2d at 17-18 n.10.

Plaintiffs have repeatedly argued that they have no written contract or agreement governing payment of a royalty relating to any of their submissions.[8] In these circumstances, it cannot be disputed that the submissions and products which are the subject of express license agreements with non-party inventors could bear no relationship to plaintiffs' claims. Indeed, if the documents plaintiffs seek would show anything about "custom and practice in the toy industry," they would show that the custom and practice is for toy companies to pay royalties only when they have negotiated a written license agreement. This would not support plaintiffs' claims. As the Magistrate Judge ruled:

> The issue in this litigation is whether defendant incorporated plaintiffs' concepts and after doing so, failed to pay plaintiffs a royalty . . . . [I]t is not custom and practice that determines the payment of a royalty to the inventors for the use of the inventors' concept or for products based on or influenced by the concept; rather, according to defendant, the payment of a royalty is determined on a case-by-case basis after a review of a submission results in its selection for further development, and possibly manufacture and sale, at which time defendant negotiates an individualized license agreement. . . . ***[Plaintiffs] never entered into a licensing agreement with defendant for the product at issue and because of the individualized nature of the licensing agreement process, the only relevant concept submission and resulting agreement or lack thereof, is that of plaintiffs.***

---

[8] For example, plaintiffs originally sued for breach of express contract. (*See* Complaint ¶¶ 34-40.) In their First Amended Complaint, however, plaintiffs eliminated their breach of express contract claim and proceeded with a claim of breach of implied contract. (*See* First Amended Complaint ¶¶ 34-40.)

- 15 -

4/27 Ruling at 5-6 (emphasis added). *See also* 9/28 Ruling at 7 ("Plaintiffs have offered no authority supporting their assertion that the individually negotiated licenses involving non-parties demonstrate custom and practice").

### 2. The practices of one industry participant cannot demonstrate custom and practice.

Plaintiffs argue that the documents they seek relating to non-party inventor submissions will establish custom and practice in the industry by "demonstrat[ing] the extent to which Fisher-Price has considered past products offered for sale by the company to use, be based on or influenced by concept submissions from outside toy inventors." (Kipling Decl. ¶ 8.)

The requested documents could not, as plaintiffs contend, establish any custom or practice in the toy industry: "The practice of one company . . . is generally insufficient to establish a trade usage." *British Int'l Ins. Co. Ltd.*, 342 F.3d at 84 (rejecting plaintiff's attempt to use "industry custom and practice") (citing *Encyclopaedia Britannica*, 422 F.2d at 18). *See also* 9/28 Ruling at 7. The proper way to show custom and practice in the industry is for experts or others to testify about widespread accepted practices which are invariable in the industry. The documents plaintiffs seek are not probative on this issue.

### 3. Review of outside inventor submissions and agreements would require a series of mini-trials.

Finally, the discovery plaintiffs seek, and the manner in which they claim they will use the information, will turn the trial of this matter into a series of mini-trials about the circumstances underlying a large number of non-party inventor submissions. The issues in these mini-trials would not be limited to questioning about Fisher-Price's decisions to pay or not pay outside inventors. *See World Wrestling Federation*, 204 F.R.D. at 265 (acknowledging that

- 16 -

disclosure of talent agency's contracts with other clients would also require additional discovery beyond agreements themselves). Rather, the argument plaintiffs seek to support would require examination of specific license agreements or other contractual provisions which govern Fisher-Price's decision to pay each non-party inventor. In addition, it would require introduction of evidence regarding the chronology of development of each of the Fisher-Price toys based on outside inventor submissions. (*See* Bollinger Decl. ¶ 6.)

While the documents requested may or may not ultimately prove to be voluminous,[9] the testimony of numerous Fisher-Price designers, managers and legal personnel, as well as the outside inventors themselves, would be required as to each product and license or other agreement. (*See* Clutton Decl. ¶ 7.) Moreover, the parties would be required to prove the differences and similarities between the inventor's submission and the final product, which could also require the services of additional expert witnesses. Not surprisingly, opposing the argument plaintiffs seek to make could require document discovery from and depositions of numerous non-party inventors, as well as non-party toy companies. Subjecting the jury to a number of mini-trials relating to non-party inventor submissions that are not at issue in this case would be totally inappropriate and would be a waste of the resources of the Court as well as the parties.[10] Plaintiffs' motion to compel was properly denied.

---

[9] Because of the burden involved in locating responsive documents, (*see* Clutton Decl. ¶ 9), Fisher-Price has not conducted a search for responsive documents.

[10] Moreover, plaintiffs' proposed use of non-party contracts and related documents may force Fisher-Price to respond by using other inventor contracts where a product "close" to the one submitted was produced, but no payment was made. Clearly, plaintiffs' tactics would lead to the parties moving far afield from the real issues in this case.

- 17 -

C.  **Documents Relating to Other Outside Inventors
    Are Not Related to Fisher-Price's "Non-Use" Defense**

As plaintiffs correctly acknowledge, Fisher-Price has consistently stated in defense of this action that it has not used plaintiffs' submissions in any of its products. (*See* Bollinger Decl. ¶ 4.) In their Objection, however, plaintiffs have distorted Fisher-Price's straightforward non-use defense, claiming that "implicit in this defense is an argument that . . . the products actually produced were not 'close enough' to Plaintiffs' submissions." (Objection at 12-13.) This mischaracterization of Fisher-Price's non-use defense appears to be an attempt by plaintiffs to justify their request to examine other agreements to determine whether other inventor submissions (not at issue here) were "close" or "not close" to the product ultimately manufactured by Fisher-Price.

"Not close enough," however, has never been a defense of Fisher-Price. (*See id.*) Instead, Fisher-Price's defense is that it did not make *any* use of plaintiffs' submission; *i.e.*, the Fisher-Price designers and outside consultants who designed the Rescue Heroes products at issue here did not make reference to plaintiffs' submission in doing so, nor did they make use of the novel features (if any) of plaintiffs' submissions. The record is devoid of any proof that Fisher-Price referred to or used plaintiffs' submissions in designing the products at issue.[11] Most important, no amount of discovery relating to other outside inventors will assist plaintiffs in demonstrating that the claimed novel features of their submissions were used by Fisher-Price.

---

[11] Plaintiffs' expert makes note of Fisher-Price's argument that "it is undisputed that Fisher-Price never used the concepts reflected on any of the three submissions submitted by plaintiffs" and states it is a central issue in the case. (*See* Kipling Decl. ¶ 6.) Neither plaintiffs nor their expert offered any evidence in support of plaintiffs' motion to compel demonstrating that Fisher-Price did, in fact, use the concepts reflected in their submissions.

- 18 -

Indeed, plaintiffs never explain how submissions made by and licensed agreements entered into with unrelated, non-party inventors could be relevant to this issue.

### D. Even if Other Agreements Were Relevant, the Burden to Fisher-Price Outweighs Any Probative Value

Finally, even if other inventor agreements and related documents had some marginal relevance to the claims or defenses here (which they do not), production of these documents should not be compelled because of the undue burden it would impose. In denying a similar request, one court ruled:

> "[T]he nature of the agreements that William Morris enters into and how those agreements are enforced, although it has some probative value, *the probative value is so small that I don't think the burden of producing those documents and the concomitant discovery that that discovery would require justifies the discovery of those documents . . .*"

*World Wrestling Federation*, 204 F.R.D. at 265 (emphasis added).

If compelled to produce the requested documents, Fisher-Price will have to devote over two weeks just to locate responsive documents. *See* Clutton Decl. ¶ 9. This burden can hardly be justified in light of plaintiffs' failure to articulate why these documents would be relevant to their claims.

### Conclusion

For the foregoing reasons, plaintiffs' Objection to Ruling on Plaintiffs' Motion to Compel should be denied.

- 19 -

Dated: November 2, 2004

                              **DEFENDANT FISHER-PRICE, INC.**

By *[signature]*
Bradford S. Babbitt (ct15938)
email: bbabbitt@rc.com
Michael J. Kolosky (ct22686)
email: mkolosky@rc.com
**ROBINSON & COLE, LLP**
280 Trumbull Street
Hartford, CT 06103-3597
Tel. no.: (860) 275-8200
Fax no.: (860) 275-8299

and

Robert J. Lane, Jr. (ct24598)
e-mail: rlane@hodgsonruss.com
Jodyann Galvin (ct24599)
e-mail: jgalvin@hodgsonruss.com
**HODGSON RUSS LLP**
One M&T Plaza, Suite 2000
Buffalo, New York 14023-2391
Tel. no: (716) 856-4000
Fax no.: (716) 849-0349

- 20 -

## CERTIFICATION

The undersigned hereby certifies that a copy of the foregoing opposition to Objection To Ruling On Plaintiffs' Motion to Compel was mailed, first class postage prepaid, to the attorneys of record recited below on this 2nd day of November, 2004.

Gregory J. Battersby (Bar No. 07386)
Edmund J. Ferdinand, III (Bar No. 21287)
Russell D. Dize (Bar No. 23064)
488 Main Avenue, Third Floor
Norwalk, Connecticut 06851-1008
Phone: 203-849-8300
Fax: 203-849-9300

_____
Bradford S. Babbitt

- 22 -