UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---

VICTOR G. REILING ASSOCIATES and DESIGN INNOVATION, INC.,

    Plaintiffs,

- against -

FISHER-PRICE, INC.,

    Defendant.

---

Index No.: 3:03 CV 222(JBA)

**SECOND AMENDED COMPLAINT**

November 19, 2004

**Jury Trial Demanded**

---

Plaintiffs, Victor G. Reiling Associates ("Reiling") and Design Innovation, Inc. ("DI"), (collectively, "Plaintiffs" or "Inventors") by their attorneys, Grimes & Battersby, LLP, for their complaint against defendant Fisher-Price, Inc. ("Fisher-Price"), allege as follows:

INTRODUCTION

1. Plaintiffs are independent toy inventors in the business of developing new toy concepts. Upon information and belief, Fisher-Price is a subsidiary of Mattel, Inc., one of the world's largest toy companies. Toy companies, such as Fisher-Price, regularly do business with independent inventors, such as the Plaintiffs, in order to develop and market new concepts. Based on longstanding toy industry custom and practice, when a toy company adopts an independent inventor's concept and brings it to market, the inventor is compensated by being paid a royalty on the overall sales of the product.

2. In 1998, Plaintiffs submitted to Fisher-Price a novel concept for adding an animation reel component to Fisher-Price's existing "Rescue Heroes" toy line. Specifically, Plaintiffs developed the concept for an interchangeable battery-operated animated image player

that would be placed on the "Rescue Heroes" characters in the form of a backpack. The backpack allowed children to view animated images through a viewer. Plaintiffs named this concept "Reel Action/Real Heroes."

3.  Fisher-Price expressed interest in the concept and, pursuant to industry custom, the parties entered into an Option Agreement dated February 16, 1999. The Option Agreement provided Fisher-Price with the exclusive option for a fixed period of time to acquire the rights to make licensed products from Plaintiffs' concept. Prior to the expiration of the option period, as extended, Fisher-Price notified Plaintiffs that it was declining to license the concept from them because of cost considerations, namely that the concept would be too expensive to manufacture and sell. Hence, the Option Agreement expired. Thereafter, Plaintiffs sent Fisher-Price two additional submissions, consisting of different ways to execute the original concept, which allowed viewing of still images in conjunction with Rescue Heroes characters to enhance play value. Fisher-Price rejected the second and third submissions in March 1999 and January 2001, respectively.

4.  Within one year of Fisher-Price's final rejection, Fisher-Price released a new series of action figures in their "Rescue Heroes" line entitled "Voice Tech Video Mission Rescue Heroes," which employs the same idea and design as Plaintiffs' concept -- a backpack feature with an animated image component. Fisher-Price featured an entire line of "Voice Tech Video Mission Rescue Heroes" that all had animated image backpacks. In 2003, Fisher-Price introduced its "Mission Select Rescue Heroes" action figure toy line, featuring a re-designed backpack depicting still images on a rotating dial visible through a viewer. Importantly, this new design is strikingly similar to Plaintiffs' third submission. In addition, Fisher-Price also introduced a cameraman action figure in its "Optic Force Rescue Heroes" toy line, "Telly

2

Photo," that closely resembles the storyboard artwork submitted with Plaintiffs' first submission, and several accessories, line extensions and licensed DVD, video and software products that also are covered by Plaintiffs' novel product concept submissions.

5. Fisher-Price has taken Plaintiffs' novel concept and has used it in connection with a major toy line without paying any compensation to Plaintiffs. Accordingly, Fisher-Price has breached an implied-in-fact agreement between the parties that was formed based on their conduct, and has misappropriated the idea of Plaintiffs' concept, causing serious harm to Plaintiffs. In addition, defendant has unfairly competed with Plaintiffs under both the Connecticut Unfair Trade Practices Act, Connecticut General Statutes §§ 42-110a, *et seq.*, and the common law.

## PARTIES

6. Plaintiff Reiling is a professional association organized and existing under the laws of the State of Connecticut, having an address and principal place of business at 119 North Main Street, P.O. Box 677, Kent, Connecticut, 06757.

7. Plaintiff Design Innovation is a corporation organized and existing under the laws of the State of Connecticut, having an address and principal place of business at 20 Tower Lane, Avon, Connecticut, 06001.

8. Upon information and belief, Fisher-Price is a corporation organized and existing under the laws of the State of Delaware, having an address and principal place of business at 636 Girard Avenue, East Aurora, New York, 14052.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that it is a dispute between citizens of different states and the amount in

controversy exceeds $75,000 exclusive of interest and costs.

10. This Court has personal jurisdiction over Fisher-Price pursuant to Connecticut General Statutes § 33-929(e) and (f).

11. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) and (c).

## FACTS COMMON TO THE COUNTS

A. <u>Victor G. Reiling Associates</u>

12. Victor G. Reiling Associates is a group of toy developers headed by Victor G. Reiling, a toy industry veteran and former employee of both Fisher-Price and Milton Bradley. From 1970 through 1974, Mr. Reiling served as a design group manager with Fisher-Price. From 1974 through 1977, Mr. Reiling was the Director of Research & Development for two of Milton Bradley's divisions.

13. Since 1977, Mr. Reiling has been an independent toy developer, creating concepts that are offered to various toy manufacturers. Mr. Reiling does not manufacture and market toys, but rather works with toy manufacturers to develop new toys based on his product concepts. When a toy manufacturer adopts one of his product concepts, in accordance with the long-established custom and practice in the toy industry, Mr. Reiling is remunerated by being paid a royalty based on the sales of toys incorporating the concept. Victor G. Reiling Associates has created more than twelve toys and games that have sold over one million units.

B. <u>Design Innovation Incorporated</u>

14. Design Innovation Inc. is an industrial design firm that employs a team of designers using advanced tools and equipment to develop prototypes and working models of toys, games and other products for submission to potential purchasers and distributors.

15. Victor G. Reiling Associates and Design Innovation Inc., since 1997, have

4

worked on fifty or more projects and continue to frequently cooperate on the development of new game and toy concepts. As a result of this cooperation, the credit for the toys that they develop is attributed jointly to both companies, and the profits generated are divided equally. The concept for Reel Action/Real Heroes was conceived and developed in a joint effort by the two inventors.

C. <u>Fisher-Price</u>

16. Fisher-Price is a division of Mattel, one of the largest toy companies in the world. Upon information and belief, Fisher-Price routinely seeks concept submissions from private toy developers in an effort to create and manufacture new toy lines.

D. <u>Plaintiffs' Submission of Their Novel Product Concept to Fisher-Price</u>

17. Upon information and belief, Fisher-Price's "Rescue Heroes" is a successful line of toy action figures introduced in 1998 and based on firefighters, police officers, construction workers and forest rangers. Each "Rescue Hero" has a mounting bracket on its back, allowing different accessories to be removed and mounted on this bracket. (See Exhibit A, attached hereto and incorporated herein by reference).

18. In 1998, Plaintiffs created the novel concept of a battery operated animated image player designed to look like a backpack and mount on existing Fisher-Price "Rescue Heroes" action figures that would help create role-playing scenarios for the "Rescue Heroes" and their users. Plaintiffs also created a concept for a TV cameraman and TV projection truck to complement the "Reel Action/Real Heroes" concept. (See Exhibit B, attached hereto and incorporated herein by reference). Plaintiffs' animated image player was designed to mount on the bracket of each "Rescue Heroes" action figure and to play images of that specific "Rescue Heroes" action figure's adventures.

19. Based on common practice in the toy industry and extensive prior dealings with Fisher-Price, on October 29, 1998, Plaintiffs met with Paul Snyder, Vice President of Research and Development Services and Inventor Relations for Fisher-Price, and submitted a prototype and drawings of the "Reel Action/Real Heroes" concept to him. (See Exhibit C, attached hereto and incorporated herein by reference).

20. Fisher-Price expressed initial excitement about the product to Plaintiffs, and stated that they would further evaluate the product during the month of December, 1998. (See Exhibit D, attached hereto and incorporated herein by reference). After this evaluation, Fisher-Price initiated discussions with the Plaintiffs about taking an option on the "Reel Action/Real Heroes" concept. (See Exhibit E, attached hereto and incorporated herein by reference).

21. In early 1999, Plaintiffs changed the name of their concept to "Reel Heroes." During this same period, Plaintiffs and Fisher-Price began negotiating an Option Agreement via telephone and correspondence. On February 16, 1999, Plaintiffs and Fisher-Price finalized and signed the Option Agreement for the "Reel Action/Real Heroes" concept. The Option Agreement provided Fisher-Price with the exclusive option for a fixed period of time either to acquire Plaintiffs' rights in the concept, or, in the alternative, to acquire the right to make licensed products from Plaintiffs' concept, in exchange for a monetary payment to Plaintiffs totaling $7,500. (See Exhibit F, attached hereto and incorporated herein by reference). The Option Agreement was, by industry custom and practice, merely a preliminary, standstill agreement, akin to an "agreement to agree." It left important material terms to be negotiated by the parties in the event Fisher-Price exercised the option.

22. On March 23, 1999, Fisher-Price returned the prototypes and drawings of the "Reel/Real Heroes" concept to the Plaintiffs. Fisher-Price explained that it returned the concept

6

for reasons "that boil down to cost." (See Exhibit G, attached hereto and incorporated herein by reference). The Option Agreement, by its very terms, expired on May 1, 1999. (See Exhibit F).

23. On May 22, 1999, Plaintiffs submitted a revision of the "Reel Heroes" concept to Paul Snyder at Fisher-Price. Most of the changes were designed to reduce cost and simplify the image player with fewer moving parts. (See Exhibit H, attached hereto and incorporated herein by reference). The revised version of the "Reel Heroes" concept did not generate any further interest by Fisher-Price at that time, however.

24. On December 7, 2000, Plaintiffs submitted another revised sketch of the "Reel Heroes" concept to Peter Pook, Fisher-Price's Vice President of Product Development. The revision was designed to further simplify the film player by incorporating discs that hold frames of still images, each frame about one centimeter square. (See Exhibit I, attached hereto and incorporated herein by reference).

25. On January 5, 2001, Fisher-Price returned the sketches and diagrams submitted by the Plaintiffs, once again explaining that the concept was "[t]oo expensive for what it does." (See Exhibit J, attached hereto and incorporated herein by reference).

26. The January 5, 2001 letter was the final correspondence between the parties regarding development of the "Reel Heroes" concept.

27. In February 2002, Plaintiffs attended the American International Toy Fair in New York, where they saw a Fisher-Price brand catalog that contained the new line of Fisher-Price "Rescue Heroes," including the "Voice Tech Video Mission Rescue Heroes" that misappropriated Plaintiffs' original "Reel Heroes" concept. (See Exhibit K, attached hereto and incorporated herein by reference). The "Voice Tech Video Mission Rescue Heroes" came equipped with "Special Video Mission Backpacks," a battery operated video image viewer that

"let[s] these quick-response specialists see their next rescue mission, receive and respond to exciting Voice Tech messages" and also emits a recorded voice of the "Rescue Heroes" character. To operate these "Special Video Mission Backpacks," one only has to "push backpack button for moving video image and sounds!" (See Exhibit K).

28. In March, 2002, Fisher-Price began to market and sell the "Voice Tech Video Mission Rescue Heroes" in stores around the country and on the Internet. Upon information and belief, these "Voice Tech Video Mission Rescue Heroes" were sold nationwide at retail toy stores and by Internet retailers in 2002 and 2003. (See Exhibit L, attached hereto and incorporated herein by reference).

29. In 2002, the "Voice Tech Video Mission Rescue Heroes" line was made up of ten or more separate action figures. Ten of these figures are Billy Blazes (a Firefighter), Jake Justice (a Police Officer), Wendy Waters (a Firefighter), Rocky Canyon (a Mountain Hero), Roger Houston (an Astronaut), Jack Hammer (a Construction Specialist), Warren Waters (a Commander), Gil Gripper (a Scuba Diver), Matt Medic (a Physician) and Ariel Flyer (a Pilot and Veterinarian). Each one of these characters has a battery operated video image viewer backpack that misappropriates Plaintiffs' novel concept. (See Exhibit M, attached hereto and incorporated herein by reference).

30. Design elements that are common to the "Voice Tech Video Mission Rescue Heroes" and the "Reel Heroes" concept are as follows:

    A. Plaintiffs' basic concept was to integrate Fisher-Price's successful "Rescue Heroes" figures and cartoon-like images by using a removable backpack that could be made for a specific character. It was designed to mount to each "Rescue Heroes" figure and show animated images of that character in action. For example, a firefighter would be shown

putting out a fire or rescuing a child from a building. The animated images enrich the role-playing that a child often enjoys when using toy action figures. The backpack is a battery-operated film strip/disc player with a viewer. By looking through the small viewer and pressing a button, the child could see the "countless RESCUE HERO adventures." (See Exhibit N, attached hereto and incorporated herein by reference).

    B.  The Fisher-Price "Voice Tech Video Mission Rescue Heroes" are "Rescue Heroes" action figures that come equipped with a battery powered animated image viewer that depicts "moving images of rescue missions." (See Exhibit M). The image is viewed on a small screen (about 1 1/4 inches wide and 1 1/8 inches high) mounted on the top half of the backpack and is activated by pressing a button. The moving image is accompanied with sounds. The sound and animation last about five seconds.

  31.  Prior to the filing of this complaint, Plaintiffs attempted on several occasions to discuss compensation for the use of Plaintiffs' concept by Fisher-Price. On July 25, 2002, Plaintiffs' attorneys initiated correspondence with Neil Friedman, the President of Fisher-Price. (See Exhibit O, attached hereto and incorporated herein by reference). Fisher-Price denied any liability and expressed no interest in further discussions with Plaintiffs.

  32.  On October 17, 2002, after a series of phone discussions, Plaintiffs sent a letter to Stan Clutton, the Vice President of Fisher-Price reiterating Plaintiffs' belief that Fisher-Price misappropriated Plaintiffs' novel concept. The letter also reiterated Plaintiffs' belief that the original concept for "Reel Heroes" was that it be applied to the entire "Rescue Heroes" line. (See Exhibit P, attached hereto and incorporated herein by reference).

  33.  Plaintiffs, through their counsel, sent a third letter via e-mail on October 24, 2002 to Stan Clutton and asked for Fisher-Price to reconsider its position given the importance of the

9

Plaintiffs to the development of new toys. (See Exhibit Q, attached hereto and incorporated herein by reference). Again, Fisher-Price denied any liability and refused to correspond further. (See Exhibit Q).

34. Plaintiffs commenced this action by filing a Complaint on January 31, 2003, as amended on May 1, 2003.

35. In late 2003, long after the filing of the First Amended Complaint in this action, Plaintiffs learned of several additional products that were released by Fisher-Price under the Rescue Heroes brand. Upon information and belief, Fisher-Price introduced a new line of action figures in 2003 known as the "Mission Select" Rescue Heroes. (See Exhibit R, attached hereto and incorporated herein by reference). These action figures feature a re-designed backpack depicting still images on a rotating dial visible through a viewer. Importantly, this new design is strikingly similar to Plaintiffs' third submission that Fisher-Price had considered and ultimately rejected in January 2001. (See Exhibit I). In addition to action figures, the "Mission Select" line includes, but may not be limited to, a Mountain Action Command Center, a Mission Select Police Cruiser and a Mission Select Firetruck. (See Exhibit R).

36. At the same time, Plaintiffs also learned about several additional products that were released in connection with the Voice Tech Video Mission Rescue Heroes line of toys that were also covered by Plaintiffs' novel submissions to Fisher-Price. These accessories to the "Voice Tech" line include, but may not be limited to, the Voice Tech Rescue Firetruck, the Voice Tech Rescue Jet, the Voice Tech Police Cruiser and the Aquatic Rescue Command Center. (See Exhibit S, attached hereto and incorporated herein by reference). These toys are intended to be used by children for interactive play with the Voice Tech Video Mission Rescue Heroes characters.

37. Additionally, Plaintiffs also learned of yet another new line of Rescue Heroes toys, the "Optic Force" Rescue Heroes. Again, this line of toys is remarkably similar to Plaintiffs' concept and even includes a camera man, "Telly Photo," that is virtually identical in design and appearance to the storyboard artwork submitted with Plaintiffs' first "Reel Heroes" submission. (See Exhibit T, attached hereto and incorporated herein by reference).

38. In late 2003 Plaintiffs also learned of the "Voice Tech Mission Command" line of toys that came out before the Voice Tech Video Mission Rescue Heroes line of toys that is referenced in the First Amended Complaint. This Mission Command line of toys apparently used special "mission command" cards that were inserted into the Rescue Hero character's backpack to provide an image of a "mission" with accompanying sound. (See Exhibit U, attached hereto and incorporated herein by reference). This feature is also covered by Plaintiffs' concept submissions.

39. Finally, Plaintiffs have also learned that their novel concept submissions have been incorporated into (1) a Rescue Heroes movie available on video and DVD that shows the characters using their Mission Select equipment; and (2) videos, DVDs, computer games and video games that have been released and/or are being released concurrent with the Voice Tech Video Mission Rescue Heroes line of toys, the Mission Select Rescue Heroes line of toys, and the Optic Force Rescue Heroes line of toys.

40. After the First Amended Complaint was filed, Defendant threatened to terminate its business relationship with Plaintiff DI unless DI withdrew from the lawsuit. Because the business relationship between Defendant and DI results in significant business to DI, DI considered this request. However, DI was then informed that not only would DI have to withdraw from the lawsuit in order to maintain the business relationship, but Reiling would have

11

to withdraw as well. When Reiling refused to withdraw, Defendant terminated its business relationship with DI. The foregoing acts by Defendant constitute tortious interference with the business relationship between Reiling and DI in that Defendant has attempted and continues to attempt to force DI to use its influence with Reiling to persuade Reiling to withdraw from the lawsuit.

First Cause of Action

BREACH OF IMPLIED-IN-FACT CONTRACT

41. Plaintiffs repeat and re-allege each and every allegation of paragraphs 1 through 40 as though fully set forth herein.

42. The facts and circumstances of Plaintiffs' disclosure of their novel and original toy concept to Fisher-Price and the subsequent conduct of the parties created a contract implied-in-fact between Plaintiffs and Fisher-Price, pursuant to which Fisher-Price agreed to compensate Plaintiffs in the event Fisher-Price actually used Plaintiffs' novel product concept as set forth in their first, second and third submissions to Fisher-Price.

43. Plaintiffs fully performed their obligations under the contract and have satisfied all conditions precedent to bringing this claim.

44. Fisher-Price used Plaintiffs' product concept but never remunerated Plaintiffs as agreed.

45. Defendant breached its implied-in-fact contract with Plaintiffs.

46. Plaintiffs have been damaged as a result of such breach in an amount not yet ascertainable.

47. Defendant's conduct has been willful and malicious.

Second Cause of Action

MISAPPROPRIATION

48. Plaintiffs repeat and re-allege each and every allegation of paragraphs 1 through 40 and 42 through 47 as though fully set forth herein.

49. The facts and circumstances of Plaintiffs' disclosure of their novel and original toy concept to Fisher-Price and the subsequent conduct of the parties created a duty on Fisher-Price's part that it would compensate Plaintiffs in the event Fisher-Price actually used Plaintiffs' novel product concept in connection with the "Rescue Heroes" line.

50. Fisher-Price's use of Plaintiffs' novel and original concept in its "Rescue Heroes" line without Plaintiffs' consent and without remunerating Plaintiffs constitutes misappropriation.

51. Fisher-Price's misappropriation has caused serious harm to Plaintiffs.

52. Fisher-Price's conduct has been willful and malicious.

Third Cause of Action

UNFAIR COMPETITION

53. Plaintiffs repeat and re-allege each and every allegation of paragraphs 1 through 40, 42 through 47 and 49 through 52 as though fully set forth herein.

54. Fisher-Price's aforementioned acts constitute unfair competition and unfair or deceptive acts or practices in violation of the Connecticut Unfair Trade Practices Act, Connecticut General Statutes §§ 42-110a, *et seq*. This count encompasses Defendant's actions with respect to its failure to pay Plaintiffs for the product concept as described above, Defendant's termination of its relationship with Plaintiff DI, its attempt to force DI to withdraw from the lawsuit, and its attempt to tortiously interfere with the business relationship between

Reiling and DI by seeking to force DI to use its influence with Reiling to persuade Reiling to withdraw from the lawsuit.

55. Plaintiffs have been damaged by the defendant's aforementioned acts.

### Fourth Cause of Action

### COMMON LAW UNFAIR COMPETITION

56. Plaintiffs repeat and re-allege each and every allegation of paragraphs 1 through 40, 42 through 47, 49 through 52 and 54 through 55 as though fully set forth herein.

57. Fisher-Price's aforementioned acts constitute unfair competition under the common law. This count encompasses Defendant's actions with respect to its failure to pay Plaintiffs for the product concept as described above, Defendant's termination of its relationship with Plaintiff DI, its attempt to force DI to withdraw from the lawsuit, and its attempt to tortiously interfere with the business relationship between Reiling and DI by seeking to force DI to use its influence with Reiling to persuade Reiling to withdraw from the lawsuit.

58. Plaintiffs have been damaged by the defendant's aforementioned acts.

### Fifth Cause of Action

### ACCOUNTING

59. Plaintiffs repeat and re-allege each and every allegation of paragraphs 1 through 40, 42 through 47, 49 through 52, 54 through 55 and 57 through 58 as though fully set forth herein.

60. As a result of the actions of Fisher-Price complained of herein, including its breach of implied contract and misappropriation of Plaintiffs' idea, Plaintiffs have been unable to determine the amounts that Plaintiffs have lost as a result of these actions.

61. Accordingly, Plaintiffs are entitled to an accounting from Fisher-Price of all

revenue derived by Fisher-Price by the unauthorized use of Plaintiffs' novel concept.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendant as follows:

a. That Defendant be required to account to Plaintiffs for all sales of "Rescue Heroes" action figures, accessories, line extensions and licensed products which use Plaintiffs' product concept, and all profit derived by Fisher-Price from such sales;

b. That Plaintiffs be awarded compensatory damages consisting of a royalty on Fisher-Price's sales of the "Rescue Heroes" action figures, accessories, line extensions and licensed products which use Plaintiffs' product concept;

c. That Plaintiffs be awarded compensatory damages consisting of a disgorgement of all Fisher-Price profits and other benefits gained from the commercialization of "Rescue Heroes" action figures, accessories, line extensions and licensed products which use Plaintiffs' product concept;

d. That Plaintiffs be awarded punitive damages based on Fisher-Price's willful and wanton misappropriation and activities that unfairly compete with Plaintiffs;

e. That a permanent injunction be granted restraining, enjoining and prohibiting Fisher-Price, its officers, servants, agents, employees, attorneys and representatives, and those persons in active concert or participation with them, from displaying, importing, exporting, shipping or selling the "Rescue Heroes" action figures, accessories, line extensions and licensed products which use Plaintiffs' product concept and any other product which uses Plaintiffs' product concept, and from directly or indirectly incorporating Plaintiffs' product concept in any other products;

f. That Fisher-Price be required to deliver up to Plaintiffs for destruction all products

incorporating Plaintiffs' aforementioned concept, including all materials for making any products incorporating Plaintiffs' aforementioned concept, in the possession of or under the control of Fisher-Price, or any of its agents, servants, employees, attorneys or other parties in privity with it;

 g. That Plaintiffs be awarded their costs and attorneys' fees to the extent permitted by law; and

 h. That the Court grant such other and further relief as it shall deem just and proper.

Dated: Norwalk, Connecticut
   November 19, 2004

          Respectfully submitted,

          GRIMES & BATTERSBY, LLP

          By: _____
          Gregory J. Battersby (Bar No. 07386)
          Edmund J. Ferdinand, III (Bar No. 21287)
          Russell D. Dize (Bar No. 23064)
          488 Main Avenue, Third Floor
          Norwalk, Connecticut 06851-1008
          (p) (203) 849-8300
          (f) (203) 849-9300

          Attorneys for the Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Second Amended Complaint has been served upon defendant Fisher-Price, Inc. on this 19th day of November, 2004, via U.S. Mail, First Class, postage prepaid, to:

> Robert Lane, Esq.
> Jodyann Galvin, Esq.
> Hodgson Russ LLP
> One M&T Plaza
> Suite 2000
> Buffalo, NY  14203-2391

> Bradford S. Babbitt, Esq.
> Robinson & Cole
> One Commercial Plaza
> 280 Trumbull Street
> Hartford, CT  06103-3597

_____
Russell D. Dize