**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

VICTOR G. REILING ASSOCIATES and     :
DESIGN INNOVATION, INC.,     :
    :
         Plaintiffs     :
    :       Civil No. 303CV222(JBA)
      v.     :
    :       April 29, 2005
FISHER-PRICE, INC.     :
    :
         Defendant.     :
    :

**DECLARATION IN SUPPORT OF**
**FISHER-PRICE'S MOTION FOR SUMMARY JUDGMENT**

      ROBERT J. LANE, JR., pursuant to 28 U.S.C. § 1746 and under penalty of

perjury, declares that the following is true and correct:

      1.      I am a member of the firm of Hodgson Russ LLP, attorneys for defendant

Fisher-Price, Inc. ("Fisher-Price"), together with Robinson & Cole LLP. I make this declaration

in support of Fisher-Price's motion for summary judgment.

      2.      The parties conducted their pre-motion conference pursuant to this Court's

Order on Pretrial Deadlines (e) and (f) at the February 14, 2005 conference with the Court.

Fisher-Price was given leave to file this motion.

      3.      The purpose of this declaration is to place before the Court, and

summarize, the relevant pleadings, deposition testimony, and exhibits that establish Fisher-

Price's entitlement to summary judgment.

- 2 -

      a.      A copy of plaintiffs' second amended complaint is attached as Exhibit 1.

      b.      A copy of Fisher-Price's answer to the second amended complaint is attached as Exhibit 2.

      c.      Relevant pages from the deposition of Victor Reiling on December 10, 2003 are attached as Exhibit 3.

      d.      Relevant pages from the deposition of Victor Reiling on February 15, 2005 are attached as Exhibit 4.

      e.      Relevant pages from the deposition of Design Innovation principal Bruce Popek on November 19, 2003 are attached as Exhibit 5.

      f.      Relevant pages from the deposition of Bruce Popek on January 28, 2005 are attached as Exhibit 6.

      g.      Relevant pages from the deposition of Design Innovation principal Bruce Benedetto on November 18, 2003 are attached as Exhibit 7.

      h.      Relevant pages from the deposition of Bruce Benedetto on January 27, 2005 are attached as Exhibit 8.

- 3 -

i.      Relevant pages from the deposition of Design Innovation principal Douglas Melville on January 22, 2004 are attached as Exhibit 9.

j.      Relevant pages from the deposition of Douglas Melville on January 28, 2005 are attached as Exhibit 10.

k.      Relevant pages from the deposition of plaintiffs' expert witness James Kipling on January 30, 2004 are attached as Exhibit 11.

l.      Relevant pages from the deposition of James Kipling on February 10, 2005 are attached as Exhibit 12.

m.      Relevant pages from the deposition of Fisher-Price employee Chris Pardi on November 12, 2003 are attached as Exhibit 13.

n.      Relevant pages from the deposition of Fisher-Price employee Kenneth Morton on March 18, 2005 are attached as Exhibit 14.

o.      Relevant pages from the deposition of Design Innovation employee Brian Manzolli on January 27, 2005 are attached as Exhibit 15.

- 4 -

## Factual Background

**Plaintiff Victor Reiling**

4.      Victor Reiling, principal of Victor G. Reiling Associates, is a "toy industry veteran"[1] who was employed at Fisher-Price from 1970 through 1974 as a design group manager.  Exhibit 3 at 7-9.  From 1974 to 1977, he was employed by Milton Bradley as Director of Research and Development, where he was responsible for reviewing inventor submissions. He required inventors to fill out, and sign, "concept submission forms" describing their submissions.  Exhibit 4 at 18.

5.      Reiling began working as an independent toy inventor in 1977.  Exhibit 3 at 11-12.  He is familiar with the fact that the larger toy companies have their own concept submission forms that they require inventors to use.  Exhibit 4 at 14.  He has filled out approximately 200 concept submission forms of the type utilized by Fisher-Price.  *Id.* at 14. Reiling has, over the years, filled out at least 26 concept submission forms in connection with submissions of product ideas to Fisher-Price.  Copies of 26 such forms are attached as Exhibit 16.  On each of these forms, Reiling described at least one product idea he was submitting, identifying the features he considered unique.  Many of the forms reflect more than one product idea submitted by Reiling to Fisher-Price.

6.      Reiling has licensed products to more than thirty-five different toy companies (some of which licensed more than one product from him) and has obtained more

---

[1]      Second Amended Complaint ("SAC") ¶ 12.

- 5 -

than twenty patents.  Exhibit 4 at 12, 24-25, 53, 93-94.  Reiling negotiated his license agreements

with toy companies on his own without the use of an attorney.  Exhibit 4 at 93-94.  He reviewed

and approved the description of the concept being licensed without the assistance of an attorney

on more than 30 occasions over the last 25 years.  *Id.* at 94.

7.     From 1986 through May 2001, Reiling had approximately 50 meetings

with Fisher-Price.[2]  Each of these meetings was governed by Fisher-Price Policy and Agreement,

signed by Reiling and acknowledging that his submissions were not made on a confidential basis

and that Fisher-Price assumed no implied obligation as a result of the submission.[3]  Twenty-

seven Policy and Agreement forms executed by Reiling, each disclaiming any confidential

relationship or implied obligation, are attached as Exhibit 17.

8.     Reiling signed option agreements with Fisher-Price like the one at issue in

this case on other occasions, including one dated February 26, 1987 and one dated September 14,

1992.  Exhibit 4 at 85, 90.  He never took those option agreements to an attorney for review

---

[2]     In the years prior to 1990, inventors completed a Policy and Agreement for each submission to Fisher-Price.  Beginning in 1990, inventors annually completed a Policy and Agreement to cover all of their submissions in a calendar year.  Exhibits 16 and 17 reflect 20 policy and agreements prior to 1990 and 27 concept submission forms after that date, reflecting that Reiling presented concepts on at least 47 occasions to Fisher-Price between 1986 and 2001.

[3]     For many years prior to and after the time frame at issue here, Fisher-Price only accepted toy idea submissions from a limited number of pre-approved independent inventors who had executed a Fisher-Price "Policy and Agreement Concerning Ideas Submitted by Persons Outside of Fisher-Price, Inc.," which sets forth the terms on which submission were accepted for review.  Declaration of Stan Clutton, dated April 27, 2005 (the "Clutton Dec.") ¶ 3.

- 6 -

before signing them.  He believed that he was experienced and competent enough to negotiate option agreements on his own.  *Id.* at 92-93.

**Plaintiff Design Innovation**

9.     Design Innovation is an independent design group which has in the past provided modeling and design services to Fisher-Price on a work-for-hire basis.  SAC ¶¶ 14 & 40.  Design Innovation's work-for-hire projects for Fisher-Price included work on the Rescue Heroes line and, more specifically, work on the Optic Force figures at issue in this case.[4]  Prior to 1998, Design Innovation signed at least one Fisher-Price Policy and Agreement (a copy of which is attached as Exhibit 18) and it was therefore aware of Fisher-Price's policy that inventor submissions were not treated as confidential by Fisher-Price.

10.     Design Innovation had no contract for work on an ongoing, continuous or guaranteed basis with Fisher-Price, but was retained separately for individual projects.[5]  With respect to the submission of the Real Heroes concept, Design Innovation was represented by Victor Reiling.[6]

**The Rescue Heroes Action Figures**

11.     This case involves a line of Fisher-Price action figures known as "Rescue Heroes," together with associated toy vehicles and playsets.  SAC ¶¶ 28-29, 35-38.  "Fisher-

---

[4]     Exhibit 8 at 35-56.

[5]     Clutton Dec. ¶ 13.

[6]     Exhibit 6 at 128-29; Exhibit 8 at 106.

- 7 -

Price's 'Rescue Heroes' is a successful line of toy action figures introduced in 1998 [sic - 1997] and based on firefighters, police officers, construction workers and forest rangers."  SAC ¶ 17. From the very beginning, all Rescue Heroes figures were designed with backpacks configured to correspond with the figure's character.[7]

**Plaintiffs' Submissions**

12.     As discussed above, over the years Reiling completed at least 26 Concept Submission Forms and at least 27 Policy and Agreements in connection with his submission of ideas to Fisher-Price.  In addition, Fisher-Price wrote to Reiling at least four times advising him in writing that all of his submissions were governed by the Policy and Agreement.  Copies of four of these letters are attached as Exhibit 19.  *See also* Exhibit 4 at 67-68.

13.     On December 15, 1994, Victor Reiling signed a Fisher-Price Policy and Agreement that (like the other 26 he signed) indicated:  (1) that inventor submissions would not be treated on a confidential basis; and (2) that Fisher-Price accepted no implied obligations.  A copy is attached as Exhibit 20.  Reiling completed the provision relating to the durational term of the agreement in his own handwriting, indicating that the agreement would remain in effect until terminated in writing.  Exhibit 4 at 245-46.  He has admitted that the December 15, 1994 Policy and Agreement was never terminated and remained in effect, governing all of his subsequent submissions until this lawsuit was commenced.  Exhibit 4 at 68-70.  That includes the three Reel

---

[7]     For example, the firefighter came with a backpack shaped like a water tank, and a water cannon. Declaration of Tyler Berkheiser, dated April 27, 2005 (the "Berkheiser Dec.") ¶ 4.

- 8 -

Heroes submissions at issue here.  *See also* Exhibit 12 at 275 (testimony of expert witness James Kipling that the Policy and Agreement was in effect at the time of plaintiffs' submissions, to Kipling's knowledge).

14.    **The 1998 Submission.**  Approximately a year after the successful introduction of Rescue Heroes, plaintiffs made the first of the three submissions at issue in this case.  In October 1998, Reiling, acting on behalf of himself and Design Innovation, met with Paul Snyder, then Fisher-Price's inventor relations representative, to present the "Reel Heroes concept" that is the subject of this action.[8]  Plaintiffs' submission did not propose or conceive of a new product, but suggested a modification or variation to pre-existing Rescue Heroes figures.  SAC ¶ 18.  Plaintiffs' submission in late 1998 (the "1998 Submission") included drawings and a prototype comprising an existing Rescue Heroes firefighter character with a backpack (like all other Rescue Heroes), which contained a film cassette.[9]  To view the film, the child placed one eye up to a magnifying lens and looked into the backpack.  *See* Exhibit 20.  This submission was not solicited by Fisher-Price.  Exhibit 3 at 44-45; Exhibit 7 at 38.

---

[8]    SAC ¶ 19.  *See* Exhibit 3 at 44-45.  Plaintiffs claim that all three inventor submissions at issue in this action reflect a single "concept," which they have named the "Reel Heroes" concept.  Second Amended Complaint ("SAC") ¶¶ 19-24; Exhibit 4 at 11-12; Exhibit 12 at 14-15; Exhibit 8 at 6.  *See also* plaintiffs' January 5, 2005 interrogatory answers (attached as Exhibit 21) at page 3 (referring to plaintiffs' "concept" "embodied in three submissions to Fisher-Price").  The spelling of "Reel" (R-E-E-L) was intended to emphasize that the concept include the use of a film reel.  Exhibit 5 at 39.

[9]    Photos of the prototype of the firefighter figure with the film cassette in his backpack, which plaintiffs included with their 1998 Submission, are attached as Exhibit 22.  The drawings and written description (which are Exhibit C to the SAC) are attached as Exhibit 23.

- 9 -

15.    Before coming to the meeting, Reiling completed a Fisher-Price "Concept Submission Form" describing the Reel Heroes concept.[10]  On the Concept Submission Form (a copy of which is attached as Exhibit 24), Reiling provided a detailed description of the Reel Heroes concept under the heading:  "Description and Unique Feature(s)/Technology."  Reiling and Paul Snyder both signed the Concept Submission Form, indicating that the submission was accurately described in the Concept Submission Form.

16.    **The Option Agreement.**  In early 1999, Fisher-Price and plaintiffs negotiated and executed an Option Agreement under which plaintiffs granted to Fisher-Price an exclusive three-month option to license plaintiffs' concept.[11]  In exchange, Fisher-Price agreed to pay $2,500 for each thirty-day period.  As stated by plaintiffs' expert witness, James Kipling, the Option Agreement included all of the material terms of a license in the event that Fisher-Price exercised the option:  the term of the license was perpetual; it was exclusive and the geographic scope was worldwide; and plaintiffs would be compensated with a 3% royalty (calculated on gross wholesale selling price) if their submission was used in the Rescue Heroes line.[12]  Fisher-Price did not exercise its option.  SAC ¶ 22.  In fact, it made only two option payments before rejecting the 1998 submission.  Clutton Dec. ¶ 9.

---

[10]    Exhibit 4 at 44-45.

[11]    A copy of the Option Agreement (which is Exhibit F to the SAC) is attached as Exhibit 25.  *See also* SAC ¶ 21 ("On February 16, 1999, Plaintiffs and Fisher-Price finalized and signed the Option Agreement for the 'Reel Action/Reel Heroes' concept").

[12]    *See* Kipling's Second Supplemental Expert Report (relevant pages are attached as Exhibit 26) ¶¶ 26 & 69 (Kipling opines that the Option Agreement "included all major material terms for a license agreement. . . . In fact, Plaintiffs had 'no exit' from the obligation to follow through and execute a license agreement. . . .").

- 10 -

17.    **Boys Team Review.**  Plaintiffs' prototype was shown by Ken Morton, then the Design Manager of the Boys Team, to two other Boys Team members, Tyler Berkheiser and Chris Pardi.  All three agreed that the prototype did not fit the planned direction for development of the Rescue Heroes line, was too passive for preschooler play, and would be far too expensive to manufacture.[13]  Neither Morton nor Berkheiser believed the prototype was unique or novel.[14]  In March 1999, Fisher-Price rejected plaintiffs' 1998 Submission as being too expensive and not versatile enough.[15]

18.    **The May 1999 Submission.**  Plaintiffs re-submitted their concept, again on an unsolicited basis, in May 1999 (the "1999 Submission").[16]  That submission consisted of a drawing (no prototype) of a Rescue Heroes Billy Blazes figure with a backpack-shaped viewer which included a tinted housing containing a drum with approximately twenty still-action frames of Rescue Heroes.[17]  These frames were advanced sequentially by means of a hand crank and could be viewed only by placing one eye up to a magnifying lens and looking inside the

---

[13]      Exhibit 14 at 61-69; Exhibit 13 at 135-38; Berkheiser Dec. ¶ 31.

[14]      Exhibit 14 at 64-65; Berkheiser Dec. ¶ 31.

[15]      Exhibit 27 (March 23, 1999 rejection letter).

[16]      Exhibit 3 at 89.

[17]      A copy of the 1999 Submission (Exhibit H to the SAC) is attached as Exhibit 28.

- 11 -

backpack.  No Boys Team designer saw the 1999 Submission.[18]  In July 1999, Fisher-Price

rejected this submission.[19]

19.    **The December 2000 Submission**.  Plaintiffs submitted their concept,

again on an unsolicited basis, for a third time in December 2000 (the "2000 Submission"),

nineteen  months after their 1999 Submission.[20]  The 2000 Submission included drawings

showing an action figure with a backpack and a digital camera device (which the figure held in

its hand) containing a Viewmaster-style film disc about two inches in diameter with six or more

images.  A copy of the 2000 Submission (Exhibit I to the SAC) is attached as Exhibit 29.  The

images were located inside the backpack or camera and could be viewed only by placing one eye

up to a magnifying lens and looking into the interior of the backpack or into the digital camera

device.  The images were advanced sequentially by pushing a lever.  *Id.*  No Boys Team designer

saw the 2000 Submission.[21]  Fisher-Price rejected this submission in January 2001.[22]

20.    **The Cameraman "Concept."**  Plaintiffs claim that their Reel Heroes

concept also included a second, independent concept of a TV cameraman figure holding a TV

---

[18]      Berkheiser Dec. ¶ 33.

[19]      SAC ¶ 23; Exhibit 3 at 119-20.

[20]      Exhibit 3 at 119-20.

[21]      Berkheiser Dec. ¶ 33.

[22]      SAC ¶ 25.

- 12 -

camera, as well as the aesthetic design of that cameraman.  SAC ¶ 18.[23]  The camera was designed with a window on top, through which the child could look to see out of the camera lens — giving the impression that he was viewing what the cameraman was "filming."[24]

**The Fisher-Price Products at Issue**

        21.    There are three categories of Rescue Heroes products plaintiffs claim misappropriate their Reel Heroes concept:

        a.    **Rescue Heroes figures.**  Plaintiffs have asserted claims against four separate sub-lines of Rescue Heroes figures:  Voice Tech Mission Command figures, Voice Tech Video Mission figures, Voice Tech Mission Select figures, and Optic Force figures.  SAC ¶¶ 28, 35-38.  Catalog pages depicting these figures are attached as Exhibit 31.

        b.    **Rescue Heroes Vehicles.**  Plaintiffs have asserted claims against the Voice Tech Firetruck, Police Cruiser, and Jet, and the Mission Select Firetruck and Police Cruiser.  SAC ¶ 36.  Catalog pages depicting these vehicles are attached as Exhibit 32.

        c.    **Rescue Heroes Playsets.**  Plaintiffs have asserted claims against the Aquatic Rescue Command Center playset (the "ARCC") and the Mountain Action Command

---

[23]      The drawings of plaintiffs' cameraman submitted with the 1998 Submission are attached as Exhibit 30.  The cameraman figure is also depicted in the drawings submitted with plaintiffs' 2000 Submission.  *See* Exhibit 29.

[24]      Exhibit 4 at 135.

- 13 -

Center playset (the "MACC").  SAC ¶¶ 35-36.  Catalog pages depicting these playsets are attached as Exhibit 33.

**Plaintiffs' Ever-Changing Definition
of the Reel Heroes Concept**

22.    Plaintiffs have, at various times, offered at least six different definitions of the Reel Heroes concept.  The first three, which were offered during the submission of the concept to Fisher-Price and in the original complaint, focus on specific design features.  After the commencement of this action, plaintiffs offered three more definitions of their concept, each time increasing the generality and scope of the definition.  Plaintiffs' six definitions of the Reel Heroes concept are described below.

23.    **The Concept Submission Form.**  In their 1998 submission and in response to the instructions on their Concept Submission Form, plaintiffs described the "unique features" of their Reel Heroes concept as follows:

> Batt[ery] op[erated] film strip units for each Rescue Hero & dedicated 'TV' and adventure photog[rapher]/ reporter.  Can be expande[d] to include TV projection truck.  Hand held camera has shutter opened by child and look-in viewer.[25]

---

[25]    Exhibit 24.

- 14 -

This description of their product was written in Victor Reiling's handwriting before his meeting with Paul Snyder[26] and before any litigation.  It was written by Reiling without any input from Fisher-Price.[27]

       24.    **The Option Agreement.**  The first paragraph of the Option Agreement provides that it relates to "the Reel/Real Heroes concept as is more completely described in the attached Exhibit A."  Exhibit A to the Option Agreement, in language tracking Reiling's definition on the Concept Submission Form, defined the Reel Heroes concept as follows:

> Submitted concept extends cartoons to action figures play pattern.  ***The concept is a battery operated film reel that is activated when the child pushes a button on the backpack of the action figure.***  The child may then look through the viewer on the backpack to see the film.  The concept may include a hand-held "camera" with shutter that is operated by the child.  The concept may be incorporated into the assorted Fisher-Price Rescue Heroes action figures.  ***The unique aspect of the concept is the combination of existing action figures with film for play pattern.***[28]

       25.    Reiling agreed at his deposition that the description of the Reel Heroes concept in the Option Agreement was accurate in that "it covered the Reel Heroes concept as presented to Paul Snyder."[29]  Reiling further agreed that the language indicating that "[t]he

---

[26]    Exhibit 3 at 37.

[27]    Exhibit 4 at 44-45.

[28]    Exhibit 25 (Exhibit A) (emphasis added).

[29]    Exhibit 3 at 80.  *See also id.* at 80-82 (Reiling reviewed the description of the Reel Heroes concept in the Option Agreement before signing it to make sure it was correct).

- 15 -

concept is a battery-operated film reel that is activated when the child pushes a button on the backpack of the action figure" was an accurate description of the prototype and drawings Reiling presented to Fisher-Price in the first submission.[30]  Finally, Reiling admitted that the language in the Option Agreement indicating that "[t]he unique aspect of the [Reel Heroes] concept is the combination of existing action figures with film for play pattern" is "an accurate statement of the unique aspect of the concept as [he] presented it to Fisher-Price."  Exhibit 3 at 81-82.

26.    **The Complaint.**  In their original complaint, plaintiffs defined the Reel Heroes concept as follows:

> Plaintiffs' basic concept was to integrate Fisher-Price's successful "Rescue Heroes" figures and cartoon-like images by using a removable backpack that could be made for a specific character.  It was designed to mount to each "Rescue Heroes" figure and show animated images of that character in action.  For example, a firefighter would be shown putting out a fire or rescuing a child from a building.  The animated images enrich the role-playing that a child often enjoys when using toy action figures.  ***The backpack is a battery-operated film strip/disc player with a viewer.***  By looking through the small viewer and pressing a button, the child could see the "countless Rescue Hero adventures."[31]

27.    As this litigation progressed, plaintiffs re-defined their concept to eliminate all of the specific features in the submissions they made to Fisher-Price.

---

[30]    Exhibit 3 at 81.

[31]    January 31, 2003 Complaint ¶ 30(A) (emphasis added).

- 16 -

28.     **2003-04 Deposition Testimony.**  In their deposition testimony in late 2003 and early 2004,[32] the plaintiffs each testified in a manner  consistent with the following definition of the concept:

> The use of an image or images on an action figure to enhance the role play of children using the action figure.[33]

29.     **The 2005 Expert Report.**  In his January 2005 report, plaintiffs' expert James Kipling broadened the definition of the Reel Heroes concept even further, eliminating any requirement that the image be located on an action figure.  Kipling defined plaintiffs' Reel Heroes concept as follows:

> A device ***associated with*** a Rescue Heroes figure (for example, part of a backpack) for visually communicating to the mind of a child a cue or prompt for role-playing in which the child would use the Rescue Heroes figure and imagine accomplishing a mission assignment, resolving a dangerous situation, performing a rescue or engaging in some other adventurous pretend scenario.[34]

---

[32]     Plaintiffs in this case were deposed on two separate occasions:  in late 2003 and 2004 with respect to the first amended complaint and in early 2005 with respect to the second amended complaint (which added 15 products to this case).

[33]     *See* Exhibit 7 at 126 (Benedetto testimony that the concept is an image "with . . . action figures . . . to enhance a role play"); Exhibit 5 at 42 (Popek testimony that the concept was "putting an image on the backpack to create a better role playing experience for the child"); Exhibit 7 at 171 (Benedetto testimony that the image does not have to be on or in the backpack to embody plaintiffs' concept, but can be anywhere on the action figure); Exhibit 9 at 21-22 (Melville testimony that images did not have to be associated with the backpack and could be on chest of action figure); Exhibit 3 at 42 (Reiling testimony that the novelty of plaintiffs' concept was "to be able to bring these images into the [Rescue Heroes] line and give a child a chance to really get involved with play patterns and how much it would enhance the play value of the rest of the [Rescue] [H]eroes").

[34]     Exhibit 26 ¶ 11 (emphasis added).

- 17 -

30.    Kipling not only does not deny that his definition eliminates any specific features or concrete form from the Reel Heroes concept; he affirmatively asserts that its abstract character is its primary attribute.  In his March 4, 2004 declaration, Kipling described his definition of the Reel Heroes concept as ***"primarily devoid of mechanical specifics and details."***[35]  He goes on to indicate that the Reel Heroes concept "can be fulfilled . . . by any of a multiplicity of forms."[36]

31.    **2005 Deposition Testimony.**  In their recent deposition testimony in January and February 2005, plaintiffs and their expert confirmed the generality and scope of their newly crafted definition of the Reel Heroes concept.  Kipling's report and plaintiffs' recent deposition testimony make three aspects of their new definition of the Reel Heroes concept clear:

a.    ***The Reel Heroes concept does not require that the images or visual cues be located on a backpack.***  Kipling and the plaintiffs each testified that the image or visual cue could be located on the figure's chest or in a device in the figure's hand.[37]  Plaintiffs' 2000 Submission depicts a photographer action figure holding a digital camera in his left hand; the digital camera contains a Viewmaster disk of images showing the character.[38]

---

[35]    Relevant pages of this declaration are attached as Exhibit 34.  *See* ¶ 9.

[36]    *Id.* ¶ 10.

[37]    Exhibit 4 at 165, 223-24; Exhibit 9 at 21-22; Exhibit 11 at 137-38; Exhibit 6 at 46-51; Exhibit 7 at 171.

[38]    Exhibit 29.

   **b.**    ***The Reel Heroes concept is not limited to Rescue Hero action figures.***  Kipling and the plaintiffs testified that the Reel Heroes concept includes all action figures — not just Rescue Heroes.  At different times, they testified that Spiderman, Captain America, and Batman action figures were included within the Reel Heroes concept.[39]  Bruce Popek testified that the Reel Heroes concept was submitted to one of Fisher-Price's competitors, Toy Biz, for use in connection with its "Spiderman and Friends" line of superhero action figures.[40]  A copy of Popek's letter to Toy Biz submitting the Reel Heroes concept is attached as Exhibit 36.  A copy of Toy Biz's letter rejecting the concept is attached as Exhibit 37.  Popek also testified that the Reel Heroes concept was not limited to Rescue Heroes action figures, but "can be incorporated into ***assorted*** action figures or vehicles."[41]

   **c.**    ***The Reel Heroes concept is not even limited to action figures.***  Plaintiffs and Kipling testified that the Reel Heroes concept does not require that the visual cue or image component of the concept be physically located on, or even connected to, an action figure.  Kipling's definition of the Reel Heroes concept makes this clear with its reference to "[a] device ***associated with*** a Rescue Heroes figure. . . ."[42]  Plaintiffs indicated that visual cues or images located on playsets or toy vehicles satisfy the Reel Heroes concept, and that Fisher-

---

[39]    *See* Exhibit 7 at 171 (the concept is "not particular or specific to the Rescue Heroes" action figures; Captain America is within the concept); Exhibit 6 at 7-8 (Spiderman is within the concept); Exhibit 9 at 24 (Batman is covered).

[40]    Exhibit 6 at 7, 9.  *See also* Exhibit 35 at page 2 (February 20, 2004 interrogatory answers).

[41]    Exhibit 6 at 25 (emphasis added).

[42]    Exhibit 26 ¶ 11.

- 19 -

Price's MACC and ARCC playsets and Fisher-Price's Mission Select vehicles actually "used,"

and directly infringed, the Reel Heroes concept.[43]  Victor Reiling testified "that a product need

not even be an action figure to be a use of the Reel Heroes concept."  Exhibit 4 at 155.

Moreover, in his letter submitting the Reel Heroes concept to Toy Biz for its consideration,

Bruce Popek stated that the concept "can be incorporated into assorted action figures *or*

*vehicles*."[44]

### Plaintiffs' Admissions That Fisher-Price
### Never Used the Reel Heroes Concept

32.    Victor Reiling acknowledged that he never showed Fisher-Price anything

in connection with the three submissions of the Reel Heroes concept, other than a viewing

mechanism that required the child to look through a lens to see a film inside a backpack (or, in

the third submission, inside a toy digital camera).  Exhibit 3 at 99-100, 116, 135-137.

33.    Similarly, Kipling testified that in all of plaintiffs' three submissions of the

Reel Heroes concept, "the child had to put his or her eye up to a viewing lens in order to see the

---

[43]    *See* Exhibit 4 at 154-57; Exhibit 6 at 116-19.  Plaintiffs assert in their January 20, 2005 interrogatory answers (attached as Exhibit 21) that the definition of the Reel Heroes concept includes the use of "an image component in connection with accessories, such as vehicles and playsets."  Exhibit 21 at page 3. Plaintiffs also state that Fisher-Price's Mountain Action Command Center playset, Aquatic Rescue Command Center playset, Mission Select Firetruck, and Mission Select Police Cruiser "are covered by Plaintiffs' submissions" of the Reel Heroes concept.  Exhibit 21 at page 4.  In their February 11, 2005 interrogatory answers (attached as Exhibit 38), plaintiffs expressly affirm that "Plaintiffs' [Reel Heroes] Concept covers" these vehicles and playsets.   Exhibit 38 at page 4, 6, & 9.  Plaintiffs have also stated in their March 3, 2004 interrogatory answers (attached as Exhibit 39) that the Reel Heroes concept includes "accessories, such as vehicles and playsets."  Exhibit 39 at 2-3.

[44]    Exhibit 35.

- 20 -

image inside the backpack." Exhibit 11 at 185-86. Kipling further acknowledged that plaintiff

never disclosed to Fisher-Price "any embodiment of the [Reel Heroes] concept other than one in

which a child put his eye up to a viewing lens to view an image inside the Rescue Hero figure's

backpack." *Id.* at 186. *See also id.* at 187.

34.    Kipling specifically admitted that ***"Fisher-Price never used any of the***

***three specific embodiments disclosed by plaintiffs"*** in their three submissions of the Reel

Heroes concept. Exhibit 11 at 237-38 (emphasis added). Kipling further agreed ***"that Fisher-***

***Price has never manufactured a product that meets the literal description set forth in Exhibit***

***A of Exhibit 210 [the Option Agreement]."*** *Id.* at 192 (emphasis added).

35.    Because he recognized that Fisher-Price never made a product described

in any of plaintiffs' submissions or in the description attached to the Option Agreement, Kipling

adopted the strategy of arguing that plaintiffs' definitions of their concept were "wrong," and

that plaintiffs should not be bound by these allegedly "inaccurate" definitions of their concept.

Kipling argued that Reiling "failed to describe his concept accurately in filling out Exhibit 205

[the Concept Submission Form]." Exhibit 11 at 175. Kipling similarly testified "that the parties

failed to accurately describe plaintiffs' concept in the Option Agreement." Exhibit 11 at 168.

*See also* Exhibit 12 at 188-91 (Kipling testimony that plaintiffs were "bamboozled" into

accepting a wrong definition of the Reel Heroes concept in the Option Agreement).[45] Benedetto

---

[45]    This does not explain, however, how Victor Reiling could have been "bamboozled" into inaccurately describing his concept in a Concept Submission Form he filled out before even meeting with Fisher-Price.

- 21 -

also testified that the description of the "unique aspect" of the Reel Heroes concept in Exhibit A

to the Option Agreement was not accurate.  Exhibit 7 at 89.

36.    Kipling's conclusion is directly contrary to Victor Reiling's testimony.

Reiling testified specifically that the description of the Reel Heroes concept in Exhibit A to the

Option Agreement "certainly covered the Reel Heroes concept as presented to Paul Snyder,"

(who was then Fisher-Price's Vice President of Inventor Relations).  Exhibit 3 at 80.  Reiling

further confirmed that the "unique aspect of the [Reel Heroes] concept as [he] presented it to

Fisher-Price" was accurately described in Exhibit A to the Option Agreement.  *Id.* at 81-82.

37.    Kipling testified that it would be reasonable for Fisher-Price's Inventor

Relations Department to rely on the definition of the Reel Heroes concept in the Option

Agreement.  Exhibit 11 at 191-92.  Indeed, Kipling admitted that he took the position, when

employed as an in-house attorney at Kenner Toys, that inventors were bound by the definitions

of their concepts in license agreements.  He confirmed that this position was "consistent with the

practice in the toy industry."  Exhibit 11 at 159-60.  Finally, Kipling acknowledged that if he had

seen the definition of the Reel Heroes concept in Exhibit A to the Option Agreement while

employed at Kenner, he would have interpreted the concept as "limited to the use of film inside

an action figure."  *Id.* at 176.  As discussed above, plaintiffs admit that Fisher-Price never made

any use of such concept.

- 22 -

**Plaintiffs' Admissions Regarding**
**Prior Art and Novelty**

38.    The starting point in evaluating whether plaintiffs' Reel Heroes concept was novel or whether it had been anticipated by prior art is defining their concept. For purposes of discussing novelty and prior art only, Fisher-Price accepts plaintiffs' most recent definition of the Reel Heroes concept as set forth in Kipling's January 2005 report. *See* Exhibit 26 ¶ 11.

39.    As discussed above in paragraphs 30-31, plaintiffs and Kipling testified that the Reel Heroes concept is extraordinarily broad in scope and essentially includes the use of any images or visual cues to enhance a child's play with action figures. In that regard, plaintiffs and Kipling testified that the Reel Heroes concept: (1) is not limited to images or visual cues on a Rescue Hero action figure's backpack, but includes images or visual cues located on a device in the action figure's hand, on the action figure's chest, or elsewhere on the action figure; (2) is not limited to images or visual cues on a Rescue Hero action figure, but includes other types of action figures; and (3) is not limited to images or visual cues on an action figure, but includes images or visual cues on playsets, toy vehicles, etc.

40.    In their deposition testimony, plaintiffs and their expert witness made a number of admissions relating to the existence of prior art and the lack of novelty of their Reel Heroes concept, and particularly their current definition of the Reel Heroes concept. This testimony is summarized below.

- 23 -

**Admissions Regarding the
Projector Figure Prior Art**

41.     There are two pieces of prior art from the early to mid-1990s relating to "projector" action figures — action figures that include mechanisms for projecting images of the figures' adventures.  Plaintiffs have admitted that this prior art embodied the Reel Heroes concept.

a.     In 1993, Toy Biz introduced a line of superhero (*e.g.,* Spiderman, Wolverine, etc.) action figures known as "Projectors."[46]  Each figure came with three Viewmaster-style film disks, each including 12 images.  The disks were inserted into a projector device in the figure's chest.  When activated, the device would project images from the disk through a lens in the figure's chest onto a nearby surface.  Each of the images showed the particular action figure in action, on an adventure, performing a mission, etc.

b.     In August 1996, the United States Patent Office issued Patent No. 5,545,072, entitled "Image Projective Toy" (the "'072 Patent").  The '072 Patent describes and covers the Toy Biz Projector figures.[47]  In addition to projecting an image of the character in action or on an adventure, the '072 Patent discloses an alternative embodiment of the invention in which the child looks through the lens on the action figure's chest to view the images within.

---

[46]     A photo of a Projector figure is attached as Exhibit 40.

[47]     The '072 patent is attached as Exhibit 41.

- 24 -

*See* Exhibit 41 at column 3, lines 56-58 ("Alternatively, the images may be viewed internally by placing the lens directly in front of the eye").

42.    Kipling testified that if Fisher-Price manufactured "an action figure . . . which contained a projector mechanism in its chest [which] when switched on would project the action figure's next adventure onto a nearby wall [that] would embody plaintiffs' concept." Exhibit 11 at 49.  This describes the Toy Biz Projector figure, and Kipling acknowledged that this figure (first sold in 1993) was an embodiment of plaintiffs' Reel Heroes concept.  Kipling also admitted that, "if instead of projecting the action figure's next adventure onto the wall, the child had to look through the lens on the chest . . . to see the images of the next adventure [that would] also embody the plaintiffs' concept."  Exhibit 11 at 49-50.  This is an admission that the 1996 "Image Projective Toy" patent (attached as Exhibit 41) embodied plaintiffs' Reel Heroes concept.

43.    Douglas Melville admitted in his deposition testimony that the device disclosed in the Image Projective Toy patent is a "use" of the Reel Heroes concept:

> Q.    How about if instead of using a film loop inside [the action figure's] chest, they put a Viewmaster disk inside of his chest and it could be viewed by looking through a lens either on his chest or his back?
>
> A.    Yes.
>
> Q.    That would still be a use of your concept?

- 25 -

A.    Yes.[48]

44.    Bruce Benedetto testified that if Fisher-Price made a Rescue Hero "with the exact same mechanism on Exhibit 254 [the Toy Biz Wolverine Projector figure], meaning a projector in the chest of the Rescue Hero's figure that showed images on a wall of the Rescue Hero in action, [that] would . . . infringe the Reel Heroes Concept." Exhibit 8 at 64. Reiling testified that if Fisher-Price took the projector mechanism from the Toy Biz Projector figure's chest and put it in a Rescue Heroes figure, that would be a use of the Reel Heroes concept. Exhibit 4 at 177. Popek also agreed that if Fisher-Price took the Wolverine projector mechanism and put it in a Rescue Hero's backpack, that would infringe the Reel Heroes concept. He further acknowledged that "the Reel Heroes concept is essentially the Wolverine Projector mechanism from Exhibit 254 just applied to a Rescue Hero's backpack." Exhibit 6 at 109.

45.    Melville acknowledged that if Fisher-Price "took the mechanism out of Exhibit 254 [the Wolverine projector figure] that displays film disk images by projecting them onto a nearby surface and put it into one of the Rescue Hero character's backpacks . . . that [would] infringe the Reel Heroes Concept." Exhibit 10 at 22. Melville further agreed that "the Reel Heroes Concept is essentially a combination of the mechanism in Wolverine, Exhibit 254, with Rescue Heroes figure backpacks." *Id.* at 22-23.

---

[48]    Exhibit 9 at 25.

- 26 -

46.     Benedetto also testified that, if "Fisher-Price made Rescue Heroes with . . . a Viewmaster-type disk in the character's chest but instead of projecting it on the wall, the child looked through the lens to see the images on the Viewmaster disk in the character's chest, [that] would . . . infringe the Reel Heroes Concept." Exhibit 8 at 66-67. This is an acknowledgement that the exact mechanism disclosed in the Image Projective Toy patent (attached as Exhibit 41) embodies the Reel Heroes concept.

47.     Benedetto testified that the concept of projection with Rescue Heroes action figures was part of the Reel Heroes concept and that "the Wolverine Projector figure [from Toy Biz] is similar to the Reel Heroes Concept in that they both include the feature of projecting images onto a nearby surface." Exhibit 8 at 124-26. *See also* Exhibit 6 at 11-15 (the idea of projecting images from an action figure was part of the Reel Heroes concept submitted to both Fisher-Price and Toy Biz). Melville also agreed that the Reel Heroes concept "includes the feature of projecting images" and that the fact that the Toy Biz Wolverine projector figure marked as Exhibit 254 includes a projector makes is "similar to" the Reel Heroes concept. Exhibit 10 at 41-42.

48.     Popek admitted that the Reel Heroes concept he submitted in 2001 to Toy Biz was the same concept he submitted to Fisher-Price as the Reel Heroes concept. Exhibit 6 at 7-8.

49.     Popek acknowledged that when he submitted the Reel Heroes concept to Toy Biz, it included the feature of projecting images of the figure in action out of the figure onto

a nearby surface.  Exhibit 6 at 11-15.  This is exactly the same as the 1993 Toy Biz Projector

figures.  Popek also admitted that he submitted the same projection feature to Fisher-Price as part

of the Reel Heroes concept.  Exhibit 6 at 12.

50.     Popek agreed that, when he submitted the Reel Heroes concept to Toy Biz,

Toy Biz advised that it had done "similar things in the past" and that Toy Biz "did not consider

the Reel Heroes Concept novel."  Exhibit 6 at 30-31.  He was advised by Toy Biz that the reason

it did not consider the Reel Heroes concept to be novel was "because of the Projector figures Toy

Biz had sold to the public" in 1993-96.  *Id.* at 33.

**Admissions Regarding the**
**Secret Wars Prior Art**

51.     "Secret Wars" was a line of action figures sold by Mattel beginning in

1984.  The line included both superheroes and villains, each of which came with a shield that the

action figure held in its hand.[49]  The shield contained a lenticular lens with images showing the

action figure in action.  Each figure came with eight different pieces of lenticular artwork that

could be placed in the shield showing different adventures.  For example, one of the Captain

America lenticular images shows Captain America swinging down to carry a boy out of the path

of an oncoming train.[50]

---

[49]     A photo of a Secret Wars figure is attached as Exhibit 42.

[50]     Bollinger Dec. ¶ 40.

- 28 -

52.     Kipling agreed that the Captain American Secret Wars figure (submitted as Exhibit Q to the Bollinger declaration) includes a shield with a lenticular lens image, and that the shield is "a device associated with the Captain America figure for visually communicating to the mind of a child a cue or prompt for role-playing." Exhibit 12 at 116. He admitted that the lenticular lens, which depicts Captain America saving a child from an oncoming train, "is a visual communication of an adventurous pretend scenario." Exhibit 12 at 120. Finally, Kipling agreed that he could not identify any part of his definition of plaintiffs' Reel Heroes concept from paragraph 11 of his report that the Captain America Secret Wars figure did not satisfy. *Id.* at 120-21.

53.     Similarly, Kipling acknowledged that a Spiderman action figure holding a shield including a lenticular lens with artwork showing Spiderman aiming his web shooter at Dr. Octopus (a Spiderman villain) and capturing Dr. Octopus is within the scope of the Reel Heroes concept. Exhibit 11 at 137-38. This is another admission that the 1984 Secret Wars action figures embodied the Reel Heroes concept as Kipling defines it.

54.     Popek testified that simply taking the lenticular lens from the Secret Wars action figures and putting it on the backpack of a Rescue Heroes figure would be an infringement of the Reel Heroes concept. Exhibit 6 at 111-12.

- 29 -

**Admissions Regarding the**
**Movie Viewer Prior Art**

55.    In 1980, Fisher-Price introduced a product named the "Movie Viewer." This was a product that allowed a child to look through a magnifying lens to see a filmstrip inside a plastic housing.[51]  The film was advanced by turning a crank on the side of the plastic housing, giving the effect of a traditional motion picture.

56.    Bruce Benedetto agreed that the Fisher-Price Movie Viewer marked as Exhibit 208 was the inspiration for "coming up with the Reel Heroes concept."  Exhibit 7 at 74-75.

57.    Reiling also indicated that the Fisher-Price Movie Viewer was the "inspiration" for the Reel Heroes concept.  The idea of taking the Movie Viewer and turning it into a Rescue Heroes backpack "was an influence" on the creation of the Reel Heroes concept. Exhibit 3 at 31-34.  Finally, Reiling acknowledged that if Fisher-Price took its own 1980 Movie Viewer and put it on the back of its own Rescue Heroes figure, that would be a use of the Reel Heroes concept for which he would claim a royalty.  Exhibit 4 at 187-88.  He testified that "combining the movie viewer, Exhibit 282, with the Billy Blazes [Rescue Heroes] figure, Exhibit 213, results in the Reel Heroes concept."  Exhibit 4 at 189-90.  *See also* Exhibit 12 at 227-29 (same).

---

[51]    A photo depicting the 1980 Fisher-Price Movie Viewer is attached as Exhibit 43.

- 30 -

**Plaintiffs' Admissions Regarding**
**Their Implied Contract Claim**

58.    Plaintiffs' implied-in-fact contract claim is based on the allegation that "Fisher-Price agreed ***to compensate*** Plaintiffs in the event Fisher-Price actually used Plaintiffs' novel product concept."  SAC ¶ 42.  This is the same subject matter governed by the parties' Option Agreement.  Plaintiffs have admitted that the Option Agreement embodies the only agreement between plaintiffs and Fisher-Price as to compensation for any use of plaintiffs' concept.[52]  Plaintiffs' original complaint in this action included a cause of action for breach of express contract, based on alleged breach of the Option Agreement.[53]

59.    Kipling stated in his January 2005 report: "There were in fact contract negotiations for licensing the product from the inventor, and the terms that resulted from those negotiations were incorporated into the [O]ption [A]greement."[54]  He also stated that the Option Agreement "included all major material terms for [the] license agreement that would result from Fisher-Price's exercise of the option."[55]  The material terms of the Option Agreement included

---

[52]    Exhibit 9 at 35; Exhibit 4 at 103 ("Q.  . . . Was there some agreement between you and Design Innovation and Fisher-Price relating to the use of and compensation for the Reel Heroes concept, other than what's in [the Option Agreement]? . . . A.  No, not that I know of.").

[53]    Bruce Popek testified that the "express contract" referenced in the original complaint was the Option Agreement.  Exhibit 5 at 150.

[54]    Exhibit 26 at ¶ 26.

[55]    *Id.* ¶ 69.

- 31 -

compensation in the form of a royalty if Fisher-Price exercised its option for plaintiff's submission.[56]

      60.    Kipling agreed that the subject matter of both the express contract and the implied-in-fact contract are identical:

> Q.    . . . Didn't the option agreement relate to the exact same subject matter [as the alleged implied contract]?
>
> A.    Subject matter, yes.
>
> Q.    And by that "subject matter" I mean Plaintiffs' submission and how it would be compensated if Fisher-Price were to use it.
>
> A.    Yes.[57]

      61.    Finally, Reiling and Kipling both expressly affirmed that all of the conduct on which the alleged implied agreement is based occurred ***prior to the Option Agreement***.[58]

      62.    Plaintiffs' March 30, 2005 interrogatory answers are attached as Exhibit 44.

---

[56]    Exhibit 25 ¶ 6(c) (Option Agreement); Exhibit 12 at 229-30; Exhibit 26 ¶¶ 26, 69.

[57]    Exhibit 12 at 286-87. Kipling also testified that the "Option Agreement is one element in creating an implied contract." *Id.* at 186.

[58]    "[T]he implied contract was, in my view, formed by the accumulation of elements that was culminated by the option agreement." Exhibit 12 at 284. Kipling agreed that the facts supporting the implied contract are: "the submission itself, the dealings between the parties up to the option agreement and the signing of the option agreement." *Id.* at 288-89. Reiling testified that the implied agreement formed as of December 8, 1998 when he received a fax from Fisher-Price, two months before the Option Agreement in February 1999. Reiling recalled no communications with Fisher-Price relating to the 1999 Submission or the 2000 Submission. Exhibit 4 at 115, 120-21.

- 32 -

Dated:   April 29, 2005

                                        <u>S/Robert J. Lane, Jr.</u>
                                        Robert J. Lane, Jr.

03279/0136 BFLODOCS 1236161v1