# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| VICTOR G. REILING ASSOCIATES and<br>DESIGN INNOVATION, INC., | : | |
| | : | |
| Plaintiffs | : | |
| | : | Civil No. 303CV222(JBA) |
| v. | : | |
| | : | April 28, 2005 |
| FISHER-PRICE, INC. | : | |
| | : | |
| Defendant. | : | |
| | : | |

## DECLARATION IN SUPPORT OF
## FISHER-PRICE'S MOTION FOR SUMMARY JUDGMENT

HOWARD BOLLINGER, under penalty of perjury and pursuant to 28 U.S.C. § 1746, declares that the following is true and correct:

1.      I have been retained by defendant Fisher-Price, Inc. ("Fisher-Price") to provide my independent expert opinion on certain issues in this case.  My qualifications and background are summarized below:

a.      I am an expert in the areas of toy design and inventor relations.  I have a Bachelor of Science in Industrial Design from the University of Cincinnati.  I worked for more than 30 years as a toy designer.  For 10 years, I was the Vice President of Product Design and Engineering responsible for all product development at Kenner Toys, which was a major competitor in the action figure market.  I supervised a staff of 60 to 80 designers, engineers, and sculptors.

- 2 -

       b.     For 22 years, I acted as Vice President and then Senior Vice President of Product Concepts at Hasbro, Inc. (which acquired Kenner).  In that capacity, I was responsible for identifying all creative products outside from inventors and licensors.  I supervised a staff of 70 persons in the Design Group and also supervised an internal Advanced Concepts Group generating innovative product concepts for all Kenner and Hasbro product categories.  During the last 5 years of my tenure, my responsibilities were expanded to include strategic new business development, with a focus on seeking out new technologies for toy innovation.

       c.     Since 2001, I have been working as an independent inventor.  In that capacity, I have shown toy designs to more than twenty different toy companies.

       2.     This case relates to a concept for a variation of Fisher-Price's successful Rescue Heroes action figures that consisted of a film reel mechanism located inside the figure's backpack.  Plaintiffs named their concept, which was disclosed Fisher-Price in three separate submissions between 1998 and December 2000, "Reel Heroes," because of its use of a film reel.

       3.     The purpose of this affidavit is:  (1) to discuss the outside inventor submission process and the documentation of outside inventor submissions in the toy industry; (2) to demonstrate that no Fisher-Price products have made any use of the ideas or concepts reflected in plaintiffs' three submissions of the Reel Heroes concept; (3) to show that plaintiffs' current definition of their concept is so abstract and general that it would never have been accepted for review by a toy company; and (4) to demonstrate that plaintiffs' concept, ***as they themselves***

- 3 -

***have now defined it***, is not novel and was not novel at the time of plaintiffs' first submission to

Fisher-Price in 1998.

**Acceptance and Review of**
**Outside Inventor Submissions**

      4.     Many toy companies do not rely solely on an internal design staff for all of

their product ideas.  Often, they will accept the submission of product ideas from outside

professional inventors, at least those who have been pre-approved to submit ideas to the company.

      5.     The larger toy companies will not accept a submission from an outside

inventor unless the inventor has executed a formal agreement with the company establishing the

specific terms on which the company will accept and review inventor submissions.  Often these

agreements are "blanket" agreements — meaning that they apply to all submissions an inventor

makes during a particular year or they apply to all submissions made by the inventor while they are

in effect.

      6.     Fisher-Price's version of an agreement governing inventor submissions is

called "Policy and Agreement Concerning Ideas Submitted by Persons Outside of Fisher-Price,

Inc." and is referred to below as a "Policy and Agreement."  A Policy and Agreement executed by

Victor Reiling is attached as Exhibit A.  A Policy and Agreement executed by Design Innovation is

attached as Exhibit B.

- 4 -

7.    Fisher-Price's Policy and Agreement includes four terms that are relevant here.

(a)    The first unnumbered paragraph indicates that, "in order to avoid disagreements, ***Fisher-Price can review outside ideas only according to the conditions of the agreement below***."  (Emphasis added).

(b)    The second unnumbered paragraph provides that Fisher-Price's Policy and Agreement is intended "to preserve [its] rights . . . to use anything in the public domain."

(c)    Paragraph 1 states that:

This disclosure must be understood to be purely voluntary and ***no confidential relationship is to be established*** by such disclosure or implied from our consideration of the submitted material, and the material is not to be considered submitted "in confidence." ***Confidential relationships have been held to create obligations beyond those that the company is willing to assume***. (Emphasis added).

(d)    Paragraph 2 states:

No obligation of any kind is assumed by, ***nor may be implied against***, Fisher-Price, Inc. unless and until a formal written contract is entered into, and then the obligations shall be only such as is expressed in the formal written contract. . . .  (Emphasis added).

8.    In my experience in the toy industry, all toy companies require that they retain their rights to use public domain ideas, regardless of outside inventor submissions.  The term described in paragraph 7(b) above is the unvarying practice in the industry.

- 5 -

9.      The terms described in paragraphs 7(c) and 7(d) above (disclaiming any confidentiality obligation or implied obligation) are common, but not universal, in the toy industry. Any experienced inventor (and I have been an independent inventor myself for the last four and one-half years) would be familiar with the fact that many toy companies, especially the larger ones, accept inventor submissions for review only on a non-confidential basis and with a disclaimer of implied obligations.

10.     Almost all toy companies require inventors to complete a disclosure form or submission form describing any product idea submitted.  This document is often (but not always) separate from and in addition to the outside inventor agreement that toy companies often require before even accepting an inventor's submission for review.

11.     The purpose of the disclosure or submission form is to require the inventor to describe the product idea he is submitting, and in particular those aspects he considers to be unique, for three reasons:  (1) so that both the toy company and the inventor have a record of what was submitted; (2) so that the toy company has a description it can use in determining whether it has already seen the idea from another outside inventor or has developed the same idea internally; and (3) so that the toy company will have a record of the product idea against which it can measure future products.  Toy companies rely on idea disclosure forms for these purposes.

12.     Fisher-Price makes use of a disclosure form entitled "Concept Submission Form."  A copy of the particular Concept Submission Form completed by Victor Reiling for the Reel Heroes concept is attached as Exhibit C.  Fisher-Price's Concept Submission Form requests

- 6 -

that the inventor "[p]lease help us to distinguish your concepts **by fully describing each and indicating its unique features.**"  The Concept Submission Form also includes a designated space for the inventor to identify the ***"Description and Unique Feature(s)/Technology,"*** where the inventor is instructed:  "The description of ***the submitted ideas and/or technology incorporated must be carefully defined*** in the description/unique feature(s) area below."

13.    Plaintiffs defined the "unique feature(s)" of their concept as follows:

> Batt[ery] op[erated] film strip units for each Rescue Hero & dedicated 'TV' and adventure photog[rapher]/reporter.  Can be expande[d] to include TV projection truck.  Hand held camera has shutter opened by child and look-in viewer.[1]

This definition was written out in handwriting by plaintiff Victor Reiling.  The Concept Submission Form was signed by Victor Reiling and was countersigned by Paul Snyder, Fisher-Price's Vice President of Research and Development Services on October 29, 1998.

14.    Sometimes when a toy company has received a submission from an inventor and it needs additional time to evaluate the product idea, it will enter into an "option agreement" with the inventor.  A typical option agreement provides for a payment to the inventor, in return for which the toy company is granted a time period to review an option to license the product idea, usually on specified terms, if it later elects to do so.  Option agreements always contain a description of the product idea being optioned.

---

[1]    *See* Exhibit C.

- 7 -

15.     In this case, the parties entered into an Option Agreement for the Reel Heroes concept in February 1999.  A copy is attached as Exhibit D.  Exhibit A to the Option Agreement set forth a detailed definition of the Reel Heroes concept.  That definition tracks the definition written out by Victor Reiling in his own handwriting in the Concept Submission Form (although the language is slightly more formal).  There is no substantive difference between the definition of the Reel Heroes concept in the Option Agreement and the definition written by Mr. Reiling in the Concept Submission Form.

16.     The Option Agreement between plaintiffs and Fisher-Price defined the Reel Heroes concept as follows:

> Submitted concept extends cartoons to action figures play pattern. **_The concept is a battery operated film reel that is activated when the child pushes a button on the backpack of the action figure._**  The child may then look through the viewer on the backpack to see the film.  The concept may include a hand-held "camera" with shutter that is operated by the child.  The concept may be incorporated into the assorted Fisher-Price Rescue Heroes action figures.  **_The unique aspect of the concept is the combination of existing action figures with film for play pattern._**[2]

17.     Plaintiffs' expert in this case has argued that plaintiffs are not bound by the definitions of the Reel Heroes concept that Victor Reiling wrote in the Concept Submission Form or that they agreed to in the Option Agreement.  This is contrary to custom and practice in the toy industry.  Toy companies invariably take the position that it is important for inventors to completely

---

[2]     *See* Exhibit D (at Exhibit A) (emphasis added).

- 8 -

and accurately describe their product submissions on disclosure forms and even more important in

formal contracts like the Option Agreement, and that the toy company will only recognize the

inventor's rights (if any) to the extent the submission is described in these documents.  This is

known to all experienced inventors (like Reiling and Design Innovation).

18.    In my experience, toy companies always take the position that inventors are

bound by the definition of their submissions in formal contracts such as option agreements and

licenses, and that inventors' rights (if any) do not extend beyond those definitions.  Again, this is

well known to experienced inventors who, as a result, typically take great care in negotiating the

language defining their submission in any such formal contract.

19.    I have reviewed and analyzed plaintiffs' three submissions to Fisher-Price

that are at issue in this case.  My comments are set forth below.

20.    Plaintiffs allege in their Second Amended Complaint (the "SAC") that in late

1998, approximately 11 months after the successful introduction of the Rescue Heroes product line

by Fisher-Price, plaintiffs made the first submission at issue in this case.  SAC ¶¶ 18-19.  It is

important to understand that plaintiffs' submissions did not propose or conceive of a new product or

new product line.  Instead, plaintiffs suggested a modification or variation to pre-existing Rescue

Heroes figures.  *Id*. ¶¶ 17-18.  Plaintiffs' first submission in late 1998 (the "1998 Submission")

showed an existing Rescue Heroes firefighter character with a backpack (like all previous Rescue

- 9 -

Heroes).[3]  The feature that plaintiffs themselves identified as novel with respect to their 1998

Submission was the fact that the backpack contained a battery operated film reel which could be

viewed by a child placing one eye up to a magnifying lens and looking into the interior of the

backpack.[4]  Fisher-Price rejected plaintiffs' 1998 Submission as being too expensive and as lacking

sufficient play value.  A copy of the March 23, 1999 rejection letter is attached as Exhibit G.

      21.     Plaintiffs re-submitted their concept in May 1999 (the "1999 Submission").

SAC ¶ 23.  The cover letter and drawings comprising the 1999 Submission are attached as Exhibit

H.  That submission reflected a Rescue Heroes firefighter figure with a backpack-shaped viewer.

The backpack included a tinted housing containing a drum with approximately twenty still action

frames showing Rescue Heroes in action.  These frames could be viewed only by placing one eye

up to a magnifying lens and looking inside the backpack.  The frames were advances sequentially

by means of a hand crank.  Fisher-Price also rejected this submission.  SAC ¶ 23.

      22.     Plaintiffs submitted their concept for a third time in December 2000 (the

"2000 Submission") showing an action figure with a backpack, holding a digital camera device in

its left hand, each containing a Viewmaster-style film disc[5] about two inches in diameter with six or

---

[3]      Photos of the prototype of the firefighter figure with the film cassette in his backpack, which plaintiffs included with their 1998 Submission, are attached as Exhibit E.  The cover letter and drawings included with the 1999 Submission are attached as Exhibit F.  The Concept Submission Form attached as Exhibit C was also submitted as part of the 1998 Submission.

[4]      *See* Exhibit C (Concept Submission Form).

[5]      "Viewmaster" is a hand-held viewing device for film discs that has been sold for decades.  The discs were traditionally made out of cardboard and contained approximately 14 transparent film images.  The images were viewed by looking through a magnifying lens to see the film image which was illuminated by ambient light.

- 10 -

more images.  The images were located inside the backpack or digital camera and could be viewed

only by placing one eye up to a magnifying lens and looking into the interior of the backpack or into

the digital camera.  The images were advanced sequentially by pushing a lever.  SAC ¶ 24.  The

cover letter and drawings comprising the 2000 Submission are attached as Exhibit I.  Fisher-Price's

January 5, 2001 letter rejecting the 2000 Submission is attached as Exhibit J.

**Fisher-Price Never Used Plaintiffs' Submissions**

23.     I have reviewed Fisher-Price's Rescue Heroes figures as presented in its

catalogs and on its website.  I have reviewed physical samples of the specific Rescue Heroes

figures, vehicles, and playsets identified in the Second Amended Complaint as allegedly

misappropriating plaintiffs' Reel Heroes concept.

24.     Based on that review, it is clear that Fisher-Price never used the design

features or concepts reflected in any of the three submissions submitted by plaintiffs.

a.     Fisher-Price never made or sold a Rescue Heroes figure with the

principal design features of plaintiffs' 1998 Submission:  a film reel inside a backpack which could

be viewed only by placing an eye up to a magnifying lens (or with any film at all).  Fisher-Price

never used the feature (the film reel) that plaintiffs identified (in conjunction with an action figure)

- 11 -

as the "unique aspect" of their concept and which they considered so central to their concept that they named their concept after it (**"Reel"** Heroes).

        b.     Fisher-Price never made or sold a Rescue Heroes figure with the principal design features of plaintiffs' 1999 Submission:  a backpack containing a drum with still frames, which could be viewed only by placing an eye up to a magnifying lens to look inside the backpack.

        c.     Fisher-Price never made or sold a Rescue Heroes figure with the principal design features of plaintiffs' 2000 Submission:  a backpack, digital camera, or other device into which Viewmaster-style film discs could be inserted for viewing.

        25.     Moreover, none of the vehicles (*i.e.*, the Voice Tech Jet, Police Cruiser and Firetruck, and the Mission Select Police Cruiser and Firetruck) utilize a film reel, a drum with still frames, or a Viewmaster-style film disc viewed through a magnifying lens or viewer.  *See* Exhibit K (catalog pages reflecting Voice Tech and Mission Select Vehicles).  Finally, the Fisher-Price playsets identified in the Second Amended Complaint (at ¶¶ 35-36) — the Aquatic Rescue Command Center (the "ARCC") and the Mountain Action Command Center (the "MACC") — do not utilize a film reel, a drum with still frames or a Viewmaster-style film disc viewed through a magnifying lens or viewer.  *See* Exhibit L (catalog pages reflecting ARCC and MACC).

- 12 -

**Fisher-Price Never Made a Product Satisfying Plaintiffs'**
**Definitions of the Reel Heroes Concept in the Concept**
**Submission Form, the Option Agreement, or Their Complaint**

      26.    In the Concept Submission Form submitted to Fisher-Price with respect to the

Reel Heroes concept, plaintiffs defined the "unique feature(s)" of their concept as follows:

> Batt[ery] op[erated] film strip units for each Rescue Hero & dedicated
> 'TV' and adventure photog[rapher]/reporter.  Can be expande[d] to
> include TV projection truck.  Hand held camera has shutter opened by
> child and look-in viewer.[6]

The Concept Submission Form containing this definition of the Reel Heroes concept was signed by

plaintiff Victor Reiling and was countersigned by Paul Snyder, Fisher-Price's Vice President of

Research and Development Services on October 29, 1998.

      27.    The Option Agreement between plaintiffs and Fisher-Price defined the Reel

Heroes concept in language that tracks the Concept Submission Form:

> Submitted concept extends cartoons to action figure's play pattern.
> ***The concept is a battery operated film reel that is activated when the
> child pushes a button on the backpack of the action figure.***  The
> child may then look through the viewer on the backpack to see the
> film.  The concept may include a hand held 'camera' with shutter that
> is operated by the child.  The concept may be incorporated into the
> assorted Fisher-Price Rescue Heroes action figures.  ***The unique
> aspect of the concept is the combination of existing action figures
> with film for play pattern.***[7]

---

[6]     *See* Exhibit C.

[7]     *See* Exhibit D (at Exhibit A) (emphasis added).

- 13 -

28.     In paragraph 30(A) of their original complaint, plaintiffs define the Reel

Heroes concept as follows:

> Plaintiffs' basic concept was to integrate Fisher-Price's
> successful "Rescue Heroes" figures and cartoon-like images
> by using a removable backpack that could be made for a
> specific character.  It was designed to mount to each "Rescue
> Heroes" figure and show animated images of that character in
> action.  For example, a firefighter would be shown putting out
> a fire or rescuing a child from a building.  The animated
> images enrich the role-playing that a child often enjoys when
> using toy action figures.  ***The backpack is a battery-operated
> filmstrip/disc player with a viewer.***  By looking through the
> small viewer and pressing a button, the child could see the
> "countless Rescue Hero adventures."[8]

Plaintiffs' definition of the Reel Heroes concept in paragraph 30(A) of their complaint is, in

substance, the same as the definitions in the Concept Submission Form and the Option Agreement.

29.     My review of Fisher-Price's products makes clear that it never made or sold a

product meeting the descriptions of the Reel Heroes concept set forth in Victor Reiling's

handwriting in the Concept Submission Form, the Option Agreement, or paragraph 30(A) of the

complaint.  Fisher-Price has never made or sold a Rescue Heroes product with a film strip unit or

film reel, either inside a Rescue Hero figure's backpack or otherwise associated with the Rescue

Heroes line of products.

---

[8]     January 31, 2003 Complaint ¶ 30(A) (emphasis added).  This same definition appears at paragraph 30(A) of
the Second Amended Complaint.

- 14 -

**Plaintiffs' Definition of the Reel Heroes**
**Concept Is Too Abstract and General**

30.    Plaintiffs' current definition of the Reel Heroes concept is set forth in the

January 2005 expert report of James Kipling:

> A device associated with a Rescue Heroes figure (for example, part of
> a backpack), for visually communicating to the mind of a child a cue
> or prompt for role-playing in which the child would use the Rescue
> Heroes figure and imagine accomplishing a mission assignment,
> resolving a dangerous situation, performing a rescue, or engaging in
> some other adventurous pretend scenario.[9]

31.    This definition is so general and abstract that it would never be accepted for

review by any toy company.  In dealing with outside inventors, toy companies look for specific

product ideas or mechanisms that operate in a new way or accomplish a new function.  Typically,

they will not consider "themes" or generalized concepts.  The general feeling at toy companies is:

anyone can propose a theme or general concept with little or no effort; show us what it is you want

us to *make* and *sell*.

32.    Plaintiffs' definition of the Reel Heroes concept does not describe a product

or products that a toy company could make and sell.  It is so broad and generalized that it would not

be recognized even as a submission and would not be accepted for review.

---

[9]    Lane Dec., Exhibit 26 ¶ 11.

- 15 -

33.    An analysis of their definition makes this clear.  It includes at least five undefined abstract elements.

(a)    A ***"device."***  The nature of the "device" is entirely undefined.  Apparently, it could include almost anything:  a film viewer, a lenticular lens, a hologram, a playset, a toy vehicle, a camera, a computer screen, a viewmaster, a card with an icon, a wheel or a disk, etc.

(b)    The identified function of the device is ***"for visually communicating to the mind of a child a cue or prompt for role-playing."***  This does not define or limit the device at all, except that it apparently must have a "visual" aspect that assists the child in role-play with the figures.  Anything that can be seen and which relates to the figure's character would fit within this definition.  Nothing in this definition provides any limitation on the form of the ***"device."***  For example, a toy gun in the policeman figure's hand, an ax in the fireman figure's hand, or a hammer in the construction worker's hand would all satisfy this definition.

(c)    ***"Cue or prompt for role-playing"*** is entirely undefined.

(d)    The device must be ***"associated with a Rescue Heroes figure."***  This vague and generalized language expands plaintiffs' claims to products other than the Rescue Heroes figures themselves.  For example, plaintiffs and their expert have testified that playsets (*i.e.,* the Aquatic Rescue Command Center and the Mission Action Center) are "device[s] ***associated with*** a Rescue Heroes figure" and that the Mission Select Police Cruiser and Firetruck also fall within this definition.[10]  Accordingly, the "device" for "visually communicating . . . a cue or prompt for role-playing" need not be physically connected to an action figure.  It can be located on ***anything*** that might be used with an action figure.  Thus, plaintiffs' definition of the Reel Heroes concept does not even describe a particular ***product***.

---

[10]    Plaintiffs have also stated in sworn interrogatory answers that the Reel Heroes concept "covers" the Rescue Heroes playsets and vehicles.  Lane Dec., Exhibit 21 at page 3 (January 20, 2005 interrogatory answers) & Exhibit 38 at pages 4, 6 & 9 (February 11, 2005 interrogatory answers).

- 16 -

(e)    Finally, although the definition advocated by plaintiffs' expert appears to limit their concept to ***Rescue Heroes*** figures, both plaintiffs and their expert have testified that it is not so limited and includes devices associated with ***any*** action figure.[11]

**The Reel Heroes**
**Concept Lacks Novelty**

34.    As stated above, the most recent definition of the Reel Heroes concept offered by plaintiffs is:

> A device associated with a Rescue Heroes figure (for example, part of a backpack), for visually communicating to the mind of a child a cue or prompt for role-playing in which the child would use the Rescue Heroes figure and imagine accomplishing a mission assignment, resolving a dangerous situation, performing a rescue, or engaging in some other adventurous pretend scenario.[12]

35.    As discussed above, plaintiffs have made clear that their concept:  (1) is not limited to visual cues or images on or in a Rescue Hero's backpack; it includes Rescue Hero figures with visual cues or images on devices held in the figure's hand, on its chest, etc.; (2) is not limited to visual cues or images on a Rescue Hero figure; it includes other action figures, such as Spiderman, Captain America, etc.; and (3) is not even limited to visual cues or images on an action figure; it includes playsets and toy vehicles with visual cues or images.

36.    In essence, as defined by Kipling and plaintiffs, the Reel Heroes concept includes the use of ***any visual images*** that would prompt a child to use an action figure "to imagine

---

[11]    Lane Dec., Exhibit 7 at 171; Exhibit 6 at 7-8; Exhibit 9 at 24.

[12]    Lane Dec., Exhibit 26 ¶ 11.

accomplishing a mission assignment, resolving a dangerous situation, performing a rescue, or engaging in some other adventurous pretend scenario."  Not surprisingly, there is a vast body of prior art that satisfies this broad, generalized definition, which anticipates plaintiffs' Reel Heroes concept, and which renders the concept non-novel.  Six pieces of such prior art are discussed below.

37.    **Toy Biz Projector figures.**  In 1993, Toy Biz introduced a line of superhero (*e.g.,* Spiderman, Wolverine, etc.) action figures known as "Projectors."[13]  Each figure came with three Viewmaster-style film disks, each including 12 images.  The disks were inserted into a projector device in the figure's chest.  When activated, the device would project images from the disk through a lens in the figure's chest onto a nearby surface.  Each of the images showed the particular action figure in action, on an adventure, performing a mission, etc.  Thus, the Toy Biz Projector figures satisfy plaintiffs' definition of their Reel Heroes concept:  they contain "a device [*i.e.,* the projector device] associated with [an action] figure . . . for visually communicating to the mind of the child a cue or prompt for role-playing in which the child will use the [action] figure and imagine accomplishing a mission assignment, resolving a dangerous situation . . . or engaging in some other adventurous pretend scenario."

38.    **The "Image Projective Toy" patent.**  In August 1996, the United States Patent Office issued Patent No. 5,545,072, entitled "Image Projective Toy" (the "'072 patent").  The

---

[13]        Photos of a Wolverine Projector figure and packaging are attached as Exhibit M.  A sample of a Wolverine Projector figure is submitted to the Court as Exhibit N.

- 18 -

'072 Patent describes and covers the Toy Biz Projector figures.[14]  In addition to projecting an image

of the character in action or on an adventure, the '072 patent discloses an alternative embodiment of

the invention under which the child looks  through the lens on the action figure's chest to view the

images within.  *See* Exhibit O at column 3, lines 56-58.  ("Alternatively, the images may be viewed

internally by placing the lens directly in front of the eye").

39.    Thus, in 1996, the '072 patent disclosed to the public "a device [*i.e.,* the

device for viewing images on a Viewmaster disk] associated with [an action] figure . . . for visually

communicating to the mind of a child a cue or prompt for role-playing in which the child will use

the [action] figure and imagine accomplishing a mission assignment, resolving a dangerous

situation . . . or engaging in some other adventurous pretend scenario."

40.    **Secret Wars figures.**  "Secret Wars" was a line of action figures sold by

Mattel beginning in 1984.  The line included both superheroes and villains, each of which came

with a shield that the action figure held in its hand.  The shield contained a lenticular lens with

images showing the action figure in action.  The figures came with eight different  pieces of

lenticular artwork that could be placed in the shield showing different adventures.  For example, one

of the Captain America lenticular images shows Captain America swinging down to carry a boy out

of the path of an oncoming train.[15]

---

[14]    A copy of the '072 patent is attached as Exhibit O.

[15]    Photos of the Captain America Secret Wars figure and packaging are attached as Exhibit P.  A sample of the
Captain America Secret Wars figure is submitted to the Court as Exhibit Q.

- 19 -

This line of action figures satisfies the definition of the Reel Heroes concept advocated by Kipling and plaintiffs. The lenticular shield in each action figure's hand is clearly "a device associated with [an action] figure . . . for visually communicating to the mind of a child a cue or prompt for role-playing in which the child will use the [action] figure and imagine accomplishing a mission assignment, resolving a dangerous situation," etc.

41.    **Fortress of Solitude playset.** The Fortress of Solitude was a 1976 play set sold to the public by Mego Corporation for use with superhero (Superman, Batman, Wonder Woman, etc.) action figures. The playset includes multiple pieces of artwork showing the characters in action, engaged in adventures.[16] The playset is "[a] device associated with [an action] figure . . . for visually communicating to the mind of a child a cue or prompt for role-playing in which the child would use the [action] figure and imagine accomplishing a mission assignment, resolving a dangerous situation . . . or engaging in some other adventurous pretend scenario."

42.    Indeed, the images on the Fortress of Solitude playset show action figures engaged in missions or assignments, while the images on the Rescue Heroes ARCC and MAC playsets simply show images of disasters, without depicting an action figure responding to those disasters. If anything, the Fortress of Solitude playset more closely tracks plaintiffs' current definition of the Reel Heroes concept than the Fisher-Price playsets.

---

[16]    Photos of the Fortress of Solitude playset, showing the artwork, are attached as Exhibit R.

- 20 -

43.     **The Hall of Justice playset.**  This is a 1976 Mego playset intended for use with Batman, Superman, Aqua Man, etc. action figures.  It includes artwork showing Super Girl fighting a meteor storm, the Green Lantern and the Green Arrow fighting invading aliens, Wonder Woman fighting a dragon, and Superman responding to a collapsing bridge.  It also includes a feature that allows the action figure to be "translocated" to the scene of a disaster or crime, by placing the selected action figure within a screen showing an image of the particular disaster or crime.[17]

44.     The Hall of Justice playset is clearly "[a] device associated with [an action] figure . . . for visually communicating to the mind of a child a cue or prompt for role-playing in which the child would use the [action] figure and imagine accomplishing a mission assignment, resolving a dangerous situation," etc.  This 1976 playset clearly anticipated plaintiffs' Reel Heroes concept and renders it non-novel.

45.     <u>**The Mobile Bat Lab.**</u>  In 1976, Mego sold a vehicle for use with Batman and Robin action figures.  The vehicle included a flip-up "sun roof" containing an image of Batman fighting the Joker.[18]  This vehicle, and its sun roof with an image of Batman in action, satisfies plaintiffs' definition of the Reel Heroes concept as "[a] device associated with [an action] figure . . . for visually communicating to the mind of a child a cue or prompt for role-playing in which the

---

[17]     This feature was referred to as the "translocation chamber."  Photos showing the Hall of Justice playset and its artwork and translocation chamber are attached as Exhibit S.

[18]     A photo of the Mobile Bat Lab is attached as Exhibit T.

- 21 -

child would use the [action] figure and imagine accomplishing a mission assignment, resolving a

dangerous situation . . . or engaging in some other adventurous pretend scenario."

**The Secondary Concept in Plaintiffs' Submissions**

46.    Plaintiffs claim that their submissions (at least the 1998 and 2000

Submissions) also included a second, independent concept — a TV cameraman figure holding a TV

camera.  SAC ¶¶ 18, 24.[19]  The camera was designed with a window on top, through which the

child could look to see out of the camera lens — giving the impression that he was viewing what the

cameraman was "filming."

47.    This element of plaintiffs' concept was not novel in late 1998.  Indeed,

Fisher-Price had itself sold a TV cameraman action figure as early as the 1970s.  That figure also

came with a TV camera that the child could look through to see what the cameraman was "filming."

It was functionally the same as the camera mechanism plaintiffs describe as part of the Reel Heroes

concept.  A copy of a 1978 Fisher-Price catalog reflecting that figure is attached as Exhibit V.

Dated:    April 28, 2005

                                                    S/Howard Bollinger
                                                    Howard Bollinger

03279/0136 BFLODOCS 1226659v1

---

[19]    The 1999 Submission made no reference to this figure.