**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

VICTOR G. REILING ASSOCIATES and          :
DESIGN INNOVATION, INC.,                   :
                                           :
                    Plaintiffs             :
                                           :          Civil No. 303CV222(JBA)
          v.                               :
                                           :          May 2, 2005
FISHER-PRICE, INC.                         :
                                           :
                    Defendant.             :
                                           :

**MEMORANDUM IN SUPPORT OF**
**<u>FISHER-PRICE'S MOTION FOR SUMMARY JUDGMENT</u>**

**HODGSON RUSS LLP**                       **ROBINSON & COLE, LLP**
One M&T Plaza, Suite 2000                  280 Trumbull Street
Buffalo, New York  14203-                  Hartford, CT  06103-3597

## Table of Contents

**Page**

Table of Authorities ............................................................................................iv - vii

Preliminary Statement ..................................................................................................1

Statement of Facts .......................................................................................................2

    Fisher-Price's Design of Toys and Review of Outside Inventor Submissions ...................2

    Plaintiffs ...................................................................................................................3

    The Rescue Heroes Action Figures ............................................................................4

    Plaintiffs' Submissions .............................................................................................5

    The Fisher-Price Products at Issue ...........................................................................8

    Plaintiffs' Ever-Changing Definition of the Reel Heroes Concept ...............................12

    Design Innovation Work for Fisher-Price ....................................................................16

Argument ....................................................................................................................17

    I.     PLAINTIFFS' CLAIM FOR BREACH OF IMPLIED
           CONTRACT IS PRECLUDED AS A MATTER OF LAW .................................17

           A.     Fisher-Price's Policy and Agreement Negates Plaintiffs'
                  Implied Contract Claim..............................................................................17

           B.     Where an Express Agreement Covers the Subject
                  Matter of a Party's Implied Contract Claim, That
                  Claim is Precluded as a Matter of Law .......................................................18

           C.     Plaintiffs' Alleged Implied Contract Fails for Lack
                  of Definiteness ..........................................................................................20

           D.     Plaintiffs' Implied Contract Claim Is Barred by the
                  Statute of Frauds ......................................................................................21

           II.    PLAINTIFFS' MISAPPROPRIATION CLAIM IS BARRED
             BY THE ABSENCE OF A CONFIDENTIAL RELATIONSHIP .......................23

**Table of Contents**
**(continued)**

**Page**

III.    FISHER-PRICE NEVER USED THE REEL HEROES CONCEPT ...................25

    A.    Plaintiffs Admit That Fisher-Price Never Made a Product
        Satisfying Their Definitions of the Reel Heroes Concept in
        the Concept Submission Form, the Option Agreement, or
        the Complaint ............................................................................26

    B.    Plaintiffs Are Bound by Their Definition of the Reel Heroes
        Concept in the Option Agreement ............................................28

IV.    PLAINTIFFS' DEFINITION OF THE REEL HEROES CONCEPT
    LACKS CONCRETENESS....................................................................29

    A.    Only Concrete Ideas Are Protected...........................................30

    B.    Plaintiffs' Definition of the Reel Heroes Concept
        Lacks Concreteness...................................................................31

V.    THE REEL HEROES CONCEPT WAS NOT ABSOLUTELY NOVEL ............33

    A.    The "Absolute Novelty" Standard Applies to All
        of Plaintiffs' Claims.................................................................35

    B.    The Reel Heroes Concept Lacks Absolute Novelty ...................37

    C.    A Mere Combination of Known Elements Is Non-Novel .........43

    D.    The Concept of a Cameraman Figure Was Not Novel ..............45

VI.    THE REEL HEROES CONCEPT WAS NOT NOVEL TO
    FISHER-PRICE ...................................................................................45

VII.    PLAINTIFFS HAVE DISCLAIMED ALL CLAIMS ALLEGED
    IN THEIR COMPLAINT .....................................................................46

VIII.    PLAINTIFFS HAVE NO CLAIM TO COMPENSATION ON LINE
    EXTENSIONS, ACCESSORIES, OR RELATED PRODUCTS..........................48

ii

**Table of Contents**
(continued)

**Page**

IX.    FISHER-PRICE'S DISCONTINUATION OF ITS RELATIONSHIP
WITH DESIGN INNOVATION IS NOT A TORT ...............................................49

X.    BECAUSE NEW YORK LAW APPLIES TO THIS CASE,
PLAINTIFFS' CUTPA CLAIM MUST BE DISMISSED...................................50

XI.    PLAINTIFFS' PUNITIVE DAMAGES CLAIM MUST
BE DISMISSED ...............................................................................................52

Conclusion ...........................................................................................................................52

**Table of Authorities**
**(Continued)**

Page

**Federal Cases**

*AEB & Assocs. Design Group, Inc. v. Tonka Corp.*, 853 F. Supp. 724
(S.D.N.Y. 1994) ................................................................................................ passim

*Ahlert v. Hasbro, Inc.*, 325 F. Supp. 509 (D.N.J. 2004) ................................................ 28, 52

*Baer v. Chase*, 392 F.3d 609 (3d Cir. 2005) ........................................................................ 20, 21

*Ball v. Hershey Foods Corp.*, 842 F. Supp. 44, 47 (D. Conn.),
*aff'd*, 14 F.3d 591 (2d Cir. 1993) ........................................................ 23, 25, 26, 30

*Bergin v. Century 21 Real Estate Corp.*, 234 F.3d 1261, 2000 U.S. App.
LEXIS 28028 (2d Cir. Nov. 8, 2000) ...................................................................... 21

*Bianco v. Erkins*, 243 F.3d 599 (2d Cir. 2001) .................................................................... 50

*Brandwynne v. Combe Int'l, Ltd.*, 74 F. Supp. 2d 364 (S.D.N.Y. 1999) ............................. passim

*Diversified Group, Inc. v. Daugerdas*, 139 F. Supp. 2d 445 (S.D.N.Y. 2001) ...................... 21, 22

*Ed Kaplan Assoc. v. Fisher-Price*, 17 U.S.P.Q. 2d 1877 (S.D.N.Y. 1990) ................................. 44

*Granoff v. Merrill Lynch & Co.*, 775 F. Supp. 621 (S.D.N.Y. 1991) ............................... 26, 34, 36

*Hogan v. D.C. Comics*, 48 F. Supp. 2d 298 (S.D.N.Y. 1999) ....................................................... 43

*Kavanau v. Courtroom Television Network*, 23 U.S.P.Q. 2d 1938
(S.D.N.Y. 1992) .............................................................................................. 34, 44

*Kearns v. Ford Motor Co.*, 203 U.S.P.Q. 884 (E.D. Mich. 1978) .......................................... 24, 47

*Khreativity Unlimited v. Mattel*, 101 F. Supp. 2d 177 (S.D.N.Y.),
*aff'd*, 242 F.3d 366 (2d Cir. 2000) ................................................ 26, 34, 36, 44

*Koret, Inc. v. RJR Nabisco, Inc.*, 702 F. Supp. 412 (S.D.N.Y. 1988),
*aff'd¸* 875 F.2d 307 (2d Cir. 1989) ...................................................................... 22, 34

iv

**Table of Authorities**
**(Continued)**

**Page**

*Kublan v. Hasbro*, 50 U.S.P.Q. 2d 1539 (S.D.N.Y. 1999) .................................................... 24, 34

*Link Group v. Toymax, Inc.*, 2000 U.S. Dist. LEXIS 4567
    (D. Conn. Mar. 17, 2000)........................................................................... passim

*London v. Carson Pirie Scott & Co.*, 946 F.2d 1534 (Fed. Cir. 1991) ......................................... 29

*M.H. Segan Ltd. P'ship v. Hasbro, Inc.*, 924 F. Supp. 512 (S.D.N.Y. 1996) ....................... passim

*Markogianis v. Burger King Corp.*, 42 U.S.P.Q. 2d 1862 (S.D.N.Y. 1997) ............................... 30

*McGhan v. Ebersol*, 608 F. Supp. 277 (S.D.N.Y. 1985) ....................................................... passim

*MM Global Servs. v. Dow Chem. Co.*, 283 F. Supp. 2d 689 ................................................. 50, 51

*Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368 (2d Cir. 2000) .................. 23, 25, 33

*O'Brien v. RKO Radio Pictures, Inc.*, 68 F. Supp. 13 (S.D.N.Y. 1946) ...................................... 30

*Otis Elevator Co. v. Civil Factory Mut. Ins. Co.*, 353 F. Supp. 2d 274
    (D. Conn. 2005) .................................................................................................... 50, 51

*Ring v. Estee Lauder*, 702 F. Supp. 76, 77 (S.D.N.Y. 1988),
    *aff'd*, 874 F. 109 (2d Cir. 1989) ................................................................... 34, 44

*Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989)....................................................................... 50

*Sir Speedy, Inc. v. L&P Graphics, Inc.*, 957 F.2d 1033 (2d Cir. 1992)....................................... 52

*Telechron, Inc. v. Parissi*, 120 F. Supp. 235 (N.D.N.Y. 1954),
    *aff'd*, 229 F.2d 440 (2d Cir. 1956) ............................................................................... 24

*United States Fid. & Guar. Co. v. S.B. Phillips Co., Inc.*, 359 F. Supp. 2d 189
    (D. Conn. 2005) .......................................................................................................... 50

*Wanberg v. Ocean Spray Cranberries, Inc.*, 194 U.S.P.Q. 350 (N.D. Ill. 1977) ........................ 47

*Women Golfer, Inc. v. Meredith Corp.*, 792 F. Supp. 211 (S.D.N.Y. 1992) .......................... 26, 34

v

**Table of Authorities**
**(Continued)**

**Page**

**State Cases**

*Morsette v. "The Final Call,"* 309 A.D.2d 249, 254, 764 N.Y.S.2d 416
(1st Dep't 2003)................................................................................................................. 52

*Apfel v. Prudential-Bache Sec., Inc.*, 81 N.Y.2d 470, 600 N.Y.S.2d 433 (1993)......................... 30

*Downey v. General Foods Corp.*, 31 N.Y.2d 56, 334 N.Y.S.2d 874 (1972)......................... 23, 35

*Ed Graham Prods., Inc. v. National Broad. Co.*, 75 Misc. 2d 334, 347 N.Y.S.2d 766
(S. Ct. N.Y. Co. 1973) ......................................................................................... 26, 34, 35

*Educational Sales Programs, Inc. v. Dreyfus Corp.*, 65 Misc. 2d 412, 317 N.Y.S.2d 840
(S. Ct. N.Y. Co. 1970) .................................................................................................. passim

*Eenkhoorn v. N.Y. Tel. Co.*, 148 Misc. 2d 999, 568 N.Y.S.2d 677 (1st Dep't 1990)................... 35

*Evans v. Stranger*, 307 A.D.2d 439, 762 N.Y.S.2d 678, (3d Dep't 2003) ................................... 52

*Ferber v. Sterndent*, 51 N.Y.2d 782, 433 N.Y.S.2d 85 (1980)......................................... 34, 36, 40

*Futter v. Paramount Pictures, Inc.*, 69 N.Y.S.2d 438 (S. Ct. N.Y. Co. 1947) ........................... 44

*Julien J. Studley, Inc. v. N.Y. News, Inc.*, 70 N.Y.2d 628, 518 N.Y.S.2d 779 (1987) ................. 18

*Kantor v. Watson*, 167 A.D.2d 297, 562 N.Y.S.2d 39, 40 (1st Dep't 1990)................................ 22

*Level Export Corp. v. Wolz, Aiken & Co.*, 305 N.Y. 82 (1953)................................................... 28

*Marraccini v. Bertelsmann Music Group, Inc.*, 221 A.D.2d 95, 644 N.Y.S.2d 875
(3d Dep't 1996) ......................................................................................................... 21

*Metzger v. Aetna Ins. Co.*, 227 N.Y. 411 (1920) ..................................................................... 28

*Oasis Music, Inc. v. 900 U.S.A., Inc.*, 161 Misc. 2d 627, 614 N.Y.S.2d 878
(N.Y. Co. 1994) ...................................................................................................... passim

**Table of Authorities**
**(Continued)**

**Page**

*Paul v. Haley*, 183 A.D.2d 44, 588 N.Y.S.2d 897 (2d Dep't 1992)............................ 33, 34, 35, 44

*Renee Knitwear Corp. v. ADT Sec. Sys.*, 277 A.D.2d 215, 715 N.Y.S.2d 341
    (2d Dep't 2000) ................................................................................................................ 28

*Robert Plan Corp. v. Perot Sys. Corp.*, 278 A.D.2d 119, 718 N.Y.S.2d 50
    (1st Dep't 2000)................................................................................................................. 52

*Turner Construction Co. v. Seaboard Sur. Co.*, 98 A.D.2d 88, 469 N.Y.S.2d 725
    (1st Dep't 1983).................................................................................................................. 49

*WFB Telecomms., Inc. v. NYNEX Corp.*, 188 A.D.2d 257, 590 N.Y.S.2d 460
    (1st Dep't 1992).................................................................................................................. 50

**<u>Preliminary Statement</u>**

This action arises out of claims by plaintiffs Victor G. Reiling Associates and Design Innovation, Inc. that Fisher-Price, Inc. misappropriated their design for an action figure containing a mechanism for viewing a film strip depicting images of Rescue Heroes characters. Fisher-Price submits this memorandum in support of its motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing plaintiffs' first cause of action for implied contract, as well as plaintiffs' three causes of action alleging tort-based theories of misappropriation.

There are nine independent grounds that require dismissal of all or some of plaintiffs' claims in this action:

(1)    Plaintiffs' implied contract claim is barred:  (a) by the contractual agreement of the parties which clearly, explicitly, and unequivocally disclaims any implied obligations; (b) by the existence of an express agreement governing the same subject matter; (c) because it is indefinite; and (d) by the statute of frauds.

(2)    Plaintiffs' tort-based misappropriation of idea claims are barred because plaintiffs cannot show that they submitted their idea to Fisher-Price on a confidential basis.

(3)    The accused Fisher-Price products are all materially different from plaintiffs' submission and do not use the features or ideas plaintiffs submitted.

(4)    An idea must be specific and "concrete" to support a contract or tort-based misappropriation claim.  Plaintiffs' definition of their concept is generalized and abstract and fails to satisfy the concreteness requirement.

(5)    An idea must be "novel" to support a contract or tort-based misappropriation claim.  Plaintiffs' idea was well-known in the public domain and does not satisfy the novelty requirement.

(6)     Plaintiffs have asserted claims against Fisher-Price products which they acknowledge do not embody their idea.  Plaintiffs have no right under any contract or tort-based theory to compensation with respect to such products.

(7)     Plaintiffs have asserted a misappropriation claim under the Connecticut Unfair Trade Practices Act ("CUTPA").  Because the transactions at issue and the alleged wrongful conduct took place solely in New York, neither the law of Connecticut nor CUTPA applies to this action.

(8)     Plaintiff Design Innovation has charged Fisher-Price with unfair competition and unfair trade practices based on its decision to cease doing business with Design Innovation.  Because Fisher-Price had the absolute right to determine whether to continue doing business with Design Innovation, this claim is without legal basis and must be dismissed.

(9)     Plaintiffs have asserted a claim for punitive damages in this action. Because they cannot allege facts sufficient to support a punitive damages claim under either New York or Connecticut law, this claim must be dismissed.

## **Statement of Facts**

### **Fisher-Price's Design of Toys and Review of Outside Inventor Submissions**

Fisher-Price is engaged in the business of designing, marketing, and selling toys and juvenile products, including action figures.  Fisher-Price employs internal designers and engineers who are responsible for the design and engineering of the vast majority of its products. In addition to designing products internally, Fisher-Price also receives product submissions on an unsolicited basis from certain outside independent inventors.[1]  It reviews approximately 2,000

---

[1]     *See* Declaration of Stan Clutton, dated April 27, 2005 (the "Clutton Dec.") ¶ 3.

such submissions annually.  Clutton Dec. ¶ 3.  Fisher-Price accepts product submissions only from pre-approved independent inventors.  In the years leading up to 1998 and thereafter, Fisher-Price required all inventors making submissions to execute its "Policy and Agreement concerning Ideas Submitted by Persons Outside of Fisher-Price, Inc." which set forth the terms on which submissions were accepted for review.  This included terms providing that Fisher-Price would not treat submissions as confidential and which disclaimed any implied obligations to inventors.[2]

Because of the volume of submissions, it is important that Fisher-Price have a record of what each inventor showed it.  To document submissions, Fisher-Price asked the inventor to complete a "Concept Submission Form," which requested that the inventor "[p]lease help us to distinguish your concepts ***by fully describing each and indicating its unique features.***"[3]  The Concept Submission Form also included a designated space for the inventor to identify the ***"Description and Unique Feature(s)/Technology,"*** where the inventor was instructed:  "The description of ***the submitted ideas and/or technology incorporated must be carefully defined*** in the description/unique feature(s) area below."

**<u>Plaintiffs</u>**

Victor Reiling, principal of Victor G. Reiling Associates, is a self-proclaimed "toy industry veteran"[4] who was employed at Fisher-Price from 1970 through 1974 as a design group manager.  He was also employed by Milton Bradley, where he was responsible for reviewing inventor submissions.  Lane Dec., Ex. 4 at 18-21.

---

[2]    Clutton Dec. ¶ 3.  A copy of the Policy and Agreement at issue in this case is attached as Exhibit 20 to the April 29, 2005 declaration of Robert J. Lane, Jr. (the "Lane Dec.").

[3]    Clutton Dec. ¶ 4.  A copy of the Concept Submission Form at issue in this case is attached as Exhibit 24 to the Lane declaration.

[4]    Second Amended Complaint, Docket No. 85 ("SAC") ¶ 12.

Reiling began working as an inventor in 1977.  He has licensed products to more than thirty-five toy companies (some of which licensed more than one product from him) and has obtained more than twenty patents.[5]  From 1986 through May 2001, Reiling had approximately 50 meetings with Fisher-Price.  Each of these meetings was governed by a Fisher-Price Policy and Agreement, signed by Reiling and acknowledging that his submissions were not made on a confidential basis and that Fisher-Price assumed no implied obligation as a result of any disclosure.[6]

Design Innovation is an independent design group which has in the past provided modeling and design services to Fisher-Price on a work-for-hire basis.  Clutton Dec. ¶ 13. Design Innovation's work-for-hire projects for Fisher-Price included work on the Rescue Heroes line and, more specifically, work on the Optic Force figures at issue in this case.  Lane Dec., Ex. 8 at 35-56.

**The Rescue Heroes Action Figures**

In the late 1990s, internal designers at Fisher-Price, including Ken Morton, Tyler Berkheiser, and Peter Pook, developed a line of action figures that were attractive both to preschoolers and their parents.  These figures, which were developed by the Fisher-Price "Boys Team,"[7] were eventually marketed and sold under the name "Rescue Heroes."  The Rescue Heroes are a team of characters with specific rescue-related identities such as Billy Blazes (firefighter), Jake Justice (police officer), Gil Gripper (scuba diver), etc.  Rescue Heroes figures were first sold to the public in December 1997.  Berkheiser Dec. ¶¶ 3, 5, 6.

---

[5]    Lane Dec., Ex. 4 at 12, 24-25, 53, 93-94.

[6]    Lane Dec. ¶¶ 7-8, Exs. 16 & 17.

[7]    The "Boys Team" is responsible for developing toys and related products for boys aged 3 to 6.  *See* Declaration of Tyler Berkheiser, dated April 27, 2005 (the "Berkheiser Dec.") ¶ 3.

The first Rescue Heroes were known as "basic" figures. They did not have any speech or sound effect capability. The basic figures have continued since the inception of Rescue Heroes, and many different sub-lines have been introduced over the last six years. Berkheiser Dec. ¶¶ 7-8.

Shortly after the introduction of the Rescue Heroes figures, the Boys Team designers began pursuing the goal of bringing communication and interactivity to the figures in the form of a "premium" line of Rescue Heroes. Berkheiser Dec. ¶ 10. The accused Rescue Heroes figures at issue in this case represent the continuing effort of the Boys Team to achieve increased communication and interactivity between the figures.

**Plaintiffs' Submissions**

1.     **The 1998 Submission.**  Approximately a year after the successful introduction of Rescue Heroes, plaintiffs made the first submission at issue in this case. In October 1998, Reiling, acting on behalf of himself and Design Innovation, met with Paul Snyder, Fisher-Price's inventor relations representative, to present the "Reel Heroes concept" that is the subject of this action.[8] Plaintiffs' submission did not propose or conceive of a new product, but suggested a modification or variation to pre-existing Rescue Heroes figures. SAC ¶ 18. Plaintiffs' first submission in late 1998 (the "1998 Submission") included drawings and a prototype comprising an existing Rescue Heroes firefighter character with a backpack (like all other Rescue Heroes), which contained a film cassette.[9] To view the film, the child placed one

---

[8]     Plaintiffs claim that all three inventor submissions at issue in this action reflect the same "concept," which they have named the "Reel Heroes" concept. SAC ¶¶ 19-24; Lane Dec., Ex. 4 at 11, Ex. 12 at 14-15, Ex. 8 at 6. *See also* Lane Dec., Ex. 21 (plaintiffs' 1/20/05 interrogatory answers) at page 3 (referring to plaintiffs' "concept" "embodied in three submissions to Fisher-Price"). The spelling of "Reel" (R-E-E-L) was intended to emphasize that the concept included the use of a film reel. Lane Dec., Ex. 5 at 39.

[9]     Photos of the prototype of the firefighter figure with the film cassette in his backpack, which plaintiffs included with their 1998 Submission, are attached as Exhibit 22 to the Lane declaration. The drawings

Footnotes continued on next page.

eye up to a magnifying lens and looked into the backpack.  This submission was not solicited by Fisher-Price.

Before coming to the meeting, Reiling completed a Fisher-Price "Concept Submission Form" describing the Reel Heroes concept.[10]  On the Concept Submission Form, Reiling provided a detailed description of the Reel Heroes concept under the heading: "Description and Unique Feature(s)/Technology."

2.  **The Option Agreement.**  In early 1999, Fisher-Price and plaintiffs negotiated and executed an Option Agreement under which plaintiffs granted to Fisher-Price an exclusive three-month option to license plaintiffs' concept.[11]  The Option Agreement included all of the material terms of a license in the event that Fisher-Price exercised the option:  the term of the license was perpetual; it was exclusive and the geographic scope was worldwide; and plaintiffs would be compensated with a 3% royalty if their submission was used in the Rescue Heroes line.[12]  Fisher-Price did not exercise its option.

3.  **Boys Team Review.**  Plaintiffs' prototype was shown by Ken Morton, then the Design Manager of the Boys Team, to two other Boys Team members, Tyler Berkheiser and Chris Pardi.  All three agreed that the prototype did not fit the planned direction for development of the Rescue Heroes line, was too passive for preschooler play, and would be far

---

Footnotes continued from previous page.

and written description that were part of the 1998 Submission are attached as Exhibit 23 to the Lane declaration.

[10]     Lane Dec., Ex. 4 at 43-45, Ex. 12 at 191-92.

[11]     Lane Dec. ¶ 16, Ex. 25, Ex. 26 ¶¶ 26, 69.

[12]     Lane Dec., Ex. 12 at 229-32, Ex. 26 ¶¶ 26, 69.

too expensive to manufacture.[13]  Neither Morton nor Berkheiser believed the prototype was

unique.[14]  In March 1999, Fisher-Price rejected plaintiffs' 1998 Submission.  SAC ¶ 22, Ex. G.

       4.     **The May 1999 Submission.**  Plaintiffs re-submitted their concept, again

on an unsolicited basis, in May 1999 (the "1999 Submission").  The 1999 Submission consisted

of a drawing (no prototype) of a Rescue Heroes Billy Blazes figure with a backpack-shaped

viewer which included a tinted housing containing a drum with approximately twenty still action

frames showing Rescue Heroes in action.  Lane Dec., Ex. 28.  These frames were advanced

sequentially by means of a hand crank and could be viewed only by placing one eye up to a

magnifying lens and looking inside the backpack.[15]  No Boys Team designer saw the 1999

Submission.  Berkheiser Dec. ¶ 33.  Fisher-Price also rejected this submission.  SAC ¶ 23; Lane

Dec., Ex. 3 at 119-20.

       5.     **The December 2000 Submission.**  Plaintiffs submitted their concept,

again on an unsolicited basis, for a third time in December 2000 (the "2000 Submission"),

nineteen months after their 1999 Submission.  The 2000 Submission included drawings showing

an action figure with a backpack and a digital camera device (which the figure held in its hand)

containing a Viewmaster-style film disc with six or more images.  Lane Dec., Ex. 29.  The

images could be viewed only by placing one eye up to a magnifying lens and looking into the

interior of the backpack or into the digital camera device.  The images were advanced by pushing

a lever.  *Id.*  No Boys Team designer saw the 2000 Submission.  Berkheiser Dec. ¶ 33.  Fisher-

Price rejected this submission.  SAC ¶ 25.

---

[13]      Lane Dec., Ex. 14 at 64-70, Ex. 13 at 135-38; Berkheiser Dec. ¶¶ 30-31.

[14]      Lane Dec., Ex. 14 at 64-70; Berkheiser Dec. ¶ 31.

[15]      *See* Declaration of Howard Bollinger, dated April 28, 2005 (the "Bollinger Dec.") ¶ 21.

   **6.**  **The Cameraman "Concept."** Plaintiffs claim that their submissions also included a second, independent concept of a TV cameraman figure holding a TV camera, as well as the aesthetic design of that cameraman.  SAC ¶ 18.  The camera was designed with a window on top, through which the child could look to see out of the camera lens — giving the impression that he was viewing what the cameraman was "filming."  Lane Dec., Exs. 23 & 30.

**The Fisher-Price Products at Issue**

   The premium Rescue Heroes figure line as it existed before the introduction of any of the accused products focused on the goal of bringing communication and interactivity to the figures.  The premium figures were marketed under the "Voice Tech" name.[16]  When the child pressed a button, the figure would say something related to the disaster associated with that figure.  Berkheiser Dec. ¶ 11.   The first Voice Tech figures were introduced in early 2000.  Variations (or "sub-lines") were introduced in 2001, 2002, and 2003.  The new sub-lines changed the configuration of the figure's backpacks and were primarily intended to improve interactivity between the figures (*i.e.*, provide different ways to get them to talk to each other or, at least, to speak about the same thing).  *Id.* ¶¶ 11-13.  Three of the Voice Tech figure sub-lines — Mission Command, Video Mission, and Mission Select — are at issue here.  Plaintiffs have also asserted claims against two Rescue Heroes playsets and five toy vehicles.  These are described below.

   **1.**  **Voice Tech Vehicles.** The Rescue Heroes line of toys has included vehicles for use with the figures from the line's inception in 1997.  In summer 2000, Fisher-Price

---

[16]   Berkheiser Dec. ¶ 11.  The reason that the Voice Tech line is referred to as Fisher-Price's "premium" line of Rescue Heroes is because the electronics necessary to generate sound effects and speech add to the expense of producing the figures.  Thus, Voice Tech figures typically sell for approximately $10, while the basic Rescue Heroes figures sell for approximately $7.  "Power Max" and "Robotz" are other premium Rescue Heroes lines, but plaintiffs have no claim against them.  Berkheiser Dec. ¶ 11, n.1.

introduced the Voice Tech Jet and Firetruck.[17]  The Voice Tech Police Cruiser was sold in 2003.

*See* Product Appendix at 1-2.[18]  There was a receptacle in the seat of the vehicles that would

receive a Voice Tech figure and activate a speech feature.  The Voice Tech vehicles do not

include any images, decals or pictures.  Berkheiser Dec. ¶ 23, Ex. J.

> **2.**    **Voice Tech Mission Command Figures.**  Fisher-Price introduced the

Voice Tech Mission Command figures, which were designed by Tyler Berkheiser, in early 2001.

*See* Product Appendix at 3.

> The Mission Command figures came with a card that carried a computer chip

which stored speech.  The card could be inserted into the figure's backpack and, like the Voice

Tech figures, when a button was pressed, the figure would say something related to a rescue

mission.  Each figure's card was unique to that figure; the fireman figure came with a card with a

decal showing a burning building, the construction worker came with a card showing a road

cracking from an earthquake, etc.  The decal on the card identified the subject of the speech

stored in the chip.  The mission cards could be switched to any figure.  Thus, although the

earthquake card was sold only with the construction worker figure, it could be placed in the

fireman's backpack and the fireman would then speak about an earthquake.  Berkheiser Dec.

¶¶ 15-17.  This allowed the child, by moving the card from figure to figure, to have them all talk

about the same "mission."

---

[17]    The Court has previously ruled that claims relating to the Voice Tech vehicles for misappropriation, unfair competition and violation of CUTPA are barred by the statue of limitations.  *See* Rulings on Plaintiffs' Motion for Leave to File a Second Amended Complaint, Docket No. 80, at 7-9.

[18]    Photos and catalog pages depicting the Fisher-Price products at issue in this case and the prior art products discussed in this memorandum are included in the attached "Product Appendix" for convenient reference. All of these documents have been authenticated in the declarations submitted by Fisher-Price on this motion.

3.     **Aquatic Rescue Command Center.**  The Aquatic Rescue Command Center (the "ARCC"), which was introduced in late 2001, is an aircraft carrier playset.  *See* Product Appendix at 4.  James Bauman, a designer on the Boys Team, designed the ARCC.[19] During the design phase of the ARCC, Carterbench/Virtual Video, an independent outside inventor, submitted to Fisher-Price its technology for a lenticular lens mechanism which is synchronized with sound so that a two-dimensional picture of a character appears to be talking. The Boys Team was excited about the technology and added it as a feature for the ARCC. Berkheiser Dec. ¶¶ 18-19.  Fisher-Price pays Carterbench/Virtual Video a royalty on a sales of the ARCC.  Clutton Dec. ¶¶ 10-11.

4.     **Voice Tech Video Mission Figures.**  Introduced in 2002, the Voice Tech Video Mission figures feature speech related to rescue missions.  *See* Product Appendix at 5. Each figure's backpack also includes a picture on the backpack related to the Rescue Heroes character (*e.g.*, Billy Blazes' backpack has a picture of a burning building, Matt Medic's backpack has a picture of an x-ray, etc.).  The picture appears to move through use of a moving lenticular lens activated when a plunger is depressed and a backwind motor is triggered.  Jim Bauman designed the Voice Tech Video Mission backpacks with the assistance of Jeff Neaves, a Fisher-Price engineer, and Carterbench/Virtual Video.  Berkheiser Dec. ¶ 20; Bauman Dec. ¶ 3. Carterbench/Virtual Video was paid a royalty on the Voice Tech Video Mission figures.  Clutton Dec. ¶ 11.

5.     **Voice Tech Mission Select Figures.**  Fisher-Price introduced the Voice Tech Mission Select figures in early 2003.  *See* Product Appendix at 6-7.  Mission Select represented a further advance toward reaching the Boys Team's goal of speech interactivity among the figures.  Former Fisher-Price designer Brian Trzeciak designed the Mission Select

---

[19]     *See* Declaration of James Bauman, dated April 27, 2005 (the "Bauman Dec.") ¶ 2.

figures, assisted by James Bauman.  Bauman Dec. ¶ 4.  Each figure came with a dial on the figure's backpack.  The dial allowed the child to **"select"** among the six scenarios that form the core of the Rescue Heroes storyline (fire, earthquake, flood, avalanche, volcanic eruption, tornado).  Berkheiser Dec. ¶ 22.

　　　　6.	**Mountain Action Command Center.**  The Mountain Action Command Center ("MACC") is a large playset for Rescue Heroes figures.  *See* Product Appendix at 6.  When a speech button is pressed, voices of particular Rescue Heroes relay spoken messages about rescue missions.  The MACC includes a Mission Select dial so the child can coordinate the disasters on the MACC to the disasters selected on the Mission Select figures.  The MACC was designed by James Bauman.  Berkheiser Dec. ¶ 22; Bauman Dec. ¶ 5.

　　　　7.	**Mission Select Vehicles.**  The Mission Select Firetruck and Police Cruiser were designed by adding the Mission Select dial to the existing Voice Tech Firetruck and Police Cruiser.  *See* Product Appendix at 6.  When a figure with speech capability is inserted in the vehicle, it will talk about the scenario specified on the dial.  The Mission Select Firetruck and Police Cruiser are compatible with all Rescue Heroes figures.  Berkheiser Dec. ¶ 24.

　　　　8.	**Optic Force Rescue Heroes.**  Fisher-Price introduced this sub-line of basic figures in October 2003.  *See* Product Appendix at 8-10.  They are not part of the "Voice Tech" line and have no sound or speech capability.  Each "Optic Force" figure comes with some type of optical tool or accessory, such as a microscope, periscope, camera, etc.  Berkheiser Dec. ¶¶ 25-28.  None of these figures include a film reel or film.  The Optic Force Rescue Heroes are based on a "Team Optics" submission from BangZoom, an independent inventor, which is being paid royalties on the Optic Force team.[20]

---

[20]	Berkheiser Dec. ¶¶ 25-26; Clutton Dec. ¶ 12; Lane Dec., Ex. 15 at 16-17.

**Plaintiffs' Ever-Changing Definition
of the Reel Heroes Concept**

Plaintiffs have, at various times, offered at least six different definitions of the Reel Heroes concept. The first three, which were offered during the submission of the concept to Fisher-Price and in the original complaint, focus on specific design features. After the commencement of this action, plaintiffs apparently recognized that none of Fisher-Price's products include the features they had identified as necessary elements of the Reel Heroes concept. In an apparent effort to capture as wide an array of Fisher-Price products as possible, plaintiffs offered three more definitions of their concept, each time increasing the generality and scope of the definition. Plaintiffs' six definitions of the Reel Heroes concept are described below.

**1.     The Concept Submission Form.** In response to the instructions on their Concept Submission Form, plaintiffs described the "unique features" of their Reel Heroes concept as follows:

> Batt[ery] op[erated] film strip units for each Rescue Hero & dedicated 'TV' and adventure photog[rapher]/reporter. Can be expande[d] to include TV projection truck. Hand held camera has shutter opened by child and look-in viewer.[21]

This description of their product was written, in Victor Reiling's handwriting, at the time of the submission and before any litigation. It was written without any input from Fisher-Price. Lane Dec., Ex. 4 at 44.

**2.     The Option Agreement.** The first paragraph of the Option Agreement provides that it relates to "the Reel/Real Heroes concept as is more completely described in the

---

[21]     Lane Dec., Ex. 24.

attached Exhibit A." Exhibit A to the Option Agreement, in language tracking the Concept

Submission Form, defines the Reel Heroes concept as follows:

> Submitted concept extends cartoons to action figures play pattern. ***The concept is a battery-operated film reel that is activated when the child pushes a button on the backpack of the action figure.*** The child may then look through the viewer on the backpack to see the film. The concept may include a hand-held "camera" with shutter that is operated by the child. The concept may be incorporated into the assorted Fisher-Price Rescue Heroes action figures. ***The unique aspect of the concept is the combination of existing action figures with film for play pattern.***[22]

    **3.**    **The Complaint.** In their original complaint, plaintiffs defined the Reel

Heroes concept as follows:

> Plaintiffs' basic concept was to integrate Fisher-Price's successful "Rescue Heroes" figures and cartoon-like images by using a removable backpack that could be made for a specific character. It was designed to mount to each "Rescue Heroes" figure and show animated images of that character in action. For example, a firefighter would be shown putting out a fire or rescuing a child from a building. The animated images enrich the role-playing that a child often enjoys when using toy action figures. ***The backpack is a battery-operated film strip/disc player with a viewer. By looking through the small viewer and pressing a button,*** the child could see the "countless Rescue Hero adventures."[23]

    As this litigation progressed, plaintiffs recognized that Fisher-Price never

produced any product using the concept reflected in their Concept Submission Form, the Option

---

[22]    Lane Dec., Ex. 25 (Exhibit A) (emphasis added).

[23]    January 31, 2003 Complaint ¶ 30(A), Docket No. 1 (emphasis added).

Agreement, or their complaint.[24]  As a result, they re-defined their concept to eliminate all of the specific features in the submissions they made to Fisher-Price.  By eliminating any reference to specific features and describing their "concept" in the most general terms possible, plaintiffs sought to craft a definition of their alleged "concept" which — although never submitted to or even discussed with Fisher-Price — might capture within it some of Fisher-Price's products.

       4.      **2003-04 Deposition Testimony.**  In their deposition testimony in late 2003 and early 2004,[25] plaintiffs each testified consistent with the following definition of the concept:

> The use of an image or images on an action figure to enhance the role play of children using the action figure.[26]

       5.      **The 2005 Expert Report.**  In his January 2005 report, plaintiffs' expert James Kipling broadened the definition of the Reel Heroes concept even further, eliminating any requirement that the image be located on an action figure.  Kipling defined plaintiffs' Reel Heroes concept as follows:

A device ***associated with*** a Rescue Heroes figure (for example, part of a backpack) for visually communicating to the mind of a child a cue or prompt for role-playing in which the child would use the Rescue Heroes figure and imagine accomplishing a mission assignment, resolving a

---

[24]     Plaintiffs' expert admitted at his deposition that "Fisher-Price never used any of the three specific embodiments disclosed by plaintiffs" in their three submissions and that "Fisher-Price has never manufactured a product that meets the literal description set forth in [the Option Agreement]."  Lane Dec., Ex. 11 at 237-38, 192.

[25]     Plaintiffs in this case were deposed on two separate occasions:  in late 2003 and 2004 with respect to the first amended complaint and in early 2005 with respect to the second amended complaint (which added 15 products to this case).

[26]     *See* Lane Dec., Ex. 7 at 126 (the concept is an image "with . . . action figures . . . to enhance role play"), Ex. 3 at 42 (the novelty of plaintiffs' concept was "to be able to bring these images into the [Rescue Heroes] line and give a child a chance to really get involved with play patterns and how much it would enhance the play value of the rest of the [Rescue] Heroes").

dangerous situation, performing a rescue or engaging in some other adventurous pretend scenario.[27]

      **6.**    **2005 Deposition Testimony.**  In their deposition testimony in January and February 2005, plaintiffs and their expert confirmed the breathtaking generality and scope of their newly crafted definition of the Reel Heroes concept. Kipling's report and plaintiffs' recent deposition testimony make the following aspects of their new definition of the Reel Heroes concept clear:

      **a.**    ***The Reel Heroes concept does not require that the images or visual cues be located on a backpack.***  Kipling and plaintiffs each testified that the image or visual cue could be located on the figure's chest or in a device in the figure's hand.[28] Plaintiffs' third submission depicts a photographer action figure holding a digital camera in his left hand; the digital camera contains a Viewmaster disk of images showing the character in action. Lane Dec., Ex. 29.

      **b.**    ***The Reel Heroes concept is not limited to Rescue Hero action figures.***  Kipling and plaintiffs each testified that the Reel Heroes concept includes all action figures — not just Rescue Heroes. At different times, they testified that Spiderman, Captain America, and Batman action figures were included within the Reel Heroes concept.[29] Design Innovation principal Bruce Popek testified that the Reel Heroes concept was actually submitted to one of Fisher-Price's competitors, Toy Biz, for use in connection with its "Spiderman and Friends" line of superhero action figures.[30]

---

[27]    Lane Dec., Ex. 26 ¶ 11 (emphasis added).

[28]    Lane Dec., Ex. 4 at 165, 223-24, Ex. 9 at 21-22, Ex. 11 at 137-38, Ex. 6 at 46-51.

[29]    Lane Dec., Ex. 7 at 170-71 (concept is "not particular or specific to the Rescue Heroes" action figures; Captain America is within concept), Ex. 9 at 24 (Batman figure is within concept), Ex. 6 at 7-8 (Spiderman figure is within concept).

[30]    Lane Dec., Ex. 6 at 7, 9.  *See also* Lane Dec., Ex. 35 at page 2 (2/20/04 interrogatory answers).

- 15 -

c.    *The Reel Heroes concept is not even limited to action figures*.

Plaintiffs and Kipling also testified that the Reel Heroes concept does not require that the visual cue or image component of the concept be physically located on, or even connected to, an action figure.  Kipling's definition of the Reel Heroes concept makes this clear with its reference to "[a] device *associated with* a Rescue Heroes figure."  If there was any doubt, it was removed when plaintiffs and Kipling testified that visual cues or images located on playsets or toy vehicles satisfy the Reel Heroes concept.  Confirming the extraordinary breadth of their new definition of the Reel Heroes concept, plaintiffs testified that Fisher-Price's MACC and ARCC playsets and Fisher-Price's Mission Select vehicles actually "used," and directly infringed, the Reel Heroes concept.[31]  Moreover, in his letter submitting the Reel Heroes concept to Toy Biz for its consideration, Bruce Popek stated that the concept "can be incorporated into assorted action figures *or vehicles*."  Lane Dec., Ex. 36.

## Design Innovation Work for Fisher-Price

In the past, Fisher-Price had hired Design Innovation to provide services on a project-by-project, work for hire basis.  After the commencement of this lawsuit, Fisher-Price ceased doing business with Design Innovation.  Clutton Dec. ¶ 15.  Design Innovation has asserted in its fourth cause of action that this business decision by Fisher-Price constitutes unfair competition.  SAC ¶ 57.

---

[31]    *See* Lane Dec. ¶ 28(c).  *See also* Lane Dec., Ex. 4 at 155 ("a product need not even be an action figure to be a use of the Reel Heroes concept").

**Argument**

## I. PLAINTIFFS' CLAIM FOR BREACH OF IMPLIED CONTRACT IS PRECLUDED AS A MATTER OF LAW

In their first cause of action, plaintiffs allege that Fisher-Price breached an implied-in-fact contract "pursuant to which Fisher-Price agreed to compensate Plaintiffs in the event Fisher-Price actually used Plaintiffs' novel product concept." SAC ¶ 42. Plaintiffs' implied-in-fact contract claim fails for four independent reasons: (a) plaintiffs expressly agreed that their submission of product ideas would give rise to no implied obligations by Fisher-Price; (b) the Option Agreement is an express contract which governs the same subject matter; (c) the alleged agreement is unenforceable because it is too indefinite; and (d) plaintiffs' implied contract claim is barred by the applicable statute of frauds.

### A. Fisher-Price's Policy and Agreement Negates Plaintiffs' Implied Contract Claim

As discussed above, Fisher-Price only accepts product submissions from inventors who have executed its Policy and Agreement. *See* Lane Dec., Ex. 4 at 68-69. In the Policy and Agreement, Fisher-Price states that it will "review outside ideas only according to the conditions of th[is] agreement." Lane Dec., Ex. 20. By executing the Policy and Agreement, inventors agree that the submission process creates no implied obligations on the part of Fisher-Price:

> No obligation of any kind is assumed by, nor may be implied against Fisher-Price, Inc., unless and until a formal written contract has been entered into, and then the obligation shall be only such as is expressed in the formal written contract executed by an officer of Fisher-Price, Inc.[32]

---

[32]    Lane Dec., Ex. 20 (emphasis added).

Courts and commentators have recognized that provisions like this, which expressly negate any implied obligations, are effective to bar implied contract claims.[33]

      Since 1983, Reiling has signed at least 27 Policy and Agreement forms.[34]  In December 1994, Reiling signed a Policy and Agreement which provided that it would govern all product ideas submitted by Reiling to Fisher-Price thereafter, until terminated in writing by either party.  Lane Dec., Ex. 20.  Neither Reiling nor Fisher-Price ever terminated the Policy and Agreement,[35] and the plaintiffs have admitted that it was therefore in effect at the time of the Reel Heroes submission.[36]  Accordingly, plaintiffs' claim for breach of implied-in-fact contract must be dismissed.

**B.    Where an Express Agreement Covers the Subject Matter of a Party's Implied Contract Claim, That Claim is Precluded as a Matter of Law**

      "A contract cannot be implied in fact where there is an express contract covering the subject matter involved."[37]  This well-settled principle applies in cases where an inventor

---

[33]    *See M.H. Segan Ltd. P'ship v. Hasbro, Inc.,* 924 F. Supp. 512, 525 (S.D.N.Y. 1996) (upholding enforceability of waiver of implied obligations).  *See also* 2 MILGRIM ON TRADE SECRETS § 7.01[2] at 7-27 (2004) ("Nor can disclosure of information, *after the prospective licensee has carefully disclaimed a confidential relationship or any implied duty*, be the basis for an action") (emphasis added).  *See also* Lane Dec., Ex. 12 at 220-21 (plaintiffs' expert acknowledging that some toy companies require inventors to sign documents disclaiming any implied obligations).

[34]    In the early years, a Policy and Agreement form was required for each specific product submission.  In 1990, the Policy and Agreement was changed so that it governed all submissions made during a calendar year.  In 1994, it was changed again to allow the inventor to select whether it would remain in effect for a specified time period or until terminated by written notice.  Lane Dec. ¶ 7, Exs. 16, 17 & 20.

[35]    Lane Dec., Ex. 4 at 68-70.

[36]    Lane Dec., Ex. 4 at 70, Ex. 12 at 275.

[37]    *Julien J. Studley, Inc. v. N.Y. News, Inc.,* 70 N.Y.2d 628, 629 518 N.Y.S.2d 779, 780 (1987).  *See also AEB & Assocs. Design Group, Inc. v. Tonka Corp.*, 853 F. Supp. 724, 731 (S.D.N.Y. 1994) ("*AEB*") ("An implied-in-fact-contract arises in the absence of an express agreement, and is based on the conduct of the parties from which a fact-finder may infer the existence and terms of a contract").  It should be noted that *AEB* involved allegations of misappropriation of a toy idea and claims identical to those asserted by plaintiffs in this case.

- 18 -

discloses a concept under the terms of an agreement.[38]

Plaintiffs' allegations regarding their implied contract make clear that it concerns compensation for the alleged use by Fisher-Price of their Reel Heroes submission. Their implied-in-fact contract claim is based on the allegation that "Fisher-Price agreed **to compensate** Plaintiffs in the event Fisher-Price actually used Plaintiffs' novel product concept." SAC ¶ 42. This is the exact same subject matter governed by the parties' Option Agreement. In fact, plaintiffs have testified that it was the only such agreement covering this subject matter.[39] Plaintiffs' expert has confirmed this, stating: "There were in fact contract negotiations for licensing the product from the inventor, and the terms that resulted from those negotiations were incorporated into the [O]ption [A]greement." Lane Dec., Ex. 26 ¶ 26. He has also stated that the Option Agreement "included all major material terms for [the] license agreement that would result from Fisher-Price's exercise of the option."[40]

Plaintiffs' expert has admitted that the subject matter of both the express contract and the implied-in-fact contract is identical:

Q.     . . . Didn't the option agreement relate to the exact same subject matter [as the alleged implied contract]?

A.     Subject matter, yes.

---

[38]     *See M.H. Segan Ltd. P'ship*, 924 F. Supp. at 524-25 (holding that a written agreement precluded a breach of implied contract because the written agreement dealt with the same subject matter). *See also Brandwynne v. Combe Int'l, Ltd.*, 74 F. Supp. 2d 364, 379 (S.D.N.Y. 1999) (an implied-in-fact contract claim, based on the plaintiff's disclosure of a concept, was barred because the parties' "Secrecy Agreement exclusively govern[ed] the rights and obligations of the parties with respect to [the] use of . . . ideas").

[39]     Lane Dec., Ex. 9 at 35, Ex. 4 at 103 ("Q. Was there some agreement between you and Design Innovation and Fisher-Price relating to the use of and compensation for the Reel Heroes concept, other than what's in [the Option Agreement]? . . . A. No, not that I know of"). Bruce Popek testified that the express contract referenced in the original complaint was the Option Agreement. Lane Dec., Ex. 5 at 150. Plaintiffs voluntarily dismissed their breach of express contract claim to avoid the mandatory venue clause in the Option Agreement. *See* Docket Nos. 1, 9-10, 16.

[40]     Lane Dec., Ex. 26 ¶ 69. *See also* Lane Dec., Ex. 25, Ex. 12 at 229-30, Ex. 26 ¶¶ 26, 69.

> Q.    And by that "subject matter" I mean Plaintiffs' submission and how it would be compensated if Fisher-Price were to use it.
>
> A.    Yes.[41]

Moreover, plaintiffs and Kipling have expressly affirmed that all of the conduct on which the implied agreement is based occurred ***prior to the Option Agreement***.[42] Accordingly, any implied contract would have been superseded by or merged into the parties' subsequent express agreement — the Option Agreement.

Therefore, plaintiffs' implied contract claim must be dismissed as a matter of law.[43]

## C.    Plaintiffs' Alleged Implied Contract Fails for Lack of Definiteness

"An agreement so deficient in the specification of its essential terms that the performance by each party cannot be ascertained with reasonable certainty is not a contract, and clearly is not an enforceable one."[44]  The lack of definite terms is another independent basis for

---

[41]    Lane Dec., Ex. 12 at 286.  Kipling also testified that the "option agreement is one element in creating an implied contract."  *Id.* at 186.

[42]    "[T]he implied contract was, in my view, formed by the accumulation of elements that was culminated by the option agreement."  Lane Dec., Ex. 12 at 284.  Kipling agreed that the facts supporting the implied contract are:  "the submission itself, the dealings between the parties up to the option agreement and the signing of the option agreement."  *Id.* at 288-89.  Reiling testified that the implied agreement was formed as of December 8, 1998 when he received a fax from Fisher-Price, two months before the Option Agreement in February 1999.  Reiling recalled no communications with Fisher-Price relating to the 1999 Submission or the 2000 Submission.  Lane Dec., Ex. 4 at 115, 120-21.

[43]    *See AEB,* 853 F. Supp. at 731 (dismissing an implied contract claim relating to the submission of a toy idea due to the existence of an express contract).  Fisher-Price has previously obtained summary judgment on an inventor's implied contract claim where "the written contract covers the submission of ideas and use thereof."  *M.H. Segan & Co., Inc. v. Fisher-Price, Inc.*, Index No. 2003-40, Memorandum Decision and Order at 4 (S. Ct. Erie Co. Jan. 19, 2005).  A copy of this case, along with all other unpublished decisions, is included in the accompanying Case Appendix.

[44]    *Baer v. Chase*, 392 F.3d 609, 619 (3d Cir. 2005) (affirming summary judgment dismissing implied contract claim in the misappropriation context and holding that the absence of terms regarding compensation and duration of contract renders it unenforceable; applying New Jersey law).

- 20 -

dismissal of plaintiffs' implied contract claim.

Such an "agreement" is fatally indefinite under case law governing implied contract claims in the misappropriation of idea context. "Nothing in the record indicates that the parties agreed on how, how much, where or for what period [Fisher-Price] would compensate [plaintiffs]."[45]  Thus, as in *Baer*, this Court should dismiss plaintiffs' implied contract claim.[46]

The sole substantive allegation in plaintiffs' implied contract claim is that Fisher-Price "agreed to compensate Plaintiffs in the event Fisher-Price actually used Plaintiffs' novel product concept."  SAC ¶ 42.  No specifics have been alleged as to the scope or duration of the agreement or as to the compensation plaintiffs would receive.

## D.    Plaintiffs' Implied Contract Claim Is Barred by the Statute of Frauds

Even if there were no express contract governing the same subject matter as plaintiffs' alleged implied contract, their implied contract claim must be dismissed because it is barred by the statue of frauds.  "Although parties are free to enter into a binding contract without memorializing their agreement in a fully executed document . . . New York law requires certain agreements to be in writing."[47]  New York General Obligations Law § 5-701(a) provides that an agreement not in a "writing . . . subscribed by the party to be charged therewith" is void if "[b]y

---

[45]    *Baer*, 392 F.3d at 621.

[46]    *See Bergin v. Century 21 Real Estate Corp.*, 234 F.3d 1261, 2000 U.S. App. LEXIS 28028, *4-6 (2d Cir. Nov. 8, 2000) (upholding dismissal of implied contract claim where "alleged agreement was too vague" because it lacked compensation terms and "dates of commencement and termination"); *Marraccini v. Bertelsmann Music Group, Inc.*, 221 A.D.2d 95, 97, 644 N.Y.S.2d 875, 877 (3d Dep't 1996) (dismissing contract claim for misappropriation of idea; "definiteness as to material matters is of the very essence in contract law ").

[47]    *Diversified Group, Inc. v. Daugerdas,* 139 F. Supp. 2d 445, 458 (S.D.N.Y. 2001) (internal quotation omitted) (citing *Zupan v. Blumberg*, 2 N.Y.2d 547, 550, 161 N.Y.S.2d 428, 430 (1957) ("The endurance of the defendant's liability is the deciding factor")).

- 21 -

its terms [it] is not to be performed within one year from the making thereof."[48]

"[T]he touchstone of an inquiry under Section 5-701(a)(1) is . . . whether the contract by its terms is incapable of performance within one year, because the agreement places indefinite liability on the defendant."[49]  When a plaintiff sues for breach of implied contract alleging a right to an ongoing, perpetual royalty for the use of its ideas (as plaintiffs do here), its claim must fail in the absence of a "writing that evidences the agreement."[50]

In their first cause of action, plaintiffs allege that their submission of the Reel Heroes concept to Fisher-Price gave rise to an  implied contract under which Fisher-Price was required to compensate them for any use of their concept.  SAC ¶ 42.  Plaintiffs claim that, under the terms of the implied contract, they are entitled to a "reasonable royalty" on sales of products using their concept, beginning in 2000 and ***continuing in perpetuity***.[51]  This is exactly the sort of implied agreement found to be impossible to perform within one year, and barred by the statute of frauds in *Diversified Group* and *Koret*.[52]

---

[48]    *Koret, Inc. v. RJR Nabisco, Inc.,*  702 F. Supp. 412, 414-15 (S.D.N.Y. 1988), *aff'd*¸ 875 F.2d 307 (2d Cir. 1989) (granting summary judgment to defendant on breach of implied contract claim).  *See also Kantor v. Watson*, 167 A.D.2d 297, 297-98, 562 N.Y.S.2d 39, 40 (1ˢᵗ Dep't 1990) (holding "contract" for compensation for exploitation of screenplay violated statute of frauds because payments could not be accomplished within one year).

[49]    *Diversified Group, Inc.,* 139 F. Supp. 2d at 459 (quotation omitted).

[50]    *Koret*, 702 F. Supp. at 414.

[51]    *See* Lane Dec., Ex. 44 at page 2 (plaintiffs' 3/30/05 interrogatory answers) ("Sales are ***continuing*** and Plaintiffs seek a reasonable royalty on ***future sales*** as well") (emphasis added).   *See also* SAC, Prayer for Relief ¶ (b).

[52]    In opposition to this argument, plaintiffs cannot rely on the Option Agreement as evidencing Fisher-Price's promise to pay, or they will be admitting (again) that an express agreement governs the subject matter, and their implied contract claim will fail on that basis.

- 22 -

## II. PLAINTIFFS' MISAPPROPRIATION CLAIM IS BARRED BY THE ABSENCE OF A CONFIDENTIAL RELATIONSHIP

Plaintiffs' second cause of action alleges misappropriation of plaintiffs' Reel Heroes concept. The elements of a misappropriation claim under New York law[53] are: (1) the idea must be "concrete";[54] (2) the idea must be "novel in absolute terms";[55] (3) the inventor must show that the idea was disclosed in the context of a confidential relationship;[56] and (4) the inventor must show that the defendant used the idea.[57] Because plaintiffs cannot establish a confidential relationship with Fisher-Price their misappropriation claim is barred.

As demonstrated by the undisputed facts, Fisher-Price expressly disclaimed the formation of any confidential relationship in its Policy and Agreement, which states:

> The disclosure must be understood to be purely voluntary and ***no confidential relationship is to be established*** by such disclosure or implied from our consideration of the submitted material, and the material is not to be considered submitted "in confidence." Confidential relationships have

---

[53]    SAC ¶¶ 48-52. Plaintiffs acknowledge that their misappropriation claim is governed by New York law. Plaintiffs' Reply Memorandum of Law in Further Support of Plaintiffs' Motion for Leave to File a Second Amended Complaint, Docket No. 53, at 6, n.4 ("Plaintiffs agree that New York law should govern this action in light of the fact that New York law is well-developed with respect to submission of idea cases"). *See also* Rulings on Plaintiffs' Motion for Leave to File a Second Amended Complaint, Docket No. 80, at 7, n.2 ("The parties agree that New York law governs the breach of contract and misappropriation claims").

[54]    *Educational Sales Programs, Inc. v. Dreyfus Corp.*, 65 Misc. 2d 412, 417, 317 N.Y.S.2d 840, 845 (S. Ct. N.Y. Co. 1970). *See also Link Group v. Toymax, Inc.*, 2000 U.S. Dist. LEXIS 4567, *30 (D. Conn. Mar. 17, 2000); *Ball v. Hershey Foods Corp.*, 842 F. Supp. 44, 47 (D. Conn.), *aff'd,* 14 F.3d 591 (2d Cir. 1993).

[55]    *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 373 (2d Cir. 2000); *Downey v. General Foods Corp.*, 31 N.Y.2d 56, 61, 334 N.Y.S.2d 874, 877 (1972).

[56]    *M.H. Segan Ltd. P'ship*, 924 F. Supp. at 526; *Ball*, 842 F. Supp. at 47.

[57]    *AEB,* 853 F. Supp. at 734.

been held to create obligations which are beyond those that the company is willing to assume.[58]

The courts have recognized that provisions like this are effective to disclaim the existence of a confidential relationship between an inventor and a toy company and bar misappropriation claims.[59]

Reiling agreed that his submissions to Fisher-Price were not made on a confidential basis. He signed at least 27 Policy and Agreements, each time expressly affirming that his submissions to Fisher-Price were not made in confidence.[60] Reiling knew at all times that they "would not consider [his] concept submissions unless [he] had a Policy and Agreement form in effect."[61] Reiling admitted that the Policy and Agreement was in effect when he

---

[58]    Lane Dec., Ex. 20 (Policy and Agreement ¶ 1) (emphasis added).

[59]    *M.H. Segan Ltd. P'ship,* 924 F. Supp. at 526 (holding that a nearly identical waiver of any confidential relationship "negates the existence of a legal relationship based on a . . . confidential relationship" necessary for a misappropriation claim). *See also Kublan v. Hasbro,* 50 U.S.P.Q. 2d 1539, 1540 (S.D.N.Y. 1999) (upholding waiver of confidentiality and rejecting plaintiffs' argument that the waiver was unconscionable because plaintiff was — like Reiling —  an "experienced toy inventor . . . seeking something for his own profit"). *See also* 2 MILGRIM ON TRADE SECRETS § 7.01[2] at 7-27 ("Nor can disclosure of information, after the prospective licensee has carefully disclaimed a confidential relationship or any implied duty, be the basis for an action"); 1 MILGRIM ON TRADE SECRETS § 3.03 at 3-30 ("[an] express disclaimer by the disclosee of a confidential relationship from the outset will dispel the existence of such a relationship"). Such waivers are not unique to the toy industry. *See Kearns v. Ford Motor Co.*, 203 U.S.P.Q. 884, 886 (E.D. Mich. 1978) (no confidential relationship where plaintiff "acknowledged defendant's disclaimer regarding its practical incapacity to receive and accept confidential disclosures" by signing a waiver agreement when making disclosures to automobile company); *Telechron, Inc. v. Parissi,* 120 F. Supp. 235, 240 (N.D.N.Y. 1954), *aff'd,* 229 F.2d 440 (2d Cir. 1956) (noting that, in the 1940s, General Electric warned inventors that the company "cannot consider any idea or invention on the basis of a confidential relationship").

[60]    Lane Dec., Ex. 17.

[61]    Lane Dec., Ex. 4 at 79-80. The Policy and Agreement states:  "Our policy requires that we accept outside submissions only when a copy of this Agreement is signed, and further states we accept only such matter as is reduced to writing, dated, and signed by you and acknowledged by us as detailed on our Concept Submission Form."  Lane Dec., Ex. 20.

submitted the Reel Heroes concept.[62]

Even setting aside Reiling's written acknowledgement that his submissions to Fisher-Price were not made in confidence, plaintiffs would be unable to carry their burden of establishing a confidential relationship. Reiling acknowledges that Fisher-Price never promised or represented that it would hold the Reel Heroes submission (or any other submission) confidential.[63] Moreover, plaintiffs have testified that there is no custom or practice in the toy industry that inventor submissions are made on a confidential basis.[64]

Because plaintiffs cannot carry their burden of showing that they had a confidential relationship with Fisher-Price, their misappropriation claim fails. And, to the extent plaintiffs' claims for common law unfair competition and violation of CUTPA relate to their misappropriation claim, they too must fail.[65]

### III.    FISHER-PRICE NEVER USED THE REEL HEROES CONCEPT

Both plaintiffs' implied contract claim and their tort claims require them to show that Fisher-Price actually **used** the Reel Heroes concept. "A plaintiff cannot recover for

---

[62]    Lane Dec., Ex. 4 at 69-70 (Reiling understood that the Policy and Agreement form was in effect from 1994 through the commencement of this lawsuit).

[63]    Lane Dec., Ex. 4 at 78-80.

[64]    Plaintiffs' expert admitted that there are a "variety of practices" as "to whether toy companies commit to keep inventors' submissions confidential." Lane Dec., Ex. 12 at 168-69. Reiling knew that agreements like Fisher-Price's Policy and Agreement were "required by a number of companies" and that Mattel and Hasbro (as well as Fisher-Price) required inventors to sign agreements that they would not keep inventor submissions confidential. Lane Dec., Ex. 4 at 76-77.

[65]    *See, e.g., Ball*, 842 F. Supp. at 45, n.l. (dismissing misappropriation claim because plaintiff failed to establish a confidential relationship between himself and defendant; dismissing CUTPA claim on same basis). *See also Nadel*, 208 F.3d at 373, n.2 (treating unfair competition claim as a claim for misappropriation).

misappropriation absent a showing that its ideas were actually used by the defendant."[66] "Where it is clear that defendant's concepts are not essentially similar to plaintiff's, and that the defendant's ideas are not based upon original ideas of the plaintiff, summary judgment will follow."[67]

Here, plaintiffs and their expert witness have admitted that Fisher-Price never made or sold a product satisfying the definitions of the Reel Heroes concept set forth in the Concept Submission Form, the Option Agreement, or their complaint.

**A.    Plaintiffs Admit That Fisher-Price Never Made a Product Satisfying Their Definitions of the Reel Heroes Concept in the Concept Submission Form, the Option Agreement, or the Complaint**

In the Concept Submission Form submitted to Fisher-Price with respect to the Reel Heroes concept, plaintiffs defined the "unique feature(s)" of their concept as follows:

> Batt[ery] op[erated] film strip units for each Rescue Hero & dedicated 'TV' and adventure photog[rapher]/reporter. Can be expande[d] to include TV projection truck. Hand held camera has shutter opened by child and look-in viewer.[68]

---

[66] *AEB,* 853 F. Supp. at 734 (granting summary judgment for defendant). *See also Ball,* 842 F. Supp. at 48 (summary judgment granted for defendant where the "differences between the two ideas preclude the inference that the defendant used the plaintiff's idea"); *McGhan v. Ebersol,* 608 F. Supp. 277, 286 (S.D.N.Y. 1985) ("A plaintiff cannot recover for misappropriation of ideas unless the ideas are actually used by a defendant"); *Women Golfer, Inc. v. Meredith Corp.,* 792 F. Supp. 211, 214 n.6 (S.D.N.Y. 1992) (same); *Granoff v. Merrill Lynch & Co.,* 775 F. Supp. 621, 630 (S.D.N.Y. 1991) (granting the defendant summary judgment and finding that the "plaintiff . . . failed to demonstrate there is a genuine issue as to material fact with respect to defendants' proof of . . . the lack of use of plaintiff's concept").

[67] *Ed Graham Prods., Inc. v. National Broad. Co.,* 75 Misc. 2d 334, 337, 347 N.Y.S.2d 766, 768 (S. Ct. N.Y. Co. 1973). *See also Khreativity Unlimited v. Mattel,* 101 F. Supp. 2d 177, 184 (S.D.N.Y.), *aff'd,* 242 F.3d 366 (2d Cir. 2000) (granting summary judgment to defendant Mattel because "[t]he record is clear that Mattel returned the prototype doll to plaintiff and never produced the suggested product"); *Women Golfer, Inc.,* 792 F. Supp. at 214 (granting summary judgment to defendant where plaintiffs failed to "demonstrate[ ] that defendants used their idea in any way").

[68] Lane Dec., Ex. 24.

The Option Agreement between plaintiffs and Fisher-Price defined the Reel Heroes concept in language that tracks the Concept Submission Form:

> Submitted concept extends cartoons to action figures play pattern. The concept is a battery operated film reel that is activated when the child pushes a button on the backpack of the action figure. The child may then look through the viewer on the backpack to see the film. The concept may include a hand held "camera" with shutter that is operated by the child. The concept may be incorporated into the assorted Fisher-Price Rescue Heroes action figures. ***The unique aspect of the concept is the combination of existing action figures with film for play pattern.***[69]

Plaintiffs' definition of the Reel Heroes concept in paragraph 30(A) of their complaint is similar to the definitions in the Concept Submission Form and the Option Agreement:

> Plaintiffs' basic concept was to integrate Fisher-Price's successful "Rescue Heroes" figures and cartoon-like images by using a removable backpack that could be made for a specific character. It was designed to mount to each "Rescue Heroes" figure and show animated images of that character in action. For example, a firefighter would be shown putting out a fire or rescuing a child from a building. The animated images enrich the role-playing that a child often enjoys when using toy action figures. ***The backpack is a battery-operated filmstrip/disc player with a viewer.*** By looking through the small viewer and pressing a button, the child could see the "countless Rescue Hero adventures."[70]

Plaintiffs' expert witness, James Kipling, admitted at his deposition that Fisher-Price never made or sold a product meeting the description of the Reel Heroes concept in the

---

[69]     Lane Dec., Ex. 25 (at Exhibit A) (emphasis added).

[70]     January 31, 2003 Complaint ¶ 30(A) (emphasis added).

Concept Submission Form.[71]  Kipling further admitted under oath that Fisher-Price "never manufactured a product" meeting the description of the Reel Heroes concept in the Option Agreement.[72]  Kipling made the same admissions in his second supplemental expert report.[73]

Accordingly, because Fisher-Price has not made any use of the features submitted to it by plaintiffs, all four causes of action in the complaint must be dismissed.

**B.     Plaintiffs Are Bound by Their Definition
of the Reel Heroes Concept in the Option Agreement**

The Option Agreement is a formal contract between plaintiffs and Fisher-Price and they are bound by its terms, including the definition of the Reel Heroes concept in Exhibit A to the agreement.[74]  In Exhibit A, plaintiffs defined their concept in detail, identifying its "unique aspect."  One purpose of this was to provide Fisher-Price with fair notice of the scope and

---

[71]     Lane Dec., Ex. 11 at 237-38 (admitting that Fisher-Price never used any of the embodiments disclosed in **any** of plaintiffs' three submissions, the first of which was reflected in the Concept Submission Form).

[72]     Lane Dec., Ex. 11 at 192.  *See Ahlert v. Hasbro, Inc.,* 325 F. Supp. 2d 509, 515 (D.N.J. 2004) (court relied on inability of plaintiff's expert to identify elements of plaintiff's submission in defendant's product as supporting summary judgment on the issue of non-use).

[73]     Lane Dec., Ex. 26 ¶¶ 46 & 47.  Kipling contends that plaintiffs did not accurately describe the Reel Heroes concept in the Concept Submission Form or the Option Agreement, referring in paragraph 46 to plaintiffs' "failure properly to articulate their concept," and in paragraph 47, to "the restricted and convoluted description [of the Reel Heroes concept in] the Option Agreement."  Kipling goes on to argue that the descriptions in the Concept Submission Form and the Option Agreement describe plaintiffs' "prototype" but fail to define "***the concept*** represented by the prototype."  *Id.* ¶ 47 (emphasis added).  Kipling argues that the definitions of the Reel Heroes concept in the Concept Submission Form and the Option Agreement are **wrong**, because he recognizes that none of the Fisher-Price's products fall within these definitions.  *See also* Lane Dec., Ex. 11 at 168, 175 (definitions in Option Agreement and Concept Submission Form "failed to accurately describe" the Reel Heroes concept).

[74]     Under New York law, "[a] party who signs a written contract is conclusively presumed to know its contents and to assent to them and the signer is bound by its terms. . . ."  *Renee Knitwear Corp. v. ADT Sec. Sys.,* 277 A.D.2d 215, 216, 715 N.Y.S.2d 341, 341 (2d Dep't 2000) (internal citations omitted).  *See also Metzger v. Aetna Ins. Co.,* 227 N.Y. 411, 416 (1920) ("[W]hen a party to a written contract accepts it as a contract he is bound by the stipulations and conditions expressed in it whether he reads them or not.  Ignorance through negligence or inexcusable trustfulness will not relieve a party from his contract obligations"); *Level Export Corp. v. Wolz, Aiken & Co.,* 305 N.Y. 82 (1953).

boundaries of their concept.  Clutton Dec. ¶ 7.[75]

Patent law provides an instructive analogy.  The courts have ruled that the purpose of a patent is to provide public notice of the "metes and bounds" of the intellectual property owned by the patentee; to provide clear notice of the boundaries beyond which one will be liable as an infringer.[76]  Anything not within the boundaries clearly defined by the patent may freely be used by the public.[77]

Here, it was plaintiffs' duty to clearly define the boundaries of their Reel Heroes concept in the Option Agreement and the Concept Submission Form.  Because plaintiffs have admitted that no Fisher-Price products fall within the definitions in the Option Agreement or the Concept Submission Form, the claims in the complaint should be dismissed in their entirety.

## IV.    PLAINTIFFS' DEFINITION OF THE REEL HEROES CONCEPT LACKS CONCRETENESS

Plaintiffs recognize that if they are held to the definition of the Reel Heroes concept in their Concept Submission Form, the Option Agreement, and the prototype, they will not be able to show that Fisher-Price made any use of the concept, and their claims will be dismissed as a matter of law.  In response, plaintiffs have redefined their concept, making it more generalized and abstract in an effort to capture within its expanded scope both action figures that are entirely dissimilar to their submissions and products such as playsets that were never even

---

[75]    This was also a purpose of the definition in the October 29, 1999 Concept Submission Form completed by Reiling.

[76]    *See, e.g., London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1538 (Fed. Cir. 1991) (patent claims must be drafted "so that the public has fair notice of what the patentee and the Patent and Trademark Office have agreed constitute the metes and bounds of the claimed invention.  Notice permits other parties to avoid actions which infringe the patent and to design around the patent.").

[77]    *See id.*

mentioned in their submissions.[78]

Only specific and concrete ideas are entitled to legal protection.[79] Because plaintiffs' effort to expand the scope of their concept has resulted in a definition that is entirely abstract and lacking in specificity or concreteness, all four causes of action in the complaint must be dismissed.

## A.    Only Concrete Ideas Are Protected

"Ideas not reduced to concrete form are not protected."[80] This principle is based on the recognition that in the context of the submission of ideas, the traditional indicia of property (*i.e.*, something that is tangible, measurable, or otherwise susceptible of identification) are not necessarily present.[81] The concreteness requirement prevents an inventor from asserting ownership of an idea that is too abstract to warrant protection under the law.

Whether an idea is sufficiently concrete to be legally protectible is an issue of law

---

[78]    Plaintiffs assert in their January 20, 2005 interrogatory answers that the definition of the Reel Heroes concept includes the use of "an image component in connection with accessories, such as vehicles and playsets." Lane Dec., Ex. 21 at page 3. Plaintiffs also state in these interrogatory answers that Fisher-Price's MACC playset, ARCC playset, Mission Select Firetruck, and Mission Select Police Cruiser "are covered by Plaintiffs' submissions" of the Reel Heroes concept. Lane Dec., Ex. 21 at page 4. Finally, in their February 11, 2005 interrogatory answers, plaintiffs expressly affirm that "Plaintiffs' [Reel Heroes] Concept covers" these vehicles and playsets. Lane Dec., Ex. 38 at pages 4, 6, & 9.

[79]    *Ball,* 842 F. Supp. at 47 (to support a misappropriation of idea claim, "the idea must be novel and concrete"); *Oasis Music, Inc. v. 900 U.S.A., Inc.,* 161 Misc. 2d 627, 631, 614 N.Y.S.2d 878, 881 (N.Y. Co. 1994) (idea must be concrete to be protectible); *Markogianis v. Burger King Corp.,* 42 U.S.P.Q. 2d 1862, 1865 (S.D.N.Y. 1997) (an idea must be concrete to support a breach of implied contract claim).

[80]    *Educational Sales Programs,* 65 Misc. 2d at 417, 317 N.Y.S.2d at 845 (citing *O'Brien v. RKO Radio Pictures, Inc.*, 68 F. Supp. 13, 14 (S.D.N.Y. 1946) ("It is well-settled law that an author has no property right in his ideas unless the same are given embodiment in a tangible form")). *See also McGhan,* 608 F. Supp. at 284 ("In order for an idea to be susceptible to a claim of misappropriation, two essential elements must be established: the requisite legal relationship must exist between the parties, and the idea must be novel ***and concrete***") (emphasis added).

[81]    *See Apfel v. Prudential-Bache Sec., Inc.*, 81 N.Y.2d 470, 478, 600 N.Y.S.2d 433, 436 (1993) ("Unlike tangible property, an idea lacks title and boundaries and cannot be rendered exclusive by the acts of the one who first thinks it").

properly determined on summary judgment.  In *Educational Sales Programs,* plaintiff claimed that defendant misappropriated its idea for educational and promotional material for independent mutual fund salesmen, alleging both tort and contract causes of action.[82]  In granting summary judgment for the defendant, the court recognized that because "[t]he details of presentation and marketing changed considerably from September to November," the idea was "[c]learly . . . quite malleable and not in such fixed and concrete form as to indicate a protectible idea."[83]  The same finding is equally applicable here.

**B.     Plaintiffs' Definition of the Reel
         Heroes Concept Lacks Concreteness**

Plaintiffs' current definition of their concept, as disclosed in the January 31, 2005 expert report of James Kipling, is a nearly pure abstraction with no concrete or specific aspects or features:

> A device associated with a Rescue Heroes figure (for example, part of a backpack), for visually communicating to the mind of a child a cue or prompt for role-playing in which the child would use the Rescue Heroes figure and imagine accomplishing a mission assignment, resolving a dangerous situation, performing a rescue, or engaging in some other adventurous pretend scenario.[84]

Just reading this definition makes clear that it is a nearly pure abstraction with no concrete form or content.  It includes at least five undefined abstract elements.

(1)     A *"device."*  The nature of the "device" is entirely undefined.  Apparently, it could include almost anything:  a film viewer, a lenticular lens, a

---

[82]     65 Misc. 2d at 414, 317 N.Y.S.2d at 842.

[83]     *Id.* at 417, 317 N.Y.S.2d at 845.  *See also Link Group, Int'l,* 2000 U.S. Dist. LEXIS 4567 at *38 (granting summary judgment for defendant, because "many aspects of the ideas Link Group submitted to Toymax would fail to meet New York's requirement of 'concreteness'").

[84]     Lane Dec., Ex. 26 ¶ 11.

hologram, a playset, a toy vehicle, a camera, a computer screen, a viewmaster, a card with an icon, a wheel or a disk, etc.

(2)    The identified function of the device is ***"for visually communicating to the mind of a child a cue or prompt for role-playing."***  This does not define or limit the device at all, except that it apparently must have a "visual" aspect that assists the child in role-play with the figures.

(3)    ***"Cue or prompt for role-playing"*** is entirely undefined.

(4)    The device must be ***"associated with a Rescue Heroes figure."***  This vague and generalized language was dictated by plaintiffs' desire to expand their claims to products other than the Rescue Heroes figures themselves, such as playsets and vehicles.  The "device" for "visually communicating . . . a cue or prompt for role-playing" can be located on ***anything*** that might be used with an action figure.  Plaintiffs' definition of the Reel Heroes concept does not even describe a particular ***product***.

(5)    Finally, although the definition as written by plaintiffs' expert appears to limit their concept to ***Rescue Heroes*** figures, both plaintiffs and their expert have testified unequivocally that it is not so limited and includes devices associated with ***any*** action figure.[85]

In view of plaintiffs' position that the Reel Heroes concept is not limited to a device located on an action figure, and is not even limited to a device associated with the Rescue Heroes line of toys, their definition is even more generalized and abstract than it first appears. The essence of plaintiffs' definition of their concept can be summarized as:

A device for visually communicating to the mind of a child a cue or prompt for role-playing adventures with an action figure.

No one could seriously contend that this "concept" is sufficiently concrete to be legally protectible.

Kipling not only does not deny that his definition of the Reel Heroes concept lacks concrete specifics; he affirmatively asserts that its abstract character is its primary attribute.

---

[85]    Lane Dec. ¶ 31(b).

- 32 -

In his March 4, 2004 declaration, Kipling described his definition of the Reel Heroes concept as ***"primarily devoid of mechanical specifics and details."***[86] He goes on to indicate that the Reel Heroes concept "can be fulfilled . . . by any of a multiplicity of forms." *Id.* ¶ 10.  This is essentially an admission that the Reel Heroes concept is too abstract to be legally protectible.

The defects in plaintiffs' definition of the Reel Heroes concept are not curable. They did not adopt a highly abstract and generalized definition by accident.  They crafted this definition, after more than a year of litigation, because they concluded (correctly) that any specific or concrete definition of the Reel Heroes concept would — if consistent with their submissions to Fisher-Price and their prototype — exclude all of the Fisher-Price products accused in this action.  Thus, plaintiffs' claims in this case depend on the definition of their concept as offered by Kipling in his January 2005 expert report.

Because that definition is so abstract that it fails to describe an idea that is sufficiently concrete to be legally protectible, Fisher-Price is entitled to summary judgment dismissing all four causes of action in the complaint.

## V.   THE REEL HEROES CONCEPT <u>WAS NOT ABSOLUTELY NOVEL</u>

Ideas which are not novel "are in the public domain and may freely be used by anyone with impunity."  In fact, copying of ideas in the public domain is not only permitted, it is encouraged.[87]

Thus, any claim based upon the alleged misappropriation of idea requires a showing of novelty.[88]

---

[86]     Lane Dec., Ex. 34 ¶ 9 (emphasis added).

[87]     *Brandwynne,* 74 F. Supp. 2d at 375 (quoting *Ed Graham Prods.,* 75 Misc. 2d at 337, 347 N.Y.S.2d at 769).

[88]     *See Paul v. Haley*, 183 A.D.2d 44, 52, 588 N.Y.S.2d 897, 902 (2d Dep't 1992); *Nadel,* 208 F.3d at 378.

"A 'novel' idea is one that has not been suggested to or known by the public at a prior time."[89]

It is the plaintiffs' burden to show novelty:

> [I]n opposing summary judgment, the plaintiff, who bears the burden of coming forward with proof of novelty, 'cannot rest on mere assertions of novelty and originality,' but must instead demonstrate some basis in fact for those claims. Case law is replete with instances in which plaintiffs alleging misappropriation of novel ideas have failed to meet this burden.[90]

"[W]hether an idea is novel is an issue of law which may properly be decided on a motion for summary judgment."[91]

---

[89]    *Koret,* 702 F. Supp. at 414.

[90]    *Paul*, 183 A.D.2d at 53, 588 N.Y.S.2d at 903 (quoting *Women Golfer, Inc.,* 792 F. Supp. at 414, and citing *Ferber v. Sterndent Corp.,* 51 N.Y.2d 782, 783, 433 N.Y.S.2d 85, 86 (1980)).  *See also Oasis Music, Inc.,* 161 Misc. 2d at 632, 614 N.Y.S.2d at 881 ("A plaintiff cannot rest on mere assertions of novelty and originality, but must, instead, demonstrate some basis for" its claim of novelty); *AEB,* 853 F. Supp. at 734 (same); *McGhan,* 608 F. Supp. at 287 (same).

[91]    *AEB,* 853 F. Supp. at 734.  *See also Brandwynne*, 74 F. Supp. at 375 (same); *Paul,* 183 A.D.2d at 53, 588 N.Y.S.2d at 903 ("whether an idea is sufficiently novel or original to merit protection under New York law is a question amenable to summary disposition"; dismissing misappropriation claim); *Oasis Music, Inc.,* 161 Misc. 2d at 631, 614 N.Y.S.2d at 881 (same); *Ring v. Estee Lauder,* 702 F. Supp. 76, 77 (S.D.N.Y. 1988), *aff'd*, 874 F.2d 109 (2d Cir. 1989); *Ferber,* 51 N.Y.2d at 783-84, 433 N.Y.S.2d at 86 (finding that plaintiff's failure "to produce any evidence to support his claim that the idea which he disclosed to defendants was novel either in the abstract or as to them" was fatal to his claim for breach of contract, and affirming the appellate division's decision granting summary judgment for the defendants); *Ed Graham Prods., Inc.,* 75 Misc. 2d at 338, 347 N.Y.S.2d at 770 (granting defendant's motion for summary judgment dismissing plaintiff's claim for misappropriation based on finding that submitted idea was not novel); *Khreativity Unlimited*, 101 F. Supp. 2d at 185 *aff'd,* 242 F.3d 366 (2d Cir. 2000) (stating that "as a matter of law, [plaintiff's] idea for a cross-marketing venture between Mattel and the NBA was so unoriginal and lacking in novelty that knowledge of the idea can be imputed to Mattel" and granting defendant's motion for summary judgment dismissing plaintiff's contract claims); *Link Group Int'l*, 2000 U.S. Dist. LEXIS 4567, at *38-39 (finding that plaintiff's idea was not novel as a matter of law and granting defendant's motion for summary judgment dismissing plaintiff's claims for breach of implied contract and unjust enrichment);  *Kublan*, 50 U.S.P.Q. 2d at 1540 (granting toy manufacturers' motion for summary judgment and dismissing plaintiff's claims for lack of novelty); *Kavanau v. Courtroom Television Network,* 23 U.S.P.Q. 2d 1938, 1942 (S.D.N.Y. 1992) (stating that "[w]hether an idea is novel is an issue of law which may properly be decided on a motion for summary judgment," and granting defendants' motion for summary judgment dismissing plaintiff's claims); *Women Golfer, Inc.,* 792 F. Supp. at 214 (finding that plaintiff's idea was not novel as a matter of law and granting defendants' motion for summary judgment); *Granoff,* 775 F. Supp. at 630 (granting summary judgment and dismissing the plaintiff's claims for breach

Footnotes continued on next page.

As discussed above, in pursuing this litigation, plaintiffs were forced to choose between a definition of the Reel Heroes concept that was appropriately narrow and concrete and consistent with the Concept Submission Form and the Option Agreement, but which did not cover Fisher-Price's products, and a broad, abstract definition which, while it might cover some of Fisher-Price's products, also covers a large number of products sold to the public before their 1998 Submission. Faced with this Hobson's choice, plaintiffs elected to adopt a new definition of their concept so broad and abstract that it covers an extensive body of prior art products that were sold to the public before plaintiffs' October 1998 submission. As a result, plaintiffs' Reel Heroes concept, as they define it in this lawsuit, is not novel, and all four causes of action in the complaint must therefore be dismissed.

A.    **The "Absolute Novelty" Standard**
      **Applies to All of Plaintiffs' Claims**

To support a tort-based claim for misappropriation, the idea at issue must be *absolutely* novel; *i.e.*, it must be unique and novel to the public in general.[92] This requirement recognizes the established principle that ideas which are known and "in the public domain . . . may freely be used by anyone with impunity."[93]

The general rule is that, to support a claim for breach of contract based on misappropriation of idea, a plaintiff must demonstrate only that its idea was "novel to the

---

Footnotes continued from previous page.

of contract and misappropriation based on lack of novelty); *McGhan*, 608 F. Supp. at 287 (finding that plaintiff's idea lacked novelty and granting defendant's motion for summary judgment); *Eenkhoorn v. N.Y. Tel. Co.*, 148 Misc. 2d 999, 1001, 568 N.Y.S.2d 677, 678 (1st Dep't 1990) (reversing the trial court's decision on the law and dismissing plaintiff's claim because she failed to establish novelty).

[92]    *See Downey*, 31 N.Y.2d at 61, 334 N.Y.S.2d at 877 (1972); *Paul*, 183 A.D.2d at 52, 588 N.Y.S.2d at 902; *Oasis Music, Inc.*, 161 Misc. 2d at 631, 614 N.Y.S.2d at 882; *Ring*, 874 F.2d at 110, n.1.

[93]    *Ed Graham Prods., Inc.*, 75 Misc. 2d at 337, 347 N.Y.S.2d at 769.

- 35 -

buyer."[94]  The idea need not be novel in an absolute sense, as required for a tort-based misappropriation claim.  The novelty-to-the-buyer requirement ensures that there is sufficient consideration to support the contract.[95]

       Under the circumstances of this case, the Court should apply the absolute novelty standard normally applicable to tort claims in evaluating plaintiffs' implied contract claim, because plaintiffs agreed contractually that any ideas they submitted to Fisher-Price would be novel in the sense that they were not in the public domain, not merely novel to Fisher-Price. This contractual agreement took two forms.  First, the Option Agreement between the parties provides:

> Inventors represent that they own all rights in and to the concept and have the sole right to grant the option and exclusive license as set forth herein.[96]

       It is well-established that a party has no ownership of or property interest in an idea that is already in the public domain.[97]  Thus, by representing in the Option Agreement that they "own all rights in and to the [Reel Heroes] concept," plaintiffs warranted that the concept was novel in the absolute sense and was not in the public domain.

       Fisher-Price's Policy and Agreement contained a provision with the same effect:

---

[94]    *See Khreativity Unlimited*, 101 F. Supp. 2d at 185; *Oasis Music, Inc.*, 161 Misc. 2d at 630-31, 614 N.Y.S.2d at 881.

[95]    *See Ferber*, 51 N.Y.2d at 783-84, 433 N.Y.S.2d at 86 (finding that plaintiff's failure "to produce any evidence to support his claim that the idea which he disclosed to defendants was novel either in the abstract or as to them" was fatal to his claim for breach of contract).

[96]    Lane Dec., Ex. 25.

[97]    *Granoff*, 775 F. Supp. at 627, 630; *Brandwynne*, 74 F. Supp. 2d at 378 (an inventor has no property right in an idea that is "already the subject of general knowledge"); *Educational Sales Programs, Inc.*, 65 Misc.2d at 414, 317 N.Y.S.2d at 842-43 (without novelty, an inventor has no property right in an idea).

> We receive many unsolicited outside ideas and have found that most of these are not new and often are either concepts which are already in the public domain or are the same or similar to ideas developed by our own staff. . . . Our policy is founded on our desire to preserve our rights . . . to use anything in the public domain.[98]

By signing this document, plaintiffs agreed that any submission made pursuant to the Policy and Agreement would not limit Fisher-Price's ability to use ideas already in the public domain. This was an agreement that, for plaintiffs to be entitled to any compensation with respect to an idea submitted to Fisher-Price, that idea would have to absolutely novel.

For these reasons, this Court should apply the absolute novelty standard in analyzing both plaintiffs' tort-based misappropriation claims and their implied contract claim.

**B.    The Reel Heroes Concept
         Lacks Absolute Novelty**

The first step in determining whether plaintiffs' Reel Heroes concept meets the absolute novelty standard is to fix a precise definition of plaintiffs' concept to be evaluated for novelty. For purposes of this argument only, Fisher-Price accepts the definition of the Reel Heroes concept proffered by plaintiffs' expert James Kipling and advocated by Kipling and plaintiffs in their depositions. The definition in Kipling's expert report is:

> A device associated with a Rescue Heroes figure (for example, part of a backpack), for visually communicating to the mind of a child a cue or prompt for role-playing in which the child would use the Rescue Heroes figure and imagine accomplishing a mission assignment, resolving a dangerous situation, performing a rescue, or engaging in some other adventurous pretend scenario.[99]

As discussed in section IV above, plaintiffs have made clear in interrogatory

---

[98]    Lane Dec., Ex. 20.

[99]    Lane Dec., Ex. 26 ¶ 11.

answers and testimony that their concept: (1) is not limited to visual cues or images on or in a Rescue Hero's ***backpack***; it includes (for example) Rescue Hero figures with visual cues or images on devices held in the figure's hand, on its chest, etc.; (2) is not limited to visual cues or images on a ***Rescue Hero*** figure; it includes other action figures, such as Spiderman, Captain America, etc.; and (3) is not even limited to visual cues or images on an ***action figure***; it includes playsets and toy vehicles with visual cues or images. In essence, as defined by Kipling and plaintiffs, the Reel Heroes concept includes the use of ***any visual images*** that would prompt a child to use an action figure "to imagine accomplishing a mission assignment, resolving a dangerous situation, performing a rescue, or engaging in some other adventurous pretend scenario." Not surprisingly, there is a vast body of prior art that satisfies this broad, generalized definition, which anticipates plaintiffs' Reel Heroes concept, and which renders the concept non-novel. Six dispositive pieces of prior art are discussed below.

       1.       **Toy Biz Projector figures.** In 1993, Toy Biz introduced a line of superhero (*e.g.,* Spiderman, Wolverine, etc.) action figures known as "Projectors." *See* Product Appendix at 11. Each figure came with three Viewmaster-style film disks, including 12 images. The disks were inserted into a projector device in the figure's chest. When activated, the device would project images from the disk through a lens in the figure's chest onto a nearby surface. Each of the images showed the particular action figure in action, on an adventure, performing a mission, etc. Thus, the Toy Biz Projector figures satisfy plaintiffs' definition of their Reel Heroes concept: they contain "a device [*i.e.,* the projector device] associated with [an action] figure . . . for visually communicating to the mind of the child a cue or prompt for role-playing in which the child will use the [action] figure and imagine accomplishing a mission assignment, resolving a dangerous situation . . . or engaging in some other adventurous pretend scenario." Bollinger Dec. ¶ 37.

      Plaintiffs have essentially admitted that the Toy Biz Projector figures embodied

the Reel Heroes concept.  In fact, when plaintiffs submitted the Reel Heroes concept to Toy Biz

for use with its Spiderman and Friends line of action figures, Toy Biz rejected the concept as

non-novel, specifically citing to its Projector figures and indicating that "this is an idea that Toy

Biz has worked with in the past."[100]  Bruce Popek acknowledged at his deposition that Toy Biz

rejected the Reel Heroes concept as non-novel based on the Toy Biz Projector figures.[101]

Because the Toy Biz Projectors were on sale to the public in 1993, five years

before plaintiffs allegedly conceived of the Reel Heroes concept, they anticipated the Reel

Heroes concept and rendered it non-novel.

2.    **The Image Projective Toy patent.**  In August 1996, the United States

Patent Office issued Patent No. 5,545,072, entitled "Image Projective Toy" (the "'072 Patent").

*See* Product Appendix at 12-19.  The '072 Patent describes and covers the Toy Biz Projector

figures.  In addition to projecting an image of the character in action or on an adventure, the '072

Patent discloses an alternative embodiment of the invention under which the child looks through

the lens on the action figure's chest to view the images within.  *See* Lane Dec., Ex. 41 at column

3, lines 56-58 ("Alternatively, the images may be viewed internally by placing the lens directly

in front of the eye").

Design Innovation principal Douglas Melville admitted in his deposition

testimony that this embodiment of the image projective toy patent invention is a "use" of the

Reel Heroes concept.  *See* Lane Dec., Ex. 9 at 25 (admitting that "if instead of using a film loop

inside [the action figure's] chest  [Fisher-Price] put a Viewmaster disk inside of his chest, and it

could be viewed by looking through a lens either on his chest or in his back," that would be a use

of the Reel Heroes concept).

---

[100]     Lane Dec., Ex. 37.

[101]     Lane Dec., Ex. 6 at 33.

Thus, the Reel Heroes concept was in the public domain more than two years before plaintiffs themselves claim to have conceived the concept.[102]

3.     **Secret Wars figures**.  "Secret Wars" was a line of action figures sold by Mattel beginning in 1984.  *See* Product Appendix at 20.  The line included both superheroes and villains, each of which came with a shield that the action figure held in its hand.  The shield contained a lenticular lens with images showing the action figure in action.  The figures typically came with eight different  pieces of lenticular artwork that could be placed in the shield showing different adventures.  For example, one of the Captain America lenticular images shows Captain America swinging down to carry a boy out of the path of an oncoming train.[103]

This line of action figures satisfies the definition of the Reel Heroes concept advocated by Kipling and plaintiffs.  The lenticular shield in each action figure's hand is clearly "a device associated with [an action] figure . . . for visually communicating to the mind of a child a cue or prompt for role-playing in which the child will use the [action] figure and imagine accomplishing a mission assignment, resolving a dangerous situation," etc.  Bollinger Dec. ¶ 40.  In fact, plaintiffs' expert, James Kipling, specifically testified that the Secret Wars figures "appears to be" a use of the Reel Heroes concept.[104]

4.     **Fortess of Solitude playset**.  As discussed above, plaintiffs have alleged the Fisher-Price's Rescue Heroes MACC and ARCC playsets use the Reel Heroes concept.  The Fortess of Solitude was a 1976 playset sold to the public by Mego Corporation for use with

---

[102]     *Ferber*, 51 N.Y.2d at 784, 433 N.Y.S.2d at 86 ("[A]ll novelty was lost with the issuance of these patents because they caused plaintiff's idea to fall into the public domain").

[103]     Bollinger Dec. ¶ 40.

[104]     Lane Dec., Ex. 12 at 116 & 120.  *See also id.* at 120-21 (Kipling admits that he can't identify "any part of the definition of Plaintiffs' concept in paragraph 11 of [his] report" that the 1984 Captain America Secret Wars figure does not satisfy).  *See also* Lane Dec., Ex. 11 at 137-38 (a Spiderman figure with a lenticular shield showing Spiderman capturing Doctor Octopus would be a use of plaintiffs' Reel Heroes concept).

superhero (Superman, Batman, Wonder Woman, etc.) action figures.  *See* Product Appendix at 41.  The playset included a number of pieces of artwork showing the characters in action.  It cannot be disputed that the playset is "[a] device associated with [an action] figure . . . for visually communicating to the mind of a child a cue or prompt for role-playing in which the child would use the [action] figure and imagine accomplishing a mission assignment, resolving a dangerous situation . . . or engaging in some other adventurous pretend scenario."  Bollinger Dec. ¶¶ 41-42.

Indeed, the images on the Fortress of Solitude playset show action figures engaged in missions or assignments, while the images on the Rescue Heroes playsets simply show images of disasters, without depicting an action figure responding to those disasters.  If anything, the Fortress of Solitude playset more closely tracks plaintiffs' definition of the Reel Heroes concept than the Fisher-Price playsets.

    5.  **The Hall of Justice playset.**  This is a 1976 Mego playset intended for use with Batman, Superman, Aqua Man, etc. action figures.  It includes artwork showing Super Girl fighting a meteor storm, Green Lantern and Green Arrow fighting invading aliens, Wonder Woman fighting a dragon, and Superman responding to a collapsing bridge.  *See* Product Appendix at 23-24.  It also includes a feature that allows the action figure to be "translocated" to the scene of a disaster or crime, by placing the selected action figure within a screen showing an image of the particular disaster or crime.  Bollinger Dec. ¶ 43.  The Hall of Justice playset is clearly "[a] device associated with [an action] figure . . . for visually communicating to the mind of a child a cue or prompt for role-playing in which the child would use the [action] figure and imagine accomplishing a mission assignment, resolving a dangerous situation," etc.  Bollinger Dec. ¶ 44.

    6.  **The Mobile Bat Lab.**  Plaintiffs contend that Fisher-Price's Mission Select Police Cruiser and Mission Select Firetruck are a "use" of, and directly infringe, the Reel

Heroes concept.[105]  Plaintiffs argue that the disk on each vehicle, which contains six icons identifying disaster scenarios and allows the user to "select" the disaster a figure placed in the vehicle will talk about, displays images that satisfy their definition of the Reel Heroes concept.

In 1976, Mego sold a vehicle for use with Batman and Robin action figures.  The vehicle included a flip-up "sun roof" containing an image of Batman fighting the Joker.  *See* Product Appendix at 25.  This vehicle, and its sun roof with an image of Batman in action, satisfies plaintiffs' definition of the Reel Heroes concept as "[a] device associated with [an action] figure . . . for visually communicating to the mind of a child a cue or prompt for role-playing in which the child would use the [action] figure and imagine accomplishing a mission assignment, resolving a dangerous situation . . . or engaging in some other adventurous pretend scenario."

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

As demonstrated by these prior art examples of action figures, playsets, and vehicles, the Reel Heroes concept as defined by plaintiffs has long been in the public domain in each of the three categories of products against which plaintiffs have asserted claims in this action.  For this reason, this Court should rule that the Reel Heroes concept is not novel as a matter of law and should dismiss all four of plaintiffs' causes of action.

---

[105]     Lane Dec., Ex. 4 at 154-57.  *See also* Lane Dec., Ex. 21 at page 3 (1/20/05 interrogatory answers stating that the definition of the Reel Heroes concept includes "the use of an image component with accessories such as vehicles and playsets").

## C.     A Mere Combination of Known
##          Elements Is Non-Novel

Plaintiffs testified that the 1980 Fisher-Price Movie Viewer (Product Appendix at 28) was the "inspiration" for the Reel Heroes concept.[106]  The Movie Viewer product was a viewer that allowed the child to look through a magnifying lens to see a filmstrip inside a plastic housing.  The film was advanced by turning a crank on the side of the plastic housing.  Plaintiffs acknowledged that their Reel Heroes concept was nothing more than "a combination of the Fisher-Price Movie Viewer and a Rescue Heroes figure."[107]

Similarly, Popek, Melville, Benedetto, Reiling, and Kipling each admitted that the Reel Heroes concept is simply a combination of the Toy Biz Projector device and the pre-existing Rescue Heroes figure.[108]  Popek also testified that taking the lenticular shield from a Secret Wars figure and putting it on a Rescue Heroes figure would infringe the Reel Heroes concept.  Lane Dec., Ex. 6 at 111-12.  This is an admission that the Reel Heroes concept is simply a combination of the Secret Wars lenticular shield idea and the Rescue Heroes characters.

New York caselaw makes clear that, to be protected, an inventor's idea must show "***genuine novelty and invention***, and not merely a clever or useful adaptation of existing knowledge.'"[109]  "Novelty cannot be found where the idea consists of nothing more than a variation on a basic theme."[110]  Simply combining pre-existing elements or features does not

---

[106]     Lane Dec., Ex. 7 at 74-75, Ex. 3 at 31-34.  A photo of the Movie Viewer is included in the Product Appendix at 28.

[107]     Lane Dec., Ex. 4 at 189-90, Ex. 12 at 227-29.

[108]     *See* testimony summarized at Lane Dec. ¶¶ 41-50.

[109]     *See Hogan v. D.C. Comics*, 48 F. Supp. 2d 298, 314 (S.D.N.Y. 1999); *Educational Sales Programs, Inc.*, 65 Misc. 2d at 416, 317 N.Y.S.2d at 844 ("[T]he idea need not reflect the 'flash of genius,' but it must show genuine novelty and invention, and not a merely clever or useful adaptation of existing knowledge").

[110]     *Link Group Int'l*, 2000 U.S. Dist. LEXIS 4567, at *31.  *See also Oasis Music, Inc.*, 161 Misc. 2d at 631, 614 N.Y.S.2d at 882 ("An idea which is a variation on a basic theme will not support a finding of

Footnotes continued on next page.

create a novel product or idea.[111]  A combination of non-novel elements — even if never before found together in the same product — is nothing more than "a variation on a [known] basic theme" and is non-novel as a matter of law.[112]

       Plaintiffs do not even claim that any of the individual features in their Reel Heroes concept were novel in themselves.  Rather, they admit that the Reel Heroes concept is nothing more than a combination of pre-existing elements that were known in the toy industry and known in the action figure portion of the toy industry (with respect to the Toy Biz Projector figures and the Secret Wars figures).  This is exactly the sort of idea that the courts cited above have found to be an obvious combination of features known to the public which is non-novel as a matter of law.

---

Footnotes continued from previous page.

       novelty"); *Paul*, 183 A.D.2d at 53, 588 N.Y.S.2d at 903 ("Not every good idea is a legally protectible [sic] idea, and an idea which is a variation on a basic theme will not support a finding of novelty"); *Educational Sales Programs, Inc.*, 65 Misc. 2d at 415, 317 N.Y.S.2d at 843 ("A sensible suggestion must have more to it than good sense to be compensable").

[111]   *See Oasis Music Inc.,* 161 Misc. 2d at 634, 614 N.Y.S.2d at 883 (where the individual elements of plaintiff's concept are known, its "program is based on ideas and concepts already in the public domain," and is non-novel as a matter of law); *Brandwynne*, 74 F. Supp. 2d at 376 ("a combination of pre-existing elements is not considered 'novel'"); *Khreativity Unlimited,* 101 F. Supp. 2d at 185-86 (recognizing that even if "plaintiffs provided a compilation of elements never before offered to the public, plaintiff's idea nevertheless lacked novelty because a combination of pre-existing elements is not considered novel"); *Educational Sales Programs, Inc.*, 65 Misc. 2d at 416, 317 N.Y.S.2d at 844 ("[T]he judicious use of existing means, or the mixture of known ingredients in somewhat different proportions . . . partake more of the nature of elaboration and renovation than of innovation"); *Ring,* 702 F. Supp. at 78 (granting summary judgment because plaintiff's idea, a combination of known elements, was non-novel as a matter of law); *Kavanau*, 23 U.S.P.Q. 2d at 1943 (plaintiff's "assertion of novelty must also be rejected because the CJN Plan is a mere compilation of elements that were already in use in the television industry"); *Futter v. Paramount Pictures, Inc.,* 69 N.Y.S.2d 438, 440 (S. Ct. N.Y. Co. 1947) ("[M]erely combining these obvious elements cannot convert a general idea, which is not novel, into a unique concept").

[112]   *See McGhan*, 608 F. Supp. at 286-87; *Ed Kaplan Assoc. v. Fisher-Price*, 17 U.S.P.Q. 2d 1877 (S.D.N.Y. 1990); *Khreativity Unlimited v. Mattel, Inc.,* 101 F. Supp. 2d at 185; *Link Group Int'l,* 2000 U.S. Dist. LEXIS 4567, at * 36-37 (applying New York law).

- 44 -

**D.** **The Concept of a Cameraman**
**Figure Was Not Novel**

Plaintiffs have asserted a claim relating to Fisher-Price's Optic Force photographer figure, alleging that it appropriates a secondary concept in their 1998 and 2000 Submissions which showed a cameraman holding a camera that the child could look through to see out the camera lens — giving the impression that he was viewing what the cameraman was "filming." SAC ¶¶ 18, 24. Like the primary Reel Heroes concept, this secondary concept was lacking in novelty. Fisher-Price itself sold a TV cameraman action figure as early as the 1970s. That figure also came with a camera the child could look through to see what the cameraman was "filming." Bollinger Dec. ¶ 47. Plaintiffs have admitted that the idea a cameraman action figure is not novel.[113]

Accordingly, any claim that plaintiffs' cameraman action figure was novel in 1998 must be rejected.

**VI.** **THE REEL HEROES CONCEPT WAS**
**NOT NOVEL TO FISHER-PRICE**

As discussed above, the Court should apply the absolute novelty standard to both plaintiffs' implied contract and tort claims because plaintiffs contractually agreed that Fisher-Price reserved its right to use any ideas in the public domain. However, even if this Court were to rule that the "novel-to-the-buyer" standard applied to plaintiffs' implied contract claim, that claim must be dismissed, because the persons principally responsible for the design of the figures, vehicles, and playsets at issue in this action were aware of much of the prior art discussed above during 1998.

---

[113]     Lane Dec., Ex. 5 at 57. ("Q. So action figures who were photographers carrying TV cameras were not new in the fall of 1998? A. No, it had been done before. Q. So that is not part of the novelty of this idea using a photographer action figure? A. Absolutely not. Q. Even one carrying a TV camera, that is not a new idea? A. Oh, no.").

- 45 -

Tyler Berkheiser was the principal designer of the Voice Tech Mission Command Rescue Heroes figures — the earliest figures that are accused of infringement in this action. In addition, he was the manager of the Fisher-Price Boys Team (which is responsible for Rescue Heroes products) when the accused Voice Tech Video Mission figures, Voice Tech Mission Select figures, Mission Select vehicles, ARCC playset, and MACC playset were designed. He was involved in supervising and directing the design of all of those products. Berkheiser Dec. ¶ 2.

Berkheiser has submitted a declaration indicating that he was aware of the Toy Biz Projector figure prior art in 1998 before the Reel Heroes concept was submitted. In fact, he kept one of the Projector figure projector mechanisms on his desk as a reference. Berkheiser was also aware of the Hall of Justice playset. Berkheiser Dec. ¶¶ 36-37.

James Bauman was the primary designer of the Voice Tech Video Mission figures, the Aquatic Rescue Command Center playset, and the Mountain Action Command Center playset. He was one of the designers working on the Voice Tech Mission Select figures. Bauman Dec. ¶¶ 2-5. Prior to designing these products, Bauman was aware of the Secret Wars action figures. Bauman Dec. ¶ 6.

Thus, the designers responsible for the design of the accused Fisher-Price products were aware of prior art in the public domain that anticipated the Reel Heroes concept (as defined by plaintiffs) and rendered it non-novel. Accordingly, the Reel Heroes concept was not novel to Fisher-Price, and plaintiffs' implied contract claim must be dismissed.

## VII.  PLAINTIFFS HAVE DISCLAIMED ALL CLAIMS ALLEGED IN THEIR COMPLAINT

As an entirely independent basis for the dismissal of all of plaintiffs' claims, the Policy and Agreement expressly disclaims the claims made by plaintiffs here.

Paragraph 3 of the Policy and Agreement provides that:

- 46 -

> You must understand and agree that in return for receiving and examining your disclosure, ***we are released from any liability in connection with the receipt and examination of your disclosure***, except as to such liability that may accrue under any valid patents or copyrights that you now or hereafter own or control.[114]

The agreement governing the submission of the Reel Heroes concept thus specifically disclaims ***any liability*** for use of submissions made pursuant to it, with the exception of use which would violate valid patents or copyrights.

Such disclaimers of liability are enforceable and binding.[115]  In *M.H. Segan Limited Partnership v. Hasbro*, an inventor commenced suit against a toy company, alleging various causes of action based on the toy company's allegedly unauthorized use of its toy submissions.[116]  The court upheld the enforceability of language in Hasbro's submission agreement which is nearly identical to that at issue here:

> All of inventor's rights and remedies arising out of [its] Submission(s) . . . shall be limited to any rights and remedies . . . accorded under United States Patent and Copyright Laws.  All other claims of whatever nature arising out of Inventor's Submission to Hasbro are hereby waived.[117]

---

[114]    Lane Dec., Ex. 20 ¶ 3 (emphasis added).

[115]    Disclaimers of liability have a long-standing history in many industries.  In *Kearns v. Ford Motor Co.*, the court upheld liability waivers entered into by an inventor and an automobile company.  The court held that, by signing the waivers, the inventor "formally disavowed [the submissions'] confidential nature on three separate occasions.  In absolute terms he acknowledged defendant's disclaimer of a confidential relationship between them and relinquished all rights and remedies against defendant with respect to his disclosures except those provided for by the patent and copyrights laws." *Kearns*, 203 U.S.P.Q. at 889.  *See also Wanberg v. Ocean Spray Cranberries, Inc.,* 194 U.S.P.Q. 350, 352 (N.D. Ill. 1977) (dismissing plaintiff's claim because he "voluntarily surrendered" his right to pursue common law claims where he signed a release limiting his rights to those under patent and copyright laws).

[116]    924 F. Supp. at 526.

[117]    *Id*. at 526.

- 47 -

Relying on this language, the court ruled that plaintiff's claims were precluded. For the same reason, plaintiffs' claims in this case are barred by the Fisher-Price Policy and Agreement.

### VIII.   PLAINTIFFS HAVE NO CLAIM TO COMPENSATION ON LINE EXTENSIONS, ACCESSORIES, OR RELATED PRODUCTS

Plaintiffs have asserted claims against various Rescue Heroes playsets and vehicles, which they characterize as "product which are sold together with or are marketed by Fisher-Price for use with Rescue Hero figures."[118]

Plaintiffs have never articulated any legal basis for a claim against line extensions, accessories or other products that do not themselves embody their Reel Heroes concept. Moreover, plaintiffs and their expert witness have both testified to facts that preclude any implied contract claim against such products. Plaintiffs admit that "royalties on line extensions are [the subject of] specific negotiations between inventors and toy companies"[119] and are "negotiated . . . on a case-by-case basis."[120] Kipling agrees that inclusion of line extensions and accessories in a license agreement is "a matter of negotiation."[121] Plaintiffs concede that "[s]ometimes the toy companies will agree to pay on line extensions and sometimes they refuse."[122] Kipling also acknowledges that toy companies often take the position that "they will pay royalties on products that embody an inventor's concept, but not on accessories or line extensions" and that this is a "good faith" position.[123] Accordingly, there is no custom or

---

[118]    Lane Dec., Ex. 26 ¶ 68. These products are: the Voice Tech Rescue Jet, Firetruck, and Police Cruiser, the ARCC and MACC playsets, and the Mission Select Firetruck and Police Cruiser. Plaintiffs apparently contend that some of these products are also embodiments of the Reel Heroes concept.

[119]    Lane Dec., Ex. 6 at 90.

[120]    Lane Dec., Ex. 8 at 77.

[121]    Lane Dec., Ex. 12 at 234; Lane Dec., Ex. 11 at 184-85.

[122]    Lane Dec., Ex. 8 at 78 (agreeing that "the inventor gets whatever he can negotiate . . .").

[123]    Lane Dec., Ex. 12 at 236-37.

practice in the toy industry which would obligate Fisher-Price to pay royalties on line extensions and accessories absent an express agreement to do so.[124]

     The Option Agreement, which provides terms of compensation relating to the Reel Heroes concept, does not provide any right to royalties on line extensions or accessories.[125] Because royalties on line extensions are only payable when the inventor has negotiated an express right to them, plaintiffs' claims relating to line extensions must be dismissed.

## IX. FISHER-PRICE'S DISCONTINUATION OF ITS RELATIONSHIP WITH DESIGN INNOVATION IS NOT A TORT

     In the third and fourth causes of action, plaintiffs claim that Fisher-Price's determination to discontinue sending Design Innovation new projects after this lawsuit had been filed, constitutes some sort of unfair competition. This determination, which was an exercise of business judgment and discretion and which did not violate any contract with Design Innovation, (Clutton Dec. ¶ 15), is not a tort of any kind:

> [It] is the well-settled law of this state that the refusal to maintain trade relations with any individual is an inherent right which every person may exercise lawfully, for reasons he deems sufficient or for no reasons whatever, and it is immaterial whether such refusal is based upon reason or is the result of mere caprice, prejudice or malice.[126]

---

[124]    *See* 21A AM. JUR. 2d *Customs and Usages* § 8 ("A custom or usage that . . . lacks uniformity furnishes no definite standard by which the terms of an implied consent can be determined. . . . A custom permitting performance by one of two methods cannot operate to imply that the person to be bound had in mind one method rather than the other").

[125]    *See* Lane Dec., Ex. 25. Kipling opined in his report that the Option Agreement contains all major material terms for a complete license agreement. Lane Dec., Ex. 26 ¶ 26. In fact, plaintiffs had "no exit" from the terms of the Option Agreement, and therefore had "no exit" from its failure to provide a royalty for line extensions and accessories. *Id.* ¶ 69.

[126]    *Turner Construction Co. v. Seaboard Sur. Co.*, 98 A.D.2d 88, 90, 469 N.Y.S.2d 725, 727 (1st Dep't 1983) (internal quotations omitted) (citing RESTATEMENT (SECOND) OF TORTS § 762 (*Privilege of Selecting Persons for Business Relations*). *See also WFB Telecomms., Inc. v. NYNEX Corp.*, 188 A.D.2d 257, 258-

Footnotes continued on next page.

To the extent that the third and fourth causes of action are based on Fisher-Price's decision not to do business with Design Innovation in the future, they must be dismissed.

### X. BECAUSE NEW YORK LAW APPLIES TO THIS CASE, PLAINTIFFS' CUTPA CLAIM MUST BE DISMISSED

Where a choice of law analysis requires the application of another state's laws, CUTPA does not apply.[127]  Plaintiffs have previously conceded that "***New York law should govern this action*. . . ."[128]  This Court noted that plaintiffs agreed to the applicability of New York law.[129]  This alone is sufficient to resolve the choice of law issue and require dismissal of plaintiffs' CUTPA claim.

As a federal court sitting in diversity, this Court must apply the choice of law principles of Connecticut,[130] which are based on the Restatement (Second) of Conflict of Laws, and "require the court to select the local law of the state having the most significant relationship

---

Footnotes continued from previous page.

59, 590 N.Y.S.2d 460, 461-62 (1st Dep't 1992) (reversing lower court and dismissing plaintiff's complaint based on allegations of wrongful termination of business relations).

[127]  *See, e.g., United States Fid. & Guar. Co. v. S.B. Phillips Co., Inc.*, 359 F. Supp. 2d 189, 207 (D. Conn. 2005) (holding that the application of South Carolina law was "fatal" to the plaintiff's CUTPA claim); *MM Global Servs. v. Dow Chem. Co.*, 283 F. Supp. 2d 689, 704-05 (dismissing CUTPA claim because Connecticut law did not apply under Connecticut choice-of-law principles).

[128]  Plaintiffs' Reply Memorandum of Law in Further Support of Plaintiffs' Motion for Leave to File a Second Amended Complaint, Docket No. 53, at 6 (emphasis added).

[129]  In its Ruling on Plaintiffs' Motion for Leave to File a Second Amended Complaint, the Court stated that "[t]he parties agree that New York law governs the breach of contract and misappropriation claims. Defendant has argued, and plaintiffs have not disputed, that New York law also governs plaintiffs' common law unfair competition claims." Docket No. 80, at 7, n.2.

[130]  *See, e.g., Bianco v. Erkins*, 243 F.3d 599, 601 (2d Cir. 2001); *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989); *Otis Elevator Co. v. Civil Factory Mut. Ins. Co.*, 353 F. Supp. 2d 274, 284 (D. Conn. 2005).

to the occurrence and the parties to the dispute."[131]  In this choice-of-law analysis, the primary

factors are:

> (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.  These contacts are to be evaluated according to their relative importance with respect to the particular issue.[132]

New York law must be applied to plaintiffs' tort claims, because New York has the

"most significant relationship to the occurrence and the parties to the dispute."[133]  The "injury" to

plaintiffs' property (their alleged concept) occurred in East Aurora, New York, where it was

allegedly misappropriated.  Plaintiffs' idea was submitted to Fisher-Price at its New York City

offices and all development of the accused products happened in East Aurora.  Thus, the conduct

alleged to have caused the plaintiffs' injury occurred in New York.  The third factor, residence of the

parties, is neutral as plaintiffs are located in Connecticut and Fisher-Price is located in New York.

Finally, the fourth factor — the center of the parties' relationship —  clearly favors New York.  The

meeting during which plaintiffs initially disclosed their concept occurred in New York, and plaintiffs

sent their 1999 and 2000 Submissions, on an unsolicited basis, to Fisher-Price in New York.

Therefore, under Connecticut choice-of-law principles, New York governs the plaintiffs' tort

claims.[134]  As a result, plaintiffs' CUTPA claim must be dismissed.

---

[131]    *MM Global Servs.*, 283 F. Supp. 2d at 699.  *See also Otis Elevator*, 353 F. Supp. 2d at 285.

[132]    *Otis Elevator*, 353 F. Supp. 2d at 285 (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145).  *See also MM Global Servs.*, 283 F. Supp. 2d at 703.

[133]    *MM Global Servs.*, 283 F. Supp. 2d at 699.

[134]    Under Connecticut law, where a ***second*** state was the situs of the conduct causing the injury, and was the center of the parties' relationship, the substantive law of that second state applies, even where the plaintiff is domiciled the same state where the injury occurred.  *See, e.g.*, *Otis Elevator*, 353 F. Supp. 2d at 285-86 (holding that Minnesota law applied to the plaintiff's tort claim even though the injury occurred and

Footnotes continued on next page.

# XI.    PLAINTIFFS' PUNITIVE DAMAGES
## CLAIM MUST BE DISMISSED

"[I]n order for punitive damages to be awarded, the plaintiff must demonstrate that the defendant's conduct is intentional and deliberate, has fraudulent or evil motive, and has the character of outrage frequently associated with crime."[135]  Because plaintiffs can identify no facts to support their claim for punitive damages, it must be dismissed.[136]

## Conclusion

For the foregoing reasons, the Second Amended Complaint should be dismissed in its entirety.

---

Footnotes continued from previous page.

plaintiff lived in Connecticut, but where the conduct causing the injury arguably occurred in Minnesota and the parties' relationship was centered in Minnesota).  *See also Ahlert*, 325 F. Supp. 2d at  512 (applying New Jersey law over Connecticut law in an analogous submission-of-idea case based on the defendant's alleged misappropriation even though the plaintiff was located in Connecticut, because the defendant was located in New Jersey; "[p]laintiff's idea was submitted in New Jersey, and any alleged wrongdoing would have taken place there as well").

[135]    *Morsette v. "The Final Call,"* 309 A.D.2d 249, 254, 764 N.Y.S.2d 416, 420 (1st Dep't 2003) (vacating punitive damages award).  *See also Evans v. Stranger*, 307 A.D.2d 439, 440, 762 N.Y.S.2d 678, 680 (3d Dep't 2003) (upholding dismissal of punitive damages claim, and stating that "[t]he imposition of punitive damages generally requires conduct that evidences a high degree of moral culpability, is so flagrant as to transcend simple carelessness, or constitutes willful or wanton negligence or recklessness so as to evince a conscious disregard for the rights of others"); *Robert Plan Corp. v. Perot Sys. Corp*., 278 A.D.2d 119, 119, 718 N.Y.S.2d 50, 51 (1st Dep't 2000) (affirming dismissal of punitive damages claim because "[p]laintiff's allegations that defendant misappropriated proprietary information . . . do not show conduct so reprehensible as to support a claim for punitive damages").

[136]    As discussed above, because New York law applies to the plaintiffs' tort claims, plaintiffs have no claim under CUTPA.  But even if their CUTPA claim survives (which it should not), punitive damages are proper only where "the defendant's conduct was recklessly indifferent, intentional and wanton, malicious, violent, or motivated by evil."  *Sir Speedy, Inc. v. L&P Graphics, Inc.*, 957 F.2d 1033, 1040 (2d Cir. 1992) (upholding district court finding that defendant's conduct did not meet the standard for an award of punitive damages).

Dated:  May 2, 2005

HODGSON RUSS LLP


By   s/Robert J. Lane, Jr.        
         Robert J. Lane, Jr.
e-mail:  rlane@hodgsonruss.com
Federal Bar No.:  ct24598
         Jodyann Galvin
e-mail:  jgalvin@hodgsonruss.com
Federal Bar No.:  ct24599
**HODGSON RUSS LLP**
One M&T Plaza, Suite 2000
Buffalo, New York  14203-2391
Telephone: (716) 856-4000


and

Bradford S. Babbitt
e-mail:  babbitt@rc.com
Federal Bar No.:  ct13938
Michael J. Kolosky
email:  mkolosky@rc.com
Federal Bar No.:  ct22686
**ROBINSON & COLE LLP**
280 Trumbull Street
Hartford, CT  06103-3597
Telephone:  (860) 275-8200

*Attorneys for Fisher-Price, Inc.*

BFLODOCS 1237986 v1

- 53 -