UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

VICTOR G. REILING ASSOCIATES and
DESIGN INNOVATION, INC.,

                            Plaintiffs,

   - against -

FISHER-PRICE, INC.,

                           Defendant.

Index No.: 3:03 CV 222 (JBA)

May 23, 2005

## PLAINTIFFS' LOCAL RULE 56(a)(1) COUNTER-STATEMENT OF DISPUTED MATERIAL FACTS

Plaintiffs, Victor G. Reiling Associates ("Reiling") and Design Innovation, Inc. ("DI") (collectively, "Plaintiffs"), pursuant to Rule 56(a)(1) of the Local Rules of Civil Procedure, respectfully submit their counter-statement of disputed material facts.

The Parties

1.      Plaintiffs do not dispute the allegations contained in paragraph 1 of defendant's Local Rule 56(a)(1) Statement ("Defendant's 56(a)(1) Statement").

2.      Plaintiffs dispute defendant's assertion that its internal designers and engineers are responsible for the design and engineering of the vast majority of its products. Paul Snyder, Fisher-Price's former Vice President of Inventor Relations, testified regarding the increased importance of outside inventor submissions to Fisher-Price. (Dize Decl., Exh. B at 19, lines 2-24). Stan Clutton, Fisher-Price's current Vice President of Inventor Relations, testified that

Fisher-Price receives thousands of outside inventor submissions each year. (Dize Decl. Exh. A at 115, lines 6-8.)

    3.    Plaintiffs dispute defendant's assertion that it receives product submissions from outside inventors on an unsolicited basis. Fisher-Price routinely seeks concept submissions from a select group of private toy developers in an effort to create and manufacture new toy lines as well as expand existing product lines. (Reiling Decl. ¶ 27.) Fisher-Price employs certain individuals who are responsible for interfacing with independent toy inventors nationwide, including conducting nationwide "sweeps" of new toy concepts. (Id.) Reiling regularly met with Mr. Snyder to show new toy concepts, including a number of meetings in New York City and at least one meeting at Reiling's studio in Connecticut. (Id. ¶¶ 26-27.) In advance of these meetings, Fisher-Price would often send inventors documents called "Wish Lists," which would indicate areas in which Fisher-Price had an interest for new concept submissions. (Id. ¶ 27.) Rescue Heroes were routinely included on these wish lists. (Id.; Exh. T.)

    4.    Plaintiffs dispute that Fisher-Price required all inventors making submissions to execute its "Policy and Agreement Concerning Ideas Submitted by Persons Outside of Fisher-Price, Inc." DI has never signed a P&A form like the one that Reiling signed in 1994 (i.e., one that does not reference a particular concept and purports to have an indefinite duration). (Popek Decl. ¶ 8.) DI did sign one P&A form with respect to three specific concepts they presented in 1992. (Id.; Benedetto Decl. ¶ 8, Exh. A.) This form was signed by DI during the time when Fisher-Price required such a form to be signed in connection with every concept submission, a procedure the company later abandoned. (Id.) The form references three specific concepts that were presented in 1992, and a separate page is attached to the document that describes each of these three concepts. (Id.)

DI has never signed any agreement related to the submissions in this case other than the Option Agreement with Fisher-Price. (*Id.* ¶ 9.) In addition, DI did not begin working with Reiling until after Reiling signed the 1994 P&A Form, which was never shown to DI by Reiling or Fisher-Price. (*Id.*) DI is not bound by the P&A Form that Reiling signed in 1994 because there is no agency relationship between Reiling and DI. (Popek Decl. ¶ 6; Benedetto Decl. ¶ 6; Reiling Decl. ¶ 5.)

Moreover, Reiling is not bound by the P&A Form. Fisher-Price required Reiling to sign a number of different forms during his career as a toy inventor before he was permitted to make concept submissions, including a Fisher-Price Policy and Agreement form that he signed in 1994 (the "P&A Form"). (Reiling Decl. ¶ 11.) These forms were mandatory. (*Id.*) Inventors had to sign them or they would not be permitted to show concepts. (*Id.*) Simply stated, inventors had no bargaining power on this issue. (*Id.*) Since showing concepts was Reiling's livelihood, he signed the documents as Fisher-Price demanded. (*Id.*) Because these agreements were mandatory, Reiling's experience was that inventors and the inventor relations personnel of toy companies treated them as a mere formality – administrative paperwork that had to be completed in order to do business – and that is how he treated them. (*Id.*) He was not represented by counsel in connection with his execution of the P&A Form. (*Id.*) Because Fisher-Price had always treated him fairly in the past, and because the P&A Form indicated that Fisher-Price would deal with him fairly in the future, he was not concerned about the impact of these forms. (*Id.*)

Fisher-Price changed the rules regarding these required forms every few years. (*Id.* ¶ 12.) When Reiling first began to make concept submissions, Fisher-Price required a separate P&A form for each submission. (*Id.*) The P&A contractual language was printed on the same form on

which Reiling described his concepts. (*Id.*) Later, Fisher-Price required Reiling to sign a P&A form once a year, instead of at the time of each submission, and he would submit a separate Concept Submission Form each time he made a submission. (*Id.*) Finally, Fisher-Price required Reiling to sign the P&A Form in 1994 that purports to have an indefinite duration. (*Id.*)

At the times plaintiffs made their three submissions to Fisher-Price relative to this case, Reiling did not recall that the P&A Form was in existence. (*Id.* ¶ 13.) No one at Fisher-Price referenced this agreement when plaintiffs submitted the three executions of their concept, nor did the Concept Submission Form that Reiling submitted with plaintiffs' concept indicate that it related back to the P&A Form or to any of its terms. (*Id.*) Because Reiling did not recall the P&A Form, he did not have an expectation at the time plaintiffs made their submissions that it would govern those submissions. (*Id.*) Because Fisher-Price changed forms frequently and previously had him sign such an agreement at the time he made each submission, he did not believe that they would have one form that would last forever. (*Id.*) When he signed the P&A Form in 1994, he did not believe that it would cover all future submissions. (*Id.*) Reiling has never signed a P&A form specifically with regard to plaintiffs' submissions in this case. (*Id.*)

The forms that toy companies require inventors to sign in order to do business are not uniform. (*Id.* ¶ 14; Popek Decl. ¶ 16.) For example, Hasbro uses a concept submission form that provides on its face that the submission is confidential. (Reiling Decl. ¶ 14; Exh. G.) In addition, Fisher-Price Brands, Mattel and Hasbro all incorporate waiver language on the face of their concept submission forms. (*Id.*; Exh. G, H.) Some companies do not require any forms or agreements. (*Id.*) With respect to plaintiffs' submissions in this case, Reiling expected to see any waiver language or disclaimer of a confidential relationship on the face of Fisher-Price's

4

Concept Submission Form, where other toy companies in the industry include such language, including Fisher-Price's related companies Fisher-Price Brands and Mattel. (*Id.*)

Based upon their prior experience in the industry, plaintiffs expected their concept submission to be held in confidence by Fisher-Price, and they treated their disclosure as confidential. (Reiling Decl. ¶ 22; Popek Decl. ¶ 17). This is the manner in which plaintiffs had dealt with Fisher-Price and other toy companies in the past, and plaintiffs' Option Agreement with Fisher-Price relative to the submissions in this case confirmed a confidential relationship. (*Id.*; Exh. V.) Notably, Fisher-Price's own expert, also an independent inventor, testified that he considers his concept submissions to Fisher-Price to be confidential. (Dize Decl., Exh. C at p. 52, line 9 -- p. 54, line 5; p. 206, line 21 -- p. 209, line 23.)

5.    Plaintiffs dispute the allegations contained in paragraph 5 of Defendant's 56(a)(1) Statement. At the initial meeting with Mr. Snyder, Reiling submitted a Fisher-Price Concept Submission Form for the products he was showing that day. (*Id.* ¶ 28; Exh. O.) Fisher-Price's Concept Submission Form contains spaces for multiple concepts to be listed, and there is a small rectangular space (approximately 1" x 3") in which to describe each concept. (*Id.*) Reiling showed Mr. Snyder approximately six concepts that day. (*Id.*) Fisher-Price has suggested in this case that plaintiffs should be limited to the description of their concept in this small rectangular space on their Concept Submission Form. (*Id.*) However, it was impossible to accurately describe the concept in such a small space. (*Id.*) In filling out the Concept Submission Form, Reiling attempted to identify the concepts that were being shown that day for administrative purposes, so that he and Fisher-Price would both have a record in the event there was a dispute about what concepts had been shown. (*Id.*) The description on the Concept Submission Form was not intended to be a precise definition of the concept. (*Id.*) In fact, Reiling submitted a

separate written description with the submission materials because he realized that he could not accurately describe the concept in such a small space. (*Id.*) Plaintiffs' expert, Jim Kipling, has confirmed that the Concept Submission Form is a record-keeping form and not meant to be legally binding. (Kipling Decl. ¶ 29.) It is also undisputed that the Concept Submission Form that plaintiffs submitted in this case did not related back to the 1994 P&A Form that Reiling signed. (Reiling Decl. ¶ 13; Exh. O.)

Per industry practice, inventors illustrate a concept through the combination of a prototype, drawings, written description and a concept submission form. (*Id.* ¶ 29.) The concept is illustrated by looking at these materials collectively, not individually. (*Id.*) For example, the prototype plaintiffs submitted with the submission documents demonstrated one possible execution of the concept. (*Id.*) It was not intended to show all possible executions of the concept or to limit the concept to the exact mechanisms that were disclosed in the prototype. (*Id.*) Accordingly, plaintiffs' concept did not require that the child place one eye up to a magnifying lens and look inside the backpack, nor that film be used, as Fisher-Price has suggested. (*Id.*)

6.    Plaintiffs dispute the allegations contained in paragraph 6 of Defendant's 56(a)(1) Statement and incorporate herein plaintiffs' response to paragraph 5 above. Plaintiffs and Plaintiffs' expert have testified regarding the administrative nature of the Concept Submission Forms. (Reiling Dec. ¶¶ 13, 28-29; Kipling Dec. ¶ 29.)

7.    Plaintiffs do not dispute the allegations contained in paragraph 7 of Defendant's 56(a)(1) Statement.

8.    Plaintiffs do not dispute the allegations contained in paragraph 8 of Defendant's 56(a)(1) Statement.

9.      Plaintiffs dispute that Reiling's meeting with Paul Snyder of Fisher-Price was governed by a Fisher-Price Policy and Agreement form. Fisher-Price required Reiling to sign a number of different forms during his career as a toy inventor before he was permitted to make concept submissions, including a Fisher-Price Policy and Agreement form that he signed in 1994 (the "P&A Form"). *(Id ¶ 11.)* These forms were mandatory. *(Id.)* Inventors had to sign them or they would not be permitted to show concepts. *(Id.)* Simply stated, inventors had no bargaining power on this issue. *(Id.)* Since showing concepts was Reiling's livelihood, he signed the documents as Fisher-Price demanded. *(Id.)* Because these agreements were mandatory, Reiling's experience was that inventors and the inventor relations personnel of toy companies treated them as a mere formality – administrative paperwork that had to be completed in order to do business – and that is how he treated them. *(Id.)* He was not represented by counsel in connection with his execution of the P&A Form. *(Id.)* Because Fisher-Price had always treated him fairly in the past, and because the P&A Form indicated that Fisher-Price would deal with him fairly in the future, he was not concerned about the impact of these forms. *(Id.)*

Fisher-Price changed the rules regarding these required forms every few years. *(Id ¶ 12.)* When Reiling first began to make concept submissions, Fisher-Price required a separate P&A form for each submission. *(Id.)* The P&A contractual language was printed on the same form on which Reiling described his concepts. *(Id.)* Later, Fisher-Price required Reiling to sign a P&A form once a year, instead of at the time of each submission, and he would submit a separate Concept Submission Form each time he made a submission. *(Id.)* Finally, Fisher-Price required Reiling to sign the P&A Form in 1994 that purports to have an indefinite duration. *(Id.)*

At the times plaintiffs made their three submissions to Fisher-Price relative to this case, Reiling did not recall that the P&A Form was in existence. *(Id ¶ 13.)* No one at Fisher-Price

7

referenced this agreement when plaintiffs submitted the three executions of their concept, nor did the Concept Submission Form that Reiling submitted with plaintiffs' concept indicate that it related back to the P&A Form or to any of its terms. (*Id.*) Because Reiling did not recall the P&A Form, he did not have an expectation at the time plaintiffs made their submissions that it would govern those submissions. (*Id.*) Because Fisher-Price changed forms frequently and previously had him sign such an agreement at the time he made each submission, he did not believe that they would have one form that would last forever. (*Id.*) When he signed the P&A Form in 1994, he did not believe that it would cover all future submissions. (*Id.*) Reiling has never signed a P&A form specifically with regard to plaintiffs' submissions in this case. (*Id.*)

The forms that toy companies require inventors to sign in order to do business are not uniform. (*Id.* ¶ 14; Popek Decl. ¶ 16.) For example, Hasbro uses a concept submission form that provides on its face that the submission is confidential. (Reiling Decl. ¶ 14; Exh. G.) In addition, Fisher-Price Brands, Mattel and Hasbro all incorporate waiver language on the face of their concept submission forms. (*Id.*; Exh. G, H.) Some companies do not require any forms or agreements. (*Id.*) With respect to plaintiffs' submissions in this case, Reiling expected to see any waiver language or disclaimer of a confidential relationship on the face of Fisher-Price's Concept Submission Form, where other toy companies in the industry include such language, including Fisher-Price's related companies Fisher-Price Brands and Mattel. (*Id.*)

The Concept Submission Form that Reiling submitted in 1998 is silent on the issue of confidentiality, and it does not relate back to the 1994 P&A Form. (Reiling Decl., Exh. O). The Option Agreement between plaintiffs and Fisher-Price confirms a confidential relationship. (*Id.*; Exh. V, ¶¶ 5, 8). Notably, Fisher-Price's own expert, also an independent inventor, testified that

he considers his concept submissions to Fisher-Price to be confidential. (Dize Decl., Exh. C at p. 52, line 9 – p. 54, line 5; p. 206, line 21 – p. 209, line 23.)

10.    Plaintiffs do not dispute that DI, in the past, has provided modeling and design services to Fisher-Price, but state that such work was done as an independent contractor on a work for hire basis. (Popek Decl. ¶¶ 7, 10; Benedetto Decl. ¶¶ 7, 10.) DI did sign at least one development agreement with Fisher-Price for such work, but such agreement had a very different purpose. (*Id.*)

11.    Plaintiffs do not dispute that there is no express oral or written contract containing any continuing obligation of Fisher-Price to hire DI and there has never been such a contract. However, Plaintiffs contend that, pursuant to industry custom and practice, Fisher-Price has an obligation to deal with plaintiffs fairly. (Reiling Decl. ¶ 20; Popek Decl. ¶ 15.)

12.    Plaintiffs do not dispute that DI's work for hire projects for Fisher-Price included work on the Rescue Heroes line. However, DI did very little work on the "Rescue Heroes" line in the few years prior to this lawsuit. (Popek Decl. ¶ 7.) Moreover, the work that DI performed related only to ancillary products like vehicles, not to the core action figure line. (*Id.*) In addition, DI was typically given very finite and specific design tasks that would only encompass one small portion of the overall toy. (*Id.*) For example, DI was often hired by Fisher-Price to perform sculpting of individual components of larger products. (*Id.*) Hence, DI typically had no idea what the actual finished product would look like, what product line it would be used in, or what engineering mechanisms it would utilize. (*Id.*) For this reason, DI was unaware of Fisher-Price's misappropriation with respect to these lines.

The Rescue Heroes Action Figures

13.    Plaintiffs do not dispute the allegations contained in paragraph 13 of Defendant's 56(a)(1) Statement.

14.    Plaintiffs do not dispute the allegations contained in paragraph 14 of Defendant's 56(a)(1) Statement.

15.    Plaintiffs do not dispute the allegations contained in paragraph 15 of Defendant's 56(a)(1) Statement.

16.    Plaintiffs do not dispute the allegations contained in paragraph 16 of Defendant's 56(a)(1) Statement, but state that based upon the products that Fisher-Price has manufactured and sold, the result of the Boys Team's efforts was to communicate to the child the character's mission through the use of an image on a backpack. For example, from a design perspective, the most important purpose of the still images on the Mission Select and Mission Command backpacks is to communicate a play scenario to the child of the character's mission or obstacles and dangers the character might face, not to identify the subject matter of the action figure's speech. (Reiling Decl. ¶ 63; Popek Decl. ¶ 22; Benedetto Decl. ¶ 22.) If the voice or sound element was not there, or not working, the child would still view and talk about the image. (Popek Decl. ¶ 22; Benedetto Decl. ¶ 22.) With Mission Select, the child would still rotate the disc to reveal the multiple images that would lead the child to different adventures. (*Id.*)

Plaintiffs' Submissions

17.    Plaintiffs dispute defendant's allegations that Reiling was acting on behalf of himself and DI when he met with Paul Snyder to present plaintiffs' concept. Reiling and DI frequently cooperate on the development of new toy and game concepts and submit their concepts to toy manufacturers for possible development and production. (Reiling ¶ 4.) In this

regard, Reiling and DI are joint inventors and always maintain an equal ownership interest in their jointly developed concepts (*i.e.*, 50% Reiling, 50% DI). (*Id.* ¶ 5; Popek Decl. ¶ 6; Benedetto Decl. ¶ 6.) Reiling does not act on behalf of DI and there is no agency relationship (either in writing or by oral agreement). (*Id.*) Reiling has no authority to bind DI, and in fact, DI retains the right to approve all proposed actions with respect to their jointly developed concepts. (*Id.*) While DI is a joint inventor, Reiling routinely presents their jointly developed concepts to toy companies due to his longstanding relationships with inventor relations personnel in the industry. (*Id.*) No one from Fisher-Price ever asked Reiling about his relationship with DI or whether he had authority to bind DI. (Reiling Decl. ¶ 5.)

18.     Plaintiffs dispute defendant's allegation that the Concept Submission Form "described" plaintiffs' concept. At the initial meeting with Paul Snyder, Reiling submitted a Fisher-Price Concept Submission Form for the products he was showing that day. (Reiling ¶ 28; Exh. O.) Fisher-Price's Concept Submission Form contains spaces for multiple concepts to be listed, and there is a small rectangular space (approximately 1" x 3") in which to describe each concept. (*Id.*) Reiling showed Mr. Snyder approximately six concepts that day. (*Id.*) Fisher-Price has suggested in this case that plaintiffs should be limited to the description of their concept in this small rectangular space on their Concept Submission Form. (*Id.*) However, it was impossible to accurately describe the concept in such a small space. (*Id.*) In filling out the Concept Submission Form, Reiling attempted to identify the concepts that were being shown that day for administrative purposes, so that he and Fisher-Price would both have a record in the event there was a dispute about what concepts had been shown. (*Id.*) The description on the Concept Submission Form was not intended to be a precise definition of the concept. (*Id.*) In

fact, Reiling submitted a separate written description with the submission materials because he realized that he could not accurately describe the concept in such a small space. (*Id.*; Exh. P.)

Per industry practice, inventors illustrate a concept through the combination of a prototype, drawings, written description and a concept submission form. (*Id.* ¶ 29.) The concept is illustrated by looking at these materials collectively, not individually. (*Id.*) For example, the prototype plaintiffs submitted with the submission documents demonstrated one possible execution of the concept. (*Id.*) It was not intended to show all possible executions of the concept or to limit the concept to the exact mechanisms that were disclosed in the prototype. (*Id.*) Accordingly, plaintiffs' concept did not require that the child place one eye up to a magnifying lens and look inside the backpack, nor that film be used, as Fisher-Price has suggested. (*Id.*)

Jim Kipling, plaintiffs' expert, has confirmed that the Concept Submission Forms are record-keeping forms and not meant to be legally binding. (Kipling Decl. ¶ 29.)

19.    Plaintiffs dispute defendant's allegations that Reiling provided a "detailed description" of plaintiffs' concept on the Concept Submission Form, and incorporate herein by reference the response to paragraph 18 above.

20.    Plaintiffs dispute defendant's allegations that Reiling "described" plaintiffs' concept on the Concept Submission Form, and incorporate herein by reference the response to paragraphs 18 and 19 above. Notably, plaintiffs' included a much more detailed description of the concept in the separate written description submitted with the concept. (Reiling Decl., Exh. P.)

21.    Plaintiffs had several working names for their concept, including "Reel Action," "Reel Heroes," "Reel/Real Heroes" and "Reel Action/Reel Heroes." The "Reel" portion of the

12

working names was a play on words with respect to the film reel that was first shown in the prototype, but this in no way was meant to be a limitation on the concept. (Reiling Decl. ¶ 24.)

Per industry practice, inventors illustrate a concept through the combination of a prototype, drawings, written description and a concept submission form. (*Id.* ¶ 29.) The concept is illustrated by looking at these materials collectively, not individually. (*Id.*) For example, the prototype plaintiffs submitted with the submission documents demonstrated one possible execution of the concept. (*Id.*) It was not intended to show all possible executions of the concept or to limit the concept to the exact mechanisms that were disclosed in the prototype. (*Id.*) Accordingly, plaintiffs' concept did not require that the child place one eye up to a magnifying lens and look inside the backpack, nor that film be used, as Fisher-Price has suggested. (*Id.*)

22.    Plaintiffs dispute defendant's allegations that plaintiffs' submissions did not propose or conceive of a new product. While it is true that plaintiffs' concept was submitted specifically for pre-existing Rescue Heroes figures, those figures never before were sold with an image viewer in the form of a backpack for each "Rescue Heroes" action figure that enhanced role play for the child by depicting the mission of that particular "Rescue Heroes" character. (Reiling Decl. ¶ 23.) In that respect, plaintiffs did propose and conceive of a new product. However, even if defendant's allegations were true, this is hardly sufficient justification for them to avoid a royalty obligation. Toy companies routinely pay royalties for modifications to existing toy lines. (Reiling Decl. ¶ 55.)

23.    Plaintiffs dispute defendant's allegations because plaintiffs' submitted more than Fisher-Price suggests with respect to its 1998 execution of the concept. Plaintiffs' initial submission, on or about October 29, 1998, consisted of a written description, drawings, a prototype and the Concept Submission Form, which collectively envisioned an interchangeable

battery-operated animated image player that would be placed on the "Rescue Heroes" characters in the form of a backpack. (Reiling Decl. ¶ 24, Exh. O, P, Q and R; Popek Decl. ¶ 18.) The backpack allowed children to view animated images. (Reiling Decl. ¶ 24.) Plaintiffs' concept was submitted specifically for Rescue Heroes, and specifically as a backpack, although plaintiffs' written description indicated that the concept could be expanded by Fisher-Price into line extensions and accessories. (Id. ¶ 24, Exh. O; Popek Decl. ¶ 18).

Importantly, Fisher-Price did not actively market the original lines of Rescue Heroes as having "backpacks." (Id. ¶ 41.) The original lines were marketed as having "equipment packs" or simply "packs." (Id.; Exh. AA.) Starting with Mission Command Rescue Heroes in 2001 (after plaintiffs' submissions), Fisher-Price began to actively use the term "backpacks." (Id.) For example, the packaging for the Video Mission Rescue Heroes, which were marketed and sold in 2002, indicated: "Now! See my mission on my video backpack!" (Id.; Exh. BB, CC.) This language is strikingly similar to the language plaintiffs used to describe their concept in their initial written description: "A backpack TV/movie monitor and a separate TV/Movie camera are the equipment for recording and viewing countless RESCUE HERO Adventures! The film clips give the child a great start on fantasy adventures." (See Tab P).

Per industry practice, inventors illustrate a concept through the combination of a prototype, drawings, written description and a concept submission form. (Id. ¶ 29.) The concept is illustrated by looking at these materials collectively, not individually. (Id.) For example, the prototype plaintiffs submitted with the submission documents demonstrated one possible execution of the concept. (Id.) It was not intended to show all possible executions of the concept or to limit the concept to the exact mechanisms that were disclosed in the prototype. (Id.)

Accordingly, plaintiffs' concept did not require that the child place one eye up to a magnifying lens and look inside the backpack, nor that film be used, as Fisher-Price has suggested. (*Id.*)

Moreover, plaintiffs dispute defendant's assertions that the 1998 Submission was not solicited by Fisher-Price. Fisher-Price routinely seeks concept submissions from a selected group of private toy developers in an effort to create extensions and modifications to existing toy lines. (Reiling Decl. ¶ 55, Exh. T.) Fisher-Price sends "Wish Lists" to outside toy inventors for the purpose of soliciting new product concept submissions from them, and they have sent such documents out with regard to Rescue Heroes, noting that "Fisher-Price continually looks for "ways to bring these characters to life, and expand the play." (*Id.*; Exh. T.)

24.    Plaintiffs do not dispute that they executed an Option Agreement with Fisher-Price in early 1999, but do dispute that it was negotiated. Fisher-Price's attorneys drafted the Option Agreement with little, if any, input from Reiling and no input from DI, including Exhibit A which purports to describe the concept. (Reiling Decl. ¶ 32; Popek Decl. ¶ 11.) Neither DI nor Reiling were represented by counsel in connection with the execution of the Option Agreement. (*Id.*)

25.    Exhibit A to the Option Agreement, which purports to describe plaintiffs' concept, was drafted by Fisher-Price's attorneys with little, in any, input from Reiling and no input from DI. (*Id.*) Plaintiffs were not represented by counsel in connection with the drafting or execution of the Option Agreement. (*Id.*) Importantly, Fisher-Price accurately recognized in Exhibit A that the *"unique aspect of the concept* is the combination of existing action figures with film for play pattern." (emphasis added) (Reiling Decl. ¶ 32.) In this context, industry professionals would know that "film" was not limited to film in a literal sense, but rather encompassed images and/or video to enhance the play pattern for the child. (*Id.*; Popek Decl. ¶ 5;

Benedetto Decl. ¶ 5.)  Exhibit A also specifically indicates that the concept is for the Rescue

Heroes and for backpacks. (Reiling Decl. ¶ 32; Exh. V.)

As an aside, plaintiffs note that the emphasis (bold and italics) contained in paragraph 25

of Defendant's 56(a)(1) Statement are not present in Exhibit A to the Option Agreement, but

were added by defendant. (Reiling Decl., Exh. V.)

26.    Plaintiff disputes the allegations that the Option Agreement included all material

terms.  While the Option Agreement did contain certain material terms that would apply if the

option was exercised (*e.g.*, royalty rate, term, advance, etc.), the agreement did not contain all

material terms. (*Id.* ¶ 33.)  For example, payment of a royalty on line extensions and accessories

was not addressed. (*Id.*)  This item would have been addressed had Fisher-Price proceeded with a

formal license agreement, instead of using plaintiffs' concept without authorization. (*Id.*)  Fisher-

Price should not now be permitted to rely upon the Option Agreement as evidence that royalties

were not payable on line extensions and accessories. (*Id.*)  Moreover, Fisher-Price should not

receive the benefit of the terms contained in the Option Agreement, including the royalty rate,

because Fisher-Price chose not to exercise the option but to use plaintiffs' concept anyway. (*Id.*)

Moreover, Option Agreements are usually merely "standstill" agreements, in effect.  The

principal purpose of the option agreement is to give the toy company an additional, exclusive

period of time to make a final decision on whether or not to license the concept.  (That the option

agreement in this case was so lengthy and detailed is the rare exception to the rule, and militates

toward the seriousness with which Fisher-Price viewed the potential value of Plaintiffs' concept.)

(Kipling Decl. ¶ 30.)

27.    Plaintiffs' do not dispute that Fisher-Price did not execute its option.  On March

23, 1999, Fisher-Price returned the prototypes and drawings of the concept to plaintiffs, allegedly

16

due to prohibitive production costs. (Reiling ¶ 31.) In the letter from Henry Schmidt of Fisher-Price rejecting the concept, he stated that the concept had been given "very careful consideration and evaluation from design, costing, engineering and marketing perspectives," thereby confirming that the concept had been considered by many different departments within Fisher-Price. (*Id.*; Exh. W.) Accordingly, the Option Agreement expired by its very terms on May 1, 1999. (*Id.*) (Dize Decl., Exh. O.)

28.    Plaintiffs do not dispute the allegations contained in paragraph 28 of Defendant's 56(a)(1) Statement. All three executions of plaintiffs' concept were entered into Fisher-Price's database of inventor submissions by inventor relations personnel. (Dize Decl., Exh. H, p. 8, line 18 – p. 9, line 15; p.50, line 2 – p. 52, line 19; p. 57, line 3 – p. 60, line 16; Exh. Q.) In addition, Fisher-Price employees Tyler Berkheiser and Ken Morton (designers) and Chris Pardi (marketing) admitted that they had seen portions of plaintiffs' submissions, including the prototype. (*Id.*; Exh. D, p. 38, line 1 – p. 40, line 7, p. 44, line 14 – p. 45, line 15, p. 46, line 4 – p. 47, line 6; Exh. E, p. 58, line 8 – p. 59, line 22, p. 60, line 21 – p. 62, line 4, p. 71, line 6 – p. 74, line 23; Exh. F, p. 45, line 8 – p. 46, line 9; p. 50, line 1 – line 22, p. 51, line 18 –line 22, p. 54, line 12 – p. 55, line 5.) Mr. Morton, Manager of Design at the time, admitted that he had control over the prototype for a period of more than three weeks, that he also had seen some of plaintiffs' drawings and that he had at least one conversation with Mr. Berkheiser about plaintiffs' submissions. (Dize Decl., Exh. E, p. 58, line 8 – p. 59, line 22, p. 60, line 21 – p. 62, line 4, p. 71, line 6 – p. 74, line 23.) Notably, Fisher-Price has admitted that Mr. Berkheiser and Mr. Pardi saw portions of plaintiffs' original submission and were later involved in developing the Rescue Heroes product lines at issue in this case. (*Id.*; Exh. R, Interrogatory Response No. 6.)

29.     Plaintiff disputes the allegations contained in paragraph 29, because the only reasons ever provided to plaintiffs regarding Fisher-Price's lack of interest in plaintiffs' concept were that the concept was too expensive, it was a "one-trick pony" and that it did not fit the current Rescue Heroes theme. (Reiling Decl. ¶ 46; Popek Decl. ¶ 21). Fisher-Price never indicated that plaintiffs' concept did not fit the planned direction for development of the Rescue Heroes line, that it was too passive for preschooler play, and never said it was "far too expensive" to manufacture. (*Id.*) Although defendant now claims that the concept did not fit the planned direction of the Rescue Heroes line, defendant came out with same concept soon after. Moreover, defendant even optioned plaintiffs' concept, and Paul Snyder, former Vice President of Inventor Relations for Fisher-Price, testified that the company would typically not option a concept unless it was of interest to the company. (Dize Decl.; Exh. B, p. 65, line 1 – p. 72, line 21, p. 75, line 2 – p. 76, line 7.)

30.     Based upon plaintiffs' decades of experience in the toy industry, at the times plaintiffs submitted their three concept executions to Fisher-Price, plaintiffs had never seen their concept marketed or sold by Fisher-Price or any other toy company. (Reiling ¶ 43; Popek Decl. ¶ 19; Benedetto Decl. ¶ 19.) That is, plaintiffs had never seen the following marketed or sold: an image component in the form of a backpack for an action figure that enhanced role play for the child by depicting the mission of that particular character or obstacles and dangers that character might face. (*Id.*) Specifically, plaintiffs had never seen such a product marketed or sold in connection with the Rescue Heroes. (*Id.*) Moreover, Fisher-Price's former inventor relations director and its designers - including the very designers who worked both on Rescue Heroes and also admitted seeing portions of plaintiffs' submissions - testified either that they had never seen such a product at the time Fisher-Price marketed and sold the Video Mission Rescue Heroes, or

18

that they could not identify such a product that existed at that time. (Dize Decl., Exh. B, p. 143, line 18 – p. 145, line 3; Exh. D, p. 73, line 11 – p. 76, line 13; Exh. E, p. 99 line 21 – p. 101, line 13; Exh. F, p. 61, line 18 – p. 63, line 18; Exh. G, p. 47, line 2 – p. 48, line 18.) Moreover, Fisher-Price's current Vice President of Inventor Relations testified that he did not consider the issue of novelty when reviewing plaintiffs' claims to determine if a royalty was owed. (Dize Decl., Exh. A, p. 109, line 24, p. 111, line 11.)

Fisher-Price never communicated to plaintiffs that they did not think the concept was novel or unique. The only reasons ever provided to plaintiffs regarding Fisher-Price's lack of interest in plaintiffs' concept were that the concept was too expensive, it was a "one-trick pony" and that it did not fit the current Rescue Heroes theme. (Reiling Decl. ¶ 46; Popek Decl. ¶ 21). Fisher-Price never indicated that plaintiffs' concept did not fit the planned direction for development of the Rescue Heroes line, that it was too passive for preschooler play, and never said it was "far too expensive" to manufacture. (Id.)

31. Plaintiffs do not dispute the allegations contained in paragraph 31 of Defendant's 56(a)(1) Statement.

32. Plaintiffs dispute the allegations contained in paragraph 32, and state that despite Fisher-Price's initial rejection of the concept for reasons that "boiled down to cost," plaintiffs continued their efforts toward gaining Fisher-Price's acceptance of the concept by focusing on cost reductions. (Reiling Decl. ¶ 34.) Plaintiffs submitted a revised execution of the concept to Paul Snyder at Fisher-Price on May 22, 1999. (Id.; Exh. X.) Fisher-Price did not require an additional Concept Submission Form for the 1999 execution. (Id.) Seeking to address Fisher-Price's concerns regarding cost, plaintiffs eliminated the motor, batteries and several other parts from the original submission and instead focused on including eight or more still, printed images

19

mounted on a wheel or drum in the backpack of each "Rescue Heroes" action figure that enabled children to view still images through a viewing mechanism. (*Id.*) The images related to the mission of each "Rescue Heroes" character and were designed to enhance role play for the child. (*Id.*) Plaintiffs were demonstrating to Fisher-Price that there were alternative ways to execute the concept. (*Id.*) Accordingly, it was not necessary to the second execution of the concept that the child place one eye up to a magnifying lens and look inside the backpack, or that a hand crank be used, as Fisher-Price has suggested. (*Id.*)

Moreover, plaintiffs state that the submission was solicited, in that Fisher-Price routinely seeks concept submissions from a selected group of private toy developers in an effort to create extensions and modifications to existing toy lines. (Reiling Decl. ¶ 55, Exh. T.) Fisher-Price sends "Wish Lists" to outside toy inventors for the purpose of soliciting new product concept submissions from them, and they have sent such documents out with regard to Rescue Heroes, noting that "Fisher-Price continually looks for "ways to bring these characters to life, and expand the play." (*Id.*; Exh. T.)

33.    Plaintiffs dispute the allegations contained in paragraph 33. Plaintiffs were demonstrating to Fisher-Price that there were alternative ways to execute the concept. (Reiling ¶ 34.) Accordingly, it was not necessary to the second execution of the concept that the child place one eye up to a magnifying lens and look inside the backpack, or that a hand crank be used, as Fisher-Price has suggested. (*Id.*)

34.    Plaintiffs dispute the allegations contained in paragraph 34. The 1999 submission was cataloged by Fisher-Price's Inventor Relations Department and Paul Snyder, former Vice President of Inventor Relations, testified that would take the concepts to the relevant design departments as soon as possible after the submissions came in. (Dize Decl.; Exh. B, p. 41, line 12

– p. 42, line 11.)  Pat Grabianowski testified that there was usually a meeting at which new concepts were discussed during which it was decided who would have responsibility for a submission. (Dize Decl., Exh. H, p. 16, line 17 – p. 21, line 19.)  In this case, Ken Morton was listed in the Fisher-Price database as having responsibility for the 1999 Submission. (Dize Decl., Exh. 18.)

35.    Fisher-Price did not reject the 1999 execution of plaintiffs' concept. (Reiling Decl. ¶ 35.)  Plaintiffs have not been able to locate a rejection letter and Fisher-Price has not been able to locate one either. (Id.; Dize Decl., Exh. A, p. 120 – 121.)  Moreover, plaintiffs do not recall any oral communication from Fisher-Price rejecting the 1999 execution. (Reiling Decl. ¶ 35; Popek Decl. ¶ 5.)  To the extent the Second Amended Complaint indicates that Fisher-Price rejected the 1999 Submission, plaintiffs specifically retract those assertions.

36.    Plaintiffs dispute defendant's allegation that the 2000 Submission was unsolicited. Fisher-Price routinely seeks concept submissions from a select group of private toy developers in an effort to create and manufacture new toy lines as well as expand existing product lines. (Reiling Decl. ¶ 27.)  Fisher-Price employs certain individuals who are responsible for interfacing with independent toy inventors nationwide, including conducting nationwide "sweeps" of new toy concepts. (Id.)  Reiling regularly met with Mr. Snyder to show new toy concepts, including a number of meetings in New York City and at least one meeting at Reiling's studio in Connecticut. (Id. ¶¶ 26-27.)  In advance of these meetings, Fisher-Price would often send inventors documents called "Wish Lists," which would indicate areas in which Fisher-Price had an interest for new concept submissions. (Id. ¶ 27.)  Rescue Heroes were routinely included on these wish lists. (Id.; Exh. T.)

37.     Plaintiffs do not dispute the allegations contained in paragraph 37, but also state that in addition to drawings, the 2000 Submission included another written description, and plaintiffs re-submitted the originally submitted materials (the written description, drawings and prototype from the 1998 submission). (Reiling Decl. ¶ 36.)

38.     The December 2000 execution of plaintiffs' concept depicted still images on a round disc instead of on a wheel or drum device. (*Id.*) Again, while the concept envisioned depicting images in the form of a backpack for the "Rescue Heroes" action figures, the concept could be incorporated into accessories, such as vehicles and play sets, and line extensions relating to the "Rescue Heroes." (*Id.*) The 2000 submission demonstrated yet another way to execute plaintiffs' concept. (*Id.*) Accordingly, it was not necessary to the concept that the child place one eye up to a magnifying lens and look into the interior of the backpack, or that a lever be used, as Fisher-Price has suggested. (*Id.*)

39.     Plaintiffs dispute the allegations contained in paragraph 39 and incorporate herein by reference their response to paragraph 34 herein with respect to the 2000 Submission. For the 2000 Submission, former Vice President of Inventor Relations Peter Pook was listed in the Fisher-Price database as having responsibility. (Dize Decl., Exh. Q.)

40.     Plaintiffs do not dispute the allegations contained in paragraph 40.

41.     Plaintiffs do not dispute the allegations contained in paragraph 41, but state that in addition to being a second independent concept, the cameraman could also be considered a line extension because it extended plaintiffs' concept of adding an image component in the form of a backpack for each Rescue Heroes character to enhance role play for the child by depicting the character's mission and/or obstacles and dangers the character might face. (Reiling Decl. ¶ 51.)

42.     Plaintiffs dispute that their concept for a cameraman figure was not novel. It was novel, in part, because Rescue Heroes did not have such a camera man figure in the line at the time plaintiffs made their submissions. (*Id.*) The unique features were the distinctive appearance of the cameraman and the role play. (*Id.*) While Fisher-Price's optical camera from the 1970s and its current optical camera used in conjunction with the "Telly Photo Optic Force" figure are similar, plaintiffs are not seeking to claim novelty for the type of camera mechanism used. (Reiling ¶ 50.) Rather, plaintiffs claim novelty for the look and feel of the cameraman figure, including the fact that he was holding an optical camera (which enhanced mobile play value) in one hand and a microphone in the other. (*Id.*) Moreover, the 1970s product was certainly not an action figure, it is more fairly characterized as a doll. (*Id.*) It was a small, free-standing camera operator and studio-type camera apparatus that bears no resemblance to plaintiffs' concept, which involved an attempt to draw an association between the action figure and the figure's mission. (*Id.*)

43.     Plaintiffs dispute the allegations contained in paragraph 43 and incorporate by reference herein their response to paragraph 42 above. Plaintiffs specifically state that the 1970's product that Fisher-Price relies upon was not an action figure. (Reiling ¶ 50.) It was a small, free-standing camera operator and studio-type camera apparatus that bears no resemblance to plaintiffs' concept, which involved an attempt to draw an association between the action figure and the figure's mission. (Reiling ¶ 50.)

The Accused Products

44.     Plaintiffs dispute the allegations contained in paragraph 44 and state that the premium Rescue Heroes figure line focused on enhancing role play for the child by depicting missions. (Reiling Decl. ¶ 63.) Fisher-Price has attempted to argue that the purpose of the still

images on their Mission Select and Mission Command backpacks was simply to identify the subject matter of the action figure's speech. (*Id.*; Popek Decl. ¶ 22 ; Benedetto Decl. ¶ 22). From a design perspective, the most important aspect of these images was to communicate a play pattern to the child of the character's mission or obstacles and dangers the character might face. (*Id.*) While Fisher-Price has asserted that speech is the most important aspect of these lines, Paul Snyder indicated at plaintiffs' initial meeting with him regarding their concept that they should not worry about speech – that Fisher-Price put speech in everything. (Reiling Decl. ¶ 63.)

45.    Plaintiffs do not dispute the allegations contained in paragraph 45 of Defendant's 56(a)(1) Statement.

46.    Plaintiffs do not dispute the allegations contained in paragraph 46 of Defendant's 56(a)(1) Statement.

47.    Plaintiffs dispute the allegations contained in paragraph 47 and incorporate herein by reference their response to paragraph 44.

48.    Plaintiffs do not dispute the allegations contained in paragraph 48 of Defendant's 56(a)(1) Statement.

49.    Plaintiffs dispute that Tyler Berkheiser "designed" the Voice Tech Mission Command line. Mr. Berkheiser had seen portions of plaintiffs' submissions and later worked on the Voice Tech Mission Command line. (Dize Decl., Exh. R.)

50.    Plaintiffs dispute the allegations contained in paragraph 50 and incorporate herein by reference their response to paragraph 44. Moreover, plaintiffs' state that the Mission Command line is covered by plaintiffs' concept. (Reiling Decl. ¶¶ 58-59, 60(b), 61(a), 62(a); Exh. M.)

51.    Plaintiffs do not dispute the allegations contained in paragraph 51, but state that the ARCC is covered by plaintiffs' concept. (Reiling Decl. ¶¶ 58-59, 60(g), 61(c), 62(e); Exh. M.)

52.    Plaintiffs dispute that James Bauman "designed" the ARCC. The Fisher-Price Boys' Team, including designers Tyler Berkheiser, Chris Pardi and Ken Morton, had seen portions of plaintiffs' submissions and later worked on the ARCC. (Dize Decl., Exh. R.; Exh. D, p. 38, line 1 – p. 40, line 7, p. 44, line 14 – p. 45, line 15, p. 46, line 4 – p. 47, line 6; Exh. E, p. 58, line 8 – p. 59, line 22, p. 60, line 21 – p. 62, line 4, p. 71, line 6 – p. 74, line 23.)

53.    Plaintiffs do not dispute the allegations contained in paragraph 53 of Defendant's 56(a)(1) Statement.

54.    Plaintiffs do not dispute the allegations contained in paragraph 54, but state that this occurred several years after defendant first received plaintiffs' submissions and after the Boys' Team, including designers Tyler Berkheiser, Chris Pardi and Ken Morton, had seen portions of plaintiffs' submissions. (Dize Decl., Exh. R.; Exh. D, p. 38, line 1 – p. 40, line 7, p. 44, line 14 – p. 45, line 15, p. 46, line 4 – p. 47, line 6; Exh. E, p. 58, line 8 – p. 59, line 22, p. 60, line 21 – p. 62, line 4, p. 71, line 6 – p. 74, line 23.)

55.    Plaintiffs do not dispute the allegations contained in paragraph 53 of Defendant's 56(a)(1) Statement.

56.    Plaintiffs dispute the allegations contained in paragraph 56 and state that the Voice Tech Video Mission figure sub-line feature an image component for the backpack of each Rescue Heroes character to enhance role play for the child by depicting the character's mission or obstacles and dangers the character might face. The Video Mission line is covered by plaintiffs' concept. (Reiling Decl. ¶¶ 58-59, 60(a); Exh. M.)

25

57.    Plaintiffs dispute that Jim Bauman "designed" the Voice Tech Video Mission backpacks with the assistance of Jeff Neaves and Carterbench/Virtual Video.  The Fisher-Price Boys' Team, including designers Tyler Berkheiser, Chris Pardi and Ken Morton, had seen portions of plaintiffs' submissions and later worked on the Voice Tech Video Mission Rescue Heroes. (Dize Decl., Exh. R.; Exh. D, p. 38, line 1 – p. 40, line 7, p. 44, line 14 – p. 45, line 15, p. 46, line 4 – p. 47, line 6; Exh. E, p. 58, line 8 – p. 59, line 22, p. 60, line 21 – p. 62, line 4, p. 71, line 6 – p. 74, line 23.)

58.    Plaintiffs do not dispute the allegations contained in paragraph 58 of Defendant's 56(a)(1) Statement.

59.    Plaintiffs do not dispute the allegations contained in paragraph 59, but state that the Voice Tech Mission Select Figures are covered by plaintiffs' concept. (Reiling Decl. ¶¶ 58-59, 60(c), 61(b), 62(b); Exh. M.)

60.    Plaintiffs dispute the allegations contained in paragraph 60, and state that the Mission Select Rescue Heroes figures sub-line represented a further advance toward reaching the goal of enhancing role play for the child by adding an image component in the form of a backpack for each Rescue Heroes character to enhance role play for the child by depicting the character's mission or obstacles and dangers the character might face. (Reiling Decl. ¶ 63; Popek Decl. ¶ 22.)

61.    Plaintiffs dispute that Brian Trzeciak "designed" the Mission Select figures, along with James Bauman.  The Fisher-Price Boys' Team, including designers Tyler Berkheiser, Chris Pardi and Ken Morton, had seen portions of plaintiffs' submissions and later worked on the Voice Tech Video Mission Rescue Heroes. (Dize Decl., Exh. R.; Exh. D, p. 38, line 1 – p. 40,

line 7, p. 44, line 14 – p. 45, line 15, p. 46, line 4 – p. 47, line 6; Exh. E, p. 58, line 8 – p. 59, line 22, p. 60, line 21 – p. 62, line 4, p. 71, line 6 – p. 74, line 23.)

62.    Plaintiffs do not dispute the allegations contained in paragraph 62, but incorporate herein by reference their response to paragraph 59 above.

63.    Plaintiffs do not dispute the allegations contained in paragraph 63, but state that the MACC is covered by plaintiffs' concept. (Reiling Decl. ¶¶ 58-59, 60(g), 62(d); Exh. M.)

64.    Plaintiffs dispute that the MACC was designed by James Bauman. The Fisher-Price Boys' Team, including designers Tyler Berkheiser, Chris Pardi and Ken Morton, had seen portions of plaintiffs' submissions and later worked on the Voice Tech Video Mission Rescue Heroes. (Dize Decl., Exh. R.; Exh. D, p. 38, line 1 – p. 40, line 7, p. 44, line 14 – p. 45, line 15, p. 46, line 4 – p. 47, line 6; Exh. E, p. 58, line 8 – p. 59, line 22, p. 60, line 21 – p. 62, line 4, p. 71, line 6 – p. 74, line 23.)

65.    Plaintiffs do not dispute the allegations contained in paragraph 65 of Defendant's 56(a)(1) Statement.

66.    Plaintiffs do not dispute the allegations contained in paragraph 66, but state that the Voice Tech Jet, Firetruck and Police Cruiser are covered by plaintiffs' concept. (Reiling Decl. ¶¶ 58-59, 60(e); Exh. M.)

67.    Plaintiffs do not dispute the allegations contained in paragraph 67 of Defendant's 56(a)(1) Statement.

68.    Plaintiffs do not dispute the allegations contained in paragraph 68 of Defendant's 56(a)(1) Statement.

69.    Plaintiffs state that the Voice Tech Jet, Firetruck and Police Cruiser are covered by plaintiffs' concept. (Reiling Decl. ¶¶ 58-59, 60(e); Exh. M.)

70.     Plaintiffs dispute that the Mission Select Firetruck and Police Cruiser were designed by Devin Roberts. The Fisher-Price Boys' Team, including designers Tyler Berkheiser, Chris Pardi and Ken Morton, had seen portions of plaintiffs' submissions and later worked on the Voice Tech Video Mission Rescue Heroes. (Dize Decl., Exh. R.; Exh. D, p. 38, line 1 – p. 40, line 7, p. 44, line 14 – p. 45, line 15, p. 46, line 4 – p. 47, line 6; Exh. E, p. 58, line 8 – p. 59, line 22, p. 60, line 21 – p. 62, line 4, p. 71, line 6 – p. 74, line 23.)

Plaintiffs state that the Mission Select Firetruck and Police Cruiser are covered by plaintiffs' concept. (Reiling Decl. ¶¶ 58-59, 60(f), 62(c); Exh. M.)

71.     Plaintiffs do not dispute the allegations contained in paragraph 71 of Defendant's 56(a)(1) Statement.

72.     Plaintiffs do not dispute the allegations contained in paragraph 72 of Defendant's 56(a)(1) Statement.

73.     Plaintiffs state that the Optic Force sub-line of basic figures are covered by plaintiffs' concept. (Reiling Decl. ¶¶ 58-59, 60(d); Exh. M.) In addition, plaintiffs' prototype demonstrated one possible execution of the concept. It was not intended to show all possible executions of the concept or to limit the concept to the exact mechanisms that were disclosed in the prototype. Accordingly, plaintiffs' concept did not require that the child place one eye up to a magnifying lens and look inside the backpack, nor did it require that film be used, as Fisher-Price suggests. (Reiling Decl. ¶ 29.)

74.     Plaintiffs dispute the allegations contained in paragraph 74 and state that the Optic Force Rescue Heroes are based on plaintiffs' submissions. The Fisher-Price Boys' Team, including designers Tyler Berkheiser, Chris Pardi and Ken Morton, had seen portions of plaintiffs' submissions and later worked on the Voice Tech Video Mission Rescue Heroes. (Dize

Decl., Exh. R.; Exh. D, p. 38, line 1 – p. 40, line 7, p. 44, line 14 – p. 45, line 15, p. 46, line 4 –
p. 47, line 6; Exh. E, p. 58, line 8 – p. 59, line 22, p. 60, line 21 – p. 62, line 4, p. 71, line 6 – p.
74, line 23.)

Plaintiffs' Definition of the Reel Heroes Concept

75.    Plaintiffs do not dispute the allegations contained in paragraph 75, but state that
Fisher-Price's Concept Submission Form contains spaces for multiple concepts to be listed, and
there is a small rectangular space (approximately 1" x 3") in which to describe each concept.
(Reiling Decl. ¶ 28.) Plaintiffs showed Mr. Snyder approximately six concepts that day. (*Id.*)
Fisher-Price has suggested in this case that plaintiffs should be limited to the description of their
concept in this small rectangular space on their Concept Submission Form. (*Id.*) However, it was
impossible to accurately describe the concept in such a small space. (*Id.*) In filling out the
Concept Submission Form, Reiling attempted to identify the concepts that were being shown that
day for administrative purposes, so that Fisher-Price and he would both have a record in the
event there was a dispute about what concepts had been shown. (*Id.*) The description on the
Concept Submission Form was not intended to be a precise definition of the concept. (*Id.*) In
fact, Reiling submitted a separate written description with the submission materials because he
realized that he could not accurately describe the concept in such a small space. (*See* Tab P).

Per industry practice, inventors illustrate a concept through the combination of a
prototype, drawings, written description and a concept submission form. (*Id.* ¶ 29). The concept
is illustrated by looking at these materials collectively, not individually. (*Id.*) For example, the
prototype we submitted with the submission documents demonstrated one possible execution of
the concept. (*Id.*) It was not intended to show all possible executions of the concept or to limit
the concept to the exact mechanisms that were disclosed in the prototype. (*Id.*) Accordingly, our

concept did not require that the child place one eye up to a magnifying lens and look inside the backpack, nor did it require that film be used, as Fisher-Price suggests. (*Id.*) Plaintiffs' expert, Jim Kipling, has confirmed that the Concept Submission Form is a record-keeping form and not meant to be legally binding. (Kipling Decl. ¶ 29.)

76.     Plaintiffs incorporate herein by reference their response to paragraph 75 of Defendant's 56(a)(1) Statement.

77.     Plaintiffs incorporate herein by reference their response to paragraph 75 of Defendant's 56(a)(1) Statement.

78.     Plaintiffs state that Exhibit A to the Option Agreement, which purports to describe plaintiffs' concept, was drafted by Fisher-Price's attorneys with little, in any, input from Reiling and no input from DI. (*Id.* ¶ 32; Popek Decl. ¶ 11.) Plaintiffs were not represented by counsel in connection with the drafting or execution of the Option Agreement. (*Id.*) Importantly, Fisher-Price accurately recognized in Exhibit A that the "*unique aspect of the concept* is the combination of existing action figures with film for play pattern." (emphasis added) (Reiling Decl. ¶ 32.) In this context, industry professionals would know that "film" was not limited to film in a literal sense, but rather encompassed images and/or video to enhance the play pattern for the child. (*Id.*; Popek Decl. ¶ 5.) Exhibit A also specifically indicates that the concept is for the Rescue Heroes and for backpacks. (Reiling Decl. ¶ 32.) Hence, Fisher-Price has recognized that a concept can be a combination and also unique.

79.     Plaintiffs dispute the allegations contained in paragraph 79 and state that the definition in Exhibit A was only binding for purposes of the Option Agreement, which has now expired. (Reiling Decl. ¶ 31). Plaintiffs also submitted two additional executions of their concept after the option expired. (Reiling Decl. ¶¶ 34-36.)

80.    Plaintiffs dispute the allegations contained in paragraph 80 and state that defendant has ignored definition of their concept as contained in a sworn Interrogatory Answer, through which plaintiffs were asked to define their concept. Plaintiffs define their concept as stated in said Interrogatory Answer. (Dize Decl., Exh. L.)

81.    Plaintiffs incorporate herein by reference their response to paragraph 80 above. Plaintiffs further state that Mr. Kipling's definition is one possible definition, broader than plaintiffs' definition, but it is not binding on plaintiffs.

82.    Plaintiffs dispute the allegations contained in paragraph 82 and state that Plaintiffs submitted their concept specifically for Rescue Heroes and specifically as a backpack. (Reiling Decl. ¶ 24; Popek Decl. ¶ 18; Benedetto Decl. ¶ 18.)

83.    Plaintiffs dispute the allegations contained in paragraph 83 and state that digital camera is intended to be a line extension. Plaintiffs incorporate herein by reference their response to paragraph 80 above. Plaintiffs further state that Mr. Kipling's definition is one possible definition, broader than plaintiffs' definition, but it is not binding on plaintiffs.

84.    Plaintiffs dispute the allegations contained in paragraph 84 and state that the concept was submitted specifically for Rescue Heroes. (Reiling Decl. ¶ 24; Popek Decl. ¶ 18; Benedetto Decl. ¶ 18.)

85.    Plaintiffs state the toy industry custom and practice dictates that line extensions and accessories are royalty-bearing. Hence, play sets and vehicles are covered by plaintiffs' concept. (Reiling Decl. ¶ 18.)

86.    Although DI did submit the Reel Heroes concept to Toy Biz in 2002, this was after the final rejection of plaintiffs' concept by Fisher-Price in January, 2001. Moreover, DI

removed the Rescue Heroes figure when the submission was made. (Popek Decl. ¶ 17; Benedetto Decl. ¶ 17.)

87.     Toy industry custom and practice dictates that concepts can be incorporated into line extensions, such as action figures and vehicles. (Reiling Decl. ¶ 18.)

Use of the Reel Heroes Concept

88.     Plaintiffs' dispute the allegations contained in paragraph 88.   Per industry practice, inventors illustrate a concept through the combination of a prototype, drawings, written description and a concept submission form. (*Id.* ¶ 29.) The concept is illustrated by looking at these materials collectively, not individually. (*Id.*)   For example, the prototype plaintiffs submitted with the submission documents demonstrated one possible execution of the concept. (*Id.*) It was not intended to show all possible executions of the concept or to limit the concept to the exact mechanisms that were disclosed in the prototype. (*Id.*)  Accordingly, plaintiffs' concept did not require that the child place one eye up to a magnifying lens and look inside the backpack, nor that film be used, as Fisher-Price has suggested. (*Id.*)

The 1999 Execution of Plaintiffs' Concept

Despite Fisher-Price's initial rejection of the concept for reasons that "boiled down to cost," plaintiffs continued their efforts toward gaining Fisher-Price's acceptance of the concept by focusing on cost reductions. (*Id.* ¶ 34.) Plaintiffs submitted a revised execution of the concept to Paul Snyder at Fisher-Price on May 22, 1999. (*Id.*) Fisher-Price did not require an additional Concept Submission Form for the 1999 execution. (*Id.*)  Seeking to address Fisher-Price's concerns regarding cost, plaintiffs eliminated the motor, batteries and several other parts from the original submission and instead focused on including eight or more still, printed images mounted on a wheel or drum in the backpack of each "Rescue Heroes" action figure that enabled

children to view still images through a viewing mechanism. (*Id.*) The images related to the mission of each "Rescue Heroes" character and were designed to enhance role play for the child. (*Id.*) Plaintiffs were demonstrating to Fisher-Price that there were alternative ways to execute the concept. (*Id.*) Accordingly, it was not necessary to the second execution of the concept that the child place one eye up to a magnifying lens and look inside the backpack, or that a hand crank be used, as Fisher-Price has suggested. (*Id.*)

       The 2000 Execution of Plaintiffs' Concept

       Thereafter, plaintiffs submitted another revised execution of the concept on December 7, 2000 to Peter Pook, Fisher-Price's Vice President of Product Development and Inventor Relations at that time. (Reiling Decl. ¶ 36.) Fisher-Price did not require an additional Concept Submission Form for the 2000 execution. (*Id.*) The December 2000 execution depicted still images on a round disc instead of on a wheel or drum device. (*Id.*) Again, while the concept envisioned depicting images in the backpacks of the "Rescue Heroes" action figures, the concept could be incorporated into accessories, such as vehicles and play sets, and line extensions relating to the "Rescue Heroes." (*Id.*) The 2000 submission demonstrated yet another way to execute plaintiffs' concept. (*Id.*) Accordingly, it was not necessary to the concept that the child place one eye up to a magnifying lens and look into the interior of the backpack, or that a lever be used, as Fisher-Price has suggested. (*Id.*) As referenced in their cover letter to Mr. Pook, Plaintiffs included the prior submission materials (*i.e.*, prototype, drawings, written description) when they submitted the 2000 execution of their concept. (*Id.*;) Fisher-Price returned plaintiffs' final submission on January 5, 2001 with the explanation that the concept remained too expensive to develop and that it did not fit the current Rescue Heroes theme. (*Id.*)

89.    Plaintiffs dispute the allegations contained in paragraph 89 and incorporate herein by reference their response to paragraph 88 above.

90.    Plaintiffs dispute the allegations contained in paragraph 90 and state that Fisher-Price's products are covered by Plaintiffs' concept. (Reiling Decl. ¶¶ 58-63; Exh. M.)

91.    Plaintiffs dispute the allegations contained in paragraph 90 and state that Exhibit A to the Option Agreement, which purports to describe plaintiffs' concept, was drafted by Fisher-Price's attorneys with little, in any, input from Reiling and no input from DI. (*Id.* ¶ 32; Popek Decl. ¶ 11.) Plaintiffs were not represented by counsel in connection with the drafting or execution of the Option Agreement. (*Id.*) Importantly, Fisher-Price accurately recognized in Exhibit A that the "*unique aspect of the concept* is the combination of existing action figures with film for play pattern." (emphasis added) (Reiling Decl. ¶ 32.) In this context, industry professionals would know that "film" was not limited to film in a literal sense, but rather encompassed images and/or video to enhance the play pattern for the child. (*Id.*; Popek Decl. ¶ 5.) Exhibit A also specifically indicates that the concept is for the Rescue Heroes and for backpacks. (Reiling Decl. ¶ 32.)

92.    Plaintiffs incorporate herein by reference the response to paragraph 91 above. Plaintiffs' submitted two additional executions of the concept after the Option Agreement expired. (Reiling Decl. ¶¶ 34-36.)

Prior Art

93.    Plaintiff disputes the allegations contained in paragraph 93 and states that the prior art cited does not read on concept. (Reiling Decl. ¶¶ 47-53.) (Kipling Dec. ¶¶ 48-54.)

94.    Plaintiffs dispute the allegations contained in paragraph 94 and state that paragraph 94 does not contain plaintiffs' definition of their concept. (Dize Decl., Exh. L.)

34

(Kipling Dec. ¶¶ 48-54.)   Plaintiffs otherwise incorporate herein by reference their response to paragraph 93 herein.

95.   Plaintiffs dispute the allegations contained in paragraph 95 and otherwise incorporate herein by reference their response to paragraph 94 above. (Kipling Dec. ¶¶ 48-54.)

96.   Plaintiffs dispute the allegations contained in paragraph 96. (Benedetto Decl. ¶ 23.) (Kipling Dec. ¶¶ 48-54.)

97.   Plaintiffs incorporate herein by reference their response to paragraph 96 above. (Kipling Dec. ¶¶ 48-54.)

98.   Plaintiff disputes the allegations contained in paragraph 98 and states that the prior art cited does not read on plaintiffs' concept. (Reiling Decl. ¶¶ 47-53.) (Kipling Dec. ¶¶ 48-54.)

99.   Plaintiffs dispute the allegations contained in paragraph 99 and state that Secret Wars does not read on plaintiffs' concept. (Reiling Decl. ¶ 52.) (Kipling Dec. ¶¶ 48-54.)

100.   Plaintiffs incorporate herein by reference their response to paragraph 94 above. (Reiling Decl. ¶ 52.) (Kipling Dec. ¶¶ 48-54.)

101.   Plaintiffs dispute the allegations contained in paragraph 101. (Benedetto Decl. ¶ 23.) (Kipling Dec. ¶¶ 48-54.)

102.   Plaintiffs dispute the allegations contained in paragraph 102 and state that Secret Wars does not read on plaintiffs' concept. (Reiling Decl. ¶ 52.) (Kipling Dec. ¶¶ 48-54.)

103.   Plaintiffs dispute the allegations of paragraph 103 and state that Fortress of Solitude does not embody the Reel Heroes concept. (Reiling Decl. ¶ 53.) (Kipling Dec. ¶¶ 48-54.)

104. Plaintiffs incorporate herein by reference their response to paragraph 94 above. (Kipling Dec. ¶¶ 48-54.)

105. Plaintiffs dispute the allegations of paragraph 105 and state that Fortress of Solitude does not embody the Reel Heroes concept. (Reiling Decl. ¶ 53.) (Kipling Dec. ¶¶ 48-54.)

106. Plaintiffs dispute the allegations of paragraph 106 and state that the Hall of Justice playset does not embody the Reel Heroes concept. (Reiling Decl. ¶ 53.) (Kipling Dec. ¶¶ 48-54.)

107. Plaintiffs dispute the allegations of paragraph 107 and state that the Hall of Justice playset does not embody the Reel Heroes concept. (Reiling Decl. ¶ 53.) (Kipling Dec. ¶¶ 48-54.)Plaintiffs incorporate herein by reference their response to paragraph 94 above.

108. Plaintiffs dispute the allegations of paragraph 108 and state that the Mobile Bat Lab does not embody the Reel Heroes concept. (Reiling Decl. ¶ 53.) (Kipling Dec. ¶¶ 48-54.)

109. Plaintiffs incorporate herein by reference their response to paragraph 94 above. (Kipling Dec. ¶¶ 48-54.)

110. Plaintiffs state that Toy Biz projector figures do not embody plaintiffs' concept. (Kipling Dec. ¶¶ 48-54.) Mr. Berkheiser never communicated to plaintiffs anything about the Toy Biz projector figure, and Fisher-Price optioned the concept. Moreover, Fisher-Price never indicated to plaintiffs that they were not interested in the concept due to its lack of novelty. (Reiling Decl. ¶ 46; Popek Decl. ¶ 21). The only reasons ever provided regarding Fisher-Price's lack of interest were that the concept was too expensive, it was a "one-trick pony" and that it did not fit the current Rescue Heroes theme. (*Id.*) In the past, when Fisher-Price had rejected Reiling's concepts on the basis of novelty, they typically indicated that novelty was the reason for the rejection. (*Id.*) In addition, plaintiffs' experience has been that toy companies simply do

not option a concept if there is an issue about its novelty. (*Id.* ¶ 48; Popek Decl. ¶ 5.)  Tellingly, Fisher-Price's current Vice President of Inventor Relations, who reviewed plaintiffs' claim letter and submissions prior to the filing of this lawsuit to determine whether a royalty was owed, admitted that novelty was not one of his considerations in rejecting plaintiffs' claim for a royalty. (Dize Decl. Exh. A, p. 109, line 24 -- p. 111, line 11.)

111.    Plaintiffs dispute the allegations of paragraph 111 and state that the Hall of Justice playset does not embody the Reel Heroes concept. (Reiling Decl. ¶ 53.) (Kipling Dec. ¶¶ 48-54.) Plaintiffs also incorporate herein their response to paragraph 110 above.

112.    Plaintiffs dispute the allegations of paragraph 112 and state that the Mobile Bat Lab and the Fortress of Solitude playset do not embody the Reel Heroes concept. (Reiling Decl. ¶ 53.) (Kipling Dec. ¶¶ 48-54.)

113.    Plaintiffs dispute the allegations contained in paragraph 113 and state that Secret Wars does not read on plaintiffs' concept. (Reiling Decl. ¶ 52.) (Kipling Dec. ¶¶ 48-54.)

114.    Plaintiffs dispute the allegations contained in paragraph 114 and state that the Movie Viewer does not read on plaintiffs' concept. (Reiling Decl. ¶ 47-53.) (Kipling Dec. ¶¶ 48-54.)

115.    Plaintiffs dispute the allegations contained in paragraph 115 (Reiling Decl. ¶ 23.) (Kipling Dec. ¶¶ 48-54.)

116.    Plaintiffs dispute the allegations contained in paragraph 116 (Benedetto Decl. ¶ 23.) (Kipling Dec. ¶¶ 48-54.)

Plaintiffs' Implied Contract Claim

117.    Plaintiffs dispute the allegations contained in paragraph 117, and state that the implied-in-fact contract claim and the Option Agreement exist independently. (Dize Decl., Exh. O.)

118.    Plaintiff disputes the allegations that the Option Agreement included all material terms.  While the Option Agreement did contain certain material terms that would apply if the option was exercised (*e g.*, royalty rate, term, advance, etc.), the agreement did not contain all material terms. (*Id.* ¶ 33.) For example, payment of a royalty on line extensions and accessories was not addressed. (*Id.*) This item would have been addressed had Fisher-Price proceeded with a formal license agreement, instead of using plaintiffs' concept without authorization. (*Id.*) Fisher-Price should not now be permitted to rely upon the Option Agreement as evidence that royalties were not payable on line extensions and accessories. (*Id.*) Moreover, Fisher-Price should not receive the benefit of the terms contained in the Option Agreement, including the royalty rate, because Fisher-Price chose not to exercise the option but to use plaintiffs' concept anyway. (*Id.*)

119.    Plaintiffs dispute the allegations contained in paragraph 19, and state that the second and third submissions post-date Option Agreement. (Reiling Decl. ¶¶ 31-36.)

Dated: Norwalk, Connecticut
       May 23, 2005

Respectfully Submitted,

GRIMES & BATTERSBY, LLP

By: _____
   Gregory J. Battersby (Bar No. 7386)
   Edmund J. Ferdinand, III (Bar No. 21287)
   Russell D. Dize (Bar No. 23064)
   Susan Schlesinger (Bar No. 26625)
   488 Main Avenue, Third Floor
   Norwalk, Connecticut 06851-1008
   (p) (203) 849-8300
   (f) (203) 849-9300

Attorneys for Plaintiffs Victor G. Reiling
Associates and Design Innovation, Inc.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Plaintiffs' Local Rule 56(a)(1) Counter-Statement of Disputed Material Facts has been served upon defendant Fisher-Price, Inc., on this 23rd day of May, 2005, via Federal Express, priority overnight delivery, to:

Bradford S. Babbitt, Esq.
Michael J. Kolosky, Esq.
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103-3597

Robert J. Lane, Jr., Esq.
Jodyann Galvin, Esq.
HODGSON RUSS LLP
One M&T Plaza, Suite 2000
Buffalo, New York 14203-2391

Russell D. Dize