EXHIBIT A

1

UNITED STATE DISTRICT COURT   ORIGINAL

DISTRICT OF CONNECTICUT

Index No: 3:03 CV 222(JBA)

----------------------------

VICTOR G. REILING ASSOICATES
and DESIGN INNOVATION,

            Plaintiffs,

      -agaisnt-

FISHER-PRICE, INC.,

            Defendant.

- - - - - - - - - - - - - - - -

                  DATE:  April 25, 2005

                  TIME:  9:30 a.m.


            Deposition of STANLEY T. CLUTTON, taken

by and before JOYCE SILVER, a Certified Shorthand

Reporter and Notary Public of the State of New

York, held at the office of HODGSON RUSS, 152 West

57th Street, New York, New York.


N O N - C O N F I D E N T I A L   P O R T I O N

84

STANLEY T. CLUTTON

aspect, so I don't know.

Q.    Mr. Clutton, based upon your very

extensive experience in inventor relations for toy

companies, would you agree with the statement that

typically the thing being licensed when toy

companies enter into a license with an inventor is

a concept of a design for a toy product?

A.    You have to repeat that again, I'm

sorry.

Q.    Okay.    When a toy company licenses

something from a toy inventor --

A.    Yes.

Q.    -- typically what they are licensing is

a concept or a design for a toy product?

A.    Yes.

Q.    Would you further agree that in most

instances these concepts and designs are not fully

developed yet?

MR. LANE:    Object to the form.

A.    Sometimes they are, sometimes they are

not, but yeah -- many times they are not.

Q.    Sometimes they may be a little raw,

more raw in a concept?

MR. LANE:    Object to the form.

85

STANLEY T. CLUTTON

A.    Sometimes the concept needs further development, yes.

Q.    Sometimes they can be much more refined even to the point of having a brand attached. Is that fair to say?

A.    Sometimes they come in with brands attached and an idea whether the inventor wants it in the line and sometimes they don't.

Q.    But that's unusual?

A.    Unusual that they don't?

Q.    That they are that refined that they have a brand attached to them?

A.    No, not at all. Inventors oftentimes will look and say this is an idea for Barbie or an idea for Rescue Heros.

Q.    Is it fair to say that under a toy inventor license, it's the role of toy company to take the ideas and concepts and develop them into a finished product?

MR. LANE:  Object to the form.

A.    Yes, a finished product because it's not the inventor's responsibility to tool it or do the final design, exactly.

Q.    And it is the toy company that

86

STANLEY T. CLUTTON

1
2   typically would design the final product, create a
3   trademark or a brand around the product.  Correct?
4           MR. LANE:  Object to the form.
5       A.    Usually, not always.  Sometimes an
6   inventor will come in with an idea for their own
7   brand.
8       Q.    And the licensor sometimes comes in
9   with little more than just an idea?
10          MR. LANE:  Object to the form.
11      A.    Licensor being the inventor?
12      Q.    The anybody, correct.
13      A.    The anybody comes in?  Repeat that
14  again.
15      Q.    And that the licensor or inventor
16  sometimes come in with little more than an idea?
17          MR. LANE:  Object to the form.
18      A.    Usually you would need a
19  well-thought-out idea, yeah.
20      Q.    It is not uncommon for a toy company to
21  make substantial changes to a concept that a toy
22  inventor has brought to them, is it?
23          MR. LANE:  Object to the form.
24      A.    Oftentimes toy companies make changes,
25  yes.

STANLEY T. CLUTTON

1

2    Q.    Very often it comes in as an idea, well

3    developed albeit but an idea, goes through the

4    process of design and development, marketing gets

5    into it and what comes out at the other end

6    sometimes will be very different from the idea

7    originally licensed; isn't that correct?

8         MR. LANE:  Object to the form.

9    A.    Sometimes there can be significant

10   changes, yes.

11   Q.    And typically when you license an idea

12   like this, you agree to pay royalty to the

13   inventor, correct?

14        MR. LANE:  Object to the form.

15   A.    Under the terms we agree to pay a

16   royalty to the inventor under the terms of the

17   agreement.

18   Q.    And the fact that a property goes

19   through the process of change and refinement and

20   development, which may be a substantial change

21   from the original concept, doesn't relieve the toy

22   company of the obligation to pay a royalty to the

23   inventor, does it?

24        MR. LANE:  Object to the form.

25   A.    It depends.

88

STANLEY T. CLUTTON

Q.    And what does it depend on?

A.    The most important thing it depends upon is the unique concept that was brought by the inventor to the toy company that's still part of the toy, still part of the concept that we end up with.

Q.    Now, I just want to ask you, do you recall that you and I sat in a slightly different setting on September 23, 2004 for your deposition in the matter of Pilot Corporation versus Fisher-Price et al.?

A.    I remember I was part of that, yeah.

Q.    Do you recall my asking you the question whether it was unusual for a toy inventor to bring in a much more refined idea, even to the point of having a brand attached?  Do you recall my asking that question?

MR. LANE:  Object to the form.

A.    No, I don't.

Q.    Do you recall responding at that time that that would be unusual?

MR. LANE:  Object to the form.

A.    I don't.

Q.    When you were at Tyco, Tyco introduced

88

STANLEY T. CLUTTON

Q.    And what does it depend on?

A.    The most important thing it depends upon is the unique concept that was brought by the inventor to the toy company that's still part of the toy, still part of the concept that we end up with.

Q.    Now, I just want to ask you, do you recall that you and I sat in a slightly different setting on September 23, 2004 for your deposition in the matter of Pilot Corporation versus Fisher-Price et al.?

A.    I remember I was part of that, yeah.

Q.    Do you recall my asking you the question whether it was unusual for a toy inventor to bring in a much more refined idea, even to the point of having a brand attached?  Do you recall my asking that question?

      MR. LANE:  Object to the form.

A.    No, I don't.

Q.    Do you recall responding at that time that that would be unusual?

      MR. LANE:  Object to the form.

A.    I don't.

Q.    When you were at Tyco, Tyco introduced

89

STANLEY T. CLUTTON

a product it was Tickle Me Elmo; isn't that
correct?

    A.    Yes.

    Q.    And the Tickle Me Elmo had a toy
inventor license associated with it, didn't it?

    A.    Yes, it did.

    Q.    And I gather from what you described
earlier, that you would have been instrumental in
the negotiation and development of that toy
inventor license.  Is that fair to say?

    A.    Actually, not on that license
agreement.

    Q.    Is there some particular reason why you
missed that one?

    A.    At the time that the Tickle Me Elmo
license agreement was brought in, there were
two -- there was Tyco Preschool, and for a brief
time we co-existed with another FOB or small
company that was the subsidiary of Tyco called
Tyco Playtime.

    And when the idea came in from those
inventors, the idea -- we didn't have any rights
to Sesame Street plush at all.  And so I gave it
to a compatriot who saw the product, and he signed

90

STANLEY T. CLUTTON

1
2    the agreement with the idea that the product would

3    be Tickle Me Tasmanian Devil for them as part of

4    the Looney Toons line.

5            So he was the one that completed the

6    license agreement, even though I was the one that

7    saw the concept first.

8        Q.    But you saw it first?

9        A.    Yes.

10       Q.    And when you saw it, in fact it was

11   neither Elmo nor the Tasmanian Devil, was it?

12       A.    That's correct.

13       Q.    It was an unbranded plush toy; isn't

14   that correct?

15       A.    That's correct.

16       Q.    And do you recall what the mechanism

17   was that created the -- withdrawn.

18           The concept was essentially a mechanism

19   that created a sound when manipulated by the user

20   that simulated a laugh; isn't that correct?

21       A.    You have to repeat that again.

22       Q.    The concept that was brought to you at

23   that time was essentially a plush toy unbranded.

24   Correct?

25       A.    Correct.

91

STANLEY T. CLUTTON

Q.    And it had a mechanism in it which, when manipulated by the user of the toy, created a simulated laugh sound, correct?

A.    In the simplest form yes, but that would not have been a licensable item because there had been particular licensing dollars done before, so we wouldn't have licensed that.

Q.    What was there about this mechanism that you thought was licensable?

A.    There was a couple different things. I can't say what was in the mind of Gene Murtha when he licensed it. There was two elements. It was a unique switching mechanism, some electronic mechanism that made the particular licensing rather easy for the child. And secondly, there was a an ever increasing level of laughter, different levels of laughter the finish alley being the feeling that the character, whatever the character might be, totally lost it and would have had that uncontrollable giggles.

Q.    As you described it, this was first presented to you?

A.    Yes.

Q.    And you then referred it to a Mr.

92

STANLEY T. CLUTTON

1

Murtha?

2

3    A.    Yes M-u-r-t-h-a.

4    Q.    And his full name is?

5    A.    Eugene Murtha.

6    Q.    Do you know where Mr. Murtha is now?

7    A.    Yes, he works for Mattel.

8    Q.    And in what capacity?

9    A.    Vice president in charge of the Toys 'R

10   Us sales team.

11   Q.    What was Mr. Murtha's relative position

12   to you in terms of the reporting structure at Tyco

13   at that time?

14   A.    He was working on the -- I guess the

15   name of the company contacts Tyco Playtime and he

16   was in charge of the toys in that line. So he was

17   my equal. I was in charge of the preschool stuff

18   and he was in charge of the older age.

19   Q.    Was a license ultimately entered into

20   with the inventor with regard to what had been

21   presented to you?

22   A.    Yes.

23   Q.    And what was that license for?

24   A.    Without having it in front of me, I'd

25   have to look at the description.

93

STANLEY T. CLUTTON

1

2      Q.     Was there an identification of a

3   particular toy or character associated with it?

4      A.     No.

5             Let me go back on that and say I don't

6   believe so.

7      Q.     But ultimately the character that came

8   out of it was Tickle Me Elmo?

9      A.     Sure, yeah.

10     Q.     And by that time the Sesame Street

11  characters were under your auspices?

12     A.     Yes.

13     Q.     Under your management?

14     A.     Yes.

15     Q.     And royalties were paid to the

16  inventors?

17     A.     Yes.

18     Q.     For Tickle Me Elmo?

19     A.     Yes.

20     Q.     Quite a few?

21     A.     Yeah.

22     Q.     Quite a lot of royalties.  Quite a

23  success, Tickle Me Elmo?

24     A.     Yes, it was.

25     Q.     But the mechanism that ultimately came

94

STANLEY T. CLUTTON

out in Tickle Me Elmo was not the same mechanism

that you were presented with in the plush toy, was

it?

         MR. LANE: Object to the form.

   A.    The mechanism itself, I mean from the

standpoint it was a voice unit so that was the

same. The implementation of the switching unit we

decided not to use. We used a more traditional

switch. That was somewhat different. The three

levels of laughter that lead to the hysterical

laugh was incorporated and so that was, indeed,

part of it, yes.

   Q.    But the switching unit was

significantly different from what had been

presented to you?

         MR. LANE: Object to the form.

   A.    Yes, yes.

         Can we take a real quick break?

         (Recess taken at 11:10 a.m.

         Resumed at 11:55 a.m.)

   Q.    Now the point that Tyco agreed to

license from the inventor the tickle concept, it

had the -- and it licensed the tickle mechanism

that the inventor's had presented to you, right?

95

STANLEY T. CLUTTON

1

2    A.    Yes.

3    Q.    By the time you came out with Tickle Me

4  Elmo, it had this different switching mechanism;

5  isn't that right?

6          MR. LANE:  Object to the form.

7    A.    Yes.  It had a different switching

8  mechanism, but it had many of the same elements

9  that they presented to us.

10   Q.    So it had a continuity of some

11 elements?

12   A.    Yes.

13   Q.    And it also had some significant change

14 in some elements.

15          MR. LANE:  Object to the form.

16   Q.    Is that fair to say?

17   A.    Yes.  The switching mechanism was

18 eliminated.

19   Q.    The switching mechanism was eliminated

20 and is it fair to say that if anything was

21 presented was proprietary, it might have been that

22 switching mechanism?

23          MR. LANE:  Object to the form.

24   A.    You know, what's proprietary and what's

25 not is always, you know, different with every

96

STANLEY T. CLUTTON

1

2    product.

3       Q.    Let's talk in different terminology.

4    To your experience up to that point, that

5    switching mechanism had some novelty to it, didn't

6    it?

7       A.    I don't think we ever got into depth in

8    the switching mechanism.  It was more the three

9    levels of laughter.

10       Q.    And it was no longer a plush toy,

11    correct?

12       A.    It was.

13       Q.    Withdrawn.  Sorry.

14       It was no longer a generic plush toy?

15       A.    Correct.

16       Q.    Sorry?

17       A.    Okay.

18       Q.    Tricky little word.

19       A.    Yes.

20       MR. LANE:  I thought I didn't

21    understand what plush meant for a moment.

22       Q.    Did Fisher-Price ever do a Tickle Me

23    Tas?

24       A.    We didn't.

25       Q.    And when we talk about a switching

97

STANLEY T. CLUTTON

mechanism, we're talking about how the

manipulation of the doll is detected and relates

that to activation of the laughing mechanism.

Correct?

    A.    Yes.

    Q.    And I believe in your description of

this earlier you said it had a fairly unique

system of depicting the particular licensing, did

you not?

    A.    Yes.

    Q.    But in fact, that did not make it

through to the final toy, did it?

    A.    That particular unique aspect of the

submission was eliminated.

    Q.    Okay.  But the elimination of that did

not eliminate Tyco's obligation, in your view, to

pay royalties to the inventors did it?

        MR. LANE:  Object to the form.

    A.    No it didn't because there are other

unique aspects of the submission that were

incorporated.

        MR. MacLEAN:  I think this would be a

good point to break.

        (Lunch recess at 12 noon.

109

STANLEY T. CLUTTON

Q.    Has there been an ongoing process in your department to identify documents germane to this litigation?

A.    Well, yes, of course.  I mean due to requests by opposing counsel.

Q.    You had a request for production --

A.    Right.

Q.    -- that you had to look and see --

A.    Searched high and low, yeah.

Q.    Have you seen, do you recall as you sit here now, have you seen any document, either internal that is not communicated outside of Fisher-Price, or that was communicated to or shared with Victor Reiling or Douglas Melville that identified any reason for the rejection of the submission in 1999 other than the reasons set forth in this letter?

A.    I think this was asked before but I would say I don't remember.  There are so many documents in this case, I don't remember another one.  To the best of my knowledge, I don't remember another one.

Q.    You ultimately made the decision, did you not, and communicated that to Greg Battersby,

110

STANLEY T. CLUTTON

1

2    that Fisher-Price was not -- did not feel

3    obligated to pay any royalty to either Victor

4    Reiling or Design Innovation on the Reel Hero

5    submission?

6        A.    That is correct.

7        Q.    Did you communicate to Greg Battersby a

8    reason or reasons for your determination?

9        A.    Yes, I believe I did.

10       Q.    And what was that reason or reasons?

11       A.    Well, I'm sure it was more specific,

12    but the thing that is most important is that the

13    concept presented, submitted by Vic Reiling and

14    Design Innovation, and the concept that we

15    produced were not one and the same.  They were two

16    different concepts.

17       Q.    Did you communicate to Greg Battersby

18    that a reason or one of reasons that you

19    determined that Fisher-Price was not obligated to

20    pay royalty to Victor Reiling and/or Design

21    Innovation on the Reel Heros concept was that the

22    Reel Heros concept was not novel?

23       A.    I don't believe at the time -- are you

24    talking about the initial communication?

25       Q.    Yes.

111

STANLEY T. CLUTTON

A.    I do not believe at the time that I
told -- had the discussion with Greg Battersby
that I used -- that that was one of my reasons.

Q.    Was that part of your determination at
that time?

A.    I was primarily concerned with the idea
we produced and the idea that was submitted, and
upon seeing the fact that they were different,
there was very little reason to go beyond that.
So I didn't.

Q.    I will show you another document.    I
will show you the original.    The original of
Exhibit No. 88, and ask if that's a document which
you have previously seen?

A.    Again, I don't specifically remember if
I saw this specific document.    I certainly have
seen a lot of documents in relation to this case.
I wouldn't doubt that I have seen it.    It's
possible.

Q.    Now, this appears, does it not, to be
another document generated from Ms. Grabianowski's
database --

A.    It is.

Q.    -- with regard to a submission, in this

120

STANLEY T. CLUTTON

1

2      idea, that was the only -- would only work, the

3      way I'm reading it, would only work with a TV

4      camera man theme.  She is not saying the TV camera

5      man idea is a unique idea, nor is she saying the

6      Reel Heros idea is unique either.

7          Q.    She isn't saying either?

8          A.    Right.

9          Q.    In March of 1999 a letter of rejection

10     is sent out with regard to a submission.  In

11     January 5th of 2001, a letter of rejection is sent

12     out returning the materials.  But we have been

13     unable to locate or identify a letter

14     corresponding with the June 2, 1999 submission,

15     rejecting or returning materials and you have no

16     knowledge of such a letter existing?

17         A.    No.

18         Q.    Theoretically, until a letter such as

19     that is received or the materials are received,

20     returned in the absence of the letter, an inventor

21     could be under the impression that their

22     submission was still pending, couldn't they?

23             MR. LANE:  Object to the form.

24         A.    It's possible.

25         Q.    For some period of time, an inventor

121

STANLEY T. CLUTTON

1

2          would expect their submission is still pending

3          until it has been rejected, given standard

4          practice in the industry, isn't that true.

5                    MR. LANE:  Object to the form.

6              A.    If you assume no communication had been

7          made.

8              Q.    Absolutely, that's part of my question.

9              A.    Yes.

10             Q.    Assuming there is no communication --

11             A.    Yes, and we don't know that no

12         communication was made, but we just know that we

13         can't find a written communication.  It could have

14         been a verbal communication or it could have been

15         a lost document.

16             Q.    Okay.  In the communication that you

17         received which initially made you aware of the

18         contention of Mr. Reiling and Design Innovation

19         that they believe they are entitled to royalty,

20         there were specific products that Fisher-Price had

21         come out with that they had identified as, in

22         their belief, incorporating elements of their

23         submission.  Correct?

24                    MR. LANE:  Object to the form.

25             A.    Yes, I believe that's so.

138

STANLEY T. CLUTTON

1

2    was in fact a year earlier?

3          A.    I'm certain that the Headquarters came

4    out before these figures.  If it was -- whether it

5    was a year apart, I'm not sure.

6          Q.    But you are certain they came out

7    before?

8          A.    Yes.  That the Headquarters came out

9    before this line of figures?

10          MR. DIZE:  Can we agree for the record

11    it was the Aquatic Rescue Demand Center?

12          MR. LANE:  I think it's undisputed it

13    came out ahead of time.

14          A.    So it was Aquatic Rescue Command

15    Center, ARCC.

16          Q.    Mr. Clutton, I am going to show you

17    another document which has been identified as

18    Exhibit 101.  And ask you if you are familiar with

19    product that is depicted in this document?

20          A.    Yes, I am.

21          Q.    And was this a product -- that's the

22    character -- which character is that?

23          A.    That's Elmo.

24          Q.    I thought it was.  So this depicts the

25    character Elmo from the Sesame Street line?

139

1                STANLEY T. CLUTTON

2        A.    Yes.

3        Q.    With a flashlight in the shape of Elmo.

4    Correct?

5        A.    Correct.

6        Q.    This was developed at Tyco Toys while

7    you were there?

8        A.    Tyco Preschool, part of Tyco.

9        Q.    Do you recall what year, approximately?

10       A.    I don't but it would be someplace

11   between '95 and '98.

12       Q.    This is a product line in which Tyco

13   Preschool paid a royalty to a toy inventor, is it

14   not?

15       A.    That's correct.

16       Q.    And at that time you, as you've

17   testified earlier, were the one principally

18   responsible for inventor relations and certainly

19   inventor licenses; isn't that correct?

20       A.    Yes.

21       Q.    Did you negotiate this license?

22       A.    Yes, I did.

23       Q.    What was there, if you recall, that was

24   unique about this concept that warranted Tyco

25   paying a royalty for the use of it?

140

1                    STANLEY T. CLUTTON

2        A.    I don't remember the description, per

3    se, but it was -- I really don't remember the

4    exact description of the contract, rough and tough

5    was the idea of a child's flashlight that was

6    integrated in a real sensible way, you know, with

7    a character.  I'm not sure it was more specific

8    than that, than the description I'm giving you.

9        Q.    The notion of a flashlight not hardly

10   unique or novel, is it?

11       A.    No.

12       Q.    The notion of a licensed figure

13   apparently plastic, perhaps metal, is not

14   particularly novel, wasn't novel in '95 to '98

15   goes was it?

16            MR. LANE:   Object to the form.

17       A.    The idea of a flashlight?

18       Q.    Yes.

19       A.    No.

20       Q.    And the idea of an Elmo character you

21   already owned Elmo characters, correct?

22       A.    We licensed it, yes.

23       Q.    And you owned all of the marketing

24   rights to them and toys?

25       A.    Yes.

141

STANLEY T. CLUTTON

1

2        Q.    But the integration of these two

3    elements into a toy, that is a flashlight and a

4    licensed character, in your view at that time was

5    sufficient novelty to warrant paying the investor

6    a royalty who brought that idea to you.  Is that

7    fair to say?

8              MR. LANE:  Object to the form.

9        A.    Yes, we paid a royalty and it was

10   deemed to be an idea that we did not have before.

11       Q.    And in truth that is the standard in

12   most situations in which a decision is made as to

13   who to accept the submission, go to license and

14   pay a royalty to a toy inventor is whether it was

15   an idea that they brought to you that you had not

16   had before.  Isn't that true.

17             MR. LANE:  Object to the form.

18       A.    It really is more than that.  It's also

19   an idea that is not obvious.  So it can't just be

20   two, three elements that are obviously thrown

21   together that would be obvious to any toy

22   designer.  So it is something that stands out a

23   little bit in some way.

24       Q.    Something creative and something that

25   you had not thought of before, those essentially?

142

STANLEY T. CLUTTON

MR. LANE:  Object to the form.

A.    Something unique, unique would be a better word than creative.

Q.    Okay.  To your knowledge were there children's flashlights incorporated in toy characters, toy figures prior to this one in the marketplace?

A.    I -- it may have been the thing that strikes me as I think there might have been some flashlights that basically had decoration on the flashlight.  It looked more like a slide as opposed to a character, but I don't think we did -- we didn't do -- I'm sure at the time we probably didn't do a huge in-depth search of industry to find out whether this had been done before.

Q.    Let me show you another document, and I will ask the court reporter to mark this as 123.

(P-123, E-mail dated 11/7/03, Bates No. DI 063 is received and marked for identification.)

Q.    Mr. Clutton, why don't you take a look at this document which appears to be a printout of an E-mail and it states that it is from you to Design Innovation, Inc. with a copy to Greg

Doerner & Goldberg, New York, Inc.                    212-292-5026

143

STANLEY T. CLUTTON

1
2    Battersby, Bruce Benedetto, Doug Melville and
3    Dennis Waslowsky?
4        MR. LANE:  I want my objection on the
5    record that we contend that privileged E-mail
6    privileged under Rule 408 under the Federal Rules
7    of Evidence which deal with settlement
8    negotiation, but I am not going to stop you
9    questioning about it, but I want to make sure my
10   objection to this document and its content is on
11   the record.
12       MR. MacLEAN:  And I am only going to
13   ask the witness to comment on the penultimate
14   paragraph of this with that in mind.
15       Q.  If you look -- first of all, do you
16   recall sending this E-mail?
17       A.  I have looked at it in preparation for
18   this case, but I don't have a distinct memory of
19   sending it, no.
20       Q.  And it is dated November 7, 2003.  Do
21   you recall at some point in time in some fashion
22   communicating to Design Innovation and/or Doug
23   Melville personally that if they did not withdraw
24   that lawsuit against Fisher-Price, that
25   Fisher-Price and Mattel would no longer continue

144

STANLEY T. CLUTTON

to do business with Design Innovation?  Do you

recall that?

        MR. LANE:  Object to the form.  Go

ahead.

    A.    I think the expression was that we had

a policy where we couldn't do business with people

that had a lawsuit against us, and that I wanted

him to be aware of implications of an action

that -- that it would affect him in that way.

    Q.    Where did that policy emanate from?

    A.    It's been something that I have been

aware of from the standpoint of dealing with

Mattel.

    Q.    This is a Mattel policy?

    A.    I don't believe it's a written policy,

but it's a policy that was instituted in at least

one other instance that I'm familiar with.

    Q.    What instance is that?

    A.    There was another design firm that was

starting a lawsuit against Mattel and I was told

that we should not do business with them any

longer.

    Q.    Is it a policy that, in your

experience, was universally applied to anybody

145

STANLEY T. CLUTTON

1

2  that was involved in litigation against Mattel?

3          A.    To the best of my knowledge, yes.

4          Q.    The supplier -- do you have any

5  knowledge --

6          A.    I wouldn't have knowledge of other

7  areas like suppliers, you know, plastic or

8  factories and that type of thing so I wouldn't

9  know what the policy is in regards to that or if

10  that policy even applied, you know -- if that was

11  a policy for those people. Within the inventor

12  relations group, this is a lot of -- this is a

13  business of trust and fair play and we feel that,

14  you know, it's very hard to deal with people that

15  are suing you.

16          Q.    Who communicated this policy to you?

17          A.    Who communicated this policy to me?

18  The first I became aware of this was through a

19  phone call from three years before from Judy

20  Willis who was in charge of inventor relations for

21  Mattel.

22          Q.    What was the subject of that

23  conversation?

24          A.    That there is what a pending lawsuit

25  and we should not do business with a particular

Doerner & Goldberg, New York, Inc.

212-292-5026

146

1                    STANLEY T. CLUTTON

2    company any longer.

3         Q.    What company was that?

4               (The following confidential portion is

5    under separate cover.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25