# EXHIBIT B

1            IN THE UNITED STATES DISTRICT COURT OF
            THE EASTERN DISTRICT OF CONNECTICUT
2                     CIVIL DIVISION

3   VICTOR G. REILING ASSOCIATES  :   NO. 3:03 CV 222
    And DESIGN INNOVATION, INC.    :
4                 Plaintiffs       :
                                   :
5                 vs.              :
                                   :
6   FISHER-PRICE, INC.,            :
                  Defendant        :
7

8             DEPOSITION OF PAUL SNYDER

9                     Taken in the offices of Slifer,

10  Voice and Shade, 3055 College Heights Boulevard,

11  Allentown, Pennsylvania, on Wednesday, March 9,

12  2005, commencing at 9:10 a.m., before Suzanne L. E.

13  Toto, Registered Professional Reporter.

14  APPEARANCES:

15              GRIMES & BATTERSBY, LLP
                BY:  RUSSELL D. DIZE, ESQ.
16              488 Main Avenue
                Norwalk, CT  06851-1008
17              -- For The Plaintiffs

18

19

20

21                     *  *  *
                SLIFER, VOICE & SHADE
22                A Veritext Company
            3055-57 College Heights Boulevard
23                   Second Floor
                 Allentown, PA   18104
24                  (610) 434-8588

25

ORIGINAL

PAUL SNYDER

1   every six weeks.  It really depended on the
2   management.
3   Q.          While you were there in your -- in the
4   four or five years that you were vice president of
5   inventor relations, how often, generally, would you
6   say that they occurred?
7   A.          Generally, it was probably every other
8   week or so or different categories.
9   Q.          Did you attend those meetings?
10  A.          I attended some of them, the ones when I
11  was in town, I would attend them.
12  Q.          I want you to think back to the time
13  when you were vice president of inventor relations
14  and describe for me when a submission came in from
15  an outside inventor, what happened?  Can you
16  describe for me that process of what would happen
17  from the beginning to the end?
18  A.          First of all, I would work with the
19  inventing community and review concepts, as I said.
20  Could have been under any venue, at somebody's
21  house, at the New York City office, whatever.  And I
22  would decide what concepts to bring in.  And after
23  they were sent in, I would usually have an inventor
24  product review with the various leaders of the
25  design groups.  And they weren't as organized as the

PAUL SNYDER

42

1    product review meetings.  And this was because I had

2    to do many times the catch as catch can to get

3    people involved in this process.

4                    They loved looking at outside

5    ideas, but the day-to-day activities were always

6    tugging them.  So I might meet with one group for

7    certain types of products and then another group for

8    other types of products.  I would try my best to get

9    these products to the design groups as quickly as

10   possible once they were sent in and documented at

11   Fisher Price.

12   Q.          I think you just said that you held a

13   product review with the appropriate group?

14   A.          Right.

15   Q.          But that is different from a line

16   review, is that correct?

17   A.          That's different, yes.

18   Q.          And how was it different, I guess?

19   A.          Well, first of all, you don't have all

20   of the supporting data, the marketing, research, the

21   costing and so forth.  You just show the product

22   raw; and then if there is an interest in the

23   product, the design groups will take that product

24   and begin developing it, doing some costing.

25                    In the end right before I retired,

PAUL SNYDER

1                    MR. LANE:  Object to the form.

2    A.          It could have been.  And his boss,

3    whoever that was, I don't know.  But as I said, I

4    don't remember; and I didn't show to marketing

5    people that often.  I don't know if I ever showed

6    anything to Chris.

7    Q.          You said his boss?

8    A.          I don't know who his boss is.

9    Q.          Do you remember Tyler Berkheiser

10   attending those meetings?

11   A.          No, I don't.

12   Q.          In your experience, did outside

13   inventors typically bring -- strike that.

14                    In your experience, did inventors

15   usually bring finished products to Fisher Price?

16                    MR. LANE:  Object to form.

17   A.          In my experience, most of it was not

18   finished.

19   Q.          In your experience, did the fact that

20   most of the concepts were not finished, would the

21   inventor still receive a royalty?

22   A.          Yes.

23                    MR. LANE:  Object to the form.

24   Q.          And can we agree then that toy companies

25   when they are dealing with outside inventors, they

PAUL SNYDER

1   are typically looking for a concept or idea as

2   opposed to a finished product?

3               MR. LANE:  Object to form.

4   A.          Well, you take what you get, and

5   different inventors bring in different levels of

6   finished concept.  If you know it costs a lot of

7   money to do a concept, if you finish it so you --

8   most people don't do it generally, as I said before,

9   the concepts are not finished.

10  Q.          If it's used, the inventor is still paid

11  a royalty?

12  A.          If what?

13              MR. LANE:  Objection to form.

14  Q.          If Fisher Price used that, the inventor

15  would still be paid a royalty?

16  A.          Yes, some form of royalty.

17  Q.          Would you also agree that toy companies

18  will frequently change the underlying concept to

19  make the -- underlying concept that is submitted to

20  make the product more commercially viable?

21              MR. LANE:  Object to the form.

22  A.          Yes, yes, they would normally do that.

23  Q.          And would you agree that regardless of

24  those changes, that the inventor -- if the concept

25  is used, the inventor would still be entitled to a

PAUL SNYDER

60

1    royalty?

2    A.            Some type of royalty.

3                    MR. LANE:  Object to form.

4    BY MR. DIZE:

5    Q.            Can you recall any product during your

6    time at Fisher Price that was submitted by an

7    outside inventor that went to market in an identical

8    form to the product that was originally submitted?

9    A.            I would say that there were two that

10   were close, one was Puffalumps.

11   Q.            I'm sorry?

12   A.            Puffalumps.  And the other was the 1, 2,

13   3 Roller Skates.

14   Q.            And that is --

15   A.            And, you know, there are variations of

16   other products that I could probably name a couple

17   more, but I can't think of them now.

18   Q.            Were those identical to when they came

19   in?

20                    MR. LANE:  Object to form.

21   A.            Were these identical in --

22   Q.            Yes.

23   A.            No.

24   Q.            Some changes were made, although be it

25   few?

PAUL SNYDER

62

1    percentage on that.

2    Q.        Would it be fair to say that all of the

3    products were at least somewhat changed by the time

4    they went to market?

5                    MR. LANE:  Object to form.

6    A.        I would say that most of them had some

7    change, yes.

8    Q.        When an outside inventor makes a

9    submission to Fisher Price, is it with the intention

10   of getting compensated if Fisher Price uses the

11   submission?

12                   MR. LANE:  Object to the form.

13   Asked and answered.  Go ahead.

14   A.        Yes.

15   Q.        Based on your experience, when an

16   outside inventor made a submission to Fisher Price,

17   was there an expectation that Fisher Price would

18   keep the information that was submitted

19   confidential?

20                   MR. LANE:  Object to the form.

21   A.        I'm -- say that again.

22   Q.        Sure.  Based on your experience when you

23   were vice president of inventor relations, when an

24   outside inventor made a submission to Fisher Price,

25   was there an expectation that Fisher Price would

PAUL SNYDER

1    keep the information that was submitted

2    confidential?

3                    MR. LANE:  Object to the form.

4    A.         Well, we could never promise that it

5    would be kept confidential.  It was impossible to

6    make that promise.

7    Q.         Did you treat the information as

8    confidential?

9    A.         I tried to keep it as confidential as

10   possible.

11                   MR. LANE:  Object to form.

12   Q.         And do you think that inventors expected

13   you to try to keep it confidential?

14                   MR. LANE:  Object to form.

15   A.         Well, yes, but they all knew that -- in

16   my experience, inventors know that if -- you know,

17   what level confidential is.  You got to show a

18   product to a costing engineer.  Who knows if he is

19   going home to tell his wife and their wife tells

20   someone else and says they are working on this neat

21   product.  But generally, you try to, certainly.

22   It's a relationship job.  You want to try to make

23   sure that you treat the inventor as correctly as

24   possible.

25   Q.         When you were vice president of inventor

PAUL  SNYDER

1  Q.          Was part of your job as vice president

2  of inventor relations optioning concept submissions

3  from outside inventors?

4  A.          Yes.

5  Q.          Can you explain the thought process that

6  would go into optioning an item?

7  A.          Well, first of all, in any agreement,

8  you -- both parties want to come outside.  I would

9  always be trying to get the least amount of money

10  paid per month for an option, and the inventor would

11  want the most amount of money that they could get.

12  You negotiate that level.  Options could run from

13  $500 to $5,000, depending on the product.

14                  And, you know, I would try to

15  negotiate a fair option; and the option also would

16  be based on, you know, if, in fact, the company felt

17  good about a product.  If we are kind of not sure, I

18  would probably be tougher on the option and telling

19  the inventor we are not sure.  If you don't agree,

20  you can take it to another company and, you know,

21  that could be done on friendly terms normally.

22  That's it.

23  Q.          I guess -- let me rephrase my question a

24  little bit.

25                  Why would Fisher Price decide to

PAUL SNYDER

1  option a product?

2                    MR. LANE:  Object to the form.

3  A.           Normally, an option is done so the

4  inventor doesn't take the product somewhere else.

5  Q.           So it is sort of a right to hold it

6  exclusively for a certain period of time, is that

7  correct?

8  A.           Normally, it's exclusive.  Sometimes it

9  isn't, but sometimes it is.

10 Q.           And is that because the company has

11 interest in it and wants to pursue it and doesn't

12 want another company to be able to exploit it?

13                   MR. LANE:  Object to form.

14 A.           That's correct.

15 Q.           What considerations go into deciding

16 whether to option them or not?

17 A.           Well, as I said earlier, it's, you know,

18 what level we feel the product would be appropriate

19 for the product line.  That's pretty much it, you

20 know.

21 Q.           So would it be fair to say that if

22 Fisher Price had a concept, they felt that it would

23 be appropriate to their product line?

24                   MR. LANE:  Object to form.

25 A.           No.  I would say that they felt it was

PAUL  SNYDER

1  appropriate to investigate the appropriateness for

2  the product line.

3  Q.          Is one of the considerations that go

4  into deciding to option them or not is whether it is

5  novel?

6                MR. LANE:  Object to form.

7  A.          Yes.

8  Q.          What do you understand the term novel to

9  mean?

10 A.          Could mean anything.  Novel is in the

11 eye of the beholder.  What might be novel to me,

12 might not be novel to the design group, which is why

13 sometimes we decide not to pursue a product.  Novel

14 is a very unsure word.  As I said, one person's

15 novelty, may not be another person's, I have seen it

16 before.

17 Q.          What does novel mean to you?

18 A.          Novel means to me that there is a

19 difference, and the difference can be at different

20 levels.  It could be somewhat different or

21 completely different, depending on what the product

22 is.

23 Q.          Again, going back to the time that you

24 were vice president of inventor relations, if you're

25 feeling that way, that the concept submission was

PAUL SNYDER

68

1  not novel, would you disclose that to the inventor
2  at the time that the submission was made?
3              MR. LANE:  Object to the form.
4  A.          Normally, I would try to do that.  I
5  don't think I would use the term, novel.  Sometimes
6  I just say it is not right for the company.  An
7  inventor -- or I might infer that it's not right
8  because it may not be novel.  As I said, there is
9  many different ways to look at novelty.  Most
10 inventors understood that if you say it is not
11 correct for the company, it is not right for the
12 company, perhaps not novel enough but it may be
13 novel but we have done it and we have worked on it.
14 Q.          If you knew it was -- if you had a
15 strong feeling when you were reviewing a product
16 submission that it was not novel, would you tell the
17 inventor at that time at the initial meeting?
18             MR. LANE:  Object to form.
19 A.          I don't know if I would use those
20 particular words.  I would say many things to
21 different inventors.  It's hard to say what I did
22 say or what I would say.
23 Q.          Would you say at that time that it was
24 no interest to the company?
25             MR. LANE:  Object to the form.

PAUL SNYDER

69

1    A.         Yes, I would.  Like we get 3,000 ideas a

2    year and maybe bring in 300.  So there is 2700 ideas

3    that were no interest to me on the first level.  I

4    was the first gatekeeper.  What is novel to me and

5    what is novel to the company, might be two different

6    things.

7    Q.         And also, if while you were reviewing an

8    inventor's submission, you realized that this was

9    something that the company had done before, would

10   you let the inventor know at that time?

11   A.         Normally, if I knew that, yes.

12              MR. DIZE:  We will mark this as

13   Exhibit 59.

14              (Deposition Exhibit Number 59 was

15   marked for identification.)

16   BY MR. DIZE:

17   Q.         I will show you what has been marked as

18   Exhibit 59.  Do you recognize that document?

19   A.         I recognize it that it sounds like I

20   probably dictated this.

21   Q.         This letter was from you to Victor

22   Reiling?

23   A.         Um-hum.

24   Q.         And in this letter, it looks like the

25   concept was called Tumblekinz?

PAUL SNYDER

70

1    A.        Um-hum.

2    Q.        And you indicate in the first paragraph,

3    we didn't feel the rest of the product was right for

4    us and was similar to other items we have worked on

5    internally.

6              So in this case, you did disclose

7    to Mr. Reiling that this was something that the

8    company had done in the past, correct?

9    A.        Um-hum.  This was also an area that I

10   was more familiar with, it was more of a Little

11   People type of thing.

12   Q.        When you were at Fisher Price, did the

13   company run a patent search prior to entering into

14   an option with an inventor?

15             MR. LANE:  Object to the form.

16   A.        I wouldn't say that they didn't, but

17   normally, we wouldn't do that.  Kind of an expensive

18   process to do.

19   Q.        Did the company typically run a prior

20   art search prior to entering into an option?

21   A.        Really depended on the product and the

22   area.  We wouldn't normally do that, if I recall.

23   Q.        You recall that it was done?

24   A.        We would certainly -- Pat might take a

25   look to see if anything was done through her

PAUL SNYDER

71

1    documentation system. And there may have been a
2    search of other products that were done internally.
3    Q.        Who would have done that search?
4               MR. LANE:  Object to the form.
5    A.        Could be anybody.  Pat really was the
6    one responsible.
7    Q.        Do you have knowledge that those
8    searches were done at least with respect to some
9    products?
10   A.        Some, not all.
11              MR. LANE:  Object to form.
12   Q.        They were done on some?
13   A.        Yes.  They may have at one level or
14   another.  Again, there is so much going on in the
15   company that not all of this happened.  You have
16   to -- it's an icing and reward thing.  You do what
17   you can.  And sometimes you don't do anything.
18   Q.        Prior to going back to when you were
19   vice president of inventor relations, prior to
20   entering into an option agreement with an outside
21   vendor, did you personally consider submissions that
22   had been shown to you previously?
23              MR. LANE:  Object to the form.
24   A.        I'm not sure.
25              MR. LANE:  Object to form.

PAUL  SNYDER

72

1    BY MR. DIZE:

2    Q.            When you were deciding to enter into an

3    option with an outside vendor, did you consider what

4    had been shown to you before?

5                        MR. LANE:  Object to form.

6    A.        Yes.

7    Q.            And did you personally consider what you

8    knew was being done in-house?

9                        MR. LANE:  Object to form.

10   A.            If I knew what was done in-house, but

11   sometimes I didn't.

12   Q.            Did you ever ask a few questions or do a

13   quick search to figure out what was being done

14   in-house?

15   A.            Sure, on an option, yes.

16   Q.            Was that something that you would

17   routinely do before entering into an option?

18   A.        Yes.

19                       MR. LANE:  Object to form.

20   A.            It would help to know as much as I

21   could, yeah.

22   Q.            Who at Fisher Price participated in the

23   decision to option an item?

24   A.            It would -- it would normally be the

25   head of the department and myself.  And before I

PAUL SNYDER

75

1    know.

2    Q.        Well, for example, let me ask you

3    another question, would you agree that Fisher Price

4    would not option an item that they knew they were

5    working on in-house?

6    A.        Well, I mean, if it were exactly the

7    same, yes, they probably wouldn't option it.

8    Q.        Do you ever recall an instance where

9    Fisher Price optioned a product that was the same as

10   something they were working on in-house?

11   A.        I don't recall any specific. I can't

12   think of any.

13   Q.        Wasn't part of your job as vice

14   president of inventor relations to identify and

15   reject outside inventor submissions that -- where

16   the company was working on something similar

17   in-house?

18   A.        Um-hum.

19   Q.        Yes, I'm sorry?

20   A.        Yes.

21   Q.        And if you personally -- as vice

22   president of inventor relations, when you were

23   reviewing outside inventor submissions, if you knew

24   that the concept submitted had been done in the

25   market or was out of the market previously, would

PAUL SNYDER

· 76

1    you enter an option on that item?

2    A.        It depends on what that option was or

3    what that product was and as it related to the

4    product in the marketplace.

5    Q.        If it was exactly the same, would you

6    option that item?

7    A.        Probably not.

8    Q.        When a concept is optioned, when it gets

9    to that stage that an option is actually entered

10   into, who sees the submission at that point?

11   A.        Who has seen it?

12   Q.        Yes.

13   A.        Well, myself, Pat Grabianowski, probably

14   the head of the department in which the product is

15   in or submitted to and a designer.  And then

16   depending how far it gets on the development

17   process, it could be anyone within the company.

18   Q.        And would that also include your

19   superiors?

20   A.        It could, yes.  As I said before,

21   usually, if I was spending money on an option, it

22   would be a superior, yes, my superior that would

23   approve it.

24   Q.        And as part of that approval process,

25   they would review the submission?

PAUL SNYDER

78

1    optioned?

2                    MR. LANE:  Object to form.

3    A.            No idea whatsoever.

4    Q.            Would it be fair to say that it was

5    typically many?

6    A.            I would say it could be three --

7                    MR. LANE:  Object to form.

8    A.            -- or it could be 30, depending on how

9    long it's been in and depending on what level the

10   concept was taken.

11   Q.            Did you participate in the evaluation of

12   the submissions made by Victor Reiling that are at

13   issue in this case?

14   A.            I think I had seen, just from what you

15   had sent me, I think I had seen one or two

16   submissions -- or not you, but your office had sent

17   me.

18   Q.            So just to be clear for the record, you

19   believe you saw -- at the time that you were vice

20   president of inventor relations, you believe you saw

21   one or two of the submissions made by the Plaintiffs

22   in this case?

23                    MR. LANE:  Object to form.

24   A.            Yes, yes.

25   Q.            Did you participate in the decision

PAUL  SNYDER

79

1  about whether to option the item?

2                    MR. LANE:  Object to the form.

3  A.           I may have, yes, you know, given that

4  time, yeah, probably, but I'm not sure totally.

5  Q.           Do you know who else participated in

6  that decision?

7  A.           No, I don't remember.

8  Q.           Based on the people that you knew that

9  were at the company during that time period, do you

10  recall who would have -- if the proper channels were

11  followed, who would have participated in that

12  decision to option?

13                    MR. LANE:  Object to form.

14  A.           As I said, I showed it to Ken Morton, I

15  think, but I am not sure.  I showed it to somebody

16  else in the group, but I don't remember who.  I

17  don't even remember if Ken was in the group at that

18  time.  I'm not sure who I showed it to.  And I'm not

19  sure who my boss was then, but my boss would not

20  have seen it if we sent it back or we optioned it,

21  maybe he would have seen it.  As I said, I did not

22  show him everything.  I may have just gotten the

23  approval to spend the money.

24  Q.           I think you listed under you saying you

25  don't know who exactly it was, Len Mazzocco?

PAUL SNYDER

83

1    that.

2                    Would you agree what was shown to

3    you that day was sufficient to you that you had him

4    send it in to the company for further review?

5    A.          Yes.

6    Q.          And some of the other concepts that were

7    submitted that day, you did not have him submit to

8    the company, correct?

9    A.          That's correct.

10   Q.          Do you recall what was presented to you

11   at the initial meeting with Mr. Reiling?

12   A.          I recall it generally, it's because of

13   what you sent me and I think refreshing my memory;

14   but I recall there was a film -- kind of a film

15   cartridge that -- it was of some other

16   characteristic or something, but a film cartridge

17   that would have a little movie in it, kind of a

18   continuous film.

19   Q.          Okay.

20   A.          I don't know if it was battery operated

21   or hand operated, I don't remember that.

22   Q.          Do you remember -- you are talking about

23   a prototype?

24   A.          Yes.

25   Q.          Do you remember seeing the prototype on

PAUL  SNYDER

84

1    the day that this was submitted?  Do you have a

2    recollection of seeing this prototype?

3    A.          I don't recall if I saw a prototype or a

4    drawing.  I may have seen neither or both.

5    Q.          I will show you what has been previously

6    marked in this case as Exhibit 202.  Do you

7    recognize that?

8    A.          Yeah, I think this is what I saw, but I

9    am not sure.  It looks like pretty much the same

10   thing that I saw.

11   Q.          Based on your initial meeting with

12   Mr. Reiling, what was your impression of what he was

13   submitting?

14             MR. LANE:  Object to the form.  He

15   testified he doesn't remember it.

16   BY MR. DIZE:

17   Q.          If he knows.

18   A.          Repeat that.

19   Q.          Do you have an impression after the

20   initial meeting with Mr. Reiling of what was being

21   presented?

22             MR. LANE:  Object to the form.

23   A.          Yeah, a film of the activity, I think.

24   If it's a fireman, maybe a film of firefighting or

25   something like that.

PAUL SNYDER

132

1   A.        No.  That is confidential information.

2   In another deposition, I wouldn't tell what Pete's

3   royalties were.  It's just not right to do that.

4   Q.        What was the name of that product?

5   A.        Puffalumps.

6   Q.        Can we agree if there was a royalty

7   obligation, for example, with regard to the Mission

8   Select figure, which we have marked as Exhibit 237,

9   there would also be a royalty obligation with

10  respect to the Mission Select, not the Mountain

11  Action Command Center, which is depicted in Exhibit

12  278?

13            MR. LANE:  Object to form.

14  A.        I'm not sure there is a royalty due on

15  that.

16  Q.        Assuming there is a royalty due on

17  Exhibit 237, is it fair to say that there would be a

18  royalty due on the Mountain Action Command Center

19  shown on Exhibit 278?

20            MR. LANE:  Object to form.

21  A.        Since I have never seen that product,

22  I'm not sure.  I have not seen that product in the

23  flesh.  I could only guess.

24  Q.        Mr. Snyder, I am going to again ask you

25  to take a look at some exhibits that I previously

PAUL SNYDER

133

1  gave you. I will point them out to you. It might

2  be faster. I think the first one I showed you was

3  Exhibit 205, which was the concept submission form.

4  I also showed you Exhibit 200, which is a written

5  description.

6  A.       Right.

7  Q.       I showed you Exhibit 201, which is a set

8  of drawings. I showed you Exhibit 202, which is the

9  prototype.

10  A.       Yes.

11  Q.       I showed you Exhibit 203, which was

12  another drawing.

13  A.       Right.

14  Q.       Exhibit 204, still another drawing.

15  A.       Um-hum.

16  Q.       Showed you the option agreement, which

17  was Exhibit 210.

18  A.       Okay.

19  Q.       And I showed you a document that we

20  referred to as the second submission, Exhibit 212,

21  and I showed you a document, which we referred to as

22  the third submission, which was Exhibit 228.

23  A.       Okay.

24  Q.       And in addition, I have shown you a

25  Voice Tech Video Mission Rescue Hero figure, which

PAUL SNYDER

134

1    is Exhibit 60, a Mission Select Rescue Hero action

2    figure, which is Exhibit 237, an Optic Force Rescue

3    Hero figure, which is Exhibit 238; and I showed you

4    an exhibit in the complaint, which was the Mission

5    Command Rescue Hero line with mission cards?

6    A.        Um-hum.

7    Q.        Have you had an opportunity to at least

8    review all of the drawings and so forth?

9    A.        Just the time I had when you had shown

10   them to me.

11   Q.        And do you recall at least having seen

12   the prototype back in the time when you were vice

13   president of inventor relations, is that correct?

14   A.        Yes.

15   Q.        If you were asked by Fisher Price

16   management at the time that Fisher Price introduced

17   the products that I have shown you --

18   A.        All of them or -- all of the products

19   here?

20   Q.        Yes.  -- whether Mr. Reiling should have

21   received a royalty on these items, what would you

22   have recommended to management?

23             MR. LANE:  Object to form.  This

24   is a multiple question; there's no foundation.  He

25   testified he didn't remember 95 percent of the

PAUL SNYDER

1    things you showed him.  And you are also asking him

2    to give uncompensated testimony here about facts

3    that he wasn't involved in.  Those are my

4    objections.

5                    MR. DIZE:  Okay.

6    A.          Could you repeat that again?

7    Q.          If you were asked by Fisher Price

8    management -- let's assume -- I will ask it like

9    this, if you were asked by Fisher Price management

10   at the time that the Fisher Price introduced these

11   items as to whether Mr. Reiling should have received

12   a royalty, what would you have recommended to

13   management?

14                   MR. LANE:  Same objection.

15   A.          Well, it's really hard to say, not

16   having been in the development process, but there

17   are some here that should get a royalty.  There is

18   one that is somewhat similar, and that is the one

19   that I talked about before too, I think when I

20   talked to someone in your office.

21   Q.          Which one?

22   A.          That's the only one.  This product right

23   here.

24   Q.          You are referring to the Voice Tech

25   Video Mission Rescue Hero?

PAUL SNYDER

136

1    A.       Yes.

2    Q.       And that is the one that we also marked

3    as Exhibit 60, is that correct?

4    A.       Yes.  But I don't remember seeing that

5    product, though.

6    Q.       Would you agree that is the same as --

7    A.       Conceptually.

8    Q.       -- the product you brought to the

9    deposition today?

10   A.       Yes.

11   Q.       That you were familiar with?

12   A.       Yes.  But all I said, this was a

13   similarity.  I don't know what the background is of

14   that.  I don't know how it was developed.  You told

15   me there was another submission on this, and that

16   also brings a whole new light to how a product is

17   dealt with.

18   Q.       With respect to -- can you review for me

19   the second and third submissions, which were Exhibit

20   228, which is this one, and Exhibit 212?

21   A.       What do you want me to do?

22   Q.       Exhibit 212, we identified as the second

23   submission made by Victor Reiling to Fisher Price.

24   I would just ask you to review that submission and

25   also Exhibit 228, which we identified as the third

PAUL SNYDER

139

1                    MR. LANE:  He went out of his way
2     to say that wasn't his testimony.
3     BY MR. DIZE:
4     Q.            What did you say with respect to the
5     exhibit?
6     A.            I said that is a similarity, that's what
7     I told Fisher Price and that's what I told who is
8     the one partner that you have up there.
9     Q.            Jeff Barsay?
10    A.            Yes, that's who I spoke to.
11    Q.            Let's go back.  I asked if you were
12    asked by Fisher Price management at the time --
13    let's stick with Exhibit 60, if you were asked by
14    Fisher Price management at the time that they
15    introduced Exhibit 60, whether Mr. Reiling should
16    have received a royalty on that item, what would you
17    have recommended to management?
18                    MR. LANE:  Objection.  Asked and
19    answered.
20    A.            What I said before is I would have to
21    know what was done internally.  I would have to know
22    what was in the marketplace.  I would have to know
23    if there were any other inventor items submitted.  I
24    would have to know a lot before -- you don't make a
25    recommendation to your management unless you have a

PAUL SNYDER

140

1  lot of facts.  It's hard to say what my

2  recommendations would have been until I know all of

3  the underlying facts.

4  Q.          Knowing what you know today, do you

5  believe Mr. Reiling is entitled to royalty on

6  Exhibit 60?

7              MR. LANE:  Object to form.

8  A.          Knowing what I know today and from

9  everyone I talked to, I would say a very small

10 royalty would go to him.  I know this was another

11 submission.  Normally, when there were two

12 submissions, the inventor -- and I have told this to

13 every inventor that I ever worked with, the

14 inventor, which sends in the submission, which is

15 the reason we go to market with the product, that is

16 the person that would get the royalty.

17             If there are extenuating

18 circumstances when you are trying to, say, keep a

19 good relationship with another inventor, I may

20 negotiate a lower royalty than what would be paid on

21 this royalty to the original inventor that may have

22 had a product sent in that had some of the

23 similarities, which I mentioned.  I do think this is

24 similar, which I said.  You always go to market, at

25 least that's what I did, you go to market with the

PAUL SNYDER

143

1  whether Mr. Reiling should have been paid a royalty,

2  do you have any idea what you would have recommended

3  to management?

4              MR. LANE:  Objection.  No

5  foundation.

6  A.          I would need to know a lot more

7  information before I would provide or before I could

8  provide a valid opinion.  I can only speculate.

9  Q.          With respect to -- would your answer be

10  the same with respect to Exhibit 238, which is the

11  Optic Force Rescue Heroes?

12  A.          Yes, exactly what I said before about

13  this.

14  Q.          Would your answer be the same with

15  respect to the mission cards, the Mission Command

16  line?

17  A.          Yes.

18  Q.          At the time -- I'm going to ask you to

19  go back to the time that you were vice president of

20  inventor relations, at the time the Reel Heroes

21  concept was presented to you, had Fisher Price, to

22  your knowledge, ever marketed or sold an action

23  figure having a backpack that displayed images

24  depicting the character's mission or obstacles and

25  dangers that the character might face to enhance

PAUL SNYDER

144

```
1    role play for the child?
2                MR. LANE:  Object to form.
3    A.          Not to my recollection.
4    Q.          To your knowledge, had anyone other than
5    Fisher Price ever marketed or sold an action figure
6    having a backpack that displayed images depicting
7    the character's mission or obstacles and dangers
8    that the character might face to enhance the play
9    pattern for the child?
10               MR. LANE:  Object to form.
11   A.          I don't know the answer to that.  To my
12   best recollection, I remember something where you
13   could look into the figure and see something.  I
14   don't know, like those Niagara Falls things you get,
15   you could look into a figure and see something.  I
16   don't remember what figure it was.  I remember there
17   was something like that.
18   Q.          To be clear, my specific question was
19   whether if you had recalled whether anyone other
20   than Fisher Price ever marketed an action figure
21   that had a backpack depicting the character's
22   mission?
23               MR. LANE:  Object to form.  He
24   answered.
25               MR. DIZE:  I want to make sure
```

PAUL SNYDER

145

1  that he was sure the question was in regard to the

2  backpack as well.

3  A.          I understand.  I don't recall.

4  Q.          Mr. Snyder, we talked a little bit

5  earlier about the attitude at Fisher Price and

6  Mattel toward inventors.  Do you think that attitude

7  changed in the mid 1990s at all?

8                MR. LANE:  Objection.  Asked and

9  answered.  The question exactly has been asked and

10  answered.  Are we going to ask every question over

11  again?  You asked him that exact question.

12                MR. DIZE:  I'm asking --

13                MR. LANE:  Again?

14                MR. DIZE:  Yes.

15  A.          I will answer the way I think before.  I

16  hope under my leadership and just the fact that the

17  inventor community became more important to us that

18  inventor relations improved in the mid '90s to the

19  time that I left.

20  Q.          How about the standard under which an

21  inventor would receive compensation?  Did you

22  initiate a change in the late '90s?

23  A.          Fisher Price has always been a company

24  that always dealt fairly.  We were tough, but I

25  think we dealt fairly with the inventing community