# EXHIBIT C

HOWARD N. BOLLINGER

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------------

VICTOR G. REILING ASSOCIATES and
DESIGN INNOVATION, INC.,

                          Plaintiffs,

    -vs-

FISHER-PRICE, INC.,

                          Defendant.

-------------------------------------------------------

                          Examination Before Trial of

HOWARD N. BOLLINGER, taken pursuant to the Federal Rules of

Civil Procedure, in the law offices of HODGSON RUSS LLP,

One M & T Plaza, Suite 2000, Buffalo, New York, taken on

March 24, 2005, commencing at 9:40 A.M., before SUE ANN

SIMONIN, Notary Public.

## Sue Ann Simonin Court Reporting

421 Franklin Street
Buffalo, New York 14202
(716) 882-8059
Fax (716) 882-8099



8337 Ziblut Court
Niagara Falls, New York 14304
(716) 297-8059
Fax (716) 297-8710

15

1   A.   I don't quite know what you mean by the word

2        differences.

3   Q.   Well, let me ask you this.   What is the basis for

4        your conclusion that Fisher-Price did not make

5        use of Plaintiffs' concept submissions?

6   A.   There's nothing in the Fisher-Price product that

7        reflects anything I saw in the Plaintiffs'

8        submissions.

9   Q.   Okay.   So what I'm trying to ask you is, isn't

10       the basis for your conclusion -- isn't -- let me

11       ask it this way.   Isn't how you arrived at your

12       conclusion a comparison of the concept submission

13       by Plaintiffs and the ultimate products produced

14       by Fisher-Price?

15  MS. GALVIN:   Objection.

16  THE WITNESS:   Well, I see nothing in the Fisher-Price

17       products that were in the Plaintiffs'

18       submissions.

19  BY MR. DIZE:

20  Q.   And you did that by comparing the two, correct?

21  A.   You look at the submission, you look at the

22       product.

23  Q.   Isn't it a fact that toy companies will make

16

1      significant changes to a licensed toy concept to

2      make it a commercial product?

3   A.   It's not a fact.

4   Q.   Do you know that that happens?

5   A.   Sometimes possibly.

6   Q.   And isn't it also a fact that it's not uncommon

7      for the finished toy product to look nothing like

8      the concept that was originally presented to the

9      toy company?

10  MS. GALVIN:   Objection.

11  THE WITNESS:   That's not a fact either.

12  BY MR. DIZE:

13  Q.   But do you know that that happens?

14  A.   Yes, sometimes.   Could be.

15  Q.   And both the inventors and the toy companies

16      understand and accept the notion that a toy

17      company will make changes to a submission, isn't

18      that correct?

19  A.   Well, I -- not necessarily.

20  Q.   Why not?

21  A.   Because you're stating it, it seems, as a

22      foregone conclusion, and I don't -- that's not

23      really what happens.

17

1   Q.   Do you understand -- well, you're an inventor,

2        correct?

3   A.   Yeah.

4   Q.   Do you understand that when you make a submission

5        to a toy company, that a toy company will make

6        changes to that submission sometimes?

7   A.   Sometimes maybe.

8   Q.   And you understand that frequently significant --

9        let's not say frequently.  Do you understand that

10       significant changes can be made to that

11       submission?

12  A.   Could be.

13  Q.   And isn't it the case that despite these changes

14       that are made by a toy company, the inventor will

15       still be compensated for the use of the submitted

16       concept?

17  MS. GALVIN:   Objection.

18  THE WITNESS:   First of all, I don't think it's the

19       case.  And it's not necessarily true that the

20       inventor will always be paid.

21  BY MR. DIZE:

22  Q.   Do you know that that happens, that they are paid

23       sometimes?

18

1  A.  Well, I think people are paid royalties

2      sometimes, certainly.

3  Q.  When their concepts have been changed?

4  A.  Depends on what you mean by changed.  I mean,

5      it's like not a very definitive, you know, term.

6  Q.  Well, we just established, I think, that you're

7      an inventor.  Correct?

8  A.  Yes.

9  Q.  And you make submissions to toy companies?

10 A.  Yes.

11 Q.  When you submit an item, I think you -- let me

12     ask you, has an item that you submitted ever been

13     changed by a toy company by the time it is

14     manufactured?

15 A.  Again, when you say the word changed, it's like I

16     can't answer yes to that because it's too, it's

17     too vague.

18 Q.  What does changed mean to you?

19 A.  Something that's different than it was before.

20 Q.  Okay.  Well, based on your experience in

21     submitting toy concepts to toy companies, has it

22     ever happened to you that there are differences

23     in what the company comes out with than what you

19

1    submitted?

2  A.  Sometimes yes, sometimes no.

3  Q.  And -- well, has this ever happened to you, that

4      there are differences in the product that is sold

5      by the company and what you submitted?

6  MS. GALVIN:  Objection.  Asked and answered.

7  BY MR. DIZE:

8  Q.  I'm sorry.  Maybe that's what you were referring

9      to when you said sometimes.

10  A.  Yeah.  Sometimes yes, sometimes no.

11  Q.  And in those cases, were you paid a royalty?

12  MS. GALVIN:  Objection.  Which cases?

13  MR. DIZE:  Yeah.  The witness just identified a

14      number -- or, just identified sometimes.  I think

15      the answer was sometimes the product that the

16      company comes out with is different than the

17      concept that was submitted.  My question is, in

18      his experience in those cases, was he paid a

19      royalty.

20  THE WITNESS:  Well, if they didn't do the product, I

21      wasn't paid.

22  BY MR. DIZE:

23  Q.  If they did the product.

20

1  A.  Yes.

2  Q.  Okay.  Do you know who Paul Snyder is?

3  A.  Yes, I know him well.

4  Q.  He was formerly vice president of inventor

5      relations at Fisher-Price, was he not?

6  A.  I don't know if that's his exact title, but --

7  Q.  Do you recognize that that's generally what he

8      did, he was in charge of the inventor relations

9      department?

10  A.  For a time, yes.

11  Q.  And that's a similar job to what you held at

12      Kenner, is that correct?

13  A.  Yes.  I believe so.  To the best of my knowledge,

14      it was the same type of job.

15  Q.  Okay.  Do you know who Stan Clutton is?

16  A.  I know him well.

17  Q.  And he's currently a vice president at

18      Fisher-Price, is that correct?

19  A.  Well, either vice president, senior vice

20      president or something.

21  Q.  Okay.  And he handles inventor relations for

22      Fisher-Price, right?

23  A.  Yes.

52

1    MS. GALVIN:  Objection.

2    THE WITNESS:  Explain issue of fact.

3    BY MR. DIZE:

4    Q.  Well, do you understand that that is the basic

5        disagreement between the parties in this action?

6    MS. GALVIN:  Objection.

7    THE WITNESS:  That -- what is, an issue of fact or --

8    BY MR. DIZE:

9    Q.  No.  Let me start over.  Would you agree that

10       there's a basic disagreement between the parties

11       in this lawsuit on whether Fisher-Price actually

12       used Plaintiffs' submission?

13   A.  I think that's pretty well understood.

14   Q.  You've indicated that you're currently working as

15       a toy inventor, is that correct?

16   A.  Yes.

17   Q.  Have you submitted any concepts to Fisher-Price

18       during your career as a toy inventor?

19   A.  Yes.

20   Q.  What were those concepts?

21   A.  They're confidential.

22   Q.  In this case we have a Confidentiality Order to

23       protect Fisher-Price as to the confidentiality of

53

1    those submissions.  I think probably they're

2    covered.

3  MS. GALVIN:  Let me give that some thought for a

4    second.

5  THE WITNESS:  They're my confidential material.

6  MS. GALVIN:  Are any of them currently pending?

7  THE WITNESS:  You mean the ones with Fisher-Price?

8  MS. GALVIN:  Right.

9  THE WITNESS:  No.

10  MS. GALVIN:  I think you're free to testify.  I think

11    we'll designate the transcript accordingly

12    afterward.

13  THE WITNESS:  Okay.  Question again?

14  BY MR. DIZE:

15  Q.  Sure.  We were talking about concepts that you

16    submitted to Fisher-Price, and I asked you what

17    were those concepts that you submitted.

18  A.  I think there's only one that I submitted, and it

19    was a thing for Rescue Heroes that used an

20    adhesive that went on the wall that would be a

21    platform for positioning Rescue Heroes, as a play

22    set type of thing that was on the wall.  I think

23    that's the only one I submitted to them.

54

1  Q.  Okay.  And do you consider that submission to be

2      confidential?

3  A.  As far as my information about disclosing it,

4      yes, I do.  It's confidential to me.

5  Q.  Okay.  I won't go farther.

6         Did you -- when you submitted that concept

7      to Fisher-Price, how did you submit it?

8  A.  I think I contacted Steve Toth or Stan Clutton,

9      and I think I sent it in to Steve.

10  Q.  Okay.  Did you have a face-to-face initial

11      meeting about it or was it over the phone or --

12  A.  I don't think I had a face-to-face.  I think it

13      was over the phone.

14  Q.  Do you remember what documents you sent in with

15      that submission?

16  A.  No.  I sent back a signed submission form of

17      Fisher-Price with the description of the concept

18      on it.

19  Q.  Okay.  That's a form provided by Fisher-Price, is

20      that correct?

21  A.  Yes.

22  Q.  Did you send anything else with your submission?

23  A.  I think I sent a little model of the piece.

206

1       submit concepts for toy inventions to

2       Fisher-Price, does it?

3   A.  Well, without reading the entire thing, I have to

4       qualify it as such, it would seem to me that it

5       does not, since it's work for hire.

6   Q.  And I want to ask you, with regard to the

7       agreement you saw or you think you saw with

8       respect to Design Innovation that referred to

9       confidential information, can you tell me

10      everything you remember about that document?

11  A.  No.  You know, I can't recollect, you know,

12      specifics about it.

13  Q.  Do you recall if the agreement that you're

14      speaking of contemplated outside submissions by

15      Design Innovation?

16  A.  I think it did, yes.

17  Q.  When did you see that document?

18  A.  In the course of doing my expert report and

19      reviewing things supplied, documents supplied to

20      me.

21  Q.  I want to show you again the option agreement

22      which was previously marked as Exhibit 210, and

23      I'll refer your attention to paragraph five.

207

1       Could you please familiarize yourself with

2       paragraph five.

3   A.  Okay.

4   Q.  Does paragraph five contemplate the existence of

5       a confidential relationship between the

6       Plaintiffs and Fisher-Price?

7   MS. GALVIN:  Objection.

8   THE WITNESS:  I'm not so sure about the details of

9       that, because again, I'm not a lawyer, as in what

10      -- how this would be legally interpreted.

11  BY MR. DIZE:

12  Q.  Okay.  Well, paragraph five says, during the

13      option term, inventors agree not to show or

14      discuss the concept or any similar idea, product

15      or concept with any other prospective licensee or

16      agent thereof or any other party, unless approved

17      in writing by Fisher-Price Incorporated

18      beforehand.

19          Based on that, were Plaintiffs prohibited

20      from disclosing their concept to third parties?

21  A.  That's what it does say here.

22  Q.  And based on your understanding of the toy

23      industry, Fisher-Price wouldn't disclose the

208

1    concept to third parties, would they, because it
2    would -- well, would they?
3  MS. GALVIN:   Objection.
4  THE WITNESS:   I don't know what would happen at
5    Fisher-Price.
6  BY MR. DIZE:
7  Q.   Okay.  Would you agree that it would be in their
8    business interest to maintain confidentiality?
9  MS. GALVIN:   Objection.
10  THE WITNESS:   I -- again, I can't answer how
11    Fisher-Price would deal with this specific.
12  BY MR. DIZE:
13  Q.   Well, when you were at Kenner and you optioned
14    concepts, did you try to keep them confidential?
15  A.   Tried to, yes.
16  Q.   Wouldn't it be against your business interest to
17    disclose them, for example, to another toy
18    company?
19  A.   Yes.
20  Q.   And I show you paragraph eight.  Paragraph eight
21    says, inventors understand that Fisher-Price's --
22    Fisher-Price Incorporated's ability to
23    successfully market the licensed products

209

1    requires that any information regarding

2    Fisher-Price Incorporated's products or plans for

3    marketing products must be regarded as a secret

4    of Fisher-Price.  Accordingly, inventors agree to

5    treat in strictest confidence, in a manner

6    adequate to protect trade secret rights, any

7    information relating to the licensed products and

8    the existence of this option agreement itself,

9    unless the information is made public by

10    Fisher-Price Incorporated.

11        Does paragraph eight contemplate the

12    existence of a confidential relationship between

13    Plaintiffs and Fisher-Price?

14  MS. GALVIN:  Objection.

15  THE WITNESS:  It says that inventors must do what it

16    says here.

17  BY MR. DIZE:

18  Q.  Which is to keep Fisher-Price's products or plans

19    a secret, correct?

20  A.  That's what it says.

21  Q.  And to treat that information in strictest

22    confidence, correct?

23  A.  That's what it says.

186

1   A.   Yeah.   New sets of eyes.

2   Q.   I want to turn your attention to your

3        supplemental report which is Exhibit 96, page

4        ten, under the heading lack of novelty, first

5        paragraph.   You state, I have also been advised

6        by Fisher-Price's counsel that an idea or concept

7        is not novel under New York law if it is a

8        variation on a known basic theme, a clever or

9        useful adaptation of existing knowledge, an

10       improvement of a standard technique or a quality,

11       or the mixture of known product ingredients.

12            Is that correct?

13  A.   That's what I said.

14  Q.   So just to be clear, it's your testimony that the

15       combination of known elements to create a

16       particular product cannot be novel?

17  MS. GALVIN:   Objection.

18  THE WITNESS:   According to what I've learned about

19       New York law, that's true.

20  BY MR. DIZE:

21  Q.   How about your knowledge of how the toy industry

22       works, can a combination of known elements

23       combined create a product that is novel in its

187

1    own right?

2  A.  Could be, possibly.

3  Q.  Have you seen that occur before in the toy

4    industry?

5  A.  Can't recollect any, you know, specifics.

6  Q.  Would you agree that some of the best inventions

7    in the toy industry are unique combinations of

8    existing product -- sorry, of existing elements?

9  A.  The most successful? Some of the most successful

10   did you say?

11  Q.  I said some of the best inventions in the toy

12   industry.

13  A.  First, you know, there's a quanti -- there has to

14   be a quantifying of best.

15  Q.  Okay. Would you agree that successful inventions

16   in the toy industry are unique combinations of

17   existing elements?

18  A.  Yes and no.

19  Q.  And by that you mean it can be or it can't be, is

20   that correct?

21  A.  Could be.

22  MR. DIZE:  Could be. Okay.

23       I want to show you -- actually I need to

# EXHIBIT D

TYLER ROBERT BERKHEISER

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------

VICTOR G. REILING ASSOCIATES and
DESIGN INNOVATION, INC.,

                         Plaintiffs,

    -vs-

FISHER-PRICE, INC.,

                         Defendant.

-------------------------------------------------

                         Examination Before Trial of

TYLER ROBERT BERKHEISER, taken pursuant to the Federal Rules

of Civil Procedure, in the law offices of HODGSON RUSS LLP,

One M & T Plaza, Suite 2000, Buffalo, New York, taken on

March 17, 2005, commencing at 2:00 P.M., before MARY ANN

MORETTA, Notary Public.

## Sue Ann Simonin Court Reporting

421 Franklin Street
Buffalo, New York 14202
(716) 882-8059
Fax (716) 882-8099


NATIONAL COURT REPORTERS
NCRA
ASSOCIATION

8337 Ziblut Court
Niagara Falls, New York 14304
(716) 297-8059
Fax (716) 297-8710

29

1    Again, I'm going to ask you about the inventor

2    submission meetings and your experience. Does

3    inventor relations show a submission to anyone in

4    design prior to having the inventor submission

5    meeting?

6  A.  I don't know.

7  Q.  Okay. When you were shown outside inventor

8    submissions through an inventor submission

9    meeting or otherwise, did you treat that

10    information confidential?

11  A.  Most of the time.

12  Q.  And by that, I mean simply I understand that

13    you -- I assume you showed it to other people

14    within -- or you talked about it with other

15    people in your design group?

16  MS. GALVIN:  Objection.

17  THE WITNESS:  Not always.

18  BY MR. DIZE:

19  Q.  But my -- would you show it to people outside of

20    Fisher-Price, is basically my question?

21  A.  We have mom panels that we do, that are part of

22    our process and it's not typical by any means,

23    but sometimes an item will come in that is -- a

38

1   Q.  Did you, to your knowledge, participate in the

2       evaluation of the submissions that are at issue

3       in this case?

4   A.  I gave my opinion on an item that was shown to me

5       that was claimed to have come from this case,

6       from Victor Reiling.

7   Q.  When did you give that opinion?

8   A.  I don't recall exactly.

9   Q.  Was that opinion part of an inventor submission

10      meeting?

11  A.  No.

12  Q.  Was it part of a meeting?

13  A.  No.  Not a formal meeting.  It depends on your

14      definition of meeting.  Define meeting for me,

15      please.

16  Q.  Okay.  Can you describe for me the situation in

17      which you were asked to give your opinion about

18      the submission?

19  MS. GALVIN:  Objection.

20  THE WITNESS:  I was in my office and Ken Morton asked

21      me to look at a submission which was a motorized

22      film loop that was trapped inside of a backpack

23      that was put on one of our figures.  And he asked

39

1      me if he thought we had an interest. We, being

2      the boys team, had an interest in keeping the

3      submission in to do further work on it.

4   BY MR. DIZE:

5   Q.   Did this occur in your office?

6   A.   To my recollection, yes.

7   Q.   Was there anyone else present?

8   A.   No.   Ken Morton and myself.

9   Q.   Was -- were there any other occasions in which

10      you were asked to give input regarding the

11      submissions?

12   MS. GALVIN:   Objection.

13   THE WITNESS:   I don't recall.

14   BY MR. DIZE:

15   Q.   At that meeting between you and Ken Morton, do

16      you remember Chris Pardi being there?

17   A.   I don't recall anyone but Ken Morton and myself.

18   Q.   Can you describe for me what was shown to you at

19      the meeting?

20   MR. LANE:   Objection.

21   THE WITNESS:   When I was in my office and Ken brought

22      me the submission, it was a Rescue Hero figure, I

23      don't remember specifically which one, that had a

40

1    white breadboard mechanism on it. And there was

2    a film loop inside the mechanism that was trapped

3    inside there with a button on it that you press

4    that would motorize the film loop.

5  BY MR. DIZE:

6  Q. Did he show you anything else?

7  A. Yes, a rendering, drawing.

8  Q. Did he show you anything else?

9  A. No.

10 Q. And when Mr. Morton asked for your opinion, what

11    did you tell him?

12 A. I told him that I thought the submission was not

13    of interest to me. It appeared to be a mechanism

14    that we had done in the past in 1985 called the

15    Cartoon Viewer that was on one of our figures.

16    So I did not feel it was unique. And,

17    furthermore, it didn't seem to me like it was a

18    good play pattern for boys action figures to be

19    played with.

20 Q. Do you remember, did he say anything to you?

21 A. I don't remember.

22 Q. Did you say anything else to him?

23 A. I don't remember.

44

1   Q.   Okay.

2   A.   -- it would be impossible for me to talk about

3        it.

4   Q.   I'll show you what's been previously marked as

5        Exhibit 201, it's a two-page document.

6   A.   Okay.

7   Q.   Prior to your involvement in this case, had you

8        ever seen Exhibit 201 before?

9   A.   No.

10  Q.   Were you, prior to your involvement in this case,

11       were you ever aware or were you aware that

12       Exhibit 201 existed?

13  A.   No.

14  Q.   Showing you what's previously been marked as

15       Exhibit 203, prior to your involvement in this

16       case, had you ever seen Exhibit 203 before?

17  A.   I don't know.

18  Q.   Was this the drawing that you saw when Mr. Morton

19       showed you a submission, the submission we just

20       talked about?

21  A.   I saw a picture, a color picture of a cameraman.

22       I can't recall if this was exactly it or not.

23  Q.   Do you have any reason not to believe that this

45

1       was the document, this was the drawing that you

2       saw when Mr. Morton and you spoke about the

3       inventor submission we have been speaking about?

4   MS. GALVIN:   Objection.

5   BY MR. DIZE:

6   Q.  That was a horrible question.   Let me start over.

7       We have been talking about the meeting between

8       you and Mr. Morton in which he showed you an

9       outside inventor submission, correct?

10  A.  Yes.

11  Q.  Do you have any reason to believe that this is

12      not the drawing he showed you?

13  MS. GALVIN:   Objection.

14  THE WITNESS:   I saw a picture of a cameraman.   I

15      can't say if this is it or not.

16  BY MR. DIZE:

17  Q.  And I'll show you what's previously been marked

18      as Exhibit 204.

19  A.  Okay.

20  Q.  Did you ever see that document prior to your

21      involvement in this case?

22  A.  No.

23  Q.  Did you ever have -- did you have knowledge that

46

1     Exhibit 204 existed prior to your involvement in

2     this case?

3  A.  No.

4  Q.  I'll show you what's previously been marked as

5     Exhibit 202.  Have you ever seen Exhibit 202

6     before?

7  A.  I don't know.  The breadboard I saw I thought was

8     white.

9  Q.  Other than the color, is this what -- generally

10    what Mr. Morton showed you?

11  A.  The submission I saw had a film loop that was

12    trapped inside and a lens you looked in and a

13    button you pressed.  I can't recall specifically

14    more than the fact that I thought it was a white

15    breadboard.  If those elements are occurring on

16    this, then those are the similarities to the

17    submission.

18  MS. GALVIN:  You can look at it closer.

19  THE WITNESS:  Does it work?  I don't know if this was

20    the exact submission I saw, but it did have a

21    film loop and a motorized button and a lens you

22    looked through.

23  BY MR. DIZE:

47

1    Q.   Do you remember, during your meeting with Mr.

2         Morton, did you look through the viewer and test

3         it out just like you did a minute ago?

4    A.   Yes.

5    Q.   Do you remember what was displayed?

6    A.   A cartoon.

7    Q.   Do you remember what the cartoon was?

8    A.   Not specifically.

9    Q.   Did Mr. Morton from time to time ask you to

10        comment on submissions that came in?

11   A.   It was -- from time to time, I did comment on a

12        few submissions that would come in.

13   Q.   And do you remember what his position was at the

14        time when he showed you a submission?  Let me

15        rephrase.  The submission we have been talking

16        about at a meeting with you and Mr. Morton

17        regarding a submission that he showed you, at

18        that time do you recall what his position was?

19   A.   When Ken showed me a submission that was similar

20        to this one, it was when he was my manager and I

21        was the design project manager.  I don't recall a

22        specific title, but he was acting as my manager.

23   Q.   I will show you what's previously been marked as

73

1      solicited, that's all.

2   BY MR. DIZE:

3   Q.   Okay.  Other than your job, which I understand

4        you just said your involvement was limited, but

5        are you aware on a corporate level of any

6        policies or procedures regarding consideration of

7        outside inventor submissions?

8   MS. GALVIN:  Objection.  Asked and answered.

9   THE WITNESS:  No, I'm not aware of any.

10  BY MR. DIZE:

11  Q.   Okay.  I want to go back to Exhibit 60, which is

12       the Voice Tech Mission Rescue Hero figure.  Do

13       you recall when that product was first sold by

14       Fisher-Price?

15  A.   I don't know.

16  Q.   Okay.  Do you recall when it was being developed

17       by Fisher-Price?

18  A.   I don't recall specifically, no.

19  Q.   Do you recall what job you had when that product

20       was being developed?

21  A.   I was the manager of the boys team at that time.

22  Q.   At the time Exhibit 60 was first sold by

23       Fisher-Price, had Fisher-Price ever marketed or

74

1    sold an action figure backpack that displayed

2    images depicting the character's mission or

3    obstacles and dangers the character might face?

4  MS. GALVIN:  Objection.

5  THE WITNESS:  I don't know.

6  BY MR. DIZE:

7  Q.  Do you recall any specifically?

8  A.  I don't recall any specific ones Fisher-Price has

9    sold.

10  Q.  At the time Exhibit 60 was first sold by

11    Fisher-Price, do you recall any company, other

12    than Fisher-Price, that marketed or sold an

13    action figure having a backpack that displayed

14    images depicting the character's mission or

15    obstacles or dangers the character might face?

16  MS. GALVIN:  Objection.

17  THE WITNESS:  I'm sorry.  Could you please restate

18    again?

19  BY MR. DIZE:

20  Q.  Sure.  Although it's a mouthful.  Again,

21    referring to Exhibit 60, at the time Fisher-Price

22    first sold Exhibit 60.

23  A.  First sold Exhibit 60.

75

1    Q.  Were you aware of any company other than

2        Fisher-Price having marketed or sold an action

3        figure having a backpack that displayed images

4        depicting the character's mission or obstacles

5        and dangers the character might face?

6    MS. GALVIN:  Objection.

7    THE WITNESS:  I don't know.

8    BY MR. DIZE:

9    Q.  Do you recall any specifically?

10   A.  I don't know.

11   Q.  Well, I'm sorry, you said you don't know.  You

12       don't know if you recall any specifically?

13   MS. GALVIN:  Objection.

14   THE WITNESS:  I don't know.

15   BY MR. DIZE:

16   Q.  Can you name one as we sit here today?

17   A.  I don't know.  You have to restate the question

18       again.  You confused me.

19   Q.  Okay.  I'll restate it.  Again, referring to

20       Exhibit 60, at the time when Exhibit 60 was first

21       sold by Fisher-Price, can you identify for me a

22       company that had marketed or sold an action

23       figure having a backpack that displayed images

76

1        depicting the character's mission or obstacles

2        and dangers the character might face?

3    MS. GALVIN:   Objection.

4    THE WITNESS:   The figure that depicted an image of an

5        obstacle the character might face?  There was the

6        Secret Wars line.  It was an action figure line

7        that had an articular image of a character in a

8        situation.

9    BY MR. DIZE:

10   Q.   Was that on a backpack?

11   A.   That was an accessory to the figure.

12   Q.   Was it on a backpack?

13   A.   No.

14   MR. DIZE:   I think I'm done.  Can we take a couple

15       minutes to review my notes?

16            (Whereupon, a short recess was then taken.)

17   BY MR. DIZE:

18   Q.   Just one more question.  Do you have any

19       knowledge regarding royalty rates paid to outside

20       inventors?

21   A.   No, that's not my area.

22   MR. DIZE:   Okay.  We are done.

23

# EXHIBIT E

KENNETH P. MORTON

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

_____

VICTOR G. REILING ASSOCIATES and
DESIGN INNOVATION, INC.,

                              Plaintiffs,

    -vs-

FISHER-PRICE, INC.,

                              Defendant.

_____

                    Examination Before Trial of

KENNETH P. MORTON, taken pursuant to the Federal Rules of

Civil Procedure, in the law offices of HODGSON RUSS LLP,

One M & T Plaza, Suite 2000, Buffalo, New York, taken on

March 18, 2005, commencing at 9:05 A.M., before MARY ANN

MORETTA, Notary Public.

### Sue Ann Simonin Court Reporting

421 Franklin Street
Buffalo, New York 14202
(716) 882-8059
Fax (716) 882-8099


NATIONAL COURT REPORTERS
NCRA
ASSOCIATION

8337 Ziblut Court
Niagara Falls, New York 14304
(716) 297-8059
Fax (716) 297-8710

46

1   Q.   When you considered -- again, back in the same

2        time period, when you considered an outside

3        inventor -- let me start again.  When you

4        reviewed an outside inventor submission, did you

5        keep the information relative to that invention

6        confidential?

7   A.   I was very careful about it.

8   Q.   For example, you wouldn't disclose to anyone

9        outside of Fisher-Price, would you?

10  A.   I think it would depend on the specific

11       invention.

12  Q.   Okay.  Did you attempt to keep the information --

13       let me start over.  I realize there is things

14       like play labs and testing that goes on.

15  A.   Right.

16  Q.   But aside from that, would you attempt to keep

17       the information inside Fisher-Price?

18  A.   I would attempt to do that personally, yes.

19  Q.   Were you ever involved in decisions whether to

20       pay royalties to an outside inventor?

21  A.   I would give my input on that.

22  Q.   And when were you asked for that input in the

23       process of reviewing the submission?

59

1    the one you had in front of you, were you aware

2    that Exhibit 200 existed before your involvement

3    in this lawsuit?

4  MS. GALVIN:  Objection.  Foundation.

5  THE WITNESS:  No, I wasn't aware.

6  MS. GALVIN:  Off the record.

7        (Discussion off the record.)

8  BY MR. DIZE:

9  Q.  Showing you now what's previously been marked as

10     Exhibit 201, it's a two-page document.  Did you

11     ever see this document before today?

12  A.  Yes, I recall that.

13  Q.  Okay.  When did you see this document?

14  A.  I don't know the exact date when I saw this.

15  Q.  Was it back in the time when you were manager of

16     design?

17  A.  Yes.

18  Q.  Okay.  Can you tell me what you remember about

19     how you came in contact with this document?

20  A.  I really don't know.

21  Q.  Do you know if it was in connection with

22     reviewing an inventor submission?

23  A.  Yes.

59

1    Q.   And was it -- I asked you if you knew.  You said

2         yes.  Was it in connection in reviewing an

3         outside inventor submission?

4    A.   I said yes.

5    Q.   Okay.

6    A.   I'm not sure where you are going.

7    Q.   I want to make sure the question is clear.  Did

8         you ever discuss Exhibit 201 with anyone at

9         Fisher-Price?

10   A.   I don't know if I discussed this exact document.

11   Q.   Do you remember who gave you Exhibit 201?

12   A.   I do not.

13   Q.   And I'm going to show you what's been previously

14        marked as Exhibit 203.  Did you ever see Exhibit

15        203 before today?

16   A.   Yes.

17   Q.   And did you see Exhibit 203 back in the time when

18        you were manager of design?

19   A.   Yes.

20   Q.   And was that in connection with reviewing an

21        outside inventor submission?

22   A.   Yes.

23   Q.   Did you -- can you tell me the circumstances

60

1    surrounding -- let me ask a better question.  Can

2    you tell me how you came in contact with Exhibit

3    203?

4  A.  I don't recall.

5  Q.  Did you ever discuss Exhibit 203 with anyone else

6    at Fisher-Price?

7  A.  I don't recall discussing this exact exhibit with

8    anybody.

9  Q.  I want to show you what's been previously marked

10    as Exhibit 204.  Do you recall, did you see this

11    document before today?

12  A.  I don't recall this.

13  Q.  Did you ever talk to anyone at Fisher-Price

14    regarding Exhibit 204?

15  MS. GALVIN:  Objection.

16  THE WITNESS:  I don't know.

17  BY MR. DIZE:

18  Q.  But you never saw it?

19  A.  I didn't say I never saw it.  I said I don't

20    recall seeing it.

21  MR. DIZE:  Okay.  I want to show you what has been

22    previously marked as Exhibit 202.  And -- off the

23    record.

61

1          (Discussion off the record.)

2    BY MR. DIZE:

3    Q.   Do you recall -- strike that.  Did you see

4         Exhibit 202 before today?

5    A.   I don't know if it's exactly what I seen, but I

6         seen something very similar to this, yes.

7    Q.   And was that in the time period when you were

8         manager of design?

9    A.   That's correct.

10   Q.   And was it in connection with reviewing an

11        outside inventor submission?

12   A.   Yes.

13   Q.   Can you tell me how you came in possession of

14        Exhibit 202?

15   A.   No.

16   Q.   Were you asked to provide input with respect to

17        Exhibit 202?

18   MS. GALVIN:   Objection.  Go ahead.

19   THE WITNESS:   I don't recall being asked that

20        exactly.

21   BY MR. DIZE:

22   Q.   Did you discuss Exhibit 202 with anyone at

23        Fisher-Price?

62

1  A.  I do recall discussion about that, yes.

2  Q.  Okay.  Can you describe for me -- well, first,

3      who was present at that discussion?

4  A.  I remember discussing it with Tyler Berkheiser.

5  Q.  Okay.  Anyone else present at that discussion?

6  A.  I don't recall that.

7  Q.  Where did that discussion take place?

8  A.  I don't know.

9  Q.  When you discussed Exhibit 202 with Mr.

10     Berkheiser, were Exhibits 201 -- well, let me ask

11     you.  Was Exhibit 201 present at that time, which

12     is this one?

13 A.  I don't recall if it was or not.

14 Q.  And when you discussed Exhibit 202 with Mr.

15     Berkheiser, was Exhibit 203 present, which is

16     this one?

17 A.  I don't recall that.

18 Q.  Do you recall examining Exhibit 202 in connection

19     with providing input?

20 A.  Yes.

21 Q.  What did you do specifically, if you recall?

22 A.  You asked me what I recall of the conversation.

23 Q.  No, no.  I'm asking you, did you examine Exhibit

71

1    Q.   And was there anything else that was discussed in

2         your discussions with Mr. Berkheiser regarding

3         Exhibit 202 or the other document I've shown you

4         this morning?

5    A.   Not that I recall.

6    Q.   Do you recall how long you had possession of

7         Exhibit 202?

8    A.   No, I do not.

9    Q.   Well, let me ask you this first.  Did you have

10        possession of Exhibit 202 for a period of time?

11   A.   Yes.

12   Q.   And did you, likewise, have possession of

13        Exhibits 201 and 203 for a period of time -- I'm

14        sorry.  This is 201 and this is 203.

15   A.   Yes.

16   Q.   Do you remember how long it took to have the cost

17        evaluation done?

18   A.   No, I do not.

19   Q.   Would you say that you had these materials in

20        your possession for longer than a week?

21   A.   Yes, I would say it's longer than a week.

22   Q.   Would you say it was longer than two weeks?

23   A.   I would say it would be longer than two weeks.

72

1  Q.  Would you say it would be longer than three

2      weeks?

3  A.  I don't know.  I don't know.

4  Q.  Did you have it as long as a month?

5  A.  It's possible, but I don't recall that.

6  Q.  And while you were in possession of Exhibit 202,

7      Exhibit 201 and Exhibit 203, where did you keep

8      them?

9  A.  I don't recall where I kept them exactly.

10 Q.  Is it reasonable to assume they were in your

11     office?

12 MS. GALVIN:  Objection.

13 THE WITNESS:  I don't recall if they were in my

14     office, but it could have been.

15 BY MR. DIZE:

16 Q.  Would there have been any other place where you

17     would have kept materials such as these?

18 A.  We didn't have a particular place that I can

19     recall.

20 Q.  You've testified that you had Exhibit 202 and 201

21     and 203 in your possession for a period of time.

22     What were you doing with those materials during

23     that period of time?

73

1   A.   I was evaluating them.

2   Q.   Okay.  I guess my question is why did it take --

3        I think you testified that it was probably longer

4        than two weeks that you had these materials.  I

5        guess my question would be why did it take that

6        amount of time to do an evaluation on these

7        materials?

8   A.   It could be several reasons.  I want to be fair

9        to the inventor, make sure I evaluate it

10       properly.  I would have discussions with other

11       team members to get their opinions.  We certainly

12       have other priorities in the team that need to be

13       attended to immediately.  I'm not sure where this

14       stood as a priority.  And I do recall doing some

15       evaluation on costing.  And that generally takes

16       a period of time, two weeks or more.

17  Q.   Okay.  You just mentioned several reasons why you

18       may have had it in your possession for a period

19       of time.  Do you remember specifically any

20       discussions with other team members during that

21       time period regarding these materials?

22  MS. GALVIN:  Objection.  Asked and answered.

23  THE WITNESS:  I don't recall that.

Sue Ann Simonin Court Reporting

74

```
 1  BY MR. DIZE:
 2  Q.  Okay.  And you were, during this time, manager of
 3      design, is that correct?
 4  A.  That is correct.
 5  Q.  And I believe you testified -- well, let me ask
 6      you.  Did you have people working for you at that
 7      time?
 8  A.  Yes.
 9  Q.  Designers?
10  A.  Yes.
11  Q.  Did you, during that time, for example, did you
12      meet with designers in your office during that
13      period of time to discuss projects they were
14      working on?
15  A.  Yes.
16  Q.  For example, would you have met with Tyler
17      Berkheiser in your office regarding projects he
18      was working on?
19  A.  Yes, I would.
20  Q.  And would you meet with Chris Pardi, ever,
21      regarding projects he was working on?
22  MS. GALVIN:  Objection.
23  THE WITNESS:  Yes, I would meet with him.
```

99

1  which is the Voice Tech Video Mission Rescue

2  Hero. Do you recall when that figure was first

3  sold by Fisher-Price?

4 MS. GALVIN: Objection.

5 THE WITNESS: When this figure was first sold?

6 BY MR. DIZE:

7 Q. This line, the Voice Tech Video Mission line of

8  toys. Do you remember when that line was first

9  sold by Fisher-Price?

10 A. No, I don't recall that date.

11 Q. Okay. Do you recall -- do you have any

12  recollection during your tenure at Fisher-Price

13  of this product coming out on the market?

14 A. Can you say that again? I'm sorry.

15 Q. Do you remember when this product line came out?

16  Not specifically the date, but do you remember

17  that happening while you were at Fisher-Price?

18 MS. GALVIN: Objection.

19 THE WITNESS: Yes, I remember when it came out.

20 BY MR. DIZE:

21 Q. Okay. To your knowledge, at the time Exhibit 60

22  came out, by that I mean was marketed and sold by

23  Fisher-Price, are you aware -- or let me start

100

1     over.  At the time Exhibit 60 was first marketed

2     and sold by Fisher-Price, had Fisher-Price ever

3     marketed or sold an action figure having a

4     backpack that displayed images that depicted the

5     character's mission or obstacles and dangers the

6     character might face?

7     MS. GALVIN:  Objection.

8     THE WITNESS:  I don't know.

9     BY MR. DIZE:

10    Q.  Could you recall?

11    A.  I don't know the history of every product at

12       Fisher-Price.

13    Q.  Sure.  Could you recall any specifically that

14       Fisher-Price had marketed or sold?

15    MS. GALVIN:  Objection.

16    THE WITNESS:  I don't recall it, no.

17    BY MR. DIZE:

18    Q.  Okay.  And at the time Exhibit 60 was first

19       marketed or sold by Fisher-Price, do you -- or

20       had Fisher-Price -- I'm sorry, let me start over.

21       At the time when Exhibit 60 was first marketed or

22       sold by Fisher-Price, had any other toy company,

23       to your knowledge, ever sold an action figure

101

```
 1      having a backpack that displayed images depicting
 2      the character's mission or obstacles and dangers
 3      the character might face?
 4   MS. GALVIN:  Objection.
 5   THE WITNESS:  I don't know that because I'm not
 6      familiar with every product out there.  So I do
 7      not know that.
 8   BY MR. DIZE:
 9   Q.  Is it fair to say that you cannot recall any
10      specifically?
11   MS. GALVIN:  Objection.
12   THE WITNESS:  I don't recall any figures of that
13      description.
14   MR. DIZE:  I think I'm about done, if you can give me
15      a couple minutes to look over my notes.
16          (Whereupon, a short recess was then taken.)
17   BY MR. DIZE:
18   Q.  I just have a couple more questions.  Going back
19      to the time period we have been speaking about
20      today when you were manager of design and
21      director of product design.  Did the company have
22      any policies regarding the manner -- let me start
23      that again.  Did the company have any policies
```