# EXHIBIT F

CHRISTOPHER PARDI

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

--------------------------------------------------

VICTOR G. REILING ASSOCIATES and
DESIGN INNOVATION, INC.,

                    Plaintiffs,

    -vs-

FISHER-PRICE, INC.,

                    Defendant.

--------------------------------------------------

                    Examination Before Trial of

CHRISTOPHER PARDI, taken pursuant to the Federal Rules of

Civil Procedure, in the law offices of HODGSON RUSS LLP,

One M & T Plaza, Suite 2000, Buffalo, New York, taken on

March 16, 2005, commencing at 9:05 A.M., before MARY ANN

MORETTA, Notary Public.

## Sue Ann Simonin Court Reporting

421 Franklin Street
Buffalo, New York 14202
(716) 882-8059
Fax (716) 882-8099



8337 Ziblut Court
Niagara Falls, New York 14304
(716) 297-8059
Fax (716) 297-8710

```
1    BY MR. DIZE:
2    Q.  What other types of decision can be made?
3    A.  What color something is going to be, what package
4        it's going to be put in.  Every decision that
5        needs to be made to make a product.
6    Q.  When you receive a submission from design, do you
7        keep that information confidential?
8    MR. LANE:  Object to the form.
9    THE WITNESS:  Do I keep it confidential?  I don't
10       tell anybody.  I don't understand.  Do I keep it
11       confidential and talk to nobody about it?  I
12       don't understand what you are asking me, to be
13       honest with you.
14   BY MR. DIZE:
15   Q.  Do you try to keep it within the company, within
16       the team?
17   MR. LANE:  Object to the form.
18   THE WITNESS:  Do I try to?  I never talk to outside
19       people about inventor submissions, no, never
20       have.  Everything we do is confidential in the
21       team center.
22   BY MR. DIZE:
23   Q.  Is there anything that you have to sign or agree
```

45

1    your review. Prior to my showing you this at

2    your previous deposition, had you ever seen this

3    document before?

4  A.  Never.

5  Q.  Do you know of anyone at Fisher-Price who saw

6    this document at any time?

7  A.  No.

8  Q.  I want to show you what's been previously marked

9    as Defendant's Exhibit 202. Do you recognize

10   Exhibit 202?

11 A.  Portions of it.

12 Q.  What portions of it do you recognize?

13 A.  I recognize the Rescue Heroes character.

14 Q.  Do you recognize the red backpack?

15 A.  No. Other than you showed it to me prior.

16 Q.  Okay. Had you ever seen this in its entirety

17   before your previous deposition?

18 A.  In that form, I don't think so.

19 Q.  I had thought at your previous deposition you

20   spoke of a meeting with Ken Morton in his office.

21   Was this prototype at that meeting?

22 A.  My recollection was it was a -- the film loop was

23   in a white casing. That's my recollection.

46

1    Q.   Okay.   Do you remember seeing a prototype with a

2         film loop in a casing in Mr. Morton's office?

3    A.   Yes.

4    Q.   Did the casing -- did the prototype that you saw

5         in Mr. Morton's office, other than the color,

6         look substantially like Exhibit 202, if you

7         recall?

8    A.   You would have to define substantially.   But it

9         had a film loop, as I recall.

10   Q.   Okay.   At the time you were meeting with Mr.

11        Morton in his office, were you aware that the

12        prototype you were looking at was submitted by

13        Victor Reiling and Design Innovation?

14   A.   No.

15   Q.   As you sit here today, are you aware that the

16        prototype you were looking at in Mr. Morton's

17        office was submitted by Victor Reiling and Design

18        Innovation?

19   MR. LANE:   Object to the form.

20   THE WITNESS:   Say that question one more time.

21   BY MR. DIZE:

22   Q.   Sure.   As you sit here today, are you aware that

23        the prototype you reviewed in Mr. Morton's office

50

1  Q.  I guess what I'm asking, is what you saw

2      consistent with what is displayed in Exhibit

3      202 -- let me rephrase the question.  Is what you

4      saw in the prototype you saw in Mr. Morton's

5      office consistent with what you see in Exhibit

6      202 or was it something totally different?

7  MR. LANE:  Object to the form.  Go ahead.

8  THE WITNESS:  It was a film loop is what I saw.  This

9      looks to be similar.

10  BY MR. DIZE:

11  Q.  It was a film loop in some sort of housing or

12      casing?

13  A.  Yes.

14  Q.  Was it on -- was it attached to the figure as a

15      -- similar as a backpack?

16  A.  I really don't recall.

17  Q.  Do you remember anything else about what you saw

18      in Mr. Morton's office?

19  A.  I remember there was a cartoon in the film, I

20      think.

21  Q.  Do you remember what the cartoon was?

22  A.  I don't.  I remember thinking I had seen it.

23  Q.  Did the prototype you saw in Mr. Morton's office

51

```
 1        -- in order to view the cartoon, did you have to
 2        look into something like what is displayed in the
 3        back of Exhibit 202?
 4   A.   Yes.  You had to look through an eye piece.
 5   Q.   Okay.  Do you have any reason to believe that
 6        Exhibit 202 was not what you viewed in Mr.
 7        Morton's office?
 8   MR. LANE:  Object to the form.
 9   THE WITNESS:  Yes.  Because I thought -- my
10        recollection was it was white.
11   BY MR. DIZE:
12   Q.   Other than the color, do you have any reason to
13        believe that Exhibit 202 was not what you saw in
14        Mr. Morton's office.
15   A.   I didn't spend that much time with it.
16   MR. LANE:  Object to the form.
17   BY MR. DIZE:
18   Q.   Who else was at that meeting in Mr. Morton's
19        office?
20   A.   Tyler Berkheiser.
21   Q.   Anyone else?
22   A.   No.
23   Q.   Are you aware of anyone else at Fisher-Price who
```

61

1  Q.  That was the only time, correct?

2  A.  Yes.

3  Q.  Were you aware that a third submission by Victor

4     Reiling and Design Innovation had been made to

5     Fisher-Price prior to your involvement in this

6     lawsuit?

7  A.  No.

8  Q.  From your conversations with Mr. Berkheiser and

9     Mr. Morton while you were in his office, do you

10     know if anyone else at Fisher-Price had expressed

11     an opinion about the submission?

12  A.  No, I don't.

13  Q.  You don't recall or you don't know?

14  MR. LANE:  Object to the form.

15  THE WITNESS:  I know of nobody that expressed an

16     opinion.

17  BY MR. DIZE:

18  Q.  I want you to go back to that day when you were

19     in Mr. Morton's office looking at the prototype

20     you saw in his office with Mr. Berkheiser.  At

21     that time, to your knowledge, had Fisher-Price

22     ever marketed or sold an action figure having a

23     backpack that displayed images depicting the

62

1    character's mission or obstacles and dangers and

2    the character might face?

3  MR. LANE:  Object to the form.

4  THE WITNESS:  There was an action figure in the

5    Adventure People line.  It was a cameraman.  You

6    could look through a viewer and see whatever he

7    was viewing.

8  BY MR. DIZE:

9  Q.  Okay.  But at that time, had Fisher-Price ever

10    marketed or sold an action figure having a

11    backpack that displayed images depicting the

12    character's mission or obstacles and dangers the

13    character might face?

14  MR. LANE:  Object to the form.

15  THE WITNESS:  Fisher-Price had already been selling

16    action figures with backpacks.

17  BY MR. DIZE:

18  Q.  Do you know if those backpacks displayed images

19    depicting the character's mission or obstacles or

20    dangers the character might face?

21  MR. LANE:  Object to the form.

22  THE WITNESS:  No, I don't think we have.

23  BY MR. DIZE:

63

1    Q.   Had you seen that done elsewhere --

2    MR. LANE:   Object to the form.

3    BY MR. DIZE:

4    Q.   -- at that point?

5    A.   Repeat the question, please.

6    Q.   At the time you were in Mr. Morton's office

7         viewing the prototype, had you seen some, outside

8         of Fisher-Price, an action figure having a

9         backpack that displayed images depicting the

10        character's mission or obstacles and dangers the

11        character might face?

12   MR. LANE:   Object to the form.

13   THE WITNESS:   That action -- you know, you look at

14        action figures, have always displayed --

15   BY MR. DIZE:

16   Q.   Do you recall an item with those characteristics?

17   MR. LANE:   Object to the form.

18   THE WITNESS:   No, I don't.

19   MR. DIZE:   I'm at a breaking point if anybody needs a

20        short break, I'm getting ready to change areas.

21   MR. LANE:   Off the record.

22            (Whereupon, a short recess was then taken.)

23   BY MR. DIZE:

Sue Ann Simonin Court Reporting

EXHIBIT G

JAMES BAUMAN

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------

VICTOR G. REILING ASSOCIATES and
DESIGN INNOVATION, INC.,

                              Plaintiffs,

     -vs-

FISHER-PRICE, INC.,

                              Defendant.

------------------------------------------------------

                         Examination Before Trial of

JAMES BAUMAN, taken pursuant to the Federal Rules of Civil

Procedure, in the law offices of HODGSON RUSS LLP, One

M & T Plaza, Suite 2000, Buffalo, New York, taken on March

16, 2005, commencing at 2:00 P.M., before MARY ANN MORETTA,

Notary Public.

## Sue Ann Simonin Court Reporting

421 Franklin Street
Buffalo, New York 14202
(716) 882-3059
Fax (716) 882-8099



8337 Ziblut Court
Niagara Falls, New York 14304
(716) 297-8059
Fax (716) 297-8710

47

1      your knowledge?

2  A.  Not to my knowledge.

3  Q.  I'm going to show you what's been previously

4      marked as Exhibit 60. Do you recognize Exhibit

5      60?

6  A.  Yes.

7  Q.  Prior to the time that Exhibit 60 was sold by

8      Fisher-Price, had Fisher-Price ever marketed or

9      sold an action figure having a backpack that

10     displayed images depicting the character's

11     mission or obstacles or dangers the character

12     might face?

13  MS. GALVIN:  Objection.

14  THE WITNESS:  I'm not really sure.

15  BY MR. DIZE:

16  Q.  Do you recall any instance where Fisher-Price had

17     done that prior to Exhibit 60?

18  A.  I don't really know their entire line from the

19     beginning, so I'm not really sure.

20  Q.  Is it fair to say that you don't know of an

21     instance where they have done that?

22  A.  Yes, it's fair to say.

23  Q.  And, again, at the time, prior to the time when

48

1      Exhibit 60 was manufactured and sold -- actually,
2      strike that.  Prior to the time when Exhibit 60
3      was sold by Fisher-Price, based on your knowledge
4      of the industry, had anyone other than
5      Fisher-Price marketed or sold an action figure
6      having a backpack that displayed images depicting
7      the character's mission with obstacles and
8      dangers the character might face?
9  MS. GALVIN:  Objection.
10 THE WITNESS:  I remember toys being sold with images,
11     maybe not a backpack but images.
12 BY MR. DIZE:
13 Q.  Do you recall any with images in a -- strike
14     that.  Do you recall any that -- any action
15     figures having a backpack that displayed images
16     depicting the character's mission or obstacles or
17     dangers the character might face?
18 A.  Not that I recall.
19 Q.  I want to show you what has previously been
20     marked as Exhibit 263, it's the second amended
21     Complaint.  I don't think I gave Bob a copy.
22 MS. GALVIN:  That's fine.
23 BY MR. DIZE:

# EXHIBIT H

PATRICIA GRABIANOWSKI

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------

VICTOR G. REILING ASSOCIATES and
DESIGN INNOVATION, INC.,

                              Plaintiffs,

     -vs-

FISHER-PRICE, INC.,

                              Defendant.

-------------------------------------------------

                              Examination Before Trial of

PATRICIA GRABIANOWSKI, taken pursuant to the Federal Rules

of Civil Procedure, in the law offices of HODGSON RUSS LLP,

One M & T Plaza, Suite 2000, Buffalo, New York, taken on

March 18, 2005, commencing at 2:00 P.M., before MARY ANN

MORETTA, Notary Public.

## Sue Ann Simonin Court Reporting

421 Franklin Street
Buffalo, New York 14202
(716) 882-8059
Fax (716) 882-8099


NATIONAL COURT REPORTERS
NCRA
ASSOCIATION

8337 Ziblut Court
Niagara Falls, New York 14304
(716) 297-8059
Fax (716) 297-8710

8

1  A.  I believe I was, yes.

2  Q.  Who did you work for during that time period from

3      1997 through 2001?

4  A.  You know, I really don't recall all the -- I can

5      give you vague, but it would be better if I could

6      be sure, check that.  You know, I can go back and

7      give you names.

8  Q.  Okay.  Well, over the last ten years, do you have

9      a recollection of about who your bosses have been

10     during that time period?

11 A.  Yes.

12 Q.  Who were they?

13 A.  Paul Snyder, Peter Pook, P-O-O-K, David Burke,

14     and then I believe Stan Clutton and Steve Toth.

15 Q.  Do you currently report to Stan Clutton and Steve

16     Toth?

17 A.  Yes, I do.

18 Q.  In approximately -- again, I want to focus your

19     attention to the period of time that I have spoke

20     about earlier, 1997 to 2001, did you work for

21     Paul Snyder during that period?

22 A.  I don't recall the exact time frame.

23 Q.  Okay.  And do you know if you worked for Peter

9

1      Pook during that time period?

2  A.  Again, I would have to check the dates.

3  Q.  When you said you take care of receiving and

4      documenting inventions from outside inventors,

5      how do you do that?

6  A.  Items come in-house and I make a record of

7      receiving them in-house.

8  Q.  I'm sorry?

9  A.  I make a record of receiving them in-house.

10  Q.  Okay.  And what type of record do you make?

11  A.  It is an online record, a system.

12  Q.  Like a database?

13  A.  Yes.

14  Q.  Okay.  And what kind of information do you

15      record?

16  A.  I record the name of the inventor, usually, the

17      date the item was received in-house, a brief

18      description of the item.  And there is other date

19      fields and a category field and a toy type field.

20  Q.  Okay.  Could you describe those other fields.

21      What information goes in those fields?

22  A.  A category is -- it's a drop-down menu.  And

23      there are selections in it like Little People.

16

1      asked, yes.

2  Q.  Do you recall, other than in Exhibit 57, do you

3      recall the company doing that in other wish lists

4      as well?

5  A.  Particular to Rescue Heroes are you saying?

6  Q.  Yes.

7  A.  No, I don't recall.

8  Q.  I was wondering if you could tell me the process

9      of what happened to an inventor submission from

10     the time it first came into the company?

11  A.  Currently?

12  Q.  Actually, can we talk about that time period I

13     was referring to earlier, roughly 1997 through

14     2001.

15  A.  If I -- I would have to -- it would depend.  I

16     know what the current circumstances are.

17  Q.  Let's talk about the current circumstances.

18  A.  Okay.  Currently my senior person goes out into

19     the field or meets with people in-house and they

20     look at product.  Product is submitted to me and

21     I document it.

22  Q.  Okay.  After you finish documenting the

23     product -- well, actually, let me ask you first.

17

1    You said product was submitted to you.  Did it

2    ever come to your senior person?

3  A.  It may have, but I would have no knowledge of

4    that.

5  Q.  Okay.  Generally, it was the submissions came to

6    you, addressed to you?

7  A.  Not always.

8  Q.  Okay.  Did your senior person ever provide you

9    with submissions that they had received when they

10    went out into the field?

11  A.  They may have, but I could not really be

12    specific.

13  Q.  Okay.  After you got done documenting the

14    submissions, what would happen to them at that

15    point?

16  A.  Currently?

17  Q.  Okay.

18  A.  Currently we have five monthly -- bi-monthly

19    meetings and senior management, senior design

20    management are invited to these meetings to go

21    look at the product bi-monthly, every two weeks.

22  Q.  Do those meetings have a name now?

23  A.  I would call them inventor submission meetings.

18

1      I don't know what anyone else would call them.

2   Q.  Okay.  And do all the products that you document

3      make it to those meetings?

4   A.  It depends.

5   Q.  Okay.  What does it depend on?

6   A.  Senior management.  Like my senior -- my

7      supervisor would look at that product once it's

8      in-house and see if it's applicable for East

9      Aurora or not.

10  Q.  Okay.  So after you -- the materials that are

11     submitted, I take it while you are documenting

12     their receipt, you had those materials in your

13     possession?

14  A.  The ones I receive, yes.

15  Q.  And then do you transfer them back to your senior

16     person after you get done documenting the

17     materials?

18  A.  We have an area where they are kept in boxes, you

19     know, closed, covered until such time until when

20     they are taken into the meeting.

21  Q.  And are you responsible for getting the -- the

22     materials from that storage area to the meeting?

23  A.  Currently I am, yes.

19

1   Q.   And how do you determine which materials to bring

2       to the meeting?

3   A.   My senior manager will tell me that.

4   Q.   Are you -- other than your senior manager, do you

5       have any dealings with anyone else at

6       Fisher-Price regarding the outside inventor

7       submissions?

8   A.   No, not really.

9   Q.   And other than getting them to the meeting, do

10       you have any other -- once they are taken from

11       the storage area and to the meeting, do you have

12       any further dealings with those materials?

13   A.   I remove them from the meeting and take them back

14       to the secured area.

15   Q.   Was there a record made of who saw those

16       materials after you had cataloged them?

17   A.   Explain to me what you mean by a record made of

18       who saw them.

19   Q.   For example, after you had finished cataloging

20       the items that were entered into the database, if

21       those materials were shown to someone at

22       Fisher-Price other than your senior person, would

23       anyone create a written record of who saw those

20

1    materials?

2  A.  Well, whoever would have been at that meeting

3      would have seen them.

4  Q.  Yes.  I'm curious as to whether once, for

5      example, once they are in the storage area, does

6      someone, in order to review those materials, have

7      to sign anything or indicate that they are

8      receiving them?

9  A.  If someone is interested in that product, it will

10     be transferred to them.

11 Q.  Okay.  But my question is, is there a record

12     of -- a written record of those transfers?

13 A.  Currently, there is no written record of those

14     transfers.  The person that accepts the

15     responsibility for that product is who gets that

16     product.

17 Q.  Okay.  Was there a time when there was a written

18     record?

19 A.  There may have been, I don't recall.

20 Q.  You said the person who accepts responsibility

21     for the item.  How is that determined?

22 A.  At the meeting someone might express an interest

23     in the product.

21

1  Q.  And at the meeting, is that when the

2      responsibility is assigned?

3  A.  Yes.

4  Q.  And so I'm assuming at some point -- is someone

5      always given responsibility with respect to an

6      inventor submission?

7  MS. GALVIN:  Objection.

8  THE WITNESS:  No.  Because not everything is kept

9      in-house.

10  BY MR. DIZE:

11  Q.  With respect to things that are kept in-house, is

12      someone always given responsibility for an item?

13  A.  Yes.

14  Q.  And then I assume at some point the -- correct me

15      if I'm wrong, I think you just said if someone

16      has responsibility, they might receive the

17      materials from the storage area, that they might

18      be transferred to them?

19  A.  Yes.

20  Q.  After that, does your department have any further

21      dealings with those materials?

22  A.  It would depend on what you mean by, you know,

23      further dealings.

50

1  A.  No.

2  Q.  I want to show you what was previously marked as

3      Exhibit 87.  Do you recognize the type of

4      document that Exhibit 87 is?

5  A.  This appears to be a printout of an old iteration

6      of a database, inventor relations database.

7  Q.  Is this the database that was used to record

8      submissions for outside inventors?

9  A.  At that time it may have been.

10 Q.  Do you remember dealing with that database at

11     that time?

12 A.  I may have, yes.

13 Q.  Okay.  Is there anything about this document that

14     you can identify as that you were the person who

15     entered this information?

16 A.  No.

17 Q.  Was there anyone else in inventor relations that

18     was responsible for entering information into the

19     database?

20 A.  The person I worked with in the department.

21 Q.  Who was that?

22 A.  Kathy Kepp, K-E-P-P.  Kathy, with a K.

23 Q.  I want to ask you about some of the fields on

51

1       this document.  First of all, it says

2       responsibility, Ken P. Morton?

3   A.  Yes.

4   Q.  Does that indicate that Mr. Morton was the person

5       responsible for this submission?

6   A.  I couldn't say with a hundred percent certainty.

7   Q.  Okay.  Well, is that the purpose of having that

8       field?

9   A.  In our current database, that is the purpose of

10      having that field.

11  Q.  Okay.  When you entered information into the

12      database over your career at Fisher-Price, did

13      you do your best to accurately enter information?

14  MS. GALVIN:  Objection.

15  THE WITNESS:  Yes.

16  BY MR. DIZE:

17  Q.  Did that include who had responsibility for an

18      item?

19  MS. GALVIN:  Objection.

20  THE WITNESS:  It's hard to tell from this.

21  BY MR. DIZE:

22  Q.  That aside, my question is really, did you do

23      your best over your career at Fisher-Price when

52

1    you were entering information into the database,

2    including the responsibility for an item, to

3    enter that information accurately?

4  MS. GALVIN:  Objection.  Asked and answered.

5  THE WITNESS:  There are a couple things that could

6    happen here.  One, is the responsibility could be

7    in there but you also have a ditto function.  It

8    could be an error in an entry.  There are many

9    number of things that could happen when it's that

10    human element when you are entering a record.

11  BY MR. DIZE:

12  Q.  Understood.  My question is simply did you do

13    your best --

14  A.  Yes.

15  Q.  -- to enter the information about responsibility

16    as accurately as possible?

17  A.  Yes.  At --

18  MS. GALVIN:  Objection.  Just answer his question.

19  THE WITNESS:  Yes.

20  BY MR. DIZE:

21  Q.  I want to ask you about a few more --

22  A.  I'm sorry.

23  Q.  -- fields.  What you see, the field on the right

57

1    are developed by the company?

2  A.  Yes.

3  Q.  Back in the time period from 1997 to 2001, were

4      you the person responsible for entering outside

5      inventor submissions into the database?

6  A.  Yes.

7  Q.  And are you currently the person responsible for

8      entering outside inventor submissions into the

9      database?

10  A.  In East Aurora, yes.

11  Q.  I'll show you what has previously been marked as

12      Exhibit 88.  Does this appear to be a report from

13      that old database we talked about previously with

14      respect to Exhibit 87?

15  A.  It appears that way, yes.

16  Q.  Given that you just testified that in the period

17      from 1997 through 2001 you were the person

18      responsible for entering outside inventor

19      submissions into the database, would it be fair

20      to say that you were the person who entered in

21      the information into Exhibit 88?

22  A.  I was the primary, yes.

23  Q.  And the same would hold true for Exhibit 87?

58

1   A.   Yes.   But I have no way of knowing, actually.

2   Q.   I understand.   Do you remember, as you sit here

3        today, do you remember anything about the

4        submissions that are reflected in Exhibit 88?

5   A.   No, I do not.

6   Q.   And Exhibit 88 indicates that responsibility for

7        the submission identified in Exhibit 88 is with

8        Ken P. Morton, is that correct?

9   A.   Yes.

10  Q.   And when, in your career at Fisher-Price, you

11       have entered information into the database

12       regarding responsibility, you tried to do that

13       accurately, haven't you?

14  MS. GALVIN:   Objection.

15  THE WITNESS:   To the best of my ability, yes.

16  MR. DIZE:.  I need to mark this.

17

18           (Whereupon, an Exterior Design Report was

19        then received and marked as Exhibit 90, for

20        identification.)

21

22  BY MR. DIZE:

23  Q.   Showing you what's been marked as Exhibit 90 --

59

1    I'll show you what has been marked as Exhibit 90.

2    Is this the same type of report from the database

3    that we spoke about with respect to Exhibits 87

4    and 88?

5  A.  Yes, it appears to be.

6  Q.  And given that you've indicated that you were the

7    person who was responsible for cataloging outside

8    inventor submissions from the period from 1997

9    through 2001, would it be fair to say that you

10   were the person who entered this information in

11   Exhibit 90?

12 A.  That would have been my primary responsibility,

13   yes.

14 Q.  Okay.  An Exhibit 90 indicates that

15   responsibility from this submission was with

16   Peter D: Pook?

17 A.  Correct.

18 Q.  And the date of submission on this document is

19   December 10th, 2000.  Do you recall Mr. Pook

20   being your superior on or about that time?

21 A.  I would have to check the time frame.  I don't

22   recall.

23 Q.  And do you recall anything specific about the

60

1    submission that you were -- or that is reflected

2    in the information that appears in Exhibit 90?

3  A.  No.

4  Q.  I want to ask you about Exhibit 87 again.  Given

5    that Ken Morton is listed as the person with the

6    responsibility for this submission, would it be

7    fair to say that Mr. Morton would have seen these

8    submission materials?

9  MS. GALVIN:  Objection.

10  THE WITNESS:  I don't know that.

11  BY MR. DIZE:

12  Q.  Typically, when someone is assigned

13    responsibility for submission, do they see the

14    submission materials?

15  MS. GALVIN:  Objection.

16  THE WITNESS:  I don't know.

17  BY MR. DIZE:

18  Q.  Okay.  Prior to your involvement in this case,

19    were you aware that -- prior to your involvement

20    with this case, did you ever speak with anyone at

21    Fisher-Price regarding the submission that I've

22    shown you today?

23  MS. GALVIN:  Objection.

# EXHIBIT I

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT



----------------------------------)
VICTOR G. REILING ASSOCIATES and )
DESIGN INNOVATION, INC.           )
          Plaintiff               ) Civil Action No.
VS                                ) 3:03 CV 222 (JBA)
                                  )
FISHER-PRICE, INC.                )
          Defendant               )
----------------------------------)




          DEPOSITION OF:  VICTOR G. REILING
          DATE:  FEBRUARY 15, 2005
          HELD AT:  ROBINSON & COLE
                    280 TRUMBULL STREET
                    HARTFORD, CONNECTICUT




     Reporter: WENDY J. ALLEN, RPR, CRR, LSR #00221
          BRANDON SMITH REPORTING SERVICE
               44 Capitol Avenue
               Hartford, CT 06106
               Tel (860) 549-1850

Reiling vs Fisher-Price

Victor G. Reiling

1    questions and I'm going to have to review my notes

2    briefly to do that.  Give me ten minutes.

3                    MR. LANE:  Sure.

4                        (Off record.)

5

6                CROSS-EXAMINATION BY MR. DIZE:

7

8        Q    Mr. Reiling, I show you what has been marked

9    as Exhibit 239.  Do you recognize that document?

10       A    I do.

11       Q    And what do you recognize it to be?

12       A    It's a Policy and Agreement concerning ideas

13   submitted by persons outside of Fisher-Price.

14       Q    Do you remember Mr. Lane questioning you about

15   that document earlier today?

16       A    Yes, we had talked about that earlier.

17       Q    I just wanted to clarify some issues with

18   respect to Exhibit 239.  At the time that you submitted

19   your, you made your first submission to Fisher-Price,

20   did you recall that the 1994 agreement was in existence?

21                   MR. LANE:  Object to the form.  Go ahead.

22                   THE WITNESS:  No, I did not.

23   BY MR. DIZE:

24       Q    Did anyone at Fisher-Price reference Exhibit

25   239 when you made either of the three submissions to

Page 226

1   Fisher-Price?

2       A    No, not to my recollection.

3       Q    I'd like to show him also Exhibit 205, please.

4   I show you what's previously been marked as Defendant's

5   Exhibit 205.  Do you recognize that document?

6       A    Yes, I do.

7       Q    And what do you recognize that to be?

8       A    This was a Concept Submission Form that I

9   filed on the 29th of October of 1998.

10      Q    To your knowledge, does that form reference

11  Exhibit 239, the Policy and Agreement, in any way?

12              MR. LANE:  Object to the form.  Go ahead.

13              THE WITNESS:  Would you repeat the

14  question, please?

15  BY MR. DIZE:

16      Q    Does Exhibit 205 reference Exhibit 239, the

17  Fisher-Price Policy and Agreement, in any way?

18              MR. LANE:  Object to the form.

19              THE WITNESS:  No, I don't see any

20  reference to it.

21  BY MR. DIZE:

22      Q    And no one at Fisher-Price, I believe you just

23  testified, no one at Fisher-Price mentioned Exhibit 239,

24  the Policy and Agreement, when you made your submission,

25  is that correct?

Reiling vs Fisher-Price

Page 227

1                    MR. LANE:  Object to the form.

2                    THE WITNESS:  Certainly not to my

3    knowledge.

4    BY MR. DIZE:

5        Q    And did you even remember Exhibit 239 at that

6    time when you made your first submission, or any of the

7    submissions?

8                    MR. LANE:  Object to the form.

9                    THE WITNESS:  No, I did not.

10   BY MR. DIZE:

11       Q    Did you have an expectation at the time you

12   made your original submission that Exhibit 239 governed

13   that submission?

14                   MR. LANE:  Object to the form.

15                   THE WITNESS:  No, not at all.

16   BY MR. DIZE:

17       Q    Did you have an expectation when you made your

18   second or third submissions to Fisher-Price that Exhibit

19   239 governed those submissions?

20                   MR. LANE:  Object to the form.

21                   THE WITNESS:  No, I did not.

22   BY MR. DIZE:

23       Q    Did you believe that Fisher-Price, when you

24   made your submission to Fisher-Price did you believe

25   that Fisher-Price could use your concept disclosure, use

16464d07-b773-4273-952f-48de543920fb

Reiling vs Fisher-Price

2-15-2005                                              Victor G. Reiling

Page 228

1    your concept, without paying you for it?

2                    MR. LANE: Object to the form.

3                    THE WITNESS: No, it's always been my

4    belief that Fisher-Price would pay if they took the

5    concept.

6    BY MR. DIZE:

7        Q    Would you have expected Fisher-Price to

8    provide you with a new form for your submissions if they

9    wanted you to be bound by them?

10                   MR. LANE: Object to the form.

11                   THE WITNESS: There were -- it seemed for

12   a while that Fisher-Price just had about every year or

13   so they seemed to change forms and formats and things

14   like that, and I would have lost that one. I mean I

15   can't keep track of one. And certainly with the

16   rapidity that they changed, it would be kind of

17   unbelievable, they'd have one that would just last

18   forever.

19   BY MR. DIZE:

20       Q    When you signed the Policy and Agreement in

21   Exhibit 239, did you know that that would govern concept

22   submissions in the future?

23                   MR. LANE: Object to form.

24                   MR. DIZE: Let me rephrase that.

25   BY MR. DIZE:

Reiling vs Fisher-Price

2-15-2005                                                    Victor G. Reiling

Page 229

1          Q     When you signed Exhibit 239, were you under

2     the understanding that that would cover all future

3     concept submissions in the future?

4                    MR. LANE:  Object to the form.

5                    THE WITNESS:  Please repeat the question.

6     BY MR. DIZE:

7          Q     If you recall, when you signed Exhibit 239, do

8     you remember whether you believed that that would cover

9     all future concept submissions in the future?

10                    MR. LANE:  Object to the form.

11                    THE WITNESS:  I don't think so, no.

12                    MR. DIZE:  I've got a few things to mark.

13    It's going to be four exhibits, start with Plaintiff's

14    300.

15    BY MR. DIZE:

16         Q     Mr. Reiling, I show you what's been marked as

17    Exhibit 50.  Are you familiar with Exhibit 50?

18         A     Yes, I made this prototype.

19         Q     What is it?

20         A     This is a battery powered preschool car, and a

21    unique feature is that it has a horizontal wheel about

22    two and a half inches in diameter in front, and this is

23    so that when it powers along and it comes to a wall or a

24    fence, that it will bounce off and continue to follow

25    the vertical track that's been laid out, and there

Brandon Smith Reporting

16464d07-b773-4273-952f-f8de543920fb

Reiling vs Fisher-Price

1    define that concept?

2         A    The concept is image components on backpacks

3    or Fisher-Price Rescue Hero figures, and the same image

4    component extends to vehicles, aircraft, place sets, and

5    the like, and to other things.  And the purpose of the

6    concept was to allow a child to really enjoy their play

7    and to get a feel for the adventure and the action that

8    we had with Rescue Heroes.

9         Q    I'm going to show you what's been previously

10   marked as Exhibit 254-A.  Do you recognize that figure?

11        A    Yes.  It's a Wolverine figure from Toy Biz.

12        Q    Do you remember Mr. Lane questioned you about

13   that figure earlier today?

14        A    Yes, he did.

15        Q    Does that figure have a backpack?

16        A    No, it does not.

17        Q    Is that figure a Rescue Heros figure?

18        A    No, it is not.

19        Q    Does that figure have images in connection

20   with the backpack that enhance role play?

21             MR. LANE:  Object to the form.

22             THE WITNESS:  No, it does not.

23   BY MR. DIZE:

24        Q    I show you what's been marked as Exhibit 282

25   previously.  Do you recognize that?

16464d07-b773-4273-952f-f3de5432920fb

Reiling vs Fisher-Price

2-15-2005                                                    Victor G. Reiling

Page 238

1      A    I do.

2      Q    What is it?

3      A    It is a Fisher-Price Movie Viewer, circa 1980

4   or so, I think.

5      Q    Do you remember that Mr. Lane questioned you

6   about that earlier today?

7      A    Yes, he did.

8      Q    Do you remember that Mr. Lane asked you

9   whether combining that with a Rescue Heros backpack

10  would be an infringement of your concept?

11     A    Please repeat the question.

12     Q    Do you recall if Mr. Lane asked you whether

13  combining Exhibit 282 with a Rescue Heros backpack would

14  be an infringement of your concept?

15     A    My recollection is that I declared that this

16  mechanism could have been a candidate for use and for

17  offering the film in the backpack if they chose to go

18  with the film.

19     Q    As far as you can tell, does Exhibit 282 have

20  images to enhance role play?

21          MR. LANE:  Object to the form.

22          THE WITNESS:  I believe you're asking me

23  to look at the pictures that are in here.

24  BY MR. DIZE:

25     Q    Or if you know.

Brandon Smith Reporting

Reiling vs Fisher-Price

2-15-2005

Victor G. Reiling

Page 239

1      A    I don't know what's -- well, if it was sold as

2    an accompaniment to a Snoopy toy, or whatever, it does

3    deal with Snoopy, and it would give you some ideas.

4      Q    Does it show missions or obstacles and

5    dangers?

6                MR. LANE:  Object to form.

7                THE WITNESS:  Certainly not that I can

8    see or imagine.

9    BY MR. DIZE:

10     Q    Does it show images related to the Rescue

11   Heros?

12               MR. LANE:  Object to the form.

13               THE WITNESS:  No, it does not.

14   BY MR. DIZE:

15     Q    Or obstacles and danger that the Rescue Heros

16   might face?

17               MR. LANE:  Object to the form.

18               THE WITNESS:  No, it does not.

19               MR. DIZE:  I believe that's all I have.

20               MR. LANE:  I do have a few follow-ups.

21

22               REDIRECT EXAMINATION BY MR. LANE:

23

24     Q    Mr. Reiling, Exhibit 202, the prototype, has a

25   film inside it, correct?

Brandon Smith Reporting