UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

VICTOR G. REILING ASSOCIATES and
DESIGN INNOVATION, INC.,

Plaintiffs,

- against -

FISHER-PRICE, INC.,

Defendant.

Index No.: 3:03 CV 222 (JBA)

**DECLARATION OF
VICTOR G. REILING**

I, VICTOR G. REILING, pursuant to the requirements of 28 U.S.C. §1746, declare that
the following is true and correct under the penalties of perjury:

1.      I am the principal of Victor G. Reiling Associates ("Reiling"), a plaintiff in the
above captioned action.  I have personal knowledge of all facts stated herein.  I make this
declaration based upon personal knowledge and a review of documents relevant to this
proceeding.  I submit this declaration in opposition to defendant's Motion for Summary
Judgment in this action and specifically to rebut the erroneous assertions contained in Fisher-
Price's moving papers.

Background

2.      Reiling, based in Kent, Connecticut, is a small, entrepreneurial toy development
company.  I am the principal of the company and I oversee all aspects of the business.  Presently,
I am the only employee.

3.      I am a graduate of the United States Naval Academy in Annapolis, Maryland and
served in the U.S. Navy from 1962 to 1970.  After I left the Navy, I immediately began my

career in the toy industry, a career that has continued to this day. From 1970 through 1974, I was a designer and later design group manager with defendant, Fisher-Price, Inc. ("Fisher-Price"). From 1974 through 1977, I was the Director of Research & Development for two divisions of Milton Bradley, another major toy company, now owned by Hasbro. Since 1977, I have been an independent toy developer, creating concepts that are offered to various toy manufacturers. My company does not manufacture and market toys, but rather works with toy manufacturers to develop new toys based on our product concepts. Including toys created while at Fisher-Price, I have created more than twelve toys and games that have sold over one million units.

Relationship Between Reiling and Design Innovation

4.    Plaintiff Design Innovation ("DI") is a small, entrepreneurial industrial design firm. Based in Avon, Connecticut, DI develops and produces prototypes and working models of toy and game concepts. It is my understanding that DI has three principals, Bruce Popek, Bruce Benedetto and Doug Melville, and several other employees. In the past, Reiling and DI frequently cooperated on the development of new toy and game concepts and submit their concepts to toy manufacturers for possible development and production.

5.    As a result of my three decades of experience in the toy industry, I have cultivated longstanding relationships with inventor relations personnel of many toy companies. For this reason, I routinely presented to toy company executives the concepts that DI and I collectively developed. Although I typically made the concept presentations, my relationship with DI was that of joint inventors and we always maintained an equal ownership interest in our jointly developed concepts (*i.e.*, 50% Reiling, 50% DI). I did not act on behalf of DI and there was no agency relationship (either in writing or by oral agreement). I had no authority to bind DI, and in fact, DI had to approve all proposed actions with respect to our jointly developed concepts. This

is illustrated by the fact that the Option Agreement with Fisher-Price relating to this case was executed by both myself and DI. (*See* Tab V). No one from Fisher-Price ever asked me about my relationship with DI or whether I had authority to bind DI. The matter was simply never discussed.

Consolidation In The Toy Industry

      6.     Fisher-Price is a wholly-owned subsidiary of Mattel, Inc., one of the largest toy companies in the world (if not the largest). Increasingly, the toy industry has become dominated by two companies, Mattel/Fisher-Price and Hasbro. There is a wide gap in sales between these companies and the next tier of toy companies.

      7.     According to Mattel's 2003 Annual Report, the company has more than 25,000 employees. Mattel's gross sales for 2003 were $5.379 billion, $3.203 billion of which were U.S. sales. Fisher-Price itself had U.S. sales in 2003 that exceeded $1.265 billion. (Copies of relevant pages printed from Mattel's 2003 Annual Report are attached hereto at Tab A).

      8.     The Toy Industry Association reported on its website (http://www.toy-tia.org) that 2003 sales of toy products in the U.S. were $20.7 billion, not including video games. (A copy of the relevant page printed from the Toy Industry Association's website is attached hereto at Tab B).

      9.     Based upon sales figures provided in Mattel's Annual Report, its gross domestic toy and game sales in 2003 constituted more than 15% of the U.S. Toy Industry's total sales. (*See* Exhibits A and B). Upon information and belief, the only other toy company that approaches this level of sales is Hasbro. According to Hasbro's Annual Report, its U.S. toy and game sales in 2003 were over $1.9 billion, more than 9% of the total U.S. market. (Copies of relevant pages from Hasbro's 2003 Annual Report are attached hereto at Tab C).

10.    The Toy Industry Association's statistics report that the size of the U.S. infant and pre-school market was $2.6 billion in 2003. This is the market in which the Rescue Heroes products at issue in this case are sold. I note that packaging for the Voice Tech Video Mission Rescue Heroes line of toys indicates that the product is for ages three and up (*i.e.*, the pre-school market). Fisher-Price is, by far, the most recognized name in the pre-school market. Upon information and belief, virtually all of the company's sales are in this market. Assuming this is correct, Fisher-Price's gross domestic sales of $1.265 billion in 2003 constituted approximately 48% of the pre-school market. As evidenced by the foregoing, there is no doubt that Fisher-Price and Mattel dominate the toy industry, and specifically, the pre-school market.

Prior Agreements With Fisher-Price

11.    During my career as an inventor, Fisher-Price has required me to sign a number of different forms before I was permitted to make concept submissions, including the Fisher-Price Policy and Agreement form that I signed in 1994. (A true and correct copy of the 1994 Policy and Agreement form is attached at Tab D). These forms were mandatory. Inventors had to sign them or they would not be permitted to show concepts. Simply stated, inventors had no bargaining power on this issue. Since showing concepts was my livelihood, I signed the documents as Fisher-Price demanded. Because these agreements were mandatory, my experience was that inventors and Inventor Relations personnel of toy companies treated them as a mere formality – administrative paperwork that had to be completed in order to do business – and that is how I treated them. I was not represented by counsel in connection with my execution of the 1994 agreement. Because Fisher-Price had always treated me fairly in the past, and because the Fisher-Price Policy and Agreement forms indicated that they would deal with me fairly in the future, I was not concerned about the impact of these forms.

4

12.    Fisher-Price changed the rules regarding these agreements every few years. When I first began to make concept submissions, Fisher-Price required a separate Policy and Agreement form for each submission. (*See* Tab E). The Policy and Agreement language was printed on the same form on which I described my concepts. Later, Fisher-Price had me sign a Policy and Agreement form once a year, instead of at the time of each submission, and I would submit a separate Concept Submission Form each time I made a submission. (*See* Tab F). Finally, Fisher-Price had me sign an agreement in 1994 that purports to have an indefinite duration. (*See* Tab D).

13.    As I testified at my deposition, at the times DI and I made our three submissions to Fisher-Price relative to this case, I did not recall that the 1994 Policy and Agreement was in existence. No one at Fisher-Price referenced this agreement when we made the submissions, nor did the Concept Submission Form that I submitted with our concept indicate that it related back to the 1994 Policy and Agreement or to any of its terms. (*See* Concept Submission Form, attached hereto at Tab O). Because I did not recall the 1994 Policy and Agreement, I did not have an expectation at the time we made the submissions that the agreement would govern those submissions. Because Fisher-Price changed forms frequently and previously had me sign such an agreement at the time I made each submission, I did not believe that they would have one form that would last forever. When I signed the 1994 Policy and Agreement, I did not believe that it would cover all future submissions. At no time did I sign a Policy and Agreement form specifically with regard to our submissions in this case.

14.    It is important to note that the agreements and forms that toy companies require inventors to sign in order to do business are not uniform. For example, Hasbro uses a concept submission form that provides on its face that the submission is confidential. (A true and correct

copy of the Hasbro form is attached hereto at Tab G). In addition, Fisher-Price Brands, Mattel

and Hasbro all incorporate waiver language on the face of their concept submission forms. (True

and correct copies of the Fisher-Price Brands and Mattel forms are attached hereto at Tab H).

Some companies do not require any forms or agreements. With respect to our submissions in

this case, I expected to see any waiver language or disclaimer of a confidential relationship on

the face of Fisher-Price's Concept Submission Form, as was the case with other toy companies in

the industry, including related companies Fisher-Price Brands and Mattel.

15.    To my knowledge, DI never signed a Policy and Agreement form similar to the

form I signed in 1994, nor did they sign any form specifically with regard to our submissions in

this case.

Toy Industry Custom and Practice

16.    Based upon my experience, when a toy manufacturer adopts one of our product

concepts, in accordance with the long-established custom and practice in the toy industry, we are

remunerated by being paid a royalty based on the sales of toys incorporating the concept and any

line extensions thereto. Industry custom dictates that such a royalty be paid, regardless of changes

that are made by the toy company between the time the concept is submitted and the time when an

ultimate product is manufactured and sold. My experience is that changes made by toy companies

to submitted concepts are often substantial, yet a royalty is still paid.

17.    For example, in or about 1988, I submitted a novel toy concept to Fisher-Price

known as "Slam Jammers." The concept that I presented to Fisher-Price involved a battery-

powered car with two vertical wheels and one horizontal wheel that could guide the car around a

rail or fence. The toy was approximately 3" by 5" and was intended for the preschool motif (2 to

4 years of age). Fisher-Price optioned the concept and then purchased it. (A true and correct

copy of the "Slam Jammers" contract is attached hereto at Tab I). Fisher-Price then took 18 months to bring the final product to market. During this time I asked Paul Snyder, Fisher-Price's head of inventor relations, whether or not they needed any additional input from me. He replied: "No, we are taking a different approach, but you will be really pleased when you see the finished product." When it came to market under a different name, "Crash Zone," Fisher-Price had changed the toy to such an extent that it was unrecognizable from my initial submission and was essentially a different toy both in design and function. (*See* photograph of "Slam Jammers" prototype, attached hereto at Tab J; *Compare* photographs of "Crash Zone" product and accessories, attached hereto at Tab K). The car was much smaller and more realistic – it had 4 normal wheels, no horizontal wheels and had a front bumper that was rounded to withstand the effect of bouncing the car off of a wall. The age demographic had also changed and the toy was now directed to an older demographic (5+). Indeed, the toy had a small driver which ejected when the car hit something that was so small that it would never have passed the choking parameters for a pre-school toy. Fisher-Price also introduced both a large car-crusher and a large launcher accessory to go along with the toy. Despite the significant change in the toy from initial submission to finished product, Fisher-Price still satisfied its monetary obligations to me pursuant to the agreement. Ultimately, I received an advance of $125,000 in exchange for a lower royalty than provided for in the contract. Importantly, the contracts of Fisher-Price's parent corporation, Mattel, Inc., confirm that the company will still pay a royalty notwithstanding its right to "produce and sell" the concept in a "new form." (*See* License Agreement ¶ 8, attached hereto at Tab L).

18.    In my experience, I have always been paid royalties on line extensions and accessories, *i.e.*, new products that are derived from the concept submission and/or are sold with the

ultimate product produced from the concept submission (e.g., play sets and vehicles). During my career, the custom and practice in the toy industry has been to pay royalties on these items equal to the royalty paid on the initial product derived from the concept submission. This has been true in all contracts I have signed. Accordingly, in this case, my expectation was that DI and I would be paid a royalty if Fisher-Price used our concept, regardless of changes made to the submission by Fisher-Price, and that royalties would be paid on line extensions and accessories derived from the initial concept submission.

19.     Also in my experience, it is standard toy industry practice for an inventor to combine several existing elements to create a concept that is new and different. This is the way the toy industry has operated for years. Even though a proposed concept includes elements that are already in existence, my experience has been that the toy companies are looking for new concepts, and a royalty is paid if the submitted concept represents something that is new and different and has profit potential for the company.

20.     Over the course of my career, I have had a few disputes with toy companies regarding royalties owed on submitted concepts. The custom and practice in the industry has been for toy companies to deal with inventors fairly. I have made hundreds of submissions to toy companies over the years and have typically been treated fairly. Typically, if there is a valid dispute regarding whether a royalty is owed, the inventor and toy company will attempt to reach an amicable resolution because the inventor/toy company relationship has traditionally been based on trust. DI and I attempted to reach an amicable resolution with Fisher-Price prior to filing this lawsuit.

21.     I had one such dispute with Fisher-Price in the mid 1990's. My partner at the time and I had submitted a concept for a pre-school riding toy which quickly converted from a tricycle to

8

a bicycle by moving two wheels from the tricycle position toward the center axis of the frame to the bicycle position. We called the concept "First Bike." Fisher-Price rejected this concept in 1986. In 1994, Fisher-Price began selling a product called "Mountain Bike" that was remarkably similar to the prototype we had submitted. (*See* photographs of prototype and Fisher-Price product, attached hereto at Tab M). When we first contacted Fisher-Price about this matter, they refused to pay on the grounds that they had not used our concept. After a few letters back and forth, they agreed to pay us either $200,000 or a royalty on the sales of all Fisher-Price Mountain Bikes. (True and correct copies of my correspondence with Fisher-Price regarding "First Bike" is attached hereto at Tab N). While Fisher-Price was careful to emphasize that they did not have an obligation to pay, they nevertheless paid us $200,000.

22.    Based upon my prior experience in the industry, I also expected my concept submission to be held in confidence by Fisher-Price, and I treated my disclosure to them as confidential. This is the manner in which I had dealt with Fisher-Price and other toy companies in the past, and our Option Agreement with Fisher-Price relative to the submissions in this case confirmed a confidential relationship. (*See* Tab V, ¶¶ 5, 8).

Plaintiffs' Submissions to Fisher-Price and Definition of the "Concept"

23.    In 1998, DI and I devised a novel concept for adding an image component in the form of a backpack for each "Rescue Heroes" action figure that enhanced role play for the child by depicting the mission of that particular "Rescue Heroes" character, which concept could be expanded into accessories and line extensions relating to the "Rescue Heroes" line pursuant to industry custom and practice. Plaintiffs submitted their novel concept to Fisher-Price in three different variations.

The 1998 Execution of Plaintiffs' Concept

24.    Plaintiffs' initial submission, on or about October 29, 1998, consisted of a written description, drawings and a prototype which envisioned an interchangeable battery-operated animated image player that would be placed on the "Rescue Heroes" characters in the form of a backpack. (A true and correct copy of the relevant Concept Submission Form is attached hereto at Tab O); My written description of the concept is attached hereto at Tab P; DI's drawings are attached hereto at Tab Q; Photographs of plaintiffs' prototype are attached hereto at Tab R; Plaintiffs' original prototype has been submitted to the Court for ease of reference). The backpack allowed children to view animated images. It is important to note that our concept was submitted specifically for Rescue Heroes and specifically as a backpack, although we did indicate that the concept could be expanded by Fisher-Price into line extensions and accessories. (*See* Tab P). We had a number of working names for our concept, including "Reel Action," "Reel Heroes," "Reel/Real Heroes" and "Reel Action/Reel Heroes." The "Reel" portion of the working names was a play on words with respect to the film reel that was first shown in the prototype, but this in no way was meant to be a limitation on the concept, as Fisher-Price has suggested.

25.    As part of the initial submission, plaintiffs also presented Fisher-Price with the idea for an action-adventure reporter/photographer character to be part of the "Rescue Heroes" line. This character, dubbed "Fillmore Schotz," was drawn with a distinctive look and feel and was presented holding a camera with an optical device in one hand and microphone in the other hand. (True and correct copies of storyboard artwork of the "Fillmore Schotz" character and the accompanying camera submitted to Fisher-Price are attached hereto at Tab S). Plaintiffs specifically indicated that this character could be used with line extensions such as vehicles.

(*See* Tab P).

26.    I presented our concept to Paul Snyder, Vice President of Inventor Relations for Fisher-Price, in October 1998. I regularly presented product concepts to Mr. Snyder during this time period, and had actually worked with him when Fisher-Price licensed my "Slam Jammers" concept. He also was involved in working out a resolution regarding my "First Bike" concept, referenced previously.

27.    Based upon my longstanding relationship with Fisher-Price, I know that they routinely seek concept submissions from a select group of private toy developers in an effort to create and manufacture new toy lines as well as expand existing product lines. I am also aware that Fisher-Price employs certain individuals who are responsible for interfacing with independent toy inventors nationwide, including conducting nationwide "sweeps" of new toy concepts. I met with Mr. Snyder a number of times in New York City to show him new toy concepts, and he met with me at my studio in Connecticut on at least one occasion for such purpose. In advance of these meetings, Fisher-Price would often send out documents called "Wish Lists," which would indicate areas in which Fisher-Price had an interest for new concept submissions. I do recall that Rescue Heroes were included on these wish lists. (True and correct copies of Fisher-Price's Wish Lists are attached hereto at Tab T).

28    At the initial meeting with Mr. Snyder, I submitted a Fisher-Price Concept Submission Form for the products I was showing that day. (*See* Tab O). Fisher-Price's Concept Submission Form contains spaces for multiple concepts to be listed, and there is a small rectangular space (approximately 1" x 3") in which to describe each concept. I showed Mr. Snyder approximately six concepts that day. Fisher-Price has suggested in this case that we should be limited to the description of our concept in this small rectangular space on their

Concept Submission Form. However, it was impossible to accurately describe the concept in such a small space. In filling out the Concept Submission Form, I attempted to identify the concepts that were being shown that day for administrative purposes, so that Fisher-Price and I would both have a record in the event there was a dispute about what concepts had been shown. The description on the Concept Submission Form was not intended to be a precise definition of the concept. In fact, I submitted a separate written description with the submission materials because I realized that I could not accurately describe the concept in such a small space. (*See* Tab P).

29.    Per industry practice, inventors illustrate a concept through the combination of a prototype, drawings, written description and a concept submission form. The concept is illustrated by looking at these materials collectively, not individually. For example, the prototype we submitted with the submission documents demonstrated one possible execution of the concept. It was not intended to show all possible executions of the concept or to limit the concept to the exact mechanisms that were disclosed in the prototype. Accordingly, our concept did not require that the child place one eye up to a magnifying lens and look inside the backpack, nor did it require that film be used, as Fisher-Price suggests.

30.    After we submitted our concept, I received a fax from Fisher-Price dated December 8, 1998 notifying me that "Paul [Snyder] has shown Reel Action and there is a genuine excitement level for that product. . ." (A true and correct copy of the December 8, 1998 letter is attached hereto at Tab U). In all my years in the toy industry, I had never received a letter from any toy company that expressed such a "genuine excitement level." I can only conclude that Fisher-Price was excited because we had shown them something new and different.

The Option Agreement

31.    On February 16, 1999, the parties finalized and signed an Option Agreement for plaintiffs' concept, which granted to Fisher-Price an exclusive three-month option to either acquire plaintiffs' rights in the concept or to license the concept, in exchange for the monetary payment of $7,500. (A true and correct copy of the Option Agreement is attached hereto at Tab V). In my experience, a toy company enters into an option agreement to prevent the inventor from showing the concept to another toy company because there is interest in the concept – not to obtain more time to evaluate the concept as Fisher-Price suggests. Notably, the Option Agreement does not reference the Fisher-Price Policy and Agreement form that I signed in 1994. It does not contain similar language and actually indicates that there is a confidential relationship between the parties. (*See* Tab V, ¶¶ 5, 8). On March 23, 1999, Fisher-Price returned the prototypes and drawings of the concept to plaintiffs, allegedly due to prohibitive production costs. In the letter from Henry Schmidt of Fisher-Price rejecting the concept, he stated that the concept had been given "very careful consideration and evaluation from design, costing, engineering and marketing perspectives," thereby confirming that the concept had been shown to and considered by many different departments within Fisher-Price. (A true and correct copy of the March 23, 1999 letter is attached hereto at Tab W). Accordingly, the Option Agreement expired by its very terms on May 1, 1999.

32.    It should be noted that Exhibit A to the Option Agreement, which purports to describe our concept, was drafted by Fisher-Price's attorneys with little, if any, input from me and no input from DI. Neither DI nor I were represented by counsel in connection with the execution of the Option Agreement. Exhibit A accurately indicates that the concept is for backpacks. Also, Fisher-Price accurately recognizes in Exhibit A that the "unique aspect of the

concept is the combination of existing action figures with film for play pattern." In this context, industry professionals would know that "film" was not limited to film in a literal sense, but rather encompassed images and/or video to enhance the play pattern for the child.

33.    While the Option Agreement did contain certain material terms that would apply if the option was exercised (*e.g.*, royalty rate, term, advance, etc.), the agreement did not contain all material terms. For example, payment of a royalty on line extensions and accessories was not addressed. This item would have been addressed if Fisher-Price had proceeded with a formal license agreement, instead of using our concept without authorization. Fisher-Price should not now be permitted to rely upon the Option Agreement to show that royalties were not payable on line extensions and accessories. Moreover, Fisher-Price should not receive the benefit of the terms contained in the Option Agreement, including the royalty rate, because Fisher-Price chose not to exercise the option but to use our concept anyway.

The 1999 Execution of Plaintiffs' Concept

34.    Despite Fisher-Price's initial rejection of the concept for reasons that "boiled down to cost," DI and I, knowing the concept had enormous potential, continued our efforts toward gaining Fisher-Price's acceptance of the concept by focusing on cost reductions. We submitted a revised execution of the concept to Paul Snyder at Fisher-Price on May 22, 1999. (Attached hereto at Tab X is a true and correct copy of my May 22, 1999 letter to Fisher-Price, with an attached revised drawing). Fisher-Price did not require an additional Concept Submission Form for the 1999 execution. Seeking to address Fisher-Price's concerns regarding cost, we eliminated the motor, batteries and several other parts from the original submission and instead focused on adding approximately eight or more still, printed images mounted on a wheel or drum (also called a "reel") to the backpack of each "Rescue Heroes" action figure that enabled

14

children to view still images through a viewing mechanism. The images related to the mission of each "Rescue Heroes" character and were designed to enhance role play for the child. It is important to note that we were demonstrating to Fisher-Price that there were alternative ways to execute the concept. Accordingly, it was not necessary to the second execution of the concept that the child place one eye up to a magnifying lens and look inside the backpack, or that a hand crank, thumb wheel or lever be used, as Fisher-Price suggests. Notably, the eight or more images on a drum that we proposed were approximately the same size as the images Fisher-Price ultimately used.

35.    It appears that Fisher-Price did not reject the 1999 execution of our concept. I have not been able to locate a rejection letter and I am informed by my attorneys that Fisher-Price has not been able to locate one either. Moreover, I do not recall any oral communication from Fisher-Price rejecting the 1999 execution.

<u>The 2000 Execution of Plaintiffs' Concept</u>

36.    Thereafter, DI and I submitted another revised execution of the concept on December 7, 2000 to Peter Pook, Fisher-Price's Vice President of Product Development and Inventor Relations at that time. (Attached hereto at Tab Y is a true and correct copy of my letter to Peter Pook, with revised drawings attached). Fisher-Price did not require an additional Concept Submission Form for the 2000 execution. The December 2000 execution depicted the still images on a round disc instead of on a wheel or drum device. Again, while the concept specifically envisioned depicting images in the backpacks of the "Rescue Heroes" action figures, the concept was also designed to be incorporated into accessories, such as vehicles and play sets, and line extensions relating to "Rescue Heroes" pursuant to industry custom and practice. It is important to note that the 2000 submission demonstrated yet another way to execute our concept.

Accordingly, it was not necessary to the third execution of the concept that the child place one eye up to a magnifying lens and look into the interior of the backpack, or that a lever be used, as Fisher-Price suggests. It is also important to note that I included the prior submission materials (prototype, drawings, written description) when we submitted the 2000 execution, as referenced in my cover letter to Mr. Pook. Fisher-Price returned our final submission on January 5, 2001 with the explanation that the concept remained too expensive to develop and that it did not fit the current Rescue Heroes theme. (A true and correct copy of the January 5, 2001 letter is attached hereto at Tab Z).

Plaintiffs' Implied Contract With Fisher-Price

37.    We disclosed our novel concept to Fisher-Price by submitting three proposals in or about November 1998, May 1999 and December 2000, and by presenting the concept to Paul Snyder of Fisher-Price in a meeting on October 29, 1998. The custom and practice in the toy industry dictates that if Fisher-Price used our concept by incorporating it into a product or line of products, Fisher-Price would pay us a reasonable royalty on the sales of said products. In addition, the course of dealing between Fisher-Price and me in the past had been that I was paid a reasonable royalty on sales of products which utilized my submitted concepts, even if the concept submissions were different, aesthetically or mechanically, than the product Fisher-Price ultimately sold.

38.    The custom and practice in the toy industry described above, the course of dealing between the parties, the meeting between Paul Snyder and myself during which I disclosed our novel concept, the subsequent telephone conversations and correspondence between the parties and the fact that Fisher-Price optioned the concept, collectively was the conduct that formed the basis for an implied-in-fact contract between Fisher-Price and Plaintiffs. Fisher-Price breached

16

the implied-in-fact contract when it used our submitted novel concept without our authorization and without remunerating us. Under the formed implied-in-fact contract, we are entitled to compensation from Fisher-Price in accordance with toy industry standards. I do not know all who were involved at Fisher-Price in forming the implied-in-fact contract with plaintiffs, but Paul Snyder and I were involved. The exact date of the formation of the implied-in-fact contract between Fisher-Price and plaintiffs is unknown, but it formed during the initial meeting between Paul Snyder and I, through subsequent telephone conversations and correspondence between the parties and in accordance with custom and practice in the toy industry and the course of dealing between the parties as described above.

39.     It is also important to note that the implied contract in this case could have been performed within one year. For example, Fisher-Price could have commenced sales of royalty-bearing products, then stopped selling them within a few months for a variety of reasons. There was no obligation on Fisher-Price to continue to sell royalty-bearing products for a particular period of time.

Plaintiffs' Discovery of Fisher-Price's Repeated and Blatant
Unauthorized Use of Their Concept in the "Rescue Heroes" Line

40.     I discovered Fisher-Price's misappropriation of our novel toy concept after seeing a Fisher-Price brand catalog at the February 2002 American International Toy Fair in New York. The catalog featured a new line of Fisher-Price "Rescue Heroes," namely the "Voice Tech Video Mission Rescue Heroes." Fisher-Price's new toy line misappropriated our original and revised submissions on the "Reel Heroes" concept.     It contained elements from our sketches and prototype, including the backpack-style video image viewer that displayed moving images.

41.     It is important to note that Fisher-Price did not actively market the original lines of Rescue Heroes as having "backpacks." The original lines were marketed as having

17

"equipment packs" or simply "packs." (Copies of relevant pages from Fisher-Price's catalogs are attached hereto at Tab AA). Starting with Mission Command Rescue Heroes in 2001 (after our submissions), Fisher-Price began to use the term "backpacks." For example, the packaging for the Video Mission Rescue Heroes, which were marketed and sold in 2002, indicated: "Now! See my mission on my video backpack!" (Copies of relevant pages from Fisher-Price's catalogs are attached hereto at Tab BB; A true and correct copy of the packaging for Video Mission Rescue Heroes is attached hereto at Tab CC). This language is strikingly similar to the language I used to describe our concept in my initial written description: "A backpack TV/movie monitor and a separate TV/Movie camera are the equipment for recording and viewing countless RESCUE HERO Adventures! The film clips give the child a great start on fantasy adventures." (*See* Tab P).

42. I did not discover Fisher-Price's misappropriation with respect to the additional products referenced in the Second Amended Complaint, namely the "Mission Select Rescue Heroes" line, the "Mission Command Rescue Heroes" line, the "Optic Force Rescue Heroes" line and the vehicles and line extensions related thereto, until late 2003 or early 2004. Prior to 1999 I had routinely received Fisher-Price's annual product catalogues and was invited to visit Fisher-Price's showroom at the American International Toy Fair in New York City ("Toy Fair") each year. In 1999 or thereabouts, however, Fisher-Price changed its policy and stopped inviting outside inventors to its Toy Fair showroom and stopped giving its product catalogues to outside inventors (this was part and parcel of a demonstrable negative change in attitude by Fisher-Price and its new corporate parent, Mattel, Inc.). As a result, since 1999 I have not been privy to Fisher-Price's new products as shown at Toy Fair or prior to their launch. I can only see them on toy store shelves.

Plaintiffs' Concept was Novel When We Submitted it to Fisher-Price

43.    Based upon my three decades of experience in the toy industry as an independent inventor and as a toy industry designer and executive, at the times we submitted our three concept executions to Fisher-Price, I had never seen our concept marketed or sold by Fisher-Price or any other toy company. That is, I had never seen the following marketed or sold: an image component in the form of a backpack for an action figure that enhanced role play for the child by depicting the mission of that particular character or obstacles and dangers that character might face. Certainly, I had never seen it done in connection with the Rescue Heroes.

44.    Innovative features of our concept include, but are not limited to, the following: (a) interchangeable film strip units contained in backpacks for each Rescue Heroes character that displayed mission assignments or obstacles and dangers the characters might face; (b) removable backpack units containing an image viewer that were designed specifically to attach to the existing connector on each Rescue Heroes character; (c) an image viewer that was designed specifically to be a backpack and attach to the Rescue Heroes characters; (d) an image positioned for viewing from behind the Rescue Heroes character, enabling the child to mentally become the eyes of the action figure to enhance play pattern; (e) a backpack for each Rescue Heroes character containing a working image viewer that changed images; (f) a backpack connected to a camera that fit into the Rescue Heroes character's hand, enabling the user to view animated images and real-time images at the same time and to open and close the camera remotely via the trigger on each Rescue Hero; and (g) a cameraman Rescue Heroes action figure with a distinctive appearance, including: (1) baseball hat, (2) press pass, (3) red hair, (4) red facial hair, (5) laced boots, (6) camera in right hand, (7) microphone in left hand, (8) brown work gloves, (9) blue shirt, and (10) utility vest.

45.    In addition, there are a number of factors that help to demonstrate the novelty of our concept. First, our concept had a specific, rather than general, application, namely, incorporating an image component on a backpack for each Rescue Heroes character to show the character's mission or obstacles and dangers the character might face. Secondly, our concept was not commonly known in the industry, as evidenced by the fact that no other companies had executed our concept before. Third, our idea was unique in that it was different from generally known ideas. For example, we do not dispute that images had been used in connection with action figures before. However, to my knowledge, such images had never been used on a backpack to enhance role play by depicting the character's mission or obstacles and dangers the character might face. And again, such images had never been used in connection with Rescue Heroes. Finally, our concept was simply not commercially available in the marketplace at the times our three executions were submitted.

46.    Moreover, in all my communications with Fisher-Price regarding our submissions, Fisher-Price never indicated to me that they were not interested in the concept due to its lack of novelty. The only reasons ever provided regarding Fisher-Price's lack of interest were that the concept was too expensive, it was a "one-trick pony" and that it did not fit the current Rescue Heroes theme. In the past, when Fisher-Price has rejected one of my concepts on the basis of novelty, they have typically indicated that novelty was the reason for the rejection. (*See* letters from Fisher-Price, attached hereto at Tab DD).

47.    I am aware that Fisher-Price's expert, Mr. Bollinger, claims that plaintiffs' concept was not in fact novel at the time plaintiffs first submitted it to Fisher-Price in late 1998 because of the existence of other toy products, including: (1) an "Image Projective Toy" produced by Toy Biz from 1993 to 1995; (2) a camera produced by Fisher-Price in the 1970s; (3)

a "Secret Wars" figure; and (4) various play sets.

48    As a threshold matter, I wholeheartedly agree with the testimony of plaintiffs' expert, Jim Kipling, that Fisher-Price's purported "evidence" of novelty, consisting of obscure references, is nothing more than an after-the-fact attempt to undermine plaintiffs' concept and flies in the face of longstanding toy industry custom and practice providing that *such evidence is typically disclosed to the inventor during the submission process.* Moreover, my experience has been, both inside Fisher-Price and in dealing with companies as an outside inventor, that Fisher-Price's execution of an option agreement with plaintiffs is dispositive of the issue of novelty. Toy companies simply do not option a concept if there is an issue about its novelty. This certainly makes intuitive sense, as toy companies are not in the business of handing out money willy-nilly.

49.    Nevertheless, Fisher-Price's purported evidence of prior use of allegedly similar products (*i.e.* prior art) does not detract from the novelty of plaintiffs' concept. First, with respect to the Toy Biz projection action figure, that toy is not covered by plaintiffs' concept because: (1) the toy projects an image from its chest, rather than from a removable backpack; and (2) the toy projects an image out onto a wall or screen, while plaintiffs' concept envisions a view-in device allowing the child to view the image on or in the backpack itself, not on a wall. Essentially, it is an entirely different toy. The letter from Toy Biz rejecting our submission to them in 2002 (attached to Declaration of Robert Lane at Exhibit 37) confirms that the toy projected images "onto a wall or similar surface." Moreover, Toy Biz also states that while it had worked on prototypes of an animation projection toy internally, such toys were never actually produced.

50.    Fisher-Price has previously claimed that its own camera from the 1970s detracts

from the novelty of plaintiffs' concept for the "Fillmore Schotz" character, but that camera is not at all relevant. First, while Fisher-Price's optical camera from the 1970s and its current optical camera used in conjunction with the "Telly Photo Optic Force" figure are similar, plaintiffs are not seeking to claim novelty for the type of camera mechanism used. Rather, plaintiffs claim novelty for the look and feel of the cameraman figure, including the fact that he was holding an optical camera (which enhanced mobile play value) in one hand and a microphone in the other. Moreover, the 1970s product was certainly not an action figure, it is more fairly characterized as a doll. It was a small, free-standing camera operator and studio-type camera apparatus that bears no resemblance to plaintiffs' concept, which involved an attempt to draw an association between the action figure and the figure's mission. Finally, I am aware that Fisher-Price is paying a royalty on the Telly Photo optical camera technology to a company known as "Bang Zoom," even though Fisher-Price developed what they consider to be the very same product in the 1970s. This begs the question, how can Fisher-Price pay a royalty to one company for development of the camera on the one hand, and then claim to assert that the same product is relevant to the issue of novelty here on the other hand?

51.     In any event, at a minimum, Fisher-Price's Telly Photo character was a line extension of our concept, because it extended our concept of adding an image component in the form of a backpack for each Rescue Heroes character to enhance role play for the child by depicting the character's mission and/or obstacles and dangers the character might face. It was novel because Rescue Heroes did not have such a camera man figure at the time we made our submissions.

52.     The Secret Wars figures cited by Fisher-Price as prior art fail to anticipate plaintiffs' submission because none of the figures or characters is a Rescue Heroes character, and

the images are not on, in or otherwise associated with the Rescue Heroes backpacks (or any other backpacks) as principally intended by plaintiffs' submission. In addition, the images are only visible to one who is facing the figure from the front – that is, when properly positioned, the image cannot be "seen" by the figure itself or by the child from behind the figure. Therefore, the images cannot be messages to or mission assignments for the figures, and fail to fulfill the definition of plaintiffs' concept set forth above.

53.    The playsets cited by Fisher-Price in its moving papers are not valid prior art. None of the playsets purports to include or suggest anything other than general communications, none conveys visual messages to figures via their backpacks or devices connected to their backpacks, and, most significantly, none of the playsets involves the Rescue Heroes.

The "Rescue Heroes" Characters, Accessories and Line Extensions
Referenced in the Second Amended Complaint are Covered by Plaintiffs' Concept

54.    Defendant's expert, Mr. Bollinger, has argued in this case that Fisher-Price never used the concepts reflected in any of the three submissions submitted by plaintiffs based on his assertions that Fisher-Price did not specifically incorporate a film loop, drum with still frames or Viewmaster-style film discs into the backpacks of its Rescue Heroes characters. I strongly disagree with Mr. Bollinger's ultimate conclusion and the assumptions that he made to reach that conclusion.

55.    Mr. Bollinger has claimed that it is somehow important for the Court to understand that plaintiffs' submissions did not propose or conceive of a new product, thereby implying that Fisher-Price would only be obligated to remunerate plaintiffs if they had conceived of a new product. That is utter nonsense and it flies in the face of the longstanding practice of the toy industry, in general, and Fisher-Price, in particular. Based on my prior work at Fisher-Price and my dealings with them as a private inventor, I know that Fisher-Price routinely seeks

23

concept submissions from a selected group of private toy developers in an effort to create extensions and modifications to existing toy lines. And I am also aware that Fisher-Price will pay a royalty if the concept is incorporated into the existing toy line. Indeed, attached hereto at Tab T are true and correct copies of Fisher-Price's May 2001 and February 2002 "Wish Lists," which Fisher-Price sent to outside toy inventors for the purpose of soliciting new product concept submissions from them. Both documents specifically reference the "Rescue Heroes" line and state that Fisher-Price continually looks for "ways to bring these characters to life, and expand the play." As such, any implication that Fisher-Price is not obligated to pay a royalty to plaintiffs because their concept involved a modification to an existing toy line, rather than the creation of a brand new line, is simply erroneous.

56.    Importantly, Mr. Bollinger's conclusion is based on the application of an erroneous standard, namely that in order for Fisher-Price to owe a royalty to plaintiffs they would have had to have used the exact same engineering mechanism described in plaintiffs' concept in the exact same manner in connection with the "Rescue Heroes" figures. Put another way, Mr. Bollinger's approach, if taken to its logical conclusion, is that Fisher-Price would not owe a royalty unless the precise mechanism used by Fisher-Price is disclosed within the four-corners of plaintiffs' concept submission. This runs afoul of longstanding custom and practice in the toy industry and is simply not the correct standard to be applied. First, plaintiffs are not claiming that the specific type of engineering mechanism used, standing alone, was novel in and of itself. Rather, plaintiffs' definition of the concept involved is broader and consists of the application of the image on the backpack as it relates to the particular character's mission. The novelty of the concept may also include a particular combination of engineering mechanisms as they relate to the overall concept. But the failure of Fisher-Price to use the precise engineering

mechanism in the same exact way would not alleviate its obligation to pay a royalty in this case. To this end, I note that Mr. Bollinger has tried to hold plaintiffs to the definition of the concept as listed on Fisher-Price's Concept Submission Form (attached hereto at Tab O). But that is untenable. That form leaves very little room to describe the product concept with any degree of precision and, in my experience, is not controlling for purposes of defining the concept. As I recall I filled it out just prior to meeting with Paul Snyder of Fisher-Price to submit the original concept, and my experience is that these forms are not given much thought by the inventor or the toy company's inventor relations representative – they are purely administrative forms.

57.    Rather, the correct standard to be applied in determining whether toy companies are obligated to pay for products based on outside inventor submissions has been provided in this case through plaintiffs' expert, James Kipling. Mr. Kipling, himself a toy industry veteran on the company side, contradicts Mr. Bollinger's view that "use" by Fisher-Price would occur only if each and every detail of the concept were replicated. Based on his own experiences working for a toy company, Mr. Kipling confirms that (1) concepts submitted by outside inventors are typically broadly construed; (2) the performance of the concept by Fisher-Price could be achieved in many different ways and Fisher-Price would still owe a royalty regardless of the particular device used; and (3) the concept may ultimately be changed because the toy company has expended substantial resources to refine and embellish the concept into a "finished" licensed product, but a royalty would still be owed nonetheless. Mr. Kipling's view is consistent with my own experience in dealing with concept submissions from several different toy manufacturers, including Fisher-Price.

58.    Our concept, embodied in three submissions to Fisher-Price, included the following features: an image component in the form of a backpack for each "Rescue Heroes"

action figure that enhanced role play for the child by depicting the mission of that particular "Rescue Heroes" character (for example, obstacles and dangers the character might face), which concept could be expanded into accessories and line extensions relating to the "Rescue Heroes" line pursuant to industry custom and practice.

59. A comparison of plaintiffs' definition of the concept at issue with each of Fisher-Price's "Rescue Heroes" products at issue reveals that these products do "embody" essential elements of plaintiffs' concept because, in particular, the action figures in the "Video Mission," "Mission Select" and "Mission Command" lines each depict an image on the backpack of the figure that enhances role play for the child by depicting the mission of that particular character.

60. I also note the following specific similarities between Fisher-Price's products and the 1998 "Reel Action"/"Reel Heroes" execution:

### a)  Video Mission Rescue Heroes

Each Video Mission Rescue Heroes figure came with a backpack containing moving images via a lenticular lens. The lenticular lens was comprised of two still images which, when a button was pressed, moved to create the appearance of a moving image. The images on the backpacks related to the character's mission and/or obstacles and dangers the character might face. As such, it shares the same core features as Plaintiffs' Concept, namely (a) an image component viewed from behind; (b) in connection with the backpack of each Rescue Heroes figure; and, (c) that enhanced role play for the child by depicting the mission of that particular character (for example, obstacles and dangers that character might face).

### b)  Mission Command Rescue Heroes

Each Mission Command Rescue Heroes figure came with a mission card depicting a still, printed image of a mission adventure that the child could insert into the figure's backpack and view from behind. As such, it shares the same core features as Plaintiffs' Concept, namely (a) an image component viewed from behind; (b) in connection with the backpack of each Rescue Heroes figure; and, (c) that enhanced role play for the child by depicting the mission of that particular character (for example, obstacles and dangers that character might face). Moreover, the mission cards could be transferred among figures. Plaintiffs' concept included the idea that the image (in the 1998 submission it was a film reel) could be interchangeable.

c)    **Mission Select Rescue Heroes**

Each Mission Select Rescue Heroes figure came with a backpack that depicted still images on a disc or dial that is embedded in the backpack. The images are viewed from behind. As such, it shares the same core features as Plaintiffs' Concept, namely (a) an image component viewed from behind; (b) in connection with the backpack of each Rescue Heroes figure; and, (c) that enhanced role play for the child by depicting the mission of that particular character (for example, obstacles and dangers that character might face).

d)    **Optic Force Line**

Plaintiffs' 1998 submission also included a TV cameraman character with a distinct design and appearance (for example, who could film the "Rescue Heroes" adventures), to extend the Reel Heroes concept of depicting a "Rescue Heroes" mission (which allows the child to visualize a play scenario through an image component in connection with the backpack). The character had red hair, facial hair, a baseball cap, press pass and an optical camera attached to the backpack in one hand and a microphone in the other. Fisher-Price has produced the very same reporter/photographer action figure, which it calls "Telly Photo," with a virtually identical look, feel and play pattern.

Moreover, the Optic Force line (Telly Photo, Maureen Biologist, Matt Medic and Rock Miner) includes action figures that have hand-held optical devices (Jake Justice has a telescope not hand held) attached to the backpack and viewed by the child from behind the character. The optical devices serve to enhance play value for the child by creating real time images and images related to the character's mission. Plaintiffs' first submission included the feature of a hand-held optical device (in the form of a camera) attached to the backpack and viewed from behind, with a viewer and fisheye lens, that showed real time images and enhanced play value for the child.

e)    **Voice Tech Rescue Fire Truck, Jet and Police Cruiser**

Plaintiffs' Concept covers these types of accessories, such as vehicles and play sets, because they are sold together with, or are marketed by Fisher-Price specifically for use with, the accused Rescue Heroes action figure lines (Voice Tech Video Mission, etc.). Moreover, Plaintiffs' first submission specifically referenced and included vehicle accessories (in the form of a mobile communication and command vehicle).

f)    **Mission Select Fire Truck and Police Cruiser**

The response to sub-paragraph (e), above is incorporated by reference herein.

g) **Mountain Action Command Center and Aquatic Rescue Command Center**

The response to sub-paragraph (e), above is incorporated by reference herein.

h) **Videos, DVDs, Computer Games and Video Games**

Plaintiffs' Concept covers these types of products because they are referred to as "line extensions." They are either sold together with, are marketed specifically for use with, or arise out of the images, trademarks or other elements of the popularity and goodwill created by or associated with, the accused Rescue Heroes action figure lines (Voice Tech Video Mission, etc.).

61.    In addition to the features identified in paragraph 60 above, I also note the following similarities between Fisher-Price's products and the 1999 execution of our concept:

a) **Mission Command Rescue Heroes**

Each Mission Command Rescue Heroes figure came with a mission card depicting a still, printed image of a mission adventure that the child could insert into the figure's backpack. Plaintiffs' second submission included the feature of adding still, printed images to the backpack of each "Rescue Heroes" character that enabled children to view still images through a viewing mechanism. The mechanism and images are viewed from behind. As such, the Mission Command Rescue Heroes line shares the same core features as Plaintiffs' Concept, namely (a) an image component viewed from behind; (b) in connection with the backpack of each Rescue Heroes figure; and, (c) that enhanced role play for the child by depicting the mission of that particular character. Moreover, the mission cards could be transferred among figures. Plaintiffs' concept included the idea that the image (in the second submission the still images were mounted on a drum) could be interchangeable.

b) **Mission Select Rescue Heroes**

Each Mission Select Rescue Heroes figure came with a backpack that depicted still images on a disc or dial used to select missions that is embedded in the backpack and viewed from behind. Plaintiffs' second submission included the feature of adding still, printed images to the backpack of each "Rescue Heroes" character that enabled children to view still images from behind through a viewing mechanism. As such, the Mission Select Rescue Heroes line shares the same core features as Plaintiffs' Concept, namely (a) an image component viewed from behind; (b) in connection with the backpack of each Rescue Heroes figure; and, (c) that enhanced role play for the child by depicting the mission, obstacles, and dangers facing that particular character.

28

c)    **Aquatic Rescue Command Center**

This accessory uses interchangeable mission cards similar to those used by the Mission Command action figures.

62.    In addition to the features identified in paragraphs 60 and 61 above, I note the following similarities between Fisher-Price's products and the 2000 execution of our concept:

a)    **Mission Command Rescue Heroes**

Each Mission Command Rescue Heroes figure came with a mission card depicting a still, printed image that was viewed from behind of a mission adventure that the child could insert into the figure's backpack. Plaintiffs' third submission included the feature of adding still, printed images to the backpack of each "Rescue Heroes" character. As such, the Mission Command Rescue Heroes line shares the same core features as Plaintiffs' Concept, namely (a) an image component viewed from behind; (b) in connection with the backpack of each Rescue Heroes figure; and, (c) that enhanced role play for the child by depicting the mission of that particular character. Moreover, the mission cards could be transferred among figures. Plaintiffs' concept included the idea that the image (in the third submission the still images were mounted on a round disc or dial) could be interchangeable.

b)    **Mission Select Rescue Heroes**

Each Mission Select Rescue Heroes figure came with a backpack that depicted still images on a 2" disc or dial used to select missions and to show obstacles and dangers. The dial is embedded in the backpack and viewed from behind. Plaintiffs' third submission included the feature of depicting still images on a round 2" disc that was embedded in the backpack and viewed from behind each Rescue Heroes figure. As such, the Mission Select Rescue Heroes line shares the same core features as Plaintiffs' Concept, namely (a) an image component viewed from behind; (b) in connection with the backpack of each Rescue Heroes figure; (c) that enhanced role play for the child by depicting the mission of that particular character; and (d) which image was changed by rotating a disc.

c)    **Mission Select Fire Truck and Police Cruiser**

These vehicles feature the same rotating 2" dial as the Mission Select action figures, depicting still images that are used to select missions and to show obstacles and dangers.

d)    **Mountain Action Command Center**

This accessory features a dial similar to that of the Mission Select action figures that depicts still images that are used to select missions and to show obstacles and dangers.

e)    **Aquatic Rescue Command Center**

This accessory uses interchangeable mission cards similar to those used by the Mission Command action figures.

f)    **DVDs, Videos, Video Games and Computer Games**

Certain of these line extensions feature the same rotating dial as the Mission Select action figures, depicting still images that are used to select missions and to show obstacles and dangers.

63.    Fisher-Price has attempted to argue that the purpose of the still images on their Mission Select and Mission Command backpacks was simply to identify the subject matter of the action figure's speech.  From a design perspective, the most important aspect of these images was to communicate a play pattern to the child of the character's mission or obstacles and dangers the character might face.  While Fisher-Price has asserted that speech is the most important aspect of these lines, Paul Snyder indicated at my initial meeting with him regarding our concept that I should not worry about speech – that Fisher-Price put speech in everything.

Termination of DI

64.    It is my understanding that after this lawsuit commenced, Fisher-Price removed DI from its list of approved vendors for contract work, and indicated that DI would not be placed back on the approved vendor list until they withdrew from the lawsuit and obtained my withdrawal as well.  I had no intention of withdrawing.  However, the result of such action by Fisher-Price is that a wedge has been driven between DI and me in that DI has been restricted from working with me on concept generation projects.  I have lost business as a result.

I declare that the foregoing is true and correct under the penalty of perjury.

Victor G. Reiling

Dated: Kent, Connecticut
      May 20, 2005