# EXHIBIT A

2003 Annual Report



adverse effect on Mattel's results of operations and financial condition, depending on the product affected by the recall and the extent of the recall efforts required. A product recall could also negatively affect Mattel's reputation and the sales of other Mattel products.

Mattel's advertising is subject to the Federal Trade Commission Act, The Children's Television Act of 1990, the rules and regulations promulgated by the Federal Trade Commission and the Federal Communications Commission as well as laws of certain countries that regulate advertising and advertising to children. In addition, Mattel's websites that are directed to children are subject to the Children's Online Privacy Protection Act of 1998. Mattel is subject to various other federal, state and local laws and regulations applicable to its business. Mattel believes that it is in substantial compliance with these laws and regulations.

Mattel's operations are from time to time the subject of investigations, conferences, discussions and negotiations with various federal, state and local environmental agencies with respect to the discharge or cleanup of hazardous waste and compliance by those operations with environmental laws and regulations. See Item 8 "Financial Statements and Supplementary Data—Note 9 to the Consolidated Financial Statements—Environmental."

## Employees

The total number of persons employed by Mattel and its subsidiaries at any one time varies because of the seasonal nature of its manufacturing operations. At year end 2003, Mattel's total number of employees including its international operations, was approximately 25,000.

## Executive Officers of the Registrant

The current executive officers of Mattel, all of which are appointed annually by the board of directors and serve at the pleasure of the board, are as follows:

| Name | Age | Position | Executive Officer Since |
|---|---|---|---|
| Robert A. Eckert | 49 | Chairman of the Board of Directors and Chief Executive Officer | 2000 |
| Matthew C. Bousquette | 45 | President, Mattel Brands | 1999 |
| Ellen L. Brothers | 48 | President, American Girl and Executive Vice President | 2003 |
| Thomas A. Debrowski | 53 | Executive Vice President, Worldwide Operations | 2000 |
| Joseph F. Eckroth, Jr. | 45 | Chief Information Officer | 2000 |
| Kevin M. Farr | 46 | Chief Financial Officer | 1996 |
| Neil B. Friedman | 56 | President, Fisher-Price Brands | 1999 |
| Alan Kaye | 50 | Senior Vice President, Human Resources | 2000 |
| Douglas E. Kerner | 46 | Senior Vice President and Corporate Controller | 2001 |
| Robert Normile | 44 | Senior Vice President, General Counsel and Secretary | 1999 |
| William Stavro | 64 | Senior Vice President and Treasurer | 1993 |
| Bryan Stockton | 50 | Executive Vice President, International | 2000 |

Mr. Eckert has been Chairman of the Board of Directors and Chief Executive Officer since May 2000. He was formerly President and Chief Executive Officer of Kraft Foods, Inc., the largest packaged food company in North America, from October 1997 until May 2000. From 1995 to 1997, Mr. Eckert was Group Vice President of Kraft Foods, Inc. From 1993 to 1995, Mr. Eckert was President of the Oscar Mayer foods division of Kraft Foods, Inc. Mr. Eckert worked for Kraft Foods, Inc. for 23 years prior to joining Mattel.

The tables below present information about revenues, income and assets by segment. Segment revenues do not include sales adjustments such as trade discounts and other allowances. Such adjustments are, however, included in the determination of segment income from operations. Segment income from operations represents operating income from continuing operations, while consolidated income from operations represents income from continuing operations before income taxes as reported in the consolidated statements of operations. The corporate and other category includes costs not allocated to individual segments, including charges related to the financial realignment plan, incentive compensation and corporate headquarters functions managed on a worldwide basis. Segment assets are comprised of accounts receivable and inventories, net of applicable reserves and allowances.

| | For the Year | | |
| | 2003 | 2002 | 2001 |
|---|---|---|---|
| | | (In thousands) | |
| **Revenues** | | | |
| **Domestic:** | | | |
| Mattel Brands US .................................... | $1,594,144 | $1,790,006 | $1,817,272 |
| Fisher-Price Brands US .............................. | 1,265,224 | 1,282,221 | 1,234,169 |
| American Girl Brands .............................. | 344,446 | 350,178 | 340,843 |
| Total Domestic .................................... | 3,203,814 | 3,422,405 | 3,392,284 |
| International .................................... | 2,175,709 | 1,890,939 | 1,680,291 |
| Gross sales .................................... | 5,379,523 | 5,313,344 | 5,072,575 |
| Sales adjustments .................................... | (419,423) | (428,004) | (384,651) |
| Net sales from continuing operations ................ | $4,960,100 | $4,885,340 | $4,687,924 |
| **Segment Income** | | | |
| **Domestic:** | | | |
| Mattel Brands US .................................... | $ 388,666 | $ 445,982 | $ 403,933 |
| Fisher-Price Brands US .............................. | 180,133 | 187,009 | 157,030 |
| American Girl Brands .............................. | 61,968 | 58,106 | 49,907 |
| Total Domestic .................................... | 630,767 | 691,097 | 610,870 |
| International .................................... | 364,963 | 304,989 | 198,242 |
| | 995,730 | 996,086 | 809,112 |
| Goodwill amortization .................................... | — | — | 46,121 |
| Corporate and other expense (a) ...................... | 210,020 | 262,545 | 183,671 |
| Operating income .................................... | 785,710 | 733,541 | 579,320 |
| Interest expense .................................... | 80,577 | 113,897 | 155,132 |
| Interest (income) .................................... | (18,966) | (17,724) | (15,481) |
| Other non-operating (income) expense, net .............. | (16,755) | 15,871 | 9,659 |
| Income from continuing operations before income taxes ....... | $ 740,854 | $ 621,497 | $ 430,010 |

(a)  Corporate and other expense is higher in 2002 compared to 2003 and 2001, largely due to higher incentive compensation expense and a $25.4 million charge in 2002 resulting from the settlement of shareholder litigation related to the 1999 acquisition of Learning Company.

83

EXHIBIT B





Advanced Search

Members Login

Toy Net | Toy Industry Association | TIA Trade Shows & Events | Toy Industry Foundation | Parents

| Press Releases | Statistics | Industry Statements | Toy Book: TIA Fact File | Publications/Resources | Betcha Didn't K
| Classic Toys | Hot Toy List | FAQs |

Home → Library → Statistics → State of the Industry

## 2003 vs. 2002 STATE OF THE INDUSTRY

### Sales Reflect Total U.S. Industry
(Listed alphabetically)

| SUPERCATEGORY | ANNUAL 2002 | ANNUAL 2003 | % Cl |
|---|---|---|---|
| Action Figures & Accessories | $1.4B | $1.2B | |
| Arts & Crafts | $2.3B | $2.4B | |
| Building Sets | $766M | $625M | |
| Dolls | $2.7B | $2.8B | |
| Games/Puzzles | $2.2B | $2.4B | |
| Infant/Preschool | $2.9B | $2.6B | |
| Learning & Exploration | $473M | $477M | |
| Outdoor & Sports Toys | $2.5B | $2.4B | |
| Plush | $1.5B | $1.4B | |
| Vehicles | $2.2B | $2.0B | |
| All Other Toys | $2.4B | $2.5B | |
| **TOTAL TRADITIONAL TOY INDUSTRY** | **$21.3B** | **$20.7B** | |
| Video Games | $10.3B | $10.0B | |

NOTE: There may be variances due to rounding

**DATA COMPILED BY:**   The NPD Group / NPD Funworld® / Consumer Pa
900 West Shore Road
Port Washington, NY 11050
(516) 625-0700

**IN CONJUNCTION WITH:**   Toy Industry Association, Inc

Site Map  |  Privacy  |  About TIA  |  Contact Us  | ©2004 Toy Industry Association, Inc.

# EXHIBIT C





Making The World Smile

### To Our Shareholders

Three years ago we set a new strategic direction for the Company: One in which we would change the culture at Hasbro to focus on growing our incredible portfolio of core brands and developing new and innovative products. In addition, we wanted to reduce our reliance on entertainment properties, improve operating margins and strengthen our balance sheet.

## We are happy to report that three years later, we are delivering against all of these objectives!

In 2003, revenues increased 5.9%, excluding the impact of foreign exchange. We re-energized our business by leveraging our rich collection of core brand drivers, which as a category were up 23% worldwide and include brands like PLAYSKOOL and TRANSFORMERS. Our core brand worth calling out was MONOPOLY, which was up 18% in 2003, an impressive number for a brand that is nearly 70 years old. Innovative products like BEYBLADE and VIDEONOW also contributed significantly to our solid growth.

Improving our operating margin to 10% or better by 2003 was a major objective as well, and we surpassed that goal, delivering an operating margin of 11%. We are particularly pleased that we achieved this goal during a year in which we also took a number of charges relating to actions to improve future profitability. These charges included severance payments related to the cessation of toy manufacturing operations at our Valencia, Spain facility and charges for exiting leases and severance for the employees of the remaining Wizards of the Coast retail stores.

In the last three years, we have made tremendous strides in strengthening our balance sheet and have reduced our short and long-term debt, net of cash, by over $1.0 billion. In addition, we have improved our debt to total cap ratio to 34%. We are pleased that this progress has been recognized by both Fitch Ratings and Moody's, who have upgraded our long-term unsecured debt ratings to investment grade.

This success was driven by all three of our major segments.

### Games

**Revenues up 8.8%**

Games is a solid, profitable business for Hasbro. Consumers have always enjoyed the fun and educational opportunities that games provide, and the way they bring people together. The segment had a strong year, registering an 8.8% increase in revenues. They posted $804.5 million in revenues for the year and an operating profit that increased by 40.6% to $175.3 million. Driving this success were core brands, such as MONOPOLY, TRIVIAL PURSUIT and MAGIC: THE GATHERING trading card games, as well as new innovative products, such as TWISTER MOVES, BULLS-EYE BALL and ELEFUN.

## U.S. Toys

**Revenues up 6.2%**

The U.S. Toys business also made substantial improvements in both revenue and operating profit. This year, the segment grew revenues 6.2% to $1.1 billion for the year and operating profit increased 21.6% to $92.0 million. We had strong performance from many toy core brand drivers, such as TRANSFORMERS, which was up 57%, and PLAYSKOOL, which grew 25% in 2003. In addition, we had a number of new introductions that performed well, such as VIDEONOW and continued strong sales from BEYBLADE and FURREAL FRIENDS.

## International

**Revenues up 22%**

The international segment is an area we targeted to improve in 2003 and we did. Revenues increased 22% to $1.2 billion for the year. Excluding the positive impact of foreign exchange of $129.7 million, revenues increased 8.2% for the year to $1.1 billion. Operating profit increased significantly to $91.3 million, compared with $5.2 million last year. This growth shows the progress we are making in improving our global business. The segment experienced strength in board games and many of our core product lines, including TRANSFORMERS, MAGIC: THE GATHERING trading card games, and PLAYSKOOL. BEYBLADE was also a significant contributor to the segment's performance.

Our success in 2003 was a direct result of delivering on our strategy. In this annual report you will learn about five brands – TRANSFORMERS, MY LITTLE PONY, MAGIC: THE GATHERING, FURREAL FRIENDS and MONOPOLY – that illustrate how this strategy is working. Each of the highlighted brands provides a snapshot of how we are growing our toys and games business globally with new innovative products based on consumer insights, compelling storylines, strategic licensing agreements, and strong, integrated marketing campaigns.

We made substantial improvement in our corporate governance efforts in 2003 as well. We split the roles of Chairman and CEO and amended our articles of incorporation to eliminate classification of our Board of Directors through a shareholder vote. In addition since 2001, we have added eight new independent members to our Board, supplementing our expertise in key area. This year we were delighted to welcome Jack M. Greenberg, former Chairman and Chief Executive Officer of McDonald's Corporation, and Jack M. Connors, Jr., Chairman of the full-service marketing communications company, Hill, Holliday, Connors, Cosmopulos, Inc., to our Board of Directors. Both are very highly respected business leaders. You can be sure that we remain committed to building shareholder value, while conducting ourselves with integrity with all of our constituents.

EXHIBIT D



# Fisher-Price, Inc.

### POLICY AND AGREEMENT
## CONCERNING IDEAS SUBMITTED BY PERSONS OUTSIDE OF FISHER-PRICE, INC.

### POLICY

New product ideas are important to Fisher-Price, Inc. While we employ a staff of designers and engineers to develop new products for us we are also receptive to offers of rights to new ideas from certain sources outside the company. We receive many unsolicited outside ideas and have found that most of these are not new and often are either concepts which are already in the public domain or are the same or similar to ideas developed by our own staff. For these reasons, and in order to avoid any disagreements, Fisher-Price, Inc. can review outside ideas only according to the conditions of the agreement below.

Our policy is founded in our desire to preserve our rights (A) in the previous and current ideas and developments of our own staff, (B) to use anything in the public domain, (C) to defend against patents which we believe to be invalid. We also wish to avoid uncertainty or disagreement as to what is disclosed to us.

### AGREEMENT

Our policy requires that we accept outside submissions only when a copy of this Agreement is signed, and further that we accept only such matter as is reduced to writing, dated, and signed by you and acknowledged by us as detailed on our Concept Submission Form. Please understand that it is necessary for us and for your protection to retain a record of your disclosure for our files.

1. The disclosure must be understood to be purely voluntary and no confidential relationship is to be established by such disclosure or implied from our consideration of the submitted material, and the material is not to be considered submitted "in confidence". Confidential relationships have been held to create obligations which are beyond those that the company is willing to assume.

2. No obligation of any kind is assumed by, nor may be implied against Fisher-Price, Inc., unless and until a formal written contract has been entered into, and then the obligation shall be only such as is expressed in the formal written contract executed by an officer of Fisher-Price, Inc. Fisher-Price, Inc. has no obligation to compensate you for any damage which may occur in shipment. Any claims for loss or damage occurring during shipment should be filed directly with the transportation company.

3. We assure you that we intend to deal fairly with you in connection with your disclosure. You must understand and agree that in return for receiving and examining your disclosure, we are released from any liability in connection with the receipt and examination of your disclosure, except as to such liability that may accrue under any valid patents or copyrights that you now or hereafter own or control. Fisher-Price, Inc. alone shall determine whether compensation shall be paid, and if paid, the amount of such compensation.

4. Product concepts will be submitted to Fisher-Price, Inc. by the Designer in written supplements to this Agreement in the form of Concept Submission Forms, signed and dated by both parties. Our review of your idea and/or an offer to negotiate with you is not an admission of novelty, priority, or originality and does not prejudice our rights to contest any existing or future patents or copyrights on the idea. All features which you believe to be unique or points of differentiation must be outlined on the Concept Submission Form, and all areas of this sheet must be completed in full for your submission to be eligible for review and evaluation by Fisher-Price, Inc. Any form received without this information will be returned for completion.

Page 1 of 2

FP 3552 : 34 /5

Fisher-Price, Inc. 636 Girard Ave, East Aurora, NY 14052 (716) 687-3000

FP 0018

5. No employee or representative of Fisher-Price, Inc. is authorized to solicit any disclosure or to do any other act or make any representations from which any relationship may be implied other than that expressed in this document.

6. A) This Agreement shall have an indefinite term commencing on ___12/15/94___ and expiring upon thirty (30) days written notice.

or

B) This Agreement shall have a term commencing on _____ and expiring _____, unless earlier terminated by Fisher-Price Inc. on thirty (30) days written notice.

7. This Agreement is the entire understanding between the parties and no change in Agreement or modification shall be effective unless executed in writing.

_____          For Fisher-Price Inc.:

_____          _____
SIGNATURE                              SIGNATURE

VICTOR G. REYNOLDS                     PAUL D. SNYDER      12/15/94
PRINT NAME              DATE           PRINT NAME              DATE

PRINCIPAL                              V.P. R&D SERVICES
TITLE                                  TITLE

294  34  9575  (SS)
SOCIAL SECURITY OR FEDERAL ID #

VICTOR G. REYNOLDS ASSOC.
COMPANY NAME

209 SHARON RD
ADDRESS

LAKEVILLE, CT
CITY/COUNTRY STATE ZIP

203 435 8932 (FAX SAME)
PHONE #          FAX #

Please send your signed, dated and completed Concept Submission Form, together with any materials you wish to have us consider to:

FISHER-PRICE, INC.
Outside Submissions
Research & Development
636 Girard Avenue
East Aurora  New York  14052

NOTE: Please pack all materials carefully and enclose a detailed packaging list.

FP 0019

EXHIBIT E



## POLICY AND AGREEMENT
### CONCERNING IDEAS SUBMITTED BY PERSONS OUTSIDE OF
### THE FISHER-PRICE TOYS DIVISION OF THE QUAKER OATS COMPANY

### POLICY

New product ideas are important to Fisher-Price. While we employ a staff of designers and engineers to develop new products for us, we are also receptive to offers of rights to new ideas from sources outside the company. We receive many unsolicited outside ideas and we have found that most of these are not new and often are the same or similar to ideas developed by our own staff. For these reasons, and in order to avoid any disagreements, Fisher-Price can review outside ideas only according to the conditions of the agreement below.

Our policy is founded in our desire to preserve our rights (A) in the previous and current ideas and developments of our own staff, (B) to use anything in the Public Domain, (C) to defend against patents which we believe to be invalid. We also wish to avoid uncertainty or disagreement as to what is disclosed to us.

### AGREEMENT

Our policy requires that we accept outside submissions only when accompanied by a signed copy of this Agreement and further that we accept only such matter as is reduced to writing, dated, and signed by you and acknowledged by us. Please understand that for our records it is necessary for us to retain through notation, photography or xerography a satisfactory copy or description of your disclosure.

1. The disclosure must be understood to be purely voluntary and is not made in confidence.

2. No obligation of any kind is assumed by, nor may be implied against The Quaker Oats Company or its Fisher-Price Toys Division, unless and until a formal written contract has been entered into, and then the obligation shall be only such as is expressed in the formal written contract executed by an officer of Fisher-Price Toys.

3. We assure you that we intend to deal fairly with you in connection with your disclosure. You must understand and agree that in return for our receiving and examining your disclosure, we are released from any liability in connection with the receipt and examination of your disclosure or in connection with our use or disclosure to others of any portion of your disclosure, except as to such liability that may accrue under any valid patents or copyrights that you now or hereafter own or control. Fisher-Price alone shall determine whether compensation shall be paid.

4. No employee or representative of Fisher-Price is authorized to solicit any disclosure or to do any other act or make any representations from which any relationship may be implied other than that expressed in this document.

FP 15131

I accept the terms and conditions of the above agreement as the basis for submitting my ideas to Fisher-Price Toys and ask you to consider them.

Brief description of disclosure: _____

① SPEEDOMETERS - ELECTRONIC SPEED/RPM CARS.

② JUMP STARTERS - EXPAND - AND - GO CAR SYSTEM.

③ ~~BIG WHEELS - F/X INTERFUSION SYSTEM w/ SNAP LOCK FLOOR SYSTEMS~~

④ SLAM JAMMERS - R&D FRONT DISC BAT/VEH.

⑤ TRAC TEAM - R/C FIGURE MODULE SYSTEM w/ BATTERIES R&D UNIT IN FIGURE.

_____

_____

_____
Signature

U.S. RETAIL ASSOCIATES
Type or Print Name and Date

_____
Address

REJECTED BY LARRY McCOOE
9-25-89

_____
For Fisher-Price Toys — Sign and Date

Please keep one copy of this agreement and send one signed and dated copy together with any materials you wish to have us consider to:

FISHER-PRICE TOYS
Outside Submissions
Research & Development
636 Girard Avenue
East Aurora, New York 14052

NOTE: Please pack all materials carefully and enclose a detailed packaging list.

Log # 89342 9AB/CTO

Page 2 of 2

FP 15182

# EXHIBIT F



Fisher-Price
*Division of The Quaker Oats Company*

## POLICY AND AGREEMENT
## CONCERNING IDEAS SUBMITTED BY PERSONS OUTSIDE OF
## THE FISHER-PRICE DIVISION OF THE QUAKER OATS COMPANY

### POLICY

New product ideas are important to Fisher-Price. While we employ a staff of designers and engineers to develop new products for us we are also receptive to offers of rights to new ideas from certain sources outside the company. We receive many unsolicited outside ideas and have found that most of these are not new and often are either concepts which are already in the public domain or are the same or similar to ideas developed by our own staff. For these reasons, and in order to avoid any disagreements, Fisher-Price can review outside ideas only according to the conditions of the agreement below.

Our policy is founded in our desire to preserve our rights (A) in the previous and current ideas and developments of our own staff, (B) to use anything in the Public Domain; (C) to defend against patents which we believe to be invalid. We also wish to avoid uncertainty or disagreement as to what is disclosed to us.

### AGREEMENT

Our policy requires that we accept outside submissions only when a copy of this Agreement is signed, and further that we accept only such matter as is reduced to writing, dated, and signed by you and acknowledged by us as detailed on our Concept Submission Summary sheet. Please understand that it is necessary for us and for your protection to retain a record of your disclosure for our files.

1. The disclosure must be understood to be purely voluntary and no confidential relationship is to be established by such disclosure or implied from our consideration of the submitted material, and the material is not to be considered submitted "in confidence." Confidential relationships have been held to create obligations which are beyond those that the company is willing to assume.

2. No obligation of any kind is assumed by, nor may be implied against The Quaker Oats Company or its Fisher-Price Division, unless and until a formal written contract has been entered into, and then the obligation shall be only such as is expressed in the formal written contract executed by an officer of Fisher-Price. Fisher-Price has no obligation to compensate you for any damage which may occur in shipment. Any claims for loss or damage occurring during shipment should be filed directly with the transportation company.

3. We assure you that we intend to deal fairly with you in connection with your disclosure. You must understand and agree that in return for receiving and examining your disclosure, we are released from any liability in connection with the receipt and examination of your disclosure or in connection with our use or disclosure to others of any portion of your disclosure, except as to such liability that may accrue under any valid patents or copyrights that you now or hereafter own or control. Fisher-Price alone shall determine whether compensation shall be paid, and if paid, the amount of such compensation.

VGR 0287

FP-3552 (12/89) LJD

*Produced by Fisher-Price Print Services, East Aurora*

Fisher-Price, Division of The Quaker Oats Company
636 Girard Avenue, East Aurora, New York 14052-1885
716 687-3000     Fax 716-687-3517

/30/90

4.  Product concepts will be submitted to Fisher-Price by the Designer in written supplements to this Agreement in the form of "Concept Submission Summary" sheets, signed and dated by both parties. Our review of your idea and/or an offer to negotiate with you is not an admission of novelty, priority, or originality and does not prejudice our rights to contest any existing or future patents or copyrights on the idea. All features which you believe to be unique or points of differentiation must be outlined on the "Concept Submission Summary" sheet, and all areas of this sheet must be completed in full for your submission to be eligible for review and evaluation by Fisher-Price. Any form received without this information will be returned for completion.

5.  No employee or representative of Fisher-Price is authorized to solicit any disclosure or to do any other act or make any representations from which any relationship may be implied other than that expressed in this document.

6.  This Agreement shall have a term commencing on _January 1, 1990_ and expiring _December 31, 1990_ unless earlier terminated by Fisher-Price on thirty (30) days written notice. This Agreement is the entire understanding between the parties and no change in Agreement or modification shall be effective unless executed in writing.

FOR _VICTOR G. REMLEY_ 
Company Name

Address _5 RAILROAD SQ._
_W. CORNWALL 06796_

Signature _____

Print Name _Victor G. Remley_

Title _Designer_

Date _1/30/90_

FOR FISHER-PRICE
Division of The Quaker Oats Company
636 Girard Avenue
East Aurora, NY 14052

Signature _____

Print Name _Leslie DiFranco_

Title _Manager, R&D Services_

Date _January 30, 1990_

Please send your signed, dated, and completed Concept Submission Summary, together with any materials you wish to have us consider to:

FISHER-PRICE
Outside Submissions
Research & Development
636 Girard Avenue
East Aurora, New York  14052

NOTE: Please pack all materials carefully and enclose a detailed packaging list.

Page 2 of 2

EXHIBIT G

# HASBRO GAMES GROUP INVENTOR INTERVIEW RECORD

NAME: VIC REILING

ADDRESS: 155 NORTH MAIN STREET, P.O. BOX 677
KENT, CT 06757

860-927-1927

DATE: AUG 30 1998

PRESENT: VIC REILING
JONATHAN (LAW?)
M.H.     R.O.W.

| NO. | CATEGORY | NAME | DESCRIPTION | DISP. |
|-----|----------|------|-------------|-------|
| 1 | CHILDRENS (BOYS) | S.B.R. ROLL AND RACE | PLAYERS ROLL MAGNETIC SPHERES ONTO A BOARD TRYING TO CONNECT WITHIN ... ... ... OR TWO PLAYERS TRIES TO GET THREE OR MORE OF YOUR COLOR IN ASSEMBLIES | 4 |
| 2 | CHILDRENS (GIRLS) | MAGICA | MAGIC & BALL TYPE OF QUESTION ANSWERER. USES A MAGNETIC WHEEL WITH AN INTERESTING GREAT ACTION | 2 |
| 3 | WORD GAME | X WORDS | PLAYERS RACE TO PUT LETTER TILES ON A CROSSWORD GRID. UP AND ACROSS ARE DIFFERENT FOR EACH PLAYER | 2 |
| 4 | ADULT | GET THE MESSAGE | PHONETIC PHRASE IS PLACED ON A AUDIO TRACK THAT TURNS. REPEATING PART OF MESSAGE AS IT DOES. PLAYERS GUESS PHRASE (COULD BE ELECTRONIC) | 2 |
| 5 | ADULT | BEST SELLERS | PLAYERS WRITE STORIES ABOUT A THEME ... ... ... ... 7 LETTER WORDS DIRECT WHICH WORD STORY EASY ... STARTING WITH THOSE LETTERS | 2 |
| 6 | FEATURE | PRESSURE SENSITIVE TRAP | AN PATENTED ELECTRONIC DEVICE THAT SOUNDS ALARM WHEN TOUCHED WITH TOO MUCH FORCE. INTERESTING, BUT NEEDS TO BE DEVELOPED INTO A GAME | 6 |

**SEND PARCELS TO:**
**HASBRO GAMES**
**PRODUCT ACQUISITION**
**50 DUNHAM ROAD**
**BEVERLY, MA 01915**

Inventor acknowledges and agrees that all submissions described hereon shall be treated as confidential ...
employees, affiliates and subsidiaries shall have full and exclusive rights of usage of all such submissions and submitted material for the purposes of completing ...
(i) mutual further agreement between Hasbro and the inventor;
(ii) Hasbro advises inventor that it has no interest, or further interest in pursuing the submission; or
(iii) written withdrawal of the submission by the inventor.

DISPOSITION:
1 – HOLD SAMPLE SHOWN
2 – REJECT (not of interest)
3 – REJECT (too expensive)
4 – REJECT (done before).
5 – REJECT (similar to in-house project)
6 – INVENTOR TO DO MORE WORK
7 – INVENTOR TO SEND SAMPLE
8 – HOLD PHOTOS, DESCRIPTION, ILLUSTRATIONS
9 – SUBMIT TO HASBRO TOY

Inventor acknowledges and agrees that all submissions hereon are governed by the terms and conditions as listed on the back of this form.

INVENTOR: _____     FOR HASBRO GAMES GROUP: _____

Form No. Y112 (3/95)   Received Time May 16   9:58AM     Page ____ of ____

# AGREEMENT TO HOLD CONFIDENTIAL

1. The parties have a continuing mutual need for and obtain benefit from exchanging information that may be proprietary to them (the "Information") and expect the confidential portions of said information to be protected and desire to set forth specific procedures for identifying and maintaining such confidential portions of said Information.

2. All information intended by the disclosing party to be protected under this Agreement shall be in writing and clearly identified in writing as confidential at the time of disclosure or within thirty (30) days thereafter. With respect to disclosures by Inventor to the Company of concepts for toys, games, puzzles, characters, mechanisms, juvenile products or novelty items (referenced herein together or separately as "Amusements"), the Inventor shall complete and sign the Company's Inventor Review Record (and have same countersigned by the Company's Senior Vice President for Research and Development or designee) and attachments incorporating a written and/or graphic description of each such concept presented to the Company. The Company reserves the right to require that any description be supplemented by additional detail or otherwise modified to more accurately describe the concept disclosed, and shall not be obliged to countersign any disclosure not described to its reasonable satisfaction. The Company assumes no obligation of confidentiality or in any other respect with regard to information or a submission related to Amusements for which the Inventor has failed to deliver all materials which it has agreed to deliver, including the Inventor Review Record and such additional materials as may be required by Company pursuant to the preceding sentence. Each submission shall be deemed an offer to license the concept comprehended by the submission.

3. The receiving party agrees during the period of confidentiality specified in Paragraph 13, to handle, preserve and protect information identified as being confidential hereunder with the same degree of care which the receiving party normally affords its own confidential information including taking efforts (equivalent to those efforts which the receiving party uses to protect its own information) to avoid disclosure to any third party. Without limiting the foregoing, the Company may disclose such identified information to its officers, directors, agents and employees for the purpose of enabling it to determine its interest in licensing the identified information from the Inventor.

4. The receiving party acknowledges that, during the period of confidentiality, as specified in Paragraph 19, it will not use information identified as being confidential hereunder for commercial purposes without the consent of the disclosing party. "Use" shall mean conscious consideration of the information in conjunction with deliberate implementation of the information. "Commercial purpose" shall mean the incorporation of the information into products or product concepts which are offered for sale or license

5. Inventor acknowledges that the Company receives numerous submissions of similar concepts from many parties, and that the adoption by the Company of any alternative submission (as opposed to the concept submitted by the Inventor) may be due to market conditions at the time at which such alternative submission is received and/or the positioning of the concept suggested by the party making the submission as well as to any inherent merit of the concept. Selection by the Company of alternative submissions shall be without obligation to Inventor.

6.1 The obligations of the receiving party with respect to identified information as set forth in this Agreement are not applicable to any information which

(A) was demonstrably known to the receiving party prior to the date of the disclosure thereof to the receiving party by the disclosing party; or

(B) was known to the public or generally available to the public prior to the date of the disclosure to the receiving party by the disclosing party; or

(C) becomes known to the public or generally available to the public subsequent to the date of disclosure to the receiving party through no act of the receiving party contrary to the obligations imposed by this agreement; or

(D) has not been described and memorialized in the Company's Inventor Review Record in accordance with paragraph 2 hereof, if applicable; or

(E) is or was disclosed by the disclosing party to any third party without obligation to maintain confidentiality; or

(F) is or was independently developed by the receiving party or one of its subsidiaries, divisions, groups or parent or affiliated companies without any breach of this Agreement; or

(G) is received in good faith by the receiving party from a third party and is not subject to an obligation of confidentiality owed by said party to the disclosing party.

6.2 Failure by the Company to disclose the existence of any of the conditions listed in A through G, above, shall not be deemed a representation that such conditions do not exist or a waiver of such conditions.

6.3 A disclosure shall not be deemed to violate this Agreement, which:

(A) is disclosed by the receiving party, or by a person(s), for whom the receiving party is responsible, inadvertently, accidentally or without the receiving party's informed authorization despite the exercise of the degree of care which the receiving party affords its own confidential information; or

(B) is required to be disclosed by judicial or governmental action; or

(C) is disclosed in a judicial or governmental proceeding subject to a protective order.

7.1 Inventor represents and warrants that:

(A) it is the sole owner of all information disclosed to Company and that its disclosure thereof or any grant of rights thereto to Company shall not violate the rights of any third party; or

(B) if a third party has ownership of or a claim to all or any part of the information, then by virtue of any arrangement with such third party, Inventor has the unqualified right to make the disclosure made pursuant to this Agreement; and that the third party in interest has been informed of the terms of this Agreement and agrees to be bound by them; and that its disclosure of such information or any grant of rights thereto to Company shall not violate the rights of any third party; and that

(C) in the event either (A) or (B) applies, Inventor has the sole control over the disposition of the information by licensing same or otherwise, and that it has the sole control over enforcement of rights to the information by litigation or otherwise.

7.2 Notwithstanding anything herein to the contrary, it is hereby agreed that except as referenced in

7.1(B) above, Inventor shall not disclose any terms of this Agreement to any third party during or after the Term. If Inventor shall violate the terms of this Paragraph the Company's obligations of confidentiality hereunder shall cease forthwith and be void and of no effect.

8. Inventor shall fully disclose to the Company immediately upon the occurrence thereof any change in business structure, departure or arrival of principal(s), modifications of its legal entity or affiliation with any third party. In addition to the provisions of the following paragraph, this Agreement shall be deemed to control any business conducted between the Company and Inventor or any principal thereof or third party related thereto or new or revised entity thereunder until such time as required disclosures have been made to the Company and a mutually agreed new or supplementary agreement created.

9. In the event of any breach or violation of Paragraphs 7 or 8 hereof, Inventor shall defend, indemnify and hold completely harmless the Company, its subsidiaries, divisions, groups or parent or affiliated companies as well as their respective officers, directors, employees and agents, from any claim, loss or damage (including reasonable attorney fees) against or suffered by any or all of them brought or caused by any party and related to or arising out of any submission made under this Agreement.

10. The disclosure of information hereunder by either party to the other shall not be construed as granting to the receiving party either a license under any patent or patent application or any right of ownership in confidential information or other intellectual property rights whatsoever.

11. This Agreement contains the entire understanding between the parties relative to the protection of information which may be exchanged, and supersedes any prior or collateral related communications and understandings, whether written or oral, between the parties. The terms of this Agreement shall apply in lieu of and notwithstanding any specific legend or statement associated with any particular information exchanged. Moreover, no subsequent agreement between the parties hereto concerning the protection of information nor termination of or modification of this Agreement shall have effect upon the parties unless such agreement or modification is in writing, signed by an officer of the Company and an authorized representative of Inventor and specifically makes reference to this Agreement.

12. Either party may terminate this agreement, such termination to become effective thirty (30) days after the mailing of written notice to the other party by certified mail, return receipt requested; provided, however, that all obligations as otherwise provided herein as to disclosures of confidential information made prior to the effective date of such termination.

13. The obligation of confidentiality imposed by this Agreement shall extend, with respect to each identified item of confidential information, for two (2) years from the date of the initial disclosure of such information; provided, however, that in the case of disclosures by Inventors of an Amusement, and in the event that Company elects not to consider the Amusement from Inventor, such obligations of confidentiality shall extend for two years from the date that such election is communicated to the Inventor. Upon the expiration of the stated period, the Company shall have no further obligations to Inventor with respect to such disclosures or confidential information.

14. This Agreement shall be governed by and construed in accordance with the laws of the State of New York excluding its choice of law rules.

# EXHIBIT H

**MATTEL, INC.**

**PRODUCT DISCLOSURE FORM COVER PAGE** MAT-4017-E
(THIS FORM TO BE USED ONLY WITH ATTACHED DESCRIPTIONS)

TO:
☐ Mattel, Inc.
Outside Resources, D1-0106
333 Continental Blvd.
El Segundo, CA 90245-5012

☐ Mattel Mt. Laurel
New Product Development
6000 Midlantic Drive
Mt. Laurel, NJ 08054

☐ Fisher-Price, Inc.
Inventor Relations
636 Girard Avenue
East Aurora, NY 14052

☐ Tyco Preschool Toys, Inc.
Marketing Department
675 Avenue of the Americas, 2nd floor
New York, NY 10010-5104

I AM INTERESTED IN PRESENTING FOR YOUR CONSIDERATION MY PROPOSAL FOR NEW PRODUCTS. THESE PRODUCTS ARE DESCRIBED AS ATTACHED: (IDENTIFY EACH PRODUCT BY NAME)  SHADED AREAS FOR OFFICE USE ONLY

I understand your caution in permitting me to disclose to you my ideas, suggestions, inventions, designs, sketches, models, or other materials including any additional or supplemental disclosures (all hereinafter referred to as "ideas") because your company has developed or had suggested to you many ideas for future products, and there is the possibility that some of such ideas are similar to those which I might disclose to you. I understand that this submission to you is not made in confidence and that no obligation is assumed by Mattel, Inc. unless and until a formal written contract is agreed to and entered into, and then the obligation shall be only that which is expressed in the formal written contract. I understand that Mattel's willingness to review these ideas is not admission by Mattel of novelty, priority, or originality and does not impair Mattel's right to contest existing or future patents claiming the ideas. I hereby represent that I have the right to disclose these ideas and to make the present agreement. It is also understood by me that you cannot and will not be bound in any manner by ideas of a general nature which are not in such form when disclosed that they can be protected under the Patent and Copyright Statutes of the United States of America. I therefore agree that you assume no liability in reviewing these ideas and agree to rely solely upon such protection for these ideas as may be afforded under the Patent and Copyright Statutes of the United States of America. The foregoing terms and conditions shall apply to any further information of the idea that I elect to submit. Mattel, Inc. has no obligation to compensate you for the idea. Any claims for loss or damage occuring during shipment should be filed directly with the transportation company.

**PLEASE PRINT**

NAME

ADDRESS (STREET, CITY, STATE AND ZIP CODE)

TELEPHONE NUMBER (AREA CODE)        FAX NUMBER
(     )

SIGNATURE                                 DATE

FROM : REILING ASSOCIATES          PHONE NO. : 8629271921          May 16 2005 01:30 PM P5

Page 1 of 1

**Fisher-Price**
**Brands**

Submit to:  ☐ Fisher-Price Brands.    ☐ Tyco Preschool Toys, Inc. (Sesame Street/Disney)
                Inventor Relations         Inventor Relations
                636 Girard Avenue          675 Avenue of the Americas, 2nd Floor
                East Aurora, NY 14052      New York, NY 10010-5104

## PRODUCT DISCLOSURE FORM COVER PAGE
## FISHER-PRICE BRANDS          (THIS FORM TO BE USED ONLY WITH ATTACHED DESCRIPTIONS)

MEETING HELD AT _____ ON __3/15/00__

PRESENT _____ Pat B _____

I am interested in presenting for your consideration my proposal for new products. These proposed products are described on the attached. (It is the Inventor's responsibility to attach a description.) The description must appear on letterhead and include a photograph or drawing of proposed product and includes a description of all features Inventor believes are unique or are points of differentiation.

| P.D.F. NO. FISHER-PRICE BRAND USE ONLY | PRODUCT NAME | CATEGORY | SEND TO | COMMENTS |
|---|---|---|---|---|
| | COPY CAT | | EA | |
| | WITCHES DRAWER | | EA | Mike for Tim |
| | BI LINGUAL | | Head | Bristol and Page |
| | Doll | | | |
| | | | | |
| | | | | |
| | QC Timber Chesterwood | | | |
| | washer set | | EA | Provintage |

I understand your caution in permitting me to disclose to you any ideas, suggestions, inventions, designs, sketches, models, of other materials including any additional or supplemental disclosures (all hereinafter referred to as "ideas") because your company has developed or suggested to you ideas for future products, and there is the possibility that some of these ideas are similar to those which I might disclose to you. I understand that this submission to you is purely voluntary and is not made in confidence and that no obligation is assumed by Fisher-Price, Inc. unless and until a formal written contract is agreed to and entered into, and then the obligation shall be only that which is expressed in the formal, written contract. I understand that Fisher-Price, Inc.'s willingness to review these ideas is not an admission by Fisher-Price, Inc. of novelty, priority, or originality and does not impair Fisher-Price, Inc.'s right to contest existing or future patents claiming the ideas. I hereby represent that I have the right to disclose these ideas and to make the present agreement. Fisher-Price, Inc. assures you that we intend to deal fairly with you in connection with your disclosure. You must understand and agree that in return for receiving and examining your disclosure, we are released from any liability in connection with the receipt and examination of your disclosure, except as to such liability that may accrue under any valid patents or copyrights that you now or hereafter own or control Fisher-Price, Inc. alone shall determine whether compensation shall be paid, and if paid, the amount of such compensation. The foregoing terms and conditions shall apply to any further information concerning these ideas that I elect to submit. Fisher-Price, Inc. has no obligation to compensate you for any damage which may occur in shipment. Any claims for loss or damage occurring during shipment should be filed directly with the transportation company.

SIGNATURE _____  DATE __3/15/00__

**PLEASE PRINT**

NAME
Vic Reiling

COMPANY
Reiling Assoc

ADDRESS (STREET, CITY, STATE & ZIP CODE)
119 N Main
Kent CT 06

TELEPHONE _860 927-1921_   FAX NUMBER

INTERNET ADDRESS

REVIEWED BY: _____

# Fisher-Price Brands

## PRODUCT DISCLOSURE FORM (LIST OR ATTACH DESCRIPTION)

Submit to:
- ☐ Fisher-Price Brands
  Inventor Relations
  636 Girard Avenue
  East Aurora, NY 14052

- ☐ Fisher-Price Brands
  Inventor Relations
  675 Avenue of the Americas, 2nd Floor
  New York, NY 10010-5104

MEETING HELD AT _____  ON _____  Page _____ of _____

RECEIVED BY _____

I am interested in presenting for your consideration my proposal for new products. These proposed products are described on the attached. (It is the inventor's responsibility to attach a description.) This description can appear on letterhead and include a photograph or drawing of proposed product, and include a description of all features inventor believes are unique or are points of differentiation.

| P.D.F. NO. FISHER-PRICE BRAND USE ONLY | PRODUCT NAME | DESCRIPTION (must be included) | SEND TO | COMMENTS |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

I understand your caution. In permitting me to disclose to you my ideas, suggestions, inventions, designs, sketches, models, or other materials including any additional or supplemental disclosures (all hereinafter referred to as "Ideas") because your company has developed or suggested to you ideas for future products, and there is the possibility that some of these ideas are similar to those within I might disclose to you. I understand that this submission to you is purely voluntary, then this obligation shall be only that which I have expressed in this formal, written contract, that no obligation is assumed by Fisher-Price, Inc. unless and until a formal written contract is agreed to and entered into, and not an obligation by Fisher-Price, Inc. of novelty, priority, or originality and does not impair Fisher-Price, Inc.'s right to contest existing or future patents claiming the ideas. I hereby represent that I have the right to disclose these ideas and to make the present agreements. Fisher-Price, Inc. assumes you that we intend to deal fairly with you in connection with your disclosure. You must understand and agree that in return for receiving and examining your disclosure, we are released from any liability in connection with the receipt and examination of your disclosure, except as to such liability that may accrue under any valid patents or copyrights that you now or hereafter own or control. Fisher-Price, Inc. alone shall determine whether compensation shall be paid, and if paid, the amount of such compensation. The foregoing terms and conditions shall apply to any further information concerning these ideas that I elect to submit. Fisher-Price, Inc. has no obligation to compensate you for any damage which may occur in shipment. Any claims for loss or damage occurring during shipment should be filed directly with the transportation company.

SIGNATURE _____

DATE : _____

PLEASE PRINT

NAME _____

COMPANY _____

ADDRESS (STREET, CITY, STATE & ZIP CODE) _____

TELEPHONE ( ) _____    FAX NUMBER ( ) _____

INTERNET ADDRESS _____

FP-4198 (1/31/01) MF

☐ WHITE - Fisher-Price Brands    ☐ CANARY - Type Preschool Toys (Sesame Street / Disney)    ☐ PINK - Inventor

Source from Fisher-Price Copy Services, East Aurora

EXHIBIT I



November 30, 1987

Messrs. Victor G. Reiling and Bryan L. Dean
Victor G. Reiling Associates
P.O. Box 180
Toy Building at Railroad Square
West Cornwall, CT    06796

Dear Vic and Bryan:

SUBJECT:  <u>Signed Contract - "Slam Jammers"</u>

Enclosed for your files is one fully completed copy, with approval signatures, of the Assignment Agreement between Fisher-Price and Victor G. Reiling Associates, for the "Slam Jammers" Concept.

Hope you had a happy Thanksgiving holiday.

Sincerely yours,

FISHER-PRICE

D. Lawrence Davis
Senior Manager
Planning & Business Development

DLD/mer
Enclosure

cc:  F. Buckley — Fisher-Price
     L. Mazzacco — Fisher-Price

VGR 0140

CONFIDENTIAL

ASSIGNMENT AGREEMENT

between

FISHER-PRICE, DIVISION
OF THE QUAKER OATS COMPANY

and

VICTOR G. REILING ASSOCIATES

## TABLE OF CONTENTS

### Sections

|  |  | Page |
|---|---|---|
|  | Introduction | 1 |
| 1. | Definitions | 1 |
| 2. | Grant | 2 |
| 3. | Term | 2 |
| 4. | Royalties | 2 |
| 5. | Royalty Payments, Records | 3 |
| 6. | Rights; Enforcement of Rights | 4 |
| 7. | Warranties and Representations | 4 |
| 8. | Third-Party Claim Indemnification | 4 |
| 9. | Termination | 5 |
| 10. | No Joint Venture | 5 |
| 11. | Waiver | 5 |
| 12. | Applicable Law | 6 |
| 13. | Assignment | 6 |
| 14. | Invalidity | 6 |
| 15. | Force Majeure | 6 |
| 16. | Entire Understanding | 6 |
| 17. | Notices | 6 |

### Exhibits

| A. | Item Description | 8 |
|---|---|---|
| B. | Option Agreement | 9 |
| C. | List of Countries – Patent Protection | 11 |

VGR 0141

CONFIDENTIAL

## ASSIGNMENT AGREEMENT

Agreement entered into this _____ day of _____ , 1987 between Fisher-Price, Division of The Quaker Oats Company, 636 Girard Avenue, East Aurora, New York 14052 (hereinafter FISHER-PRICE) and Victor G. Reiling Associates and Bryan L. Dean as equal co-inventors, (hereinafter REILING/DEAN).

WHEREAS, REILING/DEAN has submitted an idea to FISHER-PRICE for a new toy which embodies a proprietary concept now known as "SLAM JAMMERS" as further defined in attached Exhibit A (hereinafter ITEM);

WHEREAS, REILING/DEAN, and FISHER-PRICE have entered into an Agreement (Exhibit B, attached) whereby FISHER-PRICE has paid the sum of $15,000 for exclusive rights in and to the ITEM for a specified period of time; and

WHEREAS, REILING/DEAN desires to grant and FISHER-PRICE wishes to obtain assignment of all rights to manufacture, market and sell toys which embody all or part of the ITEM.

NOW THEREFORE, FISHER-PRICE and REILING/DEAN jointly and severally agree as follows:

### I.    DEFINITIONS

For the purpose of this Agreement, the following words and terms shall have the meaning set forth below:

a.    ASSIGNED PATENT RIGHTS -- All rights in inventions directed to the ITEM and to improvements therein, including but not limited to the invention described in Exhibit A, now owned or hereafter acquired by REILING/DEAN, and further including all patents and patent applications therefor directed thereto.

b.    PRODUCTS -- Toys which embody all or part of the ITEM and which may or may not embody the ASSIGNED PATENT RIGHTS.

c.    TERRITORY -- The entire world.

d.    SUBSIDIARY OR AFFILIATE -- Any corporation or other entity which FISHER-PRICE controls, or of which FISHER-PRICE, or any subsidiary or affiliate of FISHER-PRICE, possesses a legal and/or beneficial interest of at least fifty percent (50%), or which owns, controls or possesses at least a fifty percent (50%) legal or beneficial interest in FISHER-PRICE.

e.    AVERAGE U.S. NET WHOLESALE PRICE -- The gross invoice amount for the sale of all PRODUCTS by FISHER-PRICE to non-related entities, less the aggregate deduction of 10.50% (which deduction is agreed upon to cover the aggregate of all discounts and allowances of whatever nature

VGR 0142

(1)

CONFIDENTIAL

allowed customers including: cash or trade discounts and allowances, credits for returned, lost or damaged goods, royalties paid to a third party for character or related endorsement, retail advertising allowances, and any other costs to Licensee or deductions allowed to customer). FISHER-PRICE may, commencing on the twenty-fifth month of this Agreement (and thereafter at twelve month intervals), increase the 10.50% deductible percentage but the maximum of any such increases shall be one percentage point per twelve month interval (e.g. 10.50% to 11.50% commencing on the twenty-fifth month).

## 2. GRANT

a. REILING/DEAN assigns to FISHER-PRICE all rights, title and interest in and to the ITEM, including the ASSIGNED PATENT RIGHTS to make, use and sell and to have made, used and sold, PRODUCTS in the TERRITORY.

b. To the extent that REILING/DEAN may acquire any rights to the non-functional design features or ornamental features of any products made and sold by FISHER-PRICE hereunder, then REILING/DEAN will assign all such rights to FISHER-PRICE.

## 3. TERM

This Agreement shall continue until properly terminated by either party under the provisions of this Agreement.

## 4. ROYALTIES

a. REILING/DEAN acknowledges that FISHER-PRICE has heretofore paid REILING/DEAN the non-refundable sum of fifteen thousand dollars ($15,000), as an advance against compensation as set forth below hereinafter referred to as royalties.

b. Upon execution hereof FISHER-PRICE shall pay REILING/DEAN the non-refundable sum of ten thousand dollars ($10,000), as an advance against compensation as set forth.

c. FISHER-PRICE shall pay to REILING/DEAN in connection with all sales of PRODUCTS covered by this Agreement in the TERRITORY a royalty of three percent (3%) of the AVERAGE UNITED STATES NET WHOLESALE PRICE on all PRODUCTS sold by FISHER-PRICE or its subsidiary or affiliate. No royalty shall be paid based on transfers of PRODUCTS between FISHER-PRICE and its subsidiaries or affiliates.

d. Notwithstanding the actual sales of PRODUCTS, FISHER-PRICE shall pay minimum royalty amounts of two thousand five hundred dollars ($2,500) in each of the first five years of this Agreement.

VGR 0143

CONFIDENTIAL

e.    The obligation to pay royalties hereunder shall terminate twenty years from the date of this Agreement.

## 5.    ROYALTY PAYMENTS, RECORDS

a.    The royalties calculated pursuant to paragraph 4 hereof shall be shared equally by Victor G. Reiling Associates and Bryan L. Dean and paid in separate checks to Victor G. Reiling Associates and Bryan L. Dean within thirty (30) days after the last day of each calendar quarter for amounts accruing during that preceding calendar quarter and such payment shall be accompanied by a report setting forth the number and description of PRODUCTS, and the total gross sales revenue for the PRODUCTS.

b.    FISHER-PRICE shall at all times keep accurate accounts and maintain complete records of the quantity of the PRODUCTS, both made and sold by FISHER-PRICE and of the other information necessary to determine the AVERAGE U.S. NET WHOLESALE PRICE of the PRODUCTS and in sufficient detail to enable the amounts payable to REILING/DEAN hereunder to be determined.

Such records of FISHER-PRICE shall be open to inspection on behalf of REILING/DEAN by a Certified Public Accountant selected by REILING/DEAN (the choice of accountant to be subject to FISHER-PRICE's reasonable approval) on reasonable notice, during ordinary business hours, but not more than once in any twelve (12) month period, for the purpose of verifying the records and the accuracy of royalty payments provided for in this Agreement; provided, however, that no such inspection may be made with respect to any calendar quarter ending more than two (2) years prior to the date of the inspection notice. Each inspection shall be at the expense of REILING/DEAN. In the event that examination of the records in FISHER-PRICE's possession is made, certain confidential and proprietary business information of FISHER-PRICE's may necessarily be made available to the Certified Public Accountant making examination on behalf of REILING/DEAN, and the parties hereto agree that such accountant shall make his reports to REILING/DEAN in such manner that the names of customers or other information deemed confidential by FISHER-PRICE shall not be disclosed to REILING/DEAN or any other person, firm or corporation; provided, however, that nothing herein contained shall be construed to prevent such accountant from testifying in any court of competent jurisdiction with respect to the information obtained as the result of such examination in any action instituted to enforce the rights of REILING/DEAN under the terms of this Agreement. In the event that such Certified Public Accountant shall examine the records, documents and materials in the possession of or in the control of FISHER-PRICE with respect to the subject matter hereof, such examination shall be conducted in such manner as not to unduly interfere with the business of FISHER-PRICE.

VGR 0144

CONFIDENTIAL

VGR 0145

CONFIDENTIAL

## 6.   RIGHTS: ENFORCEMENT OF RIGHTS

a.    REILING/DEAN agrees to cooperate with FISHER-PRICE such that FISHER-PRICE may enjoy to the fullest extent the rights conveyed hereunder. Included within the scope of this duty is cooperation in such proceedings involving the United States and foreign applications and patents as opposition, cancellation proceedings, priority contests, public use proceedings, court actions, and the like. Notwithstanding the foregoing or any other provision of this Agreement, FISHER-PRICE shall have no obligation to obtain or enforce intellectual property rights including but not limited to patents, trademarks and copyrights relating to the ITEM.

## 7.   WARRANTIES AND REPRESENTATIONS

a.  REILING/DEAN warrants and represents that:

1.  It has not heretofore nor will in the future make any Agreement with any person inconsistent with the terms and conditions of this Agreement.

2.  It has no knowledge of any infringement of any third-party's rights or any other claim which would interfere with the commercialization of the ITEM.

3.  It owns all rights in and to the ITEM and has the right to assign all rights as set forth herein.

b.    REILING/DEAN acknowledges that FISHER-PRICE has made no representations regarding the size of the market for products embodying the ITEM, their potential end uses, the net dollar value, if any, of this Agreement, or FISHER-PRICE's plans regarding commercial exploitation of products embodying the ITEM.

## 8.   THIRD-PARTY CLAIM INDEMNIFICATION

a.  In the event that any claim is made or any suit is brought by any party with respect to a claim of adverse title or any other claim relating to the right to assign the ITEM, until such claim/suit is resolved to FISHER-PRICE's satisfaction and in REILING/DEAN's favor, all royalty payments due hereunder shall be suspended. Royalty amounts shall accrue to the benefit of REILING/DEAN during the period of suspension. FISHER-PRICE shall have complete control of such claim/suit and may, if in FISHER-PRICE's judgement settlement appears to be advantageous, settle the claim and deduct any amount paid in settlement from the royalties payable hereunder.

b.    FISHER-PRICE agrees to maintain at its sole expense, and throughout the term of this Agreement, a program of insurance to include product liability insurance. FISHER-PRICE agrees to include REILING/DEAN as an additional named insured under FISHER-PRICE's product liability insurance as far as any product covered by this Agreement is concerned. Such

CONFIDENTIAL

becomes effective with a limit of one million dollars ($1,000,000) per occurrence, $5 million aggregate. FISHER-PRICE shall furnish REILING/DEAN a certificate from its product liability insurance carrier naming REILING/DEAN as an additional insured.

## 9.    TERMINATION

a.    This Agreement may be terminated by either party in the event that the other party shall default in the performance of any of its material obligations arising hereunder and shall fail to cure such default within sixty (60) days after receipt of written notice thereof from the other party.

b.    Either party shall have the right to terminate this Agreement if the other makes an assignment for the benefit of creditors; or files a voluntary petition of bankruptcy; or seeks or consents to any reorganization or similar relief; or is adjudicated bankrupt or insolvent; or if a third party commences any bankruptcy, insolvency, reorganization or similar proceeding involving the other party; or if the assets of such other party or a major part thereof are expropriated, nationalized or otherwise made subject to government control. Upon the occurrence of any such event the other party shall have the right to terminate this Agreement effective upon notice at any time within ninety (90) days of such event coming to its knowledge.

c.    Upon the expiration or termination prior to expiration of this Agreement in any manner provided herein, FISHER-PRICE shall have a period of twelve (12) months to dispose of its then existing inventory and work in progress of the PRODUCTS hereunder, subject to all terms and conditions of this Agreement, including but not limited to reporting and the payment of royalties as provided for in Paragraph 6 herein. At REILING/DEAN'S request, FISHER-PRICE shall sell to REILING/DEAN all existing inventory and work in progress at the most favorable "sell-off" price available to FISHER-PRICE'S customers.

## 10.    NO JOINT VENTURE

Nothing herein shall be construed to place the parties in the relationship of partners or joint venturers and neither party shall have the power to obligate or bind the other in any manner.

## 11.    WAIVER

No waiver by either party, whether express or implied, of any provisions of this Agreement, nor any breach nor default of either party, shall constitute a continuing waiver, or a waiver of any other provision or provisions of this Agreement, and no such waiver by either party shall prevent such party from enforcing any or all other provisions of this Agreement or from acting upon the same or any subsequent breach or default of the other party under any provisions of this Agreement.

(5)

## 12. APPLICABLE LAW

This Agreement shall be construed and applied in accordance with the laws of the State of New York, except as to any provisions hereof that are governed by the laws of the United States of America, in which case the latter shall govern.

## 13. ASSIGNMENT

a.    FISHER-PRICE'S obligations and rights under this Agreement cannot be assigned by FISHER-PRICE except to a purchaser of the entire business of FISHER-PRICE which shall agree to be bound by the terms and conditions of this Agreement.

b.    REILING/DEAN's obligations and rights under this Agreement cannot be assigned by REILING/DEAN except to a purchaser of the entire business of REILING/DEAN, provided that:

(i)    such purchaser is not a manufacturer, marketer or licensor of children's toys or amusement devices, and

(ii)    such purchaser agrees to be bound by the terms and conditions of this Agreement.

## 14. INVALIDITY

Invalidity, illegality or unenforceability of any part of this Agreement shall not affect the validity, legality or enforceability of the balance thereof.

## 15. FORCE MAJEURE

In the event an act of the government or war conditions, or fire, flood or labor trouble in the factory of FISHER-PRICE or in the factory of those manufacturing parts necessary for the manufacture of the PRODUCTS prevents the performance by FISHER-PRICE of the provisions of this Agreement, then such non-performance by FISHER-PRICE shall not be considered a breach of this Agreement and such non-performance shall be excused while, but no longer than, the conditions described in this paragraph prevail.

## 16. ENTIRE UNDERSTANDING

This Agreement is the entire understanding between the parties and no change in Agreement or modification shall be effective unless executed in writing.

## 17. NOTICES

Any communication, report or notice required or permitted to be given under this Agreement shall be made in writing and shall be deemed to have been duly and validly given effective upon receipt of same, or if sent by Certified or

(6)

VGR 0147

Registered   Mail,   effective   three   (3)   days   after   mailing,
addressed in each case as follows:

        a.    If to REILING/DEAN, to it at:
                Victor G. Reiling Associates
                P.O. Box 180
                Toy Building at Railroad Square.
                West Cornwall, Connecticut· 06796
                Attention:  Victor G. Reiling/Bryan L. Dean

        b.    If to FISHER-PRICE, to it at:
                Fisher-Price
                Division of The Quaker Oats Company
                636 Girard Avenue
                East Aurora, New York  14052
                Attention:  Charles S. Riter
                            Vice President
                            Research & Development

        IN  WITNESS  WHEREOF  the parties hereto have caused
this  Agreement  to  be  executed effective as of the date of this
Agreement.

VICTOR G. REILING ASSOCIATES    FISHER-PRICE, DIVISION OF
                                THE QUAKER OATS COMPANY

BY: _____   BY: _____

PRINT NAME: VICTOR G. REILING   PRINT NAME: _Charles S. Riter_

TITLE: _PRINCIPAL_         TITLE: _Vice Present, R&D_

DATED: _10/29/87_         DATED: _11/24/87_


BY: _____

PRINT NAME: BRYAN L. DEAN

TITLE: _ASSOCIATE_

DATED: _10/29/87_

                      (7)

CONFIDENTIAL

EXHIBIT A

DESIGNERS:                    Victor G. Reiling Associates

                              Co-Inventor:  Bryan L. Dean

CONCEPT:                      "Slam Jammers" Vehicle Concept

DESCRIPTION:                  Vehicle:    Rotary front disc vehicle with
                              a wall-oriented track system. Four inch
                              long vehicle has two rear wheels and one
                              large horizontal disc in front that
                              extends beyond the car body in the front
                              and on the sides.  Ball shaped metal
                              guide; under horizontal disc supports
                              front end and allows vehicle to turn and
                              go forward.

                              Track:    Series of modular connecting
                              plastic pieces consisting of straight and
                              curved sections.  Pieces connect to form
                              a race track area with side walls. Other
                              features include: recessed paddles that,
                              when activated, direct vehicle to veer
                              away from the wall; curved wedge for
                              altering track layout, U-turn section;

Received Time Mar.10  12:55PM

CONFIDENTIAL   VGR 0149

EXHIBIT B



January 21, 1987

Messrs. V. Reiling and B.L. Dean
Victor G. Reiling Associates
South Street
Litchfield, Connecticut  06759

Dear Messrs. Reiling and Dean:

SUBJECT: Option Agreement on "Slam Jammers" Vehicle Concept

This option agreement will confirm the understanding between you,
V. Reiling Associates, and Fisher-Price relative to the Slam Jammers
concept as more completely described in the attached Exhibit A (here-
inafter "ITEM").

V. Reiling Associates represents that it owns all rights in and to
the ITEM and has the right to grant the option and exclusive license
as set forth herein.

V. Reiling Associates hereby grants to Fisher-Price the exclusive
option to obtain from V. Reiling Associates the exclusive worldwide
right to make, have made, use and sell the ITEM. This option shall
expire on August 31, 1987.

Fisher-Price agrees to pay, as a non-refundable advance against any
future royalties, ten thousand dollars ($10,000) to retain this
option until May 31, 1987. An additional five thousand dollars
($5,000) non-refundable advance against future royalties may be paid
by May 31, 1987 to extend this option until August 31, 1987. If
Fisher-Price decides to exercise this option, Fisher-Price will pay
V. Reiling Associates $10,000 upon execution of the written contract,
as a non-refundable advance against any future royalties.

If Fisher-Price should choose not to exercise the option on or before
the end of the option agreement, we will have no additional
obligation to each other except the above mentioned advances and the
return to you of all prototypes developed by you.

During the option period, V. Reiling Associates agrees not to show
to, or discuss the ITEM with any other prospective Licensee or agent
thereof or any other party unless approved by Fisher-Price.

If Fisher-Price should choose to exercise the option, both parties
agree to negotiate, in good faith, an agreement which shall include,
among others, the following material terms:

...Continued...

VGR 0150

CONFIDENTIAL

Page 2
Letter to V. Reiling Associates
January 21, 1987

1.  <u>Term</u> – Perpetual as long as Fisher-Price actively sells the ITEM
    including a twelve (12) month sell-off period upon termination
    of the License Agreement.

2.  <u>Rights</u> – Exclusive and worldwide to Fisher-Price.

3.  <u>Royalty</u> –  Three percent (3%) of the average United States net
    wholesale price.

If this accurately describes our agreement, please sign and return
the duplicate letter enclosed. Also enclosed is a check for $10,000
as a non-refundable advance against future royalties which belongs to
you upon signing this Option Agreement.

                          Sincerely yours,

                          FISHER-PRICE


                          D. Lawrence Davis
                          Senior Manager
                          Planning & Business Development


DLD/slk
Encs.

BY:

Victor G. Reiling Associates

DATE:  1/23/87


                                        **VGR 0151**

                                     CONFIDENTIAL

## EXHIBIT A

## "SLAM JAMMERS" VEHICLE CONCEPT"

SLAM JAMMERS – Rotary front disc vehicles with a wall-oriented track system; battery operated.   From Victor Reiling, co-inventor: Bryan L. Dean.

VGR 0152

CONFIDENTIAL

EXHIBIT C

1.    Australia
2.    Canada
3.    China
4.    Hong Kong
5.    Belgium
6.    France
7.    Holland
8.    Italy
9.    Japan
10.   Korea
11.   Luxemburg
12.   New Zealand
13.   Spain
14.   Switzerland
15.   Taiwan
16.   United Kingdom
17.   United States
18.   West Germany

VGR 0153

CONFIDENTIAL



June 22, 1988

Mr. Victor G. Reiling
Mr. Bryan L. Dean
Victor G. Reiling Associates
P.O. Box 180
Toy Building at Railroad Square
West Cornwall, Connecticut  06796

Dear Vic and Bryan:

SUBJECT:  Amendment to Final Agreement for "Slam Jammers"

Per the terms of our Amendment dated June 16, 1988 to the Final Agreement
for "Slam Jammers" dated October 29, 1987, enclosed is Fisher-Price check
#058752 in the amount of $50,000 to the order of Victor G. Reiling
Associates and Fisher-Price check #058588 in the amount of $50,000 to the
order of Bryan Dean as a non-refundable advance against compensation.

It has been a pleasure working with you on this project.

Sincerely yours,

FISHER-PRICE

D. Lawrence Davis
Senior Manager
Planning & Business Development

DLD/slk
Encs.

cc:  F. Buckley - Fisher-Price
     K. Dahmer - Fisher-Price
     L. DiFranco - Fisher-Price
     J. Leimer - Quaker Oats
     C.S. Riter - Fisher-Price
     P.D. Snyder - Fisher-Price
     I. Sole - Fisher-Price

VGR 0154

CONFIDENTIAL

VGR 0155

CONFIDENTIAL



June 16, 1988

Mr. Victor G. Reiling
Mr. Bryan L. Dean
Victor G. Reiling Associates
P.O. Box 180
Toy Building at Railroad Square
West Cornwall, Connecticut  06796

Dear Vic and Bryan:

SUBJECT:  Amendment to Final Agreement for "Slam Jammers"

This letter is written confirmation of our agreement to amend the Final Agreement for
"Slam Jammers" signed by you on October 29, 1987.

In consideration of amending Paragraph 4(c) of the October 29, 1987 Agreement,
Fisher-Price agrees to pay Victor G. Reiling Associates and Bryan L. Dean an additional
non-refundable sum of one hundred thousand dollars ($100,000), as an advance against
compensation.

The amended paragraph reads as follows:

    4.c.  FISHER-PRICE shall pay to REILING/DEAN in connection with all sales of
        PRODUCTS covered by this Agreement in the TERRITORY a royalty of two
        and one half percent (2.5%) of the AVERAGE UNITED STATES NET WHOLESALE
        PRICE on all PRODUCTS sold by FISHER-PRICE or its subsidiary or affili-
        ate.  No royalty shall be paid based on transfers of PRODUCTS between
        FISHER-PRICE and its subsidiaries or affiliates.

All other provisions of the Assignment Agreement remain unchanged.

If this accurately describes our agreement, both of you please sign and return the dup-
licate letter enclosed. Once I have received the signed duplicate, I will forward one
check in the amount of $50,000 to Victor G. Reiling Associates and one check in the
amount of $50,000 to Bryan L. Dean at your address in West Cornwall, Connecticut.

As Paul Snyder told you, the product is developing well and we are looking forward to a
successful introduction in our 1989 line.  Thanks.

Sincerely yours,

FISHER-PRICE

D. Lawrence Davis
Senior Manager
Planning & Business Development

ACCEPTED: _____
         Bryan L. Dean

ACCEPTED: _____    ACCEPTED: _____
         Victor G. Reiling                Charles S. Riter

DATE: _____6/20/88_____    DATE: _____6/17/88_____