EXHIBIT J





# EXHIBIT K







EXHIBIT L



# INTERNATIONAL GAMES, INC.

### A Mattel Company

6800 Jericho Turnpike · Suite 202 East · Syosset, NY 11791
Telephone: (516) 682-4100 · Facsimile: (516) 364-3687

Laurie Curran
Vice President
Product Acquistion
& Licensing

June 12, 1996

Mr. Loren T. Taylor
TAYLORED CONCEPTS
822 Topsail Lane
Secaucus, N.J. 07094

Dear Loren:

It gives me great pleasure to enclose the executed agreement for *CLEAN UP YOUR ROOM!* I will call MATTEL today to initiate the check requests for you, Debby and Bruce.

It's been wonderful working with you this year. Your creative concepts certainly reflect the best of the industry you were a vital part of for so long. Wishing you all the best for a real winning game in 1997. In the interim, I look forward to seeing more great concepts from all of you in the future.

Best regards,

Laurie Curran

cc: A. Passas
    N. Van Dam
    J. Filipeli
    W. Santos
    D. Young
    B. Benedetto

## LICENSE AGREEMENT

THIS AGREEMENT is made and entered into as of the 15th day of May, 1996 by and among LOREN T. TAYLOR, 822 Topsail Lane, Seacaucus, New Jersey 07094, an individual, DEBBY YOUNG, 541 E. 20th Street, No. 4F, New York, New York 10010, an individual, and DESIGN INNOVATION, INC., 573 Hopmeadow Street, Simsbury, Connecticut 06070, a Connecticut corporation, collectively d/b/a TAYLORED CONCEPTS (hereinafter referred to as LICENSOR), and MATTEL, INC., a corporation organized and existing under the laws of the State of Delaware, and having its principal office at 333 Continental Boulevard, El Segundo, California 90245-5012 (hereinafter referred to as LICENSEE).

### WITNESSETH:

WHEREAS, LICENSOR is the owner of rights to an item currently being referred to as "CLEAN UP YOUR ROOM" and which is described in Exhibit A (hereinafter referred to as the ITEM); and

WHEREAS, LICENSOR hereby warrants that it is the sole and exclusive owner of the ITEM, that it has the sole and exclusive right to grant the license herein, and that it has granted no other licenses on the aforementioned ITEM; and

WHEREAS, LICENSEE is in the business of manufacturing and selling toys and games; and

WHEREAS, LICENSEE is desirous of obtaining the sole and exclusive rights to manufacture and sell the ITEM in the United States of America and foreign countries.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, receipt of which is hereby acknowledged, it is hereby agreed as follows:

1.    LICENSOR hereby grants to LICENSEE and its affiliates the sole and exclusive right to manufacture, to have manufactured for it, to use and to sell the ITEM worldwide, and in addition, grants LICENSEE the exclusive right to make, use and sell the subject matter of all patents and patent applications whether pending or subsequently filed on the ITEM and to sublicense such rights. In addition, such rights include, but are not limited to, the right to license the ITEM for use on merchandise or in connection with television or radio shows, for similar use in connection with motion picture or stage productions, and for advertising and promotion of any nature.

2.    LICENSOR hereby expressly warrants that it is the sole owner of the ITEM and all rights pertaining thereto, and it will during the life of this Agreement help LICENSEE defend its interest in and to the ITEM by appearing as a witness to any suit at law or in equity brought by LICENSEE or against LICENSEE, in which said lawsuit concerns the ownership or title of the ITEM;

provided, however, that in the event that LICENSEE requests LICENSOR to appear as a witness, as aforesaid, LICENSEE will pay reasonable expenses covering said appearance.

LICENSOR further warrants that it is not engaged in any litigation or conflict of any nature whatsoever involving the ITEM, and LICENSOR agrees that during the life of this Agreement, it will not give any other person, firm, association, or corporation a license or right to manufacture or sell in the licensed territory any item similar to the ITEM. LICENSOR further agrees, upon LICENSEE's request, to execute any and all documents and do all acts necessary to carry out the terms of this Agreement.

3. LICENSOR agrees to use its best efforts and to bear the expense of obtaining patent protection that will adequately protect the ITEM from competition, subject, however, to the provisions of Paragraph 10 hereof relating to foreign patent protection. LICENSEE may assist LICENSOR in the preparation and filing of a patent application in the United States to protect the ITEM, but in such event, the LICENSOR agrees to cooperate and to reimburse LICENSEE for all costs and attorneys' fees associated with the filing. LICENSEE may, at its option, deduct the amount of any such fees and costs from any royalty payments due to LICENSOR. Any patent filed in LICENSEE's name or jointly with LICENSOR and LICENSEE shall be at LICENSEE's expense.

4. LICENSEE shall pay LICENSOR a royalty at the rate of Five Percent (5%) of the "Net Wholesale Selling Price" on all sales of the ITEM by LICENSEE and its subsidiaries or affiliates. As used herein, "Net Wholesale Selling Price" is defined as the gross wholesale selling price on all sales of the ITEM after deductions for freight allowances, taxes, commissions, returns which are accepted and credited by LICENSEE and customary trade discounts. The dollar amount of royalty per ITEM paid to LICENSOR from sales of the ITEM to customers affiliated with LICENSEE shall be the same sum as paid on sales of the ITEM to unaffiliated customers regardless of the actual Net Wholesale Selling Price to such affiliated customer. No royalties shall be paid on "close-out" sales defined as any sale at a net selling price of less than Seventy-five Percent (75%) of LICENSEE's usual price to its customers, and made in contemplation of ceasing sales of the ITEM.

5. LICENSEE agrees to pay LICENSOR the sum of Thirty Thousand Dollars ($30,000), such sum being an advance against royalty payments under Paragraph 4, which advance is due upon execution of this Agreement. Said advance shall be paid in equal shares to Loren T. Taylor, Debby Young and Design Innovations, Inc., at their respective addresses specified above.

6. (a) LICENSOR warrants that all development of the ITEM is of United States origin.

(b) The value of the prototype of the ITEM presented to LICENSEE by LICENSOR hereunder is Fifteen Hundred Dollars ($1500).

7. If the ITEM is not offered to the trade at or before the New York Toy Fair in February, 1997, this agreement shall thereupon terminate and the prototype shall be returned to the LICENSOR; subject, however, to the provisions of Paragraph 19 hereof relating to occurrences beyond LICENSEE'S control.

l:\wandam\cleanup\lic1.doc

2

LICENSOR acknowledges that LICENSEE has made no warranty or representation regarding the size of the market for the ITEM or the royalties or other revenues that will be paid to LICENSOR pursuant to this Agreement. LICENSEE shall have no duty to manufacture and/or sell the ITEM or to otherwise exploit the ITEM and in no event shall LICENSEE be liable to LICENSOR for indirect, punitive, special, incidental or consequential damages, including lost profits.

8. LICENSEE has the right to change the form of the ITEM and to produce and sell it under the new form, provided, however, that all the provisions of this Agreement shall apply to said new form of the ITEM.

9. LICENSEE will, in its discretion, apply to the ITEM any trademarks that it selects and appropriate patent notices and/or copyright notices. All such intellectual property shall be owned by LICENSEE apart from the intellectual property owned by LICENSOR and licensed hereunder.

10. If LICENSEE considers it necessary or desirable to obtain patent protection for the ITEM in a foreign country, it shall notify LICENSOR of that decision. If obtaining the foreign patent protection is not barred by prior use or publication, LICENSEE may file such foreign application. LICENSOR shall be responsible for one-half (1/2) of the cost of obtaining foreign patent protection, including, without limitation, all attorneys' fees and filing costs, upon presentation to LICENSOR of LICENSEE's invoices for such costs; provided, however, that LICENSEE shall recover LICENSOR's share of said expenses as a deduction from international royalties falling due LICENSOR on the ITEM, but only from the royalties due for the specific country in which such expenses are incurred.

11. (a) LICENSEE may grant sublicenses on the ITEM in the territory licensed hereunder upon any terms and conditions which it wishes to grant and establish; provided, however, that in the event that LICENSEE does so grant sublicenses on the ITEM, LICENSEE shall pay to LICENSOR Fifty Percent (50%) of all royalties received by it from any such sublicense or grant, net of any third party royalty obligations or One and One-half Percent (1.5%) of the sublicensee's net sales, whichever is less.

(b) In the event that LICENSEE sublicenses its rights hereunder for entertainment or for the sale of third party merchandise, which shall be defined as goods other than goods actually sold or offered for sale by LICENSEE, LICENSEE shall pay LICENSOR Twenty Five Percent (25%) of the net royalty income received by LICENSEE net of third party royalty obligations for said sales or use by its sublicensees.

12. Each party agrees to keep the other fully advised and informed of the progress of any patent applications, and to provide copies of said applications and office actions and amendments thereto as soon as such are available.

13. (a) LICENSOR agrees to indemnify LICENSEE against any and all loss and expense arising out of any claims, demands, actions, suits or prosecutions that may be instituted

against LICENSEE by reason of any claim by any other person, firm or corporation of either (1) a superior right in and to said ITEM or any feature thereof, or (2) any patent infringement arising out of the distribution and sale of said ITEM by LICENSEE based on the design submitted by LICENSOR. It is agreed, however, that the maximum amount due from LICENSOR under this Paragraph shall not exceed Fifty Percent (50%) of the amounts paid to LICENSOR under Paragraphs 4 and 5 above. Moreover, after notice has been received by LICENSEE alleging patent infringement, LICENSEE shall be entitled to escrow all royalties accrued thereafter until a total of Fifty Percent (50%) of the royalties paid under this Agreement to date have been accrued and, thereafter, Fifty Percent (50%) of all royalties accrued thereafter shall be escrowed, to be used to defray costs incurred and damages assessed until such time that the infringement charge is settled or otherwise disposed of. Any excess in such escrow account shall be paid to LICENSOR; provided, however, that if such a claim of infringement shall be proven valid, all of LICENSEE's obligations hereunder, including the obligation to pay further royalties, shall terminate forthwith. Pursuant to its warranty of ownership of the ITEM, LICENSOR agrees to indemnify and hold harmless LICENSEE, without limitation, from and against any claim of infringement of trade secrets or the like, arising out of LICENSEE's sale of the ITEM, to the extent that such claim is attributable to LICENSOR's actions. Such indemnity shall be in addition to any other remedy available to LICENSEE.

(b)    LICENSEE agrees to indemnify and save harmless LICENSOR as to all damages, costs and attorneys' fees resulting from all claims for injury or property damage based on the use of the ITEM as produced and sold by LICENSEE, its subsidiaries, affiliates and sublicensees, except to the extent that the loss, damage or injury resulted from an inherent feature of the ITEM as designed by LICENSOR and presented to the LICENSEE.

14.    In the event of infringement of any patent that may be issued on the ITEM and upon notice thereof from LICENSEE, LICENSOR shall, within twenty (20) days, notify LICENSEE of its election to prosecute or not to prosecute a suit for infringement. If LICENSOR prosecutes said suit, it may select legal counsel and shall pay all the legal fees and costs of prosecution, subject to being reimbursed therefor from any recovery in said suit. The balance of any recovery shall be divided equally between LICENSOR and LICENSEE. If LICENSOR elects not to prosecute any infringement suit, LICENSEE may do so after notice to LICENSOR of that intention. LICENSEE may select legal counsel and shall bear all the legal fees and costs subject to reimbursement therefor from any recovery in said suit. The balance of any recovery shall be divided equally between LICENSOR and LICENSEE.

15.    LICENSEE shall, within forty-five (45) days following the end of each calendar quarter, starting with the quarter in which sales of the ITEM commence, submit to LICENSOR a report covering the sales of the ITEM during the preceding quarter, and LICENSEE shall therewith transmit to LICENSOR payment of the amount due under Paragraph 4 hereof less any applicable withholding taxes. Notwithstanding the foregoing, all royalties payable from foreign sales of the ITEM shall be due to LICENSOR within forty-five (45) days following the end of the calendar quarter in which such royalty payments are received by LICENSEE.

All royalty payments made hereunder shall be paid in equal shares to Loren T. Taylor, Debby Young and Design Innovation, Inc., at their respective addresses specified above.

16.     LICENSEE agrees to keep for a minimum of two (2) years, full and accurate books of account, records, data and memoranda respecting the manufacture and sales of the ITEM in sufficient detail to enable the payments hereunder to LICENSOR to be determined, and LICENSEE further gives LICENSOR the right, at its own expense, to examine said books and records on prior written notice of at least ten (10) days, insofar as they concern the ITEM and not more often than once in any calendar year, for the purpose of verifying the reports provided for in this Agreement.  In the event that LICENSOR examines the records, documents and materials in the possession or under the control of LICENSEE with respect to the subject matter, such examination shall be conducted by an independent auditor selected by LICENSOR and approved by LICENSEE, such examination shall be conducted in such manner as to not unduly interfere with the business of LICENSEE.  LICENSOR's representatives shall not disclose to any other person, firm or corporation any information acquired as a result of any such examination; provided, however, that nothing herein contained shall be construed to prevent LICENSOR and/or its duly authorized representatives from testifying in any court of competent jurisdiction with respect to the information obtained as a result of such examination, in any action instituted to enforce the rights of LICENSOR under the terms of the Agreement.

17.     If LICENSEE shall at any time default by failing to make any payment hereunder, or by failing to make any report required under this Agreement, or by making an intentionally false report and LICENSEE shall fail to remedy such default within sixty (60) days after notice thereof by LICENSOR, then LICENSOR may, at its option, terminate this Agreement and the license granted herein by notice to that effect, but such act shall not relieve LICENSEE of its liabilities accruing up to the time of termination.

18.     If, outside the United States, LICENSEE has not introduced the ITEM or if any sublicensee has not introduced the ITEM within one (1) year following the introduction of the ITEM in the United States, LICENSOR may give LICENSEE written notice and, if LICENSEE does not commence marketing the ITEM or if any sublicensee does not commence marketing the ITEM within one hundred twenty (120) days of the LICENSEE's receipt of the LICENSOR'S notice, the rights granted to LICENSEE for such country will automatically terminate at the end of said period and revert to LICENSOR.  It is understood and agreed that if LICENSEE ceases the manufacture and sale of the ITEM for a period of one (1) year, except as provided in Paragraph 19 hereof, either party may give notice to the other of its desire to terminate this Agreement.  If LICENSOR gives notice pursuant to this clause and if LICENSEE does not within sixty (60) days resume the manufacture and sale of the ITEM, this Agreement and the license granted herein shall terminate as of the end of that sixty (60) day period.

19.     It is understood and agreed that in the event an act of government, war, fire, flood, an Act of God or labor trouble in the factory of LICENSEE, or in the factory of those manufacturing parts necessary for the manufacture of the ITEM, prevents the performance by LICENSEE of the provisions of this Agreement, then such nonperformance by LICENSEE shall not be considered a breach of this Agreement and such nonperformance shall be excused while, but no longer than, the conditions described herein prevail.

20.    This Agreement shall continue for the life of the patent or patents that may be granted on the ITEM. In the absence of such a patent, this Agreement shall continue for a period of fifteen (15) years from the date hereof, unless sooner terminated under the provisions of this Agreement. At the expiration of such patent(s) or fifteen (15) year period, LICENSEE shall be deemed to have a non-exclusive, irrevocable, and fully-paid license under all rights comprehended by this Agreement and no further payment shall be due LICENSOR.

21.    LICENSEE agrees that if this Agreement is terminated under any of its provisions, all rights to the ITEM and to any patent applications filed hereunder shall revert to LICENSOR. Patent rights to improvements to the ITEM made by LICENSEE shall, notwithstanding termination, be and remain the sole property of LICENSOR.

22.    Upon termination of this Agreement, LICENSEE shall have the right to dispose of its existing inventory, whether completed or in the process of manufacture, for a period of six (6) months after termination, and may do so at prices less than its normal wholesale price as a "close-out" price, as set forth in paragraph 4 above. LICENSEE's sublicensees shall have the right as well. Royalty payments shall continue, unless such sales are on a "close-out" basis.

23.    (a)    LICENSEE may assign the rights granted by LICENSOR hereunder with LICENSOR's prior written consent.

(b)    In addition, LICENSOR agrees that LICENSEE may assign this Agreement to any subsidiary or affiliate corporation; provided, however, that such assignee shall thereafter be bound by the provisions of this Agreement.

(c)    In addition, LICENSEE shall have the right to assign this license in the event of the transfer of substantially all of the assets or business of LICENSEE, a merger or consolidation.

(d)    No assignment pursuant to this paragraph shall create any additional advance or guaranteed royalty.

24.    Trademarks, trade names, slogans, designs, copyrights and methods (except as expressly protected by LICENSOR's patent rights) used in connection with the manufacture, sale or advertisement of the ITEM, shall, notwithstanding termination, be and remain the sole property of LICENSEE.

25.    All notices wherever required in this Agreement shall be in writing and sent by facsimile, certified mail or overnight delivery and shall be deemed given when sent or mailed.

26.    If any provisions of this Agreement are for any reason declared to be invalid, the validity of the remaining provisions shall not be affected thereby.

27.    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns.

28.     This Agreement and each and every one of its provisions shall be interpreted under the laws of the State of California.

29.     This Agreement represents and expresses the entire agreement of the parties and supersedes all prior agreements, representations and understandings (written or oral) between the parties concerning the subject matter hereof. An amendment or modification of a term or condition of this Agreement must be in writing and duly executed by both parties.

30.     LICENSOR agrees to consider the financial terms of the Agreement as confidential and not to divulge the business terms and conditions of the Agreement without the prior written consent of LICENSEE.

[Signature block on next page]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

TAYLORED CONCEPTS

By: _____
Loren T. Taylor

SS#: 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

By: _____
Debby Young

SS#: 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

Design Innovations, Inc.

By: Bruce Benedetto
Title: Vice President

Fed. Tax ID# 06-1226521

MATTEL, INC.

By: _____
Title: Vice President

# EXHIBIT A

## See the attached.

# EXHIBIT M

# EXHIBIT N

FAX to
PAUL SNYDER
5/12/94



March 21, 1986

Mr. Victor G. Reiling
Victor G. Reiling Associates
South Street
Litchfield, CT 06759

Dear Vic:

Sorry to report our findings on your First Bike. The look of the product is excellent, but tipping is a real problem with 2 & 3 year olds. As I mentioned to Dan, you should probably buy a small, regular bike and test both in a day care center. We have a regular bike here with training wheels, and 2 1/2 year olds are able to ride that with no problem. Dan suggested he may be able to improve the tipability. If you can, and confirm it to me via a video tape, I'd be happy to retest the product here.

My best,

FISHER-PRICE

Peter D. Pook
Manager, Product Design

PDP/d

cc: F. Buckley
    D. Ferrara
    L. Nagode
    P. Snyder

VGR 0171



**Ferrara Design Inc**

Looking Glass Hill
Easton CT 06758
203-587-4188



Daniel R. Ferrara Jr.

6/6/96 94

Mr. Paul Snyder
VP Inventor Relations , R&D
Fisher Price Toys
636 Girard Ave
East Aurora , N. Y. 14052

In February 1986 , VGR and DAF presented to FP a major pre school
riding toy concept . The key uniqueness and value of this concept
was the ability y to quickly convert a tricycle to a bicycle by moving
two wheels from the tricycle position , towards the center axis of the
bike frame , to the bicycle position . We called it " First Bike " .

As is obvious from the fully operational sample we provided , this
was a serious project and was a result of months of development , it
was well thought out , stylish , ergonometrically correct and very
salable .
The FP version is ergonometrically identical .

The prototype was presented to FP 's Peter Pook , at a pre
scheduled meeting in FP 's New York show room , on February 3 ,
1986 . Both of us were in attendance at this presentation .

We both explicitly recall that Peter's reaction was " I definitely want it
and do not show it to anyone else " We complied with his request
discussed further development options , e.g. a wider rear wheel
displacement fabrication methods , colors , graphics , general
aesthetic considerations , chain drive , etc.

At this meeting Peter instructed us to send the working sample to his
office , which we did ; and we spoke about terms of licensing and the
need to prepare a contract as per our discussions . Peter was to start
progress on both a contract and some preliminary child testing to
ascertain specific dimensional data re ; ergonomics , stability ,

VGR 0172



**Ferrara Design Inc**



conversion and fabrication . Mr. Pook clearly indicated that this was "
a done deal " and we would work out the details re; product
refinements in the next few weeks . Our terms were , $ 30,000
against royalties of 5% .

Peter sent his letter of March 17 , 1986 stating a stability problem in
the bicycle position , we found this statement puzzling due to the fact
that our bike had an overall four positions to allow a gradual increase
in skill level . We complied with this request by supplying Peter with
a set of additional " training wheels " and an accompanying video
showing their use . This video is the second segment on the video
enclosed .

After some time , probably a couple of months , Peter , in a telecon
said that FP was purchasing a company that had a riding toy and they
were going to pursue that direction . To say the least we were
perplexed and frustrated by these actions , first the request for more
stability in the bicycle mode and then no comment for a couple of
months and finally this vague reason and indefinite rejection . We
realize that at times business priorities follow strange paths and we
being busy with other projects temporarily shelved the concept .

You can imagine that after seeing our exact design concept on the
market , offered by FP , we were amazed ! This must be a result of in
house mis-communication or other internal snafus by FP . The fact
is that our product concept is being sold without our consent or
remuneration .

VGR 0173



**Ferrara Design Inc**

We would like to , resolve this issue " in a fair manner " as stated in your disclosure form . - Our terms remain as originally discussed at our first meeting on February 3 , 1986 . We as inventors hold FP in great respect as an honorable and forthright corporation and look forward to a speedy , amicable conclusion to this situation .

Best Regards

Daniel Ferrara
Victor Reiling



Enclosures :

1) video tape , two parts
2) comparative photographs ( 8 )
3) diagram of poss. wheel positions

VGR 0174

6/29/94

Daniel R. Ferrara Jr.



③

**Ferrara Design Inc**

Looking Glass Hill
Bantam CT 06750
203-567-4113

Mr Paul Snyder                                                6/28/94
Director of Inventor Relations
Fisher-Price Toys Inc

Dear Paul ,

We would like to thank you for the careful attention that you and your
associates at Fisher-Price have given to our problem . We feel that Fisher-Price
is the most honorable of all the toy companies and are relying on this fact in
equitably resolving our present situation .

As we discussed , inventing is our livelihood , and both inventor and
manufacturer have a responsibility to each other . We developed our concept
for presentation to Fisher-Price and received very favorable remarks of
acceptance from your representative . We maintain that it is the responsibility
of the manufacturer to keep records of submitted products and to refer to
them when embarking on a new development program . Just because FP
"forgot" does not seem a fair mediation of the situation . Please put yourself in
our shoes ! How would you feel ?

Another point to remember is that successes in our field are few and far
between and we need to carefully value successful products in order to be
financially viable and maintain our business .

We do realize that payment of a large sum of money that was not planned for
is a bitter pill to swallow for anyone , but it has also been the same for us .

Being stubborn is not in our character . We would like to say that we will be
" reasonably " flexible in our demands and are relying on Fisher- Price's
corporate integrity to take responsibility and offer us a fair settlement .

We are making a sincere request to be treated fairly and are placing ourselves
in your hands and what is at stake is integrity , which in our experience Fisher-
Price regards as most important . So we reiterate , what would you be satisfied
with if you were in our place ? What is fair ? We recall in our first telecon that
you said , " Don't worry , we will do what is right ! "

Thank you again and we look forward to your response .

Best regards ,
DF & VR

VGR 0175



**Fisher-Price**



July 1, 1994

Dan Ferrara
Ferrara Design, Inc.
Looking Glass Hill
Bantam, CT  06750

Victor Reiling
197 Sharon Road
Lakeville, CT  06039

Dear Dan and Vic:

I received your June 28, 1994 letter and just wanted to let you know that I will get back to you with a response to your letter by July 15. I am on vacation next week and can only begin addressing this situation a couple of days into the week of July 11.

Have a safe and restful 4th of July.

My best regards,

Paul

Paul D. Snyder
Vice President, R&D Services and
Inventor Relations

PDS/cje

cc: M. Casey
    T. Mason





July 14, 1994

Mr. Dan Ferrara
Ferrara Design, Inc.
Looking Glass Hill
Bantam, Connecticut 06750

Mr. Victor Reiling
The Toy Studio
197 Sharon Road
Lakeville, Connecticut 06039

Dear Dan and Vic:

We have again reviewed the situation regarding your claims concerning the Fisher-Price Mountain Bike.

As we previously informed you, this product was independently developed by Fisher-Price in-house, in direct response to the marketplace and Playskool's 1-2-3 Bike. The concept which you had submitted many years before our independent development was not, as we informed you at the time, feasible for many reasons and resulted in its return to you. Accordingly, we must maintain our position that Fisher-Price has no obligation to Ferrara Design concerning the Fisher-Price Mountain Bike.

However, in recognition of our long-standing and mutually beneficial relationship, and with the hope of maintaining and building upon that relationship, we would like to offer you the choice of the two following options. This is a one-time offer and is made solely with the intent of maintaining our good relationship and doing future business together, and is not in any way, an admission of liability.

We would like to offer either:

1.  A one-time lump sum payment of $200,000., or

2.  A royalty of 3/4 of one percent on the sale of all Fisher-Price Mountain Bikes.

VGR 0177

Fisher-Price, Inc. 636 Girard Ave. East Aurora, New York 14052 (716) 687-3000

⑤

Mr. Dan Ferrara
Mr. Victor Reiling
July 14, 1994
Page 2

If you choose to accept one of these offers, please sign below and return the enclosed copy to me by July 29, 1994.

Sincerely,

Paul D. Snyder
Vice President, R&D Services

We hereby agree to release Fisher-Price from any and all claims for royalties with regard to the Fisher-Price Mountain Bike in exchange for Option ⑩ & set forth above.

FERRARA DESIGN, INC.

By: _____
Dan Ferrara

Date: 7/15/94

THE TOY STUDIO

By: _____
Victor Reiling

Date: 7/15/94

VGR 0178



July 15 ,1994

Dear Paul ,

We would like to express our gratitude for your offer , and would like to accept Option One . Enclosed is an original duly executed , agreement

Would you please make the checks out as follows and send to our corresponding addresses .

1) Ferrara Design , Inc. -  $ 100,000.00

2) Victor G Reiling  -  $ 100,000.00

Thanks again and I will be speaking to you soon .

Best Regards ,

Dan Ferrara



July 27, 1994


Mr. Victor Reiling                                          <u>VIA OVERNIGHT MAIL</u>
The Toy Studio
197 Sharon Road
Lakeville, Connecticut 06039


Dear Vic:

      Enclosed please find check number 6994 made payable to Victor Reiling Associates in the amount of $100,000.00.   This payment, along with a similar payment to Ferrara Design, Inc., represents payment in full as referenced in the acceptance letter, dated July 14, 1994 and executed July 15, 1994, by you and Dan Ferrara.

      If you have any questions, please call me at 716-687-3940.

                 Sincerely,

                 Mary B. Casey
                 Senior Legal Counsel

/iaw

cc:    Dan Ferrara

# VICTOR G. REILING ASSOCIATES

## THE TOY STUDIO

### 197 SHARON RD - P.O. BOX 1600

### LAKEVILLE, CONNECTICUT 06039

### (203) 435-8932 - FAX (203) 435-8934

FISHER PRICE TOYS
Attention PAUL SNYDER
VICE PRESIDENT, INVENTOR RELATIONS
636 Girard Avenue
East Aurora, NY
14052

Dear Paul,

The following is addressed to FISHER PRICE TOYS:

I am in receipt of your check for $100,000 that is full and final settlement
for my claim to rights and interest in your MOUNTAIN BIKE.

By accepting this check, I acknowledge that you own my full right, title and
interest in and to my submission. Additionally, no further claims for royalty
payments will be made for this item.

I understand that the sum agreed was based on royalty projections as evidenced
by the royalty option.

Please insure that the amount is entered under "ROYALTIES" on the 1994 form 1099.

Sincerely,

Victor G. Reiling

August 9, 1994

VGR 0181

# EXHIBIT O

# FISHER-PRICE CONCEPT SUBMISSION FORM

FISHER-PRICE REVIEWS THOUSANDS OF CONCEPTS EACH YEAR. MANY ARE SIMILAR. PLEASE HELP US TO DISTINGUISH YOUR CONCEPTS BY FULLY DESCRIBING EACH AND INDICATING ITS UNIQUE FEATURES. THANK YOU.

PAGE ____ OF ____

**FOR INVENTOR'S USE:**

**DESCRIPTION AND UNIQUE FEATURES/TECHNOLOGY**
The description of the submitted idea and/or technology incorporated must be carefully defined in the description/unique failure(s) area below.

**FOR FISHER-PRICE USE:**

| PRIOR SUBMISSION* | CONCEPT NAME | | STATUS | CATEGORY | COMMENTS | LOG |
|---|---|---|---|---|---|---|
| NO | FEEZL ACTION | Baff od Plum steads winds for small feeds use kids + dedicated to kids and | ☒ SUBMIT | | | |
| | | advendicable knives/separate can be exchanged to manual to practical teeth * | ☐ SUBMIT | | | |
| YES | TUMBLE WOODS | Teizaly of life used action - of tames or vehicles | ☒ SUBMIT | | send in only actioon oppurtunity opprl | |
| NO | PIZZLE PLAY | Pizzad sections have knives attached perhaps please help in stries | ☐ SUBMIT | | | |
| YES? NO | FEEL TIME | Gess activity - piece mini F-shirts | ☐ SUBMIT | | | |
| YES? | MAGIC MOTION ROCKIN SPIN - | R/c PoushoppinG cart/Stroller Rock 'N Spin | ☒ SUBMIT | | | |
| | | * HANED pRized computers top switches grabbed led esoned and widgle | ☐ SUBMIT | | | |
| | | | ☐ SUBMIT | | | |

*If prior submission, list date.

FOR: _____
Company Name

Address

City, State, Zip

FP-0172 (12/97) AIP

Signature
Print Name
Date _____ Phone _____ Fax _____

ORIGINAL - Fisher-Price    2nd COPY - Submitter

FOR: Fisher-Price, Inc.
636 Girard Ave.
East Aurora, NY 14052

Signature
Print Name PAUL D. SNYDERS VP REP SERVICES
Title
Date 10/29/98

To: ____-Price, ____/___ ____ Corp/or, Production, East Aurora