UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| VICTOR G. REILING ASSOCIATES and DESIGN INNOVATION, INC., <br><br> Plaintiffs, <br><br> – against – <br><br> FISHER-PRICE, INC., <br><br> Defendant. | Index No.: 3:03 CV 222 (JBA) <br><br><br> May 23, 2005 |

## DECLARATION OF JAMES M. KIPLING

I, JAMES M. KIPLING, pursuant to the requirements of 28 U.S.C. §1746, declare that the following is true and correct:

## QUALIFICATIONS

1.     I have been retained by Plaintiffs to be an expert witness in this case. I am familiar with the facts set forth herein and I make this declaration upon personal knowledge. I submit this declaration in support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment.

2.     I am an expert in toy industry custom and practice as it relates to the process by which toy and game concepts are created, developed and marketed, as well as the various intellectual property law protections for such concepts and products. A true and correct copy of my Expert Report, Supplemental Expert Report and Second Supplement to Expert Report in this matter are attached hereto at Exhibit A.

3.     I am an attorney licensed to practice in the State of Ohio and before the United States Patent and Trademark Office. I have been a practicing attorney for more than 35 years, the bulk of which time I spent as in-house counsel for several major toy companies. Between 1968 and 1974, I was employed by the General Electric Company and worked in the Company's Patent Law Department in its Alexandria, Virginia and Cincinnati, Ohio offices. In 1974, I became House Counsel with the Kenner Toy Company, then a subsidiary of General Mills, Inc. In 1980, I became Vice President Law with the Kenner Products Division of CPG Products Corporation, and later with Kenner-Parker Toys, Inc. From 1987 through 1990, the latter entity was a subsidiary of Tonka Corporation. In 1991, Tonka was acquired by Hasbro, Inc. and I was Vice President and Managing Attorney with Hasbro until 2001. Thereafter, I joined the law firm of Frost Brown Todd LLC as Of Counsel to the Intellectual Property Law Department based in Cincinnati, Ohio.

4.     The toy industry has been the principal focus of my practice since 1974. Among my responsibilities during and throughout my career since 1974 has been negotiation of license and other agreements involving new toy concepts and various other properties for toy and game products, and I have participated in several hundred such negotiations. My experience includes the licensing of inventions, technologies, brands, sports stars, entertainment properties, and celebrity rights for use in the creation and development of toy products. Products which have resulted from negotiations that I have personally handled have sold in excess of $2 billion dollars at wholesale prices.

5.     I have negotiated hundreds of license agreements on behalf of toy companies, toy designers and inventors in connection with intellectual property rights in toy products. In

2

negotiating these agreements, I have come to understand the compensation that is typically paid in connection with the licensing of new toy concepts and other properties applicable to the toy and game industry.

6.    Since joining my current law firm, I have been active in industry events and associations including those of the International Licensing Industry Merchandisers' Association ("LIMA"), and the Toy Industry Association ("TIA"), and have participated in seminars and programs conducted by these associations. I have written articles and given presentations on matters involving intellectual property and licensing to and on behalf of such professional groups. I have also been a panelist and moderator at various TIA and LIMA seminars and presentations on toy product development and licensing principles.

7.    As the result of my practice and these professional activities, I have become familiar with the practice of licensing new toy and game concepts and properties in the toy industry, as well as the valuation thereof and compensation typically paid to designers and inventors by toy companies. The purpose of this declaration is to refute the assertions raised by Fisher-Price's legal counsel, its fact witnesses and its toy industry expert, Howard Bollinger, a former colleague of mine for many years. In rendering the opinions expressed herein, I rely upon my knowledge and experience in the toy and game industry and, in particular, in connection with the inventorship, disclosure and licensing of new toy products by outside inventors to toy and game manufacturers.

3

## CONCEPT SUBMISSIONS FROM OUTSIDE TOY INVENTORS

8.    As Mr. Bollinger recognizes (Bollinger S.J. Dec. ¶ 4), the toy industry has relied for many years on outside inventors and designers for new ideas and concepts which they acquire and develop into finished toy products  The use of such outside resources is a normal practice for the majority of toy companies because such inventors provide a diversity and flow of new ideas without the overhead burden associated with employing a similar number of inventors and designers.

9.    Historically, toy inventing developed as a "cottage industry" of individuals or small groups, though there are a number of sophisticated toy design firms now in existence.  Toy manufacturers routinely seek out and/or accept the submissions of talented inventors, both from small groups as well as from the larger design firms.

10.    Toy concepts are usually disclosed by outside inventors to toy manufacturers in the form of "kit-bash" models that may use pieces of existing toy and non-toy products assembled by the inventor and used to demonstrate the structure and/or function of a proposed toy concept  Embellishments and potential variations or line extensions to the basic concepts are often communicated in accompanying renderings and/or written descriptions.  The inventor sometimes describes additional elements, capabilities and enhancements in these forms or orally during concept presentation meetings with company representatives.  The submission of "concepts" as distinguished from "finished products" is typical of both individual inventors and the more sophisticated design firms.

11    It is fully understood and widely accepted in the toy industry that manufacturers expect to acquire new toy properties from inventors in "concept" form and to expend substantial

4

company resources in refining, embellishing and expanding those concepts into "finished" licensed products and product lines.  In addition to the normal "finishing" changes and refinements to the inventor's original concept, in the event that an inventor's concept is to be incorporated into an existing branded product line (for example, "Barbie", "Nerf" or "Rescue Heroes"), additional adaptations may be made by the manufacturer to insure that the thematic and aesthetic "consistency" of the respective branded line is maintained.  Moreover, the packaging and advertising plans of the toy manufacturer can influence the final execution of the licensed product line as well.

12.    As noted above, I have personally negotiated hundreds of toy license agreements on behalf of my various clients including Kenner, Tonka, Hasbro and a number of inventors as well.  The majority of these license agreements resulted from the submission of partially developed toy concepts or ideas which the toy manufacturer ultimately refines, engineers and manufactures.  I do not recall the occurrence of any manufacturer's marketing a product in the form submitted by an outside inventor. The custom and practice for the 30 odd years of my participation in the industry has been to compensate inventors and designers for the underlying concept in its various product line manifestations regardless of revisions, enhancements and changes made by the toy company subsequent to submission.

## THE NATURE OF INDEPENDENT TOY INVENTORS

13.    As in-house counsel at several toy companies, I had occasion to interact with many outside inventors   In my current practice, I represent a number of independent toy inventors and designers, some highly successful and others less so.  Without exception, these individuals and entities are extremely cautious to avoid creating any impediments in their access

to and relationships with toy manufacturers. Despite my prodding, they seemingly will sign any paper put in front of them in order to gain and maintain this access. Particularly at the point of making concept presentations to the executives of toy companies, in my experience, independent toy inventors and designers are loathe to raise any issue that might cause the toy executives to reverse a favorable result. The "Holy Grail" of favorable results is to have the executives express a desire to have the submission taken into the toy company for further efforts toward developing marketable executions of the concept after a presentation has been concluded.

14      In my experience, toy designers and inventors are primarily visual communicators, and have a preference for intuitive, non-verbal expression. Written documents, if unavoidable, are disposed of as quickly as possible, and legal terminology and interpretations seem to be a source of discomfort if not physical pain.

### FISHER-PRICE'S "POLICY AND AGREEMENT" IS NOT INDUSTRY STANDARD

15      In representing certain toy and game companies and in representing inventors who make concept submissions to such companies, I have become familiar with the manner in which toy companies use forms of agreement and concept submission forms to document the parties' rights as well as to record the concepts submitted. In paragraph 5 of his declaration, Mr. Bollinger correctly asserts that toy companies typically require outside inventors to sign a document that defines and clarifies each party's rights either prior to or co-existent with a concept submission. However, the remainder of Mr. Bollinger's assertions in paragraph 5 are either false or are a vast oversimplification, as follows:

(a)      Not all toy companies require outside inventors to enter into a "formal" agreement prior to submitting a concept. In fact, some toy companies do not require a formal

6

agreement at all  Instead, they simply incorporate certain terms on a concept submission form on which the inventor describes the concept submission, without having had the inventor enter into any prior agreement, "blanket" or otherwise.

       (b)     Even when toy companies require an outside inventor to execute a formal agreement, the type and substance of these agreements differ markedly from company to company.  For example, Fisher-Price, through its "Policy and Agreement Concerning Ideas Submitted by Outside Persons of Fisher-Price, Inc.," denies the existence of a confidential relationship between the company and the outside inventor (because it perceives that such language affords it certain legal advantages if a litigation were to ensue, a fact the typical non-attorney toy inventor would never understand at the time of execution).  In sharp contrast, the inventor submission agreements currently used by Hasbro (and its affiliates Milton Bradley, Parker Brothers, Tiger Electronics, etc.), agreements which I drafted and helped put into practice, are titled "Agreement to Hold Confidential." (See Declaration of Victor Reiling, Exh. G).  These agreements establish the existence of a confidential relationship between the outside inventor and Hasbro  Older Hasbro agreements contained language closer to Fisher-Price's Policy and Agreement.  I convinced Hasbro to change its contractual language because I was concerned that such one-sided, restrictive language would someday be struck down by a court because it would be ruled as violative of public policy.

     As a further example of the lack of the consistency in the toy industry regarding the language contained submission agreements argued by Mr. Bollinger, one of my inventor-clients has submitted toy concepts to ten different toy companies over the past two and one-half years, including three of the four largest toy companies.  Mattel, Inc., Fisher-Price's parent company,

7

was the only one of the ten companies that required my client to enter into a restrictive agreement, akin to Fisher-Price's Policy and Agreement, containing such terms as a waiver of liability and rejection of confidential relationship, etc. No other toy company's agreements had terms that were nearly as one-sided and restrictive as Mattel's or Fisher-Price's, and none of the others requires the submitter to waive all rights of confidentiality, as Fisher-Price's purports to do

Thus, Mr. Bollinger is simply wrong when he states that "[a]ny experienced inventor . . . would be familiar with the fact that many toy companies, especially the larger ones, accept inventor submissions for review only on a non-confidential basis . . . ." (Bollinger Dec. ¶ 9). Hasbro is the world's second largest toy company and, as shown, it maintains a contractual confidential relationship with outside inventors. Eight of the other nine toy companies to whom my inventor-client (referenced above) made recent submissions, entered agreements on their own forms (or those I provided) providing obligations confidentiality flowing to my client. Accordingly, it is improper to make sweeping generalizations about what "any experienced inventor" would know, as Mr. Bollinger has done herein. (In fact, any accurate generalizations appear more likely to be the reverse of Mr. Bollinger's representations.)

(c)    Moreover, a "blanket" agreement with an indefinite term covering all future submissions is, to my knowledge, a rare the exception in the toy industry, rather than the rule, and when such an agreement is used, any future written document, including a concept submission form and/or option agreement, should expressly refer back to the prior "blanket" agreement  It would be totally unreasonable for a multinational toy company to expect that an outside inventor who, typically works out of his family room or basement, to remember a form

8

that he may have signed years ago without making some reference to that form. In my opinion, it would be totally reasonable for an inventor to conclude in making a submission on a submission form that did not reference any earlier waiver of confidentiality, to conclude that it did not apply to such submission. It is my further opinion that Fisher-Price's failure to include any reference on the concept submission form to a prior waiver agreement was an error of significant proportion, the significance of which was to render any earlier agreement inapplicable to the subsequent submission. The Fisher-Price form used in the present case failed to meet any of these requirements, the import of which is that the inventor, Mr Reiling, would have had no reason to believe that the earlier signed waiver agreement was controlling. That is, assuming that Mr Reiling had any memory whatsoever of a document that he had signed four years prior to the submission. As set forth below, because Fisher-Price utterly failed to remind Plaintiff Reiling of his execution of the 1994 Policy and Agreement form at any point during the period of concept submission or negotiation of the option agreement, I believe that Fisher-Price's Policy and Agreement form does not bind Plaintiff Reiling in this case and, more importantly, that its practice of requiring an inventor to sign such a Policy and Agreement form which would be intended to control subsequent concept submissions that make no reference whatsoever to the earlier signed Policy and Agreement form, violates public policy and the general sensibilities of a reasonable man.

I am aware of no other toy company besides Fisher-Price that has used a blanket agreement that forces inventors to waive all rights of confidentiality as to all future concept submissions

9

Based on my review of documents produced by Fisher-Price in this case, I am aware that Fisher-Price changed its procedure for having outside inventors enter into Policy and Agreement forms. In the 1980s, the outside inventors executed these agreements for each concept submission. In 1990, Fisher-Price had the inventors execute these agreements on an annual basis. As of 1994, the agreements had an indefinite duration. (Compare, Lane Dec., Exhs. 16, 17 & 20; Bollinger Dec., Exh A). (As discussed below, certain language changes from prior iterations of the Policy and Agreement form are important for purposes of Plaintiff Reiling's expectations in this case). As stated above, most toy companies do not have outside inventors enter into agreements containing such patently unfair and restrictive terms *at all*, much less on a "blanket" basis that last for an indefinite duration and apply to all future submissions. The ones that do have continuing applicability (e.g., Hasbro's), however, are careful to ensure that the outside inventor is reminded of such continuing applicability. More particularly, Hasbro has at times used agreements with outside inventors containing an indefinite duration. But I am also aware that Hasbro took care to ensure future written documents between the outside inventor and Hasbro, such as a concept submission form and/or option agreement, expressly referred back to the prior agreement.

As set forth below, because Fisher-Price utterly failed to remind Plaintiff Reiling of his execution of the 1994 Policy and Agreement form at any point during the period of concept submission or negotiation of the option agreement, I believe that Fisher-Price's Policy and Agreement form does not bind Plaintiff Reiling in this case, regardless whether such a patently unfair and one-sided continuing "waiver of rights" document otherwise fails to meet minimum standards of public policy norms.

## PLAINTIFFS ARE NOT BOUND
## BY FISHER-PRICE'S POLICY AND AGREEMENT IN THIS CASE

16.    In its memorandum of law, Fisher-Price claims that Plaintiffs claims are barred in whole or in part because of certain language contained in Fisher-Price's Policy and Agreement forms. Based upon my thirty years of experience in the toy industry, I believe that the Fisher-Price Policy and Agreement forms are not binding on Plaintiffs, for the following reasons.

**Plaintiff DI Never Signed a "Blanket" Waiver, Nor Did it
Sign Any Other Policy and Agreement Covering the Submissions at Issue in this Case**

17.    With respect to Plaintiff Design Innovation ("DI"), Fisher-Price has produced one Policy and Agreement form signed by one of DI's officers in 1992. (Bollinger Dec., Exh. B). That agreement does not bind DI in this case because that particular iteration of the Policy and Agreement only applied to the specific concept submission referenced in the form. Unlike the agreement signed by Plaintiff Reiling in 1994, this agreement did not purport to be a "blanket" waiver covering all future submissions. (Compare Bollinger Dec., Exhs. A and B). Indeed, the 1992 form states that "Our policy requires that we accept outside submissions **only when accompanied by a signed copy of this Agreement . . .,**" while the language changed in 1994 to read: "**"Our policy requires that we accept outside submissions only when a copy of this Agreement is signed . . . ."** The 1994 Policy and Agreement signed by Plaintiff Reiling contemplates future concept submissions in paragraph 4 of the Agreement and it contains a term clause on page 2 of an indefinite duration. The 1992 Policy and Agreement contains neither provision, and the plain language of the Agreement, namely on page 2 where it asks for "name of submission," "brief description of disclosure" and "unique points of differentiation," makes clear that the 1992 form applies only to that particular submission. Accordingly, the obligations and

11

restrictions of the 1992 Policy and Agreement only applied to the craft items referenced therein, and not to any future submission, including, but not limited to, the submission at issue in this case that occurred six years later. Thus, Mr. Bollinger is simply incorrect to the extent that he implies that Plaintiff DI ever signed a "blanket" waiver. DI clearly never did so.

18.    I have also reviewed other agreements that DI entered into with Fisher-Price, which were in the nature of "Development" agreements. These are standard "work made for hire" agreements in which Fisher-Price hired DI to perform design work on certain products. These types of agreements are principally designed to clarify that Fisher-Price owns all of the intellectual property rights for specifically assigned work done by DI on behalf of Fisher-Price and under commission. These types of agreements are vastly different in nature and purpose from the Policy and Agreements forms, which are intended to govern concept submissions by outside toy inventors. I note that Fisher-Price has not asserted that DI's claims are barred in whole or in part by any such work for hire agreement. Nor could they, because based on my thirty years of experience in the toy industry I am aware that any such agreement would not be used for, nor would it apply in any way to nor govern, an outside inventor submission.

19.    Nor is Plaintiff DI bound by any Policy and Agreement that Plaintiff Reiling may have signed, including, without limitation, the 1994 Policy and Agreement form. This is because Plaintiff Reiling did not act as DI's agent for purposes of the submissions sent by Plaintiffs to Fisher-Price in 1998, 1999 or 2000, and Reiling never had any authority to bind DI. Plaintiffs' submissions were always intended to be joint submissions, which is best evidenced by the fact that the February 16, 1999 Option Agreement entered into between Fisher-Price and Plaintiffs defined "Inventors" to include both DI and Reiling, and each entity signed the agreement.

12

(Reiling Dec., Exh. V).  Thus, based on my experience in the toy industry, there is no possible way that the 1994 Policy and Agreement that Reiling signed should be construed as binding upon or otherwise negatively against Plaintiff DI.

**Plaintiff Reiling Should Not Be Bound by the 1994 Policy and**
**Agreement Under the Circumstances of This Case**

20.    Fisher-Price asserts that the 1994 Policy and Agreement signed by Plaintiff Reiling bars all of his claims in this lawsuit.  Specifically, Fisher-Price contends that:

(a) Reiling's implied contract claim is barred because the Agreement provides that "[n]o obligation of any kind is assumed by, nor may be implied against, Fisher-Price, Inc., unless and until a formal written contract has been entered into . . . ." (Bollinger Dec., Exh. A, ¶ 2);

(b) Reiling's misappropriation claim is barred because the Agreement states that "no confidential relationship is to be established" by the disclosure (*Id.*, Exh. A, ¶ 1), and the existence of a confidential relationship is an essential element of a claim for misappropriation under New York law.  (Fisher-Price Mem. at 23-24); and,

(c) All of Reiling's claims are barred because the Agreement provides that Fisher-Price is "released from any liability in connection with the receipt and examination of your disclosure, except as to such liability that may accrue under any valid patents or copyrights . . . ." (Bollinger Dec., Exh. A, ¶ 3).

21.    Contrary to Fisher-Price's arguments, important facts militate against applying the 1994 Policy and Agreement to bar Plaintiff Reiling's claims.  There is a very strong argument supported by deposition testimony that Reiling did not understand at the time of the 1998, 1999

and 2000 submissions that he remained bound by the 1994 Policy and Agreement. Relevant factors to consider include, without limitation:

     (a)    As stated, I have seen in my practice that outside inventors seemingly will sign any paper put in front of them in order to gain and maintain access to toy companies. This is fully understandable in light of the nature of the relationship between toy companies and outside inventors. Simply put, toy companies have all of the leverage; inventors have none. An inventor would be loathe to raise an objection to any form put in front of him or her, because it might mean risking access to that company. Put another way, it might mean risking access to their "meal ticket." This is the very essence of a one-sided, adhesionary relationship. The toy companies make the rules, and the inventors simply get in line like sheep. This problem is exacerbated by the consolidation in the toy industry over the past 15 years. There used to be a number of major toy companies. Now there are essentially two – Mattel (which owns Fisher-Price, Tyco Toys and a number of other companies) and Hasbro (which has an effective monopoly on games, among other products). If an inventor offends one of these two giants (or their subsidiaries), he or she has effectively cut off a major source of potential business.

     (b)    Based on my interaction with outside inventors over the past thirty years, it is my opinion that the vast majority of them do not understand the legal implications of many documents put in front of them. There are several reasons for this.

     (i) First, as stated, toy inventors tend to be visual communicators who lack a fundamental interest in or familiarity with complex written language, and in particular legal language (which they often term "legalese"). In my experience, they rarely understand the full

14

implications of these agreements and treat them as mere formalities to gain access to toy companies.

(ii) As stated above, these types of agreements are not uniform. Important provisions, such as whether they purport to negate the existence of a confidential relationship, differs from company to company.

(iii) Apparently by design, in one of the *only statements not articulated in "legalese"*, Fisher-Price's Policy and Agreement states **"[W]e assure you that we intend to deal with you fairly in connection with your disclosure."** (Bollinger Dec., Exh. A, ¶ 3). This comforting statement is stated succinctly and without apparent reservation, and is the ultimate form of Orwellian misdirection – it lulls the inventor into a false sense of security, and is likely the only part of the document readily understood by the inventor. Yet it is cynically followed by complex legal text that has precisely the opposite significance and ultimate impact, if the position of Fisher-Price put forth in this case is allowed to prevail. In complete contradiction to the comfort offered by the reassuring statement of fairness by Fisher-Price, the non-attorney inventor, is supposed to understand esoteric legalese having the effect that he or she will have *no claim under theories of implied contract or misappropriation in the event Fisher-Price decides not to treat them fairly and in fact uses their concept without payment.* Moreover, if the arguments of Fisher-Price's counsel are to be believed, the inventor also is expected to have sufficient familiarity with the caselaw cited in their Memorandum to understand that the representation of <u>ownership</u> of the submitted concept does not simply mean that the inventor independently created and did not steal it, but also that the *concept satisfies a requirement of absolute novelty in all of its elements*

15

(iv) As additional evidence of this cynicism, Fisher-Price actually *changed the wording* of the waiver referenced in paragraph 3 of the 1994 Policy and Agreement, above to make it *even more arcane.* Prior to 1994, paragraph 3 had stated that Fisher-Price was "released from any liability in connection with the receipt and examination of your disclosure **or in connection with our use or disclosure to others of any portion of your disclosure,** except as to such liability that may accrue under any valid patents or copyrights . . . . (Compare Bollinger Dec., Exhs. A, B). By deleting the language in bold from the 1994 Policy and Agreement, Fisher-Price enhanced the likelihood that it would mislead inventors who mistakenly believed that Fisher-Price was *not released* from liability for *use of the concepts being submitted.*

(c)     Equally significant in this case, and a question of material fact in determining whether Reiling is bound by the 1994 Policy and Agreement is the fact that Fisher-Price did not refer back to the 1994 Policy and Agreement in either the Concept Submission Form or the Option Agreement at issue in this case. Plaintiffs submitted their concept to Fisher-Price in 1998, *four years after* Reiling signed the 1994 Policy and Agreement. The 1994 Policy and Agreement stated in paragraph 4 that concept submissions would be in writing and would be considered written supplements to the Agreement. (Bollinger Dec., Exh. A, ¶ 4). Based on my experience in the toy industry, companies that use waiver agreements with an indefinite duration ensure that future written communications between the parties contain language that relates back to the prior, indefinite-term agreement, or at least in some way reminds the inventor of his or her supposed continuing obligations under such an agreement. Thus, attached to the Reiling Declaration at Exhibits G and H are Concept Submission Forms from Mattel, Hasbro and Fisher-Price Brands which all contain a large box on the bottom-left hand side of the form containing a

16

restatement of, *inter alia*, the waiver provision. Based on my years of experience in the toy industry, the fact that neither the Concept Submission Form at issue in this case, nor the parties' Option Agreement, ever referred to the 1994 Policy and Agreement, nor contained any other restatement of the waiver provision, coupled with the four-year gap in time from execution of the 1994 Policy and Agreement to the time of Plaintiffs' first submission, (i) renders it unreasonable that Reiling would believe that he remained bound by the prior agreement for purposes of the Reel Heroes submission; (ii) gives rise to a strong argument that the execution of the Option Agreement was a constructive termination of the 1994 Policy and Agreement; and/or (iii) renders the applicable provisions of the 1994 Policy and Agreement void as against public policy under the circumstances of this case, *even if it otherwise survived scrutiny* under minimum standards of public policy.

(d)     As a separate and independent consideration, it is also important to note that the parties' Option Agreement contemplated and gave rise to a confidential relationship between the parties. Paragraph 5 of the Option Agreement prohibits Plaintiffs from showing their concept to others during the term of the Agreement, and paragraph 8 specifically obligates Plaintiffs to "treat in strictest confidence" any information related to their concept. (See Reiling Dec., Exh. V). Thus, the Option Agreement, by its very terms, conflicted with the 1994 Policy and Agreement with respect to the existence of a confidential relationship. This is sufficient, standing alone, to create a factual issue whether or not the parties' Option Agreement modified, superceded or constructively terminated, as applicable, the 1994 Policy and Agreement signed by Reiling.

17

## PLAINTIFFS' CONCEPT DEFINED

### Two Types of Play

22.    The play pattern of children when they use action figures is primarily that of "pretending" – that is they imagine that they are, or are assisted by, the heroic figures who usually are the centerpieces of action figure product lines. For example, a young boy playing with a "Batman" figure will usually role-play being Batman, flying the "Batplane" and defeating the "Joker". The "Rescue Heroes" product line is based upon these play patterns, which are generally termed "aspirational"    that is, the child aspires to be the hero character or to participate with the hero and to achieve heroic accomplishments.

23.    In contrast, children also play with toys like rubber balls and "Hula Hoops" that involve mainly mechanical or physical play patterns, and these toys may be termed "perspirational", for obvious reasons. In the case of the latter kinds of toys, the specific mechanical executions of the toys can have a significant impact. For example, when one toy company created the first foam football with a finned tail, the flying performance and accuracy of which was greatly enhanced in comparison with prior foam footballs, a large percentage of sales of prior foam footballs were diverted to that company. Similarly, when the "Hula Hoop" itself was improved by placing ball bearings inside the plastic tubing for making sound and enhancing the twirling action, significant sales were enjoyed by the "new" version. In each case, the specific design of the mechanical modification to the respective toy was essential to enhanced performance, hence to play enjoyment, hence to sales.

24.    Since action figure play is more driven by "pretending", the means by which the pertinent role-playing scenario is triggered is more intuitive (i.e. relating to what the child

18

imagines rather than to how the laws of physics affect <u>performance</u> of a particular design or a device), and the structural details of the means for suggesting such a scenario more subject to variation <u>without departing from the essence of the concept.</u>

**Plaintiffs' Concept Defined**

    25        I have previously testified in this case as to one possible definition of Plaintiffs' concept. (See Exhibit A, Second Supplement to Expert Report at Paragraph 12) Because my definition differs somewhat from the legal definition provided by Plaintiffs in response to an Interrogatory in this case – a definition which Fisher-Price has conveniently ignored in its moving papers – Fisher-Price claims that my definition lacks concreteness and gives rise to certain other instances of prior art that supposedly reads on Plaintiffs' concept. As a threshold matter, I have always said that my prior definition of the concept was <u>one</u> definition, not <u>the only</u> definition.

        Plaintiffs seek to advance the definition of their concept that was provided more than one year ago in response to an Interrogatory in this case. Therefore, I adopt Plaintiffs definition, as follows:

> "a concept for adding an image component to the backpack of each "Rescue Heroes" action figure that enhanced role play for the child by depicting the mission of that particular "Rescue Heroes" character, which concept could be expanded into accessories and line extensions relating to the "Rescue Heroes" line pursuant to industry custom and practice." Plaintiffs submitted their novel concept to Fisher-Price in three different variations."

    26.       The above definition is primarily devoid of mechanical specifics and details, and Fisher-Price has sought to create an issue out of this fact. However, based upon my experience

in the toy industry, a lack of mechanical specifics and details is quite common in the *contractual definitions* of concept submissions that have previously been represented in one or more specific forms at the time of submission. In fact, it is not the *contractual definition* of what is royalty-bearing but rather the *submission* that should be "concrete". Moreover, any difference between my definition and Plaintiffs' definition is a distinction without a difference because the accused Fisher-Price products are covered under either one.

Toy companies will license such concepts and pay a royalty for commercialized products arising out of such submissions on the basis of legal definitions of the concept as negotiated at the time a license agreement is entered. In this case, because Fisher-Price has used Plaintiffs' concept without a license agreement, this litigation is the first opportunity for Plaintiffs to put forward such a definition. (Mr. Bollinger asserts that the legal definition is routinely established at the time the inventor fills out a Concept Submission Form or in an option agreement. As will be seen below, this assertion is without support in fact or in the custom of the industry.)

As an example of a broad contractual definition of a concept submitted in a narrow form, during the 1970's an individual submitted to Parker Brothers (now a subsidiary of Hasbro) a concept for using cellular foam material for an undefined line of products that offered "safe, soft fun" in indoor play. The concept was represented by the inventor in the form of an approximately spherical ball cut from a "foam rubber" pillow. Recognizing and acknowledging the true breadth of the submission, Parker Brothers took a license from the inventor on the basis of this submission, and subsequently Parker and its successors have designed and sold hundreds of extremely diverse products in the NERF® product line (which is the brand created for the line and owned by Parker), as exemplified by those shown in Exhibit B. These represent only a few

of the NERF® products, and the *inventor receives royalties on all sales of all such NERF® products*, under the agreed contractual definition of the concept.

27.    Another example of this custom and practice in the toy industry is represented by the product marketed successfully for may years by Kenner under the name "Alvin the Aardvark". As depicted in Exhibit C, this product was a pre-school kids- push-toy that included a flexible bulb at the top of the handle that operated as a bellows to force air down through hollow handle and operate a piston housed within the hard-plastic wheeled body in the shape of anteater  The piston drove a rod in form of the anteater's tongue which was tipped with Velcro® material.  The toy was sold with several cloth "ants", and the child could wheel the anteater figure around and "capture" the ants by aligning the tongue of the figure properly and squeezing the bulb to cause the tongue to spring out and snatch the ants.

However, the product was derived from an outside inventor's submission that was almost entirely different from the product.  Nevertheless, a license agreement was entered by Kenner and royalties were paid on all sales.  In fact, the inventor's submission was a *board game* in which players rolled dice and moved flat upright cardboard pictures of ants around the board on a defined pathway.  At the center of the board was a squeeze-bulb on which was painted the body of an anteater.  The body had an opening located where the anteater's mouth would be and a plastic dart decorated as a "tongue" could be "fired" from the opening by squeezing the bulb. The pathway on the game board had certain portions that were within range of the tongue-darts, and when one player's cardboard ant landed in range, it could be knocked over by another player operating the squeeze bulb  Notwithstanding the nearly complete revision of the submission, the

21

inventor was paid on all sales of the Alvin the Aardvark push toy under the broad contractual definition of the concept.

28.    The Plaintiffs' concept can be executed to achieve the described "visual communication" in any of a multiplicity of structure or forms that are derived from and are entirely consistent with the forms of the concept presented by Plaintiffs in their three submissions to Fisher-Price.  Such structures and forms can include: a battery-powered film viewer embodied in the backpack of the Rescue Heroes figure for viewing one or more impending dangerous events; a backpack-mounted film viewer that uses ambient rather than electric lighting and a hand-crank rather than a motor to advance the film; a backpack-mounted slot for disposition of cards bearing a variety of "still" pictures of an impending dangerous event; a backpack-mounted viewer for holding and advancing a flat disc on which are disposed a series of various individually viewable "still" pictures of similar dangerous events; a lenticular lens carried by a Rescue Heroes figure that provides the illusion of "moving" pictures of dangerous events; a handheld fisheye lens "pretend" camera carried by a Rescue Heroes figure that uses a light-pipe to convey the scene picked up by the fisheye lens to a "viewer" carried by the backpack of the Rescue Heroes figure; and doubtless many more. These *conceptually interchangeable executions* describe certain categories of Rescue Heroes products as well as certain specific versions of Plaintiffs' concept as submitted to Fisher-Price by Plaintiffs, and *none of these various executions departs from Plaintiffs' concept.*

22

## THE CONCEPT SUBMISSION PROCESS

### Mr. Bollinger Mischaracterizes Certain Aspects of the Concept Submission Process

29.     In paragraphs 11 and 13 of his declaration, Mr. Bollinger places far too much emphasis on the manner in which inventors choose to articulate descriptions of their submissions in concept submission forms. Based on my experience in the toy industry, such forms simply serve a record-keeping function, as Mr. Bollinger has stated in paragraph 11. The concept submission forms used by Fisher-Price provide a very small box for the inventor to describe his or her concept. It is not a reasonable expectation that an inventor will believe that he or she is to be *legally bound by this description*. There is also no indication that Fisher-Price emphasized to Plaintiffs while they were scribbling the description, or at any other time, that its content would later *determine whether or not Fisher-Price would pay them for use of the concept*.

The best evidence to confirm that inventors typically give little consideration to the description on the concept submission form is to examine the concept submission form submitted by an extremely successful inventor named Avi Arad, which is attached to the declaration of Stan Clutton, Fisher-Price's current vice president of inventor relations, at Exhibit C. Mr. Arad submitted a concept for what he described on the Fisher-Price form as "an action figure, containing a mini-projector. The projector have [sic] an animation like ability by rotation of a wheel." (*Id*). Mr. Arad then described the unique features as "high clarity projection" and "animation." That description can hardly be characterized as detailed or well-defined. Clearly Mr. Arad had no expectation that Fisher-Price might elect to use his concept without payment on the pretext that his description was deficient.

23

30.    Moreover, Mr. Bollinger also mischaracterizes the standard custom and practice in the toy industry with respect to option agreements in general in paragraph 14 of his declaration. In my experience, option agreements are entered into far less frequently than license agreements themselves. Because options entail payments to inventors for product concepts that may not ultimately be marketed, companies much prefer to avoid them entirely. Even when used, they are usually merely a "standstill" agreement, in effect. The principal purpose of the option agreement is to give the toy company an additional, exclusive period of time to make a final decision on whether or not to license the concept. (That the option agreement in this case was so lengthy and detailed is the rare exception to the rule, and militates toward the seriousness with which Fisher-Price viewed the potential value of Plaintiffs' concept.) Despite Mr. Bollinger's assertions that inventors should be "bound by" the descriptions of their concepts in option agreements, his own philosophy during the 20+ years of our association as co-workers at Kenner was that option agreements should be as simple and informal as possible. Seldom did they even contain a royalty rate that would apply for use of the concept if a license agreement were to result. Consistent with this philosophy, the identification of the concept being optioned was intended as a mere shorthand reference to the concept, not a legally binding definition. Were Mr. Bollinger, the toy-company executive, to have handled the option agreement in this case, the likely "definition" of Plaintiffs' concept in the option agreement would merely have been a brief designation such as "Reel Heroes". The reality regarding option agreements in the toy industry is more accurately represented by Mr. Bollinger in the role of toy executive than by Mr. Bollinger as the paid witness for Fisher-Price.

24

31.    Importantly, Plaintiffs are not bound by the definition of the concept submission attached to the option agreement in this case because (1) that definition, which was prepared by Fisher-Price's counsel, is too limited in its scope in that it overemphasizes the mechanical features of the concept submission and underemphasizes the utility of the concept (e.g. adding an animated or moving image component to the backpack); and (2) it fails to take into account the fact that Plaintiffs submitted two additional executions of their concept _after_ the Option Agreement expired, those executions describing how to add still images to the backpacks of the Rescue Heroes characters.    This latter point is particularly important, because Fisher-Price continues to try to hold Plaintiffs to the definition of the concept as stated in the Option Agreement.  (See Fisher-Price Mem. of Law at 27).  But doing so completely ignores Plaintiffs' second and third examples of the possible multiplicity of executions of the concept as submitted to Fisher-Price in the summer of 1999 and December 2000, after expiration of the Option Agreement and as subsequently derived from the concept by Fisher-Price.  (I also note that the definition in the Option Agreement includes the sentence "The unique aspect of the concepts is the combination of existing action figures with film for play pattern." As set forth below, this is extremely important to the issue of novelty, because Fisher-Price has argued that Plaintiffs' concept lacks novelty because it is merely a "combination" of existing elements.")

**Certain Aspects of Fisher-Price's Evaluation of Plaintiffs' Submission Are Important**

32.    Although in the context of the current dispute, Fisher-Price seeks to dismiss Plaintiffs' concept as merely an "improvement to an existing product line" (which characterization has absolutely no materiality to the issue in dispute) and lacking in "novelty", nevertheless Fisher-Price acknowledged in a letter to Mr. Reiling dated 12/8/98 that when Mr.

Snyder showed Plaintiffs' submission internally at Fisher-Price, the result was a *"genuine excitement level."* (Reiling Dec., Exh. U). This letter communicates neither dismissal as an insignificant "improvement" nor due to a lack of "novelty" -- at the very least, this expression confirms that the concept was *novel to Fisher-Price* and shows that Fisher-Price was very interested in developing the products based on or derived from concept at that time.

33.    The fact that Fisher-Price entered into an option agreement for Plaintiffs' concept was is very significant. It evidences that fact that: (i) as Fisher-Price itself stated, Fisher-Price was "excited" and serious about developing the concept; and (ii) it signifies that, as far as Fisher-Price was concerned, the concept was novel, because Fisher-Price in general, and its Vice President of Inventor Relations at that time, Paul Snyder, in particular, never would have optioned a concept that they knew at the time was not novel. It would be against their business interest to do so (i.e., why would a company choose to expend resources to consider a concept which it knew was not novel) Mr. Snyder recently confirmed at his deposition that he did not consider lack of novelty as a basis for rejecting Plaintiffs' concept. (Dize Dec., Exh. B).

## PLAINTIFFS' CONCEPT COVERS THE ACCUSED RESCUE HEROES PRODUCTS

## Fisher-Price's Assertion of Non-Use is Contrary to Toy Industry Custom and Practice

34.    In its various papers, Fisher-Price repeatedly denies that it has "used" the concept submitted by Plaintiffs in any of its products, denies that any of its products is "based on" the Plaintiffs' concept and denies that any of Fisher-Price's products has been "influenced by" Plaintiffs' concept Fisher-Price engages in "pretending" of their own – i.e., that "use" would only occur if each and every detail of the prototype were replicated, as though the *concept and its*

*function could not be achieved in other ways*. In so doing, Fisher-Price relies upon an improper definition of what constitutes "use" of a concept in the toy industry.

35.    Fisher-Price repeats the argument that it has asserted throughout this proceeding — it never used Plaintiffs' concept because the accused products do not incorporate the precise engineering mechanisms described in either the Concept Submission Form or in the Option Agreement. (Fisher-Price Mem. of Law at 26-28). Those are not the operative definitions of Plaintiffs' concept, for the reasons stated. A more appropriate legal definition is the one Plaintiffs submitted in response to an Interrogatory from Fisher-Price. Moreover, Fisher-Price's arguments about "use" are contrary to industry standard. It is fully understood and widely accepted in the toy industry that manufacturers expect to acquire new toy properties from inventors in "concept" form and to expend substantial company resources in refining, embellishing and expanding those concepts into "finished" licensed products and product lines. The custom and practice in the toy industry has been to compensate inventors and designers for the underlying concept in its various toy product line manifestations, *regardless of revisions, enhancements and changes made by the toy company subsequent to submission*. Simply put, toy companies pay for "inspiration," without regard to additional work, even significant additional work, that needs to be done to commercialize the product. "Use" is, therefore, a very broad standard in the industry.

The "Alvin the Aardvark" case referenced above is a perfect illustration of this fact. Another such example is represented by the extremely broad STARTING LINEUP® product line marketed by Kenner Products from 1988 through 2000. A few products in this line are depicted in Exhibit D. The inventor of this product submitted to Kenner one of its own existing

action figures (the Han Solo figure in the Star Wars® line) together with an existing Topps or Upper Deck bubble gum collector card depicting and describing the playing statistics of a baseball player. The concept was submitted to combine a 3-D figure of an athlete or celebrity with a collector card further describing the athlete's accomplishments. On the basis of this submission, Kenner took a license from the inventor under which it paid him a royalty on all products sold in the Starting Lineup® line (a brand created and owned by Kenner).

36.    In fact, on several occasions while we were colleagues at another toy company, Fisher-Price's expert in this case, Mr. Bollinger, often complained to me that he and the people he supervised had taken a concept received from an outside submitter in an unmarketable form and had transformed it substantially to create a marketable execution. To paraphrase Mr. Bollinger, "I made the real invention. The submitter gets the royalty; I get a pat on the back."

**Products Subject to Royalty Obligation**

37.    The following categories of Fisher-Price's Rescue Heroes product line embody, incorporate, are based on, derived from or influenced by Plaintiffs' concept submission:

- Mission Command Rescue Heroes
- Voice Tech Video Mission Rescue Heroes
- Rescue Heroes Aquatic Rescue Command Center
- Mission Select Rescue Heroes
- Mission Select Mountain Action Command Center
- Mission Select Police Cruiser, Fire Truck, and any other accessory items incorporating the "Mission Select" dial
- Optic Force Rescue Heroes

38.    In my experience, products that fall within any of three levels of connection to the Plaintiffs' concept will bear royalty, and should be subject to payment by Fisher-Price in the current case:

28

(a)    Category 1 includes those Fisher-Price products that use, embody, are based on, derived from or influenced by the Plaintiffs' concept. That these products are appropriately subject to the royalty obligation of Fisher-Price to Plaintiffs goes without saying. Products of Fisher-Price within Category 1 include, but may not be limited to, "Mission Command Rescue Heroes", "Mission Select Rescue Heroes", "Voice Tech Video Mission Rescue Heroes", at least the "Telly Photo" figure and accessories in the "Optic Force Rescue Heroes" product line, and any other current or future product that meets the criteria of this Category 1.

(b)    Category 2 includes those products which are sold together with or are marketed by Fisher-Price specifically for use with any of the Category 1 products (commonly referenced in the toy industry as "accessories"). In the present case, such products include, but may not be limited to, the "Mission Select Police Cruiser", the "Mission Select Firetruck", the "Mission Select Mountain Action Command Center", the "Voice Tech Video Mission Rescue Firetruck", the "Voice Tech Video Mission Rescue Jet", the "Voice Tech Video Mission Police Cruiser", the "Voice Tech Video Mission Aquatic Rescue Command Center".

(c)    Category 3 includes those products and services marketed or licensed by Fisher-Price that arise out of the images, trademarks or other elements of the popularity and goodwill created by Category 1 or Category 2 products but which are not themselves within either said category.

Revenues enjoyed by Fisher-Price as the result of these Category 3 products and services exist only as the result of the popularity of the Plaintiffs' concept as executed, distributed and promoted in the marketplace. Examples of this category typically include kids' lunch boxes,

apparel, video games and other products and services that use the images, names, etc. which are specific to the Category 1 and/or Category 2 products. In this case, they would include such Fisher-Price products as videos, DVDs and video games that specifically depict or are sold together with "Mission Select" or "Voice Tech Video Mission" Rescue Heroes figures or accessories and any other products and services that currently or in the future are marketed by Fisher-Price which fulfill the criteria of Category 3. It should be noted in this regard that participation of the outside concept submitter (e.g. Plaintiffs) in revenues arising from Category 3 products and services are typically a subject of negotiation in the license agreement by which the concept is originally licensed to the toy company, but the obligation in this case is appropriate because the actions of Fisher-Price to proceed without necessary permission have deprived Plaintiffs of the opportunity to participate in that negotiation.

39.    Prior to Plaintiffs' submission, Fisher-Price <u>had no version of Rescue Heroes</u> which offered children a visual cue or prompt for role-playing in which the child would use Rescue Heroes figures to visualize accomplishing a mission assignment, resolving a dangerous situation, performing a rescue or engaging in some other adventurous pretend scenario. <u>*After Plaintiffs' submission,*</u> Fisher-Price has introduced <u>four separate Rescue Heroes product lines</u> each *embodying such visual cues* which Fisher-Price describes in catalog and packaging "sell copy" in the following interesting ways:

> "Special Video Mission backpacks let these quick-response specialists see their next rescue mission….".

> "Push backpack button for moving video image and sounds!"

> "Kids can see and hear Warren Waters relay missions from space to the Rescue Heroes figures on earth."

30

"See and hear me assign missions!"

"It's loaded with exciting sound effects and "magical" Video Mission Cards that bring Mission Command to life. Kids can see AND hear Warren Waters relay missions from space to the Rescue Heroes figures on earth."

"See & hear Voice Tech figures respond to mission commands! Moving images of rescue missions appear on backpack screen."

"You're in charge. You select the mission on each team member's dial. And the Rescue Heroes Mission Select team turns up the team work! Dial up the excitement with six different missions to choose from!"

*"For kids, these mission cards serve as "story starters" for their own imaginations to take off."* (Emphasis added)

(Reiling Dec., Exh. CC). Moreover, prior to Plaintiffs' submission, the packs on backs of the Rescue Heroes characters had virtually no play value. They were merely an extension of the object that the character was holding in his or her hand. Fisher-Price referred to these packs, appropriately, as "equipment packs." Plaintiffs' submission referred to the packs as "backpacks," and, as stated, offered significant visual cues for role play. It is hardly a coincidence that in the marketing of the accused product lines, Fisher-Price now refers to the packs as "backpacks" and emphasizes the visual nature of the backpacks. (Id.).

40.    The "Voice Tech Mission Command" line was introduced by Fisher-Price not later than Toy Fair 2001 and included yet another execution of Plaintiffs' concepts. This Rescue Heroes line includes "Special Mission Command cards which 'slide into backpacks' so these quick-response specialists can receive and respond to ..." mission assignments. Each "mission card" includes a *visual representation* of a cue or prompt for role-playing in which the child would use the Rescue Heroes figure and imagine accomplishing a mission assignment. When slid into the figure's backpack, the image of the visual cue is readily *visible through a clear*

31

*panel in the backpack* while a verbal message associated with the same mission assignment is articulated through a voice chip within the same mission card.

40.    The "Voice Tech Video Mission" line was introduced in 2002 and incorporates in the backpack of each figure a battery powered animated image viewer that depicts moving images of rescue missions on a small screen mounted on the backpack that is activated by pressing a button. The moving image is accompanied with sounds. Paul Snyder, Fisher-Price's former vice president of inventor relations and the individual who initially evaluated Plaintiffs' concept, has testified that he believes Plaintiffs' concept is similar to the Voice Tech Video Mission line, such that a royalty is owed. (Dize Dec., Exh.B at 134-136; 139-140).

41.    The subsequent "Mission Select Rescue Heroes" line was introduced in 2003 and incorporates in the backpack of each figure and in each accessory item a circular dial that includes a series of depictions of visual mission assignments which combines with verbal statements associated with those assignments. The Mission Select Rescue Heroes figures thus bear *a striking resemblance to the third execution of Plaintiffs' concept* that was submitted to Fisher-Price in December of 2000, in which a rotatable circular disc can be "dialed" to make visible a series of depictions of mission assignments to be selected by the child for play. In this recent product line, it appears that Fisher-Price has nearly replicated the disc arrangement of images as depicted in the referenced third submission by Plaintiffs.

42.    Plaintiffs' concept also covers the Optic Force line, first distributed in 2003, for the following reasons:

> Plaintiffs' 1998 submission included a TV cameraman character with a distinct design and appearance (for example, who could film the "Rescue Heroes" adventures), to extend the Reel Heroes concept of depicting a "Rescue Heroes" mission (which allows the child to visualize a play scenario through an image

32

component in connection with the backpack). The character had red hair, facial hair, a baseball cap, press pass and an optical camera in one hand and a microphone in the other. Fisher-Price has produced the very same reporter/photographer action figure, which it calls "Telly Photo," with a virtually identical look, feel and play pattern

Moreover, the entire Optic Force line (Telly Photo, Jake Justice, Maureen Biologist, Matt Medic and Rock Miner) includes action figures that have hand-held optical devices which serve to enhance play value for the child. Plaintiffs' first submission included the feature of a hand-held optical device (in the form of a camera), with a viewer and fisheye lens, that enhanced play value for the child.

43.    Finally, Plaintiffs' Concept covers all of the accused accessories, such as vehicles and play sets, because they are sold together with, or are marketed by Fisher-Price specifically for use with, the accused Rescue Heroes action figure lines (Voice Tech, etc.). Moreover, Plaintiffs' first submission specifically referenced and included vehicle accessories (in the form of a mobile communication and command vehicle). (Reiling Dec., Exh. P).

**The Carterbench Rationale is Unavailing**

44.    Fisher-Price does not explicitly assert the defense of independent invention in their summary judgment papers. Nevertheless, because Fisher-Price has asserted Carterbench's involvement in the development of certain of the accused products (Fisher-Price Mem. of Law at 10), and, therefore, by implication has raised an issue of independent invention, it is important to point out why this argument is untenable and why important factual issues exist.

45.    Fisher-Price attributes the origin of the Voice Tech Video Mission Rescue Heroes product line to a company located in the UK by the name of Carterbench. In his deposition testimony, Mr. Tyler Berkheiser of Fisher-Price admitted that the tangible submission from Carterbench was merely "a lenticular lens mounted in a white box." (Dize Dec., Exh. D). In the toy industry, such a device is commonly referred to as a "bread board" used to demonstrate only

the operation of a mechanism and not its application in a particular product. There appears to have been no prototype or other operating example of the Virtual Video technology in a Rescue Heroes figure or accessory. There were indeed a number of sketches produced by Fisher-Price ostensibly prepared and submitted by Carterbench, but none of these bears a submission date earlier than *18 months after Plaintiffs' initial submission* was made, and none of these describes or depicts a product remotely similar to the "Rescue Heroes Aquatic Rescue Command Center" (the "ARCC"), which Fisher-Price has identified as the first product marketed under the license. Nevertheless, Fisher-Price has produced a license agreement with Carterbench/Virtual Video (related entities) under which Fisher-Price is alleged to pay a royalty applicable to the Voice Tech Video Mission figures and the ARCC despite the absence of the kind of "concrete" submission Mr. Bollinger asserts is essential to qualify an inventor for a license agreement or royalty payments. Furthermore, that license agreement specifically states that the Voice Tech Video Mission products *do not use the "Virtual Video" technology* that was the supposed point of "novelty" of the Carterbench concept. As a result, in addition to entering a license agreement for a submission that lacks "concreteness", Fisher-Price also acknowledges that the Carterbench license is for a concept that lacks "novelty", another absolute necessity articulated by Bollinger and emphasized throughout Fisher-Price's submissions to the Court. In any case, Carterbench is stated in the agreement to have been paid 2% on the limited Voice Tech Video Mission line despite its fatally defective (twice over!) concept submission.

46.     Fisher-Price also claims that it received the Carterbench submission on an unsolicited basis. But perhaps the most interesting question is why the Carterbench submission titled "Virtual Video Rescue Heroes Backpack" bears the note "Requested by Fisher-Price as

the operation of a mechanism and not its application in a particular product. There appears to have been no prototype or other operating example of the Virtual Video technology in a Rescue Heroes figure or accessory. There were indeed a number of sketches produced by Fisher-Price ostensibly prepared and submitted by Carterbench, but none of these bears a submission date earlier than *18 months after Plaintiffs' initial submission* was made, and none of these describes or depicts a product remotely similar to the "Rescue Heroes Aquatic Rescue Command Center" (the "ARCC"), which Fisher-Price has identified as the first product marketed under the license. Nevertheless, Fisher-Price has produced a license agreement with Carterbench/Virtual Video (related entities) under which Fisher-Price is alleged to pay a royalty applicable to the Voice Tech Video Mission figures and the ARCC despite the absence of the kind of "concrete" submission Mr. Bollinger asserts is essential to qualify an inventor for a license agreement or royalty payments. Furthermore, that license agreement specifically states that the Voice Tech Video Mission products *do not use the "Virtual Video" technology* that was the supposed point of "novelty" of the Carterbench concept. As a result, in addition to entering a license agreement for a submission that lacks "concreteness", Fisher-Price also acknowledges that the Carterbench license is for a concept that lacks "novelty", another absolute necessity articulated by Bollinger and emphasized throughout Fisher-Price's submissions to the Court. In any case, Carterbench is stated in the agreement to have been paid 2% on the limited Voice Tech Video Mission line despite its fatally defective (twice over!) concept submission.

46.     Fisher-Price also claims that it received the Carterbench submission on an unsolicited basis. But perhaps the most interesting question is why the Carterbench submission titled "Virtual Video Rescue Heroes Backpack" bears the note "Requested by Fisher-Price as

34

part of Virtual Video per Dave C. 8/27/02, 3:20 pm," which at least gives rise to an inference that, *having seen Plaintiffs' concept and Carterbench's technology,* Fisher-Price decided to "combine" the two to create the Voice Tech Video Mission line. (It is important to note that Carterbench is not paid a royalty on any of the other products in dispute in this case, and the royalty that is paid on these few products is lower than that defined in the Fisher-Price Option Agreement with Plaintiffs. I believe the entire Carterbench arrangement may have been contrived in an effort to create a smokescreen behind which Fisher-Price intends to hide the royalties improperly denied Plaintiffs.)

47.    In any event, Fisher-Price's own words belie its argument that the existence of the Carterbench submission and subsequent license agreement precludes any royalty payment to Plaintiffs. In a submission of idea case currently pending in the Supreme Court of the State of New York, Erie County, Fisher-Price has taken the position that the first-in-time inventor warrants a royalty payment over the second-in-time inventor. (See Memorandum of Law in Support of Fisher-Price's Motion for Summary Judgment at 4, *M.H. Segan Co. v Fisher-Price,* Index No. I 2003-40) (Relevant pages of the brief are attached hereto as Exhibit E). Plaintiffs in the instant litigation wholeheartedly agree.

### FISHER-PRICE'S NOVELTY ARGUMENTS ARE MERITLESS

48.    Fisher-Price's attorneys place great emphasis on the alleged lack of "novelty" of Plaintiffs' concept. It is quite telling that at no point prior to this litigation did any Fisher-Price employee ever consider novelty to be an issue or communicate that fact to Plaintiffs. Fisher-Price's novelty defense can, therefore, be seen for what it is – an after the fact creation of counsel that never once entered the minds of Fisher-Price's employees at any point prior to this litigation.

**Plaintiffs' Concept Was Novel to Fisher-Price**

49.    Regardless what may be the requirement of "novelty" applicable to concept submissions in other industries, in the toy industry it is not a significant consideration, with two exceptions: (a) a concept submitted to a company that is currently developing executions of an internally created (i.e., "home-grown") and substantially similar concept can be declined without prejudice to the company's position with respect to its own concept; and (b) a concept that is the substantially similar to one submitted to the company (and which is under current development) by a third-party outside inventor (who owes no obligation to the current submitter) can be declined without prejudice to the company's position with respect to the third-party concept. In addition, toy companies likely will reject a submission for "lack of novelty" that is substantially identical to previously marketed products of the company itself or of another in the industry. However, there are exceptions even to this, as referenced below in Paragraph 51. Other than in these situations, the "novelty" of a submitted concept is not a material consideration in the toy industry.

50.    A caveat is necessary, however: the custom and practice of the toy industry is that a lack of novelty disqualifying a submission from consideration is typically disclosed to the submitter at the time of rejection. Paul Snyder, Fisher-Price's former head of inventor relations, confirmed this at his deposition as well (Dize Dec., Exh. B). This fact is also evidenced by Fisher-Price's own forms. Attached to the Reiling Declaration as Exhibit DD is a copy of a Fisher-Price concept submission form and accompanying letter in which they rejected an unrelated concept from Plaintiff Reiling due to, *inter alia*, lack of novelty. It is significant that

36

*at no time prior to this litigation* did anyone from Fisher-Price ever communicate the supposed lack of novelty of Plaintiffs' concept to Plaintiffs, to wit:

(a)     Paul Snyder did not raise the issue of lack of novelty following his initial review of Plaintiffs' concept in New York City on October 29, 1998;

(b)     Paul Snyder did not raise the issue of lack of novelty on the Concept Submission Form;

(c)     Pat Grabanowski of Fisher-Price did not raise the issue of lack of novelty in her letter to Plaintiffs, dated December 8, 1998, in which she stated that there was a "genuine excitement level" at Fisher-Price for Plaintiffs' concept;

(d)     Fisher-Price did not raise the issue of lack of novelty at any point during the negotiation or execution of the Option Agreement, dated February 22, 1999;

(e)     Fisher-Price did not raise the issue of lack of novelty in its letter to Plaintiffs, dated March 23, 1999, in which it declined to pursue development of Plaintiffs' concept "for reasons which boil down to cost."

(f)     Fisher-Price did not raise the issue of lack of novelty following acceptance and evaluation of Plaintiffs' second execution of its concept in the summer of 1999;

(g)     Fisher-Price did not raise the issue of lack of novelty when it rejected Plaintiffs' third execution of its concept in a letter dated January 5, 2001, because it was "too expensive for what it does";

(h)     Paul Snyder testified at his deposition that it was his practice to let inventors know at the time of rejection about a lack of novelty, but he did not do so in this case; (Dize Dec., Exh. B); and,

37

(i)    Stan Clutton, Fisher-Price's current vice president of inventor relations, testified at his deposition that when Plaintiffs first asserted a claim of rights to their concept in the summer of 2002, he never considered lack of novelty as one of Fisher-Price's defenses. (Dize Dec., Exh. A). To him, he perceived this as a case of "apples and oranges" (i.e., Fisher-Price didn't use Plaintiffs' concept), not a case of lack of novelty. (*Id.*)

All of these facts conclusively establish that Plaintiffs' concept was novel, at least to Fisher-Price.

51.    Fisher-Price, in reliance upon certain case law which may or may not still be valid, argues that the mere combination of known elements is insufficient to establish novelty. (Fisher-Price Mem. of Law at 43). This does not comport with my own experience in the toy industry. I am aware that toy companies routinely and consistently license the combination of known elements, without any concern for a lack of novelty:

(a)    Perhaps the most graphic example of this principal of which I am aware involved a product originally marketed with great success by Kenner Products in the late 1970's and early 1980's called "Stretch Armstrong". At some time during the early 1990's, an independent inventor submitted to another toy company the concept that was simply "It is a good time to re-introduce Stretch Armstrong." The company liked the *timing of the idea*, entered a license agreement with the inventor and paid the inventor a royalty on its sales of "Stretch Armstrong". (I became aware of this in connection with the acquisition by Hasbro, Inc. of the licensee toy company, and reviewed the license agreement.) To say that the re-launched "Stretch Armstrong" line lacked "novelty" at the time of the submission is an understatement. The line had been hugely successful for Kenner, was heavily advertised in the United States and other

38

countries, and sales levels were in the hundreds of millions of dollars. If novelty is a function of lack of public awareness, it is unlikely that there were many individuals in North America to whom "Stretch Armstrong" would have been "novel".

(b)    Another example of the relaxed view of novelty taken by toy companies was the product line known as "Starting Lineup", previously discussed. The elements of the inventor's submission could not have been less novel to Kenner, one being its own "Star Wars" action figure and the other a common "baseball card" as had been broadly sold for nearly a century. The inventor was Pat McNally, the longtime punter and wide receiver for the Cincinnati Bengals football team. (Mr. McNally once bragged to me that his royalties from Kenner accumulated to may multiples of his total income from his years in the NFL.)

(c)    Another example is taken directly from the case of *Nadel v. Play-by-Play Toys & Novelties*, 208 F. 3d 368 (2d Cir. 2000). There, Nadel developed a concept that was simply the result of transplanting a mechanism found in publicly available Halloween toys then on the market and placing that same mechanism inside a plush toy monkey skin to develop a prototype for a new table-top toy figure. The Halloween toys had performed the exact same function as Nadel's concept. Notably, the Court reversed the lower court's summary judgment ruling on the issue of novelty, finding that genuine issues of fact existed regarding the novelty of Nadel's concept that precluded the grant of summary judgment.

(d)    Moreover, as stated, the definition of Plaintiffs' concept in the Option Agreement identifies the unique aspects of the submission as "the combination of existing action figures with film for play pattern." This language was drafted by Fisher-Price's own attorneys. Thus, Fisher-Price, by its own actions, recognized that the combination of known elements was

39

novel (or else why would they have entered into the Option Agreement?), and thus should be estopped from even asserting this as a defense.

**Plaintiffs' Concept Was Novel to the Industry**

52.    Based upon my thirty years of experience in the toy industry, I can testify that Plaintiff's concept was unique and not common as of the time of the 1998, 1999 and 2000 executions of Plaintiffs' concept, in that I am not aware of any other toy that was marketed and sold in the United States that embodies Plaintiffs' concept (or to use the vernacular, any other instance of "prior art" that "anticipate" Plaintiffs' concept).

53.    Fisher-Price has sought to unearth piles of "prior art" that are argued to show one or another characteristics of Plaintiffs' concept. Importantly, even assuming, for the sake of argument, that the instances of prior art that are contained in the summary judgment record actually anticipate Plaintiffs' concept, a fact which I dispute, the few remote instances are insufficient to show that use or knowledge of Plaintiffs' concept was "widespread" in the industry prior to 1998.

54.    In any event, Fisher-Price's alleged instances of prior art do not anticipate Plaintiffs' concept and are not relevant to show lack of novelty to the industry:

(a)    Mr. Bollinger and Fisher-Price believe that the closest item is a line of "projector action figures" introduced by Toy Biz in 1993 and a patent covering that product that issued in 1996 (although it appears that the product had ceased to be sold by that time). (Bollinger Dec. ¶¶ 37-38). However, even this hindsight effort fails because the Toy Biz product simply does not fulfill the main purpose of Plaintiffs' concept which was to " ..give the child a great start on fantasy adventures... [by means of] clips of obstacles and dangers each might

face....". (Reiling Dec., Exh. P). At column three of the Toy Biz patent, the last sentence of the penultimate paragraph states:

> "In all events, the ability to project images *which may be related in some manner to the character of the toy figure,* greatly increases the "play value" and appeal of such a product to children." [Emphasis added.]

Moreover, the projection device was located in the character's chest, not on or in its backpack; and the device was exclusively meant to project images onto a wall or through the chest, while Plaintiffs' concept principally envisioned that images would be viewed on or in the backpacks themselves. These are important differences which highlight the fundamental irrelevancy of the Toy Biz product. Furthermore, the figures themselves have so few points of articulation (i.e., movable joints) relative to their size that they can hardly be considered "action figures" at all, which are typically highly poseable and can hold a multitude of positions to assist the child in portraying various activities. In other words, the Toy Biz figures function simply as *projectors of films that may be entirely unrelated to the characters.* No reference is made to mission assignments, rescue situations or any story line associated with activities and pretend scenarios in which the child having the toy may be led to engage. The Toy Biz figure *could as easily be used to project images of Charlie Brown and the Peanuts characters* as anything having to do with the figures themselves. The Toy Biz products were merely film projectors having the interesting shape of character figures.

> (b)   Secret wars. Fisher-Price has made much of the fact that these figures come with images of the characters involved in exploits of one kind or another, and that the images can be positioned on the fronts of shields held by the figures. However, the images are

41

only visible to one who is *facing the figure from the front* – that is, when properly positioned, the *image cannot be "seen" by the figure itself*. Therefore, the images cannot be messages to or mission assignments for the figures, and fail to fulfill the definition of Plaintiffs concept set forth above. Moreover, the Secret Wars figures fail to anticipate Plaintiffs' submission because none of the figures or characters is a Rescue Heroes character, and the images are not on, in or otherwise associated with the Rescue Heroes backpacks (or any other backpacks) as principally intended by Plaintiffs' submission.

      (c)    Playsets. Fisher-Price for the first time introduces certain playsets as prior art to pre-empt Plaintiffs' submission. Several points are pertinent: none of the playsets purports to include or suggest anything other than general communications, none conveys visual messages to figures via their backpacks or devices connected to their backpacks, and, most significantly, none of the playsets involves the Rescue Heroes

      (d)    Finally, regarding the "Tellyphoto" figure of the Optic Force line, despite its similarity to Plaintiffs' description and depiction of a nearly identical figure in their third execution, Fisher-Price should not be obligated to Plaintiffs because Fisher-Price had previously marketed a "camera man" figure in their "Adventure People" product line in the 1970s. (Bollinger Dec. ¶ 47). That product is described as a *series of figures* comprising a TV news camera crew having a child-size camera wheeled around and carried by a van that is part of the set. The product is completely unlike the TellyPhoto figure that carries a toy camera *scaled to be held and carried by the figure*, nor is there a thematic connection in the Adventure People product which would suggest inclusion of such a figure and character within the Rescue Heroes

product lines. The 1970s product was certainly not an action figure, it is more fairly characterized as a doll. Moreover, Plaintiffs are not seeking to claim novelty for the type of camera mechanism used. Rather, Plaintiffs claim novelty for the look and feel of the cameraman figure, including the fact that he was holding an optical camera (which enhanced mobile play value) in one hand and a microphone in the other. In other words, this is yet another red herring introduced by Fisher-Price.

## CONCLUSION

55      As emphasized above, the crucial non-"legalese" sentence in the Fisher-Price Policy and Agreement states **"We assure you that we intend to deal fairly with you in connection with your disclosure."** Apparently, since that sentence was drafted, the philosophy of Fisher-Price has changed markedly. In the current case, at some point after Fisher-Price expressed "genuine excitement" for Plaintiffs' concept, and after it had obtained from Plaintiffs an exclusive option, Fisher-Price decided not to pay Plaintiffs. Fisher-Price has abandoned its trumpeted fairness and instead masses its great resources against Plaintiffs in attempts to camouflage actions which are in clear conflict with the custom and practice of the toy industry, as well as in violation of its obligations to Plaintiffs.

As articulated by Mr. Bollinger, toy companies encourage concept submitters to **"Show us what you want us to make and sell...."** Plaintiffs obviously succeeded in doing that with their three submissions of the "Reel Heroes" concept to Fisher-Price. Plaintiffs just didn't realize, however, that Fisher-Price would finish the sentence, "....**but don't expect us to pay you when we do!"**

43

I hereby declare that the foregoing is true and correct under penalty of perjury

Dated:  May 23, 2005

_____
James M. Kipling

CfnLibrary 1508002v4