EXHIBIT E

RECEIVED

FEB 0 1 2005

LAWRENCE M. SEGAN

STATE OF NEW YORK
SUPREME COURT : COUNTY OF ERIE

M.H. SEGAN & COMPANY, INC.,

                        Plaintiff

     v

FISHER-PRICE, INC.,

                      Defendant.

Index No. I 2003-40

Assigned Justice:
Hon. Eugene M. Fahey

## MEMORANDUM IN SUPPORT OF FISHER-PRICE'S MOTION FOR SUMMARY JUDGMENT

**HODGSON RUSS LLP**
*Attorneys for Defendant*
Robert J. Lane, Jr.
Jodyann Galvin
Stephen W. Kelkenberg
One M&T Plaza, Suite 2000
Buffalo, New York 14203
(716) 856-4000

Table of Contents

Page

Preliminary Statement .................................................................................................. 1

Statement of Facts ....................................................................................................... 2

    A.   The BMT Submission ....................................................................................... 4

    B.   The Development Agreement ............................................................................ 7

    C.   Segan's Product Designs Under the Development Agreement .......................... 8

         1.   The "Rocking/Wave" Product ................................................................... 8

         2.   The "Colored Oil" Product ....................................................................... 9

         3.   The "L-scoop" Product ............................................................................ 11

    D.   The Rejection of Segan's Submission and Expiration of the
         Development Agreement .................................................................................. 12

    E.   Segan's 1997 Patent Disclosure ...................................................................... 13

    F.   Fisher-Price Designs and Markets the Peaceful Planet Aquarium ................... 14

    G.   BMT's Claim for a Royalty ............................................................................. 17

    H.   Segan's Claim for a Royalty ............................................................................ 18

Argument ..................................................................................................................... 19

    I.   FISHER-PRICE CANNOT BE LIABLE FOR BREACH OF AN
        EXPIRED AGREEMENT .............................................................................. 19

    II.   FISHER-PRICE NEVER BREACHED THE DEVELOPMENT AGREEMENT ... 22

    III.   THE SEGAN CRIB AQUARIUM DESIGN WAS NOT NOVEL .................. 23

        A.   Segan Is Required to Show That Its Crib Aquarium
            Submission Was Novel ........................................................................... 23

        B.   Segan's L-Scoop Design Was Not Novel to Fisher-Price Because
            BMT Submitted Its "Crib Aquarium" Concept Four Years Earlier ......... 26

Table of Contents
(continued)

Page

1.    BMT submitted a crib aquarium in 1989 and
      Fisher-Price is paying BMT a royalty ............................ 26

2.    Segan admits that its alleged L-scoop design was identical
      to the BMT submission ............................................ 28

C.    The Segan Submission Did Not Meet the Novelty Standard
      Set Forth in the Development Agreement ........................... 31

IV.    THE PEACEFUL PLANET AQUARIUM WAS INDEPENDENTLY
       DEVELOPED BY FISHER-PRICE ......................................... 32

V.     FISHER-PRICE NEVER USED THE SEGAN CRIB AQUARIUM
       SUBMISSION ......................................................... 36

A.    The Only Documented Crib Aquarium Submission Was Based
      on Different Densities of Colored Oil ............................ 37

B.    The Peaceful Planet Aquarium Is Not a Use of the Segan
      Colored Oil Design ............................................... 38

VI.    SEGAN'S BREACH OF CONTRACT CLAIM MUST BE DISMISSED
       BECAUSE IT DISCLOSED ITS L-SCOOP DESIGN TO THE PUBLIC ............ 39

A.    Segan Disclosed Its L-Scoop Design to the Public ................ 40

B.    Segan's Disclosure Dedicated the L-Scoop Aquarium Design to
      the Public Domain ................................................ 41

C.    Segan's Disclosure Was a Material Breach of Its Obligations
      Under the Development Agreement .................................. 42

D.    Segan's Disclosure Resulted in a Failure of Consideration ....... 43

VII.   SEGAN HAS DISCLAIMED ANY BREACH OF CONTRACT CLAIM ............... 45

VIII.  SEGAN'S CLAIMS AGAINST SUBSEQUENT PRODUCTS MUST
       BE DISMISSED ....................................................... 46

1.    Ocean Wonders Aquarium Swing .................................... 47

2.    Ocean Wonders Fish Bowl ......................................... 48

## Table of Contents
### (continued)

Page

3.    Ocean Wonders Aquarium Bouncer. .................................................. 48

4.    "Mini" Peaceful Planet Aquarium. .................................................. 48

5.    Ocean Wonders Aquarium. .................................................. 48

Conclusion ............................................................................................. 49

## Preliminary Statement

This action arises out of the claims by plaintiff M.H. Segan & Company, Inc. ("Segan")
that Fisher-Price, Inc. made unauthorized and uncompensated use of its design for a toy crib aquarium
product, in breach of an expired agreement between the parties (the "Development Agreement"). Fisher-
Price submits this memorandum in support of its motion for summary judgment pursuant to CPLR 3212.
Specifically, Fisher-Price seeks summary judgment dismissing Segan's first and only remaining cause of
action, alleging breach of express contract.[1]

There are eight independent grounds that require dismissal of Segan's claim for breach of
the Development Agreement:

(1)     The alleged breach occurred after the Development Agreement expired by its own
        terms when there were no contractual obligations in effect between the parties.

(2)     Even assuming the existence of a valid and unexpired contract, Fisher-Price never
        breached any obligations imposed by the Development Agreement.

(3)     The crib aquarium design Segan allegedly submitted to Fisher-Price was not unique
        or novel and therefore created no enforceable obligation on Fisher-Price to refrain
        from using it.

(4)     Fisher-Price's Peaceful Planet Aquarium was developed independently by Fisher-
        Price with no reliance on or use of any submission by Segan.

---

[1]    See Affirmation of Robert J. Lane, Jr., dated April 7, 2005 (the "Lane Aff."), Ex. C (Justice Makowski's January 19, 2005
Memorandum Decision and Order, granting Fisher-Price partial summary judgment dismissing Segan's second and third
causes of action and acknowledging Segan's withdrawal with prejudice of its fourth cause of action).

(5)     Fisher-Price's Peaceful Planet Aquarium was materially different from Segan's submission and does not use the features or ideas Segan submitted.

(6)     In 1995, Segan disclosed his alleged crib aquarium design to the public, thereby destroying any consideration provided to Fisher-Price and rendering any alleged contract unenforceable.

(7)     The Development Agreement contains a provision in which Segan disclaimed the exact claim it attempts to assert here.

(8)     Even if the Court declines to dismiss this action in its entirety, it should nevertheless dismiss all claims against products other than the Peaceful Planet Aquarium, because it is undisputed that such products do not make use of Segan's alleged submission.

As discussed below, each of these grounds for dismissal is established by uncontroverted evidence and testimony developed during discovery in this action.

## Statement of Facts

Fisher-Price is engaged in the business of designing, marketing, and selling toys and juvenile products on a worldwide basis. Fisher-Price has three primary sources for new product designs.

- Fisher-Price employs internal designers and engineers that are responsible for the design and engineering of the vast majority of its products.[2]

- Fisher-Price also accepts submissions of products on an unsolicited basis from certain outside, independent inventors. On an annual basis, Fisher-Price reviews approximately 2,000 product submissions from outside inventors.[3]

---

[2]   *See* Affidavit of Stan Clutton, sworn to April 6, 2005 (the "Clutton Aff."), ¶ 2(a).

- In addition to receiving outside inventor submissions on an unsolicited basis, Fisher-Price occasionally enters into a "development agreement" with an outside designer, pursuant to which the outside designer is retained to develop a toy or product within parameters established by Fisher-Price.[4]

This case involves the development and sale of an aquarium-themed infant soother product[5] and product designs that came to Fisher-Price by all three routes described above. First, in 1989, an outside inventor known as Breslow, Morrison, Terzian & Associates ("BMT") submitted to Fisher-Price an aquarium-themed crib product, which included a transparent disk-shaped chamber, water, toy fish, music, lights, and a rotating scoop mechanism that generated a stream of bubbles.[6] BMT is not a party to this litigation.

Second, in 1993, as part of an initiative to develop a new product for the infant soother category, Fisher-Price entered into a Development Agreement with plaintiff Segan, pursuant to which Segan agreed to develop infant crib soother concepts.[7] Segan ultimately submitted a design which was entirely dissimilar from the BMT design. Segan's aquarium-themed infant crib soother submission was rejected by Fisher-Price on July 30, 1993.[8]

Third, in mid-1997, one of Fisher-Price's designers (Greg Martin) working with an outside designer (Charles Paddock) designed an aquarium-themed infant soother with essentially the same features as BMT's 1989 submission; i.e., clear liquid, toy fish, music, lights, and bubbles. Martin and

---

[3]   Clutton Aff. ¶ 2(b).

[4]   Clutton Aff. ¶ 2(c).

[5]   An "infant soother" is a product for the crib or playpen which features soft lights and music (and sometimes moving parts), intended to sooth a newborn or infant to sleep. Clutton Aff. ¶ 8.

[6]   Clutton Aff. ¶ 12.

[7]   Lane Aff. ¶ 20, Ex. N.

[8]   Lane Aff. ¶ 41, Ex. X.

Paddock were both unaware of either the BMT or the Segan aquarium-themed infant soothers, and conceived of the product design entirely independently of both.[9] Fisher-Price completed development of Martin's crib aquarium design and marketed it to the public under the name "Peaceful Planet Aquarium" beginning in early 1999.

Fisher-Price's position on the facts underlying this dispute (as opposed to the legal theories requiring dismissal of this case) is simple. Fisher-Price contends that it developed the design for the Peaceful Planet Aquarium internally on an independent basis and without reference to either the BMT submission or the Segan submission. Moreover, the crib aquarium design submitted by Segan was entirely different from the design submitted by BMT and the design ultimately manufactured and sold by Fisher-Price. Finally, even if Segan had submitted to Fisher-Price a design similar to the Peaceful Planet Aquarium (which it did not), BMT submitted such a design first. As a result, if any outside inventor is entitled to a royalty with respect to the Peaceful Planet Aquarium, it is BMT and not Segan.[10]

The factual background underlying the development of the Peaceful Planet Aquarium, and the BMT and Segan submissions, is discussed in greater detail below.

## A.  The BMT Submission

In May 1989, BMT submitted to Fisher-Price's inventor relations department a "crib aquarium" product. In its May 2, 1989 written description, BMT described its crib aquarium product as follows:

---

[9]  The Martin design also included the feature of projecting light through rippling waves to create a ripple design on the ceiling of the infant's room. See affidavit of Greg Martin, sworn to March 31, 2005 (the "Martin Aff.") ¶¶ 7-8; affidavit of Charles Paddock, sworn to April 7, 2005 (the "Paddock Aff.") ¶ 5.

[10]  As discussed below, BMT made a claim for a royalty with respect to the Peaceful Planet Aquarium. After investigating BMT's claim, Fisher-Price settled it by entering in a license agreement under which BMT was paid royalty. Clutton Aff. ¶ 15.

A novel type of crib amusement device comprising a water filled circular container mounted generally in a vertical plane which when rotated produces a steady stream of bubbles from the bottom floating to the top. This is accomplished by a series of radial ribs around the edge of the circular container which, in conjunction with an air bubble at the top, produce this effect. This effect occurs when the container is rotated and the fins around the periphery trap air and bring that trapped air to the bottom thus releasing it as the rotational positioning of the fins allow. Many colorful and interesting plastic elements are included in the water filled container which give the effect of an aquarium or other type of undersea scenario and the whole effect is that of a thriving moving aquarium. This device may be motor driven with battery motor, or spring wound music box, or may be hand powered by the child. This device may be incorporated not only into busy box-type elements but may also be mounted in a semi-horizontal position over a crib such as a mobile or could be hand held and usable outside the crib or playpen.[11]

Set forth below are photographs of: (1) BMT's original prototype; (2) a refined version of the BMT prototype; and (3) Fisher-Price's Peaceful Planet Aquarium as sold to the public in 1999.



**Original BMT Prototype**



**Refined BMT Prototype**

---

[11] Chitton Aff. ¶ 13.



**Peaceful Planet Aquarium**

Segan has admitted in its interrogatory answers and in deposition testimony that there is no difference between the BMT 1989 submission and the Peaceful Planet Aquarium (other than the fact that the Peaceful Planet Aquarium includes a projection feature, projecting a ripple design on the ceiling of the infant's room).[12]

Fisher-Price was interested in the BMT crib aquarium submission and assigned it to internal designers for further development.[13] Ultimately, however, Fisher-Price determined not to go forward with commercializing a product based on the BMT submission, and it was rejected on May 22, 1990.[14]

---

[12] Lane Aff., Ex. Z.

[13] The internal Fisher-Price design personnel who worked on the BMT submission were Tina Zinter and Martin Trossman. Neither Ms. Zinter nor Mr. Trossman were involved in the review of the Segan crib aquarium submission. Lane Aff., Ex. I at 75-76.

[14] Clutton Aff. ¶ 14.

**B.     The Development Agreement**

In May 1993, Fisher-Price and Segan entered into the Development Agreement at issue in this action, pursuant to which Segan agreed to develop unique "General Crib and Playpen Mood Electronic Items Concepts" in exchange for a non-refundable fee of $5,000.[15] By 1993, the product category of "crib and playpen mood items" was well-developed and highly competitive. It consisted of electronic items that typically included music and lights and that were intended to soothe the new born baby or infant to sleep.[16] When Fisher-Price presented this project to Segan, it provided photos and product literature for five of the major competitive products already on the market.[17] It is important to note that Segan was not asked to create a new product category; instead it was asked to develop a novel and unique product for the already-existing crib soother category.

The Development Agreement set forth specific requirements for the crib soother products that Segan was to develop. The products were required to be: "[n]ewborn appropriate — mood setting" products; "[c]rib attached or crib to floor"; "[e]ffective in ambient light, but primarily used in darker room" and to incorporate both parent and baby activation features.[18] Fisher-Price further specified that the product or products developed must include "unique visual effects," "unique light effects," "unique sound effects," and "innovative technologies." The contractual requirement that any product developed by Segan include "*unique*" visual effects, light effects and sound effects and "innovative technologies" was central to the purpose of the Development Agreement. Because the crib soother product category was an existing and highly competitive category, Fisher-Price was looking for new and novel features that

---

[15]  Lane Aff., Ex. N. It is undisputed that Fisher-Price paid Segan the non-refundable $5,000 fee as required by the parties' contract. Lane Aff. ¶ 20, Ex. D at 217.

[16]  Lane Aff. ¶ 21.

[17]  *See* Lane Aff. ¶ 20, Ex. O.

[18]  Lane Aff., Ex. N, Ex. A ("Concept Area" definition attached as Exhibit A to the Development Agreement).

would differentiate its product from those already on the market.[19] Segan agreed to those contractual requirements when it executed the Development Agreement.

The term of the agreement was three months, commencing April 1, 1993 and expiring June 30, 1993.[20] During the term of the agreement, Segan was required to keep any products or designs it developed confidential.[21] Fisher-Price was also granted an option, which expired on June 30, 1993, to license any crib soother product developed by Segan under the Development Agreement.[22] If Fisher-Price declined to exercise its option before June 30, 1993, then "neither party shall have any additional obligations to each other, except the return to M.H. Segan of all prototypes developed by M.H. Segan."[23]

**C.    Segan's Product Designs Under
the Development Agreement**

**1.    The "Rocking/Wave" Product.**

In early April 1993, Marc Segan (Segan's president) traveled to Fisher-Price's offices in East Aurora, New York for a meeting to kick off the crib soother project.[24] Segan contends that it presented its first design for a crib aquarium product to Fisher-Price at this meeting.[25] This design was based on different densities of blue and clear fluid in a rectangular chamber that rocked back and forth to generate a wave-like effect. Segan intended that the chamber contain fish and sea life. This design is referred to below as the "Rocking/Wave" product. Segan does not claim that Fisher-Price made any use

---

[19]  Lane Aff. ¶ 21, Ex. M.

[20]  Lane Aff., Ex. N ¶ 1.

[21]  Lane Aff., Ex. N ¶ 7.

[22]  Lane Aff., Ex. N ¶ 3.

[23]  Lane Aff., Ex. N ¶ 6.

[24]  Lane Aff. ¶ 25, Ex. D at 72-73.

[25]  Lane Aff., Ex. D at 72-73.

- 8 -

of the Rocking/Wave product design. One of Segan's drawings of its Rocking/Wave product is

reproduced below.[26]



A photo of an item purchased from a novelty store that Segan showed Fisher-Price to demonstrate the

Rocking/Wave chamber is reproduced below.[27]



### 2.    The "Colored Oil" Product.

Later in April 1993, pursuant to the Development Agreement, Segan submitted to Fisher-

Price a series of drawings reflecting a second product design. Segan's drawings reflected an aquarium-

---

[26] Lane Aff., Ex. P.

[27] Lane Aff., Ex. Q.

themed, crib soother design that incorporated different densities of colored oil contained within two clear plastic disks (referred to below as the "Colored Oil Product").[28] The drawings and accompanying written description showed an aquarium-shaped device with toy fish and two rotating disks, one located behind the other. Each disk was primarily filled with light yellow oil. The front disk contained a smaller amount of heavy blue oil; the rear disk contained a smaller amount of heavy red oil. The heavy oil began each cycle at the bottom of the disk in a reservoir. As the disks rotate, the heavy blue and red oils were raised to the top of the aquarium, where they were released from that reservoir creating what Segan called "a unique visual effect" of heavy colored oil dripping through the lighter yellow oil that fills the disks.[29] One of Segan's drawings showing a side view of the Colored Oil Product is reproduced below.[30]



---

[28] Lane Aff., Ex. R.

[29] Lane Aff., Ex. D at 151. See also Ex. G at 147-150, 173-175; Ex. H at 47-48.

[30] Lane Aff., Ex. R.

On May 10, 1993, Segan submitted a prototype of its Colored Oil Product. The prototype worked in the same manner described above. A photograph of the May 10, 1993 prototype is reproduced below.[31]



### 3.    The "L-scoop" Product.

Segan also alleges that it showed Fisher-Price a clear plastic disk containing L-shaped scoops, clear liquid and an air bubble at the top. Segan contends that it showed someone from Fisher-Price (it can't identify who)[32] that the disk could be rotated so that the scoops would move air from the top of the disk to the bottom and release it to generate bubbles. Segan also claims that he intended that this design contain fish or sea life and include music. This design is referred to below as the "L-scoop Product."

In contrast to the Rocking/Wave Product and the Colored Oil Product, neither Segan nor Fisher-Price has any record that the L-scoop Product design was ever submitted to Fisher-Price.

- Segan has produced a number of drawings of both the Rocking/Wave Product and the Colored Oil Product which it claims it submitted to Fisher-Price. Segan does not even allege that it ever submitted a drawing of the L-scoop Product to Fisher-Price.

---

[31]  This photo comes from Fisher-Price's inventor submission database. Clutton Aff. ¶ 17, Ex. L. Fisher-Price has no record of any other crib aquarium product design from Segan. Clutton Aff. ¶ 18.

[32]  *See* Lane Aff. ¶ 38, Ex. G at 68-70, 200; Ex. H at 23-24.

- There are numerous memos from Segan to Fisher-Price describing the details of the Colored Oil Product. Segan has produced no e-mails, memos, letters, notes, or drawings evidencing submission of the L-scoop Product to Fisher-Price.[33]

- Fisher-Price produced during discovery, a photo of the prototype of the Colored Oil Product. Fisher-Price also produced during discovery the actual blue and clear rocking fluid container that was the basis of the Rocking/Wave Product.[34]

- The sole evidence Segan relies on to show that the L-scoop Product design ever existed is two clear disks formed out of plastic with L-shaped scoops that Segan claims were part of a bubble-generating mechanism (of which no photos or drawings exist).[35] Fisher-Price has no record of ever receiving these disks.[36]

- The two Fisher-Price employees Segan identifies as persons who may have seen the L-scoop disks (Paul Snyder and Liz Krisel) both testified that they had never seen them.[37] Paul Snyder is no longer a Fisher-Price employee and testified as a non-party witness.[38]

- Fisher-Price maintains a database and records of outside inventor submissions. There is no database entry or record of the alleged L-scoop Product.[39]

## D. The Rejection of Segan's Submission and Expiration of the Development Agreement

By letter dated July 30, 1993, Fisher-Price rejected Segan's submission and returned its prototype.[40] Consistent with the fact that there is no record that Fisher-Price ever received the L-scoop Product, there is no record that Fisher-Price ever rejected it. This is further evidence that the L-scoop Product was never submitted.

---

[33] *See* Lane Aff. ¶ 36, Exs. R and V.

[34] *See* Lane Aff., Ex. Q.

[35] *See* Lane Aff., Ex. W.

[36] Clutton Aff. ¶¶ 17-18.

[37] Lane Aff., Ex. L at 82-83; Ex. AA at 90-91.

[38] Lane Aff., Ex. AA at 17-18.

[39] Clutton Aff. ¶¶ 17-18.

[40] *See* Lane Aff., Ex. X. The Rocking/Wave Product had been superseded by the Colored Oil Product; no formal action was taken with respect to it.

The Development Agreement expired on June 30, 1993. Fisher-Price did not exercise its option; nor did it enter into a license agreement for Segan's design at any time. As set forth in paragraph 6 of the Development Agreement, upon expiration, "neither party shall have any additional obligations to each other, except the return to M. H. Segan of all prototypes developed by M. H. Segan."[41]

**E.    Segan's 1997 Patent Disclosure**

Segan clearly understood that the Development Agreement had expired and that neither party had any further obligation under it. On May 25, 1995, two years after expiration of the agreement, Segan filed an application for a patent entitled "Decorative Article with Flake Circulating Means," disclosing a Christmas ornament with a rotary wheel including L-shaped scoops that moved snowflakes from the bottom of the ornament to the top and released them to float down, creating a snow-globe effect. Figure 3 from the '750 patent showing the L-scoop mechanism for moving snowflake particles is reproduced below.[42]



---

[41]  Lane Aff., Exhibit N ¶ 6.

[42]  Lane Aff., Ex. Y (figure 3). A copy of this patent (the "'750 patent") is attached as Exhibit Y to the Lane Affirmation.

The '750 patent also disclosed an alternative design in which the device was a toy aquarium rather than a Christmas ornament. In the alternative design, "the scoops may be intentionally configured to drag air from the air bubble at the top of the [aquarium] down to the bottom . . . whereupon the air released from the scoops will filter up through the cavity as small air bubbles for creating an underwater effect." Segan's patent was issued on September 16, 1997, thereby publicly disclosing to the world the bubble-generating aquarium design (*i.e.*, the L-scoop Product) it claims to have submitted to Fisher-Price in 1993.[43]

F.    **Fisher-Price Designs and Markets**
      **the Peaceful Planet Aquarium**

By 1997, the market for infant soothers was crowded and highly competitive. In addition, both crib aquarium products and bubbling toy aquarium products had been on the market for a number of years. A photo of a 1980 crib aquarium product marketed by Shelcore is set forth below.[44]



A photo of Mattel's "Musical Bubbling Aquarium" is reproduced below.[45]

---

[43]  As discussed above, Fisher-Price denies that this design was *ever* submitted to it.

[44]  Clutton Aff. ¶ 10, Ex. B.

[45]  Clutton Aff. ¶ 10, Ex. C.

– 14 –



The Musical Bubbling Aquarium, which was sold to the public beginning in 1994, contains essentially the same features as the Peaceful Planet Aquarium: clear liquid, toy fish, music, lights and bubbles. Thus, this exact combination of features in an aquarium toy was in the public domain, and freely available for use by any toy company, by 1994 at the latest.

In Spring 1997, a Fisher-Price designer named Greg Martin was working on water-based toy designs. During that process, he designed an aquarium-themed crib soother, with toy fish, clear liquid, bubbles, music, and a feature that projected rippling-wave shapes on the ceiling. The earliest drawing still available of Martin's design (dated June 5, 1997) is reproduced below.[46]



---

[46] *See* Martin Aff., Ex. B.

While Martin's earliest design included bubbles rising through the aquarium, he had not conceived of or designed a specific mechanism for generating the bubbles. In July 1997, Fisher-Price retained an outside independent designer, Charles Paddock, to work with Martin to develop the details of the mechanism that would accomplish Martin's crib aquarium design.[47] Paddock developed a mechanism that included scoops on the inside of the aquarium disk. The disk was not entirely filled with liquid. When the disk was rotated, the scoops would capture air from the top of the aquarium, drag it to the bottom and release it, creating a stream of bubbles.

In February 1999 — nearly six years after expiration of the Development Agreement and 17 months after Segan disclosed its L-scoop bubble-generating design to the public — Fisher-Price introduced a crib soother known as the "Peaceful Planet Aquarium."[48] The main features of the Peaceful Planet Aquarium were: clear fluid in a disk-shaped chamber, a rotating wheel with scoops that generated bubbles, moving toy fish, lights, music, underwater sounds, and a mechanism that projected light through rippling water to create a ripple design on the ceiling of the infant's room. A photo of the Peaceful Planet Aquarium is reproduced below.[49]

---

[47]  Paddock Aff. ¶ 2. Fisher-Price retained outside designers on a work-for-hire basis to assist on projects when its internal design staff was overextended.

[48]  See Clutton Aff. ¶ 9. See also Lane Aff., Ex. A (Segan's Amended Complaint) ¶ 9 ("In or about February 1999, Defendant began to market and sell a product described as the 'Peaceful Planet Aquarium'")

[49]  See Clutton Aff., Ex. A.



G.    **BMT's Claim for a Royalty**

In February 1999, shortly after the release of the Peaceful Planet Aquarium, BMT

contacted Fisher-Price and claimed that it was entitled to a royalty on the Peaceful Planet Aquarium based

on its 1989 submission of a similar aquarium.[50] While Fisher-Price initially denied that it had used or

relied on any submission by BMT in the development of the Peaceful Planet Aquarium, it agreed to

investigate BMT's claim[51] in view of the significant number of submissions Fisher-Price receives

annually (over 2,000) and the ten-year period between the BMT submission and the introduction of the

Peaceful Planet Aquarium. As a result of its investigation, Fisher-Price determined that the mechanism

employed in the Peaceful Planet Aquarium to generate bubbles was similar to the mechanism in BMT's

1989 crib aquarium design.[52] Thus, while Fisher-Price denied that it had made any use of BMT's

submission in designing the Peaceful Planet Aquarium, Fisher-Price agreed to pay BMT a royalty on the

Peaceful Planet Aquarium.[53] On May 12, 1999, Fisher-Price and BMT entered into a license settling

BMT's royalty claim.

---

[50]  Clutton Aff. ¶ 11.

[51]  Fisher-Price receives thousands of product submissions every year from outside inventors. Clutton Aff. ¶ 26.

[52]  *See* Clutton Aff. ¶ 15.

[53]  *Id.*

**H.    Segan's Claim for a Royalty**

In September 1999, nine months after the Peaceful Planet Aquarium was introduced to the public and four months after Fisher-Price reached an agreement to pay BMT a royalty, Segan contacted Fisher-Price claiming that it was entitled to a royalty on the Peaceful Planet Aquarium based on its 1993 submission under the Development Agreement.[54]  By letter dated September 25, 2000, Fisher-Price rejected the claim as unfounded.[55]

Segan commenced this action on November 13, 2002 — almost ten years after its submission of the Crib Aquarium concept and more than three years after raising its initial claim — claiming that Fisher-Price used its product design in creating the Peaceful Planet Aquarium and other allegedly derivative toy products, which were marketed and/or sold to the public after the Peaceful Planet Aquarium.[56]

Segan's complaint originally included claims for breach of express contract, breach of implied contract, unjust enrichment, and misappropriation of idea.[57]  With the exception of the breach of express contract claim at issue here, all of Segan's other claims have been previously dismissed or withdrawn.[58]

---

[54]   *See* Clutton Aff. ¶ 16.

[55]   *See* Clutton Aff. ¶ 16 & Ex. J.

[56]   These products include the Ocean Wonders Aquarium, Ocean Wonders Bubbler, Ocean Wonders Fishbowl, Ocean Wonders Cradle Swing, Ocean Wonders Aquarium Bouncer, and a miniature version of the Peaceful Planet Aquarium.  *See* Lane Aff., Ex. A.

[57]   *See* Lane Aff., Ex. A.

[58]   *See* Lane Aff., Ex. C.

<u>Argument</u>

Summary judgment should be granted where there are no genuine issues of material fact and the defendant establishes its defenses as a matter of law.[59] A plaintiff opposing a summary judgment motion "must produce evidentiary proof in an admissible form sufficient to require a trial of material questions of fact on which [its] claim rests."[60] "Mere conclusions, expressions of hope or unsubstantiated allegations or assertions" are not enough to avoid summary judgment.[61]

**I.    FISHER-PRICE CANNOT BE LIABLE FOR
       BREACH OF AN EXPIRED AGREEMENT**

A contract that has expired by its own terms cannot thereafter be breached.[62] Stated differently, when a contract expires, so too do the parties' rights and obligations.[63] And if there has been

---

[59] See CPLR 3212. See also *Zuckerman v. City of New York*, 49 N.Y.2d 557, 562, 427 N.Y.S.2d 595, 597 (1980); *Friends of Animals, Inc. v. Associated Fur Mfrs., Inc.*, 46 N.Y.2d 1065, 1067-68, 416 N.Y.S.2d 790, 791 (1979); *Smith v. Johnson Products Co.*, 95 A.D.2d 675, 463 N.Y.S.2d 464, 465-66 (1st Dep't 1983).

[60] *Gilbert Frank Corp. v. Federal Ins. Co.*, 70 N.Y.2d 966, 967, 525 N.Y.S.2d 793, 794 (1988) (citing *Zuckerman v. City of New York*, 49 N.Y.2d 557, 568, 427 N.Y.S.2d 595 (1980)).

[61] *Id.*

[62] See *Int'l Ry. of Cent. Am. v. United Brands Co.*, 358 F. Supp. 1363, 1376 (S.D.N.Y. 1973) (granting partial summary judgment dismissing plaintiff's breach of contract claim and stating that "[s]ince the terminal date for breach of the main contract is held to be January 1, 1963, any actionable breach must have occurred before that date").

[63] *Sevel Argentina, S.A. v. Gen. Motors Corp.*, 46 F. Supp. 2d 261, 268 (S.D.N.Y. 1999) (paraphrase) (granting defendant's motion for summary judgment and holding that where the plaintiff had "affirmatively pled" that the acts constituting breach did not occur until after the expiration of the contract, no claim for breach of contract could be maintained); *Greenspon v. E. R. Squibb & Sons*, 290 N.Y. 772, 50 N.E.2d 105 (1943) (affirming and quoting trial court's directed verdict for defendant licensee under an option contract, holding that "the agreement is not ambiguous and . . . under Paragraph 6th * * * the defendant was relieved of all its obligations under the agreement including any payments that under the agreement became due after the termination became effective"); *New York Tel. Co. v. Jamestown Tel. Corp.*, 282 N.Y. 365, 372, 26 N.E.2d 295, 297 (1940) (affirming the trial court's judgment and recognizing that "[t]he rights and obligations of the parties after March 1, 1932, cannot be measured by the terms of the contract which had come to an end on March 1st"). See also *Schloss v. Danka Bus. Sys. PLC*, 2000 U.S. Dist. LEXIS 2909, at * 10 (Mar. 16, 2000 S.D.N.Y.) (granting defendant's motion to dismiss and holding that "defendants were not contractually required to cooperate with the sale of the . . . [s]hares because the Rights Provisions had expired by its terms"). A copy of the *Schloss* decision is attached as Exhibit A. See generally *Matthews v. Wozencraft*, 15 F.3d 432, 442 (5th Cir. 1994) (affirming district court's grant of summary judgment dismissing plaintiff's breach of contract claim because the contract expired by its own terms "extinguishing [plaintiff's] rights at that time"); *All West Pet Supply Co. v. Hill's Pet Prods. Div.*, 847 F. Supp. 858, 861 (D. Kan. 1994) (denying the plaintiff's motion for reconsideration of the court's decision granting summary judgment and responding to the plaintiff's argument that the contract is silent as to the obligations which survive the agreement by stating that "a contract that specifies the period of its duration generally terminates on the

- 19 -

no breach of the contract prior to its termination, neither party has an actionable claim for breach based on the other's conduct occurring after the contract's termination date.[64] This is true even if the party's conduct would have been actionable had it occurred prior to the termination of the contract.[65]

New York courts have consistently applied this principle in dismissing claims for breach of contract in the context of licensing agreements. For example, in *Greenspon v. E.R. Squibb & Sons*, the New York Court of Appeals upheld the trial court's directed verdict, stating that the defendant licensee could not be liable for breach because it was "relieved of all its obligations under the agreement [that] became due after the termination became effective."[66] Likewise, in *Sevel Argentina, S.A.*, the plaintiff's breach of contract claims were dismissed where the allegations in the plaintiff's complaint clearly established that the alleged breach of the licensing agreement occurred after its expiration.[67]

---

expiration of such period. If the contract expires on a particular date, the mutual obligations of the parties that comprise the contract of course also terminate on that date, unless the parties otherwise expressly provide in the contract").

[64] Fisher-Price is not arguing that a claim for breach of contract must be filed while the agreement is in effect. CPLR 213(2) clearly provides that the statute of limitations for a breach of contract claim is six years from the date of the breach. Rather, Fisher-Price is arguing that a party cannot be liable for breach of contract where the alleged breach occurred after the contract's expiration, because upon expiration, there was no longer a contract to breach.

[65] *See Sevel Argentina, S.A.*, 46 F. Supp. 2d at 268 (granting defendant's motion for summary judgment where license agreement had expired prior to alleged breach); *Int'l Ry. of Cent. Am.*, 358 F. Supp. at 1376 (granting partial summary judgment dismissing plaintiff's breach of contract claim). *See also Matthews*, 15 F.3d at 441 (affirming district court's grant of summary judgment dismissing plaintiff's breach of contract claim where underlying contract expired before alleged breach); *Great Lakes Exteriors, Inc. v. Dryvit Sys., Inc.*, 2000 U.S. Dist. LEXIS 1094, at * 6-7 (E.D. Mich. Jan. 27, 2000) (granting summary judgment as a matter of law where defendant established that the breach alleged by the plaintiff related to an agreement that had expired by its express terms) (a copy of the *Great Lakes* case is attached as Exhibit B); *Equitable Life & Cas. Ins. Co. v. Rutledge*, 454 P.2d 869, 872 (Ariz. Ct. App. 1969) (affirming trial court's grant of summary judgment and stating that "[s]ince there was no actual solicitation by these defendants until after proper termination of the contract, there was no breach of the contract").

[66] *Greenspon*, 290 N.Y at 773, 50 N.E.2d at 105 (affirming the trial court's decision based on prior history without further opinion).

[67] *Sevel Argentina, S.A.*, 46 F. Supp. 2d at 268.

Segan acknowledges that the Development Agreement expired by its express terms on June 30, 1993.[68] Indeed, it must; paragraph 1 of the Agreement specifically provides:

> This Development Agreement shall have a term of three (3) months commencing on April 1, 1993, ("Effective Date") unless earlier terminated by Fisher-Price, Inc. on thirty (30) days written notice.[69]

Paragraph 6 of the Agreement further provides:

> If Fisher-Price, Inc. should choose not to exercise the OPTION on or before the end of the OPTION TERM [i.e., June 30, 1993], neither party shall have any additional obligations to each other, except the return to M. H. Segan of all prototypes developed by M. H. Segan.[70]

This provision makes clear that none of the parties' obligations under the Development Agreement (other than return of any prototype) survived expiration of the agreement. On July 30, 1993, rejected Segan's submission, and returned to Segan the prototype submitted pursuant to the Development Agreement.[71]

Nevertheless, in the first cause of action, Segan charges that Fisher-Price somehow breached the expired Development Agreement in February 1999, when Fisher-Price first introduced the Peaceful Planet Aquarium for market and sale.[72] But even if Fisher-Price's conduct was contrary to the Agreement (which it was not), it occurred — as Segan's allegations make clear — almost six years after

---

[68] See Lane Aff., Ex. A ¶¶ 4 & 8 (Amended Complaint).

[69] See Lane Aff., Ex. N ¶ 1.

[70] See Lane Aff., Ex. N ¶ 6. At the very least, this language means that no obligations between the parties under the Development Agreement survived the expiration of the Agreement. Fisher-Price is not arguing that all obligations under the law extinguish upon the expiration of the contract. To be certain, the common law provides other remedies (e.g., misappropriation, unjust enrichment, etc.). The point here, rather, is that upon the expiration of the Development Agreement neither party had any *contractual rights* under the Agreement.

[71] See Lane Aff., Ex. X

[72] See Lane Aff., Ex. A ¶ 9 (Amended Complaint) ("In or about February 1999, Defendant began to market and sell a product described as the 'Peaceful Planet Aquarium'").

the Development Agreement had expired. And, as noted above, the Agreement specifically provided (at paragraph 6) that none of the parties' obligations survived the expiration date.

Because it is undisputed that the Development Agreement expired on June 30, 1993 and the breach alleged by Segan occurred in early 1999, almost six years after such expiration, Fisher-Price is entitled to summary judgment as a matter of law dismissing Segan's breach of contract claim.

## II.    FISHER-PRICE NEVER BREACHED THE DEVELOPMENT AGREEMENT

Even if the Development Agreement survived past its June 30, 1993 expiration date (which it did not), Segan's breach of contract claim must be dismissed because it has not identified any breach of the Development Agreement at issue.[73] Even a cursory review of the agreement reveals that it imposed only one obligation on Fisher-Price. This obligation was to pay Segan a $5,000 non-refundable fee and to return the prototype — which it did.

It is undisputed that Fisher-Price paid to Segan a $5,000 non-refundable fee for the option to consider and *potentially* license any of Segan's submissions under the Development Agreement.[74] As such, Fisher-Price satisfied its only concrete obligation under the Development Agreement.

If Segan's breach of contract claim is based on the view that would constitute a breach, disclosing or using information submitted under the Development Agreement, it must be dismissed as directly contrary to the express terms of the agreement. Paragraph 14 of the Development Agreement states expressly that Fisher-Price "shall not be subject to an obligation of confidence . . . and shall not be

---

[73] *See Claymer Int'l, Inc. v. Shurtape Techs., Inc.*, 1999 U.S. Dist. LEXIS 19698, at * 5 (S.D.N.Y. Dec. 21, 1999) (setting forth the elements of a breach of contract claim and dismissing plaintiff's contract claim as a matter of law where it failed to identify any breach by defendant of the parties' agreement). A copy of the *Claymer* decision is attached as Exhibit C.

[74] *See* Lane Aff. ¶ 21, Ex. D at 217.

liable for any use or disclosure of such information [unless for copyright or patent infringement]."[75]  This

makes clear that there was no contractual obligation imposed on Fisher-Price to refrain from disclosing or

using any information submitted by Segan.

Accordingly, Segan has not identified any provision of the Development  Agreement that

was breached.  Segan's claim for breach of contract thus fails as a matter of law and must be dismissed.

### III.     THE SEGAN CRIB AQUARIUM DESIGN WAS NOT NOVEL

For purposes of this argument only, Fisher-Price assumes that the Development Agreement

did not expire and that Segan's 1993 Crib Aquarium design contained all of the elements present in

Fisher-Price's Peaceful Planet Aquarium (*i.e.*, clear water, bubbles, plastic fish, music, lights, and

projection).[76]  Even if this were true, Segan has no claim to compensation from Fisher-Price, because this

design was not novel to Fisher-Price in 1993.  Accordingly, Fisher-Price is entitled to summary judgment

dismissing Segan's breach of contract claim.

### A.     Segan Is Required to Show That Its Crib Aquarium Submission Was Novel

> Ideas which are not novel 'are in the public domain and may freely
> be used by anyone with impunity.'  In fact, copying of ideas in the
> public domain is not only permitted, it is encouraged.[77]

Thus, any claim based upon the alleged misappropriation of idea requires a showing of

novelty.[78]  "A 'novel' idea is one that has not been suggested to or known by the public at a prior time."[79]

---

[75]  Lane Aff., Ex. N ¶ 14.

[76]  As discussed below in Section VI, however, Fisher-Price disputes this and believes that there is no admissible evidence to support it.

[77]  *Brandwynne v. Combe Int'l, Inc.*, 74 F. Supp. 2d 364, 375 (S.D.N.Y. 1999) (quoting *Ed Graham Prods. Inc., v. Nat'l Broad. Co.*, 75 Misc. 2d 334, 337, 347 N.Y.S.2d 766, 769 (S. Ct. N.Y. Co. 1973)). *See also  Paul v. Haley*, 183 A.D.2d 44, 52, 588 N.Y.S.2d 897, 902 (2d Dep't 1992) (same).

The courts have made clear that "whether an idea is novel is an issue of law which may properly be decided on a motion for summary judgment."[80]

> [I]n opposing summary judgment, the plaintiff, who bears the burden of coming forward with proof of novelty, 'cannot rest on mere assertions of novelty and originality,' but must instead demonstrate some basis in fact for those claims. Case law is replete with instances in which plaintiffs alleging misappropriation of novel ideas have failed to meet this burden.[81]

---

[78]  *See Nadel v. Play-By-Play Toys & Novelties Inc.*, 208 F.3d 368, 378 (2d Cir. 2000) (recognizing both novelty standards).

[79]  *Koret, Inc. v. R.J.R. Nabisco, Inc.*, 702 F. Supp. 412, 414 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 307 (2d Cir. 1989).

[80]  *AEB & Assocs. Design Group Inc.*, 853 F. Supp. 724, 734 (S.D.N.Y. 1994). *See also Brandwynne*, 74 F. Supp. 2d at 375 (same); *Paul*, 183 A.D.2d at 53, 588 N.Y.S.2d at 903 ("whether an idea is sufficiently novel or original to merit protection under New York law is a question amenable to summary disposition"; dismissing misappropriation claim); *Oasis Music, Inc.*, 161 Misc. 2d at 631, 614 N.Y.S.2d at 881 (same); *Ring*, 702 F. Supp. at 77 (same); *Ferber*, 51 N.Y.2d at 783-84, 412 N.E.2d at 1312, 433 N.Y.S.2d at 86 (finding that plaintiff's failure "to produce any evidence to support his claim that the idea which he disclosed to defendants was novel either in the abstract or as to them" was fatal to his claim for breach of contract, and affirming the appellate division's decision granting summary judgment for the defendants); *Ed Graham Prods., Inc.*, 75 Misc. 2d at 338, 347 N.Y.S.2d at 770 (granting defendant's motion for summary judgment dismissing plaintiff's claim for misappropriation based on finding that submitted idea was not novel); *Khreativity Unlimited v. Mattel, Inc.*, 101 F. Supp. 2d 177, 185 (S.D.N.Y. 2000) (stating that "as a matter of law, [plaintiff's] idea for a cross-marketing venture between Mattel and the NBA was so unoriginal and lacking in novelty that knowledge of the idea can be imputed to Mattel" and granting defendant's motion for summary judgment dismissing plaintiff's contract claims), *aff'd*, 242 F.3d.366, 2000 U.S. App. LEXIS 33118 (2d Cir. 2000); *Link Group International v. Toymax Inc.*, 2000 U.S. Dist. LEXIS 4567, at *1 (D. Conn. Mar. 17, 2000) (finding that plaintiff's idea was not novel as a matter of law and granting defendant's motion for summary judgment dismissing plaintiff's claims for breach of implied contract and unjust enrichment) (a copy of the *Link Group* decision is attached as Exhibit D); *Kublan v. Hasbro Toy Div. of Hasbro & Tonka Corp.*, 1999 U.S. Dist. LEXIS 3226, at *7 (S.D.N.Y. Mar. 23, 1999) (granting toy manufacturers' motion for summary judgment and dismissing plaintiff's claims for lack of novelty) (a copy of the *Kublan* decision is attached as Exhibit E); *Kavanau v. Courtroom Television Network*, 1992 U.S. Dist. LEXIS 11472, at *12 (S.D.N.Y. July 31, 1992) (stating that "[w]hether an idea is novel is an issue of law which may properly be decided on a motion for summary judgment," and granting defendants' motion for summary judgment) (a copy of the *Kavanau* decision is provided as Exhibit F); *Woman Golfer, Inc. v. Meredith Corp.*, 792 F. Supp. 211, 214 (S.D.N.Y. 1992) (finding that plaintiff's idea was not novel as a matter of law and granting defendants' motion for summary judgment); *Granoff v. Merrill Lynch & Co.*, 775 F. Supp. 621, 630 (S.D.N.Y. 1991) (granting summary judgment and dismissing the plaintiff's claims for breach of contract and misappropriation based on lack of novelty); *McGhan v. Ebersol*, 608 F. Supp. 277, 287 (S.D.N.Y. 1985) (finding that plaintiff's idea lacked novelty and granting defendant's motion for summary judgment); *Eenkhoorn v. N.Y. Tel. Co.*, 148 Misc. 2d 999, 1001, 568 N.Y.S.2d 677, 678 (1st Dep't 1990) (reversing the trial court's decision on the law and dismissing the plaintiff's claim because she failed to establish novelty).

[81]  *Paul*, 183 A.D.2d at 53, 588 N.Y.S.2d at 903 (citing *Ferber*, 51 N.Y.2d at 783, 412 N.E.2d at 1312, 433 N.Y.S.2d at 86). *See also Oasis Music, Inc.*, 161 Misc. 2d at 631, 614 N.Y.S.2d at 881 ("A plaintiff cannot rest on mere assertions of novelty and originality, but must, instead, demonstrate some basis for those [ideas]"); *AEB & Assocs. Design Group Inc.*, 853 F. Supp. at 734 (same); *Woman Golfer, Inc.*, 792 F. Supp. at 214 ("A plaintiff cannot rest on mere assurances of novelty and originality. He must demonstrate some basis in fact for those claims."); *McGhan*, 608 F. Supp. at 287 ("[Plaintiff's] assertions of originality cannot overcome his failure to provide some affirmative indication that his version of relevant events is not fanciful").

To support a tort-based claim for misappropriation, the idea at issue must be **absolutely** novel; *i.e.*, it must be unique and novel to the public generally.[82] This requirement simply recognizes the established principle that ideas which are known and "in the public domain . . . may freely be used by anyone with impunity."[83]

To support a claim for breach of contract based on misappropriation of idea, a plaintiff must demonstrate only that its idea was "novel-to-the-buyer" at the time it was disclosed.[84] The idea need not be novel in an absolute sense, as required for a tort-based misappropriation claim. The novelty-to-the-buyer requirement ensures that there is sufficient consideration to support the contract. Without it, consideration is lacking and a contract claim cannot survive.[85]

Here, as a matter of contract, Fisher-Price required, and Segan agreed, that any submission under the Development Agreement must satisfy the more stringent absolute novelty standard before Segan would have any enforceable rights under the agreement.[86] As discussed above, the Development Agreement specifically required Segan to submit ideas with "unique visual effects," "unique light

---

[82] *Downey v. Gen. Foods Corp.*, 31 N.Y.2d 56, 61, 286 N.E.2d 257, 259, 334 N.Y.S.2d 874, 877 (1972) ("An idea may be a property right. But when one submits an idea to another, no promise to pay for its use may be implied, and no asserted agreement enforced, if the elements of novelty and originality are absent, since the property right in an idea is based upon these two elements."); *Paul*, 183 A.D.2d at 52, 588 N.E.2d at 902 (stating same); *Oasis Music, Inc.*, 161 Misc.2d at 631, 614 N.Y.S.2d at 882 ("While ideas which reflect genuine novelty and invention are fully protected against unauthorized use, ideas which are not novel 'are in the public domain and may freely be used by anyone with impunity'"); *Ring v. Estee Lauder, Inc.*, 874 F.2d 109, 110 n.1 (2d Cir. 1989) ("New York requires a protectable idea to be both novel and original").

[83] *Ed Graham Prods., Inc.*, 75 Misc.2d at 337, 347 N.Y.S.2d at 769.

[84] *See Khreativity Unlimited*, 101 F. Supp. 2d at 185, *aff'd* 242 F.3d 366, 2000 U.S. App. LEXIS 33118 (2d Cir. 2000); *Oasis Music, Inc.*, 161 Misc.2d at 630-31, 614 N.Y.S.2d at 881.

[85] *See Ferber*, 51 N.Y.S.2d at 783-84, 412 N.E.2d at 1312, 433 N.Y.S.2d at 86 (finding that plaintiff's failure "to produce any evidence to support his claim that the idea which he disclosed to defendants was novel either in the abstract or as to them" was fatal to his claim for breach of contract).

[86] Lane Aff., Ex. N at Ex. A (The "Concept Area" of the Development Agreement, which established the parameters of the Segan development project, included "unique visual effects/innovative technologies; unique light effects; [and] unique sound effects").

effects," "unique sound effects," and "innovative technologies."[87]  The requirement for unique ideas with unique elements reflects the parties' agreement that Segan was to submit ideas that were novel in the absolute sense; *i.e.*, the submission needed to contain elements previously unseen in the toy industry. Francine Segan, identified as one of the inventors of Segan's crib aquarium design, testified at her deposition that she understood this language to mean that Segan was required to submit ideas that were truly new and novel.[88]  But as discussed below, *none* of the elements of Segan's bubble-generating crib aquarium design were novel.

Moreover, regardless of which novelty standard is applied in this case, the undisputed evidence in the record establishes that Segan's alleged crib aquarium design was not novel.

**B.    Segan's L-Scoop Design Was Not Novel to Fisher-Price Because BMT Submitted Its "Crib Aquarium" Concept Four Years Earlier**

**1.    BMT submitted a crib aquarium in 1989 and Fisher-Price is paying BMT a royalty.**

As indicated above, in 1989, BMT submitted a design to Fisher-Price for an infant soother product it identified as a "Crib Aquarium."[89]  The principal features of the BMT crib aquarium submission were: (1) plastic fish and sea life in a transparent disk filled with clear liquid, (2) a scoop-

---

[87]  Lane Aff., Ex. N at Ex. A.

[88]  Lane Aff., Ex. F at 37-38. *See* Ex. F at 38 ("Q: Well, what did you mean when you used the word unique in your last answer? A: Something different than what's come before it. It can be combinations of components that are put together in a new and novel way. Q: Okay. Did you understand that Fisher-Price was looking for something that was novel or unique as you just described it to the toy industry? A: Yes Q: And with respect to the infant soother category? A: Yes."). *See also* Ex. F at 46-47 ("Q: So did you understand at the beginning of the project that Fisher-Price was looking for unique visual effects? A: Yes. Q: And unique light effects? A: Yes. Q: And unique sound effects? A: Yes. Q: And that it was looking for innovative technologies? A: Yes.").

[89]  Clutton Aff., Ex. F (photographs of the BMT submission).  Photographs of the BMT submission are also reproduced above on page 6.

based bubble-generating mechanism, (3) soothing music, and (4) interior lights.[90]  BMT described its

bubble-generating mechanism as follows:

> This [stream of bubbles] is accomplished by a series of radial ribs
> around the edge of the circular container which, when in conjunction
> with an air bubble at the top, produce this effect.  This effect occurs
> when the container is rotated and the fins around the periphery trap
> air and bring that air to the bottom, thus releasing it as the rotational
> positioning of the fins allow.[91]

BMT submitted a prototype of this design and worked with Fisher-Price to create a refined model of a

crib aquarium infant soother product for sale to the public.[92]  A photo of that model, which included

plastic fish and sea life, lights and music, is set forth below.



Ten years later, in 1999, Fisher-Price introduced its Peaceful Planet Aquarium infant

soother.[93]  Its main features, similar to the 1989 BMT submission, included clear fluid in a transparent,

---

[90]  Clutton Aff. ¶ 12.  *See also* Clutton Aff., Exs. F & G.

[91]  Clutton Aff. ¶ 13.

[92]  Clutton Aff. ¶ 13 & Ex. G.

[93]  Clutton Aff. ¶ 9.

disk-shaped chamber, scoops that generated bubbles, moving toy fish, lights, music, and underwater sounds.[94]

Shortly after the introduction of the Peaceful Planet Aquarium in 1999, BMT made a claim for royalties based on its 1989 submission. After initially rejecting the BMT claim (because the Peaceful Planet Aquarium was developed entirely independently of the BMT submission), Fisher-Price negotiated a settlement of BMT's claim, agreeing to pay BMT a royalty — in part because of certain similarity between the Peaceful Planet Aquarium and the BMT design.[95] At the time of Segan's submission, Fisher-Price not only had knowledge of BMT's crib aquarium design, it had actually possessed a prototype (i.e., the BMT submission) over four years earlier. Therefore, the concept of a crib aquarium that made use of scoops to generate bubbles was not novel to Fisher-Price, because of the crib aquarium submission.

### 2.    Segan admits that its alleged L-scoop design was identical to the BMT submission.

Segan has admitted in a sworn interrogatory answer that the Peaceful Planet Aquarium (which Segan contends has the same features as its L-scoop product) is essentially identical to the 1989 BMT submission.[96] According to Segan, the only "'significant difference' between the Peaceful Planet Aquarium and the submission by BMT is that the former incorporates a projection system and the latter does not."[97] But Marc Segan admitted in his deposition that projection was not a material feature of the crib aquarium submission.[98] Moreover, projection has been a common feature of crib soothers since the

---

[94]    Id. ¶ 12 & Ex. A.

[95]    Id. ¶ 15.

[96]    Lane Aff., Ex. Z ¶ 5.

[97]    Lane Aff., Ex. Z ¶ 5.

[98]    See Lane Aff., Ex. G at 277 ("The presence or absence of projection does not determine whether or not a crib aquarium is a use of" Segan's submission).

1980s.[99] Segan testified that projection was a common feature in infant soother products prior to his 1993 submission.[100] In fact, in early 1993, when Fisher-Price contacted Segan about designing a unique infant soother product, it provided him with examples of infant soother products then on the market. These included the "Lullaby Light Show" and the "Dreamtime Carousel" infant soothers — both of which projected light and shapes onto the wall and ceiling of the infant's room.[101] Thus, Fisher-Price was fully aware of the use of projection in infant soothers before Segan's submission and actually suggested the possibility of including such a feature to Segan.

New York caselaw makes clear that, to be protected, an inventor's idea must show "*genuine novelty and invention*, and not merely a clever or useful adaptation of existing knowledge."[102] "Novelty cannot be found where the idea consists of nothing more than a variation on a basic theme."[103] "Improvement of [a] standard technique or quality, the judicious use of existing means, or the mixture of known ingredients in somewhat different proportions — all variations on a basic theme — partake more

---

[99] Lane Aff., Ex. M.

[100] Lane Aff., Ex. D at 281, Ex. G at 220-221. *See also Link Group Int'l*, 2000 U.S. Dist. LEXIS 4567, at * 32 ("An idea cannot be 'novel' if it was already in use in the industry at the time of the submission") (citation omitted); *AEB & Assocs. Design Group Inc.*, 853 F. Supp. at 734 (recognizing that "a plaintiff may not claim that an idea is original if it was already in use in the industry at the time of the submissions") (citation omitted); *McGhan*, 608 F. Supp. at 287 ("A plaintiff may not claim that an idea is novel if the idea was already in use in the industry at the time of plaintiff's submission or if the defendant himself had already used that idea"). *See generally Educ. Sales Programs, Inc. v. Dreyfus Corp.*, 65 Misc. 2d 412, 415, 317 N.Y.S.2d 840, 843 (S. Ct. N.Y. Co. 1970) ("Nothing is bestowed if the facts of a 'secret' imparted in confidence are already the subject of general knowledge").

[101] Lane Aff., Ex. O.

[102] *See Hogan v. D.C. Comics*, 48 F. Supp. 2d 298, 314 (S.D.N.Y. 1999); *Educ. Sales Programs, Inc.*, 65 Misc. 2d at 416, 317 N.Y.S.2d at 844 ("[T]he idea need not reflect the flash of genius, but it must show genuine novelty and invention, and not a merely clever or useful adaptation of existing knowledge").

[103] *Link Group Int'l*, 2000 U.S. Dist. LEXIS 4567, at *31. *See also Oasis Music, Inc.*, 161 Misc. 2d at 631, 614 N.Y.S.2d at 88 ("An idea which is a variation on a basic theme will not support a finding of novelty"); *Paul*, 183 A.D.2d at 53, 588 N.Y.S.2d at 903 ("Not every good idea is a legally protectible [sic] idea, and an idea which is a variation on a basic theme will not support a finding of novelty"); *Educ. Sales Programs, Inc.*, 65 Misc. 2d at 415, 317 N.Y.S.2d at 843 ("A sensible suggestion must have more to it than good sense to be compensable.").

of the nature of elaboration and renovation than innovation."[104] Simply combining pre-existing elements or features does not create a novel product or idea.[105] A combination of non-novel elements — even if never before found together in the same product — is nothing more than "a variation on a [known] basic theme" and is non-novel as a matter of law.[106]

Here, Segan does not even contend that any of the individual features of its alleged L-scoop aquarium design were novel; in its interrogatory answers, it claims only that these features had not previously been used in the precise combination present in its design.[107] Moreover, even crediting Segan's unsupported allegations, its L-scoop design consists of nothing more than adding a projection feature (which was then a common and well-known feature of infant soother products) to the pre-existing BMT design and prototypes from 1989-90.[108] This is exactly the sort of claim that the courts cited above found to be an obvious combination of features known to the public which is non-novel as a matter of law.

---

[104] See Kavanau, 1992 U.S. Dist. LEXIS 11472, at * 17-18 (quoting Educ. Sales Programs, Inc., 65 Misc. 2d at 416, 317 N.Y.S.2d at 844).

[105] See Oasis Music Inc., 161 Misc. 2d at 634, 614 N.Y.S.2d at 883 (where the individual elements of plaintiff's concept were known, its "program is based on ideas and concepts already in the public domain," and is non-novel as a matter of law); Brandwynne, 74 F. Supp. 2d at 376 ("a combination of pre-existing elements is not novel"); Khreativity Unlimited, 101 F. Supp. 2d at 185-86, aff'd 242 F.3d 366, 2000 U.S. App. LEXIS 33118 (2d Cir. 2000) (even if "plaintiffs provided a compilation of elements never before offered to the public, plaintiff's idea nevertheless lacks novelty because a combination of pre-existing elements is not considered novel") (citing Brandwynne, 74 F. Supp. 2d at 376); Educ. Sales Programs, Inc., 65 Misc. 2d at 416, 317 N.Y.S.2d at 844 ("the judicious use of existing means, or the mixture of known ingredients in somewhat different proportions . . . partake more of the nature of elaboration and renovation than of innovation"); Ring, 702 F. Supp. at 78 (granting summary judgment because plaintiff's idea, as a combination of known elements was non-novel as a matter of law); Kavanau, 1992 U.S. Dist. LEXIS 11472, at *17 (plaintiff's "assertion of novelty must also be rejected because the CJN Plan is a mere compilation of elements that were already in use in the television industry"); Futter v. Paramount Pictures, Inc., 69 N.Y.S.2d 438, 440 (S. Ct. N.Y. Co. 1947) ("[M]erely combining these obvious elements cannot convert a general idea, which is not novel, into a unique concept")

[106] See Ed Kaplan Assoc. v. Fisher-Price, 1990 U.S. Dist. LEXIS 6347, at * 8 (S.D.N.Y. May 29, 1990) (a copy is attached as Exhibit G); McGhan, 608 F. Supp. at 286-87; Khreativity Unlimited v. Mattel, Inc., 101 F. Supp. 2d 177, 185, aff'd 242 F.3d 366, 2000 U.S. App. LEXIS 33118 (2d Cir. 2000); Link Group International v. Toymax Inc., 2000 U.S. Dist. LEXIS 4567, at * 36-37 (applying New York law).

[107] Lane Aff., Ex. U ¶ 7. See also Lane Aff., Ex. E at 321-322; Ex. F at 47; Ex. G at 221.

Because Segan's L-scoop bubble-generating design was (at most) a variation on a basic theme well-known within the toy industry, and specifically known to Fisher-Price through the BMT submission, Segan's idea was not novel at the time it was disclosed. Segan's contract claim thus fails as a matter of law and must be dismissed.

## C.    The Segan Submission Did Not Meet the Novelty Standard Set Forth in the Development Agreement

The Development Agreement expressly provides that Segan was to develop "general crib and playpen mood electronic items," which incorporated "*unique* visual effects/*innovative* technologies," "*unique* light effects," and "*unique* sound effects."[109] In other words, the Development Agreement called for Segan to design products that incorporated individual elements which themselves were novel in the absolute sense — not merely novel to Fisher-Price.

Moreover, Segan does not even argue that it satisfied the requirement in the Development Agreement that it submit a design with individual features (*i.e.*, visual effects, light effects, sound effects) that were themselves novel; it merely argues that the precise combination of elements found in its alleged L-scoop design had not been done before (which is untrue).[110] The problem with this is that, even if it was true, the Development Agreement required novel *elements* or *features*. Segan does not even claim to have complied with this requirement. New York law is clear that when a party has not satisfied its own

---

[108] Lane Aff., Ex. Z ¶ 5.

[109] Lane Aff., Ex. N, ¶ 5 at Ex. 4 (emphasis added).

[110] Lane Aff., Ex. U ¶ 7.

obligations under a contract — like Segan here — it is precluded from seeking recovery under that contract.[111] Segan's claim for breach of contract should therefore be dismissed.

## IV.  THE PEACEFUL PLANET AQUARIUM WAS INDEPENDENTLY DEVELOPED BY FISHER-PRICE

Even if the Development Agreement had not expired and Segan's crib aquarium design had been novel, Fisher-Price would nevertheless be entitled to summary judgment because it independently developed the Peaceful Planet Aquarium. Independent development of an idea is a complete defense to any claim (contract or tort) based on the alleged misappropriation of that idea.[112]

> [E]ven when a plaintiff's concept is novel and original, a recovery will be denied where it is established that the party alleged to have misappropriated another's concept, arrived on its own initiative or by wholly independent means at a concept similar to that devised by the party seeking recovery for misappropriation.[113]

Moreover, where a plaintiff fails to provide admissible evidence that the persons responsible for developing the idea ever saw its submission, summary judgment is appropriate.[114]

---

[111] *See Alesayi Beverage Corp.*, 947 F. Supp. at 670, *aff'd*, 1997 U.S. App. LEXIS 23052 (2d Cir. Sept. 3, 1997); *Daniel Perla Assocs.*, 12 A.D.3d at 557, 786 N.Y.S.2d at 77; *Da Eira*, 126 Misc. 2d at 706, 483 N.Y.S.2d at 628; *Rawcliffe*, 108 Misc. 2d at 1031-32, 438 N.Y.S.2d at 700. *See also Pitts v. Davey*, 40 Misc. 96, 99, 81 N.Y.S. 264 (S. Ct. Montgomery Co. 1903) ("It is undoubtedly the rule of law that one party to a contract cannot recover against the other so long as he himself is in default."); *Bonesteel v. Mayor*, 22 N.Y. 162, 170 (1860) ("The entire performance, on the part of the assignor of the plaintiff, through whom he claims, is a condition precedent to the plaintiff's right of recovery, and to the maintenance of this action. On this ground, without the consideration of any other, the plaintiff cannot succeed").

[112] *AEB & Assocs. Design Group Inc.*, 853 F. Supp. at 734; *Ball v. Hershey Foods Corp.*, 842 F. Supp. 44, 48 (D. Conn. 1993); *Granoff*, 775 F. Supp. at 630 (the failure to provide any "proof to counter defendants' affidavits that the [idea] was conceived and implemented by a separate group of [defendant's] executives, independent of any assistance from plaintiff and without knowledge of his submission" was fatal to plaintiff's claims); *Hogan*, 48 F. Supp. 2d at 314 (granting summary judgment and noting that "[e]ven where an idea is novel, however, a misappropriation claim will be defeated if a defendant can show that she independently created the idea").

[113] *AEB & Assocs. Design Group Inc.*, 853 F. Supp. at 734.

[114] *See Ball*, 842 F. Supp. at 48 (granting defendant summary judgment based on the defense of independent development and stating that "[a]lthough some of the defendant's employees may have seen the plaintiff's work, the plaintiff has presented no evidence calling into question the clear evidence that no such person was in any way involved in the production of [the defendant's idea]"); *Downey*, 31 N.Y.2d at 62, 286 N.E.2d at 260, 334 N.Y.S.2d at 878 (finding that the plaintiff's failure to establish any connection between those responsible for creating the advertisement and those to whom plaintiff submitted his

In this case, Fisher-Price has submitted undisputed evidence that it developed the Peaceful Planet Aquarium independently and without any reference to or use of Segan's alleged submission. Moreover, discovery is complete and Segan has developed no witness testimony or other evidence indicating that the persons who developed the Peaceful Planet Aquarium referenced or used, or even were aware of or had access to, its alleged submission.

Fisher-Price employs a large permanent staff of product designers and engineers.[115] Their full-time effort is devoted to conceiving, designing, and developing toys and related products for sale to the public.

In 1997, one of these designers was Greg Martin, who was then assigned to Fisher-Price's "Infant Team." The Infant Team was charged with conceiving and designing products intended for use with infants aged newborn to six months.[116] In spring 1997, Martin came up with the idea for an aquarium-themed infant soother — which later developed into the Peaceful Planet Aquarium at issue in this case.

Martin attributes his idea for the aquarium-themed infant soother to his interest at that time in developing a new crib-attached item. Martin focused his efforts on water-based themes because he was "interested in water's soothing nature and the general fascination that children have with such items as

---

idea was fatal to his misappropriation claim); *Paul*, 183 A.D.2d at 56, 588 N.Y.S.2d at 905 (finding that defendant had established the defense of independent creation); *Vantage Point, Inc. v. Parker Bros., Inc.*, 529 F. Supp. 1204, 1212-13 (E.D.N.Y. 1981) (finding that the defendant toy manufacturer successfully established the defense of independent development where it submitted affidavits demonstrating that those responsible for the toy's development never saw plaintiff's submission); *Ahlert v. Hasbro, Inc.*, 325 F. Supp. 2d 509, 514 (D.N.J. 2004) (noting that the plaintiff's claim for misappropriation was based on "pure speculation," and that its assertion that defendant's president "must have" transmitted plaintiff's design to the individuals responsible for creating the defendant's product did not create an issue of fact sufficient to defeat summary judgment).

[115] Clutton Aff. ¶ 2(a).

[116] Martin Aff. ¶¶ 2-3.

fishbowls and fish tanks."[117]  A copy of Martin's earliest surviving drawing of an aquarium-themed infant soother, from June 1997, is reproduced below.



CRIB AQUARIUM

Martin conceived of the Peaceful Planet Aquarium without reference to any submission by Segan or BMT (or anyone else for that matter).  Prior to the commencement of this litigation, Martin was unaware that either of these outside designers had submitted an aquarium-themed infant soother to Fisher-Price.[118]  During the development of his idea for the Peaceful Planet Aquarium, Martin did not work with anyone who participated in either the 1993 Segan project or the 1989 BMT project.  Instead, Martin worked only with an outside designer named Charlie Paddock, who conceived of the scoop-based bubble-generating mechanism that (in slightly modified form) was used in the Peaceful Planet Aquarium.[119]  As an outside designer, Paddock had no knowledge or awareness of, or access to, either the BMT or Segan submissions.[120]

---

[117] Martin Aff. ¶ 3.

[118] Martin Aff. ¶ 8.

[119] Paddock Aff. ¶¶ 2, 4-5.

[120] Paddock Aff. ¶ 5.

*Downey v. General Foods Corp.* involved facts showing independent development similar to the facts in this case.[121] In *Downey,* the plaintiff claimed that defendant misappropriated his advertising idea for defendant's Jell-O by focusing on its "wiggley" characteristic. When defendant later introduced its "Mr. Wiggle" advertising campaign, plaintiff sued alleging that defendant had misappropriated his concept. The Court of Appeals upheld summary judgment on the ground of independent development, stating:

> [I]n the present case, it was shown beyond peradventure that there was no connection between [the defendant's employees that received and handled the idea] and the defendant's other employees or the employees of the advertising outfit who took part in the creation of "Mr. Wiggle."[122]

Similarly, in *Vantage Point, Inc. v. Parker Brothers, Inc.,* Parker Brothers established its independent development defense by showing that none of the inventors responsible for creating its board game had received the plaintiff's idea.[123] Noting that the parties had completed extensive discovery and that the plaintiff failed to rebut Parker Brothers' defense of independent development, the court concluded:

> In the circumstances, it is evident that plaintiff is opposing defendant's motion for summary judgment with respect to the intertwined issues of access to plaintiff's direct submission and the independent development of [the board game] Oil Baron, entirely on the hope that a fact finder will disbelieve the persons who have submitted affidavits. This hope alone cannot defeat a properly supported motion for summary judgment.[124]

---

[121] 31 N.Y.2d 56, 286 N.E.2d 259, 334 N.Y.S.2d 877 (1972).

[122] *Downey,* 31 N.Y.2d at 62, 286 N.E.2d at 260, 334 N.Y.S.2d at 878.

[123] 529 F. Supp. at 1212-13.

[124] *Id.* at 1213.

Here, as in *Downey* and *Vantage Point*, discovery is complete and plaintiff has developed *no proof* to contradict Fisher-Price's evidence of independent development. Segan does not even allege that Greg Martin or the other persons who worked on the Peaceful Planet Aquarium ever saw the 1993 Segan submission. Caselaw is clear that without such proof a plaintiff is not entitled to go to trial on the bare hope that the jury will guess or speculate in its favor.[125]

Because Segan has failed to develop any admissible proof to rebut Fisher-Price's evidence of independent development, its breach of contract claim must be dismissed.

## V.   FISHER-PRICE NEVER USED THE SEGAN CRIB AQUARIUM SUBMISSION

"A plaintiff cannot recover for misappropriation absent a showing that its ideas were actually used by the defendant."[126] "Where it is clear that defendant's concepts are not essentially similar to plaintiff's, and that the defendant's ideas are not based upon original ideas of the plaintiff, summary judgment will follow."[127]

---

[125] *See Downey*, 31 N.Y.2d at 62, 286 N.E.2d at 260, 334 N.Y.S.2d at 878 ("The hope, expressed by the plaintiff that he may be able to prove that the witnesses who gave testimony in examinations before trial lied, is clearly insufficient to create an issue of fact requiring a trial or defeat the defendant's motion for summary judgment"); *Vantage Point, Inc.*, 529 F. Supp. at 1213 ("The opponent of the motion 'must adduce factual material which raises a substantial question of the veracity or completeness of the movant's showing or presents countervailing facts").

[126] *AEB & Assocs. Design Group, Inc.*, 853 F. Supp. at 734 (granting summary judgment for defendant and noting that "a plaintiff cannot recover for misappropriation absent a showing that its ideas were actually used by the defendant"). *See also McGhan*, 608 F. Supp. at 286 ("A plaintiff cannot recover for misappropriation of ideas unless the ideas are actually used by a defendant"); *Woman Golfer, Inc.*, 792 F. Supp. at 214 n.6 (same); *Granoff*, 775 F. Supp. at 630 (granting the defendant summary judgment and finding that the "plaintiff . . . failed to demonstrate there is a genuine issue as to material fact with respect to defendants' proof of . . . the lack of use of plaintiff's concept").

[127] *Ed Graham Prods., Inc.*, 75 Misc. 2d at 337, 347 N.Y.S.2d at 769. *See also Khreativity Unlimited*, 101 F. Supp. 2d at 184 ("Mattel persuasively argues that it was not unjustly enriched by Khreativity's idea for an NBA Commemorative Doll, because it never produced an NBA Commemorative Doll. The record is clear that Mattel returned the prototype doll to plaintiff and never produced the suggested product"); *Woman Golfer, Inc.*, 792 F. Supp. at 214 ("Plaintiff's affidavits in opposition, however, do nothing to substantiate its claims of novelty and originality in the idea presented to defendants. Nor have they demonstrated that defendants used their idea in any way. Each argument proffered is controverted by the facts, or by common sense.").

In this case, discovery has produced evidence reflecting that only the Rocking/Wave and Colored Oil product designs were submitted by Segan to Fisher-Price; there is no competent evidence supporting the claim that the alleged L-scoop bubble-generating design was ever submitted to Fisher-Price. Because it is undisputed that Fisher-Price never produced a product similar to or based on the Rocking/Wave or Colored Oil products, it is entitled to summary judgment dismissing Segan's breach of contract claim.

## A. The Only Documented Crib Aquarium Submission Was Based on Different Densities of Colored Oil

There is simply no evidence to support Segan's claim that he submitted the L-scoop bubble-generating aquarium design to Fisher-Price.[128] It has provided no drawings, no correspondence, no memoranda, and no other records reflecting that this alleged design was ever submitted to Fisher-Price.[129] Fisher-Price has no record or documentation of any type referring to the alleged L-scoop design.[130] Pursuant to its regular procedures, Fisher-Price would have Segan's alleged L-scoop design in its inventor relations records if it had been submitted.[131]

And even more telling is the fact that Segan cannot provide any details of when this alleged design was shown to Fisher-Price or to whom it was shown.[132] Segan has deposed seven Fisher-Price employees and former employees; none of them testified that they had ever seen Segan's alleged L-scoop design.

---

[128] *See* Lane Aff. ¶ 18.

[129] *See* Lane Aff. ¶ 36.

[130] Clutton Aff. ¶ 18. This strongly supports Fisher-Price's defense of independent development. Because Fisher-Price had no record of Segan's alleged bubble-generating design, there is no way that Greg Martin could have been exposed to that design when he conceived of and developed the Peaceful Planet Aquarium four years later in spring 1997.

[131] Clutton Aff. ¶ 18.

In contrast, Segan has produced numerous drawings, letters, and memoranda referencing and describing his Rocking Wave Product and his Colored Oil Product.[133]  Both of these designs were based on the use of colored oils with different densities and did not include a bubble-generating mechanism.

**B.    The Peaceful Planet Aquarium Is Not
a Use of the Segan Colored Oil Design**

Segan admits that it is not claiming that the entire concept of a "crib aquarium" was novel in 1993.[134]  It does not dispute that Fisher-Price was free to make and sell a crib aquarium that did not make use of Segan's specific design without paying Segan a royalty.[135]  Accordingly, that Fisher-Price produced an aquarium-themed infant soother is not at issue.  Rather, the issue is whether the Peaceful Planet Aquarium constitutes a "use" of the specific crib aquarium design Segan submitted to Fisher-Price in 1993.

A straightforward comparison of the Peaceful Planet Aquarium and the documented Segan Colored Oil design reveals that they have fundamentally different features.  The Peaceful Planet Aquarium utilized clear liquid and bubbles.[136]  The primary visual feature of Segan's Colored Oil design was different densities of dripping colored oils.[137]  Caselaw is clear that material dissimilarities between an inventor's submission and a defendant's product establish that the submission was not used by the

---

[132] Lane Aff. ¶ 36.

[133] Lane Aff. ¶ 52.  *See also* Lane Aff., Exs. P, R & T.

[134] Lane Aff. ¶ 52.  *See also* Lane Aff., Ex. G at 221.

[135] Lane Aff., Ex. D at 199 (lines 7-11) (Segan does not "claim rights to the general idea of a toy aquarium").

[136] Lane Aff. ¶ 47.

[137] Lane Aff. ¶ 27.

defendant.[138]  As far as Fisher-Price is aware, Segan does not even claim that Fisher-Price made use of its

Colored Oil design or that the Peaceful Planet Aquarium is similar to that submission.

Because Segan cannot establish that Fisher-Price ever "used" any crib aquarium design it

submitted, Segan's breach of contract claim must be dismissed.

### VI.    SEGAN'S BREACH OF CONTRACT CLAIM MUST BE DISMISSED BECAUSE IT DISCLOSED ITS L-SCOOP DESIGN TO THE PUBLIC

Regardless of whether the Development Agreement expired or Segan's alleged design was

novel or used by Fisher-Price, any claim for breach of the Development Agreement is barred by Segan's

conduct in publicly disclosing its design.

In 1997, a patent was issued to Segan which disclosed to the public its alleged L-scoop,

bubble generating aquarium design.  This public disclosure requires dismissal of Segan's breach of

contract claim for three reasons:

(1)    Upon public disclosure of a design or idea, the design or idea is dedicated to the

public domain and is freely available for use by anyone.

(2)    The Development Agreement required Segan to maintain in confidence any

products or designs created under the agreement.  If, as Segan apparently claims,

the Development Agreement remained in effect after 1993, then Segan breached

the agreement by disclosing his L-scoop design and is therefore barred from

enforcing it.

---

[138] *See Ed Graham Prods., Inc.*, 75 Misc. 2d at 337, 347 N.Y.S.2d at 769.  *See also Khreativity Unlimited*, 101 F. Supp. 2d at 184; *Woman Golfer, Inc.*, 792 F. Supp. at 214.

(3)     Segan is barred from enforcing the Development Agreement (if it remained in

effect) because its public disclosure of the L-scoop design resulted in a failure of

the consideration it was required to provide Fisher-Price under the agreement (*i.e.*

unique, novel and non-public product designs).

## A.    Segan Disclosed Its L-Scoop Design to the Public

In May 1995, two years after the Development Agreement, Segan filed an application for a

patent on a Christmas ornament device that included a clear plastic disk-shaped chamber filled with clear

liquid.[139]  This device contained snowflake-like particles and a rotating wheel with L-shaped scoops that

dragged the particles to the top of the disk and released them so that they drifted down, creating the

illusion of snowfall.  The patent (the "'750 patent") was issued and published to the public in September

1997.

Although directed to a Christmas ornament device, the '750 patent indicated that its

invention could be modified to give the appearance of a bubbling aquarium, with the identical bubble-

generating mechanism that Segan claims was the unique, novel part of its alleged submission to Fisher-

Price and which it contends Fisher-Price appropriated in designing the Peaceful Planet Aquarium.

Column 9 of Segan's '750 patent states:

> In a further modification, the display device may be modified to
> simulate an underwater scene replete with bubbles.  In this
> embodiment, the scoops may be intentionally configured to drag air
> from the air bubble 52 at the top of the cavity 22 down to the bottom
> thereof whereupon the air released from the scoops will filter up
> through the cavity as small air bubbles for creating an underwater
> effect.  In this embodiment, the decorative object 16 may comprise

---

[139] Lane Aff., Ex. Y (the "'750 patent").

one or more fish for providing a visual effect of fish in a bubbling underwater environment.[140]

**B.    Segan's Disclosure Dedicated the L-Scoop**
**Aquarium Design to the Public Domain**

A review of the '750 patent shows that, while Segan describes and discloses the L-scoop bubbling aquarium design in the section of its patent entitled "Detailed Description of the Presently Preferred Embodiments," it does not claim patent protection for the aquarium design.[141] It is well-established that ideas or designs that are disclosed in a patent, but for which no patent protection is claimed, are dedicated to the public domain and may be used by anyone without restriction.[142]

Moreover, New York's state and federal courts have made it perfectly clear that "[u]nder New York law, a plaintiff may not recover for a trade secret when the novelty of the idea has been lost through the issuance of a patent."[143] As articulated by the Court of Appeals in *Ferber v. Sterndent Corp.*, once a patent has been issued, "even if we were to assume that plaintiff's idea was novel when disclosed,

---

[140] Lane Aff., Ex. Y at column 9, lines 58-67.

[141] The portion of the '750 patent which sets forth the matter for which patent protection is claimed begins at column 11, line 1 and continues through the end of column 14. *See* Lane Aff., Ex. Y (the "'750 patent"). All 26 claims in the '750 patent are limited to a device circulating "flake-like particles" and creating a snowglobe effect. Of course, the fact that the L-scoop aquarium design is discussed but no patent protection is claimed for it, is an acknowledgement by Segan that the design was not novel (*i.e.*, not patentable).

[142] *See Johnson & Johnston Assocs., Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002) ("[W]hen a patent drafter discloses but declines to claim subject matter, as in this case, this action dedicates that unclaimed subject matter to the public."); *Revlon Consumer Prods. Corp. v. Estee Lauder Cos.*, 2003 U.S. Dist. LEXIS 13004, at * 80 (S.D.N.Y. July 30, 2003) ("Courts have deemed as 'disclosed but unclaimed' specification language . . . *including specification verbiage describing 'alternatives'* that 'may be used'") (emphasis added). A copy of the *Revlon* decision is attached as Exhibit H.

[143] *Laurie Visual Etudes, Inc. v. Chesebrough-Pond's Inc.*, 83 A.D.2d 505, 506, 441 N.Y.S.2d 88 (1st Dep't 1981). *See also Ferber v. Sterndent Corp.*, 51 N.Y.2d 782, 784, 412 N.E.2d 1311, 1312, 433 N.Y.S.2d 85, 86 (1980) ("[P]rior to any alleged use of plaintiff's idea by defendants, two patents had been issued to unrelated third parties for devised which encompassed the very concepts plaintiff alleges he disclosed to defendants. Therefore, even if we were to assume that plaintiff's idea was novel when disclosed, all novelty was lost with the issuance of the patents because they caused plaintiff's idea to fall into the public domain. Therefore, summary judgment for defendants was properly granted."); *Lemelson v. Kellogg Co.*, 440 F.2d 986, 987 (2d Cir. 1971) ("The case law is abundantly clear that there is no cause of action for the use of an idea claimed to have been communicated in confidence when that idea has been made public by the issuance of a copyright or patent prior to its use.").

all novelty was lost with the issuance of [the] patent[ ] because [it] caused plaintiff's idea to fall into the public domain."[144]

Here, by publicly disclosing its aquarium design with the L-scoop bubble-generating mechanism — the same design Segan claims it submitted to Fisher-Price in 1993 and that Fisher-Price allegedly incorporated into the Peaceful Planet Aquarium — Segan dedicated that design to the public domain. It thereby became available for Fisher-Price or any other member of the public to use without compensation to Segan.[145] Thus, as matter of law, Segan can bring no claim charging Fisher-Price (or anyone else) with the unauthorized use of its alleged bubble-generating aquarium design.

## C. Segan's Disclosure Was a Material Breach of Its Obligations Under the Development Agreement

It is well-established that a party which is itself in breach of an agreement may not bring an action to enforce the agreement.[146] If the Development Agreement remained in effect in 1997 (which it did not), Segan breached it by disclosing to the public the L-scoop design it claims to have developed under the agreement. As a result, Segan is barred from attempting to recover for any alleged breach of the Development Agreement.

---

[144] 51 N.Y.2d at 784, 412 N.E.2d at 1312, 433 N.Y.S.2d at 86.

[145] *See Laurie Visual Etudes, Inc.,* 83 A.D.2d at 506, 441 N.Y.S.2d at 89; *Lemelson,* 440 F.2d at 987 (affirming trial court's dismissal of plaintiff's claim for unauthorized use where the defendant established that its alleged first use occurred three years after the plaintiff's patent was issued).

[146] *See Alesayi Beverage Corp. v. Canada Dry Corp.,* 947 F. Supp. 658, 670 (S.D.N.Y. 1996) (recognizing that "a party who has committed a material breach first cannot claim a subsequent breach by the other party" and holding that the plaintiff licensee's material breach of the parties' license agreement barred it from recovering on the basis of a subsequent breach by the defendant licensor), *aff'd,* 1997 U.S. App. LEXIS 23052 (2d Cir. Sept. 3, 1997). *See also Daniel Perla Assocs. v. Krasdale Foods, Inc.,* 12 A.D.3d 555, 557, 786 N.Y.S.2d 75, 77 (2d Dep't 2004) ("As the plaintiff did not comply with the conditions of the agreement, it may not seek to enforce [the agreement]") (citations omitted); *Da Elra v. Nat'l Furniture Liquidators,* 126 Misc. 2d 705, 706, 483 N.Y.S.2d 627, 628 (S. Ct. Westchester Co. 1984) (noting that where defendant materially breached the agreement, it could not subsequently seek to enforce the contract's non-cancellation provision); *Rawcliffe v. Aguayo,* 108 Misc. 2d 1027, 1031-32, 438 N.Y.S.2d 697, 700 (S. Ct. Kings Co. 1981) (stating that the buyer's nonpayment was a material breach "defeat[ing] her right to enforce the contract").

Paragraph 7 of the Development Agreement required that Segan "retain in confidence and not . . . . show or discuss" any designs or products submitted under the agreement.[147] As discussed above, Fisher-Price's position is that the Development Agreement expired in its entirety — including Segan's confidentiality obligation under paragraph 7 — on June 30, 1993. Segan apparently contends that the Agreement remained in effect, at least until February 1999, when Fisher-Price allegedly breached it by selling the Peaceful Planet Aquarium to the public. If this is correct (which Fisher-Price denies), then Segan was equally bound by the terms of the Development Agreement, including the provision in paragraph 7 prohibiting disclosure of products or designs created under the agreement. In those circumstances, Segan's public disclosure of its L-scoop bubble-generating aquarium design in September 1997 when the '750 patent was published constituted a breach of its confidentiality obligations under paragraph 7 of the Development Agreement.

As a result, Segan's first cause of action for breach of the Development Agreement must be dismissed as a matter of law.

## D.    Segan's Disclosure Resulted in a Failure of Consideration

In the absence of patent, copyright, or trademark protection, the products and designs submitted by inventors to toy companies cannot be protected from use by third parties or competitors after they are disclosed to the public (e.g., by sale of a product). In many circumstances, when Fisher-Price licenses a product design from an outside inventor and begins selling the product to the public, there is nothing to stop a competitor from copying or "knocking-off" the product.[148] Thus, the only value a toy company like Fisher-Price receives from an outside inventor who submits a new product concept is the

---

[147] *See* Lane Aff., Ex. N ¶ 7.

[148] Clatton Aff. ¶¶ 4-5.

opportunity to design and develop a novel product in secret and the opportunity to be first to the marketplace with the product — together with the advantage of having the market to itself for whatever period of time it takes competitors to "knock off" the new product (if they believe it will be economically advantageous to do so).[149]

When Segan disclosed its alleged L-scoop bubble-generating design to the public in September 1997 in the form of the '750 patent, it destroyed any value or consideration that Fisher-Price could have realized from its submission of the idea. The design was dedicated to the public domain at that time; anyone could use it. Fisher-Price no longer had the opportunity to create a product utilizing that design in secret, free from competitors. Any competitor who believed it was economically advantageous to do so could have introduced a toy aquarium based on the L-scoop bubble-generating design disclosed in the '750 patent. Indeed, it could have done so before Fisher-Price introduced the Peaceful Planet Aquarium in February 1999.

Under New York law, when a party to a contract takes action which destroys or renders valueless the consideration given under the contract, that party forfeits any right to enforce the contract.[150] Here, that is exactly what Segan did; by disclosing its alleged L-scoop design to the public, it destroyed

---

[149] Clutton Aff. ¶ 5.

[150] *Bank of United States v. Seltzer*, 233 A.D. 225, 251 N.Y.S. 637 (1st Dep't 1931) (relying upon the Court of Appeals' decision in *Bassett v. Leslie*, 123 N.Y. 396, 25 N.E. 386 (1890), and holding that a party's conduct resulting in a failure of consideration under the contract prevented that party from attempting to enforce the contract); *Greenough v. Munroe*, 53 F.2d 362, 365 (2d Cir. 1931) (citing the *Bank of United States* decision and recognizing that a party's breach of a material obligation under the contract resulted in a failure of consideration, which "precluded the existence of any cause of action against the defendant"). *See generally Rawcliffe*, 108 Misc.2d at 1031-032, 438 N.Y.S.2d at 700 ("[I]t is often said that a material breach results in failure of the consideration for the defendant's promise, and this is regarded as a defense sufficient to defeat liability").

the value of that design to Fisher-Price as a novel design unknown to the public.[151] As a result, Segan is barred from enforcing the Development Agreement and its first cause of action must be dismissed.

### VII.  SEGAN HAS DISCLAIMED ANY BREACH OF CONTRACT CLAIM

As an entirely independent basis for dismissal of Segan's breach of contract claim, the Development Agreement itself expressly disclaims the specific type of claim Segan asserts in its first cause of action.

Paragraph 14 of the Development Agreement between Segan and Fisher-Price provides that:

> Since it is not Fisher-Price, Inc.'s desire to be afforded access to confidential information which belongs to M. H. Segan or to any third party, M. H. Segan agrees that any information which M. H. Segan provides to Fisher-Price, Inc. shall not be subject to an obligation of confidence and Fisher-Price, Inc. *shall not be liable for any use or disclosure of such information except for such liability as may arise out of infringement of valid patents or copyrights owned by M. H. Segan.*[152]

The agreement on which Segan bases its breach of contract claim thus specifically disclaims *any liability* for the use of submissions made pursuant to the Development Agreement, with the exception of uses which would violate any of Segan's copyrights or patents.

Segan has already learned that such disclaimers of liability are enforceable and binding under New York law. In *M.H. Segan Limited Partnership v. Hasbro, Inc.*, Segan commenced suit against Hasbro alleging copyright infringement and various state law causes of action based on Hasbro's alleged

---

[151] Fisher-Price denies, of course, that the bubble-generating design was novel or unknown to the public. It accepts Segan's position that it was novel and not publicly known solely for purposes of this argument.

[152] Lane Aff. ¶ 14 (emphasis added).

use of its toy submissions.[153]  Segan's agreement with Hasbro, in language nearly identical to that at issue here, stated:

> All of Inventor's rights and remedies arising out of [its]
> Submission(s) . . . shall be limited to any rights and remedies . . .
> accorded under United States Patent and Copyright Laws. All other
> claims of whatever nature arising out of Inventor's Submission to
> Hasbro are hereby waived.[154]

The court concluded that this language "unambiguously preclude[d] all of plaintiff's implied contract claims based on [its] post-Waiver submissions to Hasbro."[155]

Under the *Hasbro* court's reasoning, the nearly identical language in Segan's agreement with Fisher-Price precludes its claim for breach of express contract and requires dismissal of its first cause of action.

## VIII.  SEGAN'S CLAIMS AGAINST SUBSEQUENT PRODUCTS MUST BE DISMISSED

Finally, even if this Court were to permit Segan's breach of contract claim to continue with respect to the Peaceful Planet Aquarium (which it should not), it should nevertheless dismiss this action with respect to all other Fisher-Price products.

In paragraph 12 of the Amended Complaint, Segan alleges claims against six products that Fisher-Price introduced after the Peaceful Planet Aquarium.  Even a cursory review of these products, however, makes absolutely clear that they do not utilize what Segan claims to be the novel aspect of its crib aquarium design.

---

[153] *M.H. Segan Ltd. P'Ship v. Hasbro, Inc.*, 924 F. Supp. 512, 526 (S.D.N.Y. 1996).

[154] *Id.* at 526 (emphasis added).

[155] *Id.*

Segan was asked in an interrogatory to identify every feature of its crib aquarium

submission that it claims to be novel. It answered:

> "Plaintiff does not allege that any particular 'feature' of the Crib
> Aquarium was novel and original generally. . . . [A]s set forth
> above, the Crib Aquarium consisted of a crib mounted toy
> 'aquarium' with enclosed liquid, including toy swimming fish,
> bubbles, rippling waves, light effects within the unit and projected
> on the ceiling, sounds and/or music. While these features taken
> individually are not necessarily novel or original, the array and
> combination of features submitted by Plaintiff to Defendant was
> novel and original generally and as to Fisher-Price."

Exhibit U ¶ 7. Thus, Segan's claim in this case is not that any particular feature of its alleged L-Scoop

design was novel, but that the combination of *all* of the features together was novel.[156] None of the

products Segan identifies in paragraph 12 of the Amended Complaint contain the "array and combination

of features" identified by Segan in its interrogatory answers as novel. Moreover, none of these products

make use of the Segan design, none of the products contain features that were novel to Fisher-Price at the

time of the Segan submission and none of these products are designed or intended for use in a crib, which

was the specific directive of the Development Agreement. Each of these products is described below.

       1.    **Ocean Wonders Aquarium Swing.** This product is a baby swing. It includes an

overhead unit with a transparent dome-shaped chamber, including liquefied gel, including plastic fish,

lights, and music. It does not contain bubbles and has no bubble generating mechanism. It does not

include projection capability.[157]

---

[156] Gary Strauss, the principal designer on the Segan crib aquarium project, admitted at his deposition that all of the individual features of the Segan crib aquarium design had previously been used in infant soothers. Lane Aff., Ex. G at 220-221.

[157] *See* the affidavit of Kenneth Morton, sworn to April 7, 2005 (the "Morton Aff."), ¶ 2 and Ex. A.

2.     **Ocean Wonders Fish Bowl**. This is a fish bowl-shaped toy with clear liquid between two transparent walls. It includes plastic fish, lights, and music. It has no projection capability. It has no mechanism for generating bubbles.[158]

3.     **Ocean Wonders Aquarium Bouncer**. This is an infant bouncer seat. It includes device with clear liquid, plastic fish, lights, and music. It also includes a motorized bubble-generating mechanism. It does not include Segan's alleged L-scoop bubble-generating mechanism. It has no projection capability.[159]

4.     **"Mini" Peaceful Planet Aquarium**. This was a small, miniature version of the Peaceful Planet Aquarium which was never sold by Fisher-Price. Instead, it was given away as a "Happy Meal" toy by McDonald's. It contained a fish bowl-shaped, transparent chamber half filled with water, with a single plastic fish. It had no bubble generating mechanism, no music, no lights, and no projection capability.[160]

5.     **Ocean Wonders Aquarium**. This is an aquarium-shaped device including a rectangular chamber filled with clear liquid, plastic fish, interior lights, music, and a motorized bubble-generating mechanism. It does not include Segan's alleged L-scoop bubble-generating mechanism. It has no projection capability.[161]

Thus, none of the products introduced subsequent to the Peaceful Planet Aquarium contain the "array and combination" of features that Segan identifies in its interrogatory answers as the novel

---

[158] Morton Aff. ¶ 3 and Ex. B.

[159] Morton Aff. ¶ 4 and Ex. C.

[160] Morton Aff. ¶ 5 and Ex. D.

[161] Morton Aff. ¶ 6 and Ex. E.

aspect of the designer allegedly misappropriated by Fisher-Price. Accordingly, even if the Court allows

Segan to proceed with its breach of contract claim against the Peaceful Planet Aquarium, the Court should

dismiss Segan's claims against these products.[162]

### Conclusion

For the foregoing reasons, this Court should grant Fisher-Price's motion for summary

judgment dismissing Segan's first cause of action for breach of contract. In the alternative, if the Court

declines to dismiss the first cause of action in its entirety, it should nevertheless dismiss it as against

products other than Peaceful Planet Aquarium.

Dated:    April 8, 2005

> **HODGSON RUSS** LLP
> *Attorneys for Fisher-Price, Inc.*
>
> By _____
> Robert J. Lane, Jr.
> Jodyann Galvin
> Stephen W. Kelkenberg
> One M&T Plaza, Suite 2000
> Buffalo, NY 14203
> Telephone:  (716) 856-4000

BFLODOCS 1193622 v2

---

[162] *AEB & Assocs. Design Group, Inc.*, 853 F. Supp. at 734 (granting summary judgment for defendant and noting that "a plaintiff cannot recover for misappropriation absent a showing that its ideas were actually used by the defendant"). *See also McGhan*, 608 F. Supp. at 286 ("A plaintiff cannot recover for misappropriation of ideas unless the ideas are actually used by a defendant"); *Woman Golfer, Inc.*, 792 F. Supp. at 214 n.6 (same); *Granoff*, 775 F. Supp. at 630 (granting the defendant summary judgment and finding that the "plaintiff . . . failed to demonstrate there is a genuine issue as to material fact with respect to defendants' proof of . . . the lack of use of plaintiff's concept").