UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

VICTOR G. REILING ASSOCIATES and
DESIGN INNOVATION, INC.,

                Plaintiffs,

- against -

FISHER-PRICE, INC.,

                Defendant.

Index No.: 3:03 CV 222 (JBA)

**DECLARATION OF
BRUCE P. POPEK**

I, BRUCE P. POPEK, pursuant to the requirements of 28 U.S.C. §1746, declare that the following is true and correct under the penalties of perjury:

1. I am a principal of Design Innovation, Inc. ("DI"), a plaintiff in the above captioned action. I have personal knowledge of all facts stated herein. I make this declaration based upon personal knowledge and a review of documents relevant to this proceeding. I submit this declaration in opposition to defendant's Motion for Summary Judgment.

Background

2. DI, based in Avon, Connecticut, is an industrial design firm that employs a team of designers using advanced tools and equipment to develop prototypes and working models of toys, games and other products for manufacturers and marketing groups. I, along with my partners Bruce Benedetto and Doug Melville, Jr., oversee all aspects of the company's business.

3. I have a degree in industrial design and have worked in the field since 1980. From 1980 through 1987, I was the Director of Design of Preschool Play and Learn, and Outdoor Products at Coleco Industries. In that capacity I supervised an in-house staff of designers and

outside resources. During that time I was the designer responsible for Colecovision and the Adam computer system. I also developed internal concepts and those of outside inventors. As Director of Preschool Products, I was involved in product selection and development of concepts from Tomy Japan as well as the creation of the Cabbage Patch Baby infant line.

4. In 1988, I along with my partners founded DI and I have served as the President of the company since that time. During the last 17 years, my partners and I have created a premier design development group that has created and developed hundreds of products for the toy and juvenile products industry. We have also created concepts which have resulted in option agreements and/or the payment of advance monies at least 56 times. DI has an international client base and has worked with more than 100 leading companies including Hasbro, Fisher Price, Spin Master Toys, Little Tykes, Parker Brothers, Gerber, The First Years, Safety 1st and Kolcraft. We work with and for leading inventors in the toy industry, including our co-plaintiff, Victor G. Reiling Associates ("Reiling"). While much of our work is comprised of specific contracted projects, we also develop our own concepts and submit them to toy companies as we did in this case.

Relationship Between DI and Reiling

5. I have reviewed the declaration of Victor G. Reiling, dated May 20, 2005 ("Reiling Dec.") and the exhibits thereto. I adopt and incorporate by reference herein all of the factual assertions and opinions contained in paragraphs 4 through 5, 11 through 16, 18 through 20 and 22 through 64 of Mr. Reiling's declaration. I do so for purposes of brevity because I have personal knowledge of Mr Reiling's assertions and I agree with all of them.

6. I can confirm that DI's relationship with Reiling was that of joint inventors and we always maintained an equal ownership interest in our jointly developed concepts (i.e., 50%

Reiling, 50% DI). Mr. Reiling did not act on behalf of DI and there was no agency relationship (either in writing or by oral agreement). Mr. Reiling had no authority to bind DI, and in fact, we reserved the right to approve all proposed actions with respect to our jointly developed concepts. Mr. Reiling presented our jointly developed concepts to toy companies due to his many years of experience and contacts with inventor relations personnel.

Relationship With Fisher-Price

7. Fisher-Price has given us a significant amount of contract work in the past, including some work on various aspects of the "Rescue Heroes" line, but we did very little work on the "Rescue Heroes" line in the few years prior to this lawsuit. Moreover, the work that we did related only to ancillary products like vehicles, not to the core action figure line. In addition, we were typically given very finite and specific design tasks that would only encompass one small portion of the overall toy. For example, we were often hired by Fisher-Price in the past to perform sculpting of individual components of larger products. Hence, we typically had no idea what the actual finished product would look like, what product line it would be used in, or what engineering mechanisms it would utilize.

Prior Agreements With Fisher-Price

8. DI has never signed a Fisher-Price Policy and Agreement form like the one that Mr Reiling apparently signed in 1994 (*i.e.*, one that does not reference a particular concept and that purports to have an indefinite duration). DI did sign one Fisher-Price Policy and Agreement form with respect to three specific concepts we presented in 1992. (A copy of the 1992 agreement is attached to the Benedetto Declaration at Tab A). This agreement was signed by DI during the time when Fisher-Price required such an agreement to be signed in connection with every concept submission, a procedure the company later abandoned. The agreement references

three specific concepts that were presented in 1992, and a separate page is attached to the document that describes each of these three concepts.

9. DI has never signed any agreement related to the submissions in this case other than the Option Agreement with Fisher-Price. In addition, DI did not begin working with Reiling until after Mr. Reiling signed his 1994 Policy and Agreement with Fisher-Price, which was never shown to DI by Reiling or Fisher-Price.

10. DI did sign at least one development agreement for work assigned by Fisher-Price on a work for hire basis, but by their very terms these types of agreements did not cover the submission of toy concepts. We recognized these types of agreements to be independent contractor agreements, governing work assigned by Fisher-Price. They did not contain any language regarding the submission of independently developed toy concepts, nor did they contain any of the language that Fisher-Price relies upon to assert a waiver of rights by Mr. Reiling with respect to his 1994 agreement.

11. DI was not represented by counsel in connection with the execution of the 1992 Policy and Agreement or any development agreements with Fisher-Price. DI was also not represented by counsel in connection with the execution of the Option Agreement with Fisher-Price in this case, relying instead on our past experience and prior dealings with Fisher-Price and Paul Snyder. Exhibit A to the Option Agreement was drafted by Fisher-Price's attorneys with no input from DI.

Toy Industry Custom and Practice

12. I can specifically confirm that based on my company's own past experience, Fisher-Price will pay a royalty to an outside toy inventor for a product concept submission even though the finished product deviates significantly from the original submission. As an example,

in 1994 we submitted to Fisher-Price the concept for a large, egg-shaped toy with replaceable body parts, known as "Silly Sounds." Each nose piece would initiate a unique animal sound. The novelty was in the electronic sounds; otherwise the product was essentially a version of the famous "Mr. Potato Head" toy. Fisher-Price optioned the product and then acquired it. When it was brought to market as "Egg-A-Saurs," Fisher-Price re-themed the body parts and removed the electronic sounds. Essentially, Fisher-Price eliminated the only novel aspect of the concept, changed the aesthetics, brought it to market and still paid a full royalty on the product. (A copy of a photograph depicting Fisher-Price's "Egg-A-Saurs" product is attached hereto at Tab A).

13. I can also confirm that it is standard practice in the toy industry for inventors to combine several existing elements to create a new concept, and a royalty is paid if the submitted concept represents something that is new and different. For example, I am personally aware of one such product submitted to Fisher-Price by a third-party inventor. The inventor submitted an idea for combining existing Sesame Street licensed characters with a flashlight. Fisher-Price licensed the concept from the inventor and came out with a product line known as "Sesame Street Flashlights" that consisted of exactly what had been submitted in drawing form. (A web page depicting the "Flashlights" product is attached hereto at Tab B) The inventor was paid a royalty on all sales, and was paid for line extensions when Fisher-Price added electronic sounds and extended the concept to different licensed characters. This was done even though there was nothing novel about a licensed character, a flashlight or the added electronics at the time.

14. It has also been DI's experience that companies will routinely pay royalties for concepts that have previously been sold in the marketplace. One example is a product we developed called "Chalk Writer." This was a push toy held by a stick that dragged a piece of chalk which drew a line as you walked. We originally sold Chalk Writer to Fisher-Price, who paid us

royalties. After Fisher-Price discontinued the item, we sold the concept to a company called Big Idea, who marketed and sold the same concept and paid us royalties. Thereafter, Big Idea discontinued the item, and we sold it to Binnie & Smith. Binnie & Smith will sell the product in nearly the same form as had been done before (except they included three pieces of chalk instead of one), and they have paid us an advance and will pay us royalties.

15. Like Mr. Reiling, we have also had disputes with toy companies over the years involving concept submissions, but have typically been treated fairly. One such dispute with Fisher-Price related to a concept we submitted with a third party for a water sprinkler in the shape of a whale that blew bubbles out of the top. We presented this concept at least twice, but Fisher-Price rejected it. Approximately four years later, Fisher-Price came out with the exact same item and it appeared on the front page of their Toy Fair catalog. In fact, the product was so close to what we had submitted that other inventors who were familiar with our concept congratulated us for selling the item to Fisher-Price. When we raised the issue with Fisher-Price, they indicated that another design group had submitted the idea. After reviewing our previously rejected submission, they agreed to pay us a royalty.

16. I can also confirm that the agreements and forms that toy companies require inventors to sign in order to show concepts are not uniform. For example, in my experience, Toy Biz has no forms which it requires inventors to fill out in connection with a concept submission.

17. DI expected our three Reel Heroes submissions to be held in confidence by Fisher-Price, and we treated the submission confidential as well. This was the manner in which we had dealt with Fisher-Price and other toy companies in the past. The confidential nature of the submission was confirmed by our Option Agreement. Although DI did submit the Reel

Heroes concept to Toy Biz in 2002, this was after the final rejection of our concept by Fisher-Price in January, 2001.

Plaintiffs' Concept Was Novel When Submitted to Fisher-Price

18. The Reel Heroes concept added a separate image component in the form of a backpack for each "Rescue Heroes" action figure that enhanced role play for the child by depicting the mission of that particular "Rescue Heroes" character, which concept could be expanded into accessories and line extensions relating to the "Rescue Heroes" line pursuant to industry custom and practice. Our concept was submitted specifically for the Rescue Heroes, and specifically as a backpack, although we did show in our submission that the concept could be expanded by Fisher-Price into line extensions and accessories (specifically vehicles and play sets).

19. Based upon my twenty-five years of experience in the toy industry as a toy industry designer, at the times DI and Reiling submitted our three concept executions to Fisher-Price, I had never seen our concept marketed or sold by Fisher-Price or any other toy company. That is, I had never seen the following marketed or sold: a separate image component for the backpack of an action figure that enhances role play for the child by depicting the mission of that particular character or obstacles and dangers that character might face. Certainly, I had never seen it done in connection with the Rescue Heroes.

20. Innovative features of our concept include, but are not limited to, the following: (a) interchangeable film strip units contained in backpacks for each Rescue Heroes character that displayed mission assignments or obstacles and dangers the characters might face; (b) removable backpack units containing an image viewer that were designed specifically to attach to the existing connector on each Rescue Heroes character; (c) an image viewer that was designed

7

specifically to be a backpack and attach to the Rescue Heroes characters; (d) an image positioned for viewing by the child from behind the Rescue Heroes character, enabling the child to mentally become the eyes of the action figure to enhance play pattern; (e) a backpack for each Rescue Heroes character containing a working image viewer that changed images; (f) a backpack connected to a camera that fit into the Rescue Heroes character's hand, enabling the user to view animated images and real-time images at the same time and to open and close the camera remotely via the trigger on each Rescue Heroes character's tool; and (g) a cameraman Rescue Heroes action figure with a distinctive appearance, including: (1) baseball hat, (2) press pass, (3) red hair, (4) red facial hair, (5) laced boots, (6) camera in right hand, (7) microphone in left hand, (8) brown work gloves, (9) blue shirt, and (10) utility vest.

21. To my knowledge, the only reasons ever provided regarding Fisher-Price's lack of interest in our concept were that our first submission of the concept was too expensive to execute, it was a "one-trick pony" and that it did not fit the current Rescue Heroes theme. We disagreed with the last two reasons and addressed the cost issue with our second and third executions. To my knowledge, Fisher-Price never indicated that the concept was not novel to them or the toy industry until after this lawsuit was filed.

22. Based upon my experience as a designer, the most important purpose of the still images on the Mission Select and Mission Command backpacks is to communicate a play scenario to the child of the character's mission or obstacles and dangers the character might face, not to identify the subject matter of the action figure's speech. If the voice or sound element was not there, or not working, the child would still view and talk about the image. With Mission Select, the child would still rotate the disc to reveal the multiple images that would lead the child to different adventures.

Fisher-Price's Termination of Our Business

23.     As I indicated, Fisher-Price used to be a significant part of DI's business. At times the Fisher-Price account represented over 40% of our business. We had worked with them for over 15 years and always enjoyed an excellent working relationship. In the Fall of 2003, Fisher-Price attempted to get us to drop our lawsuit against them. Thereafter, they informed us that they would no longer give work to us because of the pending lawsuit. (A true and correct copy of an E-mail message from Stan Clutton, Vice President of Inventor Relations for Fisher-Price, is attached hereto at Tab C). Fisher-Price claimed that the decision was made by its corporate parent, Mattel, Inc. Fisher-Price also told us that we would not be able to work for them in the future until we convinced our co-plaintiff, Mr. Reiling, to also withdraw his lawsuit. Stan Clutton, the current Vice President of Inventor Relations for Fisher-Price, confirmed these facts during his deposition in this case. In a chance meeting with Mr. Clutton at the 2004 Toy Fair in New York City, he again told us that if we did not settle, DI and its owners individually would never work for or as an employee of Mattel again. We have no control over Mr. Reiling and, nevertheless, we would not ask him to drop his suit which he feels so strongly about.

24.     From 1999 to 2003, DI averaged $833,972 in annual business from Fisher-Price, Fisher-Price Brands and Mattel. That business has been lost as a result of Fisher-Price's termination of our work.

25.     The concept at issue in this case was conceived by DI and Reiling as a result of our initial meeting in Connecticut. DI built the prototype, drew sketches and prepared presentation boards in Connecticut. We signed our Option Agreement with Fisher-Price in Connecticut. Finally, DI, its owners and employees were damaged in Connecticut when Fisher-

Price terminated our business relationship and indicated we would have to drop the lawsuit and obtain Mr. Reiling's withdraw before business would be reinstated.

26. In sum, Fisher-Price used our concept after expressing a "genuine excitement level" and admitting the "unique aspect of the concept" in the Option Agreement. They did so without our consent and refused to pay us a royalty, tantamount to stealing our novel idea. Then, when we had the boldness to challenge them on their wrongful use of our concept, they fired us. To add insult to injury, they now have blackballed us for all future work until we drop the suit and convince Mr. Reiling to do so, causing us substantial loss of business. Fisher-Price's blacklisting has also restricted our working relationship with Mr. Reiling and prohibits us from selling concepts to the largest toy company in the world.

I declare that the foregoing is true and correct under the penalty of perjury.

_____
Bruce P. Popek

Dated: Avon, Connecticut
May 20, 2005

11

# EXHIBIT A


EXHIBIT 105

# EXHIBIT B

# FlashlightMuseum.com
Your #1 showplace for antique, classic and new flashlights.

Home | FLASHLIGHTS | Publications | Wish List | Contributors | Collectors | About Us | Contact Us

**Search For Flashlights:**
[    ] [Go]
Search Terms May Include:
Description, Model #, Circa

Please Visit Our Sponsor:



**Featuring Flashlights By:**
EVEREADY
MAG-LITE
RAYOVAC
SUREFIRE
InReTECH

**Buy Light Bulbs and Accessories Online**

Ads by Goooooogle

**Pelican Flashlights**
All Lights In Stock - Ready To Ship Why Pay More?
www.pelican4less.com

## Flashlights : Novelty Style

Tyco Preschool Toys, Inc. Sesame Street Elmo with Helmet Light

Circa: 1996    Battery: 1AA    Model #: N/A    Value: $7.00    Ref. #: TY00001



EXHIBIT 101
3/24/05

Copyright 2003-2005 FlashlightMuseum.com | Owned and Operated by Service Lighting, Inc.
435,893 since 7/21/03

EXHIBIT C

----- Original Message -----
From: Clutton, Stan
To: 'Design Innovation Inc.'
Cc: Greg Battersby ; Bruce Benedetto ; Doug Melville ; Wesolowski, Dennis
Sent: Friday, November 07, 2003 3:26 PM
Subject: Re: Your offer / Our Offer

Hi Bruce

I got your message saying you did not feel you should make another offer at this time. We feel the offer you made is really no offer at all since it is what we believe you might expect to win if you won every issue of your case in court. We believe that the end result in court will fully support our position. That leaves us very far apart.

In the interest of trying to get off the road we are on, we are willing to offer a [redacted] settlement. We offer this from a business standpoint of saving Fisher-Price legal expenses and avoiding the time loss and distraction from our business. In all sincerity no one here feels that we have in any way infringed upon your concept and we make this offer despite this conviction that we are in the right and have acted correctly on this issue. We are hopeful you will accept this offer and not force us to take this case to it's legal conclusion.

On a related issue, I informed you that the company can not do business with someone who has a lawsuit pending against us. The law department is in the process of notifying Fisher-Price and Mattel R&D departments not to place any additional work with Design Innovation. I have convinced them to allow current projects that have been already committed to be completed in the interest of avoiding delays on this work.

Please make sure that Vic gets a copy. I did't have his e-mail handy. I look foreward to your response.

Regards, Stan

EXHIBIT
P-183
Joyce Silver, C.S.R.
Date: 4/24/01

DI063