UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

VICTOR G. REILING ASSOCIATES and
DESIGN INNOVATION, INC.,

Index No.:  3:03 CV 222 (JBA)

Plaintiffs,

- against -

FISHER-PRICE, INC.,

May 23, 2005

Defendant.

**APPENDIX OF LEXIS CASES IN SUPPORT OF
MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

LEXSEE 1995 US DIST LEXIS 10309

JOHN C. BIEDA d/b/a JACK BIEDA and ASSOCIATES, JOHN F. CORBANI, and
MICHAEL F. KELLY, Plaintiffs, against JCPENNEY COMMUNICATIONS, INC.
and JCPENNEY CORPORATION, INC., Defendants.

92 Civ. 5910 (JFK)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*1995 U.S. Dist. LEXIS 10309*

July 24, 1995, Decided
July 25, 1995, FILED

LexisNexis(R) Headnotes

COUNSEL: [*1] For Plaintiffs: Richard deY
Manning, Esq., Harrison, New York.

For Defendants: JCPenney Legal Department, Plano,
Texas, Of Counsel: Elizabeth A. Ferguson, Esq. Weil,
Gotshal & Manges, New York, New York, Of Counsel:
Kevin P. Hughes, Esq.

JUDGES: JOHN F. KEENAN, United States District
Judge

OPINIONBY: JOHN F. KEENAN

OPINION:

## OPINION and ORDER

### JOHN F. KEENAN, United States District Judge:

Before the Court are a number of motions.
Defendants move for partial summary judgment on
Plaintiffs' first, second, third, and sixth claims for relief,
pursuant to *Fed. R. Civ. P. 56*. Plaintiffs oppose that
motion and cross-move for summary judgment on
liability for all of their claims, pursuant to *Fed. R. Civ. P.
56*. Defendants oppose the cross-motion and respond
with a motion to strike portions of the affidavit of John
C. Bieda. Plaintiffs oppose the motion to strike and
additionally move for reconsideration of two orders of
this Court, dated March 22, 1994 and March 30, 1994
respectively, that denied Plaintiffs' request to re-open

discovery. Finally, Plaintiffs move for sanctions. For the
reasons that follow, these motions are granted in part and
denied in part.

### BACKGROUND [*2]

#### I. The Parties

Plaintiffs John C. Bieda ("Bieda"), John F. Corbani
("Corbani"), and Michael F. Kelly ("Kelly") have sued
the now-defunct JCPenney Communications, Inc. and
J.C. Penney Company, Inc. n1 (collectively
"JCPenney"). Bieda has been involved in marketing and
market research for over twenty years and has been
President of Jack Bieda & Associates ("JBA"), a
marketing research and consulting firm, since 1986.
Corbani is also experienced in marketing and is presently
the owner and President of C.A. Durakis, a Connecticut
consulting firm. Since 1983, Kelly has been President of
Techtel, a California market research/consulting firm that
specializes in research utilizing personal computers.
Corbani and Kelly assisted Bieda with the project
described below.

n1 J.C. Penney Company, Inc. is incorrectly
referred to in the Complaint as JCPenney
Corporation, Inc.

#### II. The Events Giving Rise to this Litigation

In the early 1980s, JCPenney developed an internal
satellite communications [*3] network to allow its
corporate headquarters to broadcast merchandise

selections and other information simultaneously to JCPenney stores throughout the United States.

Plaintiffs first contacted JCPenney in August of 1986 with an idea to develop the JCPenney satellite communications network to conduct market research for third parties. Plaintiffs produce documentary evidence that demonstrates that JCPenney Communications, Inc. personnel and JBA personnel were in contact about the project as early as August of 1986. See Bieda Exs. 1-4, 7. n2 Paul Rush ("Rush"), JCPenney Communications, Inc.'s then Sales Manager, confirms this. See Rush Aff. PP 3, 4. The project contemplated that third-party market researchers would use the proposed interconnected, two-way satellite, computer processing and communications system to coordinate simultaneous market tests of a new product or concept. Bieda and his associates would develop the computer stations to be used at the Project Sites and would select representative groups of consumers at the Project Sites. The consumers would view either a video or a live transmission via satellite simultaneously at all the Project Sites and then JBA associates [*4] would extensively question them on what they saw. The results would be assembled and a composite report issued almost immediately thorough the computer link. Through this process, the market researchers would be able to pre-select JCPenney customers in different areas of the country and obtain responses almost immediately through the computer link.

n2 Defendants move to strike portions of the Bieda Affidavit on the basis that they were not made with personal knowledge. Bieda admits that he saw many of the documents attached as exhibits to the affidavit for the first time in discovery. Because of that admission, Defendants argue that those exhibits and the text in the affidavit referring to such affidavits should be stricken for Bieda's inability to authenticate the documents. It should be noted that Defendants do not challenge the authenticity of the documents themselves; rather, Defendants merely challenge Bieda's ability to authenticate the documents. Although Defendants object to Plaintiffs' submission in opposition to the motion to strike as untimely, the Court will accept and consider that opposition as the motion to strike goes to the core of Plaintiffs' opposition to Defendants' motion for summary judgment and to its own cross motion for summary judgment.

Plaintiffs respond that the exhibits are sufficiently authenticated by the Defendants' interrogatory responses and by the law. The Court has reviewed the challenged exhibits and

the parties' submissions on the issue. The Court agrees with Plaintiffs and finds it unnecessary to explain its analysis with respect to each and every one of the twenty-two challenged items.

In *Finance Co. of America v. BankAmerica Corp.*, 493 F. Supp. 895 (D. Md. 1980), the Court found that the defendants "tried to limit submissions" of plaintiff by moving to strike affidavit exhibits on the ground that "deponent did not have personal knowledge of their contents" and "they are not properly authenticated." That tactic was held to be improper by the Court, which noted that

the general rule is that 'the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.' This requirement, if it applies in this context, is satisfied by defendants' failure to challenge the documents' authenticity and the affidavit of [plaintiff's counsel] . . .

*Id.* at 900-01 (citations omitted). In addition, the mere fact that Defendants here produced most of the documents in question is at least circumstantial, if not conclusive, evidence of authenticity. See *Zenith Radio Corp. v. Matsushita Elec. Indus Co.*, 505 F. Supp. 1190, 1223 (E.D. Pa. 1980), aff'd in part and rev'd in part sub nom., *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 284-85 (3d Cir. 1983), rev'd on other grounds, 475 U.S. 534 (1986) (production of documents may be circumstantial evidence of authenticity); *FTC v. Hughes*, 710 F. Supp. 1520, 1522 (N.D. Tex. 1989) (production of documents is an admission of authenticity).

In view of Defendants' failure to challenge the documents' authenticity, the Court finds that the only logical explanation for the existence of the documents in Defendants' files is that they are authentic. Each one of the challenged documents has the appearance of authenticity, which is a factor that may be considered by the Court. See *Zenith*, 505 F. Supp. at 1224. Moreover, the substance of each of the documents lends

credence to arguments for their authenticity. Finally, the Defendants' answers to interrogatories help to establish the authenticity of many of the documents.

The Court finds that there is sufficient evidence of the challenged documents' authenticity to consider those documents on this motion for summary judgment. The motion to strike is therefore denied.

[*5]

Plaintiffs allege that for eight months, from August 1986 to April 1987, the parties were actively engaged in developing the project. See id. Plaintiffs state that the project was initially proposed to be a JBA owned and operated business with JCPenney supplying its sites and communication facilities for a fee. See Bieda Aff. P 9; Rush Aff. P 4(a). The pilot program was planned to commence on a limited basis as stated in a letter dated September 18, 1986 from Deborah McHugh (JCPenney Communications, Inc. Programs Manager) to Bieda. See Bieda Ex. 4. JCPenney Communications, Inc. personnel Rush, Russell Longyear ("Longyear"), and Jeffrey Stern ("Stern") (then part of the Planning and Research Department of JCPenney and now Controller of Company Communications and Administrative Services), were allegedly involved in these negotiations. See Bieda Exs. 1-4. The project allegedly proceeded on this separate basis until mid-April 1987, when Plaintiffs allege that Rush telephoned Bieda and proposed continuing with the project jointly. See Bieda Aff. P 13. Rush states that he met with Bieda and they firmly agreed that the project would proceed as a 50/50 joint venture. [*6] See Rush Aff. P 4(b). Rush states that the 50/50 joint venture structure was never altered to his knowledge. See Rush Aff. P 6.

In a letter dated April 17, 1987, JBA submitted a proposal to Rush for a joint market research company using JCPenney's satellite capabilities. See Bieda Ex. 5. The proposal, known as "The Research Network" and later as the "Satellite Research Network," contemplated supplementing the JCPenney satellite communications network with a linked computer network. See id. In a May 6, 1987 "Business Overview" prepared by Bieda both the JBA owned and operated project and the alternative joint project were outlined. See Bieda Ex. 6. That memorandum was appended to a JCPenney internal memorandum dated May 11, 1987 from Stern to Rush and Longyear, among others. See id. At a May 12, 1987 meeting, it was agreed that the project feasibility investigation would continue on a joint-ownership basis. See Bieda Aff. P 16. If the project was found to be technically and economically feasible, then the parties would create a 50/50 owned company and would raise

the funds needed to proceed with the project. See Bieda Aff. PP 17-18; Rush Aff. P 4(b) [*7]

JCPenney states that before it could enter into a joint venture with JBA, the JCPenney Communications, Inc. Board of Directors and its Capital acquisitions Committee ("CAC") had to approve the project. See Defendants' 3(g) Statement P 5. The Board of Directors approved the proposed market research project in August of 1987. See id. P 6. According the JCPenney, In October of 1987, the CAC approved the formation of the project as a joint venture subject to certain conditions: 1) that JBA provide 50% of the capital for the project ( $ 1 million); and 2) all documents memorializing the deal be approved by JCPenney's Legal Department and Finance-Treasurer Department. See id.

JCPenney further states that the parties agreed that there would be no joint venture without a signed written joint venture agreement. See id. P 8. No joint venture agreement was ever written or signed. See id. P 7. JCPenney additionally alleges that JBA was never able to obtain its part of the financing. See id. P 9. Finally, JCPenney states that several material terms of the joint venture were never agreed to, including: 1) the amount and source of financing; 2) the roles the parties would [*8] play within the company; 3) the degree of control the parties would exercise; 4) the way in which profits and losses would be shared. See id.

Plaintiffs disagree with Defendants' contention that no joint venture was ever created. Plaintiffs point to numerous exhibits wherein JCPenney employees refer to the "joint venture" and to JBA as its "joint venture partners." See Bieda Exs. 9 (at 6); 14 (at 2); 15 (at attachment); 19 (at Ex. I). Each of the individual Plaintiffs' extensive contributions to the project were detailed in a July 28, 1987 memorandum entitled "Proposed Business Opportunity," apparently developed by the JCPenney Strategic Planning Committee. See Bieda Ex. 9. Plaintiffs allege that each party had a degree of control over the venture. See Bieda Ex. 15, Attachment A, JCP 0063; Bieda Aff. P 28; Bieda Ex. 11. Plaintiffs also contend that each party had a property interest in the subject matter of the venture and there was a provision for sharing profits and losses. See Bieda Exs. 13-15.

Once approvals were received, Plaintiffs claim that JCPenney frustrated the joint venture. At a meeting held on October 28, 1987, JCPenney allegedly unilaterally changed [*9] the agreement to include the following terms: a change in the ownership to 55% for JCPenney and 45% for JBA (without any similar change in equity contribution); the establishment of a seven member board of directors with four from JCPenney and three from JBA; and the establishment of a one-year

employment contract for Bieda and Kelly with an option to renew. See Bieda Ex. 16. These changes were made despite the CAC October 21, 1987 meeting minutes' indication of approval of the 50/50 ownership and contribution division. n3 Bieda and Kelly state that they did not agree to these changes. Kelly's contemporaneous notes of the event indicate that Kelly feared that JCPenney thought that it was strong enough to undertake the project without JBA. See Bieda Ex. 17 at 3. According to Plaintiffs, the unilateral change in ownership made it impossible for JBA to obtain financing, as did JCPenney's refusal to allow JBA to use the name JCPenney in connection with their efforts to raise capital. See Bieda Aff. P 43.

> n3 The minutes of the CAC October 21, 1987 meeting indicate that "After discussion, the Request was approved." See Bieda Ex. 15. Nowhere do the minutes indicate that the approval was subject to any additional conditions.

[*10]

Plaintiffs also claim that JCPenney attempted to unilaterally impose a management structure that would give JCPenney all the control over the corporation, while giving Bieda the empty title of President. See Bieda Ex. 18. Plaintiffs also claim that JCPenney refused their reasonable alternative proposals for financing, see Bieda Ex. 19 at Ex. III. Bieda states that it became increasingly clear to him that JCPenney was trying to take over their joint venture. See Bieda Aff. P 45. Plaintiffs contend that JCPenney's management made material misstatements internally, none of which were ever shown to them until discovery in this action, about the project and the parties' positions on various issues. See Bieda Ex. 19 at Exhibits I-VI. For example, one of the offending documents states that Bieda and Kelly were offered a 87.5 (JCPenney)/12.5 (JBA) ownership proposal which they accepted. See Bieda Ex. 19 at Exhibit V). Kelly's contemporaneous notes of a November 10, 1987 telephone conference with Stem indicate that Bieda and Kelly unequivocally denied the proposal. See Bieda Ex. 21; Bieda Aff. P 46. Plaintiffs assert that certain of JCPenney's management continued [*11] to misrepresent within JCPenney the status of the project. See Bieda Exs. 22, 24.

In February and March of 1988, the parties also discussed the possibility of a consulting agreement, but were unable to agree to terms for such an agreement. See Defendants' 3(g) Statement P 10; Bieda Exs. 25A, 26, 27, 28. In April of 1988, Defendants decided to develop a market research company on their own to perform market research primarily for JCPenney internal

purposes, instead of for third-party users. See Defendants 3(g) Statement P 11. In developing this company, the "Satellite Research Company" ("SRC"), internally, JCPenney asserts that it did not use any materials prepared by Plaintiffs or any of the ideas advanced by Plaintiffs. See id. P 12. JCPenney states that the people involved in SRC's development were not even aware of prior discussions with Bieda or JBA. n4 See id. P 12. Although SRC's name includes the term "satellite," SRC as developed allegedly does not use satellite technology, live broadcasts, or "real time" interaction-- recommendations allegedly made by Plaintiffs. See id. P 16. JCPenney states that SRC uses commercially available software to create questionnaires [*12] which are uploaded to JCPenney store testing sites using JCPenney's existing E-Mail system. See id. P 15. JCPenney then mails videotapes to research testing sites where the respondents view them and input their answers on personal computers. See id. When the tests are complete, the results from all the various tests, which are not conducted simultaneously, are downloaded to JCPenney headquarters again by E-Mail. See id. The results are then tabulated and compiled by commercially available software, and are then analyzed by a JCPenney market researcher who creates a report of the results. See id. This process allegedly takes several weeks. See id. JCPenney is apparently the only user of the SRC system.

> n4 This is a curious assertion inasmuch as certain of the JCPenney employees involved in the ultimate development of SRC, including among others McHugh, had worked on the initial project with Bieda for over a year. Moreover, one Edward Lucas who worked on SRC swears that he "was not aware that any work had been done on this or any related projects." Lucas Aff. P14. Yet, despite this assertion, the documentary evidence presented by plaintiffs indicates that Lucas was involved in the Satellite Research Project Test occurring in April of 1988, the time JCPenney was supposed to have just decided to develop a system of its own. See Bieda Ex. 29.

[*13]

**III. The Arguments**

Plaintiffs allege that JBA had a joint venture contract with JCPenney to develop a marketing research business using JCPenney's existing satellite technology and that JCPenney misappropriated ideas from the joint venture. Plaintiffs allege that in order to determine the feasibility of their project, they developed a de facto joint venture in May of 1987. Plaintiffs allege that JCPenney, after obtaining approvals for the 50/50 percentage

ownership and capital contribution agreed to, changed the agreed percentage of ownership from 50/50 to 55/45 (JCPenney/JBA) without reducing plaintiffs' capital contribution or raising its own. Plaintiffs claim that this effectively blocked their efforts to raise their required capital contribution. Thereafter, plaintiffs claim that JCPenney wrongfully appropriated the project for its own use.

JCPenney, on the other hand, denies any wrongdoing. JCPenney argues that: 1) Plaintiffs did not contribute any original ideas to JCPenney; 2) JCPenney never misappropriated any ideas from Plaintiffs when it developed the SRC, because SRC did not and does not use satellite technology, "real time" interaction, n5 or any other [*14] ideas or concepts allegedly provided by Plaintiffs to JCPenney; and 3) JCPenney never had a joint venture contract with Plaintiffs, express or implied, because the parties never entered into a written contract even though they contemplated doing so.

> n5 The Court notes that Plaintiffs did not advance only the idea of simultaneous transmissions via satellite—Plaintiffs advanced the idea of videotape transmissions as well from the very beginning of their negotiations. See Bieda Ex. 2.

## DISCUSSION

Plaintiffs make the follow claims in their Complaint: 1) JCPenney breached its fiduciary duty as a joint venturer to Plaintiffs; 2) JCPenney breached an express joint venture contract; 3) JCPenney breached a quasi or implied joint venture contract; 4) JCPenney acted in bad faith in its performance of the joint venture contract; 5) JCPenney should be estopped by the application of promissory estoppel from continuing any work with SRC; 6) JCPenney misappropriated Plaintiffs' ideas from the joint venture; [*15] and 7) Plaintiffs are entitled to damages in quantum meruit from the reasonable value of their services. Defendants move for partial summary judgment on claims one, two, three and six, while Plaintiffs cross move for summary judgment on all seven of the claims.

### I. Summary Judgment Cross Motions

#### A. Summary Judgment Standards

This Court may grant summary judgment only if there is no genuine dispute as to any material fact and the moving party is thus entitled to judgment as a matter of law. See, e.g., Silver v. City University of New York, 947 F.2d 1021, 1022 (2d Cir. 1991); Montana v. First Fed. Sav. & Loan Ass'n, 869 F.2d 100, 103 (2d Cir. 1989);

Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), cert. denied, 480 U.S. 932, 94 L. Ed. 2d 762, 107 S. Ct. 1570 (1987); Falls Riverway Realty, Inc. v. Niagara Falls, 754 F.2d 49, 54 (2d Cir. 1985). The role of the Court on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d at 11. See, e.g., [*16] Twin Lab. Inc. v. Weider Health & Fitness, 900 F.2d 566, 568 (2d Cir. 1990); Montana v. First Fed. Sav. & Loan Ass'n, 869 F.2d at 103; Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989).

The movant bears the initial burden of informing the Court of the basis for its motion and identifying those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that show the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). If the movant meets this initial burden, the party opposing the motion must then demonstrate that there exists a genuine dispute as to the material facts. Id.; see also Silver v. City University of New York, 947 F.2d at 1022; Greater Buffalo Press, Inc. v. Federal Reserve Bank, 866 F.2d 38, 42 (2d Cir.), cert. denied, 490 U.S. 1107, 104 L. Ed. 2d 1022, 109 S. Ct. 3159 (1989). The opposing party may not solely rely on its pleadings, on conclusory factual allegations or on conjecture as to the facts that discovery might disclose. See, e.g., Gray v. Darien, 927 F.2d 69, 74 (2d Cir.), [*17] cert. denied, 502 U.S. 856, 112 S. Ct. 170, 116 L. Ed. 2d 133 (1991). Rather, the opposing party must present specific evidence supporting its contention that there is a genuine material issue of fact. See, e.g., Celotex Corp. v. Catrett, 477 U.S. at 324; Twin Lab. Inc. v. Weider Health & Fitness, 900 F.2d at 568; Montana v. First Fed. Sav. & Loan, Ass'n, 869 F.2d at 103; Knight v. U.S. Fire Ins. Co., 804 F.2d at 12; L & L Started Pullets, Inc. v. Gourdine, 762 F.2d 1, 3-4 (2d Cir. 1985). To show such a "genuine dispute," the opposing party must come forward with enough evidence to allow a reasonable jury to return a verdict in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986); Cinema North Corp. v. Plaza at Latham Assoc., 867 F.2d 135, 138 (2d Cir. 1989). If "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," then summary judgment must be denied. Schering Corp. v. Home Ins. Co., 712 F.2d 4, 9-10 (2d Cir. 1983) (citing [*18] New York State Energy Research & Dev. Auth. v. Nuclear Fuel Servs., Inc., 666 F 2d 787, 790 (2d Cir. 1981)).

## B. Analysis

As Defendants and Plaintiffs have cross moved for summary judgment on the Complaint, the motions can be addressed simultaneously.

### 1. Counts One, Two, Three, and Four

Counts one (breach of fiduciary duty as a joint venturer), two (breach of an express joint venture contract), three (breach of a quasi or implied joint venture contract), and four (bad faith by JCPenney in its performance of the joint venture contract) all depend on proof of the existence of a joint venture agreement. The Court finds that there are far too many disputed material facts to grant summary judgment to either Plaintiffs or Defendants on these claims.

In order to find that a joint venture exists, a court must find that the parties entered into a specific agreement to carry on an enterprise for profit and that they intended to be joint venturers. See *ITEL Containers Int'l Corp. v. Atlantrafik Express Serv., Ltd.*, 909 F.2d 698, 701 (2d Cir. 1990). To constitute a joint venture, the following five elements must be present: (1) a specific agreement between two or more [*19] parties to create an enterprise for profit, (2) the agreement must evidence the parties' mutual intent to be joint venturers, (3) each party must make a contribution of property, financing, skill, knowledge or effort, (4) each party must have some degree of joint management control over the venture, and (5) there must be a provision in the agreement for the sharing of both losses and profits. See *ITEL Containers*, 909 F.2d at 701; *Flammia v. Mite Corp.*, 401 F. Supp. 1121, 1127 (E.D.N.Y. 1975), aff'd, 553 F.2d 93 (2d Cir. 1977); *Yonofsky v. Wernick*, 362 F. Supp. 1005, 1031 (S.D.N.Y. 1973).

The court does not find it necessary to go through each and every one of these elements. It is sufficient to require the denial of the motions that the parties dispute whether there was an agreement between them to be joint venturers. Without reiterating all of the evidence put before the Court on this motion, Plaintiffs assert that they were joint venturers with Defendants in establishing a marketing research business using JCPenney's existing satellite technology. Plaintiffs produce numerous examples of Defendants referring to Plaintiffs as "joint venture partners" and the like. [*20] Plaintiffs also produce the affidavit of former JCPenney employee Paul Rush who confirms that there was a joint venture agreement

Defendants, on the other hand, deny that there was ever a joint venture agreement. As evidence for this position, Defendants produce affidavits of JCPenney personnel, including that of Jeffrey Stern, then employed

by the Planning and Research Department of JCPenney, denying that an agreement was ever reached.

Thus, the first key element that must be proven to establish a joint venture is disputed. It is not for the Court to determine which contention of fact as to that element is the more likely—that is for the jury to decide at trial. The Court therefore denies Defendants' motion for summary judgment dismissing counts one through three and likewise denies Plaintiffs' motion for summary judgment seeking a finding liability on counts one through four.

### 2. Count Five--Promissory Estoppel

Plaintiffs additionally move for summary judgment on count five of their Complaint for promissory estoppel. In order to prevail on a claim of promissory estoppel, the following elements must be proven: 1) a clear and unambiguous promise; 2) reasonable and foreseeable [*21] reliance by the party to whom the promise is made; and 3) an injury sustained as a result of the detrimental reliance of the party asserting the estoppel. See *Restatement (Second) of Contracts § 90*; *Esquire Radio & Electronics, Inc. v. Montgomery Ward & Co.*, 804 F.2d 787, 793 (2d Cir. 1986); *Smith v. Horsehead Industries, Inc.*, 1995 U.S. Dist. LEXIS 9549, 1995 WL 406024, * 8 (S.D.N.Y. July 10, 1995); *James King & Son, Inc. v. De Santis Construction*, 97 Misc. 2d 1063, 1065, 413 N.Y.S.2d 78, 81 (Sup. Ct. N.Y. Co. 1977).

The Court is also precluded from granting summary judgment on this claim by a material issue of fact as to the first element. While Plaintiffs argue that Defendants clearly promised to undertake the marketing research project as a 50/50 joint venture provided the joint venture study proved economically feasible, Defendants assert that they did not do so. Each side submits some evidence in support of its position. As with the claims dependent on a finding of a joint venture agreement, this claim likewise is inappropriate for summary judgment because it is not for the Court to decide issues of fact.

### 3. Count Six--Misappropriation

Defendants move for summary judgment dismissing [*22] count six for misappropriation while Plaintiffs cross-move for a finding of liability on this count. In order to prevail on a claim of misappropriation of an idea under New York law, two elements must be satisfied: 1) the requisite legal relationship must exist between the parties; and 2) the idea must be novel and concrete. See *McGhan v. Ebersol*, 608 F. Supp. 277, 284 (S.D.N.Y. 1985). The legal relationship required may be either a fiduciary relationship, or based on an express contract, an implied-in-fact contract, or a quasi-contract. See id. Defendants particularly attack this claim for relief on the ground that the idea is not novel.

In deciding Plaintiffs' motion to recover on this claim, the Court need not reach the question of whether or not the idea is novel. With respect to claims one through four above, the Court determined that the there was a material issue of fact as to whether there was a joint venture agreement between the parties. That question of fact precludes the Court from determining whether the requisite legal relationship exists between the parties and the Court cannot grant Plaintiffs motion on this Claim.

In order to completely address Defendants' [*23] motion on this claim, the Court must determine whether the idea is novel, because if it is not, the Court may dismiss the claim entirely without ever sending it to the jury. While Defendants produce the affidavit of an experienced market researcher to establish that the concept of market research has been around since "biblical times," the Court cannot find, however, that the concept of a Satellite Research Network was not novel or original as a matter of law. Plaintiffs produce many internal JCPenney memoranda that describe the project as "unique," "state-of-the-art," and "new." Such JCPenney memoranda further stated that there was "no comparable service in the marketplace." The Court is not in a position to determine whether or not the idea was novel and leaves that issue to the jury as well. Therefore, Defendants' motion as to this claim is denied as well.

#### 4. Count Seven—Quantum Meruit

In order to make out a claim in quantum meruit, Plaintiffs must establish the following: 1) plaintiffs' performance of services in good faith; 2) acceptance of those services by the persons to whom such services were intended; 3) expectation of compensation; and 4) the reasonable value of [*24] such services. See *Paper Corp. of United States v. Schoeller Technical Papers, 773 F. Supp. 632, 640-41 (S.D.N.Y. 1991); Martin H. Bauman Assoc., Inc. v. H & M Int'l Transp. Inc., 171 A.D.2d 479, 484, 567 N.Y.S.2d 404, 408 (1st Dept. 1991).* As with all of the other claims in this action, the Court finds that there are material issues of fact that preclude summary judgment on this claim. Defendants have submitted affidavits stating that SRC as ultimately developed did not use any materials prepared by Plaintiffs or any of the ideas advanced by Plaintiffs. JCPenney states that the people involved in SRC's development were not even aware of prior discussions with Bieda or JBA. Defendants have sufficiently disputed their alleged acceptance of Plaintiffs' services to create a question of fact for the jury.

For the foregoing reasons, both Defendants' partial motion for summary judgment and Plaintiffs' cross-motion for summary judgment are denied in their entirety.

#### II. Motion for Reconsideration [*25]

Plaintiffs also move for reconsideration and reargument of two of this Court's Orders dated March 22, 1994 and March 30, 1994 in which the Court refused to re-open discovery on the basis that discovery was to be concluded by September 10, 1993 as established at a pre-trial conference on July 29, 1993. The standard for reconsideration under Local Civil Rule 3(j) is very strict, allowing reconsideration only where it is shown that the Court "overlooked" "matters or controlling decisions."

After a review of the Court's file, it appears that the Court was in error when it stated that a pre-trial conference was held on July 29, 1993, and to the extent that the March 22 and March 30 Orders state that such a conference was held, the Orders are vacated. However, the Court was not in error when it stated that discovery was ordered to be concluded by September 10, 1993. That order appears as a Memorandum Endorsement on a letter from Plaintiffs' counsel dated July 29, 1993.

Ordering an extension of the discovery deadline is the Court's province and the Court never ordered such an extension beyond the September 10, 1993 date. It is true that Plaintiffs' counsel stated prior to the discovery [*26] deadline that he might need to take depositions of some JCPenney present and former employees in order to authenticate certain documents. As discovery was scheduled to be completed by September 10, 1993, however, and as the Court has denied Defendants' motion to strike the challenged Bieda Affidavit Exhibits, the Court sees no reason to re-open discovery at this late date in order to authenticate documents. Despite this, if Plaintiffs still feel that additional discovery is necessary, the Court will allow discovery in this matter to proceed for an additional ninety days from the date of this Opinion and Order. The Court notes that Plaintiffs' counsel was undergoing and recuperating from shoulder surgery in the last days of the scheduled discovery in this action and the Court is not unsympathetic. Therefore, to the extent that the motion for reconsideration seeks a re-opening of discovery, the motion is granted as outlined above.

#### III. Motion for Sanctions

Finally, with regard to Plaintiffs' request for sanctions under *Fed. R. Civ. P. 11*, the Court declines to grant such sanctions in this case. Rule 11 sanctions may be imposed when a motion is filed for improper purposes [*27] or is not well grounded in fact or is not warranted

Case 3:03-cv-00222-JBA    Document 111    Filed 05/23/2005    Page 9 of 40

1995 U.S Dist. LEXIS 10309, *                                    Page 8

by existing law. See *Fed. R. Civ. P. 11*. The sanctions are intended to discourage parties from using the judicial process to injure their adversaries with "dilatory and abusive litigation tactics" and to promote judicial efficiency. *McMahon v. Shearson/American Express, Inc., 896 F 2d 17, 21-22 (2d Cir 1990)*.

While a review of Plaintiffs' counsel's exhibits concerning discovery in this action indicate that Defendants' counsel should have known of Plaintiffs' desire to take additional discovery, the Court does not find that Defendants' actions or the actions of Defendants' counsel warrant sanctions. The application for sanctions is therefore denied.

## CONCLUSION

For the reasons set forth above, Defendants' motion for partial summary judgment is denied. Plaintiff's cross motion for summary judgment is also denied. Defendants' motion to strike is denied, as is Plaintiff's motion for Rule 11 sanctions. Plaintiffs' motion for reconsideration and reargument is granted. Discovery in this action is to be completed by no later than ninety days after the date of this Opinion and Order. There will be absolutely no further [*28] extensions of this deadline. The parties are directed to contact Magistrate Judge Grubin if they have any discovery problems.

This action is given a ready-for-trial date of November 20, 1995. Pre-trial materials are due no later than November 7, 1995. The Court's ready-for-trial materials are enclosed.

**SO ORDERED.**

Dated: New York, New York
July 24, 1995

　　　JOHN F. KEENAN

　　　United States District Judge

LEXSEE 2003 US DIST LEXIS 1501

CIRCLE LINE SIGHTSEEING YACHTS, INC., and NEW YORK CRUISE
LINES, INC., Plaintiffs, -against- CIRCLE LINE-STATUE OF LIBERTY FERRY,
INC., Defendant.

01 Civ. 9788(NRB)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*2003 U.S. Dist. LEXIS 1501*

February 3, 2003, Decided
February 4, 2003, Filed

**DISPOSITION:** [*1] Plaintiff's motion for leave to
amend complaint granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** For Plaintiffs: Joseph Diamante, Esq.,
Carol M. Wilhelm, Esq., Pennie & Edmonds LLP, New
York, New York.

For Defendant: David R. Francescani, Esq., Stacy J.
Grossman, Esq., Fish & Richardson P C., New York,
New York.

**JUDGES:** NAOMI REICE BUCHWALD, UNITED
STATES DISTRICT JUDGE.

**OPINIONBY:** NAOMI REICE BUCHWALD

**OPINION:**

**MEMORANDUM AND ORDER**

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

On November 6, 2001, plaintiffs Circle Line
Sightseeing Yachts, Inc. and New York Cruise Lines,
Inc. (collectively "Sightseeing") commenced this suit for
service mark infringement and related claims against
defendant Circle Line-Statue of Liberty Ferry ("Ferry").
In our Opinion and Order of April 12, 2002, we denied
plaintiffs' motion for a preliminary injunction and on
May 7, 2002 we denied reconsideration with respect to

this motion. Familiarity with these opinions is assumed.
Presently before the Court is Sightseeing's motion for
leave to amend their complaint in order to add a breach
of contract claim on the basis that Ferry has breached a
written agreement (the "Letter Agreement") made in [*2]
1981 that it would use the name "Circle Line" only for
ferry services. For the reasons that follow, the motion is
granted.

**DISCUSSION**

**I. Factual Background**

Since the preliminary injunction stage, the parties
have engaged in significant discovery. As part of this
discovery, plaintiffs claim to have uncovered evidence
that along with the 1981 Acquisition Agreement in
which New York Cruise Lines, Inc. acquired all of the
stock of Circle Line Sightseeing Yachts, Inc., there was a
written Letter Agreement between Sightseeing and Ferry,
allowing Ferry to keep using the name "Circle Line" as
long as certain conditions were met. Specifically,
Sightseeing alleges, that Frank Barry, president of Ferry,
"took aside Karl Andren, the buyer and incoming
president of Sightseeing, and negotiated a one-page
written agreement which provided that Ferry could
continue using the name 'Circle Lines Statue of Liberty
Ferry' ... but only for its ferry operations and only for so
long as the existing shareholders controlled 51% of the
company " Pls.' Brief at 5. Neither Sightseeing nor Ferry
presently have the Letter Agreement. According to
Sightseeing, the Letter Agreement has been lost. [*3]
See Pls.' Brief at 7. Ferry, on the other hand, questions
whether the agreement ever existed See Def.'s Brief at 3.

2003 U.S. Dist. LEXIS 1501, *

## II. Standard for Amending Complaint

As a general matter, a motion for leave to amend is addressed to the discretion of the district court. *Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962); Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir. 1993).* In exercising its discretion, the district court is required to grant leave to amend "freely ... when justice so requires." *Fed. R. Civ. P. 15(a).* However, the Court may deny leave to amend where it appears that doing so would be unproductive or futile. *Foman, 371 U.S. at 182*

In this Circuit, a proposed claim may be found futile only where it is clearly "frivolous or legally insufficient on its face." *Sterling v. Interlake Indus., 154 F.R.D. 579, 589 (1994)(citing Lerman v. Chuckleberry Pub., Inc., 544 F. Supp. 966, 968 (S.D.N.Y. 1982), rev'd on other grounds sub nom., 745 F.2d 123 (2d Cir. 1984), cert. denied, 471 U.S. 1054 (1985)).* If the proposed claim sets forth [*4] facts and circumstances which may entitle the plaintiff to relief, then futility is not a proper basis on which to deny the amendment. Even where the possibility of relief is remote, amendment must be permitted because "it is the possibility of recovery, not its likelihood, that guides the court's analysis." *Gallegos v. Brandeis School, 189 F.R.D. 256, 258 (E.D.N.Y. 1999).*

## III. Futility

Ferry has opposed the instant motion on the grounds that Sightseeing's proposed breach of contract claim is "futile" for three reasons: (1) that the Statute of Frauds prohibits testimonial evidence in this case; (2) that the testimonial evidence offered by Sightseeing is insufficient to establish the existence of the contract and its terms; and (3) that even if the Letter Agreement could be shown to have existed, the agreement is a "naked trademark license" which is void as a matter of public policy. For the following reasons, we reject all three of Ferry's allegations of "futility."

### A. Parol Evidence and New York's Statute of Frauds

Relying on *Matter of Talco Contractors Inc. v. New York State Tax Commission, 140 A.D.2d 834, 835, 528 N.Y.S.2d 219, 220 (3d Dept. 1988),* [*5] Ferry contends that Sightseeing's breach of contract claim is "futile" because New York law does not permit parol evidence to be offered to prove the existence of a lost writing covered by the Statute of Frauds. See id. (holding that, in the case of a security agreement, "except where the party invoking the protection of the Statute of Frauds admits the unproduced agreement was indeed entered into, the Statute of Frauds shelters certain transactions from the uncertainty of witness memory and the danger of fraud by immunizing them from parol evidence.") While we are not unsympathetic to the concern that allowing such oral testimony "plainly offends the policies the Statute [of Frauds] is meant to serve and presents the same risk of mistake (or worse) as testimony about an oral contract", see Def.'s Sur-Reply Brief at 5, we reject this argument on the ground that several post Talco decisions, have taken a contrary view and have held that a party *can* elicit parol evidence to prove the existence and terms of a written agreement. See e.g. *C.I.F. Productions Inc. v. Burlington Coat Factory Warehouse Corp., 881 F. Supp. 104, 106 (S.D.N.Y. 1995)* ("Although [*6] the issue is not entirely free of doubt, it appears that New York law permits proof of the existence of a writing sufficient to satisfy the statute [of frauds] by parol evidence where the failure to produce the original is explained adequately."); *Nicosia v. Muller, 229 A.D.2d 964, 965, 645 N.Y.S.2d 385, 386 (4th Dept. 1996)*(holding that a party may utilize parol evidence to prove the existence and terms of a written agreement in order to satisfy the requirements of the Statute of Frauds and noting that the parol evidence may "consist of the testimony of others who have first-hand knowledge of the existence of the writing and its terms.") *Lynch v. Savarese, 217 A.D.2d 648, 650, 629 N.Y.S.2d 804, 806 (2nd Dept. 1995)*("The loss or destruction of a written instrument does not deprive it of effect under the Statute of Frauds. Therefore, even if no signed copy of the [contract] can be found, the appellants could still prove its existence by extrinsic evidence.") Thus, we find that the deposition testimony of Karl Andren stating that he and Frank Barry executed such an agreement, see Andren Deposition at 25-27, combined with testimony of Thomas Heinan, [*7] who watched the execution of the agreement and was told at the time of execution of its contents, see Heinan Deposition at 20-21, if credited, would be probative of the existence of the Letter Agreement notwithstanding the Statute of Frauds. n1

n1 To be sure, the New York Court of Appeals has held that parol evidence may not be used in determining whether documents are sufficient on their face to satisfy the Statute of Frauds. See *Bazak International Corp. v. Mast Industries, Inc., 73 N.Y.2d 113, 118, 538 N.Y.S.2d 503, 505, 535 N.E.2d 633 (1989)*("Consideration of parol evidence ... in assessing the adequacy of a writing for a Statute of Frauds purposes would otherwise undermine the very reason for a Statue of Frauds in the first instance.") However, because this case did not address the question of whether parol evidence can be utilized by a party in trying prove the very existence of a particular

2003 U.S. Dist. LEXIS 1501, *

written agreement, we do not view its holding as applicable in the instant case and instead follow the several recent Appellate Division cases which directly address this issue.

[*8]

Having already decided that New York law permits the admission of parol evidence to satisfy the Statute of Frauds, we need not reach Sightseeing's alternative argument that the contract does not actually fall within the Statute of Frauds. However, solely for the sake of completeness, we address this additional argument. It has been consistently held that New York's Statute of Frauds, set forth within *N.Y. Gen. Oblig. Law § 5-701(a)* n2, "encompasses only those contracts which, by their terms, have absolutely no possibility in fact and law of full performance within one year. As long as the agreement may be fairly and reasonably interpreted such that it may be performed within a year, the Statute of Frauds will not act as a bar however unexpected, unlikely, or even improbable that such performance will occur during that time frame." *Rosbach v. Industry Trading Co., Inc. 81 F. Supp. 2d 522, 525 (S.D.N.Y. 2000)* (quoting *Nakamura v. Fujii, 253 A.D.2d 387, 389, 677 N.Y.S.2d 113, 115* (1st Dep't 1998). Moreover, it is clear that the Statute of Frauds does not apply to an agreement in which "the performance of the agreement depends upon a contingency which may [*9] or may not happen within the year." *North Shore Bottling Co. v. Schmidt and Sons, 22 N.Y.2d 171, 176, 292 N.Y.S.2d 86, 89, 239 N.E.2d 189 (1968)* In this case, the testimony of Mr. Andren indicates that the agreement was in effect only for so long as the existing shareholders of Ferry owned 51% of the company. See Andren Deposition at 25, 73-75. Thus, the agreement depended on a contingency (the sale by Ferry's shareholders of their ownership with a year of the execution of the Letter Agreement) which could or could not have happened within the year.

n2 *New York General Obligations Law § 5-701(a)* states in pertinent part:

Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking ... by its terms is not to be performed within one year from the making thereof or the performance of which is not to

be completed before the end of a lifetime ....

[*10]

Ferry seeks to distinguish the shareholders of Ferry from Ferry itself, arguing that whether the contract was terminable within one year was dependent on the will of a third party (the shareholders), rather than the will of one of the actual contracting parties, such that the contract did, in fact, fall within the Statute of Frauds. In support of this argument, Ferry cites *North Shore Bottling Co. v. Schmidt and Sons, 22 N.Y.2d at, 178, 292 N.Y.S.2d at 91* (noting that in the case of an agreement for commissions in procuring customers or orders, such contracts generally fall within the Statute of Frauds as performance is dependent "not upon the will of the parties to the contract, but upon that of a third party") as well as *Borsack v. Chalk & Vermilion Fine Arts, Ltd., 974 F. Supp. 293, 298, n.3 (S.D.N.Y. 1997)* (holding that "where an alleged contract, as here, is indefinite as to duration and does not, by its terms, permit the *defendant* to discharge its performance obligations in less than one year, the statute [of frauds] requires a writing setting forth the essential terms of the agreement.")(emphasis added). We are not convinced, however, [*11] that Ferry's shareholders can be considered a "third party" so as to place the Letter Agreement within the purview of the Statute of Frauds. Because of the overlapping interests and connections between Ferry and its shareholders, the rationale for the "third party" exception (presumably the lack of control that contracting parties have over the actions of third parties) does not apply. Thus, we not convinced by Ferry's argument that New York's Statute of Frauds is applicable to this Letter Agreement. n3

n3 Ferry's citation to *D&N Boening Inc. v. Kirsch Beverages Inc., 63 N.Y.2d 449, 457, 483 N.Y.S.2d 164, 167, 472 N.E.2d 992 (1984)*, for the proposition that agreements with the language "for so long as" fall within the Statute of Frauds is misplaced. In that case, the New York Court of Appeals held that "the oral agreement between the parties called for performance of an indefinite duration and could only be terminated within one year by its breach during that period ... the agreement fell within the Statute of Frauds and was void." Id. Here, by contrast, termination of the contract could occur within one year without a breach by either of the parties (for example, if Ferry's shareholders sold all of its shares within a year of the execution of the Letter Agreement).

[*12]

## B. The Existence of the Letter Agreement

Additionally, Ferry contends that it would be "futile" to allow Sightseeing to amend the complaint because Sightseeing's testimonial evidence is insufficient to establish that the Letter Agreement actually existed. In making this argument, Ferry tries, in a number of ways, to discredit Mr. Andren's testimony regarding the existence and terms of the Letter Agreement. n4 Even assuming *arguendo* that Ferry has raised a genuine issue of material fact as to Mr. Andren's credibility, we do not find that this renders Sightseeing's breach of contract claim completely "frivolous or legally insufficient on its face" *Lerman, 544 F. Supp. at 968*, so as to warrant our refusal to grant leave to amend. Rather, Ferry's credibility arguments are more appropriately raised at trial, as "it is the possibility of recovery, not its likelihood, that guides the court's analysis" in deciding whether to grant leave to amend. *Gallegos, 189 F.R.D. 256 at 258*. n5

n4 First, Ferry claims that the two witnesses who testified about the terms of the agreements have differing recollections: Ferry alleges that while Mr. Heinan testified that Sightseeing allowed Ferry to use the name, "Circle Line", see Heinan Deposition at 27-28, Mr. Andren testified that Sightseeing allowed Ferry to use name "Circle Line-Statue of Liberty", see Andren Deposition at 25. Next, Ferry points to alleged inconsistencies in Mr. Andren's own deposition testimony, noting that, only once, did he mention a provision in the Letter Agreement requiring that the Circle Line name be used only for ferry operations. See Andren Deposition at 25, 73-75. Finally, Ferry notes that there is "conflicting testimony" about the very existence of the Letter Agreement, citing the testimony Joseph Moran, the former president of Ferry, and Joseph Hinsey, the attorney who represented Sightseeing at the time of the acquisition, who both stated that they did not have a recollection of any such Letter Agreement, see Moran Deposition at 25, Hinsey Deposition at 15-17 [*13]

n5 To the extent that Ferry bases its "futility" argument on the fact that Sightseeing is not able to meet its burden under the so-called best evidence rule of "recounting or reciting ... 'substantially and with reasonable accuracy' all of [the] contents [of the Letter Agreement]", *Schozer v. William Penn Life Ins. Co., 82 N.Y.2d 639, 645-46, 620 N.Y.S.2d 797, 800, 644 N.E.2d*

*1353 (1994)*, we find that the deposition testimony of Mr. Andren and Mr. Heinan combined with the other forms of secondary evidence recited by Sightseeing (such as Ferry's apparent willingness to comply with the terms of the Letter Agreement for many years), presents a sufficient foundation for the admission of this evidence. We note, however, that "once a sufficient foundation is presented, the secondary evidence is subject to an attack by the opposing party not as to admissibility but to the weight to be given the evidence, with [the] final determination left to the trier of fact". *Id. at 646* (internal citation omitted). Thus, having decided that Sightseeing has laid a proper foundation for the admission of this evidence, we need not further evaluate the merits of Ferry's argument and decide the appropriate weight to give this evidence at this juncture.

[*14]

## C. The Nature of the Agreement

Finally, Ferry contends it would be "futile" for Sightseeing to amend their complaint to add a breach of contract claim because the Letter Agreement is a "naked" trademark license, whereby Sightseeing permitted Ferry to use the name "Circle Line" without exercising any control over Ferry's operations. Ferry argues that because such "naked licenses" have been held to be void, as against public policy, n6 we should deny Sightseeing's motion for leave to amend. See Def's Brief at 14-15. While Sightseeing concedes that in entering into the Letter Agreement, "there was no intention for Sightseeing to have any control over the ongoing activities of Ferry" Reply Brief at 10, Sightseeing challenges Ferry's characterization of this agreement. Indeed, Sightseeing maintains that the Letter Agreement was a not a licensing agreement, but rather a consent agreement, in which Sightseeing consented to Ferry's use of the mark for the defined usage of ferry services, thereby promising not to sue Ferry for such use. Because there is no such "quality control" required in a consent agreement, n7 Sightseeing maintains that its breach of contract claim cannot be [*15] labeled as "futile." We agree with Sightseeing that because of the factual dispute between the parties over the precise nature of the Letter Agreement n8, we cannot find, with any degree of certainty, that such a claim would be "frivolous or legally insufficient on its face." *Lerman v. Chuckleberry Pub., Inc., 544 F. Supp. at 968.*

n6 See 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 18:42 (4th

ed. 2002) ("A trademark carries with it a message that the trademark owner is controlling the nature and quality of the goods or services sold under the mark. Without quality control, this message is false because ... the goods or services are not truly genuine ... A product is not truly genuine unless it has been manufactured and distributed under quality controls established by the manufacturer .. Today, trademark licensing is permitted so long as the licensor maintains adequate control over the nature and quality of the goods and services sold under the mark by the licensee.").

n7 See 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 18:79 (4th ed. 2002) ("In a consent to use agreement, party A, the owner of the mark, consents to party Z's defined usage of the mark. In effect, A promises not to sue Z so long as Z keeps within the limits of the defined zone of use ... A consent agreement is neither an assignment nor a license ... A consent agreement does not require quality control because by the very essence of the agreement, the parties recognize that concurrent usage does not lead customers to link the goods or services of the parties. Whereas a license brings the parties together into a common public image and a joint enterprise, a consent agreement keeps the parties apart at a defined distance." [*16]

n8 While we do not, at this time, challenge Sightseeing's characterization of the Letter Agreement as a "consent agreement", we note that this characterization seems inconsistent with Sightseeing's Lanham Act claim in which it alleges that it was harmed by virtue of consumer confusion. Indeed, by its very nature, "a consent agreement does not ... lead customers to link the goods or services of the parties." See 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 18:79 (4th ed 2002).

**CONCLUSION**

For the reasons stated above, Sightseeing's motion for leave to amend the complaint to include a breach of contract claim is granted. The parties are to appear for a conference before the Court on February 26, 2003 at 9:30 a.m.

**IT IS SO ORDERED.**

DATED: February 3, 2003

NAOMI REICE BUCHWALD

UNITED STATES DISTRICT JUDGE

LEXSEE 2001 U.S. DIST. LEXIS 14070

**HOWARD R. DUFFY, III, and JAMES P. DUFFY, d/b/a RETIREMENT REPORT CARD, Plaintiffs, v. CHARLES SCHWAB & CO., INC., Defendant.**

**CIVIL ACTION NO. 98-4595 (MLC)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*2001 U.S. Dist. LEXIS 14070*

**September 4, 2001, Decided**
**September 4, 2001, Original Filed**

**NOTICE:** [*1]  NOT FOR PUBLICATION

**DISPOSITION:** Plaintiff's motion for leave to file amended complaint DENIED and defendant's motion for summary judgment as to count four of complaint DENIED.

**LexisNexis(R) Headnotes**

**COUNSEL:** For Plaintiffs: Charles P. Kennedy, Gregory S. Gewirtz, LERNER, DAVID, LITTENBERG, KRUMHOLZ & MENTLIK, LLP, Westfield, New Jersey.

For Defendant: Ellis I Medoway, ARCHER & GREINER, Haddonfield, New Jersey.

For Defendant: David Henry Dolkas, GRAY CARY WARE & FREIDENRICH, LLP, Palo Alto, California.

**JUDGES:** MARY L. COOPER, United States District Judge.

**OPINIONBY:** MARY L. COOPER

**OPINION:**

**MEMORANDUM AND ORDER**

**COOPER, District Judge**

This matter comes before the Court on plaintiffs' motion for leave to file an amended complaint pursuant to *Federal Rule of Civil Procedure 15(a)* and defendant's motion for summary judgment as to the breach of implied-in-fact contract claim in Count Four of the Complaint pursuant to *Federal Rule of Civil Procedure 56*. For the reasons stated herein, the Court will deny plaintiff's motion for leave to file an amended complaint and will deny defendant's motion for summary judgment.

**BACKGROUND**

The Court has previously set forth the relevant factual background and [*2] the procedural history in this Court's Memorandum Opinions dated May 4, 2000 and December 21, 2000, n1 which, in the interest of brevity, are incorporated by reference herein.

n1 These opinions were reported as *Duffy v. Charles H. Schwab & Co., 97 F. Supp. 2d 592 (2000)*, and *Duffy v. Charles H. Schwab & Co., 123 F. Supp. 2d 802 (2000)*, respectively.

I. Motion to Amend Complaint

*Federal Rule of Civil Procedure 15(a)* provides that leave to amend a pleading "shall be freely given when justice so requires." A motion to amend a complaint is addressed to the sound discretion of the district court. *Cureton v. Nat'l Collegiate Athletic Ass'n, 252 F.3d 267, 272 (3d Cir. 2001)*. Among the reasons for denying leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility. *Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir 1997)*; [*3] see also *Cureton, 252 F.3d at 272-73*.

A determination as to undue delay does not require that a motion to amend be denied based merely on the passage of time. See *Cureton, 252 F.3d at 273.* "In fact, delay alone is an insufficient ground to deny leave to amend." Id. (citing *Cornell & Co., Inc. v. Occupational Safety & Health Review Comm'n, 573 F.2d 820, 823 (3d Cir. 1978).* "However, 'at some point, the delay will become undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party.'" Id. (quoting *Adams v. Gould Inc., 739 F.2d 858, 863 (3d Cir. 1984).* "Delay may become undue when a movant has had previous opportunities to amend a complaint," id. (citing *Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993)* (holding that three year lapse between filing of complaint and proposed amendment was "unreasonable" delay when plaintiff had "numerous opportunities" to amend) and *Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 654-44 (3d Cir. 1998)* (rejecting proposed second amendment when plaintiffs were [*4] repleading facts that could have been plead earlier), or when a motion to amend is not made until after summary judgment has been granted to the adverse party, id. "Thus, while bearing in mind the liberal pleading philosophy of the federal rules, the question of undue delay requires that we focus on the movant's reasons for not amending sooner. Id. (citations omitted).

Moreover, substantial or undue prejudice to the non-moving party is a sufficient ground for denial of leave to amend. Id. (citing *Lorenz, 1 F.3d at 1414).* The issue of prejudice requires that we focus on the hardship to the defendant if the amendment were permitted. Id. (citing *Adams, 739 F.2d at 868).* Specifically, factors to consider include whether allowing an amendment would result in additional discovery, cost, and preparation to defend against facts or new theories. id. (comparing *Adams, 739 F.2d at 869* (finding no prejudice because no new facts or additional discovery were required) with *Rolo, 155 F.3d at 655* (finding duration of case and substantial effort and expense in resolving underlying motion to dismiss could constitute [*5] undue delay or prejudice to defendants).

Turning to the facts of this case, the motion to amend was brought more than two and one-half years after the complaint was filed. In addition, plaintiffs were aware of the facts relating to their amended claims more than two and one-half years ago. (See Pls.' Reply Mem. in Supp. Mot. for Leave to Amend Compl. dated 7-9-01 ("Pls.' 7-9-01 Br.") at 7-8 (citing Compl. PP 9-11; Decl. of Gregory S. Gewirtz filed 6-4-01 Ex. C: Tr. of 4-14-99 Dep. of Howard Duffy and James Duffy at 104-05).) Plaintiffs' explanation for not bringing the motion earlier is that until the Court issued its December 21, 2000 Memorandum Opinion it believed its complaint covered

the topics contained within its amended pleading. (See Pls.' 7-9-01 Br. at 4.) Arguably, this might provide a basis for not amending the complaint prior to December 21, 2000, but plaintiffs' explanation for its delay since entry of our opinion is unreasonable. Plaintiffs' explanation is that they "waited to see if defendant would file for summary judgment" before seeking leave to amend its complaint. (Id.) Plaintiffs' tactic to wait until after defendant filed its motion for [*6] summary judgment would place defendant in the position of having to amend its motion for summary judgment or file a fourth motion for summary judgment. This additional motion practice has placed an undue burden on the Court and has prejudiced the defendant.

An examination of plaintiffs' proposed amended complaint reveals that plaintiffs seek to revive counts one, two, three, and five of the original complaint, which were dismissed following the first two motions for summary judgment, and to increase the scope of count four, which is still pending. Count five of the proposed amended complaint is predicated on trademark infringement. Plaintiffs should have addressed all trademark issues in connection with the first motion for summary judgment. Plaintiffs have offered no explanation for their decision to wait until after the defendant filed its third summary judgment motion to seek leave to amend the complaint to add additional trademark claims. Moreover, even if plaintiffs had moved timely to amend their trademark claim, such amendment would be futile in light of our decision in connection with defendants first summary judgment motion. That decision held, among other things, that plaintiffs' [*7] limited use of the mark "MUTUAL FUND REPORT CARD" prior to the date of defendant's allegedly infringing use did not constitute prior use in commerce sufficient to establish plaintiffs' ownership interest in the mark. See *Duffy, 97 F. Supp. 2d at 597-98.*

Counts one, two, three, and four of the proposed amended complaint are predicated on misappropriation of a confidential submission, unjust enrichment, unfair competition, and breach of implied contract respectively. The amended counts are based on (1) the alleged misappropriation of plaintiffs' marketing ideas (the "Marketing Ideas Claim"), namely the concept of offering defendant's customers the first three reports for free with a modest charge for additional reports and the concept of permitting a customer who used the comparison report to easily review and switch to better rated mutual funds from defendant's SELECT LIST products, and (2) the alleged unfair inducement to refrain from providing their submission to other potential partners (the "Inducement Claim").

Although plaintiffs addressed the Marketing Ideas Claim in their brief in opposition to the second motion

for summary judgment (see generally Pls. [*8] ' Mem. in Opp'n to Def.'s Mot. for Summ. J. dated 6-28-00 ("Pls.' 6-28-00 Br."), the Court found that the Marketing Ideas Claim was not contained in the original complaint. See *Duffy*, *123 F. Supp. 2d at 806 n.2*. Plaintiffs should have moved to amend their complaint to include this claim after the Court refused to read it into the complaint.

The Inducement Claim, on the other hand, was referenced in only one sentence at the end of the unfair competition section of plaintiffs' brief in opposition to defendant's second summary judgment motion. (See Pls.' 6-28-00 Br. at 23.) We find that this sentence did not provide the Court or defendant with adequate notice of plaintiffs' Inducement Claim. Plaintiffs knew that the Court did not address this claim in its decision on the second motion for summary judgment. Plaintiffs should have moved for reconsideration on this point or promptly moved to amend their complaint to include this claim.

A further consideration is that if the plaintiffs' motion were granted, the defendant would be prejudiced because it would need to reopen discovery, which closed on January 31, 2000, on the allegations relating to both claims. [*9] (See Def.'s Opp'n to Pls.' Mot. for Leave to File Am. Compl. dated 6-25-01 at 9.) Plaintiffs' tactic to wait until after defendant filed its motion for summary judgment could also require defendant to file additional dispositive motions in connection with the amended complaint. This additional motion practice would place an undue burden on the Court and create further prejudice to the defendant. For these reasons, the Court will deny plaintiffs' motion for leave to file an amended complaint.

## II. Motion for Summary Judgment

*Federal Rule of Civil Procedure 56(c)* provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, *477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. Once the moving party has met its initial burden, the non-moving party must [*10] present evidence that establishes that a genuine issue of material fact exists, making it necessary to resolve the difference at trial. *Id. at 324; Jersey Cent. Power & Light Co. v. Lacey Township, 772 F.2d 1103, 1109 (3d Cir. 1985)*. A non-moving party may not rely on mere allegations; it must present actual evidence that creates a genuine issue of material fact. *Anderson v. Liberty*

*Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*.

In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, *475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*. The role of the judge at the summary judgment stage is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson, 477 U.S. at 249*. "By its very terms, the standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine [*11] issue of material fact." *Id. at 247-48*. Material facts are only those facts that might affect the outcome of the action under governing law. *Id. at 248; Boyd v. Ford Motor Co., 948 F.2d 283, 285 (6th Cir. 1991)*. "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson, 477 U.S. at 249-50* (citation omitted).

As we explained in our December 21, 2000 Memorandum Opinion, a contract that is implied in fact has the same legal effect as an express contract. See *St. Paul Fire & Marine Ins. Co. v. Indem. Ins. Co. of N. Am., 32 N.J. 17, 23. 158 A.2d 825, 828 (1960)*. The only difference between an implied-in-fact contract and an express contract is that the parties' agreement has been manifested by conduct instead of words. Id.; *Saint Barnabas Med. Ctr. v. County of Essex, 111 N.J. 67, 77, 543 A.2d 34, 39 (1988)*. "Like express contracts, contracts implied in fact depend on 'mutual agreement and intent [*12] to promise . . . and can be established by objective proofs." *Saint Barnabas, 111 N.J. at 77, 543 A.2d at 39* (quoting *W. Caldwell v. Caldwell, 26 N.J. 9, 29, 138 A.2d 402 (1958)*). The relevant inquiry when proof of agreement is sought to be established through conduct rather than words is whether the conduct of the defendant, as viewed by a reasonable person in the relevant custom or trade, revealed a promise to pay. *Saint Barnabas, 111 N.J. at 77, 543 A.2d at 39; St. Paul Fire, 32 N.J. at 24, 158 A.2d at 828*. Applying this standard to the facts of this case, if a reasonable person in the defendant's industry would view plaintiffs' confidential submission to defendant as an offer to let defendant use the ideas contained therein in exchange for reasonable compensation, then a contract could be inferred if defendant used the ideas contained in plaintiffs' submission. n2 Whether plaintiffs' ideas were used by defendant is a question of fact. Absent direct

evidence of such use, plaintiffs must attempt to prove this element from circumstantial evidence.

N2 In *Flemming v. Ronson Corp., 107 N.J. Super. 311, 258 A.2d 153 (Law Div. 1969)*, the court did not define the type of conduct that would constitute a "use" sufficient to impose liability under New Jersey's misappropriation law. In our December 21, 2000 Memorandum Opinion, we predicted that the New Jersey Supreme Court would look to other sources for guidance. Such guidance is provided by analogy in the Restatement of the Law of Unfair Competition. *Duffy. 123 F. Supp. 2d at 817 n.8* (citing Restatement Third, Unfair Competition § 40 cmt. c (explaining types of acts constituting "use" of a trade secret)). As with trade secrets, we believe there are no technical limitations on the nature of the conduct sufficient to constitute "use" of a novel idea. See *id.* "As a general idea, any exploitation of [a novel idea] that is likely to result in injury to the . . . owner or enrichment to the defendant is a 'use' . . . ." *Id.* Thus, marketing goods that embody the novel idea, employing the novel idea in manufacturing or production, relying on the novel idea to assist or accelerate research or development, or soliciting customers through the use of information that is a novel idea all constitute 'use' sufficient to impose liability. See *id.* "However, if the contribution made by the [novel idea] is so slight that the actor's product or process can be said to derive from other sources of information or from independent creation, the [novel idea] has not been 'used' for purposes of imposing liability     " *Id.*

[*13]

In Flemming, the court stated,

Where the issue is whether one's idea has in fact been used by another, similarities between the submission and the ultimate product may justify the factual inference that one was copied from the other. If the concept submitted is unique, or if there are many points of likeness, the inference is strengthened. On the other hand, a lack of novelty or the existence of many dissimilar features will support a denial that the idea was used by the recipient.

*Flemming. 107 N.J. Super at 317-18, 258 A.2d at 157.*

For plaintiffs to prevail, it must appear that the idea utilized by defendant came from the plaintiffs. *Id. at 319, 258 A.2d at 158.* A mere showing of similarities will not fulfill this requirement because defendant may have received or developed the material from sources independent of the plaintiffs. For example, if defendant had pre-existing knowledge of plaintiffs' idea or had independently developed the idea, then no consideration would exist for a contract with plaintiffs because defendant would have obtained the idea from other sources, and the law will not infer an obligation to pay for that [*14] which one already possesses. See, e.g., *Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368, 375.*

On the other hand, if defendant was not aware of the idea, then the idea might have substantial value to defendant even though it might not be novel in a general sense. *Id. at 377.* For example, defendant might benefit "by not having to expend resources pursuing the idea[s] through other channels or by having [] profit-making idea[s] implemented sooner rather than later." *Id.* (quoting *Apfel v. Prudential-Bache Sec. Inc., 81 N.Y.2d 470, 616 N.E.2d 1095, 600 N.Y.S.2d 433 (N.Y. 1993)).*

Recognizing the difficulty of proving consideration in a submission-of-idea case when no subsequent promise to pay for the idea was made, some courts have required a plaintiff to prove, in such situations, that the idea submitted was novel to the defendant. See, e.g., *Nadel v. Play-By-Play Novelties, Inc., 208 F.3d 368 (2d Cir. 2000); Apfel, 81 N.Y.2d 470, 616 N.E.2d 1095, 600 N.Y.S.2d 433.* These courts have not required a plaintiff to prove that the idea was novel in absolute terms, as when the claim is based upon misappropriation of a confidential submission; instead, these courts [*15] have held that a showing of novelty to the buyer will supply sufficient consideration to support an implied-in-fact contract. *Nadel, 208 F.3d at 376.* As we explained in our December 21, 2000 Memorandum Opinion, we believe that New Jersey's highest court would follow the approach taken by the Second Circuit in *Nadel v. Play-By-Play Novelties, Inc., 208 F.3d 368, 378 (2d Cir. 2000).* In Nadel, the Second Circuit held that a plaintiff in a submission-of-idea case based on an implied-in-fact contract for use of a confidential idea must show that the disclosed idea was novel to the defendant when submitted in order to find adequate consideration for the formation of a legally enforceable contract. *Id. at 380.* The novelty-to-defendant requirement provides the evidentiary basis for a fact finder to infer that (1) the idea was sufficiently valuable to defendant that he might agree to compensate plaintiff for its use and (2) defendant in fact used the idea. n3 This requirement, therefore, is a substitute for consideration.

n3 See *Joseph Lande & Son, Inc., v. Wellsco Realty, Inc.*, 131 N.J.L. 191, 34 A.2d 418 (E. & A. 1943) ("Whatever consideration a promissor assents to as the price of his promise is legally sufficient 'consideration.'"); cf. *Flemming*, 107 N.J. Super. at 317-18, 258 A.2d at 157 (stating in connection with misappropriation of confidential submission claim that novelty element was more important for its evidentiary value in establishing defendant's use of plaintiff's idea than for its substantive quality)

[*16]

Following these principles laid out above, we held that New Jersey law in submission-of-idea cases based on an implied-in-fact contract is governed by the following principles: A plaintiff must show that the disclosed idea was novel to the defendant in order to find consideration for the alleged contract. *Duffy*, 123 F. Supp. 2d at 818 (citing *Nadel*, 208 F.3d at 380). Whether or not an idea was novel to a particular defendant when an idea was submitted to it involves a fact-specific inquiry that focuses on the perspective of the defendant. Id. Finally, an idea may be so lacking in novelty that, as a matter of law, the buyer is deemed to have knowledge of the idea. Id. In such cases an implied-in-fact contract claim for uncompensated use of an idea may not lie. See id

"Of course, the mere disclosure of an unnovel idea to a defendant, to whom the idea is novel, will not automatically entitle a plaintiff to compensation upon the defendant's subsequent use of the idea." *Nadel* 208 F.3d at 377 n.5. An implied-in-fact contract requires every element of a contract to be proved: mutual assent, consideration, legality of object, [*17] and capacity of the parties. See id.; *Cohn v. Fisher*, 118 N.J. Super. 286, 291, 287 A.2d 222, 224 (Law Div. 1972). "The existence of novelty to the buyer only addresses the element of consideration necessary for the formation of a contract. Thus, apart from consideration, the formation of a contract will depend upon the presence of the other elements. The element of mutual assent, for example, must be inferred from the facts and circumstances of each case, including such factors as the specific conduct of the parties, industry custom, and course of dealing." *Nadel*, 208 F.3d at 377 n.5; see also *St. Paul Fire*, 32 N.J. at 25-26, 158 A.2d at 829-30. One aspect of the mutual assent element in an implied-in-fact breach of contract claim involving use of a confidential submission is that the defendant used the idea. n4 Defendant's use of the idea is the basis for inferring that defendant agreed to compensate the plaintiff for its idea. Unless a plaintiff proves that defendant used the idea, a plaintiff will not be able to prove that a defendant agreed to pay for the idea.

n4 Even when a breach of contract claim for use of a confidential submission is based on an express contract, liability might not lie. In order to recover for a breach of contract, a plaintiff must demonstrate some nexus or causal connection between plaintiff's disclosure and the defendant's use of the idea. *Nadel*, 208 F.3d at 380 n.10. For example, when there is an independent source for the idea used by the defendant, which defendant obtained subsequent to defendant's receipt of the idea from the plaintiff, no claim for recovery may lie because the idea used was not necessarily derived from the plaintiff. See id.

[*18]

The defendant essentially argues that plaintiffs' implied-in-fact contract claim must fail because plaintiffs' ideas were not novel to it, and it did not use plaintiffs' ideas in developing its mutual fund reports. (Def.'s Br. in Supp. of Mot. for Summ. J. as to Count IV dated 6-14-01 at 32-34.) Defendant has submitted evidence of its prior knowledge of the idea and its independent development of its mutual fund reports. (See, e.g., Certif. of David Henry Dolkas, Esq. filed 7-6-00 ("Dolkas Certif.") Exs. 8-24, 26; Supplemental Certif. of David Henry Dolkas, Esq. filed 7-6-00 ("Dolkas Certif. # 2") Exs. 3-6; Decl. of Gibson Scheid filed 7-6-00 PP 3-10; Decl. of Jerry Ball filed 7-6-00 PP 3-16; Decl. of Gibson Scheid in Supp. of Def.'s Mot. for Partial Summ. J. filed 6-15-01 PP 3-10; Decl. of Jerry Ball in Supp. of Def.'s Mot. for Partial Summ. J. filed 6-15-01 PP 4-20; Decl. of Alexandra Littlejohn Seifert in Supp. of Def.'s Mot. for Partial Summ. J. filed 6-15-01 PP 3-13; Decl. of James M. Tanner in Supp. of Def.'s Mot. for Partial Summ. J. filed 6-15-01 PP 13-17; Decl. of Robert "Bob" Newell in Supp. of Def.'s Mot. for Partial Summ. J. filed 6-15-01 PP 4-16; Decl. of Kyaw Tin [*19] in Supp. of Def.'s Mot. for Partial Summ. J. filed 6-15-01 PP 4-10; Decl. of Tracey Ayer in Supp. of Def.'s Mot. for Partial Summ. J. filed 6-15-01 PP 3-11; Decl. of Joyce Snell in Supp. of Def.'s Mot. for Partial Summ. J. filed 6-15-01 PP 2-4; Decl. of Michelle Swenson in Supp. of Def.'s Mot. for Partial Summ. J. as to Count IV filed 6-15-01 PP 3-5.)

Although defendant has submitted an abundance of direct evidence to support its independent development defense, plaintiffs have presented the Court with circumstantial evidence that the developers of defendant's mutual fund reports had access to plaintiffs' ideas, including a meeting between Michelle Swenson, who admittedly had access to plaintiffs' ideas, and Gibson Scheid, who was involved in the development of

defendant's mutual fund reports on July 16, 1997, regarding the development of defendant's mutual fund reports. (Decl. of Gregory S. Gewirtz filed 6-15-01 ("Gewirtz Decl.") Ex. S: Minutes of Investment Policy Coordinating Committee Meeting on July 16, 1997.) In addition, plaintiffs have presented the Court with circumstantial evidence that the developers of defendant's mutual fund reports used plaintiffs' ideas to improve its [*20] own mutual fund reports, including (1) defendant's use of substantially similar names for its mutual fund reports after having access to plaintiffs' ideas, n5 (2) use of plaintiffs' marketing ideas, and (3) changes to defendant's mutual fund reports that allegedly made defendant's reports more closely resemble plaintiffs' reports, (Compare Decl. of Howard R. Duffy, III filed 6-15-01 Ex. C: copies of plaintiffs' Mutual Fund Report Card and Mutual Fund Profile products with Certif. of David Henry Dolkas in Supp. of Def.'s Mot. for Partial Summ. J. Exs. 13-15, 21-24: working prototype of the Charles Schwab Mutual Fund Report and the Charles Schwab Mutual Fund Profile (June-August 1997) and id. Exs. 16-17: final versions of Charles Schwab Mutual Fund Report and the Charles Schwab Mutual Fund Profile.)

n5 For example, shortly after defendant received plaintiffs' submission, defendant began entitling one of its reports as the "Mutual Fund Report Card," the exact title plaintiffs used to refer to their mutual fund report, rather than the previously used "Mutual Fund Report." (Compare Decl. of Howard R. Duffy, III filed 6-15-01 Ex. C: sample Mutual Fund Report Card and Mutual Fund Profile products with Gewirtz Decl. Exs. I: Prototypes of Schwab's accused products (doc. nos. S15983 and S16479-16504) & J: Schwab's accused Mutual Fund Report Card and Mutual Fund Performance Profile products.) [*21]

n6 For the reasons set forth in section 1, supra, plaintiffs may not seek damages for defendant's alleged use of plaintiffs' marketing ideas in and of themselves; however, plaintiffs may argue at trial that defendant's alleged use of

its marketing ideas constitutes circumstantial evidence of defendant's access to and use of plaintiffs' other ideas.

As we stated in our December 21, 2000 Memorandum Opinion, absent direct evidence of defendant's use of plaintiffs' ideas, plaintiffs may attempt to prove this element from circumstantial evidence. *Duffy*, 123 F. Supp. 2d at 817; see also *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 459-60 (6th Cir. 2001) (holding that circumstantial evidence of similarities between ideas were sufficient to preclude summary judgment despite direct evidence of independent creation and no direct evidence of defendant's use of plaintiffs' idea). Given the state of the record, we cannot find as a matter of law that plaintiffs' ideas were not novel to defendant or that defendant did not use plaintiffs' ideas to improve its reports. Accordingly, [*22] we will deny defendant's motion for summary judgment as to Count Four of the Complaint.

## CONCLUSION

For the reasons expressed above, the Court will deny plaintiffs' motion to amend its complaint because it has failed to offer an adequate explanation for its delay in seeking leave to amend and such delay would cause an undue burden on the Court and prejudice to the defendant. In addition, the Court will deny defendant's motion for summary judgment as to count four of the complaint because it finds that a genuine issue of material fact is in dispute as to whether plaintiffs' ideas were novel to defendant and whether defendant used plaintiffs' ideas to improve its mutual fund reports.

IT IS THEREFORE on this 4th day of September 2001 ORDERED that plaintiffs' motion for leave to file an amended complaint (no. 57-1 on the docket) be and hereby is DENIED; and

IT IS FURTHER ORDERED that defendant's motion for summary judgment as to count four of the complaint (no. 59-1 on the docket) be and hereby is DENIED.

MARY L. COOPER

United States District Judge

LEXSEE 1997 US DIST LEXIS 7679

**WILLIAM R. EADIE, Plaintiff, v. VINCENT K. MCMAHON, AND TITAN SPORTS, INC. d/b/a WORLD WRESTLING FEDERATION, Defendants. RANDY COLLEY, Plaintiff, v. VINCENT K. MCMAHON, AND TITAN SPORTS, INC. d/b/a WORLD WRESTLING FEDERATION, Defendants.**

**No. 5:91CV0423(WWE), No. 5:92CV0216(WWE)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

*1997 U.S. Dist. LEXIS 7679*

**March 12, 1997, Decided**
**March 12, 1997, FILED**

**DISPOSITION:** [*1] Defendants' motion for summary judgment of defendants (Document # 109) in Eadie v. McMahon, No. 5:91CV0423(WWE) DENIED. Defendants' motion for summary judgment (Document # 44) in Colley v. McMahon, No. 5:92CV0216(WWE) granted in part and denied in part.

**LexisNexis(R) Headnotes**

**COUNSEL:** Attorney(s) for Plaintiff: Scott Centrella, Diserio, Martin, O'Connor & Castiglioni, Stamford, CT.

Attorney(s) for Defendants: David Zabel, Cohen & Wolf PC, Bridgeport, CT. Theodore Dinsmoor, Finnegan & Stancle, Boston, Ma.

**JUDGES:** WARREN W. EGINTON, Senior United States District Judge

**OPINIONBY:** WARREN W. EGINTON

**OPINION:**

**Ruling on Defendants' Motions for Summary Judgment**

Perhaps more appropriately described as "Ax" and "Smash" of "Demolition" versus Titan, these cases provide an interesting glimpse into the world of professional exhibition wrestling. These lawsuits arise out of defendants' alleged misappropriation and commercial exploitation of the plaintiffs' ideas for two fictional wrestling characters, known as "Ax" and "Smash" of a wrestling tag team called "Demolition." Plaintiffs have sued defendants on various theories including breach of contract, fraudulent misrepresentation, negligent misrepresentation, conversion, [*2] wrongful termination, unjust enrichment, restitution, and violation of Connecticut's Unfair Trade Practices Act (CUTPA) Defendants move for summary judgment as to all counts of both complaints n1 on the ground that the booking agreements signed by plaintiffs granted Titan all rights to these fictional wrestling characters and are an absolute bar to the plaintiffs' claims. Alternatively, as to certain counts, they argue that plaintiffs' claims are time-barred by the applicable statutes of limitations.

> n1 These cases were previously consolidated for purposes of discovery. Because the facts and issues involved in the two cases are so closely intertwined, the cases are also treated together for purposes of defendants' motions for summary judgment.

Before delving into the merits of defendants' motions for summary judgment, a discussion of professional exhibition wrestling and the history of plaintiffs' involvement with defendants is necessary.

**FACTS**

**Titan Sports, Inc.**

Defendant Titan Sports, Inc., [*3] ("Titan") is a Delaware corporation with its headquarters in Stamford,

Connecticut. Titan creates, produces, and promotes professional wrestling exhibitions and television programming throughout the world. Titan owns all of the rights to the service marks "World Wrestling Federation" and "WWF" which are used to symbolize its live professional wrestling exhibitions and television programming.

Defendant Vincent K. McMahon was formerly President of Titan and later its Chief Executive Officer. At all times relevant to plaintiffs' complaints, he was the person at Titan responsible for booking wrestlers, negotiating the financial terms and conditions of their engagements, and was generally responsible for all of Titan's wrestling operations.

The WWF wrestling exhibitions feature two or more professional wrestlers, often appearing as fictional characters in outlandish costumes, who demonstrate their wrestling skills and abilities in the context of a simulated wrestling match. All of the personnel appearing in WWF wrestling matches are performing in designated roles including the wrestlers themselves, the managers who attend them, and the officials, such as referees and timekeepers. According [*4] to defendants, these wrestling matches are roughly scripted or formatted so that the winner of each match is predetermined. Professional exhibition wrestling is a form of staged entertainment, not a contest to win like a sport.

Titan produces its live professional wrestling exhibitions by providing all financing for the exhibitions, preparing creative material for the exhibitions, engaging the wrestlers and other characters who appear and perform in the exhibitions, hiring the hall or arena for the exhibitions, setting up the staging and other equipment, directing the exhibitions, promoting the exhibitions, and selling tickets to wrestling fans. Titan owns and controls the rights to its exhibitions, including television rights.

Titan also uses its professional wrestling exhibitions for the production of its own original television programs. Titan provides all personnel and equipment for recording the exhibition and then takes the recordings to its studios for purposes of formatting and editing to produce a television program. Titan then distributes these television programs to television stations for broadcast or to cable stations for cablecast.

Titan asserts that the individuals [*5] who appear and perform in WWF wrestling exhibitions are required to execute booking agreements with Titan, which set forth the contractual relationship between Titan and its wrestlers As will be discussed more fully below, contrary to Titan's assertion, it is not clear that Titan always required a booking agreement and it also is not clear whether a booking agreement was executed for each character that a wrestler portrayed (the wrestler's

"ring name") or whether a single agreement covered more than one character that a wrestler might portray over the course of several years.

Two of the wrestlers who appeared in WWF wrestling exhibitions are the plaintiffs in these cases, Randy Colley and William Eadie, both of whom had been involved in professional wrestling exhibitions since the early 1970's.

**Randy Colley**

Randy Colley began his career as a professional wrestler in the early 1970's in the South, wrestling for various promoters under his own name and later as characters such as "The Executioner," "The Assassin," and "The Mountain Man," with a costume appropriate for each character. For example, as "The Mountain Man" he wrestled in jeans and a ragged cowboy hat. He [*6] generally worked with a partner, who assumed the role of a related character He would wrestle both single match and tag team n2 and at times worked "baby face" and at other times "heel," which terms, although not defined by the parties, presumably reference the "good guy" and "bad guy" roles played by the wrestlers.

n2 In tag-team matches, each wrestler wrestles with a partner. The wrestler can tag out at any time if he gets in trouble, is at a loss for a next move, or is just too tired. The partner who is not wrestling must stay in the corner of the ring until physically tagged by the wrestler who is seeking some relief from his partner.

Colley began working midcard and gradually worked up to main event. The card is the program of wrestling matches, with the main event being the major attraction for a live wrestling match. Colley describes "midcard" as "when you go out and just squash somebody and then the last couple of weeks around you are the main event." (Colley depo at 53). n3 It is the main event wrestlers [*7] that earn the largest percentage of the gate receipts at a live show.

n3 All references to "(Colley depo at    )" are to the deposition of Randy Colley taken by the defendants in this litigation on March 12, 1993, and submitted by defendants in support of their motions for summary judgment.

As Colley's wrestling career took off, he began to look at new territories in which to wrestle. In September, 1979, Colley began working in New York for Vincent J.

McMahon, Sr., then President of Titan's predecessor corporation, Capitol Wrestling Corporation. As Colley describes it, he was "climbing on the way up from mid to main event" (Colley depo at 58), and was told by fellow wrestlers that New York was the place to be. He began wrestling for McMahon, Sr., under the ring name "Ripper Hawkins."

McMahon, Sr., was impressed with Colley's aggressiveness in the ring and encouraged him to "put some more thought into his gimmick." n4 (Colley depo at 61). According to Colley, McMahon, Sr., told him "because I was so wild [*8] looking, with the hair bleached out and — I was so excited finally about being on New York TV that I was just like 90 miles an hour. He [McMahon, Sr.] said, 'That is the excitement I'm looking for. . . . Let's get something we can go with." (Colley depo at 62).

> n4 A "gimmick" in professional exhibition wrestling is a wrestler's mode of dress, his character or persona, or some other object that he uses to rile or excite the crowd

So Colley came up with a new gimmick in the form of a new persona or wrestling character, "Moondog Rexx," who wore ragged pants and carried a big bone, with wild long hair sprayed to stick out in spikes. As "Moondog Rexx," he worked tag team with another wrestler who became known as "Moondog King," and together they appropriately became known as the "Moondogs." Colley wrestled as "Moondog Rexx" for about a year. The record is unclear as to exactly when Colley first began wrestling as "Moondog Rexx," but it appears from his deposition testimony that it was in the early 1980's. (Colley [*9] depo at 67-79).

According to Colley (Colley depo at 67): "At this time a year was about your limit there. And then it was time for somebody else to come in." They "needed new faces." McMahon, Sr., told Colley to "go out for awhile, stay in contact with him, . . . he liked the Moon Dog thing. In fact, he made us the tag team champions." So, Colley left New York and went to South Africa, wrestling as "Moondog Strongbow" for another promoter and as "Moondog" for several other promoters in the southern United States. As these various "Moondog" characters, he always appeared in the same costume he wore as "Moondog Rexx."

As instructed, Colley stayed in touch with McMahon, Sr., and went on several Middle Eastern tours for McMahon, Sr., as "Moondog Rexx." In 1984 he returned to New York to work for WWF for another year as "Moondog Rexx." In 1985, he was scheduled to return

to the Middle East for WWF. Those bookings fell through due to problems in the Middle East, and Titan had already booked its United States shows. So, Colley once again left WWF to wrestle for other promoters in the South, this time as "The Nightmare," and as such, he became the North American champion. Finally, after [*10] a stint in Japan for New Japan Pro-Wrestling, he returned to New York in response to a call from the WWF, once again to appear as "Moondog Rexx."

Titan alleges that on January 15, 1985, Colley, using the "ring name" of "Rexx Moondog," signed a booking agreement with Titan. The copy of the 1985 agreement that has been provided by defendants in support of their motion for summary judgment is incomplete. However, the portion that has been supplied indicates the agreement was between Titan Sports, Inc. ("Promoter") and "Randy Colley ("Wrestler") whose ring name is 'Rexx Moondog.'" The territory of the agreement was "the world" and the term was for two years from the date of the contract. The agreement provided that it would automatically renew for successive one-year terms unless either party served written notice of that party's decision to terminate the agreement.

In October, 1986, a second contract was signed between the parties apparently because Titan had misplaced the original contract. The contract is not dated, and Colley states in his affidavit that it never was dated. The only information that has been provided regarding when the second agreement was signed is a transmittal [*11] letter from WWF to Colley bearing the date of October 6, 1986.

This second agreement was signed by Colley using the ring name "Moondog Rex." The term of the contract was for two years "from the date hereof," there being no date as noted above, with automatic renewals unless terminated by either party in writing. It is unclear whether the parties intended this contract to date back to the original 1985 contract or whether the initial two-year term would commence from the date the new agreement was signed. Regardless of the contract term, however, the evidence indicates that Colley wrestled as "Moondog Rexx" for Titan until late 1986.

Under the terms of both booking agreements, the "Wrestler" granted to Titan the right to book Wrestler for professional wrestling events whether before a live audience or for broadcast, and to own in perpetuity

> all of the rights, results, products and proceeds in and to, or derived from, Wrestler's services hereunder (including without limitation, all incidents, dialogue, characters, actions, gags, routines, ideas, titles, inventions, and other material

written, composed, submitted, added, improvised, interpolated and invented by Wrestler [*12] in connection with the rendering of Wrestler's services hereunder) . . . (Emphasis added).

In consideration for the services to be performed, Wrestler was to receive certain compensation, which included a $ 50 per diem appearance fee; and "an amount equal to such percentage of the gross gate receipts for [an event in an arena before a live audience] as is consistent with the nature of the wrestling match in which Wrestler appears, i.e., preliminary bout, main event, etc., and the prevailing practices of the United States professional wrestling community; and at the sole discretion of the Promoter;" and five percent (5%) of the net receipts on the sale of Wrestler's merchandise items in arenas or through Promoter's mail order outlet and twenty-five (25%) of net receipts from outside licensing. (Section 4)(emphasis added) The agreements further provided that:

> Wrestler acknowledges the right of Promoter to make any changes in the product of any of the Wrestler's services hereunder . . . . Wrestler acknowledges and agrees that Promoter's decision with respect to any agreement disposing of the rights to Wrestler's Name and Likeness . . will be final. (Section [*13] 9).

> Wrestler acknowledges that his ring name, and any props and/or costumes associated with Wrestler in the performance of his services hereunder are trademarks of Promoter . . . and all rights therein and good will pertaining thereto belong exclusively to Promoter, and that all use of the Trademarks will inure to the exclusive benefit of Promoter. (Section 10).

> Wrestler acknowledges and agrees that the services to be rendered or furnished by him and the rights granted to Promoter hereunder are of a special, unique, unusual and extraordinary character, giving them peculiar value . . . . (Section 13).

As noted above, although the record is not clear as to when Colley first began wrestling for Titan as "Moondog Rexx," it is clear that he began in this role for Titan prior to the execution of the first booking agreement and that

he worked for other promoters in similar roles using the same costume at various times during the 1980's.

**William Eadie**

William Eadie, who had also been wrestling since the early 1970's, entered into his first booking agreement with Titan Sports on January 6, 1984. n5 The agreement provided for Eadie to appear and wrestle professionally [*14] as "The Masked Superstar" for Titan for the year 1984. Eadie claims that he terminated this agreement at the end of 1984 when he communicated his intention to terminate the agreement to several agents of Titan at the Olympic Auditorium in Los Angeles, California in December, 1984. Indeed, the contract stated that it would terminate on December 31, 1984, "unless extended for an additional period of time at the sole discretion of Promoter [Titan]." All notices required by the agreement were to be in writing. Neither party has produced a written extension of this agreement, and the evidence is undisputed that in January, 1985, Eadie left Titan and entered into a written agreement with New Japan Pro-Wrestling of Tokyo wherein he agreed to wrestle as "The Masked Superstar" for that Japanese promoter. Titan had no involvement with this contract or with his performances for New Japan Pro-Wrestling.

> n5 Defendants have submitted a letter from Titan's counsel to Eadie that indicates that there was an earlier booking agreement between Eadie and Titan's predecessor. This agreement has not been submitted by either party and is not relied upon in connection with the motions for summary judgment.

[*15]

In compliance with this new agreement, Eadie wrestled for New Japan Pro-Wrestling on various tours from January, 1985, through January, 1987, in Japan, Taiwan and Pakistan. When not touring for New Japan Pro-Wrestling, he worked as "The Masked Superstar" for several other promoters, including several in the southern United States, one from Montreal, and another in Kuwait. None of his booking agreements with these promoters involved Titan.

In September, 1986, Eadie returned to wrestle for Titan as "The Super Machine" along with Andre the Giant as members of the tag team known as "The Machines." This stint lasted eight to ten weeks, and he was paid at a rate of compensation that was approximately twice what he had received when wrestling for Titan as "The Masked Superstar." n6 Neither party has produced a booking agreement for Eadie's appearing as "The Super Machine" and, based on

events that later transpired wherein Titan tried to resurrect the 1984 Masked Superstar agreement, one could reasonably infer that there never was a booking agreement for "The Super Machine."

> n6 The 1984 agreement between Eadie a/k/a "The Masked Superstar" and Titan Sports, Inc. provided for compensation of $ 50 per day for television and live appearances plus an additional fee for appearances at live events, "which fee shall consist of a percentage of the gross gate receipts as determined in accordance with the status of Talent's match (preliminary bout, main event, etc.,) and the prevailing practices of the wrestling community." (Section 4)

[*16]

**Collie and Eadie Become Partners -- The Creation of "Ax" and "Smash" of "Demolition"**

Colley states that in 1986 he approached Vincent K. McMahon n7 about a new character, a "Demolition type of character," which he claims to have conceived several years earlier. He describes this "Demolition" character as very colorful, totally different from "Moondog" in terms of his interview style and ring gestures all of which were an integral part of this new character. The "Demolition" character wore a black costume with studs and spikes. Part of the gimmick for this character was a hockey mask and jacket that looked like heavy armor but could be easily removed as the wrestler made his entrance into the ring. According to Colley, the costume was "designed in a way when you walked through the ropes all you had this, like whoosh, and the outfit was gone, just that quick." (Colley depo at 135). Colley showed the costume to McMahon who "loved it" and told him he was "going all of the way with it. This is going to be the big money." (Colley depo at 153).

> n7 Vincent K. McMahon is the defendant in this case and the son of Vincent J. McMahon, Sr.

[*17]

Colley and McMahon discussed whether the "Demolition" character should wear a mask or facial make-up and Colley insisted on facial make-up so that his facial expressions would be visible to the audience when he got hit. As it later turned out, this may have been an unfortunate choice for Colley

While Colley claims to have developed this "Demolition" character several years earlier, Titan

attempts to downplay the uniqueness of this character and asserts that the idea came directly from another popular wrestling team, "The Road Warriors." Titan also attempts to take credit for developing the two "Demolition" characters. While the extent of Eadie's involvement with the initial development of the "Demolition" characters is not set forth in detail, Eadie admits that in developing this character he and Colley were influenced by The Road Warriors, but that they also took part of the concept from the Monkey Man, as well as from Humongous, both of whom are apparently other professional wrestlers, as well as from various motion pictures, including Mad Max, Friday the Thirteenth, Humongous, Conan the Barbarian, and Planet of the Apes. Regardless of the uniqueness of the characters, [*18] it is undisputed that Titan was able to develop dolls, videos, and other concession items based on these characters and that it obtained several copyright registrations for products bearing the likeness of the "Demolition" characters for which it collected significant sums of money.

The two "Demolition" tag-team characters were called "Smash" and "Ax," with Colley portraying "Smash" and Eadie portraying "Ax." Titan claims that McMahon suggested that they put the new wrestling characters "on hold" because Titan had already booked sufficient wrestlers for the WWF wrestling events for the next few months. It is undisputed, however, that on December 29th or 30th, 1986, at a meeting involving McMahon and several other Titan representatives with Colley and Eadie, McMahon agreed to book Eadie and Colley in the roles of "Ax" and "Smash" of "Demolition" at the Meadowlands, New Jersey on January 5, 1987, and at Hershey, Pennsylvania, on January 6, 1987.

No one contends that a new booking agreement was signed by Titan and Eadie or Colley for these characters. Colley contends, however, that at the various meetings that took place regarding these new characters, he was repeatedly told by "various [*19] agents of Titan how glad they were that I was getting this opportunity [to wrestle as the character "Smash"] and how much money I would be making." (Colley affidavit at P 7; see also Colley depo at 215). He further alleges that every time he talked to McMahon about the finances associated with the character, McMahon informed him not to worry and McMahon stressed how much money he would be making. (Colley affidavit at P 8).

While all parties admit that no specific dollar amounts were discussed at the meetings, Colley and Eadie contend that McMahon promised them that they were going to be the main event and that an oral contract was formed between the parties regarding their compensation for the development and portrayal of these new professional wrestling characters. Colley states that

they were to paid according to the main event "pay scales," which presumably referred to the customary practice in the wrestling industry as referenced in their earlier booking agreements.

As will be discussed more fully below, defendants counter that there never was an oral contract; that there never was a meeting of the minds; and that the original booking agreements with each party controlled [*20] the relationships of the parties vis-a-vis these new characters.

**Round One**

Unfortunately, Colley's debut as "Smash" did not turn out to be a smashing success for him. When he appeared at the Meadowlands, some of his hard-core fans immediately recognized him as "Moondog Rexx" and began chanting "Moon Dog! Moon Dog!" Despite the fact that Colley had gone to great lengths to disguise his appearance and to avoid recognition, including driving a rental car to the event so that his fans would not recognize his car, and despite the drastic change in his costume -- from ragged blue jeans and a large dog bone to black leather with spikes and studs -- the appearance of his nose somehow gave him away; so he was told by many people.

Fortunately for Eadie, however, no one recognized him as his former persona, "The Masked Superstar."

**Round Two**

The second night was no better for Colley. Colley's fans in Hershey once again recognized him as "Moondog" and began the same chant. McMahon was extremely upset by the fans' recognition of Colley as "Moondog Rexx," presumably because he could not credibly portray his new character "Smash," and McMahon decided that he had to [*21] be replaced. McMahon substituted another wrestler as "Smash," and Colley never wrestled again as part of the "Demolition" tag team. Eadie, however, continued to wrestle as "Ax."

**Eadie's Career as "Ax"**

While Eadie continued to wrestle in the role of "Ax" of "Demolition" from January, 1987, until June 26, 1990, he alleges that he did so without a contract and was under-compensated for his work. He states that he was repeatedly promised compensation by McMahon in addition to the monies he actually received for his personal appearances and as royalties for the merchandising materials, but that these promises never materialized. Defendants state that Eadie received domestic earnings, including royalties, of $ 776,508 and Canadian earnings of $ 99,811 for the period 1987 to 1991.

In May, 1990, Eadie became ill after suffering what he describes as an allergic reaction to seafood he had eaten. Eadie claims that the doctor who examined him misdiagnosed his condition and communicated to Vincent McMahon that Eadie would never wrestle again. During his absence from work, McMahon replaced Eadie with another wrestler. Eadie claims that on May 26, 1990, he had a telephone conversation [*22] with McMahon who promised him that if he should become disabled from wrestling, Titan would employ Eadie as an agent for life. He states that this promise was reiterated to him on May 29, 1990. Eadie claims that he was promised a starting annual salary of $ 125,000, which was part of the bargain for his trading his interest in the "Demolition" characters that he had helped to develop.

In June, 1990, within weeks of McMahon's learning that Eadie might never wrestle again, another representative of Titan approached Eadie and asked him to sign an "amendment" to his 1984 booking agreement. Eadie refused to sign the document because he did not believe that the document was correct in several respects, including the fact that, in his opinion, the January 6, 1984 contract had been completed and terminated. In other words, there was nothing to amend. Subsequently, he was approached again by Titan about signing the amendment, and he again refused. Finally, on June 26, 1990, a representative of Titan threatened Eadie that if he did not sign the agreement he would be terminated immediately and would not be hired as an agent for life with Titan, as had been previously promised to him. Based on [*23] Titan's representation that he would be made an agent for life, and because of these threats, Eadie states that he finally signed the amendment. The amendment provided as follows:

> At the time you signed your talent contract with us, your character identity as "Ax"/"Demolition" had not been established. Therefore, that ring name and characterization are not listed in the contract.
>
> This letter will serve as an amendment to your contract. It acknowledges that effective September 1, 1987, you began wrestling for Titan Sports, Inc., d/b/a The World Wrestling Federation under the ring name and characterization of "Ax"/"Demolition," which name was created and developed by Titan, and that all rights granted to Titan under your contract dated January 6, 1984 as extended, including all terms and conditions therein, are and will remain in force and effect.

Eadie was cleared by his doctor to return to work in July, 1990. At that time, McMahon advised Eadie that he would work as a professional wrestler for Titan until March, 1991, at which time he would become an agent for Titan. Subsequently, Eadie states that he was told that he would start as an agent in January, 1991. Eadie [*24] asserts that on September 24, 1990, McMahon informed him that his wrestling activities with Titan would be terminated but that he would be given an agent's position with the company. This was reconfirmed at a meeting on October 9, 1990. On October 30, 1990, Eadie states that he met with McMahon, who told him that he would only be able to employ him for two to three days per week. This was not acceptable to Eadie, so on November 6, 1990, Eadie wrote to McMahon and requested that his wrestling contract not be renewed.

Titan registered several copyrights for products bearing the names and/or likeness of "Ax/Demolition" and "Smash/Demolition" and collected substantial sums of money as a result of vendor sales of toys, videos, and concessions based on the "Demolition" characters. Certain royalty payments were made to Eadie based on the "Ax/Demolition" sales ($ 61,533.43 for United States sales and $ 1,162.61 for Canadian sales through September 30, 1991), n8 but no royalty payments were ever made to Colley for "Smash/Demolition." Eadie's last match with Titan was in November, 1990. Since leaving Titan, Eadie has also received additional royalties of over $ 35,000.

n8 From defendants' statement of material facts, no. 8, it is unclear whether these figures are included in the earnings figures set forth above or whether these are in addition to Eadie's earnings.

[*25]

### Colley's Career After "Smash"

Colley claims that when he was replaced by another wrestler as "Smash" McMahon promised him a good position with Titan as a different character to make up for the money he was losing in not being part of the "Demolition" team. He states that they came up with the character of "The Shadow." Colley wrestled under this ring name for WWF for several months. By the end of 1987, however, he states, things were "pretty much a disaster." (Colley depo at 199). He complains that this new character was never developed by Titan to the point that it was promised to be. Colley left Titan with what he describes as an understanding that he would receive his promised compensation and that he would be put back to work as soon as a spot came open.

Colley turned to construction work, tried opening a gymnasium, and eventually returned to wrestling in Germany as "Moon Dog" again. In 1990 he returned to the South to wrestle for WWF's major competitor, World Championship Wrestling ("WCW") as the "Black Scorpion," "Moondog Rexx," and "Dead Eye Dick" (part of a Western Three Stooges wrestling routine). Unfortunately, during one of Colley's matches in WCW's "Big [*26] Bash," Colley was dropped on his head during a wrestling maneuver called the "DDT." The following night he hurt his head again. In 1992, he underwent surgery because of these injuries and since that time he has not been able to wrestle.

Colley states that in 1990 he ran into McMahon while wrestling in Alabama, and McMahon informed him that he would bring him back to work for Titan and would make good on his promise of compensation for the use of "Demolition." (Colley affidavit P 14). Colley states that McMahon told him to call in a couple of weeks and Titan would come up with a new gimmick for him. Colley alleges that through 1992 he was repeatedly promised a position with Titan as compensation for defendants' use of "Demolition." He never received this position he claims he was promised, and he asserts that he never received the compensation promised him for Titan's use and exploitation of his character "Smash."

### DISCUSSION

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the moving party is entitled to summary judgment as a matter of law. *Fed. R. Civ. P. 56(c); Anderson* [*27] *v. Liberty Lobby, Inc., 477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* The substantive law governing the case identifies those facts that are material on a motion for summary judgment. *Anderson, 477 U.S. at 248.* The burden of showing that there exist no genuine issues of material fact rests on the party moving for summary judgment. *Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970).* A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523* (2d Cir.)(internal quotation marks and citation omitted), cert. denied, *506 U.S. 965, 121 L. Ed. 2d 359, 113 S. Ct. 440 (1992).* In assessing the record to determine whether a genuine issue of material fact exists, all ambiguities must be resolved and all inferences must be drawn in favor of the party against whom summary judgment is sought. *Anderson, 477 U.S. at 255.* Within this framework, the facts of these cases will be reviewed as to each of the plaintiff's counts for purposes of determining whether defendants are entitled to summary

judgment [*28] as to any or all of the claims asserted by plaintiffs.

### Defendants' Motion for Summary Judgment as to Plaintiff Eadie Count I -- Breach of Contract

In the first count of his amended complaint, Eadie asserts that defendants McMahon and Titan breached an oral contract with him relating to the compensation he was to be paid for allowing defendants to commercially exploit the "Demolition" characters that he had developed. He alleges that defendants breached this oral contract both with respect to the amount of royalties he was to receive and the compensation he was to earn for wrestling live and on television and pay-for-view cable as the "Ax" of the "Demolition" team. Eadie alleges that Titan further breached this agreement by terminating him and refusing to continue paying him royalties.

Titan contends that the 1984 booking agreement governed the contractual relationship between it and Eadie. It argues that the extension of the agreement was at its sole discretion and that it was extended at least through 1990. Moreover, just as it had the power to extend the agreement, it claims that it had the power to limit it, such that its unilateral decision not to renew the agreement [*29] (presumably when it substituted a new wrestler as the "Ax") was within its contractual rights and not a breach of contract.

Eadie counters that the 1984 booking agreement pertained solely to his portrayal of the character "The Masked Superstar" and was not intended to create a contractual relationship beyond December 31, 1984. As evidence that his 1984 agreement was terminated, he asserts that he wrestled as "The Masked Superstar" for various other promoters for several years after December 31, 1984, and that Titan did nothing to try to stop him or to receive any compensation for the concept of "The Masked Superstar." Further, when he returned to Titan, he did so as "The Super Machine," under compensation terms different than in 1984. He states that as the "Ax" he worked for Titan only pursuant to an oral contract between the parties. Therefore, he claims his oral agreement with defendants, not the 1984 booking agreement, controlled the relationship between the parties, as it existed from January 1987 through November 1990 when he was wrestling as "Ax" of "Demolition."

The 1984 booking agreement contained a definite term and provided that it could only be extended by Titan. All notices [*30] were to be in writing. There is no evidence that this contract was ever extended in writing. At the end of the contract's initial term, Eadie left Titan and continued his wrestling career as "The Masked Superstar" for other promoters for three years

There is no evidentiary support for defendants' position that the 1984 agreement remained in force and effect during the intervening three years or that it covered Eadie's relationship with Titan when he wrestled as "The Super Machine" or as "Ax/Demolition."

Moreover, given the uncontradicted testimony of both plaintiffs regarding their wrestling careers, that they worked for numerous promoters in different territories under various ring names, and at times with the knowledge and consent of defendants, it seems implausible that the parties intended that a 1984 agreement relating to one particular character would govern the parties' relationship in perpetuity or to govern the wrestler's performance as other characters. As Colley testified, a wrestler could only wrestle in a given territory under a particular ring name for a limited period of time. The fans demanded new talent. Thus, the nature of the industry does not support defendants' [*31] reading of their own booking agreement.

In ascertaining the intent of the parties to a contract, the Connecticut courts have considered not only the language used in the contract but also the circumstances surrounding the making of the contract, the motives of the parties, and the purposes which the parties sought to accomplish. *Barnard v. Barnard*, 214 Conn. 99, 570 A.2d 690 (1990); *John F Epina Realty, Inc. v. Space Realty, Inc.*, 194 Conn. 71, 480 A.2d 499 (1984); *Connecticut Co. v. Division 425 of Amalgamated Ass'n of St., Elec., Ry. and Motor Coach Emp. of America*, 147 Conn. 608, 164 A.2d 413 (1960) Neither the circumstances surrounding the making of the original booking agreement nor the parties' motives nor the purposes sought to be accomplished by this agreement support the conclusion urged by defendants that the parties intended the original booking agreement to remain in effect or to cover other wrestling characters.

Further, the 1984 agreement provided that Eadie waived all rights to any income such as royalties from any promotional products. But, as noted above, Titan paid Eadie substantial royalties for "Ax" of "Demolition." Thus, the parties' course of dealings [*32] over the intervening years belies defendants' claim that the 1984 agreement controlled their relationship

Titan invokes the 1990 "amendment" to the 1984 agreement to argue that the 1984 agreement controlled the parties' relationship during all of the intervening years, but genuine issues of material fact exist as to whether Eadie was fraudulently induced to sign that amendment at a time when he and Titan thought that his wrestling career might be coming to an end. The timing of the amendment is more than a little suspicious. One can reasonably infer that Titan was concerned about protecting its rights to the "Demolition" characters and

was attempting to get a "headlock" on Eadie by forcing him to sign this amendment in an effort to protect its continued stream of income from the "Demolition" characters. If Eadie could not return to the ring, Titan wanted to insure that it had all rights to these characters, and, once it thought that it had secured those rights, it gave Eadie the "ax," so to speak.

Furthermore, defendants have not shown that any consideration was given to Eadie for his signing the "amendment" to an agreement that had already been terminated, and an amendment that [*33] would foreclose his right to receive future royalties for merchandise based on his "Ax/Demolition" character. See *Brian Constr. & Dev. Co. v. Brighenti, 176 Conn. 162, 166, 405 A.2d 72 (1978); Dick v. Dick, 167 Conn. 210, 224, 355 A.2d 110 (1974).* The court finds that the 1990 "amendment" was not a binding contract.

Therefore, the relationship between the parties had to have arisen as a result of an oral or implied contract as to the compensation to be paid Eadie and the royalties he was to receive.

In Connecticut, "an implied employment contract may arise under the doctrine of promissory estoppel, where injustice to a promisee who has acted in reliance can be avoided only by enforcement of 'a clear and definite promise which a promisor could reasonably have expected to induce reliance.' *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, 202 Conn. 206, 213, 520 A.2d 217 (1987)." Manning v. Cigna Corp., 807 F. Supp. 889, 895 (D. Conn. 1991).* Connecticut courts have held that the plaintiff must show that the employer agreed either by words or conduct to undertake some form of actual contractual commitment to him under which he could not be terminated without [*34] just cause. *Coelho v. Posi-Seal Int'l, Inc., 208 Conn. 106, 112, 544 A.2d 170 (1988)*(citations omitted). Statements made to an employee must be examined in light of the circumstances under which they were expressed. *Torosyan v. Boehringer-Ingelheim Pharmaceuticals, Inc., 234 Conn. 1, 17 n. 6, 662 A.2d 89 (1995).* The determination of whether certain statements were promissory, whether a contract was created, and what the parties intended to encompass in their contract are questions of fact, "peculiarly a jury function." *Coelho, 208 Conn. at 113; Torosyan, 234 Conn. at n.6; see also Manning, 807 F. Supp. at 895.*

The court finds that any contractual obligations between the parties arose as a result of an oral contract between Titan and Eadie under which the parties performed for over three years, if not longer. The precise terms of this contract, including the parties' intent concerning termination of the agreement, Eadie's rights to continuing employment, and Eadie's rights to

continuing royalties, as well as whether any breach occurred, are factual issues to be resolved by a jury. *Torosyan, 234 Conn. at 15-16; Heller v. Champion Internat'l Corp., 891 F.2d [*35] 432, 434-35 (2d Cir. 1989).* Defendants' motion for summary judgment as to the breach of contract count of Eadie's first amended complaint will be denied.

### Count II -- Quantum Meruit; Count V -- Unjust Enrichment

Defendants' next argument is premised on their first -- that plaintiff Eadie's claims for quantum meruit and unjust enrichment must be dismissed because there is an express written contract governing the relationship between the parties. Having found that the 1984 booking agreement was terminated in 1984 and was not resurrected by the 1990 amendment, the court will also deny defendants' motion for summary judgment on these two counts.

### Count III -- Fraudulent Misrepresentation

In Count III, Eadie asserts that defendants made certain fraudulent misrepresentations to him regarding compensation he would receive as royalties for defendant's use of the characters "Ax" and "Smash" of "Demolition" and in reliance on this, he allowed Titan to copyright these characters. While Titan does not copyright the characters per se, it states that it has obtained copyrights on videotapes portraying the characters and on other items of merchandise.

Defendants argue [*36] somewhat inconsistently that plaintiff Eadie's claim for fraudulent misrepresentation must be dismissed because under the 1984 agreement, which they contend was in full force and effect, Eadie waived the right to all income from royalties; notwithstanding which, Titan paid Eadie royalties anyway; and, therefore, there could be no detrimental reliance.

As previously found, the 1984 booking agreement does not govern Titan's relationship with Eadie as "Ax/Demolition" nor does it govern Eadie's rights to the "Demolition" characters. Obviously, Titan must have felt some obligation to pay royalties or it would not have gratuitously turned over in excess of $ 100,000 to Eadie. Genuine issues of material fact abound as to what representations were made to Eadie regarding the royalty payments and what actions were taken in reliance on these representations. Defendants' motion for summary judgment on this count will be denied.

### Count IV -- Fraudulent Inducement

Defendants next move for summary judgment as to Eadie's fraudulent inducement count on the ground that

the undisputed facts show that what Eadie considered to be an offer of permanent employment was based on his own assumptions, [*37] not based upon any proposal that McMahon actually made to him. Moreover, defendants assert that any permanent employment is terminable at will under Connecticut law. Finally, they assert that there was no detrimental reliance by Eadie for he had no rights in the abstract to the characters "Ax" and "Smash" of "Demolition," which were neither novel nor original in that they were based on another wrestling group, "The Road Warriors."

Defendants misconstrue Eadie's Fourth Cause of Action. Eadie contends that defendants intentionally and fraudulently induced him to sign the amendment to the 1984 booking agreement with promises of permanent employment with compensation commencing at an annual salary of $ 125,000 at a time when defendants thought McMahon could no longer wrestle. Eadie claims that defendants had no intention of providing him with employment, as he soon thereafter discovered. In reliance on these promises, he surrendered valuable rights to the "Demolition" characters

To state a claim for fraudulent inducement under Connecticut law based upon misrepresentations, a plaintiff must demonstrate (1) that a false representation was made as a statement of fact; (2) that it was known [*38] to be false; (3) that it was made to induce the action by the other party; and (4) that the party acted on the statement to his or her detriment. *Topf v. Warnaco, Inc.*, 942 F. Supp. 762, 768 (D. Conn. 1996); *Miller v. Appleby*, 183 Conn. 51, 54-55, 438 A.2d 811, 813 (1981). The plaintiff's reliance upon another's misrepresentation must be justifiable or reasonable. *Amatulli v. People's Bank*, 917 F. Supp. 895, 906 (D. Conn. 1996).

Eadie has sufficiently pled the elements of a cause of action for fraudulent inducement under Connecticut law. As previously found, there are factual issues as to Eadie's fraudulent inducement claim regarding the signing of the 1990 "amendment," as well as the terms of the parties' agreement with respect to Eadie's permanent employment by Titan and his relinquishment of his royalty rights.

Defendants' argument that Eadie had no "rights" to the character "Ax/Demolition" is unpersuasive. If Eadie had no rights, why did defendants pay Eadie over $ 100,000 over the course of five years for use of this character's image on merchandise?

In ruling on a motion for summary judgment, a court must construe all facts in favor of the non-moving party and [*39] must draw all reasonable inferences in that party's favor. Sufficient issues of fact exist for this claim to survive defendants' motion for summary judgment.

Therefore, defendants' motion for summary judgment on this count will be denied.

### Defendants' Motion for Summary Judgment as to Plaintiff Colley Count 1 -- Breach of Oral Contract

Defendants claim that they are entitled to summary judgment as to Count I of plaintiff Colley's complaint which alleges a breach of an oral contract because any such claim is barred by the 1985 booking agreement and by Connecticut's three-year statute of limitations. Colley responds that the booking agreement pertained solely to his rendering of professional wrestling services as "Moondog Rexx" and is irrelevant to his claims relating to the character "Smash" that he developed. Colley asserts that there was no mention of the "Demolition" characters in this agreement and Colley signed it solely in his "Moondog Rexx" persona.

Defendants' position as to Colley's 1985 booking agreement is somewhat incongruous in light of the position that they took with respect to Eadie. Had Eadie's earlier booking agreement controlled in and of its own right, [*40] why did defendants insist upon his executing the 1990 "amendment?" The only reference in Colley's booking agreement that could possibly be construed to include Colley's new wrestling persona "Smash" is the reference in section 1(c) to Titan's ownership of all rights to Wrestler's services thereunder "including . . . all characters." However, it is undisputed that Titan did not own control of Colley's performances for other promoters from 1985 forward; nor did Titan own all rights to any and every character portrayed by Colley from that time forward, including his appearances as "Moondog" for other promoters. Although the booking agreement provided that it would be automatically extended for one-year terms unless terminated in writing by either party, the parties' course of dealings indicates that the agreement was terminated once Colley was no longer wrestling as "Moondog Rexx." The court finds that the 1985 agreement did not control the parties' relationship as to the "Smash/Demolition" character.

As to Colley's breach of contract claim with respect to defendants' failure to continue to employ him as "Smash," Colley has failed to allege sufficient facts to establish that defendants [*41] had agreed to employ him permanently in this capacity. Colley alleges only that McMahon told him that he was going to make a lot of money, but he never claims that McMahon promised him that he and only he would wrestle in this role or that McMahon guaranteed him a certain number of bookings or appearances. Indeed, it appears that Colley consented to assume the role of a new character "The Shadow," which unfortunately did not turn out to be as successful or as lucrative as the "Demolition" wrestling team.

To the extent Colley seeks to assert a claim for breach of an oral employment contract "by virtue of their failure to continue to employ the plaintiff in their organization (presumably in some capacity other than as "Smash") despite their repeated representations and assurances to the contrary," (Amended Complaint at P 10), these representations are not sufficiently promissory or sufficiently definite to support contractual liability. See *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, 202 Conn. at 214-15.* Plaintiff Colley has failed to adduce any evidence that would establish that defendants intended to undertake an immediate contractual obligation to him. Furthermore, [*42] none of the representations relied upon by Colley contained any of the material terms that would be essential to an employment contract, such as salary.

Colley alleges only that in 1990, McMahon promised to put him back to work for Titan, and that they would come up with a new gimmick for him, and that in 1992, Joe Scarpa, an agent of Titan, approached him inquiring about the status of his current employment and whether he wanted to come back to work for Titan. Colley states that it was his "understanding" that this was for the purpose of making good on McMahon's promises of compensation, but nothing ever came of the conversation with Scarpa. The oral promises allegedly made by defendants are too tenuous to support a claim for breach of an implied or oral contract of future permanent employment. See *D'Ulisse-Cupo. 202 Conn. at 214-15.*

As to Colley's breach of contract claim for defendants' failure to pay him royalties for defendants' commercial exploitation of the "Smash" and "Demolition" character, there are clearly factual questions concerning the terms of any oral agreement as to royalties to be paid to Colley for defendants' use of the "Smash/Demolition" character. These factual [*43] issues preclude the granting of summary judgment to defendants on plaintiff's breach of contract claim for unpaid royalties.

Defendants have also raised Connecticut's three-year statute of limitations, *Conn. Gen. Stat. § 52-581,* as a bar to plaintiff's breach of oral contract claim. Since Colley allegedly created the "Demolition" characters in the fall of 1986 and was terminated almost immediately thereafter after just two appearances as "Smash" in January, 1987, defendants argue that any claims that he would have for defendants' alleged breach of oral contract are time-barred.

Colley asserts that defendants fraudulently concealed facts from him and made misrepresentations as late as 1992 which would have kept him from discovering the existence of his cause of action for breach of contract. He claims that defendants' concealment of facts tolls the running of any applicable statute of limitations.

The Connecticut Supreme Court has held that to establish that a defendant fraudulently concealed the existence of a cause of action a plaintiff must prove that the defendant was aware of the facts necessary to establish the cause of action and that the defendant intentionally concealed [*44] those facts from plaintiff. The burden of proof is on plaintiff. See *Connell v. Colwell, 214 Conn. 242, 250, 571 A.2d 116 (1990).* In this case, plaintiff has failed to specify how defendant fraudulently concealed the existence of a cause of action from him for breach of an agreement to pay royalties. Defendants did not pay plaintiff royalties, and plaintiff knew that he was not being paid royalties. There is no fraudulent concealment involved.

Defendants, however, have incorrectly sought to apply a three-year statute of limitations to this claim. Although *Conn. Gen. Stat. § 52-581* generally applies to oral contracts, where the oral contract has been fully performed by the plaintiff, the Connecticut courts have held that the six-year statute of limitations of *Conn. Gen. Stat. § 52-576* applies. See *Nowakowski v. Rozbicki, 39 Conn. Supp. 454, 461, 466 A.2d 353 (1983); Tierney v. American Urban Corp., 170 Conn. 243, 248-49, 365 A.2d 1153 (1976)* Here, with respect to Colley's breach of contract claim for unpaid royalties, Colley had fully performed his end of the bargain. The only remaining performance was due from defendants -- i.e. the payment of royalties.

Accordingly, [*45] plaintiff's claim for breach of an oral contract relating to the payment of royalties survives in that it is based on an alleged oral contract entered into less than six years prior to plaintiff's filing this action in April, 1992. Defendants' motion for summary judgment will be denied as to Colley's breach of contract claim for the payment of royalties. The motion will be granted as to the remaining portions of plaintiff's breach of contract claim.

## Counts II and III -- Fraudulent Misrepresentation and Negligent Misrepresentation

Defendants next assert that plaintiff Colley's tort claims for fraudulent misrepresentation and negligent misrepresentation are likewise barred by Connecticut's three-year statute of limitations for actions sounding in tort. *Conn. Gen. Stat. § 52-577.* Again, Colley responds that defendants fraudulently concealed facts from him which would toll the statute of limitations

The statute of limitations for tort actions begins to run at the moment of the act or omission complained of occurs. *S.M.S. Textile Mills, Inc. v. Brown, Jacobson,*

*Tillinghast, Lahan & King, P.C.*, 32 Conn. App. 786, 790, 631 A.2d 340, cert. denied, 228 Conn. 903, [*46] 634 A.2d 296 (1993). Colley's claims for fraudulent and negligent misrepresentation concern the representations made to Colley regarding the compensation he was to receive for defendants' use of the "Demolition" characters. Colley asserts that these representations were made to him not only in 1986 and 1987, but also in 1990 and 1992. His complaint was filed in April, 1992.

The court has previously found that genuine issues of fact exist as to the representations that were made to Colley regarding his compensation for defendants' commercial exploitation and use of the "Demolition" characters for their own benefit and profit. These representations continued beyond the initial 1986 meetings with McMahon into 1990 and 1992. Again, there are sufficient factual issues to preclude the granting of summary judgment.

To the extent that Colley asserts a claim with respect to any negligent or fraudulent misrepresentations made within three (3) years of his filing his complaint, these are not time-barred. As to misrepresentations made prior to this time, Colley has not sustained his burden of alleging sufficient facts probative of fraudulent concealment to toll the running of the statute of limitations. [*47] *See Fichera v. Mine Hill Corp.*, 207 Conn. 204, 541 A.2d 472 (1988). Therefore, defendants' motion for summary judgment as to counts two and three will be granted in part and denied in part.

## Count IV -- Conversion

Defendants next seek summary judgment as to plaintiff Colley's conversion count on the ground that Colley consented to Titan's use of the "Demolition" characters by virtue of his signing the booking agreement in 1985 which gave Titan all rights to any characters. As this Court has previously ruled, the 1985 agreement pertaining to "Moondog Rexx" did not apply to the "Demolition" characters

Defendants also contend that a cause of action for conversion will not lie for conversion of intangible property, in this case the likeness of a character. No Connecticut court has addressed this precise issue. However, in *Holmes v. Golub, 1991 Conn. Super. LEXIS 2114, No. 50 49 31, 1991 WL 188668* (Conn. Super. Sept. 13, 1991), the court recognized that intangible property interests have not traditionally been subject to conversion. Quoting Prosser and Keaton on The Law of Torts § 15 (5th ed. 1985), the court noted that this rule has been relaxed to reach intangible rights customarily merged [*48] in or identified with some document. *Id.* at *2. However, no Connecticut case has extended the tort of conversion to intangible interests in and of

themselves. *See also Aetna Life & Cas. Co. v. Union Trust Co.*, 230 Conn. 779, 790 n.6, 646 A.2d 799 (1994) (in which the Connecticut Supreme Court refused to resolve the question of whether the tort of conversion could be extended to intangibles). This court will not expand state substantive law.

Accordingly, because Connecticut does not recognize the tort of conversion for intangible property, defendants' motion for summary judgment as to the fourth count will be granted.

## V -- Wrongful Termination

Defendants claim that they are entitled to summary judgement on plaintiff Colley's fifth count which alleges wrongful termination of Colley. Defendants assert that to the extent Colley may be able to show that there was a permanent employment relationship, which they deny, it was terminable at will. In responding, plaintiff intertwines his CUTPA claim with his wrongful termination claim.

While plaintiff Colley has alleged that McMahon on several occasions discussed with him the possibility of employment as compensation [*49] for Titan's use of the "Demolition" characters, there is nothing to indicate that there was ever an oral agreement to that effect. Colley's situation is different than Eadie's where Eadie had been receiving significant compensation for his appearances as "Ax" and for royalties, and was then induced to sign a 1990 "amendment" to a 1984 agreement, by which he would forego those royalties, and pursuant to which he claims he was promised a permanent position at a starting salary of $ 125,000 per year. Colley alleges no more than that he was repeatedly promised future employment with Titan as compensation for defendants' use of his "Smash/Demolition" character, for which he never received any compensation. As with Colley's breach of contract claim, Colley has failed to allege sufficiently definite terms to establish a promise of employment on which Colley could have reasonably relied. *See D'Ulisse-Cupo, 202 Conn. at 215.*

Even construing the facts in a light most favorable to plaintiff Colley, the court finds no evidence to support plaintiff's claim of wrongful termination. Accordingly, defendants' motion for summary judgment as to the fifth count of plaintiff Colley's first amended [*50] complaint will be granted.

## Count VI -- CUTPA

In this count, plaintiff Colley incorporates by reference all allegations of the first four counts. Defendants assert that this count must be dismissed in that CUTPA does not apply to employment or independent contractor relationships. Defendants

Case 3:03-cv-00222-JBA    Document 111    Filed 05/23/2005    Page 34 of 40

1997 U.S. Dist. LEXIS 7679, *    Page 13

construe Colley's claims too narrowly. Colley's claims are not limited to an alleged employer-employee relationship, or even an independent contractor relationship. Colley has incorporated by reference all of the preceding allegations of his complaint into this CUTPA count, including defendants' misappropriation and exploitation of the "Demolition" characters.

Connecticut courts have applied the Federal Trade Commission's "cigarette rule" in determining whether a particular trade practice is unfair. *Chem-Tek, Inc. v. General Motors Corp., 816 F. Supp. 123, 130 (D. Conn. 1993)*. These criteria are: (1) does the practice offend the public policy of the state as it has been established by common law, statute, or some other measure of unfairness; (2) is it immoral, unethical, oppressive, or unscrupulous; and (3) does it cause substantial injury to consumers, competitors or other [*51] businessmen. *Chem-Tek, Inc., 816 F. Supp. at 130* (citations omitted). All criteria do not necessarily need to be satisfied. "A practice may be unfair because of the degree to which it meets one of the criteria or because of a lesser extent if it meets all three." *Shell Oil Co. v. Wentworth, 822 F. Supp. 878, 884 (D. Conn 1993).*

Colley has sufficiently pled a cause of action for violation of CUTPA. There are sufficient factual issues regarding defendants' alleged misappropriation of Colley's "Demolition" characters to preclude the granting of summary judgment.

However, for the same reasons as set forth above, Connecticut's three-year statute of limitations, *Conn. Gen. Stat. § 42-110g(f)*, will bar Colley's CUTPA claims as to defendants' misappropriation and exploitation of the "Demolition" characters prior to April, 1989. Therefore, defendants' motion for summary judgment as to this count will be granted in part and denied in part.

**Count VII -- Unjust Enrichment**

Lastly, defendants move for summary judgment as to plaintiff Colley's unjust enrichment count on the basis of the written contract, the 1985 booking agreement for "Moondog Rexx." Since the court has [*52] found that the 1985 agreement does not control the relationship of the parties as to "Smash/Demolition," defendants' motion for summary judgment on this last count will be denied.

**CONCLUSION**

For the reasons set forth above, defendants' motion for summary judgment of defendants (Document # 109) in Eadie v. McMahon, No. 5:91CV0423(WWE) is DENIED. Defendants' motion for summary judgment (Document # 44) in Colley v. McMahon, No. 5:92CV0216(WWE) is granted in part and denied in part. The motion is GRANTED as to count one except with respect to Colley's breach of contract claim relating to the payment of royalties. As to counts two, three, and six, defendants' motion is GRANTED as to all claims accruing more than three years prior to the date of plaintiff's filing his complaint; it is DENIED as to all claims accruing thereafter. As to counts four and five, defendants' motion for summary judgment is GRANTED. As to count seven, defendants' motion for summary judgment is DENIED.

**SO ORDERED.**

**Date: March 12, 1997.**

    **Bridgeport, Connecticut.**

    **WARREN W. EGINTON,**

    **Senior United States District Judge**

LEXSEE 1998 US DIST LEXIS 20378

**STEVEN H. LEVIN dba SHL CREATIONS, Plaintiff, - against - THE GAP, INC., Defendant.**

**97 Civ. 4452 (DC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1998 U.S. Dist. LEXIS 20378*

**December 29, 1998, Decided
December 30, 1998, Filed**

**DISPOSITION:** [*1] Gap's motion for summary judgment granted in part and denied in part. Levin's claims for breach of express contract, violation of property rights, and breach of a confidential relationship dismissed.

**LexisNexis(R) Headnotes**

**COUNSEL:** Dennis H. Tracey, III, Esq., DAVIS WEBER & EDWARDS P.C., New York, New York, for Plaintiff.

Pamela T. Johann, Esq., HOWARD, RICE, NEMEROVSKI, CANADY, FALK & RABKIN, San Francisco, California, for Defendant.

Arthur S. Greenspan, Esq., RICHARDS SPEARS KIBBE & ORBE, New York, New York, for Defendant.

**JUDGES:** DENNY CHIN, United States District Judge.

**OPINIONBY:** DENNY CHIN

**OPINION:**

### MEMORANDUM DECISION

**CHIN, D.J.**

In early 1993, plaintiff Steven H. Levin, doing business as SHL Creations, conceived and developed the idea of a Gap Kids line of clothing for Barbie dolls. He believed that cross-marketing the well-known brand of children's clothing with the popular dolls would benefit the makers of both lines of merchandise.

In April 1993, Levin contacted defendant The Gap, Inc. (the "Gap") to inquire about submitting the idea. A Gap representative advised him that he could submit the idea for the Gap's consideration, but that he would have to sign a form submission agreement first. [*2] Levin eventually signed the form submission agreement and submitted it along with a written presentation of the idea, but he did so only after the Gap had agreed that it would "attempt in good faith to negotiate a formal written agreement" with him before using the idea. Some two weeks later, the Gap advised Levin that his idea was not "compatible" with its "current plans."

Levin heard nothing more from the Gap. Three years later, however, the Gap started marketing a Gap Barbie doll. Levin commenced this lawsuit, alleging that the Gap had used his idea and seeking compensation therefor.

The Gap moves for summary judgment dismissing the complaint, arguing, inter alia, that the form submission agreement signed by Levin precludes the relief he seeks. For the reasons that follow, the Gap's motion is granted in part and denied in part.

### STATEMENT OF THE CASE

#### A. The Facts

In early 1993, Levin, a resident of New York, conceived and developed his idea for the cross-marketing of Gap Kids clothing and Barbie dolls. He prepared a ten-page written presentation that elaborated on the idea.

One specific suggestion was the creation of a Gap Kids Barbie doll.

In April 1993, [*3] Levin telephoned the Gap, a Delaware corporation with its principal places of business in California, at its offices in California to discuss the submission of his idea. He spoke with one of the Gap's in-house lawyers, Julie Kanberg, who advised Levin that the Gap had a form "Submission Letter" to be used for the submission of ideas. After their conversation, the Gap mailed Levin a form "Submission Letter," which provided in part as follows:

> 1. A submission to The Gap, either orally or in writing, will not in any way establish a confidential relationship with The Gap, nor will it place The Gap in the position of receiving a disclosure in trust......

> ....

> 3. No obligation is assumed or may be implied on the part of The Gap by receipt or examination of the submission to compensate Submitter or otherwise enter into an agreement with the Submitter, unless or until a formal written agreement has been entered into and then The Gap's obligations will be only as expressed in that agreement.

> 4. In the absence of a formal written agreement between The Gap and Submitter, all rights and remedies of the Submitter arising out of the disclosure of information to The Gap . [*4] . . shall be limited to any rights and remedies as may now or in the future be accorded to the Submitter under United States patent, trademark or copyright laws. The Gap will have no liability to the Submitter for receipt, review, use or disclosure of any part of the information disclosed to The Gap except as may arise under valid U.S patents, copyrights or trademarks.

After reading the Submission Letter, Levin was concerned that it did not protect his rights. Accordingly, he contacted Kanberg and advised her that he would not submit his idea to the Gap without appropriate protection. He advised her that he was willing to submit the idea, but only if the Gap would agree not to use the idea without first negotiating a formal written agreement, as referred to in the Submission Letter. He told Kanberg that he would put this condition into a cover letter that would amend the Submission Letter, and that he would

then submit the cover letter, the Submission Letter, and the written presentation of his idea to the Gap. Kanberg responded that she would review the cover letter.

On April 12, 1993, Levin mailed the Submission Letter, which he had signed, with a cover letter and the written [*5] presentation to the Gap in California. The cover letter stated that Levin understood that "the Gap will negotiate a formal written agreement with SHL Creations before using the idea."

On April 21, 1993, Kanberg telephoned Levin and advised him that the Gap would agree to the terms of the cover letter if he made two alterations, one relating to the Gap's prior consideration of the idea and the other relating to the Gap's obligation to negotiate a formal agreement before using the idea. Levin agreed to make the proposed changes and mailed a second cover letter to the Gap incorporating the changes. The second letter stated:

> I understand that I have no rights whatsoever if (i) someone at The Gap has previously considered my idea or any idea reasonably similar to or related to my idea prior to review of my submission or (ii) someone outside of The Gap has previously submitted my idea or any idea reasonably similar to or related to my idea to The Gap. If, however, neither my idea nor any idea reasonably similar to or related to my idea has (i) previously been considered by someone at The Gap or (ii) previously been submitted to The Gap, and The Gap desires to use the idea, it is [*6] my understanding that The Gap will attempt in good faith to negotiate a formal written agreement with SHL Creations before using the idea.

On May 5, 1993, Kanberg wrote Levin, informing him that his idea was not "compatible" with the Gap's "current plans."

Levin did not hear from the Gap again. In November 1996, however, the Gap began selling Gap-clothed Barbie dolls. Although the Gap denies that it used Levin's idea, it concedes that for purposes of this motion I must accept Levin's allegation that the Gap "utilized material and essential parts" of his idea. Levin contends that the Gap has realized gross revenues in excess of $4.5 million from using his idea, and he claims that he is entitled to a percentage of that income.

**B. Prior Proceedings**

Levin commenced this diversity action in June 1997. The complaint contains five counts: Count I is for breach

of express contract; Count II alleges unjust enrichment; Count III asserts breach of implied contract; Count IV is for violation of property rights; and Count V alleges breach of a confidential relationship.

The Gap filed the instant motion for summary judgment, before the parties had completed discovery

## [*7] DISCUSSION

### A. Choice of Law

The threshold question is whether California or New York law applies. Levin argues that California law governs, while the Gap contends that New York law should apply. I hold that California law governs this case. n1

> n1 At a conference on February 6, 1998, I instructed the parties to brief the motion under both California and New York law. Having further considered the issue, however, I conclude that California law applies.

In deciding the choice of law question, I apply New York's choice of law rules. In contract cases, New York applies the "center of gravity" or "grouping of contacts" approach, under which "courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." *Brink's Ltd. v. South African Airways,* 93 F.3d 1022, 1030-31 (2d Cir. 1996), cert. denied, 519 U.S. 1116, 117 S. Ct. [*8] 959, 136 L. Ed 2d 845 (1997).

Here, the parties dispute whether a contract was created at all, and there are contacts with both New York and California. Levin resided in New York and drafted the cover letters in New York. The Gap was headquartered in California and the Submission Letter was drafted or issued in California. All the negotiations took place by telephone, with Levin in New York and the Gap in California. I conclude, however, that the more significant contacts were with California. Levin telephoned the Gap in California. He sent the documents to the Gap in California. The Gap's in-house counsel, Kanberg, accepted Levin's submission in California. The Gap considered the idea in California. Kanberg wrote from California to advise Levin that his idea was not "compatible" with the Gap's plans. The place of performance would have been in California. For these reasons, the California contacts are the more important contacts and California law therefore should apply. See generally *In re Allstate Ins. Co.,* 81 N.Y.2d 219, 225-28, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993).

### B. The Merits

#### 1. Breach of Express Contract

Count I of the complaint is for breach [*9] of express contract. Levin contends that the Gap explicitly agreed not to use his idea without "attempting in good faith to negotiate a formal written agreement." He contends further that the Gap breached that contractual obligation by using his idea without making any effort to negotiate a formal written agreement.

Even accepting Levin's factual allegations as true for purposes of this motion, Levin does not state a legally cognizable claim for breach of an express contract because California does not recognize agreements to negotiate or agreements to agree. In California, "preliminary negotiations or an agreement for future negotiations are not the functional equivalent of a valid, subsisting agreement." *Kruse v. Bank of America,* 202 Cal. App. 3d 38, 59, 248 Cal. Rptr. 217 (1988); accord *Columbia Pictures Television v. Krypton Broadcasting Of Birmingham, Inc.,* 106 F.3d 284, 292 (9th Cir. 1997) (agreement to negotiate in the future cannot not be basis for breach of contract claim); *Cain v. United States Testing Co.,* 1994 U.S. Dist. LEXIS 13967, No. C-94-02159 (MHP), 1994 WL 564670, at *3 (N.D. Cal. Sept. 29, 1994) ("under California law an agreement for future negotiations is not the functional equivalent [*10] of a valid agreement"). Here, at best, the Gap merely agreed to negotiate in good faith; it did not enter into a "valid, subsisting agreement."

Levin's reliance on several "idea submission" cases is misplaced, for those cases involved situations where the defendants expressly agreed to pay the plaintiff reasonable compensation if they used the idea. See, e.g., *Thompson v. California Brewing Co.,* 150 Cal. App. 2d 469, 472, 310 P.2d 436 (1957) (plaintiff stated a cause of action for breach of an oral contract where he alleged that "defendants . . . expressly and orally agreed to pay to plaintiff the reasonable value of such new and novel idea if and when the defendants, or any of them used the same"); *Fink v. Goodson-Todman Enterprises, Ltd.,* 9 Cal. App. 3d 996, 88 Cal. Rptr. 679 (1970) ("express oral agreement . . . to compensate plaintiff" with reasonable royalties, percentage of receipts, and reasonable fees). Hence, in these cases, although the parties did not agree on the precise amount to be paid the plaintiff, they did agree that the plaintiff would be paid a reasonable amount.

In contrast, in the present case, there was no express agreement that Levin would be paid [*11] anything if his idea were used. Rather, the parties merely agreed that they would negotiate, in good faith, if the Gap used the idea. Hence, the agreement was not to pay a reasonable

1998 U.S. Dist. LEXIS 20378, *

amount; rather, the agreement was merely to negotiate. No enforceable agreement was created, and Count I is therefore dismissed.

## 2. Unjust Enrichment and Breach of Implied Contract

Counts II and III of the complaint assert claims for unjust enrichment and breach of implied contract, respectively. I discuss Counts II and III together because they raise similar issues.

Levin contends that even if the Submission Letter and April 21, 1993 cover letter do not together constitute an express contract, he is entitled to relief because the Gap was unjustly enriched at his expense when it knowingly and voluntarily accepted his idea, implicitly agreed to compensate him if it used the idea, and then used the idea to its advantage without honoring its implied promise.

In *Whitfield v. Lear, 751 F.2d 90 (2d Cir. 1984),* a case also governed by California law, the Second Circuit discussed the concept of an implied contract in an idea submission situation. The Court held that:

> California law will [*12] imply a contract from the conduct of the parties in certain circumstances. Thus, if a [party] accepts a submitted idea with full knowledge that the offeror expects payment in the event of use, California courts impose liability under a theory of implied-in-fact contract.

*751 F.2d at 92.* The Second Circuit in *Whitfield* relied on *Desny v. Wilder, 46 Cal. 2d 715, 299 P.2d 257 (1956)* (in bank), in which the California Supreme Court explained:

> The idea purveyor cannot prevail in an action to recover compensation for an abstract idea unless (a) before or after disclosure he has obtained an express promise to pay, or (b) the circumstances preceding and attending disclosure, together with the conduct of the offeree acting with knowledge of the circumstances, show a promise of the type usually referred to as 'implied' or 'implied-in-fact.'

*46 Cal. 2d at 738.* Hence, a "purveyor" of an idea can proceed on either an express or implied contract theory.

Here, a reasonable jury could find that the circumstances preceding and attending Levin's submission of his idea to the Gap, together with the Gap's conduct in accepting the submission, created an implied contract [*13] that the Gap would reasonably compensate Levin in the event it used his idea.

First, a reasonable jury could find that the Gap knew, or should have known, that Levin was not interested in submitting his idea unless he had some reasonable assurance that he would be compensated if the Gap used his idea.

Second, a reasonable jury could find that Levin would not have submitted his idea unless he believed that he had obtained appropriate protection and that, in fact, he believed that he had obtained such protection. A jury could find that the Gap assured Levin that it would not use his idea without making a good faith effort to negotiate a compensation agreement and that Levin acted reasonably in believing that the Gap would act in good faith.

Third, a reasonable jury could find that the Gap, knowing that Levin expected to be compensated if it used his idea, accepted the submission -- on his terms -- and considered the idea, ultimately using it to its advantage. The Gap could have refused to accept Levin's submission, or it could have insisted that he sign the Submission Letter without any amendments. Instead, as a reasonable jury could find, the Gap agreed that the Submission Letter [*14] could be amended and accepted Levin's submission with these understandings.

A reasonable jury could conclude, from these circumstances, that the Gap implicitly promised to pay Levin if it used his idea. See *Desny, 46 Cal. 2d at 733* (holding that, in absence of express contract, contract to pay may be implied when "the person who can and does convey a valuable idea to a producer . . . who voluntarily accepts it knowing that it is tendered for a price should . . . be entitled to recover"); 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright § 16.05[C] (1998)* ("If the recipient at the time he permits the submission to be made knows that the person submitting does so in the expectation of payment if the idea is used, the California courts regard the recipient's inaction at the time of submission as conduct from which may be inferred a promise to pay in the event of use.").

The Gap argues that Counts II and III must be dismissed because claims for unjust enrichment and implied contract do not lie "'when an enforceable, binding agreement exists defining the rights of the parties.'" (Def. Mem. at 19-23) (quoting *Paracor Finance, Inc. v. General Electric Capital Corp., [*15] 96 F.3d 1151, 1167 (9th Cir. 1996)* (applying both California and New York law)).

The difficulty with the Gap's argument is that it assumes there existed an "enforceable, binding agreement." On the facts alleged by Levin, however, a reasonable jury could conclude that there was no "enforceable, binding agreement," and in that event Levin would not be precluded from recovering on his unjust enrichment and implied contract claims. See *Lance Camper Manufacturing Corp. v. Republic Indemnity Co.*, 44 Cal. App. 4th 194, 203 (1996) (observing that party to contract could proceed with "quasi-contract claim" if "the express contract is void or was rescinded")

As a preliminary point, because the cover letter and Submission Letter were submitted together as part of a single transaction, they must be considered together. *Nish Noroian Farms v. Agricultural Labor Relations Board*, 35 Cal. 3d 726, 727, 201 Cal. Rptr. 1, 677 P.2d 1170 (1984) ("multiple writings must be considered together when part of the same contract"). The Gap has argued, and I have accepted the argument, that the agreement to negotiate, as reflected in the cover letter, is unenforceable. The Gap takes the position nonetheless [*16] that the Submission Letter is enforceable by itself, and that Levin's rights therefore are governed by the Submission Letter alone

This argument must be rejected, at least at this point, for the severability of a contract turns at least in part on the intent of the parties. See, e.g., *Eckles v. Sharman*, 548 F.2d 905, 909 (10th Cir. 1977) (applying California law) (severability of a contract turns on whether clauses to be severed are "essential" to contract, and "essentiality depends on the intent of the parties"); *Keene v. Harling*, 61 Cal. 2d 318, 320, 38 Cal. Rptr. 513, 392 P.2d 273 (1964) ("Whether a contract is entire or separable depends upon its language and subject-matter, and this question is one of construction to be determined by the court according to the intention of the parties.") (in bank) (quoting *California Civil Code § 1599*).

The record contains ample evidence from which a reasonable factfinder could conclude that the agreements reflected in the cover letter were essential to the contract, that consequently the contract was not severable, and that therefore the entire contract is unenforceable. Levin, for example, apparently did not intend for the contract [*17] to be severable, for he was unwilling to submit his idea unless the Submission Letter was amended and he submitted his written presentation only after the Gap agreed to the understandings set forth in the cover letter. Under these circumstances, I cannot hold, as a matter of law at this juncture, that those understandings were not essential to the contract and that the Submission Letter is severable from the cover letter and enforceable by itself.

Moreover, even assuming the Submission Letter is severable, a substantial question exists as to whether it is unenforceable for lack of mutuality of consideration. Under basic contract principles of mutuality, "contracts are valid if there are definite covenants of value entered into by the respective parties and . . . they are void if one party or the other promises nothing." *Black Light Corp. v. Ultra-Violet Products, Inc.*, 195 Cal. App. 2d 473, 479, 15 Cal. Rptr. 852 (1961). Here, if the Gap's arguments are accepted and the agreement to negotiate is void, then in essence the Gap promised Levin nothing in return for his agreement to submit his idea. If the Gap is correct that Levin was bound by the Submission Letter even though the [*18] Gap was bound by nothing in return, then the contract would have been completely one-sided and arguably void for lack of mutuality of consideration. At this juncture of the case, on a summary judgment motion filed even before discovery has been complete, I cannot hold as a matter of law that the Submission Letter, by itself, was severable, enforceable, and supported by covenants of value made by both sides

The motion for summary judgment is denied as to Counts II and III. n2

n2 The Gap relies heavily on Judge Cote's decision in *M.H. Segan Ltd. v. Hasbro, Inc.*, 924 F. Supp. 512 (S.D.N.Y. 1996) (applying New York law). While that decision did involve a similar submission agreement, there was no comparable cover letter or agreement by the defendant to modify the agreement or to negotiate in good faith. Hence, different issues were raised and the case is distinguishable.

### 3. Violation of Property Rights

Count IV, for violation of property rights, must be dismissed, for California law does not recognize [*19] an idea as a "property right." *Whitfield*, 751 F.2d at 92; see also *Desny*, 46 Cal. 2d at 731-32 (noting that "an idea is usually not regarded as property," and holding that "California does not now accord individual property type protections to abstract ideas") (in bank). n3

n3 In his memorandum of law, Levin makes no effort to oppose the Gap's motion to the extent it seeks dismissal of Counts IV and V of the complaint.

### 4. Breach of Confidential Relationship

Levin's final cause of action is Count V, which asserts a claim for breach of a confidential relationship.

"'A confidential relationship exits between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind." *Davies v. Krasna, 14 Cal. 3d 502, 510, 121 Cal Rptr. 705, 535 P.2d 1161 (1975)* (citations omitted).

Levin has not alleged any facts that would establish that he had a "confidential relationship" with the Gap. On the contrary, the Gap and Levin negotiated at arms [*20] length. Levin had no prior relationship with the Gap, and his contact with the Gap was unsolicited. Levin acknowledged that he did not have a confidential relationship with the Gap and that his submission of his idea did not create such a relationship. Indeed, the first paragraph of the Submission Letter, which Levin signed, provided that "[a] submission to The Gap, either orally or in writing, will not in any way establish a confidential relationship with The Gap, nor will it place The Gap in the position of receiving a disclosure in trust."

Even construing all the facts in Levin's favor, he has not alleged facts from which a reasonable jury could conclude that he had a confidential relationship with the Gap. Count V is therefore dismissed.

**CONCLUSION**

The Gap's motion for summary judgment is granted in part and denied in part. Levin may proceed with his claims for unjust enrichment and breach of an implied contract. His claims for breach of express contract, violation of property rights, and breach of a confidential relationship are dismissed.

All discovery is to be complete by April 9, 1999. Counsel for the parties are to appear for a pretrial conference that day [*21] at 10 a.m. in Courtroom 11A of the Courthouse at 500 Pearl Street.

SO ORDERED.

Date: New York, New York

December 29, 1998

DENNY CHIN

United States District Judge