LEXSEE 2000 US DIST LEXIS 4567

**LINK GROUP INTERNATIONAL, Plaintiff, v. TOYMAX, INC., Defendant.**

**CIVIL ACTION NO. 3-97-CV-670 (JCH)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

***2000 U.S. Dist. LEXIS 4567***

**March 17, 2000, Decided**
**March 17, 2000, Filed**

**DISPOSITION:** [*1] Defendant's motion for summary judgment [Dkt. # 149] GRANTED with respect to plaintiff's claims of breach of express contract, breach of implied-in-fact contract, unjust enrichment and conversion and DENIED summary judgment with respect to fraud, promissory estoppel, CUTSA and CUTPA claims. Plaintiff's Motion to Strike [Dkt. # 161] GRANTED.

**LexisNexis(R) Headnotes**

**COUNSEL:** For Link Group International, plaintiff: Paul K. Vickrey, Sally J. Wiggins, Paul C. Gibbons, Niro, Scavone, Haller & Niro, Chicago, Illinois.

For Toymax, Inc., defendant: Jonathan K. Cooperman, Robert S Friedman, Kelley, Drye & Warren, New York, NY

**JUDGES:** Janet C. Hall, United States District Judge.

**OPINIONBY:** Janet C. Hall

**OPINION:**

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. # 149] AND PLAINTIFF'S MOTION TO STRIKE [DKT. # 161**

**I. BACKGROUND**

This case arises out of the alleged misuse of information belonging to the plaintiff, Link Group International, LLP ("Link Group"), in the development of a toy marketed by the defendant, Toymax, Inc. ("Toymax"), called "Laser Challenge." The gravamen of Link Group's complaint is that Toymax's Laser Challenge was improperly based on information provided by Link Group relating [*2] to its own product, "Laser Combat," and other related toy concepts, and that Link Group was never compensated for the use of its ideas.

Following this court's prior Rulings on the defendant's two Motions to Dismiss, dated February 23, 1998 [Dkt. # 40] and January 27, 1999 [Dkt. # 99], and the plaintiff's filing of two subsequent amended complaints [Dkt. # 43 and Dkt. # 113], the plaintiff's claims now include breach of express contract, unjust enrichment, promissory estoppel, conversion, fraud, violation of the Connecticut Uniform Trade Secrets Act ("CUTSA"), and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"). The defendant has now moved for summary judgment on all claims.

Under *Federal Rule of Civil Procedure 56(c)*, summary judgment may be granted only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* The court must draw all inferences and resolve all ambiguities in favor of [*3] the non-moving party. See *Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 721 (2d Cir.1994); Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir.1997).* A court may grant summary judgment only when no rational jury could find in favor of the non-moving party. See *Heilweil, 32 F 3d at 721*

Upon review of the voluminous submissions by both parties on the instant motion, n1 the court concludes that

summary judgment is appropriate for some, though not all, of Link Group's claims.

n1 In deciding the Motion for Summary Judgment, the court found no need to rely on Exhibits A and B to Toymax's reply brief, which are the subject of Link's Motion to Strike Those Portions of Toymax's Reply Brief that Violate Local Rule 9(g) [Dkt. # 161]. Accordingly, Link's Motion to Strike is GRANTED and Exhibits A and B are stricken.

## II. FACTS

Plaintiff Link Group is a Connecticut Limited Partnership in the business of inventing toys. Its partners are Robert McDarren, Barry Piels and [*4] Deborah McDarren. Link develops new toy ideas and brings them to companies for development and marketing. Link also assists companies in the development and marketing of the toys.

In February of 1986, at the annual New York Toy Fair, Link's representatives saw demonstrations of two new laser toys, Lazer Tag and Photon, which had been developed by other companies. The games involved guns that shot infrared light that registered hits on targets that could be worn by the player's opponent.

After viewing the two demonstrations at Toy Fair, Link decided to develop a new toy with some similar features to Lazer Tag and Photon, but including some different components. The toy Link ultimately developed in early 1986 was called "Laser Combat." Laser Combat, which Link had originally considered calling "Laser Chase Challenge," included a randomly moving target, (originally named "F.R.E.D." and subsequently changed to "B.A.R.T.") so that a single player could play the game without a partner. Link Group also used white light, although Link also developed plans for future versions of Laser Combat that would use infrared light. Link Group did not at any time attempt to get patent protection for [*5] any aspect of Laser Challenge.

In July of 1986, Link Group entered into a licensing agreement with a Hong Kong toy development company, Panosh Hong Kong ("Panosh"). Panosh employee Steve Lebensfeld worked with Link Group to successfully develop and market Laser Combat. Neither Lebensfeld nor Panosh entered into any confidentiality agreements with Link Group related to Laser Combat.

During the time period of the licensing agreement, Link Group provided Panosh and Lebensfeld with several ideas for future versions and variations of Laser Combat, including "Alien Laser Attack," another white-light target game which was also licensed to Panosh, the use of different types of moving targets, the use of infra-red light in a "senior edition" of the game, the use of a "game computer" in the gun to record the number of shots fired and hits scored, several "water target" versions of the game, and an "Attacking B.A.R.T." which could randomly shoot a light beam back at the player. None of these ideas were ultimately developed or marketed, however, because Panosh filed for bankruptcy in the fall of 1987. All rights to Laser Combat reverted back to Link Group.

Lebensfeld subsequently left Panosh [*6] and moved on to other toy companies, but continued to work with Link Group on other projects. In 1990, Lebensfeld, together with Harvey Goldberg and David Chu, founded Toymax., Inc. ("Toymax"). Link Group continued its working relationship with Lebensfeld at this time and Link and Toymax successfully developed others toys and worked on other projects together, including the Creepy Crawlers line of toys. Throughout the early 1990s, Lebensfeld, Chu, McDarren and Piels worked closely together on several confidential matters, including some unrelated to the toy business, and saw one another socially.

At some point in the 1990s, Link Group decided that bringing back Laser Combat in an updated version could be a profitable idea. In 1994, Link Group began negotiations with a division of Sega of Canada called Ages Direct to have them develop the new version of Laser Combat and introduce it at Toy Fair in February of 1996. The record is unclear as to what materials were disclosed to Ages Direct in connection with those negotiations, but no confidentiality agreement was executed between Ages Direct and Link in connection with Ages Direct.

Sometime in 1995, Toymax's Lebensfeld contacted Link [*7] Group regarding the idea of reintroducing Laser Combat. After Link Group told Lebensfeld that it was negotiating with Sega of Canada to reintroduce Laser Combat, Link Group and Toymax agreed to ask Sega of Canada whether it would withdraw from the project to allow Toymax to develop the toy.

At Toy Fair 1995, a meeting occurred with Sega's Jeff McCarthy, Toymax's Lebensfeld, and Link's McDarren and Piels. The result of this meeting was that Sega agreed to withdraw from the project.

Over the following months, Link Group and Toymax further discussed the possibilities for how to bring back Laser Combat. Toymax and its representatives did not sign any confidentiality agreements with Link Group in connection with Laser Combat. As part of these discussions, Link Group provided information to Toymax regarding the original

Laser Combat, including a working sample of the original 1986 toy, information dating back to the Panosh era concerning ideas for the next generation of Laser Combat, a list of five "oriental vendors" generated during the Panosh era, and preliminary costing information for the new Laser Combat. Link Group representatives state that, during discussions with Toymax, they [*8] talked about using a roving target that could register hits, using targets that reacted when hit, using the "Fire-back B.A.R.T." that had been proposed in 1987, and using guns that were not shaped like conventional guns but rather had a more "futuristic" look. Barry Piels also testified that McDarren had presented a toy called "Water Wars," in which a water gun shot at a target which reacted when hit and could shoot back water, as a model for the shape of the gun.

During the summer and early fall of 1995, a series of memoranda were exchanged and conversations took place regarding attempts to finalize the licensing agreement for the development of Laser Combat. At a meeting on May 23, 1995, "next steps" were discussed. McDarren testified that he asked Lebensfeld specifically what was needed from Link Group for the project to go forward, and that Lebensfeld replied, "'If we need your involvement, we will contact you. . . . We intend to develop this in Hong Kong.'" McDarren TR at 665. On June 6, Piels sent a memorandum to Lebensfeld stating, "The prospective purchasers of the Ages Direct line like Laser Combat and have expressed the desire to have [it] as part of the 1996 line . . . [*9] . We need to tie up our deal with you as soon as possible. Please let me know by marking the space below if this is something you want to do with us." Lebensfeld checked "Yes." See PX29. On June 14, Piels sent a memorandum to Lebensfeld and Toymax general counsel Sandy Frank noting, "There is some urgency in concluding an agreement [for Laser Combat] as the purchaser of the Ages Direct Co./Division of Sega of Canada has expressed a strong desire in doing 'Laser Combat' next year. . . . From our past dealings, some sort of internal sign-off is required before you can devote any attention to a contract. Steve said that he would 'take care of it.' Could you please follow-up." See PX30. On June 23, Frank sent an in-house memorandum to Lebensfeld, Goldberg and Chu advising them that he had received a draft agreement from Link Group and enclosing a "Proposed Deal Point Memo . . . showing the terms as proposed by Link." Frank wrote, "If the terms are acceptable I would appreciate your signing the Deal Point Memo and returning same to me." On June 28, Lebensfeld wrote, "We agree only to max 3% [royalty rate]" at the bottom of the memo. See PX32

On July 10, Piels wrote to Goldberg [*10] and Lebensfeld, "Steve has said to us on many occasions that Toymax is 'doing [Laser Combat].' I have sent a draft agreement to Sandy Frank but there has been no response or progress . . . . Based upon Steve's assurances that Toymax is proceeding with 'Laser Combat' we have told others that it is not available." See PX34. The next day, Frank asked Lebensfeld to "Please advise as to your discussions [regarding Laser Combat] so that I can proceed with the preparation and execution of a contract." See PX35. The next day after that, a meeting took place involving the principal representatives from Link and Toymax. This meeting was memorialized in a memorandum from Piels to Lebensfeld, Goldberg and McDarren on July 19, which characterized the discussion of Laser Combat as follows: "There was agreement that Toymax will do 'Laser Combat' in 1996. Discussion centered on royalty rate and extent of Link involvement. Toymax offered 3% to Link without any developmental responsibility and 1% to Burt Trattner for electronics development. Link is open to such an arrangement."

Negotiations, however, continued into August, with an August 17 memorandum from Piels to Lebensfeld and Goldberg [*11] on "Open Matters" stating that McDarren had "waived the $ 15,000 advance which had been previously agreed upon," but suggesting that Trattner still be paid his 1/4 of the advance in keeping with the 1/4 of the royalty rate that Trattner was to receive. The memorandum also stated, "[A] license agreement still has to be drawn up . . . and in this regard, your own internal procedures call for a sign-off document so that Sandy Frank can generate a contract for review and execution. When will a contract . . . be prepared for my review? Once I have it I am sure that Sandy and I can work out any contractual language." See PX37.

On September 15, 1995, Piels sent Toymax's Carmine Russo a proposal and cost projection for a redesigned Laser Combat that had been prepared by Joe Truchsess of Pragmatic Design. The cover memorandum made no mention of a contract, but noted, "After reviewing, we should set down a development time table and budget with Burt [Trattner], so please give me a call." See PX113.

At some point during this process, Sandy Frank began work on a draft contract for Laser Combat. See PX58. However, the draft contract was never sent to Link Group, nor is there [*12] any evidence to suggest it was ever circulated within Toymax. The draft contract left blank spaces for the services Link was to provide in the development of the toy, and largely contained boilerplate contractual terms. A one-page "Exhibit A" to the draft contract contained the particulars about Laser Combat, describing the game, listing a 4% royalty rate on condition that Link provide the "necessary

electronics," no advance, a 50% "sub-license percentage," and a marketing date of February 15, 1996.

In October of 1995, Toymax apparently made an internal decision not to go forward with Laser Combat through Link Group. A handwritten note on one copy of the Toymax draft contract states, "10/19/95 Spoke w/SL & Carmine, No go on license." See PX59. At least one internal Toymax budget worksheet refers to "Einstein," Toymax's internal name for the Laser Combat project, and shows a budget for a toy that was "Redesigned - Not Using Exact Link Product." See PX79. The evidence is conflicting as to whether or when this decision was communicated to Link Group. Link's Barry Piels states that he was never informed of the decision even though he continued to call and ask about the status [*13] of the Laser Combat project throughout the fall of 1995 and continuing at least until December 1995. Link did not attempt to market the Laser Combat idea to any other companies between October 1995 and Toy Fair in February 1996.

Toymax, on the other hand, claims that it informed Link as soon as it had decided it could develop its own laser toy, using infrared light and different features from Laser Combat. Toymax states that it proceeded to do so towards the end of 1995 and in early 1996.

At the New York Toy Fair in February 1996, Toymax introduced its new toy, "Laser Challenge." Laser Challenge used infrared light and had targets on vests that could be worn by an opponent. The targets had internal computers that registered and counted hits. In addition, Laser Challenge included a separate target, also called B.A.R.T., that moved according to pre-programmed routes so that a single player could play the game. Laser Challenge, which was revised following the 1996 Toy Fair and since then has included several variations on the basic toy, has been highly successful for Toymax, generating revenues of nearly $ 200 million as of late 1999.

Although Link Group subsequently attempted to find [*14] other developers for Laser Combat, developers were not interested, at least in part due to the success of Toymax's Laser Challenge. For example, in a memo from Toy Island, another toy developer, in late 1997, Bob Leff told Link Group it would not develop Laser Combat after discussions with buyers at Kay Bee Toy Stores. Leff wrote, "Kay Bee would not buy 'Laser Combat' because of its similarity to Toymax's 'Laser Challenge,' a target game that also has a roving target called 'B.A.R.T.'" Leff told Link Group that Laser Combat was perceived as a "me too" toy.

**III. DISCUSSION**

A. BREACH OF EXPRESS CONTRACT

In order to prevail on a breach of contract claim under New York law, n2 the plaintiff must prove: (1) the existence of an agreement, (2) adequate performance by the plaintiff, (3) breach of the contract by the defendant, and (4) damages. See *Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996)* (citations omitted). The parties may be bound by an oral agreement even if they intended to memorialize the agreement in writing at some later date. See *Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 72 (2d Cir. 1989)*.

> n2 This court previously found that New York law applied to the plaintiff's contract claims, and that finding is undisputed between the parties in the instant motion.

[*15]

Whether the parties intended to be bound is generally a question of fact. However, it may be resolved on summary judgment where intent can readily be determined by examining the factual record. See *id. at 73*.

Toymax argues that the evidence presented by the plaintiff could not, as a matter of law, support a fact-finder's conclusion that there was an express contract, that the defendant breached it, and that the plaintiff suffered damages as a result. The Second Circuit, applying New York law, has laid out a four-factor test in analyzing whether an express contract exists. See *R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 74-77 (2d Cir. 1984)*. The court must look to (1) whether either party expressly reserved the right not to be bound by the contract, (2) whether part performance had occurred and been accepted by the other party, (3) whether open terms remained, and (4) whether the contract is of a nature that is usually written. See *Winston v. Mediafare Entertainment Corp., 777 F.2d 78, 80-81 (2d Cir. 1986)* (applying test). No one of these factors is necessarily determinative. See, e.g., *Arcadian Phosphates, Inc., supra, 884 F.2d 69 (2d Cir. 1989)* [*16] (holding agreement not binding despite "considerable partial performance"). Moreover, there is a "strong presumption" against finding a binding agreement if there are open terms, future approvals are required, and the parties expressly anticipate the future preparation and execution of contract documents. *Arcadian Phosphates, Inc., supra, 884 F.2d at 73* (quoting *Teachers Ins. & Annuity Assoc. v. Tribune Co., 670 F. Supp. 491, 499 (S.D.N.Y. 1987)*).

While Link Group does offer evidence that it had tendered significant performance by turning over various documents, plans, and samples to Toymax, thus meeting

the second factor of the R. G. Group test, none of the other factors weigh in Link Group's favor.

First, Link Group has presented no convincing evidence to suggest that the terms that remained open were immaterial. The plaintiff bases its claim that an express agreement existed on a series of conversations between the principals of the two parties, and on draft contracts that had been prepared by each side but never executed. The plaintiff argues that all material terms had been agreed to, and that any "future approvals" required by Toymax's [*17] "internal sign-off" procedure were mere formalities.

The court finds that the facts cannot support Link Group's arguments. Link Group claims that the parties had specifically agreed as follows: that a royalty of 4% would be paid to Link; that Toymax would have worldwide distribution rights; that Link would have no further duties under the contract; that no guarantee was to be provided; the fact that no advance was to be paid; that the duration of the contract was to be indefinite; and that the marketing date would be February 15, 1996. Link further argues that the parties had agreed on the definition of the licensed property, that it was Toymax's practice to deal with others in the absence of a formal, written contract, and that the "internal sign-off" Toymax claims was needed was a mere formality

In making these claims, Link Group relies heavily on exhibit PX70A, which appears to be an internal Toymax document summarizing what appear to be contract terms. It is entitled "Toymax Inc. - Inventor Agreements," and across the top it reads "Link Group International; DATE OF CONTRACT: Pending; TERM: Indef.," and a line for "Expiration Date" is blank. The document describes the "licensed [*18] property" as follows:

> Laser Combat -- a target game system in which a light beam emitted from a transceiver carried by the user strikes a retro-reflective target and is in turn received by the transceiver. The transceiver can contain an electronic speech chip which can be designed to emit an appropriate phrase(s) when the returning beam is received. The play action can also involve (at user's option) a moving or stationary target decorated with retro-reflective material to permit one or multi-player use.

Below this summary appears a table containing the following information: "Advance -- $ 0.00; Devel. Fee - Non-deduct. -- $ 0.00; Devel. Fee Deduct. -- $ 0.00; Guarantee -- None; Guarantee due date -- [blank];" and four different references to "Roy Rates -- 4" for what are presumably different sales scenarios. Below this appears a line for "Date Pd." which is blank, and an area for "Notes" which is also blank.

The court finds this evidence unpersuasive as to all of the claims for which Link cites it. First, there is no dispute over the fact that PX70A is an internal Toymax document, and that it was never provided to Link Group prior to the commencement of this litigation. [*19] Second, there is no indication anywhere on PX70A that the information summarized therein conveys information about an actual, finalized agreement. In fact, to the contrary, PX70A states the "date of contract" as "pending," and the Declaration of Sanford Frank, the Toymax general counsel who created PX70A, explains that the "Status: C" appearing in the top line indicates that the file had been closed by the time it was printed out in response to a discovery request in this lawsuit. There has been no testimony or other evidence to suggest that PX70A represents the terms of an actual agreement, other than Link's assertion that the document itself is revelatory of Toymax's intent to be bound. By Link's theory of contract formation, any internal notes taken by a party during the process of negotiation, or any database entry by which a party keeps track of pending or potential contracts, as PX70A appears to be, would binding upon that party. See *Teachers Insurance Annuity Ass'n v. Tribune Co., 670 F. Supp. 491, 497 (S.D.N.Y. 1987)* ("It is fundamental to contract law that mere participation in negotiations and discussions does not create a binding obligation, even if agreement [*20] is reached on all disputed terms."). Thus, the court does not consider PX70A supportive of Link Group's express contract claim.

As to the definition of the licensed property, the guarantee (or lack thereof), and the advance (or lack thereof), Link relies exclusively on its exhibit, PX70A in support of all of these terms. The court therefore rejects Link's claim that the parties had reached final agreement as to these terms.

With respect to Link Group's claim that the parties had agreed to a 4% royalty, Link additionally relies upon PX37, a memo which references an "agreed upon royalty" of 4%, but in the same sentence notes that Toymax's "own internal procedures" call for a "sign-off...so that Sandy Frank can generate a contract." This belies Link's claim that the parties did not anticipate any further approval requirements or the future preparation and execution of contract documents. Finally Link relies upon the deposition of Link's Barry Piels, in which he recounts two telephone conversations, one with Steve Lebensfeld in which he asked that the royalty be raised from 3% to 4% and Lebensfeld agreed, and another with Sandy Frank in which Frank stated that he had not

known that the [*21] $ 15,000 advance had been waived and the royalty rate raised to 4%, but said he would confirm this with "Steve" and "Harvey" (Mr. Lebensfeld and Mr. Goldberg, two Toymax principals). See Piels TR at 389, 1130-32.

Far from embodying a final meeting of the minds on the royalty issue, these conversations are indicative of a negotiating process, in which some terms may be agreed upon while others remain in flux. Nothing about the conversations suggests they were the final agreement on the royalty issue, or even that the discussions involved all the relevant individuals needed to make a final decision on the matter

As to worldwide distribution rights, Link relies on testimony regarding a meeting at which Toymax apparently indicated a strong desire to have worldwide distribution rights. Barry Piels described the request as "a mention that Toymax wanted a worldwide license," and Robert McDarren recalled that Mr. Goldberg had stated "either 'we must have' or 'we want'" a worldwide license. See Piels TR at 1088; McDarren TR at 788. However, nothing about either statement suggests that this term was finally agreed upon, but rather reveals that it was raised during the course of negotiations [*22] as one party's demand.

Next, Link claims that final agreement had been reached as to its duties under the agreement. In support of this proposition, Link cites Mr McDarren's testimony, in which he states that, when he asked what Link's next steps should be after submitting the Laser Combat materials to Toymax, he was told "If we need your involvement, we will contact you." McDarren TR at 665. Link further cites to PX36, a memorandum summarizing a meeting at which "Toymax offered 3% to Link without any developmental responsibility and 1% to Burt Trattner for electronics development. Link is open to such an arrangement." The characterization of Link's position as "open to" the "offer," rather than as having agreed to it or accepted it, undermines Link's position that the meeting described in PX36 resulted in a final agreement as to the terms of the alleged contract.

As to the "indefinite" duration of the purported agreement, Link once again cites PX70A, which this court rejects for the same reasons outlined above. Link further cites the testimony of Sandy Frank. The essence of the Frank testimony on this point is captured in the following exchange:

> Q: . . . The term is indefinite, [*23] was that unusual in terms of Toymax's practices?
> A: No. It was usual . . . .

See Deposition of Sanford Frank at 234:18-22.

This reveals nothing about the actual terms purportedly agreed upon with respect to the duration of the "agreement" between Link and Toymax. It does not establish an agreement to an indefinite term for the license. At best, it suggests that it would not have been unusual had the parties ultimately agreed to a term of indefinite duration.

Link further claims that a marketing date of February 1996 had been agreed upon by the parties. The only support Link cites for this assertion is PX58, which is an unsigned, incomplete, apparently uncirculated draft contract prepared by Toymax's Sandy Frank. Link Group has offered no evidence that the draft contract was ever presented to anyone at Link Group or, in fact, even circulated within Toymax. On the other hand, Sandy Frank's Declaration explains that while he personally may have begun working on a draft contract, the draft was not completed and would not have been circulated either within Toymax or outside Toymax absent the approvals of the three Toymax principals. Link Group has not refuted this contention, [*24] and in fact, Link's own memoranda reveal an awareness of the need for a sign-off before proceeding with a draft contract. See, e.g., PX37 (Memo from Piels to Lebensfeld and Goldberg, stating "Your own internal procedures call for a sign off document . . . When will a contract be prepared for my review?")

Thus, Link has not presented sufficient evidence to allow a reasonable fact finder to conclude that no material terms remained open. The evidence does show that the parties were engaged in involved and detailed negotiations, but nothing about those negotiations suggests that at any time a final, binding agreement had been reached as to its terms.

Moreover, "more is needed than agreement on each detail [to create a binding obligation. There must be] overall agreement . . . to enter into the binding contract." *Arcadian Phosphates, Inc., supra* (quoting *Tribune Co., supra, 670 F. Supp. at 497)*. Even if a reasonable jury could conclude that some of the individual terms outlined above had been agreed upon, it could not conclude based on the evidence presented by Link Group that there was overall agreement on all material terms.

Second, documents [*25] offered by both Link Group and Toymax show that the parties expected the agreement to be finalized in writing at some point. While it is true that parties may agree to be bound by an oral agreement while simultaneously agreeing to memorialize the agreement in writing at a later date, no evidence shows that either party thought their discussions constituted a completed deal. Rather, it appears that both

sides viewed the completion of a written contract as a necessary prerequisite to moving forward.

Although Link Group did provide a substantial portion of the material that would have been covered by the licensing agreement, there is no evidence that Link Group expected to be compensated for its performance prior to the finalizing of the contract in writing. Link asserts that the internal sign-off was a "mere technicality" and not a prerequisite to entry into a binding agreement. However, while there is evidence that Toymax downplayed the difficulty of getting a sign-off, see, e.g., Piels TR at 1059-60, there is no evidence that Toymax ever represented to Link that it could proceed to enter into a final, written contract without the internal approvals. To the contrary, Link's own [*26] repeated memoranda and phone calls requesting that the sign-off be completed and a draft contract generated, as well as the concern expressed by both sides that a written deal be completed prior to the upcoming Toy Fair, suggest that the written contract was more important than a mere formality. See, e.g., PX37.

This case raises a similar situation to that addressed in *Winston v. Mediafare, 777 F.2d 78 (2d Cir. 1986)*, in which the Second Circuit found that "although neither party had "expressly reserved the right not to be bound prior to the execution of a document, language in the correspondence . . . revealed such an intent." *Id. at 81.* Here, Link Group memoranda refer to having to "tie up the deal as soon as possible" (PX29, memo to Toymax dated 6/6/95); note the fact that "some sort of internal sign-off is required before [Toymax] can devote any attention to a contract" (PX 30, memo to Toymax dated 6/14/95); describe having "drafted a license agreement" (PX 30); characterize Laser Combat in July 1995 as an "outstanding matter" with a "draft agreement" sent that had resulted in "no response or progress on either product development or the [*27] license agreement" (PX 34); note that "a license agreement still has to be drawn up;" and foresee a need to then "work out any contractual language" (PX37, memo to Toymax dated 8/17/95). Toymax memos refer to receiving a "proposed License Agreement from Link for Laser Combat;" drafting a "proposed Deal Point Memo . . . showing the terms as proposed by Link" (PX32, Toymax internal memo dated 6/23/95); and the need to finalize discussion so that in-house counsel could "proceed with the preparation and execution of a contract" (PX 35, Toymax internal memo dated 7/11/95). Toymax's choice of language and the nature of the discussions between the parties about Laser Combat make clear that, as a matter of law, Toymax did not intend to be bound prior to obtaining internal approval and executing a written contract, and that Toymax had expressly reserved the right not to be bound. The evidence further indicates that Link Group understood the need for a formal procedure before a contract would be entered. Link Group has therefore failed to establish that there is a material question of fact as to Toymax's intent to be bound by statements made during the negotiation process

Finally, in considering [*28] whether the contract was of a type usually finalized in writing, the court concludes that this factor does not clearly support either side. The parties have introduced conflicting evidence concerning industry standards, as well as the history of prior dealings between Link Group and Toymax. Thus, the court considers this factor neutral in applying the R.G. Group test. As Link Group has failed to provide sufficient evidence to allow a reasonable finder of fact to find that the R.G. Group test weighs in its favor, the court grants summary judgment on the express contract claim.

This analysis of the facts does not suggest that Toymax did not in any way wrongfully suggest to Link that a contract or binding agreement was imminent or forthcoming. But, while the facts may support other causes of action related to the misleading manner in which the negotiations appear to have been conducted, they cannot support a finding of the kind of "meeting of the minds" and "intent to be bound" that an express contract requires under New York law. See *Arcardian Phosphates, Inc., supra, 884 F.2d at 73* (citing *Reprosystem, B.V. v. SCM Corp., 727 F.2d 257, 261 (2d Cir. 1984))*. [*29]

**B. BREACH OF IMPLIED CONTRACT/ UNJUST ENRICHMENT**

1. IMPLIED-IN-FACT CONTRACT

In order to prove there was an implied-in-fact contract, Link Group must show that the parties manifested an intent to be bound through their actions and conduct. Under New York law, n3 as a preliminary matter, ideas can be protected from misappropriation through a claim of breach of an implied contract if, and only if, the "appropriate relationship" existed between the parties and the idea or product in question is "novel and concrete." See *Markogianis v. Burger King Corp., 1997 U.S. Dist. LEXIS 4452, 1997 WL 167113* at *5 (S.D.N.Y. 1997) (citing *McGhan v. Ebersol, 608 F. Supp. 277, 285 (S.D.N.Y. 1985))*. This allows recovery to "persons who disclose their ideas with the expectation of reimbursement . . . should those ideas be used." See *Vantage Point, Inc. v. Parker Bros., Inc., 529 F. Supp. 1204, 1216 (E.D.N.Y. 1981)*, affirmed sub nom. *Vantage Point, Inc. v. Milton Bradley, 697 F.2d 301 (2d Cir. 1982)*.

n3 As with the breach of express contract claim, this court has previously ruled that New York law applies to the implied contract claim, and the parties do not currently dispute the court's choice of law as to this claim.

[*30]

With respect to the first prong, the relationship between the parties, the court first notes that an implied-in-fact contract can be based on industry custom. See *Vantage Point, supra, 529 F. Supp. at 1217-18.* In Vantage Point, the existence of a regular system followed by the defendant concerning submissions of ideas permitted the inference of such a custom. Similarly, there is evidence in the record that Toymax and others in the industry held submitted ideas in confidence, paid for new ideas, and returned rejected submissions. Moreover, Link Group has presented evidence that Toymax followed this system in its dealings with Link Group on other matters. A reasonable jury could infer that this was an "industry custom," thus meeting the first prong of the implied-in-fact contract test.

As to the requirement that an idea be novel and concrete before it can be protected under New York law, the question of novelty is a mixed question of law and fact that may properly be decided on a motion for summary judgment. See *M.H. Segan Lim. Partnership v. Hasbro, Inc., 924 F. Supp. 512, 523 (S.D.N.Y. 1996)*; see also *Kavanau v. Courtroom Television Network, 1992 U.S. Dist. LEXIS 11472, 1992 WL 197430* [*31] at *4 (S.D.N.Y. 1992). The plaintiff may not rest on mere assertions, but must demonstrate some basis in fact for its claims. See *Women Golfer, Inc. v. Meredith Corp., 792 F. Supp. 211, 214 (S.D.N.Y. 1992).*

The standard for novelty under New York law is a stringent one. While an idea need not reflect a "flash of genius" to be novel, it "must show[] genuine novelty and invention, and not a merely clever or useful adaptation of existing knowledge." *A.E.B. & Assoc. Design Grp. v. Tonka Corp., 853 F. Supp. 724, 734 (S.D.N.Y. 1994)* (quoting *Educational Sales Programs, Inc. v. Dreyfus Corp., 65 Misc. 2d 412, 317 N.Y.S.2d 840, 844 (1970)).* Novelty cannot be found where the idea consists of nothing more than a variation on a basic theme. *Murray v. National Broadcasting Co., 844 F.2d 988, 993 (2d Cir. 1988).* See also *Paul v. Haley, 183 A.D.2d 44, 588 N.Y.S.2d 897, 903 (1992)* (quoting *Educational Sales, supra, 317 N.Y.S.2d at 844*, as stating that "improvement of standard technique or quality, the judicious use of existing means, or the mixture of known ingredients in somewhat different proportions . . . partake more of [*32] the nature of elaboration and renovation than innovation"). An idea also cannot be "novel" if it was already in use in the industry at the time of the submission. See *McGhan v. Ebersol, supra, 608 F. Supp. at 286 (S.D.N.Y. 1985).* n4

n4 Plaintiff's citations to *Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 476, 40 L. Ed. 2d 315, 94 S. Ct. 1879 (1974)* and *Softel Inc. v. Dragon Medical Sci. Commun., Inc., 118 F.3d 955, 968 (2d Cir. 1997)* are not persuasive. Both cases pertain to the common law of trade secrets in New York and Ohio, which differs from the instant claim of implied contract. The latter, under New York law, clearly requires genuine novelty.

The key features Link Group claims make Laser Combat "novel" are (1) using a roving target that registers hits; (2) putting a computer in the shooter that scores shots and/or hits, (3) the idea for having a "shoot-back" BART, (4) the idea for a water game using a target that reacts to hits and the design for a "water wars" pistol, (5) the names [*33] "Laser Challenge" and "BART," (6) the television commercial used to market both Laser Combat and Laser Challenge, (7) the use of infra-red light in the toy, and (8) the "non-gun" look for the shooter. See Plaintiff's Brief in Opposition to Summary Judgment (hereinafter "Plf's Brief") at 1, 6, 7.

In a variety of cases with facts more compelling than those argued by the plaintiff herein, courts have found, as a matter of law, that product ideas were not sufficiently "novel" to support a claim under New York law. For example, in Murray v. National Broadcasting Co., supra, the plaintiff sued the producers of The Cosby Show for misappropriating his idea for a half-hour situation comedy that would star Bill Cosby as the head of a "non-stereotypical," that is, nuclear, upper middle-class, "wholesome" family. Despite the fact that, when The Cosby Show premiered four years later, it was considered a breakthrough by many critics, the Second Circuit affirmed the district court's holding that the idea could not have been novel, as it "merely combined two ideas which had been circulating in the industry for a number of years -- namely, the family situation comedy, which was a standard [*34] formula, and the casting of black actors in non-stereotypical roles." Id. (quoting *Murray v. National Broadcasting Co., 671 F. Supp. 236 (S.D.N.Y. 1987)).* Despite the specific details of the plaintiff's proposal, such as casting Bill Cosby as the lead, the court found that since Cosby himself had publicly proposed a similar idea many years earlier and had portrayed many non-stereotypical African-American characters throughout his career, it was only natural, and

therefore not novel, to think of casting him as the lead. Summary judgment was therefore granted.

In another case, summary judgment was granted against a plaintiff who claimed its idea for an interactive telephone adventure game was novel. The court held that, even though all previous interactive telephone games used a linear progression through the game, rather than the plaintiff's "skip logic" system through which a player could proceed on any one of several different plot lines, this was "a mere adaption or natural progression of the concept of linear plot sequence" and "a variation on a basic theme," and therefore could not be novel. *Oasis Music, Inc. v. 900 U.S.A., Inc., 161 Misc. 2d 627, 614 N.Y.S.2d 878, 882-83 (Sup. Ct. NY 1994).* [*35]

Again, in *Ring v. Estee Lauder, Inc., 702 F. Supp. 76 (S.D.N.Y. 1988),* the court granted summary judgment to the defendant, holding that the idea of videotaping customers' in-store "makeovers" and allowing them to take the videotape home was not novel, because the use of makeovers as promotional tools was common, giving customers something (usually a diagram) to memorialize the makeover technique was common, and "a variety of self-improvement techniques" had been marketed by video in recent years. *Id. at 78.* The court noted that, while the plaintiff's idea was "clearly a good one," it only incorporated known ingredients and therefore could not be novel. Id.

Turning to a case arising out of the toy industry, in *AEB & Associates Design Group, Inc. v. Tonka Corp., 853 F. Supp. 724 (S.D.N.Y. 1994),* the plaintiff had designed an "airbrush toy" for children that was based on the design for commercial airbrush tools. The toy used a canister with a hand pump to pump air through a hose and a nozzle to which a marker could be attached. The plaintiff sued Tonka when it came out with a "Colorblaster" toy that used a similar mechanism. The [*36] commercial airbrush tools which had apparently sparked the idea for both toys used compressed air canisters rather than hand pumps. The court held that the use of a hand-pump as opposed to compressed air was not novel, and was only a "clever or useful adaptation of existing knowledge." *Id. at 734* (citation and internal quotation marks omitted).

As in all of these cases, Link Group's product was not novel. Most of its components had previously been used in the toy industry. Link Group does not dispute that numerous toys involving either white or infra-red light guns shooting at moving robot targets existed prior to 1986. See Defendant's 9(c) Statement at P 73. Even reading Toymax's chart in the manner requested by Link Group, see Plaintiff's 9(c)(2) Statement, Pt. I at P 73, Link Group has not disputed that such toys as "Mr. Machine II" by Ideal, in which a gun shoots white light at a moving robot target that changed direction when hit, "Hornby's 3DS," in which a gun shoots infra-red light at a moving train target with a photocell, Axlon's "Moving Boar," in which a moving boar target deactivates after a certain number of hits from a light shooter, and the "Blue [*37] Box Moving Target Game," in which a space vehicle which can "shoot back" at the player "explodes" after a certain number of hits with an infra-red light shooter, all incorporated most of the same basic features as both Laser Combat and Laser Challenge. Further, it appears that Laser Combat itself may have been inspired, at least in part, by Lazer Tag and Photon, both introduced at Toy Fair 1986, see McDarren Tr. at 74-75, 87-80, and by other products with which Link Group's principals had had prior experience. See McDarren Tr. at 64-66, 69-72.

Link Group also claims that the "random" nature of its target's movements was novel. Even if this were true, however, this feature is more on the order of an improvement in technology, insufficient to render it an "innovation" rather than an "elaboration or renovation." *Educational Systems, supra, 317 N.Y.S.2d at 844.* Though it may be true that no toy manufacturer had combined the elements in precisely the same fashion before, it cannot be said that Laser Combat is anything other than a "variation on a theme." *Murray v. National Broadcasting Co., supra, 844 F.2d at 993.* n5

n5 Link Group additionally argues that Toymax represented to the United States Patent and Trademark Office, as well as in a court proceeding seeking a temporary restraining order against a competitor, Toymax, Inc. v. Thinkway Toys (USA) Inc., 97-Civ.-0961 (RO) (S.D.N.Y. 1997), that its Laser Challenge was significantly unique. This, Link Group argues, allows an inference that, if Laser Challenge was based in part on Laser Combat, Laser Combat must similarly be unique. However, Link Group overlooks the fact that the features highlighted in both the patent proceeding and the action against Thinkway differed significantly from the features Link Group claims are unique about Laser Combat. Link Group does not dispute that many of the features Toymax sought to protect either by patent or injunction are not the same as the features Link Group now claims are protected. Toymax argued in those proceedings that the non-gun shape, the lightweight plastic, the size, color scheme, and sounds of Laser Challenge, the "homing beeping" feature, the precise number of hits that would register before a game ended, the internal lens assembly, and the resetting mechanism on the game were the "novel"

features it sought to protect. In the Thinkway case, with the exception of the non-gun shape for the shooter, none of the specific features that were at issue overlap with those Link Group claims are novel. See PX18, Exh. M.

[*38]

The court also notes that many aspects of the ideas Link Group submitted to Toymax would fail to meet New York's requirement of "concreteness" as well. See id. Link Group relies on its 1987 marketing plans, design sketches, and other "proposals" in support of its claim, but does not dispute the fact that no prototype or schematics for an updated version of Laser Combat or, for that matter, for any of the other related concepts, such as "Water Wars" or a "shoot-back BART" were ever submitted to Toymax.

Having determined that Laser Combat and the related ideas Link Group provided to Toymax were not sufficiently "novel and concrete" to be protected under New York's implied-in-fact contract standard, this court thus declines to reach the question, also relevant to analysis of an implied-in-fact contract claim, of whether Toymax actually used Link Group's materials in the development of Laser Challenge. Summary judgment is granted as to the plaintiff's implied-in-fact contract claim.

2. IMPLIED-IN-LAW CONTRACT

A contract implied in law, or quasi contract, may be created where there has been no express or implied-in-fact agreement, but a failure to apply equitable principles would [*39] result in the unjust enrichment of one party at the expense of another. In order to prevail on this claim under New York law, however, Link Group must again demonstrate "novelty" in the same sense in which it is required for a showing of an implied-in-fact contract. See, e.g., *Werlin v. Reader's Digest Ass'n, 528 F. Supp. 451, 465 (S.D.N.Y. 1981)* (stating that in order to prevail on unjust enrichment claim, plaintiff must demonstrate her idea is novel, concrete, and was actually appropriated by defendant in development of its article). Because the court does not find that a material issue of fact exists as to the novelty and concreteness of Link Group's ideas for Laser Combat, as discussed with respect to Link Group's implied in fact contract claim, summary judgment is granted as to the plaintiff's unjust enrichment claim.

**C. PROMISSORY ESTOPPEL**

In order to prevail on a claim of promissory estoppel, Link Group must establish that there was a clear and unambiguous promise, that Link reasonably and foreseeably relied upon the promise, and that Link sustained an injury, as a result of its reliance. See *R. G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 78 (2d Cir. 1984)*. [*40] Although the cause of action for promissory estoppel is based in contract law, the grant of summary judgment as to the contract claim here does not necessarily dispose of the promissory estoppel claim. See, e.g., *Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 73 (2d Cir. 1989)* (granting summary judgment with respect to contract claim but denying as to promissory estoppel). As in Arcadian Phosphates, the facts in this case, while not supportive of an express or implied contract claim, could support a finding that Toymax in effect promised to negotiate a contract with Link Group in good faith, or, at the very least, promised to inform Link Group promptly and accurately as to the progress of the Laser Combat project.

Link Group cites to various Link Group documents memorializing conversations with Toymax principals, as well as the testimony of a Link Group principal describing such conversations, in which Toymax repeatedly stated it was "going forward" with the Laser Combat project and planned to "do" Laser Combat in 1996. See, e.g., Link Group 9(c)(2) Statement, Part II at P 35, 38, 46. Link Group additionally cites industry custom and its history [*41] of prior dealings with Toymax as bases for its reliance. This evidence, viewed in the light most favorable to Link Group, could support a finding that Toymax made a promise that was sufficiently clear and unambiguous to meet this element of the promissory estoppel claim. While Toymax denies that promises were ever made, and denies that any such promise was clear and unambiguous, these are questions of fact for the jury.

As for the other two elements of promissory estoppel, it is undisputed that Link Group withdrew from negotiations with Sega Canada because Toymax and Link Group expected, at the very least, to be negotiating a contract together. It is further undisputed that Link Group turned some Laser Combat and related materials over to Toymax and that it did not attempt to market Laser Combat to other companies during 1995, after it withdrew from its agreement with Sega Canada. Thus, Link has presented sufficient evidence for a reasonable jury to find reliance. Moreover, Toymax's Goldberg testified that in July of 1995, had Link Group sought out a Toymax competitor and tried to market Laser Combat to the competitor, he would have felt Link Group was obligated to inform Toymax of [*42] any such efforts, since the companies "were sharing information and having discussions that we shouldn't have had if they were working with somebody else." Goldberg Tr. at 223-24. A reasonable juror could infer from this statement that Toymax expected Link Group to work exclusively with Toymax on the Laser Combat idea at the very least

until some time in July 1995. Thus, it could be inferred that, based on the relationship between the parties, it was foreseeable that Link Group would act accordingly and refrain from marketing the Laser Combat idea to Toymax's competitors.

Therefore, there are material issues of fact as to the promissory estoppel claim. The court denies summary judgment on this claim.

**D. FRAUD**

1. CHOICE OF LAW

Toymax raises the question, previously argued in its Motion to Dismiss, of whether Connecticut or New York law should apply. Link Group argues that this issue is inappropriate for reconsideration at this time, and that even if the court could now reconsider the issue, Connecticut law should apply. The court declines to consider whether Toymax's argument is in effect an untimely motion for reconsideration, since the result would be the same whether reconsideration [*43] were appropriate or not: The new evidence offered by the defendant is insufficient to persuade this court that New York law should apply.

Connecticut has recently moved toward the Restatement approach in its conflict of laws rules, and no longer looks solely to the place of injury. Under the Restatement approach, the court must look to the place of injury, the place of the conduct causing the alleged injury, the residence, place of incorporation and place of business of the parties, and the place where the relationship between the parties is centered. See Restatement (Second) of Conflict of Laws § 145 (1971); *O'Connor v. O'Connor, 201 Conn. 632, 652, 519 A.2d 13 (1986)*

It is clear that the place of the injury in this case is Connecticut, since that is where Link Group would have suffered any loss of revenue. The conduct allegedly causing the injury occurred in New York, Hong Kong and Connecticut. It is undisputed that Toymax initiated communication with Link Group in Connecticut. Moreover, one of the parties is incorporated and has its principal place of business in Connecticut, while the other is a New York corporation. Thus, this factor could support either finding. The [*44] relationship between the parties is centered in Connecticut and New York, since those are the two states in which various discussions and correspondence relevant to this dispute occurred. Finally, Connecticut has an interest in applying Connecticut law in this case, as Link Group is a Connecticut-based company. While this case admittedly requires the drawing of a fine line, the court finds that the application of Connecticut law is justified and appropriate in this case.

2. FRAUD UNDER CONNECTICUT LAW

Turning to the merits of the fraud claim, in order to defeat a summary judgment motion, the evidence presented must at least raise a material question as to whether representations made by Toymax were (1) made as statements of fact, (2) untrue and known to be untrue by Toymax, (3) made to induce action by Link Group, and (4) relied upon by Link Group to its detriment. See *Rizzo Pool Co. v. Del Grosso, 232 Conn. 666, 657 A.2d 1087 (1995)* (citing *Maturo v. Gerard, 196 Conn. 584, 494 A.2d 1199 (1985)*).

Link Group argues that sometime in or around September or October 1995, Toymax made a decision that it would probably not proceed in a licensing agreement with Link Group. However, [*45] Link claims that this decision was never communicated to Link Group, while Toymax continued to make affirmative statements indicating that it intended to proceed with the project subsequent to October 1995. See Link Response at pp. 12-13. Link contends that affirmative, fraudulent statements were made at least beginning in the fall of 1995 and continuing throughout 1995.

With respect to the allegation that Toymax affirmatively made fraudulent statements to Link Group prior to sometime in October 1995, Link Group has offered insufficient evidence to support the second element of its fraud claim, namely, that Toymax made a false statement that it knew to be untrue. Until approximately September or October of 1995, it is factually undisputed that any representations made by Toymax that it intended to proceed in a contract with Link to develop Laser Combat were true when made. See, Link Response at p. 12 (arguing that in September 1995, Toymax first decided to develop a plan to "cut Link out of the picture"). However, Link Group has alleged that fraudulent statements also occurred in the summer and fall of 1995. See Fourth Amended Complaint at P 60 (outlining reliance on allegedly [*46] fraudulent statements dating back to February 1995)

The sole evidentiary basis offered by Link Group for the alleged fraud during the pre-September time period is that Toymax represented orally to Link Group that it was "progressing" with Laser Combat and planned to develop it for Toy Fair 1996 during this time period. However, there is no evidence suggesting that Toymax actually had different intentions with respect to Laser Combat prior to September or October of 1995. Link Group has also presented no evidence to indicate that a decision not to proceed with the project was made at any time earlier than October of 1995. While the facts must be construed in the light most favorable to Link Group, Link may not rely on mere conclusory allegations nor speculation, and

must offer some "hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)* (citing *Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 101 (2d Cir. 1997)*). n6

n6 In addition, referring to Toymax's decision not to proceed with Laser Combat as a "purported decision," Link Group argues there is an issue of fact because Toymax claims it made this decision in October 1995, while Toymax internal documents show Link Group as an inventor entitled to royalties as late as February, 1996. See Link Response at p.38. The question on a summary judgment motion, however, is not merely whether there is a dispute as to facts, but whether there are disputed issues of *material* fact. Link Group's citation to such internal Toymax documents as support for its fraud claim again undermines the very premise of its argument. Internal documents not intended for Link Group's eyes, suggesting Toymax thought of Link Group as a potential collaborator on Laser Combat as late as February 1996, does not support a theory that Toymax had schemed in the summer and fall of 1995 to keep Link Group out of the toy laser gun market while secretly having already decided not to proceed with Link Group's Laser Combat, and in fact supports the opposite theory -- that Toymax had intended to collaborate with Link until as late as February 1996, and thus had not been merely stringing Link along by lying to it.

[*47]

The court will not infer, nor allow a jury to infer, from the mere fact that certain statements were made and then, at some later date, that Toymax acted in a manner contradictory to its earlier statements, that the earlier statements were "known to be untrue" to the defendant at the time they were made. While it is true that intent is a "mental process" that "must usually . . . be proven by circumstantial evidence," *DeLuca v. C.W. Blakeslee and Sons, Inc., 174 Conn. 535, 546, 391 A.2d 170 (1978)*, here, Link Group has not even offered circumstantial evidence showing that Toymax intended to deceive Link Group prior to October 1995. Absent any evidence supporting such a proposition, the court finds that a reasonable jury could not conclude that the statements occurring in or before October 1995 were untrue and known to be untrue to Toymax at the time they were made.

However, Toymax's alleged failure to disclose its decision not to proceed with Laser Combat once that decision had apparently been made in October 1995 presents a separate issue. It is true that "mere nondisclosure . . . does not ordinarily amount to fraud." Nevertheless, nondisclosure can reach the level of fraud where [*48] there is "a failure to disclose known facts and, in addition thereto, a request or an occasion or a circumstance which imposes a duty to speak." *Egan v. Hudson Nut Products, Inc. 142 Conn. 344, 347-48, 114 A.2d 213 (1955)*. One occasion that imposes such a duty is when a party assumes to speak. That party must then "make a full and fair disclosure as to the matters about which he assumes to speak." *Kenney v. Healey Ford-Lincoln-Mercury, Inc., 53 Conn. App. 327, 333, 730 A.2d 115 (1999)*. Other occasions may arise, such as in agency relationships, see, e.g., *Maturo v. Gerard, 196 Conn. 584, 494 A.2d 1199 (1985)*, or during the course of negotiations, see, e.g., *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A., 731 F.2d 112, 123 (S.D.N.Y. 1984)* (applying New York law), but in general, the determination of whether there is a duty to disclose is a question of fact. *Amatulli v. People's Bank, 917 F. Supp. 895, 905 (D. Conn. 1996)* (vacated in part on reconsideration on other grounds, *965 F. Supp. 1 (1997)*).

In this case, a reasonable jury could find that Toymax had assumed a duty to speak, either by virtue of the relationship between [*49] Toymax and Link, or by virtue of Link's direct inquiries and Toymax's partial responses. There is evidence that Toymax and Link Group had a long-standing relationship of trust and confidence, and that they dealt with one another regularly with respect to a variety of toy development projects. See McDarren Decl. P 7 (describing access to internal confidential Toymax departments); Lebensfeld TR at 53-54 (noting Link's Barry Piels had done legal work for Toymax at times); Goldberg TR at 201 (same); Goldberg TR at 139-40 (describing McDarren's involvement in internal suggestions and organizational plans at Toymax); Lebensfeld TR at 93-94 (same); Brown TR at 61 (Toymax expected Link would keep Toymax information confidential); Chu TR at 174-75 (same). There is evidence that Toymax's principals believed they should be informed if Link Group was working with another company on the Laser Combat project. See Goldberg Tr. at 223-24. And there is evidence that Link Group asked Toymax's representatives directly on numerous occasions about the status of the Laser Combat project, both before and after the alleged October decision not to proceed with Link. See, e.g., PX34, PX 36, and [*50] PX37 (Link Group memos to Toymax in July and August 1995 inquiring about progress of Laser Combat final agreement); PX113 (Link Group memo to Toymax reflecting belief project was going forward); Piels TR at 396-98 (describing September conversations with Toymax on Laser Combat

status), 402-08 (describing October and early November calls to Sandy Frank on Laser Combat status), 447-48 (describing November calls to Carmine Russo on Laser Combat status), 450-51 (describing December calls to Frank on Laser Combat status). This evidence could support a jury's finding that Toymax had an obligation to answer Link Group truthfully when asked about any changes or final decisions made regarding the Laser Combat project.

As to the second requirement for fraud based on nondisclosure, that is, actual failure to disclose material facts, the parties disagree as to whether Toymax ever disclosed its final decision to Link Group. Toymax claims Link Group was informed in October 1995 that the Laser Combat project was definitely not going forward. See Frank Decl. P 7; Russo TR at 75-76; Toymax's 9(c) Statement at P 115. Link Group claims it had no basis to know that the project had been canceled until [*51] Toy Fair 1996. See Link's Response at 13-15; Piels TR at 396-98, 402-08, 445-51. Clearly, this factual dispute is material to Link's fraud claim; in fact, the outcome of the fraud claim may well turn on the resolution of this factual dispute. Toymax has thus failed to demonstrate that there is no issue of material fact with respect to the question of when -- or whether -- it told Link Group the Laser Combat project would not be going forward. Summary judgment with respect to the fraud claim is therefore denied.

### E. CONVERSION

With respect to Link Group's conversion claim, Toymax argues that "it is well-established that the common law . . . has been superceded by CUTSA and that CUTSA preempts any other tort remedy for misappropriation of trade secrets" (citing *Pro-Fitness, Inc. v. Plankenhorn, 1995 Conn. Super. LEXIS 3404, 1995 WL 774494* at *3 (Conn. Super. 1995); *Nora Beverages, Inc. v. Perrier Group of America, Inc., 164 F.3d 736, 751 (2d Cir. 1998))*

The court agrees that Nora is dispositive. Like this case, Nora was a diversity case applying Connecticut law. The Second Circuit held that "the district court correctly found that CUTSA preempts any tort remedy [*52] for misuse of trade secrets." *Id. at 751.* Accordingly, summary judgment is granted as to the plaintiff's claim of conversion.

### F. CUTSA

The Connecticut Uniform Trade Secrets Act ("CUTSA") covers misappropriation of trade secrets CUTSA defines a trade secret as:

> information . . . that (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Conn. Gen. Stat. § 35-51(d).*

The plaintiff claims that Toymax violated CUTSA by improperly using or obtaining various "trade secrets" belonging to Link Group, including certain features of the original Laser Combat; plans for updated versions of Laser Combat, including the possible use of infra-red light, a new computer chip, reactive targets, and a water game based on the same concept; updated costing information on Laser Combat; and documents relating to Alien Laser Attack, a toy that was never marketed in the United States. Toymax claims [*53] that none of the information it received from Link Group constitutes a "trade secret" because, first, it was not novel and was readily observable in the marketplace, and second, Link Group did not take reasonable steps under the circumstances to maintain its secrecy.

As a preliminary matter, the court notes that there appears to be a fundamental factual dispute as to precisely what information was presented to Toymax by Link Group and at what time. Toymax apparently would have this court consider solely the information provided to it sometime in 1995 as the subject matter of this dispute. Link Group, on the other hand, includes among its claims the misuse or improper acquisition of information it supplied to Lebensfeld when he was employed at Panosh in the mid to late 1980s, and which he allegedly improperly brought with him and shared with Toymax after the Link Group/Panosh licensing agreement had expired. It is not clear from the record before the court which items were provided during each time period. The court, viewing the facts in the light most favorable to the plaintiff for purposes of this motion, will accept Link Group's contention that the documents and samples provided [*54] to Toymax covered a broader range of information than simply the Laser Combat 1986 design which was available in stores in 1986.

In assessing whether information constitutes a trade secret, courts have looked at a variety of factors, including: (1) the extent to which the information is known outside the business; (2) the extent to which the information is known by employees or others in the business; (3) the extent of measures taken by the "owner" to guard the secrecy of the information; (4) the value of the information to its purported owner and to its competitors; (5) the amount of effort or money expended

by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Robert S. Weiss & Assoc. v. Wiederlight, 208 Conn. 525, 538, 546 A.2d 216 (1988).* n7

n7 It should be noted that to be protected as a "trade secret" under Connecticut law, the information does not need to be "novel" to the same degree as is required to state an intellectual property claim under New York law. Thus, although the elements of an item may all be common and generally known, the combination of the individual components in a certain way may be a trade secret. See *Allen Manufacturing Co. v. Loika, 145 Conn. 509, 515-16, 144 A.2d 306 (1958)* (holding that "the fact that every ingredient is known to the industry is not controlling for the secret may consist of the method of combining them which produces a product superior to that of competitors") (internal citation and quotation marks omitted). This is in contrast to the "novelty" requirement that must be met before stating an implied breach of contract claim for misuse of an idea under New York law, where "the mixture of known ingredients in somewhat different proportions" is insufficient to render an idea novel. *Paul v. Haley, 183 A.D.2d 44, 588 N.Y.S.2d 897, 903* (2 Dep't 1992).

[*55]

Turning first to the extent to which the information was known outside the business in this case, Toymax argues that, because the original Laser Combat was publicly marketed, its features and technology cannot be trade secrets. The court agrees. Notwithstanding the fact that a sample was apparently difficult to locate by 1995, the original product was widely marketed and therefore was, at least at one time, widely known outside of Link Group. Neither Link Group nor the passage of time can undo this past dissemination of information regarding its 1987 product.

However, Toymax has not demonstrated that, as a matter of law, the other items Link Group claims are "trade secrets" were widely known outside Link Group. There is evidence that the remaining information was shared only with a limited number of other companies with whom Link Group may have had reason to believe a confidential relationship existed. Specifically, Link Group apparently shared information only with Panosh and Lebensfeld in the 1980s, and in negotiations with Ages Direct (Sega of Canada) and Toymax in the mid-1990s, as well as one or two consultants retained in connection with those negotiations. Therefore, with [*56] the exception of the sample and schematics for the original Laser Combat, the other information does not appear to have been disclosed to very many outside parties.

With respect to the second prong, the extent to which the information was known by employees or others within the business, there is very little evidence in the record as to who within Link Group knew the relevant information. The court does note, however, that the individual employees of Link Group actively involved in the Laser Combat negotiations appear to be few in number. Specifically, the key players appear to have been Robert McDarren, Barry Piels, and perhaps, to a lesser extent, Deborah McDarren.

As to the third factor, the extent of measures taken to guard the secrecy of the information, Toymax argues that the failure of Link Group to obtain a confidentiality agreement from Toymax or to obtain formal intellectual property protection for its alleged "trade secrets" renders them non-protectable under CUTSA. The court does not agree. All that is required under CUTSA is that Link Group took steps that were "reasonable under the circumstances" to protect its interests. *Conn. Gen. Stat. § 35-51(d)(2)*. A determination [*57] of whether Link Group's steps were reasonable would require resolution of conflicting testimony about industry standards and about the practices of the parties in prior dealings with one another. Link Group correctly observes that the "substantial element of secrecy" required by CUTSA does not mean that possession must be exclusively in the hands of the plaintiff. Thus, even if Link Group disclosed information to Panosh or Sega Canada as well as Toymax, given the evidence of the relationship between the parties, prior dealings, and industry practice, a reasonable jury could still find that Link Group had taken reasonable steps to protect the secrecy of its ideas. See *Elm City Cheese Co. v. Federico, 251 Conn. 59, 752 A.2d 1037 (1999)*, available at *1999 WL 971805* at *9-*10 (Conn. 1999) (holding that in light of relationship of trust and confidentiality between parties, failure of plaintiff to obtain confidentiality, non-disclosure, or non-competition agreements from defendant or other employees did not defeat CUTSA claim). While the relationship between the plaintiff and defendant in this was not as clearly based on personal trust as that in Elm City Cheese, the court [*58] finds that the question of the degree of trust and confidence between the parties requires a determination by the trier of fact.

The question of the value of the information to Link Group and to its competitors is also not clear as a matter of law. It is undisputed that Toymax has reaped great financial rewards from the success of its Laser Challenge. However, there is a fundamental factual

dispute as to whether the information provided was valuable in the development of Laser Challenge: Toymax claims it did not use any of Link Group's information in designing Laser Challenge, while Link Group argues that a reasonable jury could infer, from the similarities between the toys, that Toymax did in fact get some, if not all, of its ideas for Laser Challenge from the materials submitted by Link Group.

Despite this court's finding that all of the basic elements of both Laser Combat and Laser Challenge had previously been used in other toys, the possibility remains open that a reasonable jury would find that those elements had not been combined in exactly the way Link Group combined them before, and could then infer from the similarities between the toys that Toymax also found the information [*59] of value in the development of Laser Challenge. n8 Both Link Group's proposals and Toymax's toy involved shooting at a randomly moving target; both had a "shoot-back" target named B.A.R.T.; both included versions of the toy using infra-red light; and both planned to incorporate a water-shooting game into the series.

n8 Taking the facts in the light most favorable to the plaintiff, the court looks at the information provided as encompassing not only schematics for Laser Combat 1987, but also sketches, business plans, and plans for future versions of Laser Combat, as well as Alien Laser Attack, Radar Wars, and a water game.

The court therefore concludes that there is sufficient evidence in the record to support a finding that the information provided to Toymax proved valuable to Toymax, and would have been highly valuable to Link Group had Link Group been able to develop it further.

Turning next to the amount of effort and money invested by Link Group, the court finds that this factor does not weigh in the plaintiff's [*60] favor. It is not disputed that Link Group spent no money on Laser Combat following the demise of Panosh sometime in 1987. See Defendant's 9(c) Statement at P 62; Plaintiff's 9(c)(2) Statement, Part I at P 62. While Link Group may have invested some of its own resources in attempting to move the Laser Combat project along, such investments appear to be minimal.

Finally, looking to the ease or difficulty with which information could be duplicated or acquired properly by others, the court finds the evidence mixed on this point. On one hand, as Toymax notes, much of the work done was quite preliminary, and incorporated components that were not in themselves unique or uncommon. On the other hand, to the extent that Link Group had already based its "update" and new ideas on existing schematics, electronics, designs, drawings, and cost estimates derived from the original Laser Combat, the combination of design elements and features contained in the Link Group submission may have taken some time for an outside company without Link Group's information to develop on its own. The court finds that, if this factor supports one party's contentions over the other's, the resolution of that question [*61] is best left for the trier of fact.

Looking at these factors together, then, the court finds that the plaintiff has marshaled sufficient evidence to raise an issue of material fact as to whether its disclosures to Toymax, with the exception of the sample and schematics for Laser Combat 1987, constituted a trade secret or secrets. Several of the factors weigh in Link Group's favor, while only one clearly weighs in Toymax's favor. Enough ambiguities remain to convince this court that there are material questions of fact, and summary judgment is therefore inappropriate at this time.

**G. CUTPA**

Finally, the plaintiff has alleged a claim under the Connecticut Unfair Trade Practices Act ("CUTPA"), *Conn. Gen. Stat. § 42-110a* et seq. The defendants argue that because the contract, fraud, and misappropriation claims must be dismissed, plaintiff's CUTPA claim must fail as well. However, the court has not granted summary judgment as to plaintiff's fraud or CUTSA claims, either of which could form the basis for finding a public policy violation under CUTPA. Moreover, as this court noted in its Ruling on Defendant's Motion to Dismiss, it is not always the case that when an underlying [*62] basis for a public policy violation is dismissed, a CUTPA claim automatically fails. See *Omega Engineering, Inc. v. Eastman Kodak Co., 908 F. Supp. 1084, 1099 (D. Conn. 1995)* (holding CUTPA claim may be stated even if underlying fraud claim insufficiently supported). Even though the plaintiff in this case had entirely failed to allege a fraud claim when the defendants' motion to dismiss was decided, the CUTPA claim was permitted to go forward at that time. See Ruling on Defendants' Motion to Dismiss, February 23, 1998.

In order to prevail on its CUTPA claim, Link must show that Toymax engaged in unfair methods of competition, or engaged in unfair or deceptive acts or practices in the conduct of its business, and that Link suffered an ascertainable loss as a result. Courts look to three factors in assessing whether the acts or methods at issue are "unfair." These are whether the acts, without necessarily having been previously considered unlawful, offend public policy as it has been established by

statutes, courts, or otherwise; whether the acts are immoral, unethical, oppressive, or unscrupulous; and whether the acts cause substantial injury to consumers, competitors, [*63] or other businesses. See *Web Press Services Corp. v. New London Motors, Inc., 205 Conn. 479, 482, 533 A.2d 1211 (1987)*.

The last criterion, injury to consumers or competitors, is the most important of the three. In deciding whether there has been sufficient injury to consumers or competitors to proceed under CUTPA, the trier of fact must examine whether the injury was substantial; whether it was outweighed by any countervailing benefits to consumers or competition; and whether it was an injury that the consumers or competitors themselves could reasonably have avoided. See *Web Press Services Corp., supra, 205 Conn. at 484*.

In this case, should Link prevail on its fraud, promissory estoppel, or CUTSA claims, the first element -- violation of established public policy -- would be met. In addition, the question of whether the acts complained of were immoral or unethical requires credibility and character determinations that are best left to the trier of fact. Finally, Link Group has clearly offered evidence of injury to itself, and possibly other potential Toymax competitors with whom Link may have done business, thus meeting the third criterion. A reasonable jury [*64] could conclude, given Toymax's phenomenal success with Laser Challenge, that the injury to others in the same market was substantial and not outweighed by any countervailing benefits. Such a jury could further conclude that, given Link Group's repeated attempts to communicate with Toymax regarding finalizing a deal and its later, unsuccessful attempts to develop Laser Combat with other companies, the injury was not avoidable by Link Group. Thus, Toymax has not shown that no question of material fact exists as to whether unfair methods of competition were used.

As an alternative to proving unfair competition, Link may also satisfy the first element of CUTPA by showing that the defendants engaged in deceptive acts or practices. Here, Link Group's burden is even less onerous. See *Associated Investment Co. v. Williams Assoc. IV, 230 Conn. 148, 158, 645 A.2d 505 (1994)*. An act or practice is deceptive if there was a statement, representation, or other communication that had a tendency or capacity to mislead or deceive the average person in the field in which the statement was made; and the statement was material, that is, it was likely to affect the decisions or conduct of the people [*65] to whom the statement was directed. In short, to prove a deceptive practice, Link need not prove intent to deceive, defraud or mislead, nor even actual reliance by Link. *Willow Springs Condominium Assoc. v. Seventh BRT Development Corp., 245 Conn. 1, 717 A.2d 77 (1998)* (quoting *Normand Josef Enterprises, Inc. v. Connecticut Nat'l Bank, 230 Conn. 486, 646 A.2d 1289 (1994))*. See also *Bailey Employment System, Inc. v. Hahn, 545 F. Supp. 62, 67 (D. Conn. 1982)* (noting that in contrast to claim for fraud or misrepresentation, party alleging CUTPA violation need not prove reliance on representation, that representation became a basis of the bargain, that there was intent to deceive, or even that statement was actually false, since "a statement that is literally true may, nonetheless, be unlawfully deceptive"); *Web Press Services Corp. v. New London Motors, Inc., 203 Conn. 342, 363, 525 A.2d 57 (1987)* (holding that knowledge of falsity need not be proven to establish CUTPA violation). Moreover, even a statement that is literally true may be unlawfully deceptive under CUTPA if it omits information necessary to make the information provided in the statement not misleading. [*66] *Bailey Employment System, Inc. v. Hahn, supra, 545 F. Supp. at 67 (D. Conn. 1982)*.

As discussed with respect to Link Group's fraud claim, there is a material question of fact as to whether Toymax made deceptive statements regarding its true intentions as to the Laser Combat project. Thus, a reasonable jury could find Link has met its burden with respect to the first element of CUTPA, under either a theory of unfair competition or one of deceptive acts or practices.

With respect to proving ascertainable loss, Link need not prove actual damages in order to prevail on a CUTPA claim. See *Hinchliffe v. American Motors Corp., 184 Conn. 607, 612-13, 440 A.2d 810 (1981)*. It need only demonstrate that it suffered a loss that is measurable. Here, although the parties disagree as to the appropriate method of measuring damages, the plaintiff has clearly presented sufficient evidence to support a finding that it missed the opportunity to sell or license its product to another company, whether that company was Sega Canada or not, during the time period from July 1995 through Toy Fair 1996. While the precise amount of Link Group's loss is not clear, assuming a jury finds that [*67] a deceptive act occurred, it could also find that an ascertainable loss occurred. The amount of that loss is a question the jury would then have to determine.

## IV. CONCLUSION

For the foregoing reasons, the court hereby GRANTS defendant's motion for summary judgment [Dkt. # 149] with respect to the plaintiff's claims of breach of express contract, breach of implied-in-fact contract, unjust enrichment, and conversion, and DENIES summary judgment with respect to the fraud, promissory estoppel, CUTSA, and CUTPA claims. In addition, plaintiff's Motion to Strike [Dkt. # 161] is GRANTED.

Page 17

2000 U S Dist. LEXIS 4567, *

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 17th day of March, 2000.

Janet C. Hall

United States District Judge

LEXSEE 2001 US DIST LEXIS 14753

**NETTECH SOLUTIONS, L.L.C. and ePARK, L.L.C., Plaintiffs, - against - ZIPPARK.COM, FEDERAL APD, INC., B.E.A.C., L.L.C., CONTROL SYSTEMS, INC., and BARRY G. LAZOWSKI, Defendants.**

**01 Civ. 2683 (SAS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

***2001 U.S. Dist. LEXIS 14753***

**September 20, 2001, Decided**
**September 20, 2001, Filed**

**DISPOSITION:** [*1] Defendants' motion for summary judgment with respect to the contract claims and to the claims asserted against Lazowski in his individual capacity denied. Plaintiffs' claim for unfair competition based on the copying of Valet 2000 preempted and dismissed.

**LexisNexis(R) Headnotes**

**COUNSEL:** For NetTech Solution, L.L.C. and ePark, L.L.C.: Eric Lee, Esq., Atlas Pearlman, P.A., Fort Lauderdale, FL.

For NetTech Solution, L.L.C. and ePark, L.L.C.: Mark A. Berman, Esq., Gafner & Shore, New York, NY.

For B.E.A.C., L.L.C., Control Systems, Inc., Barry Lazowski and ZipPark.com: Charles E. Knapp, Esq., Law Offices of Charles E. Knapp, P.C., New York, NY.

For Federal APD, Inc.: Brendan O'Rourke, Esq., Proskauer Rose LLP, New York, NY.

**JUDGES:** Shira A. Scheindlin, U.S.D.J.

**OPINIONBY:** Shira A. Scheindlin

**OPINION:**

**OPINION AND ORDER**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

Plaintiffs, NetTech Solutions, L.L.C. ("NetTech") and ePark, L.L.C. ("ePark"), are suing B.E.A.C., L.L.C. ("BEAC"), Control Systems, Inc. ("Control"), Barry Lazowski, ZipPark.com, and Federal APD, Inc. ("Federal"), for copyright infringement of NetTech's Valet 2000 System Software and accompanying documentation ("Valet 2000"). Plaintiffs also assert [*2] common law claims of unfair competition and breach of contract. BEAC, Control, Lazowski and ZipPark.com (collectively the "moving defendants") n1 now seek summary judgment pursuant to *Rule 56 of the Federal Rules of Civil Procedure*. n2 For the reasons stated below, the moving defendants' motion is denied in part and granted in part.

n1 Federal, a manufacturer of parking revenue control equipment that has had a business relationship with Control dating back to 1988, see Affidavit of Barry Lazowski in Support of Defendants' Motion for Summary Judgment ("Lazowski Aff.") P 6, does not join its co-defendants in moving for summary judgment at this time.

n2 The moving defendants do not seek summary judgment with respect to plaintiffs' copyright claim. Due to its highly technical nature, plaintiffs' copyright claim is being addressed separately, by agreement between the parties, through a Court appointed Special Master. See 8/3/01 Order. The parties were directed to provide the Special Master with their

pleadings as well as the software and/or documentation relevant to this claim. See id. After a review of these materials, the Special Master will prepare a report summarizing his findings and conclusions for the Court. See id. As of the date of this Opinion and Order, no report has been filed.

[*3]

## I. LEGAL STANDARD

Rule 56 provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. "An issue of fact is 'material' for these purposes if it might affect the outcome of the suit under the governing law [while] an issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Shade v. Hous. Auth. of City of New Haven, 251 F.3d 307, 314 (2d Cir. 2001)* (quotation marks and citations omitted). "In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party." *Flanigan v. General Elec. Co., 242 F.3d 78, 83 (2d Cir. 2001)*

## II. BACKGROUND

### A. NetTech, BEAC, Control and Lazowski

Founded in 1996, NetTech provides information processing services and database management systems to customers nationwide. See Affidavit of Seth Daley, [*4] President of NetTech and President and Manager of ePark, in Opposition to Defendants' Motion for Summary Judgment ("Daley Aff.") P 4.

In 1988, Lazowski founded Control, a company whose business concerns parking access and revenue control in the parking garage industry. See Lazowski Aff. PP 4, 6. Lazowski is the company's President and sole shareholder. See 8/23/00 Deposition of Barry Lazowski ("Lazowski Dep."), attached as Ex. C to the Affirmation of Charles Knapp, counsel for the moving defendants ("Knapp Aff."), at 7. Lazowski is also the President of BEAC, an investment vehicle with no employees. See Lazowski Aff. P 4. BEAC's limited liability members are Lazowski, his wife, and his two daughters. See Lazowski Dep. at 9.

### B. The Relationship of the Principal Parties

In July 1997, Control asked NetTech to create valet-related software for New York Hospital, one of Control's customers. See Defendants' Statement of Facts Pursuant to Local Rule 56.1 ("Defs. 56.1") P 6. At the time, NetTech had no previous experience with the valet parking industry. See Plaintiffs' Statement of Facts Pursuant to Local Rule 56.1 ("Pls. 56.1") P 6. After NetTech completed [*5] the job, Control and NetTech began to discuss creating software that could be used by garages throughout New York. See Defs. 56. *1 P 11;* 6/14/01 Deposition of John Coyle, Vice-President of NetTech, attached as Ex. D. to Knapp Aff., at 23-25. With input from Lazowski, NetTech developed the product, which was initially called the Valet Automated Management System ("VAMS"). See Pls. 56. *1 P 9;* Daley Aff. PP 5, 8, 10. NetTech then created a website for Control to display VAMS. See Defs 56. *1 P 12*

NetTech further developed VAMS, using information gleaned from conversations with Lazowski. See Daley Aff. P 10. The product eventually became known as Valet 2000 and is a computer system for valet and self-park facilities that provides comprehensive revenue management, automated financial reporting, and secure, accurate transactions. See id. P 5, 6. Valet 2000's source code and software were developed by NetTech's programmer, Miguel Gonzalez. See Pls. 56. *1 P 17.* On or about August 7, 1998, NetTech registered Valet 2000 with the United States Copyright Office. See Daley Aff. P 11.

#### 1. The ePark Agreement

During [*6] the development of Valet 2000, NetTech and Lazowski, acting on behalf of Control, discussed a business arrangement that would maximize the marketing and sale of licenses to use the product. See id. P 8. As a result, on March 25, 1999, the parties created ePark, a limited liability company, with NetTech holding 51% of ePark's shares, and BEAC -- which Lazowski created for purposes of this joint venture -- holding the remaining 49% (the "ePark Agreement"). See Defs. 56.1; ePark Agreement, attached as Ex. 1 to Daley Aff., § 2.1

##### a. The Duties of the Parties

NetTech's duties under the ePark Agreement included: (1) maintaining a sufficient level of inventory of Valet 2000; (2) providing future updates and upgrades of Valet 2000; (3) providing reasonable software support and maintenance, as well as training for Control's employees; and (4) warranting the software. See ePark Agreement § 2.2. BEAC's duties included: (1) using its best efforts to market and sell the product on a local and national level; (2) providing a professional sales plan; (3) arranging a third-party hardware integrator/installer for Valet 2000; and (4) providing customer support for Valet 2000. [*7] See id. § 2.3. On the same day the parties executed the ePark Agreement, BEAC entered into a

separate Service Agreement with Control to provide the services required under the ePark Agreement. See Defs. 56. *1 P 15;* Lazowski Dep. P 30; Service Agreement, attached as Ex. A to Reply Affidavit of Barry Lazowski ("Lazowski Reply Aff."), § 1. Lazowski executed the Service Agreement as President of both BEAC and Control. See Service Agreement at 6.

**b. The Rights Associated with the Valet 2000 and the Confidentiality Provisions of the ePark Agreement**

Pursuant to Article III of the ePark Agreement, BEAC, Control and ePark each agreed that NetTech owned all intellectual property rights associated with Valet 2000. See ePark Agreement § § 3.1, 3.2. BEAC and Control further agreed not to alter, modify, change, decompile, disassemble or reverse engineer the Valet 2000 software or try to discover or disclose NetTech's trade secrets by disassembling, recompiling or otherwise reverse engineering the Valet 2000 software. See id. § 3.2. Control also agreed to keep all trade secrets and proprietary information relating to Valet 2000 confidential. See id. § [*8] 3.3 In addition, during the life of the ePark Agreement,

> NetTech, ePark, B.E.A.C. and Control agreed not to collaborate with a competitor of any of the parties to develop, market or assist in the development/marketing of, a software product directly competitive with the [Valet 2000]. In the event that B.E.A.C., Control, or NetTech developed a concept for a related software product, the party that presents the concept for said product [was obligated to] first offer the product concept to ePark. In the event that ePark declined to pursue the development of the product, the party that presented said product, being either Control, B.E.A.C., or NetTech [was] free to offer the product idea to a third party.

Id. § 3.5.

**2. The Relationship Sours**

Although the parties dispute why their relationship soured, plaintiffs contend that BEAC and Control failed to provide adequate sales and support services as required under the ePark Agreement. See Daley Aff. P 14. As a result, NetTech decided its best option was to immediately terminate their business relationship. See *id. P 15.*

**a. The Correspondence**

In a letter dated February 16, 2000, Seth [*9] Daley, NetTech's President, offered Lazowski two options:

> 1. Purchase the Valet 2000 and Valet 2000 Remote software from NetTech at a price of $ 500,000. The price in [sic] non-negotiable and payable in a lump sum. [or]
> 2. NetTech and BEAC will dissolve ePark and each go our separate ways. Kindly bare [sic] in mind that there is significant liability in supporting the existing Valet 2000 customers.

2/16/00 Letter from Daley to Lazowski, attached as Ex. A to Lazowski Aff. Lazowski responded to Daley that, before Control could reply to Daley's offer to sell Valet 2000, the company would need to inspect the software. See 2/25/00 Letter from Lazowski to Daley, attached as Ex. C to Lazowski Aff. With respect to option two -- the dissolution of ePark -- Lazowski stated that if they failed to reach an agreement to sell Valet 2000, they would later discuss the details of ePark's dissolution. See id.

Daley then notified Lazowski that an independent software consultant could review the software after the proper non-disclosure and non-compete clauses were signed. See 2/28/00 Letter from Daley to Lazowski, attached as Ex. D to Lazowski Aff. In addition, Daley [*10] again offered Lazowski the dissolution option, this time stating that

> NetTech will dissolve ePark and not pursue any legal action against Control Systems or BEAC, LLC, for breach of contract. NetTech will remove any support liability from Control Systems and continue to support the existing Valet 2000 clients.

Id. The tone of Daley's letter and the parties' business relationship in general upset Lazowski, see Lazowski Aff. P 41, who responded by stating:

> Given my lack of faith in you [Daley], it is apparent that even having the software analyzed is a waste of time since you are not truly interested in selling it at any fair price. Since ePark is doomed to deadlock, I am forced to conclude that the most efficient way to proceed is to accept your second option: (a) ePark is dissolved (that is to say that its affairs are wound down, no new business is taken on, its assets marshalled, its creditors and taxes paid and the remaining assets are distributed to

> the shareholders) and (b) NetTech provides both Control Systems Inc. and BEAC, LLC with general releases and indemnifications.

3/1/00 Letter from Lazowski to Daley, attached as Ex. E to Lazowski [*11] Aff.

The next day Daley sent Lazowski a letter proposing terms for ePark's dissolution and requesting that Lazowski sign and date the letter if he agreed. See 3/2/00 Letter from Daley to Lazowski, attached as Ex. E to Lazowski Aff. Lazowski did not sign the letter and instead insisted that Daley provide Control and BEAC with an executed general release and indemnification prior to ePark's dissolution. See 3/3/00 Letter from Lazowski to Daley, attached as Ex. 6 to Daley Aff. In response, Daley faxed a letter to Lazowski stating that

> after conferring with two corporate attorneys . . . it has been determined that there is no need for, nor will there be provided any indemnification of B.E.A.C., L.L.C. or Control Systems, Inc. by NetTech Solutions, L.L.C. Pursuant to L.L.C. guidelines, each member of an L.L.C. is liable only for the total amount of capital contributions to the L.L.C. In B.E.A.C., L.L.C.'s case, the total liability is $ 4.90. The liability of $ 4.90 expires one year from the date of filing the Delaware certificate of dissolution. There should be no further discussion about indemnification.

3/3/00 Letter from Daley to Lazowski, attached as Ex. 7 to [*12] Daley Aff. Lazowski responded a few days later contending that

> the issue of the release and indemnification was part of your [Daley's] February 28 proposal, which you referred to as Option 2 to resolve this matter. You may wish to refresh your memory on this point. In any event, we accepted your proposal and fully expect you to live up to your end of the bargain

3/6/00 Letter from Lazowski to Daley, attached as Ex. 8 to Daley Aff. That same day, Daley wrote to Lazowksi that

> with regards to [the] letter dated February 28, 2000, I stated in Option 2 that "NetTech will remove any support liability from Control Systems and continue to support the existing Valet 2000 clients." This statement is quite clear. NetTech will release B.E.A.C.[,] L.L.C. from supporting the product. The statement does not say anything about indemnification.

3/6/00 Letter from Daley to Lazowski, attached as Ex. 9 to Daley Aff. Lazowski responded by again reiterating his position that option two, as set forth in the February 28 letter, included the provision of a general release and indemnification to both Control and BEAC prior to ePark's dissolution. See 3/7/00 Letter [*13] from Lazowski to Daley, attached as Ex. 10 to Daley Aff.

In an effort to clarify any misunderstanding, Daley set forth what NetTech would do in consideration for BEAC and Control's agreement to dissolve ePark:

> 1. "NetTech will dissolve ePark and not pursue any legal action against Control Systems or BEAC, LLC, for breach of contract." n3 This means that NetTech will not commence legal action against B.E.A.C., L.L.C. or Control Systems, Inc. for breach of the ePark, L.L.C. contract/agreement. This does not mean that NetTech Solutions, L.L.C. intends to indemnify any of the parties nor will NetTech Solutions, L.L.C do so.
>
> 2. "NetTech will remove any support liability from Control Systems and continue to support the existing Valet 2000 clients." This means that NetTech Solutions, L.L.C. is going to continue to support the product and maintain a help desk, which NetTech has been doing all along. Instead of a customer calling Control Systems and getting either; [sic] no return phone call, inadequate help, or being just told to call NetTech Solutions, the customer will be calling NetTech Solutions directly.
>
> Barry [Lazowski], there is no attempt by me to "get [*14] out of" any commitment. We are just ending the ePark, L.L.C. corporation. The ePark, L.L.C. operating agreement and the established guidelines for a L.L.C. restrict the amount of liability of B.E.A.C., L.L.C. to $ 4.90. I cannot help but wonder why you keep insisting [on] indemnification when it is not warranted

and not stipulated in any of ePark, L.L.C.'s operating agreements

3/7/00 Letter from Daley to Lazowski, attached as Ex. F to Lazowski Aff. (emphasis in original). Although he dropped his request for indemnification, Lazowski wrote to Daley the next day again insisting on a general release, stating that ePark's dissolution could proceed the moment such a release was executed. See 3/8/00 Letter from Lazowski to Daley, attached as Ex. F to Lakowski Aff. Daley responded that a release was "not warranted" and "would not be provided." 3/9/00 Letter from Daley to Lazowski, attached as Ex. 11 to Daley Aff. At this point, Lazowski abandoned his request for a release and "decided to trust Daley to live up to his agreement of a general waiver, based on his clear statement in his correspondence." Lazowski Reply Aff P 20. Lazowski and Daley ceased any discussion of a release [*15] or indemnification, and NetTech began the dissolution process.

n3 The quoted language was taken from Daley's February 28, 2000 letter.

By mid-March, NetTech began advising ePark's customers that NetTech no longer had a business arrangement with Control. See Pls. 56. *1 P 23.* NetTech began servicing ePark's customers directly and billing them for its services. See *id. P 24.* On April 28, 2000, Daley sent Lazowski a letter enclosing a copy of the dissolution letter that had been mailed to the Delaware Secretary of State and informed him that ePark was officially dissolved as of that date. See 4/28/00 Letter from Daley to Lazowski, attached as Ex. H to Lazowski Aff.

At a trade show in Florida a few weeks later, NetTech discovered that Lazowski was exhibiting a concept for another parking related product -- ZipPark, see Daley Aff. PP 40, 41, which NetTech alleges infringes upon the Valet 2000. Soon after the trade show, ePark's dissolution papers were returned by the Delaware [*16] Secretary of State because of a technical deficiency. See *id PP 42, 43.* NetTech decided not to correct the deficiency in the dissolution papers and ePark was never formally dissolved. See *id. P 43.*

**III. DISCUSSION n4**

n4 All parties appear to agree that New York law governs plaintiffs' common law claims.

The moving defendants seek summary judgment on four grounds. First, in consideration for BEAC and Control's agreement to dissolve ePark, plaintiffs waived any claims against them for breach of the ePark Agreement. n5 Second, plaintiffs' federal copyright claim preempts their unfair competition claims. Third, plaintiffs' claims are factually baseless. Fourth, plaintiffs' claims against Lazowski in his individual capacity must be dismissed because there are no facts warranting the piercing of the corporate veil. Each argument is addressed below.

n5 Waiver is an affirmative defense. See *Fed. R. Civ. P. 8(c).* Generally, affirmative defenses are considered to have been waived unless defendants plead them in their answer. See *Reforestacion Cafetalera Agro-Industrial S.A. v. Campesino Food Corp., 1999 U.S. Dist. LEXIS 11, No. 97 Civ. 5553, 1999 WL 4964,* at *3 (S.D.N.Y. Jan. 6, 1999). In this case, although the moving defendants did not explicitly plead waiver as a defense, they did assert the related defense of estoppel. Specifically, they asserted that plaintiffs'

> action is barred by estoppel, as plaintiffs, in consideration for BEAC's agreement to dissolve ePark . . . agreed that they would not "commence legal action against [BEAC or Control] for breach of the ePark, L.L.C contract/agreement."

Answer of Moving Defendants, Third Affirmative Defense. Plaintiffs were put on notice of a possible waiver defense and fully briefed the waiver issue without objection. The Court will therefore treat the defense as timely raised. See *Mooney v. City of New York, 219 F.3d 123, 127 n.2 (2d Cir. 2000)* (holding that the waiver defense had not been waived where plaintiff responded to the defense without objection); *Carlisle Ventures, Inc. v. Banco Espanol De Credito, S.A., 1998 U.S. Dist. LEXIS 7489,* *63 n.11, *No. 94 Civ. 5835, 1998 WL 259928,* at *23 n.11 (S.D.N.Y. May 21, 1998), rev'd on other grounds, *176 F.3d 601 (2d Cir. 1999)* (stating that because defendant "fully briefed [the waiver] issue[] in its opposition to the plaintiff's motion for partial summary judgment", the court would treat the defense as timely raised).

[*17]

**A. Waiver**

Plaintiffs allege that BEAC and Control breached the provisions set forth in Article III of the ePark Agreement by (1) misappropriating confidential information; (2) collaborating with competitors to develop a competing product to the Valet 2000; and (3) failing to present any software it developed to ePark. See Complaint ("Compl.") PP 84-86. The moving defendants argue that plaintiffs' correspondence and actions establish plaintiffs' waiver of these claims in consideration for BEAC and Control's agreement to dissolve ePark. Plaintiffs disagree and further argue that, even assuming there was a waiver, it only covered claims for breaches concerning BEAC and Control's failure to market, sell, support and service the Valet 2000 -- claims not asserted in this action.

**1. Standard**

"A waiver is an intentional abandonment or relinquishment of a known right or advantage which, but for such waiver, the party would have enjoyed." *Alsens Am. Portland Cement Works v. Degnon Contracting Co., 222 N.Y. 34, 37, 118 N.E. 210 (1917)*; see also *Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A., 707 F.2d 680, 685 (2d Cir. 1983)*. Waiver [*18] is "essentially a matter of intention", see *Alsens, 222 N.Y. at 37*, and is thus most commonly "proved through declarations, acts and nonfeasance which permit different inferences to be drawn and 'do not directly, unmistakably or unequivocally establish it.'" *Voest-Alpine, 707 F.2d at 685* (quoting *Alsens, 222 N.Y. at 37)*. In these instances the trier of fact must determine intent. See *Alsens, 222 N.Y. at 37*; see also *In re Caldor, Inc., 217 B.R. 121, 133 (Bankr. S.D.N.Y. 1998)* (waiver is "generally ill-suited for summary adjudication"); *Edrei v. Copenhagen Handelsbank A/S, 1991 U.S. Dist. LEXIS 5369*, *34-35, *No. 90 Civ. 1860, 1991 WL 64201*, at *11 (S.D.N.Y. Apr. 19, 1991) ("It is long established that, under New York law, the question of waiver is one of fact."). Occasionally, a waiver may be established as a matter of law by the express declaration of a party or in situations "where the party's undisputed acts or language are 'so inconsistent with his purpose to stand upon his rights as to leave no opportunity for a reasonable inference to the contrary.'" *Voest-Alpine, 707 F.2d at 685* (quoting *Alsens, 222 N.Y. at 37)*. [*19]

**2. Analysis**

While the correspondence clearly shows that the plaintiffs, in an effort to dissolve ePark, relieved BEAC and Control from any obligations and liability associated with the marketing, selling, service and support for the Valet 2000, nowhere in the correspondence is there an express agreement releasing them from their duty to keep information relating to the Valet 2000 confidential, or their duty to refrain from developing a competing product during the life of the ePark Agreement. In response to Daley's February 28 and March 7 letters and throughout the course of the correspondence, Lazowski, on behalf of BEAC and Control, continuously insisted on the execution of a general release and indemnification prior to the dissolution of ePark. Each time Daley refused to provide these documents. The final request for a release came in a letter dated March 8, 2000, in which Lazowski stated

> dissolution may proceed the moment you [Daley] present us [BEAC and Control] with the executed documents you had promised -- although, as I mentioned above, we will insist only on the general release. We leave the indemnification to your own conscience.

3/8/00 Letter, [*20] attached as Ex. F to Lazowski Aff. The next day Daley responded by stating that

> the words "indemnification" and "release" do not appear in Option 2 of my letter dated February 28, 2000. Your request for these two items [is] not warranted and they will not be provided. This is the last time I will address this issue.
>
> All liability for support ends with the dissolution of ePark, L.L.C. Kindly refrain from further insistence on any type of indemnification and/or release.
>
> With this issue now resolved, we shall proceed with the dissolution.

3/9/00 Letter, attached as Ex. F to Lazowski Aff. (emphasis added). Lazowski did not object to this letter and ePark's dissolution went forward, without either a release or indemnification.

"The acts and language of [a] party must be given . . . their natural and logical effect under the circumstances of [a particular] case." *Alsens, 222 N.Y. at 37-38*. Further,

> where the rights and liabilities of parties depend on contracts, and a variety of transactions and dealings arising therefrom, or where the facts are contradictory and complicated, it is a question for the jury to determine: How far [*21] parties have waived any of their legal rights? In all questions of this sort so

> much depends on the intent with which parties act that it would be impossible for courts to establish any certain rule by which all cases could be governed. They must necessarily be left to the determination of juries, whose peculiar province it is to ascertain the intent of parties as gathered from the various facts and circumstances proved in each particular case. And such we understand to be the doctrine recognized and established by judicial decisions

Id. (quoting *Fox v. Harding, 61 Mass. 516, 521, 1851 WL 3313,* at *4 (Mass. 1851). In drafting the ePark Agreement, NetTech carefully included provisions designed to protect any confidential and proprietary information relating to Valet 2000 and to ensure that Control and BEAC did not help develop a competing product during the life of the ePark Agreement. See ePark Agreement § § 3.1-3.3, 3.5. Daley continuously rejected Lazowski's requests for a release and indemnification and repeatedly referred to ending BEAC and Control's "liability for support" in return for their agreement to dissolve ePark. Although Daley stated that NetTech would not [*22] commence legal action for breach of contract against BEAC and Control if there was an agreement to dissolve ePark, in light of the surrounding circumstances, this statement is subject to differing inferences and does not unequivocally establish plaintiffs' intentional relinquishment of their right to seek relief for defendants' alleged violations of the provisions set forth in Article III of the ePark Agreement.

In addition, "without evidence to the contrary, [a] waiver must be interpreted to encompass only those future claims the parties could have reasonably expected might be brought against each other at the time it was agreed upon." *In re Seaman Furniture Co., Inc. v. Seaman Mitchell Assocs., 1996 U.S. Dist. LEXIS 19175, No. 96 Civ. 4268, 1996 WL 741604,* at *5 (S.D.N.Y. Dec. 27, 1996). According to Daley, at the time NetTech agreed not to bring claims against BEAC and Control for violations of the ePark Agreement, NetTech

> had no knowledge that [the moving] Defendants were in the process of misappropriating trade secrets, designing a competing product, having discussions with [Federal] for the distribution and sale of the competing product, and otherwise directly violating the [*23] restrictive covenants of the ePark Agreement.
>
> Had Plaintiffs known of Defendants' activities, Plaintiffs would not have agreed to dissolve ePark and would have brought an action for violating the ePark Agreement[.]

Daley Aff. PP 38, 39. Because a question of fact remains regarding plaintiffs' alleged waiver of the contract claims asserted, the motion for summary judgment on grounds of waiver is denied.

**B. Preemption of Plaintiffs' Unfair Competition Claims**

Plaintiffs' second and third causes of action allege claims of unfair competition. See Compl. PP 51-77. n6 The moving defendants argue that plaintiffs' claims of unfair competition are preempted by their federal copyright claim and therefore must be dismissed. The moving defendants are partially correct.

> n6 Plaintiffs second and third causes of action are labeled "False Designation of Origin and Unfair Competition" and "Unfair Trade Practices - Unfair Competition".

The essence of an unfair competition claim under New York law is that [*24] "the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship." *SGC Communication Res., LLC v. The Seminar Center, Inc., 2001 U.S. Dist. LEXIS 2862, *22, No. 98 Civ. 2724, 2001 WL 274053,* at *8 (S.D.N.Y. Mar. 20, 2001) (quotation marks omitted). The law of unfair competition is "broad and encompasses claims involving the misappropriation of a plaintiff's creative efforts as well as claims for false designation of origin." *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc., 155 F. Supp. 2d 1 2001 U.S. Dist. LEXIS 11568, *62, 2001 WL 901242,* at *16 (S.D.N.Y. 2001).

The federal copyright laws preempt state law claims of unfair competition if the claims are based on the copying of a plaintiff's protected expression. See *Kregos v. Assoc. Press, 3 F.3d 656, 666 (2d Cir. 1993); Warner Bros. Inc. v. Am. Broad. Cos., Inc., 720 F.2d 231, 246 (2d Cir 1986); Davis v. Trojer, 2001 U.S. Dist. LEXIS 10193, No. 99 Civ. 11056, 2001 WL 829872,* at *3 (S.D.N.Y. July 20, 2001). However, unfair competition claims that allege a false [*25] designation of origin or confusion as to source are not preempted because these claims require actual confusion — an "extra element"

beyond what is needed to prove a federal copyright violation. See *Samara Bros., Inc. v. Wal-Mart Stores, 165 F.3d 120, 131-32* (2d Cir.), rev'd on other grounds, *529 U.S. 205, 146 L. Ed. 2d 182, 120 S. Ct. 1339 (2000)*; see also *Twentieth Century Fox, 2001 WL 901242*, at *16 (noting that claims of false designation of origin do not assert rights equivalent to those protected by copyright and generally are not preempted); *Lone Wolf McQuade Assocs. v. CBS Inc., 961 F. Supp. 587, 598-99 (S.D.N.Y. 1997)* (same).

Plaintiffs have alleged an unfair competition claim based on false designation of origin or confusion as to source. See Compl. P 60 ("Defendants' sales, advertising, and marketing campaign caused, and continue to cause, a likelihood of confusion as to the source of the product Defendants sell."), and P 63 ("Defendants' product is clearly calculated to deceive and mislead the purchasers and consumers of plaintiffs' product and actually has deceived and mislead [sic] and continues [*26] to deceive and mislead consumers and causes them to buy Defendants' product."). Thus, plaintiffs' claim of unfair competition based on false designation of origin or confusion as to source is not preempted. However, to the extent that plaintiffs' unfair competition claim is based on the copying of Valet 2000, such claim is preempted and therefore dismissed.

**C. The Underlying Facts Supporting Plaintiffs' Claims**

The moving defendants also argue that plaintiffs' claims premised on the copying of Valet 2000 software and misappropriation of confidential information and trade secrets must fail because they lack a factual basis. Specifically, the moving defendants assert that according to the March 1, 2001 Affidavit of NetTech's computer programmer, Miguel Gonzalez, (1) NetTech developed Valet 2000 software based on specifications and design parameters provided by Lazowski and Control, see 3/1/01 Affidavit of Miguel Gonzalez, attached as Ex. A to Knapp Aff., P 5; (2) no one outside NetTech had access to the Valet 2000 source code, see id. PP 6, 9, 10; (3) the Valet 2000's source code is impossible to reverse engineer, see id. P 7; and the demonstration program provided [*27] to Lazowksi could not be accessed because it contained an encryption key. See id. P 10.

Plaintiffs, in turn, assert that pursuant to *Rule 56(f) of the Federal Rules of Civil Procedure*, they are entitled to further discovery in order to respond fully to the moving defendants' motion and to prove their claims. In addition, plaintiffs direct the Court's attention to a second affidavit of Miguel Gonzalez, in which he contradicts his previous affidavit and states that (1) although the source code was never provided to Lazowski, a fully functional Valet 2000 was provided to Lazowski who had the ability to "copy the executable version of the software, determine the functionality of the software, and otherwise create a product that is based on the Valet 2000 program", see 4/1/01 Affidavit of Miguel Gonzalez, attached as Ex. B to Affirmation of Eric Lee, counsel for the plaintiffs ("Lee Aff. I"), PP 6-8; (2) Valet 2000 could be recreated by Lazowski through the use of different programming languages utilizing the processes created for the product, see id. P 11; and (3) the ZipPark software appears to function in the same manner as the Valet 2000 and is clearly designed to compete [*28] directly with the Valet 2000 in the marketplace. See id. PP 14, 16.

It is well-settled that "a party may not . . . create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony." *Trans-Orient Marine Corp. v. Star Trading & Marine Inc., 925 F.2d 566, 572 (2d Cir. 1991)*. Indeed, "if a party . . . could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Perma Research and Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969)*. Thus, Gonzalez's second affidavit, by itself, cannot be used to create a genuine issue of material fact. However, plaintiffs credibly assert that additional discovery may be necessary to prove their claims.

To withstand a motion for summary judgment on the grounds that additional discovery is necessary, the party opposing summary judgment "must submit an affidavit showing (1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material [*29] fact, (3) what effort the affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir. 1999)* (quotation marks omitted); see also *John Street Leasehold v. Capital Mgmt. Res., 154 F. Supp. 2d 527, 2001 U.S. Dist. LEXIS 3643, *59, 2001 WL 310629*, at *19 (S.D.N.Y. 2001). Plaintiffs' counsel, Eric Lee, has submitted an affidavit satisfying these requirements. See Affidavit of Eric Lee ("Lee Aff. II"), attached as Ex. B to Lee Aff. I.

Plaintiffs assert that they have been repeatedly denied discovery by the moving defendants and are entitled to:

> (a) communications between the moving defendants and Federal relating to ZipPark.com;
> (b) communications between the moving defendants and Advanced Technical Support, Inc. ("ATS") (a software company involved in the creation of the

ZipPark product) relating to ZipPark.com and its product;
(c) invoices, purchase orders, and other documents relating to services provided by ATS to moving defendants relating to the ZipPark.com product;
(d) all software programs being created and offered for sale by the moving defendants;
(e) all documents relating to [*30] manuals, marketing and promotional materials concerning the ZipPark.com product;
(f) agreements on contracts between moving defendants and ATS;
(g) all information relating to potential customers or clients obtained by the moving defendants at the trade show in Florida;
(h) all documents and information utilized by the moving defendants to market, sell or promote the ZipPark.com products;
(i) documents reflecting the names of all employees of the moving defendants;
(j) all documents relating to the advertising of the ZipPark.com products; and
(k) information relating to when the ZipPark.com name was purchased and when ZipPark.com was incorporated or established.

See Lee Aff. II P 18. Plaintiffs assert that all of this information is relevant to proving that the moving defendants misappropriated confidential and proprietary information relating to Valet 2000 and helped develop a competing product. See id. P 19 Plaintiffs also assert that Magistrate Judge Kevin Fox ordered much of this information to be produced, however, there is no written Order or transcript citation memorializing the purported discovery Order. n7 As such, the parties are directed to contact [*31] Magistrate Judge Fox and schedule a conference to address any remaining discovery disputes and determine what discovery, if any, plaintiffs are entitled to receive from defendants. n8

n7 On July 18, 2001, this Court referred the parties to Magistrate Judge Fox for resolution of their discovery disputes.

n8 In turn, the moving defendants have requested (1) a stay of all discovery pending the resolution of this motion and the copyright issues; and (2) an order requiring plaintiffs to divulge the extent of their pre-filing factual inquiry under Rule 11. Both of these requests are denied.

Moreover, the issue at the heart of this action is whether defendants have infringed the copyright of Valet 2000. Because the Special Master's determination as to the infringement issue will necessarily address issues associated with plaintiffs' contract claims, it is prudent to refrain from deciding the sufficiency of plaintiffs' claims until the Court receives the Special Master's report.

**D. The Claims Against Lazowski [*32] in his Individual Capacity**

The moving defendants further argue that plaintiffs' claims against Lazowski in his individual capacity must be dismissed. Plaintiffs assert that numerous factual issues exist regarding the relationship between Lazowski, BEAC, Control and ZipPark.com that preclude the dismissal of these claims.

**1. The Contract Claims**

Under New York law, the corporate veil may be pierced if a corporation is essentially an alter ego of a family or individual. See *Statharos v. New York City, Taxi & Limousine Comm'n, 198 F.3d 317, 324 (2d Cir. 1999)*. In order to pierce the corporate veil on a claim for breach of contract, a plaintiff must show (1) the complete domination of the corporation with respect to the transaction at issue, and (2) that such domination was used to commit a fraud or wrong against the aggrieved party. See *Cary Oil v. MG Refining and Mktg., Inc., 90 F. Supp. 2d 401, 415 (S.D.N.Y. 2000)*.

The facts suggest that Lazowski exercised complete dominion and control over all matters concerning BEAC. Lazowski testified that BEAC is a limited liability company "set up as an investment vehicle for profits [derived] from [*33] ePark." Lazowski Dep. at 9. BEAC's sole purpose is to make investments and its limited liability members include Lazowski, his wife, and his two daughters. See id. at 9-10. BEAC has no employees and is currently involved in no financial investments or businesses other than its business with ePark. See id.

Furthermore, all of NetTech's dealings with BEAC were through Lazowski. If BEAC did breach the ePark Agreement by misappropriating confidential and proprietary information relating to Valet 2000 and helping develop a competing product, there can be little doubt that Lazowski used his control over BEAC to commit such wrongdoing. Accordingly, the moving defendants' motion to dismiss the breach of contract claims against Lazowski in his individual capacity is denied. n9

n9 As a separate matter, the moving defendants also appear to argue that Control, a non-signatory to the ePark Agreement, cannot be held liable for the breach of contract claims asserted in this action. While it is well-settled that generally a contract cannot bind a non-signatory, a contract can bind a non-signatory where it was signed by the non-signatory's agent, or assigned to the non-signatory, or where the party who signed the contract is the "alter ego" of the non-signatory. See *Global Entm't, Inc. v. New York Tel. Co., 2000 U.S. Dist. LEXIS 16038, No. 00 Civ. 2959, 2000 WL 1672327*, at *7 (S.D.N.Y. Nov. 6, 2000).

The facts clearly suggest that Control may be held liable under the ePark Agreement. As noted above, BEAC was merely an investment vehicle. As such, it could not comply with its obligations under the ePark Agreement. Thus, on the same day the ePark Agreement was executed, BEAC simultaneously entered into the Service Agreement with Control. Control (founded by Lazowski -- the sole shareholder) has no officers or board of directors. The Service Agreement was signed on behalf of BEAC and Control by Lazowski -- who signed his name twice, see Service Agreement at 6, pursuant to which Control was to act as BEAC's "marketing and sales agent and service call provider for the software and the Product for all service related items regarding BEAC's interest in the venture with Net-Tech Solutions, L.L.C., (the 'ePark venture') . . . ." Id. at 1. Control is mentioned throughout the ePark Agreement and is in fact expressly referred to as being bound by the provisions of Article III. Indeed, all of the work under the ePark Agreement was performed by NetTech and Control and if Control is held not to be bound by the confidentiality and non-compete provisions these provisions would be meaningless.

[*34]

### 2. The Copyright and Unfair Competition Claims

A plaintiff may pierce the corporate veil in an action for copyright infringement and unfair competition where it is established that the corporate officer is a "moving, active conscious force behind [the defendant corporation's] infringement." *Monsanto Co. v. Haskel Trading, Inc., 13 F. Supp. 2d 349, 354 (E.D.N.Y. 1998)* (quotation marks and citation omitted); see also *Mattel, Inc. v. Robarb's, Inc., 2001 U.S. Dist. LEXIS 11742, No. 00 Civ. 4866, 2001 WL 913894*, at *8 (S.D.N.Y. Aug. 14, 2001).

Lazowski is a corporate officer of BEAC, Control, and ZipPark.com. See Lazowski Aff. P 1. Although the issue of whether the ZipPark product infringes upon the rights associated with the Valet 2000 will not be decided on this motion, assuming that there was infringement, plaintiffs have presented sufficient facts demonstrating that Lazowski was the moving force behind such infringement. All of Net-Tech's dealings with BEAC and Control were through Lazowski and Lazowski was the primary actor in the development of ZipPark. As such, the moving defendants' motion to dismiss the claims of copyright infringement and unfair competition [*35] against Lazowski in his individual capacity is denied.

## IV. CONCLUSION

For the foregoing reasons, the moving defendants' motion for summary judgment with respect to the contract claims and to the claims asserted against Lazowski in his individual capacity is denied. In addition, plaintiffs' unfair competition claim based on false designation of origin or confusion as to source is not preempted by their federal copyright claim. However, to the extent that plaintiffs' claim for unfair competition is based on the copying of Valet 2000, this claim is preempted and therefore dismissed.

The parties are directed to contact Magistrate Judge Fox within ten (10) days of the date of this Opinion and Order to schedule a conference to address any remaining discovery disputes. The parties are further directed to contact this Court after any such disputes have been resolved.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: New York, New York

September 20, 2001