**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| VICTOR G. REILING ASSOCIATES and | : | |
| DESIGN INNOVATION, INC., | : | |
| | : | |
| Plaintiffs | : | |
| | : | Civil No. 303CV222(JBA) |
| v. | : | |
| | : | June 4, 2005 |
| FISHER-PRICE, INC. | : | |
| | : | |
| Defendant. | : | |
| | : | |

**REPLY DECLARATION IN SUPPORT OF
FISHER-PRICE'S MOTION FOR SUMMARY JUDGMENT**

ROBERT J. LANE, JR., pursuant to 28 U.S.C. § 1746 and under penalty

of perjury, declares that the following is true and correct:

1.      I am a member of the firm of Hodgson Russ LLP, attorneys for

defendant Fisher-Price, Inc. ("Fisher-Price"), together with Robinson & Cole LLP.  I

make this declaration in support of Fisher-Price's motion for summary judgment and in

reply to the declarations submitted by Victor G. Reiling, dated May 20, 2005 (the

"Reiling Dec.") and James M. Kipling, dated May 23, 2005 (the "Kipling Dec.").

2.      The purpose of this declaration is to bring to the Court's attention

certain testimony and exhibits responsive to statements or allegations made in the Reiling

and Kipling declarations.

3.    Relevant pages from the deposition of Victor Reiling on December 10, 2003 are attached as Exhibit A.

4.    Relevant pages from the deposition of Victor Reiling on February 15, 2005 are attached as Exhibit B.

5.    Relevant pages from the deposition of James Kipling on February 10, 2005 are attached as Exhibit C.

6.    Relevant pages from the deposition of Paul Snyder on March 9, 2005 are attached as Exhibit D.

7.    Relevant pages from the deposition of Peter Pook on March 26, 2005 are attached as Exhibit E.

8.    Relevant pages from the deposition of Bruce Popek on November 19, 2003 are attached as Exhibit F.

9.    Relevant pages from the deposition of Bruce Benedetto on November 18, 2003 are attached as Exhibit G.

**Reply to the Reiling Declaration**

10.    In paragraph 12 of his declaration, referring to the Fisher-Price Policy and Agreement that he executed on December 15, 1994, Reiling states that "Fisher-Price had me sign an agreement in 1994 that purports to have an indefinite duration."  In paragraph 13, still referring to that Policy and Agreement, he states:  "I did

not believe that they would have one form that would last forever.  When I signed the 1994 Policy and Agreement, I did not believe that it would cover all future submissions."

11.     These statements in Reiling's declaration are directly contrary to his deposition testimony.  First, a copy of the December 15, 1994 Policy and Agreement is attached as Exhibit 20 to my April 29 declaration.  Paragraph 6 is the provision dealing with the duration of the agreement.  In paragraph 6, the inventor is provided with a *choice* of specifying a particular, fixed duration (paragraph 6(B)) *or* selecting a provision that states that the "Agreement shall have an indefinite term commencing on [a date selected by the inventor] and expiring upon thirty (30) days written notice" (paragraph 6(A)).

12.     Reiling testified at his deposition that he selected the option that the Policy and Agreement would have an indefinite term.  He testified that he wrote the commencement date of the Policy and Agreement (12/15/94) in the space provided in paragraph 6(A) in his own handwriting.  Reiling does not recall anyone from Fisher-Price directing or suggesting to him that he should select an indefinite term for the 1994 Policy and Agreement.  Instead, his recollection is "that I probably got it, looked at it, filled in a date, and signed it and sent it in," indicating that he filled out the document at home and without any input from Fisher-Price.  Exhibit B at 247.  Accordingly, Reiling's statement in his declaration that "Fisher-Price *had* me sign an agreement in 1994 that purports to have an indefinite duration" is contrary to his deposition testimony, in which he confirms that he freely chose the indefinite duration after being given a choice of completing the Policy and Agreement so that it would have a specific duration.

- 4 -

13.     Reiling's statement that he "did not believe that [Fisher-Price] would have [a policy and agreement form] that would last forever" is also inconsistent with his deposition testimony.  Reiling testified that the December 15, 1994 Policy and Agreement was never terminated and remained in effect, governing all of his subsequent submissions until this lawsuit was commenced.  Lane Dec., Exhibit 4 at 68-70.[1]

14.     In paragraph 24 of his declaration, Reiling (in an apparent attempt to avoid the prior art identified by Fisher-Price) states that the Reel Heroes "concept was submitted specifically for Rescue Heroes and specifically as a backpack, although we did indicate that the concept could be expanded by Fisher-Price into line extensions and accessories."  This is contrary to the testimony offered by all of the plaintiffs and their expert witness in this action.  As discussed in paragraph 31(a) of my April 29 declaration, Kipling and plaintiffs each testified that the image component of plaintiffs' concept could be located on the action figure's chest or in a device in the figure's hand.  Plaintiffs' 2000 Submission depicts a photographer action figure holding a digital camera in his left hand; the digital camera contains a Viewmaster disk of images showing the character.  Lane Dec., Exhibit 29.  In addition, as Reiling acknowledges, plaintiffs claim that their concept can be used on vehicles or playsets, in which the image component of the concept would not be located on a backpack.  Reiling Dec. ¶ 24.  Accordingly, Reiling's effort to limit the Reel Heroes concept to images shown on an action figure's backpack is contrary to prior sworn testimony and evidence offered by plaintiffs in this action.

---

[1]      "Lane Dec." refers to my April 29, 2005 declaration submitted on this motion.

15.    Similarly, Reiling's effort to limit the Reel Heroes concept to Rescue Heroes action figures is contrary to the sworn testimony by plaintiffs and their expert witness.  As detailed in my April 29 declaration at paragraph 31(b), Kipling and the plaintiffs each testified that the Reel Heroes concept includes all action figures — not just Rescue Heroes.  At different times, they testified that Spiderman, Captain America, and Batman action figures were included within the Reel Heroes concept.  *Id.*  In addition, plaintiffs submitted the Reel Heroes concept to one of Fisher-Price's competitors, Toy Biz, for use in connection with its "Spiderman and Friends" line of superhero action figures.  Bruce Popek's letter submitting the concept to Toy Biz (attached as Exhibit 36 to my April 29 declaration) specifically indicates (at page DI 052) that "[t]he concept can be incorporated into ***assorted action figures*** or vehicles" (emphasis added).  Plaintiffs' February 20, 2004 interrogatory answers confirm that the Reel Heroes concept submitted to Toy Biz was the same Reel Heroes concept at issue in this action.  *See* Lane Dec., Exhibit 35 at page 2.  Bruce Benedetto's May 20 declaration (at ¶ 17) also confirms this, stating:  "DI did submit the Reel Heroes concept to Toy Biz in 2002. . . ."  Thus, plaintiffs have stated in sworn testimony and interrogatory answers that the Reel Heroes concept is ***not*** limited to Rescue Heroes action figures, but includes any action figures.

16.    In paragraph 32 of his declaration, Reiling claims that Exhibit A to the Option Agreement (which defines the Reel Heroes concept) "was drafted by Fisher-Price's attorneys with little, if any, input from me and no input from DI."  This is contrary to Reiling's deposition, where he testified that he could not recall the details of who drafted Exhibit A to the Option Agreement, but he believes he participated in

drafting it.  *See* Exhibit A at 229-31.  In fact, Reiling acknowledged that there are

handwritten changes on Exhibit A to the Option Agreement which are initialed by him,

showing that he reviewed and approved the definition of the concept.  Exhibit A at 80-82;

229-31.  Finally, neither Reiling or Kipling disputes that the definition of the Reel Heroes

concept in the Option Agreement closely tracks the definition in Reiling's own

handwriting in the Concept Submission Form (attached as Exhibit 24 to my April 29

declaration).

**Reply to Kipling Declaration**

17.    Paragraph 28 of Kipling's declaration contains admissions that are

relevant to Fisher-Price's position that the Reel Heroes concept lacks the concreteness

necessary to be legally protectible.

> The Plaintiffs' concept can be executed to achieve the
> desired "visual communication" in any of a multiplicity of
> structure or forms that are derived from and are entirely
> consistent with the forms of the concept presented by
> plaintiffs in their three submissions to Fisher-Price.  Such
> structures and forms can include. . . . [Kipling gives several
> examples here] and doubtless many more.

Kipling Dec. ¶ 28.  This reflects that the Reel Heroes concept lacks definite form (*i.e.,*

that it is not concrete).

18.    In paragraph 40 of his declaration, Kipling argues that "Paul

Snyder, Fisher-Price's former Vice President of Inventor Relations . . ., has testified that

he believes Plaintiffs' concept is similar to the Voice Tech Video Mission line, such that

a royalty is owed."  This mischaracterizes Snyder's testimony.  In fact, he testified:

> All I said, this was a similarity. I don't know what the background is of that. I don't know how it was developed. You told me there was another submission on this and that also brings a whole new light to how a product is dealt with.

Exhibit C at 136 (lines 12-17). Plaintiffs' counsel never asked whether plaintiffs were "owed" a royalty. Instead, he asked what Snyder "would have recommended to management." When he asked this question a second time, Mr. Snyder answered:

> What I said before is I would have to know what was done internally. I would have to know what was in the marketplace. I would have to know if there were any other inventor items submitted. I would have to know a lot before—you don't make a recommendation to your management unless you have a lot of facts. Its hard to say what my recommendations would have been until I know all of the underlying facts.

Exhibit C at 139-40.

19.     When pressed to answer even though he did not have sufficient facts, Snyder stated:

> If there are extenuating circumstances when you are trying to, say, keep a good relationship with another inventor, I may negotiate a lower royalty than what would be paid on this royalty to the original inventor than may have had a product sent in that had some of the similarities which I mentioned.

Exhibit C at 140.

20.     Finally, Snyder clarified that he was "not sure exactly what [he] would recommend" to management regarding the Voice Tech Video Mission figures. Exhibit C at 160.

- 8 -

21.     Kipling places substantial weight on the December 8, 1998 fax from Pat Grabianowski (an employee in Fisher-Price's Inventor Relations Department) to Victor Reiling stating that "Paul has shown Reel Action in there is a genuine excitement level for that product.  We are holding for further evaluation."  Kipling Dec. ¶ 32.  *See* Reiling Dec., Exhibit U.  Ignoring the clearly preliminary nature of that document (which indicates that "further evaluation" is necessary), Kipling argues that it somehow reflects a near-final determination as to the value and novelty of plaintiffs' concept.  Kipling Dec. ¶ 32.  The deposition testimony of Paul Snyder, who was Ms. Grabianowski's supervisor in December 1998 and on who's behalf she was writing the December 8, 1998 fax, makes clear this is not correct.  When asked about whether there was "genuine excitement" for the Reel Heroes concept, Mr. Snyder said that he did not recall, but that this sort of language was a "bromide," that it was common in communications with inventors, and had no particular significance.  Exhibit D at 89.

**Miscellaneous Issues**

22.     Because they are unable to address Fisher-Price's argument that it did not use the Reel Heroes concept on the merits, plaintiffs argue that Fisher-Price should be "estopped" from raising it.  In support of this, plaintiffs contend that Fisher-Price's counsel "assured the Court on two occasions that it would not" raise or pursue a non-use defense.  Pltfs' Memo. at 21 n. 4.  Even a cursory review of the transcripts cited by plaintiffs shows this is wrong.  *See* Dize Dec., Exhibit J at 34 (Fisher-Price's counsel, stating to the Court that "one [of Fisher-Price's defenses] is that we didn't use it. . . ."); at 34-35 (the Court confirming its understanding of Fisher-Price's non-use defense); at 35

- 9 -

(Fisher-Price's counsel stating that "the features of the submissions are not incorporated into the features of this action figure in whole or in part"). *See also* Dize Dec., Exhibit K at 21(plaintiffs' counsel confirming that Fisher-Price "raised the defense of we didn't use your concept submission"); at 28 (the Court acknowledging that "we've had some colloquy about the defendant's non-use defense"). Thus, far from representing that Fisher-Price would not raise a non-use defense, Fisher-Price's counsel advised both the Court and plaintiffs' counsel at every available opportunity that this was one of Fisher-Price's central defenses in this action.

23.     Plaintiffs state at page 11 of their memorandum of law that "F-P's own expert, also an independent inventor, testified that he considers his concept submissions to F-P to be confidential." This mischaracterizes Howard Bollinger's testimony. At pages 52-54 of his deposition (attached as Exhibit C to the Dize declaration), Bollinger testified only that he believed that ***he*** was required to keep his submissions to Fisher-Price confidential, not that Fisher-Price was required to do so or that Fisher-Price had any confidentiality obligation with regard to such submissions. Plaintiffs also cite to pages 206-09 of the Bollinger declaration. When asked whether Fisher-Price had an interest in maintaining the confidentiality of inventor submissions, Bollinger testified: "I — again, I can't answer how Fisher-Price would deal with this specific." Dize Dec., Exhibit C at 208.

Date:  June 4, 2005

_____s/Robert J. Lane, Jr._____
           Robert J. Lane, Jr.