# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - )
                                  )
VICTOR G. REILING ASSOCIATES      )
AND DESIGN INNOVATION, INC.,      )     ORIGINAL
        PLAINTIFFS                )
                                  )
VS.                               ) CASE NO.
                                  ) 303CV222 JBA
FISHER-PRICE, INC.,               )
        DEFENDANT                 )
                                  )
- - - - - - - - - - - - - - - - - )

DEPOSITION OF: VICTOR G. REILING
    ON: DECEMBER 10, 2003,
    HELD AT: ROBINSON & COLE, L.L.P.
             ONE COMMERCIAL PLAZA
             HARTFORD, CONNECTICUT


Reporter: KATHLEEN S. NORTON, RPR, LSR #105
    BRANDON SMITH REPORTING SERVICE, LLC
         44 Capitol Avenue
         Hartford, CT  06106
         Tel: (860) 549-1850
         Fax: (860) 549-1537

Page 13

| | | |
|---|---|---|
| 1 | Q | Is there a particular physical location where |
| 2 | | you carry on the business? |
| 3 | A | It's usually a studio on my property. |
| 4 | Q | Have you ever had another person working in the |
| 5 | | studio with you on a regular basis? |
| 6 | A | No, I have not. |
| 7 | Q | Do you ever hire people to do particular tasks |
| 8 | | for you on an hourly or other compensation |
| 9 | | basis? |
| 10 | A | Not that I can recollect. |
| 11 | Q | Can you describe for me -- well, strike that. |
| 12 | | Let me go back to the 1977 time |
| 13 | | frame.  In the early years, who were your |
| 14 | | clients? |
| 15 | A | I worked during the -- starting in 1977 through |
| 16 | | about 1980, I worked in conjunction with a |
| 17 | | gentleman known as John Holden of John Holden |
| 18 | | Associates. |
| 19 | Q | What business was that company in? |
| 20 | A | He was in inventing and marketing toy concepts. |
| 21 | Q | For any -- strike that. |
| 22 | | With a focus on any particular toy |
| 23 | | company or the industry in general? |
| 24 | A | The industry in general. |
| 25 | Q | And do you remember any of the toy concepts you |

```
 1        a lull in the action, so to speak, and they're
 2        able to use their designers to work on new
 3        projects, different projects, on a speculative
 4        basis.  And this essentially is the basis of
 5        our understanding of the relationship.
 6   Q    That you partner on speculative projects?
 7   A    Yes, we do.
 8   Q    And does your business include any
 9        work-for-hire?
10   A    I have had one work-for-hire project in my
11        career.
12   Q    What company was that for?
13   A    Fisher-Price.
14   Q    And what was the product?
15   A    It was a redesign of the schoolhouse and barn
16        in about 1984 or '5, as I recall.
17   Q    Who did you deal with at Fisher-Price with
18        respect to that project?
19   A    Paul Snyder.
20   Q    And other than that single project?  Has your
21        work since the late 1970's been on a
22        speculative basis?
23   A    Yes, it has.
24   Q    And can you define what that means, doing
25        projects on a speculative basis?
```

Reiling vs Fisher-Price

12/10/2003                                                    Victor G. Reiling

Page 16

| | | |
|---|---|---|
| 1 | A | If I don't sell it, I don't get paid. |
| 2 | Q | If you do sell it, what basis do you get paid on? |
| 4 | A | A royalty basis. |
| 5 | Q | Are there any other entities that you work with on the same basis as you work with Design Innovation? |
| 8 | A | Not at this time, no. |
| 9 | Q | Over the last ten years? |
| 10 | A | Yes. |
| 11 | Q | Who else? |
| 12 | A | Bryan Dean, B-R-Y-A-N, D-E-A-N. |
| 13 | Q | Anyone else? |
| 14 | A | For example, I have worked on two small projects with a Karen Lyons in the plush area. And there may have been others, but nothing really significant. |
| 18 | Q | Have you done any projects that were ultimately sold to Fisher-Price since you established your own business? |
| 21 | A | Yes. |
| 22 | Q | Can you identify those for me? |
| 23 | A | It was called Crash Zone. It was introduced in 1988. |
| 25 | Q | And give me just a brief description of what |

Page 76

| | | |
|---|---|---|
| 1 | Q | In Exhibit 207, it indicates that Fisher-Price |
| 2 | | will pay an option of 2500 a month for up to |
| 3 | | three months.  Do you know how many months |
| 4 | | Fisher-Price ultimately paid? |
| 5 | A | Yes, three months. |
| 6 | Q | At the bottom, you wrote, "They will probably |
| 7 | | want both of us to sign option agreements," and |
| 8 | | that's directed to Design Innovation, I take |
| 9 | | it? |
| 10 | A | Yes, it is. |
| 11 | Q | And why did you write that? |
| 12 | A | As I -- as we discussed a bit earlier today, |
| 13 | | when I sign agreements and things with |
| 14 | | companies and Design Innovation is part of it, |
| 15 | | we normally co-sign. |
| 16 | Q | Why do you do that? |
| 17 | A | Protects both of us.  That, essentially, is a |
| 18 | | declaration of our partnership in the item and |
| 19 | | the company knows that the checks, et cetera, |
| 20 | | will go half-and-half to each party. |
| 21 | Q | And it's because you're joint owners of the |
| 22 | | concept that is being submitted? |
| 23 | A | That's correct. |
| 24 | Q | Let me show you what we have marked as |
| 25 | | Exhibit 208.  At the top of Exhibit 208 there's |

Page 80

```
 1         suspect I would have sent it in as a regular,
 2         larger page, and they took it down in size and
 3         attached it here.
 4    Q    Do you know who drafted the description? The
 5         product description?
 6    A    I believe it was --
 7    Q    On Exhibit A?
 8    A    I believe Mrs. Tommaney.
 9    Q    You didn't draft the product description; is
10         that right?
11    A    To my recollection, right. No. I'm sorry.
12         Did I answer that correctly? Please ask the
13         question again.
14    Q    Sure. Did you draft the description that
15         appears on Exhibit A to Exhibit 210?
16    A    I don't believe so.
17    Q    Did you review the description that appears on
18         Exhibit A to Exhibit 210 before you signed the
19         option agreement?
20    A    Yes, I did.
21    Q    And did you do your best to make sure that it
22         was a true and accurate statement describing
23         your Reel Heroes concept?
24    A    Well, it certainly covered the Reel Heroes
25         concept as presented to Paul Snyder. And as
```

Page 81

1      we'll talk here in a minute, there is,
2      obviously, room for looking at future expansion
3      of the concept.
4   Q  Okay. In the description on Exhibit A to
5      Exhibit 210, it refers to a 3-D film reel and
6      3-D cartoons. Was there ever any discussion of
7      this being a 3-D type of system?
8   A  No, there wasn't.
9   Q  So that was just an error in the drafting?
10  A  I believe it to be an error. I mean, I can
11     speculate where it may have come from, but I
12     don't think it's germaine at all. We all
13     crossed it out and initialed it.
14  Q  Okay. The second sentence of the description
15     states, quote, "The concept is a
16     battery-operated film reel that is activated
17     when the child pushes a button on the backpack
18     of the action figure."
19          Is that an accurate statement of the
20     concept as it was presented to Fisher-Price?
21  A  That accurately describes the physical model
22     that I showed Paul Snyder in New York.
23  Q  And the drawings that you showed him as well?
24  A  Yes.
25  Q  At the bottom of the description on Exhibit A

Page 82

```
 1        to Exhibit 210, it indicates that, quote, "The
 2        unique aspect of the concept is the combination
 3        of existing action figures with film for play
 4        pattern."
 5             Was that an accurate description of
 6        the unique aspect of the concept as you
 7        presented it to Fisher-Price?
 8   A    I would have preferred the word "images"
 9        instead of "film," but it does say film, yes.
10   Q    And as you presented it to Fisher-Price, up
11        until February 17, '99, the concept included
12        film, correct?
13   A    Yes.
14   Q    What is the next contact you remember having
15        with Fisher-Price after February 22, 1999 about
16        the Reel Heroes concept?
17   A    Let's look at the letter from --
18   Q    The letter from Henry Schmidt, Exhibit 211?
19   A    Yes.
20   Q    So there were no discussions with Mr. Snyder or
21        Ms. Tommaney between February 22 and
22        March 1999?
23   A    I can recall talking to Paul each time that
24        they elected to renew or to continue the
25        option.
```

Reiling vs Fisher-Price

12/10/2003                                                    Victor G. Reiling

Page 229

| | | |
|---|---|---|
| 1 | Q | So why didn't you in connection with |
| 2 | | Exhibit 228? |
| 3 | A | Well, Fisher-Price requires that these forms be |
| 4 | | filled out for new submissions, but they did |
| 5 | | not ask for it on my two additional submissions |
| 6 | | which would lead you to conclude that they are |
| 7 | | part of the original concept. |
| 8 | Q | Okay.  With respect to Exhibit 210, that's the |
| 9 | | cover letter attaching the option agreement. |
| 10 | | Do you remember we looked through that? |
| 11 | A | Yes. |
| 12 | Q | Exhibit A to the option agreement is attached. |
| 13 | | Do you have that in front of you? |
| 14 | A | I do. |
| 15 | Q | I think we earlier talked about the fact that |
| 16 | | in the review of Exhibit A somebody noticed |
| 17 | | that this referred to 3-D cartoons and 3-D |
| 18 | | film, and that was changed by striking out the |
| 19 | | words 3-D, correct? |
| 20 | A | Yes. |
| 21 | Q | Are you the person that asked for that change, |
| 22 | | do you remember? |
| 23 | A | I don't recall. |
| 24 | Q | Putting aside the change where the words 3-D |
| 25 | | were stricken, did you ask for any changes or |

Page 230

```
 1          modifications to the description of the
 2          concepts submissions shown on Exhibit A to
 3          Exhibit 210?
 4    A     Let's look at the original submission here.
 5    Q     You're looking at Exhibit 205, for the record.
 6    A     Yes.
 7    Q     Okay.
 8    A     You know, my recollection is that Paul Snyder
 9          probably called me -- I'm sorry, probably
10          called me when it was time to talk about the
11          option agreement and may have asked for me to
12          send him a product description.  I do that for
13          a lot of companies and then they'll modify it
14          to do whatever.
15                So, essentially, whatever I wrote, and
16          I'm sure I don't have anything on that, I
17          probably did that.  It's normal for me to do
18          that, because I want to have my two cents worth
19          in as far as what it is and the company wants
20          to have it be their description, them having
21          written this, and that would have, you know --
22          then when this came back, I would say, "I agree
23          with these things."  The 3-D may or may not
24          have related to an initial ViewMaster tie-in
25          because they have -- a lot of ViewMaster is
```

Page 231

1       3-D. And since it was not, we didn't want 3-D
2       in there.
3 Q So you're not -- you don't have a specific
4       recollection, but it would not have been
5       unusual for you to have made a first crack at
6       describing the concept and you may have sent
7       that to Paul Snyder?
8 A Yes, that's true. It's possibly true.
9 Q And Fisher-Price may have drafted what we see
10      on Exhibit A with reference to whatever you
11      submitted?
12 A Yes. Remember, we talked before about they
13      certainly took the drawing I sent in and
14      incorporated that as part of Exhibit A. I
15      didn't send it in to be Exhibit A, but they
16      brought that in as part of it.
17 Q But when you got the option agreement,
18      Exhibit 210 with Exhibit A attached, did you
19      ask for any changes other than potentially
20      striking the word 3-D?
21 A I don't believe so.
22              MR. LANE: We're all done
23              THE REPORTER: Do you both want full
24      size and mini transcripts?
25              MR. DIZE: Okay. Mini.