# EXHIBIT B

# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT



```
------------------------------------)
VICTOR G. REILING ASSOCIATES and    )
DESIGN INNOVATION, INC.             )
        Plaintiff                   ) Civil Action No.
VS                                  ) 3:03 CV 222 (JBA)
                                    )
FISHER-PRICE, INC.                  )
        Defendant                   )
------------------------------------)
```

DEPOSITION OF: VICTOR G. REILING
DATE:          FEBRUARY 15, 2005
HELD AT:       ROBINSON & COLE
               280 TRUMBULL STREET
               HARTFORD, CONNECTICUT

Reporter: WENDY J. ALLEN, RPR, CRR, LSR #00221
BRANDON SMITH REPORTING SERVICE
44 Capitol Avenue
Hartford, CT 06106
Tel (860) 549-1850

1   Q   Now, Mr. Reiling, have you written any
2   publications with respect to the toy industry?
3   A   Not that I recall.
4   Q   Do you teach at all?
5   A   No.
6   Q   Or give speeches on the toy industry?
7   A   I think I've talked to the ladies garden club
8   in Kent, Connecticut, once or twice, but no, I do not.
9   Q   Other than that, nothing?
10  A   Right.
11  Q   Have you seen Mr. Kipling's expert report in
12  this case?
13  A   Would it be his first or his second? His most
14  recent one?
15  Q   His most recent one.
16  A   Yes, I have.
17  Q   Let me hand you Exhibit 273.
18  A   May I put these aside?
19  Q   Sure. And let me direct your attention to
20  page 19 of Mr. Kipling's expert report, Exhibit 273.
21  A   All right.
22  Q   At the top of that page. Mr. Kipling is
23  talking about the option agreement, Exhibit 210, and he
24  indicates that it "included all major material terms for
25  license agreement that would result from Fisher-Price's

Page 96

1   exercise of the option." Do you agree with that, that
2   the option agreement, Exhibit 210, included all major
3   material terms for a license agreement, relating to the
4   Reel Heros concept?
5       A   I can go back to what I had said before about
6   a previous question, in that I believe it was on the Air
7   Drums where we had identified the royalty, the advance,
8   and things like that. I think there were four major
9   points. We can check that if we like. But you
10  negotiated those so we know where we stand on that. But
11  again, those could be subject to change by mutual
12  agreement if there are other parts. If you're going to
13  a contract, there are other things you need to do some
14  give and take on.
15      Q   But only by mutual agreement, right?
16      A   As not an attorney, I would think that would
17  be the case, yes.
18      Q   Do you see where Mr. Kipling says, "Plaintiffs
19  had no exit from the obligation to follow through and
20  execute a license agreement should Fisher-Price wish to
21  proceed." Do you agree with that, that you would have
22  had to option the concept to Fisher-Price under Exhibit
23  210 if Fisher-Price --
24      A   Well, let's go back, then. I need to go back
25  and search that out, because you had just included all

1   major material terms for the license agreement, those we
2   talked about. Those material terms don't necessarily to
3   my mind have anything to do with no exit. That must be
4   another part of it. Would you mind going back and
5   looking at that?
6       Q   Well, I'm just asking you do you agree with
7   your expert's opinion or do you think he's wrong?
8       A   I think he's right.
9       Q   So you agree that if Fisher-Price wanted to
10  exercise its option in Exhibit 210, plaintiffs would
11  have had no exit, they would have been required to enter
12  into a license, right?
13      A   I could only hope such would have happened.
14      Q   Well, was the option agreement a complete
15  agreement between the parties governing the Reel Hero
16  submission?
17      A   That's a legal term. I really can't answer
18  that.
19      Q   Was it complete as far as you were concerned?
20      A   It set certainly material standards. All of
21  these agreements depend on the goodwill of both parties
22  to proceed, and if there's not goodwill and you don't
23  want to do it, then complications can arise.
24      Q   I'm just trying to ask you, when you signed
25  the option agreement, did you understand that it was a

Page 98

1   complete agreement between the parties governing the
2   Reel Heros submission at that time?
3       A    To me that calls for a legal definition.  I
4   don't know that I can give you that.
5       Q    Well, I'm asking for your understanding.  Did
6   you understand it to be complete, or did you think there
7   were things that had been left out of it on purpose?
8       A    I thought it was complete enough for them to
9   send money to us, and to proceed with the, you know,
10  checking on the potential for development.
11      Q    Had you asked for anything to be included in
12  the option agreement marked as Exhibit 210 which was not
13  included?
14      A    No.  There was one part that I had negotiated
15  with Paul Snyder, and that was a royalty rate, but the 5
16  percent, if it was not used with -- I think you probably
17  know Paul well enough that he would not have given it to
18  me without some negotiation.  It was a 3 percent for the
19  Rescue Heros, but again, the whole purpose of the
20  concept was directed to Rescue Heros.
21      Q    So then from that last answer I understand
22  that there were points of the option agreement that were
23  negotiated between you and Mr. Snyder?
24      A    To my recollection, we may have done that.  I
25  should not state it absolutely happened that way, but

Reiling vs Fisher-Price

2-15-2005                                                    Victor G. Reiling

Page 111

1    wanted to then start talking option, et cetera, I felt
2    that we had a very good opportunity to move ahead with
3    it.
4        Q    So was the implied contract formed sometime
5    before the option agreement was signed?
6        A    I think it's almost synonymous.
7        Q    Almost synonymous with the option agreement?
8        A    Well, you know, the timing, you're talking
9    about several months here, and I'm not doing a very good
10   job being a lawyer.
11       Q    I'm just trying to find out when this implied
12   contract claim alleged in the first cause of action was
13   formed. Is it fair to say it was formed by the date the
14   option agreement was signed?
15            MR. DIZE:  I renew my objection, same
16   objection.
17   BY MR. LANE:
18       Q    Well, Mr. Reiling, this is your implied
19   contract claim, you tell me when it was formed. I can't
20   tell you.
21       A    Well, again, it's working on the implied
22   contract, I told you, I was being challenged there in
23   trying to come up with a good description of an implied
24   contract.
25       Q    Well, when you authorized this document to be

Page 118

1   about it. We were willing to put the time and the
2   effort if we needed to to do more models and drawings,
3   and et cetera.
4       Q    So that was as of December 8, 1998, the date
5   of Exhibit 206, that you felt there was an implied
6   agreement in place, right?
7       A    I certainly did at that time.
8       Q    Did the terms of that implied agreement ever
9   change from what they were on December 8, 1998, or did
10  they stay the same?
11           MR. DIZE: I'm just going to object for
12  the record, and to the extent any of these questions
13  call for a legal conclusion about the existence or terms
14  of an implied agreement, it's a legal conclusion.
15           MR. LANE: I disagree. The terms of an
16  agreement are a matter of fact, and I'm asking about
17  that factual matter.
18           THE WITNESS: Please repeat your
19  question.
20  BY MR. LANE:
21      Q    Did the terms of the implied agreement that
22  you just testified were in place by December 8, 1998,
23  ever change, or did they always stay the same,
24  throughout your dealings with Fisher-Price?
25      A    They remained substantially as they were at

Page 119

1   that time.

2       Q    Did the signing of the option agreement

3   replace the implied agreement, in your mind?

4       A    Please repeat the question.

5       Q    Did the signing of the option agreement on

6   February 17, 1999, by yourself, replace the implied

7   agreement, in your view?

8       A    I'm going to give you a layman's view and say

9   no.

10      Q    Why not?

11      A    Well, you're talking here -- you're into

12  paragraph 42, and you -- "creating the contract from the

13  facts and circumstances of plaintiffs' disclosure, their

14  novel and original toy concept to Fisher-Price, and the

15  subsequent conduct of the parties created contract

16  implied in fact between plaintiffs and Fisher-Price

17  pursuant to which Fisher-Price agreed to compensate

18  plaintiffs in the event Fisher-Price actually used

19  plaintiffs' novel product concept as set forth in their

20  first, second, and third submissions to Fisher-Price."

21           Because we're dealing with first, second, and

22  third submissions, then we must conclude that there were

23  ongoing assurances that we would receive compensation

24  above and beyond the contract which had, I'm sorry, not

25  contract, but the option agreement, which had expired

Page 158

1    Q    But it is still a use of the Reel Heros
2    concept, correct?
3    A    Yes, it is.
4    Q    Let me hand you what's been marked in this
5    case as Exhibit 254-A, a Wolverine projector figure.
6    Have you ever seen one of these before?
7    A    I've just seen black and white pictures of
8    them.
9    Q    Is this the first time you've actually seen
10   one in person?
11   A    It is.
12   Q    Back in 1998 were you aware that these figures
13   had been out on the market in the mid-nineteen-nineties?
14   A    No.
15   Q    Do you recognize Exhibit 254-A as a Wolverine
16   action figure?
17   A    According to the package, that's what it's
18   called, yes.
19   Q    And do you recognize that as being an action
20   figure suitable for a child to play with, role play and
21   pretend and things like that?
22   A    I would think so, yes.
23   Q    And you'd expect that the child would pretend
24   to be Wolverine having an adventure with Exhibit 254-A
25   in his hand, right?

1    A    It would seem logical.

2    Q    Do you have a general understanding of how

3    Exhibit 254-A works?

4    A    I'm going to guess that it projects a light

5    beam.  Try that?  Is this it?  No.

6    Q    There you go.

7    A    Okay.

8    Q    And do you see that it projects images,

9    cartoon images from inside the figure's chest?

10   A    Um-hmm.

11   Q    You have to say yes.

12   A    I'm sorry.  Yes, it does.

13   Q    And that you can change from image to image by

14   turning the dial on the back of the figure?

15   A    Yes, you can.

16   Q    Do you recognize that those images are, in

17   fact, images of the particular action figure having an

18   adventure?

19   A    I would think so.  Conversely, from a play

20   standpoint, it's extremely difficult to see the picture

21   in ambient light.  It might be a play-in-the-dark sort

22   of toy.

23   Q    It's probably hard to show it on the glass.

24   A    All right, yes, I see that.

25   Q    Now, let me open it up for you.  Do you see

1   other, then it is a line extension.  If it's brought

2   into being, I don't know, golly, if you have a cartoon

3   character, Donald Duck, and you add a cup and saucer set

4   for a young child and put it out there without Donald

5   Duck on it, there's no relationship, but if you start

6   bringing Donald Duck on there, then you darn well are

7   going to have to pay a royalty on it.

8        Q    Even if the cup and saucer don't contain what

9   made the original product unique?

10       A    That's right.  In this case they're using a

11  license, they're using the Donald Duck license.

12       Q    Yeah, that's different.  In the third

13  submission I think you pointed out that the Viewmaster

14  disk was supposed to have, did you say six or more

15  images, or eight or more images?

16       A    I believe it's six.  Let's check the -- number

17  what, please?

18       Q    228.

19       A    I'm showing six here, and verbally it says six

20  or so images.

21       Q    Was the intent with respect to the third

22  submission that the images on the Viewmaster disk would

23  show a sequence of events depicting a particular Rescue

24  Hero having an adventure?

25       A    I think that's strictly, you know, the

Page 200

1  character or the use you wanted to put it to. For
2  example, it could have been just as they did with the
3  click-around disk and putting various disasters, as we
4  had mentioned in our initial submission, hazards,
5  dangers, and et cetera, it could be that, or it could
6  show adventures that the character went off in.
7      Q    Mr. Reiling, let me hand you what we've marked
8  as Exhibit 330. These are Plaintiffs' Amended Responses
9  to Defendant's Third Set of Interrogatories. Is that
10 your signature on the second to last page?
11     A    Yes, it is.
12     Q    And did you review these interrogatory answers
13 before signing them?
14     A    I did.
15     Q    And did you ensure that they were true and
16 accurate to the best of your knowledge?
17     A    To the best of my knowledge, I did.
18     Q    Let me direct your attention to page 4. On
19 page 4 in item 7 you list videos, DVD's, computer games,
20 and video games, and indicate that plaintiffs' concept
21 covers these type of products because they are referred
22 to as line extensions. Do you see that?
23     A    Yes, I do.
24     Q    Do the Fisher-Price Rescue Heros videos make
25 use of plaintiffs' concept?

Page 245

1   A   It was almost a selective basis or a luck
2   basis. I assume you're talking about this one right
3   here, which is, is that 205?
4   Q   Well, we could start with that one. Did you
5   have a copy of 205 in your files?
6   A   Yes, I did.
7   Q   And do you still have that today, or is that
8   one of the ones you threw out?
9   A   No, I did not throw that out. It's, I believe
10  it's an exhibit. It's probably with the attorney, isn't
11  it? It being my original, then you would have your
12  original.
13  Q   Did you have a folder of the Concept
14  Submission files where they were all in one spot?
15  A   Not to my recollection, no.
16  Q   So you didn't have like a Fisher-Price
17  submissions folder or something like that?
18  A   I had a Fisher-Price folder that I put notes
19  or ideas or things that applied to Fisher-Price. That's
20  in my attorney's hands now.
21  Q   Now, again, back to Exhibit 239, I think you
22  testified to Mr. Dize that you didn't remember this form
23  at the time of the Reel Hero submission, is that right?
24  A   That is correct.
25  Q   Now, paragraph 6-A of Exhibit 239 is the

Reiling vs Fisher-Price

2-15-2005                                           Victor G. Reiling

Page 246

```
 1    paragraph that deals with the term, meaning how long
 2    this agreement will stay in effect, right?
 3        A    It does say that.
 4        Q    And paragraph 6-B allows you, if you wish, to
 5    select a specific term that starts on a particular date
 6    and ends on a particular date, right?
 7        A    That's what it says, yes.
 8        Q    And paragraph 6-A allows you to fill out this
 9    form in a way so that it begins on a particular date,
10    but then continues indefinitely unless terminated on
11    written notice, right?
12        A    That is what it says.
13        Q    And you are the person that filled in the date
14    showing when Exhibit 239 would commence effect, right?
15        A    That is, I believe that to be my printing.
16        Q    And you filled in that date in the specific
17    area that selects an indefinite term that continues
18    until terminated, right?
19               MR. DIZE:  Objection.
20    BY MR. LANE:
21        Q    Go ahead.
22        A    Yes, on the date, yes, this is my printing.
23        Q    Do you remember if it was your decision to
24    select an indefinite term for Exhibit 239 rather than
25    specify a one-year or other term for this document?
```

1   A   I had never put a lot of stock in these
2   documents and I did not pay attention to the detail.
3   Q   Well, do you remember someone from
4   Fisher-Price handed you Exhibit 239 and said, it's up to
5   you, you can make this indefinite in duration, and just
6   fill this out now, or we can fill it out every year, you
7   decide how to, how you want it to work?  Did someone
8   from Fisher-Price say that to you in substance?
9   A   Not to my recollection.
10  Q   Do you remember how Exhibit 239 came to be
11  filled out so that it had an indefinite term and would
12  continue until terminated?
13  A   I can only recollect that I probably got it,
14  looked at it, filled in a date, and signed it and sent
15  it in.
16  Q   One last thing I just want to clarify, in the
17  fall of 1998 when you made the Reel Heros Concept
18  Submission, is it your testimony that you just didn't
19  think one way or another about whether there was a
20  Policy and Agreement form in effect, or did you actually
21  think that there was not a Policy and Agreement form in
22  effect?
23  A   I can only say the former, that I did not
24  think that there was one in effect.
25  Q   You didn't think about it one way or the