# EXHIBIT  D

1              IN THE UNITED STATES DISTRICT COURT OF
            THE EASTERN DISTRICT OF CONNECTICUT
2                       CIVIL DIVISION

3    VICTOR G. REILING ASSOCIATES   :   NO. 3:03 CV 222
     And DESIGN INNOVATION, INC.    :
4                   Plaintiffs      :
                                    :
5              vs.                  :
                                    :
6    FISHER-PRICE, INC.,            :
                    Defendant       :
7

8              DEPOSITION OF PAUL SNYDER

9                   Taken in the offices of Slifer,

10   Voice and Shade, 3055 College Heights Boulevard,

11   Allentown, Pennsylvania, on Wednesday, March 9,

12   2005, commencing at 9:10 a.m., before Suzanne L. E.

13   Toto, Registered Professional Reporter.

14   APPEARANCES:

15              GRIMES & BATTERSBY, LLP
                BY:   RUSSELL D. DIZE, ESQ.
16              488 Main Avenue
                Norwalk, CT  06851-1008
17               -- For The Plaintiffs

18

19

20

21                   * * *
                SLIFER, VOICE & SHADE
22              A Veritext Company
            3055-57 College Heights Boulevard
23                   Second Floor
                Allentown, PA  18104
24                   (610) 434-8588

25

PAUL  SNYDER

1    Q.          If I told you that Mr. Reiling has

2    testified in this case that Exhibit 203 and 204 were

3    sent in to you with Exhibit 200 and the prototype

4    and Exhibit 201, would you have any reason to refute

5    that?

6    A.          No.

7    Q.          I want to show you what has previously

8    been marked as Exhibit 206.  Do you recognize that

9    document?

10   A.          No.

11   Q.          Would you take a minute and review it?

12   A.          This was from Pat to Vic.  I don't

13   remember it.

14   Q.          You recognize --

15   A.          I know it was sent from Pat

16   Grabianowski.

17   Q.          And you are copied in on the document,

18   correct?

19   A.          Yes.

20   Q.          And this relates to, it says in the

21   first line, reel action.  Do you recognize that as

22   the submission that we are talking about in this

23   case?

24   A.          Yes.  My guess is it would be.

25   Q.          If you take a look at Exhibit 205, it

PAUL  SNYDER

88

1    refers to reel action?

2    A.          Right.

3    Q.          And it says in the first line, Paul has

4    shown -- second sentence, Paul has shown reel action

5    and there is a genuine excitement level for that

6    product.  Who had the genuine excitement level for

7    the product?

8                     MR. LANE:  Object to the form.

9    A.          I don't know who did.

10   Q.          Who would have seen the submission or

11   actually -- strike that.

12                     Who saw the submission to this

13   point when this was sent in December, 1998?

14                     MR. LANE:  Objection.  Asked and

15   answered.

16   A.          As I said earlier, I don't remember who

17   saw it.

18   Q.          If typical procedures had been followed

19   regarding how you normally operated, who would have

20   seen the submission by the time Exhibit 206 was sent

21   in December of 1998?

22                     MR. LANE:  Objection.  Asked and

23   answered.

24   A.          The reel action would have been probably

25   shown to the head of the design group.

PAUL  SNYDER

89

1    Q.          And that would have been the head of the

2    boy's team, is that the proper channel you are

3    referring to?

4                    MR. LANE:  Objection to form.

5    A.          Yes.

6    Q.          Would there have been any other design

7    group that it would have been shown to?

8    A.          It may have, but I don't remember.

9    Q.          Do you recall there being a genuine

10   excitement level for the product?

11                   MR. LANE:  Object to form.

12   A.          I don't recall that.  A lot of times, we

13   would say that to an inventor.  It's kind of a

14   bromide, maybe there was, and maybe there wasn't.

15   Maybe there was an excitement or we just like to

16   keep it a little longer.  It's hard to tell.

17   Q.          Is it fair to say you don't recall?

18   A.          I don't recall.

19   Q.          But certainly, you had thought enough of

20   the concept at this point to ask Mr. Reiling to

21   submit it?

22                   MR. LANE:  Object to form.

23   A.          That's correct.

24   Q.          So this was enough interest to you

25   personally, correct?

PAUL  SNYDER

133

1    gave you.  I will point them out to you.  It might

2    be faster.  I think the first one I showed you was

3    Exhibit 205, which was the concept submission form.

4    I also showed you Exhibit 200, which is a written

5    description.

6    A.          Right.

7    Q.          I showed you Exhibit 201, which is a set

8    of drawings.  I showed you Exhibit 202, which is the

9    prototype.

10   A.          Yes.

11   Q.          I showed you Exhibit 203, which was

12   another drawing.

13   A.          Right.

14   Q.          Exhibit 204, still another drawing.

15   A.          Um-hum.

16   Q.          Showed you the option agreement, which

17   was Exhibit 210.

18   A.          Okay.

19   Q.          And I showed you a document that we

20   referred to as the second submission, Exhibit 212,

21   and I showed you a document, which we referred to as

22   the third submission, which was Exhibit 228.

23   A.          Okay.

24   Q.          And in addition, I have shown you a

25   Voice Tech Video Mission Rescue Hero figure, which

PAUL  SNYDER

1    is Exhibit 60, a Mission Select Rescue Hero action

2    figure, which is Exhibit 237, an Optic Force Rescue

3    Hero figure, which is Exhibit 238; and I showed you

4    an exhibit in the complaint, which was the Mission

5    Command Rescue Hero line with mission cards?

6    A.        Um-hum.

7    Q.        Have you had an opportunity to at least

8    review all of the drawings and so forth?

9    A.        Just the time I had when you had shown

10   them to me.

11   Q.        And do you recall at least having seen

12   the prototype back in the time when you were vice

13   president of inventor relations, is that correct?

14   A.        Yes.

15   Q.        If you were asked by Fisher Price

16   management at the time that Fisher Price introduced

17   the products that I have shown you --

18   A.        All of them or -- all of the products

19   here?

20   Q.        Yes.  -- whether Mr. Reiling should have

21   received a royalty on these items, what would you

22   have recommended to management?

23              MR. LANE:  Object to form.  This

24   is a multiple question; there's no foundation.  He

25   testified he didn't remember 95 percent of the

1    things you showed him.  And you are also asking him

2    to give uncompensated testimony here about facts

3    that he wasn't involved in.  Those are my

4    objections.

5                        MR. DIZE:  Okay.

6    A.          Could you repeat that again?

7    Q.          If you were asked by Fisher Price

8    management -- let's assume -- I will ask it like

9    this, if you were asked by Fisher Price management

10   at the time that the Fisher Price introduced these

11   items as to whether Mr. Reiling should have received

12   a royalty, what would you have recommended to

13   management?

14                       MR. LANE:  Same objection.

15   A.          Well, it's really hard to say, not

16   having been in the development process, but there

17   are some here that should get a royalty.  There is

18   one that is somewhat similar, and that is the one

19   that I talked about before too, I think when I

20   talked to someone in your office.

21   Q.          Which one?

22   A.          That's the only one.  This product right

23   here.

24   Q.          You are referring to the Voice Tech

25   Video Mission Rescue Hero?

PAUL  SNYDER

136

1    A.          Yes.

2    Q.          And that is the one that we also marked

3    as Exhibit 60, is that correct?

4    A.          Yes.  But I don't remember seeing that

5    product, though.

6    Q.          Would you agree that is the same as --

7    A.          Conceptually.

8    Q.          -- the product you brought to the

9    deposition today?

10   A.          Yes.

11   Q.          That you were familiar with?

12   A.          Yes.  But all I said, this was a

13   similarity.  I don't know what the background is of

14   that.  I don't know how it was developed.  You told

15   me there was another submission on this, and that

16   also brings a whole new light to how a product is

17   dealt with.

18   Q.          With respect to -- can you review for me

19   the second and third submissions, which were Exhibit

20   228, which is this one, and Exhibit 212?

21   A.          What do you want me to do?

22   Q.          Exhibit 212, we identified as the second

23   submission made by Victor Reiling to Fisher Price.

24   I would just ask you to review that submission and

25   also Exhibit 228, which we identified as the third

PAUL  SNYDER

1    submission to Fisher Price.

2    A.          I guess this one is the --

3                    MR. LANE:  Object to the form.

4    A.          This one is the attempt to do something

5    at a lower price as a result of a letter from -- I

6    can't remember who, I guess Henry Schmidt, saying

7    that the price point on what was submitted was too

8    high.  I think Pete was trying to get something that

9    was a little lower in price here.  Again, I was at

10   the company, but I don't recall seeing this.  That

11   doesn't mean I didn't, but I don't recall seeing it.

12   Q.          For the record, you were referring to

13   Exhibit 212 identified as the second submission?

14   A.          That's correct.  This one I did not see

15   at all, so it's hard for me to comment on it.  I

16   don't know the background on it.

17   Q.          Could you take a look at it?

18   A.          When I look at the TV camera, I know

19   that we did that before.  I probably would have

20   rejected that as an idea because I think it was in

21   Adventure People that we did a TV camera adventure

22   person.  I don't remember if there was one that you

23   looked into the top like this or not, but I do

24   remember we did a TV camera, so that wasn't new to

25   us.

PAUL  SNYDER

138

1    Q.        Could you look at that whole Exhibit 228

2    and take a minute to review it?

3    A.        The whole thing?

4    Q.        Yes.

5    A.        Right.  And it has some of the same

6    things that this had, perhaps a lower price, a film

7    strip, never-ending film strip, and also kind of

8    like a ViewMaster thing here, too.

9    Q.        Does that change your opinion at all

10   about which items you would recommend that royalty

11   be paid on?

12               MR. LANE:  Object to the form.

13   Same objections as before.  No foundation.

14   A.        Again, depends how it is done.  Like I

15   said, this is just a picture.  I guess that is a

16   picture that is turned by hand.  I don't know what

17   you are asking me.  If this were something that was

18   done?

19   Q.        No.  I was asking if that changes --

20   first of all, let's start over.

21               You already said that you thought

22   Exhibit 60 was entitled to a --

23               MR. LANE:  Objection.  That is

24   totally mischaracterizing.

25   A.        No.

PAUL  SNYDER

1          MR. LANE:  He went out of his way
2    to say that wasn't his testimony.
3    BY MR. DIZE:
4    Q.        What did you say with respect to the
5    exhibit?
6    A.        I said that is a similarity, that's what
7    I told Fisher Price and that's what I told who is
8    the one partner that you have up there.
9    Q.        Jeff Barsay?
10   A.        Yes, that's who I spoke to.
11   Q.        Let's go back.  I asked if you were
12   asked by Fisher Price management at the time --
13   let's stick with Exhibit 60, if you were asked by
14   Fisher Price management at the time that they
15   introduced Exhibit 60, whether Mr. Reiling should
16   have received a royalty on that item, what would you
17   have recommended to management?
18          MR. LANE:  Objection.  Asked and
19   answered.
20   A.        What I said before is I would have to
21   know what was done internally.  I would have to know
22   what was in the marketplace.  I would have to know
23   if there were any other inventor items submitted.  I
24   would have to know a lot before -- you don't make a
25   recommendation to your management unless you have a

PAUL SNYDER

1   lot of facts.  It's hard to say what my

2   recommendations would have been until I know all of

3   the underlying facts.

4   Q.          Knowing what you know today, do you

5   believe Mr. Reiling is entitled to royalty on

6   Exhibit 60?

7                   MR. LANE:  Object to form.

8   A.          Knowing what I know today and from

9   everyone I talked to, I would say a very small

10  royalty would go to him.  I know this was another

11  submission.  Normally, when there were two

12  submissions, the inventor -- and I have told this to

13  every inventor that I ever worked with, the

14  inventor, which sends in the submission, which is

15  the reason we go to market with the product, that is

16  the person that would get the royalty.

17                  If there are extenuating

18  circumstances when you are trying to, say, keep a

19  good relationship with another inventor, I may

20  negotiate a lower royalty than what would be paid on

21  this royalty to the original inventor that may have

22  had a product sent in that had some of the

23  similarities, which I mentioned.  I do think this is

24  similar, which I said.  You always go to market, at

25  least that's what I did, you go to market with the

PAUL  SNYDER

141

1    invention sent in by the inventor.

2                    That is the reason you can go to

3    market.  It could be a cost issue or a cost

4    resolution.  It could be a different way of

5    approaching the same problem.  There's a lot of

6    reasons why you would go to market with another

7    inventor.  I have always dealt fairly with

8    inventors.  Obviously, what we talked about with the

9    bike.

10   Q.          Do you know who the other inventor was

11   on Exhibit 60 that I think you just referenced as

12   another inventor?

13   A.          You had told me it was Carter Mitchell.

14   Q.          Do you know what they brought in?

15   A.          No.

16   Q.          How can you then say that Mr. Reiling

17   would be entitled to a very small royalty based on

18   the other submission if you are not familiar with

19   that submission?

20                    MR. LANE:  Objection.

21   A.          I will say smaller royalty.

22   Q.          Do you know that for a fact?

23   A.          No.  But I'm saying if you go to

24   market -- the way you posed the question, if you go

25   to market with an invention that was brought in by

PAUL  SNYDER

142

1    another inventor and that is the reason you go to

2    market with that inventor, the first inventor that

3    may have brought in a similar product is not even

4    necessarily entitled to a royalty.

5                    What I would do at times,

6    depending on my relationships with the inventors,

7    negotiate a royalty on behalf of that inventor so

8    that perhaps they are getting something.

9    Q.          Do you know for a fact that of

10   whether -- do you know for a fact whether the

11   Carterbench submission for Mr. Reiling was the

12   reason that Exhibit 60 went to market?

13   A.          No.

14                    MR. LANE:  Objection.  You asked

15   him to speculate, and now you are arguing with

16   speculation.  You specifically asked him to

17   speculate.

18                    MR. DIZE:  I didn't.  I'm asking

19   if he knows.

20   A.          I don't know.

21   Q.          With respect to the other items on the

22   table,  Exhibit 237, did you have an opinion as to

23   whether -- again, I will ask you the same question,

24   if you were asked by Fisher Price management at the

25   time that Fisher Price introduced Exhibit 237,

PAUL  SNYDER

143

```
 1    whether Mr. Reiling should have been paid a royalty,
 2    do you have any idea what you would have recommended
 3    to management?·
 4                        MR.  LANE:  Objection.  No
 5    foundation.
 6    A.           I would need to know a lot more
 7    information before I would provide or before I could
 8    provide a valid opinion.  I can only speculate.
 9    Q.           With respect to -- would your answer be
10    the same with respect to Exhibit 238, which is the
11    Optic Force Rescue Heroes?
12    A.           Yes, exactly what I said before about
13    this.
14    Q.           Would your answer be the same with
15    respect to the mission cards, the Mission Command
16    line?
17    A.           Yes.
18    Q.           At the time -- I'm going to ask you to
19    go back to the time that you were vice president of
20    inventor relations, at the time the Reel Heroes
21    concept was presented to you, had Fisher Price, to
22    your knowledge, ever marketed or sold an action
23    figure having a backpack that displayed images
24    depicting the character's mission or obstacles and
25    dangers that the character might face to enhance
```

PAUL  SNYDER

144

1    role play for the child?

2                          MR.  LANE:  Object to form.

3    A.          Not to my recollection.

4    Q.          To your knowledge, had anyone other than

5    Fisher Price ever marketed or sold an action figure

6    having a backpack that displayed images depicting

7    the character's mission or obstacles and dangers

8    that the character might face to enhance the play

9    pattern for the child?

10                         MR.  LANE:  Object to form.

11   A.          I don't know the answer to that.  To my

12   best recollection, I remember something where you

13   could look into the figure and see something.  I

14   don't know, like those Niagara Falls things you get,

15   you could look into a figure and see something.  I

16   don't remember what figure it was.  I remember there

17   was something like that.

18   Q.          To be clear, my specific question was

19   whether if you had recalled whether anyone other

20   than Fisher Price ever marketed an action figure

21   that had a backpack depicting the character's

22   mission?

23                         MR.  LANE:  Object to form.  He

24   answered.

25                         MR.  DIZE:  I want to make sure

PAUL  SNYDER

1    that he was sure the question was in regard to the

2    backpack as well.

3    A.          I understand.  I don't recall.

4    Q.          Mr. Snyder, we talked a little bit

5    earlier about the attitude at Fisher Price and

6    Mattel toward inventors.  Do you think that attitude

7    changed in the mid 1990s at all?

8              MR. LANE:  Objection.  Asked and

9    answered.  The question exactly has been asked and

10   answered.  Are we going to ask every question over

11   again?  You asked him that exact question.

12             MR. DIZE:  I'm asking --

13             MR. LANE:  Again?

14             MR. DIZE:  Yes.

15   A.          I will answer the way I think before.  I

16   hope under my leadership and just the fact that the

17   inventor community became more important to us that

18   inventor relations improved in the mid '90s to the

19   time that I left.

20   Q.          How about the standard under which an

21   inventor would receive compensation?  Did you

22   initiate a change in the late '90s?

23   A.          Fisher Price has always been a company

24   that always dealt fairly.  We were tough, but I

25   think we dealt fairly with the inventing community

PAUL SNYDER

1   royalty was legally owed?  Did that occur from time

2   to time?

3   A.          Yes.

4   Q.          And did you on behalf of Fisher Price

5   agree to pay reduced royalties in circumstances

6   where you thought it was a good idea to do so to

7   maintain relationships with the inventor?

8   A.          That's true.

9   Q.          Earlier, Mr. Dize asked you some

10  questions about Exhibit 60, which is the Video

11  Mission -- I'm sorry, Voice Tech -- Mr. Dize asked

12  you questions about this earlier, about the Voice

13  Tech Mission figure.  And he specifically asked you

14  what you would recommend to management with respect

15  to that figure if you had been at Fisher Price when

16  it was introduced.  Do you remember that question?

17  A.          Yes.

18  Q.          And let me ask you for a second about

19  the recommendations you made to management on the

20  subject of royalties to outside inventors.  When you

21  did make recommendations like that, were you taking

22  into consideration things like Fisher Price's

23  historical relationship with the inventor?

24  A.          Sure.

25  Q.          And whether it wanted to continue doing

PAUL  SNYDER

1    business with the inventor?

2    A.          Yes.

3    Q.          And when you made recommendations of the

4    type that Mr. Dize asked about to upper management,

5    were you taking into account factors other than

6    whether or not Fisher Price actually owed a royalty

7    to the inventor, in your opinion, in the legal

8    sense?

9    A.          Sure, you always have to take those

10   things into consideration.

11   Q.          When you testified earlier that you

12   believe you would have recommended a small royalty

13   with respect to the Voice Tech Video Mission figure,

14   were you including in your analysis factors like

15   inventor relationships as opposed to whether or not

16   Fisher Price strictly owed a royalty from a legal

17   point of view?

18   A.          I actually think I said smaller royalty.

19   I don't know if I said small royalty.  But smaller

20   royalty.  Again, the way I approach something like

21   this was and this was, there were some things that I

22   have always said to inventors and that was, again,

23   that if an invention comes in -- and I think this is

24   a way many companies work, but if an invention comes

25   in and the reason you are doing the product is

PAUL  SNYDER

160

1    because of the particular invention that comes in,

2    then you can go ahead and do that product because

3    there is so many similarities out in the

4    marketplace.  And so if the reason you are doing a

5    product, the invention that is currently at hand and

6    that is why you are doing the product, then that is

7    the inventor who gets the royalty.

8                      If they are almost exactly the

9    same, then there should be a split royalty.  If you

10   are trying to maintain a relationship with an

11   inventor and there is something else that is sent

12   in -- that was sent in that was similar, which I

13   said before seemed to be, then you could negotiate a

14   royalty with that inventor as well.  And each case

15   is different, and each product is different.  Each

16   inventor is different.  So you negotiate on what you

17   have at the time.

18   Q.          And when you gave your answer to

19   Mr. Dize about what you would recommend to Fisher

20   Price management with respect to the Voice Tech

21   Mission figure, were you taking into account all of

22   those factors that you just listed?

23   A.          I just said I'm not sure exactly what I

24   would recommend, but I would take all of those

25   things into consideration, yes.

PAUL  SNYDER

1    Q.            And is it fair to say that what you did

2    during your time with Fisher Price was go through an

3    analysis of the type you just described, that you

4    were not making a determination as to whether Fisher

5    Price legally owed a royalty, you were trying to

6    arrive at a business solution to whatever problem

7    you were dealing with?

8    A.            Yeah.  The legalities, I guess you can

9    always say, you are looking at the business side of

10   it, at least in my case.  If I was wrong in doing

11   something that wasn't legal, of course, our

12   attorneys would tell me so.

13   Q.            And if you wanted to know whether Fisher

14   Price actually legally owed a royalty with respect

15   to a certain circumstances, you would go to the

16   in-house lawyers and ask for their advice, is that

17   correct?

18   A.            Yes, if that were the case.

19   Q.            Do you recall that when you were the

20   vice president of inventor relations from time to

21   time, an inventor would bring in a concept that was

22   already out in the public domain, another toy

23   company had done it?

24   A.            Yes.

25   Q.            And under those circumstances, I take

PAUL  SNYDER

162

1    it, Fisher Price would typically reject the concept?

2    A.          Yes.

3    Q.          And in those circumstances, did Fisher

4    Price feel free to still make products using that

5    concept without paying the inventor the royalty

6    because it had already been in the public domain?

7    A.          Yes.  We would be considerate when that

8    product was in the public domain, but if it's out

9    there, it's free game.

10   Q.          And does the same thing hold true with

11   respect to concepts that had been developed by

12   Fisher Price in-house?

13   A.          Right.

14   Q.          And by that, I mean, if an inventor

15   brought in a concept that Fisher Price had

16   previously developed in-house but perhaps not sold

17   to the public, would Fisher Price feel free to use

18   that concept?

19   A.          Yes, absolutely.

20   Q.          Without paying the inventor a royalty?

21   A.          Yes, and all inventors know that.

22   Q.          I was going to ask you that.

23              Have you communicated that to

24   inventors in the past in discussions?

25   A.          Yeah, I think that is part of just

PAUL  SNYDER

163

1   general knowledge in the industry.

2   Q.          Is it also general knowledge in the

3   industry that if a concept is out in the public

4   domain, the toy company -- strike that.

5                   Is it also general knowledge if a

6   toy is out in the public domain, all toy companies

7   are free to use it without paying an inventor a

8   royalty?

9   A.          Yes.  Unless, you know, you have to be

10   careful certainly of what you do as it relates to

11   that product out in the marketplace because you may

12   be sued by another company.

13   Q.          If you infringe a patent or a trade or

14   something like that?

15   A.          Yes.

16   Q.          Putting that aside -- and I'm trying to

17   focus on your relationship with an inventor that

18   brings out an idea --

19   A.          If it's out in the marketplace or you

20   worked on it internally, you are not obligated to

21   pay a royalty.

22   Q.          Even if the inventor shows you the same

23   concept?

24   A.          Oh, yes.

25   Q.          And that is, in your experience, how all