## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

VICTOR G. REILING ASSOCIATES and     :
DESIGN INNOVATION, INC.,             :
                                     :
             Plaintiffs      :
                                     :        Civil No. 303CV222(JBA)
       v.                     :
                                     :
FISHER-PRICE, INC.               :
                                   :
             Defendant.     :
                                     :

## REPLY DECLARATION IN SUPPORT OF
## FISHER-PRICE'S MOTION FOR SUMMARY JUDGMENT

HOWARD BOLLINGER, under penalty of perjury and pursuant to 28 U.S.C.

§ 1746, declares that the following is true and correct:

1.      I have been retained by defendant Fisher-Price, Inc. ("Fisher-Price") to

provide my independent expert opinion on certain issues in this case. I previously provided a

declaration in support of Fisher-Price's motion for summary judgment, dated April 28, 2005 (the

"Bollinger Dec."). This declaration supplements my April 28 declaration and is submitted in reply

to the declaration of James M. Kipling, dated May 23, 2005 (the "Kipling Dec."). This declaration

is also submitted in reply to the declaration of Victor Reiling, dated May 20, 2005 (the "Reiling

Dec.")

- 2 -

## <u>REPLY TO THE KIPLING DECLARATION</u>

### <u>The Design Innovation Policy and Agreement</u>

2.     In his declaration, Kipling argues that the February 4, 1992 Fisher-Price Policy and Agreement signed by Design Innovation and attached as Exhibit B to my April 28 declaration does not apply to the submissions at issue in this case.  He also states that I am "simply incorrect to the extent that I impl[y] that Plaintiff DI ever signed a single 'blanket' waiver."  Kipling Dec. ¶ 17.  In fact, I never implied anything of the sort.  One of the reasons that I attached the Fisher Price Policy and Agreement form signed by Design Innovation to my declaration was to show that Design Innovation was familiar with Fisher-Price's documents and practices relating to submission of ideas by outside inventors.  As a result, Design Innovation should have been aware (and presumably was) that Fisher-Price did not accept inventor submissions on a confidential basis, that it expressly disclaimed any implied obligations in connection with such submissions, and that it required inventors to waive any claims for the use or disclosure of their ideas.  *See* Bollinger Dec. ¶¶ 6-9 & Exhibit B.

3.     Because Design Innovation had experience with Fisher-Price's Policy and Agreement, it could not have had any reasonable expectation that the submissions at issue in this case were made on a confidential basis or that there were any implied obligations between the parties with respect to those submissions.

- 3 -

**The Option Agreement**

4.      In paragraph 30 of his declaration, Kipling argues that plaintiffs should not be bound by the definition of their concept contained in the parties' Option Agreement.  In support of this argument, he makes two directly contradictory statements:  (1) "that the Option Agreement in this case was so lengthy and detailed is the rare exception to the rule"; and (2) that "the identification of the concept being optioned was intended as a mere shorthand reference to the concept, not a legally binding definition."  Kipling Aff. ¶ 30.  Obviously, Kipling's description of the Option Agreement as "lengthy and detailed" is directly contrary to his statement that the definition of the Reel Heroes concept attached as Exhibit A to the Option Agreement should be considered a "shorthand reference" not binding upon the plaintiffs.  In my experience, Option Agreements are treated as legally binding contracts, including their definitions of the concepts being optioned.  Toy companies make efforts insist on accurate and complete definitions of the concept being optioned to protect their own interests because, if the concept is not fully and comprehensively defined, then the inventor may take the position that it can disclose a similar concept or sell it to other toy companies.

5.      In paragraph 31 of his declaration, Kipling argues that the definition of the concept attached to the Option Agreement should not be binding because it was "prepared by Fisher-Price's counsel," among other reasons.  However, the definition of the Reel Heroes concept in Exhibit A to the Option Agreement closely tracks the definition written by Reiling in his own handwriting in the Concept Submission Form attached as Exhibit C to my April 28 declaration.  Any implication that counsel for Fisher-Price generated the substance of the definition of the

- 4 -

concept in Exhibit A attached to the Option Agreement is unwarranted; the substance of the definition comes from Reiling himself.

      6.      In paragraph 31 of his declaration, Kipling also notes that the Option Agreement was executed before the 1999 and 2000 submissions by the plaintiffs, which provide "second and third examples of the possible multiple separate executions of the [Reel Heroes] concept." I agree with Kipling that the fact that plaintiffs submitted three separate executions of their Reel Heroes concept is significant. In circumstances in which an inventor submitted multiple executions of his concept, one experienced in the toy industry would identify the core or essence of the concept by focusing on those elements which are present in all of the submitted executions. In this case, all three of plaintiffs' submissions contain the following features:

      a.      A series of sequential images showing Rescue Heroes characters in action, on a mission, etc.

      b.      The images are located *inside* the Rescue Heroes figure's backpack.

      c.      The images can be viewed only by placing one eye up to a magnifying lens on the back of the action figure's backpack.

Because all three of plaintiffs' Reel Heroes submissions included these features, one experienced in the toy industry would interpret these features as the essence or a core of plaintiffs' concept and would consider these features to be necessary to any product using plaintiffs' concept. If they were not necessary features, then one would expect that in the course of showing a "multiplicity of

- 5 -

executions" (to quote Kipling) at least one of the executions would be lacking these features (or at least some of them).  Because none of Fisher-Price's products include these features,  it is clear that Fisher-Price has not used plaintiffs' concept.

**Fisher-Price Did Not
Use Plaintiffs' Concept**

7.     Throughout his declaration (particularly paragraph 34), Kipling distorts Fisher-Price's position in this action as contending "that 'use' would only incur if each and every detail of the [plaintiffs'] prototype were replicated."  Kipling Dec. ¶ 34.  Kipling implies that I have argued that any change from plaintiffs' submissions, no matter how small or immaterial, would be sufficient so that a Fisher-Price product would not be a "use" of plaintiffs' concept.  This has never been my position.  The custom and practice in the toy industry is *not* that *any* change from an inventor's submission, no matter how small or immaterial, will allow the toy company to claim that it did not "use" the inventor's submission.  Instead, as stated in my April 28 declaration (at paragraphs 11-13 and 26-29), the issue is whether the toy company uses the *novel* or *unique* aspect of the inventor's submissions.  If so, then the toy company would typically enter into negotiations for a license agreement which would include a royalty provision.[1]  It is for this reason that Fisher-Price's Concept Submission Form requires the inventor to identify what it considers to be the "unique features" of the submission (although the toy company may not necessarily agree).  If a toy company creates a product utilizing those unique features, the parties would expect to negotiate a

---

[1]     This assumes that the idea was not otherwise obtained from an independent source, developed internally, developed on a work-for-hire basis, subject to other contractual provisions or agreements that did not require royalty, etc.

- 6 -

license including a royalty to be paid (in the absence of considerations like those listed in footnote

2), regardless of whether the non-unique features of the submission had been changed.  Conversely,

if the toy company used the non-unique (*i.e.*, public domain) features of the submission, but not the

novel or unique features, there would be no obligation to pay a royalty.  The Option Agreement is

also consistent with this.  This is the reason that the definition of the Reel Heroes concept attached

as Exhibit A to the Option Agreement specifically identifies what the inventor considered to be

"[t]he unique aspect of the concept."[2]

8.      It is in this context that Fisher-Price's position that it did not "use" plaintiffs'

Reel Heroes concept must be evaluated.  The question to be answered is whether Fisher-Price ever

produced a product incorporating the features that plaintiffs themselves identified as the "unique"

features or aspects of their concept.  Because Kipling and plaintiffs acknowledge that Fisher-Price

never produced a product incorporating the features of the Reel Heroes concept that plaintiffs

identified as unique, plaintiffs have no claim to a royalty.[3]

9.      Kipling also argues in paragraph 34 of his declaration that it would be unfair

to find use only if "each and every detail" of the inventor's submission were replicated because "the

concept and its function" could be "achieved in other ways."  This reflects a problem with

---

[2]      "The unique aspect of the concept" is identified in the Option Agreement as "the combination of existing action figures with film" [in the form of "a battery operated film reel that is activated when the child pushes a button on the back of the action figure"].  Bollinger Dec., Exhibit D.

[3]      This is not to say that these aspects were in fact unique or novel.  However, even assuming they were unique or novel, they were never incorporated into any Fisher-Price product.

- 7 -

plaintiffs' theory that runs throughout plaintiffs' declarations:  the inherent assumption that "the

function" of their Reel Heroes concept is somehow novel and entitled to protection separate and

apart from the specific manner of achieving that function that plaintiffs presented to Fisher-Price.

Describing the "function" of plaintiffs' concept (something Kipling is careful not to do) makes clear

why this is wrong.  From a design perspective, the "function" of the Reel Heroes concept is to

provide a series of sequential images showing the action figure on a mission or adventure to provide

the child with ideas for playing with the action figure.  Kipling does not describe this function

because to do so would make clear that the Toy Biz Projector figures and Mattel Secret Wars

figures described in my April 28 affidavit (at paragraphs 37 & 40) already provided this function in

the 1980s and early 1990s and it was therefore not novel or unique at the time of plaintiffs'

submissions, even as applied to action figures.

        10.     In paragraph 41 of his declaration, Kipling argues that Fisher-Price's Mission

Select Rescue Heroes figures (with the dial containing small decals with symbols relating to disaster

scenarios) "nearly replicated the disc arrangement of images as depicted in the referenced third

submission by Plaintiffs."  This is simply wrong.  Plaintiffs' third submission is attached as Exhibit

A.  It depicts a Viewmaster-type disk (*i.e.*, a cardboard disk containing a series of film images)

showing the particular Rescue Heroes figure on an adventure or mission.[4]  The Viewmaster film

disk is inserted into a toy "digital camera" in the Rescue Heroes figure's hand, and the film is

---

[4]       *See* the reply declaration of Robert J. Lane, Jr., dated June 4, 2005 (the "Lane Reply Dec."), Exhibit B at 199-200.

- 8 -

viewed through a magnifying lens.[5]  A magnifying lens is necessary because plaintiffs' third

submission calls for "six or so images" on a two-inch diameter disk, which would mean that each

image would be approximately .5 inch or less square.

      11.     Plaintiffs' third submission bears no similarity to Fisher-Price's Mission

Select figures.  A photo depicting one of those figures is attached as Exhibit B.  Each Mission

Select figure includes a dial on its backpack.  Instead of a disk with sequential images showing a

Rescue Heroes character progressing through an adventure (which must be viewed by looking

through a magnifying lens), the disk on the Mission Select backpack contains separate iconic

images symbolic of disasters that Rescue Heroes might face.  The icons are used to "select" the

subject that the particular Rescue Heroes figure will talk about when a button is pressed.

      12.     It is important to note the inconsistency in plaintiffs' treatment of the features

disclosed in their three submissions.  Some features — *e.g.,* the location of images ***inside*** some

portion of the action figure which can be viewed only by peering through a magnifying lens with

one eye — are present in all three submissions; yet plaintiffs argue that these features are not a

necessary part of their concept.[6]  In contrast, there are features that are in only one or two of the

submissions (*e.g.,* images in a backpack; in the 2000 Submission, the images are in a toy digital

---

[5]     *See* the declaration of Robert J. Lane, Jr., dated April 29, 2005 (the "Lane Dec."), Exhibit 3 at 136.

[6]     Indeed, they must take this position, because none of the accused products has images located inside an action figure that are viewed through a magnifying lens.  As a second example, all three of plaintiffs' submissions include six or more sequential images showing an action figure character's adventure.  Most of the accused Fisher-Price products include only a single image; the Mission Select figures have a dial with six separate (*i.e.,* non-sequential) disaster icons that do not show the action figure character engaged in an adventure.

- 9 -

camera), which plaintiffs claim are a necessary part of their concept.  This reflects that plaintiffs'

definition of their concept is not consistent with their submissions and, therefore, should not be

credited.

**The Concept Submission**

13.    In paragraph 29 of his declaration, Kipling argues that plaintiffs should not be

bound by their Concept Submission Form because it provides only "a very small box" for

describing a concept, which he argues is insufficient.[7]  This mischaracterizes the role of the Concept

Submission Form.  Its instructions make clear that the inventor is not required to describe "each and

every detail" of the submission.  Kipling Dec. ¶ 34.  Instead, the inventor is requested to describe

only the "unique features/technology" of the submission, for the reasons described above.  The

space provided on the Fisher-Price Concept Submission Form should be sufficient; if it is not, then

the inventor can use more than one space, as Reiling did with respect to the Reel Heroes concept.

Moreover, inventors sometimes attach additional sheets if they believe if they are necessary to

describe the unique features of their concept.  Reiling had done this in the past himself.  Lane Dec.,

Exhibit 16.

**Response to Kipling on Novelty**

14.    Paragraph 39 of Kipling's declaration emphasizes the lack of novelty of

plaintiffs' Reel Heroes concept.  Kipling states:

---

[7]        Reiling actually used three blocks for describing the Reel Heroes concept.  *See* Bollinger Dec., Exhibit C.

- 10 -

> Prior to Plaintiffs' submission, Fisher-Price had no version of Rescue
> Heroes which offered a visual cue or prompt for role-playing in which
> the child would use Rescue Heroes figures to visualize accomplishing
> a mission assignment, resolving a dangerous situation, performing a
> rescue or engaging in some other adventurous pretend scenario.

Plaintiffs cannot rely on the Rescue Heroes characters themselves for distinguishing their concept

from prior art, because they did not invent or create the Rescue Heroes characters. Removing that

element, it is clear that even Kipling's description of plaintiffs' concept is anticipated by the Toy

Biz Projectors figures and the Secret Wars action figures. Each of them offer children "a visual cue

or prompt for role-playing in which the child would use [the action] figures to visualize

accomplishing a mission assignment, resolving a dangerous situation, performing a rescue or

engaging in some other adventurous pretend scenario."

     15.    In paragraphs 48 and 50 of his declaration, Kipling argues that Fisher-Price's

position that plaintiffs' concept lacks novelty is somehow disingenuous, because Fisher-Price never

communicated this to plaintiffs at the time of their submissions. There are three responses to this:

First, Fisher-Price's Senior Vice President of Inventor Relations, Stan Clutton, testified that the

novelty of the concept was never analyzed, because Fisher-Price simply did not use plaintiffs'

concept. Because Fisher-Price rejected plaintiffs' concept on the merits and had no plans to use it,

there was no need to analyze whether the concept was novel.[8] Second, it is not uncommon in the

toy industry that novelty would not be evaluated until the inventor's submission had at least been

---

[8]     Dize Dec., Exhibit A at 110-11.

- 11 -

selected for further design and development.  In this case, of course, the Reel Heroes concept never reached that stage.

16.    Third, and perhaps most importantly, Kipling's argument begs the question of **what** Fisher-Price would have analyzed for novelty.  For example, at the time of plaintiffs' first submission, Fisher-Price personnel may have made a preliminary determination that they had not previously seen an action figure containing a film loop mechanism showing a film of the action figure character on an adventure.  Plaintiffs' submissions provided Fisher-Price them with no notice that the use of **any** images (for example, a decal of a volcano on a dial, like the Mission Select figures) relating to an action figure character's possible adventures were covered by plaintiffs' concept.  Thus, with no reason to be aware of the extraordinarily broad scope of the Reel Heroes concept that plaintiffs are now asserting, Fisher-Price's personnel would have been unable to comply with Kipling's preference that lack of novelty be communicated soon after the inventor's submission.

17.    In paragraph 49 of his declaration, Kipling asserts that "the requirement of 'novelty'. . . in the toy industry . . . is not a significant consideration."  This is simply incorrect and it is shown to be incorrect by the Hasbro submission agreement attached as Exhibit G to the Victor Reiling declaration, which Kipling indicates that he himself drafted.  Kipling Dec. ¶ 15(b). Paragraph 6.1 of the Hasbro agreement specifically indicates that the toy company will have no obligation with respect to submissions that were "known to the public or generally available to the public prior to the date of disclosure," or which "become known to the public or generally available to the public subsequent to the date of disclosure" or which "was disclosed by the disclosing party

- 12 -

to any third party without obligation to maintain confidentiality."  Thus, the Hasbro inventor

submission agreement drafted by Kipling demonstrates that his statements that novelty is not a

significant consideration in the toy industry is inaccurate; in the absence of novelty, Hasbro

disclaimed any obligations to the inventor.

**Plaintiffs Cannot Rely on Features
Developed by Fisher-Price to
<u>Distinguish Their Concept From the Prior Art</u>**

18.    Reiling and Kipling both attempt to distinguish the Reel Heroes concept from

the Toy Biz Projector figures and the Secret Wars figures because:  (1) those figures are not

"Rescue Heroes" characters; and (2) the images of those figures in action or on an adventure are not

located on a backpack.  Kipling Dec. ¶ 54(a); Reiling Dec. ¶ 49.  These attempted distinctions fail

for two reasons.

19.    First, plaintiffs themselves have acknowledged that the Reel Heroes concept

is not limited to images on a Rescue Heroes figure or located on or in a backpack.[9]  A review of

plaintiffs' three submissions and the accused products show that plaintiffs do not believe their

concept is limited to images on an action figure's backpack.  In plaintiffs' 2000 Submission, the

Viewmaster-style disk containing images of a Rescue Heroes figure in action is inserted into a

digital camera held in the figure's hand in front of its body; it is not associated with the backpack in

any respect.  Bollinger Dec., Exhibit I.  Plaintiffs also claim that the use of images in the Fisher-

---

[9]    *See* Lane Dec. ¶ 31.

- 13 -

Price vehicles and the MACC and ARCC playsets is a "use" of the Reel Heroes concept.  Reiling Dec. ¶¶ 61-62.  The images on those products are not located on a backpack.  In addition, as discussed in the April 29 Lane declaration (¶ 31(b)), the Reel Heroes concept has never been limited to Rescue Heroes action figures.  Indeed, in their February 20, 2004 interrogatory answers, plaintiffs admit that they submitted the Reel Heroes concept "to Toy Biz for consideration in connection with its 'Spiderman Friends' line of toys."  Lane Dec., Exhibit 35 at 2.  They even submitted a model showing the film strip backpack on a Spiderman-shaped action figure.  *See* Lane Dec., Exhibit 36, page 2 (showing a photo of that model).  Thus, the Reel Heroes concept cannot be restricted to Rescue Heroes action figures and images contained on backpacks in order to avoid anticipatory prior art.

20.     Second, plaintiffs' argument that they can rely on features developed by Fisher-Price (*i.e.,* the Rescue Heroes characters, with their backpacks) simply makes no sense.  In evaluating the novelty or lack of novelty of an inventor's submission, the focus should be on what the ***inventor*** has created, not pre-existing products or features which the inventor did not contribute.  Only in this way can it be determined whether the ***inventor*** contributed anything novel or unique.  Moreover, as discussed above, if plaintiffs were permitted to rely on the Rescue Heroes characters and their backpacks to distinguish the Reel Heroes concept from prior art, this would lead to absurd results.  Assuming that the Rescue Heroes action figures with backpacks were novel, then ***anything*** that an inventor suggested as an addition to those products would itself automatically be novel and unique under plaintiffs' analysis.  Obviously, that would allow the inventor to "free-ride" on the novelty of the pre-existing product.

- 14 -

**Kipling's Statements**
**Regarding Prior Art**

   21. In an effort to distinguish the prior art identified in my initial declaration,

Kipling makes several inaccurate statements.

     a. First, Kipling states that "the Toy Biz product simply does not fulfill

the main purpose of plaintiffs' concept which was to '. . . give the child a great start on fantasy

adventures . . . [by means of] clips of obstacles and dangers each might face. . . .'"  Kipling Dec. ¶

54(a).  Kipling then cites to column 3 of the Toy Biz patent, which states that "the ability to project

images which may be related in some manner to the character of the toy figure greatly increases the

'play value' and appeal of such a product to children."  He argues from this that the Toy Biz patent

would allow the projected images to be ***unrelated*** to the character, which would be different from

the Reel Heroes concept.  Kipling Dec. ¶ 54(a).  He further states that "[n]o reference is made to

mission assignments, rescue situations or any story line associated with the activities and pretend

scenarios in which the child having the toy may be led to engage."  Kipling Dec. ¶ 54(a).

     b. This is simply wrong.  First, the Toy Biz patent indicated that the

preferred embodiment of the invention includes images related "to the character of the toy figure"

because it "greatly increases the 'play value" and appeal of such a product to children."[10]

Moreover, Kipling admitted at his deposition that the Toy Biz patent "disclose[d] to the public the

---

[10] Lane Dec., Exhibit 41 (column 3, lines 60-61).

- 15 -

idea of an action figure including a disk showing film images of the action figure having an

adventure."[11]  Thus, the idea behind the Reel Heroes concept was disclosed in the Toy Biz patent.

         c.      In any event, Kipling entirely ignores the actual Toy Biz Projector

products that were successfully sold to the public between 1994 and 1996.  Attached as Exhibit C is

a  photograph of a Wolverine Projector figure sold by Toy Biz to the public.  This action figure

includes three disks, each with twelve sequential film images showing the Wolverine character

during an adventure.  Attached as Exhibit D are photographs of the packaging for the Wolverine

Projector figure, together with the printed materials included inside the package.  The packaging

indicates that it includes "3 Different **Adventures** from the TV Animation" and "Pop in the Film

Disk . . . Project on the Wall & Recreate the Action!"  The third page of Exhibit D is a photocopy of

printed materials that accompanied the Wolverine projector figure.  Those materials state:

> The film disks provided with your figures are all taken directly from
> the X-Men animated TV show.  Each film disk tells a different story.

It then lists the three different film disks, identifying each as an "Adventure Story."  Thus, Kipling's

argument that "the Toy Biz figures function simply as **projectors of films that may be entirely**

**unrelated to the characters**" (emphasis in original) is demonstrably incorrect.  The Court can

confirm this for itself.  An actual sample of the Wolverine Projector figure with film disks showing

the character's adventures has been submitted to the Court as Exhibit N to my April 28 declaration.

Most troubling is the fact that Kipling himself admitted in his deposition that his statements in his

---

[11]      *See* Lane Reply Dec., Exhibit C at 88.

declaration about the Projector figures are not true, agreeing that the film disks that accompanied the Wolverine projector figure did in fact show the figure on an adventure.[12]

        d.      Next, Kipling attempted to distinguish the Toy Biz Projector figures because they were "meant to project images onto a wall or through the chest, while Plaintiffs' concept principally envisioned that images would be viewed on or in the backpacks themselves." Kipling Dec. ¶ 54(a).  This is directly contrary to Kipling's deposition testimony, in which he agreed that an action figure "which contained a projector mechanism in its chest [which] when switched on would project the action figure's next adventure on to a nearby wall . . .  would embody plaintiffs' concept."  Lane Dec., Exhibit 11 at 49.  Moreover, both Bruce Popek and Bruce Benedetto testified that the concept of projecting the action figure's adventures on to a nearby wall *was* part of the Reel Heroes concept.  *See* Lane Dec. ¶¶ 47 & 49.  In any event, as discussed in paragraph 38 of my April 28 declaration, the Toy Biz patent discloses an alternative embodiment of the projector action figure invention under which the child looks through the lens on the action figure's chest to view the images within.  *See* Bollinger Dec., Exhibit O at column 3 lines 56-58 ("Alternatively, the images may be viewed internally by placing the lens directly in front of the eye.").  This shows that the idea of an action figure containing multiple sequential images showing the action figure's character on an adventure or mission was in the public domain by 1996 when the Toy Biz patent was published, at the latest.

---

[12]      Lane Reply Dec., Exhibit C at 79-80 (Kipling agreed that the Wolverine Projector figure "as marketed to the public included disks showing images relating to each particular action figure that the disks were sold with").

- 17 -

   e.  Kipling also seems to attempt to distinguish the Toy Biz Projector figure because the images are viewed within the chest or projected from the chest, rather than viewed within the backpack or projected from the backpack. Kipling Dec. ¶ 54(a). As discussed above, locating the images in or on the backpack is not a limitation of the Reel Heroes concept and cannot be, because it relies on features that pre-existed the concept. Plaintiffs' submissions themselves also reflect that the images need not be located on or in a backpack. The 2000 Submission refers to a Viewmaster disk located inside a toy digital camera held in the action figure's hand.[13]

   f.  In a final effort to distinguish the Toy Biz Projector figures from the Reel Heroes concept, Kipling argues that "the figures themselves have so few points of articulation (*i.e.,* movable joints) relative to their size that they can hardly be considered 'action figures' at all." Kipling Dec. ¶ 54(a). This is not a serious argument. Action figures come with different combinations of articulating joints. The Toy Biz Projector figures are articulated at the shoulders, hips, and neck, which is common for action figures (although some have a greater number of points of articulation). The packaging and marketing materials make clear that the Projector figures are

---

[13]  The 1998 Submission also referred to projection, indicating: "the same film clips could be rear projected for a large screen look at the action." Bollinger Dec., Exhibit F.

- 18 -

intended to be played with by the child, the same as any action figure.  Finally, plaintiff Victor

Reiling admitted in his deposition testimony that the Projector figures are, in fact, "action figures."[14]

        22.     Kipling's attempt to distinguish the Secret Wars action figure prior art is even

less persuasive.  He agrees that "these figures come with images of the characters involved in

exploits of one kind or another, and that the images can be positioned on the fronts of shields held

by the figures."  Kipling Dec. ¶ 54(b).  Kipling attempts to distinguish the Secret Wars figures

solely on the basis that "the images are only visible to one who is ***facing the figure from the front***

— that is, when properly positioned, the ***image cannot be 'seen' by the figure itself***."  *Id.* (emphasis

added).  First, it is hard to understand how this distinguishes the Secret Wars figures from either

plaintiffs' first two submissions or the accused Rescue Heroes figures.  Plaintiffs' first two

submissions included film or images ***inside*** the figure's backpack; the images "cannot be 'seen' by

the figure itself."  Fisher-Price's Mission Command, Voice Tech Video Mission, and Mission

Select figures all include images on the ***outside*** of the figure's backpack, which "cannot be 'seen'

by the figure itself."  Finally, plaintiffs' third submission calls for images on a Viewmaster film disk

inserted in a toy digital camera held in front of the Rescue Heroes action figure in its hand and

viewed by the child from the front by placing his eye up to a magnifying lens on the toy digital

---

[14]     Attached as Exhibit B  to the Lane Reply Declaration are pages 158-59 from the February 15, 2005 Victor Reiling deposition, agreeing that the Wolverine Projector figure is an action figure suitable for a child to pretend and role-play with.

- 19 -

camera.  Bollinger Dec., Exhibit I.  This is the exact same orientation as the shield in the Secret

Wars figure's hand.  Kipling's attempt to distinguish the Secret Wars prior art should be rejected.[15]

23.    In paragraph 54(c) of his affidavit, Kipling discusses the playsets offered by

Fisher-Price as prior art.  He does not dispute that the playsets satisfy every element of the

definition of the Reel Heroes concept he advocated in his expert report; *i.e.,* each playset displays

images "for visually communicating to the mind of a child a cue or prompt for role-playing in

which the child would use [an action] figure and imagine accomplishing a mission assignment,

resolving a dangerous situation," etc.  He attempts to distinguish the playsets as involving only

"general communications," without explaining the significance of this.  All of the playsets show

action figure characters engaged in adventures or missions.

24.    Kipling's only other point of distinction between the playsets and the Reel

Heroes concept is that "none convey visual messages to figures via their backpacks or devices

connected to their backpacks, and, most significantly, none of the playsets involves the Rescue

Heroes."  Kipling Dec. ¶ 54(c).  This attempted distinction is not contained in ***any*** of plaintiffs'

various definitions of the Reel Heroes concept.  Moreover, the attempted distinction that "none of

the playsets involves the Rescue Heroes" is nonsense.  Obviously, nothing offered as prior art with

---

[15]    Plaintiffs acknowledge that all three submissions are alternative embodiments of a ***single*** Reel Heroes concept.  Reiling Dec. ¶ 23.  Thus, the third submission makes clear that it is not a necessary element of the concept that the images be displayed on or in the Rescue Heroes figure's backpack or be viewed from behind the figure.

- 20 -

respect to Rescue Heroes would involve Rescue Heroes, which is a proprietary Fisher-Price product.

25.     Plaintiffs also attempt to distinguish the Toy Biz figures and Secret Wars figures on the basis that they do not display images that can be "viewed from behind" the action figure. Reiling Dec. ¶ 44. This distinction has nothing to do with any of plaintiffs' various definitions of the concept. None of those definitions include the "viewed form behind" language or anything similar. Plaintiffs never explain why "viewed from behind" would be a material element of their concept. Moreover, as discussed above, plaintiffs' 2000 Submission reflects an execution of plaintiffs' concept in which the images must be viewed by placing one eye up to a magnifying lens on a toy digital camera to see film images within. That toy digital camera is held in front of the action figure and cannot be "viewed from behind." Finally, plaintiffs have asserted that Fisher-Price's Optic Force Matt Medic figure (holding an X-ray machine displaying an image in his left hand in front of his chest), Fisher-Price's ARCC and MACC playsets, and Fisher-Price's Mission Select vehicles are all "uses" of the Reel Heroes concept. None of them include images that are "viewed from behind." In each instance, the images must be viewed by looking at the item from the front.

26.     In paragraphs 25 and 26 of his declaration, Kipling seems to abandon the definition of plaintiffs' Reel Heroes concept that he advocated in his expert report and defended in his deposition, adopting in its place an earlier definition that had been provided by plaintiffs in the form of an interrogatory answer (and which had been presumably superseded by Kipling's later definition). This change was made in response to Fisher-Price's argument that the definition

- 21 -

Kipling proposed lacks concreteness and that his definition reads on the prior art products described in my original declaration. Kipling Dec. ¶ 25. Nevertheless, Kipling seems to take the position that, while he now prefers the definition offered by plaintiffs in their March 2, 2004 interrogatory answers, the definition he advocated in his expert report is still "one possible definition of plaintiffs' concept." *Id.* If Kipling's definition remains "one possible definition of plaintiffs' concept," then he presumably continues to contend that it is still accurate (although perhaps not sufficiently concrete). Kipling never disputes in his declaration that the prior art identified in my original declaration satisfies the definition of the Reel Heroes concept in his expert report. Accordingly, those items of prior art are embodiments of plaintiffs' concept and anticipated plaintiffs' concept, rendering it non-novel.

## REPLY TO THE REILING DECLARATION

27.    In paragraph 13 of his declaration, Reiling notes that "the agreements and forms that toy companies require inventors to sign in order to do business are not uniform." He indicates that "Hasbro uses a concept submission form that provides on its face that the submission is confidential."

28.    The Hasbro agreement attached as Exhibit G to Reiling's declaration provides an interesting example of how the current dispute would be handled by other toy companies.[16]  I was Senior Vice President responsible for inventor relations during a number of

---

[16]    Plaintiffs' expert, James Kipling, states that he drafted this document when he was counsel to Hasbro. Kipling Dec. ¶ 15(b).

- 22 -

years when this form was in use.  Paragraph 13 of the Hasbro agreement provides:

> [T]he obligation of confidentiality imposed by this Agreement shall extend . . . for two years from the date of the initial disclosure of such information. . . . ***Upon expiration of the stated period, the Company shall have no further obligations to inventor with respect to such disclosures of confidential information.***[17]

The effect of this provision is that Hasbro agreed only that it would not use or disclose the inventor's submission for a period of two years "without the consent of the disclosing party." Reiling Dec., Exhibit G ¶ 4.[18]  After the expiration of two years from the date of initial disclosure, Hasbro had the contractual right to use or disclose the inventor's submission without restriction and without the necessity of compensating the inventor.  *Id.* ¶ 13.

29.    ***Under the circumstances of this case, if the Hasbro agreement had been in effect, plaintiffs would be owed no royalty***.  Their initial disclosure of the Reel Heroes concept was made on October 29, 1998.  Bollinger Dec., Exhibit C.  The first accused Fisher-Price product at issue in this case was sold to the public in early 2001.  Berkheiser Dec. ¶ 15.[19]  Because this was more than two years after plaintiffs' initial disclosure, if the Hasbro agreement had been in effect, they would have had no claim against Fisher-Price.  This directly undercuts Kipling's claim that the

---

[17]    Reiling Dec., Exhibit G ¶ 13 (emphasis added).

[18]    And even this obligation was only assumed if the information was not otherwise public, did not come to Hasbro through other sources, etc.  *Id.* ¶ 6.1.

[19]    Plaintiffs have also asserted claims against the Voice Tech vehicles, which were on the market earlier than 2001, but only to the extent that they were "sold together with" accused Rescue Heroes figures.  Kipling Dec. ¶ 43.  Thus, under plaintiffs' theory, there was no "use" of their concept until the Mission Command figures appeared on the market in early 2001.

- 23 -

Fisher-Price submission agreements are somehow unfair to the extent that they relieve Fisher-Price

from liability for alleged unauthorized use of the Reel Heroes concept; the Hasbro agreement

authored by Mr. Kipling would have had the same effect under the circumstances of this case.

30.     The Hasbro agreement is also instructive on another issue.  Plaintiffs argue

that they should not be bound by the definitions of the Reel Heroes concept in the Concept

Submission Form and the Option Agreement.  Kipling Dec. ¶¶ 16-21.  The Hasbro agreement

makes clear that they would have been bound by these documents in any dealings with Hasbro.

Paragraph 6.1 of the Hasbro agreement states:

> The obligations of the receiving party with respect to identified
> information is set forth in this Agreement are not applicable to any
> information which: . . . .
>
> (D) has not been described and memorialized in the Company's
> Inventor Review Record. . . .

Reiling Dec., Exhibit G ¶ 6.1(D).  The Hasbro "Inventor Review Record" served the same purpose

as the Fisher-Price Concept Submission Form.  The effect of this paragraph is that Hasbro assumed

**no obligations** with respect to anything that was not "described and memorialized" in Hasbro's

version of the Concept Submission Form.  In the circumstances of this case, this would mean that

Fisher-Price would have no obligation with regard to anything not described in Reiling's October

29, 1998 Concept Submission Form.

31.     In paragraph 32 of his affidavit, Reiling acknowledges as follows:  "Fisher-

Price **accurately** recognizes in Exhibit A [to the Option Agreement] that the 'unique aspect of the

concept is the combination of existing action figures with film for play pattern."  This appears just

- 24 -

below the language stating "the concept is a battery-operated film reel that is activated when the child pushes a button on the backpack of the action figure. The child may then look through the viewer on the backpack to see the film." Fisher-Price never used this concept, and neither Kipling or Reiling claim that they did.

32.     Reiling's admission that the "unique aspect" of the concept is "accurately" described in Exhibit A of the Option Agreement is significant, because Fisher-Price never used film with any action figure product. Reiling's argument that the word "film" does not mean "film" (Reiling Dec. ¶ 32), should be rejected. This is a particularly surprising argument coming from a toy designer with over 35 years experience. Parties to option agreements take great care to describe the inventor's concept as accurately as possible. Moreover, it is clear that the reference to "film" refers to what Reiling described as "at least a thirty-second film strip" in his narrative submission document. Bollinger Dec., Exhibit F.

33.     In paragraph 34 of his declaration, Reiling states that "it was not necessary to the second execution of the concept that the child place one eye up to a magnifying lens and look inside the backpack. . . . as Fisher-Price suggests." In paragraph 36, he states that "it was not necessary to the third execution of the concept that the child place one eye up to a magnifying lens and look into the interior of the backpack . . . as Fisher-Price suggests." Both of these statements are incorrect.

34.     In paragraph 23 of his declaration, Reiling states that "plaintiffs submitted their novel concept to Fisher-Price in three different variations." All three of those variations

- 25 -

showed the child placing one eye up to a magnifying lens to view film images (whether on a film strip or Viewmaster-type disk or a drum) inside a Rescue Hero's backpack.[20]  As discussed above, the fact that all three of plaintiffs' submissions include the element of showing small images inside the backpack which can be viewed only by placing one eye up to a magnifying lens reflects that this was the essence or core of plaintiffs' concept and that one would expect it to be present in any execution of that concept.

35.    Describing the 1999 Submission, Reiling states that "the 8 or more images on a drum that we proposed were approximately the same size as the images Fisher-Price ultimately used."  Reiling Dec. ¶ 34.  This is demonstrably untrue.  The images on the cards used in the Mission Command backpack are 1.25 by 1.5 inches.  A drum containing eight of those images would have a circumference of 10 inches and a diameter of approximately 3.6 inches.  A Rescue Heroes backpack is 3.5 inches tall and less than 1.5 inches deep.  A drum with a 3.6 inch diameter would not come close to fitting in a Rescue Hero backpack.  Reiling's statement that the 1999 Submission contemplated images the same size as those appearing on Rescue Heroes Mission Command figures is simply inaccurate.

---

[20]    *See* Bollinger Dec., Exhibit F (page 2) (showing the child looking through a magnifying lens to see the film strip within the first submission); Exhibit H at page 2 (showing the child looking through a magnifying lens labeled "magnifying lens" as a specific feature of the viewing mechanism); Exhibit I at page 4 (showing the child placing one eye up to a magnifying lens to look within the toy digital camera to see the Viewmaster disk images in the third submission).

- 26 -

Dated:      June 3, 2005

                                        _____s/Howard Bollinger_____
                                                  Howard Bollinger

BFLODOCS 1258189 v1