UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

VICTOR G. REILING ASSOCIATES and
DESIGN INNOVATION, INC.,

                              Plaintiffs,

        - against -

FISHER-PRICE, INC.,

                              Defendant.

Index No.: 3:03 CV 222 (JBA)

June 27, 2005

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE

### Preliminary Statement

Plaintiffs, Victor G. Reiling Associates ("Reiling") and Design Innovation, Inc. ("DI") (collectively, "Plaintiffs"), respectfully submit this memorandum in opposition to Fisher-Price's Motion to Strike portions of the declarations of plaintiffs' expert, James M. Kipling, and plaintiff, Victor G. Reiling. Fisher-Price attempts to portray Mr. Kipling as a mere "attorney in private practice" and therefore, not qualified to render opinions regarding toy design, toy use, novelty, concreteness or prior art. As a threshold matter, Mr. Kipling has not offered any opinions in this case regarding toy design, or for that matter, any opinions that would require expertise in toy design. Although Mr. Kipling does render opinions regarding toy use, play patterns, novelty and prior art, Fisher-Price has failed to mention that Mr. Kipling was a patent attorney at a toy company for more than twenty-five years. As such, he is qualified to give opinions regarding novelty and prior art. His responsibilities and experience while a patent attorney for General Electric, and patent counsel for Kenner Toy Company and its successors,

illustrate that he is so qualified. Novelty and prior art were concepts he dealt with on a daily basis, as is the case with most, if not all, patent attorneys. In addition, Mr. Kipling's experience of more than thirty years in the toy industry demonstrates that he is qualified to give opinions about toy use, play patterns and the concreteness of toy concepts.

Fisher-Price also seeks to strike portions of the declaration of Victor G. Reiling on the grounds that he has offered undisclosed expert opinions. However, a review of Mr. Reiling's declaration makes clear that he has simply commented upon his personal experiences as an inventor in the toy industry. While Fisher-Price attempts to portray his testimony as involving "specialized knowledge," the fact is that Mr. Reiling has testified regarding his first-hand, personal observations. Furthermore, a review of Mr. Reiling's testimony reveals that the experiences about which he testifies are not based upon specialized knowledge at all, but instead would be observable by anyone who has submitted ideas to toy companies.

For the following reasons, Plaintiffs respectfully submit that Fisher-Price's Motion to Strike should be denied in all respects, and the declarations of James M. Kipling and Victor G. Reiling should be fully considered by the Court in opposition to Fisher-Price's Motion for Summary Judgment.

I.     **PORTIONS OF THE DECLARATION OF JAMES M. KIPLING SHOULD NOT BE STRICKEN**

   A.     **Kipling Is Qualified to Give Opinions Regarding Novelty and Prior Art**

Fisher-Price alleges that James M. Kipling ("Kipling") is not qualified to render opinions regarding the novelty of toy and game concepts or the evaluation of prior art. (*See* Memorandum in Support of Fisher-Price's Motion to Strike, dated June 4, 2005 ("Motion to Strike Memo.") at 4.) Fisher-Price attempts to portray Kipling as simply "a lawyer in private practice" who was previously "a lawyer in the legal department of Kenner/Hasbro," implying that he would have no

practical experience with regard to these issues. (*Id.* at 1.) However, nothing could be further from the truth. Such an argument is based upon a misunderstanding of Kipling's responsibilities while employed with General Electric, Kenner and Hasbro. (*See* Declaration of James M. Kipling in Opposition to Defendant's Motion to Strike, dated June 27, 2005 ("Kipling Strike Decl.") ¶¶ 9-22.)

Kipling was a patent attorney during his tenure at General Electric for approximately six years from the late 1960's to the mid 1970's. (*Id.* ¶ 10.) He participated in a training program that taught new attorneys to become patent attorneys. (*Id.*) As part of that program, he was trained in conducting patent searches, evaluating prior art and in determining if a proposed product or invention was novel in view of the prior art and whether the implementation of such an invention might infringe adversely held patent rights. (*Id.*) He was also trained in preparing patent applications, including patent claims. (*Id.*)

After successfully completing the training program, Kipling worked in the Aircraft and Engine Group of General Electric in Cincinnati, Ohio. (*Id.* ¶ 11.) His job was to prepare, file and prosecute patent applications before the United States Patent Office, to evaluate novelty, patentability and freedom-to-practice of new product designs and features. (*Id.*) His responsibilities included conducting patent searches, evaluating prior art revealed by the patent searches and making determinations regarding the novelty, or lack thereof, of such proposed products. (*Id.*) Evaluating prior art and making determinations regarding novelty were functions that he performed on a daily basis for more than five years with General Electric, an industry-leader in innovation. (*Id.*)

Moreover, prior to Kipling's training and experience as a patent attorney, his undergraduate degree was Bachelor of Science in Mechanical Engineering. (*Id.* ¶ 12.)

Throughout the period of his engineering education, he worked as an engineering apprentice with a leading machine tool manufacturer (R.K. LeBlonde Machine Tool Company) which had awarded Kipling a five year engineering scholarship to the University of Cincinnati. (*Id.*) This education and actual engineering experience provided Kipling with a thorough understanding of how mechanisms included in toys and their features would function. (*Id.*)

Later, Kipling became House Counsel for Kenner Toy Company and he continued in that position for Kenner and its successors, including Hasbro, for more than twenty-five years. (*Id.* ¶ 13.) He was also Patent Counsel for Kenner, as he was the sole in-house patent attorney employed by the company during that time. (*Id.*) His responsibilities included making determinations regarding the advisability of seeking patent protection for Kenner's new toy products, including those conceived in-house and also those submitted by outside inventors. (*Id.*) In deciding whether to seek patent protection for a particular toy, he regularly made determinations regarding whether the toy in question was novel and non-obvious to one reasonably skilled in the art. (*Id.*) He also conducted and evaluated patent searches to determine what toys had been disclosed by the prior art, and compared the prior art with the proposed toy. (*Id.*) Because Kipling was the only in-house patent attorney, he was the ultimate in-house authority at Kenner on the issues of novelty and prior art. (*Id.*)

In fact, at the same time, Howard Bollinger (defendant's expert) ("Bollinger") worked at Kenner in product development, but in a limited design capacity. (*Id.*) He often came to Kipling with questions regarding the patentability of new products or with concerns about potential conflicts with the patent rights of existing products (*Id.*) Of course, in making such determinations for Mr. Bollinger and providing such advice, the essential elements Kipling was dealing with were novelty, evaluation of prior art and comparison of the features of existing toys.

4

(*Id.*) Bollinger does not have a degree in engineering. (*Id.*) Considering Kipling's education and training as an engineer and as a patent attorney, his experience in innovative technology while with General Electric as well as in the toy industry, he is better equipped than Bollinger is now, and was better equipped than Bollinger was when they worked together, to make determinations regarding novelty and prior art with respect to the features and functions of toys. (*Id.*)

In addition to reviewing products being developed by Kenner to determine patentability, Kipling was also in charge of the company's patent portfolio. (*Id.* ¶ 14.) He was responsible for overseeing outside patent counsel with regard to the prosecution of patent applications. (*Id.*) He was also responsible for evaluating competitor's products to make determinations about whether those products infringed Kenner's patent portfolio. (*Id.*) Similarly, in the event a legal action was threatened or brought against Kenner for infringement, Kipling was responsible for comparing Kenner's product with the claimant's patent to determine if there was an infringement. (*Id.*) If any of these situations resulted in litigation, he selected counsel and supervised the proceeding to its conclusion. (*Id.*) Throughout his tenure as Patent Counsel, he evaluated toy products and their features for novelty, compared them with other toys for similarity and evaluated them in connection with prior art. (*Id.*) It is astounding that Fisher-Price would question Kipling's qualifications on these issues, as this is what patent attorneys do every day. (*Id.*)

**B.    Kipling Is Qualified to Give Opinions Regarding Toy Use
and Play Patterns of Children**

Fisher-Price also asserts that Kipling is not qualified to give expert opinions regarding toy design and use. (*See* Motion to Strike Memo. at 4.) As a threshold matter, Kipling does not claim expertise in the limited area of toy design, nor has he offered any opinions in this case that would require expertise in toy design. (Kipling Strike Decl. ¶ 15.) To the contrary, Kipling has

given opinions regarding toy novelty and use, toy features and play patterns of toys, all areas in which he is qualified to give expert opinions based upon his experience. (*Id.*)

Fisher-Price's arguments regarding Kipling's qualifications seem to stem from a misunderstanding of his role as in-house counsel for Kenner. (*Id.* ¶ 16.) Fisher-Price would have the Court believe that Kipling was simply drafting and revising agreements every day for more than twenty-five years. (*Id.*) In actuality, as the only in-house attorney for Kenner, he was part of the management team of the company and was not engaged solely in legal work. (*Id.*) Tasks were not highly compartmentalized, and he dealt with and developed broad facility with toys and related business matters, as well as with broad legal issues affecting the business. (*Id.*)

One of Kipling's responsibilities was to ensure the company maintained compliance with Federal Trade Commission ("FTC") regulations regarding advertising of toys, particularly with regard to television commercials. (*Id.* ¶ 17.) Pursuant to FTC regulations, a toy manufacturer could not advertise a product in a manner that was misleading. (*Id.*) That is, the manufacturer could not show a toy functioning in a way that it was incapable of functioning, nor could it show children playing with a toy in a manner that was inconsistent with how children actually played with the toy (i.e., the "play pattern"). (*Id.*) Kenner had to be very careful to portray products and play patterns accurately. (*Id.*) Accordingly, Kipling had to be intimately familiar with how Kenner's products worked and how children played with them, so that he could be sure that Kenner's advertising was FTC compliant. (*Id.*)

Once Kipling was aware of the various FTC restrictions, he became intimately and continuously involved in this area and insisted that he approve all commercials that Kenner planned to air. (*Id.* ¶ 21; *See also* discussion of Kipling's FTC related activities with specific products, ¶¶ 18-20.) Much of his time was spent evaluating toys, features, play patterns and

related television commercials, as well as brochures, packaging and other types of product representations, to determine if they accurately portrayed the capabilities of the toy and the play pattern that the child would experience. (*Id.* ¶ 21.) In order to be in a position to approve the advertisements, Kipling had to understand how Kenner's products worked. (*Id.*) He also had to understand the manner in which a child would play with a toy, and he spent substantial time observing "play tests," in which Kenner toys were actually used by children. (*Id.*)

During most of his career at Kenner, Kipling routinely reviewed all forms of advertisements for FTC compliance and he signed off on all such advertisements. (*Id.* ¶ 22.) As a result, he became intimately familiar with how toys work and how children perceive and play with them. (*Id.*)

## C.    Specific Paragraphs in the Kipling Declaration Should Not Be Stricken

Fisher-Price argues that paragraphs 22 through 24 of Kipling's declaration should be excluded because he makes statements regarding "play patterns," "role-playing scenario," and "performance of a particular design." (Motion to Strike Memo. at 4.) As outlined previously herein, these are all areas he dealt with extensively during his career and in which he has attained high levels of expertise, which likely exceed those of Fisher-Price's expert witness. (Kipling Strike Decl. ¶ 23.)

Fisher-Price argues that paragraph 28 of Kipling's declaration should be excluded because he discusses different ways in which a toy concept can be executed. (Motion to Strike Memo. at 4.) However, this is an issue Kipling dealt with nearly every day during his tenure at Kenner. (Kipling Strike Decl. ¶ 24.) As previously discussed herein, he had to understand how each toy functioned and what each toy was delivering with respect to play value. (*Id.*) Further, in drafting as well as overseeing the drafting and prosecution of patent applications with the United

States Patent and Trademark Office, he routinely dealt with (and even created) alternative ways in which toys could achieve results equivalent to those of initial designs. (*Id.*)

With regard to paragraphs 39 through 43, Fisher-Price alleges that Kipling impermissibly compares Plaintiffs' submissions with defendant's products and comments on play value and design features. (Motion to Strike Memo. at 4.) As discussed previously herein, this is exactly what Kipling did nearly every day, both in his role as patent counsel for Kenner, as well as in his role of evaluating product representations made in advertising. (Kipling Strike Decl. ¶ 25.) He evaluated toys that potentially infringed upon Kenner's toys, which necessarily involved a comparison of toy features. (*Id.*) He evaluated claims of infringement by Kenner's competitors, which involved a similar comparison of toy features. (*Id.*) Kipling's patent background and experience enabled him to ascertain the novel features of a toy, and his non-patent background, including his engineering and advertising experience, enabled him to identify, evaluate and understand the toy's design features, equivalent structures and the child-user's play patterns with toys. (*Id.*)

Fisher-Price alleges that paragraph 54 of Kipling's declaration should be excluded because he evaluates the prior art presented with its Motion for Summary Judgment. (Motion to Strike Memo. at 4.) This is an incredible argument, given that Kipling was a patent attorney for more than twenty-five years. (Kipling Strike Decl. ¶ 26.) Throughout the product development process, he evaluated prior art in making determinations about the patentability of Kenner's toys, whether Kenner's proposed toys infringed anyone else's patents and whether anyone else infringed upon Kenner's patents. (*Id.*) In doing so, he had to evaluate the prior art and make determinations of novelty. (*Id.*) That is what a patent attorney does every day. (*Id.*)

Fisher-Price argues that paragraphs 49 through 51 of Kipling's declaration contain opinions that are contrary to law, and should be excluded. (Motion to Strike Memo. at 5-6.) As a preliminary matter, Kipling's opinions in these paragraphs concern how the toy industry operates based upon his many years experience in the industry. (Kipling Strike Decl. ¶ 27.) He is not testifying about the law, but rather about the custom and practice in the toy industry and how the industry operates. (*Id.*) Fisher-Price contends that Kipling did not consider any law in rendering his opinions, but that statement is simply incorrect. (*Id.*) The quoted testimony was taken from Kipling's first deposition in this matter. (*Id.*) By the time he was deposed again and issued his Second Supplement to Expert Report, he had reviewed and considered *Nadel v. Play-By-Play Toys and Novelties* in great detail, and his opinions about the facts of present case remained unchanged. (*Id.*) In fact, Kipling's opinions are entirely consistent with the *Nadel* case. (*Id.*) Furthermore, the product in question in the Nadel case had a much lower level of novelty than Plaintiffs' submissions in this case. (*Id.*) The toy at issue in Nadel was nothing more than an existing mechanism performing its same function in a fabric covering having a different appearance than the original. (*Id.*)

Fisher-Price argues that paragraphs 15, 16 and 19 should be excluded because they are legal conclusions. (Motion to Strike Memo. at 7-8.) Again, these are Kipling's opinions based upon custom and practice in the toy industry and his own perceptions of the industry's ethical sensibilities. (Kipling Strike Decl. ¶ 28.)

Finally, Fisher-Price argues that paragraphs 44 through 47 of Kipling's declaration should be excluded, allegedly because there is no basis for his statements regarding CarterBench in the record. (Motion to Strike Memo. at 8-9.) Again, this is incorrect. (Kipling Strike Decl. ¶ 29.) Kipling's expert reports had previously commented on the same issue and the facts in

evidence. (*Id.*)    More particularly, the license agreement that Fisher-Price signed with CarterBench states at a later-added page near its end that the specified royalty would be paid *even though the novel concept submitted by CarterBench,* which was voice synchronized with a lenticular lens, *was not used by Fisher-Price.* (*Id.* ¶ 29, Exh. A.) Moreover, a handwritten note by one of Fisher-Price's product development employees that was produced in this case confirms that the specific CarterBench concept submission on which the royalty was based was made at Fisher-Price's request. (*Id.* ¶ 29, Exh. B.)    These "odd" factors create serious implications pertinent to this case, upon which Kipling comments in the above-referenced paragraphs. (*Id.* ¶ 29.)    Based upon these documented facts, it is reasonable to believe that Fisher-Price used a fabricated low royalty paid to CarterBench to reduce its total royalty obligation at Plaintiff's expense. (*Id.*)    The facts that (a) Fisher-Price conspicuously paid CarterBench royalties even though they admitted that they did not use the novel technology, and (b) that they specifically requested the operative submission, support Kipling's conclusion that they used CarterBench as a carefully contrived excuse to avoid paying higher royalties to Plaintiffs. (*Id.*)

## II.    PORTIONS OF THE DECLARATION OF VICTOR G. REILING SHOULD NOT BE STRICKEN

Fisher-Price seeks to strike portions of the declaration of Victor G. Reiling on the grounds that he has offered undisclosed expert testimony. (*See* Motion to Strike Memo. at 9-12.) In support of its assertions, Fisher-Price cites Federal Rule of Evidence 701, which limits opinions of non-experts to those which are: (a) rationally based on the perception of the witness; (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue; and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702. (*Id.* at 9.)

10

Fisher-Price argues that Reiling is testifying based upon specialized knowledge, but that is not the case. A review of Reiling's testimony reveals that he is testifying based on his own personal experience working as an inventor. He is testifying as to his past experiences regarding the submission of toy concepts to toy companies, including Fisher-Price. This is not testimony based on specialized knowledge in the nature of what an expert would provide, but rather, it is based on his first-hand knowledge. In addition, his testimony is not technical or scientific. Instead, his testimony concerns his perceptions about what happened when he submitted toy concepts to toy companies in the past. Anyone who has submitted a toy concept to a toy company would be capable of providing the same type of testimony, and no specialized knowledge would be required to do so.

The Second Circuit has held that opinions that are rationally based on the witness's perceptions are not specialized knowledge within the scope of expert testimony. *Medforms, Inc. v. Healthcare Management Solutions, Inc.*, 290 F.3d 98, 110-11 (2d Cir. 2002) (supervisor's testimony regarding significance of employee's work on two projects and the meaning of a term used in copyright registrations satisfied requirements for lay opinion testimony because opinions were rationally based upon his perceptions and his "everyday experience as a computer programmer"), *quoting Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175 (3d Cir. 1993) (finding no abuse of discretion in permitting owner of company to give lay opinion testimony with regard to damages where testimony was based upon his knowledge and participation in the day-to-day affairs of the business). Notably, *Medforms* was decided after the 2000 amendments to Federal Rule of Evidence 701, which added the requirement that testimony must be scrutinized under the rules regulating expert testimony to the extent the witness is providing testimony based on scientific, technical, or other specialized knowledge. In this case, Reiling's

testimony is rationally based upon his perceptions and his everyday experience as an inventor in the toy industry, and therefore it is permissible lay opinion testimony under the holding of *Medforms*.

Moreover, the Advisory Committee notes with regard to the amendment of Federal Rule of Evidence 701[1] make clear that Reiling's testimony is not the type which is based upon specialized knowledge within the meaning of the rule:

> "The amendment is not intended to affect the 'prototypical examples[s] of the type of evidence contemplated by the adoption of Rule 701 relat[ing] to the appearance of persons or things, identity, *the manner of conduct*, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences.'" (*quoting Asphundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1196 (3d Cir. 1995)) (emphasis added).

> "For example, most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert . . . Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business. The amendment does not purport to change this analysis." (*citing Lightning Lube, Inc.*, 4 F.3d 1153).

In this case, Reiling is testifying about the manner of conduct of those he has dealt with in the toy industry, including Fisher-Price. Much like the owner of the business discussed above, he is testifying with regard to particularized knowledge he has by virtue of his position as an inventor.

The Advisory Committee notes to Rule 701 continue as follows:

> "Similarly, courts have permitted lay witnesses to testify that a substance appeared to be a narcotic, so long as a foundation of familiarity with the substance is established. *See, e.g. United States v. Westbrook*, 896 F.2d 330 (8th Cir. 1990) (two lay witnesses who were heavy amphetamine users were properly permitted to testify that a substance was amphetamine . . .) Such testimony is not based on

---

[1] The Advisory Committee notes are attached hereto for the Court's ease of reference.

specialized knowledge within the scope of Rule 702, but rather is based upon a layperson's personal knowledge."

"The amendment incorporates the distinctions set forth in *State v. Brown*, 836 S.W.2d 530, 549 (1992), a case involving former Tennessee Rule of Evidence 701, a rule that precluded lay witness testimony based on "special knowledge." In *Brown*, the court declared that the distinction between lay and expert witness testimony is the lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.' The court in Brown noted that a lay witness with experience could testify that a substance appeared to be blood, but that a witness would have to qualify as an expert before he could testify that bruising around the eyes is indicative of skull trauma. That is the kind of distinction made by the amendment to this Rule."

Here, it is clear that Reiling is offering testimony based upon a layperson's personal knowledge. Likewise, it is clear that Reiling's testimony results from a process of reasoning familiar in everyday life, not from a process of reasoning that can only be mastered by specialists in the field. The matters Reiling testifies on, *e.g.*, the fact that toy companies pay royalties on concepts they use and pay equal royalties for line extensions, can be easily ascertained from everyday life – no specialized knowledge is necessary to perceive these facts.

While defendant attempts to portray Reiling as merely providing testimony regarding "the custom and practice in the toy industry," the fact is that Reiling discusses at length at least two products with which both he and Fisher-Price were personally involved in the past to support his testimony about how the industry operates. (Declaration of Victor G. Reiling, dated May 20, 2005 ("Reiling Decl.") ¶¶ 16-22.) These concepts were "Slam Jammers" and "Mountain Bike," both of which were inventor submissions by Reiling to Fisher-Price. (*Id.*) It is within the context of these two submissions to Fisher-Price, as well as submissions to other toy companies, that Reiling testifies regarding his personal knowledge.

Reiling has testified, *inter alia*, that: (1) toy companies pay royalties on concepts they use; (2) equal royalties are paid on line extensions; (3) inventors often combine several existing

13

elements to create a new toy; (4) when he had had disputes with toy companies in the past, typically he and the toy company have attempted to reach a resolution; (5) he expected his concept submissions to be held in confidence; (6) inventors use a combination of media to illustrate their concepts; (7) toy companies enter into option agreements to prevent the inventor from showing the concept to another toy company; (8) Fisher-Price owes a royalty in this case; (9) lack of novelty is typically disclosed to the inventor during the submission process; and (10) toy companies do not typically option a concept if there is an issue about its novelty. (Motion to Strike Memo. at 11-12.)

It is clear that these opinions are all based upon Reiling's personal observations as an inventor in the toy industry and as the inventor in this case. His opinions are not based upon scientific, technical or other specialized knowledge. Anyone who has presented toy concepts to Fisher-Price and other toy companies would be capable of making similar statements about the manner in which these companies dealt with them.

It should also be noted that many of the statements that Fisher-Price seeks to strike have been admitted by Fisher-Price's own witnesses. For example, Paul Snyder, Fisher-Price's Vice President of Inventor Relations at the time Plaintiffs' made their submission, testified that based upon a comparison of Plaintiffs' submission and Fisher-Price's Voice Tech Video Mission Rescue Heroes line of toys, Plaintiffs were entitled to a royalty. (Declaration of Russell D. Dize, dated May 23, 2005 ("Dize Decl.") Exh. B at 134-35, 139-40). He also testified that if he knew an inventor's submission was not novel, he would tell the inventor the concept was of no interest to the company at the time it was submitted. (*Id.* at 67-69.) In addition, he testified that Fisher-Price pays inventors a royalty if their concepts are used, regardless of changes made by the toy company (*Id.* at 59-60); that inventors expected their submissions to be held in confidence and

14

that he treated the submissions as such (*Id.* at 62-63); that Fisher-Price entered into option agreements with inventors to keep them from taking their submissions elsewhere (*Id.* at 65-66); and that novelty was one of Fisher-Price's considerations in deciding whether to option an item. (*Id.* at 67.)

In addition, defendant's own expert, Howard Bollinger, who is also an inventor, testified that he considered his concept submissions to Fisher-Price to be confidential. (Dize Decl.; Exh. C at 52-54.) He also testified that he was aware of situations where an inventor had combined existing elements to create a new toy, and a royalty was paid. (*Id.* at 186-87.)

Furthermore, Kipling has confirmed that Reiling's observations about his experiences in the toy industry are entirely consistent with Kipling's own experiences over thirty years in the industry. (Kipling Strike Decl. ¶ 30.) Specifically, Kipling confirms that toy companies pay royalties on concepts they use, and that the custom is to pay equal royalties on line extensions in the nature of the Fisher-Price variations of Plaintiffs' concept. (*Id.* ¶ 31.) Furthermore, it is standard toy industry practice for an inventor to combine several existing elements to create something new. (*Id.*) Over the course of Kipling's career, it has been his experience that toy companies and inventors will attempt to resolve disputes amicably. (*Id.*) Based upon his experience, inventors expect their submissions to be held in confidence. He agrees that inventors use a combination of media to illustrate their concept, and that toy companies enter into option agreements to prevent inventors from showing their concept to other toy companies. (*Id.*) He also agrees that the fact that a submission is rejected because it is not considered novel is normally disclosed to the inventor when the submission is made, and toy companies do not typically option a concept if they know it is not novel and for that reason lack interest in it. (*Id.*)

Fisher-Price attempts to rely upon *Bank of China v. NBM LLC*, 359 F.3d 171, 180-82 (2d Cir. 2004) to support its allegation that Reiling's testimony is based upon specialized knowledge. However, that case is distinguishable from the instant case because the Bank of China employee who was testifying needed to have education and training related to international banking transactions to render his opinions. He testified that certain transactions "did not comport with the business community's understanding of normal, true, trade transactions between a buyer and seller"; he explained the concept of a trust receipt and how it works in the context of an international business transaction; and he testified that it is considered fraud when an importer presents a trust receipt to a bank to obtain a loan knowing that there are no real goods involved." *Id.* at 180-81. It is clear that the employee's opinions were technical in nature and based upon specialized knowledge of international banking. In this case, the concepts that Reiling is testifying about are much more basic, and they are based upon his own personal experience and perception.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that Fisher-Price's Motion to Strike should be denied in all respects. Plaintiffs respectfully request that the Court consider the declarations of James M. Kipling and Victor G. Reiling in their entirety in opposition to Fisher-Price's Motion for Summary Judgment.

Dated: Norwalk, Connecticut
     June 27, 2005

Respectfully Submitted,

GRIMES & BATTERSBY, LLP

By: _____
    Gregory J. Battersby (Bar No. 7386)
    Edmund J. Ferdinand, III (Bar No. 21287)
    Russell D. Dize (Bar No. 23064)
    Susan Schlesinger (Bar No. 26625)
    488 Main Avenue, Third Floor
    Norwalk, Connecticut 06851-1008
    (p) (203) 849-8300
    (f) (203) 849-9300

    Attorneys for Plaintiffs Victor G. Reiling
    Associates and Design Innovation, Inc.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Plaintiffs' Memorandum in Opposition to Defendant's Motion to Strike and the Declaration of James M. Kipling in support, have been served upon defendant Fisher-Price, Inc., on this 27th day of June, 2005, via facsimile and U.S. Mail, First Class, postage prepaid, to:

Bradford S. Babbitt, Esq.
Michael J. Kolosky, Esq.
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103-3597

Robert J. Lane, Jr., Esq.
Jodyann Galvin, Esq.
HODGSON RUSS LLP
One M&T Plaza, Suite 2000
Buffalo, New York 14203-2391

Russell D. Dize

Service: **Get by LEXSTAT®**
TOC: United States Code Service: Code, Const, Rules, Conventions & Public Laws > /..../ > ARTICLE VII. OPINIONS AND EXPERT
TESTIMONY > Rule 701. Opinion Testimony by Lay Witnesses
Citation: **USCS FED RULES EVID 701**

*USCS Fed Rules Evid R 701*

UNITED STATES CODE SERVICE
Copyright © 2005 Matthew Bender & Company, Inc.,
one of the LEXIS Publishing (TM) companies
All rights reserved

\*\*\* CURRENT THROUGH CHANGES RECEIVED MAY, 2005 \*\*\*

FEDERAL RULES OF EVIDENCE
ARTICLE VII. OPINIONS AND EXPERT TESTIMONY

USCS Fed Rules Evid R 701 (2005)

✦ Review Court Orders which may amend this Rule.

Rule 701. Opinion Testimony by Lay Witnesses

If the witness is not testifying as an expert, the witness' testimony in the
form of opinions or inferences is limited to those opinions or inferences
which are (a) rationally based on the perception of the witness, and (b)
helpful to a clear understanding of the witness' testimony or the
determination of a fact in issue, and (c) not based on scientific, technical,
or other specialized knowledge within the scope of Rule 702.

## ⊼ History:

(Jan. 2, 1975, P.L. 93-595, § 1, 88 Stat. 1937; Oct. 1, 1987.)
(As amended Dec. 1, 2000.)

## ⊼ History; Ancillary Laws and Directives:

Other provisions

**Notes of Advisory Committee on Rules.** The rule retains the traditional objective of putting the trier of
fact in possession of an accurate reproduction of the event.
Limitation (a) is the familiar requirement of firsthand knowledge or observation.
Limitation (b) is phrased in terms of requiring testimony to be helpful in resolving issues. Witnesses often
find difficulty in expressing themselves in language which is not that of an opinion or conclusion. While the
courts have made concessions in certain recurring situations, necessity as a standard for permitting opinions
and conclusions has proved too elusive and too unadaptable to particular situations for purposes of
satisfactory judicial administration. McCormick § 11. Moreover, the practical impossibility of determining by
rule what is a "fact," demonstrated by a century of litigation of the question of what is a fact for purposes of
pleading under the Field Code, extends into evidence also. 7 Wigmore § 1919. The rule assumes that the
natural characteristics of the adversary system will generally lead to an acceptable result, since the detailed
account carries more conviction than the broad assertion, and a lawyer can be expected to display his witness
to the best advantage. If he fails to do so, cross-examination and argument will point up the weakness. See
Ladd, Expert Testimony, 5 Vand.L.Rev. 414, 415-417 (1952). If, despite these considerations, attempts are

---

**Practitioner's Toolbox**

📥 **History**

📥 **Interpretive Notes and
Decisions**

📥 **History; Ancillary Laws and
Directives**

**Resources & Practice Tools**

🔍 **Research Guide**

Annotations:
> Construction and application of
Rule 701 of Federal Rules of
Evidence, providing for opinion
testimony by lay witnesses
under certain circumstances. 44
ALR Fed 919.
> When will expert testimony
"assist trier of fact" so as to be
admissible at federal trial under
Rule 702 of Federal Rules of
Evidence. 75 ALR Fed 461.
> Federal Rules of Evidence or
state evidentiary rules as
applicable in diversity cases. 84
ALR Fed 283.

Law Review Articles:
> Limpert. Beyond the Rule in
Mohan (R v Mohan, [1994] 2
SCR 9]: A New Model for
Assessing the Reliability of
Scientific Evidence. 54 U Toronto
Fac. L Rev 65, Winter 1996.

📥 **More ..**

made to introduce meaningless assertions which amount to little more than choosing up sides, exclusion for lack of helpfulness is called for by the rule.

The language of the rule is substantially that of Uniform. Rule 56(1). Similar provisions are California Evidence Code § 800; Kansas Code of Civil Procedure § 60-456(a); New Jersey Evidence Rule 56(1).

**Notes of Advisory Committee on 1987 amendments.** The amendments are technical, No substantive change is intended.

**Notes of Advisory Committee on 2000 amendments.** Rule 701 has been amended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing. Under the amendment, a witness' testimony must be scrutinized under the rules regulating expert opinion to the extent that the witness is providing testimony based on scientific, technical, or other specialized knowledge within the scope of Rule 702. See generally Asplundh Mfg. Div. v. Benton Harbor Eng'g, 57 F.3d 1190 (3d Cir. 1995). By channeling testimony that is actually expert testimony to Rule 702, the amendment also ensures that a party will not evade the expert witness disclosure requirements set forth in Fed.R.Civ.P. 26 and Fed.R.Crim.P. 16 by simply calling an expert witness in the guise of a layperson. See Joseph, Emerging Expert Issues Under the 1993 Disclosure Amendments to the Federal Rules of Civil Procedure, 164 F.R.D. 97, 108 (1996) (noting that "there is no good reason to allow what is essentially surprise expert testimony," and that "the Court should be vigilant to preclude manipulative conduct designed to thwart the expert disclosure and discovery process"). See also United States v. Figueroa-Lopez, 125 F.3d 1241, 1246 (9th Cir. 1997) (law enforcement agents testifying that the defendant's conduct was consistent with that of a drug trafficker could not testify as lay witnesses; to permit such testimony under Rule 701 "subverts the requirements of Federal Rule of Criminal Procedure 16(a)(1)(E)").

The amendment does not distinguish between expert and lay witnesses, but rather between expert and lay testimony. Certainly it is possible for the same witness to provide both lay and expert testimony in a single case. See, e.g., United States v. Figueroa-Lopez, 125 F.3d 1241, 1246 (9th Cir. 1997) (law enforcement agents could testify that the defendant was acting suspiciously, without being qualified as experts; however, the rules on experts were applicable where the agents testified on the basis of extensive experience that the defendant was using code words to refer to drug quantities and prices). The amendment makes clear that any part of a witness' testimony that is based upon scientific, technical, or other specialized knowledge within the scope of Rule 702 is governed by the standards of Rule 702 and the corresponding disclosure requirements of the Civil and Criminal Rules.

The amendment is not intended to affect the "prototypical example[s] of the type of evidence contemplated by the adoption of Rule 701 relat[ing] to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences." Asplundh Mfg. Div. v. Benton Harbor Eng'g, 57 F.3d 1190, 1196 (3d Cir. 1995).

For example, most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. See, e.g., Lightning Lube, Inc. v. Witco Corp. 4 F.3d 1153 (3d Cir. 1993) (no abuse of discretion in permitting the plaintiffs owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business). Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business. The amendment does not purport to change this analysis. Similarly, courts have permitted lay witnesses to testify that a substance appeared to be a narcotic, so long as a foundation of familiarity with the substance is established. See, e.g., United States v. Westbrook, 896 F.2d 330 (8th Cir. 1990) (two lay witnesses who were heavy amphetamine users were properly permitted to testify that a substance was amphetamine; but it was error to permit another witness to make such an identification where she had no experience with amphetamines). Such testimony is not based on specialized knowledge within the scope of Rule 702, but rather is based upon a layperson's personal knowledge. If, however, that witness were to describe how a narcotic was manufactured, or to describe the intricate workings of a narcotic distribution network, then the witness would have to qualify as an expert under Rule 702. United States v. Figueroa-Lopez, supra.

The amendment incorporates the distinctions set forth in State v. Brown, 836 S.W.2d 530, 549 (1992), a case involving former Tennessee Rule of Evidence 701, a rule that precluded lay witness testimony based on "special knowledge." In Brown, the court declared that the distinction between lay and expert witness testimony is that lay testimony "results from a process of reasoning familiar in everyday life," while expert testimony "results from a process of reasoning which can be mastered only by specialists in the field." The

court in Brown noted that a lay witness with experience could testify that a substance appeared to be blood, but that a witness would have to qualify as an expert before he could testify that bruising around the eyes is indicative of skull trauma. That is the kind of distinction made by the amendment to this Rule.

## COMMENTARY

Stephen A. Saltzburg, Daniel J Capra, and Michael M. Martin

Opinion versus fact

Rule 701 provides that a witness may testify in the form of opinion if the opinion is rationally based on the perception of the witness and helpful in understanding his testimony or in determining a fact in issue. Lay witness opinion is admissible so long as it would be helpful to the factfinder and is rationally based on personal perception. See, e.g., _Mattison v. Dallas Carrier Corp., 947_ F.2d 95 (4th Cir. 1991) (in an action arising from a collision with a parked tractor trailer during rainy weather, the Trial Court properly permitted an eyewitness to testify that the emergency flashers on the tractor-trailer did not provide "an adequate warning under the conditions of the weather at that time"). If, on the other hand, the opinion is too abstract and it would be more helpful for the witness to testify to raw data, then the Trial Court can exercise its discretion to exclude the opinion. See, e.g., _United States v. Hauert_, 40 F.3d 197 (7th Cir. 1994) (the Trial Judge properly excluded lay witness testimony concerning the defendant's sincerely held beliefs that he was exempt from taxation; this testimony was too abstract to assist the jury). And if the witness' opinion is speculative or is not based on personal knowledge, it must be excluded.

Rule 701 properly recognizes that a lay witness' opinion can be helpful to the jury, indeed more helpful at times than the raw data on which the opinion is based. An opinion is often a convenient shorthand device. For example, testimony that a person was "excited" or "angry" is more evocative and understandable than a long, physical description of the person's outward manifestations.

The Ninth Circuit case of _United States v. Yazzie, 976 F.2d 1252_, 1254-56 (9th Cir. 1992), provides an extensive discussion and valuable application of Rule 701. Yazzie was charged with statutory rape. The federal statute, unlike that of many states, permits a defense of reasonable mistake as to the age of the minor. Yazzie claimed that he reasonably believed that the minor was over sixteen years old at the time of the incident; in fact, she was fifteen-and-a-half. To establish the reasonableness of his belief, Yazzie called several witnesses who offered to testify that as of the date of the alleged sexual abuse, their observations caused them to believe the minor to be between sixteen and twenty years old. The Trial Court excluded this testimony as impermissible opinion. The witnesses were permitted to testify to "facts," such as that the minor smoked cigarettes, wore make-up, and drove a car. But they were not permitted to give their opinion as to how old they thought she was.

The Court of Appeals found the Trial Court's limitation on opinion testimony to be reversible error. It analyzed the question as follows:

We understand Rule 701 to mean that opinions of non-experts may be admitted where the facts could not otherwise be adequately presented or described to the jury in such a way as to enable the jury to form an opinion or reach an intelligent conclusion. If it is impossible or difficult to reproduce the data observed by the witnesses, or the facts are difficult of explanation, or complex, or are of a combination of circumstances and appearances which cannot be adequately described and presented with the force and clearness as they appeared to the witness, the witness may state his impressions and opinions based upon what he observed. It is a means of conveying to the jury what the witness has seen or heard.

The _Yazzie_ Court explained how the witnesses' opinions as to the minor's age would be helpful to the jury:

Here, the opinion testimony not only meets the requirements of sub-part (a) of Rule 701, but of both the alternative sub-parts of (b). The testimony helps in the understanding of the witnesses' descriptive testimony and in determining a critical fact at issue -- whether it was reasonable for Yazzie to believe that the minor was sixteen or older. In the case before us, the jurors could not themselves assess how old the minor looked at the time of the incident: by time of the trial, the minor was almost seventeen years old, and her appearance was undoubtedly substantially different than it had been on the night in question, a year and a half earlier. Thus, the jurors were wholly dependent on the testimony of witnesses. Yet the witnesses were permitted to testify only to the minor's describable features and behavior. Their testimony was no substitute