UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| VICTOR G. REILING ASSOCIATES and DESIGN INNOVATION, INC., <br><br> Plaintiffs, <br><br> - against - <br><br> FISHER-PRICE, INC., <br><br> Defendant. | Index No.: 3:03 CV 222 (JBA) <br><br><br> June 27, 2005 |

## DECLARATION OF JAMES M. KIPLING IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE

I, JAMES M. KIPLING, pursuant to the requirements of 28 U.S.C. §1746, declare that the following is true and correct:

### QUALIFICATIONS

1.    I have been retained by Plaintiffs to be an expert witness in this case. I am familiar with the facts set forth herein and I make this declaration upon personal knowledge. I submit this declaration in opposition to Fisher-Price's motion to strike portions of my declaration, dated May 23, 2005, and portions of the declaration of Victor G. Reiling, dated May 20, 2005, both in opposition to defendant's Motion for Summary Judgment.

2.    As I indicated in my May 23, 2005 declaration, I am an expert in toy industry custom and practice as it relates to the process by which toy and game concepts are created, developed and marketed, as well as the various intellectual property law protections for such concepts and products. True and correct copies of my Expert Report, Supplemental Expert

Report and Second Supplement to Expert Report in this matter are attached to my May 23, 2005 declaration as Exhibit A.

3.    I am an attorney licensed to practice in the State of Ohio and before the United States Patent and Trademark Office. I have been a practicing attorney for more than 30 years, the bulk of which time I spent as in-house counsel for several major toy companies. Between 1968 and 1974, I was employed by the General Electric Company and worked in the company's Patent Law Department in its Alexandria, Virginia and Cincinnati, Ohio offices. In 1974, I became House Counsel with the Kenner Toy Company, then a subsidiary of General Mills, Inc. In 1980, I became Vice President Law with the Kenner Products Division of CPG Products Corporation, and later with Kenner-Parker Toys, Inc. From 1987 through 1990, the latter entity was a subsidiary of Tonka Corporation. In 1991, Tonka was acquired by Hasbro, Inc. and I was Vice President and Managing Attorney with Hasbro until 2001. Thereafter, I joined the law firm of Frost Brown Todd LLC as Of Counsel to the Intellectual Property Law Department based in Cincinnati, Ohio.

4.    The toy industry has been the principal focus of my practice since 1974. Among my responsibilities during and throughout my career since 1974 has been negotiation of license and other agreements involving new toy concepts and various other properties for toy and game products, and I have participated in several hundred such negotiations. My experience includes the licensing of inventions, technologies, brands, sports stars, entertainment properties, and celebrity rights for use in the creation and development of toy products. Products which have resulted from negotiations that I have personally handled have sold in excess of $2 billion dollars at wholesale prices.

5    I have negotiated hundreds of license agreements on behalf of toy companies, toy

2

designers and inventors in connection with intellectual property rights in toy products.  In negotiating these agreements, I have come to understand the compensation that is typically paid in connection with the licensing of new toy concepts and other properties applicable to the toy and game industry

      6.    Since joining my current law firm, I have been active in industry events and associations including those of the International Licensing Industry Merchandisers' Association ("LIMA"), and the Toy Industry Association ("TIA"), and have participated in seminars and programs conducted by these associations. I have written articles and given presentations on matters involving intellectual property and licensing to and on behalf of such professional groups   I have also been a panelist and moderator at various TIA and LIMA seminars and presentations on toy product development and licensing principles.

      7.    As the result of my practice and these professional activities, I have become familiar with the practice of licensing new toy and game concepts and properties in the toy industry, as well as the valuation thereof and compensation typically paid to designers and inventors by toy companies.

      8.    The purpose of this declaration is to refute the assertions raised by Fisher-Price that I am not qualified to render opinions on several topics addressed in my May 23, 2005 declaration, including the novelty of toy and game concepts and the evaluation of prior art.  In rendering the opinions expressed herein, I rely upon my knowledge and experience in the toy and game industry.  I also rely upon more than twenty-five years of experience as a patent attorney.

## EXPERT OPINIONS REGARDING NOVELTY OF TOY AND GAME CONCEPTS AND EVALUATION OF PRIOR ART

9.    In support of its motion to strike portions of my May 23, 2005 declaration, Fisher-Price alleges that I am not qualified to render opinions regarding the novelty of toy and game concepts or the evaluation of prior art. Fisher-Price attempts to portray me as simply "a lawyer in private practice" who was previously "a lawyer in the legal department of Kenner/Hasbro," implying that I would have no practical experience with regard to these issues. However, nothing could be further from the truth. Such an argument is based upon a misunderstanding of my responsibilities while employed with General Electric, Kenner and Hasbro over the years.

10.    During the approximately six years I was employed by General Electric from the late 1960's to the mid 1970's, I was a patent attorney. Initially, I participated in a training program that taught new attorneys to become patent attorneys. As part of that program, I was trained in conducting patent searches, evaluating prior art and in determining if a proposed product or invention was novel in view of the prior art and whether the implementation of such invention might infringe adversely held patent rights. I was also trained in preparing patent applications, including patent claims.

11.    After successfully completing the training program, I worked in the Aircraft Engine Group of General Electric in Cincinnati, Ohio. My job was to prepare, file and prosecute patent applications before the United States Patent Office, to evaluate the novelty, patentability and freedom-to-practice of new product designs and features. My responsibilities included conducting patent searches, evaluating prior art revealed by the patent searches and making determinations regarding the novelty, or lack thereof, of such proposed products. In fact, evaluating prior art and making determinations regarding novelty were functions that I

performed on a daily basis for more than five (5) years with General Electric, an industry-leader in innovation.

12.    Moreover, prior to my training and experience as a patent attorney, my undergraduate degree was Bachelor of Science in Mechanical Engineering. Throughout the period of my engineering education, I worked as an engineering apprentice with a leading machine tool manufacturer (R.K. LeBlonde Machine Tool Company) which had awarded to me a five (5) year engineering scholarship to the University of Cincinnati. This education and actual engineering experience provided me with a thorough understanding of how mechanisms included in toys and their features would function.

13.    Later in my career, I became House Counsel for Kenner Toy Company and I continued in that position for Kenner and its successors, including Hasbro, for more than twenty-five years. In fact, I was also Patent Counsel for Kenner, as I was the sole in-house patent attorney employed by the company during that time. My responsibilities included making determinations regarding the advisability of seeking patent protection for Kenner's new toy products, including those conceived in-house and also those submitted by outside inventors. In deciding whether to seek patent protection for a particular toy, I regularly made determinations regarding whether the toy in question was novel and non-obvious to one reasonably skilled in the art. I also conducted and evaluated patent searches to determine what toys had been disclosed by the prior art, and compared the prior art with the proposed toy. Because I was the only in-house patent counsel, I was the ultimate in-house authority at Kenner on the issues of novelty and prior art. In fact, at the same time, Howard Bollinger (defendant's expert) worked at Kenner in product development, but in a limited design capacity. He often came to me with questions regarding the patentability of new products or with concerns about potential conflicts with the

5

patent rights of existing products. Of course, in making such determinations for Mr. Bollinger and providing such advice, the essential elements I was dealing with were novelty, evaluation of prior art and comparison of the features of existing toys. To the best of my knowledge, Howard Bollinger does not have a degree in engineering. Considering my education and training as an engineer and as a patent attorney, my experience in innovative technology while with General Electric as well as in the toy industry, I am better equipped than Mr. Bollinger is now, and was better equipped than he was when we worked together, to make determinations regarding novelty and prior art with respect to the features and functions of toys.

14.    In addition to reviewing products being developed by Kenner to determine patentability, I was also in charge of the company's patent portfolio. I was responsible for overseeing outside patent counsel with regard to the prosecution of patent applications. I was also responsible for evaluating competitor's products to make determinations about whether those products infringed Kenner's patent portfolio. Similarly, in the event a legal action was threatened or brought against Kenner for infringement, I was responsible for comparing Kenner's product with the claimant's patent to determine if there was an infringement. If any of these situations resulted in litigation, I selected counsel and supervised the proceeding to its conclusion. Throughout my tenure as patent counsel, I evaluated toy products and their features for novelty, compared them with other toys for similarity and evaluated them in connection with prior art. This is what patent attorneys do every day, which makes it all the more astounding that Fisher-Price would question my qualifications on these issues.

## EXPERT OPINIONS REGARDING TOY USE AND PLAY PATTERNS

15.    Fisher-Price also asserts that I am not qualified to give expert opinions regarding toy design and use. As a preliminary matter, I do not claim expertise in the limited area of toy

6

design, nor have I offered any opinions in this case that would require expertise in toy design. To the contrary, I have given opinions regarding toy novelty and use, toy features and play patterns of toys, all areas in which I am qualified to give expert opinions based upon my experience.

16.     Again, Fisher-Price's arguments regarding my qualifications seem to stem from a misunderstanding of my role as in-house counsel for Kenner. Fisher-Price would have the Court believe that I was simply drafting and revising agreements every day for more than twenty-five years. In actuality, as the only in-house attorney for Kenner, I was part of the management team of the company and was not engaged solely in legal work. Tasks were not highly compartmentalized, and I dealt with and developed broad facility with toys and related business matters, as well as with broad legal issues affecting the business

17.     For example, one of my responsibilities was to ensure the company maintained compliance with Federal Trade Commission ("FTC") regulations regarding advertising of toys, particularly with regard to television commercials. Pursuant to FTC regulations, a toy manufacturer could not advertise a product in a way which was misleading. That is, we could not show a toy functioning in a way that it was incapable of functioning, nor could we show children playing with a toy in a manner that was inconsistent with how children actually played with the toy (i.e., the "play pattern"). We had to be very careful to portray products and play patterns accurately. Accordingly, I had to be intimately familiar with how our products worked and how children played with them, so that I could be sure that our advertising was FTC compliant.

18.     The first FTC issue I dealt with arose shortly after I joined the company and involved a Kenner product that was a toy horse with a soft body. In our television

7

advertisement, we showed a companion doll sitting on the horse. In actual fact, the horse could not support the doll, and would topple over when the doll was placed upon it. As I was to learn, the advertising agency that created the commercial had used hidden supports to enable the horse to support the doll during filming. This raised an issue with the FTC, because the product was shown doing something that it could not do in real life; that is, the toy did not fulfill the play-pattern depicted. After discovering what had led to the problem, I developed and implemented a comprehensive procedure by which all new toys and their features were required to be demonstrated for me in order to achieve my sign-off before any TV commercial could be trafficked for broadcast. In evaluating the toys and advertisements, I worked closely with development engineers, designers, marketers, quality control engineers (viewing and evaluating product testing) and market researchers (viewing child-play-pattern testing and drafting play-pattern research questionnaires) as well as reviewing commercial storyboards, "rough-cuts" and final commercial edits for accurate representations of toys, their features and children's play patterns when using them.

19.    In performing these functions, I maintained awareness of FTC actions against various toy companies regarding such issues. An example was an airbrush toy that had a pressure chamber which the child pumped up to pressurize. Air was released from the chamber through a valve across a felt-tipped marker and through a stencil to make a design. With that toy, an FTC issue arose because the actual play pattern of the toy involved significantly more pumping up of the pressure chamber than was shown in the commercial, and the creating of the design required more effort and stages that depicted. The FTC felt that the play pattern was not clearly depicted.

20    Another example concerned a toy race car that ran around plastic tracks. FTC

8

regulations specified that advertisements could only show the play pattern that the child actually would experience when playing with the toy. The company in question was found in violation as a result of showing the viewpoint of the race car driver in a commercial. This was determined to be an inaccurate representation of the play pattern, because children could not experience the same viewpoint when playing with the toy.

21.    Once I was aware of the various FTC restrictions, I became intimately and continuously involved in this area and insisted that I approve all commercials that Kenner planned to air. Much of my time was spent evaluating toys, features, play patterns and related television commercials, as well as brochures, packaging and other types of product representations to determine if they accurately portrayed the capabilities of the toy and the play pattern that the child would experience. In order to be in a position to approve the advertisements, I had to understand how our products worked. I also had to understand the manner in which a child would play with a toy, and I spent substantial time observing "play tests," in which Kenner toys were actually used by children.

22.    During most of my career at Kenner, I routinely reviewed all forms of advertisements for FTC compliance and I signed off on all such advertisements. As a result, I became intimately familiar with how toys work and how children perceive and play with them.

### PORTIONS OF MY DECLARATION SHOULD NOT BE EXCLUDED

23.    Fisher-Price argues that paragraphs 22 through 24 of my declaration should be excluded because I make statements regarding "play patterns," "role-playing scenario," and "performance of a particular design." As discussed above, these are all areas I dealt with extensively during my career and in which I have attained high levels of expertise, which likely exceed those of Fisher-Price's expert witness.

9

24.    Fisher-Price argues that paragraph 28 of my declaration should be excluded because I discuss different ways in which a toy concept can be executed. However, this is an issue I dealt with nearly every day during my tenure at Kenner. As discussed above, I had to understand how each toy functioned and what each toy was delivering with respect to play value. Further, in drafting as well as overseeing the drafting and prosecution of patent applications with the United States Patent and Trademark Office, I routinely dealt with (and even created) alternative ways in which toys could achieve results equivalent to those of initial designs.

25.    With regard to paragraphs 39 through 43, Fisher-Price alleges that I impermissibly compare Plaintiffs' submissions with defendant's products and comment on play value and design features. As discussed previously, this is exactly what I did nearly every day, both in my role as patent counsel for Kenner, as well as in my role of evaluating product representations made in advertising. I evaluated toys that potentially infringed upon our toys, which necessarily involved a comparison of toy features. I evaluated claims of infringement by our competitors, which involved a similar comparison of toy features. My patent background and experience enabled me to ascertain the novel features of a toy, and my non-patent background, including my engineering and advertising experience, enabled me to identify, evaluate and understand the toy's design features, equivalent structures and the child-user's play patterns with toys.

26.    Fisher-Price alleges that paragraph 54 of my declaration should be excluded because I evaluate the prior art presented with their Motion for Summary Judgment. This is incredible to me, given that I was a patent attorney for more than twenty-five years. Throughout the product development process, I evaluated prior art in making determinations about the patentability of Kenner's toys, whether Kenner's proposed toys infringed anyone else's patents

and whether anyone else infringed upon Kenner's patents. In doing so, I had to evaluate the
prior art and make determinations of novelty. That is what a patent attorney does every day.

27.    Fisher-Price argues that paragraphs 49 through 51 of my declaration contain
opinions that are contrary to law, and should be excluded. As a preliminary matter, my opinions
in these paragraphs concern how the toy industry operates based upon my many years experience
in the industry. I am not testifying about the law, but rather about the custom and practice in the
toy industry and how the industry operates. Fisher-Price contends that I did not consider any law
in rendering my opinions, but that statement is simply incorrect. The quoted testimony was
taken from my first deposition in this matter. By the time I was deposed again and issued my
Second Supplement to Expert Report, I had reviewed and considered *Nadel v. Play-By-Play Toys
and Novelties* in great detail, and my opinions about the facts of present case remain unchanged.
In fact, my opinions are entirely consistent with the *Nadel* case. Furthermore, the product in
question in the *Nadel* case had a *much lower level of novelty* than Plaintiffs' submissions in this
case. The toy at issue in *Nadel* was nothing more than an *existing mechanism performing its
same function in a fabric covering having a different appearance than the original*.

28.    Fisher-Price argues that paragraphs 15, 16 and 19 should be excluded because
they are legal conclusions. Again, these are my opinions based upon custom and practice in the
toy industry and my own perceptions of the industry's ethical sensibilities.

29.    Fisher-Price argues that paragraphs 44 through 47 should be excluded, allegedly
because there is no basis for my statements regarding CarterBench in the record. Again, this is
incorrect. My expert reports had previously commented on the same issue and the facts in
evidence  More particularly, the license agreement that Fisher-Price signed with CarterBench
states at a later-added page near its end that the specified royalty would be paid *even though the*

11

*novel concept submitted by CarterBench*, which was voice synchronized with a lenticular lens, *was not used by Fisher-Price*. (A true and correct copy of the license agreement between Fisher-Price and CarterBench is attached hereto as Exhibit A.) Moreover, a handwritten note by one of Fisher-Price's product development employees that was produced in this case confirms that the *specific CarterBench concept submission on which the royalty was based <u>was made at Fisher-Price's request</u>*. (A true and correct copy of the aforementioned handwritten note is attached hereto as Exhibit B.) These "odd" (to say the least!) factors create serious implications pertinent to this case, upon which I comment in the above-referenced paragraphs. Based upon these documented facts, it is reasonable to believe that Fisher-Price used a fabricated low royalty paid to CarterBench to reduce its total royalty obligation at Plaintiff's expense. The facts that (a) Fisher-Price conspicuously paid CarterBench royalties even though they *admitted that they did not use the novel technology*, and (b) that they *specifically requested* the operative submission, support my conclusion that they used CarterBench as a carefully contrived excuse to avoid paying higher royalties to Plaintiffs.

## <u>REILING'S STATEMENTS ABOUT HIS EXPERIENCES IN THE TOY INDUSTRY ARE CONSISTENT WITH MY EXPERIENCES</u>

30.     Fisher-Price also seeks to exclude portions of Victor G. Reiling's declaration on the basis that it contains improper expert opinions. However, I can confirm that Mr. Reiling's observations about his experiences in the toy industry are entirely consistent with my experiences over thirty years in the industry.

31.     Specifically, I can confirm that toy companies pay royalties on concepts they use, and that the custom is to pay equal royalties on line extensions in the nature of the Fisher-Price variations of Plaintiffs' concept. Furthermore, it is standard toy industry practice for an inventor

12

to combine several existing elements to create something new. Over the course of my career, it has been my experience that toy companies and inventors will attempt to resolve disputes amicably. Based upon my experience, inventors expect their submissions to be held in confidence. It is true that inventors use a combination of media to illustrate their concepts. I agree that toy companies enter into option agreements to prevent inventors from showing their concept to other toy companies. The fact that a submission is rejected because it is not considered novel is normally disclosed to the inventor when the submission is made. Toy companies do not typically option a concept if they know it is not novel and for that reason lack interest in it.

I hereby declare that the foregoing is true and correct under penalty of perjury.

Dated: June 27, 2005

_____
James M. Kipling

# EXHIBIT A

# FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# EXHIBIT B

# FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER