UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

VICTOR G. REILING ASSOCIATES and      :
DESIGN INNOVATION, INC.,      :
     :
           Plaintiffs      :
     :      Civil No. 303CV222(JBA)
    v.      :
     :      July 12, 2005
FISHER-PRICE, INC.      :
     :
           Defendant.      :
     :

## REPLY MEMORANDUM OF LAW IN FURTHER
## SUPPORT OF FISHER-PRICE'S MOTION TO STRIKE

**HODGSON RUSS LLP**                           **ROBINSON & COLE, LLP**
One M&T Plaza, Suite 2000                  280 Trumbull Street
Buffalo, New York  14203                  Hartford, CT  06103-3597

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................................................1

Argument ...........................................................................................................................................1

    I.        PORTIONS OF KIPLING'S DECLARATION SHOULD BE STRICKEN ......................1

            A.     Kipling Is Not Qualified to Render an Expert Opinion on
Issues Relating to Design, Novelty, or Prior Art .....................................................1

            B.     Kipling Gives Impermissible Legal Conclusions and Ignores
Clearly Applicable Legal Principles .......................................................................5

    II.       PORTIONS OF REILING'S DECLARATION MUST BE STRICKEN............................8

Conclusion ........................................................................................................................................10

**Introduction**

Fisher-Price, Inc. ("Fisher-Price") submits this reply memorandum of law in further support of its motion to strike, in part, the Declaration of James M. Kipling, dated May 23, 2005 (the "Kipling 5/23 Dec.") and the Declaration of Victor G. Reiling, dated May 20, 2005 (the "Reiling Dec.").

**Argument**

**I.      PORTIONS OF KIPLING'S DECLARATION
        SHOULD BE STRICKEN**

As set forth in Fisher-Price's motion to strike, portions of the Kipling 5/23 Dec. should be stricken because of Kipling's lack of qualification. Moreover, Kipling gives improper legal testimony and testimony contrary to well-established caselaw on novelty.

**A.      Kipling Is Not Qualified to Render
        an Expert Opinion on Issues Relating
        to Design, Novelty, or Prior Art**

Kipling admits that he has no expertise in the area of toy design. *See* the declaration of James M. Kipling, dated June 27, 2005 (the "Kipling 6/27 Dec.") ¶ 15. Nevertheless, he contends that he should be permitted to give expert opinions "regarding toy novelty and use, toy features and play patterns of toys." *Id.* It is, to say the least, difficult to understand how one who admits that he is not an expert in "toy design" could be permitted to give expert opinions on the use of toy designs, the novelty of toy designs, the features of toy designs, and play patterns of children using toys.

An analysis of whether Fisher-Price's toy action figures and vehicles are a "use" (or infringement) of the Reel Heroes design requires a comparison of the individual features of each accused toy design with the individual features of the Reel Heroes design, as well as a comparison of the combination of features comprising each accused Fisher-Price toy with the combination of features comprising the Reel Heroes design. An analysis of whether the Reel Heroes design was novel when it was submitted to Fisher-Price in October 1998 and whether the prior art available at that time

- 2 -

anticipated the Reel Heroes design requires a comparison of the design features of the Reel Heroes

design, both individually and in combination, to the design features of the prior art. Simply describing

these tasks makes clear that a person must be an expert in toy design to give an opinion.[1]

It is plaintiffs' burden to establish that Kipling is qualified to testify about the subjects on

which he is offered as an expert.[2] In an effort to satisfy this burden, Kipling relies on two alleged

qualifications: (1) his degree as a mechanical engineer (although he never practiced as a mechanical

engineer); and (2) his experience as an intellectual property lawyer. Kipling 6/27 Dec. ¶¶ 12-13.

Kipling never explains why his education as a mechanical engineer is relevant to this case, nor does he

identify any mechanical engineering issues in to this case. The most persuasive evidence that Kipling's

mechanical engineering degree is irrelevant to the issues in this lawsuit is the fact that *all* of the persons

involved in the facts of this case are toy designers and none of them are mechanical engineers:

> a.    Plaintiff Victor Reiling, who claims to be co-inventor of the Reel Heroes design,
> is a professional toy designer with over 35 years experience in the toy industry.
> Second Amended Complaint ("SAC") ¶¶ 12-13.

> b.    The principals of plaintiff Design Innovation (Bruce Popek, Bruce Benedetto),
> who claim to be co-inventors of the Reel Heroes design, are all professional toy
> designers with 20 years or more experience in the toy industry.[3]

---

[1]    Kipling has also offered opinions about childrens' play patterns with Fisher-Price's accused products and with the prior
art toys upon which Fisher-Price relies. Kipling 5/23 Dec. ¶¶ 22-24, 39, 41. Kipling does not even claim expertise in
child psychology or experience in studying child play patterns.

[2]    *See Dreyer v. Ryder Auto. Carrier Group, Inc.*, 2005 U.S. Dist. LEXIS 7018, *20 (W.D.N.Y. Feb. 9, 2005) (the party
offering the testimony of an expert witness must "carry the burden to establish [the expert] as qualified to testify as an
expert witness in [the] case and that his opinions meet Rule 702 and *Daubert* requirements"). The District Court upheld
the magistrate judge's ruling at 367 F.Supp. 2d 413 (W.D.N.Y. 2005). All unpublished cases cited herein are attached in
alphabetical order.

[3]    *See* the Declaration of Bruce Popek, dated May 20, 2005 (Docket No. 109) ¶¶ 3-4; Declaration of Bruce Benedetto,
dated May 20, 2005 (Docket No. 110) ¶¶ 3-4.

- 3 -

c.  Reiling submitted the Reel Heroes design to Paul Snyder, then Fisher-Price's Vice President of Research and Development. Mr. Snyder was a professional toy designer with decades of experience in the toy industry.[4]

d.  Snyder forwarded the Reel Heroes design for further evaluation by the designers on Fisher-Price's "Boys Team," which was responsible for designing toys for boys ages 3 through 7. The Reel Heroes design was reviewed (and rejected) by Ken Morton, Manager of Design on the Boys Team, and Tyler Berkheiser, a Senior Designer on the Boys Team. *See* the Declaration of Tyler Berkheiser, dated April 27, 2005 (Docket No. 96) (the "Berkheiser Dec.") ¶¶ 29-33.

e.  The various accused Fisher-Price products were all created by professional toy designers on the Boys Team, including Tyler Berkheiser and James Bauman. *See* Berkheiser Dec. ¶¶ 15, 18, 20-24; the Declaration of James Bauman, dated April 27, 2005 (Docket No. 98) ¶¶ 2-5; Galvin Reply Dec., Ex. B. at 9-13, Ex. C at 6-8.

The fact that all of the principal witnesses for both parties are professional toy designers, and none are mechanical engineers, establishes that any expert witness in this case should be qualified as a toy designer and not a mechanical engineer. *See* Galvin Reply Dec., Ex. A at 9-10, Ex. B at 7, Ex. C. at 8.

Kipling's second alleged qualification for testifying as an expert in this case is his years of service as an intellectual property lawyer. He notes that he acted as a patent lawyer for General Electric between 1968 and 1974. Kipling 6/27 Dec. ¶ 3.[5] Patent attorneys are not qualified to testify as experts with regard to the technology or art underlying the patents that they prosecute or with respect to which they give legal opinions.[6] Thus, Kipling's claimed status as a patent lawyer does not qualify him

---

[4]  *See* the Reply Declaration of Jodyann Galvin, dated July 11, 2005 (the "Galvin Reply Dec."), Ex. A at 6-10.

[5]  Apparently, he has not prosecuted any patents in over 30 years, and claims only to have been "responsible for overseeing outside patent counsel with regard to the prosecution of patent applications" during his years as in-house counsel for Kenner Toys. Kipling 6/27 Dec. ¶ 14.

[6]  *See Buckley v. Airshield Corp.,* 116 F.Supp. 2d 658, 662 (D. Md. 2000) (patent attorney not permitted to testify that defendants' products did not infringe (*i.e.,* use) plaintiff's patent); *J & M Corp. v. Harley-Davidson, Inc.,* 2000 U.S. Dist. LEXIS 21756, * 60-61 (D. Ariz. Feb. 9, 2000), *aff'd,* 269 F.3d 1360 (Fed. Cir. 2001) (patent attorney not permitted to testify to infringement under the doctrine of equivalents); *Acoustical Design, Inc. v. Control Elecs. Co.,* 932 F.2d 939, 942 (Fed. Cir. 1991) (patent attorney not permitted to testify "that the claims in suit read on the prior art"); *Intex Recreation Corp. v. Metalast, S.A.,* 245 F.Supp. 2d 65, 74 n.2 (D.D.C. 2003) (patent attorney not permitted to testify regarding claim interpretation; "this court has on numerous occasions noted the impropriety of patent lawyers testifying

Footnotes continued on next page.

- 4 -

to testify as an expert on issues of use (*i.e.,* infringement), novelty, or prior art.

Kipling has ignored the distinction between an attorney who gives advice regarding legal issues connected with a particular subject matter and a person who is an expert with regard to the underlying subject matter. Kipling has never acted as an expert with regard to the underlying subject matter of toy design or issues relating to toy design. Instead, he rendered *legal* advice about issues that came up in connection with the business of a toy company. *See* Kipling 6/27 Dec. ¶¶ 13-14. If Kipling's argument is accepted, then all lawyers would be considered experts in the subjects underlying their areas of practice. For example, an experienced medical malpractice attorney often reviews medical records, interviews medical professionals, and provides his client with an opinion regarding whether the medical care at issue was appropriate and in accordance with the standard of care applicable to the medical specialty involved. Such an attorney is not a physician, however, and he cannot testify at trial to his conclusions about whether the medical care at issue was negligent or constituted malpractice.[7] For the same reason, the fact that Kipling has interviewed toy design professionals, reviewed patents and toy designs, and provided his client with an opinion regarding novelty, prior art, or infringement, does not qualify him to testify about those subjects at trial.

---

Footnotes continued from previous page.

as expert witnesses") (quoting *Endress + Hauser, Inc. v. Hawk Measurement Sys., Inc.*, 122 F.3d 1040, 1042 (Fed. Cir. 1997)).

[7]  Similarly, an experienced construction attorney might analyze drawings and test results and interview engineers, architects, and other witnesses in order to provide his client with an opinion as to the cause of the collapse of a building or bridge and whether the architect or civil engineer who designed the building or bridge acted negligently. That attorney would not be qualified as an expert to testify at trial about the cause of the collapse or to render an opinion as to whether the architect or engineering professional involved had committed malpractice.

- 5 -

Kipling's position on this motion is most succinctly summarized at paragraph 18 of his June 27 declaration, where he argues that he should be accepted as an expert because he has, over the years, "***worked closely with*** development engineers, designers, marketers, quality control engineers (viewing and evaluating product testing) and market researchers (viewing child-play-pattern testing and drafting play-pattern research questionnaires). . . ." Simply having associated with and observed people who are experts does not make one an expert.

Finally, it is not enough that a witness have "special knowledge or experience" to testify as an expert; his special knowledge or experience must match the subject matter on which he seeks to testify.[8] Kipling has failed to show this. This is not a case about mechanical engineering, and Kipling is not seeking to testify as an intellectual property law expert.[9] This case is about toy designs — whether the designs of Fisher-Price's toys misappropriated the Reel Heroes design and whether that design was novel. Because Kipling acknowledges he does not have the expertise necessary to testify about toy design issues, Fisher-Price's motion to strike his June 27 declaration, in part, should be granted.

## B.    Kipling Gives Impermissible Legal Conclusions and Ignores Clearly Applicable Legal Principles

Plaintiffs do not dispute the "axiomatic principle" that an expert witness "may not give testimony stating ultimate legal conclusions. . . ."[10] "It is not for the witnesses to instruct the jury as to

---

[8]  *See* 29 Wright & Gold, *Federal Practice and Procedure* § 6265 at 255-56 (2nd ed. 1993) ("Even where a witness has special knowledge or experience, qualification to testify as an expert also requires that the area of the witness's competence matches the subject matter of the witness's testimony"); *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994) ("The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question"); *Coal Res., Inc. v. Golf & Western Indus., Inc.*, 954 F.2d 1263, 1268-69 (6th Cir. 1992); *Dreyer*, 2005 U.S. Dist. LEXIS 7018 at * 24-25.

[9]  Testimony on legal issues is not permitted. *See Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 512 (2d Cir. 1977).

[10]  *In re Initial Public Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64-65 (S.D.N.Y. 2001). *See also Palazzetti Import/Export, Inc. v. Morson*, 2001 U.S. Dist. LEXIS 9538, *6 (S.D.N.Y. July 13, 2001) (attorney-expert's testimony about whether

Footnotes continued on next page.

- 6 -

applicable principles of law, but for the judge."[11]  When an expert witness attempts to give an "[o]pinion

as to the legal standards . . . to be derived from [a] contract" preclusion is proper.  *Marx & Co.*, 550 F.2d

at 509.  This rule applies where the proposed expert is an attorney — "attorneys cannot testify as expert

witnesses regarding their opinion as to the meaning and applicability of the law."[12]

      Kipling's opinions that Fisher-Price's Policy and Agreement is not binding upon Reiling

or Design Innovation are precisely such impermissible legal conclusions and should accordingly be

stricken.  Even when challenged, Kipling scarcely tries to defend these legal conclusions, stating simply

that the opinions are based on "custom and practice in the toy industry."  *See* Kipling 6/27 Dec. ¶ 28.

The Second Circuit has soundly rejected attempts to characterize expert opinion about legal obligations

as testimony regarding the custom and practice of an industry.  *Marx*, 550 F.2d at 509.

      Even if custom and practice in the industry were properly considered here as to legal

effect of the Policy and Agreement  (which it is not), plaintiffs have failed to meet the rigorous standard

for the admissibility of custom and practice evidence.  And, Kipling's testimony does not meet the

reliability requirement of Federal Rule of Evidence 702.  In order to provide the proper foundation for

---

Footnotes continued from previous page.

    the parties' contract was a "franchise agreement" was not proper; "the determination of purely legal issues in the exclusive purview of the court [and] expert testimony which merely states a legal conclusion must be excluded" ); *Aguilar v. International Longshoreman's Union Local #10,* 996 F.2d 443, 447 (9th Cir. 1992) (on summary judgment, employment expert's declaration properly excluded where expert opined on reasonableness and foreseeability; such issues are "matters of law for the court's determination"); cases cited in Fisher-Price's Memorandum of Law in Support of Motion to Strike (Docket No. 115) ("Fisher-Price's Memo.") at 7-8.

[11]  *Marx & Co.,* 550 F.2d at 509-10 (noting that "such testimony amounts to no more than an expression of the witness's general belief how the case should be decided"; holding that expert testimony which was  an "opinion as to the legal obligations of the parties under [a] contract" was not proper).

[12]  *NTP, Inc. v. Research in Motion, Ltd.,* 2003 U.S. Dist. LEXIS 14338 (E.D. Va. May 23, 2003) (preclusion of attorney's testimony regarding claim construction during patent infringement trial was proper where attorney-expert "sought to offer legal opinions regarding the claim construction," which was the exclusive province of the judge).

- 7 -

the admissibility of custom and practice, the proffering party must show that the practice is "fixed and invariable in the industry,"[13] and that it is a "definite, uniform and known practice."[14]    Kipling has repeatedly acknowledged there is no uniform practice as to whether toy companies require forms like the Policy and Agreement and that the terms of the agreements "differ markedly from company to company" and there is a "lack of consistency" regarding such agreements.  Kipling 5/23 Dec. ¶ 15(b).[15] This lack of a definiteness and uniformity voids entirely the claim of any custom and practice.[16] Moreover, Kipling does not purport to conclude that all such agreements are invariably and uniformly not binding.  And if he did, it would be contrary to well-established law upholding such agreements and would be subject to preclusion on that basis.  *See, e.g., Hebert v. Lisle Corp.,* 99 F.3d 1109, 1117 (Fed. Cir. 1996).

In addition to giving impermissible legal conclusions, Kipling also testifies contrary to established law, and his testimony should also be precluded on this basis.  Specifically, Kipling ignores the well-established body of case law which holds that a combination of known features cannot be novel.  *See* Fisher-Price's Memo. at 6.  Instead, he testifies to the purported custom and practice in the toy industry to the contrary.  Kipling 6/27 Dec. ¶ 27.  Plaintiffs make no further attempt to lay a foundation for this alleged custom and practice; nor do they address case law which states that a custom which is contrary to law is inadmissible.  *See* Fisher-Price's Memo. at 5.

---

[13]    *British Int'l Ins. Co., Ltd. v. Seguros LA Republica, S.A.,* 342 F.3d 78, 84-85 (2d Cir. 2003) (quotation omitted).

[14]    *Anglo-Saxon Petroleum Co., Ltd. of London, England v. United States,* 222 F.2d 75, 77 (2d Cir. 1955).  *See also Encyclopaedia Britannica, Inc. v. SS Hong Kong Producers,* 422 F.2d 7, 18 (2d Cir. 1969).

[15]    Kipling has also admitted there is not custom as to confidentiality in the toy industry.  *See* Declaration of Robert J. Lane, Jr., dated April 29, 2005 (Docket No. 94), Ex. 12 at 168-69.

[16]    *See Anglo-Saxon Petroleum Co.,* 222 F.2d at 77 ("in order to give any custom the force of law, there must be evidence that it is a definite, uniform and known practice").

- 8 -

## II.    PORTIONS OF REILING'S DECLARATION MUST BE STRICKEN

Reiling's declaration opposing Fisher-Price's motion for summary judgment contains expert testimony regarding custom and practice in the toy industry masquerading as fact testimony, precisely the sort of testimony that the Federal Rules of Evidence are designed to prevent. This testimony must be stricken for two reasons. First, Reiling has never been disclosed as an expert. Second, even if the Court could properly consider Reiling's testimony regarding custom and practice, such testimony would be properly precluded for lack of proper foundation and unreliability. Reiling's opinion as to Fisher-Price's obligation to pay plaintiffs is also expert testimony and must also be stricken.

Reiling may not opine as to industry custom and practice as a fact witness because "*expert testimony is necessary for the introduction of custom and practice evidence.*"[17] Fact witnesses who have not been disclosed as experts are simply not permitted to give testimony as to custom and practice,[18] and *there is no dispute that Reiling has never been disclosed as an expert.* In order to avoid certain preclusion, plaintiffs now try to disavow Reiling's reliance on his extensive experience and argue that Reiling's testimony is based only on his "basic" "perception." Plaintiffs' Memo at 16. This is a transparent attempt to distinguish Reiling's testimony from the precluded testimony in *Bank of China*

---

[17]  *Didzbalis v. Sheridan Transp. Co.*, 2002 U.S. Dist. LEXIS 22378, *2 (S.D.N.Y. Nov. 19, 2002) (barring fact witness from testifying as to "propriety of the practices" used in the industry) (emphasis added). *See also Bank of China v. NBM LLC*, 359 F.3d 171, 182 (2d Cir. 2004) (holding that testimony that was based on the witness's "specialized knowledge . . . because of his extensive experience in the industry" was expert testimony which was inadmissible because the witness was not disclosed as an expert under FRE 702).

[18]  *Bank of China*, 359 F.3d at 182 (the witness's "*explanations regarding typical international banking transactions or definitions of banking terms, and any conclusions that he made that were not a result of his investigation, were improperly admitted* . . . Bank of China was obligated to satisfy the reliability requirements set forth in [Rule 702], and disclose [the witness] as an expert pursuant to Rule 26(a)(2)(A) of the Federal Rules of Civil Procedure") (emphasis added).

- 9 -

where a fact witness was barred from testifying about compliance with industry standards.[19]  Reiling

repeatedly uses the phrase "custom and practice" in his challenged declaration (Reiling Dec. ¶¶ 16-22,

29, 39, 55-56) and states again and again that he based his opinions on information learned "[o]ver the

course of [his] career" and "prior experience in the industry." (Reiling Dec. ¶¶ 20, 22).  Reiling's

repeated claim of specialized knowledge of the toy industry is indistinguishable from the specialized

knowledge based on extensive experience of the banking industry of the witness in *Bank of China,* and it

must be precluded for the same reasons.

Even if Reiling had been disclosed as an expert witness, his testimony regarding custom

and practice would not be properly considered by the Court.  Reiling's testimony does not come close to

meeting the rigorous standard of admissibility for custom and practice evidence.  Rather than showing

any fixed, invariable, definite, and uniform practice, he offers only conclusory statements as to what

constitutes custom and practice.  *See* cases cited above in Section I.B.  Personal, specific experience

Reiling may have had with Fisher-Price (or any other particular toy company) (Reiling Dec. ¶¶ 11, 16-

17) does not meet the stringent standard for admissibility of custom and practice evidence.

Finally, Reiling's conclusion that Fisher-Price is obligated to pay a royalty to plaintiffs is

based on Reiling's opinion that Fisher-Price used plaintiffs' idea.  There is no question that ***an inventor***

***cannot testify as to infringement if he has not been disclosed as an expert witness.***[20]  Thus, even if

---

[19]  Plaintiffs' heavy reliance on *Medforms, Inc., v. Healthcare Mgmt. Sols., Inc.*, 90 F.3d 98, 110-11 (2d Cir. 2002), is particularly curious.  In *Medforms,* the court stated specifically that the employee's testimony was "based on his everyday experience as a computer programmer *and specifically on his work on FormFree and Superbill Express,*" the copyrighted works at issue.  *Id.* (emphasis added).  Not surprisingly, plaintiffs failed to include the relevant part of the quotation which related to the witness's specific experience.

[20]  *See J & M Corp.,* 2000 U.S. Dist. LEXIS 21756 at * 60-62 (refusing to consider opinion of inventor regarding infringement as part of opposition to summary judgment motion because inventor was never designated as an expert during the litigation); *Freedom Wireless, Inc. v. Boston Comms. Group, Inc.*, 2005 U.S. Dist. LEXIS 8190, * 5-6 (D.

Footnotes continued on next page.

- 10 -

Reiling could qualify as an expert in the toy industry or as a toy design expert, his opinion as to Fisher-Price's obligation to pay a royalty to plaintiffs because of the alleged unauthorized use of their idea is plainly expert testimony and must be precluded.

### Conclusion

For the foregoing reasons, this Court should strike, in part, the declarations of James Kipling and Victor G. Reiling.

Dated:  July 12, 2005

**ROBINSON & COLE LLP**

By _____

Bradford S. Babbitt
e-mail: babbitt@rc.com
Federal Bar No.: ct13938
Michael J. Kolosky
email: mkolosky@rc.com
Federal Bar No.: ct22686
280 Trumbull Street
Hartford, CT  06103-3597
Telephone:  (860) 275-8200

**HODGSON RUSS LLP**
Robert J. Lane, Jr.
e-mail: rlane@hodgsonruss.com
Federal Bar No.: ct24598
Jodyann Galvin
e-mail: jgalvin@hodgsonruss.com
Federal Bar No.: ct24599
One M&T Plaza, Suite 2000
Buffalo, New York  14203-2391
Telephone:  (716) 856-4000

*Attorneys for Fisher-Price, Inc.*

---

Footnotes continued from previous page.

Mass. May 2, 2005) (portions of inventor's testimony stricken because they were based on specialized knowledge; holding that opinion as to triviality or obviousness were "abstract opinion, which is several degrees removed from [the witness's] actual experience [and] is the classic type of expert testimony contemplated by Rule 702"). *See also Air Turbine Tech., Inc. v. Atlas Copco AB,* 2005 U.S. App. LEXIS 10417, *29-30 (Fed. Cir. June 7, 2005) (holding that co-inventor's testimony regarding infringement was properly barred by the District Court).

- 11 -

## CERTIFICATION

The undersigned hereby certifies that a copy of the foregoing *Reply Memorandum of Law in*

*Further Support of Fisher-Price's Motion to Strike* was mailed via first-class mail to the attorneys of

record recited below on this 12th day of July, 2005.

Gregory J. Battersby, Esq. (Bar No. 07386)
Edmund J. Ferdinand, III, Esq. (Bar No. 21287)
Russell D. Dize, Esq. (Bar No. 23064)
488 Main Avenue, Third Floor
Norwalk, Connecticut 06851-1008
Phone: 203-849-8300
Fax: 203-849-9300

Bradford S. Babbitt

LEXSEE 2005 US APP LEXIS 10417

**AIR TURBINE TECHNOLOGY, INC., Plaintiff-Appellant, v. ATLAS COPCO AB, ATLAS COPCO TOOLS AB, ATLAS COPCO NORTH AMERICA, INC., and ATLAS COPCO TOOLS, INC., Defendants-Appellees.**

04-1387

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

*410 F.3d 701; 2005 U.S. App. LEXIS 10417*

**June 7, 2005, Decided**

**PRIOR HISTORY:** [*1] Appealed from: United States District Court for the Southern District of Florida. Judge Kenneth A. Marra. *Air Turbine Tech., Inc. v. Atlas Copco AB, 2003 U.S. Dist. LEXIS 24027 (S.D. Fla., Nov. 12, 2003)*

**DISPOSITION:** AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant patent owner sued appellee distributors of power tools, alleging that the distributors engaged in false advertising, breached the parties' distribution contract, and infringed the owner's patent for a power tool. The owner appealed the judgment in favor of the distributors entered in the United States District Court for the Southern District of Florida.

**OVERVIEW:** The owner contended that the distributors advertised their power tool as comparable to the owner's tool, and dissatisfaction with the distributor's tool caused the owner's sales to decline. The owner also asserted that the distributors' advertising constituted exploitation of patented technology in breach of the parties' contract, and that evidence supporting patent infringement was improperly excluded. The appellate court first held that the owner failed to show that the allegedly false advertising by the distributors effectively destroyed the tool market thereby causing the owner's loss of sales. Further, exploitation of the owner's technology, as contractually prohibited, required actual or productive use of the technology, and the distributors' mere advertising by reference to the owner's tool did not

constitute exploitation. Also, the owner's failure to disclose an expert's opinion concerning an infringement issue warranted exclusion of the expert's testimony with regard to such issue, a co-inventor of the patent was properly precluded from testifying concerning the distributor's tool, and the owner's untimely request for testimony by video teleconference was properly denied.

**OUTCOME:** The judgment in favor of the distributors was affirmed.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] Summary judgment must be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*.

*Patent Law > Jurisdiction & Review > Standards of Review > General Overview*
[HN2] When the U.S. Court of Appeals for the Federal Circuit is dealing with an issue not unique to patent law, the applicable substantive law is that of the appropriate regional circuit.

*Civil Procedure > Appeals > Standards of Review > De Novo Review*
*Civil Procedure > Summary Judgment > Standards of Review*

[HN3] Review of a district court's grant of summary judgment is de novo.

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN4] For purposes of summary judgment, an issue of fact is material if, under the applicable substantive law, it might affect the outcome of the case. An issue of fact is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
[HN5] A movant for summary judgment carries the initial burden of proving that there are no genuine issues of material fact. If the movant shows a prima facie case for summary judgment, then the burden of production shifts to the nonmovant to present specific evidence indicating there is a genuine issue for trial.

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN6] When ruling on a motion for summary judgment, all of the nonmovant's evidence is to be credited, and all justifiable inferences are to be drawn in the nonmovant's favor.

*Antitrust & Trade Law > Consumer Protection > False Advertising*
[HN7] False advertising under the Lanham Act requires, among other things, a showing of both an injury and a causal link between the injury and the allegedly false advertising.

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
*Evidence > Procedural Considerations > Rulings on Evidence*
[HN8] A district court's evidentiary rulings are not subject to reversal on appeal absent a clear abuse of discretion.

*Evidence > Witnesses > Examination & Presentation of Evidence*
[HN9] See *Fed. R. Civ. P. 43(a).*

**COUNSEL:** Richard L. Horn, Akerman Senterfitt, of West Palm Beach, Florida, argued for plaintiff-appellant. With him on the brief was Philip M. Burlington, of West Palm Beach, Florida.

William P. Atkins, Pillsbury Winthrop LLP, of McLean, Virginia, argued for defendants-appellees. With him on the brief were Scott J. Pivnick, Guillermo E. Baeza, and Benjamin L. Kiersz.

**JUDGES:** Before LOURIE, SCHALL, and PROST, Circuit Judges.

**OPINIONBY:** SCHALL

**OPINION:** SCHALL, Circuit Judge.

Air Turbine Technology, Inc. ("ATT") is the owner of *United States Patent No. 5,439,346* ("the *'346 patent*"). ATT sued Atlas Copco AB ("ACAB"), Atlas Copco Tools AB ("ACTAB"), Atlas Copco North America, Inc., and Atlas Copco Tools, Inc. (collectively, "Atlas") in the United States District Court for the Southern District of Florida for infringement of the *'346 patent*, for violation of the Lanham Act, and for unfair competition under Florida law. In the same action, ATT sued ACTAB separately for breach of contract, fraud, and breach of confidential relationship. ATT now appeals from the final judgment of [*2] the district court that was adverse to it on all of its claims. *Air Turbine Tech., Inc. v. Atlas Copco AB, 2003 U.S. Dist. LEXIS 24027, No. 01-8288-CIV (S.D. Fla. Nov. 13, 2003)* ("Final Judgment"). We affirm.

BACKGROUND

I.

ATT, located in Boca Raton, Florida, is a manufacturer of pneumatic industrial tools. n1 One of its products is a "governed turbine pencil grinder." This is a tool that has a high-speed grinding bit at one end and is typically used for high-precision work, such as engraving. Among the various means of powering pencil grinders, the turbine engine has several advantages, such as reduced noise and fewer maintenance requirements. However, at least as used in grinding tools, turbines have the disadvantage of losing power under load. This means that the rotation speed of the grinding bit tends to decrease as resistance is applied to it. So, for example, a person using a turbine grinder to engrave a piece of metal might find that the rotation speed of the grinder's bit decreased as the bit was applied against the surface of the metal.

> n1 Generally speaking, pneumatic tools are tools that operate using compressed air or some other compressed gas.

ATT acquired *U.S. Patent* [*3] *No. 4,776,752* ("the *'752 patent*") in an effort to overcome this power-loss shortcoming of turbine grinders. The *'752 patent*, entitled "Speed Governed Rotary Device," claims a "governor" that can be used to control (or govern) the rotary speed of a turbine grinder. ATT used this technology to develop

several governed-turbine models of its pencil grinder, one of which is the Model 201 A grinder. ATT believed that this new tool overcame many of the power-loss problems experienced by turbine pencil grinders.

Atlas is a large power-tool distributor based in Sweden. It is comprised of multiple corporate entities, one of which is ACTAB, its worldwide distribution subsidiary. One of the many products marketed by Atlas, and distributed by ACTAB, is a high-speed pencil grinder. On May 1, 1992, ACT AB and ATT entered into a Private Brand Agreement ("PBA") under which ACTAB obtained the rights to market and sell ATT's Model 201A grinder worldwide, with the exception of the United States and Canada. The PBA included, among others, the following provision protecting ATT's intellectual property:

> ACTAB will not exploit ATT's technology covered by ATT's patents. ATT will inform ACTAB well [*4] in advance before implementing any modifications or improvements of the Product. This provision is valid for the life of the patent (including applicable application periods).

Operating under the PBA, Atlas marketed the Model 201A pencil grinder as the "TSF06." Atlas intended to eventually sell the TSF06 worldwide (with, presumably, the exception of the Untied States and Canada). It never did so, however, because in March 1993, ATT terminated the PBA. n2

> n2 ATT contends that it rescinded the contract because Atlas was in breach for failing to make timely payments. That issue is not before us in this appeal.

Several years later, ATT acquired ownership of the '346 patent, which relates to an "automatic braking mechanism" for turbine grinders and other rotary devices. The patent is based on an application filed on September 16, 1993, by Gregory A. Bowser and Edward C. McCollough. It describes a braking mechanism that uses pressurized fluid, such as air, to enable or inhibit the rotation of, for example, a turbine's rotor. The braking mechanism is located inside of a chamber that is adjacent to the rotor. '346 patent, col. 3, ll. 22-23. The mechanism consists, [*5] in part, of a spring and a brake pad that are oriented in such a manner that, in the absence of external forces, the spring exerts pressure on the brake pad so as to push the brake pad into the rotor, thereby inhibiting rotation. Id. col. 5, ll. 33-50. However, when compressed air flows through the chamber, an exhaust

pressure is created that is greater than the ambient pressure normally present in the chamber. This in turn exerts a force on the brake pad greater than, and opposite to, the force exerted on it by the spring, thereby pushing the brake pad away from the rotor and enabling rotation. Id. col. 5, ll. 12-21. The automatic braking mechanism can therefore be summarized as follows: in the presence of a compressed fluid, the braking mechanism enables rotation of the rotor; in the absence of a compressed fluid, the braking mechanism inhibits rotation of the rotor. Id. col. 5, ll. 47-57.

At some point after ATT terminated the PBA with ACTAB, Atlas began looking for other suppliers of pencil grinders. Atlas found Schmid & Wezel GmbH & Co. ("Schmid"), a German company, to be a suitable supplier and, in 1999, entered into a PBA with Schmid for turbine pencil grinders. [*6] Atlas marketed the Schmid pencil grinder as the "TSF07" and began selling it in October 1999. Atlas continued to sell the TSF07 until the spring of 2001, when it received notice that ATT believed the TSF07 incorporated an automatic braking mechanism that infringed the '346 patent.

II.

On April 6, 2001, ATT sued Atlas in the Southern District of Florida. ATT's first amended complaint alleged a total of six causes of action: (1) infringement of the '346 patent; (2) unfair competition under section 43 of the Lanham Act, 15 U.S.C. ?? 1125; (3) breach of contract; (4) fraud; (5) breach of confidential relationship; and (6) unfair competition under Florida law. (First Am. Compl. PP 18-50.) Counts one, two, and six were asserted collectively against Atlas, while counts three, four, and five were asserted separately against ACTAB. n3

> n3 Counts three, four, and five were also asserted against ACAB, but ACAB was subsequently dismissed from the suit for lack of personal jurisdiction. Air Turbine Tech., Inc. v. Atlas Copco AB, 235 F. Supp. 2d 1287, 1290-91 (S.D. Fla. 2002).

The patent infringement and unfair competition claims asserted [*7] against Atlas were all alleged to arise from Atlas's marketing of the TSF07 grinder subsequent to ATT terminating the PBA with ACTAB. ATT's theory with respect to count one-patent infringement-was that the TSF07 marketed by Atlas incorporated an automatic braking mechanism that infringed the '346 patent. (Id. P14.) ATT based its Lanham Act claim of count two on a theory of false advertising. Specifically, ATT alleged that Atlas made

the TSF07 to look like the TSF06 and that it advertised the TSF07 as having the same governed turbine characteristics as the TSF06, when in fact the TSF07 did not have such capabilities. (Id. PP 27-28.) ATT alleged that this false advertising caused consumer confusion as to product origination and, moreover, caused consumers to stop buying the TSF06 because they believed it had the same inferiorities as the TSF07. (Id. PP 29-32.) In other words, ATT alleged that consumers were not satisfied with the TSF07 because it lacked the advertised "governed turbine" feature and that, because of the falsely advertised similarities to the TSF06, they stopped buying the TSF06. With respect to the unfair competition claim under Florida law, count six, ATT [*8] similarly alleged that Atlas had falsely represented the TSF07 as having the same characteristics as the TSF06 and thereby caused consumer confusion as to product origination. (Id. PP 48-49.)

The three causes of action asserted separately against ACTAB arise from ATT's perceived breach of the PBA by ACTAB. Indeed, ATT based its breach of contract claim, count three, on its belief that ACTAB's marketing of the competing TSF07 product breached the promise ACTAB made in the PBA not to exploit any of ATT's technology during the life of ATT's patents. (Id. PP 34-37.) ATT specifically alleged that ACTAB exploited its technology by marketing a product that infringed the '346 patent. (Id. P36.) Along these same lines, ATT alleged that ACTAB also committed fraud, count four, by entering into the PBA under false pretenses and with the intent to steal ATT's technology. (Id. PP 39-40.) Finally, ATT alleged in count five that ACTAB acquired a position of trust by entering into the PBA and gaining access to ATT's proprietary and confidential technology. (Id. P43.) According to ATT, ACTAB then breached this confidential relationship when it "used and disclosed [ATT's] information [*9] to others in the sale and promotion of ACTAB['s] ???tools incorporating [ATT] technology." (Id. P44.)

III.

Trial on all claims was set to begin the week of October 6, 2003. Air Turbine Tech., Inc. v. Atlas Copco AB, et al., No. 01-8288-CIV (S.D. Fla. May 5, 2003) ("Order Setting Trial"). However, on September 23, 2003, the district court granted Atlas's motion for summary judgment on the unfair competition, breach of contract, and fraud claims. Air Turbine Tech., Inc. v. Atlas Copco AB, 295 F. Supp. 2d 1334, 1349 (S.D. Fla. 2003) ("Summary Judgment"). ATT's two remaining claims of patent infringement and breach of confidential relationship proceeded to trial as scheduled.

With respect to ATT's false advertising claim under the Lanham Act, the court granted summary judgment

for Atlas on the ground that ATT had not produced any evidence suggesting it was Atlas's false advertisements that caused consumers to not buy ATT's product. Id. at 1344-46. The court summarized "ATT's evidence of causation" as "sworn testimony from its employees and distributors that customers told them at trade shows that they will not buy ATT's tool because [*10] they have an Atlas Copco tool just like it and it does not operate as they would like." Id. at 1344. The court found that, with the exception of one affidavit, the employee and distributor testimony did not go to the ultimate issue of causation. That was because, although the testimony suggested that customers stopped buying the ATT tool as a result of dissatisfaction with the Atlas tool, it did not suggest that customers stopped buying the ATT tool as a result of Atlas's false advertisements. Id. Additionally, the court concluded that Mr. Verbruggen's affidavit-which was the one affidavit that did suggest a causal link to Atlas's advertisements-was based on inadmissible hearsay. Id. at 1344-45.

The district court also granted Atlas summary judgment on the breach of contract claim because it concluded that ATT had not shown that defendant exploited any of ATT's patented technology. Id. at 1346-47. In particular, the court concluded that, as a matter of law, use of technology covered by the '346 patent (relating to the automatic braking mechanism) could not form the basis of the breach of contract claim because the application for [*11] the '346 patent was not filed until after ATT terminated the PBA. Id. at 1346. The court noted that while a claim could have been made based on exploitation of the '752 patent (relating to the governor system), ATT did not advance such a claim. Id. at 1346-47 ("Plaintiff has framed the alleged breach in its amended complaint as infringement of the '346 patent."). n4 In addition, the court ruled that "exploit" means actual or productive use of technology covered by an ATT patent. Accordingly, the court ruled that "simply advertising a similar product using descriptions similar to the descriptions used by ATT is not exploiting ATT's technology. It may be exploitation of advertising materials, or false advertising or a trademark violation, but such acts are not exploitation of technology." Id. at 1347.

n4 The district court also noted the inconsistency of alleging false advertising based on a lack of a governed turbine in the TSF07 on the one hand, and in alleging breach of contract based on the use of the governed turbine covered by the '752 patent on the other. Summary Judgment, 295 F. Supp. 2d at 1347 n. 10.

[*12]

With respect to the fraud claim, the district court granted summary judgment for ACTAB because it concluded that "ATT [had] not presented more than a scintilla of evidence regarding ACTAB's intent to fraudulently induce ATT into a contractual relationship." *Id. at 1348.* The district court also granted Atlas summary judgment on ATT's claim for unfair competition under Florida law because the claim did not add anything beyond what the court had addressed already in the Lanham Act and breach of contract claims. *Id. at 1348-49.*

As mentioned, the district court denied summary judgment as to the claims for patent infringement and breach of confidential relationship, and so those two claims proceeded to trial. Prior to trial, the district court denied ATT's expedited motion requesting an order to require testimony via live video conference. *Air Turbine Tech., Inc. v. Atlas Copco AB, 217 F.R.D. 545, 546-47 (S.D. Fla. Sept. 3, 2003).* As a result, and due to the fact that many of Atlas's employees are Swedish citizens, much of ATT's testimonial evidence was presented to the jury by recitation of deposition transcripts. Atlas also succeeded [*13] in having two of ATT's witnesses-Dr. Jerome Catz and Gregory Bowser-barred from testifying at trial on the issue of infringement. The trial lasted about three weeks and, on October 29, 2003, the jury returned a verdict against ATT on both its infringement and breach of confidential relationship claims. The district court entered final judgment as to all six of ATT's claims on November 14, 2003. Final Judgment.

ATT subsequently filed a motion for a new trial on its patent infringement claim based on, among other things, the district court's evidentiary rulings excluding the testimony of Dr. Catz and Mr. Bowser. On April 20, 2004, the district court denied ATT's motion. *Air Turbine Tech., Inc. v. Atlas Copco AB, 2004 U.S. Dist. LEXIS 28037, No. 01-8288-CIV, slip op. at 9-10 (S.D. Fla. Apr. 20, 2004)* ("Order Denying Plaintiff's Motion for New Trial"). In the same order, the court also stayed, pending appeal, Atlas's motion for costs and attorney's fees. Id.

ATT has timely appealed from the final judgment of the district court. We have jurisdiction pursuant to 28 U.S.C. ?? 1295(a)(1).

DISCUSSION

On appeal, ATT challenges the grant of summary judgment to Atlas on the false advertising [*14] n5 and breach of contract claims, as well as the denial of its request for a new trial on its patent infringement claim. We turn first to the district court's summary judgment rulings.

n5 ATT concedes that the requirements for a false advertising claim are the same under Florida law as under the Lanham Act. *Babbit Elecs., Inc. v. Dynascan Corp., 38 F.3d 1161, 1181 (11th Cir. 1994).* Accordingly, our review is limited to the Lanham Act false advertising claim.

I.

As discussed, the district court granted summary judgment for Atlas on ATT's Lanham Act false advertising claim because the court found that ATT had not provided admissible evidence to suggest Atlas's false advertising caused consumers to stop buying ATT's product. Rather, the court found that, at most, ATT's admissible evidence only suggested that consumers stopped buying ATT's product because they were not satisfied with Atlas's product. *Summary Judgment, 295 F. Supp. 2d at 1344-45.* With respect to the breach of contract claim, the district court granted summary judgment to Atlas because it found that ATT did not provide evidence to suggest that Atlas had exploited any [*15] of ATT's patented technology covered by the PBA. *Id. at 1346-47.* The court held that "exploit ," as used in the PBA, required actual or productive use of ATT's patented technology and therefore, as a matter of law, advertising a product as having similar characteristics as ATT's products could not be considered exploitation of ATT's technology. *Id. at 1347.*

[HN1] Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* [HN2] When we are dealing with an issue not unique to patent law, the applicable substantive law is that of the appropriate regional circuit, in this case, the Eleventh. *Sulzer Textil A.G. v. Picanol N.V., 358 F.3d 1356, 1363 (Fed. Cir. 2004).* As in the Federal Circuit, see *TorPharm Inc. v. Ranbaxy Pharms., Inc., 336 F.3d 1322, 1326 (Fed. Cir. 2003),* in the Eleventh Circuit, [HN3] review of a district court's grant of summary judgment [*16] is de novo, *Vector Prods., Inc. v. Hartford Fire Ins. Co., 397 F.3d 1316, 1318 (11th Cir. 2005).* Under Eleventh Circuit law, [HN4] "an issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004).* "An issue of fact is 'genuine 'if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id. at 1260.* [HN5] The movant carries the initial burden of proving that there are no genuine issues of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 322-24, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* If the movant shows a

prima facie case for summary judgment, then the burden of production shifts to the nonmovant to present specific evidence indicating there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). [HN6] "When ruling on a motion for summary judgment, all of the nonmovant's evidence is to be credited, and all justifiable inferences are to be drawn in the nonmovant's favor." *Caterpillar Inc. v. Deere & Co.*, 224 F.3d 1374, 1379 (Fed. Cir. 2000); [*17] see also *Tackitt v. Prudential Ins. Co. of Am.*, 758 F.2d 1572, 1574 (11th Cir. 1985) ("We resolve all reasonable doubts about the facts in favor of the non-movant.").

A.

With respect to the false advertising claim, ATT first argues it was deprived of its due process rights when the district court granted summary judgment for Atlas. ATT asserts that the case law of both this and the Eleventh Circuit requires that a party have a reasonable opportunity to present its case before a court enters judgment against it. ATT argues that it was not given this opportunity because the causation theory upon which the district court relied in granting summary judgment was not raised by Atlas but, rather, sua sponte by the district court. In particular, ATT argues that it had no notice of, and, consequently, no opportunity to address, the court's findings that Mr. Verbruggen's affidavit consisted of inadmissible hearsay and that ATT had not produced other evidence to suggest it was injured as a result of false advertising by Atlas.

In the alternative, ATT contends that it presented sufficient evidence of causation to survive summary judgment. First, ATT argues that it was not [*18] required to submit evidence of "causation of damages" because the elements needed to show a violation of the law are not the same as the elements needed to establish the right to a particular remedy, such as damages or an injunction. Second, ATT argues that it "offered substantial evidence of injury and damages caused by Atlas's false advertising ???so as to create a genuine issue of fact." Third, ATT contends that, like the plaintiff in *Cashmere & Camel Hair Manufacturers Institute v. Saks Fifth Avenue*, 284 F.3d 302 (1st Cir. 2002), it was entitled in the district court to a reasonable inference that "[Atlas's] intentional conduct caused harm to ATT."

In response, Atlas argues that ATT received due process because it put ATT on notice of the causation issue in its Consolidated Motion for Summary Judgment and that causation was discussed at length at the summary judgment hearing. As for ATT's alternative arguments regarding the sufficiency of the evidence, Atlas argues that the Lanham Act requires a plaintiff to provide evidence of both an injury and a causal link

between that injury and the allegedly false advertisements, something Atlas maintains ATT failed to [*19] do in this case. Atlas also notes that, beyond its due process argument, ATT does not actually contest the district court's ruling excluding the Verbruggen affidavit on the ground that it was hearsay. Atlas lastly argues that while an inference of causation may be reasonable in some circumstances, it is not reasonable in this case, where ATT is asking the court to infer that Atlas's false advertising caused consumers to "shun all turbine grinders, including ATT's."

We see no error in the district court's grant of summary judgment in favor of Atlas on ATT's false advertising claim. First, we do not think the entry of summary judgment deprived ATT of its due process rights because ATT had a fair opportunity to present its case to the district court and, specifically, to come forward with evidence of causation. ATT was on notice of the causation issue generally because Atlas raised it in its motion for summary n6 judgment. The district court judge and ATT also had a substantial discussion on the issue at the summary judgment hearing. (Summ. J. Hr'g Tr. at 35-41.) In addition, although in the context of the materiality of the alleged deception, Atlas raised the general hearsay issue [*20] in its motion for summary judgment. Thereafter, ATT responded to it in opposition to Atlas's motion for summary judgment, arguing that the customer and distributor statements fell within the present-state-of-mind exception to the hearsay rule. (Pl.'s Mem. in Opp'n to Def.'s Consol. Mot. for Summ. J. at 25-26.) In sum, contrary to ATT's contentions, this is not a situation where the nonmovant lacked notice as to the risk of summary judgment so as to deprive the nonmovant of a fair opportunity to present its case. Compare *Burns v. Gadsden State Cmty. Coll.*, 908 F.2d 1512, 1517 (11th Cir. 1990) ("The defendants' ???motion for summary judgment was 'bare 'boned. It failed to apprise plaintiff of the facts and legal theories on the basis of which defendants claimed to be entitled to summary judgment."); *Thoen v. United States*, 765 F.2d 1110, 1115 (Fed. Cir. 1985) (holding that summary judgment was improper where the plaintiff had no notice of the court's decision to render judgment).

n6 "Even assuming literal falsity and materiality, ATT has no evidence that links an injury, or likelihood of an injury, to the alleged falsity in the accused advertisements. Because of this, its false advertising claim cannot survive summary judgment." (Def.'s Consol. Mot. for Summ. J. at 31.)

[*21]

Second, we do not think that ATT presented sufficient evidence to survive summary judgment. Atlas is correct that [HN7] false advertising under the Lanham Act requires, among other things, a showing of both an injury and a causal link between the injury and the allegedly false advertising. *Hickson, 357 F.3d at 1260; Johnson & Johnson Vision Care, Inc. v. 1-800 CONTACTS, Inc., 299 F.3d 1242, 1247 (11th Cir. 2002).* Accordingly, ATT's argument distinguishing between the elements required for establishing a claim and those required for establishing the right to a particular remedy misses the point. The critical issue is whether ATT provided evidence sufficient to allow a reasonable juror to find that Atlas's false advertising caused the alleged injuries to ATT. We do not think that it did.

At the summary judgment proceedings, ATT relied on affidavits from its distributors and customers to show causation. The district court correctly determined that these affidavits, with the exception of Mr. Verbruggen's, did not go to the issue of causation. At most, the affidavits suggest that customers were dissatisfied with Atlas's TSF07 product and consequently stopped [*22] buying similar products. n7 That, however, does not provide a causal link between Atlas's false advertising and resulting injury to ATT. In its reply brief, ATT again asserts that Mr. Verbruggen's affidavit was sufficient to show a genuine issue of fact as to whether the false advertising caused ATT's injuries. However, the district court excluded Mr. Verbruggen's affidavit as based on inadmissible hearsay and ATT does not challenge that evidentiary ruling on appeal.

---

n7  For example, Peter Hold, an ATT distributor in Switzerland, stated: "My interest level on promoting Air Turbine Tools decreased with the appearance of a product with the same characteristics from the major manufacturer of power tools." (Decl. of Peter Hold at 2.) Jurgen Uhlarz, an ATT distributor in Germany, similarly stated that "sales of [ATT] tools were negatively affected by the [Atlas] tool and the attitude of prospective customers created by the unjustified claims which [Atlas] made for its TSF07 turbine tool, which claimed to have a governor, but did not have governed performance." (Decl. of Jurgen Uhlarz at 3.) And, Abby Petzenbaum, an ATT distributor in Brazil, stated that "the presence of a product claiming to be equivalent to [ATT] robbed the [ATT] products of the uniqueness of their performance. Our sales force was frustrated to work for [ATT] sales in this environment and our efforts to market the product were hindered and stalled as a result." (Decl. of Abby Petzenbaum at 2-3.)

[*23]

Nor do we think that the cumulative evidence submitted by ATT is sufficient to permit an inference of causation. The cases cited by ATT involve situations where a court drew an inference of causation based on evidence of a direct diversion of sales from one competitor to another. In *Cashmere & Camel Hair,* for example, a fabric wholesaler and a trade association of cashmere manufacturers brought suit against a manufacturer of cashmere products for falsely advertising the cashmere content of its women's blazers, in violation of the Lanham Act. *284 F.3d at 306-07.* In opposition to summary judgment, plaintiffs provided evidence that: (1) defendant overstated the percentage of cashmere in its blazers; (2) defendant priced its blazers below the prices offered by plaintiff-wholesaler; and (3) plaintiff-wholesaler had lost business to defendant. *Id. at 319-20.* Based on this evidence, the First Circuit reversed the district court's grant of summary judgment for defendant, finding that "a rational fact-finder could reasonably infer that the substituted cost savings [defendant] enjoyed from using non-cashmere or recycled cashmere fabric allowed [defendant] to [*24] lower the price of its blazers, thereby preventing [plaintiff's] customers from competing in the market." *Id. at 319*; see also *Grove Fresh Distribs. v. New England Apple Prods. Co., Inc., 969 F.2d 552, 557 (7th Cir. 1992)* (holding that, based on evidence as to the importance consumers placed on the "100% Florida" label, the jury could have inferred that consumers switched to the defendant's product because of its false "100% Florida" label).

This case, by contrast, is not based on a diversion-of-sales theory. Indeed, ATT states that "the damage caused by the false advertising of the TSF07 was not the amount of tools Atlas sold, but rather the destruction of the marketability and distribution of governed turbine grinders and the underlying technology ???." (Br. of Appellant at 21.) Therefore, instead of asking for an inference of causation based on diversion of sales, ATT is really asking us to draw an inference based on its contention that Atlas poisoned the entire tool-industry well against governed turbine grinders. That is, ATT contends that Atlas's false advertising caused consumers to stop buying all governed turbine grinders, irrespective [*25] of the product's origin. We conclude that such an inference is not warranted based on the evidence of record, and therefore affirm the grant of summary judgment to Atlas.

B.

Regarding the district court's grant of summary judgment to ACTAB on the breach of contract claim, ATT contends that the court erred in interpreting

"exploit" from the PBA to mean "to make productive use of." ATT argues that "exploit" is not so limited, but "extends to all the activities of commercialization and to advertising and promotion." ATT also asserts that the district court's construction effectively limits the type of conduct that could constitute a breach to patent infringement. Such a construction, ATT continues, is too narrow because "technology" is an "extremely broad term" and if the parties had wanted to limit exploitation to patent infringement, they would have done so. This, according to ATT, is shown by the fact that in another provision of the PBA Atlas promised not to commit patent infringement by "manufacturing or selling competing products using ATT's air governor system." In short, ATT argues that the disputed contract provision prohibited ACTAB from not only infringing its patents but [*26] also from advertising its product as having the resulting benefits of ATT's patented technology.

In response, Atlas argues that the district court correctly interpreted "exploit" as requiring actual or productive use and that the court also correctly interpreted "technology" to mean ATT's patented technology. Atlas argues that, in any event, ATT cannot prevail on its appeal because, while ATT does challenge the district court's contract construction, ATT does not challenge the district court's finding that neither the '346 patent nor the '752 patent could form the basis for the breach of contract claim.

We agree with the district court's interpretation of the scope of ACTAB's promise in the PBA not to "exploit ATT's technology covered by ATT's patents." The district court did not necessarily preclude "advertising" from the scope of the term "exploit." Rather, the district court held that the PBA used "exploit" in conjunction with "technology covered by ATT's patents," so as to limit the types of conduct that could be considered exploitation of ATT's technology. The court provided the following ex planation: "Simply advertising a similar product using descriptions similar to the descriptions [*27] used by ATT ???may be exploitation of advertising materials or false advertising or a trademark violation, but such acts are not exploitation of ATT's technology."

Accordingly, we agree with the district court that ATT was required to assert that Atlas exploited-i.e., put into practical use-technology covered by a particular ATT patent. In its complaint, ATT alleged that Atlas breached the PBA by infringing the '346 patent. However, the district court held that, as a matter of law, the '346 patent could not form the basis of a breach of contract claim because the patent's application was filed after ATT terminated the PBA with ACTAB. ATT does not challenge this holding of the district court. The district court also noted that the '752 patent could form a

basis for a breach of contract claim, but concluded that ATT had not asserted it as such. ATT also does not challenge this ruling on appeal. We therefore affirm the district court's grant of summary judgment to ACTAB because ATT neither contests the court's rejection of the '346 and '752 patents as bases for the breach of contract claim nor argues that some other patented technology was exploited.

II.

ATT also argues that the district [*28] court should have granted it a new trial on the patent infringement claim because of three prejudicial evidentiary rulings. First, ATT argues that the court erred in preventing its expert witness on infringement, Dr. Jerome Catz, from fully testifying. The district court excluded Dr. Catz's testimony insofar as it went to infringement of a particular means-plus-function limitation, "braking means." The court made this decision pursuant to Fed. R. Civ. P. 37(c)(1) because ATT failed to disclose the content of Dr. Catz's opinion as to infringement of the means-plus-function claim in an expert report as required by Fed. R. Civ. P. 26(a) and 26(e)(1). (Trial Tr. of Oct. 9, 2003, at 148-50.) ATT argues that it was "substantially justified" in not supplementing the report because the court's claim construction-namely, its conclusion that "braking means" was a means-plus-function limitation-was not finalized until just before trial. ATT also argues that under the Fifth Circuit's decision in Texas A&M Research Foundation v. Magna Transportation, Inc., 338 F.3d 394, 402 (5th Cir. 2003), [*29] exclusion of Dr. Catz's testimony was not warranted because it was important to ATT's case; the risk of prejudice to Atlas in allowing the testimony was minimal; and ATT's failure to supplement the report was excused by the court's late claim construction ruling.

Second, ATT argues the district court erred in excluding the testimony of Gregory Bowser, a co-inventor of the '346 patent. ATT called Mr. Bowser to testify as to what he observed when he examined the accused product. Atlas objected on the ground that Mr. Bowser was not an expert and his testimony consequently violated Fed. R. Evid. 701 as testimony of a lay witness on a matter requiring special scientific knowledge. The district court sustained the objection. (Trial Tr. of Oct. 20, 2003, at 74-75.) ATT argues the district court erred because Mr. Bowser's testimony was simply based on his observations of the structure of the accused device. n8 ATT contends that cases such as Tampa Bay Shipbuilding & Repair v. Cedar Shipping Co., 320 F.3d 1213, 1221 (11th Cir. 2003), make clear that Rule 701 does not prohibit a witness from testifying to a matter "rationally based on their [*30] own perceptions and experience." And, ATT continues, as a co-inventor of the '346 patent, Mr. Bowser had

experience with grinding tools and his testimony related simply to his observations of the structure of the accused device. In other words, ATT argues that Mr. Bowser "was entitled to testify based upon his particularized knowledge and experience to what he observed when he disassembled" the accused product.

> n8 The structure of the accused device is relevant to whether it reads on the "braking means" limitation. ATT sought to establish, through Dr. Catz and then Mr. Bowser, that the accused device contained the corresponding structure of the "braking means" limitation.

Third, ATT argues the district court erred in denying its expedited motion to require Atlas to produce Swedish-employee witnesses by video teleconference for examination in ATT's case-in-chief. The district court denied ATT's motion because it believed it lacked jurisdiction to compel testimony by non-U.S. citizens. In addition, even if it had jurisdiction, the court stated it did not think ATT had shown "compelling circumstances" under *Fed. R. Civ. P. 43(a)* [*31] to justify such an order because ATT waited until a month before trial to bring the motion and, moreover, this type of situation "occurs all the time" in complex litigation. ATT argues the district court erred because it mistook the motion for a motion to compel, when in fact it merely asked the court to "regulate" testimony by requiring Atlas to present testimony in the same manner as ATT. n9 ATT also contends it has shown "compelling circumstances" to warrant granting its request. To that end, ATT argues that this type of situation-i.e., a situation where one party must present a witness's testimony by reading deposition transcripts even though the other party may later call that same witness into court to give live testimony-is unfair and does not "occur all the time" in litigation. It also urges us to excuse the untimeliness of its motion on the ground that the Joint Pre-Trial Stipulation, which listed likely witnesses to be called by each party, was not filed until after the court decided the expedited motion.

> n9 For example, if ATT was forced to present the testimony of the Swedish-citizen employees in its case-in-chief by reading deposition transcripts, then the proposed order would have required Atlas to do the same in its case-in-chief. In this manner, the motion was intended to eliminate the perceived unfairness of having one party present its evidence to the jury by reading deposition transcripts while the other party used live witnesses.

[*32]

Atlas responds that none of these three rulings by the district court amount to an abuse of discretion. First, with respect to the exclusion of Dr. Catz's testimony, Atlas argues that ATT had ample time to supplement the report because the claim construction ruling came twenty-nine days before trial and did not even relate to the "braking means" limitation. Furthermore, Atlas stresses that ATT made no attempt to supplement Dr. Catz's expert report after the court issued its ruling. Second, Atlas argues that the court correctly excluded Mr. Bowser's testimony because "like Dr. Catz's excluded analysis, Mr. Bowser's testimony was directed to the function and identification of various structures in the [accused de vice] in an attempt to dodge the consequences of ATT's failure to include the means-plus-function analysis in Dr. Catz's expert report." Mr. Bowser's testimony, Atlas argues, "is more akin to an engineer's or mechanic's testimony about the technical design of an accused product, which has traditionally been treated as Rule 702 expert testimony." Third, with respect to the video teleconference issue, Atlas argues that the district court correctly concluded that it lacked [*33] jurisdiction to issue such an order and that, in any event, ATT's justification for the motion is undermined by the fact that Atlas did not call any Swedish witnesses at trial.

Although the underlying claim is for patent infringement, the issues presented are not unique to patent law, so we apply the relevant law of the Eleventh Circuit. In the Eleventh Circuit, [HN8] "[a] district court's evidentiary rulings are not subject to reversal on appeal absent a clear abuse of discretion." *Tampa Bay Shipbuilding, 320 F.3d at 1216*; see also *United States v. Myers, 972 F.2d 1566 (11th Cir. 1992)*. Under this standard of review, we see no reason to disturb the judgment in favor of ATT on the patent infringement part of the case.

First, we do not think the district court abused its discretion in excluding Dr. Catz's testimony under *Fed. R. Civ. P. 37(c)(1)* insofar as his testimony exceeded the material disclosed in his expert report. The district court construed "braking means" as a means-plus-function limitation on September 12, 2003 (about one month before trial). *Air Turbine Tech., Inc. v. Atlas Copco AB, 295 F. Supp. 2d 1327, 1333 (S. D. Fla. 2003)* [*34] ("Amended Claim Construction Order"). Furthermore, it appears that the issue of whether "braking means" was a means-plus-function claim was in play even earlier. *Id. at 1329* (stating that a Markman hearing was held on August 8, 2003). It is true that the district court later amended its claim construction, but it did not change its prior ruling that "braking means" is a means-plus-function limitation. *Air Turbine Tech., Inc. v. Atlas*

*Copco AB*, 2003 U.S. Dist. LEXIS 24028, 2003 WL 22939357 (S. D. Fla. Oct. 3, 2003) ("Second Amended Claim Construction Order"). Under these circumstances, ATT should have at least attempted to supplement Dr. Catz's expert report. See *Fed. R. Civ. P. 26(e)* (requiring a party to supplement expert reports).

Second, we do not think the district court abused its discretion in excluding the testimony of Mr. Bowser. Relevant excerpts of Mr. Bowser's testimony are as follows:

> Q: When you disassembled and inspected the Biax T365 brake, what did you find?
>
> A: When I removed the end cap, first of all I saw the brake pad that was supported by a spring, and also the fact that the tool was a rear exhaust [*35] tool, which was known, because it was exactly like the Air Turbine tool as far as the exhaust path.
>
> Q: Now, were you able to see how the brake pad was secured to the T365?
>
> A: Yes. There was--the guide post for that particular tool was a multi-sided post as opposed to a round, circular post. The brake pad was also matching multi-sided that could slide over the post. Obviously, since it was not round, though, that is what kept the brake pad from rotating.

(Trial Tr. of Oct. 20, 2003, at 69.) n10 Mr. Bowser's testimony refers to both the structural components of the accused device and to their respective functions. Moreover, the fact that Mr. Bowser may have particularized knowledge and experience as a co-inventor of the claimed invention does not necessarily mean he also has particularized knowledge and experience in the structure and workings of the accused device. Under these circumstances, we cannot say that

the district court abused its discretion in concluding that Mr. Bowser's testimony amounted to improper expert testimony.

> n10 The Biax T365 is, presumably, an Atlas product similar to the TSF07 accused of infringing the *'346 patent*.

Third, [*36] we do not think the district court abused its discretion in denying ATT's motion to order testimony via video teleconference. Even assuming the district court had power to issue such an order, the motion involved a matter expressly reserved to the sound discretion of the trial court. *Fed. R. Civ. P. 43(a)* [HN9] ("The court may, for good cause shown in compelling circumstances, ???permit presentation of testimony in open court by contemporaneous transmission from a different location." (emphasis added)). The district court stated that ATT should not have waited until one month before trial to file its motion and that requiring ATT to read the deposition transcripts of the foreign witnesses would not give Atlas an unfair tactical advantage because "this circumstance occurs all the time" in civil litigation. We cannot say that the district court abused its discretion on this point.

CONCLUSION

We hold that, as to the appealed summary judgment decisions, the district court correctly determined that there were no genuine issues of material fact so as to preclude judgment for Atlas. We also hold that the district court did not abuse its discretion in [*37] connection with any of the three challenged evidentiary rulings. We therefore do not disturb the court's denial of ATT's motion for a new trial on its claim of patent infringement. For these reasons, the final judgment of the district court is affirmed.

COSTS

Each party shall bear its own costs. AFFIRMED

LEXSEE 2002 US DIST LEXIS 22378

**ALAN T. DIDZBALIS, Plaintiff, -against-SHERIDAN TRANSPORTATION COMPANY, SECOND TUG/ BARGE CORPORATION, AMERICAN MANUFACTURING COMPANY, INC. and ATLANTIC CORDAGE CORP., Defendants.**

**00 Civ. 4329 (JCF)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2002 U.S. Dist. LEXIS 22378*

**November 19, 2002, Decided
November 19, 2002, Filed**

**SUBSEQUENT HISTORY:** Motion denied by, Summary judgment denied by *Didzbalis v. Sheridan Transp. Co., 2003 U.S. Dist. LEXIS 7720* (S.D.N.Y., May 6, 2003)

**DISPOSITION:** [*1] Plaintiff's application for reconsideration granted. Prior decision adhered to with one minor clarification.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff submitted a letter application seeking reconsideration of the court's order precluding a captain from testifying as an expert witness, including with respect to the customs and practices used in mooring the vessel on which the accident at issue occurred.

**OVERVIEW:** The captain's testimony was excluded to the extent that he was to offer expert opinion because he had not been designated as an expert witness in a timely manner. Nevertheless, in his letter application, plaintiff's counsel argued for the first time that the captain should be permitted to testify about mooring practices aboard the vessel in order to rebut any claims of contributory negligence. There was a narrow range of non-expert testimony admissible in this regard. If the vessel's command staff directed the mooring procedures to be done in a particular way, or if they were aware of the crew's practices and acquiesced in them, this could have a significant impact on the allocation of responsibility. It

remains the case, however, that the captain may not testify as to the propriety of the practices used.

**OUTCOME:** Reconsideration was granted, and the captain could testify.

**LexisNexis(R) Headnotes**

*Evidence > Witnesses > Expert Testimony*
[HN1] Generally, expert testimony is necessary for the introduction of custom and practice evidence.

**COUNSEL:** For Alan T Didzbalis, PLAINTIFF: Ralph J Mellusi, Tabak and Mellusi, New York, NY USA.

For Sheridan Transportation Company, Second Tug/ Barge Corporation, DEFENDANTS: Frank H Loomis, Hills Betts & Nash, NY, NY USA.

For American Manufacturing Company, Inc, DEFENDANT: John J Doody, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, New York, NY USA.

For Atlantic Cordage Corp, DEFENDANT: Stuart Diamond, Thurm & Heller, LLP, New York, NY USA.

For Sheridan Transportation Company, Second Tug/ Barge Corporation, CROSS-CLAIMANTS: Frank H Loomis, Hills Betts & Nash, NY, NY USA.