For American Manugacturing Company, Inc, CROSS-CLAIMANT: John J Doody, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, New York, NY USA.

For Atlantic Cordage Corp, CROSS-CLAIMANT: Stuart Diamond, Thurm & Heller, LLP, New York, NY USA.

For Sheridan Transportation Company, Second Tug/Barge Corporation, CROSS-DEFENDANTS: Frank H Loomis, Hills Betts & Nash, NY, NY USA.

For American Manugacturing Company, Inc, CROSS-DEFENDANT: John J Doody, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, [*2] New York, NY USA.

For Atlantic Cordage Corp, CROSS-DEFENDANT: Stuart Diamond, Thurm & Heller, LLP, New York, NY USA.

**JUDGES:** JAMES C. FRANCIS IV, UNITED STATES MAGISTRATE JUDGE.

**OPINIONBY:** JAMES C. FRANCIS IV

**OPINION:**

MEMORANDUM AND ORDER

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

The plaintiff, Alan Didzbalis, has submitted a letter application seeking reconsideration of my order precluding Captain Aiello from testifying as an expert witness, including with respect to the customs and practices used in mooring the vessel on which the accident at issue occurred. Reconsideration is granted, and I adhere to my prior decision with one minor clarification.

Captain Aiello's testimony was excluded to the extent that he was to offer expert opinion because he had not been designated as an expert witness in a timely manner. [HN1] Generally, expert testimony is necessary for the introduction of custom and practice evidence. See *Bayway Refining Co. v. Oxygenated Marketing and Trading A.G., 215 F.3d 219, 225 (2d Cir. 2000)* (custom and practice of tax treatment in petroleum industry); *Antilles Steamship Co. v. Members of the American Hull Insurance Syndicate, 733 F.2d 195, 198 (2d Cir. 1984)* [*3] (custom and practice of marine insurers); *Brandtjen & Kluge, Inc. v. Aakron Rule Corp., 2001 U.S. Dist. LEXIS 21102, No. 94-CV-411C(M), 2001 WL 1804345, at *5 (W.D.N.Y. June 20, 2001)* (custom and practice of printing press manufacturers); *Marketing/ Trademark Consultants, Inc. v. Caterpillar, Inc., 2000 U.S. Dist. LEXIS 7952, No. 98 Civ. 2570, 2000 WL 744371, at *2 (S.D.N.Y. June 9, 2000)* (expert testimony on custom and practice "is received to assist the trier of fact in evaluating the effect or propriety of ... [the] conduct"); *R.B. Ventures, Ltd. v. Shane, 2000 U.S. Dist. LEXIS 5631, No. 91 Civ. 5678, 2000 WL 520615, at *2-3 (S.D.N.Y. May 1, 2000)* (custom and practice regarding commissions); *Project Hope v. M/V IBN SINA, 96 F. Supp. 2d 285, 295 (S.D.N.Y. 2000)* (custom and practice of checking container temperature only if required by bill of lading; not sufficient to show absence of negligence), aff'd in part and vacated in part on other grounds, *250 F.3d 67 (2d Cir. 2001)*.

Nevertheless, in his letter application, plaintiff's counsel argues for the first time that Captain Aiello should be permitted to testify about mooring practices aboard the vessel in order to rebut any claims [*4] of contributory negligence. There is, indeed, a narrow range of non-expert testimony that is admissible in this regard. If the vessel's command staff directed the mooring procedures to be done in a particular way, or if they were aware of the crew's practices and acquiesced in them, this could have a significant impact on the allocation of responsibility. It remains the case, however, that Captain Aiello may not testify as to the propriety of the practices used.

Conclusion

Captain Aiello may testify only with respect to factual matters as set forth above.

SO ORDERED.

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York

November 19, 2002

Case 3:03-cv-00222-JBA    Document 129-2    Filed 07/12/2005    Page 2 of 15

LEXSEE 2005 US DIST LEXIS 7018

STEVEN D. DREYER, ROBERTA M. DREYER, Plaintiffs, vs. RYDER
AUTOMOTIVE CARRIER GROUP, INC., RYDER AUTOMOTIVE
OPERATIONS, INC., d/b/a DELAVAN; DELAVAN INDUSTRIES, INC.; RYDER
SYSTEM, INC. and RYDER AUTOMOTIVE CARRIER SERVICES, INC.,
Defendants.

98-CV-82A(F)

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
NEW YORK

*2005 U.S. Dist. LEXIS 7018*

**February 9, 2005, Decided
February 9, 2005, Filed**

**SUBSEQUENT HISTORY:** Objection denied by, Motion denied by, Motion to strike denied by *Dreyer v. Ryder Auto. Carrier Group, Inc., 367 F. Supp. 2d 413, 2005 U.S. Dist. LEXIS 7019 (W.D.N.Y., Apr. 14, 2005)*

**DISPOSITION:** [*1] Plaintiffs' motion to exclude (Doc. No. 92) GRANTED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a products liability action alleging defective design, plaintiff individuals moved to exclude the opinions of defendant companies' expert.

**OVERVIEW:** One of the plaintiff individuals slipped and fell from the upper-level of a tractor-trailer that was used to transport cars, light trucks, and minivans (autohauler). The court found that despite his many credentials the expert was not qualified to testify. Even if he was qualified, his testimony that the individual's own negligence was the actual cause of the fall was irrelevant to the issue of the individual's allegations that the autohauler was defectively designed. Although relevant to defendants' comparative negligence defense, as the testimony was predicated upon application of common sense, given the evidence, the testimony was not required to assist the jury in understanding or deciding the issues. Finally, to the extent the opinion purported to assert the safe design of the auto-hauler and the actual reason for the fall, issues on which the jury could benefit from expert testimony, the expert's report and opinions did not meet the minimum standards for technical reliability established by *Fed. R. Evid. 702* and *Daubert*. Additionally, opinion regarding the individual's negligence based on use of prescription medications in causing the accident violated *Fed. R. Evid. 403*.

**OUTCOME:** The motion was granted.

**LexisNexis(R) Headnotes**

*Evidence > Witnesses > Expert Testimony*
[HN1] In federal court, persons qualified as experts in the relevant subject may offer opinion testimony involving scientific, technical or other specialized knowledge if such testimony will assist the fact trier in understanding the evidence or determining an issue of fact provided (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. *Fed. R. Civ. 702*.

*Evidence > Procedural Considerations > Preliminary Questions*
*Evidence > Witnesses > Expert Testimony*
[HN2] Pursuant to *Fed. R. Evid. 104(a)*, the proponent of expert testimony carries the burden to establish that the

Case 3:03-cv-00222-JBA    Document 129-2    Filed 07/12/2005    Page 4 of 15

Page 2
2005 U.S. Dist. LEXIS 7018, *

proffered testimony satisfies the requirements for admissibility under *Fed. R. Evid. 702*.

*Evidence > Procedural Considerations > Preliminary Questions*
*Evidence > Witnesses > Expert Testimony*
[HN3] Pursuant to *Fed. R. Evid. 104(a)*, the party seeking to qualify a witness as an expert must establish that the witness possesses scientific, technical or other specialized knowledge, relevant to issues in the case, as required by *Fed. R. Evid. 702*, based on the witness's knowledge, skill, experience, training or education. Rule 702. Whether a witness possesses these attributes sufficient to qualify as an expert witness in the particular case is within the broad discretion of the court.

*Evidence > Witnesses > Expert Testimony*
[HN4] While the court approaches the question of expert qualification with liberality and feasibility and avoids subjecting the witness to an overly narrow test of his qualifications, nevertheless, the expert must stay within the reasonable confines of his subject area, and cannot render expert opinion on an entirely different field or discipline. Further, in assessing qualifications, the court should take care not to preclude an expert for lack of specific experience in the area of product design at issue so as to limit the source of qualified experts for the plaintiff to persons with direct experience in the industry of which the defendant is a member.

*Evidence > Witnesses > Expert Testimony*
[HN5] A witness who otherwise may possess sufficient professional credentials to qualify as an expert in the particular case yet fails to employ investigative techniques sufficient to give a reliable opinion or is unable to explain the technical basis for his opinion, may be disqualified. Thus, a witness objectively competent to testify as an expert may, by his failure to apply such apparent expertise to the issues upon which expert testimony could assist the jury, render himself disqualified as an expert. Further, where an expert's opinion exceeds the scope of his qualifications, the witness's opinions are subject to exclusion.

*Evidence > Witnesses > Expert Testimony*
[HN6] *Fed. R. Evid. 702* expressly requires that to testify as an expert, the witness must be shown to qualify as an expert by virtue of knowledge, skill, experience, training, or education that will assist the jury in understanding evidence or determining a fact in issue.

*Evidence > Witnesses > Expert Testimony*
[HN7] Failure by a witness to determine whether, in applying the witness's expertise, a design defect exists in the accused product justifies disqualification despite the witness's apparent qualifications.

*Evidence > Witnesses > Expert Testimony*
[HN8] An expert who is incapable of explaining forthrightly basic concepts within his claimed area of expertise, as they apply to the issues in a case upon which his expertise is sought, at a deposition is not competent to offer testimony to the jury on such matters.

*Evidence > Witnesses > Expert Testimony*
[HN9] While experience can provide the basis to qualify a witness as an expert, the experience must be demonstrated and have direct relevance to the issues in the case.

*Evidence > Witnesses > Expert Testimony*
[HN10] Daubert requires federal courts evaluate all proffered expert testimony, when challenged under *Fed. R. Evid. 702*, on a case-by-case basis, and directs district courts not to merely "rubber-stamp" such evidence based solely upon the expert's resume, including any testimonial history.

*Evidence > Witnesses > Expert Testimony*
[HN11] Presented with a challenge to the admissibility of expert testimony, a court determines whether the testimony meets *Fed. R. Evid. 702*'s standard of evidentiary reliability. Courts are to particularly assess whether the reasoning or methodology underlying the proposed testimony is scientifically valid and whether such reasoning or methodology applies to the facts of the case. Additionally, the court must take care to admit only scientifically valid expert testimony that will assist the trier of fact to understand the evidence or to determine a fact in issue. The court's inquiry must be directed to whether the testimony at issue has been subjected to the scientific method; it must rule out subjective belief or unsupported speculation.

*Evidence > Witnesses > Expert Testimony*
[HN12] Proposed expert testimony must be supported by appropriate validation -- i.e., good grounds, based on what is known. Thus, federal judges are required to exercise more control over experts than over lay witnesses. Additionally, the testimony must be calculated to be of assistance to the jury in determinating an issue or evidence in the case. This condition goes primarily to relevance. In deciding whether the proffered testimony is relevant to the issues before the jury the court must, as *Fed. R. Evid. 702* requires, also satisfy itself that the testimony is sufficiently tied to the facts of the case. This consideration has been aptly described as one of fit. Fit is not always obvious, and scientific validity for one

purpose is not necessarily scientific validity for other unrelated purposes.

*Evidence > Relevance > Confusion, Prejudice & Waste of Time*
*Evidence > Witnesses > Expert Testimony*
[HN13] Even if found relevant under *Fed. R. Evid. 702*, proffered expert testimony should also be excluded pursuant to *Fed. R. Evid. 403*, where the testimony's probative value is outweighed by the risk of undue prejudice, confusion of the issues, or misleading the jury, potential problems especially present when expert testimony is involved.

*Evidence > Relevance > Confusion, Prejudice & Waste of Time*
*Evidence > Witnesses > Expert Testimony*
[HN14] In performing its gatekeeping function with respect to the admissibility of expert testimony under *Fed. R. Evid. 702*, a court also must determine whether, as part of such gatekeeping obligation, the expert testimony fully satisfies *Fed. R. Evid. 403* as well as *Fed. R. Evid. 702*. Even if the testimony is admissible under Rule 702, it still must pass muster under *Fed. R. Evid. 403*: Its probative value must not be substantially outweighed by unfair prejudice. Moreover, where the expert strays from his scope of expertise, such intrusion into subjects beyond proffered findings based on reliable science or technology, may produce an equally undue degree of juror confusion violative of Rule 403.

*Evidence > Witnesses > Expert Testimony*
[HN15] The thresholds for admissibility established in Daubert also apply to technical and engineering opinions.

*Evidence > Witnesses > Expert Testimony*
[HN16] Although Daubert sets forth several factors as guidance to a court in assessing the reliability of expert testimony, i.e., whether the methodology underlying the objective basis for the opinion has been subjected to peer review, can be or has been tested, is subject to controlled error rates, or enjoys general acceptance within a relevant scientific community, other factors may be applied based on the circumstances of a particular case. The reliability of the expert's methodology in reaching his conclusions must therefore be evaluated against the specific facts at issue, not generalized theories.

*Evidence > Witnesses > Expert Testimony*
[HN17] As with the question of a witness's qualifications to provide expert testimony, the court has broad discretion in exercising the important gatekeeping function of determining relevancy. Thus, if the expert's conclusions or opinions are neither relevant to an issue of fact pertinent to the case, nor based on specialized or engineering knowledge using adequate data or reliable scientific principles and methods reliably applied to the facts of the case that will assist the jury in understanding evidence and deciding fact questions germane to this case, *Fed. R. Evid. 702*, they should be excluded. Accordingly, for purposes of satisfying Rule 702, the relevancy of the challenged testimony turns on the circumstances of the specific case, the factual issues presented, and the legal standards to be applied by the jury in their resolution.

*Civil Procedure > State & Federal Interrelationships > Choice of Law*
*Torts > Negligence > Defenses > Comparative & Contributory Negligence*
[HN18] Under New York's choice of law rule, as to the defense of comparative negligence, the law of the state where the plaintiff is domiciled and the accident occurred applies as a matter of post-accident loss allocation.

*Torts > Negligence > Defenses > Comparative & Contributory Negligence*
[HN20] New York comparative negligence law makes the question of a plaintiff's comparative negligence irrelevant to the issue of a defendant's product liability causing plaintiff's injuries as found by the jury. N.Y. C.P.L.R. 1422.

*Evidence > Witnesses > Expert Testimony*
[HN19] Under *Fed. R. Evid. 702*, a threshold condition of admissibility is that the proffered testimony be calculated to assist the trier of fact to understand the evidence or to determine a fact in issue. This condition goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.

*Evidence > Witnesses > Expert Testimony*
[HN21] A district court is not required to admit opinion evidence that is connected to the case only by the ipse dixit of the expert.

*Evidence > Witnesses > Expert Testimony*
[HN22] An expert must testify to something more than what is obvious to the layperson in order to be of any particular assistance to the jury.

*Evidence > Witnesses > Expert Testimony*
[HN23] In seeking the admissibility of expert testimony, a party cannot avoid compliance with *Fed. R. Evid. 702* and Daubert by tailoring the witness's review of the issues amenable to expert testimony plainly raised by the claims or defenses in the case.

*Evidence > Witnesses > Expert Testimony*
[HN24] An expert may reasonably be expected to be able to articulate the nature and extent of any experience and evaluation relied upon to demonstrate that the experience and evaluation is a reliable basis for the proffered opinion.

*Evidence > Witnesses > Expert Testimony*
[HN25] *Fed. R. Evid. 702* requires that an expert's opinion be based upon sufficient data. Where an expert fails to verify the accuracy of data upon which the expert creates a statistical analysis or renders an opinion, the resultant analysis and opinion are inherently unscientific requiring exclusion of such evidence under Daubert.

*Evidence > Witnesses > Expert Testimony*
[HN26] An analysis is only as good as the data upon which it rests and it is important to verify the accuracy of the data collection. Data relied upon by an expert as the basis for an opinion that is neither verified as to its accuracy and completeness or, if from a recognized source, is speculative in nature and therefore inherently insufficient, should be excluded.

*Evidence > Witnesses > Expert Testimony*
[HN27] *Fed. R. Evid. 703* permits reliance upon inadmissible evidence only if of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.

*Evidence > Relevance > Confusion, Prejudice & Waste of Time*
*Evidence > Witnesses > Expert Testimony*
[HN28] Testimony that strays from an expert's scope of expertise violates *Fed. R. Evid. 403*.

**COUNSEL:** MARCUS ANDREOZZI & FICKESS, LLP, Attorneys for Plaintiffs, DAVID P. MARCUS, of Counsel, Amherst, New York.

LARSON & LARSON, P.C., Attorneys for Defendants, DAVID E. LARSON, of Counsel, Leawood, Kansas.

HISCOCK & BARCLAY, LLP, Attorneys for Defendants, SAMUEL J. BURRANO, JR., of Counsel, Buffalo, New York.

**JUDGES:** LESLIE G. FOSCHIO, UNITED STATES MAGISTRATE JUDGE.

**OPINIONBY:** LESLIE G. FOSCHIO

**OPINION:**

**DECISION and ORDER**

**JURISDICTION**

This matter was referred to the undersigned by Hon. Richard J. Arcara for all pretrial matters on March 31, 1998 (Doc. No. 13). It is presently before the court on Plaintiffs' Motion to Exclude the Opinions of Defendants' Expert (Doc. No. 92).

**BACKGROUND**

This products liability action alleging defective design of a multi-vehicle autohauler was commenced February 2, 1998. Plaintiffs' motion to exclude the testimony of Defendants' designated expert witness Charles L. Proctor, II, Ph.D. ("Proctor"), was filed on July 26, 2002 ("Plaintiffs' Motion"), with the supporting affidavit of David P. Marcus, Esq., dated July 26, 2002 (Doc. No. 94) ("Marcus Affidavit") along with Exhibits A - V [*2] ("Plaintiffs' Exhibit(s) ___"), a video tape ("Plaintiffs' Exhibit S"), and a Memorandum of Law in Support of Plaintiffs' Motion to Exclude (Doc. No. 93) ("Plaintiffs' Memorandum").

Defendants opposed Plaintiffs' Motion by filing, on October 2, 2002, the Declaration of Samuel J. Burrano, Jr., Esq., dated October 2, 2002 ("Burrano Declaration") (Doc. No. 101) together with Exhibits A - D ("Defendants' Exhibit(s) ___"), and a Memorandum of Law in Opposition to Plaintiffs' Motion to Exclude Expert Testimony (Doc. No. 102) ("Defendants' Memorandum").

On October 23, 2002, Plaintiffs filed the Affidavit of David P. Marcus, Esq. in further support of Plaintiffs' motion, attaching Plaintiffs' Exhibits W -- X, together with Plaintiffs' Reply Memorandum of Law (Doc. No. 106) ("Marcus Reply Affidavit") ("Plaintiffs' Reply Memorandum"). On June 4, 2003, Plaintiffs submitted a letter to the court submitting additional authority in further support of Plaintiffs' Motion. Oral argument was deemed unnecessary. For the following reasons, Plaintiffs' Motion is GRANTED. n1

---

n1 A motion to disqualify a prospective testifying expert is non-dispositive in nature and subject to review as clearly erroneous or contrary to law. *Nikkal Industries, Ltd. V. Salton, Inc., 689 F.Supp. 187, 189 (S.D.N.Y. 1988)* (motion to disqualify defense witness expected to testify as an expert considered a non-dispositive motion under *28 U.S.C. § 636(b)(1)(A)*).

---

[*3]

**FACTS** n2

Case 3:03-cv-00222-JBA   Document 129-2   Filed 07/12/2005   Page 7 of 15

Page 5
2005 U.S. Dist. LEXIS 7018, *

n2 Taken from the pleadings and papers filed in this action.

On February 27, 1997, Plaintiff, Steven Dreyer ("Dreyer"), slipped and fell from the left side of the upper-level of a Model 3200 tractor-trailer assembled by Defendant Delavan Industries and used to transport cars, light trucks, and minivans ("the autohauler" or "the Model 3200"). The autohauler is comprised of a tractor unit or cab where the driver sits and a trailer on which loaded vehicles are transported. Defendants' Exhibit A; Plaintiffs' Exhibit B (Report of Charles L. Proctor, II, Ph.D., December 4, 2000) ("Proctor(s) Report")) at 11, P1; Plaintiffs' Exhibit D (Report of Linda L. Weseman, P.E., November 1, 2002 ("Weseman(s) Report")) at 1-2. n3 The autohauler, a "modified" Model 3200, was capable of carrying up to twelve cars. n4 Proctor Report at 11, P5. Using a system of hydraulic devices and ramps, the Model 3200 enables the driver of the autohauler ("driver") to load two vehicles on an upper level, located above the tractor's [*4] cab, ("the headramp"), one vehicle below the headramp on the flat part of the trailer portion of the autohauler, and additional vehicles on the upper and lower levels of the trailer portion of the autohauler. Proctor Report at 1, P1; Weseman Report at 1, P3; Plaintiffs' Memorandum at 3; Plaintiffs' Exhibits A1 - A2.

n3 Proctor's Report refers to the instant litigation as *Dreyer v. GACS*. However, GACS is not a defendant in this action. Plaintiffs' Exhibit C, Deposition of Charles L. Proctor, II, Ph.D., May 30, 2001 (pp. 1-254); May 31, 2001 (pp. 255-438) ("Proctor Deposition") at 81. GACS Incorporated ("GACS") is the successor, by merger, of Defendants Ryder Automotive Carrier Group, Inc., Ryder Automotive Operations, Inc., d/b/a Delavan, Delavan Industries, Inc., and Ryder Automotive Carrier Systems, Inc. ("Defendants"). Affidavit of John E. Stanton, Jr., Esq. in Support of Defendants' Cross-Motion to Substitute GACS for Defendants, June 17, 1999 (Doc. No. 21) (Exhibits A-E) ("Stanton Affidavit"). On the date of the accident, Dreyer was employed by Commercial Carriers, Inc., ("CCI"), a wholly owned subsidiary of Defendant Ryder Automotive Operations, Inc. owned by Defendant Ryder Automotive Carrier Services, Inc., which is owned by Defendant Ryder System, Inc. Stanton Affidavit, P9. After the accident, CCI was purchased by Allied Holdings, Inc. ("Allied") August 20, 1997. Plaintiffs' Exhibit H. On February 5, 2003, the District Judge, Hon. Richard J. Arcara, denied Defendants' Motion to Substitute GACS for all Defendants, except Ryder System, Inc. (Doc. No. 114). [*5]

n4 Although Proctor describes the Model 3200 as capable of transporting 12 cars, Proctor Report at 11, P5, a photograph of a fully loaded Model 3200 shows only eight autos (the photo actually depicts eight pick-up trucks) at full capacity. *See* Plaintiffs' Exhibit A-1.

The accident giving rise to this action occurred while Dreyer was unloading six Chevrolet Astro minivans ("Astro minivan(s)" or "minivan(s)") at Defendant Ryder Automotive Carrier Services, Inc.'s Roanoke, Indiana facility near Ft. Wayne, Indiana, having previously loaded the minivans at Elkhart, Indiana, approximately an hour's drive away. Defendants' Exhibit B (ACD Supervisor's First Report of Injury); Proctor Report at 11, P6. After unloading the minivans from the first level of the autohauler, Dreyer positioned the No. 2 position ramp, on which Dreyer had loaded an Astro minivan front-end-first, to enable him to unload the minivan. n5 Proctor's Report at 12, P1; Plaintiffs' Exhibit E (Deposition of Steven D. Dreyer, March 15, 1999) ("Dreyer Deposition") at 73, 76; Plaintiffs' Exhibit A-3, A-4, A-5. Drivers can unload minivans [*6] from the Model 3200's headramp by walking up a ramp from the lower level of the autohauler's trailer to gain access to the driver's seat through the minivan's rear door, or by stepping along the side of the minivan on the ramp to gain access through the driver's side door. Plaintiffs' Exhibit K (Deposition of Timothy Vincent on September 28, 2000) ("Vincent Deposition") at 28 - 30, 31, 34; Plaintiffs' Exhibit A-3.

n5 The No. 2 position is actually considered as the No. 3 position by Defendant Delavan; however, for the purposes of the instant litigation, Plaintiffs and Defendants refer to it as the No. 2 position to remain consistent with Dreyer's description of it as the No. 2 position. Proctor Report at 1, P1. To avoid confusion, Proctor continued to refer to it as the "No. 2 position." Proctor Deposition at 287.

An alternate, and, according to Defendants, the proper, means of reaching a minivan on the headramp is to climb to the headramp area using "foot brackets" located behind the cab. Defendants' Memorandum [*7] at 2-3; Plaintiffs' Memorandum at 4, n. 6; Plaintiffs'

Case 3:03-cv-00222-JBA   Document 129-2   Filed 07/12/2005   Page 8 of 15

Page 6
2005 U.S. Dist. LEXIS 7018, *

Exhibit A-8. However, according to Leo Ferguson, an experienced Model 3200 driver, such foot brackets, or "foot pegs," are limited to accessing a vehicle in the Model 3200's No. 1 position, *i.e.*, a vehicle loaded on the headramp over the cab in front of a vehicle loaded in the No. 2 position, Plaintiffs' Exhibit A-8, as such "foot pegs" can only be safely used by the driver "to get the front one [the vehicle in the No. 1 position] off." Plaintiffs' Exhibit L (Deposition of Leo B. Ferguson, September 29, 2000) ("Ferguson Deposition") at 12 (bracketed material added). Ferguson testified that the foot brackets or pegs would be of "no help" in climbing up to the No. 2 position as "there are no foot pegs on the back of the trailer and you can't get in between Number 1 to get to Number 2, because it's just not enough room." *[sic]. Id.;* Plaintiffs' Exhibit A-9.

Vehicles are loaded on the No. 1 and No. 2 positions by extending the No. 2 position ramps using hydraulic devices, which lengthen the ramps to allow for loading of a vehicle by driving the vehicle up the ramp to the No. 1 or No. 2 position. Proctor Report at 12, P1. [*8] To accommodate the vehicle, the ramps forming the No. 2 position are horizontally extended by hydraulic pistons, and, as a result, the metal rod of the piston is exposed beyond the metal cover of the hydraulic unit. Vincent Deposition at 31-35; Plaintiffs' Exhibit F (Deposition of Peter J. Terzian, Jr., August 26, 1999 ("Terzian Deposition")) at 135; Plaintiffs' Exhibits A-2, A-4. According to Terzian, when extended the metal shaft of the piston rod is likely to be oily. n6 Terzian Deposition at 135. The vehicle to be loaded on the headramp is then driven, front-end or back-end-first, up the lowered rear ramps, onto the extended No. 2 position ramp and secured. Vincent Deposition at 29; Plaintiffs' Exhibits A-3 - A-7. Additional vehicles can then be loaded using the same procedure in the open remaining positions on the upper and lower ramps of the trailer unit. Plaintiffs' Exhibits A-1, A-2. The Model 3200 is not equipped with an "after the market" "cat walk," or walking surface, covering the entire length of the hydraulic cylinder and the extended piston. Vincent Deposition at 30-31. Vehicles loaded by backing them into the No. 2 position can also be accessed through their driver's [*9] side doors by climbing steps located on the right side of the autohauler cab. Proctor Report at 13, P11; Plaintiffs' Exhibit S.

n6 The record does not conclusively indicate whether the piston rod on which Dreyer stepped at the time of the accident was in fact oily. However, Plaintiffs' expert, Ms. Weseman, based on Terzian's testimony, agreed the piston was probably oily at the time of the accident. Weseman Report at 24.

In this case, Dreyer, 6' 5" tall and weighing over 300 pounds, attempted to unload the No. 2 position Astro minivan, which Dreyer had loaded onto the autohauler front-end-first, by walking up the ramps from the rear of the autohauler intending to enter the minivan through its driver's side door. n7 Dreyer Deposition at 76; Proctor Report at 12, P1; Plaintiffs' Exhibit A-4. As the Astro minivan involved in the accident had a factory-installed "cage" for commercial use inside the rear area of the minivan, access to its passenger compartment could not be gained through the minivan's rear doors. [*10] Dreyer Deposition at 76, 78. Intending to enter the minivan through the driver's side door, Dreyer, while moving along the side of the minivan toward the driver's side door and attempting to support himself by gripping the minivan's roof with his hands, stepped on the exposed portion of the fully extended hydraulic piston rod. n8 Proctor Report at 12, P1; Dreyer Deposition at 76-78; Vincent Deposition at 30; Ferguson Deposition at 19. However, Dreyer lost his balance in a high wind gust and slipped, falling eight feet to the ground. *Id.* As a result of the fall, Dreyer suffered a broken right ankle, a fractured right elbow, and an injury to his right wrist requiring five surgeries as of March 15, 1999 when Dreyer was deposed. Proctor Report at 12, P2.

n7 Dreyer had been hired in 1988 and received one week of safety training prior to commencing work. Proctor Report at 11, P11.

n8 The record is unclear whether at that point both of Dreyer's feet were on the piston rod.

Vincent testified that in order to [*11] obtain access to the driver side door of a minivan loaded, as in this case, front-end-first in the Model 3200's No. 2 position, a driver must "lean[] in towards [the minivan] trying to keep your balance as best you could." *[sic]* Vincent Deposition at 30. Because of a slight bulge in the shape of the minivan, Vincent estimated a driver has about five inches of footing on the ramp surface on each side of the loaded minivan. *Id.* at 43. Additionally, because of the limited width of the ramps, the wider shape of an Astro minivan, compared to other models, and the absence of baggage rails along the length of its roof which drivers could grip to help secure themselves, Harold Banks, another experienced Model 3200 driver, testified that in order to unload an Astro minivan from the No. 2 position, it is necessary for the driver to step on the exposed piston of the hydraulic cylinder as "it's the only way you can get across [the cylinder] to get into that van." Plaintiffs' Exhibit M (Deposition of Harold Banks,

Case 3:03-cv-00222-JBA    Document 129-2    Filed 07/12/2005    Page 9 of 15

Page 7
2005 U.S. Dist. LEXIS 7018, *

September 29, 2000) ("Banks Deposition") at 19 (bracketed material added).

Alexander L. Faler, a driver trainer for Model 3200 drivers, employed by Allied Holdings, Inc. [*12], successor to CCI, testified that he had observed drivers approaching loaded vehicles by walking up the ramps from the rear of the autohauler and stepping on the exposed piston in order to gain access to the driver's side door of the vehicles, and that such mode of access was "common practice" by drivers despite verbal warnings that it was unsafe to do so. (Deposition of Alexander L. Faler, Sept. 28, 2000) ("Faler Deposition"). n9 Faler also testified he was aware of other drivers falling from the head ramp area of the Model 3200, similar to Dreyer's accident. *Id.* at 16.

n9 Proctor acknowledged that Dreyer's method of unloading the minivan by walking up the ramp and approaching the minivan from the rear to unload it, thus inviting use of the piston as a foot support, "is not the preferred method of ingress, but it is accepted," and that in employing this method of unloading the driver "would not have a three-point stance." Proctor Deposition at 95 (underlining added).

In preparing his report, Proctor [*13] inspected the autohauler and observed an experienced driver, Faler, load and unload a minivan from the No. 2 position as a basis for Proctor's opinion that the Model 3200 autohauler was not defectively designed because the accident resulted from Dreyer's own negligence in improperly loading the minivan front-end-first, instead of backing the vehicle into the No. 2 position, and in Dreyer's attempt to unload it during high winds, without maintaining a three-point stance, and while under the possible influence of prescription medications. Proctor Report at 13, P11. Autohauler drivers, including Dreyer, are trained to maintain a three-point stance, *i.e.*, three limbs in contact with the autohauler and load at all times while loading or unloading. Proctor Report at 11, PP2-3.

According to Proctor, Dreyer's decision to load the Astro minivan front-end-first on the Model 3200's No. 2 position prevented Dreyer from being able to maintain a stable three-point stance while unloading the minivan from the No. 2 position. Proctor Deposition at 182, 198-97; Defendants' Memorandum at 8-9. Dreyer's failure to load and unload the minivan so as to assure maintaining the three-point stance, as Dreyer's [*14] training dictated, was, according to Proctor, the primary cause of the accident. Proctor Deposition at 94, 165, 178, 182-84; Defendants' Memorandum at 4, 8-9. n10 In preparation for his report, Proctor did not attempt to reconstruct the accident as he deemed it too dangerous to do so. Proctor Deposition at 74, 177. Nor did Proctor take any measurements, perform any tests, review the Model 3200's blueprints, or refer to the experience of Model 3200 drivers, like Banks, Ferguson and, Vincent, regarding safety issues in loading and unloading the Model 3200, review a videotape of Plaintiffs' demonstration of loading and accessing to the headramp area, replicating Dreyer's actions prior to the accident, consider Dreyer's training experience, or prior safety studies of the Model 3200 regarding driver falls from the headramp conducted by academic researchers. Proctor Deposition at 44, 50-51, 73-74, 103-04; Plaintiffs' Memorandum at 9.

n10 The three-point stance requirement is also promulgated by the Occupational Safety and Health Administration ("OSHA") as an industrial safety standard by *49 C.F.R. § 399.207(a)* ("*§ 399.207(a)*"). As relevant, *§ 399.207(a)* requires that any person entering or exiting a "truck or truck-tractor" must be able, using "sufficient steps and handholds, and/or deck plates" to maintain "at least three limbs in contact with the truck or truck-tractor at any time."

[*15]

## DISCUSSION

Plaintiffs contend that Proctor is not qualified to give expert testimony pursuant to *Fed.R.Evid. 702 ("Rule 702")* on the issues presented for determination of the jury in this case. n11 Plaintiffs' Memorandum at 1-2. Specifically, Plaintiffs argue that although Proctor is a trained mechanical engineer and a licensed professional engineer, he lacks sufficient experience in, or special knowledge of, the design and operation of autohaulers particularly in regard to the risk of driver falls like the one at issue in this case. *Id.* at 9. n12 Plaintiffs therefore maintain that Proctor's conclusions and opinions are outside his "field of expertise." *Id.* at 2.

n11 Plaintiffs have demanded a jury trial.

n12 Although not directly stated by Plaintiffs as a ground for disqualification, according to the record, Proctor also is not qualified as an accident reconstruction expert.

Plaintiffs further submit that, even if Proctor is qualified as an expert, because [*16] Proctor's opinions lack a reliable scientific or other technical basis, they must be excluded under *Rule 702* and *Daubert v. Merrill*

Case 3:03-cv-00222-JBA   Document 129-2   Filed 07/12/2005   Page 10 of 15

Page 8
2005 U.S. Dist. LEXIS 7018, *

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1994) ("*Daubert*"). Plaintiffs' Memorandum at 2. In particular, Plaintiffs point to the fact that Proctor did not attempt to reconstruct the accident, conduct tests, take measurements, or review designs of the Model 3200. Plaintiffs' Memorandum at 1. Nor, Plaintiffs argue, did Proctor consider driver experience in loading and unloading autohaulers, the feasibility of additional safety features for the Model 3200 or the findings and recommendations of outside safety studies concerning the risk of driver falls from autohaulers like the Model 3200. *Id.* at 2, 13. Further, Plaintiffs assert Proctor did not purport to base his findings upon any scientific or engineering methodology, or provide any technical explanation for his conclusions. Plaintiffs' Memorandum at 15. Finally, Plaintiffs contend Proctor's conclusions that statistical evidence supports finding the Model 3200 was properly designed was based on unverified data, and that Proctor's opinion that Dreyer was adversely affected at the [*17] time of the accident by prescription medications is lacking in any expert knowledge. Plaintiffs' Memorandum at 22-25, 28. n13

n13 Plaintiffs also complain that Defendants failed to provide, pursuant to Plaintiffs' deposition subpoena, drafts of Proctor's report and communications between Proctor and Defendants' counsel relating to any editing of such drafts made by counsel or Proctor based on such communications. Plaintiffs' Memorandum at 10. However, in the absence of a motion to compel, the court will not address this issue. *See W.R. Grace & Co. -Conn v. Zotos Int'l, Inc.*, 2000 U.S. Dist. LEXIS 18096, 2000 WL 1843258 (W.D.N.Y. 2000) (finding testifying expert's report draft and related communications with counsel outside the attorney-work product doctrine and defendant's failure to preserve documents as subject to sanctions based on spoilation of evidence), *aff'd*, Slip Op. 98-CV-838S(F), August 27, 2002, (Doc. No. 62) (WMS).

Defendants contend that Plaintiffs have not persuasively shown Proctor's qualifications are [*18] insufficient. Defendants' Memorandum at 5. Defendants assert Proctor's academic training and doctorate in mechanical engineering, his status as licensed professional engineer, his research, teaching, and consulting experiences with the autohauler industry, and as an expert witness in other litigation, support a finding of expert qualification for Proctor in this case under *Rule 702. Id.* at 5-6. Proctor also stated he has expertise in the field of human-machine interface problems based on post-doctoral studies of leading treatises in this subject area. Proctor Deposition at 17-18. Particularly, Defendants contend Proctor's rejection of Plaintiffs' claims of an asserted design defect in the Model 3200 is supported by Proctor's calculation of a low "injury per exposure rate" based on Defendants' accident data pertaining to driver falls from the Model 3200. *Id.* at 6. Defendants also argue that Plaintiffs' opposition to Proctor's conclusions regarding the potential and adverse effects of Dreyer's medications are not "plausible." Defendants' Memorandum at 9.

In this case, Proctor's Report and testimony should be excluded because Defendants have failed to meet their burden to show [*19] that (1) Proctor qualifies under *Rule 702* to give expert testimony on whether the Model 3200 was negligently designed and whether Dreyer's negligence caused his injuries; (2) Proctor's findings and opinions are relevant to the issues likely to be presented to the jury; and (3) even assuming their relevance, there is a reliable scientific or technical basis for Proctor's opinions, and that they are grounded upon sufficient facts or data as required by *Rule 702* and *Daubert*.

1. Proctor's Qualifications

[HN1] In federal court, persons qualified as experts in the relevant subject may offer opinion testimony involving "scientific, technical or other specialized knowledge" if such testimony "will assist the fact trier" n14 in understanding the evidence or determining an issue of fact provided "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Fed.R.Civ. 702*. [HN2] Pursuant to *Fed.R.Evid. 104(a)* ("*Rule 104(a)*"), the proponent of the expert testimony carries the burden to establish that [*20] the proffered testimony satisfies the requirements for admissibility under *Rule 702. Plourde v. Gladstone*, 190 F.Supp.2d 708, 718-19 (D.Vt. 2002) (citing cases), *aff'd*, 69 Fed.Appx. 485 (2d Cir. 2003) (table); *Freeport-McMoran Resource Partners Ltd. Partnership v. B-B Paint Corp.*, 56 F.Supp.2d 823, 832 (E.D.Mich. 1999); Advisory Committee Notes 2000 Amendments to Rule 702 ("Under [*Fed.R.Evid. 104(a)*] the proponent [of the expert testimony] has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.") (citing *Bourjaily v. United States*, 483 U.S. 171, 97 L. Ed. 2d 144, 107 S. Ct. 2775 (1987)). Thus, Defendants carry the burden to establish Proctor is qualified to testify as an expert witness in this case and that his opinions meet *Rule 702* and *Daubert* requirements.

Case 3:03-cv-00222-JBA   Document 129-2   Filed 07/12/2005   Page 11 of 15

Page 9
2005 U.S. Dist. LEXIS 7018, *

n14 As Plaintiffs have demanded a jury trial, further references to the "trier of fact" will be to "the jury."

[HN3] Pursuant [*21] to *Rule 104(a)*, the party seeking to qualify a witness as an expert must establish that the witness possesses "scientific, technical or other specialized knowledge," relevant to issues in the case, as required by *Rule 702*, based on the witness's "knowledge, skill, experience, training or education." *Rule 702*. Whether a witness possesses these attributes sufficient to qualify as an expert witness in the particular case "is within the broad discretion" of the court. *Stagl v. Delta Airlines, Inc., 117 F.3d 76, 81 (2d Cir. 1997)* (citing *Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996)* (per curium)). [HN4] While the court approaches the question of expert qualification with "liberality and feasibility" and avoids subjecting the witness to "an overly narrow test of his qualifications," nevertheless, the expert must "stay within the reasonable confines of his subject area, and cannot render expert opinion on an entirely different field or discipline." *Lappe v. American Honda Motor Co., Inc., 857 F.Supp. 222, 227-28 (N.D.N.Y. 1994)* (citing cases), *aff'd, 101 F.3d 682 (2d Cir. 1996)* (table). Further, in assessing [*22] qualifications, the court should take care not to preclude an expert for lack of specific experience in the area of product design at issue so as to limit the source of qualified experts for the plaintiff to persons with direct experience in the industry of which the defendant is a member. *Stagl, supra, at 81*.

However, [HN5] a witness who otherwise may possess sufficient professional credentials to qualify as an expert in the particular case yet fails to employ investigative techniques sufficient to give a reliable opinion or is unable to explain the technical basis for his opinion, may be disqualified. *See Mannix v. Chrysler Corp., 2001 U.S. Dist. LEXIS 4641, 2001 WL 477291 (E.D.N.Y. March 4, 2001)* (mechanical and professional engineer who could not explain with sufficient technical support the reasons for his opinion, *i.e.*, that an airbag suspected of starting fire causing plaintiff's injuries was defectively designed, lacked qualifications as an expert on issue of defective design of airbag in product liability case). *Compare Stagl, supra* (reversing district court's exclusion of expert witness for lack of direct experience in the design of airport baggage retrieval [*23] system as unreasonably narrowing the pool of available experts for plaintiff). Thus, as the court finds in this case, a witness objectively competent to testify as an expert may, by his failure to apply such apparent expertise to the issues upon which expert testimony could assist the jury, render himself disqualified as an expert. *See Mannix, supra*. n15 Further, where an expert's opinion exceeds the scope of his qualifications, the witness's opinions are subject to exclusion. *See Stagl, 117 F.3d at 81* ("courts may properly conclude that witnesses are insufficiently qualified despite the relevance of their testimony because their expertise is too general or too deficient"). Unlike the courts in *Lappe* and *Stagl*, here the court has the benefit of an extensive deposition (435 pages over two days) of Proctor with which to evaluate whether Proctor, notwithstanding numerous credentials, is competent to serve as an expert with regard to the particular issues in this case.

n15 Both *Mannix* and *Stagl* involved the same expert.

[*24]

As to Proctor's qualifications, there are several undisputed facts demonstrating Proctor lacks sufficient competency, under *Rule 702*'s criteria, to give expert testimony in this case. First, [HN6] *Rule 702* expressly requires that to testify as an expert, the witness must be shown to qualify as an expert by virtue of "knowledge, skill, experience, training, or education that will assist the jury in understanding evidence or determining a fact in issue." *Fed.R.Evid. 702*. Here, as noted, the primary issues for the jury will be whether the Model 3200 suffered from a design defect that contributed to Dreyer's fall, the risk of which should have been reasonably foreseen requiring additional safety features to prevent such a fall, and whether Dreyer's loading and unloading of the Astro minivan under the circumstances confronting Dreyer were negligent causes contributing to the accident. While Defendants contend Proctor has "specific expertise in car hauling trailers and securement systems," Defendants' Memorandum at 6, Defendants fail to point to any facts sufficient to support this assertion, as is their burden, and a close reading of the record indicates otherwise. [*25]

Specifically, although Proctor holds a doctorate in mechanical engineering, Proctor Report at 1; Proctor Deposition at 12-13, is a licensed professional engineer, and has pursued independent study in the subject of biomechanics, n16 particularly "rachet securement systems used in the autohauler industry," Proctor Report at 2; Proctor Deposition at 13-14, Proctor has no direct experience in the design of an autohauler, Proctor Deposition at 10, nor do any of his numerous publications or teaching assignments deal, directly or indirectly, with the design of any similar devices or machines. *See Proctor Report Appendix 1, 2 (passim)*. While Proctor has taught courses on the subject of mechanical engineering design, nothing in the record suggests how these courses might relate to the design of

a major industrial product like an autohauler. Significantly, when asked to explain how a designer would go about assessing the foreseeability of user risk in connection with a product, Proctor was unable to give a direct answer stating the answer would be in "different books" and his class "notes." Proctor Deposition at 25-26. Asked how he would advise students to learn about worker fall suppression [*26] design problems, Proctor responded that he would refer them to unspecific OSHA regulations. Proctor Deposition at 37-38. Awareness that OSHA regulations should be consulted in designing products for the workplace does not require special technical skill, education, knowledge, experience or training of an engineering nature, and, Proctor made no attempt to explain how such regulations would be of assistance in the safe design of a complex mechanical product like an autohauler.

n16 Biomechanics is the study of the interface between humans and machines and includes ergonomics. Proctor Deposition at 17.

Further, none of Proctor's consulting engagements have involved autohauler fall protection systems. Proctor Deposition at 9. For instance, a careful review of Proctor's publication list, Proctor Report Appendix 1, reveals nearly all of Proctor's publications involve issues relating to problems of industrial pollution; none are directed to the proper design and safe operation of industrial or commercial products, particularly, [*27] as relevant to this case, autohaulers like Defendants' Model 3200. Additionally, while Proctor has participated in the design of "a couple" of consumer and industrial products, Proctor Deposition at 10, none of his design experiences relate to the "autohauler industry." Id. Except for unspecified consulting work for the autohauler industry other than issues pertaining to the autohaulers' rachet tie-down systems, Proctor has had no special education, professional experience or training regarding the autohauler industry. Id. at 11-12. Further, as noted, although Defendants assert Proctor has "specific expertise in car hauling trailers," Defendants Memorandum at 6, Defendants do not claim Proctor's "expertise" includes the design of autohaulers, the primary issue in this case. Here, it is evident that Proctor's expertise as it relates to autohaulers is directed to safety issues regarding failure of the tie-down rachet system used to secure vehicles on an autohauler. Finally, Proctor does not explain how his education, training and experience relates to the primary issues in this case, nor is such relevance otherwise provided in the record. The court therefore finds that expertise [*28] regarding whether an autohauler's tie down system was properly designed does not extend to questions of fall prevention design issues, and driver negligence during loading and unloading. Accordingly, Proctor's findings and opinions in this case are "outside the reasonable confines of his qualifications." Lappe, supra.

Any suggestion that Proctor, as a mechanical engineer and licensed professional engineer, possesses such "expertise" in the design of an autohauler is further negated by the deposition testimony of Earl Lempke, the head of Defendant Delavan's engineering department and Peter J. Terzian, Delavan's plant manager, who were directly involved in the design of the Model 3200. Lempke Deposition at 21; Terzian Deposition at 23. Lempke testified that, prior to being employed by Delavan, he had studied engineering for two years at a local university, forty years prior to the time the Model 3200 was designed, without achieving a degree. Id. at 4. Terzian, who holds a GED diploma, has no engineering training or background. Terzian Deposition at 38. Based on Lempke's and Terzian's testimonies, the ability to design an autohauler does not require special degree [*29] of formal engineering education, as such capacity is primarily based on experience in the actual design of autohaulers. That Proctor has no experience in the design of an autohauler is further demonstrated by his testimony that he agreed that if Earl Lempke, a non-engineer, vice president of engineering for Defendant Delavan, believed additional safety features, as Plaintiffs contend should have been incorporated in the Model 3200 from which Dreyer fell, could be feasibly added to the Model 3200, an issue that reasonably calls for some technical knowledge, Proctor would agree with Lempke's assessment. Proctor Deposition at 388. Lempke did so testify. Lempke Deposition at 77. Proctor's lack of experience or training in autohauler design therefore disqualifies him from opining as to the safe design of the Model 3200.

Additionally, Proctor's qualifications as an expert on issues of autohauler design are not established by Proctor's reliance on engineering treatises. For example, in support of his conclusion that the Model 3200 was properly designed, Proctor Report at 12-13, Proctor testified that good engineering design practice required that the designer consider the purposes and users [*30] of the product together as well as the potential for its misuse by a likely user. Proctor Deposition at 24-25. In support of this principle, Proctor cited to several engineering texts, i.e., Konz, WORK DESIGN AND INDUSTRIAL ERGONOMICS; Woodson, HUMAN FACTORS DESIGN HANDBOOK, Proctor Deposition at 52, and Earle, DESIGN HANDBOOK, id. at 117. However, other than reiterating the generalized references to good engineering design principles regarding the need to consider foreseeable uses, as discussed, according to Proctor, in these standard

treatises, Proctor failed to make any attempt to apply such principles to the facts of the instant case in either his Report or deposition testimony. Specifically, Proctor testified that because the design of the Model 3200 was in his opinion "appropriate," Proctor Deposition at 32, it was not necessary that he consider whether Dreyer's negligent use of the Model 3200, as determined by Proctor, Proctor Report at 13; Proctor Deposition at 79-80, should reasonably have been foreseen by the designers of the Model 3200. No explanation is given by Proctor of how the general good engineering principles expounded by Proctor based on the cited treatises, [*31] and as applied to the facts of the case, support his conclusion that the Model 3200's design was "appropriate." [HN7] Failure by a witness to determine whether, in applying the witness's expertise, a design defect exists in the accused product justifies disqualification despite the witness's apparent qualifications. *Mannix, supra, at \*1*.

Specifically, when asked to explain how he would apply the general good engineering practice design principles, Proctor asserted were discussed in the textbooks he cited to an actual product design assignment, such as an autohauler, in regard to the potential for product abuse, Proctor responded that the answer was beyond the scope of the deposition. Proctor Deposition at 25-27. Proctor's inability to explain, within the relatively flexible confines of a pretrial deposition of a proposed expert witness, how the good engineering practices referred to by Proctor would be applied to minimize the risk of a possibly foreseeable product misuse, such as improper loading or unloading procedures by a driver of an autohauler like the Model 3200, demonstrates Proctor lacks competency to assist the jury in understanding the issues. *See Mannix, supra*. [*32] In this court's view, [HN8] an expert who is incapable of explaining forthrightly basic concepts within his claimed area of expertise, as they apply to the issues in a case upon which his expertise is sought, at a deposition is not competent to offer testimony to the jury on such matters.

In fact, the generalized good engineering design standards articulated by Proctor, based on the cited treatises, that a designer of an industrial product consider the purposes of the product and its users as well as the possibility of misuse, do not appear significantly different from the general legal test for product liability. *See* Discussion, *infra*, at 32-33. As such, they fail to constitute information of a technical engineering nature sufficient to warrant giving expert testimony under *Rule 702*. Moreover, Proctor's inability to explain with any reasonable technical detail how the questions of proper design, anticipating how possible worker falls should be addressed by a product's design, is indicative of a fundamental unreliability under *Daubert's* requirements. *See Mannix, supra*. Such difficulties also point to the conclusion that Proctor is straying beyond the reasonable [*33] limits of his expertise in regard to autohauler design and manufacture. *See Stagl, supra at 81; Lappe, supra, at 227*.

While Proctor referenced, among his qualifications, several trials at which he was allowed to give expert testimony, none of them involved an issue of design defect based on a fall from an autohauler or similar product. *See* Proctor Deposition at 56-70. In the one case mentioned by Proctor, involving a worker fall from a piece of industrial machinery, Proctor's opinion was that the accident was caused by a failure of a hydraulic fitting, and he could not recall giving any testimony regarding the need for a fall prevention system on the machine. *Id.* at 61. Significantly, Proctor agreed he has never testified as the cause of operator falls from industrial equipment. *Id.* at 60-61. Further, although Proctor stated he has acquired expertise in human-machine interface matters, such knowledge did not result, according to Proctor, from actual scientific or engineering studies but, rather, from his reading standard texts on the subject. Proctor Deposition at 17-18. Such "post-Doctoral study," as Proctor put it, *id.*, contrasts [*34] sharply with the "in depth" work in the field of the "interaction between people and machinery," found to be sufficient to qualify plaintiff's expert in Stagl. *Stagl, 117 F.3d at 82. See also McCullock v. H.B. Fuller Company, 61 F.3d 1038, 1041-43 (2d Cir. 1995)* (consulting engineer with "extensive experience," including 15 years of research on subject of fumes or vapors in workplace qualified to testify on issue of effect of fumes on plaintiff despite lack of formal education on fume dispersion patterns or experience in interpreting air quality studies). Therefore, as Proctor lacks any special knowledge or experience in the design of autohaulers, particularly regarding driver fall prevention issues, or even other complex machinery requiring direct human involvement for their operation, is unable to explain the application of general engineering design principles to the issues in this case in a straight forward manner that could assist in the jury's understanding of the evidence in the case without direct reference to technical treatises or his class notes, and has insufficient expertise in human-machine interface issues, Proctor is not qualified to [*35] testify as to the adequacy of the Model 3200's design regarding the potential risk of driver falls.

Nor is Proctor qualified to testify on the issue of Dreyer's comparative negligence as a cause of the accident in support of Defendants' primary defense in this case. Proctor's opinions relating to this issue are based on his observation of an attempted recreation of the accident by an Allied employee, Proctor Report at 11,

P1; Proctor Deposition at 73-75, the training Proctor received from Defendants on the proper loading and unloading methods for the Model 3200, Proctor Deposition at 85-87, and Proctor's opinion that Dreyer may have been impaired by potential side-effects of prescription medications Dreyer had taken at the time of the accident. Proctor Report at 14; Proctor Deposition at 424. n17 None of these factors, even taking into account Proctor's engineering and other credentials, support a finding that Proctor is qualified to provide expert testimony on these issues.

> n17 Proctor did not review Plaintiffs' photographs Exhibits A1-16 depicting loading and unloading from the Model 3200's headramp, or a video of Plaintiffs' inspection of the Model 3200. Proctor Deposition at 46-47.

[*36]

First, neither Proctor's Report nor his deposition testimony points to any body of scientific or generally accepted engineering principles that may be reliably applied in assessing whether a worker's use of an industrial product in general, or a driver's manner of loading or unloading an autohauler in particular, is negligent. Such deficiency includes Proctor's observed demonstration by Defendants of the loading and unloading of minivans on the Model 3200 as Proctor does not claim to be an accident reconstruction expert, and his failure to reconstruct Dreyer's accident because, as Proctor asserted, such reconstruction would be too dangerous. Proctor Deposition at 74, 177. *Compare Lappe, supra, at 227* (expert witness with Ph.D in biomedical engineering without direct experience in auto design qualified as an expert in defective design case based on extensive experience in accident reconstruction and analysis of vehicular accidents).

Second, Proctor's conclusion that Dreyer failed to properly load and unload the Astro minivan while maintaining the "three-point stance" is based, not on any principles of mechanical or biomechanical engineering, but on both the training [*37] Proctor received from Defendants in the operation of the Model 3200, Proctor Deposition at 85-87, and Proctor's opinion that unloading the Astro minivan under the conditions presented constituted a lack of common sense and good judgment on Dreyer's part. Proctor Report at 13; Proctor Deposition at 409-10. However, Proctor's only actual hands-on training as relevant to this case was limited to the loading of a Model 3200, not its unloading, and Proctor has no experience in operating a fully loaded autohauler under normal commercial delivery conditions. Proctor Deposition at 85, 87, 114. Indeed, much of Proctor's training on the proper operation of a Model 3200 was gleaned from reading manuals and watching videotapes supplied by Defendants. *Id.* at 102-03. Moreover, Proctor's hands-on training in loading vehicles on the autohaulers was with Defendants' Model 2827, not the 3200. n18 *Id.* at 429-31. As, based on the training received from Defendants, Proctor lacks any significant experience in the proper operation of a Model 3200, particularly the unloading of vehicles from its headramp, the court finds he does not qualify to give expert testimony as to Dreyer's negligence on this [*38] ground. *See Byrne v. Liquid Asphalt Systems, Inc., 238 F. Supp. 2d 49, 495 (E.D.N.Y. 2002)* (excluding witness who would testify as to "more practical" design for an "asphalt kettle" as witness had neither built nor worked on any asphalt kettle but had only observed an asphalt kettle in operation four or five times over a 50 year period).

> n18 Defendants make no showing that the two models are of similar design.

Third, [HN9] while experience can provide the basis to qualify a witness as an expert, the experience must be demonstrated and have direct relevance to the issues in the case. *Wilson v. Woods, 163 F.3d 935, 938 (5th Cir. 1999)* (proposed accident reconstruction expert who had not taught accident reconstruction courses, never experimented, conducted field studies, or published on the subject, not qualified as expert witness); *Eagleston v. Guido, 41 F.3d 865, 874 (2d Cir. 1994), cert. denied, 516 U.S. 808, 133 L. Ed. 2d 18, 116 S. Ct. 53(1995)* (proposed expert who lacked familiarity [*39] with arrest procedures at issue not qualified); *Prohaska v. Sofamor, S.N.C., 138 F.Supp.2d 422, 436 (W.D.N.Y. 2001)* (board certified neurosurgeon who lacked experience in performing specific type of implant surgery at issue not qualified as an expert on the issue of product liability as a matter of skill, experience or training); *Mancuso v. Consolidated Edison Co. of New York, Inc., 967 F.Supp. 1437, 1443-44 (S.D.N.Y. 1997)* (internist with limited experience in diagnosing PCB related illness not qualified to testify that plaintiff's injuries were caused by exposure to PCB's from defendant's electrical transformers). *Compare Kelsay v. Consolidated Railway Corporation, 749 F.2d 437, 448 (7th Cir. 1984)* (police officer with experience in investigating 20 prior railroad crossing accidents qualified as expert to testify that cause of accident was driver inattention).

Here, Proctor has not demonstrated experience in the field of accident reconstruction and in evaluating driver negligence as a defense to claims based on Defendant's

Model 3200 alleged defect or other autohaulers by investigating prior accidents involving falls from autohaulers [*40] similar to Dreyer's, nor has Proctor conducted any research, accident reconstruction, field tests or experiments, or published articles on the subject of driver misuse or negligent operation of autohaulers or other types of trucks or autos, in particular, or on the issue of industrial product misuse and operator workplace negligence in general. *Compare DiMeo v. Minster Machine Co. 388 F.2d 18, 20 (2d Cir. 1968)* (where the challenged expert's opinion permitted by the court was that a design defect, which allowed a power press to recycle while the operator's hand was inside the press, was the cause of plaintiff's injury). Here, as discussed, Discussion, *infra,* at 39-46, no similar technical explanation is required to explain the cause of Dreyer's injury as determined by Proctor.

Fourth, Proctor opined that Dreyer's accident may have been caused by Dreyer's prescription medications, Depakote and Ritalin, and that such usage, in conjunction with the adverse conditions existing at the time of the accident, also constituted negligent conduct by Dreyer. Proctor Report at 14; Proctor Deposition at 424. n19 However, Proctor admitted he was untrained in pharmacology, Proctor [*41] Deposition at 420-21, and had no special knowledge or expertise concerning the potential side effects upon a worker like Dreyer from the medications. *Id.* at 420. Rather, Proctor's knowledge of such potential side effects was based on reading publically available information he obtained from the Internet. As such, Proctor's knowledge on this particular subject is no better than that of any layman with access to these sources. *See Stagl, supra, at 82* (expert knowledge needed to qualify under *Rule 702* should be information "most likely beyond the knowledge of an average juror.") While Proctor asserted that his mechanical engineering and biomechanics background enabled him to opine that Dreyer may have been adversely affected by the medications, *id. at 423,* neither Proctor nor Defendants attempt to explain how such engineering and biomechanical knowledge extends to questions regarding the side effects from prescription medications on the risk of worker on-the-job injuries sufficient to qualify Proctor as an expert on this subject. *Prohaska, supra, at 436-37* (witness who lacks specific knowledge, skill, experience or training in subject matter at [*42] issue disqualified as an expert); *Mancuso, supra, at 1442-44* (lack of extensive experience and absence of formal training requires disqualification); *Lappe, supra, at 227-28* (expert not permitted to opine on subject beyond field of expertise). *Compare McCullock, supra, at 1041-43* ("extensive experience" in working with particular subject matter at issue in case sufficient to qualify witness as an expert despite lack of formal education). As discussed, it is Defendants' burden to satisfy the court as to Proctor's claimed expertise on this and other subjects in this case. *Rule 103(a).* Defendants have notably failed to do so.

> n19 Proctor also alludes to the fact that Dreyer's commercial driver's license was suspended in November 1998, nearly two years after the accident, because Dreyer had been prescribed Clozapine, a psychotropic drug used to treat schizophrenia. Proctor Report at 11, P4. However, nothing in the record indicates that Dreyer had been prescribed this drug prior to the accident.

[*43]

Proctor appears to be, as Defendants contend, Defendants' Memorandum at 5-6, a well-credentialed mechanical engineer; however, [HN10] *Daubert* requires federal courts evaluate all proffered expert testimony, when challenged under *Rule 702,* on a case-by-case basis, and directs district courts not to merely 'rubber-stamp' such evidence based solely upon the expert's resume, including any testimonial history. In this case, Proctor's report runs 36 pages and includes a biography, teaching assignments, a listing of consultant engagements, professional publications, past trial testimony, professional membership and related activities, and descriptions of Ritalin, Depakote, and Clozapine obtained from an Internet source. Significantly, the portion of the report devoted to Dreyer's accident and Proctor's opinions regarding its cause and the safe design of the Model 3200 accounts for just over three pages. Further, a careful review of Proctor's publication list, Proctor Report Appendix 1, reveals nearly all Proctor's publications involve issues relating to problems of industrial pollution; none are directed at issues of safety considerations related to the design or manufacture of large-scale [*44] and complex industrial or commercial products, particularly autohaulers like Defendants' Model 3200.

Further, while according to Appendix 3 of his Report, Proctor has testified in at least 22 trials, only two relate to accidents involving an autohauler, and one of these specifically relates to product liability arising from the plaintiff's use of a tie-down ratchet mechanism, Proctor's Report at 28, an issue not involved in Dreyer's case. The other case, *Street v. Ryder, id.* at 27, also involves an autohauler, but the description provided fails to state whether the case involved alleged design defect issues similar to those in the instant case. As noted, Defendants represent that Proctor was recently allowed to testify in the Eastern District of Missouri against GACS, and in a product liability case involving an