autohauler in the Southern District of Illinois, Defendants' Memorandum at 6, but Defendants fail to explain whether the plaintiffs' liability theories in those cases are similar to those in this case, and whether Proctor's testimony was challenged under *Rule 702*. More specifically, at his deposition in May 2001, Proctor agreed with Plaintiffs that he has never, prior [*45] to the instant action, been requested to provide expert testimony in a case involving a driver's fall from an autohauler. Proctor Deposition at 55-56. Presumably, if Proctor's recent testimony involved an issue even similar to the instant case, Defendants could be expected to have so represented. Notwithstanding Proctor's credentials and prior experience as a testifying expert, in this case Proctor's Report and expected testimony fail to meet *Rule 702*'s and *Daubert's* requirements.

Thus, because Proctor lacks any relevant or sufficient experience, training, skill or specialized technical knowledge regarding such issue and has not put forth any reliable scientific or technical principles that could assist the jury in evaluating the evidence on this issue, Proctor is not qualified to testify as an expert concerning Dreyer's negligence as the primary cause of the accident. *See Blanchard v. Eli Lilly & Co., 207 F. Supp. 2d 308, 317* (psychiatrist who was not an expert in pharmacology, epidemiology, or toxicology not qualified to testify on causal relation between decedent's fatal assaults and suicide). *Compare Kelsay, supra* (based on lengthy accident investigative experience, [*46] expert permitted to testify that railroad crossing accident was caused by driver inattention).

2. Relevance and Reliability.

[HN11] Presented with a challenge to the admissibility of expert testimony, a court determines whether the testimony meets *Rule 702*'s standard of "evidentiary reliability." *Daubert, 509 U.S. at 590*. Courts are to particularly assess whether the reasoning or methodology underlying the proposed testimony is scientifically valid "and whether such reasoning or methodology applies to the facts of the case." *Id. at 592-93*. Additionally, the court must take care to admit only scientifically valid expert testimony that will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert, supra, at 591* (quoting *Rule 702*). The court's inquiry must be directed to whether the testimony at issue has been "subjected to the scientific method; it must rule out subjective belief or unsupported speculation." *Cummins v. Lyle Industries, 93 F.3d 362, 368 (7th Cir. 1996)* (citing and quoting cases). As the Supreme Court in *Daubert* stated, [HN12] "proposed [expert] testimony must be [*47] supported by appropriate validation -- *i.e.,* 'good grounds,' based on what is known." *Daubert, supra, at 590* (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1251 (1986)) (bracketed material added). Thus, federal judges are required to exercise "more control over experts than over lay witnesses." Additionally, the testimony must be calculated to be of assistance to the jury in determinating an issue or evidence in the case. "This condition goes primarily to relevance." *Daubert, supra, at 591*. In deciding whether the proffered testimony is relevant to the issues before the jury the court must, as *Rule 702* requires, also satisfy itself that the testimony is "sufficiently tied to the facts of the case." *Daubert, supra, at 591* (quoting *United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)*). This "consideration has been aptly . . . described . . . as one of 'fit.'" *Daubert, 509 U.S. at 591* (quoting *Downing, supra*).. "'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other unrelated purposes." *Id.*

[HN13] Even if found relevant [*48] under *Rule 702*, proffered expert testimony should also be excluded pursuant to *Fed.R.Evid. 403* ("*Rule 403*"), where the testimony's probative value is outweighed by the risk of "undue prejudice, confusion of the issues, or misleading the jury," potential problems especially present when expert testimony is involved. *Daubert, supra, at 595*. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Id.* (quoting Weinstein, J., *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended, 138 F.R.D. 631, 632 (1991)*). While not directly asserted by Plaintiffs as a ground for exclusion, [HN14] in performing its "gatekeeping function" with respect to the admissibility of expert testimony under *Rule 702*, a court also must determine whether, as part of such "gatekeeping obligation," *Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137, 141, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999)*, the expert testimony fully satisfies *Rule 403* as well as *Rule 702*. *See United States v. Dukagjini, 326 F.3d 45, 54 (2d Cir. 2003)*. As the court in *Dukagjini* stated, "even if the testimony [*49] is admissible under *Rule 702*, it still must pass muster under *Rule 403*: Its probative value must not be substantially outweighed by unfair prejudice." *Id.* Moreover, where the expert strays from his "scope of expertise," such intrusion into subjects beyond proffered findings based on reliable science or technology, may produce an equally undue degree of juror confusion violative of *Rule 403*. *Id.*

[HN15] The thresholds for admissibility established in *Daubert* also apply to technical and engineering opinions. *Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137, 141, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999)*. "Engineering testimony rests upon scientific foundations, the reliability of which will be at issue in some cases."

*Id. at 150.* [HN16] Although *Daubert* sets forth several factors as guidance to a court in assessing the reliability of expert testimony, *Kumho, 526 U.S. at 141*, *i.e.*, whether the methodology underlying the objective basis for the opinion has been subjected to peer review, can be or has been tested, is subject to controlled error rates, or enjoys general acceptance within a relevant scientific community, *id. at 149-50*, other factors may [*50] be applied based on the circumstances of a particular case. *Kumho, supra, at 150*. n20 The reliability of the expert's methodology in reaching his conclusions must therefore be evaluated against the specific facts at issue, not generalized theories. *Id. at 154* (noting that the expert's asserted technique for establishing a manufacturing defect must be measured as to the particular issue of product liability in the case, *e.g.*, the reasons for the tire failure in *Kumho*).

n20 Examples of such factors include (1) whether the testimony derives from independent research, (2) whether the expert accounted for obvious alternative explanations, (3) whether the expert has employed the same intellectual rigor in the courtroom as in the relevant field of expertise, (4) whether the expert's field itself lacks scientific reliability, (5) the non-judicial uses to which the offered method has been put, (6) the comprehensiveness of the information upon which the opinion is based, (7) disclosure of the theoretical basis for the opinion, and (8) the quantity and similarity of non-scientific opinions. *Blanchard v. Eli Lilly & Company, 207 F.Supp.2d 308, 315-17 (D.Vt. 2002)* (citing cases and authorities).

[*51]

[HN17] As with the question of a witness's qualifications to provide expert testimony, the court has broad discretion in exercising this important "gatekeeping" function. *Kumho, supra, at 153* (court has "broad latitude to determine" *Daubert* issues). Thus, if Proctor's conclusions or opinions are neither relevant to an issue of fact pertinent to the case, nor based on specialized or engineering knowledge using adequate data or reliable scientific principles and methods reliably applied to the facts of the case that will assist the jury in understanding evidence and deciding fact questions germane to this case, *Fed.R.Evid. 702*, they should be excluded. Accordingly, for purposes of satisfying *Rule 702*, the relevancy of the challenged testimony turns on the circumstances of the specific case, the factual issues presented, and the legal standards to be applied by the jury in their resolution. *Kumho, supra, at 150*.

Here, Plaintiffs allege the Model 3200 was negligently designed and manufactured by Defendant Delavan in failing to include sufficient safety features, warnings, and instructions to prevent driver falls like the one suffered [*52] by Dreyer. Complaint PP10, 14. Plaintiffs also allege breach of the implied warranty that the Model 3200 was reasonably safe for intended and foreseeable purposes, and seek punitive damages based on Defendants' reckless disregard of foreseeable harm arising from driver use of the Model 3200. Complaint P18. n21 Defendants asserted several defenses including that Dreyer's injuries were caused by his own negligence and misuse of the Model 3200. n22 Amended Answer PP9-10, 12.

n21 The parties do not specifically address the excludability of Proctor's Report under Plaintiffs' breach of implied warranty clause; rather, Plaintiffs' motion is primarily directed to Plaintiffs' defective or negligent design theory.

n22 Defendants' third affirmative defense of product misuse has been withdrawn. Stanton Affidavit, P4.

Preliminarily, the court notes that under the laws of both New York, the place of the Model 3200's manufacture, and Indiana, Plaintiffs' domicile and where the accident occurred, the issue of whether a [*53] plaintiff was comparatively negligent is irrelevant to the question of a manufacturer's liability based on a design defect. However, unlike New York, Indiana law will bar a plaintiff from any recovery if the fact trier finds the plaintiff was more than fifty percent at fault.

In denying Defendants' recent motion *in limine* seeking to apply Indiana law to the issues in the case, Judge Arcara held that Defendants had waived the issue by failing to timely object to the application of New York law to Defendants' earlier motion for summary judgment and that Defendants had failed to point to any actual conflict between the laws of New York and Indiana. Decision and Order, filed October 25, 2004 (Doc. No. 143). The test for products liability based on defective design is similar in both states. *See Liriano v. Hobart Corp., 132 F.3d 124, 126 (2d Cir. 1998)* (manufacturer has duty to use reasonable care in designing the product so that it will be safe when used in the "manner . . . intended . . . [and] unintended yet reasonably foreseeable use.") (quoting *Micallef v. Miehle Co, 39 N.Y.2d 376, 348 N.E.2d 571, 577, 384 N.Y.S.2d 115 (N.Y. 1975))*; *Dow Chemical Co. v. Ebling, 723 N.E. 2d 881, 900* [*54] (Ind. Ct. of App. 2000) (failure to use reasonable care in design of product resulting in product being "unreasonably dangerous to expected users when

used in reasonably expectable ways . . ..") (citing *Ind. Code § § 34-20-2-1; 34-20-4-1)*). [HN18] Under New York's choice of law rule, as to the defense of comparative negligence, the law of the state where the plaintiff is domiciled and the accident occurred applies as a matter of post-accident loss allocation. *See Datskow v. Teledyne Continental Motors Aircraft Products, 807 F.Supp. 941, 942 (W.D.N.Y. 1992)* ("If one of the parties is domiciled in the state where the accident happened, then that state provides the applicable law" as it is the state with the most significant interest in the effect of a limitation on the extent of a plaintiff's recovery based on the plaintiff's comparative negligence) (citing *Neumeier v. Kuehner, 31 N.Y.2d 121, 286 N.E.2d 454, 458, 335 N.Y.S.2d 64 (N.Y. 1972)* (Larimer, J.).

[HN20] New York comparative negligence law makes the question of plaintiff's comparative negligence irrelevant to the issue of a defendant's product liability causing plaintiff's injuries as found by the jury. *See* [*55] *N.Y. Civ. Prac. Law & R. § 1411* (McKinney 1997); *Dubecky v. S2 Yachts, 651 N.Y.S.2d 602, 603-04 (App. Div. 2d Dep't 1996)* (in design defect cases, plaintiff's comparative negligence does not relieve defendant of liability if "the design defect is found to be a proximate cause of the accident."). *See also Brodvin v. The Hertz Corporation, 487 F.Supp. 1336, 1338 (S.D.N.Y. 1980)* (expert testimony as to plaintiff's failure to "exercise due care to avoid or mitigate injury" by failing to use automotive seat belt cannot be considered in determining manufacturer's liability; it pertains only to the question of damages.") (citing *Spier v. Barker, 35 N.Y.2d 444, 323 N.E.2d 164, 167, 363 N.Y.S.2d 916 (N.Y. 1974)*). In contrast, under Indiana's Comparative Fault Act, if a plaintiff's "unreasonable failure to avoid an injury," is found by the jury to be more than fifty percent of all fault causing a plaintiff's injury, the plaintiff is barred from any recovery. *Ind. Code § § 34-6-2-45; Sec. 45(a)(1); 34-51-2-6(a); Heck v. Robey, 659 N.E.2d 498, 504 (Ind. 1995)*. Therefore, under applicable New York law, expert testimony is relevant [*56] to whether Defendants should reasonably have foreseen that Dreyer's method of loading and unloading the autohauler with a vehicle like the Astro minivan created unreasonable risks, and therefore should have provided additional safety features to prevent a driver's fall; but expert testimony that Dreyer was comparatively negligent in causing the fall is irrelevant to the issue of whether the Model 3200 suffered from a negligent design defect.

[HN19] Under *Rule 702*, a threshold condition of admissibility is that the proffered testimony be calculated to "assist the trier of fact to understand the evidence or to determine a fact in issue." As the Supreme Court in *Daubert* stated, "this condition goes primarily to relevance." *Daubert, 509 U.S. at 591.* "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (quoting Weinstein and M. Berger, WEINSTEIN'S EVIDENCE, P702[02], p. 702-18 (internal quotation marks omitted). *See also Fed.R.Evid. 401* ("relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the [*57] action more probable or less probable than it would be without the evidence.") (internal quotation marks omitted).

The court thus turns to the question of whether, even if Proctor is qualified to give expert testimony upon the issues of the case, his testimony would be relevant to the two issues upon which Defendants seek to admit his testimony, *i.e.*, (1) the existence or absence of a design defect in the Model 3200, and (2) Dreyer's conduct as the primary or sole cause of the accident. Although Proctor acknowledged that the questions of a potential design defect in a product and a user's negligence in using the product are "independent," Proctor Deposition at 110, the record nevertheless makes it apparent that in Proctor's judgment, because Dreyer could have loaded and unloaded the Astro minivan safely with the Model 3200's existing design but failed to do so, the availability of the safer method of loading and unloading and Dreyer's unreasonable decision to disregard the safer method and to load and unload the minivan as he chose to under the adverse conditions presented at the time of the accident, demonstrated to Proctor that the Model 3200 was properly designed. Proctor Report [*58] at 13, P11; Proctor Deposition at 78-80. As Defendants posit, "if the vans were properly loaded [by Dreyer], these issues [of defective design and Dreyer's negligence] would not exist." Defendants' Memorandum at 4.

Specifically, Proctor concluded that Dreyer was culpably negligent in attempting to unload the Astro minivan by stepping on the exposed, and presumably oily, piston rod during windy conditions. Proctor Report at 13, PP8-9. As Proctor stated, "it is known to any reasonable adult" that stepping on an exposed piston rod in windy conditions is "hazardous." *Id.* at 13, P8. Despite Proctor's view that the question of the autohauler's defective design and Dreyer's negligence were "independent" of each other, Proctor Deposition at 110, Proctor nevertheless found the Model 3200 was not defectively designed because Dreyer's negligence, not any safety deficiency in the design of the Model 3200, caused the accident. In fact, Proctor testified that it was not necessary for him to consider whether good engineering design principles required Defendants to have foreseen the possibility of the type of negligent use Proctor and Defendants attribute to Dreyer as "the design of the Delavan [*59] [Model 3200] is appropriate, so it's

not necessary . . . to do that." *Id.* at 32. Therefore, Proctor was unwilling or unable to explain why, based on his asserted competency as a mechanical engineer, the Model 3200's attributes, regarding potential driver negligence in loading and unloading the Model 3200, satisfied good engineering principles.

Proctor's conclusion that the Model 3200 was appropriately designed was based particularly on his finding, as noted, that Dreyer could have loaded the Astro minivan front-end-first in the No. 2 position thereby availing him of the safe mode of egress and ingress to the minivan's driver's side door using steps located on the autohauler cab. Proctor Report at 11, P1; 13, PP3, 11; Proctor Deposition at 78-79. Proctor also agreed that while the designer of the Model 3200 had the responsibility to include "appropriate [safety] measures," the driver was required "to use those features correctly . . . [and] that [Dreyer] failed to do that." *Id.* at 79 (bracketed material added). As a result, Proctor did not find it necessary to consider whether alternative designs to improve driver safety as to the risk of falls should, or could, have [*60] been included in, or feasibly added to, the Model 3200, and he was not requested by Defendants to perform this analysis. *Id.* at 76-78.

However, because under applicable New York law a plaintiff's comparative negligence is irrelevant to the question of liability based on negligence design in a products liability case, Discussion, *supra*, at 33-34, Proctor's opinion that the Model 3200 is properly designed because Dreyer failed to properly load and unload the autohauler is irrelevant to the threshold question for the jury of whether the Model 3200 was defectively designed. *See Brodvin, supra, at 1338.* Rather, as under New York law, Dreyer's alleged negligence may, if and to the extent found by the jury to have caused the accident, significantly limit (or even eliminate) any damages that could be awarded, Proctor's opinion as to Dreyer's negligence as the cause of the accident could be relevant to this issue, if other conditions for its admissibility under *Rule 702* and *Daubert* are satisfied. *See DiMeo, 388 F.2d at 20* ("It is the function of the expert in a case such as this to give his 'educated guess' as to the cause of the accident.") (citing [*61] McCormack, EVIDENCE, at 29-38 (1954 ed.)).

Even if under applicable state substantive law, Proctor's opinion testimony were relevant to whether the Model 3200 suffered from a design defect in regard to driver falls from the headramp because of driver negligence, Proctor's findings and conclusions on this issue would nevertheless require exclusion for failure to meet *Rule 702*'s requirement that expert testimony be based upon "scientific, technical or other specialized knowledge" of assistance to the jury in "understanding the evidence or to determine an issue of fact." *Fed.R.Evid. 702.*

First, Defendants fail to demonstrate that Proctor's opinion that the design of the Model 3200 was "appropriate," Proctor Deposition at 32, and thus free of defects because Dreyer could, by safely using the Model 3200, have avoided the accident, *id.*, at 78-79, is predicated on "scientific, technical or other specialized knowledge." Proctor admitted he did not review the schematics of the Model 3200 for this case, Proctor Deposition at 73, did not take any measurements of the autohauler loaded with an Astro minivan in the No. 2 position, *id.* at 74, [*62] did not attempt to reconstruct the accident, *id.*, and did not review the particulars of the safety training Dreyer received in the operation of the Model 3200. *Id.* at 45. Instead, Proctor's opinions were based on Dreyer's explanation of how the accident occurred, a visual inspection of the Model 3200 loaded with an Astro minivan, and Faler's attempt to unload it from the No. 2 position. *Id.* at 42, 55.

While Proctor did state that "good engineering practice" requires a product's designer to consider foreseeable use, and even potential user misuse and abuse of the product, Proctor Deposition at 27, Proctor declined to explain the application of any relevant engineering principles or methods to the design of an autohauler including issues of driver safety based on falls from the headramp during loading or unloading. *Id.* at 26. Proctor's unwillingness to provide such an explanation was based on the fact that because, according to Proctor, it requires an entire academic semester to teach such principles, they could not be explained by Proctor at the deposition. *Id.* Instead, Proctor pointed to OSHA regulations generally pertaining [*63] to safety requirements to prevent worker falls and other product safety matters, as well as to several academic textbooks on these subjects. Proctor Deposition at 21-24, 37. However, no specifics from these references were discussed by Proctor to justify his conclusion that the Model 3200 was "appropriately" designed.

Because Proctor was unable to articulate any engineering principles or methodology from these or any other sources as a basis for his opinion that the Model 3200 was not defectively designed, the court finds, under *Daubert's* standards, the reliability of Proctor's opinions insufficient on these issues. *See Brooks v. Outboard Marine Corp., 234 F.3d 89, 92 (2d Cir. 2000)* ("failure to test a theory of causation can justify a trial court's exclusion of the expert's testimony") (citing cases); *Rypkema v. Time Mfg. Co., 263 F. Supp. 2d 687, 2003 WL 21203407 *5 (S.D.N.Y. 2003)* (rejecting expert report "bereft of any engineering methodology . . . [or] . . . scientific basis . . . offered for the conclusion reached.")

Case 3:03-cv-00222-JBA    Document 129-3    Filed 07/12/2005    Page 5 of 20

Page 18
2005 U.S. Dist. LEXIS 7018, *

As such, Proctor's opinion that the Model 3200 design was "appropriate" and that Dreyer's negligence caused the accident amounts to a [*64] personal *"ipse dixit,"* unsupported by any reliable engineering principles or methods. *Kumho, supra,* at *157* [HN21] (a district court is not required to "admit opinion evidence that is connected to . . . [the case] only by the *ipse dixit* of the expert.") (quoting *General Electric Co. v. Joiner, 522 U.S. 136, 146, 139 L. Ed. 2d 508, 118 S. Ct. 512 (1997)).*

Second, Proctor's opinions on these matters are inadmissible because the factual issues to which his findings are directed do not present issues requiring engineering or scientific expertise for their determination by the jury. Specifically, Proctor's assessment that Dreyer's failure to load the minivan rear-end-first in the No. 2 position prevented Dreyer from using the safe method of ingress and egress to a vehicle in such position available on the Model 3200, Proctor Report at 11, P1, 13, PP7, 10-11, is in assertion of fact readily subject to jury consideration from the expected evidence in this case, including the deposition testimony of various experienced witnesses and observation of a video, Plaintiffs' Exhibit S, of a driver accessing a minivan loaded rear-end-first. Proctor also stressed that Dreyer's attempt to unload the [*65] minivan during adverse weather at the time of the accident, including "high wind gusts, heavy snow, rain, and icy conditions, and lightning was particularly unsafe," Proctor Deposition at 408-10, facts with which a jury is reasonably capable of evaluating without expert assistance. Additionally, Proctor found that Dreyer's actions in approaching the minivan from the rear, attempting to enter the minivan's driver's side door by stepping on the exposed portion of the hydraulic piston rod was particularly hazardous and demonstrated a failure to use reasonable care. Proctor Report at 13, PP5, 6, 8, 9.

Proctor determined that if Dreyer had approached the minivan, properly loaded rear-end first, by using the available steps of the Model 3200's to climb to the headramp, Dreyer could have maintained the three-point stance in gaining entrance to the driver's side door of the minivan, thus reducing the risk of falling. Proctor Report at 13, PP7, 10-11; n23 Proctor Deposition at 95. According to Proctor, Dreyer's decision to load the minivan front-end-first during the gusty wind conditions amounted to a lack of "reasonable care." Proctor Report at 13, P9. Proctor particularly found that Dreyer's [*66] failure "to use reasonable care" in using the piston as a foot support, a use for which it was not designed by Defendants, Proctor Deposition at 136, during the adverse weather conditions encountered by Dreyer also demonstrated Dreyer's disregard of his training. Proctor Report at 13, P8; Proctor Deposition at 97-100. As Proctor stated, "[it] is known to any reasonable adult that a rod [like the Model 3200's hydraulic piston] . . . is a hazardous foot support." Proctor Report at 13, P8, Proctor Deposition at 410. Proctor therefore concluded that Dreyer's negligent actions in attempting to unload the minivan directly resulted from Dreyer's failure to "use common sense in evaluating the [weather] conditions," Proctor Deposition at 409, and Dreyer's lack of "good judgment." Proctor Deposition at 409-10.

> n23 Although Proctor's Report does not directly state that had Dreyer been able to maintain a three-point stance the accident would not have occurred, that conclusion is strongly implied. Proctor Deposition at 97 ("most likely he [Dreyer] would not have fallen."). No technical support for that opinion appears in the record.

[*67]

In explaining the basis for his opinion that Dreyer's actions were lacking in reasonable care, *i.e.,* common sense, Proctor alluded to "general guidelines" intended "to prevent an individual from working under inappropriate environmental conditions," Proctor Deposition at 408-09; however, no technical, engineering or regulatory sources are described by Proctor as providing any basis in the form of such "general guidelines" to find that Proctor's conclusions regarding Dreyer's asserted negligence are predicated upon any reliable scientific or engineering body of knowledge including authoritative "general guidelines." Nor does Proctor give any scientific or technical rationale for his "intellectual" and "practical understanding" of autohauler "industry procedures," Proctor's alternative basis for his conclusion that Dreyer acted negligently. Proctor Deposition at 102. Hence, the court finds that Proctor's opinions on this issue are not based on reliable engineering theories or data, as required by *Daubert. Joiner, 522 U.S. at 146, 139 L. Ed. 2d 508, 118 S. Ct. 512* (insufficiency of studies relied upon by expert supported exclusion of opinions -- court not required to accept expert's *ipse dixit*); [*68] *Blanchard, supra,* at *316* (failure to review available sources of information relevant to issue and lack of adequate experimental basis for non-scientific opinion renders expert's opinion unreliable). Rather, the court finds that Proctor's findings and opinion that Dreyer acted negligently in the way Dreyer loaded and later tried to unload the minivan under the bad weather conditions prior to the accident, *i.e.,* loading the minivan front first, approaching it from the rear, attempting to enter the driver side door by stepping on the extended piston (a hazard apparent to any "reasonable adult"), and in failing to maintain a secure three-limb contact with the autohauler, present questions

of fact for the jury that require no special degree of technical difficulty requiring the assistance of a qualified expert for their resolution.

As relevant, "common sense" is defined to mean "good judgment . . . not dependent on special or technical knowledge." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 459 (Merriam-Webster 1986 ed.) (underlining added). Courts have therefore excluded proposed expert testimony under *Rule 702* where the resolution of the factual question involved [*69] in the case turned on an application of "common sense," the antithesis of expert knowledge. See *Dhillon v. Crown Controls Corporation, 269 F.3d 865, 871 (7th Cir. 2001)*; *Reyes v. Delta Dallas Alpha Corp., 2000 U.S. Dist. LEXIS 5668, 2000 WL 526851 *3 (S.D.N.Y. May 2, 2000)*; *Grdinich v. Bradlees, 187 F.R.D. 77, 81-82 (S.D.N.Y. 1999)*.

In *Dhillon*, the trial court excluded the proffered expert's opinion that a defendant's forklift truck was defectively designed because it lacked a rear door that conceivably could have prevented plaintiff's leg from falling out of the truck and being injured when the leg was caught between the forklift and a wall into which the forklift had collided. *Dhillon, supra, at 871*. Affirming the trial court's decision, the appellate court found that the expert's proposed testimony, that the proposed safety door could have prevented the plaintiff's injuries, involved a question of "common sense" for the jury to decide, and that such a matter was therefore not amenable to expert testimony. *Id.* As the Seventh Circuit stated, [HN22] "An expert . . . must testify to something more than what is obvious to the layperson in order [*70] to be of any particular assistance to the jury." *Id.* (quoting *Ancho v. Pentek Corp., 157 F.3d 512, 519 (7th Cir. 1998)* (internal quotation marks omitted)). The court also observed that while the jury "could have been assisted by testimony on whether a rear door would have been economically feasible or safe in the case of a [forklift] tipover," *id.*, no such analysis had been performed by the expert in the case. *Id.*

In *Reyes*, the court found inadmissible a plaintiff's proposed expert's conclusions that plaintiff's injuries arose from a lack of supervision during the loading of a vessel, that an inadequate number of people were assigned to the task of loading an ice bin involved in plaintiff's injuries, and that the loading of stores for a vessel was the responsibility of the vessel operator. *Reyes, supra, 2000 U.S. Dist. LEXIS 5668 at *3*. Specifically, the court held that, in reaching his conclusions, the expert relied not on objective industry standards as he had asserted, but upon "commonsense guidelines." The court found that the jury required no special training or experience to understand whether there was adequate supervision, whether loading the ice bin [*71] required more than one person, or to come to a conclusion on the question of responsibility for the loading process. *Id.* (citing *Andrews v. Metro North Commuter Railroad Co., 882 F.2d 705, 708 (2d Cir. 1989)* (expert testimony is not admissible when it addresses "matters which a jury is capable of understanding and deciding without the expert's help.")).

In *Grdinich*, the trial court rejected expert testimony intended to advise the jury on the proper stacking of ironing boards in a retail store floor display which collapsed, injuring plaintiff, while plaintiff was attempting to remove a board from the display for purchase. *Grdinich, supra, at 82*. Excluding the testimony, the court found the expert had relied on "common-sense guidelines," not objective industry standards, that such "common-sense guidelines" were not a reliable basis for the expert's opinions, and therefore the proposed testimony failed to satisfy *Rule 702*'s prerequisites for admissibility. *Id. at 82*.

Similarly, in the instant case, the record amply demonstrates that the jury will have little difficulty assessing whether and the extent to which Dreyer's failure [*72] to exercise common sense and good judgment, as Defendants' and Proctor have asserted, contributed to Dreyer's injury. Particularly, the exhibits submitted in support of Plaintiffs' motion, Plaintiffs' Exhibits A1 - A16, together with the video (Plaintiffs' Exhibit S) demonstrating an alternative and, as Proctor opined and Defendants argue, the proper and safe means of access to the No. 2 position other than the one used by Dreyer, Dreyer's expected testimony, reports of the accident, and the probable testimony of Plaintiffs' and Defendants' lay witnesses, who are knowledgeable and experienced, will be sufficient to permit the jury to determine any questions of Dreyer's failure to use "common sense" or "good judgment" in loading and attempting to unload the Astro minivan under the circumstances presented by this case.

For example, Defendant Delavan's vice president and general manager, Peter J. Terzian, Jr., provided an easily understood explanation of the hazards Dreyer faced when he attempted to gain access to the Astro minivan's driver side door by stepping on the extended piston with the minivan loaded front-end-first in the No. 2 position

> "Any part of the [piston] cylinder [*73] you don't stand on [*sic*]. It's like standing on a ketchup bottle that you set down on the floor. You stand on it, its got a round surface on it. You don't have any stability."

Terzian Deposition at 134-35 (underlining added). Alexander Faler, a driver trainer for Dreyer's employer, testified that his practice was to inform drivers not to attempt to unload vehicles from the Model 3200 headramp by approaching from the rear of the autohauler because it was unsafe to do so. Deposition of Alexander Faler, September 28, 2000 ("Faler Deposition") at 12. Presumably, Defendants intend to call Terzian and Faler as witnesses, or to offer their deposition testimony at trial. Proctor's own testimony that his assessment of Dreyer's negligence was based on the instruction Proctor and Dreyer received from Defendants on the proper operation of a Model 3200 reinforces the finding that Dreyer's negligence, if any, can be determined without expert testimony. Proctor Deposition at 86-87, 89, 93. As discussed, Discussion, *supra,* at 15-21, Proctor's training and experience in the proper operation of a Model 3200 was too superficial to constitute sufficient degree of expertise in [*74] this subject. Thus, whether Dreyer deviated from his training, and thereby acted negligently, will not require expert testimony. n24

> n24 Significantly, Proctor concluded that regardless of whether Dreyer's training condoned the procedures Dreyer utilized in loading and unloading the minivan, Dreyer "still did not use reasonable care." *Id.* at 93. Proctor and Defendants fail to explain the logic of how Dreyer was negligent because of his failure to abide by the loading and unloading guidelines promulgated by his safety training if it is determined that such training condoned or accepted the precise manner of loading or unloading Proctor found to be negligent. As noted, Proctor testified that Dreyer's approach to the minivan was "not preferred" but "it is accepted." Facts, *supra,* at 8, n. 9 (citing Proctor Deposition at 95).

Like the issues presented in *Dhillon, Reyes* and *Grdinich, supra,* the jury in the instant case will not benefit from Proctor's testimony, describing Dreyer's lack [*75] of common sense and bad judgment, in understanding the nature of the potential hazards, particularly the windy conditions, to which Dreyer exposed himself as he attempted to unload the Astro minivan. In evaluating the basis for Defendants' contentions that Dreyer's lack of reasonable care, in Proctor's opinion, negates Plaintiffs' claim of a product design defect and that Defendants' defense that Dreyer's negligence should preclude any award of damages, no technical explanation of coefficients of friction, or the force of wind upon persons working in elevated spaces, or the principles governing falling objects will be required to assist the jury's understanding of the evidence. The jury, as "reasonable adults," will instead apply their own "commonsense" understanding of the chance of a person of Dreyer's size slipping while stepping on a rounded, and likely, oily surface, for his footing particularly at an elevated level, the difficulty of maintaining balance when encountering windy conditions while maneuvering on a narrow and elevated surface without the benefit of a sturdy walking surface and handholds, and the law of gravity in considering Defendants' defense based on Dreyer's culpable [*76] and contributory negligence.

Proctor's unwillingness to consider alternative designs, as suggested by Plaintiffs, to improve the safety of drivers working on the Model 3200 headramp, provides additional support to the court's finding that Proctor's proffered testimony does not satisfy *Rule 702*'s requirements. As discussed, Discussion, *supra,* at 35-36, Proctor testified that no engineering evaluation of the technical efficacy or cost-effectiveness of such alternative or additional safety features was necessary in this case because Dreyer's negligence in failing to properly load and his attempt to unload the Astro minivan under adverse conditions was the primary cause of the accident, displacing any need for such an evaluation. Proctor Deposition at 79-80 ("It was demonstrated that he [Dreyer] could have prevented this injury with the existing design so there was no reason to go any further, because there was no design defect.") Yet, the questions of whether such additional safety features could have prevented the fall and were technically feasible to have been installed on the Model 3200, from a design engineering viewpoint, are precisely the issues in the case upon which the [*77] jury would benefit from qualified expert testimony. See *Dhillon, supra, 269 F.3d at 871.*

Proctor rationalized his failure to consider alternative safety designs for the Model 3200 claiming that he had not been engaged by Defendants to make such an analysis. Proctor Deposition at 76-77. Proctor nevertheless admitted that good engineering practice called for the design of industry and commercial products to anticipate and prevent improper or negligent use, and that the Model 3200 had not been designed to prevent improper loading of a vehicle, *i.e.,* front-end-first, in the No. 2 position. Proctor Deposition at 400-01. Proctor explained that while he may previously have evaluated the feasibility of an extended walking surface for the Model 3200's hydraulic ramp piston system in a fully extended position, he did not do so for the purposes of this case. Proctor Deposition at 411-12. n25 Additionally, as previously noted, Defendants did not request Proctor perform such an evaluation. Proctor Deposition at 76. See *Dhillon, supra,* at 871 ("jury could

have been assisted by testimony on whether a rear door would be economically feasible or safe in the case [*78] of tip-over," but proffered experts failed to follow "the proper analysis to allow them to provide such testimony.") Defendants' conscious avoidance of such an important issue in this product liability design case cannot shield Proctor's testimony from potential exclusion. In contrast, Plaintiffs' expert, Linda Weseman, provides a detailed explanation of how, in Ms. Weseman's opinion, alternative safety features could have been feasibly added to the Model 3200 such as telescoping covers for the ramp extending hydraulic pistons, extra hand holds, and hand rails in the Model 3200 headramp area. Weseman Report at 4-5. n26

n25 Defendants have not submitted anything to indicate Proctor has previously made any such evaluations.

n26 Canadian manufactured autohaulers similar to the Model 3200 are equipped with handrails to prevent driver falls from the headramp. Ferguson Deposition at 16-17. Plaintiffs' Exhibit A-13, 14 and 15 depict, respectively, alternative safety devices installed on autohaulers similar to the Model 3200, *i.e.*, railings (A-13), covers for the extended piston (A-14), related to the No. 2 position, and a cable fence system (A-15) connected to the No. 1 position. Marcus Affidavit P15; Weseman Report at 5-6 (referring to handrails on autohaulers made by Defendant Delavan for use in Canada).

[*79]

Defendants do not deny they were served with a copy of Weseman's Report prior to the preparation of Proctor's Report dated December 4, 2000. Proctor Report at 1; Proctor Deposition at 260 (Defendants stipulated that Weseman's Report was part of Dr. Proctor's file and that Proctor "has seen them" [*sic*]). Proctor testified that he had reviewed Weseman's "Supplemental" Report. Proctor Deposition at 50. In contrast to Proctor's Report and deposition testimony, Weseman's Report provided a detailed technical discussion of the potential additional safety features that could, in Ms. Weseman's opinion, have feasibly been added to the Model 3200 thereby lessening the possibility of a driver fall, as occurred in this case, from the headramp area. Weseman Report at 4-5. [HN23] In seeking the admissibility of expert testimony, a party cannot avoid compliance with *Rule 702* and *Daubert* by tailoring the witness's review of the issues amenable to expert testimony plainly raised by the claims or defenses in the case. *See, e.g., Dhillon, supra*.

Here, such potential changes to reduce the risk of driver falls from the Model 3200 headramp were irrelevant to Proctor and were therefore [*80] not evaluated by him because Defendants had not engaged him to do so, Proctor Deposition at 76, and Proctor had reached the *a priori* conclusion that Dreyer could have avoided injury by simply using the Model 3200 as he had been trained and with common sense. Proctor Deposition at 79-80. Proctor's failure to consider the availability, potential effectiveness, and feasibility of alternative safety features renders his evaluations of the Model 3200's design materially incomplete and therefore unreliable under *Daubert. Blanchard, 207 F.Supp.2d at 315-17* (failure to employ same degree of intellectual rigor as used by other experts in field to opinions at issue supports a finding of unreliability). Here, Ms. Weseman, whose expertise is unchallenged by Defendants, performed an evaluation of alternative designs. Weseman Report at 4-5. Proctor's unwillingness to do so therefore fails this test for reliability.

Although Proctor acknowledged that "good engineering practice" in the design of products requires consideration of foreseeable use, possible misuse, and potential abuse of a product by the intended user, Proctor Deposition at 27, because Proctor was of the opinion [*81] that the design of the Model 3200 was "appropriate," it was not necessary that he consider whether such good engineering practice had been applied by Defendant Delevan in its design of the Model 3200. *Id.* at 32. In fact, Proctor did not think it was necessary for him to examine the schematic diagram reflecting the actual design and specifications of the Model 3200, nor was it required that he make any measurements of the autohauler, or attempt to reconstruct the accident, as he was able to determine that the Model 3200 was safe as designed based only on his observation of the loading and unloading of an Astro minivan conducted by Defendants on November 20, 2000. Proctor Deposition at 42, 73-75. Assuming *arguendo* that Proctor's unspecific discussion of "good engineering practice" involves the application of accepted engineering design principles, Proctor Deposition at 115-16; 134-35, Proctor made no attempt to apply such practice to the design characteristics of the Model 3200 particularly those involving headramp safety issues. Therefore, Proctor's opinion that the design of the Model 3200 is "appropriate" is not the result of the application of objective and reliable engineering [*82] principles reliably applied. *Fed.R.Evid. 702*.

Indeed, Proctor testified, confusingly, that Dreyer's failure to use reasonable care did not mean that the Model 3200 was not defective, Proctor Deposition at 110 ("Those [issues] are independent"). However, earlier in the deposition, Proctor stated that because Dreyer failed

to properly use the existing design features of the Model 3200, it was not necessary for Proctor to examine further into whether the Model 3200 designers should have anticipated the specific use of the autohauler leading to Dreyer's injury because, as Proctor concluded, "there was no design defect." *Id.* at 80 (underlining added). In particular, Proctor testified that the hydraulic piston was not intended as a "foot support," Proctor Deposition at 136, but because Dreyer negligently used it as such, there was no defective design in the Model 3200 based on the Defendants' failure to anticipate such a reasonably foreseeable misuse. *Id.* at 154. Significantly, Proctor cites not engineering principles supporting such an assertion. Proctor's conclusion, that the Model 3200 was "appropriately" designed was therefore premised [*83] on Dreyer's culpable negligence in using the Model 3200. As such, Proctor's opinion is not predicated on any reliable engineering principles reliably applied to the facts of this case as required by *Rule 702*, and must therefore be excluded.

In further support of his findings regarding the Model 3200's "appropriate" design, Proctor asserted that the Model 3200 was properly designed because the "injury per exposure frequency rate" involving driver falls from the Model 3200 was one fall per 1.3 million driver "ingresses and egresses" as calculated by Proctor. Proctor Report at 12, P30. Defendants rely on this calculation as demonstrating a sufficient technical basis for Proctor's opinion that the Model 3200 was not defectively designed. Defendants' Memorandum at 7-8. Proctor also opined that Dreyer's capacity to exercise proper care in the Model 3200 loading and unloading features could have been adversely affected by medications Dreyer may have taken prior to the accident. Proctor Report at 14; Proctor Deposition at 424. As Proctor opined in his report, Dreyer "may have been susceptible to the influence of medications at the time of his fall." n27 Proctor Report at 14 (underlining [*84] added). Proctor's conclusion was in turn based on Dreyer's deposition testimony that Dreyer was "taking medications" and Proctor's review of information, obtained from the Internet, that indicated to Proctor that such medications would "influence the behavior" of the person taking them. Proctor Deposition at 418-19.

---

n27 The parties do not dispute that Dreyer had taken the medications prior to the accident.

---

Defendants rely on Proctor's calculated "injury per exposure frequency rate" for the Model 3200 to demonstrate a scientific basis for Proctor's opinion that the Model 3200 was properly designed and argue that Proctor's opinion regarding the potential effect of Dreyer's medications should be admissible as evidence supporting Defendants' comparative negligence defense that Dreyer's actions were the cause of his fall. Defendants' Memorandum at 7-9. In particular, Defendants contend, without reference to any accepted engineering design or other principles, that it was reasonable for Defendant Delavan in designing [*85] the Model 3200 to "assume that the users will be free from the influence of narcotics that can affect judgment and balance." Defendants' Memorandum at 9. The court finds that Proctor's calculated "injury per exposure frequency rate" and his opinions regarding the effects of Dreyer's medications fail to meet *Rule 702* and *Daubert* requirements.

Two reasons require exclusion of Proctor's opinion that the Model 3200 was properly designed because the "injury per exposure frequency rate" Proctor calculated was "trivial." Proctor Deposition at 293. First, Proctor provided no scientific or engineering basis demonstrating that the "injury per exposure frequency rate" is a reliable indicator of a product's safe design. While detailing Proctor's method for calculating (one not appearing to require a high degree of mathematical sophistication) the "injury per exposure frequency rate," Proctor's Report and deposition testimony, are silent as to the scientific or engineering or other basis, such as a statistical one, for the concept, and provide no explanation of whether such a calculation is even generally accepted among product design professionals as a valid indicator of a product's safe [*86] design.

In his deposition, Proctor responded to Plaintiffs' question as to why the "injury exposure frequency rate" for the Model 3200 was "trivial," (implying the Model 3200 was properly designed) that his opinion was based on his "historical evaluation of injury data . . . worldwide," Proctor Deposition at 292-93, and his "experience and evaluation." *Id.* at 293. Proctor also stated that he had "examined what OSHA considers to be injury frequency rates in industry," and that "one in one million, are remarkably small." [*sic*] Proctor Deposition at 293. However, when asked to explain the nature and extent of his asserted "experience" regarding the significance of the "injury per exposure frequency rate," Proctor conceded that he could not "specifically recall the number [of "cases" or "files"], that he was referring to." Proctor Deposition at 305-06. When asked by Plaintiffs where the information supporting Proctor's claim that OSHA uses the "injury per exposure frequency rate" as a measure of product safety, Proctor responded that his assertion was "just my understanding of the industry in general." *Id.* at 293-94. Nor did Proctor make any further attempt to elucidate [*87] how such "experience and evaluation" demonstrates that his proffered "injury per exposure frequency rate," even

assuming the completeness of its underlying accident data, is an accepted and reliable indicator of good and safe product design within the field of product design engineering. n28 *Id. (passim)*.

> n28 The fact that an accident has not occurred in a million operations of a mechanical device does not logically compel the conclusion that in the particular case the cause of the accident, once revealed, is not a design defect that should have been reasonably foreseen.

Indeed, the court's research found no published caselaw making any reference to an "injury per exposure frequency rate," or including a discussion of any similar concept, as evidence, proposed or admitted, in connection with products liability litigation. The court's research also failed to reveal any reference to the "injury per exposure frequency rate" in any regulations promulgated by OSHA with respect to product safety or otherwise. Moreover, [*88] [HN24] an expert may reasonably be expected to be able to articulate the nature and extent of any "experience and evaluation" relied upon to demonstrate that the "experience and evaluation" is a reliable basis for the proffered opinion. As such, the court finds the "injury per exposure frequency rate" and Proctor's characterization of the rate for the Model 3200 as "trivial," offered to support Proctor's conclusion that the Model 3200 did not suffer from a defective design relative to the risks to driver safety, constitutes "unscientific speculation," *Cummins v. Lyle Industries, 93 F.3d at 367*, (quoting *Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 318 (7th Cir.) cert. denied, 519 U.S. 819, 136 L. Ed. 2d 33, 117 S. Ct. 73 (1996))*, excludable for lack of any reliable technical or scientific basis. *Id.* (under *Daubert* court "must determine whether the evidence is genuinely scientific, as distinct from being unscientific"). Unsupported by any relevant and generally accepted technical authorities, Proctor's proposed testimony as to the safe design of the Model 3200 based on the "injury per exposure frequency rate" he calculated for the Model 3200 constitutes a conclusory personal [*89] opinion lacking in "good grounds" for its admissibility as required by Daubert. *Daubert, supra, at 590*; *Rypkema, supra, at *5*. In substance, on this element of Proctor's opinion, the court is asked to take Proctor's "word for it," an acceptance foreclosed by *Daubert* and *Kumho*.

Second, even if Proctor's "injury per exposure frequency rate" were shown to be grounded upon scientific or engineering methods or principles, or other indicia of technical reliability as a generally accepted indicator of product safety, Proctor's opinion, based on the "injury per exposure frequency rate," is nevertheless inadmissible under *Rule 702* for lack of a reliable foundation. Proctor testified that his calculation was based on accident data derived from Defendants' records of driver falls from the Model 3200, and his estimated driver ingresses and egresses from the Model 3200 No. 2 position, for the period 1988 through 1993 which he received from Defendants. Proctor Report at 12, P3; Proctor Deposition 277-82. n29 Proctor admitted that while he believed the data were complete, he had no first-hand knowledge of such fact and had accepted the data that had been garnered by Mr. [*90] Silber, Defendants' consultant, Proctor Deposition at 281, without verifying its accuracy because he "relied on Mr. Silber for this information." *Id.* at 280 (underlying added). However, [HN25] *Rule 702* requires that an expert's opinion be "based upon sufficient . . . data." *Fed.R.Evid. 702*. Where an expert fails to verify the accuracy of data upon which the expert creates a statistical analysis or renders an opinion, the resultant analysis and opinion are inherently unscientific requiring exclusion of such evidence under *Daubert*. *Rowe Entertainment, Inc. v. William Morris Agency, Inc., 2003 U.S. Dist. LEXIS 15976, 2003 WL 22124991 *9 (S.D.N.Y. Sep't. 15, 2003)* (excluding expert's testimony where expert "took no steps to clarify the accuracy of the data plaintiffs provided to him"); *Freeport-McMoran Resources Partners Ltd. Partnership v. B-B Paint Corp., 56 F.Supp.2d 823, 833 (E.D.Mich. 1999)* (unverified facts underlying challenged expert opinion required exclusion of expert testimony).

> n29 Proctor testified the data covered the period 1989 to 1993. Proctor Deposition at 263.

[*91]

Here, Proctor admittedly obtained the underlying accident data from a staff member in Defendants' attorney's office who obtained the information from Defendants' consultant, and Proctor made no effort to independently verify the accuracy of the data. Proctor Deposition at 279-80. As Proctor's calculation of the "injury per exposure frequency rate," and his opinion that its "trivial" nature demonstrates the Model 3200 is not defectively designed, is founded upon unverified and therefore potentially incomplete and inaccurate data, it is inadmissible for lack of compliance with *Rule 702*'s requirement that data upon which a proposed expert's testimony is based be "sufficient." *Fed.R.Evid. 702*. [HN26] "An analysis is only as good as the data upon which it rest[s]" and "'it is important to verify the accuracy of the data collection.'" *Rowe Entertainment, Inc., supra, at *4* (quoting Federal Judicial Center, Reference Manual on Statistics 90 (2d ed. 2000)). Data relied upon by an expert as the basis for an opinion that

is neither verified as to its accuracy and completeness or, if from a recognized source, is "speculative in nature and therefore [*92] inherently insufficient," should be excluded. *Rowe Entertainment, Inc., supra*, at 9 (quoting *Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996)).* Notably, Defendants do not suggest that the underlying data was prepared by Defendants in the ordinary course of business or for the purpose of meeting reporting requirements in compliance with government regulations which could provide some indicia of reliability for the data. In this case, the risk that the underlying accident data is not sufficiently reliable is heightened by the fact that its source was a paid consultant of Defendants whose own credentials and data gathering methods are not described in the record. Accordingly, Proctor's calculation and reliance upon the "injury per exposure frequency rate," as indicative of the absence of a design defect in the Model 3200, is excluded on this ground.

As discussed, Discussion, *supra,* at 50-51, Proctor's Report also included Proctor's conclusion that as Dreyer had taken prescription medications such medications, according to Proctor, could have impaired Dreyer's mental and physical capacity to safely unload the Astro minivan particularly under adverse [*93] conditions. Proctor Report at 14; Proctor Deposition at 424. Despite the obvious prejudice of this assertion to Plaintiffs' case, Proctor conceded that he had not conclusively determined that Dreyer's use of Depakote and Ritalin, antiseizure and attention disorder medications, respectively, had caused Dreyer to fall and Proctor, nevertheless, opined that "Dreyer may have been susceptible to the influence of medication at the time of fall." Proctor Deposition at 424 (underlining added). Moreover, Proctor also admitted that his understanding of the side effects of such medications, such as drowsiness or dizziness, Proctor Report Appendix 4 at 31, 33, was based on information he obtained from an Internet source describing potential side effects of Dreyer's medications, yet Proctor was not trained in pharmacology and therefore could not say with any degree of certainty that Dreyer in fact experienced such adverse side effects at the time of his fall. n30 Proctor Deposition at 420, 422. Asked specifically to state "what adverse side affects [sic] Mr. Dreyer was under the influence of at the time of his accident," Proctor responded that. "I cannot," because he did not know. [*94] *Id.* at 422. Proctor also admitted he was unaware if Dreyer's medications carried warnings against operating motor vehicle machinery or working at heights while taking the medications. Proctor Deposition at 425. n31

n30 Although Proctor asserted that his belief that Dreyer "may or may not" have been affected by the medications prior to his fall was based on a "reasonable degree of engineering certainty," Proctor Deposition at 423, how the question of the physiological effect of specific medications upon a person using them while operating an autohauler is subject to an engineering evaluation was not explained by Proctor and appears to be at odds with his admission that he lacks any expertise in regard to medicine or pharmacology. Proctor did assert that his opinion of the potential effects of use of such upon Dreyer's unloading actions were based on Proctor's "experience." However, no elaboration of the nature of such experience as a reliable basis for Proctor's opinion on this subject was provided by Proctor or Defendants.

n31 A cursory reading of the printouts regarding the medications submitted by Proctor as part of his report reveal no such cautions for Ritalin. Proctor Report Appendix 4 at 31-32. As to Depakote, the information states only that if drowsiness occurs, the patient should refrain from operating motor vehicles until the dizziness subsides. *Id.* at 33. Neither Proctor's Report nor the record indicate how long Dreyer had been taking the medications prior to the accident or whether Dreyer admitted to experiencing dizziness at that time.

[*95]

Further, because Proctor conceded his lack of expertise regarding the potential for side effects that could have adversely affected Dreyer at the time of the accident, Proctor's reliance upon the hearsay Internet sources for such information is not authorized by [HN27] *Fed.R.Evid. 703*, as the rule permits reliance upon inadmissible evidence only if of a type "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *Fed.R.Evid. 703*. Here, Proctor is admittedly not an expert on such matters, and Defendants make no showing that a qualified expert on the side effects of the medications at issue would rely upon the sources utilized by Proctor. Accordingly, the court finds that as Proctor does not possess any specialized "knowledge, skill, experience, training or education" sufficient to qualify him as an expert on this issue, neither his Report nor testimony is supported by sufficient data, required by *Rule 702*, on the potential adverse physical effects from Dreyer's medications at the time of the accident relating to the cause of the accident and Dreyer's responsibility [*96] for it.

Proctor also testified that potential adverse effects from Dreyer's medications could place Dreyer outside

the "standard design conditions for a device" like the Model 3200. *Id.* at 424. However, neither in Proctor's Report nor his deposition testimony does Proctor describe or explain the technical aspects of such "standard design conditions," their source or acceptance in the field of design or mechanical engineering, or how they might apply to the issues for the jury in this case. Based on Proctor's concession that he could not determine with reasonable certainty that Dreyer's medications in fact adversely affected Dreyer and contributed to his fall, the court finds Proctor's proposed testimony on this rationale for rebutting Plaintiffs' claimed design defect and Proctor's alleged negligence also lacks "sufficient facts or data" for its support as required by *Rule 702*.

Because Proctor's proposed opinion and testimony concerning any causal relationship between Dreyer's use of medications and his injuries constitutes unsupported speculation offered by a proposed expert on a subject outside his field of claimed expertise, the court also finds any probative value of the [*97] testimony to be outweighed by its potential to unduly prejudice or mislead the jury regarding the relevant issue. *Fed.R.Evid. 403. United States v. Cruz, 363 F.3d 187, 194 (2d Cir. 2004)* [HN28] (testimony that "strays from expert's scope of expertise violates *Rule 403*); *Dukagjini, 326 F.3d at 54* (risk of juror confusion based on mingling expert's knowledge of facts with expertise requires exclusion under *Rule 403*); *Shu-Tao Lin v. McDonnell Douglas Corp., 742 F.2d 45, 48 n.2 (2d Cir. 1984)* (expert testimony lacking any scientific basis and, alternatively, unsupported by record properly excluded pursuant to *Rule 403*); *Bonton v. City of New York, 2004 U.S. Dist. LEXIS 22105, 2004 WL 2453603 *4 (S.D.N.Y. Nov. 3, 2004)* (expert's unsupported speculation regarding actual cause for disparate placing of African-American children in foster care excluded as unduly confusing to jury without probative effect pursuant to *Rule 403*). To permit a witness not qualified as an expert on a highly technical issue, involving the interactions between prescription drugs and the user's conduct, to speculate about such effects carries a high [*98] risk of misleading the jury into believing that the opinion was accurate and reliable, which is manifestly not the case here. *Bonton, supra.*

In sum, the court finds that despite his many credentials Proctor is not qualified to testify on the issues presented in this case. Even if he was qualified, the court determines that Proctor's testimony that Dreyer's own negligence was the actual cause of Dreyer's fall from the Model 3200 headramp is irrelevant to the issue of Plaintiffs' allegations that the Model 3200 was defectively designed. Although relevant to Defendants' comparative negligence defense, as such testimony is predicated upon the application of common sense, given the evidence in this case, the testimony is not required to assist the jury in understanding or deciding these issues. Finally, to the extent that Proctor's opinion purports to assert the safe design of the Model 3200 and the actual reason for Dreyer's fall, issues upon which the jury could benefit from expert testimony, Proctor's Report and opinions do not meet the minimum standards for technical reliability established by *Rule 702* and *Daubert*. Additionally, Proctor's opinion regarding Dreyer's [*99] negligence based on use of prescription medications in causing the accident violates *Rule 403*. Therefore, Defendants have failed to meet their burden under *Fed.R.Evid. 104(a)* that Proctor's Report and testimony are admissible pursuant to *Rule 702*.

## CONCLUSION

Based on the foregoing, Plaintiffs' motion to exclude (Doc. No. 92) is GRANTED.

SO ORDERED.

LESLIE G. FOSCHIO

UNITED STATES MAGISTRATE JUDGE

Dated: February 9th, 2005

Buffalo, New York

LEXSEE 2005 US DIST LEXIS 8190

**FREEDOM WIRELESS, INC., Plaintiff v. BOSTON COMMUNICATIONS GROUP, INC., ET AL., Defendants.**

**CIVIL ACTION NO. 00-12234-EFH**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

*369 F. Supp. 2d 155; 2005 U.S. Dist. LEXIS 8190*

**May 2, 2005, Decided**

**SUBSEQUENT HISTORY:** Motion denied by *Freedom Wireless, Inc. v. Boston Communs. Group, Inc., 2005 U.S. Dist. LEXIS 8266 (D. Mass., May 5, 2005)*

**PRIOR HISTORY:** *Freedom Wireless, Inc. v. Boston Communs. Group, Inc., 218 F. Supp. 2d 19, 2002 U.S. Dist. LEXIS 16633 (D. Mass., 2002)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a patent-related case, plaintiff sought reconsideration of the court's rulings on plaintiff's objection to and motion to strike the introduction of portions of deposition testimony of a witness for defendant, which was previously admitted.

**OVERVIEW:** The court determined that the previously admitted portions of the witness's deposition were not proper lay witness testimony because they contained opinions based on highly technical and specialized knowledge. *Fed. R. Evid. 701(c)* provided that if a witness was not testifying as an expert, the witness's testimony in the form of opinions or inferences was limited to those opinions or inferences which were not based on scientific, technical, or other specialized knowledge within the scope of *Fed. R. Evid. 702*. The testimony at issue fell within the realm of expert opinion described in Rule 702. His opinions on obviousness and triviality were based on his highly technical and specialized knowledge of telecommunications. But *Fed. R. Evid. 701* explicitly barred lay witnesses from giving opinions based on technical or specialized knowledge. Instead, lay opinion was proper only when it involved a witness stating his conclusions based upon common knowledge or experience. A portion of his testimony was struck because it was not sufficiently corroborated. Corroboration was required of any witness whose testimony alone was asserted to invalidate a patent, regardless of his level of interest.

**OUTCOME:** Upon reconsideration, the court sustained plaintiff's objection and granted plaintiff's motion to strike the previously admitted portions of the witness's deposition testimony.

**LexisNexis(R) Headnotes**

*Evidence > Witnesses > Opinion Testimony by Lay Witnesses*
[HN1] See *Fed. R. Evid. 701*.

*Evidence > Witnesses > Opinion Testimony by Lay Witnesses*
[HN2] *Fed. R. Evid. 701* explicitly bars lay witnesses from giving opinions based on technical or specialized knowledge. Instead, lay opinion is proper only when it involves a witness stating his conclusions based upon common knowledge or experience.

*Evidence > Witnesses > Expert Testimony*
[HN3] Any part of a witness's testimony that is based upon scientific, technical, or other specialized knowledge within the scope of *Fed. R. Evid. 702* is governed by the standards of Rule 702 and the corresponding disclosure requirements of the Civil and Criminal Rules. *Fed. R. Evid. 701* advisory committee's note.

Case 3:03-cv-00222-JBA    Document 129-3    Filed 07/12/2005    Page 15 of 20

369 F. Supp. 2d 155; 2005 U.S. Dist. LEXIS 8190, *

Page 2

*Evidence > Witnesses*
*Patent Law > Infringement Actions > Defenses > Patent Invalidity*
[HN4] Corroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest.

**COUNSEL:** [*1] For Freedom Wireless Inc, Plaintiff: A. William Urquhart, Adrian M. Pruetz, Aimee DeSantis, Charles K. Verhoeven, Christopher Tayback, Diane C. Hutnyan, Erica P. Taggart, Johanna Y. Ong, John J. Quinn, Marshall M. Searcy, III, Michael T. Zeller, Steven D. Anderson, William C. Price, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles, CA; Douglas C Doskocil, James Rehnquist, John K. Felter, Paul F. Ware, Goodwin Procter LLP, Boston, MA; Robert A. Pressman, Bramson & Pressman, Conshohocken, PA.

For Boston Communications Group, Inc., Defendant: John Nilsson, Michael B. Keating, Philip C. Swain, Stephen B. Deutsch, Vickie L. Henry, Foley Hoag LLP, Boston, MA; Kirk A. Damman, Lewis, Rice & Fingersh, LC, St. Louis, MO.

For AT & T Wireless PCS, Defendant: Adrienne L. Taclas, Christopher B. Hockett, Eric F. Pierson, J. David Hadden, James G. Snell, Mary T. Huser, Michael E. Woods, Patrick T. Weston, Bingham McCutchen LLP, East Palo Alto, CA; Denis R. Salmon, Gibson, Dunn & Crutcher LLP, Palo Alto, CA; Rebecca Hooley, Bingham McCutchen LLP, San Francisco, CA; Victor H. Polk, Jr., Bingham McCutchen LLP, Boston, MA; Monique M. Drake, Gibson, Dunn & Crutcher LLP, Denver, CO.

For [*2] CMT Partners, doing business as Cellular One of San Francisco, Defendant: Adrienne L. Taclas, Christopher B. Hockett, Eric F. Pierson, J. David Hadden, James G. Snell, Mary T. Huser, Michael E. Woods, Patrick T. Weston, Bingham McCutchen LLP, East Palo Alto, CA; Denis R. Salmon, Gibson, Dunn & Crutcher LLP, Palo Alto, CA; Rebecca Hooley, Bingham McCutchen LLP, San Francisco, CA; Victor H. Polk, Jr., Bingham McCutchen LLP, Boston, MA; Monique M. Drake, Gibson, Dunn & Crutcher LLP, Denver, CO.

For Rogers Wireless, Inc, also known as Rogers AT&T Wireless, Defendant: Christopher R. Dillon, Mark Szpak, Ropes & Gray LLP, Boston, MA; Edward Han, Mark D. Wegener, Martin F. Cunniff, Howrey & Simon, Washington, DC.

For Western Wireless Corporation, doing business as Cellular One also known as One Cellular, Defendant: John Nilsson, Michael B. Keating, Philip C. Swain, Stephen B. Deutsch, Vickie L. Henry, Foley Hoag LLP, Boston, MA.

For Cingular Wireless LL, Defendant: Marcus E. Cohn, Monique M. Drake, Gibson, Dunn & Crutcher LLP, Denver, CO; Nicholas G. Papastavros, Christopher B. Hockett, James G. Snell, Mary T. Huser, Bingham McCutchen LLP, East Palo Alto, CA; Denis R. Salmon, [*3] Gibson, Dunn & Crutcher LLP, Palo Alto, CA.

For AT&T Wireless PCS, Inc., Counter Claimant: Christopher B. Hockett, J. David Hadden, Bingham McCutchen LLP, East Palo Alto, CA.

For Freedom Wireless Inc, Counter Defendant: A. William Urquhart, Charles K. Verhoeven, John J. Quinn, Michael T. Zeller, Steven D. Anderson, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles, CA; Douglas C Doskocil, Goodwin Procter LLP, Boston, MA.

For Litigation risk Management, Inc., Interested Party: George C. Rockas, Wilson, Elser, Moskowitz, Edelman & Dicker, Boston, MA.

For Boston Communications Group, Inc., Counter Claimant: John Nilsson, Michael B. Keating, Philip C. Swain, Stephen B. Deutsch, Vickie L. Henry, Foley Hoag LLP, Boston, MA.

For Western Wireless Corporation, doing business as Cellular One also known as One Cellular, Counter Claimant: John Nilsson, Philip C. Swain, Stephen B. Deutsch, Vickie L. Henry, Foley Hoag LLP, Boston, MA.

**JUDGES:** EDWARD F. HARRINGTON, United States Senior District Judge.

**OPINIONBY:** EDWARD F. HARRINGTON

**OPINION:**

### RULINGS ON THE ADMISSIBILITY OF STEVEN HOGAN'S DEPOSITION TESTIMONY

HARRINGTON, S.D.J.

Having reconsidered its rulings on plaintiff's [*4] objection to and motion to strike the introduction of portions of Steven Hogan's deposition testimony previously admitted, the Court sustains plaintiff's objection to the introduction of said testimony and strikes same. In raising its objection and motion to strike, plaintiff makes two arguments: first, that Hogan, a lay witness, improperly gave expert opinion testimony

Case 3:03-cv-00222-JBA   Document 129-3   Filed 07/12/2005   Page 16 of 20

Page 3
369 F. Supp. 2d 155; 2005 U.S. Dist. LEXIS 8190, *

during his deposition, and, second, that portions of Hogan's lay testimony were not sufficiently corroborated.

The previously admitted portions of Hogan's deposition are not proper lay witness testimony because they contained opinions based on highly technical and specialized knowledge. *Federal Rule of Evidence 701(c)* provides that [HN1] "if the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are . . . not based on scientific, technical, or other specialized knowledge within the scope of *Rule 702*."

Here, Hogan testified that it would have been "obvious" and/or "trivial" to use his call-processing invention (1) to process prepaid cellular calls, (2) to use the ANI instead of the debit card [*5] number to identify calls, and (3) to combine his invention with CSI's cellular switch proposal.

This testimony is not the type of lay opinion contemplated by *Rule 701*, but falls within the realm of expert opinion described in *Rule 702*. Hogan's opinions on obviousness and triviality were based on his highly technical and specialized knowledge of telecommunications. But [HN2] *Rule 701* explicitly bars lay witnesses from giving opinions based on technical or specialized knowledge. Instead, lay opinion is proper only when it involves a witness "stating his conclusions based upon common knowledge or experience." *United States v. Oliver, 908 F.2d 260, 263-64 (8th Cir. 1990)* (quoting *Batsell v. United States, 217 F.2d 257, 262 (8th Cir. 1954)*). See *United States v. Espino, 317 F.3d 788, 796-97 (8th Cir. 2003)* (permitting witnesses experienced in drug trade to testify to weight and quantity of methamphetamine based on prior experience with weighing same).

Here, it is undisputed that Hogan's opinions were not based on his prior experience of actually processing prepaid cellular calls, using an ANI to identify calls, or combining his invention with [*6] CSI's cellular switch proposal. Instead, they were derived from his specialized knowledge of telecommunications. Applying his specialized knowledge to the aforementioned topics, Hogan was then able to conjecture an opinion with respect to their triviality or obviousness. This type of abstract opinion, which is several degrees removed from Hogan's actual experience, is the classic type of expert testimony contemplated by *Rule 702*. As a lay witness, Hogan simply was not competent to testify as such. n1

n1 This is not to say that Hogan could not have so testified had he been properly disclosed as an expert under *Rule 26(a)(2) of the Federal Rules of Civil Procedure*. As an inventor, Hogan would qualify as one of exceptional skill in the art and would have been competent to testify as to what would have been obvious to one of ordinary skill in the art. *Endress &plus; Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd., 122 F.3d 1040, 1042 (Fed. Cir. 1997)*.

Notwithstanding [*7] the plain language of *Rule 701(c)*, defendants argue that Hogan's opinions were admissible under *Union Pacific Resources Co. v. Chesapeake Energy Corp., 236 F.3d 684, 692-93 (Fed. Cir. 2001)*, in which the court permitted eight lay witnesses to give an opinion as to enablement. That case, however, is distinguishable on two grounds. First, the Federal Circuit applied the law of the Fifth Circuit, which, at that time, "allowed lay witnesses to express opinions that required specialized knowledge." *Id. at 693*. The Fifth Circuit rule is antithetical to *Rule 701(c)*'s express prohibition on a lay witness giving an opinion based on specialized knowledge. Compare *Union Pacific, 236 F.3d at 693*, with *Fed.R.Evid. 701(c)*.

Second, and more importantly, the trial judge's decision in Union Pacific to admit the lay opinion testimony was made before the 2000 amendment to *Rule 701*. See *Union Pacific, 236 F.3d at 687*. This 2000 amendment added the phrase "scientific, technical, or other specialized knowledge" that now constitutes *Rule 701(c)*. Prior to the 2000 amendment, *Rule 701* did not exclude [*8] lay opinions based on scientific, technical, or specialized knowledge. n2 This lack of a prohibition blurred the distinction between lay witnesses and expert witnesses. 3 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 347 (2d ed. 1994 & Supp. July 2004).

n2 Prior to the 2000 amendment, *Rule 701* provided as follows:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

The purpose of the 2000 amendment was to ensure that witnesses would fall into either the expert-witness or lay-witness category. Indeed,

Case 3:03-cv-00222-JBA    Document 129-3    Filed 07/12/2005    Page 17 of 20

Page 4
369 F. Supp. 2d 155; 2005 U.S. Dist. LEXIS 8190, *

the amendment . . . put an end to the blurring of the line between the two categories [of expert witnesses and lay witnesses], which had led to decisions allowing "lay" witnesses to testify more and [*9] more like experts, relying on training and experience and drawing conclusions that lay witnesses are not normally allowed to draw.

Id.

In addition, the 2000 amendment would "eliminate the risk that the reliability requirements set forth in *Rule 702* will be evaded through the simple expedient of proffering an expert in lay witness clothing." *Fed.R.Evid. 701* advisory committee's note. Thus, [HN3] "any part of a witness' testimony that is based upon scientific, technical, or other specialized knowledge within the scope of *Rule 702* is governed by the standards of *Rule 702* and the corresponding disclosure requirements of the Civil and Criminal Rules." n3 Id.

---

n3 For the sake of the record, the Court notes that defendants, with respect to Hogan, did not satisfy the requirements for expert witnesses. Defendants have not pointed to any instance during this litigation in which they disclosed Hogan as an expert witness. See *Fed.R.Civ.P. 26(a)(2)* (setting forth disclosure requirement). Nor did defendants show, through the introduction of expert reports or otherwise, that Hogan's opinions were based upon sufficient facts or data, that Hogan's opinions were the result of reliable principles and methods, or that Hogan applied the principles and methods reliably to the facts of this case. See *Fed.R.Evid. 702* (listing criteria for expert-opinion testimony).

[*10]

Based on Union Pacific's reliance on a Fifth Circuit rule and an outdated version of *Rule 701*, the Court rejects defendants' argument that *Union Pacific* dictates the admission of Hogan's lay opinions on obviousness and triviality.

Next, the Court strikes the portion of Hogan's testimony concerning his implementation of a prepaid system, referred to as Link USA, at a hotel in Iowa. Although Hogan's statements on this matter constituted proper lay testimony, defendants have not introduced sufficient evidence to corroborate this testimony. [HN4] "Corroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest." *Finnigan Corp. v. Int'l Trade Comm'n, 180 F.3d 1354, 1369 (Fed. Cir. 1999)*. Here, the only evidence corroborating Hogan's testimony about the implementation is a LinkUSA advertisement. This advertisement does not indicate that Hogan had in fact implemented the system, does not refer to a hotel system, and does not mention a transparent prepaid system. Accordingly, the Court rules that the advertisement is insufficient to corroborate Hogan's testimony on this matter.

Therefore, upon reconsideration, [*11] the Court sustains plaintiff's objection and grants plaintiff's motion to strike the previously admitted portions of Hogan's deposition testimony.

SO ORDERED.

EDWARD F. HARRINGTON

United States Senior District Judge

Case 3:03-cv-00222-JBA    Document 129-3    Filed 07/12/2005    Page 18 of 20

LEXSEE 2000 US DIST LEXIS 21756

J&M CORPORATION, an Arizona corporation, Plaintiff, Vs. HARLEY-DAVIDSON, INC., a Wisconsin corporation, et al., Defendants.

No. CIV 97-2353 PHX RCB

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

*2000 U.S. Dist. LEXIS 21756*

February 9, 2000, Decided
February 10, 2000, Filed

**DISPOSITION:** [*1] Plaintiff's Motions for Partial Summary Judgment on Prosecution History Estoppel Defense, on Defendants' Patent Invalidity Defense, and on Defendants' Defenses of Laches, Equitable Estoppel, and Waiver granted. Plaintiff's Motion for Partial Summary Judgment on Defendants' Reissue Defense and Motion for a More Definite Statement denied as moot. Defendants' Motion for Summary Judgment granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent licensee filed a patent infringement claim against defendants motorcycle and audio equipment manufacturers. Defendants asserted affirmative defenses that the patent in question was invalid and void, that the doctrines of laches, estoppel, and waiver applied, and that the patent was unenforceable due to inequitable conduct. The patent licensee moved for partial summary judgment and defendants moved for summary judgment.

**OVERVIEW:** The motorcycle manufacturer originally contracted with the patent licensee to provide a double-clamp mounted helmet headset. Later, the motorcycle manufacturer contracted with the audio manufacturer for a single-clamp mounted headset. Inter alia, the court held that a patent examiner's original rejection and the subsequent amendment of one claim did not abolish claims regarding the single-clamp headset. Prosecution history estoppel did not preclude a range of equivalents encompassing the accused products' single-claim design. The single-clamp design was not equivalent to the dual-clamp limitation. The patent licensee failed to show a genuine issue of fact regarding equivalence. The court declined to consider the equivalency opinions of a patent attorney with no background in the art involved and another witness who was never designated as an expert in the case. The patent licensee's experts clearly compared the accused products to the patented invention as a whole or to limitations other than the dual clamp and failed to address the equivalence of a single clamp as opposed to dual clamps. The single-clamp design was a significant change from the patent's dual-clamp limitation.

**OUTCOME:** The court granted partial summary judgment as to the patent licensee's motions on the prosecution history estoppel defense, the patent invalidity defense, laches, equitable estoppel, and waiver. The court also granted summary judgment on the defendant's motion and terminated the case.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] To grant summary judgment, the court must determine that in the record before it there exists no genuine issue as to any material fact and, thus, that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c).* In determining whether to grant summary judgment, the court will view the facts and inferences from these facts in the light most favorable to the nonmoving party.

*Patent Law > Infringement Actions > Summary Judgment > General Overview*

Case 3:03-cv-00222-JBA    Document 129-3    Filed 07/12/2005    Page 20 of 20

Page 2
2000 U.S. Dist. LEXIS 21756, *

[HN2] Summary judgment is as appropriate in patent cases as in any other, provided that the standards of *Fed. R. Civ. P. 56* are met.

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN3] On a motion for summary judgment, if the nonmoving party bears the burden of proof on an element essential to one of his claims or defenses, that party must make a showing sufficient to establish a genuine issue as to the existence of the element. The moving party need offer no evidence tending to negate the existence of that element to gain summary judgment. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. A material fact is any factual dispute that might affect the outcome of the case under the governing substantive law. A factual dispute is genuine if the evidence is such that a reasonable jury could resolve the dispute in favor of the nonmoving party. A party opposing a motion for summary judgment cannot rest upon mere allegations or denials in the pleadings or papers, but instead must set forth specific facts demonstrating a genuine issue for trial. Finally, if the nonmoving party's evidence is merely colorable or is not significantly probative, a court may grant summary judgment.

*Patent Law > Infringement Actions > Doctrine of Equivalents > Fact & Law Issues*
*Patent Law > Infringement Actions > Claim Interpretation > Fact & Law Issues*
*Patent Law > Infringement Actions > Claim Interpretation > Scope*
[HN4] In analysis of a patent infringement claim, the first step is to construe the language of the patent claims asserted to be infringed and determine the meaning and scope of these claims. This step is known as claim construction and is a question of law to be decided by the court. The second step is to compare the properly construed patent claims to the accused device and determine whether the accused device infringes these claims. An accused device can infringe patent claims either literally or under the doctrine of equivalents.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN5] The question of whether the accused device infringes the patent claims is a question of fact.

*Patent Law > Infringement Actions > Burdens of Proof*
[HN6] In a patent infringement case, the burden lies on the plaintiff to prove infringement, literal or by equivalents, by a preponderance of the evidence.

*Patent Law > Infringement Actions > Claim Interpretation > Means Plus Function*
*Patent Law > Claims & Specifications > Description Requirement > General Overview*
[HN7] Claims of a means-plus-function type are permitted under *35 U.S.C.S. § 112,* para 6. Such means-plus-function claims contain elements expressed as a means or step for performing a specific function without the recital of structure, materials, or acts in support thereof. However, § 112 requires that a means-plus-function claim be construed to cover only the corresponding structure, material, or acts described in the specification and equivalents thereof.

*Patent Law > Infringement Actions > Doctrine of Equivalents > Elements > Equivalence*
*Patent Law > Claims & Specifications > Description Requirement > General Overview*
[HN8] In a patent infringement case, the doctrine of equivalents must be applied to individual elements of the patent claim, not to the invention as a whole. It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety. The Supreme Court imposed this limitation so that the doctrine of equivalents will not conflict with the definitional and public-notice functions of the statutory claiming requirement. The limitation has become known as the all elements rule.

*Patent Law > Infringement Actions > Doctrine of Equivalents > General Overview*
[HN9] The all elements rule is intricately connected to the equivalents analysis. The rule describes the manner in which a court must conduct the equivalents analysis. Specifically, when conducting this analysis, a court must assure that each individual element of the patent claim is found in the accused device, either literally or by equivalent.

*Patent Law > Infringement Actions > Prosecution History Estoppel > Fact & Law Issues*
*Patent Law > Infringement Actions > Doctrine of Equivalents > Fact & Law Issues*
*Patent Law > U.S. Patent & Trademark Office Proceedings > General Overview*
[HN10] Prosecution history estoppel is a well-established limit on the doctrine of equivalents. It estops a patent-holder from recapturing through equivalence subject matter that he or she surrendered during prosecution of the patent. A patent-holder can surrender