Case 3:03-cv-00222-JBA   Document 129-4   Filed 07/12/2005   Page 1 of 20

Page 3
2000 U.S. Dist. LEXIS 21756, *

subject matter during the prosecution either by a claim amendment made to overcome a rejection of patentability or by argument submitted to obtain the patent. In determining whether particular subject matter was surrendered, the standard is an objective one that depends on what a competitor reasonably would conclude from the patent's prosecution history. The determination of whether prosecution history estoppel applies is a question of law. However, the scope of estoppel can depend on factual questions regarding the prosecution history, which may be disputed.

*Patent Law > Infringement Actions > Prosecution History Estoppel > Abandonment & Amendment*
*Patent Law > Infringement Actions > Prosecution History Estoppel > Prosecution-Related Arguments & Remarks*
*Patent Law > Nonobviousness > Elements & Tests > Prior Art*
[HN11] In a patent infringement case, the defense of prosecution history estoppel applies only where patent claims were amended to surrender the claimed subject matter to avoid the prior art, or otherwise to address a specific concern -- such as obviousness -- that arguably would have rendered the claimed subject matter unpatentable. In other words, when the reason for the claim amendment was unrelated to any objection to patentability, the amendment may introduce a new element, but it does not preclude infringement by equivalents of that element.

*Patent Law > Claims & Specifications > Description Requirement > Elements*
[HN12] A patent specification must contain a written description of the invention, and of the manner and process of making and using it. *35 U.S.C.S. § 112*, para. 1. To meet this requirement, a patent specification must describe an invention and do so in sufficient detail that one skilled in the art can clearly conclude that 'the inventor invented the claimed invention.

*Patent Law > Infringement Actions > Doctrine of Equivalents > General Overview*
[HN13] In a patent infringement case, the doctrine of equivalents is not limited to equivalents that are disclosed within the patent itself.

*Patent Law > Infringement Actions > Doctrine of Equivalents > Elements > Ordinary Skill*
*Patent Law > Infringement Actions > Doctrine of Equivalents > Equitable Aspects*
*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
[HN14] Even if an accused device does not literally infringe a patent claim, infringement can still be found under the doctrine of equivalents. This doctrine has been judicially devised to do equity in situations where there is no literal infringement, but liability is nevertheless appropriate to prevent what is in essence a pirating of the patentee's invention. It prevents another from avoiding infringement by changing only minor or insubstantial details of a claimed invention while retaining their essential functionality. Whether a change is insubstantial is viewed from the perspective of one of ordinary skill in the art. The classic test for determining if an accused product is equivalent to a patent claim is the function, way, and result test. This test asks whether the accused device performs substantially the same function in substantially the same way to achieve substantially the same result. A court can also consider evidence of known interchangeability to one of ordinary skill in the art, copying, and designing around in determining whether the differences between the accused product and the claimed invention are insubstantial. Equivalence under *35 U.S.C.S. § 112*, para. 6, is somewhat distinct from the doctrine of equivalents. Equivalence under this statutory provision is related to means-plus-function patent claims.

*Patent Law > Infringement Actions > Doctrine of Equivalents > General Overview*
*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN15] Equivalence under *35 U.S.C.S. § 112*, para. 6, is somewhat distinct from the doctrine of equivalents. Equivalence under this statutory provision is related to means-plus-function patent claims.

*Patent Law > Infringement Actions > Claim Interpretation > Means Plus Function*
[HN16] See *35 U.S.C.S. § 112*, para. 6.

*Patent Law > Infringement Actions > Doctrine of Equivalents > Elements > Equivalence*
*Patent Law > Claims & Specifications > Description Requirement > General Overview*
*Patent Law > Claims & Specifications > Claim Language > Combination Claims*
[HN17] An accused device literally infringes a means-plus-function patent claim if it performs the same function using an identical or equivalent structure as that disclosed in the patent specification. In conducting an analysis under *35 U.S.C.S. § 112*, one compares the accused device to the specification, as opposed to an analysis under the doctrine of equivalents, where one compares the accused device to the claim. Though equivalency under § 112 and that under the doctrine of equivalents do therefore differ in certain respects, the test for determining equivalency remains essentially the same: Whether the issue is equivalency of a means that is

described in the specification to perform a function in a "means" clause of a combination claim (i.e., literal infringement), or equivalency to the claimed invention as a whole (i.e., infringement by the doctrine of equivalents), the test is the same three-part test of history: does the asserted equivalent perform substantially the same function in substantially the same way to accomplish substantially the same result. (In the case of "means" clauses, of course, the function is that stated in the claim.)

*Patent Law > Infringement Actions > Doctrine of Equivalents > Limits on Equivalence*
*Patent Law > Infringement Actions > Doctrine of Equivalents > Elements > General Overview*
*Patent Law > Claims & Specifications > Description Requirement > General Overview*
[HN18] In analysis of a patent infringement case one must compare an accused product to each element of the patent claim and not to the invention as a whole. Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and it is important to ensure that the application of the doctrine of equivalents, even as to an individual element, is not allowed such broad play as to effectively eliminate an element in its entirety. Regardless of the test applied, the essential inquiry in an equivalents analysis is whether the accused product or process contains elements identical or equivalent to each claimed element of the patented invention.

*Patent Law > Infringement Actions > Burdens of Proof*
*Patent Law > Inequitable Conduct > General Overview*
*Patent Law > Infringement Actions > Summary Judgment > General Overview*
[HN19] In a patent infringement case, the plaintiff must prove by a preponderance of the evidence that the accused products contain elements identical or equivalent to each claimed element of the patented invention, as the equivalents analysis is merely a method for proving infringement. The plaintiff must provide particularized testimony and linking argument as to the insubstantiality of the differences between the accused products and the patent claims. Though equivalence is a factual matter generally left to the trier of fact, the trial court should grant summary judgment in any case where no reasonable fact finder could find equivalence. To avoid summary judgment a patentee is required to proffer evidence that the accused device contains every claim element either exactly or by a substantial equivalent.

*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
*Patent Law > Infringement Actions > Doctrine of Equivalents > General Overview*
*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN20] In determining equivalency, the issue of whether an accused product constitutes only an insignificant change from the patented invention is to be viewed from the perspective of one of ordinary skill in the art.

*Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > Appeals*
*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
*Patent Law > Infringement Actions > Doctrine of Equivalents > General Overview*
[HN21] In determining equivalency in a patent infringement case, though a witness need not meet the standard of being one of ordinary skill in the art, the United States Court of Appeals for the Federal Circuit requires that a witness still qualify as an expert in order to render an opinion on technical aspects of equivalents.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
*Patent Law > Infringement Actions > Summary Judgment > General Overview*
[HN22] A party in a patent case cannot create a genuine issue of fact by having witnesses not qualified as experts in the relevant art render opinions of equivalents.

*Evidence > Witnesses > Expert Testimony*
[HN23] See *Fed. R. Civ. P. 26(a)(2)(B)*.

*Evidence > Witnesses > Expert Testimony*
[HN24] See *Fed R. Civ. P. 26(a)(2)(A)*.

*Patent Law > Infringement Actions > Infringing Acts > General Overview*
[HN25] A patent infringement plaintiff cannot prove infringement by comparing the accused infringing product to the patented product as a whole. The analysis must rather be conducted on a limitation-by-limitation basis.

*Patent Law > Infringement Actions > Doctrine of Equivalents > Elements > General Overview*
*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN26] Each element contained in a patent claim is deemed material to defining the scope of the patented invention and that in conducting the equivalents analysis one must be sure not to effectively eliminate an element in its entirety.

Case 3:03-cv-00222-JBA    Document 129-4    Filed 07/12/2005    Page 3 of 20

Page 5
2000 U.S. Dist. LEXIS 21756, *

*Patent Law > Infringement Actions > Infringing Acts > General Overview*
[HN27] An analysis of the role played by each element in the context of the specific patent claim informs the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN28] Every element of a patent claim is material.

*Patent Law > Inequitable Conduct > General Overview*
*Patent Law > Infringement Actions > Doctrine of Equivalents > General Overview*
[HN29] If a patent claim limitation must play a role in the context of the specific claim language, then an accused device which cannot play that role, or which plays a substantially different role, cannot infringe under the doctrine of equivalents.

*Patent Law > Infringement Actions > Doctrine of Equivalents > Functional & Structural Limitations*
*Patent Law > Claims & Specifications > Description Requirement > General Overview*
*Patent Law > U.S. Patent & Trademark Office Proceedings > Reissues > General Overview*
[HN30] For a patentee who has claimed an invention narrowly, there may not be infringement under the doctrine of equivalents in many cases, even though the patentee might have been able to claim more broadly. If it were otherwise, then claims would be reduced to functional abstracts, devoid of meaningful structural limitations on which the public could rely.

**COUNSEL:** For J&M CORPORATION, JOHN LAZZERONI, MELINDA CAREVICH, plaintiffs: Stephen Thomas Sullivan, Tish L Berard, Sullivan Law Group, Phoenix, AZ.

For J&M CORPORATION, plaintiff: James Lamar Sullivan, Logan & Geotas PLC, Phoenix, AZ.

For HARLEY-DAVIDSON INC, RADIO SOUND INC, defendants: Daniel D Maynard, Esq, Michael Dean Curran, Esq, Maynard Murray Cronin Erickson & Curran PLC, Phoenix, AZ. [*2]

For HARLEY-DAVIDSON INC, defendant: Michael E Husmann, Katherine W Schill, Michael Best & Friedrich LLP, Milwaukee, WI.

For RADIO SOUND INC, defendant: J Ralph King, Warren D Schickli, King & Schickli, Lexington, KY.

For HARLEY-DAVIDSON INC, RADIO SOUND INC, counter-claimants: Michael Dean Curran, Esq, Maynard Murray Cronin Erickson & Curran PLC, Phoenix, AZ.

For HARLEY-DAVIDSON INC, counter-claimant: Katherine W Schill, Michael Best & Friedrich LLP, Milwaukee, WI.

For RADIO SOUND INC, counter-claimant: J Ralph King, Warren D Schickli, King & Schickli, Lexington, KY.

For HARLEY-DAVIDSON INC, RADIO SOUND INC, counter-claimants: Daniel D Maynard, Esq, Maynard Murray Cronin Erickson & Curran PLC, Phoenix, AZ.

For HARLEY-DAVIDSON INC, counter-claimant: Michael E Husmann, Michael Best & Friedrich LLP, Milwaukee, WI.

For J&M CORPORATION, counter-defendant: Stephen Thomas Sullivan, Tish L Berard, Sullivan Law Group, James Lamar Sullivan, Logan & Geotas PLC, Phoenix, AZ.

**JUDGES:** Robert C. Broomfield, United States District Judge.

**OPINIONBY:** Robert C. Broomfield

**OPINION:**

ORDER

Plaintiff J&M Corporation ("J&M") has filed a patent infringement claim against Harley-Davidson, [*3] Inc. ("Harley-Davidson") and Radio Sound, Inc. ("Radio Sound") (collectively "Defendants"). Pending before the court are four motions for partial summary judgment filed by J&M and a motion for summary judgment filed by the Defendants. The court heard oral argument relating to all five of these motions on December 13, 1999, at which time it took the matter under advisement. Having carefully considered all the arguments raised by the parties, the court will now rule on these motions.

I. BACKGROUND

J&M is a designer, manufacturer, and seller of motorcycle audio accessories, including motorcycle helmet headsets. (Defs.' Proposed Findings of Fact ("DPFF") P 1.) It is the exclusive licensee of the patent at issue in this case, and the inventors of that patent are its president, John Lazzeroni, and vice president, Melinda Carevich. Defendant Harley-Davidson is engaged in the manufacture and sale of original equipment motorcycles

as well as parts and accessories for use on such motorcycles. (Id. P 2.) Defendant Radio Sound is engaged in the manufacture of motorcycle audio equipment, including helmet headsets. (Id. P 3.)

The patent at issue in this litigation is U.S. Reissue [*4] Patent No. 34,525 ( "525 patent"). This patent was originally issued as U.S. Patent No. 4,788,724 ( "724 patent") on December 6, 1988, and was then reissued as the 525 patent on February 1, 1994. (Id. PP 17-18.) The 525 patent includes seventeen claims. (Id. P 19.)

In its Second Amended Complaint, J&M alleges that Defendants' acts of making, using, and/or selling their motorcycle headset products, including but not necessarily limited to the Premium Stereo Helmet Headset (model or designation number 77147-98), constitute direct infringement of at least one claim of the 525 patent, literally and/or under the doctrine of equivalents. (Second Am. Compl. for Patent Infringement P 17.) J&M further alleges that Defendants' purported infringement of the 525 patent was willful. (Id. P 21.) Although J&M's complaint broadly alleges infringement of at least one claim of the 525 patent, its discovery responses have made clear that the only claims of the 525 patent at issue in this case are claims 3-7 and 15-17. (DPPF P 19.) Likewise, during the course of discovery the products alleged to have infringed the 525 patent have been limited to Harley-Davidson's headset model numbers [*5] 77147-98 and 77147-91C. (Defs.' Mem. of Points and Authorities in Supp. of Mot. for Summ. J. at 1; Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 1.)

In their answers to J&M's complaint, Defendants deny the allegation that products they manufacture and/or sell infringe the 525 patent literally or by equivalents. Defendants also raise two affirmative defenses. First, they both allege that the 525 patent is invalid and void due to lack of patentability under *35 U.S.C. § 102;* obviousness under *35 U.S.C. § 103;* failure to contain a written description of the invention as required by *35 U.S.C. § 112;* failure to satisfy the requirements of reissuance under *35 U.S.C. § 251* and *37 C.F.R. § 1.175;* and the doctrines of laches, estoppel, and waiver. Second, they both allege that the 525 patent is unenforceable due to inequitable conduct.

A. The 724 Patent

The original patent application and accompanying papers were filed with the U.S. Patent and Trademark Office ("PTO") on June 24, 1987. (Pl.'s Statement of Genuinely Disputed Material Facts ("PSOF") P 208; DPPF P 46.) The original [*6] application included seventeen claims. (PSOF P 208; DPPF P 47). Application claim 1 was an independent claim that stated as follows:

1. Helmet accessories for helmets of the type having an opening for viewing and receiving the head of a wearer, the opening having a lower edge with adjacent inside and outside helmet surfaces above the lower edge, said helmet accessories adapted to place a microphone attached at the end of a boom proximate the helmet wearer's mouth, the accessories comprising:

a microphone mount for attachment to an associated helmet, said microphone mount adapted to receive and secure an associated microphone boom for placing the microphone proximate the wearer's mouth; and

a plug mount for attachment to the associated helmet proximate said microphone mount, said plug mount adapted to receive and secure an associated electrical plug and provide for electrical connection from the electrical plug to the microphone through the boom secured by said microphone mount, to associated earphones located distal to the helmet whereby said microphone mount and plug mount secure the microphone in position and provide for electrical connections in order that the [*7] wearer may utilize the associated microphone, earphone, and audio instruments.

(Id.; Schill Decl., Ex. 3, File History, Tab 1 at 27.) Application claims 2 through 17 "depended from," or in other words added to, the features of the invention as recited in application claim 1. (PSOF P 208.) The dependent application claims relevant to the matter before this court are claims 2 through 10. These application claims read as follows:

2. The helmet accessories as defined in Claim 1 wherein both said microphone mount and said plug mount each include a clamp portion adapted to engage the lower edge of the associated helmet, said clamp portion comprising an outside elongated jaw and an inside elongated jaw, each said jaws having opposite first and second ends, and tightening means situated at said first end of each jaw to force both said jaws together, said outside and inside jaws adapted to forcibly

engage the outside surface and the inside surface above the lower edge of the helmet respectively with said first ends of both said outside and inside jaws below the edge of the helmet and the second ends of both said outside and inside jaws adjacent respectively the outside and [*8] inside surface of the helmet above the helmet edge.

3. The helmet accessories as defined in Claim 2 wherein each of said outside and inside jaws defines an arcuate shaped concavity therein, and a pair of gripping ridges in each of said concavity, each said concavity situated proximate said tightening means, said gripping ridges of said outside jaw and said inside jaw adapted to engage and hold to the outside surface and the inside surface above the edge of the helmet respectively with said tightening means situated below the edge of the helmet.

4. The helmet accessories as defined in Claim 3 wherein said tightening means comprises at least one machine bolt and nut, said machine bolt passing through said first end of both said outside and inside jaw, said machine bolt and nut operably tightening said jaws forcibly together.

5. The helmet accessories as defined in Claim 4 wherein said microphone mount includes a microphone boom seat attached to said outside jaw, said seat adapted to receive and secure the boom of a microphone, and to provide means for wires associated with the microphone to exit said seat.

6. The helmet accessories as defined in claim 5 wherein said microphone boom [*9] seat is attached to said outside jaw proximate said second end, said microphone boom seat thereby located proximate the outside surface of the helmet above the helmet edge.

7. The helmet accessories as defined in Claim 6 wherein said microphone boom seat includes a removable top cap, said cap removable to facilitate placement of the microphone boom therein for securing, and to facilitate exiting the wires associated with the microphone boom from said seat.

8. The helmet accessories as defined in Claim 7 wherein said microphone boom seat defines a separable elongated cylinder having a pair of oppositely situated circular openings, the first of said openings adapted to pass the microphone boom, and the second of said openings smaller than said first opening, said second opening comprising said means providing an exit for electrical wires connected to the microphone to exit from said seat, both said openings centered around a cylindrical longitudinal axis passing centrally through said boom seat.

9. The helmet accessories as defined in Claim 4 wherein said plug mount includes a plug seat attached to said outside jaw, said plug seat adapted to receive and secure the associated electrical [*10] plug, and to provide means for wires associated with the electrical plug to exit said seat.

10. The helmet accessories as defined in Claim 9 wherein said plug seat attached to said outside jaw comprises a plug seat attached to said outside jaw proximate said second end, said plug seat thereby located proximate the outside surface of the helmet above the helmet edge.

(Schill Decl., Ex. 3, File History, Tab 1 at 28-30.)

In the first office action, dated November 18, 1987, the examiner rejected application claims 1-3 under 35 U.S.C. § 103 for obviousness. (PSOF PP 209, 211; DPPF P 52.) Specifically, the examiner stated:

> Claims 1 through 3 are rejected under 35 U.S.C. § 103 as being unpatentable over admitted prior art when considered with the German document to Peiker and Hutchison. Pages 4 and 5 of the present application delineate prior art wherein a microphone mount clamps to a helmet and a plug mount is in the microphone mount. Figure 7 of Peikes [sic] discloses one form of structure that the admitted prior art clamp could obviously have taken. Wires to the Hutchison apparatus are mounted on the cap rather than the microphone [*11] or earphones. This teaching would have made obvious in the admitted prior art the adoption of a separate mount for the plug. Obviously a mount of the Peiker variety would have sufficed in this regard.

(Schill Decl., Ex. 3, File History, Tab 2 at 3.) The examiner also objected to application claims 4-17 as being dependent upon a rejected base claim, but stated that these claims "would be allowable if rewritten in independent form including all of the limitations of the base claim and any intervening claims." (Schill Decl., Ex. 3, File History, Tab 2 at 3-4; PSOF P 210; DPPF P 53.)

In response to this first office action, the applicants amended application claim 1 to expressly include the elements and limitations of application claims 2-4. (PSOF P 213; DPPF P 54.) Specifically, the applicants stated:

> Examiner rejects Claims 1-3 under 35 U.S.C. § 103 as being unpatentable over the submitted prior art when considered with the German patent document to Peiker and Hutchison. In regards to Examiner's rejection, and after due consideration, Applicants have amended Claim 1 to include the limitations of Claims 2-4, and in consequence thereof, respectfully [*12] submit that claim 1, as now amended, together with remaining Claims 5-17 comprise allowable subject matter, and allowance is respectfully requested.

(Schill Decl., Ex. 3, File History, Tab 3 at 8.) Application claim 1 was amended to state as follows:

> 1. Helmet accessories for helmets of the type having an opening for viewing and receiving the head of a wearer, the helmet opening having a lower side edge with adjacent inside and outside helmet surfaces above the lower side edge, said helmet accessories placing (adapting to place) a microphone attached at the end of a boom proximate the helmet wearer's mouth, the accessories comprising:
>
> a microphone mount for attachment to an associated helmet, said microphone mount adapted to receive and secure an associated microphone boom for placing the microphone proximate the wearer's mouth; and
>
> a plug mount for attachment to the associated helmet proximate said microphone mount, said plug mount adapted to receive and secure an associated electrical plug and provide for electrical connection from the electrical plug to the microphone secured by said microphone mount, to associated earphones located in the helmet, and to [*13] associated audio instruments located distal to the helmet;
>
> both said microphone mount and said plug mount each including an attached clamp portion engaging the lower side edge of the associated helmet, said clamp portion comprising an outside elongated jaw and an inside elongated jaw, each said jaws having opposite first and second ends, each said outside jaw and inside jaw second ends forcibly engaging the outside surface and the inside surface of the helmet above the lower side edge of the helmet respectively with each said outside jaw and inside jaw first end below the side edge of the helmet, each said jaw defining an arcuate shaped concavity situated between said first and second end and a pair of gripping ridges in each of said concavity, and tightening means situated at said first end of each said jaws to force said jaws together, said tightening means comprising at least one machine bolt and nut, said machine bolt passing through said first end of both said outside and inside jaw, said machine bolt and nut operably tightening said jaws forcibly together, said gripping ridges together with said second end engaging and holding said clamp portion and thus said microphone [*14] mount and said plug mount to the helmet by tightening said jaws together whereby said microphone mount and plug mount secure the microphone in position and provide for electrical connections in order that the wearer may utilize the associated microphone, earphones, and audio instruments.

(Schill Decl., Ex. 3, File History, Tab 3 at 2-3.) Because application claim 1 was amended to expressly include the elements and limitations of application claims 2-4, application claims 2-4 were canceled without prejudice by the applicants. (Id. at 4.) Application claims 5-10 remained essentially the same with only the following changes: application claim 5 was amended so as to refer to claim 1 rather than claim 4; application claim 9 was amended to refer to claim 1 rather than claim 4; and application claim 8 was amended to read as follows:

> 8. The helmet accessories as defined in Claim 7 wherein said microphone boom seat defines a separable elongated cylinder having a pair of oppositely situated circular openings, the first of said openings adapted to pass the microphone boom, and the second of said openings smaller than said first opening, said second opening comprising said [*15] means providing an exit for electrical wires connected to the microphone to exit from said seat, said second opening centrally situated with respect to said first opening (both said openings centered around a cylindrical longitudinal axis passing centrally through said boom seat).

(Id.)

Following the above-described amendments, the examiner issued a Notice of Allowability on June 13, 1988, in which all pending claims were allowed (i.e., application claims 1 and 5-17). In view of the Notice of Allowability, the PTO issued the 724 patent on December 6, 1988. In issuing the 724 patent, and in view of the March 21, 1998 amendment canceling application claims 2-4 to incorporate them into application claim 1, the application claims were renumbered as follows to obtain the patent claims: application claim 1 became patent claim 1; application claim 5 became patent claim 2; application claim 6 became patent claim 3; application claim 7 became patent claim 4; application claim 8 became patent claim 5; application claim 9 became patent claim 6; application claim 10 became patent claim 7; application claim 11 became patent claim 8; application claim 12 became patent claim 9; application [*16] claim 13 became patent claim 10; application claim 14 became patent claim 11; application claim 15 became patent claim 12; application claim 16 became patent claim 13; application claim 17 became patent claim 14. (PSOF P 217.)

B. The 525 Reissue Patent

The applicants filed the original reissue application and related papers on January 25, 1990, including a reissue declaration signed on January 19, 1990. (PSOF P 218; DPFF PP 60-61). In that declaration, the applicants stated that they were seeking reissue because "the original patent [is] partly inoperative because the original patent claims less than I had the right to claim." (DPFF P 64; Schill Decl., Ex. 3, File History, Tab 6 at 1.) The applicants proceeded to declare:

> In regard to my belief that the original patent is partly inoperative because the original patent claims less than I had the right to claim, independent Claim 1 of the original patent claims "a microphone mount . . . adapted to receive and secure an associated microphone boom" as well as "a plug mount adapted to receive and secure an associated electrical plug" wherein "both said microphone mount and said plug mount each (includes) an attached clamp portion [*17] . . . comprising an outside elongated jaw and an inside elongated jaw, each said jaws having opposite first and second ends"; original Claim 1 thus might be construed as requiring the microphone boom and the electrical plug to be attached to separate elements, thereby unduly restricting the scope of such claims, whereas I believe that a broader definition of my invention is warranted by the prior art. Specifically, I believe that my invention, as described in the original patent, properly includes within its scope an embodiment wherein the microphone boom and electrical plug are both attached to a single element; furthermore, I believe that my invention, as described in the original patent, properly includes methods for attaching accessories to helmets. Accordingly, I believe that Claim 1 might be construed too narrowly and fail to provide me with a scope of protection commensurate with the contribution to the art made by my invention.

(Schill Decl., Ex. 3, File History, Tab 6 at 1-2.)

In the original reissue application, the applicants submitted proposed application claims 15-20. These original application claims stated as follows:

> 15. A helmet accessory mount for [*18] helmets of the type having an opening for viewing and receiving the head of a wearer, the helmet opening having a lower side edge with adjacent inside and outside helmet surfaces above the lower side edge, the accessory mount placing a microphone attached at the end of a boom proximal to the helmet wearer's mouth, the accessory mount comprising:
> > a. outside and inside jaws each having opposite first and second ends, with an arcuate shaped cavity lined

with gripping ridges formed between the first and second ends, the second ends forceably engaging the inside and outside surfaces of the helmet and the first ends positioned below the side edge of the helmet;

b. means for attaching the microphone boom to one of the jaws so that a microphone can be placed near the helmet wearer's mouth;

c. means for attaching an electrical plug to one of the jaws to provide electrical connection from the electrical plug to the microphone, to associated earphones in the helmet, and to associated audio equipment located away from the helmet; and

d. a bolt passing through the first ends of the outside and inside jaws, the bolt having an associated nut, the bolt and nut operably tightening the jaws forceably [*19] together so that the gripping ridges and the second ends engage and hold the accessory mount on the helmet, thereby securing the microphone in position and providing electrical connections in order that the helmet wearer may use the associated microphone, earphones, and audio equipment.

16. The accessory mount of Claim 15 wherein both a distal end of the microphone boom and the electrical plug are operably attached to the second end of the outside jaw.

17. The accessory mount of Claim 16 wherein the means for attaching the distal end of the microphone boom and the electrical plug to the second end of the outside jaw comprises a housing attached to the second end of the outside jaw, the housing having an end proximal the helmet wearer's mouth, the proximal end adapted to enclose the distal end of the microphone boom, the housing also having an opposing distal end adapted to enclose the electrical plug, the proximal end of the housing having an opening to provide an exit for the microphone boom, and the distal end of the housing having an opening to provide an exit for wires associated with the electrical plug.

18. A method for mounting accessories to helmets of the type having [*20] an opening for viewing and receiving the head of a wearer, the helmet opening having a lower side edge with adjacent inside and outside helmet surfaces above the lower side edge, the accessory mount placing a microphone attached at the end of a boom proximal to the helmet wearer's mouth, the method comprising the steps of:

a. providing outside and inside jaws each having opposite first and second ends, with an accurate shaped cavity lined with gripping ridges formed between the first and second ends;

b. forceably engaging the inside and outside surfaces of the helmet with the second ends of the outside and inside jaws;

c. positioning the first ends of the outside and inside jaws below the side edge of the helmet;

d. attaching the microphone boom to one of the jaws so that a microphone can be placed near the helmet wearer's mouth;

e. attaching an electrical plug to one of the jaws to provide electrical connection from the electrical plug to the microphone, to associated earphones in the helmet, and to associated audio equipment located away from the helmet.

19. The method of Claim 18 wherein the step of attaching the microphone boom to one of the jaws includes [*21] the step of attaching a distal end of the microphone boom to the second end of the outside jaw and wherein the electrical plug is also attached to the second end of the outside jaw.

20. The method of Claim 19 wherein the steps of attaching the distal end of the microphone boom and the electrical plug to the second end of the outside jaw includes the steps of:

> a. attaching to the second end of the outside jaw a housing having an end proximal the helmet wearer's mouth, the housing proximal end adapted to enclose the distal end of the microphone boom, the housing having an opposing distal end adapted to enclose the electrical plug;
> b. providing in the proximal end of the housing an opening to supply an exit for the microphone boom; and
> c. providing in the distal end of the housing an opening to supply an exit for wires associated with the electrical plug.

(Schill Decl., Ex. 3, File History, Tab 5 at 13-16.)

In the first office action on the reissue application, dated September 13, 1990, the examiner rejected application claims 15-20. (PSOF P 220.) The examiner objected to the patent specification under *35 U.S.C. § 112*, P 1, "as failing to support [*22] the subject matter of claims 15 through 20 directed to a microphone boom and an electrical plug mounted on the same jaw pair," and rejected claims 15-20 based on that objection. (Id.; DPPF P 68; Schill Decl., Ex. 3, File History, Tab 7 at 2-3.) The examiner also rejected application claims 15-20 under *35 U.S.C. § 112*, P 2, "as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention." In this regard, the examiner noted that application claims 15-20 were inaccurate in that they were "directed to attachment of a microphone boom and electrical plug to a single pair of jaws; whereas each is described and shown as attached to a separate pair of jaws." (PSOF P 220; Schill Decl., Ex. 3, File History, Tab 7 at 3). Finally, the examiner rejected application claims 15-20 under *35 U.S.C. § 251* for failing to be drawn to the invention disclosed in the original patent. In this regard, the examiner stated as follows:

> [Claims 15-20] introduce new matter into the application in controversion of *35 U.S.C. § 251*. The invention disclosed in [*23] the original patent included a microphone mount attached to outside and inside jaws and a plug mount attached to other outside and inside jaws. The concept of both such mounts occurring on a single pair of jaws is not present in the original patent. Thus, claims 15 through 20 directed to this embodiment are drawn to new matter.

(PSOF P 220; DPPF P 67; Schill Decl., Ex. 3, File History, Tab 7 at 3-4.)

The applicants responded to the September 13, 1990 office action with an amendment and response filed on January 29, 1991. (PSOF P 221; Schill Decl., Ex. 3, File History, Tab 8.) In that amendment, the applicants canceled application claims 15-20 and added new application claims 21-23, which were written in a means-plus-function form as permitted by *35 U.S.C. § 112*, P 6. (PSOF P 221; DPPF PP 69-71; Schill Decl., Ex. 3, File History, Tab 8 at 1-3.) In a second office action dated May 3, 1991, the examiner rejected application claims 21-23 under *35 U.S.C. § 103* for obviousness. (PSOF P 224; DPPF P 73; Schill Decl., Ex. 3, File History, Tab 9.)

Subsequent to this second office action, applicants filed another amendment and response. [*24] (PSOF P 225; DPPF P 74; Schill Decl., Ex. 3, File History, Tab 10). Eventually, the applicants amended application claim 22 and added application claims 24 and 25. (PSOF P 227; DPPF P 80; Schill Decl., Ex. 3, File History, Tab 13.) After the examiner rejected these application claims on several occasions, the applicants amended them in a May 10, 1993 amendment and response. (PSOF PP 228-29; DPPF PP 82-83; Schill Decl., Ex. 3, File History, Tabs 15-16.) The examiner issued a notice of allowability on July 9, 1993. (Schill Decl., Ex. 3, File History, Tab 25.)

The 525 patent issued on February 1, 1994, and application claims 22, 24, and 25 became patent claims 15, 16, and 17. (DPPF P 94; Schill Decl., Ex. 1, 525 patent.) These patent claims read as follows:

> 15. An accessory mount for connection to a helmet having inner and outer surfaces

and a bottom edge, said accessory mount comprising in combination:

(a) gripping means for engaging the inner and outer surfaces of said helmet above the bottom edge, the gripping means including a fulcrum located below the bottom edge;

(b) a microphone boom having first and second ends;

(c) an electronic microphone connected to the first [*25] end of said microphone boom;

(d) means for attaching the second end of said microphone boom to said gripping means above said fulcrum and for supporting said microphone in proximity to the mouth of a person wearing said helmet;

(e) means for attaching an electrical plug to said gripping means above said fulcrum;

(f) means for providing separate electrical connections between the electrical plug and (i) said microphone,

(ii) at least one speaker in audio communication with the inner portion of the helmet, and (iii) electronic equipment external to said helmet.

16. The accessory mount of claim 15 wherein the gripping means is detachable from the helmet, and further comprising tightening means located between said fulcrum and said bottom edge for closing said gripping means on said helmet.

17. A method for mounting accessories to a helmet having inner and outer surfaces and a bottom edge, said method including the interchangeable steps of:

(a) securing a fulcrum including gripping means to the helmet by engaging the inner and outer surfaces thereof so that the fulcrum is below the bottom edge;

(b) securing one end of a microphone boom to the gripping means above said fulcrum; [*26]

(c) supporting an electronic microphone at the opposite end of the microphone boom and in proximity to the mouth of a person wearing the helmet;

(d) securing an electrical plug to the gripping means above said fulcrum;

(e) providing separate electrical connections between the electrical plug and (i) the electronic microphone,

(ii) at least one speaker in audio communication with the inside of the helmet, and (iii) electronic equipment external to the helmet.

(Schill Decl., Ex. 1, 525 patent, col. 12, lns. 13-56.)

C. The Accused Products

Harley-Davidson began buying headsets from J&M in late 1987 or early 1988. (DPFF P 160.) The headsets purchased were a commercial embodiment of the 724 patent and had a separate microphone mount and plug mount and used a separate clamp for each of the two mounts. (Id. PP 160-61; PSOF P 160.)

In the summer of 1989, Harley-Davidson decided to change its headset vendor and use Radio Sound instead of J&M. (DPFF P 162.) Harley-Davidson and Radio Sound thereafter entered into the process of designing a headset. During this process, in August and September of 1989, Harley-Davidson and Radio Sound received opinions of counsel regarding [*27] the 724 patent. (DPFF PP 166, 172.) The opinion letters concluded that integration of the microphone and plug mounts and use of a single clamping means would avoid the 724 patent. (Schill Decl., Exs. 21, 22.)

Defendants proceeded in about 1990 to manufacture a headset that used a single clamp integrating both the microphone boom seat and plug seat. (DPFF P 179.) The originally manufactured headsets placed the attachment points for the accessories below the bottom edge of the helmet. (PSOF P 204.) In 1997, however, Defendants altered the headsets and so introduced the headsets

accused by J&M, namely model numbers 77147-98 and 77147-91C. These accused headsets continue to use a single clamp integrating both the microphone boom seat and plug seat, but place the accessory attachment points above the bottom edge of the helmet. (Id. P 205; DPFF PP 97, 181.)

D. Preliminary Injunction Proceedings

J&M filed its original complaint in this action on November 12, 1997. On February 26, 1998, it filed a motion for a preliminary injunction seeking to enjoin Harley-Davidson n1 from making, using, offering for sale, selling, delivering, shipping, or transporting its motorcycle helmet headset [*28] model number 77147-98 or any other headset that infringes the 525 patent. The parties fully briefed the matter, and the court held a two-day evidentiary hearing on April 14-15, 1998.

---

n1 Radio Sound was not added as a defendant until February 16, 1999.

---

Following the evidentiary hearing, the court entered an order on May 14, 1998, denying J&M's motion for a preliminary injunction. The court concluded that based on the present evidence, J&M did not have a reasonable likelihood of proving that the Harley-Davidson headset infringes claims 3-7 and 15-17 of the 525 patent. In reaching this conclusion, the court construed the language of claims 3-7 and 15-17 and found that the accused product does not literally infringe these claims because it uses a single clamp while claims 3-7 and 15-17 disclose two clamps. The court then analyzed J&M's claim of infringement under the doctrine of equivalents and 35 U.S.C. § 112 equivalence. It noted that while the doctrine of equivalents and equivalence under [*29] § 112 differ in important respects, they each use an insubstantial change test to determine whether an accused device is equivalent. Under this test, the accused device is equivalent if, viewed from the perspective of one of ordinary skill in the art, it is an insubstantial change from the claimed invention that adds nothing of significance. The court also noted as an alternative test the triple identity test, which asks whether the accused device performs substantially the same overall function or work, in substantially the same way, to achieve substantially the same overall result as the claimed invention. The court found that J&M had not presented sufficient evidence of the characteristics of a person of ordinary skill in the art or whether such a person would consider the single clamp and dual clamp designs to be equivalent. It concluded that "because J&M has the burden of demonstrating infringement . . . and because evidence that a person of ordinary skill will view the claim and the corresponding component of the allegedly infringing device as equivalents is a necessary showing to demonstrate infringement under the doctrine of equivalents, . . . based on present evidence, J&M [*30] does not have a reasonable likelihood of proving that the Harley-Davidson headset infringes claims 3-7 and 15-17 under § 112 equivalence and/or the doctrine of equivalents." (Order dated May 13, 1998, at 18-19.) The court, however, did not reach a final conclusion as to whether the accused product is equivalent to claims 3-7 and 15-17 of the 525 patent. (See id. at 18.)

Following the court's denial of its motion for a preliminary injunction, J&M appealed the decision to the United States Court of Appeals for the Federal Circuit. The Federal Circuit affirmed the decision of this court without opinion.

II. STANDARD OF REVIEW

[HN1] To grant summary judgment, the court must determine that in the record before it there exists "no genuine issue as to any material fact" and, thus, "that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. In determining whether to grant summary judgment, the court will view the facts and inferences from these facts in the light most favorable to the nonmoving party. *Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)*. [HN2] Summary judgment is as appropriate [*31] in patent cases as in any other, provided that the standards of Rule 56 are met. See *SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1116 (Fed. Cir. 1985)*.

[HN3] If the nonmoving party bears the burden of proof on an element essential to one of his claims or defenses, that party must make a showing sufficient to establish a genuine issue as to the existence of the element. *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986)*. The moving party need offer no evidence tending to negate the existence of that element to gain summary judgment. *Id. at 323, 106 S. Ct. at 2553*.

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)*. A material fact is any factual dispute that might affect the outcome of the case under the governing substantive law. *Id. at 248, 106 S. Ct. at 2510*. A factual dispute [*32] is genuine if the evidence is such that a reasonable jury could resolve the dispute in favor of the nonmoving party. Id. A party opposing a motion for summary judgment cannot rest upon mere allegations or denials in

the pleadings or papers, but instead must set forth specific facts demonstrating a genuine issue for trial. See *id. at 250, 106 S. Ct. at 2511*. Finally, if the nonmoving party's evidence is merely colorable or is not significantly probative, a court may grant summary judgment. See, e.g., *California Architectural Build. Prods., Inc. v. Franciscan Ceramics, 818 F.2d 1466, 1468 (9th Cir. 1987)*.

III. DISCUSSION

J&M has filed a motion for partial summary judgment on Defendants' patent invalidity defense under *35 U.S.C. § 102*; a motion for partial summary judgment on Defendants' defenses of laches, equitable estoppel, and waiver; a motion for partial summary judgment on Defendants' reissue defense; and a motion for partial summary judgment on Defendants' prosecution history estoppel defense. In response to J&M's motion for partial summary judgment on the patent invalidity defense and its motion for partial summary [*33] judgment on the laches, equitable estoppel, and waiver defenses, Defendants state that they do not oppose those motions to the extent J&M's infringement claim is specifically limited to claims 3-7 and 15-17 of the 525 patent and the accused products are limited to Defendants' Premium Stereo Helmet Headset model numbers 77147-98 and 77147-91C. As discussed earlier by the court, J&M's infringement claim has been so limited during the course of this litigation. Accordingly, the court will grant J&M's motions for partial summary judgment on the Defendants' patent invalidity defense under *35 U.S.C. § 102* and on Defendants' laches, equitable estoppel, and waiver defenses. Defendants, however, have opposed J&M's motions for partial summary judgment on the reissue defense and on the prosecution history estoppel defense.

In their motion for summary judgment, Defendants seek judgment as a matter of law on three issues. First, they seek judgment as a matter of law that they did not infringe claims 3-7 and 15-17 of the 525 patent. Alternatively, they move for summary judgment that claims 3-7 and 15-17 of the 525 patent are invalid. Finally, they move for summary judgment [*34] on J&M's claim of willfulness. In relation to their assertion of non-infringement, Defendants argue that as a matter of law J&M is not entitled to a range of equivalents that would encompass the single clamp of the accused products. Alternatively, they argue that the undisputed facts establish that the accused products' single clamp is not the equivalent of the 525 patent's dual-clamp limitation and that J&M has no admissible evidence to prove otherwise. In relation to their request for judgment as a matter of law that claims 3-7 and 15-17 of the 525 patent are invalid, Defendants assert that the claims are invalid because the inventors failed to disclose the best mode known to them of practicing their invention; because if the claims are interpreted to cover the accused product, they are invalid for lack of a sufficient written description; because the reissue application did not meet the requirements of *35 U.S.C. § 251*; and because the claims were obvious to one of ordinary skill in the art at the time of the application for the patent.

The court notes that the arguments raised in J&M's motions for partial summary judgment on the reissue defense and on the [*35] prosecution history estoppel defense relate directly to arguments raised by Defendants in their motion for summary judgment. The parties in fact recognized the relatedness of the motions in their briefings. (See Defs.' Mem. of Points and Authorities in Opp. to Pl.'s Mot. for Partial Summ. J. on the Prosecution History Estoppel Defense at 5; Pl.'s Reply in Supp. of Mot. for Partial Summ. J. on Prosecution History Estoppel Defense; Defs.' Mem. of Points and Authorities in Opp. to Pl.'s Mot. for Partial Summ. J. on Reissue Defense at 2, 6; Pl.'s Reply in Supp. of Mot. for Partial Summ. J. on Reissue Defense.) Accordingly, the court will discuss J&M's motions for partial summary judgment in the context of its analysis of Defendants' motion for summary judgment. The court will begin with a discussion of the issue of infringement.

A. Defendants' Motion for Summary Judgment of Non-infringement of Claims 3-7 and 15-17 of the 525 Patent

J&M claims that the accused products infringe claims 3-7 and 15-17 of the 525 patent, of which it is the exclusive licensee. An infringement analysis involves two steps. *Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1581-82 (Fed. Cir. 1996)*. [*36] [HN4] The first step is to construe the language of the patent claims asserted to be infringed and determine the meaning and scope of these claims. See id. This step is known as claim construction and is a question of law to be decided by the court. See *Markman v. Westview Instruments, Inc., 517 U.S. 370, 372, 116 S. Ct. 1384, 1387, 134 L. Ed. 2d 577 (1996); Vitronics Corp., 90 F.3d at 1582*. The second step is to compare the properly construed patent claims to the accused device and determine whether the accused device infringes these claims. See id. An accused device can infringe patent claims either literally or under the doctrine of equivalents. See *Zelinski v. Brunswick Corp., 185 F.3d 1311, 1316 (Fed. Cir. 1999)*. [HN5] The question of whether the accused device infringes the patent claims is a question of fact. See *Insta-Foam Prods. v. Universal Foam Sys., 906 F.2d 698, 702 (Fed. Cir. 1990); Smithkline Diagnostics v. Helena Lab. Corp., 859 F.2d 878, 889 (Fed. Cir. 1988); SRI Int'l, 775 F.2d at 1116*. [HN6] The burden lies on J&M to prove infringement, literal or by equivalents, by

a preponderance [*37] of the evidence. *Lemelson v. United States, 752 F.2d 1538, 1547 (Fed. Cir. 1985).*

The court already engaged in the construction of claims 3-7 and 15-17 of the 525 patent in its prior order denying J&M's motion for a preliminary injunction. In constructing claims 3-7, the court analyzed the claims themselves, the specification, and the prosecution history. The court noted that claims 3-7 depend on claim 1, which contains the following language:

> both said microphone mount and said plug mount each including an attached clamp portion engaging the lower side edge of the said helmet...

(Schill Decl., Ex. 1, 525 Patent at col. 10, lns. 36-38 (emphasis added).) The court determined that this language necessitated two clamps, one for each the microphone mount and the plug mount. (See Order dated May 13, 1998, at 10.) In constructing claims 15-17, the court noted that these claims are of a [HN7] means-plus-function type, which is permitted under *35 U.S.C. § 112*, P 6. Such means-plus-function claims contain elements "expressed as a means or step for performing a specific function without the recital of structure, materials or acts [*38] in support thereof." *35 U.S.C. § 112*, P 6. However, *35 U.S.C. § 112* requires that a means-plus-function claim be construed to cover only "the corresponding structure, material, or acts described in the specification and equivalents thereof." Id. The court found that because the specification of the 525 patent discloses two separate clamps, claims 15-17 necessarily disclose a two-clamp design. (See Order dated May 13, 1998, at 14.)

Having determined that claims 3-7 and 15-17 require dual clamps, the court proceeded to the second step of determining whether the accused products infringe these claims as so construed. The court first found that no reasonable juror could determine that the accused products, which use a single clamp, literally infringe on claims 3-7 and 15-17 (See Order dated May 13, 1998, at 14-15.) The court then proceeded to analyze the infringement issue under the doctrine of equivalents. The court concluded that J&M had not presented sufficient evidence to show that it had a reasonable likelihood of proving that the accused products infringe claims 3-7 and 15-17 under the doctrine of equivalents. (See id. [*39] at 19.) The court, however, did not foreclose the possibility that J&M could subsequently produce such evidence. (See id. at 18.)

In their motion for summary judgment, Defendants argue that the court's determination that the accused products do not literally infringe claims 3-7 and 15-17 because these claims require dual clamps is correct and fully supported by the claim language, the specification, and the prosecution history of the 525 patent. In its response, J&M concedes that the court has already interpreted claims 3-7 and 15-17 to require two separate clamps, and it presents no evidence or argument otherwise. At oral argument, J&M's counsel again conceded that the court has already interpreted the patent claims to include a dual-clamp requirement, and he admitted that J&M has not moved to reconsider this interpretation and has in fact accepted and adopted this interpretation. J&M instead limits its argument to an assertion that the accused headsets' single-clamp design is an equivalent of the dual-clamp design claimed in the 525 patent. (See Pl.'s Opp. to Defs.' Mot. for Summ. J. at 5.) The court will accordingly limit its discussion to the issue of equivalents. [*40]

1. Is J&M Entitled to a Range of Equivalents That Would Encompass a Single-Clamp Structure?

Before reaching the issue of whether the single-clamp design is equivalent to the dual-clamp limitation of claims 3-7 and 15-17, Defendants assert that J&M is not entitled to any range of equivalents that would encompass the accused products' single-clamp element. Defendants argue that courts have recognized several limitations on the application of the doctrine of equivalents that must be applied as a matter of law. Defendants claim that three limiting principles apply in this case to bar J&M from asserting a range of equivalents that would encompass the accused products: (1) equivalents cannot be used to vitiate the all elements rule; (2) equivalents cannot be used to void a prosecution history estoppel; and (3) equivalents cannot be used to expand a claim beyond the scope of the patent's description of the invention.

a. All Elements Rule

In *Warner-Jenkinson Co. v. Hilton Davis Chemical Co., 520 U.S. 17, 117 S. Ct. 1040, 137 L. Ed. 2d 146 (1997)*, the Supreme Court confirmed the viability of the doctrine of equivalents. In doing so, however, the Court specifically [*41] limited the scope of the doctrine's application:

> [HN8] The doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole. It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety.

*117 S. Ct. at 1049.* The Supreme Court imposed this limitation so that the doctrine of equivalents will not conflict with the definitional and public-notice functions of the statutory claiming requirement. See id. at 1048-49. The limitation has become known as the all elements rule. See *Loral Fairchild Corp. v. Sony Corp., 181 F.3d 1313, 1327 (Fed. Cir. 1999)*, petition for cert. filed, *68 U.S.L.W. 3274* (Oct. 14, 1999); *Ethicon Endo-Surgery, Inc. v. United States Surgical Corp., 149 F.3d 1309, 1316 (Fed. Cir. 1998)*.

Defendants argue that J&M is trying to rewrite claims 3-7 and 15-17 to eliminate their limitation requiring two clamps. They urge that any finding that the accused devices' single clamp is equivalent to the dual-clamp limitation would ignore the role played by [*42] that limitation and, in effect, simply eliminate the limitation from the claims in violation of the all elements rule.

[HN9] The all elements rule is intricately connected to the equivalents analysis. The rule describes the manner in which a court must conduct the equivalents analysis. Specifically, when conducting this analysis, a court must assure that each individual element of the patent claim is found in the accused device, either literally or by equivalent. See *Vehicular Tech. Corp. v. Titan Wheel Int'l, 141 F.3d 1084, 1089 (Fed. Cir. 1998)*. Accordingly, the court will discuss Defendants' arguments relating to the all elements rule in the context of its subsequent analysis of whether the single-clamp design of the accused products is equivalent to the dual-clamp limitation of the 525 patent claims.

b. Prosecution History Estoppel

[HN10] Prosecution history estoppel is a well-established limit on the doctrine of equivalents. See *Warner-Jenkinson, 117 S. Ct. at 1049*. It estops a patent-holder from recapturing through equivalence subject matter that he or she surrendered during prosecution of the patent. *Loctite Corp. v. Ultraseal Ltd., 781 F.2d 861, 870 (Fed. Cir. 1985)*, [*43] overruled on other grounds by *Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059 (Fed. Cir. 1998)*. A patent-holder can surrender subject matter during the prosecution either by a claim amendment made to overcome a rejection of patentability or by argument submitted to obtain the patent. See *Haynes Int'l v. Jessop Steel Co., 8 F.3d 1573, 1579 (Fed. Cir. 1994); Townsend Eng'g Co. v. HiTec Co., Ltd., 829 F.2d 1086, 1090 (Fed. Cir. 1987)*. In determining whether particular subject matter was surrendered, the standard "is an objective one that depends on what a competitor reasonably would conclude from the patent's prosecution history." *Mark I Marketing Corp. v. Donnelley & Sons Co., 66 F.3d 285, 291 (Fed. Cir. 1995)*. The determination of whether prosecution history estoppel applies is a question of law. Id. However, "the scope of estoppel can depend on factual questions regarding the prosecution history, which may be disputed." *Hormone Research Found. v. Genentech, Inc., 904 F.2d 1558, 1564 (Fed. Cir. 1990)*.

In their motion for summary judgment, Defendants argue that the inventors surrendered [*44] subject matter that would encompass the accused headsets' single-clamp structure when they amended application claim 1 in response to the examiner's first office action on the 724 patent. In addition to opposing Defendants' motion for summary judgment on this issue, J&M has moved for partial summary judgment that it is not estopped under the doctrine of prosecution history estoppel from asserting that the accused headsets' single-clamp design infringes claims 3-7 and 15-17 of the 525 patent under the doctrine of equivalents. In support of its motion for partial summary judgment, J&M argues that the law of this case precludes Defendants from raising such a defense and that the prosecution history itself supports the determination that the inventors did not relinquish a single-clamp design.

The Supreme Court recently clarified the scope of the defense of prosecution history estoppel in relation to claim amendments. In Warner-Jenkinson, the court rejected an argument that the defense applies whenever a claim is amended during the course of prosecuting a patent. See *117 S. Ct. at 1049*. It held that [HN11] the defense instead applies only where patent claims were amended [*45] to surrender the claimed subject matter "to avoid the prior art, or otherwise to address a specific concern -- such as obviousness -- that arguably would have rendered the claimed subject matter unpatentable." See id. In other words, when the reason for the claim amendment was unrelated to any objection to patentability, the amendment may introduce a new element, but it does not preclude infringement by equivalents of that element. See id. at 1050-51.

Defendants argue that application claim 1 of the 724 patent, as originally proposed, sought protection for an assembly that included a microphone mount and a plug mount without any reference to the number of clamps to be used to attach those mounts to a helmet. Application claim 2 contained the language requiring dual clamps. Defendants contend that the inventors surrendered subject matter that would include a single-clamp headset when they amended application claim 1 to include the dual-clamp limitation of application claim 2 in response to the examiner's rejection of application claims 1-3 as unpatentable over the prior art.

Having reviewed the prosecution history, the court finds that the examiner's rejection and the subsequent [*46] amendment of application claim 1 did not cause a

relinquishment of subject matter encompassing a single-clamp headset. The examiner provided the following reason for rejecting application claims 1-3:

> Claims 1 through 3 are rejected under 35 U.S.C. § 103 as being unpatentable over admitted prior art when considered with the German document to Peiker and Hutchison. Pages 4 and 5 of the present application delineate prior art wherein a microphone mount clamps to a helmet and a plug mount is in the microphone mount. Figure 7 of Peiker discloses one form of structure that the admitted prior art clamp could obviously have taken. Wires to the Hutchison apparatus are mounted on the cap rather than the microphone or earphones. This teaching would have made obvious in the admitted prior art the adoption of a separate mount for the plug. Obviously a mount of the Peiker variety would have sufficed in this regard.

(Schill Decl., Ex. 3, File History, Tab 2 at 3.) The examiner went on to state that application claim 4 would be allowable if rewritten in independent form including all of the limitations of application claims 1-3. Application claim 4 recited the use [*47] of a machine bolt and nut for tightening the jaws of the clamps.

It is clear that the examiner did not reject application claims 1-3 due to their failure to require dual clamps. The examiner rather concluded that prior art disclosed in the patent application incorporated all of the elements of application claims 1-3 except the requirement of separate microphone and plug mounts. The examiner further concluded that the prior art made obvious the separation of the microphone and plug mounts. Therefore, the examiner did not reject application claims 1-3 because they failed to require dual clamps. Application claim 2, in fact, required dual clamps. The examiner rather determined that all of the elements of application claims 1-3, including the dual-clamp limitation, were delineated in or made obvious by the prior art.

Because the examiner did not reject application claims 1-3 due to their failure to require dual clamps, the amendment of application claim 1 did not surrender subject matter encompassing a single-clamp headset. The doctrine of prosecution history estoppel does not preclude J&M from seeking a range of equivalents encompassing the accused products' single-clamp design. To [*48] the extent it already reached this determination in its order denying J&M's motion for a preliminary injunction, the court finds no reason to alter its conclusion. n2 Accordingly, the court will grant J&M's motion for partial summary judgment on the Defendants' prosecution history estoppel defense.

> n2 Defendants argue that the court's earlier conclusion should not be followed because it was based on the erroneous factual determination that claims 2-4, which emphasized the microphone boom seat feature, were added in response to the first office action and were what convinced the examiner that the invention was patentable. Although this factual determination was incorrect because claims 2-4 were not added in response to the first office action, the determination is not relevant to the court's present conclusion that prosecution history estoppel does not apply. Prosecution history estoppel does not apply because the examiner did not reject application claims 1-3 for failing to require dual clamps.

c. Expansion [*49] of Claims Beyond the Scope of the Patent's Description of the Invention

Defendants argue that the law requires that [HN12] a specification "contain a written description of the invention, and of the manner and process of making and using it." 35 U.S.C. § 112, P 1. To meet this requirement, "a patent specification must describe an invention and do so in sufficient detail that one skilled in the art can clearly conclude that 'the inventor invented the claimed invention.'" *Regents of Univ. of Cal. v. Eli Lilly & Co., 119 F.3d 1559, 1566 (Fed. Cir. 1997)* (quoting *Lockwood v. American Airlines, 107 F.3d 1565, 1572 (Fed. Cir. 1997))*, cert. denied, *118 S. Ct. 1548 (1998)*. Defendants assert that the 525 patent lacks an adequate written description of any claim broad enough to encompass the single-clamp feature of the accused headsets.

In response to the Defendants' argument regarding the requirement of a written description, J&M notes that the Defendants failed to provide any legal authority suggesting that the doctrine of equivalents in and of itself has incorporated a written description requirement. According to J&M, [*50] Defendants' argument is in essence an argument for patent invalidity under the written description requirement of *35 U.S.C. § 112*, P 1.

The court agrees with J&M's assessment of Defendants' argument. The doctrine of equivalents imposes no requirement of a specific written description. The Supreme Court, in fact, has held that [HN13] the doctrine is not limited to equivalents that are disclosed within the patent itself. See *Warner-Jenkinson, 117 S. Ct. at 1052-53*. Defendants' argument that the 525 patent lacks a sufficient written description is better

characterized as an argument supporting patent invalidity, not as a limitation on the doctrine of equivalents. Accordingly, the court will proceed to analyze the issue of equivalency between the accused products and claims 3-7 and 15-17 of the 525 patent.

2. Is the Single-Clamp Structure of the Accused Products Equivalent to the Dual-Clamp Limitation of Claims 3-7 and 15-17 of the '525 Patent?

J&M argues that, though the court has determined that the accused products do not literally infringe the 525 patent, it has presented sufficient evidence of equivalence to withstand Defendants' motion for [*51] summary judgment of non-infringement. [HN14] Even if an accused device does not literally infringe a patent claim, infringement can still be found under the doctrine of equivalents. See *Sage Prods. v. Devon Indus.*, 126 F.3d 1420, 1423 (Fed. Cir. 1997). This doctrine "has been 'judicially devised to do equity' in situations where there is no literal infringement, but liability is nevertheless appropriate to prevent what is in essence a pirating of the patentee's invention." *Texas Instruments v. United States Int'l Trade Comm'n*, 988 F.2d 1165, 1173 (Fed. Cir. 1993). It prevents another "from avoiding infringement by changing only minor or insubstantial details of a claimed invention while retaining their essential functionality." *Sage Prods.*, 126 F.3d at 1424. Whether a change is insubstantial is viewed from the perspective of one of ordinary skill in the art. *Valmont Indus. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1043 (Fed. Cir. 1993). The classic test for determining if an accused product is equivalent to a patent claim is the function, way, and result test. This test asks whether the accused device performs substantially the [*52] same function in substantially the same way to achieve substantially the same result. See *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608, 70 S. Ct. 854, 856, 94 L. Ed. 1097 (1950). A court can also consider "evidence of known interchangeability to one of ordinary skill in the art, copying, and designing around" in determining whether the differences between the accused product and the claimed invention are insubstantial. See *Texas Instruments v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996), cert. denied, 520 U.S. 1228, 117 S. Ct. 1818, 137 L. Ed. 2d 1027 (1997).

[HN15] Equivalence under 35 U.S.C. § 112, P 6, is somewhat distinct from the doctrine of equivalents. Equivalence under this statutory provision is related to means-plus-function patent claims. Claims 15-17 of the 525 patent are such means-plus-function claims. The provision provides as follows:

> [HN16] An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover [*53] the corresponding structure, material, or acts, described in the specification and equivalents thereof.

35 U.S.C. § 112, P 6 (emphasis added). Accordingly, [HN17] an accused device literally infringes a means-plus-function patent claim if it performs the same function using an identical or equivalent structure as that disclosed in the patent specification. See *Texas Instruments v. United States Int'l Trade Comm'n*, 805 F.2d 1558, 1571 (Fed. Cir. 1986). In conducting an analysis under section 112, one compares the accused device to the specification, as opposed to an analysis under the doctrine of equivalents, where one compares the accused device to the claim. See id. Though equivalency under section 112 and that under the doctrine of equivalents do therefore differ in certain respects, the test for determining equivalency remains essentially the same:

> Whether the issue is equivalency of a means that is described in the specification to perform a function in a "means" clause of a combination claim (i.e., literal infringement), or equivalency to the claimed invention as a whole (i.e., infringement by the doctrine of equivalents), [*54] the test is the same three-part test of history: does the asserted equivalent perform substantially the same function in substantially the same way to accomplish substantially the same result. (In the case of "means" clauses, of course, the function is that stated in the claim.)

Id.

In their briefings, the parties simultaneously discussed the equivalency of the accused products to claims 3-7 and claims 15-17 of the 525 patent. The court will do likewise here, as it already construed both claims 3-7 and the specification for claims 15-17 to require dual clamps. The issue remaining to be resolved for both sets of claims is whether their requirement of dual clamps is equivalent to the accused devices' single-clamp structure.

As noted, the Supreme Court recently clarified the scope of the equivalents analysis. In Warner-Jenkinson, the Court held that [HN18] one must compare an accused product to each element of the patent claim and not to the invention as a whole. See 117 S. Ct. At 1049. The Court set forth this clarification because "each element

contained in a patent claim is deemed material to defining the scope of the patented invention," and "it is important to ensure [*55] that the application of the doctrine [of equivalents], even as to an individual element, is not allowed such broad play as to effectively eliminate [an] element in its entirety." See id. The court also held that, regardless of the test applied, the essential inquiry in an equivalents analysis is whether "the accused product or process contain[s] elements identical or equivalent to each claimed element of the patented invention." See *117 S. Ct. at 1054*.

[HN19] J&M must prove by a preponderance of the evidence that the accused products contain elements identical or equivalent to each claimed element of the patented invention, as the equivalents analysis is merely a method for proving infringement. See *S. Bravo Sys. v. Containment Tech. Corp., 96 F.3d 1372, 1376 (Fed. Cir. 1996); Lemelson, 752 F.2d at 1547*. J&M must provide particularized testimony and linking argument as to the insubstantiality of the differences between the accused products and the patent claims. See *Cypress Semiconductor Corp., 90 F.3d at 1567*. Though equivalence is a factual matter generally left to the trier of fact, see *Sage Prods., 126 F.3d at 1423;* [*56] *Insta-Foam Prods., 906 F.2d at 702*, "the trial court should grant summary judgment in any case where no reasonable fact finder could find equivalence." *Sage Prods., 126 F.3d at 1423;* see also *S. Bravo Sys., 96 F.3d at 1376* ("To avoid summary judgment [a patentee is] required to proffer evidence that [the accused device] contains[s] every claim element either exactly or by a substantial equivalent.").

J&M argues that the equivalents analysis is a factual determination and that the court must therefore approach Defendants' motion for summary judgment of non-infringement "with a care proportioned to the likelihood of its being inappropriate." See *SRI Int'l, 775 F.2d at 1116*. It maintains that it has presented sufficient evidence that the single-clamp structure of the accused headsets is equivalent to the dual-clamp limitation of claims 3-7 and 15-17. It relies on the following evidence in making this assertion: the expert report and the declaration of Mark Kinder, an expert in the field of plastic product design; the expert report and the declaration of David Weinstock, an expert in the field of motorcycle audio [*57] and helmet headsets; the expert report of John Howell, a patent law expert; and the declaration of John Lazzeroni, a co-inventor of the 525 patented headset.

Defendants, on the other hand, argue that the evidence proffered by J&M in support of its claim of equivalence is deficient in two respects and, thus, is not sufficient to create a genuine issue of fact as to whether the accused products are equivalent to the claims of the 525 patent. Defendants first contend that the opinions voiced by Mr. Howell, Mr. Kinder, and Mr. Lazzeroni that the accused products are equivalent to claims 3-7 and 15-17 are insufficient to create a triable issue of fact because these three individuals are not competent to render an opinion on equivalents. Defendants' second contention is that the expert opinions voiced by Mr. Howell, Mr. Kinder, and Mr. Weinstock are based on an incorrect analysis of equivalents. Specifically, Defendants claim that these individuals reached their opinions of equivalence by comparing the accused products to the patent claims as a whole rather than to the specific element literally missing from the accused products, i.e., the dual-clamp limitation. Defendants assert that [*58] once J&M's evidence is discounted as deficient, the undisputed evidence demonstrates that the single-clamp structure of the accused product is not equivalent to the dual-clamp limitation of the 525 patent.

a. J&M's Proffered Evidence of Equivalency

The court will first examine the Defendants' argument that the opinions of equivalency rendered by Mr. Howell, Mr. Kinder, and Mr. Lazzeroni are inadmissible due to their incompetency to render such an opinion. Each of these witnesses has set forth an opinion that the accused products' single-clamp structure is equivalent to the dual-clamp limitation. n3 Defendants argue that only a person of ordinary skill in the relevant art can render such an opinion of equivalency and that these three individuals are not so skilled. J&M, on the other hand, contends that while equivalency is to be viewed from the perspective of a person of ordinary skill in the art, this standard merely sets forth a hypothetical construct of a person, and a witness is not disqualified from rendering an opinion of equivalency merely because he or she does not meet this hypothetical construct. J&M further argues that Mr. Kinder is a person of ordinary skill in an [*59] art relevant to motorcycle headsets, namely the field of plastic product design.

---

n3 In his expert report, Mr. Howell opines "that each and every element recited in Claims 3, 7, 15 and 16 is present in the Harley Davidson headset either literally or by equivalents." (Schill Decl., Ex. 7, Expert Report of John M. Howell, at 5.) In his expert report, Mr. Kinder states, "It is my opinion that a person of ordinary skill in the art would recognize that the single clamp design is the equivalent of the two clamp design shown in illustration of the 34,525 patent; and the change from a two piece design to a one piece design represents an insignificant change." (Schill Decl., Ex. 8, Expert Report of Mark E. Kinder, at

5.) Mr. Lazzeroni states, "I believe the mount of the Accused Headsets is equivalent to the separate microphone mount and plug mount as claimed in claims 3-7, and the 'gripping means' of claims 15-17, because it represents merely a trivial and insignificant change from the use of a slightly separated microphone mount and plug mount, as shown and described in the 525 patent. (Decl. of John J. Lazzeroni P 9.)

[*60]

[HN20] In determining equivalency, the issue of whether an accused product constitutes only an insignificant change from the patented invention is to be viewed from the perspective of one of ordinary skill in the art. See *Valmont Indus., 983 F.2d at 1043*. Relying on *Endress + Hauser, Inc. v. Hawk Measurement Systems Pty. Ltd., 122 F.3d 1040, 1042 (Fed. Cir. 1997)*, J&M argues that this standard is merely a hypothetical construct and that an objection that a witness is not such a person is without merit. [HN21] Though holding that a witness need not meet the standard of being one of ordinary skill in the art, the Federal Circuit in Endress made it clear that a witness must still qualify as an expert in order to render an opinion on technical aspects of equivalents. See id. Accordingly, J&M's witnesses must qualify as experts in order to render opinions on the issue of equivalents.

Clearly neither Mr. Howell nor Mr. Lazzeroni is qualified as an expert to render an opinion regarding the technical aspects of equivalents in this case. Mr. Howell is a patent attorney with no background in the art involved here, and Mr. Lazzeroni was never designated as an expert [*61] in this litigation. n4 Therefore, the court will not consider the opinions of these two witnesses on the issue of equivalency. [HN22] J&M cannot create a genuine issue of fact by having witnesses not qualified as experts in the relevant art render opinions of equivalents. n5

---

n4 At oral argument, J&M argued that Mr. Lazzeroni was not required to provide an expert report because he is a party to this action. J&M apparently relies on [HN23] *Fed. R. Civ. P. 26(a)(2)(B)* in making this argument. That Rule provides as follows:

> This disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness.

The court, however, need not decide whether Mr. Lazzeroni was required to provide an expert report pursuant to Rule 26(a)(2)(B) because not only did J&M not provide such a report for Mr. Lazzeroni, it never identified him as an expert witness in this litigation. [HN24] Rule 26(a)(2)(A) states as follows:

> In addition to the disclosures required by paragraph (1), a party shall disclose to other parties the identity of any person who may be used at trial to present evidence under *Rules 702, 703, or 705 of the Federal Rules of Evidence*.

Even if Mr. Lazzeroni was not subject to the requirements of Rule 26(a)(2)(B), he was subject to the requirements of Rule 26(a)(2)(A). Accordingly, because J&M failed to ever identify him as an expert, the court will not consider his expert opinion in the context of analyzing Defendants' motion for summary judgment. [*62]

n5 Even if the court considered the opinions of Mr. Howell and Mr. Lazzeroni, those opinions suffer from the further defect of being based on an incorrect analysis of equivalents, comparing the accused products to the invention of the 525 patent as a whole. The court discusses this same problem with the opinions of Mr. Kinder and Mr. Weinstock, infra.

---

With respect to Mr. Kinder, Defendants do not dispute in their motion for summary judgment that he is an expert in the field of plastic product design. Defendants rather argue that plastic product design is not an art to which the 525 patent pertains. They contend that the only art pertaining to the patent is that of designing accessories for helmets. The court disagrees with Defendants' argument, as the mounts of the patented headset are constructed of plastic. It is these mounts that are directly at issue in this case. Accordingly, the court will consider Mr. Kinder's opinion on the issue of equivalents.

Defendants next contend that the opinions of J&M's various experts are insufficient to create a genuine issue of fact that the accused [*63] headsets' single-clamp structure is equivalent to the dual-clamp limitation because the opinions are based on an erroneous analysis of equivalents. They claim that J&M's experts reached their opinions of equivalents by comparing the accused

headsets to the patented invention as a whole and not to the individual element of dual clamps, in direct contravention of the Supreme Court's holding in Warner-Jenkinson.

After Warner-Jenkinson, it is clear that [HN25] J&M cannot prove infringement by comparing the accused headsets to the patented headset as a whole. The analysis must rather be conducted on a limitation-by-limitation basis. See *Vehicular Tech. Corp., 141 F.3d at 1092.* In other words, here the analysis must focus on whether the limitation of claims 3-7 and 15-17 not literally present in the accused headsets, i.e., the dual-clamp limitation, is present by an equivalent in the accused headsets, not on whether the accused headsets are similar to the overall structure of the patented invention. If J&M's experts reached their opinions regarding equivalents using the incorrect standard of an overall comparison, those opinions do not constitute admissible evidence sufficient [*64] to create a genuine issue of fact. See id.

Defendants cite several passages from the expert reports and deposition testimony of Mr. Kinder and Mr. Weinstock in support of their assertion that these two experts based their opinion of equivalence on an overall comparison of the accused products to the patented invention. n6 In addition, having reviewed the expert reports and deposition testimony of these two witnesses, the court finds other passages equally relevant to the Defendants' argument.

---

n6 Defendants also cite passages from Mr. Howell's expert report in support of their assertion that he conducted a legally incorrect analysis of equivalents. Because the court has already determined that Mr. Howell is not competent to render an opinion on the technical issue of equivalents, it need not consider the Defendants' alternative argument.

---

In his expert report, Mr. Kinder states as follows:

> In my opinion, incorporating both the microphone and electrical plug into the same clamp assembly, as done on the [*65] Harley Davidson product, does not deviate from the basic design concept of the 34,525 patent, as it would be viewed by a person of ordinary skill in the art. Further, it is my opinion that a person of ordinary skill in the art would recognize that the single clamp design is the equivalent of the two clamp design shown in illustration of the 34,525 patent; and the change from a two piece design to a one piece design represents an insignificant change. The approximate placement of the microphone attachment point and electrical plug attachment point are not the critical features of this design. The clamp geometry provides a novel and unique method of attachment. Locating the microphone separate from the plug is simply a versatile method to allow one configuration to fit different helmet skirts.

(Schill Decl., Ex. 8, Expert Witness Report of Mark E. Kinder at 4-5.) In addition, Mr. Kinder gave the following testimony during his deposition:

> Q: Is the single clamp design the whole product, the whole configuration that you are showing in your hand there?
> A: Yes, sir, that's what I referred to when I said single clamp design.
> Q: So that would include the placement of the [*66] microphone seat and the plug seat, correct?
> A: Yes, sir.
> Q: Okay. You say that the single clamp design is equivalent to the two clamp design, correct?
> A: Yes, sir.
> Q: What standard did you apply to determine whether or not the two were equivalent?
> . . . .
> A: I looked at how the clamping mechanism itself worked, how it located the product relative to the skirt of the helmet. And again I used the term "product" and "design" synonymously.

(Schill Decl., Ex. 18, Dep. of Mark E. Kinder, at 66-67.)

Mr. Weinstock offers the following opinion in his expert report:

> Since the release of the original 'dual clamp' mounting system there have been several 'single clamp' systems available, including the most recent Harley Davidson 'premium headset.' It is my opinion that though there have been some minor cosmetic and technical changes in these units, such as the placing of the electrical connector above the boom connector, these changes are insignificant, and the 'clamping' feature is equivalent to the original 'dual clamp' unit. The primary

difference in the single clamp unit is that they are somewhat easier to install reducing the installation time, but they all still incorporate [*67] the concept and design features of the original 'dual clamp' unit placing the plug and wiring above the bottom edge of the helmet.

(Schill Decl., Ex. 17, Expert Witness Report of David S. Weinstock, at 5.) Furthermore, Mr. Weinstock testified as follows during his deposition:

> Q: Okay. So you're looking at the overall headset and comparing it to --
> A: I'm looking at the clamping mechanism that goes on the helmet.
> Q: Okay. What do you define as the clamping mechanism?
> A: The -- the mechanism that clamps the device to the helmet and holds it in place, that holds the microphone seat as well as the plug seat.
> Q: Okay. So you're talking about the clamps as well as the seats in their combinations, correct?
> A: That's correct.
> Q: And you're comparing that combination to the J&M product that had a dual clamp and the J&M product that had the single clamp; is that right?
> A: That is correct.
> Q: And that is what you determined to be equivalent?
> A: That's correct.

(Schill Decl., Ex. 6, Dep. of David S. Weinstock, at 100-01.)

Having reviewed the expert reports and deposition transcripts of Mr. Kinder and Mr. Weinstock, the court agrees with Defendants that these two [*68] experts relied on an impermissible comparison of the accused headsets to the overall patented invention rather than to the single relevant limitation of dual clamps. They both focused on similarities between the accused headsets and the patented invention as a whole, or limitations of the patented invention other than the requirement of dual clamps. For instance, in his report Mr. Kinder found that the accused product "does not deviate from the basic design concept of the 34,525 patent." (Schill Decl., Ex. 8, Expert Witness Report of Mark E. Kinder at 4 (emphasis added).) Furthermore, during his deposition Mr. Kinder testified that in concluding that the single-clamp design is equivalent to the dual-clamp limitation, he referred to the whole product, including the placement of the microphone seat and plug seat in relation to the skirt of the helmet, when comparing the two designs. (Schill Decl., Ex. 18, Dep. of Mark E. Kinder, at 66-67.) The problem with such an analysis is that the placement of the microphone seat and plug seat above the bottom edge of the helmet is another limitation of the 525 patent, separate and distinct from the dual-clamp limitation. The fact that the accused [*69] headsets literally meet the limitation of placing the seats above the bottom edge of the helmet does not end the equivalents analysis. The accused headsets must separately meet each and every limitation of claims 3-7 and 15-17, including the requirement of dual clamps. See *S. Bravo Sys., 96 F.3d at 1376*. Instead of analyzing the role played by the dual-clamp limitation, see *Warner-Jenkinson, 117 S. Ct. at 1054*, Mr. Kinder simply concluded that the number of clamps used is not the critical feature of the patented invention. (See Schill Decl., Ex. 8, Expert Witness Report of Mark E. Kinder, at 5.) n7 Such a conclusion, however, is insufficient to support a finding of equivalence. The Supreme Court has made it clear that "[HN26] each element contained in a patent claim is deemed material to defining the scope of the patented invention" and that in conducting the equivalents analysis one must be sure not to "effectively eliminate [an] element in its entirety." *Warner-Jenkinson, 117 S. Ct. at 1049*. The reason for such caution is to prevent the doctrine of equivalents from conflicting with the public-notice function of the statutory claiming [*70] requirement. See id.

-----

n7 On several occasions in its opposition to Defendants' motion for summary judgment, J&M made the like assertion that the number of clamps used is a trivial and insignificant variation on the basic design of the patented headset. (See Pl.'s Opp. to Defs.' Mot. for Summ. J. at 9, 18, 25.)

-----

Like Mr. Kinder, Mr. Weinstock bases his opinion of equivalence on a comparison of the accused headsets to the overall patented invention, with little or no analysis of the role played by the dual-clamp limitation. In his expert report, Mr. Weinstock concludes that the single-clamp design "incorporates the concept and design features of the . . . 'dual clamp' unit placing the plug and wiring above the bottom edge of the helmet." (Schill Decl., Ex. 17, Expert Witness Report of David S. Weinstock, at 5.) And in his deposition, Mr. Weinstock testified that in performing his equivalents analysis he compared the combination of the clamps and the seats of the accused products and the patented invention. [*71] (See Schill Decl., Ex. 6, Dep. of David S. Weinstock, at 100-01.)