UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

VICTOR G. REILING ASSOCIATES and
DESIGN INNOVATION, INC.,

Index No.:  3:03 CV 222 (JBA)

                              Plaintiffs,

    - against -

FISHER-PRICE, INC.,

May 23, 2005

                              Defendant.

# MEMORANDUM OF LAW IN OPPOSITION TO
# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Gregory J. Battersby (Bar No. 7386)
Edmund J. Ferdinand, III (Bar No. 21287)
Russell D. Dize (Bar No. 23064)
Susan Schlesinger (Bar No. 26625)
GRIMES & BATTERSBY, LLP
488 Main Avenue, Third Floor
Norwalk, Connecticut 06851-1008
(p) (203) 849-8300
(f) (203) 849-9300

Attorneys for Plaintiffs Victor G. Reiling
Associates and Design Innovation, Inc.

## Table of Contents

**Page**

TABLE OF AUTHORITIES ................................................................................... iv

PRELIMINARY STATEMENT ............................................................................ 1

FACTUAL BACKGROUND ................................................................................ 4

    The Parties ................................................................................................ 4

    Relationship Between Reiling and DI ........................................................ 5

    Prior Agreements With Fisher-Price ......................................................... 6

    Toy Industry Custom and Practice ............................................................ 9

    Plaintiffs' Submissions to F-P and Definition of the "Concept" ................ 10

    The 1998 Execution of Plaintiffs' Concept .............................................. 11

    The Option Agreement ............................................................................ 13

    The 1999 Execution of Plaintiffs' Concept .............................................. 15

    The 2000 Execution of Plaintiffs' Concept .............................................. 15

    Access to Plaintiffs' Submissions ............................................................. 16

    Plaintiffs' Discovery of F-P's Repeated and Blatant
    Unauthorized Use of Their Concept in the "Rescue Heroes" Line ............ 17

    Plaintiffs' Concept Was Novel When Submitted to F-P ........................... 18

    The "Rescue Heroes" Characters, Accessories and Line Extensions
    Referenced in the Second Amended Complaint are Covered by Plaintiffs' Concept ...... 19

    F-P's Termination of DI's Business .......................................................... 19

ARGUMENT ...................................................................................................... 20

    I.    THE ISSUE OF NON-USE IS HIGHLY DISPUTED ........................ 21

    II.    PLAINTIFFS' NOVEL CONCEPT IS SUFFICIENTLY CONCRETE ........ 25

        A.    The Cases Cited By F-P Are Not on Point ................................... 25

## Table of Contents
### (continued)

|  |  |  | **Page** |
|---|---|---|---|

    B.    Plaintiffs Have Satisfied the Legal Test for Concreteness.......................... 27

III.    PLAINTIFFS' CONCEPT WAS BOTH ORIGINAL AND NOVEL
AT THE TIME OF SUBMISSION ................................................................ 28

    A.    Plaintiffs' Concept was Novel to F-P at the Time of Submission .............. 30

        1.    F-P Once Again Seeks to Apply the Wrong Legal
Standard to Contract-Based Claims in Submission of Idea Cases....... 30

        2.    F-P's Own Conduct and Testimony
Belies Its Claim of Lack of Novelty ..................................................... 31

    B.    Plaintiffs Have Also Satisfied the Absolute Novelty Standard.................... 32

        1.    F-P's Evidence of Alleged Prior Art is
Distinctly Different From Plaintiffs' Concept ...................................... 33

        2.    Plaintiffs' Concept Represents True Innovation,
Not a Mere Combination of Elements .................................................. 34

        3.    Plaintiffs' Cameraman Figures is Also Novel ...................................... 35

IV.    F-P'S P&A FORMS DO NOT BAR PLAINTIFFS' CLAIMS .......................... 36

    A.    No F-P P&A Form Covers Plaintiff DI's
Submission in This Case...... ................................................................... 37

    B.    The 1994 P&A Form Should Not Bar Plaintiff Reiling's Claims
Under the Circumstances of This Case .................................................... 39

V.    THERE IS NO BASIS TO DISMISS PLAINTIFFS' CLAIM
FOR BREACH OF AN IMPLIED IN FACT CONTRACT ................................ 43

    A.    The Expired Option Agreement Cannot Bar Plaintiffs' Claim..... ............. 44

    B.    Plaintiffs' Implied Contract Claim is Definite ............................................ 44

    C.    The Statute of Frauds Does Not Bar Plaintiffs' Implied Contract Claim..... 45

## Table of Contents
### (continued)

| | | Page |
|---|---|---|
| VI. | PLAINTIFFS ARE ENTITLED TO ROYALTIES ON LINE EXTENSIONS ... | 47 |
| VII. | FISHER-PRICE'S DISCONTINUATION OF ITS RELATIONSHIP WITH DI IS A TORT ...................................................... | 47 |
| VIII. | CONNECTICUT LAW APPLIES TO PLAINTIFFS' CUTPA CLAIM............ | 51 |
| IX. | PLAINTIFFS' CAN SEEK PUNITIVE DAMAGES ............................... | 54 |
| CONCLUSION.................................................................................................... | | 55 |

## Table of Authorities

**Page**

### Federal Cases

*AEB & Associates v. Tonka Corp.*, 853 F. Supp. 724 (S.D.N.Y. 1994) ........................... 22, 38, 39

*Agostini v. Felton*, 521 U.S. 203 (1997) ............................................................................ 33, 44

*Ahlert v. Hasbro, Inc.*, 325 F. Supp.2d 509 (D. N.J. 2004) ......................................................... 52

*Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520 (2d Cir. 1992) ........................................ 20

*Anderson v. Century Products Co.*, 943 F.Supp. 137 (D.N.H. 1996) ....................................... 42

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................. 20

*Baer v. Chase*, 392 F.3d 609 (3d Cir. 2004) ............................................................................... 45

*Bailey Employment System, Inc. v. Clifford Hahn*, 655 F.2d 473 (2d Cir. 1981) ........................ 52

*Ball v. Hershey Foods Corp.*, 842 F. Supp. 44 (D. Conn. 1993),
    *aff'd*, 14 F.3d 591 (2d Cir. 1993) ....................................................................................... 22, 25

*Belt v. Hamilton Nat'l Bank*, 108 F. Supp. 689 (D.C. Cir. 1952) ............................................. 29

*Bieda v. J.C. Penny Communications, Inc.*, 1995 U.S. Dist. LEXIS 10309
    (S.D.N.Y. July 25, 1995) ............................................................................................. 28, 32, 38

*Brady v. Orion TV Productions, Inc.*, 15 U.S.P.Q.2D (BNA) 1389 (S.D.N.Y. 1990) .... 28, 29, 44

*Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) ............................................................... 20

*Burten v. Milton Bradley Co.*, 763 F.2d 461 (1st Cir. 1985) .......................................................... 39

*Circle Line Sightseeing Yachts, inc. v. Circle Line-Statue of Liberty Ferry, Inc.*, 2003 U.S. Dist.
    LEXIS 1501 (S.D.N.Y. Feb. 4, 2003) ........................................................................................ 45

*Connecticut Pipe Trades Health Fund and International Brotherhood of Electrical Workers
    Local 90 Benefit Plan v. Philip Morris, Inc.*, 131 F. Supp. 2d 101 (D. Conn. 2001) ......... 51, 53

*Diversified Group, Inc. v. Daugerdas*, 139 F. Supp. 2d 364 (S.D.N.Y. 2001) ........................... 46

**Table of Authorities**
(Continued)

Page

*Duffy v. Charles Schwab & Co.*, 2001 U.S. Dist. LEXIS 14070 (D. N.J. Sept. 4, 2001)....... 22, 30

*Eadie v. McMahon*, 1997 U.S. Dist. LEXIS 7679 at (D. Conn. Mar. 12, 1997)................. 48, 50

*Fabri v United Technologies International,Inc.*, 387 F. 3d. 109 (2d Cir. 2004) .................. 48, 50

*Fasa Corp. v. Playmates Toys*, 892 F. Supp. 1061 (N.D. Ill. 1995)................................ 38, 39, 42

*Financial Technologies Int'l, Inc. v Smith*, 247 F. Supp. 2d 397 (S.D. N.Y. 2002)..................... 31

*Galanis v Procter and Gamble Corp.*, 153 F. Supp. 34 (S.D.N.Y. 1957)................................... 28

*Getty Petroleum Corp. v. Island Transportation Corp.*, 878 F.2d 650 (2d Cir.1989)................. 54

*Injection Research Specialists, Inc. v. Pacer Industries, Inc.*, 48 U.S.P.Q.2d 1719
    (Fed. Cir. 1998).................................................................................................................. 42

*Integrated Cash Management Servs , Inc. v. Digital Transactions, Inc.*, 920 F.2d 171
    (2d Cir. 1990)..................................................................................................................... 35

*Intel Corp v. U.S. Int'l Trade Comm.*, 946 F.2d 821 (Fed. Cir. 1991) ......................................... 35

*Kendall-Jackson Winery, Ltd. v. Branson*, 82 F. Supp.2d 844 (N.D. Ill. 2000) ........................... 41

*Koret, Inc. v. RJR Nabisco, Inc.*, 702 F. Supp. 412 (S.D.N.Y. 1988),
    *aff'd*, 875 F.2d 307 (2d Cir. 1989) ..................................................................................... 46

*Khreativity Unlimited v. Mattel, Inc.*, 101 F. Supp.2d 177 (S.D.N.Y. 2000), *aff'd*, 242 F.3d 366
    (2d Cir. 2000).......................................................................................................................29

*Levin v. The Gap, Inc.*, 1998 U.S. Dist. LEXIS 20378 (S.D.N.Y. Dec. 30, 1998)...................... 43

*Link Group Int'l v. Toymax, Inc.*, 2000 U.S. Dist. LEXIS 4567
    (D. Conn. Mar. 17, 2000)................................................................ 25, 34, 48, 50, 53

*Markogianis v. Burger King Corp.*, 42 U.S.P.Q.2d 1862 (S.D.N.Y. 1997) ............................... 25

*McGhan v. Ebersol*, 608 F. Supp. 277 (S.D.N.Y. 1985) .............................................................. 25

*Messenger v. Anderson*, 225 U.S. 436 (1912)...............................................................................31

Table of Authorities
(Continued)

Page

*M.H. Segan Limited Partnership v Hasbro, Inc.*, 924 F. Supp. 512 (S.D.N.Y. 1996) .......... 39, 43

*Merritt Forbes & Co. v. Newman Inv. Secur , Inc.*, 604 F. Supp. 943 (S.D.N.Y. 1985).............. 22

*MM Global Services, Inc v. Dow Chemical Company*, 283 F. Supp. 2d 689 (D. Conn. 2003).... 53

*Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368
(2d Cir. 2000)................................................................................. 3, 28, 29, 30, 34, 41, 43, 44

*NetTech Solutions, L.L.C. v. ZipPark.com*, 2001 U.S. Dist. LEXIS 14753
(S.D.N.Y. Sept. 20, 2001).................................................................................................. 43

*Otis Elevator v. Civil Factory Mutual Insurance Co* , 353 F. Supp. 2d 274 (D. Conn. 2005)..... 52

*Prisco v. A & D Carting Corp.*, 168 F.3d 593 (2d Cir. 1999) ................................................. 31, 44

*Purgess v. Sharrock*, 33 F.3d 134 (2d Cir 1994) ........................................................................ 49

*Repp.v. Lloyd Webber*, 132 F.3d 882 (2d. Cir. 1997)................................................................... 21

*Roy Export Company Establishment of Vaduz, Liechtenstein, et. al. v. Columbia Broadcasting
System, Inc.*, 672 F.2d 1095 (2d Cir. 1982) ....................................................................... 53, 54

*Sayers v  Rochester Tel. Corp.*, 7 F.3d 1091 (2d Cir. 1993)........................................................ 31

*Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.*, 118 F.3d 955
(2d Cir. 1997)..................................................................................................................... 35

*Stewart v. World Wrestling Federation Entertainment, Inc* , 2004 U.S. Dist. LEXIS 26533
(S.D.N.Y. Jan. 11, 2005).................................................................................................... 52

*Thurman v  Whitfield*, 751 F.2d. 90 (2d Cir. 1984) .................................................................... 21

*Tingley Systems, Inc. v. Norse Systems, Inc.*, 49 F. 3d 93 (2d Cir. 1995)..................................... 54

*Titan Sports, Inc. v. Turner Broadcasting Systems, Inc.*, 981 F. Supp. 65 (D. Conn. 1997)........ 51

*United States Fidelity and Guaranty Co. v. S.B. Phillips Co.*, 359 F. Supp. 2d 189
(D. Conn. 2005) ................................................................................................................. 53

**Table of Authorities**
(Continued)

**Page**

*Valtec International, Inc. v. Allied Signal Aerospace Company et al.,* 1997 U.S. Dist. LEXIS
     7670 (D. Conn. Mar. 7, 1997)................................................................................ 49, 51, 52

*Vantage Point, Inc. v. Parker Bros., Inc.,* 529 F. Supp. 1204 (E.D.N.Y. 1981),
     *aff'd* 697 F.2d 301 (2nd Cir. 1982) ........................................................................... 22

*Victor G. Reiling and Assocs. v. Fisher-Price, Inc.,* 2003 U.S. Dist. LEXIS 13277
     (D. Conn. July 31, 2003).......................................................................................... 31, 44

*White Plains Towing Corp. v. Patterson,* 991 F.2d 1049 (2d Cir. 1993) ........................... 41

*Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446 (6th Cir. 2001) ....................................... 22

**Table of Authorities**
(Continued)

Page

**State Cases**

*Davis & Davis v. S&T World Products*, 154 A.D.2d 330,
    545 N.Y.S.2d 806 (2d Dep't 1989) .................................................................................. 46

*Educational Sales Programs, Inc. v Dreyfus Corp.*, 317 N.Y.S.2d 840
    (Sup. Ct., N.Y. Cty. 1970) ............................................................................................ 26

*Nakamura v. Fujii*, 253 A.D.2d 387, 677 N.Y.S.2d 113 (1st Dep't 1998) ................................ 46

*North Shore Bottling Co., Inc. v. C. Schmidt and Sons, Inc.*, 22 N.Y.2d 171,
    239 N.E.2d 189, 292 N.Y.S.2d 86 (1968) ...................................................................... 46

*Oasis Music, Inc. v 900 U.S.A., Inc.*, 614 N.Y.S.2d 878 (S. Ct., N.Y. Cty. 1994) ................. 26

*Pollak v. Lincoln Center for the Performing Arts, et al.*, 276 A.D. 2d 403,
    715 N.Y.S. 2d 9 (1st Dep't 2000) .................................................................................. 31

*Rentways, Inc. v O'Neill Milk & Cream Co.*, 308 N.Y. 342,
    126 N.E. 2d 271 (1955) ................................................................................................. 31

*Silberberg v. Haber*, 42 A.D.2d 552, 345 N.Y.S.2d 558 (1st Dep't 1973) ............................ 46

*Tate v. Scanlan Int'l, Inc.*, 403 N.W.2d 666 (Ct. App. Minn. 1987) ..................................... 29

**Table of Authorities**
(Continued)

**Page**

**Other Authorities**

NIMMER ON COPYRIGHT § 12.10[B](2)(b) .................................................................. 22

## PRELIMINARY STATEMENT

Defendant, Fisher-Price, Inc. ("F-P"), cannot prevail on summary judgment because genuine issues of material fact dominate every facet of this case. Perhaps more importantly, F-P's showing underscores the strength of Plaintiffs' case and the likelihood that Plaintiffs will prevail at trial. This is not a typical inventor submission case where it is questionable whether the toy company ever considered the concept or where the concept is of questionable novelty. It is undisputed that F-P received the submission, considered it for many months, and paid the Plaintiffs option fees to retain the concept before finally rejecting it and subsequently developing the accused products in question. At no time during this process did F-P ever express a concern that Plaintiffs' concept lacked novelty or concreteness.

Importantly, the concreteness and novelty of Plaintiffs' concept submission and whether Plaintiffs' concept covers the accused F-P Rescue Heroes products (*i.e.*, whether F-P "used" Plaintiffs' concept), are hotly disputed issues of fact that are incapable of summary adjudication. Moreover, no F-P Policy and Agreement Form covers Plaintiff DI's claims in this case, and the blanket waiver Plaintiff Reiling signed in 1994 raises serious questions of both validity and applicability and should not bar his claims under the facts presented. To this end:

• F-P's defense of non-use (*i.e.* lack of substantial similarity), which is based on a literal reading of the precise mechanical mechanism disclosed in Plaintiffs' original written submission alone, flies in the face of toy industry custom and practice. It is undisputed that toy companies routinely make significant changes to concept submissions, including changes to the disclosed mechanical mechanisms, and such changes do not relieve the toy company of appropriately compensating the inventor. Plaintiffs have demonstrated that F-P had received, considered and even paid option money to hold Plaintiffs' submissions and that the accused Rescue Heroes products are

1

substantially similar to their novel concept. For these reasons, resolution of this issue as a matter of law is inappropriate.

• Plaintiffs' novel concept – which disclosed adding an image component to the backpack of each "Rescue Heroes" action figure to enhance role play for the child by depicting the mission of each character - is sufficiently concrete so as to warrant legal protection. F-P's attempt to show that Plaintiffs' concept is indefinite fails because Plaintiffs' actual submissions to F-P disclosed "concrete" ideas. Plaintiffs' initial 1998 submission disclosed an interchangeable battery-operated animated image player to be placed on the "Rescue Heroes" characters in the form of a backpack. This submission included a prototype, drawings and written descriptions. After expiration of the parties Option Agreement, Plaintiffs re-submitted their concept on two occasions in 1999 and 2000 to show two additional executions of the same concept – the use of still images on the backpack of each Rescue Heroes character either by means of a wheel, drum or round disk. Once again, Plaintiffs sent F-P drawings and written descriptions that were sufficiently "concrete" to warrant legal protection.

• Plaintiffs have also established the novelty of their submission to F-P. Indeed, F-P's representatives never expressed a concern over lack of novelty prior to this lawsuit, despite the fact that industry practice and F-P's own practice has been to communicate a lack of novelty to the inventor at the time of rejection. F-P's current and former Vice-Presidents of Inventor Relations testified that they never considered Plaintiffs' concept to lack novelty at any point. The fact that F-P entered into an Option Agreement and paid option fees for Plaintiffs' concept further demonstrates that F-P's lack of novelty argument is contrary to the events that transpired six years ago.

• Plaintiffs' concept is also absolutely novel because: (1) toy companies regularly license concepts with a minimal degree of innovation; (2) Plaintiffs, who are seasoned toy design

2

professionals, and their toy industry expert with 30 years of industry experience, have testified that they had never before seen the application of their concept in a toy product; (3) F-P claims that a mere combination of non-novel elements is insufficient to establish novelty, but that standard is contrary to toy industry custom and practice and F-P's own actions in this case; and (4) the few examples of alleged prior art referenced by F-P's expert are distinctly different from Plaintiffs' concept. Following the Second Circuit's decision in *Nadel v. Play-By-Play Toys,* 208 F.3d 368 (2d Cir. 2000), the presence of these genuine issues of material fact preclude the grant of summary judgment in F-P's favor on the issue of novelty.

Contrary to F-P's argument, their Policy and Agreement forms (the "P&A Form") do not bar Plaintiffs' claims in this action, because:

• Plaintiff Design Innovation ("DI") is not bound by any such Form for purposes of this case. The P&A Form signed by one of DI's officers in 1992 was specific to a concept submission that is different from the concept in suit, which DI submitted six years later. Nor is DI bound by the "blanket" form signed by Plaintiff Reiling in 1994 because Plaintiffs testified that Reiling never acted as DI's agent, nor did he have authority to act as DI's agent, at any point.

• It is also highly questionable whether F-P can rely on the "blanket" 1994 P&A Form to bar Plaintiff Reiling's claims. There is a serious question of fact as to whether it was intended by either party to cover the 1998 concept submission which should properly be a question for a jury to consider. Moreover, F-P's entire practice of having an inventor sign a blanket P&A Form for a perpetual term to cover concepts not yet created for claims that the inventor is not aware of at the time the P&A Form is signed and then accept such subsequent submissions on forms that make no reference whatsoever to the original executed P&A Form raises serious questions about the practice and whether it violates public policy, particularly considering the adhesionary nature of the

document and the relationship of the parties. "Memory tests" should not be required when an inventor is being asked to waive its rights, particularly when being told that the world's largest toy company will be "fair" to the inventor. Reiling testified that he did not believe the 1994 P&A Form covered the 1998 submission given the four-year passage of time and because the 1998 Concept Submission form he signed made no reference to the 1994 P&A Form, or to any of its terms, which deviated from toy industry practice and from F-P's own practice. Moreover, many courts have refused to enforce waiver agreements that accompanied the disclosures, let alone one intended to cover a submission four years later using a form that made no reference to such prior waiver agreement. Such a policy, at least, raises serious questions as to the intentions of the parties as of the date of the submission and, at the worst, is unenforceable as being violative of public policy. Under the facts presented, it would be a manifest injustice to bar all of Plaintiff Reiling's claims.

Regardless of the fate of Plaintiff Reiling, however, Plaintiff DI will proceed to trial as scheduled and will be able to assert all of its claims and seek the full extent of its damages (*i.e.*, an amount not less than F-P's expert's stated figure of $2.8 million). Hence, the dismissal of Plaintiff Reiling alone is of no practical benefit to F-P.

F-P's remaining defenses are not case dispositive and will be discussed in turn.

## FACTUAL BACKGROUND

The Parties

Plaintiff Reiling is a small, entrepreneurial toy development company located in Kent, CT. (Declaration of Victor G. Reiling, dated May 20, 2005 ("Reiling Dec.") ¶ 2.) Plaintiff Reiling's principal, Victor G. Reiling, is a toy industry veteran and former employee of both F-P and Milton Bradley. (*Id.* ¶ 3.) Since 1977, Reiling has been an independent toy developer, creating concepts that are offered to various toy manufacturers. (*Id.*) Reiling does not manufacture and market toys, but

rather works with toy manufacturers to develop new toys based on his product concepts. (*Id.*)  Including toys created while at F-P, Reiling has created more than twelve toys and games that have sold over one million units. (*Id.*)

Plaintiff DI is a small, industrial design firm based in Avon, CT that employs a team of designers that develop prototypes and working models of toys, games and other products. (Declaration of Bruce P. Popek, dated May 20, 2005 ("Popek Dec.") ¶ 2.)  DI's three principals, including Bruce Popek and Bruce Benedetto, are toy industry veterans each of whom has approximately twenty-five years experience in the toy industry as designers. (*Id.* ¶¶ 2-4; Declaration of Bruce Benedetto, dated May 20, 2005 ("Benedetto Dec.") ¶¶ 2-4.)  Until they were recently "black listed" by F-P for bringing and pursuing this action, Plaintiff DI had averaged more than $800,000 per year of work for F-P from 1999 to 2003.  (Popek Dec. ¶ 24).

F-P is a wholly-owned subsidiary of Mattel, Inc., the largest toy company in the world. (Reiling Dec. ¶ 6.)  The toy industry has become dominated by two companies, Mattel/F-P and Hasbro. (*Id.*)  There is a wide gap in sales between these companies and the next tier of toy companies.  (*Id.*)  Mattel's toy and game sales constitute approximately 15% of the U.S. Toy Industry's total sales. (*Id.* ¶ 9.)  F-P dominates the pre-school market, the market in which Rescue Heroes are sold, with approximately 48% of sales. (*Id.* ¶ 11.)

Relationship Between Reiling and DI

Since 1995, Reiling and DI have cooperated on the development of new toy and game concepts on occasion. (*Id.* ¶ 4.)  In this regard, Reiling and DI are joint inventors and always maintain an equal ownership interest in their jointly developed concepts (*i.e.*, 50% Reiling, 50% DI). (*Id.* ¶ 5; Popek Dec. ¶ 6; Benedetto Dec. ¶ 6).  Reiling does not act on behalf of DI and there is no agency relationship (either in writing or by oral agreement) between them.  (*Id.*)  Reiling has no

authority to bind DI, and in fact, DI retains the right to approve all proposed actions with respect to their jointly developed concepts. (*Id.*)  While DI is a joint inventor, Reiling routinely presents their jointly developed concepts to toy companies due to his longstanding relationships with inventor relations personnel in the industry. (*Id.*)  No one from F-P ever asked Reiling about his relationship with DI or whether he had authority to bind DI. (Reiling Dec. ¶ 5.)

Prior Agreements With F-P

F-P required Reiling to sign a number of different forms during his career as a toy inventor before he was permitted to make concept submissions, including the F-P P&A Form that he signed in 1994. (*Id.* ¶ 11.)  These forms were mandatory. (*Id.*)  Inventors had to sign them or they would not be permitted to show concepts. (*Id.*)  Simply stated, inventors had no bargaining power on this issue. (*Id.*)  Since showing concepts was Reiling's livelihood, he signed the documents as F-P demanded. (*Id.*)  Reiling's experience was that inventors and the inventor relations personnel of toy companies treated them as a mere formality – administrative paperwork that had to be completed in order to do business – and that is how he treated them. (*Id.*)  He was not represented by counsel in connection with his execution of the P&A Form. (*Id.*)  Because F-P had always treated him fairly in the past, and because the P&A Form indicated that F-P would deal with him fairly in the future, he was not concerned about the impact of these forms. (*Id.*)

F-P changed the rules regarding these required forms every few years. (*Id.* ¶ 12.)    When Reiling first began to make concept submissions, F-P required a separate P&A form for each submission. (*Id.*)  The P&A Form contractual language was printed on the same form on which Reiling described his concepts. (*Id.*)  Later, F-P required Reiling to sign a P&A form once a year, instead of at the time of each submission, and he would submit a separate Concept Submission Form

each time he made a submission. (*Id.*) Finally, F-P required Reiling to sign the P&A Form in 1994 that purports to have an indefinite duration. (*Id.*)

At the times Plaintiffs made their three submissions to F-P for the concepts in issue, Reiling had no recollection of the P&A Form he signed four years (and 2 management changes) previous. (*Id.* ¶ 13.) No one at F-P referenced this agreement when Plaintiffs submitted the three executions of their concept, nor did the Concept Submission Form that Reiling submitted with Plaintiffs' concept indicate that it related back to the P&A Form or to any of its terms. (*Id.*) Moreover, no one at F-P ever told Reiling that his submission in 1998 was being made under any waiver of confidentiality. Because Reiling did not recall the P&A Form, he was never told that the submission was being made under a waiver of confidentiality, nor was there any reference to any such waiver or previously signed P&A Form on the Concept Submission Form, he did not have an expectation at the time Plaintiffs made their submissions that it would govern those submissions. (*Id.*) Because F-P changed forms frequently and previously had him sign such an agreement at the time he made each submission, he did not believe that they would have one form that would last forever. (*Id.*) When he signed the P&A Form in 1994, he did not believe that it would cover all future submissions. (*Id.*) Reiling has never signed a P&A form specifically with regard to Plaintiffs' submissions in this case. (*Id.*)

The forms that toy companies require inventors to sign in order to do business are not uniform. (*Id.* ¶ 14; Popek Dec. ¶ 16.) For example, Hasbro uses a concept submission form that is accompanied by an agreement providing on its face that the submission is confidential. (Reiling Dec. ¶ 14, Exh. G). In addition, F-P Brands, Mattel and Hasbro all incorporate waiver language on the face of their concept submission forms. (*Id.*, Exhs. G, H). Some companies do not require any forms or agreements. (*Id.* ¶ 14; Declaration of James Kipling, dated May 23, 2005 ("Kipling Dec.") ¶ 15).

With respect to Plaintiffs' submissions in this case, Reiling expected to see any waiver language or disclaimer of a confidential relationship on the face of F-P's Concept Submission Form, where other toy companies in the industry include such language, including F-P's related companies F-P Brands and Mattel. (*Id.*)

DI has never signed a P&A form like the one that Reiling signed in 1994 (*i.e.*, one that does not reference a particular concept and purports to have an indefinite duration). (Popek Dec. ¶ 8.) DI did sign one P&A Form with respect to three specific concepts they presented in 1992. (*Id.*; Benedetto Dec. ¶ 8, Exh. A). This form was signed by DI during the time when F-P required such a form to be signed in connection with every concept submission, a procedure the company later abandoned. (*Id.*) The form references three specific concepts that were presented in 1992, and a separate page is attached to the document that describes each of these three concepts. (*Id.*) F-P did not license the concepts disclosed in 1992 and the P&A Form expired. (*Id.*)

DI has never signed any agreement related to the submissions in this case other than the Option Agreement with F-P. (*Id.* ¶ 9.) In addition, DI did not begin working with Reiling until after Reiling signed the 1994 P&A Form, which was never shown to DI by Reiling or F-P. (*Id.*)

DI did sign at least one development agreement for work assigned by F-P on a work for hire basis, but, by their very terms, these types of agreements did not cover the submission of toy concepts, let alone the concept in issue. (*Id.* ¶ 10; Kipling Dec. ¶ 18). They did not contain any language regarding the submission of independently developed toy concepts, nor did they contain any of the language that F-P relies upon to assert a waiver of rights by Mr. Reiling with respect to the 1994 P&A Form. (*Id.*) DI was not represented by counsel in connection with the execution of the 1992 P&A form or any development agreements with F-P. (*Id.* ¶ 11.)

8

Toy Industry Custom and Practice

Based upon Plaintiffs' own experience, when a toy manufacturer adopts one of their product concepts, in accordance with the long-established custom and practice in the toy industry, Plaintiffs are remunerated by being paid a royalty based on the sales of toys incorporating the concept and any line extensions thereto. (Reiling Dec. ¶ 16.) Industry custom and Plaintiffs' own custom dictates that such a royalty be paid, regardless of changes that are made by the toy company between the time the concept is submitted and the time when an ultimate product is manufactured and sold. (*Id.*; Popek Dec. ¶ 12; Kipling Dec. ¶ 35). F-P's current and former directors of Inventor Relations have confirmed this custom. (Dize Dec. Exh. A, pp. 84-97; Exh. B, pp. 58-60). Plaintiffs have provided several examples of concept submissions that they provided to F-P for which they received royalties despite significant changes to the initial submission. (Reiling Dec. ¶ 17, Exhs. I-K; Popek Dec. ¶¶ 12-13, Exhs. A, B; Kipling Dec. ¶ 26, B-D).

Reiling has always been paid royalties on line extensions and accessories, *i.e.*, new products that are derived from the concept submission and/or are sold with the ultimate product produced from the concept submission (*e.g.*, play sets and vehicles). (Reiling Dec. ¶ 18.) The custom and practice in the toy industry has been to pay royalties on these items equal to the royalty paid on the initial product derived from the concept submission. (*Id.*; Kipling Dec. ¶ 38). Accordingly, in this case, Plaintiffs' expectation was that they would be paid a royalty if F-P used their concept, regardless of changes made to the submission by F-P, and that royalties would be paid on line extensions and accessories derived from the initial concept submission. (*Id.*; Popek Dec. ¶ 5.)

It is also standard toy industry practice for an inventor to combine several existing elements to create a concept that is new and different. (Reiling Dec. ¶ 19; Popek Dec. ¶ 13; Popek Dec. ¶ 51). This practice is not unlike patentable inventions where patent protection is regularly and routinely available

for novel combinations of well known elements. Toy companies even routinely pay royalties for concepts that have previously been sold in the marketplace. (Popek Dec. ¶ 14). This is the way the toy industry has operated for years. (Reiling Dec. ¶ 19; Kipling Dec. ¶ 51). F-P's expert has confirmed that this occurs in the toy industry. (Dize Dec. Exh. C, p. 186-187). Even though a proposed concept includes elements that are already in existence, Plaintiffs' experience has been that the toy companies are looking for new concepts, and a royalty is paid if the submitted concept represents something that is new and different and has profit potential for the company. (*Id.*)

Over the years, Plaintiffs have had a few disputes with toy companies regarding royalties owed on submitted concepts. (Reiling Dec. ¶ 20; Popek Dec. ¶ 15.) The custom and practice in the industry has been for toy companies to deal with inventors fairly. (*Id.*) Typically, if there is a valid dispute regarding whether a royalty is owed, the inventor and toy company will attempt to reach an amicable resolution because the inventor/toy company relationship has traditionally been based on trust. (Reiling Dec. ¶ 20.)

Plaintiffs' Submissions to F-P and Definition of the "Concept"

In 1998, Plaintiffs devised a novel concept for adding an image component in the form of a backpack for each "Rescue Heroes" action figure that enhanced role play for the child by depicting the mission of that particular "Rescue Heroes" character, which concept could be expanded into accessories and line extensions relating to the "Rescue Heroes" line pursuant to industry custom and practice. (Reiling Dec. ¶ 23.) Plaintiffs submitted their novel concept to F-P in three different variations. (*Id.*)

Based upon their prior experience in the industry, Plaintiffs expected their concept submission to be held in confidence by F-P, and they treated their disclosure as confidential. (Reiling Dec. ¶ 22; Popek Dec. ¶ 17). This is the manner in which Plaintiffs had dealt with F-P and other toy companies in

the past and Plaintiffs' Option Agreement with F-P relative to the submissions in this case confirmed a confidential relationship. (*Id.*, Exh. V). F-P's own expert, also an independent inventor, testified that he considers his concept submissions to F-P to be confidential. (Dize Dec. Exh. C, pp. 52-54, 206-209).

The 1998 Execution of Plaintiffs' Concept

Plaintiffs' initial submission, on or about October 29, 1998, consisted of a written description, drawings and a prototype[1] which envisioned an interchangeable battery-operated animated image player that would be placed on the "Rescue Heroes" characters in the form of a backpack. (Reiling Dec. ¶ 24, Exhs. O-R; Popek Dec. ¶ 18.) The backpack allowed children to view animated images. (Reiling Dec. ¶ 24.) Plaintiffs' concept was submitted specifically for the Rescue Heroes line, and specifically as a backpack, although Plaintiffs' written description indicated that the concept could be expanded by F-P into line extensions and accessories. (*Id.* ¶ 24, Exh. P; Popek Dec. ¶ 18). Plaintiffs had several working names for their concept, including "Reel Action," "Reel Heroes," "Reel/Real Heroes" and "Reel Action/Reel Heroes." The "Reel" portion of the working names was a play on words with respect to the film reel that was first shown in the prototype, but this in no way was meant to be a limitation on the concept. (Reiling Dec. ¶ 24.)

As part of the initial submission, Plaintiffs also presented F-P with the idea for an action-adventure reporter/photographer character to be part of the "Rescue Heroes" line. (*Id.* ¶ 25.) This character, dubbed "Fillmore Schotz," was drawn with a distinctive look and feel and was presented holding a camera with an optical device in one hand and microphone in the other hand. (Id.; Exh. S). Plaintiffs specifically indicated that this character could be used with line extensions such as vehicles. (Id.; Exh. P).

Reiling presented Plaintiffs' concept to Paul Snyder, Vice President of Inventor Relations for

---

[1] Plaintiffs' original prototype has been submitted to the Court for ease of reference.

F-P, in October 1998. (*Id.* ¶ 26.) F-P routinely seeks concept submissions from a select group of private toy developers in an effort to create and manufacture new toy lines as well as expand existing product lines. (*Id.* ¶ 27.) F-P employs certain individuals who are responsible for interfacing with independent toy inventors nationwide, including conducting nationwide "sweeps" of new toy concepts. (*Id.*) Reiling regularly met with Mr. Snyder to show new toy concepts, including a number of meetings in New York City and at least one meeting at Reiling's studio in Connecticut. (*Id.* ¶¶ 26-27.) In advance of these meetings, F-P would often send inventors documents called "Wish Lists," which would indicate areas in which F-P had an interest for new concept submissions. (*Id.* ¶ 27.) Rescue Heroes were routinely included on these wish lists. (*Id.*; Exh. T).

At the initial meeting with Mr. Snyder, Reiling submitted a F-P Concept Submission Form for the six products he was showing that day. (*Id.* ¶ 28; Exh. O). F-P's Concept Submission Form contains spaces for multiple concepts to be listed, and there is a small rectangular space (approximately 1" x 3") in which to describe each concept. (*Id.*) As one would expect because of the constraints of the form, it was impossible to accurately describe the concept in such a small space. (*Id.*) In filling out the Concept Submission Form, Reiling attempted to identify the concepts that were being shown that day for administrative purposes to establish a record in the event there was a dispute about what concepts had been shown. (*Id.*) The description on the Concept Submission Form was not intended to be a precise definition of the concept. (*Id.*) In fact, Reiling submitted a separate written description with the submission materials because he realized that he could not accurately describe the concept in such a small space. (*Id.*)

Per industry practice, inventors illustrate a concept through the combination of a prototype, drawings, written description and a concept submission form. (*Id.* ¶ 29.) The concept is illustrated by looking at these materials collectively, not individually. (*Id.*) For example, the prototype

Plaintiffs submitted with the submission documents demonstrated one possible execution of the concept. (*Id.*) It was not intended to show all possible executions of the concept or to limit the concept to the exact mechanisms that were disclosed in the prototype. (*Id.*) Accordingly, Plaintiffs' concept did not require that the child place one eye up to a magnifying lens and look inside the backpack, nor that film be used, as F-P has suggested. (*Id.*)

After Plaintiffs submitted their concept, Reiling received a fax from F-P dated December 8, 1998 indicating that "Paul [Snyder] has shown Reel Action and there is a genuine excitement level for that product. . ." (*Id.* ¶ 30; Exh. U). In all Reiling's years in the toy industry, he had never received a letter from any toy company that expressed such a "genuine excitement level." (*Id.*)

The Option Agreement

On February 16, 1999, the parties finalized and signed an Option Agreement for Plaintiffs' concept, which granted to F-P an exclusive three-month option to either acquire Plaintiffs' rights in the concept or to license the concept, in exchange for the monetary payment of $7,500. (Id. ¶ 31; Exh. V). In Plaintiffs' experience, a toy company enters into an option agreement to prevent the inventor from showing the concept to another toy company because there is interest in the concept. (*Id.*; Popek Dec. ¶ 5.) Notably, the Option Agreement does not reference the P&A Form signed by Reiling in 1994. (Reiling Dec. ¶ 31.) It does not contain any of the language that F-P relies upon to assert a waiver of rights by Reiling, and to the contrary, actually indicates that there is a confidential relationship between the parties. (*Id.* ¶ 5, 8; Exh., ¶ V).

Exhibit A to the Option Agreement, which purports to describe Plaintiffs' concept, was drafted by F-P's attorneys with little, if any, input from Reiling and no input from DI. (*Id.* ¶ 32; Popek Dec. ¶ 11.) Plaintiffs were not represented by counsel in connection with the drafting or execution of the Option Agreement. (*Id.*) Importantly, F-P accurately recognized in Exhibit A that

13

the *"unique aspect of the concept* is the combination of existing action figures with film for play pattern." (emphasis added) (Reiling Dec. ¶ 32.) In this context, industry professionals would know that "film" was not limited to film in a literal sense, but rather encompassed images and/or video to enhance the play pattern for the child. (*Id.*; Popek Dec. ¶ 5.) Exhibit A also specifically indicates that the concept is for the Rescue Heroes line and for backpacks. (Reiling Dec. ¶ 32.)

While the Option Agreement did contain certain material terms that would apply if the option was exercised (*e.g.*, royalty rate, term, advance, etc.), it did not contain all material terms. (*Id.* ¶ 33.) For example, payment of a royalty on line extensions and accessories and F-P's purchase price to obtain an assignment of Plaintiffs' concept were not addressed. (*Id.*) These items would have been addressed had F-P proceeded with a formal license agreement, instead of using Plaintiffs' concept without authorization. (*Id.*) F-P should not now be permitted to rely upon the Option Agreement - which it never exercised - as evidence that royalties were not payable on line extensions and accessories. (*Id.*) Moreover, F-P should not receive the benefit of the terms contained in the Option Agreement, including the royalty rate, because F-P chose not to exercise the option but to use Plaintiffs' concept anyway. (*Id.*)

On March 23, 1999, F-P returned the prototypes and drawings of the concept to Plaintiffs, allegedly due to prohibitive production costs. (*Id.* ¶ 31.) In the letter from Henry Schmidt of F-P rejecting the concept, he stated that the concept had been given "very careful consideration and evaluation from design, costing, engineering and marketing perspectives," thereby confirming that the concept had been considered by many different departments within F-P. (*Id.*; Exh. W). Accordingly, the Option Agreement expired by its very terms on May 1, 1999. (*Id.*)

The 1999 Execution of Plaintiffs' Concept

Despite F-P's initial rejection of the concept for reasons that "boiled down to cost," Plaintiffs continued their efforts toward gaining F-P's acceptance of the concept by focusing on cost reductions. (*Id.* ¶ 34.) Plaintiffs submitted a revised execution of the concept to Paul Snyder at F-P on May 22, 1999. (*Id.*; Exh. X). F-P did not require an additional Concept Submission Form for the 1999 execution. (*Id.*) Seeking to address F-P's concerns regarding cost, Plaintiffs eliminated the motor, batteries and several other parts from the original submission and instead focused on including eight or more still, printed images mounted on a wheel or drum in the backpack of each "Rescue Heroes" action figure that enabled children to view still images through a viewing mechanism. (*Id.*) The images related to the mission of each "Rescue Heroes" character and were designed to enhance role play for the child. (*Id.*) Plaintiffs were demonstrating to F-P that there were alternative ways to execute the concept. (*Id.*) Accordingly, it was not necessary to the second execution of the concept that the child place one eye up to a magnifying lens and look inside the backpack, or that a hand crank be used, as F-P now suggests. (*Id.*)

F-P never formally rejected the 1999 execution of Plaintiffs' concept. (*Id.* ¶ 35.) Neither party has been able to locate a rejection letter. (*Id.*; Dize Dec. Exh. A, pp. 120-21). Moreover, Plaintiffs do not recall any oral communication from F-P rejecting the 1999 execution. (*Id.*; Popek Dec. ¶ 5.)

The 2000 Execution of Plaintiffs' Concept

Thereafter, Plaintiffs submitted another revised execution of the concept on December 7, 2000 to Peter Pook, F-P's Vice President of Product Development and Inventor Relations at that time. (Reiling Dec. ¶ 36; Exh. Y). F-P did not require an additional Concept Submission Form for the 2000 execution. (*Id.*) The December 2000 execution depicted still images on a round disc

instead of on a wheel or drum device. (*Id.*) Again, while the concept envisioned depicting images in the backpacks of the "Rescue Heroes" action figures, the concept could be incorporated into accessories, such as vehicles and play sets, and line extensions relating to the "Rescue Heroes." (*Id.*) The 2000 submission demonstrated yet another way to execute Plaintiffs' concept. (*Id.*) Accordingly, it was not necessary to the concept that the child place one eye up to a magnifying lens and look into the interior of the backpack, or that a lever be used, as F-P now suggests. (*Id.*) As referenced in their cover letter to Mr. Pook, Plaintiffs included the prior submission materials (*i.e.*, prototype, drawings, written description) when they submitted the 2000 execution of their concept. (*Id.*). F-P returned Plaintiffs' final submission on January 5, 2001 with the explanation that the concept remained too expensive to develop and that it did not fit the current Rescue Heroes theme. (*Id.*)

Access to Plaintiffs' Submissions

All three executions of Plaintiffs' concept were entered into F-P's database of inventor submissions by inventor relations personnel. (Dize Dec. Exh. Q). In addition, Members of F-P's Boys Team, Tyler Berkheiser and Ken Morton (designers) and Chris Pardi (marketing) admitted, that they had seen portions of Plaintiffs' submissions, including the prototype. (*Id.*; Exh. D, pp. 38-40, 44-47; Exh. E, pp. 58-62, 71-74; Exh. F, pp. 45-46, 50-51, 54-55). Mr. Morton, Manager of Design at the time, admitted that he had control over the prototype for a period of more than three weeks, that he also had seen some of Plaintiffs' drawings and that he had at least one conversation with Mr. Berkheiser about Plaintiffs' submissions. (*Id.*). Notably, F-P has admitted that Mr. Berkheiser and Mr. Pardi saw portions of Plaintiffs' original submission and were later involved in developing the Rescue Heroes product lines at issue in this case. (Dize Dec., Exh. R).

Plaintiffs' Discovery of F-P's Repeated and Blatant
Unauthorized Use of Their Concept in the "Rescue Heroes" Line

Plaintiffs' discovered F-P's misappropriation of their novel toy concept after seeing a F-P brand catalog at the February 2002 American International Toy Fair ("Toy Fair") in New York. (*Id.* ¶ 40.) The catalog featured a new line of F-P "Rescue Heroes," namely the "Voice Tech Video Mission Rescue Heroes." (*Id.*) F-P's new toy line misappropriated Plaintiffs' original and revised submissions on the "Reel Heroes" concept. It contained elements from their sketches and prototype, including the backpack-style video image viewer that displayed moving images. (*Id.*)

Importantly, F-P did not actively market the original lines of Rescue Heroes as having "backpacks." (*Id.* ¶ 41.) The original lines were marketed as having "equipment packs" or simply "packs." (Id.; Exh. AA). Starting with Mission Command Rescue Heroes in 2001 (after Plaintiffs' submissions), F-P began to actively use the term "backpacks." (*Id.*) For example, the packaging for the Video Mission Rescue Heroes, which were marketed and sold in 2002, indicated: "Now! See my mission on my video backpack!" (*Id.*; Exh. BB, CC)

Plaintiffs did not discover F-P's misappropriation with respect to the additional products referenced in the Second Amended Complaint, namely the "Mission Select Rescue Heroes" line, the "Mission Command Rescue Heroes" line, the "Optic Force Rescue Heroes" line and the vehicles and line extensions related thereto, until late 2003 or early 2004. (*Id.* ¶ 42.) Prior to 1999, Reiling had routinely received F-P's annual product catalogues and was invited to visit F-P's showroom at Toy Fair in New York City each year. (*Id.*) In or about 1999, however, F-P changed its policy and stopped inviting outside inventors to its Toy Fair showroom and stopped giving its product catalogues to outside inventors (this was part and parcel of a demonstrable negative change in attitude by F-P and its new corporate parent, Mattel, Inc.) (*Id.*) As a result, since 1999 Reiling has not been privy to F-P's new products prior to their launch. (*Id.*)

17

<u>Plaintiffs' Concept Was Novel When Submitted to F-P</u>

Based upon Plaintiffs' decades of experience in the toy industry, at the times Plaintiffs submitted their three concept executions to F-P, Plaintiffs have established that the concept executions were novel, i.e., they had never seen their concept marketed or sold by F-P or any other toy company. (*Id.* ¶ 43; Popek Dec. ¶ 19; Benedetto Dec. ¶ 19; Kipling Dec. ¶ 52). That is, Plaintiffs had never seen the following marketed or sold: an image component in the form of a backpack for an action figure that enhanced role play for the child by depicting the mission of that particular character or obstacles and dangers that character might face. (*Id.*) Moreover, F-P's former inventor relations director and its designers - including the very designers who worked both on Rescue Heroes and also admitted seeing portions of Plaintiffs' submissions - testified either that they had never seen such a product at the time F-P marketed and sold the Video Mission Rescue Heroes, or that they could not identify such a product that existed at that time. (Dize Dec. Exh. B, pp. 143-145; Exh. D, pp. 73-76; Exh. E, pp.99-101, Exh F, pp. 61-63; Exh. G, pp. 47-48).

Moreover, F-P never indicated to Plaintiffs that they were not interested in the concept due to its lack of novelty. (Reiling Dec. ¶ 46; Popek Dec. ¶ 21). The only reasons ever provided regarding F-P's lack of interest were that the concept was too expensive, it was a "one-trick pony" and that it did not fit the current Rescue Heroes theme. (*Id.*) In the past, when F-P had rejected Reiling's concepts on the basis of novelty, they typically indicated that novelty was the reason for the rejection. (*Id.*; Exh. DD; Kipling Dec. ¶ 50). In addition, Plaintiffs' experience has been that toy companies simply do not option a concept if there is an issue about its novelty. (*Id.* ¶ 48; Popek Dec. ¶ 5.) Tellingly, F-P's current Vice President of Inventor Relations, who reviewed Plaintiffs' claim letter and submissions prior to the filing of this lawsuit to determine whether a royalty was owed,

admitted that novelty was not one of his considerations in rejecting Plaintiffs' claim for a royalty. (Dize Dec., Exh. A, pp. 10-11).

The "Rescue Heroes" Characters, Accessories and Line Extensions
Referenced in the Second Amended Complaint are Covered by Plaintiffs' Concept

Plaintiffs' concept, embodied in three submissions to F-P, included the following features: an image component in the form of a backpack for each "Rescue Heroes" action figure that enhanced role play for the child by depicting the mission of that particular "Rescue Heroes" character (for example, obstacles and dangers the character might face), which concept could be expanded into accessories and line extensions relating to the "Rescue Heroes" line pursuant to industry custom and practice. (Reiling Dec. ¶ 58; Popek Dec. ¶ 18.)

A comparison of Plaintiffs' definition of the concept at issue with each of F-P's "Rescue Heroes" products at issue reveals that these products do "embody" essential elements of Plaintiffs' concept because, in particular, the action figures in the "Video Mission," "Mission Select" and "Mission Command" lines each depict an image on the backpack of the figure that enhances role play for the child by depicting the mission of that particular character and/or obstacles and dangers the character might face. (Reiling Dec. ¶ 59; Kipling Dec. ¶ 38).[2]

F-P's Termination of DI's Business

Until 2004, F-P comprised a significant part of DI's business, at times representing over 40% of its revenue. (Popek Dec. ¶ 23.) DI had worked with F-P for over 15 years and always enjoyed an excellent working relationship. (Id.) In the Fall of 2003, F-P attempted to convince DI to drop this lawsuit. (Id.) F-P informed them that if they persisted in this action, they would be "blacklisted", i.e., F-P would no longer give work to DI due to the pending lawsuit, claiming that the decision was

---

[2] For a complete analysis of the substantial similarity between Plaintiffs' 1998, 1999 and 2000 executions of their concept and the F-P accused products, *see* Reiling Dec. ¶¶ 58 – 63; Kipling Dec. ¶¶ 37-43.

made by its corporate parent, Mattel, Inc. (*Id.*; Exh. C). F-P also informed DI that they would not be able to work for F-P in the future until they convinced their co-Plaintiff, Reiling, to also withdraw his claims. (*Id.*) Stan Clutton, F-P's current Vice President of Inventor Relations, admitted these facts during his deposition in this case. (Dize Dec. Exh. A, pp. 138-146, 147-157).[3] Mr. Clutton, during a chance meeting with DI at the 2004 Toy Fair in New York City, again indicated that if DI did not settle, DI and its owners individually would never work for or as an employee of Mattel again. (Popek Dec. ¶ 23.) DI has no control over Reiling and, nevertheless, would not ask him to drop his lawsuit which he feels so strongly about. (*Id.*)

From 1999 to 2003, DI averaged $833,972 in annual business from F-P, F-P Brands and Mattel. (*Id.* ¶ 24.) That business has been lost as a result of F-P's termination of DI's work. (*Id.*) DI, its owners and employees were damaged when F-P terminated their business relationship and indicated that DI would have to drop the lawsuit and obtain Reiling's withdrawal as well before business would be reinstated. (*Id.* ¶ 25.) The result of such action by F-P is that a wedge has been driven between DI and Reiling such that DI has been restricted from working with Reiling on concept generation projects. (Reiling Dec. ¶ 64.) Reiling has also lost business as a result. (*Id.*)

## ARGUMENT

In order to prevail on a motion for summary judgment, F-P must establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); Fed. R. Civ. P. 56(c). A dispute regarding a material fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992). The Court resolves "all ambiguities and draws all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich*, 963 F.2d at 523. Thus, "only

---

[3] The portion of this transcript that has been marked "Confidential" is being filed under seal.

when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

Here, summary judgment is not warranted because genuine issues of material fact exist with respect to all of the grounds raised in F-P's motion.

**I.    THE ISSUE OF NON-USE IS HIGHLY DISPUTED**
(Corresponding to Section III of F-P's Memorandum)

F-P claims that it never "used" Plaintiffs' concept because it never incorporated into any of the accused Rescue Heroes action figures the precise mechanical mechanism disclosed by Plaintiffs in their original 1998 submission.[4] (Def. Mem. at 26-28). In response, Plaintiffs have come forward with significant evidence of both F-P's access to Plaintiffs' submissions and the substantial similarity of the accused products with Plaintiffs' concept. Indeed, even Paul Snyder, F-P's former Vice President of Inventor Relations, believes Plaintiffs are entitled to a royalty for at least the accused Voice Tech Video Mission line. (Dize Dec., Exh. B at 132-136, 139-140). This issue is, therefore, highly disputed and ill-suited for adjudication as a matter of law.

To be sure, Plaintiffs must prove that F-P used Plaintiffs' concept in the accused Rescue Heroes products in order to prevail. (Def. Mem. at 26, n. 66, citing cases). The legal standard for evaluating use in submission of idea cases has not been consistently applied, however. The Second Circuit, in a case applying California law, stated that: Plaintiff "must show not only access but also that the appellees actually used his ideas by demonstrating 'some substantial similarity' between the

---

[4] F-P has advanced the defense of "non-use" despite the fact that its counsel assured the Court on two occasions that it would not do so. (Dize Dec., Exh. J at 34-35; Exh. K at 23-24, 28-29). As such, F-P should be estopped from raising this argument for purposes of this motion.

ideas and themes of the two programs."[5] *Thurman v. Whitfield*, 751 F.2d. 90, 93-94 (2d Cir. 1984)

(reversing lower court's grant of summary judgment in submission of idea case); *see also Wrench*

*LLC v. Taco Bell Corp.*, 256 F.3d 446, 459-60 (6th Cir. 2001) (circumstantial evidence of similarities

between ideas were sufficient to preclude summary judgment despite direct evidence of independent

creation and no direct evidence of defendant's use of plaintiff's idea); *Duffy v. Charles Schwab &*

*Co.*, 2001 U.S. Dist. LEXIS 14070 (D. N.J. Sep. 4, 2001) (same). Other courts in this circuit have

also examined the factors of access and substantial similarity to determine actual use. *See Merritt*

*Forbes & Co. v. Newman Inv. Secur., Inc.*, 604 F. Supp. 943 (S.D.N.Y. 1985) (evaluating issue of

access; summary judgment denied as premature); *Ball v. Hershey Foods Corp.*, 842 F. Supp. 44, 48

(D. Conn. 1993) (plaintiff could not show access or similarity), *aff'd*, 14 F.3d 591 (2d Cir. 1993).

Still other courts have focused exclusively on independent invention, without regard to similarity.

*See AEB & Associates v. Tonka Corp.*, 853 F. Supp. 724 (S.D.N.Y. 1994) (plaintiff could not dispute

independent invention); *Vantage Point, Inc. v. Parker Bros., Inc.*, 529 F. Supp. 1204 (E.D.N.Y.

1981), *aff'd* 697 F.2d 301 (2nd Cir. 1982) (Plaintiff failed to controvert the defendant's evidence of

lack of access).

F-P has not asserted the defense of independent invention for purposes of this motion. (Def.

Mem. at 25-29).  Rather, it has focused exclusively on the issue of similarity, namely it argues that it

never used the mechanical mechanisms disclosed in either the Concept Submission Form submitted

by Plaintiffs in 1998 or the Option Agreement entered into in 1999 in any Rescue Heroes products.

(*Id.*).  F-P's defense should be rejected, for the following reasons.

---

[5] This is equivalent to the standard used to prove the element of copying in a copyright infringement case.
Courts and commentators have long held that the issues of independent invention and similarity are not
properly decided on a summary judgment motion. *See Repp.v. Lloyd Webber*, 132 F.3d 882, 891 (2d Cir.
1997); NIMMER ON COPYRIGHT § 12.10[B](2)(b) ("no matter how credible a claim of independent creation is,
"a court should not grant defendant summary judgment on that basis").

Plaintiffs are not bound by either the Concept Submission Form or the expired Option Agreement for purposes of defining their concept because toy industry custom and practice provides that: (1) concepts submitted by outside inventors are typically broadly construed, without regard to the limited definition provided on written submission forms; (2) the performance of the concept by F-P could be achieved in many different ways (and by means of many different engineering mechanisms) and F-P would still owe a royalty regardless of the particular device used; and (3) the concept may ultimately be changed because the toy company has expended substantial resources to refine and embellish the concept into a "finished" licensed product, but a royalty would still be owed nonetheless. (Reiling Dec. ¶¶ 17, 28-29; Kipling Dec. ¶¶ 26-27, 35-36).

To this end, Plaintiffs and their expert have submitted numerous examples of concepts for which F-P and other toy companies paid a royalty despite the fact that on each occasion the finished toy product bore little resemblance to the original concept submission. (Kipling Dec., Exhs. B-D; Reiling Dec. Exhs. I-K). F-P's witnesses have acknowledged these facts, as they must. (Dize Dec., Exh. A, pp. 84-97; Exh. B, pp. 58-60; Exh. C, pp. 15-20). Thus, even if Plaintiffs are held to the definition of their concept contained in the Option Agreement, as F-P suggests (Def. Mem. at 28),[6] Plaintiffs can still defeat this point because concepts are so broadly construed in the toy industry.

Contrary to F-P's argument, Plaintiffs have not admitted that F-P never incorporated their concept into Rescue Heroes products. (Reiling Dec. ¶¶ 29, 34, 36). In point of fact, Plaintiffs have testified consistently both during discovery and for purposes of this motion that their concept covers all of the accused products. (Id.; Dize Exh., Exh. M). For purposes of this motion, Plaintiffs have

---

[6] Plaintiffs maintain that the definition of the concept in the Option Agreement is not the operative definition because this definition was limited to Plaintiffs' original submission and, therefore, does not reflect the fact that Plaintiffs submitted two additional executions of their concept in 1999 and 2000, after the Option Agreement expired. The definition in the Option Agreement does not reflect that Plaintiffs' concept for an image component to the backpack could be achieved in a multiplicity of different engineering mechanisms and forms, such as the use of still images with different viewing mechanisms. (Kipling Dec. ¶ 26).

provided a detailed recitation of the substantial similarities between their concept and the accused Rescue Heroes products. (Kipling Dec. ¶¶ 37-43; Reiling Dec. ¶¶ 56-63).

Perhaps the best evidence that F-P used Plaintiffs' concept for adding an image component to the backpack of the accused Rescue Heroes' figures is F-P's own words. On the packaging for the accused products, F-P touts the enhanced play value provided by the image component on the backpack:

> **"SEE MY MISSION ON MY VIDEO BACKPACK."**
>
> **"Now the Rescue Heroes figures come to life with voices, sound effects and video images!**
>
> **"Press the video screen and you can see the moving video image on the backpack."**

(Reiling Dec., Exh. CC). Prior to Plaintiffs' submission, F-P had no version of Rescue Heroes which offered children an image on the backpack enhancing role play by depicting the character's mission. The backpacks had no play value at all and were actually referred to as "equipment packs," not backpacks. After Plaintiffs' submission, which referred to the packs as "backpacks," F-P introduced four separate product lines which touted the visual images on the "backpacks." This is hardly a coincidence.

Plaintiffs have demonstrated that F-P had access to Plaintiffs' original submissions. (Dize Dec., Exh. D, pp. 38-40, 44-47; Exh. E, pp. 58-62, 71-74; Exh. F, pp. 45-46, 50-51, 54-55; Exh. Q). Indeed, F-P had Plaintiffs' original materials for five months and a member of the Boys Team had possession of the prototype for at least three weeks – and they have shown that the accused Rescue Heroes products are substantially similar to their concept. (*Id.*) F-P also had access to Plaintiffs' second and third written submissions. (Dize Dec., Exh. H, pp. 8-9, 16-21, 50-52, 57-60; Exh. Q).

For all of these reasons, F-P's defense of non-use should be rejected.