## II.  **PLAINTIFFS' NOVEL CONCEPT IS SUFFICIENTLY CONCRETE**
(Corresponding to Section IV of F-P's Memorandum)

F-P claims that Plaintiffs' definition of their concept lacks sufficient concreteness to warrant legal protection. (Def. Mem. at 29-31).  Without a hint of irony, F-P excoriates Plaintiffs for allegedly "redefining" their concept in an effort to bolster their legal position. (*Id.* at 29).  Yet, at the same time, F-P ignores the very definition that Plaintiffs provided more than one year ago in response to F-P's Interrogatory asking them to define it. (Dize Dec., Exh. L).  Instead, F-P relies on a different definition of the concept in a calculated attempt to show the supposed indefiniteness of Plaintiffs' concept and a lack of novelty. (Def. Mem. at 31).  In any event, a close examination of the documents, drawings and prototype Plaintiffs actually submitted to F-P reveals that their novel concept was sufficiently concrete at the time of submission so as to warrant legal protection. Indeed, Paul Snyder confirmed his understanding of Plaintiffs' concept at his deposition (Dize Dec., Exh. B, pp. 83-84, and Plaintiffs' concept must have been sufficiently concrete for F-P to justify its payment of option fees under the Option Agreement.  (Dize Dec., Exh. V).

### A.  **The Cases Cited By F-P Are Not on Point**

F-P correctly states that Plaintiffs' concept must be concrete in order to warrant legal protection. (Def. Mem. at 30-31).  Of the cases cited by F-P, however, only two of them actually analyzed the concreteness of the ideas at issue,[7] and both of those cases are distinguishable.

In *Link Group Int'l v. Toymax, Inc.*, 2000 U.S. Dist. LEXIS 4567 at *13 (D. Conn. 2000) (Hall, J.), Plaintiff had developed a concept for a laser toy in 1986-1987 that was actually marketed

---

[7] The remaining cases are inapposite because they merely cite the principle that an idea must be concrete, without any subsequent analysis whatsoever. *See Ball v. Hershey Foods Corp.*, 842 F. Supp. 44 (D. Conn. 1993) (court ruled on issue of independent invention, not concreteness); *Oasis Music, Inc. v. 900 U.S.A., Inc.*, 614 N.Y.S.2d 878, 881 (S. Ct., N.Y. Cty., 1994) (issue was lack of novelty, not concreteness); *McGhan v. Ebersol*, 608 F. Supp. 277 (S.D.N.Y. 1985) (same); *Markogianis v. Burger King Corp.*, 42 U.S.P.Q.2d 1862 (S.D.N.Y. 1997) (copyright claim preempted implied contract claim; no discussion of concreteness).

and sold. Plaintiff had also developed several related concepts at that time. In 1995, the defendant

toy manufacturer expressed an interest to develop revised versions of Plaintiff's ideas. While

Plaintiff had created a sample of one of the concepts, sketches and marketing plans for the 1987 toy

that was actually developed, it had not provided any updated materials to the defendant in 1995.

According to the Court, Plaintiff could not show that its updated concept was sufficiently concrete

because it did "not dispute the fact that no prototype or schematics for an updated version of Laser

Combat or, for that matter, for any of the other related concepts . . . were ever submitted to

[defendant]." *Id.* at *13.

In *Educational Sales Programs, Inc. v. Dreyfus Corp.*, 317 N.Y.S.2d 840 (Sup. Ct., N.Y. Cty.

1970), Plaintiff disclosed to defendant an idea "to make tape players and monthly tape cassettes

containing educational and promotional material available free of charge to independent mutual fund

salesmen, with the player, cassettes and contents to be purchased from Plaintiff." *Id.* at 841. The

court held that Plaintiff's concept was "quite malleable and not in such a fixed and concrete form as

to indicate a protectible idea." *Id.* at 845. Indeed, Plaintiff's communications with defendant had

been oral and there was no evidence referenced in the decision regarding any written disclosure or

submission.

In contrast, as shown below, the sketches, written materials and prototype originally

submitted by Plaintiffs to F-P in 1998, as well as the written materials and sketches that Plaintiffs

submitted on two later occasions, were certainly in a "fixed and concrete form" so as to warrant legal

protection. The cases cited by F-P are, therefore, not helpful to its cause.

### B.    Plaintiffs Have Satisfied the Legal Test for Concreteness

In response to F-P's Interrogatory asking Plaintiffs to define exactly what constituted their concept, [8] Plaintiffs provided the following response: Plaintiffs novel concept called for "adding an image component to the backpack of each "Rescue Heroes" action figure that enhanced role play for the child by depicting the mission of that particular "Rescue Heroes" character." [9] (Dize Dec., Exh. L).  To the extent the definition provided by Plaintiffs' expert differs somewhat from the definition set forth in the Interrogatory answer, Plaintiffs' expert has made clear that his definition was meant to be one possible definition, not the controlling legal definition for purposes of this case.[10] (Kipling Dec. ¶¶ 25-26).  As such, F-P's selective use of a different definition from the one that Plaintiffs themselves provided, and their attempt to use that definition to show both indefiniteness and a lack of novelty, should be rejected as inapposite for purposes of evaluating the concreteness of Plaintiffs' submission.

Moreover, Plaintiffs' actual submissions were sufficiently "concrete."  Plaintiffs' initial 1998 submission envisioned an interchangeable battery-operated animated image player that would be placed on the "Rescue Heroes" characters in the form of a backpack. (Reiling Dec., Exhs. O-R). This submission included a prototype, drawings and written descriptions. (*Id.*, Exh. R).   After expiration of the Option Agreement, Plaintiffs re-submitted their concept on two occasions in 1999

---

[8] It is important to note that during a status conference in 2004 the Court stressed the "salutary function" of interrogatory answers (albeit in the context of an answer regarding Plaintiffs' definition of their withdrawn express contract claim). The Court noted that "it is not wholly unusual for Plaintiffs themselves to not know the nuances of their own legal claims," and that interrogatory responses allowed the party to "get out on the table what your claim is, what it covers . . . ." (*See* Dize Dec., Exh. J at 20-21).

[9] This same definition was also advanced by Plaintiff Reiling in connection with Plaintiffs' Motion for Leave to File a Second Amended Complaint. (*See* Declaration of Victor Reiling, dated March 4, 2004, ¶ 4).

[10] According to Mr. Kipling, F-P's argument about lack of concreteness is much ado about nothing because: (1) toy companies routinely license and pay royalties for broadly defined concept submissions; and (2) because F-P used Plaintiffs' concept without a license agreement, this litigation is the first opportunity for Plaintiffs to put forward their own definition of the concept. (Kipling Dec. ¶ 26).

and 2000 to show two additional executions of the concept – the use of still images either by means of a wheel, drum or round disk. (*Id.*, Exh. X, Y). Once again, Plaintiffs sent F-P additional drawings and additional written descriptions. (*Id.*, Exh. Y).

Plaintiffs' actual submissions, as well as their own definition of the concept, have none of the ambiguity that F-P finds so offensive, such as usage of the terms "device" or "cue." (Def. Mem. at 31-32). Instead, Plaintiffs concept is quite specific – it was restricted to (i) an image; (ii) on the backpack of a "Rescue Heroes" action figure only;[11] and (iii) to enhance role play for the child by depicting the mission of that particular "Rescue Heroes" character. (Dize Dec., Exh. L). And just as in *Nadel*, Plaintiffs submitted a prototype to demonstrate one execution of their concept. *See Nadel*, 208 F.3d 368 (court never raised issue of concreteness). As such, Plaintiffs have shown that their novel idea was sufficiently concrete at the time of submission so as to warrant legal protection. *See Galanis v. Procter and Gamble Corp.*, 153 F. Supp. 34, 38 (S.D.N.Y. 1957) (Plaintiff's letter describing idea that combined two other products was sufficiently concrete; summary judgment denied).

### III. PLAINTIFFS' CONCEPT WAS BOTH ORIGINAL AND NOVEL AT THE TIME OF SUBMISSION
(Corresponding to Sections V and VI of F-P's Memorandum)

In *Nadel*, the Second Circuit held that in submission of idea cases a party must prove its idea was original (or "absolutely novel") to support tort-based claims and novel to the buyer to support contract-based claims. *Nadel*, 208 F.3d at 380. The court also held that the question of novelty involved a "fact-specific inquiry," and provided only a single instance where courts could resolve novelty as a matter of law:

---

[11] F-P's repeated arguments that Plaintiffs' concept could apply to other action figures (Def. Mem. at 31-33), is simply incorrect. Plaintiffs have always maintained that their concept was specific to the Rescue Heroes line. (Dize Dec., Exh. L).

> [A]n idea [] may be *so unoriginal or lacking in novelty that its*
> *obviousness bespeaks widespread public knowledge of the idea . . .* In
> such cases, a court may conclude, as a matter of law, that the idea lacks
> both the originality necessary to support a misappropriation claim and the
> novelty to the buyer necessary to support a contract claim.

*Id.* at 378-79 (emphasis added); *see also Bieda v. J.C. Penny Communications, Inc.*, 1995 U.S. Dist.

LEXIS 10309, at *9 (S.D.N.Y. July 25, 1995) (Keenan, J.) ("[t]he Court is not in a position to

determine whether or not the idea was novel and leaves that issue to the jury as well"); *Brady v.*

*Orion TV Productions, Inc.*, 15 U.S.P.Q.2D 1389 (S.D.N.Y. 1990) (summary judgment denied

because of factual issues); *Belt v. Hamilton Nat'l Bank*, 108 F. Supp. 689, 692 (D.C. Cir. 1952)

(novelty is a jury issue); *Tate v. Scanlan Int'l, Inc.*, 403 N.W.2d 666 (Ct. App. Minn. 1987) (same).

Following *Nadel*, summary judgment on the issue of novelty is now the rare exception, rather than

the rule.[12]

*Nadel* also set forth the factors to determine whether an idea is original or novel: "the idea's

specificity or generality (is it a generic concept or one of specific application?), its commonality

(how many people know of this idea?), its uniqueness (how different is this idea from generally

known ideas?), and its commercial availability (how widespread is the idea's use in the industry?)."

*Nadel*, 208 F.3d at 378.

Here, Plaintiffs have satisfied each of the above-listed criteria for purposes of this motion, to

wit:  Plaintiffs' concept had a specific, rather than general, application, namely, incorporating an

image component on a backpack for each Rescue Heroes character to show the character's mission

or obstacles and dangers the character might face.  Secondly, the concept was not commonly known

---

[12] It is telling that in the five years since *Nadel* only one court in this Circuit granted summary judgment on
the issue of novelty in a submission in idea case. *See Khreativity Unlimited v. Mattel, Inc.*, 101 F. Supp.2d
177 (S.D.N.Y. 2000), *aff'd*, 242 F.3d 366 (2d Cir. 2000).  There, the court granted summary judgment for
precisely the reason stated in *Nadel*, namely Plaintiff's idea of a cross-marketing venture between Mattel and
the NBA was so unoriginal and lacking in novelty.

in the industry, as evidenced by the fact that no other companies had executed it before. Third, the idea was unique in that it was different from generally known ideas. For example, Plaintiffs do not dispute that images had been used in connection with action figures before. However, to the best of their knowledge, such images had never been used on a backpack to enhance role play by depicting the character's mission or obstacles and dangers the character might face. And again, such images had never been used in connection with Rescue Heroes. Finally, the concept was simply not commercially available in the marketplace at the times Plaintiffs' three executions were submitted. (Reiling Dec. ¶ 45; Kipling Dec. ¶¶ 48-54).

All of F-P's arguments regarding the lack of novelty of Plaintiffs' concept fall of their own weight, as set forth below.

### A. Plaintiffs' Concept was Novel to F-P at the Time of Submission

1. F-P Once Again Seeks to Apply the Wrong Legal Standard to Contract-Based Claims in Submission of Idea Cases

Incredibly, F-P repeats the same erroneous argument that it made in opposition to Plaintiffs' motion for leave to amend the complaint, namely that the "heightened" novelty standard applies to all of Plaintiffs' claims, including its breach of implied contract claim. (Def. Mem. at 35-37). In fact, *Nadel*, makes clear that novelty to the buyer standard applies to all contract-based claims, including claims for breach of an implied-in-fact contract. *See* 208 F.3d at 373, 376-77, n. 5, 380.[13] Court decisions interpreting *Nadel* confirm this conclusion. *See Duffy v. Charles Schwab & Co., Inc.*, 2001 U.S. Dist. LEXIS 14040, at *14 (D. N.J. Sept. 4, 2001) ("a showing of novelty to the buyer will supply sufficient consideration to support an implied-in-fact contract;" interpreting *Nadel*).

F-P, nevertheless, claims that Plaintiffs agreed that the heightened novelty standard should apply to any contract-based claim by executing the P&A Form and Option Agreement. (Def. Mem.

---

[13] Nadel asserted a claim for breach of implied-in-fact contract. (Dize Dec.¶ 20).

at 36). F-P's argument lacks any legal foundation and is factually untenable, for the following reasons.

First, the cited clauses from the P&A Form and Option Agreement (*see* Def. Mem. at 36-37), are, at best, ambiguous on this particular point. Since F-P prepared these agreements and Plaintiffs were not represented by counsel, any ambiguity in the agreements must be construed against F-P. *See Rentways, Inc. v O'Neill Milk & Cream Co.*, 308 N.Y. 342, 348, 126 N.E. 2d 271, 273 (1955). Summary judgment may be granted only where the language is unambiguous and conveys a definite meaning. *Sayers v. Rochester Tel. Corp.*, 7 F.3d 1091, 1094 (2d Cir. 1993). *See Financial Technologies Int'l, Inc. v Smith*, 247 F. Supp. 2d 397, 405 (S.D. N.Y. 2002); *Pollak v. Lincoln Center for the Performing Arts, et al.*, 276 A.D. 2d 403, 715 N.Y.S. 2d 9 (1st Dep't 2000) (parol evidence necessary to elucidate dispute portions of contract).

Second, F-P cannot rely on the Option Agreement as a sword in this instance because the Option Agreement expired and Plaintiffs' implied in fact contract claim is not now, nor ever was, based on the expired Option Agreement.[14] (Second Amended Complaint ¶¶ 42-47; Dize Dec., Exh. N). Finally, F-P's argument must fail at least with respect to Plaintiff DI because, as set forth below, DI is not bound by any P&A Form for purposes of this lawsuit.

      2.     F-P's Own Conduct and Testimony Belies
                    <u>Its Claim of Lack of Novelty</u>

F-P cannot escape a finding of novelty to the buyer by claiming that James Bauman and Tyler Berkheiser were aware as of 1998 of a few examples of other toy products that F-P purports to be prior art (Def. Mem. at 45-46), when these same individuals testified as to the novelty of

---

[14] The Court ruled on this issue in a prior decision, *Victor G. Reiling and Assocs. v. F-P, Inc.*, 2003 U.S. Dist. LEXIS 13277, at *9 (D. Conn. July 31, 2003), which is now "law of the case." *Agostini v. Felton*, 521 U.S. 203, 236 (1997); *Messenger v. Anderson*, 225 U.S. 436, 444 (1912); *Prisco v. A & D Carting Corp.*, 168 F.3d 593, 607 n.10 (2d Cir. 1999).

Plaintiffs' concept. (Dize Dec., Exh. D, pp. 73-76; Exh. G, pp. 47-48). Moreover, F-P has expressly, through its own words, and impliedly, through its conduct, admitted that Plaintiffs' concept was novel to F-P as of the date of submission. To this end:

- F-P's representatives never expressed a concern over lack of novelty prior to this lawsuit, despite having at least seven chances to do so from 1998 through 2001. (Kipling Dec. ¶ 50).

- It is the custom and practice in the toy industry for toy companies to state lack of novelty as a basis for rejecting a concept submission at the time of rejection.(Reiling Dec. ¶ 46, DD; Kipling Dec. ¶ 50). This is F-P's practice as well. (Reiling Dec., Exh. DD). This was never done.

- F-P's current and former Vice-Presidents of Inventor Relations, the individuals whose job it was to interface with toy inventors and to serve as gatekeepers for the company, both testified that they never considered lack of novelty to be an issue at any point. (Dize Dec., Exh. A, pp. 109-111; Exh. B, 143-145).

- F-P's entry into an Option Agreement and payment of option fees for Plaintiffs' concept evidences that the company did not consider lack of novelty to be an issue as of the date of execution. (Kipling ¶ 51, Exh. A; Dize Dec., Exh. B, pp. 65-72, 75-76).

All of these facts conclusively establish that Plaintiffs' concept was novel to F-P at all relevant times herein. *See Bieda*, 1995 U.S. Dist. LEXIS 10309 at *9 (defendants' statements that plaintiffs' idea was "unique" and "new" precluded summary judgment).

**B.     Plaintiffs Have Also Satisfied the Absolute Novelty Standard**

Plaintiffs have at least shown the existence of genuine issues of material fact regarding the absolute novelty of their concept submission in order to send their misappropriation and common law unfair competition claims to a jury.

1. F-P's Evidence of Alleged Prior Art is
   Distinctly Different From Plaintiffs' Concept

F-P once again mischaracterizes Plaintiffs' concept in an effort to raise additional examples of prior art that do not, in fact, anticipate Plaintiffs' concept. (Def. Mem. at 37-41). To reiterate, Plaintiffs' concept is limited to images only on backpacks and only for Rescue Heroes characters. (Dize Dec., Exh. L). F-P's self-serving arguments to the contrary simply mischaracterize the true nature of Plaintiffs' concept and its claims.

As a threshold matter, the examples of prior art in the summary judgment record are not at all relevant (for reasons more fully discussed in the accompanying Declarations of James Kipling (¶ 54) and Victor Reiling (¶¶ 47-53).

• **Toy Biz Projector Figures**. This toy projects an image from its chest, rather than from a backpack; and (2) the toy projects an image out onto a wall or screen, while Plaintiffs' concept envisions a view-in device allowing the child to view the image in the backpack itself, not on a wall. There is also no indication that the image depicts the mission of that character, so it does not serve to enhance play value as does Plaintiffs' concept. Essentially, it is an entirely different toy.

• **Secret Wars**. The images are only visible to one who is facing the figure from the front, i.e., when properly positioned, the image cannot be "seen" by the figure itself. Therefore, the images cannot be messages to or mission assignments for the figures, and fail to fulfill the definition of Plaintiffs concept set forth above. Moreover, the Secret Wars figures fail to anticipate Plaintiffs' submission because none of the figures is a Rescue Heroes character, and the images are not on, in or otherwise associated with the Rescue Heroes backpacks (or any other backpacks) as principally intended by Plaintiffs' submission.

• **Playsets and Other Accessories**. None of the playsets involve Rescue Heroes. Plaintiffs have always maintained that line extensions and accessories relating to the accused Rescue

Heroes characters are covered pursuant to industry custom and practice. To the extent that any of the accused accessories also makes use of a specific execution disclosed in Plaintiffs' drawings or written submission (such as the use of a dial to display images used in connection with a Rescue Heroes character to enhance role play by depicting that particular mission), they would also be covered by the concept. These two considerations are not mutually exclusive.

Even assuming, *arguendo*, that the instances of prior art contained in the summary judgment record actually anticipate Plaintiffs' concept, the few remote instances are insufficient to show that use or knowledge of Plaintiffs' concept was "common" or "widespread" in the industry prior to 1998. *See Nadel*, 208 F.3d at 380-81 (genuine issue of fact existed with regard to more than 12 instances of alleged prior art demonstrated lack of absolute novelty; lower court's grant of summary judgment reversed). In short, it is too little and too late.

2. Plaintiffs' Concept Represents True Innovation,
   Not a Mere Combination of Elements

Plaintiffs recognize that prior to the *Nadel* decision several courts granted summary judgment in favor of defendants on the ground that the concepts at issue represented merely "variations on a basic theme" or a "clever and useful adaptation of existing knowledge." (Def. Mem. at 43-44, citing cases).

As a threshold matter, however, Plaintiffs have established as a factual matter that their concept represents true innovation, because the concept of adding an image component to the Rescue Heroes product line was so revolutionary (and clearly so valuable to F-P because of the widespread use that they have made of the concept, on no less than four different product lines). (Dize Dec., Exh. A, pp. 138-142; Exh. B, pp. 186-187; Reiling Dec. ¶ 19; Popek Dec. ¶ 13).

In addition, Plaintiffs submit that the principle that a combination of existing elements cannot be novel contravenes thirty years of toy industry custom and practice. (Kipling Dec. ¶ 57, Exhs. B-

D). Indeed, for years toy companies have routinely licensed concepts that consisted of nothing more than "x known element + y known element will make a great z toy."[15] (*Id.*) Moreover, the definition of Plaintiffs' concept written by F-P's own lawyer in the parties' Option Agreement states that "<u>the unique aspect of the concept is the combination of existing action figures with film for play pattern.</u>" (Dize Dec., Exh. V). F-P, therefore, recognized that the combination of existing elements could be novel. This fact is at least sufficient to raise a genuine issue of material fact for purposes of the absolute novelty determination for a jury to consider.

It also strains credulity to reconcile how a combination of non-novel elements can be sufficient to show novelty for purposes of patent law and trade secret law, *see, e.g.*, *Intel Corp. v. U.S. Int'l Trade Comm.*, 946 F.2d 821, 842 (Fed. Cir. 1991) ("That all elements of an invention may have been old . . . is however, simply irrelevant. Virtually all inventions are combinations and virtually all are combinations of old elements"); *Integrated Cash Management Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 ("a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage"), but not for submission of idea cases, particularly when the Second Circuit has explained that the term novelty is used in a "weaker" sense in submission of idea cases than in patent law. *See Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.*, 118 F.3d 955, 968-969 (2d Cir. 1997).

     3.    <u>Plaintiffs' Cameraman Figure is Also Novel</u>

F-P claims that its own TV cameraman figure from the 1970s detracts from the novelty of Plaintiffs' concept for the "Fillmore Schotz" character. (Def. Mem. at 45). That figure is not at all

---

[15] Certain cases, like *Link Group.*, 2000 U.S. Dist. LEXIS 4567, are distinguishable from the present case in any event. In *Link Group*, Plaintiff's concept had actually been sold in commerce 8 years before he sought to bring it back with a new company. There was nothing unique about the later submission.

relevant, however. First, while F-P's optical camera from the 1970s and its current optical camera used in conjunction with the "Telly Photo Optic Force" figure are similar, Plaintiffs are not seeking to claim novelty for the type of camera mechanism used. Rather, Plaintiffs claim novelty for the look and feel of the cameraman figure, including the fact that he was holding an optical camera (which enhanced mobile play value) in one hand and a microphone in the other. Moreover, the 1970s product was certainly not an action figure, it is more fairly characterized as a doll. It was a small, free-standing reporter and studio-type camera apparatus that bears no resemblance to Plaintiffs' concept, which involved an attempt to draw an association between the action figure and the figure's mission. (Reiling Dec. ¶¶ 50-51; Kipling Dec. ¶ 54(d).

## IV. F-P'S P&A FORMS DO NOT BAR PLAINTIFFS' CLAIMS
(Corresponding to Sections I(a), II and VII of F-P's Memorandum)

F-P asserts that Plaintiffs' claims are barred in whole or in part by the waiver provisions of its P&A Form. (Def. Mem. at 17-18, 23-25, 46-47). Specifically, F-P contends that:

(a) Plaintiffs' claim for breach of an implied in fact contract is barred because the P&A Form provides that "[n]o obligation of any kind is assumed by, nor may be implied against, F-P, Inc., unless and until a formal written contract has been entered into . . . ." (Def. Mem. at 17-18; Bollinger Dec., Exh. A, ¶ 2);

(b) Plaintiffs' misappropriation claim is barred because the existence of a confidential relationship is an essential element of a claim for misappropriation under New York law and the P&A Form states that "no confidential relationship is to be established" by the disclosure. (Def. Mem. at 23-25; Bollinger Dec., Exh. A, ¶ 2); and,

(c) All of Plaintiffs' claims are barred because the P&A Form states that F-P is "released from any liability in connection with the receipt and examination of your disclosure,

36

except as to such liability that may accrue under any valid patents or copyrights . . . ." (Def. Mem. at 46-47; Bollinger Dec., Exh. A, ¶ 3).

Importantly, no P&A Form covers Plaintiff DI for purposes of this case, and compelling reasons militate against applying the 1994 blanket waiver against Plaintiff Reiling.

## A.    No F-P P&A Form Covers Plaintiff DI's Submission in This Case

Remarkably, throughout its brief F-P repeatedly argues that the P&A Form bars "Plaintiffs' claims," yet F-P utterly fails to reference exactly how Plaintiff DI is bound by any such Form. (*See* , *e.g.*, Def. Mem. at 17-18). Plaintiff's expert attaches a P&A Form that one of DI's officers signed in 1992 (Bollinger Dec., Exh. 2; Benedetto Dec., Exh. A), but that Form is a concept specific form that is <u>not applicable</u> to DI's submission in this case. That particular iteration of the P&A Form proffered by F-P only applied to the specific concept submission referenced in the Form. F-P later changed its policy to have inventors sign such forms annually, and then changed its policy once again as of 1994 to adopt Forms of an indefinite duration. (Lane Dec., Exhs. 16, 17, 20).

A comparison of the plain language of the 1992 and 1994 iterations of the Forms confirms that the 1992 version was concept-specific and not meant to be a "blanket" waiver covering all future submissions. (Compare Bollinger Dec., Exhs. A and B). For example, (1) the 1992 form states that "Our policy requires that we accept outside submissions **only when accompanied by a signed copy of this Agreement . . .,**" while the language changed in 1994 to read: ""Our policy requires that we accept outside submissions **only when a copy of this Agreement is signed . . .**"; (2) the 1994 Form contemplates future concept submissions in paragraph 4 and it contains a term clause on page 2 of an indefinite duration, while the 1992 Form contains neither provision; and (3) the second page of the 1992 Form asks for the "name of submission," "brief description of disclosure" and "unique points of differentiation," while the 1994 Form has no such provisions

because it was intended to be a blanket waiver. (*Id.*)  Simply put, nothing about the 1992 Form in any way suggests that it was intended to cover any submission other than the craft items submission referenced therein, much less last in perpetuity.[16]  Accordingly, the terms of the 1992 Form expired with respect to Plaintiff DI upon F-P's failure to license that particular concept, and certainly cannot be read to govern any future submission by Plaintiff DI, including, but not limited to, the submission at issue in this case that occurred six years later.

Nor is DI bound by the P&A Form that Plaintiff Reiling signed in 1994, prior to their business relationship. (*See* Bollinger Exh. A).  The testimony is clear that Reiling was not acting as DI's agent, nor did he have actual or apparent authority to act as DI's agent, at the time of submission in 1998, 1999 or 2000. (Reiling Dec. ¶ 5; Popek Dec. ¶ 6; Benedetto Dec. ¶ 6; Dize Dec., Exh. T, pp. 22-23).  "A principal is bound to a third person by acts of another person when the principal has **expressly** given the latter authority to act on its behalf." *AEB & Associates*, 853 F. Supp. at 732 (Plaintiff-inventor had given express authority to agent to enter into waiver agreement on its behalf).  In *Fasa Corp. v. Playmates Toys*, 892 F. Supp. 1061, 1064-65 (N.D. Ill. 1995), the court squarely dealt with this issue in a submission of idea case:

> Because [toy inventor] did not confer authority on [agent] to waive its intellectual property rights in BATTLETECH, and because [agent] did not believe that he had authority to waive [toy inventor's] property rights, the Court finds that [agent] did not have actual authority to waive [toy inventor's] intellectual property rights . . . [defendant] has failed to establish that [agent] had ostensible authority to waive [toy inventor's] intellectual property rights in BATLETECH).

*Id.* at 1065.  F-P has not raised the issue of agency in its moving papers, nor was it able to make any

---

[16] This fact distinguishes the 1992 Form from the confidentiality agreement at issue in *AEB & Associates*, where the court enforced a waiver agreement that contained a two-year term obligating the toy company to maintain confidentiality because the agreement stated that the terms "**shall be in perpetuity** unless modified or terminated as specified herein." 853 F. Supp. at 732-33 (emphasis added).  The 1992 P&A Form contains no such provision.

headway on this issue during discovery. The reason is clear: Plaintiffs have testified that their submission was intended to be a joint submission - as evidenced by the fact that both Reiling and DI signed the Option Agreement – and at no time did Reiling have actual or apparent authority to bind DI.[17]

Accordingly, F-P's P&A Form is not a legal impediment to Plaintiff DI for purposes of any cause of action in this case.

**B.    The 1994 P&A Form Should Not Bar Plaintiff Reiling's
Claims Under the Circumstances of This Case**

The enforceability of the 1994 P&A Form against Plaintiff Reiling is not as clear-cut as F-P would have the Court believe. Any waiver of tort liability must be clear and unambiguous. *Burten v. Milton Bradley Co.*, 763 F.2d 461 (1st Cir. 1985) (rejecting toy company's waiver agreement that disclaimed "any relationship" and any liability except arising under patent law). Courts have enforced waiver agreements containing language similar to the 1994 P&A Form against toy inventors on two occasions where the submission either accompanied the waiver agreement, *see AEB & Associates*, 853 F. Supp. at 728-29, or was close in time. *See M.H. Segan Limited Partnership v. Hasbro, Inc.*, 924 F. Supp. 512 (S.D.N.Y. 1996) (two submissions post-dated waiver agreement by one year). But no court has ever enforced a blanket waiver agreement, requiring the inventor to waive all unknown, future claims on concepts not yet created in perpetuity, under circumstances resembling the facts of this case.

Reiling testified that he did not understand at the time of the 1998, 1999 and 2000 concept submissions that they were to be governed by the 1994 P&A Form. (Dize Dec., Exh. I, pp. 225-229). Such an understanding is reasonable since the Concept Submission Form pursuant to which these

---

[17] The fact that only Reiling attended the concept submission meeting is, by itself, insufficient evidence to establish an agency relationship with DI. *See Fasa Corp.*, 892 F. Supp. at 1063-1064.

concepts were submitted failed to make any reference to the earlier 1994 P&A Form for or to any of its terms. (Reiling Dec., Exh. O).  The Declarations of Victor Reiling and James Kipling set forth in detail the litany of compelling reasons why it would be a manifest injustice to enforce the blanket 1994 P&A Form against Plaintiff Reiling.  (Reiling Dec. ¶¶ 6-15; Kipling Dec. ¶¶ 15, 20-21). These reasons include:

— Reiling's relationship with F-P is the essence of a one-sided, adhesionary relationship, which has been exacerbated by the consolidation in the toy industry during the past 15 years. Reiling was aware that he had to sign any form that F-P put in front of him in order to get F-P to consider his submissions.

— Irrespective of Reiling's toy industry experience, it was not reasonable for him to appreciate the significance of the waiver provisions contained in the 1994 P&A Form.  They do not clearly and unambiguously alert the toy inventor about the enormous loss of rights for all future concept submissions.  Even worse, the language that states "We assure you that we intend to deal with you fairly in connection with your disclosure" is some sort of Orwellian double-speak that lulls the inventor into a false sense of security.  Despite the comforting language of the agreement, assuring fair treatment, the non-attorney inventor is still supposed to comprehend that by signing the agreement he or she will have no legal claim for breach of an implied-in-fact contract or misappropriation in the event the toy company uses (or outright steals) the idea and fails to pay the inventor.

— Moreover, formal agreements are not uniform among toy companies.  Most toy companies do not require blanket waivers.  Some toy companies have terms that are the polar opposite of the terms in the 1994 P&A Form. For example, Hasbro, the second largest toy company,

40

provides a form that actually establishes a confidential relationship with inventors.[18] (Reiling Dec., Exh. G). The marked differences in the language of toy company agreements further serves to confuse toy inventors.

—  Most importantly, the Concept Submission form signed by Reiling in 1998 with respect to the subject concept contained no reference to the 1994 P&A Form or to any of its terms. This deviates from the longstanding practice of F-P and other toy companies. The four-year passage of time from execution of the 1994 P&A Form to the time of Reiling's first submission: (i) renders it unreasonable that Reiling would believe that he remained bound by the prior agreement for purposes of the Reel Heroes submission; (ii) gives rise to a strong argument that the execution of the Option Agreement was a constructive termination of the 1994 Policy and Agreement; and/or (iii) renders the applicable provisions of the 1994 Policy and Agreement void as against public policy under the circumstances of this case, *even if it otherwise survived scrutiny* under minimum standards of public policy.

—  It is well settled that contracts for an indefinite duration are violative of public policy and are terminable at will. *See White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1062 (2d Cir. 1993); *Kendall-Jackson Winery, Ltd. v. Branson*, 82 F. Supp. 2d 844 (N.D. Ill. 2000). Here, F-P's acceptance of a concept using a form that made no reference whatsoever to the earlier signed 1994 P&A Form or any waiver of a confidential relationship followed by the parties subsequently entering into an Option Agreement for the concept at issue that contains rights and obligations quite different than the 1994 P&A Form — including the creation of a confidential relationship between the parties — should reasonably constitute a constructive termination of that earlier signed blanket Form.

---

[18] Years ago Hasbro utilized a restrictive, perpetual waiver form akin to F-P's P&A Form. Plaintiffs' expert, James Kipling, convinced Hasbro to change its form because he was concerned that it would one day be struck down by a court for violating public policy. (Kipling Dec. ¶ 15(b)).

    –  "The standard custom and practice in the toy industry calls for companies to treat the submission of an idea as confidential." *Nadel*, 208 F.3d at 371. Plaintiffs and other inventors (including F-P's own toy industry expert) believe that toy companies will maintain the confidentiality of their submissions. (Reiling Dec. ¶ 22; Popek Dec. ¶ 17; Benedetto Dec. ¶ 17; Dize Dec., Exh. B, pp. 62-63; Exh. C, pp. 52-54, 206-209; Exh. E, p. 46; Exh. F, p. 35).

    For these reasons, it is more appropriate to look to the cases that failed to enforce waiver agreements in circumstances that were remarkably similar to, or in certain cases even less compelling than, the facts presented here. In *Fasa Corp.*, 892 F. Supp. at 1066, the court held that the toy company's waiver agreement, which was signed at the time of the inventor's submission, was "unenforceable because it purports the signor to waive unknown future claims. Such a waiver is void against public policy." Similarly, in *Anderson v. Century Products Co.*, 943 F.Supp. 137 (D.N.H. 1996), the court held:

> The general language of this provision of the ISP form is not of sufficient clarity to waive Century's tort liability. To constitute a clear and unambiguous waiver, the language must disclaim the specific obligation that the waiving party seeks to avoid. *See Burten, supra,* 763 F.2d at 466 (holding that contract clause purporting to limit Plaintiff to "such rights as I may have under U.S. Patent laws" did not preclude recovery for tortuous misappropriation of trade secret); *see also Audley v. Melton,* 138 N.H. 416, 418, 640 A.2d 777, 779 (1994) (holding that promise to hold defendants "free of any or all liability" did not release defendants from liability for negligence because language was too general). If a party refuses to conform his conduct to the requirements of tort law, he should have to bear the costs of forewarning other market participants with which he hopes to deal. **Thus the waiving party has the responsibility of announcing his disclaimer in language that leaves no doubts as to the specific conduct he wishes to hold above the state's tort law. General language in paragraph 9 of the ISP form attempting, in one broad sweep, to nullify all Plaintiff's rights except those that arise under patent law does not discharge Century's responsibility of explicit candor to the inventor community, and all Plaintiff's tort claims will not be bundled up and discarded. Century would cut with an axe where it should be doing so with a scalpel.**

*Id.* at 150-51 (emphasis added) (also rejecting provision disclaiming "any confidential relationship" between the parties). *See also Injection Research Specialists, Inc. v. Pacer Industries, Inc.,* 48 U.S.P.Q.2d 1719, 1727 (Fed. Cir. 1998) (affirming jury verdict and rejecting appellant's arguments related to enforceability of waiver agreement disclaiming "accept any submissions on confidential basis" and all obligations on the ground that language was not sufficiently clear); *NetTech Solutions, L.L.C. v. ZipPark.com,* 2001 U.S. Dist. LEXIS 14753 (S.D.N.Y. Sept. 20, 2001) (Scheindlin, J.) ("without evidence to the contrary, a waiver must be interpreted to encompass only those future claims that the parties could have reasonably expected might be brought against each other at the time it was agreed upon"; summary judgment denied); *Levin v. The Gap, Inc.,* 1998 U.S. Dist. LEXIS 20378 (Dec. 30, 1998) (Chin J.) (refusing to enforce defendant's waiver agreement and distinguishing *Segan v. Hasbro*, 924 F. Supp. 512 (S.D.N.Y. 1996); summary judgment denied).

## V.    THERE IS NO BASIS TO DISMISS PLAINTIFFS' CLAIM FOR BREACH OF AN IMPLIED IN FACT CONTRACT
(Corresponding to Sections I(b)-(d) of F-P's Memorandum)

An implied in fact contract arises "when the agreement and promise have simply not been expressed in words, but a court may justifiably infer that the promise would have been explicitly made, had attention been drawn to it." *Nadel,* 208 F.3d at 376, n.5 (citations omitted). "An implied in fact contract requires such elements as consideration, mutual assent, legal capacity and legal subject matter . . . The element of mutual assent . . . must be inferred from the facts and circumstances of each case, including such factors as the specific conduct of the parties, industry custom, and course of dealing." *Id.* Plaintiffs addressed F-P's defense based on the P&A Form above. F-P's remaining defenses will be addressed in turn.

A.    **The Expired Option Agreement Cannot Bar Plaintiffs' Claim**
(Corresponding to Section I(b) of F-P's Memorandum)

Contrary to F-P's argument, the expired Option Agreement simply does not "cover" Plaintiffs' claim for breach of an implied in fact contract in this case.[19]  Importantly, neither Plaintiffs' claim for breach of an implied in fact contract, nor the claim for breach of an express contract that Plaintiffs withdrew at the outset of the litigation, were ever based on the expired Option Agreement. (Dize Dec., Exh. N).  Rather, the implied contract claim is based on the custom and practice in the toy industry, the parties' prior course of dealing with F-P and the parties' conduct in this case. (*Id*.; Reiling Dec. ¶¶ 37-39).  Moreover, as the Court recognized in an earlier decision, "the express contract claim was never based on the option agreement.  The allegation in the now-dropped breach of express contract claim" was not "that defendants failed to abide by the terms of the option agreement by, for example, failing to pay the $7,500 due under the agreement.  Like every other count in the complaint, the express contract claim could have existed even absent the option agreement . . . ." *Reiling*, 2003 U.S. Dist. LEXIS 13277 at *9. This issue has been decided for purposes of this case pursuant to the "law of the case" doctrine. *Agostini*, 521 U.S. at 236; *Prisco*, 168 F.3d at 607 n.10.

B.    **Plaintiffs' Implied Contract Claim is Definite**
(Corresponding to Section I(c) of F-P's Memorandum)

F-P's argument that Plaintiffs' implied contract claim lacks sufficient definiteness misconstrues the inherent nature of implied contract claims, which are formed not by the parties' express writing or words but, instead, by conduct that is manifested through industry custom, course

---

[19] F-P relies on *Segan*, 924 F. Supp. at 525, where the court held that Hasbro's concept submission waiver agreement barred plaintiff's implied contract claim. To the extent Segan is even relevant on this point because F-P's argument is based on the Option Agreement, not the P&A Forms, this defense fails for the same reasons discussed above – no P&A Form covers Plaintiff DI in this case, and the 1994 Form should not bar Reiling's claims.

of dealing and actual conduct of the parties. *See Nadel*, 208 F.3d at 376, n.5. Moreover, Plaintiffs

provided a comprehensive definition of their implied contract claim in response to a F-P

Interrogatory. Hence, F-P has had due notice of the definite nature of Plaintiffs' implied contract

claim.[20] See *Brady*, 15 U.S.P.Q.2d at 1391-92 (plaintiff "has raised questions of fact with respect to

the negotiations between the parties, custom in the television industry regarding the submission of

ideas for television episodes, and defendants' use of plaintiff's ideas in the "Old Ghosts" episode";

summary judgment inappropriate for implied contract claim).[21]

    C.    **The Statute of Frauds Does Not Bar Plaintiffs' Implied Contract Claim**
            (Corresponding to Section I(d) of F-P's Memorandum

    F-P asserts that the implied-in-fact contract is barred by the statute of frauds because it is

incapable of performance in one year. (Def. Mem. at 22). However, "'[it] is not the meaning of the

statute that the contract must be performed within a year…if the obligation of the contract is not, by

its very terms, or necessary construction, to endure for a longer period than one year, it is a valid

agreement, although it may be capable of an indefinite continuance.'" *North Shore Bottling Co., Inc.*

*v. C. Schmidt and Sons, Inc.*, 22 N.Y.2d 171, 175, 239 N.E.2d 189, 191, 292 N.Y.S.2d 86, 89 (NY

1968). An implied-in-fact contract can be performed within one year. *See Circle Line Sightseeing*

*Yachts, Inc. v. Circle Line-Statue of Liberty Ferry, Inc.*, 2003 U.S. Dist. LEXIS 1501 at *8

(S.D.N.Y. Feb. 4, 2003) (explaining that "'the Statute of Frauds will not act as a bar however

unexpected, unlikely, or even improbable that such performance will occur during [one year].'"

---

[20] The fact that Plaintiffs failed to reference a specific royalty figure in the Second Amended Complaint is
of no consequence because application of a reasonable royalty is based on industry custom and practice.
Plaintiffs' expert provided a reasonable royalty in his expert report. (Kipling Dec., Exh. A)
[21] *Baer v. Chase*, 392 F.3d 609 (3d Cir. 2004) is distinguishable on this point. In that case, Plaintiff had tried
to enforce a "vague" express oral contract, then abandoned it on appeal and emphasized an alleged implied
contract. Here, the parties have a significant history of course of dealing, in which they expect to and have
been compensated when F-P has used their submissions. Toy industry custom and practice is also well-
defined on this point. Moreover, the conduct of the parties here, including the series of meetings, gave rise to
a "meeting of the minds" on the issue of payment if F-P were to use Plaintiffs' concept.

The implied-in-fact contract in this case could have been performed within one year. (Reiling Dec. ¶ 39.) For instance, F-P could have commenced sales of royalty-bearing products, and then stopped selling them within a few months for a variety of reasons. (*Id.*) F-P had no obligation to continue to sell royalty-bearing products for a particular period of time. (*Id.*) "'[T]he statute only applies to agreements which are, by express stipulation, not to be performed within a year.'" *North Shore*, 292 N.Y.S. 2d at 89. Plaintiffs' never stipulated that future sales could not take place within one year. (Def. Mem. at 22). *See Nakamura v. Fujii*, 253 A.D.2d 387, 677 N.Y.S.2d 113 (1st Dep't 1998) (explaining that where the agreement was "absent[t] of any terms mandating payments ... *at specific times*, [it] cannot be said that the agreement could not be performed within one year, notwithstanding its duration in fact." (emphasis added) *See, e.g., Silberberg v. Haber*, 42 A.D.2d 552, 345 N.Y.S.2d 558 (1st Dep't 1973) (finding it possible to create several portfolios of art and sell all of the art within one year.).

Regardless, this question involves genuine issues of material fact and is inappropriate for summary adjudication. *See Davis & Davis v. S&T World Products*, 154 A.D.2d 330, 545 N.Y.S.2d 806 (2d Dep't 1989) (where defendants denied the existence of any licensing agreement and Plaintiffs maintained the agreement was terminable at will this raised "issues of material fact ...requiring the denial of the application for summary judgment.").

Fisher-Price claims that the agreements at issue in the *Koret* and *Diversified Group* cases are the same type of implied contracts as Plaintiffs' implied contract. (Def. Mem. at 22). However, the agreements in both *Koret* and *Diversified Group* are better characterized as broker agreements, which in New York are required to be in writing. *See Koret, Inc. v. RJR Nabisco, Inc.*, 702 F. Supp. 412, 414 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 307 (2d Cir. 1989); *Diversified Group, Inc. v. Daugerdas*, 139 F. Supp. 2d 364 (S.D.N.Y. 2001).

**VI.    PLAINTIFFS ARE ENTITLED TO ROYALTIES ON LINE EXTENSIONS**
(Corresponding to Section VIII of F-P's Memorandum)

Without a hint of irony, F-P asserts that Plaintiffs have never articulated any basis for receiving royalties on the line extensions and accessories that have been sold with the accused Rescue Heroes action figures. (Def. Mem. at 48). Plaintiffs' expert has consistently opined that Plaintiffs are due a royalty on all of the accused line extensions and accessories that are "sold together with or are marketed by F-P specifically for use with" the accused Rescue Heroes figures pursuant to industry custom and practice. (Kipling Dec., Exh. A).  Plaintiffs' testified that in their own experience they are always paid a royalty on line extensions. (Reiling Dec. ¶ 18; Popek Dec. ¶ 13; Dize Dec., Exh. EE).  Moreover, in his original expert report, Plaintiffs' expert made clear the hypocrisy of the same argument that F-P now asserts on summary judgment: While a royalty figure is typically subject to negotiation in the license agreement, Plaintiffs were deprived of the opportunity to negotiate a license in this case because F-P ultimately used their concept (*i.e.* misappropriated) without Plaintiffs' knowledge or consent. (Kipling Dec., Exh. A).  Indeed, F-P should be estopped from even asserting this defense because it was their actions that prevented the negotiation of a royalty rate in the normal course. Accordingly, Plaintiffs have at the very least raised a genuine issue of material fact as to their ability to recover for the accused line extensions and accessories.

**VII.    F-P'S DISCONTINUATION**
**OF ITS RELATIONSHIP WITH DI IS A TORT**
(Corresponding to Section IX of F-P's Memorandum)

F-P mischaracterizes the nature of Plaintiffs' statutory and common law unfair competition claims when it asserts that only the termination of DI is at issue.  (Def. Mem. at 50).  In fact, F-P misappropriated Plaintiffs' concepts. Then, when Plaintiffs' initiated this lawsuit to assert their rights, F-P threatened to and, in fact, did terminate its business relationship with DI. (Popek Dec.

¶23). In addition, F-P attempted to, and ultimately did in fact, tortuously interfere with the business relationship between Reiling and DI. F-P attempted to coerce DI into convincing Reiling to withdraw from the lawsuit. *Id.* Further, DI was advised that even if they did withdraw from the lawsuit, and Reiling did not withdraw from the suit, F-P would still blacklist DI. (Popek Dec. ¶26). Once DI continued with the lawsuit, F-P did follow through on their threat and terminated their business relationship. (Popek Dec., ¶23, Tab C). These acts caused harm to DI, and it also harmed the Reiling-DI business relationship. Any or all of these various actions undertaken by F-P may be considered an act of unfair competition or practice at common law and a violation of the Connecticut Unfair Trade Practices Act ("CUTPA").

When evaluating a claim under CUTPA, "[c]onnecticut courts [apply] the Federal Trade Commission's 'cigarette rule' in determining whether a particular trade practice is unfair." *Eadie v. McMahon*, 1997 U.S. Dist. LEXIS 7679 at *50 (D. Conn. Mar. 12, 1997). Such inquiry is factually driven. The court considers the following factors:

> (1) does the practice offend the public policy of the state as it has been established by common law, statute, or some other measure of unfairness; (2) is it immoral, unethical, oppressive, or unscrupulous; and (3) does it cause substantial injury to consumers, competitors or other businessmen.

Not all of the factors have to be met for a finding of a CUTPA violation. "'A practice may be unfair because of the degree to which it meets one of the criteria or because of a lesser extent if it meets all three.'" *Eadie* at *51.

Applying these factors to F-P's termination of the business relationship with DI constitutes violation of CUTPA. Even though termination of a business relationship may not be unlawful in and of itself under the *Restatement (Second) of Torts*, a violation of CUTPA may still be found even if the practice was "not previously deemed unlawful" but meets one of the cigarette rule factors. *See Fabri v. United Technologies Int'l, Inc.*, 387 F. 3d 109, 123 (2d Cir. 2004). Here, termination of the

business relationship is oppressive by virtue of the threats made to DI and the blacklisting that accompanied the termination of the relationship.

Further, the third factor, causing substantial harm to a business, "is the most important of the three" factors. *Link Group*, 2000 U.S. Dist. LEXIS 4567 at *63. If it is indeed F-P's practice to utilize concepts developed by other toy inventors, not compensate them for the concept, and then discontinue their business relationship with the inventors, such practice causes substantial injury. (Popek Dec. ¶23). This practice not only harmed DI and Reiling (Reiling Dec. ¶ 64), it harms any other toy inventor who has a dispute with F-P and/or Mattel. In actual fact, that is the underlying reason for this policy by F-P and its parent, Mattel - to send a clear and unambiguous message to inventors that if they challenge any decision by Mattel, they will be "blacklisted" and thus cut them off from dealing with one of the two major toy companies. When there were 20 or so major toy companies to choose from, such a threat would have no practical significance. In the current market, such a threat has a chilling impact on anyone operating in this industry. There can be little question that Mattel is using is market power and threats of this type to gain an unfair business advantage. Therefore, regardless of the validity under the *Restatement (Second) of Torts* of terminating a business relationship, it may still be found to be an unfair practice in violation of CUTPA.

Moreover, F-P did not address the tortuous interference with a business relationship claim of Plaintiffs' causes of action. Tortuous interference with a business relationship is an actionable tort in both New York and Connecticut. Both states require the same showing of action, namely: "the existence of a valid business relationship, defendant's knowledge of the relationship, the defendant's intentional interference with the relationship and damages resulting from the interference" as well as a showing of "improper motive or improper means on the part of the defendant." *Valtec*

*International, Inc. v. Allied Signal Aerospace Company*, 1997 U.S. Dist Lexis 7670 at *7-8 (D. Conn. Mar. 7, 1997); *See also Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir 1994).

It is clear that Reiling and DI had a valid business relationship where they were submitting toy concepts together to F-P. F-P knew of the business relationship between Reiling and DI. F-P interfered with that relationship by trying to coerce DI to convince Reiling not to continue with the lawsuit. (Popek Dec. ¶ 26). Ultimately, DI could not persuade Reiling to withdraw from the suit. As a result, DI has been damaged as to a loss of substantial business and revenue that DI used to derive from F-P, and the Reiling/DI business relationship has been harmed as well. (Popek Dec. ¶24). F-P's conduct in driving a wedge between Reiling and DI shows improper motive. Thus, a claim for unfair competition as to tortuous interference with a business relationship exists at common law.

In addition, the facts from Plaintiffs' other causes of action, such as those underlying the cause of action for misappropriation, can be used to support a violation of CUTPA. *Eadie* 1997 U.S. Dist. LEXIS at *51.

Finally, to the extent that the common law claims which serve as a basis for a CUTPA violation are dismissed, a CUTPA claim may still prevail. *See Fabri*, 387 F.3d at 118 (explaining that the district court did not err in finding that "the CUTPA claim could be differentiated from Plaintiffs' common law claims and that the jury's general verdict rejecting the common law claims did not necessarily reject the factual allegations underlying those claims."); *see also Link Group* at *61-62 (explaining that "it is not always the case when an underlying basis for a public policy violation is dismissed, a CUTPA claim automatically fails.") Therefore, to the extent the common law unfair competition claims are dismissed, Plaintiffs' CUTPA claim should survive.

## VIII.  CONNECTICUT LAW APPLIES TO PLAINTIFFS' CUTPA CLAIM
(Corresponding to Section IX of F-P's Memorandum)

F-P incorrectly asserts that Plaintiffs' CUTPA claim should be dismissed because New York

law applies. (Def. Mem. at 50)  First, Plaintiffs never conceded that New York law should apply to

Plaintiffs' CUTPA claim.[22]  Moreover, the choice of law analysis confirms application of

Connecticut law as well.   Connecticut's choice-of-law rules apply since this Court is sitting in

diversity. *See Connecticut Pipe Trades Health Fund and International Brotherhood of Electrical*

*Workers Local 90 Benefit Plan v. Philip Morris, Inc.*, 131 F. Supp. 2d 101 (D. Conn. 2001).  For tort

based claims, Connecticut utilizes the factors as set forth in the *Restatement (Second) of Conflict of*

*Laws.  Valtec International,* 1997 U.S. Dist. LEXIS 7670 at *5.  F-P failed to present the factors

related to the tort analysis in their entirety.  (Def. Mem. at 51)  These factors include:

> (a) the needs of the interstate and international systems; (b) the relevant policies
> of the forum; (c) the relevant policies of the other interested states and the relative
> interests of those states in the determination of the particular issue; (d) the
> protection of justified expectations; (e) the basic policies underlying the particular
> field of law; (f) certainty, predictability and uniformity of result; and (g) ease in
> the determination and application of the law to be applied.

*Valtec International,* 1997 U.S. Dist. LEXIS at *5-6

As a threshold matter, Connecticut law must be applied to Plaintiffs' CUTPA claim based on

the analysis of the *Restatement* factors.  CUTPA was created out of policy considerations to protect

individuals and companies, such as Plaintiffs, who have been injured by the unfair business practices

of others.   Connecticut has an interest in protecting its residents and corporations from such unfair

---

[22] F-P mischaracterizes a quote from Plaintiffs (Def. Mem. at 50), which reads "Plaintiffs agree that New York law should govern this action in light of the fact that *New York law is well-developed with respect to submission of idea cases.*"  Plaintiffs' Reply Memorandum of Law in Further Support of Plaintiffs' Motion for Leave to File a Second Amended Complaint, Docket No. 53 at 6 (emphasis added).  The quote related specifically to Plaintiffs' breach of implied-in-fact contract cause of action. *Id.*  Accordingly, Plaintiffs' did not concede that New York law should be applicable to Plaintiffs' CUTPA claim.  Plaintiffs have always maintained that the CUTPA claim is a statutory claims separate and distinct from its common law unfair competition claim, and that Connecticut law should apply. (Dize Dec., Exh. K at 4-9).

business practices. "CUTPA is 'remedial in character…and must be liberally construed in favor of those whom the legislature intended to benefit.'" *Connecticut Pipe Trades*, 131 F. Supp. 2d at 108. Further, Plaintiffs have a justified expectation that CUTPA is available to them since they are located in Connecticut.

Having established that the principles in section 6 weigh in favor of Connecticut, an analysis of the remaining four choice-of-law factors produces the same result. Connecticut is the state where the injury occurred since this is where Plaintiffs' have suffered their economic loss for purposes of the tort-based claim. *See Titan Sports, Inc. v. Turner Broadcasting Systems, Inc.*, 981 F. Supp. 65, 72 (D. Conn. 1997) (explaining that "as long as the complaint alleges that the injury, *i.e.*, 'economic impact' occurred in Connecticut, the Plaintiff has stated a claim under CUTPA." *See also Stewart v. World Wrestling Federation Entertainment, Inc.*, 2004 U.S. Dist. LEXIS 26533, *6 (S.D.N.Y. 2005) (injury occurs where Plaintiff resides, "whatever harm incurred to Plaintiff due to the alleged misappropriation of his ideas and concepts was felt in" Plaintiff's home state.); *Bailey Employment System, Inc. v. Clifford Hahn*, 655 F.2d 473 (2d Cir. 1981).

The place where the conduct causing the injury occurred is predominantly in Connecticut. The conduct causing specific injury to Plaintiff DI for purposes of the CUTPA claim occurred in Connecticut where the e-mail informing DI of the termination of their relationship with F-P and subsequent economic loss was received in DI's Connecticut office. (Popek Dec.¶23, Tab C).[23]

---

[23] F-P argues that if the conduct is found to occur in New York, New York should law apply (Def. Mem. at 51-52). However, the cases that F-P cites for this proposition are unconvincing.  In *Otis Elevator v. Civil Factory Mutual Insurance Co.*, 353 F. Supp. 2d 274 (D. Conn. 2005), it was not just the fact that the conduct was found to occur in Minnesota, but rather the other factors were also related to Minnesota. Further, Plaintiff's company though headquartered in Connecticut, maintained an office in Minnesota.   In *Ahlert v. Hasbro, Inc.*, 325 F. Supp.2d 509 (D. N.J. 2004), the case was held in a New Jersey court and New Jersey applied the governmental interest test for choice-of-law, not the *Restatement*.

The residence of the parties also weighs in favor of Connecticut.    There are two parties that reside in and conduct their business in Connecticut.  The center of the relationship of the parties also weighs in favor of Connecticut.  The relationship between the Plaintiffs is centered in Connecticut, and the injury to their relationship has been suffered in Connecticut.  Plaintiffs created and developed their concept in Connecticut.  Plaintiffs sent concept submissions from Connecticut and received correspondence from F-P in Connecticut.

Further, "it is the significance of the factors, not the number of factors, that determines the outcome of this inquiry under the Restatement approach." *Valtec International,* 1997 U.S. Dist. LEXIS 7670 at *6.  The fact that both Plaintiffs are located in Connecticut and both Plaintiffs have suffered economic injury in Connecticut as a result of F-P's actions significantly outweigh any other factor that could possibly favor New York.  Therefore, under Connecticut choice-of-law principles, Connecticut law applies. Plaintiffs' CUTPA claim should not be dismissed.

Importantly, CUTPA may apply irrespective of the application of New York law to Plaintiffs' remaining claims.  Thus, in *Connecticut Pipe Trades* the court noted that it was possible to apply CUTPA even if New York law applied.  "[A] comment to the Restatement clearly provides for just such an eventuality: 'Provided that it is constitutional to do so, the court will apply a local statute in the manner intended by the legislature even when the local law of another state would be applicable under usual choice-of-law principles.'" 153 F. Supp. 2d at 108.    *See also Link Group* 2000 U.S. Dist. LEXIS 4567 (allowing CUTPA claim to survive even though New York law was applied to contract and misappropriation claims).

The cases cited by Fisher-Price purporting to hold to the contrary are distinguishable.  In *United States Fidelity and Guaranty Co. v. S.B. Phillips Co.,* 359 F. Supp. 2d 189 (D. Conn. 2005), the court found it appropriate to dismiss the CUTPA claim where the only potential Connecticut

interest was that the underwriter and reinsurer of insurance policies for use in South Carolina were based out of Connecticut. Similarly, in *MM Global Services, Inc v. Dow Chemical Company*, 283 F. Supp. 2d 689, 704 (D. Conn. 2003), the court found that the law of India should apply and that since "the law of India does not authorize an action for unfair trade practices ...dismissal is required as well for the CUTPA claims...." Since New York law recognizes common law unfair competition claims, it would not be required for Plaintiffs' CUTPA claim to be dismissed if New York law were applied.

## IX.    PLAINTIFFS' CAN SEEK PUNITIVE DAMAGES
(Corresponding to Section XI of F-P's Memorandum)

Under New York law, punitive damages are available for misappropriation under the rubric of "unfair competition." *See Roy Export Company Establishment of Vaduz, Liechtenstein, et. al. v. Columbia Broadcasting System, Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982) (upholding a jury award for punitive damages for unfair competition where defendant misappropriated Plaintiffs' work for use in defendant's television program because such conduct was considered to be "a form of 'commercial immorality.'"

The misappropriation of Plaintiffs' concepts by F-P was "tantamount to stealing our novel idea." (Popek at ¶16). Accordingly, an award of punitive damages is available to Plaintiffs where New York "clearly permits punitive damages where a wrong is aggravated by recklessness or willfulness." *Roy Export Company*, 672 F.2d at 1106. Stealing Plaintiffs' concept and then terminating the business relationship with Plaintiffs causing additional economic harm, is, clearly, an aggravated wrong. (Popek Dec. ¶ 24). Further, such conduct could be considered "morally culpable." *See Getty Petroleum Corp. v. Island Transportation Corp.*, 878 F.2d 650, 657 (2d Cir.1989) (upholding award of punitive damages for unfair competition claim because "'defendant's

conduct has constituted 'gross, wanton, or willful fraud or other morally culpable conduct' to an extreme degree."

Moreover, an award of punitive damages is available under CUTPA for "'a reckless indifference to the rights of others or an intentional and wanton violation of those rights'" *Tingley Systems, Inc. v. Norse Systems, Inc.*, 49 F. 3d 93, 97 (2d Cir. 1995) (awarding punitive damages for conduct based on claims of unfair competition and tortuous interference).

## CONCLUSION

Plaintiffs respectfully request that the Court deny Defendant's motion for summary judgment in all respects, and for such other and further relief as the Court deems just and proper.

Dated: May 23, 2005

Respectfully Submitted,

By: _____

Gregory J. Battersby (Bar No. 7386)
Edmund J. Ferdinand, III (Bar No. 21287)
Russell D. Dize (Bar No. 23064)
Susan Schlesinger (Bar No. 24871)
GRIMES & BATTERSBY, LLP
488 Main Avenue, Third Floor
Norwalk, Connecticut 06851-1008
(p) (203) 849-8300
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Memorandum of Law, and all accompanying declarations and appendices, have been served upon defendant Fisher-Price, Inc., on this 23rd day of May, 2005, via Federal Express, priority overnight delivery, to:

Bradford S. Babbitt, Esq.
Michael J. Kolosky, Esq.
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT  06103-3597

Robert J. Lane, Jr., Esq.
Jodyann Galvin, Esq.
HODGSON RUSS LLP
One M&T Plaza, Suite 2000
Buffalo, New York  14203-2391

Edmund J. Ferdinand, III

Dated: May 23, 2005