UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Victor G. Reiling Associates    :
and Design Innovation, Inc.,    :
            Plaintiffs,          :    Case. No. 3:03 CV 222 (JBA)
                                 :
v.                               :
                                 :
Fisher-Price, Inc.,              :
            Defendant.           :

**Ruling on Defendant's Motion for Summary Judgment [Doc. # 93]**

Plaintiffs Victor G. Reiling Associates ("Reiling") and
Design Innovation Incorporated ("DI") are independent toy design
developers and have brought this action against Defendant Fisher-
Price Incorporated ("Fisher-Price") alleging breach of implied-
in-fact contract, misappropriation, unfair competition in
violation of the Connecticut Unfair Trade Practices Act
("CUTPA"), Conn. Gen. Stat. §§ 42-110a et seq., and common law
unfair competition, in connection with plaintiffs' designs for
action figures which add an animation reel component and/or a
mechanism for viewing still images to defendant Fisher-Price's
existing "Rescue Heroes" toy line.  See Second Amended Complaint
("SAC") [Doc. # 85], at ¶¶ 2-3, 41-58.[1]  Defendant moved for
summary judgment on all of plaintiffs' claims, see [Doc. # 93],
and oral argument on the motion was held on October 24, 2005.

---

[1]  Plaintiffs also seek an accounting from Fisher-Price of
all revenue derived by Fisher-Price by the allegedly unauthorized
use of Plaintiffs' concept.  See SAC, at ¶¶ 59-61.

For the reasons that follow, that motion will be granted in part
and denied in part.

## I. FACTUAL BACKGROUND[2]

Plaintiff Reiling is a "small entrepreneurial toy
development company" based in Kent, Connecticut, whose principal
– Victor G. Reiling – is a "toy industry veteran" and former
employee of both Fisher-Price and Milton Bradley (now owned by
Hasbro).  See Declaration of Victor G. Reiling ("Reiling Decl.")
[Doc. # 107], at ¶¶ 2-3, 12; Agreement Def. L.R. 56(a) Stmt [Doc.
# 99], at ¶¶ 7-8.  Reiling does not manufacture or market toys,
but instead "works with toy manufacturers to develop new toys
based on [its] product concepts."  See Reiling Decl. at ¶ 3.
Plaintiff DI is an "industrial design firm" that develops
"prototypes and working models of toys, games and other products
for manufacturers and marking groups" and is based in Avon,
Connecticut.  See Declaration of Bruce P. Popek ("Popek Decl.")
[Doc. # 109], at ¶ 2; Agreement Def. L.R. 56(a) Stmt, at ¶ 10.
The three principals of DI – Bruce P. Popek, Bruce Bendetto, and
Doug Melville, Jr. – oversee all aspects of DI's business.
See Popek Decl. at ¶ 2.  Defendant Fisher-Price is "engaged in
the business of designing, marketing, and selling toys and

_____

[2]   The testimony of two of plaintiffs' witnesses is the
subject of a motion to strike from Fisher-Price [see Doc. # 114],
which motion is the subject of a separate ruling.  None of the
testimony stricken pursuant to that ruling forms a basis for the
Court's ruling on summary judgment.

juvenile products, including action figures."  Agreement Def. L.R. 56(a) Stmt, at ¶ 1.

In the late-1990s, the Fisher-Price "Boys Team"[3] (which designs products for boys aged 3 to 6) developed the "Rescue Heroes" line of action figures "with rescue-related identities which were attractive both to preschoolers and to their parents."[4]  Id. at ¶ 13.  They were first sold to the public in December 1997.  Id. at ¶ 14.  These first Rescue Heroes did not have any speech or sound effect capabilities and were thus known as "basic" figures.  Many different "sub-lines" of the basic figures have been introduced since the first release in 1997. Id. at ¶ 15.  Subsequent to the introduction of the Rescue Heroes figures, Boys Team designers sought to create "a premium line of Rescue Heroes that would communicate and interact."  Id. at ¶ 16. The parties dispute whether the goal of these efforts was "to communicate a play scenario to the child of the character's mission or obstacles and dangers the character might face," or simply "to identify the subject matter of the action figure's speech."  Pl. L.R. 56(a) Counter-Stmt [Doc. # 105], at ¶ 16.

In October 1998, Reiling and DI – who frequently "cooperate

---

[3]  The designers who developed the "Real Heroes" line included Ken Morton, Tyler Berkheiser, and Peter Pook.  See Agreement Def. L.R. 56(a) Stmt, at ¶ 13.

[4]  The rescue-related identities included "Billy Blazes (firefighter)," "Jake Justice (police officer)," and "Gil Gripper (scuba diver)."  Id. at ¶ 14.

on the development of new toy and game concepts and submit their concepts to toy manufacturers for possible development and production" (Reiling Decl. at ¶ 4) – presented the "Reel Heroes" concept to Paul Snyder, Fisher-Price's inventor relations representative.  See Pl. L.R. 56(a) Counter-Stmt, at ¶ 17.  The definition of the concept or concepts that were presented to Fisher-Price is a central dispute in this case.  It is clear that the "Reel" portion of plaintiffs' "working names" for its concept(s) was "a play on words with respect to the film reel that was first shown in the prototype," Pl. L.R. 51(a)(1) Counter-Stmt, at ¶ 21.  However, plaintiffs argue that "this in no way was meant to be a limitation on the concept," Reiling Decl. at ¶ 24, and that their concept included "an image viewer in the form of a backpack for each 'Rescue Heroes' action figure that [would] enhance[] role play for the child by depicting the mission of that particular 'Rescue Heroes' character," Reiling Decl. at ¶ 23.  They further argue that the concept did not necessarily require the use of film or the use of images on a backpack specifically , and was not necessarily limited to use with Rescue Heroes action figures and could also be used in connection with action figure accessories such as playsets or vehicles.  See Pl. L.R. 56(a) Counter-Stmt, at ¶¶ 21, 23; Declaration of Robert J. Lane, Jr. ("Lane Decl.") [Doc. # 94], Ex. 4 (Reiling deposition) at 155.

4

In early 1999, the parties executed an Option Agreement, granting Fisher Price "an exclusive three-month option to license plaintiffs' concept." Agreement Def. L.R. 56(a) Stmt at ¶ 24. Exhibit A to the Option Agreement provides the following definition of the Reel Heroes concept:

> Submitted concept extends cartoons to action figures play pattern. The concept is a battery operated film reel that is activated when the child pushes a button on the backpack of the action figure. The child may then look through the viewer on the backpack to see the film. The concept may include a hand-held "camera" with shutter that is operated by the child. The concept may be incorporated into the assorted Fisher-Price Rescue Heroes action figures. The unique aspect of the concept is the combination of existing action figures with film for play pattern.

See Lane Decl. Ex. 25, at Ex. A.[5] Plaintiffs' prototype was shown to Ken Morton, then the Design Manager of the Boys Team, and to two other Boys Team Members – Tyler Berkheiser and Chris Pardi. See Agreement Def. L.R. 56(a) Stmt, at ¶ 28. Ultimately, Fisher-Price chose not to execute its option and in March 1999, it rejected plaintiffs' submission. See id. at ¶¶ 27, 31.

In May 1999, plaintiffs submitted a revised execution of their concept to Fisher-Price. See Pl. L.R. 56(a) Counter-Stmt,

---

[5] Plaintiffs also claim that their 1998 and 2000 submissions included a second concept "of a TV cameraman holding a TV camera . . . with a window on top, through which a child could look and see out of the camera lens . . . giving the impression that he was viewing what the cameraman figure was 'filming.'" See Agreement Def. L.R. 56(a) Stmt, at ¶ 41; SAC, Exs. B, C.

5

at ¶ 32; Reiling Decl. Ex. X.  Plaintiffs contend that they sought to address Fisher-Price's concerns regarding the cost of executing their initial concept, and thus eliminated the motor, batteries and other parts from the original submission, in an attempt to "demonstrat[e] to Fisher-Price that there were alternative ways to execute the concept."  Pl. L.R. 56(a) Counter-Stmt, at ¶¶ 32-33.  Plaintiffs' second submission proposed the use of a "viewer" which, "[u]sing ambient light and a tinted device," would have "the capability of showing 8 or more scenes that are particularly appropriate to individual heroes." Reiling Decl. Ex. X.  While plaintiffs were initially in agreement that Fisher-Price rejected the 1999 submission in July 1999, neither party can locate a rejection letter and plaintiffs now contend that they do not recall any oral communication with Fisher-Price specifically rejecting the submission.  See id. at ¶ 35.

Plaintiffs made a third submission to Fisher-Price in December 2000, which included annotated drawings of an action figure with both "a backpack and a digital camera device (which the figure held in its hand) containing a Viewmaster-style film disk with six or more images."  Agreement Def. L.R. 56(a) Stmt, at ¶¶ 36-37; Reiling Decl. Ex. Y.  The Viewmaster disk would display images relating to the particular figure's "theme activities."  See Reiling Decl. Ex. Y.  Again, plaintiffs'

revised submission sought to "alleviate the costs of film strips that were of prior concern," by using discs that would display still images.  <u>See</u> Reiling Decl. Ex. Y.  The parties dispute whether it was "necessary to the concept that the child place one eye up to a magnifying lens and look into the interior of the backpack, or that a lever be used," as was shown in plaintiffs' drawings.  <u>See</u> Pl. L.R. 56(a) Counter-Stmt, at ¶ 38; Reiling Decl. Ex. Y.  The parties dispute whether any Boys Team designer saw the 2000 submission, but do not dispute that Fisher-price rejected the submission in January 2001.  <u>See</u> Pl. L.R. 56(a) Counter-Stmt, at ¶¶ 39-40.

Fisher-Price ultimately released their premium Rescue Heroes figure line, and sub-lines, beginning in early 2000, marketed under the "Voice Tech" name.[6]  Plaintiffs have not asserted any claims concerning the first of these figures, but have asserted claims against three of the sub-lines,[7] introduced between 2001 and 2003, <u>see</u> SAC ¶¶ 28, 35, 38, a new line of Rescue Heroes toys

---

[6]  The first line of Voice Tech figures included characters such as Billy Blazes the firefighter and Jake Justice the policeman.  <u>See</u> Declaration of Tyler Berkheiser [Doc. # 96], at ¶¶ 11-12.

[7]  The sub-lines were the "Voice Tech Video Mission" Rescue Heroes (introduced in March 2002), <u>see</u> SAC ¶ 28 & Exs. L & M, the "Mission Select" Rescue Heroes (introduced in 2003), <u>see</u> SAC ¶ 35 & Ex. R, and the "Voice Tech Mission Command" Rescue Heroes (introduced in late 2003), <u>see</u> SAC ¶ 38 & Ex. U.

entitled the "Optic Force" Rescue Heroes,[8] certain Rescue Heroes

playsets, vehicles, and accessories,[9] and certain videos, DVDs,

computer games, and video games.  See SAC ¶¶ 28, 35-39.

## II. STANDARD

Summary judgment is appropriate "if the pleadings,

depositions, answers to interrogatories, and admissions on file,

together with affidavits ... show that there is no genuine issue

as to any material fact and that the moving party is entitled to

a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party

seeking summary judgment "bears the burden of establishing that

no genuine issue of material fact exists and that the undisputed

---

[8]  Plaintiffs claim that the "Optic Force" Rescue Heroes line of toys is "remarkably similar" to plaintiffs' concept and includes a cameraman "that is virtually identical in design and appearance to the storyboard artwork, submitted with Plaintiffs' first 'Reel Heroes' submission."  See SAC ¶ 37 & Ex. T.  Fisher-Price claims that this line of toys is based on a submission from an independent inventor, Bang Zoom, and that this inventor is paid royalties on sales of these action figures.  See Def. L.R. 56(a) Stmt, at ¶ 74.

[9]  These playsets, vehicles and accessories include: the Mountain Action Command Center, see SAC ¶ 35 & Ex. R, the Mission Select Police Cruiser and Firetruck, see SAC ¶ 35 & Ex. R, the Voice Tech Rescue Firetruck, Jet and Police Cruiser, see SAC ¶ 36 & Ex. S, and the Aquatic Rescue Command Center, see id.  The Aquatic Rescue Command Center includes technology for a "lenticular lens mechanism which is synchronized with sound so that a two-dimensional picture of a character appears to be talking," which was submitted by another independent inventor, Carterbench/Virtual Video.  See Agreement Def. L.R. 56(a) Stmt, at ¶ 53.  The "character" is apparently "Warren Waters" who "relay[s] missions from space to Rescue Heroes figures on earth."  Berkheiser Decl., Ex. D.  Fisher-Price pays a royalty to Carterbench/Virtual Video for sales of this playset.  Agreement Def. L.R. 56(a) Stmt, at ¶ 55.

facts establish [its] right to judgment as a matter of law." Rodriguez v. City of N. Y., 72 F.3d 1051, 1060 (2d Cir. 1995) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)). "The duty of the court is to determine whether there are issues to be tried; in making that determination, the court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." Id. (citations omitted).  "If reasonable minds could differ as to the import of the evidence ... and if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal quotation, citation, and alteration omitted).

**III. DISCUSSION**

A.   Applicable Law

The parties appear to be in agreement that New York law governs all of plaintiffs' claims, except for their CUTPA claim, which is discussed below.  See Pl. Reply Mem. of Law in Support of Pl. Motion for Leave to File a Sec. Am. Compl. [Doc. #53], at 6; Pl. Opp. Mem. of Law [Doc. # 135], at 51 n.22.

B.   P&A Disclaimer of Liability

Since commencing his dealings with Fisher-Price in 1983, Reiling signed several (Fisher-Price avers 27 in total) Policy and Agreement ("P&A") forms.  See Def. Mem. of Law. [Doc. # 100], at 18; Lane Decl. Exs. 16, 17, 20.  In 1994, Reiling signed a P&A purporting to be a blanket agreement (as opposed to a concept-specific agreement) which would govern all concept ideas submitted to Fisher-Price.  Lane Decl. Ex. 20; see also Lane Decl. Ex. 4 (Reiling deposition), at 68-70.

Fisher-Price argues that it is entitled to summary judgment on all of plaintiffs' claims because the 1994 P&A expressly disclaims all claims brought by plaintiffs.  See Def. Mem. of Law, at 46-48; Def. Reply Mem. [Doc. # 122], at 11-13.  Paragraph 3 of the 1994 P&A provides:

> You must understand and agree that in return for receiving and examining your disclosure, we are released from any liability in connection with the receipt and examination of your disclosure, except as to such liability that may accrue under any valid patents or copyrights that you now or hereafter own or control.

See Lane Decl. Ex. 20 at ¶ 3.  The 1994 P&A further provides that "[t]his Agreement shall have an indefinite term commencing on 12/15/94 and expiring upon thirty (30) days written notice."  Id. at ¶ 6.  Defendant contends that the 1994 P&A, in contrast to earlier P&As signed by plaintiff Reiling which were concept-specific, was a blanket P&A covering all future submissions.

Compare Lane Decl. Ex. 17 (attaching concept-specific P&As signed by Reiling), with Lane Decl. Ex. 18 (1994 P&A).[10]  Plaintiffs argue that the disclaimer in the P&A is not legally enforceable to bar their claims here and that, in any case, plaintiff DI's claims cannot be barred by the disclaimer because it did not sign the P&A.

The 1994 P&A was signed by Reiling on December 15, 1994. See Lane Decl. Ex. 20 at 2.  Although plaintiff DI did not sign the agreement, Fisher-Price seeks to demonstrate that Reiling was acting as DI's agent, or that it had actual or apparent authority to act as DI's agent, in order to bind plaintiff DI to the 1994 P&A.[11]  Fisher-Price has not shown this agency issue to be factually undisputed.

"Standard principles of agency [include] that an agent must have authority, whether apparent, actual or implied, to bind his principal." Merrill Lynch Interfunding, Inc. v. Argenti, 155 F.3d 113, 122 (2d Cir. 1998); AEB & Assocs. Design Group, Inc. v.

---

[10]  The validity of defendant's argument regarding the blanket nature of the 1994 P&A is discussed below.

[11]  DI apparently did sign at least one P&A with Fisher-Price in 1992, but this agreement was concept-specific.  See Declaration of Howard Bollinger [Doc. # 95], at Ex. B.  Defendant has not claimed that this P&A can operate as a waiver of DI's claims here, and such a claim could not succeed.  It is clear that the 1992 P&A signed by DI was a concept-specific form that related only to the concept it was submitting to Fisher-Price at that time.  Compare Bollinger Decl. Exs. A & B; see also Declaration of Bruce Benedetto ("Benedetto Decl.") [Doc. # 100], at ¶ 8.

Tonka Corp., 853 F. Supp. 724, 732 (S.D.N.Y. 1994) (finding
express authority where plaintiff toy development company entered
into agreement with a designers' representative, by which the
representative would "present [plaintiff's] ideas to toy
companies, and the parties agreed to share any revenues generated
from such presentations").  First, DI did not begin working with
Reiling until after Reiling signed the 1994 P&A.  See Benedetto
Decl. at ¶ 9.  Additionally, there is a genuine dispute as to
whether, even after Reiling and DI began working together,
Reiling had the authority to act as DI's agent.  For example,
while one of DI's principals, Bruce Popek, testified that "[i]n
connection with the Reel Heroes, Vic Reiling was representing
Design Innovation and himself [in] [n]egotiating with and dealing
with Fisher-Price," see Lane Decl. Ex. 6 at 128-129, when asked
whether Reiling "ha[d] any authority to bind Design Innovation,"
however, Popek answered "No. . . . when we enter into contracts
with toy companies and Mr. Reiling, it's reviewed by both of us,
and designed by both of us."  Reply Declaration of Russell D.
Dize ("Dize Reply Decl.") [Doc. # 128], Ex. A at 155-56.  Indeed,
Messrs. Reiling, Popek and Benedetto have all submitted
declarations stating that there was no agency agreement between
Reiling and DI, that Reiling did not have the authority to bind
DI, and that the relationship between Reiling and DI was that of
"joint inventors."  See Reiling Decl. at ¶ 5; Popek Decl. at ¶ 6;

12

Benedetto Decl. at ¶ 6.  It could also be inferred from the fact that Fisher-Price drafted the Option Agreement for the signature of both Reiling and DI, see Reiling Decl. Ex. V at 1, 5, and made separate payments to DI and Reiling under the Option Agreement, that Fisher-Price did not understand Reiling to have the authority to act as DI's agent.  See Dize Reply Decl. Ex. E.

Fisher-Price's claim that DI is bound by Reiling's 1994 P&A on a partner-as-agent theory also cannot be decided as a matter of law because different inferences can be drawn from the evidence as to whether Reiling and DI had a legally-recognized partnership.  For example, when referring to the business arrangement that DI typically has with Reiling, Mr. Popek stated that DI and Reiling are typically "partners," rather than Reiling being paid by DI on an hourly basis, see Lane Reply Decl. [Doc. # 118], Ex. F at 22; Mr. Reiling concurred, see id., Ex. A at 76. However, Reiling and DI are separate corporate entities organized under the laws of Connecticut, see SAC ¶¶ 6-7, and the record contains no partnership agreement or other written agreement documenting their relationship, other than documents generated by toy companies that accept their submissions (such as the Option Agreement), see Dize Reply Decl. Ex C (Popek deposition) at 22-23, Ex. D (Benedetto deposition) at 25-27.[12]

---

[12]  See also Conn. Gen. Stat. § 34-314(c)(1) ("[J]oint property, common property or part ownership does not by itself establish a partnership, even if the co-owners share profits made

Lastly, Fisher-Price's argument that DI can be bound by the 1994 P&A because DI and Reiling are co-owners of intellectual property also fails.  Fisher-Price cites <u>Willingham v. Star Cutter Co.</u>, 555 F.2d 1340 (6th Cir. 1977), for the proposition that "co-owners are at the mercy of each other . . . [E]ach . . . may make, use or sell the patented invention without accounting to the other owners. . . . [A] co-owner can even grant a license to a third party without consent of the other owners and neither the co-owner licensor nor the third-party-licensee is liable to the other owners."  <u>See id</u>. at 1344.  The holding in <u>Willingham</u>, however, merely provides that a co-owner may grant a license to a third-party without its co-owners' consent.  Neither the parties nor the Court have found any case whose reasoning could support extending <u>Willingham</u> to find that Reiling's execution of the P&A prior to the commencement of its business relationship with DI can constitute a waiver of DI's rights to sue Fisher-Price, merely because the concept submitted to Fisher-Price is co-owned by Reiling.

Thus, a genuine issue of material fact exists as to whether Reiling had actual, apparent, or implied authority to act as DI's agent, both at the time Reiling signed the 1994 P&A, and at any

---

by the use of the property."); Conn. Gen. Stat. § 34-314(c)(2) ("The sharing of gross returns does not by itself establish a partnership, even if the persons sharing them have a joint or common right or interest in the property from which the returns are derived.").

time thereafter.  Accordingly, the 1994 P&A does not bar plaintiff DI's claims at this stage.

Even though the 1994 P&A may not be enforceable against plaintiff DI to bar its claims against Fisher-Price, it is enforceable against plaintiff Reiling barring claims related to defendant's "receipt and examination of [Reiling's] disclosure." Lane Decl. Ex. 20 (Option Agreement).  As plaintiffs concede, other courts have upheld waiver language remarkably similar to the language in the 1994 P&A.  See, e.g., M.H. Seagan Ltd. P'ship v. Hasbro, Inc., 924 F. Supp. 512, 526 (S.D.N.Y. 1996) (applying New York law and upholding a contract waiver providing that the inventor would be "limited to any rights and remedies Inventor is accorded under United States Patent and Copyright Laws" and concluding that the waiver "unambiguously preclude[d] all of plaintiff's implied contract claims based on plaintiff's post-Waiver submissions to [defendant]"), abrogated on other grounds by, Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368 (2d Cir. 2000); see also Kearns v. Ford Motor Co., 203 U.S.P.Q. 884, 889 (E.D. Mich. 1978)(applying Michigan law and upholding the enforceability of a waiver "relinquish[ing] all rights and remedies against defendant with respect to [plaintiff's] disclosures except those provided for by the patent and copyright[] laws").

While plaintiffs contend that the purported disclaimer is

unenforceable against Reiling because the P&A was of indefinite
duration and the disclaimer therefore constitutes a purported
waiver of future unknown rights, courts applying New York law
have held otherwise, see, e.g., M.H. Seagan, 924 F. Supp. at 526;
AEB, 853 F. Supp. at 732 (upholding the enforceability of a
confidentiality agreement including liability disclaimers that
provided that its terms "shall be in perpetuity unless modified
or terminated as specified herein"), and the cases plaintiffs
cite do not support a finding to the contrary.[13]  When Reiling

---

[13]  The cases cited by plaintiffs either support Fisher-
Price's position that future claims of misappropriation
concerning future submissions would be anticipated by Reiling,
are factually inapposite and/or regard enforceability of a waiver
under law that is inapplicable here.  See, e.g., NetTech
Solutions, LLC v. ZipPark.com, No. 01 CIV 2683 (SAS), 2001 WL
1111966, at *8 (S.D.N.Y. Sept. 20, 2001) (noting, "without
evidence to the contrary, [a] waiver must be interpreted to
encompass only those future claims the parties could have
reasonably expected might be brought against each other at the
time it was agreed upon," and holding that a contractual waiver
was not enforceable to bar plaintiff from bringing claims against
defendants, where defendants were violating the agreement at the
time the parties signed the waiver and therefore plaintiffs could
not have expected making such claims at the time) (internal
quotation and citation omitted); Levin v. Gap, Inc., No. 97 CIV
4452 (DC), 1998 WL 915897, at *6–7 (S.D.N.Y. Dec. 30, 1998)
(applying California law and distinguishing M.H. Segan v. Hasbro
because a jury could reasonably conclude that, in addition to a
submission agreement that contained a waiver, defendant had
agreed to modify the submission agreement or negotiate in good
faith to modify the agreement); Injection Research Specialists
Inc. v. Polaris Indus., L.P., 48 U.S.P.Q.2d 1719, 1727 (Fed. Cir.
1998) (refusing to enforce waiver where language of the waiver
was ambiguous and the agreement contained terms seemingly
inconsistent with the purported waiver); Anderson v. Century
Prods. Co., 943 F. Supp. 137, 149–51 (D.N.H. 1996) (application
of New Hampshire law); FASA Corp. v. Playmates Toys, Inc., 892 F.
Supp. 1061, 1066 (N.D. Ill. 1995) (regarding the enforceability

16

signed the 1994 P&A, it was clear from the unambiguous language of the waiver that Reiling was limiting its right to sue Fisher-Price in connection with its submissions to actions under federal statutory intellectual property protection schemes.  As this was a blanket P&A with an indefinite term (in contrast to the concept-specific P&As Reiling had signed previously), the language was clear that this waiver applied to future Reiling submissions.[14]  See NatTech Solutions, 2001 WL 1111966, at *8 ("[A] waiver must be interpreted to encompass only those future claims the parties could have reasonably expected might be brought against each other at the time it was agreed upon."); City of N.Y. v. State of N.Y., 389 N.Y.S.2d 332, 340 (N.Y. 1976) ("A waiver is the intentional relinquishment of a known right with both knowledge of its existence and an intention to

_____

of a disclaimer purporting to limit the plaintiff's right to bring federal statutory intellectual property claims, which types of claims were not limited by the 1994 P&A).

  [14]  The 1994 P&A provided that it would "have an indefinite term commencing on 12/15/94 and expiring upon thirty (30) days written notice."  Lane Decl. Ex. 20 at ¶ 6.  Plaintiff Reiling understood that the 1994 P&A was a blanket P&A that would apply to all submissions made thereafter, and understood that it would remain in effect, absent invocation of the termination provision.  See Lane Decl. Ex. 4 at 69-70 (testimony of Victor G. Reiling).  While plaintiffs now reference deposition testimony in which Mr. Reiling stated that at the time he made his 1998 submission to Fisher-Price, he did not recall that the 1994 P&A was in existence and no one at Fisher-Price made reference to the 1994 P&A when he made any of the three submissions at issue in this case (see Declaration of Russell D. Dize [Doc. # 106] ("Dize Decl."), Ex. I at 225-29), his lack of memory does not absolve his contractual obligations.

relinquish it.") (internal quotation and citation omitted).

Plaintiffs' argument that the 1994 P&A was a contract of
adhesion and therefore unenforceable because it was not fairly
negotiated and/or because Reiling did not understand its terms
also fails as a matter of law.  See Reznor v. J. Artist Mgmt.,
Inc., 365 F. Supp. 2d 565, 577 (S.D.N.Y. 2005) ("[New York]
courts have rarely found a clause to be unconscionable in
contracts involving two commercial entities, a situation in which
negotiation is presumed possible. . . . [T]he parties to a
contract are basically free to make whatever agreement they wish,
no matter how unwise it might appear to a third party.")
(internal quotation and citation omitted); Kublan v. Hasbro Toy
Division of Hasbro, 50 U.S.P.Q.2d 1539, 1540 n.1 (S.D.N.Y. 1999)
(rejecting claims of unconscionability and enforcing
confidentiality waiver signed between the parties, noting, "[a]n
unconscionable contract is characterized by bargaining power so
disproportionate to preclude any meaningful choice and by terms
unreasonable favorable to one party. . . . **Plaintiff was an
experienced toy inventor at the time he entered into this
commercial transaction seeking something for his own profit**")
(emphasis added).  Here, Mr. Reiling testified that he had signed
blanket P&As for "a number of companies."  See Lane Decl. Ex. 4
at 62.

Additionally, plaintiffs argue that the disclaimer in the

P&A is unenforceable because the P&A had seemingly perpetual
duration and thus violates public policy.  However, because the
P&A contained a termination provision, it is enforceable
notwithstanding the absence of a specific termination date.  See
Payroll Express Corp. v. Aetna Cas. & Sur. Co., 659 F.2d 285, 291
(2d Cir. 1981) ("New York limits that policy [of avoiding
perpetual commitments] to contracts having no termination
provisions and has held it inapplicable to contracts of the type
before us here, which do provide for termination or cancellation
upon the occurrence of a specified event.").  Accord Nicholas
Labs. Ltd. v. Almay, Inc., 900 F.2d 19, 21-22 (2d Cir. 1990)
(affirming district court's enforcement of an agreement of
seemingly perpetual duration, where the agreement provided for
the right to terminate upon the occurrence of certain specified
events).  Accordingly, defendant's motion for summary judgment is
granted as to all of plaintiff Reiling's claims related to its
submissions to Fisher-Price, none of which are federal statutory
claims.  Plaintiffs' CUTPA claim and common law claim of unfair
competition, however, to the extent they are based on alleged
blackballing and tortious interference with the business
relationship between Reiling and DI, arise out of plaintiffs'
suit, not directly out of their submission (although obviously
the submission is the subject matter of the suit), and thus these

claims are not barred by the 1994 P&A.[15]

C.   Breach of Implied-in-Fact Contract Claim

Plaintiffs' breach of implied-in-fact contract claim alleges that facts and circumstances surrounding plaintiffs' submission of their toy concept to Fisher-Price and the subsequent conduct of the parties created an implied-in-fact contract by which Fisher-Price agreed to compensate plaintiffs in the event that Fisher-Price used plaintiffs' concept.  See SAC ¶¶ 41-47.  An implied-in-fact contract arises in the absence of an express agreement and is based on the conduct of the parties from which an intent to enter into a contract, and the terms of that contract, may be inferred.  The relevant factors for determining whether an enforceable implied-in-fact contract exists are: "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing."  Winston v. Mediafare Entm't Corp., 777 F.2d 78, 80 (2d Cir. 1985); see also AEB, 853 F. Supp. at 731 ("An implied-in-fact contract arises in the absence of an express agreement, and is based on the conduct of the parties from which

---

[15]   The merits of defendant's motion for summary judgment on these claims are discussed below, infra.

a fact-finder may infer the existence and terms of a contract.").

Defendant claims that it is entitled to summary judgment on the breach of implied-in-fact contract claim because: (1) plaintiffs explicitly disclaimed any implied obligations in the 1994 P&A; (2) the Option Agreement is an express contract dealing with the same subject matter as the purported implied-in-fact contract and therefore no implied-in-fact contract can be found to exist as a matter of law; (3) the purported implied-in-fact contract is too indefinite to survive; and (4) the alleged implied-in-fact contract is barred by the Statute of Frauds. Because the Court concludes that the Option Agreement constitutes an express agreement regarding the same subject matter as the alleged implied-in-fact contract, the claim is barred as a matter of law, and the Court need not consider defendant's other arguments.

As noted above, an implied-in-fact contract arises only in the absence of an express agreement, and thus the absence of an express agreement covering the same subject matter is a prerequisite to finding an implied-in-fact contract. See AEB, 853 F. Supp. at 731 (citing, inter alia, Julien J. Studley, Inc. v. N.Y. News, Inc., 518 N.Y.S.2d 779, 780 (N.Y. 1987)). Defendant argues that plaintiffs' implied-in-fact contract claim is barred by the parties' Option Agreement which, it alleges, covers the same subject matter – i.e., Fisher-Price's obligation

to compensate plaintiffs in the event Fisher-Price used plaintiffs' concept.  DI contends, however, that the Option Agreement does not bar its claim because it is not based on the expired Option Agreement, but rather "on the custom and practice in the toy industry, the parties' prior course of dealing with [Fisher-Price] and the parties' conduct."  Pl. Opp. Mem. at 44. Plaintiffs reference the Court's conclusion in an earlier ruling that neither the plaintiffs' breach of express contract claim, which has now been withdrawn, nor the implied-in-fact contract claim "was pled as a breach of the option agreement."  See Victor G. Reiling & Assocs. v. Fisher-Price, Inc., 03CV222 (JBA), 2003 WL 21785580 (D. Conn. July 31, 2003) (ruling on defendant's motion to transfer venue).  However, even if plaintiffs' implied-in-fact contract claim is not a proxy for a claim of breach of the Option Agreement (which it could not be, because the Option Agreement expired on May 1, 1999, before Fisher-Price's release of the accused products), that agreement may still bar plaintiffs' claim here because it covers the same subject matter as the alleged implied-in-fact contract.

Plaintiffs' breach of implied-in-fact contract claim alleges that the "conduct of the parties created a contract implied-in-fact between Plaintiffs and Fisher-Price, pursuant to which Fisher-Price agreed to compensate Plaintiffs in the event Fisher-Price actually used Plaintiffs' novel product concept as set

forth in their first, second and third submissions to Fisher-Price."  SAC ¶ 42; see also Dize Decl. Ex. N (plaintiffs' interrogatory responses) at 4 (stating that the custom and practice in the toy industry, the conduct of the parties, and the past course of dealing between plaintiff Reiling and Fisher-Price "dictates that if Fisher-Price used Plaintiffs' concept by incorporating it into a product or line of products, Fisher-Price would pay Plaintiffs a reasonable royalty on sales of said products").  Thus, the subject matter of the alleged implied-in-fact contract is the same as the subject matter in the Option Agreement, which provided the terms by which Fisher-Price could elect to use and/or acquire plaintiffs' concept and compensate plaintiffs therefor.  See Lane Decl. Ex. 25; see also AEB, 853 F. Supp. at 731-33 (finding that a confidentiality agreement that set forth the rights and obligations of the parties with respect to the submission of toy concepts presented by plaintiff's agent to defendant precluded plaintiff's implied-in-fact contract claim).

That the Option Agreement bars plaintiffs' implied-in-fact contract claim is further illustrated by the facts and circumstances to which DI points as the basis for the alleged implied-in-fact contract.  Plaintiffs explain that the purported implied-in-fact contract "formed during the initial meeting between Plaintiff Reiling and Paul Snyder, [and] th[r]ough

23

subsequent telephone conversations and correspondence between the parties." <u>See</u> Dize Decl. Ex. N at 4-5.  While plaintiffs state that "the exact date of the formation of the implied-in-fact contract between Fisher-Price and Plaintiffs is unknown," the conduct cited in interrogatory responses all occurred in late 1998 and plaintiffs' expert testified that the "facts supporting the implied contract [are] the submission itself, the dealings between the parties up to the option agreement and the signing of the option agreement." <u>See</u> Lane Decl. Ex. 12 at 288.  The Option Agreement was executed in February of 1999.  <u>See</u> Lane Decl. Ex. 25 at 5.  Thus, all of the conduct cited as the basis for the alleged implied-in-fact contract occurred before the execution of the Option Agreement and is related to its subject matter, dictating a conclusion that the Option Agreement reflects the entire agreement between the parties as to that subject matter, <u>i.e.</u>, Fisher-Price's obligation to compensate plaintiffs in the event Fisher-Price used plaintiffs' concept.[16]

As a fellow federal district court judge reasoned, "[t]he logic at work here is obvious: If the parties have an express

---

[16]  Plaintiffs' counsel's comment at oral argument that the royalty rate in the Option Agreement could be used to evidence the parties' understanding as to the reasonable rate for compensation in the purported implied-in-fact contract further underscores this conclusion that the Option Agreement was the culmination of the parties' discussions, meetings, and negotiations.

contract that deals with a subject, it makes little sense to conclude that they in fact agreed to additional terms but simply decided to leave them out of the express contract." Radio Today, Inc. v. Westwood One, Inc., 684 F. Supp. 68, 71 (S.D.N.Y. 1988). That the Option Agreement is now expired does not by itself permit a finding of existence of an implied-in-fact contract, where no conduct post-dating the execution of the Option Agreement is referenced to indicate that the parties' intended to enter into any implied-in-fact contract.[17] Compare Watts v. Columbia Artists Mgmt. Inc., 591 N.Y.S.2d 234, 235-37 (N.Y. App. Div. 1992) (concluding that an implied-in-fact contract had been formed, on the basis of the parties' conduct after the expiration of the parties' written contract concerning the same subject matter).

        Thus, DI's implied-in-fact contract claim is precluded by the existence of the Option Agreement and defendant's motion for summary judgment on this claim is granted.

D.   Misappropriation Claim

        Under New York law, a plaintiff alleging misappropriation of idea(s) must demonstrate the following: (1) the concept is concrete, see M.H. Segan, 924 F. Supp. at 526; (2) the concept is

_____

        [17]  Thus, after expiration of the Option Agreement, plaintiffs were left with claims of misappropriation, such as the claim asserted in this action, in the event that Fisher-Price used plaintiffs' concepts without compensation.

novel, see id.; (3) the concept was disclosed in the context of a legal relationship in the form of a fiduciary relationship, an express or implied-in-fact contract, or quasi-contract - including a confidential relationship, see id.; Lehman v. Dow Jones & Co, Inc., 783 F.2d 285, 299 (2d Cir. 1986); and (4) the defendant used the concept, see AEB, 853 F. Supp. at 734.

Fisher-Price argues that it is entitled to summary judgment on the misappropriation claim because: (1) plaintiffs' Reel Heroes concept was not concrete, (2) plaintiffs' Reel Heroes concept was not novel, (3) no confidential relationship existed between plaintiffs and Fisher-Price, and (4) Fisher-Price did not use plaintiffs' concept.

i.    Concreteness

Defendant contends that plaintiffs' Reel Heroes concept is not sufficiently "concrete" to sustain a misappropriation claim. In order to be protectible, the Reel Heroes concept must be in a "fixed and concrete form [so] as to indicate a protectible idea." See Educ. Sales Programs, Inc. v. Dreyfus Corp., 317 N.Y.S.2d 840, 845 (N.Y. Sup. Ct. 1970); see also Estate of Hemingway v. Random House, Inc., 296 N.Y.S.2d 771, 776 (N.Y. 1968) ("[A]n author has no property right in his ideas unless [they are] given embodiment in a tangible form.") (internal quotation and citation omitted).

Defendant refers to the definition of plaintiffs' concept

offered in the report of plaintiffs' expert, James Kipling, and argues that the definition is "a nearly pure abstraction with no concrete form or content."  Def. Mem. of Law at 31.[18]  Plaintiffs, however, rely on the definition set out in their responses to defendant's second set of interrogatories.  See Pl. Mem. of Law at 27.  Thus, the operative definition claimed by plaintiffs of the Reel Heroes concept is:

> Adding an image component to the backpack of each "Rescue Heroes" action figure that enhanced role play for the child by depicting the mission of that particular "Rescue Heroes" character.

Dize Decl. Ex. L at 1.  This definition is consistent with, and embodied in, the concepts presented in plaintiffs' three submissions to defendant – of an image-displaying device to be used on the equipment of the Rescue Heroes action figures that enhanced role play by depicting the mission of the particular figure and/or obstacles that figure might face.

Along with the concept submission form,[19] plaintiffs also

_____

[18]  Mr. Kipling's report provides the following as "one accurate articulation" of plaintiffs' concept:
> A device associated with a Rescue Heroes figure (for example, part of a backpack), for visually communicating to the mind of a child a cue or prompt for role-playing in which the child would use the Rescue Heroes figure and imagine accomplishing a mission assignment, resolving a dangerous situation, performing a rescue, or engaging in some other adventurous pretend scenario.

Lane Decl. Ex 26 at ¶ 11.

[19]  See Lane Decl. Ex. 24 (1998 concept submission form). Plaintiffs contend that "it was impossible to accurately describe

27

submitted numerous sketches, written material, and a prototype to
Fisher-Price in 1998, 1999, and 2000.  See Reiling Decl. Exs. P-R
(written description, drawings, and prototype submitted in 1998);
Reiling Decl. Ex. S (idea for "Filmore Schotz" character, also
submitted in 1998); Reiling Decl. Ex. X (1999 letter to Fisher-
Price with attached revised drawing); Reiling Decl. Ex. Y (2000
letter to Fisher-Price with attached revised drawings).
Plaintiffs' definition coupled with their submissions provide an
evidentiary basis from which reasonable jurors could find
plaintiffs' concepts sufficiently concrete and tangible to be
protectible.  Compare Educ. Sales Programs, 317 N.Y.S.2d at 841,
845 (concluding that plaintiff's concept "to make tape players
and monthly tape cassettes containing educational and promotional
material available free of charge to independent mutual fund
salesmen, with the players, cassettes and contents to be
purchased from plaintiff" was "quite malleable and not in such
fixed and concrete form as to indicate a protectible idea"); Link
Group Int'l v. Toymax, Inc., No. 97-CV-670 (JCH), 2000 U.S. Dist.
LEXIS 4567, at *38 (D. Conn. Mar. 17, 2000) (plaintiff's concept
was not sufficiently concrete where plaintiff submitted a sample
and sketches of only one of the concepts and no updated prototype
or schematics of that concept or any of plaintiff's related

---

the concept" in the "small rectangular space" provided on the
concept submission form.  See Pl. L. R. 56(a) Counter-Stmt, at ¶
18.

concepts were ever submitted).

    ii.  Novelty

    To prove misappropriation under New York law, a plaintiff must show that the idea defendant allegedly misappropriated was "original or novel in absolute terms." Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368, 378 (2d Cir. 2000).[20] Determining whether a concept meets this standard requires a fact-specific inquiry and depends on several factors, including:

> [T]he idea's specificity or generality (is it a generic concept or one of specific application?), its commonality (how many people know of this idea?), its uniqueness (how different is this idea from generally known ideas?), and its commercial availability (how widespread is the idea's use in the industry?).

Id. The inquiry is whether the idea in question "exhibited genuine novelty or invention or whether it was a merely clever or useful adaptation of existing knowledge." Id. at 380 (internal quotation and citation omitted); see also Hogan v. DC Comics, 48 F. Supp. 2d 298, 314 (S.D.N.Y. 1999) ("The test for novelty is a stringent one: the idea must 'show genuine novelty and invention, and not merely a clever or useful adaptation of existing knowledge.'") (quoting Paul v. Haley, 588 N.Y.S.2d 897, 903 (N.Y. App. Div. 1992)).[21]  The Second Circuit has noted that it is

---

    [20]  This standard is distinct from the "novel to the buyer" standard applicable to contract-based submission of ideas claims, see id. at 380, which is inapplicable here.

    [21]  While plaintiffs' expert, Mr. Kipling, testifies that "the 'novelty' of a submitted concept is not a material

only appropriate to resolve novelty as a matter of law in cases
where "an idea [is] so unoriginal or lacking in novelty that its
obviousness bespeaks widespread and public knowledge of the
idea."  See Nadel, 208 F.3d at 378-79.

    Reel Heroes Concept

    Fisher-Price argues that plaintiffs' Reel Heroes concept
fails to meet Nadel's requirement for originality or novelty "in
absolute terms."  Using plaintiffs' definition, consistent with
plaintiffs' three submissions to Fisher-Price, the challenged
concept is the use of a device or mechanism for displaying images
on the backpack of a Rescue Heroes figure to depict that
particular character's mission so as to enhance play value for
the child by allowing the child to feel as though he or she is
being that action figure – by viewing what that action figure
might view – and/or by displaying images depicting that figure in
action, on a "mission," prompting role play about that figure.[22]

---

consideration in the toy industry," Kipling Decl. ¶ 49, and that
Fisher-Price's argument that "the mere combination of known
elements is insufficient to establish novelty . . . does not
comport with [his] own experience in the toy industry," id. at ¶
51, Mr. Kipling's testimony may not be used to contradict the
clearly established legal principle described above.  See Ruling
on Defendant's Motion to Strike, [Doc. # 143].  While Mr.
Kipling's experience and testimony may reflect more relaxed
standards actually applied in the toy industry, those standards
are contrary to the legal principles that are applicable here.

    [22]  For example, the plaintiffs' first concept incorporated
film into the Rescue Heroes figures' backpacks, "which would
provide action clips of obstacles and dangers each might face,
animated clips of Rescue Heroes in action, and the like."  SAC

Applying the Nadel factors[23] - specificity, commonality,
uniqueness, commercial availability - it is apparent that genuine
issues of material fact exist requiring a jury determination of
whether plaintiffs' Reel Heroes concept was sufficiently
"original or novel in absolute terms."

First, there is a genuine dispute as to whether prior art
rendered plaintiffs' concept non-novel.  Defendant offers six
pieces of prior art that it claims "satisf[y]" plaintiffs' Reel
Heroes concept and render it non-novel.  See Def. Mem. of Law, at
38-42.  Fisher-Price also contends that the rejection of the Reel
Heroes concept by another toy company (Toy Biz) illustrates that
the concept was not novel.  See Lane Decl. Ex. 37 ("[T]his is an
idea that Toy Biz has worked with in the past."); Lane Decl. Ex.
6 (Popek deposition testimony) at 33 (discussing the Toy Biz

---

Ex. C.  The second submission presented a "backpack type device"
including a viewer which, using ambient light and a tinted
device, would present a magnified image "with the capability of
showing 8 or more scenes that are particularly appropriate to
individual heroes."  SAC Ex. H.  Plaintiffs' third submission
presented a disc with approximately six images, each disc
relating to a particular action figure's "theme activities" that
could be dropped into a simple "digital camera" on the figure,
which would allow the pictures to be advanced and then viewed
with one eye using viewmaster optics.

   Plaintiffs' first and third submissions also presented an
idea for "Filmore Schotz" - a cameraman figure with a backpack
for a disc to be dropped into, which could then be viewed by
looking at the backpack's "screen" and could also be used as a
projector.  The figure would carry a TV camera that the child
could look through, providing the sense that the child was
viewing what was being filmed.  See SAC Exs. C & I.

   [23]  Discussed supra.

31

rejection and noting "since [Toy Biz representative Tom

McCormick] considered [Toy Biz's projector mechanism] to be a

variation of the concept that [plaintiffs] showed him, he felt

that [plaintiffs'] idea was not novel to Toy Biz").  Plaintiffs

dispute the relevance of the claimed prior art to which Fisher-

Price refers,[24] and point to testimony which they claim could

persuade a reasonable jury that the Reel Heroes concept was

novel.  Mr. Reiling states that the Reel Heroes concept had

specific application, was not commonly known in the industry,

i.e., no other companies previously had executed the concept by

using images "on a backpack to enhance role play by depicting the

character's mission or obstacles and dangers the character might

---

[24] Plaintiffs argue that defendant's six examples of prior
art are distinct enough from the Reel Heroes concept to be
rendered irrelevant.  Plaintiffs distinguish the prior art as
follows:
(1)  Toy Biz Projector Figures: these figures are "entirely
     different toy[s]," projecting an image from the chest,
     rather than from a backpack, and projecting an image onto a
     wall or screen, instead of allowing the child to view the
     image in the backpack itself ("a view-in device").
     Plaintiffs point to the further distinction that the image
     on the Projector Figures does not necessarily depict the
     mission of the character and therefore cannot serve to
     enhance play value, as plaintiffs' concept envisions.
     Additionally, the Toy Biz Projector Figures are not Rescue
     Heroes characters.  See Pl. Mem. of Law at 33;
(2)  Secret Wars Figures: these figures are not Rescue Heroes
     characters and the images are not on or associated with the
     figures' backpacks.  Additionally, plaintiffs point out that
     the images cannot be "seen" by the figure itself and
     therefore cannot be "messages to or mission assignments for
     the figures."  Id. at 33;
(3)  Playsets and Other Accessories: these do not involve Rescue
     Heroes.  See id. at 34.

face," and was not commercially available in the marketplace at the time plaintiffs' three submissions were made to Fisher-Price. See Reiling Decl. ¶ 45.  Accord Kipling Decl. ¶¶ 52-54 (distinguishing Fisher-Price's prior art examples). Additionally, several Fisher-Price designers and other representatives testified that they could not recall the concept, so defined, ever having been marketed or sold as of the time the Reel Heroes concept was presented to Fisher-Price.  See Dize Decl. Ex. B (Snyder deposition) at 143-45; Dize Decl. Ex. D (Berkheiser deposition) at 73-76; Dize Ex. G (Bauman deposition) at 47-48.  See also Dize Decl. Ex. A (Clutton deposition) at 109-11 (novelty was not one of his reasons for the rejection of plaintiffs' concept).

Whether the alleged prior art renders plaintiffs' concept non-novel is for a jury to decide.  For example, a jury could conclude that the Toy Biz Projector Figures, including the Wolverine figure discussed at oral argument, are sufficiently distinct from plaintiffs' concept so as not to render plaintiffs' concept non-novel.  The Toy Biz Projector Figures project an image from their chest, rather than on backpack devices. Additionally, the images displayed by the Toy Biz Projector Figures, while potentially related to the figure itself, do not necessarily depict the character on a mission in a way to prompt role play by making the child feel as though he or she is viewing

what the figure sees (as opposed to what the figure does).[25]
Lastly, the Toy Biz Projector Figures are not Rescue Heroes
characters.  Thus, the concept embodied in the Toy Biz Projector
Figures reasonably could be found distinct from plaintiffs'
concept, in that the Toy Biz figures embody a clever projection
device which can show the figure in action, while plaintiffs'
concept incorporates an image-displaying device on a Rescue
Heroes figure's equipment to allow the child to role play as or
with that particular figure.

    A jury also could reasonably conclude that the Secret Wars
figures – including the Captain America figure discussed at oral
argument – embody a concept different from plaintiffs'.  The
Secret Wars figures include super heroes and villains with
shields containing lenticular lenses with images of that figure
in action.  However, like the Projector Figures, while the Secret
Wars shields depict aspects of the figure's actions, they do not
do so in a way that provides the child with the feeling that he

_____

    [25]  The Toy Biz patent for their "Image Projective Toy"
claims a toy with the mechanism for projecting "a plurality of
images sequentially arranged in comic format."  Def. Mem. of Law,
Product Appx. at 18-19.  While the specifications of the patent
provide that "the ability to project images which may be related
in some manner to the character of the toy figure, greatly
increases the 'play-value' and appeal of such a product to
children," id. at 18, the invention claimed in the patent is of a
certain projection device that is different from plaintiffs'
backpack-viewer concept.  The patent does not require that the
images be of the particular character on a mission with the
purpose of providing role-playing cues to the child playing with
that particular figure.

or she is that particular figure or is viewing the missions and
action scenes as the particular figure would be viewing them.[26]

Additionally, a genuine dispute exists as to whether
plaintiffs' Reel Heroes concept was novel or merely a combination
of non-novel elements.  See Nadel, 208 F.3d at 380.  For example,
Fisher-Price points to testimony implying that the Reel Heroes
concept was simply a combination of a movie viewer (the
"Viewmaster technology and film") and Fisher-Price's Rescue
Heroes action figures.  Lane Decl. Ex. 4 (Reiling deposition) at
189-90; Lane Decl. Ex. 12 (Kipling deposition) at 227-29.
See also Lane Decl. Ex. 6 (Popek deposition) at 111-12 (the
combination of a lenticular image on an earlier product and a
Rescue Heroe's backpack would be covered by the Reel Heroes
concept); Lane Decl. ¶¶ 41-50 (citing testimony).  Plaintiffs'
evidence cited in the preceding paragraphs, augmented by the
circumstances and significance which could be attached to the
Option Agreement between the parties, rebuts this testimony by
demonstrating what may be found novel about plaintiffs' concept,
and thus creates a genuine issue of material fact for trial.  See

---

[26] The other prior art referenced by defendants are playsets
and can be distinguished on this ground, because they do not
encompass plaintiffs' concept of adding an image-displaying
device to the equipment of an action figure.  Moreover, as
discussed below, plaintiffs' claims for royalties on the Reel
Heroes playsets produced by Fisher-Price sounds in industry
custom and practice of paying royalties for line extensions, and
are not claimed to depend on the novelty of the concept of an
interactive playset in and of itself.

also Dize Decl. Ex. A (Clutton deposition) at 141 (a combination
of existing elements could be sufficiently novel to warrant
Fisher-Price paying the inventor a royalty if the combination was
"unique"); Dize Decl. Ex. B (Bollinger deposition) (unique
combination of known elements could be "combined to create a
product that is novel in its own right").

In sum, the summary judgment record shows genuine issues of
material fact on the element of novelty of plaintiffs' Reel
Heroes concept which defeat defendant's motion for summary
judgment on these figures on this ground.[27]

_____

[27]  As the parties note, few courts have granted summary
judgment on the basis of novelty after Nadel.  Plaintiffs contend
that post-Nadel "only one court in this Circuit granted summary
judgment on the issue of novelty in a submission [of] idea case."
Pl. Mem. of Law at 29 n.12.  Plaintiffs cite to Khreativity
Unlimited v. Mattel, Inc., 101 F. Supp. 2d 177 (S.D.N.Y. 2000),
aff'd 242 F.3d 366 (2d Cir. 2000), in which the court considered
a contract-based claim for which the novelty standard is
"novel[ty] to the buyer."  101 F. Supp. 2d at 185.  The court
concluded that plaintiff's "idea for a cross-marketing venture
between Mattel and the NBA was so unoriginal and lacking in
novelty that knowledge of the idea [could] be imputed to Mattel
[the buyer]."  Id.  At least two other courts in this Circuit
have granted motions to dismiss on the issue of novelty in the
context of a misappropriation claim.  In Sharp v. Patterson, the
court concluded that plaintiff's "idea to write a novel revolving
around a series of love letters is neither novel nor original."
Sharp v. Patterson, No. 03 Civ. 8772 (GEL), 2004 WL 2480426, at
*9 (S.D.N.Y. Nov. 3, 2004).  In Zikakis v. Staubach Retail
Servs., Inc., the court concluded that plaintiffs' idea to create
a real estate investment trust comprised of sale-leaseback
transactions within the automotive retailing industry was non-
novel where the ideas of real estate trusts and of sale-leaseback
transactions in the automotive retailing industry already existed
in the public domain and in defendant's own business).  Zikakis
v. Staubach Retail Svcs., Inc., No. 04 Civ. 9609 (NRB), 2005 WL
2347852. at *3 (S.D.N.Y. Sept. 26, 2005).  These cases involving

Filmore Schotz Concept

Plaintiffs claim that defendant's "Telly Photo" incorporates their Filmore Schotz concept.  Fisher-Price contends that plaintiffs' separate concept for a cameraman action figure, "Filmore Schotz," is not sufficiently novel to be actionable. Plaintiffs' concept for the cameraman action figure was a "TV cameraman holding a TV camera . . . with a window on top, through which a child could look and see out of the camera lens . . . giving the impression that he was viewing what the cameraman figure was 'filming'".  See Agreement Def. L.R. 56(a) Stmt, at ¶ 41.  Defendants contend that this concept was not novel in 1998 when first submitted to Fisher-Price and that "Fisher-Price had itself sold a TV cameraman action figure as early as the 1970s. That figure also came with a TV camera that the child could look through to see what the cameraman was 'filming.'"  Bollinger Decl. at ¶ 47; Lane Decl. Ex. 5 (Popek deposition) at 57 ("Q. So action figures who were photographers carrying TV cameras were not new in the fall of 1998?  A. No, it had been done before.  Q. So that is not part of the novelty of this idea using a photographer action figure?  A. Absolutely not.  Q. Even one carrying a TV camera, that is not a new idea?  A. Oh no.").

---

concepts that are so clearly merely variations on ideas already existing in the public domain, and thus devoid of novelty, are readily distinguished from this case, where genuine issues of material fact exist as to whether plaintiffs' Reel Heroes concept was novel.

Plaintiffs, however, clarify that they claim novelty not for
the idea of a cameraman figure generally, but for the design of
this particular cameraman action figure, "including the fact that
he was holding an optical camera (which enhanced mobile play
value) in one hand," through which a child could look and view
what the camera was "filming," and was holding a microphone in
the other hand.  Pl. Mem. of Law at 36; accord Reiling Decl. ¶
50; Kipling Decl. ¶ 54(d).  Both Mr. Reiling and plaintiffs'
expert Kipling testified that the 1970s cameraman was "certainly
not an action figure, it is more fairly characterized as a doll,"
Reiling Decl. at ¶ 50; Kipling Decl. at ¶ 54(d), and that the
1970s product was in fact "a series of figures comprising a TV
news camera crew having a child-size camera wheeled around and
carried by a van that is part of the set," Kipling Decl. ¶ 54(d),
and thus "bears no resemblance to plaintiffs' concept, which
involved an attempt to draw an association between the action
figure and the figure's mission," Reiling Decl. at ¶ 50.
Plaintiffs also reference testimony that Fisher-Price now pays
royalties to a company known as "Bang Zoom" for the "optical
camera technology" used in Fisher-Price's Telly Photo figure,
which plaintiffs claim belies Fisher-Price's contention that
plaintiffs' Filmore Schotz concept is identical to the one
Fisher-Price developed in the 1970s, otherwise it would not have
such royalty obligations.  The evidence is such that a jury could

reasonably conclude that the 1970s cameraman marketed by Fisher-Price is sufficiently dissimilar that it does not render plaintiffs' Filmore Schotz concept non-novel.

Thus, genuine issues of material fact exist as to the novelty of plaintiffs' Filmore Schotz concept sufficient to preclude summary judgment on this ground.   _

### iii. Existence of the Requisite Relationship

In order to succeed on a misappropriation claim, a plaintiff must demonstrate that an idea was disclosed in the context of a particular legal relationship, including a confidential relationship.[28]  Defendant argues that it is entitled to summary judgment on plaintiffs' misappropriation claim because the 1994 P&A "expressly disclaimed the formation of any confidential relationship."[29]  Def. Mem. of Law at 23, citing, inter alia,

---

[28] "Under New York law, a confidential relationship is 'synonymous with [a] fiduciary relationship and . . . [exists] generally where the parties do not deal on equal terms and one trusts and relies on the other. . . . Courts will find a duty not to reveal confidential information only when the recipient has accepted the confidential relationship. . . . Such a relationship may arise either explicitly by contract, or implicitly by the actions of the parties or other circumstances."  See Stewart v. World Wrestling Fed'n Entm't, Inc., No. 03 CV 2468 (RLC), 2005 WL 66890, at *4 (S.D.N.Y. Jan. 11, 2005) (citing, inter alia, Sachs v. Cluett Peabody & Co., 39 N.Y.S.2d 853, 856 (N.Y. App. Div. 1943), aff'd 291 N.Y. 772 (N.Y. 1944)).

[29]  The 1994 P&A provides:
The disclosure must be understood to be purely voluntary and no confidential relationship is to be established by such disclosure or implied from our consideration of the submitted material, and the material is not to be considered submitted "in

M.H. Segan, 924 F. Supp. at 526 (holding that nearly identical waiver language "negates the existence of a legal relationship based on a . . . confidential relationship").  However, as discussed above, the 1994 P&A may not be binding and enforceable against DI as it was not a signatory to that agreement and disputed evidence exists as to whether Reiling could or did bind DI to that agreement.  The 1992 P&A signed by DI, see Lane Decl. Ex. 18, cannot preclude DI's misappropriation claim because that agreement was concept-specific and therefore inapplicable to the submissions at issue here.

While Fisher-Price proffers testimony that confidentiality of an inventor's submissions is not a standard industry practice,[30] Mr. Kipling testifies that some toy companies assume the existence of a confidential relationship and that the parties' Option Agreement gave rise to a confidential

---

confidence."  Confidential relationships have been held to create obligations which are beyond those that the company is willing to assume.
Lane Decl. Ex. 20 at ¶ 1.

[30] See Lane Decl. Ex. 4 (Reiling deposition) at 76-77 (testifying that Mattel and Hasbro required inventors to sign agreements stating that they would not keep submissions confidential); Lane Decl. Ex. 12 (Kipling deposition) at 168-69 (testifying that "a variety of practices" exist in the toy industry "with respect to whether toy companies commit to keep inventors' submissions confidential"); Lane Reply Decl. Ex. E (Pook deposition) at 63-64 ("Q. . . . [W]hen an outside inventor made a submission to you, was there an expectation that you would keep that information confidential? . . . THE WITNESS: No.  No. I mean our form states that.")

relationship because it prohibited plaintiffs from showing their concept to others during the term of the agreement and obligated them to "treat in strictest confidence" any information related to their concept, see Kipling Decl. ¶¶ 15(b), 21(d).  Other of plaintiffs' witnesses testified that they expected that their submissions to Fisher-Price of the Reel Heroes concept would be held in confidence and that the Option Agreement confirmed that understanding.  See Reiling Decl. ¶ 22; Ex. V at ¶¶ 5, 8; Popek Decl. ¶ 17.  Defendant's expert had a similar expectation.  See Dize Decl. Ex. C (Bollinger deposition) at 52-54, 206-09.

Thus, summary judgment on DI's misappropriation claim on the ground of absence of the requisite confidential relationship is inappropriate.

iv.  Use[31]

Defendant contends that summary judgment on the misappropriation claim is warranted because no genuine issue of material fact exists as to whether Fisher-Price actually used

---

[31] Plaintiffs argue as a preliminary matter that Fisher-Price should be estopped from advancing the defense of non-use because it assured this Court on two occasions that it would not do so. See Pl. Mem. of Law at 21 n.4 (citing Dize Decl. Ex. J (Transcript of Feb. 2, 2004 Status Conference) at 34-35; Ex. K (Transcript of Feb. 14, 2005 Status Conference) at 23-24, 28-29). In fact, Fisher-Price stated that one of its defenses was "that [it] didn't use [plaintiffs' concept]".  See Dize Decl. Ex. J at 34.

plaintiffs' concepts.[32]  Defendant further contends that
plaintiffs are bound by the definition of their Reel Heroes
concept in the Option Agreement.  Use of a plaintiff's concept by
a defendant can be inferred by: (1) a showing of substantial
similarity between the plaintiff's concept and the accused
product, and (2) access of the defendant to the purportedly
misappropriated concept.  See generally Ball v. Hershey Foods
Corp., 842 F. Supp. 44, 48 (D. Conn. 1993), aff'd 14 F.3d 591 (2d
Cir. 1993); Ed Graham Prods., Inc. v. Nat'l Broad. Co., 347
N.Y.S.2d 766, 768 (N.Y. Sup. Ct. 1973).  Fisher-Price argues that
plaintiffs' Reel Heroes concept is sufficiently dissimilar from
the allegedly infringing products so as to justify summary
judgment on the claim of misappropriation of plaintiffs' Reel
Heroes concept.  Fisher-Price does not appear to rebut the
evidence that it had access to plaintiffs' concept.[33]

---

[32]  The alleged use of plaintiffs' Filmore Schotz concept is
discussed below.

[33]  Plaintiffs proffer testimony supporting the conclusion
that Fisher-Price had access to plaintiffs' submitted concepts,
and that members of the Boys Team had access to one of
plaintiffs' prototypes.  See Dize Decl. Ex. D (Berkheiser
deposition) at 38-40 (Berkheiser saw plaintiffs' submission
"which was a motorized film loop that was trapped inside of a
backpack that was put on one of our figures"), 44-47 (Berkheiser
saw plaintiffs' submission including "a color picture of a
cameraman" that utilized "a film loop and a motorized button and
a lens you looked through"); Dize Decl. Ex. E (Morton deposition)
at 58-62, 71-74 (when he was Design Manager at Fisher-Price,
Morton saw plaintiffs' submissions and had plaintiffs' submission
materials in his possession for more than two weeks); Dize Decl.
Ex. F (Pardi deposition) at 45-46, 50-51 (Pardi may have seen one

Plaintiffs contend that the definition of the Reel Heroes concept should not be limited to just the language included in the 1998 concept submission form (Lane Decl. Ex. 24) and the Option Agreement (Lane Decl. Ex. 25, Ex. A) because "(1) concepts submitted by outside inventors are typically broadly construed [notwithstanding] the limited definition provided on written submission forms; (2) the performance of the concept by Fisher-Price could be achieved in many different ways . . .; and (3) the concept may ultimately be changed because the toy company has expended substantial resources to refine and embellish the concept into a 'finished licensed product.'" Pl. Mem. of Law at 23. Defendant argues, however, that plaintiffs must be limited to the definition provided in the Option Agreement because: (1) the option agreement, including the concept definition, is a "formal contract" to which plaintiffs are bound, Def. Mem. of Law at 28 & n.74; (2) the purpose of the Option Agreement was to provide "public notice" of plaintiffs' idea, id. at 29 & n.75; and (3) plaintiffs' use of alleged custom and practice to argue that the concept definition in the Option Agreement is not binding is improper because custom and practice "cannot override specific terms agreed to by the parties," Def. Reply Mem. of Law

of plaintiffs' prototypes).   Fisher-Price admits that plaintiffs' prototype was shown to Ken Morton, then Design Manager of the Boys Team, and to two other Boys Team members, Tyler Berkheiser and Chris Pardi.   See Def. L.R. 56(a) Stmt at ¶ 28.

at 21.

The plaintiffs' articulation of their Reel Heroes concept in their three submissions, as set out in their interrogatory responses, will be used.  This definition is consistent with the Reel Heroes concept presented to Fisher-Price in each of plaintiffs' submissions, and considered in the context of their presentation to defendant, and therefore Fisher-Price's argument that it did not have proper notice, and thus cannot be found to have misappropriated that concept, will not bar this claim. Furthermore, the Option Agreement reflected only plaintiffs' first submission and thus the Agreement's definition was necessarily limited to that submission only and does not reflect the additional iterations of plaintiffs' concept.

Plaintiffs contend that Fisher-Price used their Reel Heroes concept in four different lines or sub-lines of action figures, as well as in playsets, vehicles, and other accessories (including games), and used their Filmore Schotz concept in its Telly Photo figure.  The Court will address the issue of "use" with respect to each of these products.

<u>Voice Tech Video Mission Figures ("Video Mission")</u>

The Video Mission figures are Rescue Heroes figures with backpacks that contain structures that look like television or computer screens, which, through the use of a lenticular lens, display moving images of the mission of the particular figure.

44

<u>See</u> SAC Ex. L; Berkheiser Decl. at ¶ 20; Reiling Decl. ¶ 60.  For example, the firefighter figure, Billy Blazes, has a backpack that displays a moving image of a building on fire with sound accompaniment of fire crackling.  <u>See</u> Berkheiser Decl. Ex. F.

The effect of the Video Mission figures could be found consistent with plaintiffs' concept of permitting the child to feel as though he or she is viewing the obstacle or mission that the particular figure is viewing or embarking on.  The packaging for the Video Mission figures makes plain these similarities. <u>See</u> Reiling Decl. Ex. CC (packaging for the Video Mission figures, stating "Now!  See my mission on my video backpack!  Now Rescue Heroes figures come to life with voices, sound effect, and <u>video images</u>!  . . . Kids can hear about the mission and see where it will be by pressing the buttons on the Rescue Heroes backpacks.") (emphasis added).  These backpacks with lenticular lenses can be seen as similar to the image-displaying device envisioned in plaintiffs' submissions.  Indeed, Fisher-Price Vice President Paul Snyder testified that there were similarities between plaintiffs' concept and the Video Mission line sufficient to justify a recommendation that plaintiffs were entitled to royalties.  <u>See</u> Dize Decl. Ex. B, at 135-36, 139-40.  Thus, genuine issues of material fact exist as to whether Fisher-Price used plaintiffs' concept in the Video Mission line of figures.

   Voice Tech Mission Command Figures ("Mission Command")

     The Mission Command figures are Rescue Heroes which are sold
with a "mission card" displaying an image of a scene of one of
six emergency scenarios in the Rescue Heroes storyline – fire,
earthquake, flood, avalanche, volcanic eruption, and tornado.
For example, the police officer Jake Justice is sold with a card
depicting a tornado, the firefighter Billy Blazes is sold with a
card showing a flame encompassing a burning building, and the
construction worker Jack Hammer comes with a card showing a road
cracking from an earthquake.  Insertion of a card into a figure's
backpack will trigger a voice component related to the image on
that particular card ("flood emergency," "tornado warning").  SAC
Ex. U; Reiling Decl. ¶ 60; Berkheiser Decl. ¶ 15 & Ex. A.  Thus,
the image on the card visually cues the child as to the emergency
scene, confirmed by the audio triggered by use of that particular
card.  Berkheiser Decl. ¶ 16.  While each figure is sold with one
card depicting one crisis scene, the cards are interchangeable
among the Mission Command figures and trigger the same audio
about the crisis scene depicted on the card, regardless of which
figure the card is inserted in, allowing the figures to embark on
and "talk" about joint missions by transferring a card from one
figure to another.  Id.

     Thus, a jury could reasonably conclude that the Mission
Command figures use plaintiffs' Reel Heroes concept by utilizing

                                46

a viewer device on a figure's backpack to visually cue the
child's role playing by depicting the mission of the character
and by making the child feel as though he or she is viewing the
crisis scene that the figure is viewing.  These Mission Command
figures can embark on various adventures or crises (e.g., flood,
fire, tornado) through use of the interchangeable card mechanism.
Whether these thematic and structural similarities between
plaintiffs' concept and the Mission Command figures prove "use"
requires trial determination but are sufficient to distinguish
this case from cases in which the theme underlying a plaintiffs'
concept and the theme embodied in defendant's use are so distinct
that no reasonable jury could conclude that the defendant used
plaintiff's concept.[34]   Summary judgment on this basis is

---

[34]  See e.g., Ball, 842 F. Supp. at 48 (granting defendant's
motion for summary judgment on misappropriation, finding that
plaintiff's advertising concept of "five little girls dressed up,
having a tea party at which they ate Cadbury bars [along with] a
pet dog wearing a doll's bonnet [also at the table]" was
sufficiently different from defendant's accused advertisement of
"a little girl dressed up in adult clothes hold[ing] a tea party
for her toys.  Sitting at the table with her are a stuffed bear
and elephant, and a doll.  She serves them each a different
Hershey Miniature candy, commenting on how each one likes a
different kind."  The Court concluded that, while both ideas
concerned a little girl having a tea party, the details and
themes of the two ideas were very different, noting, "[t]he theme
of the plaintiff's idea is children, enjoying candy bars" whereas
"[t]he theme of the defendant's commercial is [that] Hershey
Miniatures can satisfy a variety of individual tastes") (applying
Connecticut law in a diversity case, but citing New York case
law); see also Ed Graham Prods., Inc. v. Nat'l Broad. Co., 347
N.Y.S.2d 766, 768 (N.Y. Sup. Ct.  1973) (granting motion for
summary judgment, finding that plaintiff's "Birdman and Sparrow"
series dealing with the "same adventure, spirit and sense of

denied.

        Voice Tech Mission Select Figures ("Mission Select")

_____A further iteration of the theme of the Mission Command line
is the Mission Select figures, which are action figures with a
dial on each figure's backpack that allows a child to select
among the six emergency scenarios in the Rescue Heroes storyline
(fire, earthquake, flood, avalanche, volcanic eruption, and
tornado).  See SAC Ex. R; Berkheiser Decl. ¶ 21.  Each figure –
whether Gil Gripper the scuba diver or Matt Medic the paramedic –
has a backpack with a dial displaying these six images.  See
e.g., Berkheiser Decl. Ex. H (Gil Gripper).  In addition to
visually displaying scenes of the various missions on which these
figures embark, the settings also trigger the voice component of
the toys.  The Mission Select line added the feature that the
figures responding to the same crisis "talk" to each other
without requiring moving a picture card from one figure to
another, as with the Mission Command figures.  See Berkheiser
Decl. ¶ 21.

        As with the Mission Command figures, the similarities
between the Mission Select figures and plaintiffs' Reel Heroes
concept, specifically, the use of a framed "screen" device on the

_____

crime" as "Batman and Robin" was sufficiently different from
defendant's "Birdman" series based on the "mythological Egyption
Sun God 'Ra'," noting that the only similarities between the
characters were that "both [we]re birdmen capable of flight and
that both successfully fight for good over evil").

figures' backpacks which displays a visual cue depicting scenes of the characters' six possible missions to engage a child's role playing, are such as to preclude summary judgment disposition.

Optic Force Rescue Heroes

The Optic Force Rescue Heroes are a sub-line of basic action figures and thus have no sound or speech capabilities. Berkheiser Decl. ¶ 25. The figures (including Telly Photo, Maureen Biologist, Matt Medic, and Rock Miner) have hand-held optical devices (except for Jake Justice, who has a non-hand-held telescope) attached to the backpack through which the child can view real images. See Reiling Decl. ¶ 60; Berkheiser Decl. ¶¶ 25-28. Thus, Telly Photo has a camera with an optical lens designed so the child can look through and see what Telly Photo is filming. Berkheiser Decl. Ex. N.

While plaintiffs' briefing does not appear to claim that the Optic Force figures use plaintiffs' Reel Heroes concept, their complaint does. See SAC ¶ 37. The Optic Force figures, however, have not been shown to constitute a use of the Reel Heroes concept because they do not include a visual depiction of any sort to cue play, on a backpack or elsewhere, and their means of enhancing play value is in real-time, by what the child actually sees through the optical device, as opposed to being cued by an artificial visual depiction.

The Telly Photo figure, however, could be found by a jury to

49

constitute a use of plaintiffs' Filmore Schotz concept.  The
Filmore Schotz concept was for a cameraman action figure holding
a TV camera with a window on top, through which a child could
look and see out of the camera lens, giving the child the
impression that he or she was viewing what the cameraman was
filming.  See Agreement Def. L.R. 56(a) Stmt, at ¶ 41.
Accordingly, Telly Photo appears sufficiently similar to
plaintiffs' Filmore Schotz, in function and appearance,[35] that
the issue of whether Fisher-Price used the Filmore Schotz concept
in producing their Optic Force Telly Photo figure must be decided
at trial on a full record.

Line Extensions

Plaintiffs also claim reasonable royalties for line
extensions, including playsets, vehicles, accessories, games,
videos, DVDs, related to the accused action figures.  As
discussed infra, the basis for this claim is the purported
industry custom and practice of compensating inventors for such
line extensions related to plaintiffs' submitted concepts.
Therefore, to the extent plaintiffs are entitled to royalties on

---

[35]  Telly Photo's physical characteristics (red hair, facial
hair, a baseball cap) are similar to those of Filmore Schotz.
See Reiling Decl., Ex. S.  Mr. Berkheiser claims that the
physical attributes of the Fisher-Price's Telly Photo were
derived from an actual television cameraman and brother-in-law of
Fisher-Price employee.  See Berkheiser Decl. ¶ 28.
Notwithstanding this fact, a jury could still conclude that
Fisher-Price used plaintiffs' Filmore Schotz concept when it
produced Telly Photo.

these types of products, they are only entitled to line extensions of those products which use plaintiffs' concepts. Genuine issues of material fact as to Fisher-Price's use of plaintiffs' concepts exist as to the Video Mission, Mission Command, and Mission Select lines of figures and the Telly Photo Optic Force figure and thus only the claims for royalties based on line extensions of these products survive summary judgment.

> Summary

Genuine issues of material fact exist regarding Fisher-Price's alleged use of plaintiffs' concepts in the Video Mission, Mission Command, and Mission Select lines of figures, the Telly Photo Optic Force figure, and line extensions and accessories related to these figures.  Defendant's motion for summary judgment on plaintiffs' misappropriation claim is therefore granted in part (as to all non-Telly Photo Optic Force figures) and denied in part (as to the Video Mission, Mission Command, and Mission Select lines of figures, the Telly Photo Optic Force figure, and related line extensions and accessories).__

E.   Violation of CUTPA Claim

Plaintiffs' CUTPA claim is based on Fisher-Price's alleged misappropriation, termination of its relationship with DI for refusing to drop this lawsuit (referred to at oral argument as "blackballing"), and its tortious interference with the business relationship between Reiling and DI "by seeking to force DI to

51

use its influence with Reiling to persuade Reiling to withdraw from the lawsuit." See SAC ¶ 57.

While the parties agree that New York law governs all other claims asserted, they dispute whether the CUTPA claim under Connecticut law is viable. See Pl. Opp. Mem. of Law, at 51 n.22. CUTPA prohibits "unfair methods of competition . . . in the conduct of trade or commerce." Conn. Gen. Stat. § 42-110b(a). "Trade" or "commerce" is defined as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, person or mixed, and any other article, commodity, or thing of value in this state." Id. § 42-110a(4) (emphasis added).  Courts have held that CUTPA "is remedial in character . . . and must be liberally construed in favor of those whom the legislature intended to benefit." Fink v. Golenbock, 238 Conn. 183, 213 (1996) (internal quotation and citation omitted).  CUTPA seeks to protect consumers, as well as "competitors or other businessmen." A-G Foods, Inc. v. Pepperidge Farm, Inc., 216 Conn. 200, 215 (1990).

While the plain language of CUTPA is directed at unfair competition taking place "in this state," Conn. Gen. Stat. § 42-110a(4), courts have held that CUTPA does not require that a violation actually occur in Connecticut, if the violation "is tied to a form of trade or commerce intimately associated with

Connecticut," or if, where Connecticut choice of law principles are applicable, those principals dictate application of Connecticut law.  See Uniroyal Chem. Co. v. Drexel Chem. Co., 931 F. Supp. 132, 140 (D. Conn. 1996) (citing, inter alia, Bailey Employment Sys., Inc. v. Hahn, 655 F.2d 473, 476 (2d Cir. 1981)). On the record before the Court, plaintiffs meet neither standard.

First, the allegedly unfair practices – in the form of misappropriation, blackballing, and tortious interference – are not "tied to a form of trade or commerce intimately associated with Connecticut," see Uniroyal, 931 F. Supp. at 140, because these all took place in or from New York, where Fisher-Price is located.  Additionally, the action figures and other products that Fisher-Price sold which allegedly misappropriated plaintiffs' concepts were marketed and sold in stores nationwide and on the Internet, not just in Connecticut.  Thus, plaintiffs fail to meet the first test governing the application of CUTPA to allegedly unfair activity occurring outside of Connecticut.

As to the second test, a federal court sitting in diversity applies the choice of law rules of the forum state, in this case, Connecticut.  Md. Cas. Co. v. Cont'l Gas Co., 332 F.3d 145, 151 (2d Cir. 2003).  Connecticut courts apply the "most significant relationship" test of the Restatement (Second) of Conflict of Laws, § 145.  See O'Connor v. O'Connor, 201 Conn. 632, 648-50 (Conn. 1986).  The relevant factors are: (1) the place where the

injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (4) the place where the relationship, if any, between the parties is centered.[36]  See Otis Elevator Co. v. Factory Mut. Ins. Co., 353 F. Supp. 2d 274, 285 (D. Conn. 2005).  In this case, plaintiffs are Connecticut entities, whereas defendant is a Delaware corporation with its principal place of business in New York.  The alleged conduct causing injury took place in New York.  The relationship between the parties is centered in New York, given that the relevant contracts were signed and meetings took place in New York.  The only factor that weighs in favor of application of Connecticut law is that the alleged injury occurred here, because the economic impact of the allegedly unfair practices was

----

[36] In applying the four factors of Section 145, the Court may also take into account:
> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

See Otis Elevator Co. v. Factory Mut. Ins. Co., 353 F. Supp. 2d 274, 285 & n.15 (D. Conn. 2005) (citing Restatement (Second) Conflict of Laws § 6(2)).

felt by plaintiffs in Connecticut, where they are located.[37]
Thus, Connecticut choice of law principles favor application of
New York law over Connecticut law, with only one factor weighing
in favor of the application of Connecticut law.[38]  Plaintiffs do

-------

[37] See Stewart v. World Wrestling Fed'n Entm't, Inc., No.
03CV2468 (RLC), 2005 WL 66890, at *1 (S.D.N.Y. Jan. 11, 2005)
(applying New York choice of law rules, which are similar to
Connecticut choice of law rules, and stating that "whatever harm
incurred to plaintiff due to the alleged misappropriation of his
ideas and concepts was felt in New York" where plaintiff was a
New York resident); Link Group, 2000 U.S. Dist. LEXIS 4567, at
*43 ("[T]he place of the injury in this case is Connecticut,
since that is where [plaintiff] would have suffered any loss of
revenue.").

[38] The Court is concerned that CUTPA not be given an improper
extraterritorial reach so wide that it encompasses any conduct
taken outside of Connecticut that necessarily economically
impacts a Connecticut-based plaintiff in Connecticut.  See
Alexander Hamilton Life Ins. Co. v. James River Corp., No.
96cv1100 (AHN), 1997 WL 13053, at *5-7 (D. Conn. Jan. 14, 1997)
(concluding that Virginia law applied under the most significant
relationship test and that plaintiffs had failed to satisfy
CUTPA's jurisdictional requirements, where plaintiffs had failed
to specifically allege any trade or commerce that occurred in
Connecticut, defendant had its principal place of business in
Virginia, the parties executed the contracts at issue in
Virginia, and the conduct causing the injury took place in
Virginia, even where one of the plaintiffs was a Connecticut
resident).
     While some cases have suggested that "where there is a
sufficient showing that the economic impact of the unfair trade
practice occurred in Connecticut," a CUTPA claim may be
maintained, Federici v. Gans, No. CV940317690S, 1999 WL 49779, at
*2 (Conn. Super. Ct. Jan. 7, 1999), in such cases there were
significant other contacts with Connecticut, in addition to the
impact of injury being felt here.  See e.g., id. at *2 (in
addition to the economic injury being felt in Connecticut by
plaintiff who was a Connecticut resident, "the parties lived, met
and agreed to the terms of their business arrangement in
Connecticut," "the parties drove together, to and from work from
Connecticut," and the bank accounts of the parties' corporation
at issue were located at Connecticut banks"); Titan Sports, Inc.

not meet either test for the application of CUTPA to violations
occurring outside of the state and defendant's motion for summary
judgment on this claim is granted.[39]

F.   Common Law Unfair Competition Claim

      Plaintiffs' common law unfair competition claim is, like
their CUTPA claim, based on defendant's alleged misappropriation,
blackballing, and tortious interference with the business

---

v. Turner Broad. Sys., Inc., 981 F. Supp. 65, 71-72 (D. Conn.
1997) (plaintiff's CUTPA claim met the test for being tied to a
form of trade or commerce "intimately associated" with
Connecticut where, in addition to plaintiff having its principal
place of business in Connecticut and thus suffering injury there,
defendants' allegedly deceptive television programs aired in
Connecticut, their pay-per-views were broadcast in Connecticut,
and Connecticut residents called defendants' 900-number hotline).
Uniroyal Chem. Co. v. Drexel Chem. Co., 931 F. Supp. 132 (D.
Conn. 1996), cited in both Titan Sports and Federici, similarly
involved a case with other connections to Connecticut beyond the
fact that a Connecticut plaintiff had suffered its alleged injury
in Connecticut, including that the contract at issue was to be
performed in Connecticut.  While the Uniroyal Court stated that a
"tort is deemed to have occurred where the injury was sustained"
and implied that the fact that injury had been sustained in
Connecticut might be sufficient to meet the "intimately
associated" test for application of CUTPA, the court also
concluded that Connecticut choice of law principles would
similarly dictate application of Connecticut law, and thus CUTPA.
See id. at 140.  The facts and circumstances of these cases are
thus distinguishable from those in this case.

[39]   The cases cited by plaintiffs in support of their
position are distinguishable because the circumstances of those
cases satisfy at least one of the tests for application of CUTPA
described above.  See Connecticut Pipe Trades Health Fund v.
Philip Morris, Inc., 153 F. Supp. 2d 101, 107-08 (D. Conn. 2001)
(plaintiffs' allegations related to false and deceptive sales and
advertising, misrepresentations, and other deceptive business
practices by defendants that occurred in Connecticut); Link
Group, 2000 U.S. Dist. LEXIS 4567, at *42-44 (choice of law
analysis favored application of Connecticut law).

relationship between DI and Reiling.  As noted supra, because the
1994 P&A bars plaintiff Reiling as to all claims related to his
submissions to Fisher-Price, to the extent Reiling's unfair
competition claim is premised on alleged misappropriation of
plaintiffs' concepts, it is barred.  To the extent that Reiling's
claim is based on other theories not directly related to his
submissions, the claim on those theories is not barred by the
1994 P&A.  However, as discussed below, those theories
nonetheless fail as a matter of law.

In addition to its failed arguments regarding absence of
evidence of misappropriation, Fisher-Price also argues that
plaintiffs' unfair competition claim must fail on the other
theories because: (1) termination of a business relationship is
not tortious; and (2) there is no evidence suggesting that
plaintiffs suffered any damages as a result of Fisher-Price's
allegedly tortious interference in the business relationship
between Reiling and DI.

Defendant is correct that termination of a business
relationship, such as Fisher-Price's election not to work with DI
after DI instituted this suit, does not constitute a tort, absent
any other violation of law.  See WFB Telecomms., Inc. v Nynex
Corp., 590 N.Y.S.2d 460, 461-62 (N.Y. App. Div. 1992) ("It is the
well-settled law of this State that the refusal to maintain trade
relations with any individual is an inherent right which every

person may exercise lawfully, for reasons he deems sufficient or for no reasons whatsoever.") (internal quotation and citations omitted). Plaintiffs have not cited, and the Court has not found, any authority justifying a cause of action of common law unfair competition under New York law based on the discontinuation of a terminable-at-will business relationship on the facts of this case. Additionally, plaintiffs' unfair competition claim cannot proceed on a theory of allegedly tortious interference with the business relationship between Reiling and DI because plaintiffs have offered no evidence of the damages suffered by either plaintiff as a result of this tortious interference.[40]   See Purgess v. Sharrock, 33 F.3d 134, 141 (2d Cir. 1994) (in order to show tortious interference, a plaintiff must show damage to the relationship).

Thus, plaintiffs' claim of unfair competition cannot proceed on the basis of Fisher-Price's termination of its business relationship with DI (including pressuring DI to withdraw from this lawsuit) or Fisher-Price's allegedly tortious interference with the business relationship between Reiling and DI, and thus defendant's motion for summary judgment on plaintiffs' unfair

---

[40]   Plaintiffs do not respond to defendant's argument concerning the absence of evidence on damages. While Mr. Popek states that as a result of Fisher-Price's discontinuance of its relationship with DI, DI has lost annual business on average of $833,972, see Popek Decl. ¶ 24, Mr. Popek offers no evidence as to the damages resulting from the allegedly tortious interference with the business relationship between Reiling and DI.

competition claim as against Reiling is granted.  The motion is denied as against DI because DI can still proceed with its claim on a theory of misappropriation.

G.   Plaintiffs' Claims Relating to Line Extensions

_____Plaintiffs contend that they are entitled to compensation for the use of plaintiffs' concepts in accessories, line extensions, and licensed products, in addition to their use in Fisher-Price's action figures.  Specifically, they claim compensation for: the Mountain Action Command Center, see SAC ¶ 35 & Ex. E, the Mission Select Police Cruiser and Firetruck, see SAC ¶ 35 & Ex. R, the Voice Tech Rescue Firetruck, Jet, and Police Cruiser, see SAC ¶ 36 & Ex. S, the Aquatic Rescue Command Center, see id., a Rescue Heroes movie available on video and DVD that shows the characters using their Mission Select equipment, see SAC ¶ 39, and videos, DVDs, computer games, and video games "that have been released and/or are being released concurrent with the Voice Tech Video Mission Rescue Heroes line of toys, the Mission Select Rescue Heroes line of toys, and the Optic Force Rescue Heroes line of toys," id.

Fisher-Price contends that there can be no claim to compensation on any line extensions, accessories, or related products because no industry custom and practice exists obligating it to pay royalties on line extensions and other accessories absent an express agreement to do so.  According to

59

Fisher-Price, the Option Agreement does not obligate it to pay royalties on line extensions or other accessories.

Plaintiffs have adduced sufficient evidence demonstrating a genuine issue of material fact as to whether they are entitled by industry practice to royalties on line extensions and other accessories of those products that use of plaintiffs' concepts to survive summary judgment.[41]  See Reiling Decl. at ¶ 18 (Reiling has "always been paid royalties on line extensions and accessories, i.e., new products that are derived from the concept submission and/or are sold with the ultimate product produced from the concept submission (e.g., play sets and vehicles)"); Popek Decl. at ¶ 13 (third-party inventor "was paid for line extensions when Fisher-Price added electronic sounds and extended the concept to different licensed characters"); Reiling Decl. Ex. EE (Fisher-Price license agreement with another third-party inventor providing that "licensed products" "includ[ed] product line extensions").  Because genuine issues of material fact as to Fisher-Price's use of plaintiffs' concepts exist as to the Video Mission, Mission Command, and Mission Select lines of figures and the Telly Photo Optic Force figure, claims for compensation based

--------

[41] Plaintiffs also note that while royalties for such accessories may be typically negotiated in a license agreement, Fisher-Price deprived plaintiffs of the opportunity to negotiate a license agreement and appropriate royalties because Fisher-Price allegedly used their concept without plaintiffs' knowledge or consent.

on line extensions of these products survive summary judgment.

H.   Claim for Punitive Damages

In addition to compensatory damages, a permanent injunction, and other relief, plaintiffs seek punitive damages "based on Fisher-Price's willful and wanton misappropriation and activities that unfairly compete with Plaintiffs."  SAC Prayer for Relief (d).  Defendant argues that the punitive damages claim must be dismissed because no evidence has been proffered establishing willfulness or recklessness sufficient to support such a claim.

Punitive damages are available under New York law "where a defendant's conduct has constituted gross, wanton, or willful fraud or other morally culpable conduct to an extreme degree." Getty Petroleum Corp. v. Island Transp. Corp., 878 F.2d 650, 657 (2d Cir. 1989) (internal quotations and citations omitted).[42] Accord Swersky v. Dreyer & Traub, 643 N.Y.S.2d 33, 38 (N.Y. App. Div. 1996) ("Punitive damages are available in a tort action where the wrongdoing is intentional or deliberate, has circumstances of aggravation or outrage, has a fraudulent or evil

_____

[42]   Punitive damages are available for claims of misappropriation and/or unfair competition, as well as other tort claims.  See Getty, 878 F.2d at 657 (unfair competition); Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc., 672 F.2d 1095, 1107 (2d Cir. 1982) (affirming jury verdict awarding punitive damages on plaintiff's unfair competition claim based on defendant's misappropriation of a plaintiff's property for use in defendant's television program).

motive, or is in such conscious disregard of the rights of another that it is deemed willful and wanton.") (citing Prozeralik v. Capital Cities Commc'ns, Inc., 605 N.Y.S.2d 218 (N.Y. 1993)).

Evidence supporting an award of punitive damages in the summary judgment record is that defendant had access to plaintiffs' concepts, concealed and disclaimed its use of them to cheat plaintiffs out of rightful royalties, and then proceeded to try to force plaintiffs to disavow their claims by blackballing and driving a wedge between the two plaintiffs.[43]  Drawing all inferences in favor of the plaintiffs in consideration of the tenor, tone, and circumstances of such conduct, reasonable jurors could find that Fisher-Price's conduct rose to a level warranting punitive damages.  Therefore, there is a genuine issue of material fact as to whether plaintiff DI is entitled to punitive damages on its remaining claims and defendant's motion for summary judgment on this claim is denied.

**IV.  CONCLUSION**

Accordingly, defendant's motion for summary judgment [Doc. # 93] is granted as to all of plaintiff Reiling's claims, granted as to plaintiff DI's claims of breach of implied contract and

---

[43]  While evidence of these latter factual allegations included in plaintiffs' unfair competition claim cannot constitute an independent tort, it is properly considered by the jury in determining whether punitive damages are justified.

violation of CUTPA, granted as to non-Telly Photo Optic Force figures and denied as to all remaining aspects of DI's claim of misappropriation, and denied as to plaintiff DI's claim of common law unfair competition and claim for punitive damages.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton
United States District Judge

**Dated at New Haven, Connecticut this 14th day of December, 2005.**