UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| **VICTOR G. REILING ASSOCIATES and DESIGN INNOVATION, INC.,** | |
| | **Index No.:  3:03 CV 222 (JBA)** |
| **Plaintiffs,** | |
| - against - | |
| **FISHER-PRICE, INC.,** | **December 29, 2005** |
| **Defendant.** | |

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR RECONSIDERATION OF THE COURT'S RULING ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs, Victor G. Reiling Associates ("Reiling") and Design Innovation, Inc. ("DI")

(collectively, "Plaintiffs"), respectfully submit this Memorandum in support of Plaintiffs' Motion

under Federal Rules of Civil Procedure 59(a) and 60(b) and Local Rule 7(c)(1) for

Reconsideration of the Court's Ruling on Defendant's Motion for Summary Judgment entered on

December 15, 2005 (the "Ruling").  Notwithstanding the Court's thorough and comprehensive

Ruling, Plaintiff seeks to have the Court reconsider two aspects of the Ruling, as follows:

• The Court held that the 1994 Policy and Agreement form (the "1994 P&A") signed by

Reiling acts as a complete bar to his claim of common law misappropriation. (Ruling at 19).

This part of the Ruling appears to be inconsistent with the Court's finding that the Option

Agreement entered into between Plaintiffs and Defendant, Fisher-Price, Inc. ("F-P"), was a

binding and express agreement between the parties. (*Id*. at 20-25).  Because the 1994 P&A by its

very terms does not purport to bar claims arising out of, or after, a subsequent contractual

arrangement between F-P and Reiling, because the Option Agreement supplanted and modified

the rights of the parties, and because the misappropriation springs directly from the non-exercise and expiration of the Option Agreement, Plaintiffs ask the Court to reconsider its Ruling and permit Reiling to proceed to trial on claims of common law misappropriation and unfair competition.[1]

    • Plaintiffs also ask the Court to reconsider the dismissal of Plaintiffs' claim for violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a *et seq.* ("CUTPA"). Plaintiffs submit that the summary judgment record contains sufficient facts to establish the requisite connection between the underlying wrongful conduct and Connecticut for purposes of both CUTPA tests.

## FACTUAL BACKGROUND

F-P required Reiling to sign the 1994 P&A Form. (Reiling Dec. ¶ 11.) By its terms in its Policy Section, the 1994 P&A was intended to protect F-P in connection with "unsolicited outside ideas." (*See* Lane Dec. Ex. 20). The Court has found the significant portion of the 1994 P&A to be Paragraph 3, which provides in full:

> We assure you that we intend to deal fairly with you in connection with your disclosure. You must understand and agree that in return for receiving and examining your disclosure, we are released from any liability in connection with the receipt and examination of your disclosure, except as to such liability that may accrue under any valid patents or copyrights that you now or hereafter own or control.

*Id.* ¶ 3. The 1994 P&A also provided either party could terminate the agreement upon 30 days written notice. *Id.* ¶ 6. There was no evidence presented to the Court in connection with the Defendant's Summary Judgment Motion that the either party had served notice to terminate the 1994 P&A.

---

[1] Plaintiffs will file a separate brief in opposition to Defendant's Motion for Reconsideration directed to Plaintiff DI's misappropriation and unfair competition claims, filed on December 28, 2005.

The 1994 P&A contains the following integration language: "This Agreement is the entire understanding between the parties and no change in Agreement or modification shall be effective unless executed in writing." *Id.* ¶ 7. The 1994 P&A was signed by Reiling and was countersigned by Paul Snyder for F-P.

In 1998, DI and Reiling made a formal submission of various concepts to F-P, including their concept for adding an image component to the backpack of each "Rescue Heroes" action figure to enhance the child's role play. Plaintiffs expected their concept submission to be held in confidence by F-P, and they treated their disclosure as confidential. (Reiling Dec. ¶ 22; Popek Dec. ¶ 17). After Plaintiffs submitted their concept, Reiling received a fax from F-P dated December 8, 1998 indicating that "Paul [Snyder] has shown Reel Action and there is a genuine excitement level for that product. . ." (Reiling Dec.¶ 30; Exh. U).

Thereafter, F-P began negotiations for an option on the Plaintiffs' concept. On February 16, 1999, the parties finalized and signed an Option Agreement for Plaintiffs' concept, which granted to F-P an exclusive three-month option to either acquire Plaintiffs' rights in the concept or to license the concept, in exchange for a total monetary payment of $7,500, split evenly between DI and Reiling. (Id. ¶ 31; Exh. V). The Option Agreement prevented DI and Reiling from showing or discussing the concept or any similar idea, product or concept with any other party. The Option Agreement contained terms under which F-P might license the concept for royalty payments and also contained a provision for F-P to acquire title to the concept. The Option Agreement expired, if not extended or exercised, on May 1, 1999.

On March 23, 1999, with a letter from Henry Schmidt, F-P returned the prototypes and drawings of the concept to Plaintiffs, allegedly due to prohibitive production costs. (*Id.* ¶ 31 Exh. W.). F-P did nothing further to extend or exercise the option for which it had paid. Accordingly,

the Option Agreement expired by its terms on May 1, 1999, (*Id.*), and it is undisputed that F-P did not pay Reiling or DI anything further to option, license, or acquire the concept.

Because of F-P's initial rejection of the concept apparently for cost reasons, Plaintiffs submitted a revised execution of the concept to Paul Snyder at F-P on May 22, 1999. (*Id.*; Exh. X). F-P did not require an additional Concept Submission Form for the 1999 execution. (*Id.*) F-P never formally rejected the 1999 execution of Plaintiffs' concept. (*Id.* ¶ 35.) Neither party has been able to locate a rejection letter. (*Id.*; Dize Dec. Exh. A, pp. 120-21) and, Plaintiffs do not recall any oral communication from F-P rejecting the 1999 execution. (*Id.*; Popek Dec. ¶ 5.)

Thereafter, Plaintiffs submitted another revised execution of the concept on December 7, 2000 to Peter Pook, F-P's then Vice President of Product Development and Inventor Relations. (Reiling Dec. ¶ 36; Exh. Y). F-P did not require an additional Concept Submission Form for the 2000 execution. (*Id.*) F-P returned Plaintiffs' final submission on January 5, 2001 with the explanation that the concept remained too expensive to develop and that it did not fit the current Rescue Heroes theme. (*Id.*).

Acting on the Defendant's Motion for Summary Judgment, the Court has now ruled that the 1994 P&A constituted a waiver of all of Reiling's claims related to the "Rescue Heroes" concept submission to F-P. (Ruling at 19). The Court has further held that the express Option Agreement between F-P, Reiling and DI, precludes DI's implied-in fact-contract claim, because the Option Agreement deals with same subject matter as the alleged implied contract. (Ruling at 21-25).

**ARGUMENT**

I.    REILING'S CLAIMS FOR MISAPPROPRIATION AND
      UNFAIR COMPETITION SHOULD BE RESTORED BECAUSE THE
      OPTION AGREEMENT MODIFIED OR REPLACED THE 1994 P&A

Plaintiffs respectfully submit that the Court's Ruling overlooks the impact of the Option

Agreement on the 1994 P&A. By its terms the 1994 P&A agreement was designed to protect F-

P from claims resulting from unsolicited submissions, and the waiver provisions are limited to

claims arising "in connection with the receipt and examination of your disclosure."[2]    (Lane Dec.

Ex. 20). Further, the 1994 P&A agreement purports to be a complete agreement between Reiling

and F-P that could only be changed by a new written agreement.    Paragraph seven of the 1994

P&A provides: "This Agreement is the entire understanding between the parties and no change

in Agreement or modification shall be effective unless executed in writing." That may have been

true in 1994 at the time the parties signed the P&A.    Once the parties signed the Option

Agreement in 1999, however, the 1994 P&A ceased to be "the entire understanding of the

parties."

The Court's findings about the Option Agreement evidence that Reiling and F-P did enter

into a wholly new and express agreement governing the "Rescue Heroes" concept that Reiling

and DI submitted. The Option Agreement was binding and enforceable and the parties adhered

to its terms until it expired. The Court has found that the Option Agreement was effective and

precluded the formation of any implied contract regarding the concept on the "Rescue Heroes."

Given that finding, it must follow that the Option Agreement modified the relationship of the

---

[2] The Court's construction turns this very limited waiver into the equivalent of a general release and goes
far beyond the language used in the 1994 P&A and what any contracting party would have reasonably
assumed the language meant. Prior versions of the P&A between Reiling and F-P contained an express
waiver of claims arising from the use of the concept submission. The absence of such language in the
1994 P&A must be construed against F-P and should limit the scope of the waiver in the 1994 P&A.

parties in 1999, and added new terms and undertakings between them.

The 1994 P&A purported to disclaim any confidential relationship between the parties. (Lane Dec. Ex. 20 ¶ 1). By the terms of the Option Agreement, Reiling and DI agreed to keep the concept confidential as to all other parties and gave control of that confidentiality to F-P. (Reiling Dec, Exh. V. at ¶ 5). The Court has found, the 1994 P&A purported to waive any claims Reiling had against F-P with regard to receiving and examining the disclosure. Under the Option Agreement, however, F-P agreed to pay $2500 per month for a period of exclusive consideration of the concept (Reiling Dec, Exh. V. at ¶ 3), and most importantly, F-P agreed to pay Reiling and DI in the event that F-P sought to acquire more permanent rights to the concept. (Reiling Dec, Exh. V. at ¶ 6)   The very definition of an option agreement is that one party is buying a temporary period during which it has a further right to pay some additional amount to acquire the asset or rights at issue. *See, e.g., Stechler v. Sidley, Austin, Brown & Wood LLP,* 382 F. Supp2d 580, , 595-596 (S.D.N.Y. 2005) (*quoting Magma Power co. v Dow Chemical Co.,* 136 F.3d 316 321 (2d Cir 1998)("An option . . . is a purchased right to buy or sell property at a fixed or floating price. If not exercised within the contractually specified period, an option expires and the buyer of the option loses the acquisition price"). In other words, the parties expressly agreed F-P could acquire the concept from Reiling and DI if, and only if, F-P paid for the concept in accordance with the terms of the Option Agreement. Conversely, the parties also agreed that F-P would have no further rights to the concept if F-P did not pay. (Reiling Dec, Exh. V. at ¶ 4). That is an entirely new term which did not exist in the 1994 P&A, and reflected a significant alteration of the parties' prior positions. Thus, after the expiration of the Option Agreement, F-P had no rights to acquire any right to the concept and had no right to keep or use the concept. To the contrary, F-P agreed to return all prototypes to Reiling and DI.

Nothing in the 1994 P&A purports to waive rights or claims which might come into existence after a further written contract of the parties. Indeed, the 1994 P&A clearly contemplates that the parties might enter new agreements and those written agreements would control the rights of the parties. As noted above, the 1994 P&A expressly required modifications of the "Agreement" to be in writing. (Lane Dec. Ex. 20 ¶ 7) Moreover, the 1994 P&A states: "No obligation of any kind is assumed by, nor may be implied against Fisher-Price, Inc., unless and until a formal written contract has been entered into and then the obligation shall be only such as is expressed in the formal written contract executed by an officer of Fisher-Price Inc." (*Id.* at ¶ 2) It is undisputed that Reiling, DI and F-P entered a new written agreement with regards to this concept, in the form of the Option Agreement. Under the Option Agreement, F-P acknowledged it would have no rights to the concept after that agreement expired, if F-P failed to exercise its option rights by May 1, 1999. (Reiling Dec, Exh. V. at ¶ 4). Thus, if Reiling and DI prove at trial that F-P used the concept beginning in 2000 in connection with the "Rescue Heroes", the Plaintiffs should have a claim for misappropriation, or unfair competition based on the same conduct, because F-P had contractually acknowledged that it had no rights to the concept after May 1, 1999.

Finally, the Court must consider the language that F-P inserted into the Option Agreement concerning the termination of further obligations of the parties and its affect on the 1994 P&A . Paragraph 4 of the Option Agreement provides:

> If FISHER-PRICE, INC. should choose not to exercise the OPTION on or before the end of the OPTION TERM, neither party shall have any additional obligations to each other, except the above mentioned OPTION PAYMENTS which may be due at the time of termination of the Option Agreement, and the return to INVENTORS of all prototypes developed by INVENTORS.

7

By this plain language, F-P agreed that after the Option Agreement expired and the prototypes were returned by F-P, there were no existing obligations between the parties. There is no provision in the Option Agreement whereby F-P sought to maintain the waiver or other provisions of the 1994 P&A as viable and contractual obligations of the parties as to the concept presented to F-P which is the subject of the Option Agreement. Since F-P knew or should have known of its prior agreements with Reiling, including the 1994 P&A, if F-P intended that Reiling's waiver would continue to be effective as to any claims arising in connection with F-P's receipt and examination of the concept for the "Rescue Heroes," it should have incorporated and preserved the 1994 P&A into the Option Agreement. It did not, and, therefore, the Option Agreement by its terms canceled that prior obligation. Likewise, if F-P intended the expiration of the Option Agreement to bar Reiling from bringing a claim of misappropriation for F-P's subsequent unauthorized use of the concept, F-P should have inserted such a provision into the Option Agreement. It did not.

II.   PLAINTIFFS' CUTPA CLAIM SHOULD NOT HAVE BEEN DISMISSED
      BECAUSE IT SATISFIES BOTH LEGAL TESTS FOR APPLICATION OF CUTPA

The Court dismissed Plaintiffs' claim based on the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a *et seq.* ("CUTPA"), on the ground that Plaintiffs had failed to allege the existence of a connection between Defendants' alleged wrongful conduct (*e.g.*, misappropriation, "blackballing," *etc.*) and Connecticut sufficient to satisfy either the "most significant relationship" choice of law balancing test or the "trade or commerce intimately associated with Connecticut" test. (Ruling at 51-56). Plaintiffs respectfully submit that the Court may have overlooked significant facts in the summary judgment record which, if properly considered, would have led the Court to a contrary finding, i.e., that there was, in fact, a

sufficient nexus between the underlying wrongful conduct and Connecticut for purposes of both CUTPA tests.

**A.     "Choice of Law"**

It should be appreciated that Plaintiffs have alleged that the CUTPA count is based on two distinct acts of unfair trade, *i.e.*, misappropriation and "blackballing," both of which sound in tort. When so considered, Plaintiffs submit that there were sufficient connections with Connecticut for each act or, at the very least, there were sufficient issues of fact in dispute that should prevent the grant of a summary judgment in favor of Defendant on the CUTPA count. Accordingly, Plaintiffs move for reconsideration of the choice of law analysis for the application of CUTPA:

1.     Place Where Injury Occurred

There can be no dispute with the Court's finding that Plaintiffs suffered injury in Connecticut because "the economic impact of the allegedly unfair practices was felt in Connecticut, where [Plaintiffs] are located." (Ruling at 54-55). As the Court recognized, this factor favors Plaintiffs.

2.     Residence of the Parties

The Court correctly stated that Plaintiffs are both Connecticut companies, while Fisher-Price is a Delaware corporation with its principal place of business in New York (Ruling at 54), yet the Court did not construe this factor in Plaintiffs' favor. Because of the existence of two companies who are domiciled in this State versus one company whose principal place of business is in New York, this factor should, at best, favor Plaintiffs or, at worst, be neutral. There is no logical reason why it should favor the application of New York law.

### 3.    Center of the Parties' Relationship

The Court found that the relationship between the parties is centered in New York because the "relevant contracts were signed and meetings took place in New York." (Ruling at p. 54). As an initial matter, the facts considered to be the "relevant contracts" and "meetings" for purposes of the choice of law analysis are not stated. Assuming that the Option Agreement would be considered a "relevant contract," DI signed the agreement in Connecticut, not in New York. (Popek Dec. ¶25). Moreover, while there was an initial meeting in New York regarding the concept submissions in 1998, most of the dealings between the parties took place through telephone conversations and other written correspondence which were exchanged between the parties' offices in Connecticut and New York. (Reiling Dec. ¶ 37-38). Thus, the center of the relationship between the parties for the misappropriation claim is at least neutral and likely favors Connecticut because the concepts at issue were conceived of and developed in Connecticut.

With respect to the blackballing conduct, the signing of contracts is not a fact which is relevant to a choice of law analysis for this claim. The blackballing claim only addresses the dealings between the parties as regards this lawsuit—an action that is venued in Connecticut; involves Connecticut Plaintiffs; is based on a property that was conceived and developed in Connecticut; and involves a threat that was made in Connecticut about blackballing Design Innovation from work that was heretofore performed in Connecticut and involves work that would have been performed in the future in Connecticut.

### 4.    Conduct Causing Injury

The Court stated that the "alleged conduct causing injury took place in New York." (Ruling at p. 54). Again, the facts relied on for this conclusion are not referenced in the decision.

While the conduct underlying the misappropriation claim (*i.e.*, theft of Plaintiffs' concept) arguably took place in New York, in the context of the blackballing claim the conduct arguably occurred in Connecticut where DI received the e-mail informing them of the termination of the working relationship with Fisher-Price. (Plaintiff's Mem. at p. 52; Popek Dec. at ¶ 23).

At the very least the above analysis shows the existence of genuine issues of fact - such as where the applicable conduct occurred – as well as a dispute as to how those facts should be weighed in the choice of law analysis that requires a jury's determination.

### B.    "Intimately Associated"

Even assuming, *arguendo*, that the conduct underlying the misappropriation and "blackballing" occurred outside of Connecticut (Ruling at 52), Plaintiffs submit that, as set forth above, they have established "significant other contacts with Connecticut, in addition to the impact of injury being felt here" (Ruling at 55, n. 38), such that application of CUTPA is proper. *See, e.g., Uniroyal Chemical Co., Inc. v. Drexel Chemical Company, Inc.* 931 F. Supp. 132 (D. Conn. 1996); *Titan Sports, Inc. v. Turner Broadcasting Systems. Inc.*, 981 F. Supp. 65, 71-72, n.5 (D. Conn. 1997). Just as in *Titan Sports*, Plaintiffs have alleged other Connecticut contacts - Plaintiffs' principal places of business, concept conceived of and developed here, threats made to Connecticut and impacting business transacted and performed in this State, etc. – in addition to the harm being felt in Connecticut, sufficient to justify a claim for violations of CUTPA.

Importantly, CUTPA is intended to protect residents of the State of Connecticut. The State has an interest in applying Connecticut law where the Plaintiffs reside and have their principal places of business in Connecticut. *Link Group International v. Toymax, Inc.*, 2000 U.S. Dist. LEXIS 4567 at * 24-25 (D. Conn. 2000). Accordingly, it would not be overreaching for

this Court to apply CUTPA to this case (*see* Ruling at 55, n. 38), but would instead further the interests of the State.

Based on the foregoing, Plaintiffs respectfully request that the Court reconsider their dismissal of the CUTPA claim.

## **CONCLUSION**

For the reasons stated, Plaintiffs respectfully ask the Court to permit Plaintiff Reiling to go to trial on claims of common law misappropriation and unfair competition, and to permit Plaintiffs to pursue a claim for violations of CUTPA.

Dated: December 29, 2005

Respectfully Submitted,

SANDAK HENNESSEY & GRECO, LLP

By: *Peter M. Nolin  (by Esfrdt)*

Jay H. Sandak, Esq. (Bar No. 6703)
Peter M. Nolin, Esq. (Bar No. 6223)
707 Summer Street
Stamford, Connecticut 06901-1026
(p) (203) 425-4200
(f) (203) 325-8608

Gregory J. Battersby (Bar No. 7386)
Edmund J. Ferdinand, III (Bar No. 21287)
Russell D. Dize (Bar No. 23064)
Susan Schlesinger (Bar No. 26625)
GRIMES & BATTERSBY, LLP
488 Main Avenue, Third Floor
Norwalk, Connecticut 06851-1008
(p) (203) 849-8300
(f) (203) 849-9300

Attorneys for Plaintiff Design Innovation, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on December 29, 2005, a copy of the foregoing Memorandum of Law was served on all counsel of record below by U.S. Mail, First Class, postage prepaid, with a courtesy copy sent via electronic means to:.

Jacqueline Bucar Esq.
Robert Allen, Esq.
Tyler Cooper & Alcorn, LLP
205 Church Street
New Haven, Connecticut 06510

Bradford S. Babbitt, Esq.
Michael J. Kolosky, Esq.
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103-3597

Robert J. Lane, Jr., Esq.
Jodyann Galvin, Esq.
HODGSON RUSS LLP
One M&T Plaza, Suite 2000
Buffalo, New York 14203-2391

William Wallace, Esq.
Milbank, Tweed, Hadley & McCoy-DC
1825 Eye St., N.W.
Suite 900
Washington, DC 20006

_____
Edmund J. Ferdinand, III

13