# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

VICTOR G. REILING ASSOCIATES and
DESIGN INNOVATION, INC.,

                   Plaintiffs

     v.

FISHER-PRICE, INC.

                  Defendant.

Civil No. 303CV222(JBA)

January 2, 2006

## FISHER-PRICE'S MEMORANDUM IN OPPOSITION
## TO PLAINTIFFS' MOTION FOR RECONSIDERATION

### Preliminary Statement

This memorandum is submitted by defendant Fisher-Price, Inc. in opposition to plaintiffs' December 29, 2005 Motion for Reconsideration.

Plaintiffs ask this Court to reverse its December 14, 2005 ruling on Fisher-Price's motion for summary judgment (the "Ruling") to the extent that it dismissed the claims by plaintiff Victor G. Reiling Associates ("Reiling") for common law misappropriation and unfair competition and to the extent that it dismissed both plaintiffs' claims under the Connecticut Unfair Trade Practices Act ("CUTPA"). Plaintiffs' arguments are without basis.

**Argument**

I.    **THE COURT PROPERLY DISMISSED REILING'S COMMON LAW MISAPPROPRIATION AND UNFAIR COMPETITION CLAIMS**

Reduced to its essence, Reiling argues that the Court erred in relying on the terms of the 1994 Policy and Agreement form (the "1994 P&A") to dismiss his misappropriation/unfair competition claim because, according to Reiling, the February 1999 Option Agreement between the parties superseded and extinguished the 1994 P&A. *See* Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Reconsideration, dated December 29, 2005 ("Pltfs' Memo.") at 5-8. This argument is without merit.

First, the argument that the February 1999 Option Agreement between the parties superseded and extinguished the 1994 P&A is never reached because it is not disputed that the Reel Heroes concept was in fact submitted pursuant to the 1994 P&A and, as a consequence, it is beyond dispute that the concept was *not submitted on a confidential basis – an essential prerequisite to a claim for misappropriation*. Thus, Reiling's argument must fail before the Court even reaches the incorrect argument that the February 1999 Option Agreement superseded and extinguished the 1994 P&A.

Second, there is no evidence in the record to suggest that the parties intended the Option Agreement to supercede and extinguish the 1994 P&A. Moreover, the clause in the Option Agreement on which Reiling relies to support this newly minted articulation of the parties' intent is equally fatal to his misappropriation claim. Rather than supercede and extinguish the 1994 P&A provision waiving all claims against Fisher-Price (except patent and

-2-

copyright), the Option Agreement essentially re-affirms the waiver of claims with an equally broad waiver provision.

A.    **This Court's Ruling that Reiling's Submission of the Reel Heroes Concept was Governed by the 1994 P&A Makes Reiling's Argument About the Option Agreement Irrelevant**

Reiling's challenge to this Court's dismissal of his misappropriation/unfair competition claim relates solely to its finding that the waiver of claims in the 1994 P&A bars those claims. He does not substantively address the fact that those claims are also barred by the disclaimer of confidentiality in paragraph 1 of the 1994 P&A.[1]

In their motion for reconsideration, plaintiffs do not challenge this Court's finding that Reiling's submission of the Reel Heroes concept to Fisher-Price was made pursuant to and governed by the 1994 P&A. Ruling at 17. In the Ruling, the Court expressly determined that the 1994 P&A "is enforceable against plaintiff Reiling" in connection with "Reiling's disclosure" of the Reel Heroes concept. Ruling at 15. *See also* Ruling at 19 (granting Fisher-Price's motion for summary judgment against Reiling on the ground that his submission of the Reel Heroes concept to Fisher-Price was governed by the 1994 P&A). At pages 34-40 of the Ruling, the Court

---

[1] A plaintiff asserting a misappropriation of idea/unfair competition claim must show that the idea was disclosed on a confidential basis. *See, e.g., M.H. Segan Ltd. P'ship v. Hasbro, Inc.*, 924 F. Supp. 512, 526 (S.D.N.Y. 1996); *Ball v. Hershey Foods Corp.*, 842 F. Supp. 44, 47 (D. Conn.), *aff'd*, 14 F.3d 591 (2d Cir. 1993). Fisher-Price raised the argument that all of the plaintiffs' claims for misappropriation should be dismissed because plaintiffs cannot establish that the concept was submitted on a confidential basis in its summary judgment motion (*see* Fisher-Price's May 2, 2005 Memorandum, Docket No. 100, at 23-25) and on reply (*see* Fisher-Price's June 4, 2005 Reply Memorandum, Docket No. 122, at 8-10). All citations are to the motion papers filed by the parties with respect to Fisher-Price's summary judgment motion.

recognized that the effect of the 1994 P&A is that Reiling's disclosure of the Reel Heroes concept to Fisher-Price was made on a non-confidential basis.[2]

Because Reiling's first disclosure of the Reel Heroes concept to Fisher-Price on October 29, 1998 was on a non-confidential basis, any misappropriation claim is barred. New York law is clear that the instant an idea is disclosed on a non-confidential basis, no further claim of misappropriation can be made because any property rights in the idea have been destroyed.[3]

The following undisputed facts establish that Reiling cannot show that the Reel Heroes concept was disclosed to Fisher-Price on a confidential basis:

1.    Reiling disclosed the Reel Heroes concept to Paul Snyder, Vice President of Inventor Relations of Fisher-Price, at a meeting on October 29, 1998.[4]

2.    This Court has now ruled that Reiling's submission of the Reel Heroes concept to Fisher-Price was governed by the 1994 P&A form, which expressly provides that submissions are not confidential. Ruling at 15, 40.

---

[2]    Paragraph 1 of the 1994 P&A provides as follows:

The disclosure must be understood to be purely voluntary and *no confidential relationship* is to be established by such disclosure or implied from our consideration of the submitted material, and the material is *not to be considered submitted "in confidence."* Confidential relationships have been held to create obligations which are beyond those that the company is willing to assume.

*See* Declaration of Robert J. Lane, Jr., dated April 29, 2005, Docket No. 94 (the "Lane Dec."), Ex. 20.

[3]    *Sachs v. Cluett Peabody & Co., Inc.*, 265 A.D. 497, 500-01, 39 N.Y.S.2d 853, 856-57 (1st Dep't 1943) (An inventor's idea "is valuable only because of its being a secret, and only so long as he keeps it secret . . . . Once the trade secret has 'escaped,' unlike most things termed property, it cannot effectively be reduced to possession" and thus its value is destroyed); *see also Lemelson v. Carolina Enters., Inc.*, 541 F. Supp. 645, 659 (S.D.N.Y. 1982) ("The property in a secret process is the power to make use of it to the exclusion of the world. If the world knows the process, then the property disappears."); *M & T Chems., Inc. v. Int'l Bus. Machs. Corp. (IBM)*, 403 F. Supp. 1145, 1148 (S.D.N.Y. 1975), *aff'd without opinion*, 542 F.2d 1165 (2d Cir. 1976) ("disclosure of a trade secret totally destroys it").

[4]    Lane Dec. ¶ 14.

3.    Reiling does not claim to have had any express agreement or understanding with Fisher-Price that the Reel Heroes concept would be treated confidentially. There is no testimony that the issue of confidentiality was discussed at all with respect to the Reel Heroes concept.

When Reiling disclosed the concept to Fisher-Price on a non-confidential basis (as this Court determined), he destroyed any property rights plaintiffs could have had in the concept.[5] Because this barred any misappropriation claim as a matter of law as of the moment of first disclosure, Reiling's arguments about the alleged effect of the Option Agreement (signed nearly four months later) are irrelevant.

Reiling argues that the Option Agreement between the parties somehow "modified" *nunc pro tunc* the 1994 P&A in a way that could support a finding of a confidential relationship. Pltfs' Memo. at 5-8. This argument is wrong for three reasons. First, New York law is clear that a subsequent contract can modify or act as a novation with respect to an earlier contract only if it does so *expressly*.[6] This is especially true where, as here, the first contract contains a merger clause.[7] There is no express modification or novation of the 1994 P&A in the Option Agreement nor is there one iota of evidence from any of the parties to the effect that it was the intent of the parties, when executing the Option Agreement, to supercede and *extinguish*

---

[5]    *See* cases cited in n. 3 above.

[6]    *See, e.g., McLaughlin v. Gillings*, 18 Misc. 56, 57 (Sup. Ct. App. Term 1896) ("Novation is never presumed, and must be clearly established by a full discharge of the original debt, the express terms of the agreement, or the acts of the parties, whose intention must be clear."); *Inman v. F. N. Burt Co.*, 124 A.D. 73, 75, 108 N.Y.S. 210 (3d Dep't 1908) ("To constitute a contract of novation the original indebtedness or obligation must be extinguished. There must be a mutual agreement among the parties to the old and the new obligation, whereby the new obligation is substituted for the prior one.").

[7]    *See* N.Y. GEN. OBLIG. LAW § 15-301 (McKinney 2005). To find that an existing contract between the parties has been modified, the parties must have agreed to a "mutual, valid, and enforceable agreement *to modify the old contract.*" 22A N.Y. JUR. 2d Contracts § 473, at 169 (1996) (emphasis added).

the 1994 P&A. Indeed, Reiling has already admitted that when he submitted the concept and later signed the Option Agreement, he had no recollection whatsoever of the 1994 P&A.[8]

Second, case law is clear that even a subsequent confidentiality agreement cannot revive a property right that was lost when an idea was originally disclosed on a non-confidential basis. In *Kublan v. Hasbro and Tonka Corp.*, 1999 WL 156381 (S.D.N.Y. 1999), an inventor submitted an idea to Hasbro under a 1992 submission agreement that waived confidentiality. In 1994, he submitted the same idea under an agreement that expressly provided that the idea would be held confidential by Hasbro.[9] The court ruled that, because the idea had been first disclosed to Hasbro on a non-confidential basis, the 1994 confidentiality agreement was without effect and any misappropriation claim was barred.[10] Thus, any argument that the Option Agreement — entered into *after* Reiling's non-confidential submission of the concept to Fisher-Price —was retroactively effective to make the submission confidential fails as a matter of law.

Third, the unambiguous terms of the Option Agreement make clear that it did not impose any confidentiality obligations on Fisher-Price. As the Court noted at page 41 of the

---

[8]     Lane Dec., Exhibit 4 at 245 (lines 21-24).

[9]     The facts of this case are much less favorable to Reiling's argument, because the Option Agreement did *not* provide that Fisher-Price would hold the Reel Heroes concept confidential.

[10]     In *AEB & Assoc. Design Group v. Tonka Corp.*, 853 F. Supp. 724, 735 & n.8 (S.D.N.Y. 1994), an inventor had presented an idea to Fisher-Price under the same P&A form at issue in this case, with its express waiver of confidentiality. Shortly thereafter, the inventor presented the same idea to Kenner Toys under a confidentiality agreement. The court ruled that the non-confidential disclosure negated any possible misappropriation claim against Kenner, even though the disclosure to Kenner was made on a nominally confidential basis. Similarly, in *Techs., Inc. v. Int'l Bus. Machs. Corp. (IBM)*, 2005 U.S. Dist. LEXIS 20311, at *42-43 (S.D.N.Y. Sept. 19, 2005), the parties entered into a nondisclosure agreement. They later entered into a "Confidentiality Agreement," that expressly replaced any prior agreements between the parties. Because the Court found that none of the information disclosed prior to the Confidentiality Agreement was "intended to be confidential," it rejected the contention that either the nondisclosure agreement or the Confidentiality Agreement could support a misappropriation claim.

Ruling, it only required *plaintiffs* to refrain from disclosing the concept to anyone other than Fisher-Price during the term of the Option Agreement.

**B.      The Option Agreement Clearly Did Not
         Supercede and Extinguish the 1994 P&A**

Reiling's main argument is that the Option Agreement somehow modified, superceded, supplanted and/or extinguished the 1994 P&A.  In the absence of even a single witness testifying that the parties to the Option Agreement intended that it would supercede and extinguish the 1994 P&A (to which DI was not even a party), Reiling is relegated to relying on paragraph 4 of the Option Agreement, (*See* Pltfs' Memo. at 7-8) which provides:

> "If Fisher-Price, Inc. should choose not to exercise the Option on
> or before the end of the Option Term, *neither party shall have any
> additional obligations to each other*, except the above mentioned
> Option Payments which may be due at the time of termination of
> the Option Agreement, and the return to Inventors of all prototypes
> developed by Inventors."  (Emphasis added).

Reiling contends that the language providing that there would be no "additional obligations" after the expiration of the Option Agreement extinguished the "waiver" of all claims that this Court found barred Reiling's misappropriation and unfair competition claims.  Pltfs' Memo. at 8. Plaintiff's argument simply defies logic.

Reiling's waiver of claims regarding submissions is not an "obligation" that could be extinguished by the Option Agreement.  Instead, it is an acknowledgement that *no* obligations (*i.e.,* duties that could give rise to a claim like those Reiling seeks to assert here) exist.  Reiling's reliance on the language providing that "neither party shall have any additional obligations to each other" is especially puzzling given the fact that this language seems, on its face, to bar the

-7-

very claims he is attempting to revive on this motion. By its terms, this provision expressly releases Fisher-Price from any confidentiality obligation or any potential claim relating to misappropriation (*i.e.*, by providing that Fisher-Price shall have no future "obligations," which includes any alleged confidentiality obligation). Instead of supporting Reiling's claim that the Option Agreement revives his misappropriation claim, this language bars it.

Reiling's final argument in support of his effort to revive his misappropriation/ unfair competition claim is perhaps his most desperate. He argues that in the Option Agreement "the parties . . . agreed that F-P would have no further rights to the concept if F-P did not pay." Pltfs' Memo. at 6. *See also id.* at 7 (under the Option Agreement, F-P acknowledged it would have no rights to the concept after the Agreement expired . . . ."). First, this mischaracterizes the Option Agreement. There is no term that provides that Fisher-Price cannot use the concept without exercising the option and paying. Indeed, that would be anomalous given that one purpose of an option agreement is to allow the toy company to determine whether the concept is novel or in the public domain. In any event, the fact that this argument mischaracterizes the Option Agreement is clearly demonstrated by the fact that Reiling is careful not to quote any of the actual contract language in support of this argument. The reason for this is simple: there is no provision of the type Reiling alleges.

Moreover, in making this argument, Reiling is essentially alleging a ***breach of contract*** claim under the Option Agreement; *i.e.*, he is claiming that Fisher-Price violated the alleged terms of the Option Agreement. As this Court is aware, plaintiffs have expressly waived any claims under the Option Agreement. In response to Fisher-Price's motion to change venue, plaintiffs represented to the Court that they were not making any claim under the Option

Agreement.[11]  In fact, plaintiffs formally amended their complaint to dismiss their breach of express contract claim.  *See* Docket No. 85 (Amended Complaint).  Now, in a confusing effort to revive his misappropriation/unfair competition claim, Reiling argues that Fisher-Price's alleged breach of the terms of the Option Agreement should somehow support a misappropriation claim. This is an improper effort to cast a voluntarily dismissed breach of contract claim as a tort.  New York law is clear that a breach of contract claim cannot be disguised and pleaded as a tort claim.[12]  And, plaintiff's cannot get by sneaking in the back door that which they clearly cannot get through the front door.[13]

---

[11]     *See* Plaintiffs' Memorandum in Opposition to Defendant's Motion to Transfer Venue, dated June 5, 2003, Docket No. 24, at page 7 ("Plaintiffs have never asserted that Fisher-Price breached the Option Agreement") and page 8 ("Plaintiffs do not allege or plead a breach of the Option Agreement in their original or Amended Complaint").  Moreover, in ruling on the motion to transfer, this Court relied on and accepted plaintiffs' representations.  *See* Ruling on Defendant's Motion to Transfer Venue, Docket No. 28, at page 3 ("while the original complaint divided the breach of contract claim into one count of 'breach of express contract' and one count of 'breach of implied contract,' neither claim was pled as a breach of the option agreement") and page 6 ("the express contract claim was never based on the option agreement").

[12]     *See, e.g., Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 656 (1987) ("It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated"); *Columbus McKinnon Corp. v. China Semiconductor Co.*, 867 F. Supp. 1173, 1181 (W.D.N.Y. 1994) (citing *Clark-Fitzpatrick* for same); *Bd. of Educ. v. Sargent, Webster, Crenshaw & Folley*, 71 N.Y.2d 21, 29, 523 N.Y.S.2d 475, 479 (1987) (recognizing that no tort claim may arise under a contractual relationship in the absence of the breach of a legal duty entirely separate from the contract).  Here, Reiling is attempting to rely on the duties under the Option Agreement to create a tort claim, but those duties may only give rise to a breach of contract claim.

[13]     It should be noted that Reiling's argument that the parties agreed in the Option Agreement that "F-P would have no further rights to the concept if F-P did not pay" (Pltfs' Memo. at 6) is directly contrary to his reliance on paragraph 4 of the Option Agreement.  As noted above, that paragraph provides that "neither party shall have any additional obligations to each other" at the expiration of the Option Agreement.  By its express terms, this provision extinguishes any alleged agreement to pay for the concept if used.

## II.    THE COURT PROPERLY DISMISSED PLAINTIFFS' CUTPA CLAIM

Plaintiffs argue that the Court should not have dismissed their CUTPA claim because: (1) under Connecticut choice-of-law principles, Connecticut law should apply over New York law; and (2) even though the conduct alleged to have violated CUTPA occurred outside of Connecticut, plaintiffs argue that they have "alleged other contacts with Connecticut ... sufficient to justify a claim for violations of CUTPA." Pltfs' Memo. at 11. Plaintiffs' arguments are meritless, for reasons discussed below.

### A.    New York Law Governs All of Plaintiffs' Tort Claims, Including CUTPA

The Court's application of Connecticut's choice-of-law principles to the facts of this case yielded the correct result that New York law properly governs plaintiffs' CUTPA claim. Ruling at 54-55 ("The only factor that weighs in favor of application of Connecticut law is that the alleged injury occurred [in Connecticut] .... Thus, Connecticut choice of law principles favor application of New York law over Connecticut law.").[14]

---

[14]    Plaintiffs argue that there are factors that the Court failed to consider as part of its consideration of the center of the parties' relationship, such as where this action is venued, and where the Reel Heroes concept was conceived. See Pltfs' Memo. at 10. Such factors are, however, irrelevant to an analysis of the relationship between the parties, because the factors plaintiffs offer as probative are one-sided and do not involve the parties' "relationship" at all (e.g., the venue of this action was selected *solely* by the plaintiffs, and the concept was conceived before any relationship between the parties as to the matters at issue here was formed).

Plaintiffs have previously conceded that *"New York law should govern this action."*[15] This Court has noted that plaintiffs agreed that their common law tort claims (misappropriation and unfair competition) are governed by New York law.[16]

While it is possible that a party's contract claims and tort claims may be governed by the laws of different states,[17] it is not possible, as a matter of law, that two tort claims arising out of the same facts could be governed by the laws of different states.[18] Accordingly, plaintiffs' concession that their common law misappropriation and unfair competition claims are governed by New York law bars their argument that the substantive law of Connecticut should apply to another tort claim (CUTPA) that arises out of the same facts.[19]

---

[15]   Plaintiffs' Reply Memorandum of Law in Further Support of Plaintiffs' Motion for Leave to File a Second Amended Complaint, Docket No. 53, at 6 (emphasis added).

[16]   In its Ruling on Plaintiffs' Motion for Leave to File a Second Amended Complaint, the Court stated that "[t]he parties agree that New York law governs the breach of contract and misappropriation claims. Defendant has argued, and plaintiffs have not disputed, that New York law also governs plaintiffs' common law unfair competition claims." Docket No. 80, at 7, n.2.

[17]   *See, e.g., Link Group Int'l v. Toymax, Inc.,* 2000 U.S. Dist. LEXIS 4567 (D. Conn. Mar. 17, 2000) (applying Connecticut choice-of-law principles to determine that Connecticut substantive law applied to the plaintiff's tort claims, while New York law applied to the contract claims).

[18]   This is because all tort claims are subject to the same choice of law analysis under Connecticut law. *See, e.g., MM Global Servs. v. Dow Chem. Co.,* 283 F. Supp. 2d 689, 704 (D. Conn. 2003) ("Because [a CUTPA] cause[] of action [is] based upon elements of unfair competition similar to that which is found in the common law of unfair competition, the same choice of law analysis applies to the CUTPA . . . as applies to the [other] tort claims.").

[19]   In addition, plaintiffs argue that the question of whether to apply New York or Connecticut substantive law to this claim is a question of fact for the jury to decide. *See* Pltfs' Memo. at 11 (asserting that there is an "existence of genuine issues of fact – such as where the applicable conduct occurred – as well as a dispute as to how those facts should be weighed in the choice of law analysis that requires a jury's determination"). It is, of course, the function of the court to make determinations as to questions of choice-of-law. And this Court has already ruled that New York law applies to the plaintiffs' CUTPA claim. Ruling at 53-56.

-11-

**B.    Because New York Law Applies to Plaintiffs'
       Tort Claims, Plaintiffs' CUTPA Claim is Barred**

Plaintiffs argue that even if they accept the Court's determination that the alleged misappropriation and so-called "blackballing" occurred in New York, Fisher-Price's out-of-state conduct was so "intimately associated" with Connecticut that CUTPA should nevertheless apply. Pltfs' Memo. at 11. Plaintiffs' argument is incorrect.

Courts have consistently held that where the substantive law of one state governs a particular action, a claim that arises under the statutory scheme of another state cannot stand.[20] Because New York law governs plaintiffs' tort claims here, this Court properly dismissed plaintiffs' CUTPA claim. Accordingly, this Court need not even consider the issue of whether Fisher-Price's alleged out-of-state conduct was sufficiently "intimately associated" with Connecticut such that CUTPA should apply because that question can only be reached where Connecticut law actually governs the action as a whole.[21] Because the parties have agreed that New York law applies the plaintiffs' implied contract and common law tort claims, it is unnecessary for the Court to analyze the impact that Fisher-Price's alleged out-of-state conduct

---

[20]    *See, e.g., United States Fid. & Guar. Co. v. S.B. Phillips Co., Inc.*, 359 F. Supp. 2d 189, 207 (D. Conn. 2005) (holding that the application of South Carolina law was "fatal" to the plaintiff's CUTPA claim); *MM Global Servs.*, 283 F. Supp. 2d at 704-05 (dismissing CUTPA claim because Connecticut law did not apply under Connecticut choice-of-law principles).

[21]    The cases that plaintiffs cite in support of their argument that the CUTPA claim should not be dismissed are inapplicable here because, in all of them, the court applied Connecticut substantive law to the tort claims. *See, e.g., Uniroyal Chem. Co., Inc. v. Drexel Chem. Co., Inc.*, 931 F. Supp. 132 (D. Conn. 1996) (applying Connecticut substantive law); *Titan Sports, Inc. v. Turner Broad. Sys., Inc.*, 981 F. Supp. 65 (D. Conn. 1997) (same); *Link Group Int'l*, 2000 U.S. Dist. LEXIS 4567 (same). And, as discussed above, where Connecticut law does not apply, a CUTPA claim must fail.

-12-

may have had within the state of Connecticut for purposes of CUTPA, and plaintiffs' CUTPA

claim was properly dismissed.[22]

C.     **This Court's Ruling that Fisher-Price's Decision
        to Cease Sending New Projects to DI Was
        Lawful Under New York Law Precludes DI From
        Relying on that Conduct to Support a CUTPA Claim**

        Finally, plaintiffs may not continue to rely on any so-called "blackballing" to

support their CUTPA claim in this action.  Because this Court has ruled that Fisher-Price was

within its legal rights under New York law to cease sending new design projects to Design

Innovation, Inc. ("DI") (Ruling at 57-58), such conduct, lawful in New York where it occurred,

may not be asserted as a basis for a violation of a Connecticut statute.

        The United States Supreme Court has held that "[a] State cannot punish a

defendant for conduct that may have been lawful where it occurred"[23] and that "[a] jury must be

instructed . . . that *it may not use evidence of out-of-state conduct to punish a defendant for*

*action that was lawful in the jurisdiction where it occurred.*"[24]  Accordingly, plaintiffs may not

argue that Fisher-Price's conduct – which this Court has recognized was lawful where it occurred

– may serve as the basis for plaintiffs' CUTPA claim.

---

[22]     Furthermore, even if it is necessary to examine whether Fisher-Price's conduct was "intimately
associated" with Connecticut such that plaintiffs' CUTPA claim should not be dismissed (which it is not),
Fisher-Price agrees with the Court's previous ruling on this issue.  *See* Ruling at 50 ("[A]ll [allegedly
unfair practices] took place in or from New York, where Fisher-Price is located" and the products at issue
"were marketed and sold in stores nationwide and on the Internet, not just in Connecticut.").

[23]     *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 421 (2003).  *See also BMW of North Am. v.
Gore*, 517 U.S. 559, 572 (1996) ("[A] state may not impose economic sanctions on violators of its laws
with the intent of changing the tortfeasors' lawful conduct in other States.").

[24]     *State Farm*, 538 U.S. at 422 (emphasis added).

-13-

**Conclusion**

For the foregoing reasons, plaintiffs' motion for reconsideration should be denied.

Dated: January 2, 2006

**HODGSON RUSS LLP**

By_____ s/ _____
           Robert J. Lane, Jr.
e-mail: rlane@hodgsonruss.com
Federal Bar No.: ct24598
Jodyann Galvin
e-mail: jgalvin@hodgsonruss.com
Federal Bar No.: ct24599
One M&T Plaza, Suite 2000
Buffalo, NY 14203-2391
Telephone: (716) 856-4000

**MILBANK, TWEED, HADLEY & MCCLOY LLP**
William E. Wallace, III
email: wwallace@milbank.com
Federal Bar No. PHV0480
International Square Building
1825 Eye Street, N.W., Suite 1100
Washington, D.C. 20006
Telephone: (202) 835-7500

**TYLER COOPER & ALCORN, LLP**
Jacqueline D. Bucar, Esq.
e-mail: jbucar@tylercooper.com
Federal Bar No.: ct01187
205 Church Street
P.O. Box 1936
New Haven, CT 06509-0906
Telephone: (203) 784-8269

**ROBINSON & COLE LLP**
Bradford S. Babbitt
e-mail: bbabbitt@rc.com
Federal Bar No.: ct13938
Michael J. Kolosky
email: mkolosky@rc.com
Federal Bar No.: ct22686
280 Trumbull Street
Hartford, CT 06103-3597
Telephone: (860) 275-8200

## CERTIFICATION

The undersigned hereby certifies that copies of the foregoing Defendant Fisher-Price, Inc.'s Memorandum in Opposition to Plaintiffs' Motion for Reconsideration, dated January 2, 2006, was sent via overnight mail service to the attorneys of record recited below on this 3rd day of January 2006:

Via Hand Delivery

Gregory J. Battersby, Esq. (Bar No. 07386)
Edmund J. Ferdinand, III, Esq. (Bar No. 21287)
Russell D. Dize, Esq. (Bar No. 23064)
Grimes & Battersby LLP
488 Main Avenue, Third Floor
Norwalk, CT 06851-1008
Telephone: (203) 849-8300
Facsimile:   (203) 849-9300

Via Overnight Courier

Peter M. Nolin, Esq. (Bar No. 06223)
Jay H. Sandak (Bar No. 06703)
Sandak Hennessey & Greco LLP
707 Summer Street
Stamford, CT 06901
Telephone: (203) 425-4200
Facsimile:   (203) 325-8608

s/
_____
Robert J. Lane, Jr.

003279/00136 BFLODOCS 1429103v1

-15-