## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

**VICTOR G. REILING ASSOCIATES and
DESIGN INNOVATION, INC.,**

**Index No.:  3:03 CV 222 (JBA)**

Plaintiffs,

- against -

**FISHER-PRICE, INC.,**

**January 6, 2006**

Defendant.

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO FISHER-PRICE'S MOTION FOR RECONSIDERATION

### PRELIMINARY STATEMENT

In recognition that it cannot prevail merely by trying to show that the 1994 Policy and Agreement ("1994 P&A") might preclude a confidential relationship between Fisher-Price, Inc. ("F-P") and Victor Reiling, F-P has now shifted ground and attempts to construct a legal argument that the <u>concept</u> presented by the Plaintiffs could never be deemed confidential. F-P's "unring the bell" and "any rights in the property have been destroyed" argument may, at first blush, appear to have merit, but after a careful examination of the governing law and the summary judgment record, it becomes clear that F-P's position is untenable.

It is incontrovertible that rights in the property disclosed in this case to F-P were not lost merely because of the 1994 P&A. Indeed, this is not a trade secret case where once property rights are lost due to, for example, the fact that the secret has been disclosed to the world, assertion of a claim of misappropriation against <u>anyone</u> is no longer possible. At most, Reiling's right to assert a misappropriation claim was "released." When the facts and law are properly construed it is clear that:

**1. F-P's position is unsupported by law.**  Assuming, *arguendo*, that the 1994 P&A negated a confidential relationship between Reiling and F-P, to prevail F-P still must show that the supposed lack of confidentiality caused by "Reiling's disclosure" destroyed all property rights in the concept and negated the existence of a legal relationship as to his co-inventor, DI. F-P totally fails in this regard.  F-P has failed to cite a single case to support its position, and there is significant authority to refute it.  F-P's case-dispositive motion should be summarily dismissed in light of F-P's failure to reference any authority whatsoever that actually supports the broad position F-P takes on the motion.

**2. F-P's position is contrary to the factual record.**  The summary judgment record establishes that Reiling and DI jointly created, developed and own the concept. While Reiling himself may have been the one who actually presented the concept to F-P in October 1998, there is substantial evidence that he was doing so on behalf of both himself and DI.  Reiling and DI expected that the concept would be treated as confidential, and every act of the parties following disclosure, up through execution and performance of the Option Agreement, confirms that the parties in fact treated the disclosure as confidential.  Indeed, since the stated purpose of the 1994 P&A was to create no rights until the parties reached further written agreements, it is clear that F-P itself assumed the parties could form a protected confidential relationship after the disclosure of a concept under the 1994 P&A.  That assumption is directly contrary to the position currently taken by F-P's counsel.

The fallacy of F-P's argument is made clear by the conduct of the parties, in general, and the express terms of the agreements at issue herein, in particular.  In all such agreements, the continuing right of the disclosing party to assert patent and copyright claims is expressly acknowledged.  If, as F-P argues, the bell has been "rung" and rights in the property had been

"destroyed" by entry into the 1994 P&A, it would mean that patent or copyright rights in the concept would similarly be destroyed, which is clearly not the case. The only conclusion that can be drawn is that the bell has not "rung" and the property right has not been "destroyed."[1]

## ARGUMENT

In the Court's Ruling on Defendant's Motion for Summary Judgment, dated December 14, 2005 ("Ruling"), the Court considered, and rejected, F-P's argument that DI could not prove the existence of a legal relationship with F-P because the 1994 P&A signed by Reiling purported to disclaim the formation of a confidential relationship. (Ruling at 39-41). The Court held that genuine issues of material fact existed whether Reiling could, or in fact did, bind DI to the 1994 P&A agreement, and whether the expectations and conduct of the parties manifested the existence of a confidential relationship between DI and F-P. (*Id.*)

By the instant motion, F-P once again asks the Court to give the 1994 P&A a sweeping and unjustified reach. F-P asserts that at the moment Reiling disclosed the concept to F-P on a non-confidential basis, the mere act of disclosure destroyed: (1) any protectable rights in the concept itself; and (2) any possibility of a confidential or other legal relationship between DI and F-P, regardless of DI's expectation of confidentiality prior to disclosure, or the actual conduct of the parties to maintain the confidentiality of the concept following disclosure. (*Id.* at 3-4). F-P's argument lacks any legal or factual support, for the reasons explained below.

As a threshold matter, to prevail on its misappropriation claim DI must prove that it disclosed its concept to F-P in the context of a legal relationship. *See McGhan v. Ebersol*, 608 F.

---

[1] Additional evidence of the fact that rights were not lost can be found in the Option Agreement, wherein F-P required Reiling and DI to agree to execute any documents needed to secure patent and copyright protection in the property. If F-P's construct is correct, it would mean that rights in the property were already lost and that there would be nothing that could be the subject of any such patent or copyright application.

Supp. 277, 284 (S.D.N.Y. 1985). New York law holds that "the legal relationship between the plaintiff and defendant may be either a fiduciary relationship, or based on an express contract, an implied-in-fact contract, or a quasi-contract." *Zikakis v. Staubach Retail Servs.*, 2005 U.S. Dist. LEXIS 21105 at *11 (S.D.N.Y. Sept. 26, 2005). "Under New York law, a confidential relationship is synonymous with [a] fiduciary relationship and ... [exists] generally where the parties do not deal on equal terms and one trusts and relies on the other . . . Such a [confidential] relationship may arise either explicitly by contract, or implicitly by the actions of the parties or other circumstances." *Stewart v. World Wrestling Fed'n Entm't, Inc.*, 74 U.S.P.Q. 2d 1024, *13-14 (S.D.N.Y. Jan. 11, 2005) (*quoting Sachs v. Cluett, Peabody & Co.*, 265 A.D.2d 497, 39 N.Y.S.2d 853, 856 (App. Div. 1st Dept. 1943), *aff'd*, 291 N.Y. 772 (N.Y. 1944)).

Thus, F-P's continued effort to mischaracterize DI's claim as being limited to a confidential relationship is not supported by law. A relationship to support a claim of misappropriation can exist here: (1) because of the unequal bargaining power of the parties -- demonstrated conclusively by the1994 P&A itself and the divergent economic power of F-P and the Plaintiffs; (2) through the course of dealing of the parties to create a confidential or other legal relationship; and (3) by contract, including the Option Agreement in which F-P committed to pay for the concept if it wanted to acquire it; and, (4) by other facts and circumstances to be presented and considered at trial by the jury.

## I.    F-P's Motion Lacks Supporting Legal Authority

F-P entire motion is based on the broad proposition that "[t]he case law is clear that the instant an idea is disclosed on a non-confidential basis, no further claim of misappropriation can be made, regardless of who made the disclosure, because any property rights in the idea have

been destroyed." (F-P Mem. at 3) (emphasis added).  While F-P purports to cite a number of

cases in support of this proposition, the cases, in fact, are not even remotely on point.

The *Sachs* case involved an issue of whether a claim under a confidentiality agreement

was barred by the applicable statute of limitations.  39 N.Y.S.2d at 857.  In that case, the plaintiff

had developed a novel principle and machinery for use in the shrinking of fabrics and, in 1921,

had disclosed the concept to the defendant following the entry of a confidentiality agreement.

The defendant, in breach of the confidentiality agreement, went ahead and commercialized the

concept and actually obtained its own patent for it in 1929.  Plaintiff commenced an action

against the defendant in 1941 alleging violation of the confidential relationship.  The court

construed the complaint as alleging a cause of action for breach of the 1921 contract, and found

that the claim was barred by the applicable statute of limitations.  39 N.Y.S.2d at 857.  In a

concurring opinion, the court confirmed that the plaintiff at one time had a viable tort claim

against the defendant, but that the claim was similarly time-barred: "Assuming that plaintiff's

property rights merged into the patent obtained by the defendant, such merger occurred when the

patents were procured in 1929. <u>Any cause of action for such conversion</u> accrued at that time.

Subsequent use under the patent would merely establish a possible basis for further damage." (*Id.*

at 858).

The two subsequent decisions F-P references interpreted *Sachs* solely for the proposition

that "if the defendant publicizes or otherwise discloses the secrets revealed to him, there can be

no continuing tort of unlawful use." *Lemelson v. Carolina Enterprises, Inc.*, 541 F. Supp. 645,

659 (S.D.N.Y. 1982); *M&T Chemicals, Inc. v. Int'l Bus. Machines Corp.*, 403 F. Supp. 1145

(S.D.N.Y. 1975) ("the issuance of the '059 patent totally destroyed any value the trade secret

might have had, and the only action available to plaintiff was one for misappropriation and

complete destruction of the secret upon issuance and not for any future or continued use by defendants"). Hence, these three cases do not support F-P's contention that disclosure to a single potential purchaser on a non-confidential basis destroys the confidentiality of the idea.

The cases relied upon by F-P in other sections of its brief also fail to support F-P's argument that a lack of confidentiality as to Reiling would destroy property rights in the concept or DI's rights as a co-inventor. For example, Fisher-Price claims that "the law is clear that a subsequent confidentiality agreement cannot revive a property right that was lost when an idea was originally disclosed on a non-confidential basis." (F-P Mem. at 5) (emphasis added). Once again, however, these cases do not stand for the proposition for which F-P cites them.

In *Kublan v. Hasbro*, 1999 U.S. Dist. LEXIS 3226 (S.D.N.Y. 1999), F-P is correct that an inventor first disclosed a concept to Hasbro in 1992 pursuant to an agreement that waived confidentiality, but then later re-submitted the same concept to Hasbro in 1994 following execution of a subsequent agreement that established a confidential relationship between the parties. F-P misrepresents the holding of the case, however. The court did not rule that "because the idea had been first disclosed to Hasbro on a non-confidential basis, the 1994 confidentiality agreement was without effect and any misappropriation claim was barred." (F-P Mem. at 5). Rather, the *Kublan* court found that: (1) plaintiff had no breach of contract claim because the 1994 confidentiality agreement specifically excluded from "coverage ideas that were already known to defendants at the time of signing" and ideas that were "in the public domain"; and (2) plaintiff had no "Misuse of Trade Secret Claim" because the idea had been in the public domain for some time and, therefore, was not novel. (*Id.* at *4-5).

F-P also mischaracterizes the holding of *AEB & Assoc. v. Tonka Corp.*, 853 F. Supp. 724 (S.D.N.Y. 1994). There, the court did not, as F-P erroneously states, "rule[] that the non-

6

confidential" prior disclosure to Fisher-Price and five other toy companies "negated any possible misappropriation claim against Kenner . . ." (F-P Mem. at 5, n. 10). In fact, the court examined and dismissed plaintiff's misappropriation claim <u>solely</u> on the grounds of novelty and independent invention, without ever mentioning the element of a confidential relationship. 853 F. Supp. at 733-34. The court did reference a prior F-P agreement, but it did so merely to rebut plaintiff's argument that Hasbro's confidentiality agreement was a contract of adhesion, not in the context of misappropriation, generally, or the existence of a confidential relationship, specifically. (*Id.* at 735, n. 8).

Finally, while the outcome of *Segan v. Hasbro, Inc.*, 924 F. Supp. 512, 525-26 (S.D.N.Y. 1996) was to bar the inventor's claim to the existence of a fiduciary relationship, the case merely stands for the proposition that the particular inventor's misappropriation claim was barred. *Segan* did not engage in a thorough analysis of the other ways in which New York law recognizes facts and circumstances which could create a legal relationship under which a misappropriation might occur. Most significant, *Segan* did not involve a subsequent option agreement in which the toy company agreed it could only use the concept if it paid for it. Finally, nothing in *Segan* would support F-P's novel argument on this motion that the lack of confidentiality as to Reiling would destroy property rights in the concept or the rights of his co-inventor, DI.

In sum, the cases F-P relies upon to support this motion never address the underlying point for which F-P has cited them. Instead, F-P asks the Court to essentially forge new law in the absence of any support whatsoever, the effect of which would be to bar any claim by an otherwise innocent party who had absolutely no knowledge whatsoever of such waiver.

## II.    The Concept Never Lost Any Rights Following Disclosure to F-P

To believe F-P's position, it must necessarily follow that the concept lacked any property

rights or value whatsoever following Reiling and DI's disclosure to F-P in October, 1998. But

the facts clearly belie this point.

It is undisputed that following disclosure of the concept to F-P, Reiling and DI could

have filed for a patent or copyright on the concept – both clearly property rights, with an intrinsic

value. Likewise, F-P could have sought the same federal intellectual property protection as well

once they obtained title to the concept, which they specifically contemplated in the Option

Agreement. (Option Agmt. ¶ ¶ 2, 7).  Further, F-P could have agreed with DI and Reiling not to

disclose the concept to any other entity, *i.e.*, to treat the concept as a trade secret.[2]

The very fact that the parties entered into an Option Agreement after submission of the

concept also confirms that F-P believed the concept had value and was a property right that it

needed to agree, by contract, to hold and review further.  Indeed, F-P's entry into the Option

Agreement begs the question: why would F-P pay money to evaluate a concept that they now

claim, by this motion, lacked any property rights and was essentially in the public domain?

Under the Option Agreement, F-P agreed to pay $2500 per month for a period of

exclusive consideration of the concept (Reiling Dec, Exh. V. at ¶ 3), and most importantly, F-P

agreed to pay Reiling and DI in the event that F-P sought to acquire more permanent rights to the

concept.  (Reiling Dec, Exh. V. at ¶ 6).  By the terms of the Option Agreement, Reiling and DI

agreed to keep the concept confidential as to all other parties and gave control of that

confidentiality to F-P.  (Reiling Dec, Exh. V. at ¶ 5).  The Option Agreement requires Reiling

and DI to keep the concept confidential and not to disclose it to third parties precisely because F-

---

[2] As set forth below, DI maintains that F-P did in fact maintain the confidentiality of the concept, a fact
which F-P's own witnesses confirm.

P did not want them to take any steps which might make the concept public and, thereby, truly destroy its value. Clearly, by signing the Option Agreement F-P acknowledged that the concept was <u>not</u> in the public domain and that its value had not been destroyed by disclosure to F-P.

Further, the very definition of an option agreement is that one party is buying a temporary period during which it has a further right to pay some additional amount to acquire the asset or rights at issue. *See, e.g., Stechler v. Sidley, Austin, Brown & Wood LLP,* 382 F. Supp.2d 580, 595-596 (S.D.N.Y. 2005) (*quoting Magma Power co. v Dow Chemical Co.*, 136 F.3d 316, 321 (2d Cir 1998)("An option . . . is a purchased right to buy or sell property at a fixed or floating price. If not exercised within the contractually specified period, an option expires and the buyer of the option loses the acquisition price"). In other words, the parties expressly agreed F-P could acquire the concept from Reiling and DI if, and only if, F-P paid for the concept in accordance with the terms of the Option Agreement. Conversely, the parties also agreed that F-P would have no further rights to the concept if F-P did not pay. (Reiling Dec, Exh. V. at ¶ 4).

These facts confirm that, contrary to F-P's position, DI and Reiling's concept constituted a valuable property right following disclosure to F-P.

## III.  <u>There is No Indication that DI Ever Lost Confidentiality By Virtue of the 1994 P&A</u>

F-P cannot establish as a matter of law that DI lacked a confidential relationship with F-P following disclosure of the concept in October, 1998. The summary judgment record and established principles of agency and intellectual property law refute F-P's contention. F-P's position is also contrary to settled law in the Second Circuit: "The standard custom and practice in the toy industry calls for companies to treat the submission of an idea as confidential." *Nadel v. Play By Play Toys*, 208 F.3d 368, 378 (2d Cir. 2000). At best, as this Court previously concluded, F-P has fact issues it needs to establish before a jury if it wants to link DI to the 1994 P&A in a way that

destroys the existence of a confidential relationship. F-P does not want to take that issue to a jury because it knows that factually, logically and legally, its own conduct and the Option Agreement rebut any such claim of lost confidentiality for DI.

### A.    The Record Supports the Existence of a Confidential Relationship Based on Conduct

F-P consistently mischaracterizes the nature of the submission as "Reiling's disclosure." (F-P Mem. at 2, 3). The summary judgment record clearly establishes that the concept was jointly created, conceived and owned by both DI and Reiling. (Reiling S.J. Dec ¶¶ 5, 23-24, 36; Popek S.J. Dec. ¶¶ 5-6; Benedetto S.J. Dec. ¶¶5-6). While Reiling may have actually met with F-P alone in October, 1998, the record is clear that DI and Reiling's submission to Fisher-Price was intended to be, and was in fact, a joint submission co-owned by the two entities.[3] (Ruling at 12). The Option Agreement confirms the joint relationship and F-P's acceptance of it.

Once the submission is properly characterized as a "joint submission," the fact that DI's principals expected F-P to consider and maintain the disclosure in confidence is an important fact. (Ruling at 40-41). More importantly, however, is the testimony of F-P's principals that they sought to, and in fact did, maintain the confidentiality of the DI-Reiling submission in this case. (Dize S.J. Dec., Exh. B (Paul Snyder), pp. 62-63; Exh. E (Ken Morton), p 46; and Exh. F (Chris Pardi), p. 35). This confirms the testimony of the parties' experts that the toy industry custom and practice provides for toy companies to treat submissions as confidential. (Ruling at 40-41; Dize Dec., Exh. C (Howard Bollinger), pp. 52-54, 206-209).

---

[3] To this end, there is evidence in the record to refute F-P's claim that it was unaware of DI's involvement at the time of the initial meeting with Paul Snyder in 1998. (F-P. Mem. at 3-4). At least one of the original October 1998 submission documents is stamped with DI's name. (Sec. Am. Comp., Exh. C).

**B.**     **Agency Remains the Important Determination**

F-P is incorrect when it asserts that "the relevant issue is not whether Reiling was an agent or whether DI was "bound" by the P&A." (F-P Mem. at 3). In fact, this remains the crucial factual issue to be determined by the jury at trial. DI can only be bound by a waiver signed by its co-inventor (prior to the time that the two entities began working together) if Reiling had the intent and authority to bind DI at the time Reiling and DI jointly submitted their concept to DI in 1998 under established principles of agency law. (Ruling at 12-13).

Under New York law, "[a] principal is bound to a third person by acts of another person when the principal has **expressly** given the latter authority to act on its behalf." *AEB & Associates*, 853 F. Supp. at 732 (Plaintiff-inventor had given express authority to agent to enter into waiver agreement on its behalf). In *Fasa Corp. v. Playmates Toys*, 892 F. Supp. 1061, 1064-65 (N.D. Ill. 1995), the court squarely dealt with this issue in a submission of idea case:

> Because [toy inventor] did not confer authority on [agent] to waive its intellectual property rights in BATTLETECH, and because [agent] did not believe that he had authority to waive [toy inventor's] property rights, the Court finds that [agent] did not have actual authority to waive [toy inventor's] intellectual property rights . . . [defendant] has failed to establish that [agent] had ostensible authority to waive [toy inventor's] intellectual property rights in BATLETECH).

*Id.* at 1065. Accordingly, the jury must determine whether DI was bound by Reiling's execution of the 1994 P&A under established principles of agency law. Where, as here, Reiling has indicated he had no intent to bind DI to the 1994 P&A because he did not even remember he had signed it on his own behalf, F-P's burden at trial on this issue seems insurmountable.

**C.**     **Intellectual Property Law Squarely Contravenes F-P's Argument**

DI submits that F-P's Motion for Reconsideration is contrary to well established principles of intellectual property law. Indeed, in the Summary Judgment Ruling the Court recognized that a joint owner of an intellectual property right, such as a patent, has an indivisible

interest in that property and may license it to a third party without the co-owner's consent. (Ruling at 14) (citing, *Willingham v. Lawton*, 555 F.2d 1340, 1344 (6th Cir. 1977)).[4] *See also Schering Corp. v. Roussel*, 104 F.3d 341, 344 (Fed Cir. 1997) ("Each co-owner's ownership rights carry with them the right to license others, a right that also does not require the consent of any other co-owner").

The Federal Circuit's holding in *Schering Corp.* refutes F-P's argument that DI, as a co-owner of the concept with Reiling, is bound by Reiling's execution of the 1994 Policy and Agreement form for any purpose. As the court explained:

> The flaw in Schering's argument is that the right to license is not incompatible with the unilateral right to sue, as Schering insists. It is true that by granting a license to a prospective defendant, or to a defendant that has already been sued for infringement, a patent co-owner can effectively deprive its fellow co-owner of the right to sue for and collect any infringement damages that accrue after the date of the license. It is also true that the suing co-owner may not obtain an injunction against future acts of infringement by the licensee, since the license grants full protection against a claim of future infringement. **But the grant of a license by one co-owner cannot deprive the other co-owner of the right to sue for accrued damages for past infringement. That would require a release, not a license, and the rights of a patent co-owner, absent agreement to the contrary, do not extend to granting a release that would defeat an action by other co-owners to recover damages for past infringement . . . one co-owner lacks 'the power . . . to destroy the other's accrued right to damages.'**

(*Id.* at 345) (citations omitted; emphasis added). Thus, *Schering Corp.* confirms the Court's Summary Judgment Ruling that Reiling's execution of the 1994 P&A form does not constitute a waiver as to DI – either as a general waiver of liability or a specific waiver as to lack of a confidential relationship - simply because the parties were co-owners of the concept. Clearly, the law does not permit one co-owner of an intellectual property right to destroy the rights of its

---

[4] This is consistent with Section 262 of the Patent Act, which provides: "[i]n the absence of any agreement to the contrary, each of the joint owners of a patent may make, use, offer to sell, or sell the patented invention within the United States, or import the patented invention into the United States, without the consent of and without accounting to the other owners." 35 U.S.C. § 262.

co-owner without that co-owner's knowledge and consent, as F-P erroneously asserts.

As a result, it is clear that DI does not suffer a loss of a confidential relationship by the existence of the 1994 P&A.

## IV.    The 1994 P&A Gives F-P No Right to "Use" DI's Confidential Disclosure and Should Not Even Bind Plaintiff Reiling in this Case

F-P required Reiling to sign the 1994 P&A, a form which he signed in gross well before he first began to collaborate with DI and four years prior to the creation and development of the concept in issue. (Reiling Dec. ¶ 11). By its terms in its Policy Section, the 1994 P&A was intended to protect F-P in connection with: (1) "unsolicited outside ideas;"[5] (2) non-confidential handling of disclosures; and (3) potential mishandling of samples. (Lane Dec. Ex. 20, p. 1, ¶ 1). The Court has found the significant portion of the 1994 P&A to be Paragraph 3, which provides in full:

> We assure you that we intend to deal fairly with you in connection with your disclosure. You must understand and agree that in return for receiving and examining your disclosure, we are released from any liability in connection with the receipt and examination of your disclosure, except as to such liability that may accrue under any valid patents or copyrights that you now or hereafter own or control.

*Id.* ¶ 3.

By its terms the 1994 P&A agreement was designed to protect F-P from claims resulting from <u>unsolicited</u> submissions, and the waiver provisions are limited to claims arising "in connection with the receipt and examination of your disclosure." (Lane Dec. Ex. 20). The Court's construction turns this very limited waiver into the equivalent of a general release and goes far beyond the language used in the 1994 P&A and what any contracting party would have reasonably assumed the language meant. Prior versions of the P&A between Reiling and F-P

---

[5] F-P's counsel confirmed this at oral argument on January 4, 2006 when he stated that the purpose was to ensure that F-P was not liable to inventors who merely "threw their ideas over the transom."

contained an express waiver of claims arising from the <u>use</u> of the concept submission.[6] The

absence of such language in the 1994 P&A must be construed against F-P and should limit the

scope of the waiver in the 1994 P&A.[7]

At the Pre-Trial Conference on January 4, 2006, the Court recognized the inherent

unfairness of F-P's interpretation of the 1994 P&A. F-P's counsel confirmed F-P's position that

it can use or indeed steal a concept disclosed pursuant to the 1994 P&A with impunity, because it

is F-P's position that the agreement disclaims all common law claims under New York law,

including a claim for misappropriation.[8] F-P, thus, admits it requires inventors to sign forms

identical or similar to the 1994 P&A with the secret intent that such forms bar any liability

except as may arise under copyright or patent law, then invites inventors to submit concepts

through "wish lists" and otherwise, without clearly disclosing the intended effect of the waiver[9]

and while assuring the inventor that F-P will act fairly. This is the essence of an unfair practice,

and should not be condoned under law or equity.

---

[6] DI again points the Court to the prior version of the 1994 P&A agreement attached as Exhibit A to the Clutton Declaration which expressly stated that claims arising from F-P's "use" of the concept were waived. The omission of that language from this agreement must be controlling of its interpretation.

[7] DI refers the Court to its Motion for Reconsideration as to Reiling, which is premised on the argument that once the parties signed the Option Agreement in 1999, the 1994 P&A ceased to be "the entire understanding of the parties."

[8] F-P's counsel had the temerity to assert at oral argument that "inventors must think its terms are fair because they keep disclosing to F-P." Inventors submit to F-P not because they want to, but because they have to in order to earn a living. F-P, a subsidiary of the Mattel, the world's largest toy companies, has a significant market share generally, and a very large market share for certain properties.

[9] The actual language of the 1994 P&A Agreement is anything but a clear and unambiguous waiver, considering the vast differences between the sophistication and resources of the parties. The P&A Agreement was carefully crafted by F-P to address the elements of possible legal claims for misappropriation and implied contract which are lost on virtually all, if not all, the individuals who are being asked to sign these documents. If F-P truly wanted the inventors to appreciate and understand the import of these waivers, they would have simply said, "PLEASE UNDERSTAND THAT BY SIGNING THIS DOCUMENT, YOU HEREBY WAIVE ANY RIGHTS THAT YOU MIGHT HAVE TO SUE US IN THE EVENT THAT WE MISAPPROPRIATE YOUR INVENTION." If such language was used, inventors might actually give pause to the idea of disclosing their concepts if they knew that they would have no recourse against that company if they went ahead and misappropriated the concept.

## CONCLUSION

There are numerous facts at issue which demonstrate that it is for the jury to decide whether the relationship between DI and F-P supports a claim for misappropriation. There is no support for F-P's novel and belatedly created theory that the disclosure of the concept to F-P for its possible mutual development destroyed all of the property rights associated with the concept. Further F-P cannot show that the 1994 P&A binds DI, or that this Court should extend the term of the 1994 P&A to make it into a shield from all claims, as F-P's counsel now argues.   For all these reasons stated, DI respectfully asks the Court to deny Fisher-Price's motion for reconsideration in all respects, and for such other and further relief as the Court deems just and proper.

Dated: January 6, 2006

Respectfully Submitted,

GRIMES & BATTERSBY, LLP

By: _____

Gregory J. Battersby (Bar No. 7386)
Edmund J. Ferdinand, III (Bar No. 21287)
Russell D. Dize (Bar No. 23064)
Susan Schlesinger (Bar No. 26625)
488 Main Avenue, Third Floor
Norwalk, Connecticut 06851-1008
(p) (203) 849-8300
(f) (203) 849-9300

SANDAK HENNESSEY & GRECO, LLP
Jay H. Sandak, Esq.
Peter M. Nolin, Esq.
707 Summer Street
Stamford, Connecticut 06901-1026
(p) (203) 425-4200
(f) (203) 325-8608

## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2006, a copy of the foregoing Memorandum of Law was served on all counsel of record below by U.S. Mail, First Class, postage prepaid, with a courtesy copy sent via electronic means to:.

Jacqueline Bucar Esq.
Robert Allen, Esq.
Tyler Cooper & Alcorn, LLP
205 Church Street
New Haven, Connecticut 06510

Bradford S. Babbitt, Esq.
Michael J. Kolosky, Esq.
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT  06103-3597

Robert J. Lane, Jr., Esq.
Jodyann Galvin, Esq.
HODGSON RUSS LLP
One M&T Plaza, Suite 2000
Buffalo, New York  14203-2391

William Wallace, Esq.
Milbank, Tweed, Hadley & McCoy-DC
1825 Eye St., N.W.
Suite 900
Washington, DC 20006

_____
Edmund J. Ferdinand, III