## Proposed Final Jury Instruction No. 3.0 – Damages – Generally

DI objects on the ground that F-P seeks to charge the jury that it cannot award damages to DI unless it finds F-P liable for both "misappropriation and unfair competition." (F-P Jur. at 18). In order to prevail on its claim for common law unfair competition, DI must establish all of the elements for a claim of common law misappropriation, plus the additional element that F-P's actions were in bad faith. *See Coors Brewing Co. v. Anheuser-Busch Co.*, 802 F. Supp. 965, 974 (S.D.N.Y. 1992); *Cargill, Inc. v. Sears Petroleum & Transp. Corp.*, 388 F. Supp. 2d 37, 68 (N.D.N.Y. 2005); *Michele Pommier Models, Inc. v. Men Women NY Model Mgmt, Inc.*, 1997 U.S. Dist. LEXIS 18294 at *11 (S.D.N.Y. Nov. 18, 1997). DI can, therefore, prevail on its claim for misappropriation, but not succeed on its claim for unfair competition if the jury finds that F-P's actions were not done in bad faith. For this reason, the word "and" in lines 4 and 6 should be changed to "or."

15

## Proposed Final Jury Instruction No. 3.1
## Damages –Misappropriation/Unfair Competition

DI objects to this request to charge on the ground that it seeks to limit the amount of damages for DI's common law misappropriation and unfair competition claims to an award of DI's profits, and does not allow the jury the option to disgorge the profits F-P unfairly received from its misappropriation of DI's concept.

F-P cites two New York cases, *Suburban Graphics Supply Corp. v. Nagle*, 5 A.D. 3d 663, 666, 774 N.Y.S.2d 160, 163-64 (N.Y. App. 2d Dept. 2004) and *Allan Dampf P.C. v. Bloom*, 512 N.Y.S.2d 116, 117 (N.Y. App. 2d Dept. 1987), for the proposition that damages in cases of unfair competition and misappropriation of an idea are limited to an award of the profits that a plaintiff should have received but for the improper conduct of the defendant. (F-P Jur. at 19).

As a threshold matter, to the extent that the court in *Suburban Graphics* relied on the New York Court of Appeals' prior decision in *Michel Cosmetics, Inc. v. Tsirkas*, 282 N.Y. 195, 26 N.E.2d 16 (N.Y. 1940), for the proposition that the proper measure of damages in a case of unfair competition is limited to an award of a plaintiff's lost profits and not an award of defendant's profits (*see* 774 N.Y.S.2d at 163-164), that reading of the *Michel Cosmetics* decision appears to be erroneous. Indeed, in *Michel Cosmetics*, the court cited with approval the Supreme Court's prior decision in *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 259 (1916), in which the Court held that the plaintiff "might be compelled to yield up his gains to the true owner, upon a principle analogous to that which charges a trustee with the profits acquired by the wrongful use of the property of the *cestui que trust*." 26 N.E.2d at 17 (quoting *Hamilton-Brown Shoe Co.*, 240 U.S. at 259). The court in *Michel Cosmetics* did not seek to award plaintiff the profits of the defendant in that case because the defendant had no profits. (*Id.*) ("Here it does not appear that the defendants acquired any profits"). A later decision from the Southern District

16

of New York, *Dad's Root Beer Co. v. Doc's Beverages, Inc.*, 94 F. Supp. 121, 122 (S.D.N.Y. 1950), confirms that *Hamiton-Brown Shoe* and *Michel Cosmetics* stand for the proposition that an award of a disgorgement of a defendant's profits is a proper remedy for claims of common law unfair competition under New York law. *See* 94 F. Supp. at 122 ("The New York authorities are clear that one who has gained unlawfully, as the result of unfair competition, shall not retain his profits").

Other authority confirms the availability of the remedy of disgorgement of profits in cases of misappropriation and unfair competition under New York law. *See Gilroy v. American Broadcasting Company, Inc.*, 365 N.Y.S.2d 193, 194 (N.Y. App. 1st Dept. 1975). *Gilroy*, a case relied upon by the NEW YORK PATTERN JURY INSTRUCTIONS CIVIL (Vol. II § 3:58) to measure damages in a misappropriation case under New York law, involved a misappropriation of a literary property. There, the Court held that the lower court had erred by "limiting plaintiff's recovery to defendant's profits." *Id.* at 194 (emphasis added). *Gilroy* thus establishes that not only is disgorgement of profits a proper remedy for misappropriation under New York law, it may actually be a floor, not a ceiling, to a plaintiff's recovery depending upon the value of plaintiff's property.

Moreover, the availability of disgorgement of profits for other common law claims under New York law demonstrates, by analogy, the propriety of awarding such damages in a case of misappropriation of an idea. These include, without limitation, claims for common law misappropriation of trade secrets, which under New York law are based on the RESTATEMENT OF TORTS, *see Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.*, 118 F.3d 955, 969 (2d Cir. 1997) (disgorgement of profits is "an appropriate measure of damages under New York law); *Topps Company, Inc. v. Cadbury Stani S.A.I.C.*, 380 F. Supp.2d 250, 268 (S.D.N.Y.

17

2005); and common law breach of fiduciary duty. *See Gomez v. Bicknell*, 756 N.Y.S.2d 209, 214 (N.Y. App. 2d Dept. 2002).

Accordingly, it is proper for the Court to give the jury the option to award to DI either its lost profits or the profits that F-P received by virtue of its wrongful misappropriation of DI's concept.

## Proposed Final Jury Instruction No. 3.2
### Damages – Effect of Existing License Agreement

DI objects to this charge in full on the grounds that it is factually inaccurate and legally untenable, and, therefore, is an improper charge to be given to the jury in this case.

The fact that the parties may have agreed on a royalty rate for purposes of the Option Agreement does not mean that DI is limited to a recovery of damages based on that same rate for purposes of its misappropriation and unfair competition claims. The royalty rate provided for in the Option Agreements is a "below market" royalty rate which would only have applied if F-P had exercised the option provided for in the Option Agreement. F-P elected not to exercise the option and obtain the benefit of this "below market" royalty rate when it permitted the Option Agreement to expire. The Option Agreement never formed the basis for DI's claim for implied-in-fact contract although the Court, nevertheless, dismissed that claim. (Ruling at 21-25). As a result, only tort-based claims remain in the case.

It is well-settled that a contractual royalty rate will not govern an award of damages for purposes of a misappropriation claim, where a plaintiff has been denied the benefit of the bargain based on a defendant's wrongful conduct. *See The Topps Co.*, 380 F. Supp.2d at 268 (rejecting defendant's argument that plaintiff should be limited to 3% royalty rate in parties' agreement for purposes of claim for common law misappropriation of trade secrets, and referencing availability of disgorgement of defendant's profits as available remedy under New York law). Decisions in other cases involving royalty rates are in accord. *See Softel, Inc. v. Dragon Medical*, 891 F. Supp. 935, 942 (S.D.N.Y. 1995) ("application of the 'reasonable royalty' measure of damages in lieu of the usual approach of measuring damages by defendants' profits was appropriate where defendants made no profits from the misappropriation. If defendants had made a profit, the court indicated it would have measured damages by the profits gained by defendants through the use

19

of the plaintiff's trade secret") (*citing, University Computing Co. v. Lykes-Youngstown Corp.,* 504 F.2d 518, 536 (5th Cir. 1974)), *aff'd in part, vacated on other grounds,*, 118 F.3d 955, 969 (2d Cir. 1997).

The testimony of DI's expert, James Kipling, confirms that the royalty rate recited in the Option Agreement was a below market royalty rate and that toy companies recognize that a below market royalty rate recited in an option agreement will not apply if the toy company actually exercises the option and enters into the contemplated license agreement with the inventive entity. To hold otherwise would effectively encourage a toy company to: (1) negotiate a below market royalty rate as part of an option agreement; (2) permit the option agreement to expire; (3) commercialize the optioned property without taking a license from the inventive entity; and (4) when challenged, claim that its measure of damages should be limited to the below-market royalty rate in the expired option agreement—which the toy company elected not to exercise.

The authority F-P cites does not, in fact, support its position. F-P has mischaracterized the holding of *Ashland Management, Inc. v. Janien,* 624 N.E.2d 1007 (N.Y. 1993). That case does not stand for the proposition that the inventor, Janien, was limited to the contractual 15% royalty rate for purposes of both his breach of contract and misappropriation of trade secret claims, as F-P erroneously contends. (F-P Jur. at 20). In *Ashland Management,* the application of the 15% royalty was limited only to the breach of contract claim. 624 N.E.2d at 1009-1012. This is made clear by the fact that the lower court held that Janien's employer was not guilty of trade secret misappropriation because Janien's invention, a mathematical model for determining investment strategy, did not constitute a trade secret. (*Id.* at 1008). The Court of Appeals affirmed that finding on appeal. (*Id.* at 1013). Thus, the plain holding of *Ashland Management* is

that the 15% contractual royalty rate governed only Janien's breach of contract claim, and not the misappropriation of trade secret claim.

Nor can *Vitor Corp. of America v. Hall Chemical Co.*, 292 F.2d 678 (6th Cir. 1961) be read to limit DI's damages to the 3% royalty rate contained in the parties' expired Option Agreement for purposes of DI's misappropriation and unfair competition claims under New York law. In *Vitor*, the defendant, Hall, had disclosed a proprietary scrap metal recovery process to the plaintiff, Vitor, and the parties entered into a nondisclosure agreement. The parties also reached an "agreement in principle" for use of the proprietary process, for which Hall would be paid a fixed advance upon execution of a formal agreement and then a minimum of $50,000 over six years. Vitor ultimately decided not to license Hall's proprietary process, and following its adoption and use of a similar process for its own business, Hall brought suit alleging a claim for breach of the nondisclosure agreement. Finding that Vitor had no profits or proof of sales, a special master awarded to Hall the full amount it was to receive under the "agreement in principle." In rejecting Vitor's challenge to the damage award on appeal, the Sixth Circuit explained that an award based on the "agreement in principle" was proper as a matter of equity even though it was not a firm contract because the actual value of Vitor's profits and Hall's damages could not otherwise be measured. (*Id.* at 682-83). In contrast, DI's damages for its tort-based claims are subject to a precise measurement, either by a disgorgement of F-P's profits or by application of a reasonable royalty pursuant to toy industry custom and practice. Hence, the 3% royalty rate in the expired Option Agreement is inapplicable.

Finally, F-P's reference to *Ramada Franchise Systems, Inc. v. Boychuk*, 283 F. Supp. 2d 777, 790 (N.D.N.Y. 2003) is also unavailing. That case stands for the proposition that in the context of trademark infringement cases under the Lanham Act, 15 U.S.C. § 1051, *et seq.*, the

royalty rate from the parties' existing or contemplated license agreement is a proper way to measure plaintiff's actual damages for past acts of infringement. *See also A&H Sportswear, Inc. v. Victoria's Secret Stores*, 166 F.3d 197, 208-09 (3d Cir. 1999) (same). Importantly, there is a significant split in authority, as cases from other circuits have refused to limit an award of actual damages in this manner. *See Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947 (7th Cir. 1992); *Sands, Taylor & Wood v. Quaker Oats*, 34 F.3d 1340 (7th Cir. 1994).

Because no New York court has ever sought to limit an award of damages for common law misappropriation or unfair competition to a royalty rate that the parties had previously contemplated, F-P's proposed charge is, therefore, improper.

### Proposed Final Jury Instruction No. 3.3
### Damages – No Double Counting

DI objects to this proposed charge in full on the grounds that it is not legally supportable.

As a threshold matter, F-P cites no controlling legal authority to support its charge that DI's

damages must be reduced by one-half as a result of Reiling's dismissal. The lone case F-P cites,

*E.R. Squibb & Sons, Inc. v. Lloyd's Companies*, 241 F.3d 154, 173 n.11 (2d Cir. 2001), is wholly

inapposite. *E.R. Squibb* was a complex insurance coverage action. During the course of the

litigation, several of the insurers settled with the plaintiff, Squibb. On appeal, the remaining

insurers challenged the lower court's damage award to Squibb on the ground that it "resulted in

an improper 'double recovery' for Squibb by virtue of the fact that its allocation scheme

attributed to the [remaining defendants] excessive responsibility for certain claims that had been

the subject of settlements with the primary insurers." (*Id.* at 172). The Second Circuit rejected

the insurers' challenge on appeal and affirmed the lower court's damage award. In so doing, the

court expressly recognized that a "double recovery" might result under the particular

circumstances of the case. (*Id.* at 172-173, n. 11). *E.R. Squibb* thus does not lend support to F-P

effort to reduce DI's damages by one-half because of the dismissal of Reiling. If anything, the

decision actually refutes F-P's position.

DI submits that F-P's request to charge is also contrary to well established principles of

intellectual property law. Indeed, in the Summary Judgment Ruling the Court recognized that a

joint owner of an intellectual property right, such as a patent, has an indivisible interest in that

property and may license it to a third party without the co-owner's consent. (Ruling at 14)

(citing, *Willingham v. Lawton*, 555 F.2d 1340, 1344 (6th Cir. 1977).[4] *See also Schering Corp. v.*

---

[4] This is consistent with Section 262 of the Patent Act, which provides: "[i]n the absence of any
agreement to the contrary, each of the joint owners of a patent may make, use, offer to sell, or sell the

23

*Roussel*, 104 F.3d 341, 344 (Fed Cir. 1997) ("Each co-owner's ownership rights carry with them the right to license others, a right that also does not require the consent of any other co-owner").

The evidence at trial will establish that DI and Reiling are co-owners of the concept that they disclosed to F-P. A concept is an established property right. *Downey v. General Foods Corp.*, 31 N.Y.2d 56, 61, 334 N.Y.S.2d 874, 877, 286 N.E.2d 257 (N.Y. 1972). It follows that if DI could license its indivisible interest in the concept to F-P for full compensation without Reiling's consent, it should be entitled to receive full compensation when its rights are misappropriated.

Moreover, an award to DI of the full amount of the damages that flow from F-P's misappropriation is also consistent with the fact that F-P treated the concept here as a distinct intellectual property right, without regard to the number of owners. Indeed, the evidence will establish that pursuant to toy industry custom and practice and the parties' course of dealing in this case, F-P intended to compensate the inventive entity for the use of that concept, irrespective of the number of parties that made up the inventive entity. To argue otherwise would suggest, improperly, that if there were four parties that made up the inventive entity, F-P's liability would be twice that of a situation where the inventive entity consisted of only two parties. No rational toy company would ever allow its compensation to an inventive entity to be based on the number of parties making up that inventive entity since it would have no control over its own potential liability to the entity. To a toy company, inventor compensation is a fixed amount or percentage, irrespective of the number of parties comprising the entity. For this reason, F-P should not benefit by the fact that one of the two co-owners of the concept has now been dismissed from the

---

patented invention within the United States, or import the patented invention into the United States, without the consent of and without accounting to the other owners." 35 U.S.C. § 262.

lawsuit—it should still be liable in full to the remaining party, DI, who possesses an undivided interest in the concept.

### Proposed Final Jury Instruction 3.4
### Damages – Line Extensions

DI objects to this request on the ground that it is inaccurate in several important respects.

### I.  Coverage of Line Extensions and Accessories

F-P seeks to charge the jury that DI claims damages on sales of line extensions of Rescue

Heroes products:

> [E]ven though Design Innovation makes no claim that such line extensions
> embody or use the concept that was allegedly misappropriated by Fisher-Price.  A
> plaintiff may recover royalties or damages on line extensions only if they embody
> or use the allegedly misappropriated concept.  I have already ruled that the Rescue
> Heroes vehicles and playsets do not embody or use the Reel Heroes concepts.

(F-P Jur. at 22).  F-P's proposed charge is problematic in several different ways.

First, as the Court recognized, the basis for DI's claim of damages for line extensions and

accessories "is the purported industry custom and practice of compensating inventors for such

line extensions related to plaintiffs' submitted concepts." (Ruling at 50).  Thus, DI principally

claims damages for the accused line extensions and accessories because they are sold together

with, or were marketed by F-P specifically for use with, the accused Rescue Heroes action

figures.  The Court, therefore, should include this language in any charge to the jury related to

line extensions.[5]

Moreover, contrary to F-P's argument, DI in fact claims that certain of the accused

vehicles and playsets do embody DI's concept.  DI alleges that its first submission specifically

referenced and anticipated vehicle accessories (in the form of a mobile communication and

command vehicle).  In addition, (1) the Aquatic Rescue Command Center uses interchangeable

---

[5] F-P cites to *Ball v. Hershey Foods Corp.*, 842 F. Supp 44 (D. Conn. 1993), for the proposition that line
extensions and accessories must also embody the concept, but the case, in fact, holds no such thing. The
*Ball* case involved a determination whether defendant made use of plaintiff's concept in its television
commercials, and dealt with issues of novelty and independent development.  The case did not deal with,
or even mention, line extensions or accessories.

26

mission cards similar to those used by the Mission Command figures that are used to select missions and to show obstacles and dangers; and (2) the Mission Select Fire Truck and Police Cruiser and the Mountain Action Command Center all feature the same rotating 2" dial as the Mission Select action figures, depicting still images that are used to select missions and to show obstacles and dangers. DI's concept covers all of these features. Thus, it would not be proper for a charge to include F-P's proposed language that "the Rescue Heroes playsets and vehicles do not embody the Reel Heroes concept," for this additional reason.

## II. Inclusion of Voice Tech Vehicles

As an additional consideration, F-P's list of accused accessories and line extensions is incomplete because it does not include any of the "Voice Tech Vehicles," which included a Fire Truck, Jet and Police Cruiser. On September 30, 2004, the Court ruled that DI could not assert claims of misappropriation or unfair competition for the Voice Tech Jet or Fire Truck because they were barred New York's three-year statute of limitations governing injury to property, N.Y. C.P.L.R. § 214(4). (Ruling on Plaintiff's Motion for Leave to File a Second Amended Complaint at 7-8). The Court's prior ruling did not bar the Voice Tech Police Cruiser, so that toy should be included in the request to charge and should be considered by the jury for purposes of awarding damages. In addition, as set forth below DI respectfully submits that F-P's continued misappropriation of the Voice Tech Jet and Fire Truck after 2000 render these products subject to the "continuing tort doctrine." In the alternative, DI also submits that these two vehicles should not have been stricken on limitations grounds because they relate back to the filing of DI's original Complaint pursuant to Fed R. Civ. P. 15(c)(2).

27

## A. The Continuing Tort Doctrine Should Apply

The policy in New York behind the continuing tort doctrine is to allow a party to rely on

the defendant's wrongful conduct which occurred prior to the applicable statute of limitations

period. *See Shannon v. MTA Metro-North Railroad*, 704 N.Y.S.2d 208 (1st Dep't 2000).

Reliance on such conduct is allowed so long as the final conduct occurs within the applicable

statute of limitations period. *Id.*

The Second Circuit has held that federal courts also recognize a continuing tort doctrine.

*See Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030 (2d Cir.1992). There, the court

held:

> The doctrine applies when the defendant's conduct causes plaintiff to sustain
> damages after the time when the statute of limitations would have expired if it
> commenced at the time of defendant's first act. Instead, the claim accrues each
> time the plaintiff sustains damages. The rule is based primarily upon the
> impracticality and unfairness of requiring a plaintiff to institute his action before
> he can predict his damages. *Id.* at 1039 (citing *Taylor v. Meirick*, 712 F.2d 1112,
> 1119 (7th Cir. 1983)).

The continuing tort doctrine has been applied to a variety of cases. It has been applied in

antitrust cases because "'each time that a plaintiff is injured by an act of the defendants a cause

of action accrues to him to recover the damages caused by the act.'" *Kahn*, 970 F. 2d at 1039.

(quoting *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir. 1979), *cert.*

*denied*, 444 U.S. 1093 (1980) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S.

321, 338 (1971)). The reasoning behind allowing a continuing tort in antitrust cases is because

the conduct of the defendant "may give rise to damages in the future which are not predictable at

the time of the initial act or within the limitations period." *Id.*

The continuing tort theory has also been applied to misappropriation of trade secrets cases. *Kistler Instrumente A.G. v. PCB Piezotronics*, 419 F. Supp. 120 (W.D.N.Y. 1976). In New York, the rule is as follows:

> If a defendant misappropriates and discloses a trade secret, he becomes liable to plaintiff upon disclosure. On the other hand, if the defendant keeps the secret confidential yet makes use of it to his own commercial advantage, each successive use constitutes a new, actionable tort for the purposes of the running of the Statute of Limitations.

*Lemelson v. Carolina Enterprises, Inc.*, 541 F. Supp. 645, 659 (S.D.N.Y. 1982).

This rule has also been applied to misappropriation of information protected by patents. However, in the case of patent information it is the issuance of the patent which constitutes the public disclosure, not sales of the products which contain the patented information or process. *Construction Technology, Inc. v. The Lockformer Company, Inc.*, 704 F. Supp. 1212 (S.D.N.Y. 1989). The continuing tort doctrine has also been applied in the context of trademark infringement. *See Greenlight Capital, Inc. v. Greenlight (Switzerland) S.A.*, 2005 U.S. Dist. LEXIS 2 (S.D.N.Y. 2005).

In addition, the continuing tort doctrine has been found to apply to conduct which constitutes a trespass rather than to conduct which constitutes a conversion. *Sporn v. MCA Records*, 58 N.Y.2d 482 (N.Y. 1983). The determination of what conduct constitutes a conversion and what conduct constitutes a trespass is questionable. In *Sporn*, the misappropriation of a master recording was found to constitute a conversion and was barred by the three-year statute of limitations under N.Y. C.P.L.R. §214. *Id.* However, the court in *Sporn* also recognized that there were intangible property rights which would not properly be considered something subject to conversion. *Id.* Accordingly, intangible property rights may not necessarily be considered barred by a three-year statute of limitations for the taking of property.

29

Further, the dissent in Sporn recognized that where the defendant had continued to manufacture and sell records from the master recording, such action would not rightly be considered a conversion but a continuing trespass and should not have been barred by the statute of limitations. *Sporn*, 58 N.Y.S.2d at 490.

Moreover, the dissenting opinion in *Sporn* seems to have been recognized by a 2005 decision in the Southern District of New York. In *Greenlight Capital, Inc. v. Greenlight (Switzerland) S.A.*, 2005 U.S. Dist. LEXIS 2 *27-28 (S.D.N.Y. 2005), the court explained that the majority opinion in *Sporn* is not controlling because unfair competition claims in New York encompass a wide variety of practices and therefore the nature of the unfair competition claim at issue must be analyzed to determine the appropriate statute of limitations to apply. *Id.* The court in *Greenlight* quoted the definition of unfair competition from *Roy Export Co. Establishment of Vaduz, Lichtenstein v. Columbia Broad. Sys.*, 672 F. 2d 1095, 1105 (2d Cir. 1982), stating in pertinent part that unfair competition "has been broadly described as encompassing form of commercial immorality or simply as endeavoring to reap where (one) has not sown; it is taking the skill, expenditures and labors of a competitor and misappropriating for the commercial advantage of one person... a benefit or property right belonging to another. The tort is adaptable and capacious." *Id.* The court in *Greenlight* found that even if a three-year statute of limitations applied to the unfair competition claim, the conduct would have been a "'continuing trespass' pursuant to the Sporn trespass-conversion analysis and thus be timely" because of the "on-going activity" of defendant's misuse of plaintiff's name. *Id.* at *29.

As a result of the application of the continuing tort doctrine, DI should be entitled to damages for sales of the Voice Tech Jet and Fire Truck that occurred during the three-year period prior to the filing of the Second Amended Complaint.

30

## B. The Voice Tech Jet and Fire Truck Relate Back to the Original Complaint

Finally, DI submits that the Voice Tech Jet and Fire Truck should not have been excluded on limitations grounds because, under Fed. R. Civ. P. 15(c)(2), those vehicles relate back to the filing of DI's original Complaint. (*See* Court's September 30, 2004 Ruling at 9). As the Court recognized in its Ruling, "[t]h pertinent inquiry . . . is whether the original Complaint gave the defendant fair notice of the newly alleged claims." (*Id.*) (*quoting Wilson v. Fairchild Republic Co.*, 143 F.3d 733, 738 (2d Cir. 1998)). In the original Complaint filed with the Court in January, 2003, DI asserted that "the 'Voice Tech Video Mission Rescue Heroes' line has several accessories including an Aquatic Rescue Command Center, a Police Car, a Rescue Fire Truck and a Rescue Jet." (Complaint, Docket Index No. 1, at § 29). DI, therefore, gave fair notice to F-P in its original Complaint about its claim of rights to the Voice Tech Fire Truck and Jet, and, those products are not time-barred because they relate back to the original Complaint under Fed. R. Civ. P. 15(c)(2). Accordingly, DI requests that DI be allowed to submit evidence of these two accessories at trial, and that they be included as part of the jury charge for purposes of awarding damages to DI.

## Proposed Final Jury Instructions Nos. 3.5 and 3.6
### Damages – Punitive Damages

DI objects to F-P's request to charge in two respects:

## I. DI Must Prove Punitive Damages by a Preponderance of the Evidence

F-P erroneously seeks to impose upon DI the burden to prove punitive damages by the
heightened standard of "clear, unequivocal and convincing evidence." (F-P Jur. at 25-26). That
standard is contrary to established New York law for punitive damages cases. The correct
standard for proving punitive damages in this case is in fact the lesser "preponderance of the
evidence" standard.

In *Greenbaum v. Svenska Handelsbanken*, 979 F. Supp. 973 (S.D.N.Y. 1997) and *Rose v.
Brown & Williamson Tobacco Corp.*, 2005 N.Y. Misc. LEXIS 2392 at *19, 2005 N.Y. Slip Op
25459 (N.Y. Sup. Ct. Sept. 29, 2005), the courts analyzed the proper evidentiary standard for
proof of punitive damages under New York law. In each case, the courts concluded that the
lesser "preponderance of the evidence" standard governed. *Rose*, 2005 N.Y. Misc. LEXIS 2392
at *22; *Greenbaum*, 979 F. Supp. at 982. As the court explained in *Rose*, "under New York law,
a claim for punitive damages is 'inextricably linked to the underlying cause of action' and cannot
stand on its own." (*Id.*, quoting *Greenbaum*, 979 F. Supp. at 982, citing *Rocanova v. Equitable
Life*, 83 N.Y.2d 603, 616-17, 634 N.E.2d 940, 612 N.Y.S.2d 339 (1994)). As a result, "the level
of proof necessary to establish punitive damages must be the same as the level required to
establish the underlying claim, as it would make little sense to require a plaintiff to show proof of
certain damagers by clear and convincing evidence and other damages by a mere preponderance
of the evidence." (*Id.*) Because DI's claims for common law misappropriation and unfair
competition both require proof by a preponderance of the evidence, so too should DI's claim for
punitive damages.

The New York cases that have applied the more rigorous clear and convincing evidence

standard to show punitive damages are all consistent with *Greenbaum*, because the underlying

claims in each case also required proof by clear and convincing evidence. *See, e.g., Mahoney v.*

*Adirondack Pub. Co.*, 71 N.Y.2d 31, 40, 517 N.E.2d 1365, 523 N.Y.S.2d 480 (1987) (libel claim

required proof by clear and convincing evidence); *Roginsky v. Richardson-Merrell*, 378 F.2d

832, 851 (2d Cir. 1967) (liability of corporate defendant based on doctrine of *respondeat*

*superior* required proof by clear and convincing evidence); *Cleghorn v. The New York Central*

*and Hudson River Railroad Co.*, 56 N.Y. 44, 48 (N.Y. 1874) (same).

The case F-P cites, *Rosenberg, Minc & Armstrong v. Cadillo & Grossman*, 798 N.Y.S.2d

322, 330 (S. Ct. N.Y. Co., 2005) (quoting *Munoz v. Leib Puretz*, 753 N.Y.S.2d 463 (App. Div. 1st

Dept. 2003)), is distinguishable. *Munoz* relies on *Sladick v. Hudson General Corp.*, 641

N.Y.S.2d 270 (App. Div. 1st Dept. 1996), as authority for application of the heightened

evidentiary standard. *See Munoz*, 753 N.Y.S.2d at 466. Importantly, in *Rose*, the court

distinguished *Sladick* as authority for application of the heightened evidentiary standard, for

reasons that are equally applicable here:

> Defendants argued that, regardless of the Court of Appeals ruling in *Corrigan*,
> this court is bound by the clear language of the Appellate Division, First
> Department in *Sladick* and *Camillo*, which states that punitive damages awards
> must be supported by "clear, unequivocal and convincing evidence." However, as
> noted above, the *Camillo* Court's use of the "clear and convincing" evidentiary
> standard arose out of circumstances in that case not present here, and is thus not
> controlling in the instant case. In *Sladick*, the Court cites *Camillo* for the
> proposition that entitlement to punitive damages must be established by clear and
> convincing evidence. However, the decision simply states that plaintiff had not
> established entitlement to punitive damages and offers no details on the issue.
> (*Id.*) Specifically, it makes no mention of whether a punitive damages award was
> sought against defendant corporation for acts of its employee. Thus, it is
> impossible to tell whether the Appellate Division, First Department simply
> applied the rule because the facts were similar to those in *Camillo* or that it
> intended to broaden the "clear and convincing" evidentiary standard to all punitive
> damages cases. If this court were reading *Sladick* in a vacuum, it might be

33

convinced that "clear and convincing" evidence was the only applicable standard on the issue of punitive damages. However, in light of the differing Court of Appeals decisions discussed above, as well as the lack of any detail in the *Sladick* decision on the punitive damages issue, this court did not find *Sladick* to be controlling in the instant case.

For the reasons set forth above, this court adopted the rule, set forth in *Greenbaum*, that the burden of proof for punitive damages in a negligent design case is the same as the burden of proof for compensatory damages in a negligent design case. In a negligence action, *prima facie* entitlement to compensatory damages must be established by a fair preponderance of the evidence. Therefore, the court denied defendants' motion to instruct the jury that entitlement to punitive damages must be established by clear and convincing evidence.

*Rose*, 2005 N.Y. Misc. LEXIS 2392 at \*23 (citations omitted).

## II.    DI Need Not Show that F-P's Conduct was Directed to a Pattern of Conduct Harmful to the Public

F-P's request to charge the jury that DI must prove as an essential element of its claim for

punitive damages that F-P's conduct was "part of a pattern of conduct that is also directed at the

public and harmful to the public" (F-P Jur. at 23), is erroneous. New York courts, including the

case F-P cites as authority for its request to charge, make clear that the "harm to the public"

element of proof to establish punitive damages is only applicable for punitive damages claims

arising from breach of contract, not tort. *See New York University v. Continental Insurance Co.*,

87 N.Y.2d 308, 662 N.E.2d 763, 639 N.Y.S.2d 283, 287-88 (1995); *see also Carvel Corp. v.

Noonan*, 350 F.3d 6, 25 (2d Cir. 2003)("New York courts have applied the 'public harm'

standard only to cases in which the defendant's allegedly tortuous conduct was directly related to

the contract between the plaintiff and the defendant").

Dated: Norwalk, Connecticut
      January 3, 2006

Respectfully Submitted,

GRIMES & BATTERSBY, LLP

By: _____

Gregory J. Battersby (Bar No. 7386)
Edmund J. Ferdinand, III (Bar No. 21287)
Russell D. Dize (Bar No. 23064)
Susan Schlesinger (Bar No. 26625)
Michael Ryan Patrick (Bar No. 26556)
488 Main Avenue, Third Floor
Norwalk, Connecticut 06851-1008
(p) (203) 849-8300
(f) (203) 849-9300

SANDAK HENNESSEY & GRECO, LLP
Jay H. Sandak, Esq.
Peter M. Nolin, Esq.
707 Summer Street
Stamford, Connecticut 06901-1026
(p) (203) 425-4200
(f) (203) 325-8608

Attorneys for Plaintiff
Design Innovation, Inc.