

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| VICTOR G. REILING ASSOCIATES and DESIGN INNOVATION, INC., <br><br> Plaintiffs, <br><br> - against - <br><br> FISHER-PRICE, INC., <br><br> Defendant. | Index No.: 3:03 CV 222 (JBA) <br><br><br> January 5, 2004 |
|---|---|

### EXPERT REPORT OF JAMES KIPLING
### ON BEHALF OF PLAINTIFFS
### VICTOR G. REILING ASSOCIATES AND DESIGN INNOVATION, INC.

I.  **BACKGROUND**

I have been retained in this action by Counsel for Victor G. Reiling Associates ("Reiling") and Design Innovation, Inc. ("DI"), (collectively "Plaintiffs") to provide expert analysis and testimony, if necessary, regarding the customs and practices prevalent in the toy and game industry in connection with the development of new toy concepts by outside inventors and the process by which such concepts are disclosed to, and necessary rights are acquired by, toy manufacturers, including typical royalty compensation paid to inventors by such toy manufacturers. It is my understanding that I may be asked to review and comment on the opinions of opposing expert witnesses.

In preparing to provide this service, I have been asked to review certain documents and other materials relating to this current litigation including the First Amended Complaint and Exhibits attached thereto, filed May 1, 2003. Included among these materials are copies of certain drawings and submissions presented to Fisher-Price by Plaintiffs for a toy concept which is characterized in Plaintiffs' materials as "Real Heroes/Reel Action" (the "concept"); an Option Agreement executed by Plaintiffs and by Fisher-Price apparently during February, 1999; and certain correspondence between Plaintiffs and Fisher-Price regarding the possible acquisition of rights in the concept by Fisher-Price through license from Plaintiffs. (For simplicity, I will refer to the parties' plaintiff individually and collectively as "Plaintiffs").

The analysis and opinions stated herein are dependent upon the information and materials that have been made available to me at the time of the preparation of this report. It is possible that additional information and materials may come to my attention which may result in additions to or changes of certain aspects of this analysis. Exhibit I attached hereto comprises a

list of materials that I have reviewed in preparing this report.

## II. QUALIFICATIONS

I am a member of the Bar of the State of Ohio and am admitted to practice before the United States Patent and Trademark Office. I have practiced in the area of Intellectual Property since being admitted to the Bar in 1972.

Between 1968 and 1974, I was employed by the General Electric Company and worked in the Company's Patent Law Department in its Alexandria, Virginia and Cincinnati, Ohio offices. In 1974, I became House Counsel with the Kenner Toy Company, then a subsidiary of General Mills, Inc. In 1980, I became Vice President Law with the Kenner Products Division of CPG Products Corporation, and later with Kenner-Parker Toys, Inc. From 1987 through 1990, the latter entity was a subsidiary of Tonka Corporation. In 1991, Tonka was acquired by Hasbro, Inc. and I was Vice President and Managing Attorney with Hasbro until 2001. Thereafter, I joined Frost Brown Todd LLC as Of Counsel to the Intellectual Property Law Department based in Cincinnati, Ohio.

A principal focus of my practice since 1974 has been the process by which toy and game concepts are created, developed and marketed, as well as the various intellectual property law protections for such concepts and products. Among my responsibilities during and throughout my career since 1974 has been negotiation of license and other agreements involving new toy concepts and various other properties for toy and game products, and I have participated in several hundred such negotiations. My experience includes the licensing of inventions, technologies, brands, sports stars, entertainment properties, and celebrity rights for use in the creation and development of toy products. Products which have resulted from negotiations that I have personally handled have sold in excess of $2 billion dollars at wholesale prices.

I have negotiated hundreds of license agreements on behalf of toy companies, toy designers and inventors in connection with intellectual property rights in toy products. In negotiating these agreements, I have come to understand the compensation that is typically paid in connection with the licensing of new toy concepts and other properties applicable to the toy and game industry.

Since joining my current law firm, I have been active in industry events and associations including those of the International Licensing Industry Merchandisers' Association ("LIMA"), and the Toy Industry Association ("TIA"), and have participated in seminars and programs conducted by these associations. As set forth in greater detail in Exhibit II attached hereto, I have written articles and given presentations on matters involving intellectual property and licensing to and on behalf of such professional groups. I have also been a panelist and moderator at various TIA and LIMA seminars and presentations on toy product development and licensing principles.

As the result of my practice and these professional activities, I have become familiar with the practice of licensing new toy and game concepts and properties in the toy industry, as well as the valuation thereof and compensation typically paid to designers and inventors by toy

companies. In rendering the analysis and opinions expressed herein, I rely upon my knowledge and experience in the toy and game industry and, in particular, in connection with the inventorship, disclosure and licensing of new toy products by outside inventors to toy and game manufacturers.

My law firm's compensation in this matter is $305.00 per hour.

### III. ANALYSIS AND OPINIONS

#### A. Independent Inventors Typically Submit And Toy Companies Typically Receive Product Concepts Rather Than Finished Toy Products For Consideration; Upon Licensing Such Concepts, Toy Companies Typically Make Substantial Changes To The Submitted Concepts Prior To Marketing Licensed Products.

As further discussed in my article *"Toy Licenses Are Different"* which appeared in two parts in the February and March, 2002 issues of *The Licensing Book*, the toy industry has relied for many years on outside inventors and designers for new ideas and concepts which they acquire and develop into finished toy products. The use of such outside resources is a normal practice for the majority of toy companies because such inventors provide a diversity and flow of new ideas without the overhead burden associated with employing a similar number of inventors and designers.

Historically, toy inventing developed as a "cottage industry" of individuals or small groups, though there are a number of sophisticated toy design firms now in existence. Toy manufacturers routinely seek out the submissions of talented inventors, both from small groups as well as from the larger design firms.

Toy concepts are usually disclosed by outside inventors to toy manufacturers in the form of "kit-bash" models that may use pieces of existing toy and non-toy products assembled by the inventor and used to demonstrate the structure and/or function of a proposed toy concept. Embellishments and potential variations or line extensions to the basic concepts are often communicated in accompanying renderings and/or written descriptions. The inventor sometimes describes additional elements, capabilities and enhancements in these forms or orally during concept presentation meetings with company representatives. The submission of "concepts" as distinguished from "finished products" is typical of both individual inventors and the more sophisticated design firms.

It is fully understood and widely accepted in the toy industry that manufacturers expect to acquire new toy properties from inventors in "concept" form and to expend substantial company resources in refining, embellishing and expanding those concepts into "finished" licensed products and product lines. In addition to the normal "finishing" changes and refinements to the inventor's original concept, in the event that an inventor's concept is to be incorporated into an existing branded product line (for example, "Barbie", "Nerf" or "Rescue Heroes"), additional adaptations may be made by the manufacturer to insure that the thematic and aesthetic "consistency" of the respective branded line is maintained. Moreover, the packaging and advertising plans of the toy manufacturer can influence the final execution of the licensed

submitted concept within the Fisher-Price product line. I do not believe, however, that this royalty rate should apply as a limit upon Plaintiffs' remedy in the current situation, since behavior of Fisher-Price contrary to its obligations to Plaintiffs should result in its having lost the "benefit of the bargain". A party should not be permitted to negotiate an agreed royalty percentage and thereafter to use that percentage as a "cap" on any financial exposure it may incur by *subsequently reneging on the very deal that it seeks to enforce*, after detection of and challenge to its behavior has occurred.

This principle has been recognized by the Court of Appeals for the Federal Circuit in patent infringement litigation where damages awarded against infringers have been higher than traditional royalty rates. This is further discussed by Michael McCoy, et al in "Royalty Rate Trends and Valuation and Patent Technology Licensing", *Licensing Update, 2003*, Aspen Press by Battersby & Grimes at §8.01[E], to wit, "It should not be surprising that rates awarded as damages by courts exceed those normally found in transactions negotiated outside of litigation. In litigation, the parties are directed to compute damages to compensate for infringement, but 'in no event less than a reasonable royalty'."

Based on the foregoing, it is my opinion that the subject Fisher-Price products based upon or derived from the Plaintiffs' submitted concept appropriately should bear royalty payable to Plaintiffs in the 6% to 7% range.

### D.  Line Extension Royalties

As previously discussed, products based on or derived from an inventor's submitted concept are compensated by toy manufacturers at the applicable royalty rate regardless of changes, revisions or enhancements made in defining the finished licensed products based on or derived from the submitted concept. In addition, it has been common industry practice that toy manufacturers compensate inventors not only for such embodiments of the submitted concept itself, but also for "line extensions" which can include accessories that do not embody the submitted concept but which are marketed for use with licensed products embodying such concept. Such compensation is invariably payable when the accessories are suggested or developed by the inventor, and is frequently paid when they are independently created and developed by the toy company, notwithstanding the fact that they are not embodiments of the original submitted concept. Such line extensions may extend beyond "accessories" and include peripheral products such as video games or video tapes or third-party merchandise (eg, apparel, lunch boxes etc.) which may use or embody *images or elements* drawn from the licensed products or concept, or products that may be used independently of the original licensed products. In essence, such compensation recognizes that none of the sales of these extensions, whether accessories or stand-alone peripheral products, would be enjoyed by the manufacturer without the inventor's original concept submission.

Whether the inventor is compensated when line extensions are independently created and developed by the toy company is generally a matter of negotiation in the final license agreement for the submitted concept. In the current instance, Plaintiffs were deprived of the opportunity to negotiate this and other terms of a license agreement by an apparent Fisher-Price decision to ignore their rights and proceed without necessary permission. In reviewing the Fisher-Price

product line, it is my opinion that Video Mission video tapes and other line extensions, whether included in the original submitted concept or subsequently developed by Fisher-Price, should be subject to the royalty and other obligations of Fisher-Price to Plaintiffs.

\* \* \* \* \*

Dated: January 5, 2004

*/s/ James M. Kipling*
James M. Kipling