# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| VICTOR G. REILING ASSOCIATES and DESIGN INNOVATION, INC.,<br><br>Plaintiffs,<br><br>- against –<br><br>FISHER-PRICE, INC.,<br><br>Defendant. | Index No.: 3:03 CV 222 (JBA)<br><br><br>January 31, 2005 |

## SECOND SUPPLEMENT TO
## EXPERT REPORT OF JAMES KIPLING
## ON BEHALF OF PLAINTIFFS
## VICTOR G. REILING ASSOCIATES AND DESIGN INNOVATION, INC.

## I.   QUALIFICATIONS

1.   I have been retained by Plaintiffs to be an expert witness in this case. I am familiar with the facts set forth herein and I make this Second Supplement to Expert Report upon personal knowledge and the review of documents and other tangible evidence.

2.   As indicated in my Expert Report (dated January 5, 2004), I have practiced in the area of Intellectual Property since being admitted to the Bar in 1972. Between 1968 and 1974, I was employed by the General Electric Company and worked in the company's Patent Law Department in its Alexandria, Virginia and Cincinnati, Ohio offices. In 1974, I became House Counsel with the Kenner Toy Company, then a subsidiary of General Mills, Inc. In 1980, I became Vice President Law with the Kenner Products Division of CPG Products Corporation, and later with Kenner-Parker Toys, Inc. From 1987 through 1990, the latter entity was a subsidiary of Tonka Corporation. In 1991, Tonka was acquired by Hasbro, Inc. and I was Vice President and Managing Attorney with Hasbro until 2001. Thereafter, I joined Frost Brown Todd LLC as Of Counsel to the Intellectual Property Law Department based in Cincinnati, Ohio. A principal focus of my practice since 1974 has been the process by which toy and game concepts are created, developed and marketed, as well as the various intellectual property law protections for such concepts and products. A true and correct copy of my Expert Report in this matter is attached hereto as Exhibit A.

## II.  PLAINTIFFS' CONCEPT SUBMISSIONS TO FISHER-PRICE

### The Nature Of Independent Toy Inventors

3.      In my experience, toy designers and inventors are primarily visual communicators who often have little regard for, or facility with, written language.  They have a strong preference for intuitive, non-verbal expression.  In my current practice, I represent a number of independent toy inventors and designers, some highly successful and others less so.  Almost without exception, professional inventors and inventing groups approach relationships with toy manufacturers with an almost servile attentiveness and are loath to create friction that might result in loss of access to the concept submission process.  This is particularly the case when inventors approach their relationships with major manufacturers such as Hasbro, Mattel and Fisher-Price because of their market dominance.  Inventors go to extraordinary lengths to avoid any action that would disrupt "the relationship" that they might have with such major manufacturers.

4.      As I indicated in my Expert Report, toy concepts are usually disclosed by outside inventors to toy manufacturers in the form of "kit-bash" models that may use pieces of existing toy and non-toy products assembled by the inventor and used to demonstrate the structure and/or function of a proposed toy concept, as well as in the forms of drawings and/or written descriptions.  It is fully understood and widely accepted in the toy industry that manufacturers expect to acquire new toy properties from inventors in "concept" form and to expend substantial company resources in refining, embellishing and expanding those concepts into "finished" licensed products and product lines.

5.      As I further indicated in my original Expert Report, I do not recall the occurrence of any manufacturer's marketing a product in the exact form submitted by an outside inventor.  The custom and practice for the 25 plus years of my participation in the industry has been to compensate inventors and designers for the underlying concept in its various product line manifestations regardless of revisions, enhancements and changes made by the toy company subsequent to submission.

6.      Central issues in this case are: (i) the extent to which concept submissions made to toy companies by outside toy inventors are changed by the time finished products incorporating the concept are ultimately offered for sale by the toy company; and (ii) the extent to which inventors are entitled to royalties for use of their concept or of products embodying, derived from, based on or influenced by the concept, regardless of changes or additions to the concept submissions that may be made by manufacturers after the disclosure.

### Two Types Of Play

7.      The play pattern of children when they use action figures is primarily that of "pretending" – that is they imagine that they are, or are assisted by, the heroic figures who usually are the centerpieces of action figure product lines.  For example, a young boy playing with a "Batman" figure will usually role-play being Batman, flying the "Batplane" and defeating

the "Joker". The "Rescue Heroes" product line is based upon these play patterns, which are generally termed "aspirational" – that is, the child aspires to <u>be</u> the hero character or to participate with the hero and to <u>achieve</u> heroic accomplishments.

8.      In contrast, children also play with toys like rubber balls and "Hula Hoops" that involve mainly mechanical or physical play patterns, and these toys may be termed "perspirational", for obvious reasons. In the case of the latter kinds of toys, the specific mechanical executions of the toys can have a significant impact. For example, when one toy company created the first foam football with a finned tail, the flying performance and accuracy of which was greatly enhanced in comparison with prior foam footballs, a large percentage of sales of prior foam footballs were diverted to that company. Similarly, when the "Hula Hoop" itself was improved by placing ball bearings inside the plastic tubing for making sound and enhancing the twirling action, significant sales were enjoyed by the "new" version. In each case, the specific design of the mechanical modification to the respective toy was essential to enhanced performance, hence to play enjoyment, hence to sales.

9.      Since action figure play is more driven by "pretending", the means by which the pertinent role-playing scenario is triggered are more intuitive (i.e. relating to what the child imagines rather than to how the laws of physics affect <u>performance</u> of a particular design or a device), and the structural details of the means for suggesting such a scenario are more subject to variation <u>without departing from the essence of the concept</u>.

## III.    PLAINTIFF'S SUBMITTED CONCEPT SATISFIES THE REQUIREMENTS OF "NOVELTY"

10.     On October 29th, 1998, Victor Reiling met with Paul Snyder, Vice President Research and Development of Fisher-Price, and disclosed a number of concepts including the concept at issue which was presented in the form of a working "kit-bash" prototype and a written description. In the first paragraph of the written description, Mr. Reiling included the sentence *"The film clips give the child a great start on fantasy adventures."* Later in the description the following sentence appears *"Film subjects would be available for each Rescue Hero and would provide action clips of obstacles and dangers each might face, animated clips of Rescue Heroes in action and the like."* The remainder of the written description focuses on the specific mechanism embodied in *the prototype* used to present the concept articulated, less than perfectly, in the two quoted sentences. Had more emphasis been placed upon the underlying subject matter of these two sentences, and less upon "films" as the visual medium and the specific mechanism embodying one execution of the concept so described, much of the camouflage used by Fisher-Price in defending this entirely justified claim by Plaintiffs would be even more readily transparent.

11.     However, as described above, the Plaintiffs were at a disadvantage in attempting to define their concept adequately in verbal expression, and Fisher-Price has unfairly seized upon this difficulty to try to justify their actions. Based on 30 years' experience in the toy industry, in my opinion, one accurate articulation of Plaintiffs' concept would be:

"A device associated with a Rescue Heroes figure (for example, part of a

3

backpack) for visually communicating to the mind of a child a cue or prompt for role-playing in which the child would use the Rescue Heroes figure and imagine accomplishing a mission assignment, resolving a dangerous situation, performing a rescue or engaging in some other adventurous pretend scenario."

12.    Although in the context of the current dispute, Fisher-Price seeks to dismiss Plaintiffs' concept as merely an "improvement to an existing product line" (which characterization has absolutely no materiality to the issue in dispute) and lacking in "novelty", nevertheless Fisher-Price acknowledged in a letter to Mr. Reiling dated 12/8/98 that when Mr. Snyder showed Plaintiffs' submission internally at Fisher-Price, the result was a *"genuine excitement level."* This letter communicates neither dismissal as an insignificant "improvement" nor a lack of "novelty" --- at the very least, this expression confirms that the concept was *novel to Fisher-Price*.

13.    This latter fact is confirmed by deposition testimony of David Ciganko, Fisher-Price's Vice President Product Design, in which he stated that Fisher-Price maintains a data base (of all prior products in the industry of which Fisher-Price is aware, all prior inventor submissions to Fisher-Price, and all prior product concepts developed internally by Fisher-Price) against which new submissions are checked for "novelty" early in the review process. Had Fisher-Price been aware of a prior concept in the nature of that submitted by Plaintiffs, according to the standards of "novelty" articulated in papers submitted in this action, Plaintiffs' concept would have been eliminated for "lack of novelty" long before Fisher-Price's having taken an option to license the concept.

14.    Therefore, the concept of Plaintiffs which Fisher-Price now characterizes as lacking in significance and in novelty had managed to successfully pass three stages of Fisher-Price's process for screening, evaluating and selecting outside inventor concept submissions: First, it had sufficiently impressed Mr. Snyder, the senior officer in the department at Fisher-Price responsible for identifying potentially marketable novel concept submissions; Second, it had survived the Fisher-Price data base review for "novelty to Fisher-Price"; and Third, not only did it *survive* an initial review by management of the pertinent Fisher-Price departments and by members of the very same creative team that ultimately developed the very same accused products at issue in this litigation, it had also generated a "genuine excitement level" within Fisher-Price.

## The Concept Selection Process

15.    The difficulty and significance of an outside concept submission's surviving each of these initial tests for selection should not be underestimated. Referring to the "Expert Report of Howard N. Bollinger on behalf of Fisher-Price, Inc." previously submitted in this case, and particularly Section B "The Product Submission Process", Mr. Bollinger describes the first of these thresholds --- the initial concept submission meeting --- and focuses on the criteria applied by company representatives, such as Mr. Snyder, in evaluating concepts at such meetings for determination whether they are sufficiently significant and novel even to bother going to the next step of internal company review. At Paragraph 6 of this section of his Expert Report, Mr. Bollinger articulates the standards for the

4

"…process of deciding to accept a concept for review or not during this meeting …. As noted previously, on a review form, a disposition for each idea is recorded with the choices being: accepted for further review, or rejected."

16.     In Subparagraph (b) of this section, Mr. Bollinger articulates a bullet-point listing of reasons for which the company reviewer might reject a submitted concept at such an initial meeting. These reasons include:

- "there is or has been something like it already in the market place";
- "does not fit into the company's line or positioning";
- "does not have adequate play value";
- "the company has already had the idea internally";
- "the company is working on something inside that is too similar";
- "the reviewer recollects seeing the same idea from another inventor;"
- "the company's current marketing slot for that type product is filled".

17.     In this case, the company representative was the chief officer of Fisher-Price's Research and Development Services, Mr. Paul Snyder. In order to ascend to such a position in a major toy manufacturer of the stature of Fisher-Price, one must not only be aware whether a concept would "fit into the company's line or positioning" and has "adequate play value", but one also must have sufficient awareness of the company's own internal developments and prior submissions from other inventors as well as whether there is or has been something like it already in the market place. By accepting the Plaintiffs' submission for further review, Mr. Snyder expressed the opinion that all of these criteria had satisfactorily been met.

18.     At Paragraph 9 of this section of Mr. Bollinger's Expert Report, he states that even after this initial review by the company representative has been successfully traversed, a submitted concept still has little chance of proceeding further. He says:

"A huge majority of products accepted for company review are ultimately rejected and returned to the inventor. Just as toy companies have established procedures for accepting ideas to review, they also have procedures for returning products after the internal review.

Therefore, at the next stage, the item can be eliminated from further review if any of the requirements fall short. If some, but not all requirements are met, then a decision can be made to option the item for an additional period of review in order to answer remaining concerns and questions about the product."

19.     From Mr. Bollinger's description of the obstacle course that must be completed in order to reach the "option" stage, not only must Mr. Snyder have believed in the Plaintiffs' concept, but also those Fisher-Price officials who were "excited" by it must have believed that it had real potential.

20.    At this point in his Expert Report, Mr. Bollinger appears to have had second thoughts about the implications to his client's case resulting from the fact that Plaintiffs' concept <u>did</u>, in fact, pass all these tests and <u>was</u>, in fact, the subject of an option agreement, facts that militate in favor of its significance to Fisher-Price <u>and</u> its novelty.  His tone changes as he continues:

> "Market research or product testing can occur at varied stages of the review and can be one reason to obtain an option period.  Sometimes companies will do an option based on not having had enough time to review the item, due to extenuating seasonal demands, such as Toy Fair or holidays/vacations.  Options are given generally for these reasons, but even at that, most optioned ideas do not eventually go to contract and in fact, are never produced."

21.    Mr. Bollinger continues to seek to dispel the significance of Plaintiffs' concept being subject to an option at Paragraph III A(2) of his Expert Report where he states:

> "Mr. Kipling, in his Expert Witness Report, states that the existence of an option agreement between the parties makes it '...clear...that... Fisher-Price recognized the commercial significance and advantages of Plaintiffs' concept...'.  To the contrary, the execution of an option agreement, in my experience of granting scores and scores of them, is to basically to give a company more time to review the concept in order to ascertain <u>IF</u> it has commercial significance, not to state <u>THAT</u> it 'clearly does'."

22.    As the only attorney at Kenner during Mr. Bollinger's tenure there, I can attest that there were not "scores and scores" of option agreements entered with inventors.  The rarity with which toy manufacturers enter option agreements under which they actually have to pay money to inventors is also confirmed in my current practice in which I represent inventors as well as toy manufacturers.  Inventors often complain about the length of time toy manufacturers almost invariably take in making final determinations whether to market a product based on a submitted concept.  Many times inventors will request option fees at some point during this process, but option agreements requiring payments are only rarely entered.

23.    What Mr. Bollinger neglects to mention is that options are entered by toy manufacturers far less frequently than license agreements themselves.  Because options entail payments to inventors for product concepts that may not ultimately be marketed, companies much prefer to avoid them entirely.  If a submitted concept is one the company is *certain that it intends to market in some form*, it will seek a license agreement shortly after submission.  If the *company is uncertain*, it will prefer to extend the review process <u>without</u> entering an option until it is certain one way or the other.  In the latter situations, companies have a variety of pat answers for deflecting inventors' requests for options, among which are that they are *so interested*, they want to go "right to contract" but must just "check out one more issue."  Inventors, loathe to be "too pushy", then continue to wait, often for a contract that never comes.

24.    As I have indicated, the fact that Plaintiffs' concept was optioned at all is very significant. It evidences that fact that: (i) as Fisher-Price itself stated, Fisher-Price was "excited" and serious about developing the concept; and (ii) it signifies that, as far as Fisher-Price was concerned, the concept was novel, because Fisher-Price in general, and Mr. Snyder in particular, never would have optioned a concept that they knew at the time was not novel. It would be against their business interest to do so.

25.    The true situation in this case is more properly described by the last sentence of Paragraph II B(9) of Mr. Bollinger's Expert Report in which he states:

> "For those *few product ideas in which all requirements are met*, the company may decide to go to contract negotiations for licensing the product from the inventor." [Emphasis added.]

26.    The foregoing characterization applies precisely to Plaintiffs' concept. There were, in fact, "contract negotiations for licensing the product from the inventor", and the terms that resulted from those negotiations were incorporated into the option agreement. In contrast, for as long as Mr. Bollinger and I worked together, and regardless of the accurate number of options that may have been granted during that time, *I do not recall a single such option that incorporated all of the essential terms for licensing the product from the inventor if the option were exercised*, as is the case in the option agreement which Fisher-Price entered pertaining to Plaintiffs' concept.

27.    This was no simple "holding agreement" as implied by Mr. Bollinger; this was serious business, as a result of an intention of Fisher-Price to go forward with marketing products embodying, derived from, based upon or influenced by Plaintiffs' concept.

## Initial Rejection and Submission of Alternative Executions of Plaintiffs' Concept

28.    Subsequently, Fisher-Price sent a letter to Plaintiffs (March 23, 1999) stating that they had decided to decline Plaintiffs' concept "…for the following reasons which boil down to cost." The reasons expressed included that the "film" was too expensive in that "unless the film was sold in multiple packs it is a one-trick pony. And, multiple packs would be even further out of our price range…". No mention was made of a "lack of novelty" in this rejection letter. Whether or not "price" was truly the cause for the Fisher-Price decision, the letter makes obvious that a lack of novelty was <u>not</u> the basis.

29.    Taking Fisher-Price at its word, Plaintiffs set about addressing the concerns expressed in the foregoing letter and submitted a different and less costly execution of their concept with a letter dated May 22, 1999. A less mechanical version was described and depicted which no longer required batteries or a motor, but uses "ambient light through a clear housing" to provide the child playing with a Rescue Heroes figure with a selection of visual cues for "…a great start on fantasy adventures…" by showing the child images of "…obstacles and dangers each might face…".    (the latter of quotations are taken from Plaintiffs' original concept submission.)

30.    Subsequently, Plaintiffs submitted yet another and even less costly variation of their original concept submission in a letter dated December 7, 2000. The letter states that it is the result of "...the costs of film strips that were of prior concern." This particular execution of the concept included a disc mounted on the backpack of the Rescue Heroes figure having six or more images which could be advanced manually by the child to view images any of a series of themed mission assignments and adventures associated with the Rescue Heroes characters. This structure allowed the child to "select" among the six or more scenarios for a Rescue Heroes story line pertinent to mission assignments or rescue situations.

31.    The submission also details and depicts the "camera man character" that had been suggested in the original submission by Plaintiffs to Mr. Snyder in 1998. Thus, Plaintiffs had provided three executions of their concept, the latter two of which addressed the "price" and "variety" issues that were the rationales on which Fisher-Price had previously rejected the first version, notwithstanding the "genuine excitement level" that it had instilled within Fisher-Price. In addition, Plaintiffs had fleshed out the look and feel of a specific character embodying the concept.

32.    Nevertheless, by letter dated January 5, 2001, Fisher-Price once again expressed that the concept was "too expensive for what it does", and with particular reference to the "camera man" character, states that "it does not fit the current Rescue Heroes theme." The rejection letter made no reference to "lack of novelty".

33.    That the "lack of novelty" issue has been raised entirely in hindsight and has no validity when applied to Plaintiffs' concept is obvious from the fact that Fisher-Price expended more than two years in the process of reviewing, evaluating, optioning, developing, and corresponding with Plaintiffs regarding the three variations and executions of their concept *without once having mentioned that the concept "lacked novelty"*.

34.    This is further highlighted by the reams of materials collected by Mr. Bollinger in a vain attempt to find even a single precedent combining the characteristics of Plaintiffs' concept throughout the history of the industry. From Mr. Bollinger's "Declaration In Opposition To Plaintiffs' Motion to Amend" as well as from Defendants' brief opposing the same motion, it is apparent that Mr. Bollinger and Fisher-Price believe that the closest item he was able to find is a line of "projector action figures" introduced by Toy Biz in 1993. However, even this hindsight effort fails because the Toy Biz product *simply does not fulfill the main purpose of Plaintiffs' concept* which was to "...give the child a great start on fantasy adventures...[by means of] clips of obstacles and dangers each might face...". At column three of the Toy Biz patent, the last sentence of the penultimate paragraph states:

> "In all events, the ability to project images *which may be related in some manner to the character of the toy figure*, greatly increases the "play value" and appeal of such a product to children." [Emphasis added.]

8

35.    Moreover, the projection device was located in the character's chest, not on or in its backpack; and the device was exclusively meant to project images onto a wall or through the chest, while Plaintiffs' concept principally envisioned that images would be viewed on or in the backpacks themselves.    These are important differences which highlight the fundamental irrelevancy of the Toy Biz product.    In other words, the Toy Biz figures function simply as *projectors of films that may be entirely unrelated to the characters*.    No reference is made to mission assignments, rescue situations or any story line associated with activities and pretend scenarios in which the child having the toy may be led to engage.    The Toy Biz figure *could as easily be used to project images of Charlie Brown and the Peanuts characters* as anything having to do with the figures themselves.    The Toy Biz products were merely film projectors having the interesting shape of character figures.

36.    Of greater significance to the issue at hand is the fact that Fisher-Price makes *no representation of foreknowledge of any of the materials* which Mr. Bollinger managed to locate in his extensive search of "prior art", including the Toy Biz figures, nor does Fisher-Price suggest that any of the materials dredged up by Mr. Bollinger *were used in connection with developing the products at issue*, nor that those products were based on, derived from or influenced by any of Mr. Bollinger's materials.    Clearly, the entire elaborate exercise of Mr. Bollinger is a pointless effort to distract and mislead the Court as to the true source and origin of the Rescue Heroes products which are now the subject matter of this litigation.    Simply put, nothing in evidence disproves the novelty of the concept submitted in three forms by Plaintiffs, despite the obviously exhaustive effort of Mr. Bollinger and others to locate "prior art" to show lack of novelty.    As such, Plaintiffs' concept was novel to both Fisher-Price and to the industry in general at the time of submission.

## IV.    FISHER-PRICE    USED    PLAINTIFFS'    CONCEPT    IN    DEVELOPING CATEGORIES OF ITS RESCUE HEROES PRODUCT LINE

37.    The following categories of Fisher-Price's Rescue Heroes product line embody, incorporate, are based on, derived from or influenced by Plaintiffs' concept submission:

- Mission Command Rescue Heroes
- Voice Tech Video Mission Rescue Heroes
- Rescue Heroes Aquatic Rescue Command Center
- Mission Select Rescue Heroes
- Mission Select Mountain Action Command Center
- Mission Select Police Cruiser, Fire Truck, and any other accessory items incorporating the "Mission Select" dial
- Optic Force Rescue Heroes

38.    As stated at Paragraph 12 hereinabove, one accurate description of Plaintiffs' concept is:

"A device associated with a Rescue Heroes figure (for example, as part of

9

a backpack) for visually communicating to the mind of a child a cue or prompt for role-playing in which the child would use the Rescue Heroes figure and imagine accomplishing a mission assignment, resolving a dangerous situation, performing a rescue or engaging in some other adventurous pretend scenario."

39.    As there are surely other ways to describe Plaintiffs' concept in words, there are surely many ways in which it can be developed into marketable executions, as exemplified by the wide variety of executions which Fisher-Price has so successfully (and so profitably) marketed.  Perhaps the listing in the preceding Paragraph 37 is not complete, but each is an example of an execution by Fisher-Price of Plaintiffs' concept.

40.    As set forth in my initial Expert Report, it is fully understood and widely accepted in the toy industry that manufacturers expect to acquire new toy properties from inventors in "concept" form and to expend substantial company resources in refining, embellishing and expanding those concepts into "finished" licensed products and product lines. Toy concepts are usually disclosed by outside inventors to toy manufacturers in the form of kit-bash models that may use pieces of existing toy and non-toy products assembled by the inventor and used to demonstrate the structure and/or function of a proposed toy concept.  The custom and practice in the toy industry has been to compensate inventors and designers for the underlying concept in its various toy product line manifestations, *regardless of revisions, enhancements and changes made by the toy company subsequent to submission.*

41.    *Prior* to receiving Plaintiffs' concept through the chief officer of its research and development services department, *prior to* experiencing  "a genuine excitement level for that product", prior to requesting an option on the concept so that Plaintiffs would be barred from disclosing to any competitor of Fisher-Price their concept and requiring that they agree to "treat in strictest confidence in a manner adequate to protect trade secret rights any information relating to" the concept, and *prior to* agreeing to all major material terms of a contemplated license agreement for Plaintiffs' concept, <u>Fisher-Price had no mechanism for visually communicating to the mind of a child a cue or prompt for role-playing in which the child would use the Rescue Heroes figure and imagine accomplishing a mission assignment, resolving a dangerous situation or performing a rescue or engaging in some other adventurous pretend scenario.</u>  Fisher-Price had introduced figures with *audio chips* so that the characters could appear to communicate with one another audibly under the designation "Voice Tech Rescue Heroes"; <u>however, the *visual aspect of communication was missing*.</u>

## Profit Margin Pressures

42.    As articulated by Fisher-Price's employee, Chris Pardi in his deposition testimony, Fisher-Price needed to introduce between two and six new product line variations each year in order to maintain "freshness" and keep the Rescue Heroes product line alive. Having observed and experienced similar pressures during my 25 years with Kenner Toys, whose principal product lines were action figures and accessories, I can attest to the pressure that this need places on an organization. *Because of this pressure, one understands why Fisher-Price felt such a "genuine excitement" upon receiving Plaintiffs' novel and extremely compatible concept* for adding the enjoyment of a visual component to the communication of adventure to

10

children using Rescue Heroes figures.

43.    Another continuing pressure that I experienced first-hand in the toy industry is the need for substantial profit margins on successful product lines. For every successful line a toy company has, no fewer than five or six fail. The profitability of the successful lines must cover all the losses on all the failures before they can even begin to make the company profitable as a whole. For this reason, profit margins on high-volume, low-priced products have always been a primary focus, because a few percentage points across a broad successful product line can make a difference of millions of dollars to a company's bottom line. Action figures are particularly subject to this concern, much as are razor blades to a razor manufacturer, because the *sales volumes of figures is so much greater* than the volumes of the higher-priced more profitable accessories with which the figures are used.

44.    It is no secret that the consolidation of the retail business environment and the growing power of companies like Wal-Mart, Target and Toys R Us to squeeze manufacturers' selling prices has made it more difficult for toy manufacturers to turn a profit. In the last three years alone, previously successful manufacturers like Hedstrom, Irwin Toy and Trend Masters have gone bankrupt and left the industry. It is also no secret that the parent company of Fisher-Price, Mattel, Inc., (the world's largest toy manufacturer), is suffering financially as its main product line, BARBIE® has sunk from sales well in excess of two billion dollars annually to sales substantially below that number.

45.    Taking into account all of the above-described internal pressures at Fisher-Price as evidence of a motive to deny Plaintiffs the compensation rightfully owed to them, at some point after Fisher-Price had negotiated to pay Plaintiffs a modest royalty for use of their concept, the company appears to have decided to avoid the royalty entirely and to keep the margin points for themselves instead.

## Contrived Denials

46.    As previously discussed in my Declaration of Support of Motion to Amend Complaint, the denials by Fisher-Price that it should be required to pay Plaintiffs for use of their concept has been based in part on hyper-technical reading of the results of Plaintiffs' hasty effort to adequately describe their concept in handwriting, in an unlined space, 9/16" x 4" on the Fisher-Price "concept submission form". In his own description of "The Product Submission Process" Mr. Bollinger states: "If the inventor *does not bring a written description*, either the inventor writes in the description or the company representative will fill out the description during the meeting and the inventor will then review and sign in agreement and then be given a copy". In fact, Mr. Reiling *did* submit a written description, but nevertheless was required to fill in the Fisher-Price submission form, presumably in hopes that he would define his concept in a way that would permit Fisher-Price to do exactly what it has done – deny payment for use of Plaintiffs' concept on the basis of their failure properly to articulate the concept.

47.    Alternatively, Fisher-Price relies on the restricted and convoluted description *drafted by Fisher-Price's own attorneys* as part of the Option Agreement. In each case, it is evident that the written description was of the *prototype* submitted by Plaintiffs, not the *concept*

11

*represented by the prototype*. The argument of Fisher-Price is that these written descriptions are not broad enough to cover the Fisher-Price executions of Plaintiffs' concept that it has marketed. The fact is that a fair interpretation of the concept submitted, as described above at Paragraph 38, encompasses each of the executions developed and marketed by Fisher-Price to date.

48.     Through Mr. Bollinger, Fisher-Price also argues that it "has not used Plaintiffs' Reel Heroes submissions or product idea in its Rescue Heroes products", because Mr. Bollinger's own comparisons of the "design features" between the three submissions by Plaintiffs do not correspond, item-by-item, with Rescue Heroes marketed products. Contrary to Fisher-Price's and Mr. Bollinger's argument, this is hardly surprising or significant. As explained hereinabove and in my original Expert Report, in virtually all cases, toy manufacturers modify substantially inventor's kit-bash prototypes and renderings before marketing products. This has also been admitted by Fisher-Price deponents Pardi, Berkheiser and Ciganko. Nevertheless, Mr. Bollinger goes to great pains to misrepresent the development process in Section III C of his Expert Report by listing in tabular form highly detailed verbal definitions of "features of Plaintiffs' submissions" in his own language. Based upon his flawed analysis, he has no trouble disclaiming their presence in the accused Rescue Heroes products.

49.     Over several pages of his Expert Report, Mr. Bollinger parrots arguments made by Fisher-Price counsel ridiculing efforts by Plaintiffs to overcome in depositions the obvious shortcomings in their verbal descriptions of their concept by attempting to generalize from specific mechanical elements to functional equivalents, (in much the same fashion that Fisher-Price has revised elements of Plaintiffs' concept in its marketed products). Ironically, the very efforts of Plaintiffs to articulate their concept verbally are ridiculed by Fisher-Price as "unfair". Use of that description evokes the ostensibly comforting statement contained in the Fisher-Price concept disclosure agreement that Plaintiffs were required to sign before Fisher-Price would review their concepts:

**"We assure you that we intend to deal fairly
with you in connection with your disclosure."**

50.     At some point in dealing with Plaintiffs' concept, it is apparent that Fisher-Price simply chose to ignore this principle.

## Fisher-Price Uses of Plaintiffs' Concept

51.     Fisher-Price had a continuing need to create "freshness" in its successful Rescue Heroes line (as stated by Mr. Pardi) and a powerful financial pressure for doing so at the lowest possible cost (as indicated by corporate profitability issues). *Prior to Plaintiffs' submission*, Fisher-Price had no version of Rescue Heroes which offered children a visual cue or prompt for role-playing in which the child would use Rescue Heroes figures to visualize accomplishing a mission assignment, resolving a dangerous situation, performing a rescue or engaging in some other adventurous pretend scenario. *After Plaintiffs' submission*, Fisher-Price has introduced four separate Rescue Heroes product lines each *embodying such visual cues* which Fisher-Price describes in catalog and packaging "sell copy" in the following interesting ways:

12

"Special Video Mission backpacks let these quick-response specialists see their next rescue mission…".

"Push backpack button for moving video image and sounds!"

"Kids can see and hear Warren Waters relay missions from space to the Rescue Heroes figures on earth."

"See and hear me assign missions!"

"It's loaded with exciting sound effects and "magical" Video Mission Cards that bring Mission Command to life.  Kids can see AND hear Warren Waters relay missions from space to the Rescue Heroes figures on earth."

"See & hear Voice Tech figures respond to mission commands!  Moving images of rescue missions appear on backpack screen."

"You're in charge.  You select the mission on each team member's dial.  And the Rescue Heroes Mission Select team turns up the team work!  Dial up the excitement with six different missions to choose from!"

*"For kids, these mission serve as "story starters" for their own imaginations to take off."* (Emphasis added)

52.    For a concept that Fisher-Price asserts is so "lacking in novelty", Plaintiffs' submission certainly has had an impact on subsequent Rescue Heroes' product lines.

## The Carterbench Rationale

53.    In deposition testimony, Messrs. Pardi, Berkheiser and Ciganko attribute the origin of the Voice Tech Video Mission Rescue Heroes product line to a company located in the UK by the name of Carterbench.  One of the documents turned over to Plaintiffs is a "License Agreement" between Fisher-Price and Virtual Video (UK) Limited, which is identified as an entity related to Carterbench.  The agreement bears May 21, 2001 as its "Effective Date".  The license agreement refers to various defined terms including "Licensed Subject Matter" that is defined to include certain patents and other proprietary rights, "Licensed Products" which are products using the "Licensed Subject Matter" within certain listed product categories and "Submitted Idea" which, despite being capitalized, *is not defined in the document.*

54.    The patents and patent applications included in definition of Licensed Subject Matter describe technology, elsewhere referenced in the document as "Virtual Video Technology", which improves the functional performance of lenticular lenses to enhance the variety of poses and smoothness of transition between poses of the images of the lens.  (Lenticular lenses have been used for many years in various toys and were initially developed decades ago).  In another aspect, the patented technology enables use of lenticular lenses to be coordinated with recordings on sound chips, giving the impression that a moving picture of a

13

person is speaking, or other action is coordinated with the related sound.

55.    Regarding the undefined "Submitted Idea", it is quite surprising that a professional organization like Fisher-Price, with a large and experienced internal legal staff, would execute an agreement in which the "Submitted Idea" was not defined at all, particularly in view of their insistence that the Plaintiffs' claim in this matter is defined and limited strictly to the terms of their verbal definition of the concept that they had submitted to Fisher-Price. It appears that the Submitted Idea was purposely left undefined for other reasons. Circumstances surrounding the entire Carterbench/Virtual Video License Agreement imply that to be the case.

56.    In his deposition testimony, Mr. Berkheiser admitted that the tangible submission from Carterbench was merely "a lenticular lens mounted in a white box". In the toy industry, such a device is commonly referred to as a "bread board" used to demonstrate only the operation of a mechanism and not its application in a particular product. There appears to have been no prototype or other operating example of the Virtual Video technology in a Rescue Heroes figure or accessory. There were indeed a number of sketches produced by Fisher-Price ostensibly prepared and submitted by Carterbench, but none of these bears a submission date earlier than *18 months after Plaintiffs' initial submission* was made, and none of these describes or depicts a product remotely similar to the "Rescue Heroes Aquatic Rescue Command Center", which Mr. Pardi has identified as the first product marketed under the license. Perhaps there are documents not yet provided to us, but in view of Fisher-Price's insistence that they are only obliged to pay for products that meet "...the description of their submission whether it be written, drawn or in model form...[and] inventors have no claim to product ideas that do not satisfy such descriptions", one wonders how that can be the case with respect to Carterbench.

57.    Another interesting question is how it came to be that Carterbench apparently signed the threshold submission disclosure agreement with Fisher-Price *more than three months after the dates that appear in a series of submissions ostensibly made pursuant to its terms.*

58.    But perhaps the most interesting question is why the Carterbench submission titled "Virtual Video Rescue Heroes Backpack" bears the note "Requested by Fisher-Price as part of Virtual Video per Dave C. 8/27/02, 3:20 pm." In his deposition testimony, Mr. Ciganko testified that Carterbench submitted the lenticular lens design concept that was "the basis of the Rescue Heroes Voice Tech Video Mission line, and that there is a document describing the submission." Is this a reference to the submission *requested by Mr. Ciganko himself?* Interestingly, Mr. Pardi contradicts this testimony and states that incorporation of the lenticular technology into Rescue Heroes Voice Tech Video Mission figures was a result of *his own suggestion*, combined with that of Mr. Chuck Scothon, Senior Vice President of Fisher-Price.

59.    The Carterbench license agreement contradicts the assertions of both of these gentlemen. In an amendment dated September 26, 2001 to the original license agreement dated and executed on behalf of Fisher-Price by Mr. Stan Clutton, Senior Vice President, an addition to the "Developed Product List and Royalty Rates" lists "Rescue Heroes Mission Tech Figures with Backpack (Asst-78177) [This assortment number is that of Rescue Heroes Voice Tech Video Mission figures.]-2.0%" with an asterisk accompanying this item that is explained in a footnote as follows:

14

" * We have agreed to pay a royalty on these items *even though they do not utilize the licensed Virtual Video Technology* because of Carterbench's involvement in the development of the item and/or suggesting incorporation of lenticular images in the item." [Emphasis added.]

60.     In any case, Carterbench is stated in the agreement to have been paid 2% on the line. Until a documented explanation has been put forth, it is difficult to reconcile these various questions, particularly in view of the simple "bread board" submission which appears to have been the only physical sample submitted, and the indication that Mr. Ciganko had requested the submission of the technology in a Rescue Heroes backpack.

## Other Executions By Fisher-Price of Plaintiffs' Concept

61.     Regardless of the origin of the Rescue Heroes Voice Tech Video Mission product line, *apparently Carterbench cannot be used as the genesis for an even earlier application of Plaintiffs' concept to the Rescue Heroes line.* Indeed, the "Voice Tech Mission Command" line was introduced by Fisher-Price not later than Toy Fair 2001 (several months prior to the effective date of the Carterbench license agreement) and included yet another execution of Plaintiffs' concepts as depicted in Exhibit F of the Declaration In Opposition To Plaintiffs' Motion To Amend by Christopher Pardi. This Rescue Heroes line includes "Special Mission Command cards which 'slide into backpacks' so these quick-response specialists can receive and respond to…" mission assignments.

62.     Each "mission card" includes a *visual representation* of a cue or prompt for role-playing in which the child would use the Rescue Heroes figure and imagine accomplishing a mission assignment. When slid into the figure's backpack, the image of the visual cue is readily *visible through a clear panel in the backpack* while a verbal message associated with the same mission assignment is articulated through a voice chip within the same mission card. The introduction of this product line pre-dated by at least several months the effective date of the Carterbench license agreement (May 21, 2001) and the amendment to the license agreement (September 26, 2001) which credited Carterbench with royalties for the Rescue Heroes Voice Tech Video Mission line, even though their technology was not used in that line.

63.     The subsequent "Mission Select Rescue Heroes" line was introduced in 2003 and incorporates in the backpack of each figure and in each accessory item a circular dial that includes a series of depictions of visual mission assignments which combines with verbal statements associated with those assignments. The Mission Select Rescue Heroes figures thus bear *a striking resemblance to the third execution of Plaintiffs' concept* that was submitted to Fisher-Price in December of 2000, in which a rotatable circular disc can be "dialed" to make visible a series of depictions of mission assignments to be selected by the child for play. In this recent product line, it appears that Fisher-Price has nearly replicated the disc arrangement of images as depicted in the referenced third submission by Plaintiffs.

## Carterbench "Royalty" Has Little Profit Impact

64.    While it certainly seems uncharacteristic for Fisher-Price to *voluntarily* make royalty payments that it and Carterbench both acknowledge are not due because the products do not use the Virtual Video technology (as stated in the amendment of September 26, 2001), perhaps the reasoning of Fisher-Price was that "paying" Carterbench would save money. Perhaps a more accurate explanation is that the lenticular technology of Carterbench, when seen by Fisher-Price, appeared to be *an inexpensive method of executing Plaintiffs' concept within the Rescue Heroes line.* Further, as analyzed below, paying Carterbench 2% instead of paying 3% to Plaintiffs was only the beginning of the savings that Fisher-Price anticipated enjoying.

65.    Carterbench *receives royalties on no other Rescue Heroes products* besides the Aquatic Rescue Command Center and the figures within assortment numbers 78177, the Voice Tech Video Mission figures. This is convenient for two reasons. First, if Fisher-Price can use the Carterbench relationship to excuse its obligations to pay Plaintiffs for use of their concept, it will have *no inventor royalty payments* to be made on any of the other such figure categories incorporating visual cues of mission assignments or as "story starters" for adventures. Second, the advance payment that was made upon execution of the Carterbench license agreement was $200,000, and the sales information provided to Plaintiffs through discovery indicates that Fisher-Price has recouped less than half of that sum against royalties generated by the Aquatic Rescue Command Center and other products in the Fisher-Price line which use the Virtual Video technology. (Certain of these products are unknown to Plaintiffs because their identities have been redacted from the documents provided.)

66.    This under-recoupment was the case when Fisher-Price added the Voice Tech Video Mission figure line to the license agreement, despite the absence of Virtual Video technology from those products, and a reasonable question is whether this addition *actually will cost Fisher-Price anything at all.* That is, having paid $200,000 as an advance and being in an unrecouped position, if Fisher-Price does not make sufficient applications of the Virtual Video technology to amortize the entire advance, the addition of Voice Tech Video Mission figures to the license agreement has *no financial impact on Fisher-Price at all.*

67.    In view of the contradictions, inconsistencies, questionable application and timing of the Carterbench "submission", it cannot explain away Fisher-Price's uses of Plaintiffs' concept or insulate them from Fisher-Price's obligations to Plaintiffs.

## VI.    ADDITIONAL PRODUCTS FOR WHICH FISHER-PRICE IS OBLIGATED TO COMPENSATE PLAINTIFFS

68.    In my experience, products that fall within any of three categories of connection to the Plaintiffs' concept should bear royalty, and should be subject to payment by Fisher-Price in the current case:

(a)    Category 1 includes those Fisher-Price products that use, embody, are based on, derived from or influenced by the Plaintiffs' concept. That these products are appropriately subject to the royalty obligation of Fisher-Price to Plaintiffs goes without saying.

16

Products of Fisher-Price within Category 1 include, but may not be limited to, "Mission Command Rescue Heroes", "Mission Select Rescue Heroes", "Voice Tech Video Mission Rescue Heroes", at least the "Telly Photo" figure and accessories in the "Optic Force Rescue Heroes" product line, and any other current or future product that meets the criteria of this Category 1.

Regarding the "Tellyphoto" figure, Mr. Pardi testified in deposition that, despite its similarity to Plaintiffs' description and depiction of a nearly identical figure in their third submission, Fisher-Price should not be obligated to Plaintiffs because Fisher-Price had previously marketed a "camera man" figure in their "Adventure People" product line. That product is described in Mr. Pardi's Declaration In Opposition To Plaintiffs' Motion To Amend and is shown in a page from the 1978 Fisher-Price catalog which describes the product as a *series of figures* comprising a TV news camera crew having a child-size camera (i.e., in scale to the child user, <u>not</u> to the figures) with a fish-eye lens that the child would hold or roll around. The product is completely unlike the TellyPhoto figure that carries a toy camera *scaled to the figure*, nor is there a thematic connection in the Adventure People product which would suggest inclusion of such a figure and character within the Rescue Heroes product lines. In other words, this is yet another red herring introduced by Fisher-Price. Not having seen samples of the other "Optic Force" Rescue Heroes figures, I am unable to determine whether they would fall within the purview of this Category 1 classification. It appeared from descriptions of those figures I observed on the Fisher-Price website some weeks ago, more than one of those figures embodies the characteristics of Plaintiffs' submission, but in returning to the website more recently for confirmation, I find that only TellyPhoto figure remains on the site. Perhaps the other related Optic Force figures have been eliminated from the product line.

(b)    <u>Category 2</u> includes those products which are sold together with or are marketed by Fisher-Price specifically for use with any of the Category 1 products (commonly referenced in the toy industry as "accessories"). In the present case, such products include, but may not be limited to, the "Mission Select Police Cruiser", the "Mission Select Firetruck", the "Mission Select Mountain Action Command Center", the "Voice Tech Rescue Firetruck", the "Voice Tech Rescue Jet", the "Voice Tech Police Cruiser", the "Aquatic Rescue Command Center".

Certain of the products listed in the preceding paragraph incorporate the "Mission Select" circular dial by which the child selects a visual image of a mission assignment, and as a result those products could also be classified as Category 1 as set forth hereinabove. It is my understanding that certain of the vehicle accessory products have been sold together with Voice Tech Video Mission Rescue Heroes figures, and all of such accessory vehicles (and any other accessories sold together with the Video Mission figures or any of the figures for other products listed in Category 1 above) would be royalty bearing under this Category 2.

In addition to the foregoing, if any accessory product (such as a vehicle or other accessory adapted to be used with Rescue Heroes figures) *is not marketed together with* Rescue Heroes figures, then it is appropriate that Fisher-Price pay to Plaintiffs compensation in the form of a royalty against <u>that fraction of all sales of such accessories</u> during a particular time period (for convenience, one calendar year) in <u>proportion to a fraction,</u> the <u>numerator</u> of which is the

17

sum of all units of Rescue Heroes figures that are subject to the royalty obligation to Plaintiffs (that is, those figures identified in Category 1 above), and the <u>denominator</u> of which is the total number of all Rescue Heroes figures of all types sold by Fisher-Price within that same calendar year. For example, if one million Rescue Heroes figures of all types were sold during a calendar year, and of that total, 400,000 figures were subject to the royalty obligation to Plaintiffs under Category 1 hereinabove, then 40% of all sales of accessories should be subject to the royalty obligation to Plaintiffs. In my experience in the toy and game industry, this formula has been used to apply royalties to undifferentiated accessories usable with various products, some of which bear royalties to inventors and others of which do not.

      (c)    <u>Category 3</u> includes those products and services marketed or licensed by Fisher-Price that arise out of the images, trademarks or other *elements of the popularity and goodwill* created by Category 1 or Category 2 products, but which are not themselves within either said category.

Revenues enjoyed by Fisher-Price as the result of these Category 3 products and services exist only as the result of the popularity of the Plaintiffs' concept as executed, distributed and promoted in the marketplace. Examples of this category typically include kids' lunch boxes, apparel, video games and other products and services that use the images, names, etc. which are specific to the Category 1 and/or Category 2 products. In this case, they would include such Fisher-Price (or its licensees') products as videos, DVDs and video games that specifically depict or are sold together with "Mission Select" or "Voice Tech Video Mission" or "Mission Command" Rescue Heroes figures or accessories and any other products and services that currently or in the future are marketed by Fisher-Price which fulfill the criteria of Category 3. It should be noted in this regard that participation of the outside concept submitter (e.g. Plaintiffs) in revenues arising from Category 3 products and services is typically a subject of negotiation in the license agreement by which the concept is originally licensed to the toy company, but the obligation in this case is appropriate because the actions of Fisher-Price have deprived Plaintiffs of the opportunity to participate in that negotiation.

\*    \*    \*    \*    \*

## VII.   <u>CONCLUSION</u>

69.    In my opinion, based upon thirty years experience in the toy and game industry and particularly in connection with the customs and practices of cooperation between manufacturers and outside inventors, Fisher-Price has not lived up to its obligations to Plaintiffs. The senior officer of its Research and Development Services department reviewed Plaintiffs' submission and was sufficiently impressed with its novelty and the significance of its marketing potential that he arranged to take Plaintiffs' prototype and related descriptive materials inside Fisher-Price for further study. The concept was then vetted against the Fisher-Price database of all prior product concepts of which Fisher-Price had any awareness, and was confirmed to be novel to Fisher-Price. Next, Plaintiffs' concept was shown to executives of Fisher-Price in a management review of outside inventor product submissions and to members of the Rescue Heroes creative team, and the response of Fisher-Price was "genuine excitement". As a result of

18

this excitement, Fisher-Price negotiated an option agreement with Plaintiffs that went far beyond a "holding agreement" and included all major material terms for license agreement that would result from Fisher-Price's exercise of the option --- in fact, Plaintiffs had no "exit" from the obligation to follow through and execute a license agreement should Fisher-Price wish to proceed. At some subsequent point, however, Fisher-Price appears to have decided that paying Plaintiffs for use of their concept was not compatible with the financial pressures under which Fisher-Price found themselves.

70.    Admitting in deposition testimony to a lack of awareness of any prior product that visually communicated to the mind of a child a cue or prompt for role-playing in which the child would use Rescue Heroes figures and imagine accomplishing a mission assignment, resolving a dangerous situation, performing a rescue or engaging in some other adventurous pretend scenario, *but nevertheless desiring to use this concept*, Fisher-Price decided to disregard the rights of Plaintiffs and to develop a series of such products which have been the centerpieces of the Rescue Heroes product line for more than three years. In response to Plaintiffs justified inquiry, Fisher-Price has resorted to threats, termination of longstanding and valuable business relationships, hyper-technical legalistic arguments concerning verbal definitions of visually communicated concepts, contrived and specious arguments of lack of "novelty", and apparently contrived license relationships with a third party.

## The "Five-Minute" Decision

71.    Perhaps the attitude of Fisher-Price toward their obligations to Plaintiffs is best exemplified by the facile description by Christopher Pardi of the Fisher-Price decision to reject Plaintiffs' concept. When asked in deposition, Mr. Pardi alleged that the decision to decline Plaintiffs' submission occurred during a meeting he had with his immediate superior, Mr. Ken Morton, along with Mr. Berkheiser. Mr. Pardi testified that Mr. Morton asked him to review Plaintiffs' concept in all of the three executions in which it was submitted to Fisher-Price by Plaintiffs, and that Mr. Morton asked him:

> "...whether we should ---what we thought--- what I thought of it, and I said, I think it's --- doesn't really fit into our line, because we have our basic figures which we can't afford to put electronics and all those types of components into and then we have our Voice Tech and this doesn't have voice."

72.    Mr. Pardi alleges that Mr. Morton agreed with this off-hand assessment and "said that he would send it back", and <u>that the entire review and the disposition of Plaintiffs' concept took no longer than "four minutes, five minutes", and that he "never heard of Plaintiffs' concept again."</u>

73.    That this ludicrous description of the alleged disposition of a concept, that had passed all Fisher-Price tests for negotiation of license terms and had sparked "genuine excitement" within Fisher-Price management and the Rescue Heroes creative team, is even suggested strains credibility and flies in the face of all events that had preceded it. The callous disregard for Plaintiffs' rights that it exhibits gives an insight into the contempt of some executives of large companies like Fisher-Price toward outside inventors and others who are

dependent upon maintaining favorable relationships with such companies.

This attitude demands imposition by the Court of an appropriately stern remedy.

James M. Kipling

Date: January 31, 2005

<u>**EXHIBIT I**</u>

**ADDITIONAL DOCUMENTS REVIEWED**

1. Second Amended Complaint, *Victor G. Reiling Associates v. Fisher-Price, Inc.,* No. 3:03 CV 222 (JBA) (District Court of Connecticut, dated November 19, 2004), with Exhibits A through U attached
2. Confidentiality Stipulation and Order dated August 26, 2003
3. Deposition Transcripts of Fisher-Price witnesses Christopher M. Pardi (11/12/03); Henry Schmidt (11/12/03); Tyler Berkheiser (11/13/03); and David Ciganko (11/13/03)
4. Samples of Rescue Heroes products sold by Fisher-Price
5. Plaintiffs' Responses to Defendant's Second Set of Interrogatories, dated March 3, 2004
6. Plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories, dated January 20, 2005
7. Expert Report of Howard N. Bollinger, dated February 3, 2004
8. Memorandum of Law in Support of Plaintiffs' Motion for Leave to File a Second Amended Complaint, dated February 6, 2004
9. Declaration of Howard N. Bollinger, dated February 17, 2004
10. Declaration of Christopher Pardi, dated February 18, 2004
11. Declaration of Robert J. Lane, Jr., dated February 19, 2004
12. Fisher-Price's Memorandum in Opposition to Plaintiffs' Motion to Amend and in Support of its Motion to Strike, dated February 20, 2004
13. Reply Declaration of Bruce Popek, dated March 4, 2004
14. Reply Declaration of Victor G. Reiling, dated March 4, 2004
15. FP0336-FP0412:  Fisher-Price/CarterBench License Agreement
16. FP0297-FP0300; FP0305-FP0308; FP0533-FP0536:  Revised Contract Summaries reflecting amendments to Fisher-Price/CarterBench License Agreement
17. FP0922-FP0923:  Letter of Intent from Fisher-Price to CarterBench
18. FP0318; FP0768-0771; FP0895; FP0896-FP0906; FP0913; FP0941:  Fisher-Price External Design Reports re: CarterBench
19. FP0942-FP0945:  Fisher-Price Product Disclosure Form re: CarterBench
20. FP0542; FP0581-FP0582:  Fisher-Price Email re: CarterBench
21. FP0001-FP0005; FP0240:  Fisher-Price External Design Reports re: Victor G. Reiling Associates