Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---------------------------------)
VICTOR G. REILING ASSOCIATES     )
and DESIGN INNOVATION, INC.      )
        Plaintiff(s),            )
VS                               ) Civil Action No.
                                 ) 3:03 CV 222 (JBA)
FISHER-PRICE, INC.               )
        Defendant(s).            )
---------------------------------)

COPY

DEPOSITION of: BRUCE POPEK
DATE:          January 28, 2005
HELD AT:       Robinson & Cole
               280 Trumbull Street
               Hartford, Connecticut

Reporter: JENNY C. EBNER, RPR, LSR 00030.
BRANDON SMITH REPORTING SERVICES, LLC
            44 Capitol Avenue
            Hartford, CT. 06106
              (860) 549-1850

Page 90

1   Doh play sets?
2        A    It was a stand-alone product.
3        Q    Okay.  So you would buy a box with Buzzin'
4   Buzz Saw in it?
5        A    Right.  And it came with Play Doh.
6        Q    And it came with Play Doh, and was extra
7   Play Doh sold right on the shelf next to it?
8        A    Yes.
9        Q    Did you get royalties on the extra Play
10  Doh that was sold immediately next to your Buzzin'
11  Buzz Saw product?
12       A    Unfortunately no, but if that Play Doh had
13  said Buzzin' Buzz Saw Play Doh and featured
14  wood-smelling Play Doh that was featured in our
15  product, perhaps we would be entitled to it.
16       Q    Do you think you would be entitled to it
17  if you hadn't negotiated it with your license
18  agreement with Play Doh?
19       A    Yes, because it would be considered an
20  extension of our concept.
21       Q    Isn't line extension -- strike that.
22            Isn't it true that royalties on line
23  extensions are specific negotiations between
24  inventors and toy companies?
25       A    I believe so.

Reiling vs Fisher-Price

1-28-2005                                                     Bruce Popek

Page 122

```
1       A    The phone call was with Stan Clutton, who
2    we were dealing with on the Reel Heros at that
3    point, and we were trying to come to terms, to an
4    agreement.
5            Stan had said if we couldn't reach an
6    agreement or settlement and we pursued the lawsuit,
7    that Fisher-Price's policy or Mattel's policy, not
8    Fisher-Price's but Mattel's policy was that they
9    would have to stop doing work for us.
10      Q    You understood that Mattel was
11   Fisher-Price's parent corporation?
12      A    That is correct.
13      Q    And did you understand that the
14   conversations you were having with Mr. Clutton were
15   in the context of settlement discussions?
16      A    At that point we were hoping for a
17   settlement.
18      Q    You knew you were discussing settlement
19   with Mr. Clutton.  Correct?
20      A    We were trying to discuss settlement with
21   Mr. Clutton.  At that point there was no offers on
22   the table nor -- there was nothing suggested as a
23   settlement.  I think Mr. Clutton was saying what
24   would happen if we didn't settle.
25      Q    How did you respond?
```

Brandon Smith Reporting

6c29d58b-d890-4cdc-8f24-c0c2d25318b8

1    A    Are you asking for specific information
2    about that?
3    Q    Any information.
4    A    I have no specific information.
5    Q    Do you know who the outside inventor is
6    that submitted the Optic Force line to Fisher-Price?
7    A    I have been told it's BangZoom.
8    Q    Do you know those people?
9    A    No.
10   Q    Have you ever heard of them?
11   A    Yes, I have.
12   Q    If it were proven that BangZoon
13   independently developed Optic Force line of Rescue
14   Heros, would that impact your view as to whether you
15   have a claim to those figures?
16   A    No.
17   Q    Why not?
18   A    There is prior history that -- with
19   Fisher-Price and Design Innovation and other
20   inventor groups that there's been -- there's been
21   product that we have brought in, shown, repeatedly,
22   that was returned to us, and at a later point the
23   same, similar-type concept, variation of it,
24   perhaps, was shown to Fisher-Price, and they decided
25   to market it, and at that point, after being brought

Page 128

1  to Fisher-Price's attention, that there was an
2  oversight that we had shown them this concept
3  before, and they agreed to pay us royalties.
4      Q   What product was that?
5      A   Fisher-Price's Bubble Sprinkler.
6      Q   Who was the other inventor?
7      A   I am not sure.
8      Q   Sorry?
9      A   Could be M Design.
10     Q   And did Fisher-Price pay you a reduced
11 royalty in that circumstance or did they pay you the
12 original royalty that had been discussed when you
13 submitted the idea?
14     A   The royalty was probably a reduced
15 royalty, but I don't know what percentage it was.
16     Q   I take it you dealt with inventor relation
17 people at a number of different toy companies; is
18 that true?
19     A   Not that many. Most of the marketing of
20 our inventions is done through people like Vic
21 Reiling or Kiscom Group that reps us, and they do
22 most of the leg work dealing with inventor relation
23 people.
24     Q   Okay. In connection with the Reel Heros,
25 Vic Reiling was representing Design Innovation and