

1              UNITED STATES DISTRICT COURT

2              DISTRICT OF CONNECTICUT

3                - - -

4  VICTOR G. REILING ASSOCIATES    )
    AND                        )
5  DESIGN INNOVATION, INC.,       )
                              )
6              PLAINTIFFS,    )
                              )
7  VS                     )  CIVIL NO. 303 CV 222
                              )          (JBA)
8  FISHER-PRICE, INC.,          )
                              )
9               DEFENDANT.     )
    -----------------------------------

10

11

12

13

14          DEPOSITION OF:  JAMES M. KIPLING

15              CINCINNATI, OHIO

16             JANUARY 30, 2004

17

18

19              **ORIGINAL**

20

21

22

23  REPORTER:  JILL M. DRAGON SANDY

24

25

1    been considering it every five years for the last 20 years?

2              A.    That's a different situation.

3              Q.    Well, answer that situation.

4              A.    I think that if they did it, I think if

5    the toy company were to do what it had been doing and pull

6    it out again in another five years and try it again in five

7    years, that would be one thing.  If they recognized that now

8    is the time for this thing (indicating), or if the inventor

9    brought it in with a wrinkle that caused it to be of greater

10   interest, in either of those situations, I think that the

11   common practice would be to probably negotiate this guy

12   down, but to give him something.

13             Q.    Even if you had the exact same thing in

14   your file?

15             A.    I think that would be the way it would

16   be handled.

17             Q.    And are you testifying there is a legal

18   obligation to handle to that way?

19             A.    I'm telling you the way it's normally

20   handled.  Whether that's converted now, in this industry,

21   into a legal obligation, I think that's probably something

22   for a jury.

23             Q.    Isn't the truth, though, that every case

24   is different, that sometimes what you said is correct and

25   other times people don't handle it that way?

1          A.    I think it's more commonly handled the
2    way that I'm articulating it.
3          Q.    Do you mean 51/49 or do you mean 90/10?
4          A.    I can't -- it's more commonly than not.
5          Q.    Okay.  And that's all you can say?
6          A.    Yes.
7          Q.    All right.  Because when we're getting
8    at custom and practice in the industry, I guess I haven't
9    gotten your definition of what that means yet.  What does
10   custom and practice in the industry mean?
11         A.    What is the normal practice.
12         Q.    Does it mean it's always done that way?
13         A.    No, it means, you know, more often than
14   not.
15         Q.    So is your testimony based on the idea
16   that if something is done more often than not one way, --
17         A.    Routinely.
18         Q.    Okay.  Well, what does "routinely" mean?
19         A.    I think it's more often than not,
20   routinely.  It's -- this is the way that things are normally
21   handled in the particular industry that you're talking
22   about.
23         Q.    Is your expert opinion here based on the
24   idea that if something is more often than not done one way,
25   that a toy company is legally obligated to do it that way?

1          A.    I think the jury would have to say that.

2          Q.    Well, whatever you testify -- I'm sorry.

3                Whenever you say in your expert report

4     that the custom and the practice in the industry is such and

5     such, all you mean is more often than not?

6          A.    I would expect that it would be binding.

7          Q.    And what is your expectation based on?

8          A.    My view of the propriety of the way that

9     it's done and the fact that it has been done that way

10    routinely.

11         Q.    I mean, let's go back to the line

12    extension idea.  You've already testified that line

13    extensions and whether inventors get royalties for them is a

14    matter of negotiation between the parties, right?

15         A.    Line extensions beyond what we call

16    accessories.

17         Q.    There must be, because there's only two

18    choices, either line extensions are paid for or not, there

19    must be one of those two choices that's more common than the

20    other?

21         A.    Now, my point there is that that is a

22    matter of negotiation.  And in this particular situation, if

23    I can bring it into this context, that was what was taken

24    away, the opportunity to negotiate.

25         Q.    The decision of whether to pay for

1    accessories is also a matter of negotiation, isn't it?

2                    A.    It can be.

3                    Q.    And sometimes toy companies refuse to

4    pay for accessories, right?

5                    A.    Sometimes.

6                    Q.    And they have that right?

7                    A.    If the other party will agree.

8                    Q.    I mean they have the right to say to an

9    inventor I won't license your product unless you give up the

10   right to royalties on accessories?

11                   A.    They have the right to say I won't give

12   you 5 percent, I'll give you 1 percent, and then, you know,

13   it's a matter of a decision.

14                   Q.    Now, have you seen any disclosure

15   submitted by plaintiffs to Fisher-Price that disclosed the

16   use of an image on the outside of a Rescue Heroes figure

17   backpack?

18                   A.    It appears that each of the submissions

19   involved some manner of having the visual cue visible from

20   the outside but contained on the inside.

21                   Q.    When you say that the submissions had

22   the visual cue visible from the outside, isn't it true that

23   in every instance the child had to put his or her eye up to

24   a viewing lens in order to see the image inside the

25   backpack?