```
 1                UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF CONNECTICUT
 3
 4   VICTOR G. REILING AND       : INDEX NO. 303CV222
 5   ASSOCIATES AND DESIGN       :
 6   INNOVATIONS, INC.           :
 7        Plaintiffs,            :
 8   v.                          :    ORIGINAL
 9   FISHER-PRICE, INC.          :
10        Defendant.             :
11   ----------------------------------------------------
12        Deposition of JAMES KIPLING, taken on
13   Thursday, February 10, 2005, at the offices of
14   Frost, Brown, Todd, 201 East Fifth Street, 2200 PNC
15   Center, Cincinnati, Ohio, before Susan M. Barhorst,
16   Notary Public.
17
18
19
20
21
22              GIGLIO REPORTING SERVICES
                   3 CYPRESS GARDEN
23              CINCINNATI, OHIO 45220
                     513-861-2200
24
```

1  agreements with inventors at the present time and
2  limits its obligation to anything in a written
3  contract?
4       A.    I'm not sure. I do know that they
5  disclaim confidentiality.
6       Q.    And Fisher-Price --
7       A.    I can visualize the form, but I can't
8  tell you exactly.
9       Q.    Is it fair to say that there is no
10 practice in the industry that inventors'
11 submissions will be kept confidential?
12      A.    Well, I know that there are many
13 companies that have no forms at all. I know that
14 there are companies like Mattel who take that
15 position. I know there are companies like Hasbro
16 who take the position that I developed where they
17 limit their receipts of submissions to professional
18 inventors like Mr. Reiling and do undertake
19 obligations of confidentiality. And I can't say --
20 I can't state what is the preponderance.
21      Q.    That's really what I was asking. And
22 I think that answers it. I just want to make it
23 more clear.
24            Is it fair to say that you cannot

```
 1   testify that there is any particular custom and
 2   practice in the industry with respect to whether
 3   toy companies commit to keep inventors' submissions
 4   confidential?
 5        A.   I can testify that there are a variety
 6   of practices.
 7        Q.   On both sides of that issue?
 8        A.   Yes.
 9        Q.   Some toy companies submit to keep
10   inventors confidential and others expressly refuse
11   to do so, right?
12        A.   Yes.
13        Q.   And isn't it also true that some toy
14   companies disclaim any implied obligation to
15   inventors and limit their obligation to whatever is
16   assumed by written contract?
17             MR. DIZE:  Objection.
18        Q.   Have you seen terms like that?
19        A.   Yeah, I think so.
20        Q.   I mean, like the one we just saw in
21   the Hasbro documents in the case marked as Exhibit
22   280?
23        A.   Yes.
24        Q.   Are you familiar with the fact that
```

1  isn't it?
2        A.    Those are two different things.  I
3  think accessories more often -- much more often
4  than not are included.
5        Q.    But sometimes they're not?
6        A.    Sometimes.
7        Q.    And line extensions are often not
8  included in license agreements, correct?
9        A.    It's a matter of negotiation.
10       Q.    Right.  And a toy company can in good
11 faith take the position that they won't pay an
12 inventor on accessories in line extensions?
13       A.    In this case, Fisher-Price didn't
14 proceed in good faith.  They didn't exercise the
15 option and they used the concept anyway.
16       Q.    Mr. Kipling, we're not talking about
17 Fisher-Price.  Did you understand that from my last
18 question?  Did you understand we're talking about
19 the toy industry in general?
20       A.    Fisher-Price is part of this sentence.
21 I mean, you're talking all about Fisher-Price.
22       Q.    Mr. Kipling, do you understand that
23 you're -- you have given opinions about custom and
24 practice in the toy industry?  You've done that

```
 1   Fisher-Price wish to proceed."  Closed quote.
 2        A.   Well, assuming that the negotiation
 3   proceeded in good faith.
 4        Q.   Right.  And Fisher-Price could take in
 5   good faith the position that they only had to pay
 6   royalties on products that actually embodied the
 7   Plaintiffs' concept, couldn't they?
 8        A.   Well, if there's -- if there is any
 9   conflict between the way I had described the
10   document and the content of the document that says
11   that there would be further negotiation, I'd have
12   to go with the document.
13        Q.   I'm asking about your opinion, sir.
14   You did say that Plaintiffs had no exit from the
15   obligation to follow through and execute a license
16   agreement.  You're sticking with that opinion,
17   aren't you?
18        A.   To follow through and execute a
19   license agreement, assuming that the negotiation
20   yielded something that was fair and reasonable.
21        Q.   It is considered a good faith position
22   in the toy industry to tell an inventor that I'll
23   give you royalties on products which embody your
24   concept, but not on accessories or line extensions,
```

```
 1  isn't it?
 2       A.    Those are two different things.  I
 3  think accessories more often -- much more often
 4  than not are included.
 5       Q.    But sometimes they're not?
 6       A.    Sometimes.
 7       Q.    And line extensions are often not
 8  included in license agreements, correct?
 9       A.    It's a matter of negotiation.
10       Q.    Right.  And a toy company can in good
11  faith take the position that they won't pay an
12  inventor on accessories in line extensions?
13       A.    In this case, Fisher-Price didn't
14  proceed in good faith.  They didn't exercise the
15  option and they used the concept anyway.
16       Q.    Mr. Kipling, we're not talking about
17  Fisher-Price.  Did you understand that from my last
18  question?  Did you understand we're talking about
19  the toy industry in general?
20       A.    Fisher-Price is part of this sentence.
21  I mean, you're talking all about Fisher-Price.
22       Q.    Mr. Kipling, do you understand that
23  you're -- you have given opinions about custom and
24  practice in the toy industry?  You've done that
```

1  haven't you, sir?
2      A.   Not before this.
3      Q.   No. In your opinion, you've given
4  opinions about custom and practice in the toy
5  industry, right?
6      A.   Yeah.
7      Q.   Okay. Isn't it true that toy
8  companies -- in fact, toy companies you've
9  negotiated with have taken the position that they
10 will pay royalties on products that embody an
11 inventor's concept, but not on accessories or line
12 extensions?
13     A.   They have.
14     Q.   And regardless of whether you agree
15 with it, that's still considered to be a good faith
16 position for a toy company to take, isn't it?
17     A.   It doesn't always prevail.
18     Q.   Right. But it's a good faith position
19 for a toy company to articulate, right?
20     A.   I would say that the toy company would
21 be in good faith in representing its position in
22 that way. But in this case, there was no
23 negotiation.
24     Q.   I'm not asking you about whether there

1  was negotiation. You keep wanting to talk. This
2  is not a chance for you to talk. You're supposed
3  to answer my questions, not just give little
4  speeches in between the question, which is what's
5  happening here.
6          You know, with but, in this case, such
7  and such, which is totally unresponsive to my
8  question. It's just trying to kill time and run
9  out the clock.
10     A.    No, I'm trying to give good, accurate
11  and full answers to those questions.
12     Q.    No, you're trying to say things that
13  have nothing to do with my question.
14          Now, if Fisher-Price had exercised the
15  option, Exhibit 210, it could have taken the
16  position in good faith, in those circumstances
17  where it had exercised the option, that it was not
18  going to pay royalties on line extensions or
19  accessories, right?
20     A.    We'll never know.
21     Q.    I'm asking you for your opinion --
22  your opinion as an expert in the toy industry,
23  Mr. Kipling.
24          If Fisher-Price had exercised the

1  option in Exhibit 210, and in negotiating a
2  license, had taken the position that it would not
3  pay royalties on line extensions or accessories,
4  that would have been a good faith position?
5      A.   Yes.
6      Q.   If Fisher-Price had exercised the
7  option in Exhibit 210 and, in negotiating a
8  license, had taken the position that it would not
9  pay royalties on category three products, that
10 would have been a good faith position consistent
11 with practice in the toy industry; correct?
12     A.   Correct.
13     Q.   Can you turn to page 17 in your
14 report?
15     A.   Okay.
16     Q.   You're talking about the 1978
17 Fisher-Price --
18     A.   Second -- first full paragraph?
19     Q.   Yes.  The 1978 Fisher-Price TV news
20 camera crew.
21     A.   Mm-hmm, yes.
22     Q.   And you indicate that the camera is,
23 quote, "in scale to the child user, not to the
24 figures."  Closed quote.