UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

**Victor G. Reiling Associates** :
**and Design Innovation, Inc.,** :
        **Plaintiffs,** :   **Case. No. 3:03 CV 222 (JBA)**
                                  :
**v.** :
                                  :
**Fisher-Price, Inc.,** :
        **Defendant.** :

**Ruling on Plaintiff's Motion for Reconsideration [Doc. # 160] and**
**Defendant's Motion for Reconsideration [Doc. # 154]**

On December 15, 2005, the Court ruled on defendant's Motion for Summary Judgment, granting the Motion as to all of plaintiff Reiling's claims and as to plaintiff Design Innovation's ("DI") claims of breach of implied contract and violation of the Connecticut Unfair Trade Practice Act ("CUTPA") and denying the Motion as to plaintiff DI's claims for misappropriation,[1] unfair competition, and punitive damages. See Ruling [Doc. # 145]. Both plaintiffs and defendant filed Motions for Reconsideration of the Court's Ruling. See Pl. Motion for Reconsideration [Doc. # 160]; Def. Motion for Reconsideration [Doc. # 154]. Defendant moves for reconsideration of the Court's denial of summary judgment of DI's misappropriation and unfair competition claims and plaintiffs move for reconsideration of the grant of summary

---

[1] The Court granted summary judgment on plaintiff DI's claim of misappropriation as to one line of Fisher-Price's accused products, namely the Optic Force action figures, except for the Telly Photo figure. See Ruling [Doc. # 145] at 62-63.

1

judgment as to all of plaintiff Reiling's claims and as to plaintiffs' CUTPA claim. For the reasons that follow, the Court adheres to its Ruling on Defendant's Motion for Summary Judgment with some modification on its reasoning.

**I.   STANDARD**

Reconsideration is only appropriate where the moving party can point to controlling law or evidence that "might reasonably be expected to alter the conclusion reached by the court." See Shrader v. CSX Transp., 70 F.3d 255, 257 (2d Cir. 1995). A motion for reconsideration gives the Court an opportunity to "correct manifest errors of law or fact or to consider newly discovered evidence." LoSacco v. City of Middletown, 822 F. Supp. 870, 876-77 (D. Conn. 1993) (internal quotation and citation omitted), aff'd 33 F.3d 50 (2d Cir. 1994).

**II.  DEFENDANT'S MOTION FOR RECONSIDERATION**

Fisher-Price argues that reconsideration of the Court's denial of Summary Judgment as to DI's misappropriation and unfair competition claims is justified because the Court's finding that Reiling submitted the Reel Heroes concept to Fisher-Price while the 1994 Policy & Agreement ("P&A") was in force precludes DI from establishing the "confidential relationship" element of a misappropriation claim as a matter of law. Fisher-Price argues that because Reiling submitted the concept while the 1994 P&A was in force, it was necessarily submitted on a non-confidential

2

basis, and once so submitted, there was nothing DI could do to "unring the bell." See Def. Mem. [Doc. # 155] at 2; see also id. at 3 n.3 (citing cases). Additionally, Fisher-Price argues that the 1999 Option Agreement cannot restore the "lost" property right because the Option Agreement did not impose any confidentiality obligations on Fisher-Price, and a subsequent agreement cannot revive a property right that has already been lost because an idea was disclosed on a non-confidential basis. See id. at 5 & n.10 (citing cases).

DI responds that Reiling's signing of the 1994 P&A at most "released" his misappropriation claim and that no authority supports Fisher-Price's broad contention that the enforceability of the 1994 P&A as against Reiling bars DI from establishing that it had a confidential relationship with Fisher-Price.[2]

---

[2] DI also argues that in order to prevail on its misappropriation claim, it must prove that it disclosed its concept to Fisher-Price in the context of a legal relationship, which can be either a fiduciary or confidential relationship, or based on an express contract, an implied-in-fact contract, or a quasi-contract. See Pl. Opp. [Doc. # 168] at 3-4. Thus, DI argues, a relationship sufficient to support a misappropriation claim can exist here: "(1) because of the unequal bargaining power of the parties . . .; (2) through the course of dealing of the parties to create a confidential or other legal relationship; and (3) by contract, including the Option Agreement . . .; and (4) by other facts and circumstances to be presented and considered at trial by the jury." See id. at 4. Plaintiff is correct that as a general matter legal relationships other than a confidential relationship can support a misappropriation claim, see Zikakas v. Staubach Retail Servs., No. 04 Civ. 9609(NRB), 2005 WL 2347852 (S.D.N.Y. Sept. 26, 2005), however the alleged confidential relationship is the only legal relationship that has ever been advanced in this case. The other legal relationships

Additionally, DI reiterates arguments concerning the applicability of the 1994 P&A to plaintiff Reiling. To the extent such arguments were not already considered and rejected in the Court's initial Ruling, they will be addressed below.

The 1994 P&A signed by Reiling and Fisher-Price provides, inter alia:

> The disclosure must be understood to be purely voluntary and no confidential relationship is to be established by such disclosure or implied from our consideration of the submitted material, and the material is not to be considered submitted "in confidence." Confidential relationships have been held to create obligations which are beyond those that the company is willing to assume.

See 1994 P&A, Declaration of Robert J. Lane in Support of Motion for Summary Judgment ("Lane Decl.") [Doc. # 94], Ex. 20 at 1. In its initial Ruling, the Court concluded that the 1994 P&A was enforceable against plaintiff Reiling, although not necessarily against plaintiff DI, and rejected plaintiffs' arguments that the P&A was an unconscionable contract of adhesion and violative of public policy. See Ruling at 15-20. The Court did not

---

that might support a misappropriation claim are those pursuant to an express contract, implied contract, or quasi contract. In this case, plaintiffs' concept was not submitted in the context of an express contract because their submissions occurred before and after the term of the Option Agreement (the term of the Option Agreement ran from February 1, 1999 to May 1, 1999; plaintiffs' first submission was made on October 29, 1998, their second submission was made on May 22, 1999, and their third submission was made on December 7, 2000), plaintiffs' implied contract claim has been dismissed, and no quasi contract relationship is claimed.

explicitly address the meaning of the confidential relationship disclaimer cited above because that the more general waiver of claims in paragraph three of the P&A barred Reiling's claims. Fisher-Price now argues that because the Court ruled that the 1994 P&A was enforceable against Reiling when the plaintiffs' concept was first submitted to Fisher-Price in 1998, the confidential relationship disclaimer in the P&A operated to let the proverbial "cat out of the bag" by disclosing plaintiffs' concept in the context of a non-confidential relationship, and now DI cannot reclaim confidentiality

The Court does not agree that the enforceability of the 1994 P&A against Reiling dictates this conclusion.  Rather, the Court interprets the P&A's confidential relationship disclaimer as a legal waiver – as DI refers to it, a "release" – by Reiling of any claim he might have had that depended on the existence of a confidential relationship between himself and Fisher-Price.  The paragraph concerning confidentiality in the 1994 P&A must be read in the context of Fisher-Price seeking to protect itself in circumstances of outside unsolicited submissions, hence the understanding that the disclosure was "purely voluntary," and the disclaimer that "no confidential relationship is to be established by such disclosure or implied from our consideration of the submitted material, and the material is not to be considered submitted 'in confidence.'  Confidential relationships

have been held to create obligations which are beyond those that the company is willing to assume," see 1994 P&A, Lane Decl. Ex. 20, at ¶ 1. This language drafted by Fisher-Price is specifically tailored to extinguish any legal claim of an outside inventor that depends on the existence of such obligations. That "in confidence" appears in quotes further indicates that this is a disclaimer of particular legal duties and resulting claims. Reiling's waiver of its claims cannot dictate the conclusion that as a factual matter, the circumstances of plaintiffs' submissions constituted relinquishment of their property right or the non-existence of a confidential relationship. Thus, Fisher-Price may offer at trial a basis for binding DI to Reiling's confidential relationship disclaimer with evidence of agency or partnership or otherwise.

 The cases cited by Fisher-Price do not dictate another interpretation. Several are distinguishable because they concern the broad disclosure of trade secrets to the public, operating to destroy a plaintiff's property rights in the purported trade secret, but not submission of co-owners to another entity under circumstances claimed to be confidential.[3] Others confirm the

---

  [3] See Lemelson v. Carolina Enters., Inc., 541 F. Supp. 645 (S.D.N.Y. 1982) (broad publication of a trade secret causes the property right therein to disappear); M&T Chems., Inc. v. Int'l Bus. Machs. Corp., 403 F. Supp. 1145 (S.D.N.Y. 1975) (general disclosure to the public of a trade secret "totally destroys" any value it may have), aff'd 542 F.2d 1165 (2d Cir. 1976); Sachs v. Cluett Peabody & Co., Inc., 39 N.Y.S.2d 853 (N.Y. App. Div. 1943)

Court's reading of the confidential relationship disclaimer in this case, finding that a plaintiff had disclaimed or waived its ability to demonstrate the existence of a confidential relationship by signing a confidential relationship waiver.[4]

---

(a trade secret "escaped" by being patented and publicly disclosed and thus plaintiff could no longer seek protection under common law trade secret rights).

[4] See G5 Techs., Inc. v. Int'l Bus. Machs. Corp., No. 04 Civ.1201 (DLC), 2005 WL 2271741 (S.D.N.Y. Sept. 19, 2005) (confidential relationship waiver that was arguably signed after plaintiff's disclosure of its idea but that explicitly provided that it superceded all previous confidentiality agreements barred plaintiff's breach of confidential relationship claim); Kublan v. Hasbro Toy Division of Hasbro & Tonka Corp., No. 98 CIV. 5301(JSM), 1999 WL 156381 (S.D.N.Y. Mar. 23, 1999) (claim of breach of an agreement providing for the confidentiality of submissions was barred because plaintiff's toy idea had previously been disclosed to defendants pursuant to an agreement containing a confidential relationship disclaimer ("no confidential relationship is established between the parties") and the later-signed confidentiality agreement expressly excluded ideas already known to defendants at the time of signing); AEB & Assoc. Design Group v. Tonka Corp., 853 F. Supp. 724 (S.D.N.Y. 1994) (misappropriation claim was barred where agreement between the parties providing for confidentiality of submissions had an explicit exception for ideas already disclosed to third parties without restriction and plaintiff had already disclosed its idea to Fisher-Price pursuant to a P&A agreement similar to the one at issue here). Other cases upholding confidential relationship disclaimers similar to the one in this case also support the Court's interpretation of the confidentiality provision in the P&A as waiver of the confidential relationship element of a misappropriation claim. See M.H. Segan Ltd. P'Ship v. Hasbro, Inc., 924 F. Supp. 512, 526 (S.D.N.Y. 1996) (confidential relationship disclaimer essentially identical to the one at issue here "eliminate[d] the plaintiff's ability to claim the existence of a fiduciary [or confidential] relationship – an essential element of a misappropriation claim"); Kearns v. Ford Motor Co., 203 U.S.P.Q. 884, 886 (E.D. Mich. 1978) (by signing waivers plaintiff "acknowledged defendant's disclaimer of a confidential relationship between them and relinquished all rights and remedies against defendant with respect to his disclosures except

Whether or not DI will be able to prove that a confidential relationship was established between itself and Fisher-Price is left for the forthcoming trial, but the enforceability of the confidential relationship disclaimer in Reiling's 1994 P&A does not compel a conclusion as a matter of law that such a relationship between DI and Fisher-Price cannot be proved or that confidentiality of the submissions was waived as a factual matter.[5]  Thus, because defendant has not persuaded the Court that the 1994 P&A's enforceability against Reiling requires a legal conclusion that DI cannot satisfy the elements of its claims of misappropriation and unfair competition, defendant's

---

those provided for by the patent and copyrights laws"); Telechon, Inc. v. Parissi, 120 F. Supp. 235, 240 (N.D.N.Y. 1954) (plaintiff's receipt of a booklet from defendant warning that "the company cannot consider any idea or invention on the basis of a confidential relationship" and advising that "where an inventor relies on patent rights there is less likelihood of misunderstanding" constituted an "impairment to the creation of any confidential relationship" necessary to prove his claims).

[5]  The conclusion that Reiling's confidential relationship disclaimer just relinquished any claim Reiling might otherwise have had against Fisher-Price that required a confidential relationship is consistent with the Court's ruling on Fisher-Price's In Limine Motion # 2, concerning the admissibility of testimony from Victor Reiling about the parties' expectations of confidentiality and the course of dealing between the parties. As the Court ruled at the pre-trial conference, Reiling may testify as to any expectations of confidentiality that were communicated to Fisher-Price – either expressly or implicitly by the course of dealing between the parties – notwithstanding his confidential relationship disclaimer in the 1994 P&A, because that testimony will be relevant to DI's claim that its submissions were made in the context of a confidential relationship, an argument not precluded by Reiling's disclaimer.

Motion is DENIED.

### III. PLAINTIFFS' MOTION FOR RECONSIDERATION

#### A.   Plaintiff Reiling's Claims

Plaintiffs seek reconsideration of the Court's Ruling granting summary judgment as to all of plaintiff Reiling's claims, arguing that the Court's construction of the 1994 P&A in its Ruling turns the "very limited waiver" in the P&A "into the equivalent of a general release and goes far beyond the language used in the 1994 P&A and what any contracting party would have reasonably assumed the language meant."  Pl. Mem. at 5. Plaintiffs cite to prior versions of Fisher-Price's P&A which they argue contain broader waiver language than in the 1994 P&A, thus supporting the narrower construction of the more limited 1994 waiver language.  Id.  Plaintiffs also argue that the Court's grant of summary judgment as to all of Reiling's claims "appears to be inconsistent with the Court's finding that the Option Agreement entered between [the parties] was a binding and express agreement."  See Pl. Mem. [Doc. # 161] at 1.  Plaintiffs essentially argue that the 1999 Option Agreement supplanted or modified the rights of the parties sufficiently to effectively nullify the waivers encompassed in the 1994 P&A.

As to the plaintiffs' argument concerning the purported limited nature of the waiver in the 1994 P&A, defendant responds that the 1994 P&A's release of liability "in connection with the

9

receipt" of submissions "includes anything that occurs after the company 'receives' the concept." Def. Reply [Doc. # 186] at 8. Defendant also argues that the record lacks any supports for a claim that the parties intended the Option Agreement to supercede and extinguish the 1994 P&A and that the Court not need reach the issue of modification or nullification of the 1994 P&A because the Reel Heroes concept is subject to the 1994 P&A and thus "the concept was not submitted on a confidential basis – an essential prerequisite to a claim for misappropriation." See Def. Opp. Mem. [Doc. # 162] at 2.

i. Plaintiffs' Interpretation of the 1994 P&A Waiver

Paragraph 3 of the 1994 P&A provides: "[w]e are released from any liability in connection with the receipt and examination of your disclosure, except as to such liability that may accrue under any valid patents or copyrights that you now or hereafter own or control." 1994 P&A, Lane Decl. Ex. 20, at ¶ 3. The plaintiffs urge that this waiver of liability "in connection with the receipt and examination" does not include liability for use of any disclosure. This argument was not considered by the Court at the summary judgment stage because it was not raised. However, a motion for reconsideration allows the Court to reconsider a ruling on the basis of evidence that it may have overlooked.

Plaintiffs compare earlier P&As between Reiling and Fisher-

10

Price that are virtually identical to the 1994 P&A except that in addition to releasing Fisher-Price from liability "in connection with the receipt and examination of [the] disclosure," they also expressly released Fisher-Price from liability "in connection with [its] <u>use or disclosure to others</u> of any portion of [the] disclosure." <u>See</u> Lane Decl. Ex. 17 (emphasis added). Plaintiffs argue that omission of the "use" release from the 1994 P&A, where such language is expressly included in Fisher-Price's other P&As with Reiling, shows purposeful exclusion of this material term. Construing the 1994 P&A against Fisher-Price as drafter of the agreement,[6] and absent any explanatory response from Fisher-Price, the Court concludes that the disclaimer of liability in the 1994 P&A was not as broad as its other P&As, and does not extend to use and disclosure. Thus, the Court modifies its initial Ruling and holds that the waiver at paragraph 3 of the 1994 P&A does not operate to bar plaintiff Reiling's claims of misappropriation and common law unfair competition. This is, however, a Pyrrhic victory for Reiling.

ii. <u>Modification or Substitution by the 1999 Option Agreement</u>

Notwithstanding the Court's conclusion concerning the scope of the 1994 P&A waiver vis-a-vis plaintiff Reiling's claims of

---

[6] <u>See</u> <u>McCarthy v. American Int'l Group, Inc.</u>, 283 F.3d 121, 124 (2d Cir. 2002) ("New York follows the well established contra proferentem principle which requires that equivocal contract provisions are generally to be construed against the drafter.") (internal quotation omitted).

misappropriation and common law unfair competition, Reiling's confidential relationship disclaimer in the 1994 P&A nevertheless precludes such claims.

The 1994 P&A signed by Reiling and Fisher-Price provided that it was "the entire understanding between the parties and no change in Agreement or modification shall be effective unless executed in writing."  See 1994 P&A, Lane Decl. at Ex. 20, ¶ 7. The Option Agreement, signed by Reiling, DI, and Fisher-Price, granted Fisher-Price "the exclusive option" for three months to purchase the rights to "make, have made, use, advertise and/or sell" products incorporating plaintiffs' submitted concept or to obtain assignment of all such rights from Reiling and DI.  See Option Agreement, Lane Decl. Ex. 25 at ¶ 2.  The Option Agreement also provided that Reiling and DI "agree[d] not to show or discuss the CONCEPT or any similar ideas, product or concept with any other prospective licensee or agent thereof or any other party unless approved in writing by FISHER-PRICE, INC. beforehand" for the term of the Option Agreement.  See id. at ¶ 5.

Plaintiffs argue that the Option Agreement modified the relationship between the parties and effectively nullified Reiling's waivers from the 1994 P&A.  While it is true that the Option Agreement created a contractual relationship between the parties and gave rise to obligations for the duration of the

contract that did not exist previously, its language does not change or modify Reiling's earlier waiver. A party seeking to prove the existence of a substitute contract, or "novation," must prove: "(1) the existence of a previously valid contract; (2) an agreement [between] the parties to cancel and extinguish the first contract; (3) [an] agreement [between the parties] that the second contract shall take the place of the first; and (4) the validity of the new contract." See 30 Williston on Contracts § 76:11 (4th ed.). Likewise, a modification of a contract must be expressed in a "mutual, valid, and enforceable agreement to modify the old contract." 22A N.Y. Jur. 2d Contracts § 473. Thus, in addition to proving the existence of a second valid contract, the party must demonstrate "mutual assent to a change in terms." Beacon Terminal Corp. v. Chemprene, Inc., 429 N.Y.S.2d 715, 718 (N.Y. App. Div. 1980). The Option Agreement, while undisputably a valid and enforceable contract, does not evidence, either explicitly or implicitly, a mutual intent of the parties to modify or nullify the waivers contained in the 1994 P&A. Indeed, Mr. Reiling himself testified that around the time the plaintiffs' made their submissions to Fisher-Price, he did not remember the 1994 P&A, thus precluding any inference that he intended to modify or replace the 1994 P&A when executing the Option Agreement. See Declaration of Russell D. Dize [Doc. # 106], Ex. I at 227.

Plaintiffs also argue that paragraph 4 of the Option Agreement, providing that if Fisher-Price chose not to exercise its option, neither party would "have any additional obligations to each other," supports a conclusion that the Option Agreement extinguished Reiling's waivers in the 1994 P&A.  However, Reiling's confidential relationship disclaimer in the 1994 P&A is not properly characterized as an "obligation,"[7] and was intended to apply to all concept submissions made by Reiling for an indefinite period unless the P&A was terminated, in accordance with its termination provision, or modified in writing. Paragraph 4 of the Option Agreement provides only that after the expiration of the Option Agreement "neither party shall have any additional obligations to each other."  See Option Agreement, Lane Decl. Ex. 25, at ¶ 4.  Thus, paragraph 4 does not refer to preexisting releases.[8]

---

[7] An "obligation" is defined as "[a] legal or moral duty to do or not to do something" or "[a] formal, binding agreement or acknowledgment of a liability to pay a certain amount or to do a certain thing for a particular person or set of persons."  See Black's Law Dictionary (7th ed.).  Reiling's confidential relationship disclaimer was not an obligation to do or not do something, but rather a relinquishment of any legal claim arising out of the existence of a confidential relationship between himself and Fisher-Price.

[8] While plaintiffs also argue that the P&A does not purport to bar claims arising out of, or after, subsequent contractual agreements, and contend that the misappropriation asserted in this action "springs directly from the non-exercise and expiration of the Option Agreement," see Pl. Mem. at 2, this case is not a claim of breach of the Option Agreement.

Thus, plaintiffs' Motion for Reconsideration as to plaintiff Reiling's claims is GRANTED and the Court has considered plaintiffs' arguments of limited waiver in the 1994 P&A and the effect of the Option Agreement on these waivers, and the Court's initial Ruling is modified, as detailed above. The disposition of plaintiff Reiling's claims remains the same.

**B.   Plaintiffs' CUTPA Claim**

Plaintiffs argue that reconsideration of the Court's grant of summary judgment as to the CUTPA claim is appropriate because the Court may have overlooked "significant facts" in the summary judgment record which support a finding that there is a sufficient nexus between the allegedly wrongful conduct and Connecticut to satisfy both tests for the application of CUTPA. See Pl. Mem. [Doc. # 161] at 9-10. At oral argument, counsel for plaintiff DI agreed that its reconsideration motion was limited to a CUTPA claim on the basis of the alleged "blackballing" or "retaliation," i.e., Fisher-Price's termination of its business relationship with DI because DI brought suit against it.

In the briefing and at oral argument, the parties set out the undisputed conduct and context underlying the alleged blackballing and its nexus to Connecticut. Specifically, plaintiffs rely on the email sent by Fisher-Price to DI discontinuing their business relationship as settlement talks deteriorated. See Declaration of Bruce P. Popek [Doc. # 109] at

15

Ex. C.  Additionally, at oral argument the parties referred to at least one meeting, which took place in New York, at which Fisher-Price representatives purportedly told DI that it would discontinue its business relationship if DI and Reiling did not settle their claims against it.  See also Popek Decl. ¶ 23 (referencing "a chance meeting with Mr. Clutton at the 2004 Toy Fair in New York City").

That DI received the email from Fisher-Price discontinuing their business relationship on a computer in its offices in Connecticut is not sufficient to salvage plaintiffs' CUTPA claim.[9]  While, as considered in the Court's initial Ruling, both plaintiffs are Connecticut residents, and while the alleged blackballing concerns future work DI would have performed in Connecticut, that is not the gravamen of plaintiffs' CUTPA claim.  Instead, the focus of plaintiffs' CUTPA claim is that Fisher-Price acted wrongfully in threatening to terminate and ultimately terminating its business relationship with DI as punishment for its misappropriation lawsuit and the only conduct related to that claim that plaintiffs contend took place in Connecticut is DI's receipt of Fisher-Price's email.  See Pl's Mem. at 11.  In fact, it is debatable whether the CUTPA "unfair conduct" actually took place in Connecticut because the allegedly wrongful decision to

---

[9] There is no record evidence concerning whether and where plaintiff Reiling received any notification of the termination of its business relationship with Fisher-Price.

16

terminate the business relationship was made in New York where Fisher-Price is located; at best, this conduct implicates both Connecticut and New York and does not further plaintiffs' claim that the most significant relationship test mandates application of Connecticut law.[10] Moreover, the other conduct referenced at oral argument and in plaintiffs' own declarations took place in New York.[11] Thus, the additional Connecticut contact cited in plaintiffs' Motion, even aggregated with factors identified in the Ruling, does not suffice to satisfy the "most significant relationship" choice of law test for the application of CUTPA.[12]

---

[10] In fact, the receipt of the email by DI in Connecticut may not be accurately characterized as "conduct causing the injury," as opposed to the injury itself, which the Court has already recognized occurred in Connecticut where the economic impact of the decision to discontinue the business relationship was felt. See Otis Elevator Co. v. Factory Mut. Ins. Co., 353 F. Supp. 2d 274, 285 (D. Conn. 2005) (receipt of claim denial in Connecticut was considered injury occurring in Connecticut, rather than conduct causing the injury).

[11] Although not referenced by plaintiffs in their Motion or by the parties at oral argument, settlement negotiations apparently continued throughout October and November of 2003 and included telephone calls, telephone messages, and emails. See Affidavit of Stan Clutton in Support of motion to Strike [Doc. # 62] at ¶ 6. While it is not clear that these negotiations included statements or conduct related to plaintiffs' blackballing claim, even if they did such conduct implicates both Connecticut (where plaintiffs were located) and New York (where defendant is located).

[12] While plaintiffs also argue that the Court overlooked the fact that DI signed the Option Agreement in Connecticut, that fact does not alter the Court's analysis. First, plaintiffs state that "[w]ith respect to the blackballing conduct, the signing of contracts is not a fact which is relevant to the choice of law analysis for this claim." See Pl. Mem. at 10.

See Otis Elevator Co. v. Factory Mut. Ins. Co., 353 F. Supp. 2d 274, 285-86 (D. Conn. 2005) (most significant relationship test dictated application of Minnesota law even where plaintiff was located in Connecticut and the injury occurred in Connecticut, where defendant was located in Minnesota, the conduct causing the injury took place in Minnesota, and the parties' relationship was centered in Minnesota).  Likewise, the fact that DI received the termination email in Connecticut does not satisfy the "intimately associated" test for the application of CUTPA because, as noted above, the allegedly wrongful conduct was not tied to a form of trade or commerce intimately associated with Connecticut, see See Uniroyal Chem. Co. v. Drexel Chem. Co., 931 F. Supp. 132, 140 (D. Conn. 1996), rather, the allegedly wrongful conduct involved a decision made in New York, which was communicated to DI in Connecticut, along with threats made at a meeting in New York.

Thus, plaintiffs' Motion for Reconsideration as to the CUTPA claim is GRANTED, but the Court's initial Ruling stands.

**IV.  CONCLUSION**

For the foregoing reasons, defendant's Motion for Reconsideration [Doc. # 154] is DENIED, plaintiffs' Motion for Reconsideration [Doc. # 160] is GRANTED, and the Court adheres to

---

Moreover, in any event, Fisher-Price (and perhaps Reiling – plaintiffs do not state otherwise) signed the Option Agreement in New York and the first meeting in which plaintiffs' concepts were submitted to Fisher-Price took place in New York.

its original Ruling on Defendant's Motion for Summary Judgment [Doc. # 145] as modified herein.

                                        IT IS SO ORDERED.

                                        _____/s/_____

                                        Janet Bond Arterton
                                        United States District Judge

**Dated at New Haven, Connecticut this 10th day of January, 2006.**