Exhibit A

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

VICTOR G. REILING ASSOCIATES        §
and DESIGN INNOVATION, INC.,         §
       *Plaintiffs*,                     §
                        §      INDEX NO. 3:03 CV 222 (JBA)
v.                                  §
                        §
FISHER-PRICE, INC.,                  §
        *Defendant*.                 §      January 3, 2005

## Rule 26 First Supplemental Expert Report of Alan Ratliff

This supplemental report is being provided pursuant to the parties' agreements, the local rules, and the Federal Rules of Evidence and Civil Procedure, and as a result of the Court's Ruling on Defendant's Motion for Summary Judgment [Doc. #93], Fisher-Price's (hereafter "F-P") production of supplemental documents since March 30, 2005, and F-P's damages report and supplemental damages reports as recently as December 2005 (reports collectively, the "Hoffman Reports"). Further, discovery supplementation appears to be ongoing and incomplete on subjects that affect my opinions. Therefore, I unilaterally reserve the right to supplement this report as additional discovery becomes available and for any other reasons as I may deem appropriate.

Respectfully submitted,

*Alan Ratliff*
_____
Alan Ratliff, CPA-JD
Partner

Date: January 3, 2006

### Scope of Supplemental Report

1. Except as otherwise described herein, all statements and opinions contained in my original report (including exhibits) dated January 31, 2005, my transmittal letter (including exhibits) dated March 30, 2005, and my deposition in this matter, remain unchanged. Supplemental Exhibits 1, 2 and A (labeled A-2) are attached hereto. Exhibit B (from March 30, 2005) remains unchanged, and Exhibits C – E attached hereto are new based on the aforementioned Hoffman Reports and the Court's Order.

## Supplemental Opinions on Accused Sales & Disgorgement of Defendant's Profits

2. The most current version of defendant's financial information that has been provided to me purports to represent the worldwide net sales of the accused product lines from January 2000 to September 30, 2005, less certain proposed adjustments by Hoffman. However, it appears that this information may be inaccurate or incomplete since there are defective return amounts in 2000 for SKU 77457 (Voice Tech Billy Blaze) but no corresponding sales on or after that period for this product line, and certain product lines cumulatively decreased by $5.5 million between the original and revised version of defendant's 2000-2004 accused sales data. See Exhibit A-1 (Attached to March 30, 2005 correspondence).

3. Additionally, based on F-P's supplemental production and the most recent Hoffman report, there are two categories of proposed adjustments to accused sales that affect the defendant's profits analysis.[1]  One type of adjustment increases accused sales for direct program and location sales (Mattel's American Girl division, the Toy Store and the Mattel Toy Club),[2] and the other type of adjustment decreases accused sales in 2001 for sales of SKU 77456 purportedly because such products are an old, non-accused version of the product. Hoffman merely assumes these products are not accused and no explanation or other proof supporting their exclusion is provided. The net effect of these two adjustments is to reduce accused sales by $165,180. StoneTurn Exhibits A-2 and C.

---

[1]  A third adjustment, close-out sales, is only relevant to the reasonable royalty analysis and does not effect defendant's profits since amounts are simply moved from an expense offset into revenue.
[2]  The sales made by American Girl, the Toy Store and the Mattel Toy Club are based on the first update to the Hoffman reports and Fisher-Price documents referenced therein.

4. While I assume these adjustments for purposes of my computations herein, I note that F-P produced sales information three or four times before finally including these additional accused sales and deciding to make the aforementioned (net downward) adjustments to accused sales.

5. As described in my original report, to calculate damages based on defendant's profits, a plaintiff may simply establish the amount of accused sales thereby shifting the burden to defendant to explain any allowable deductions from sales or reductions for apportionment of income to sources other than the subject of the alleged liable acts. Based on defendant's supplemental production, but subject to the aforementioned caveats relating to unexplained reductions in sales of certain products, it is my opinion that accused sales are $105,496,320.

6. The defendant must establish the existence and amount of any allowable deductions and reductions. What defendant provided and Hoffman has relied upon to reduce the amount of unjust enrichment by more than $90 million are summaries of expense categories by SKU including "CGS & Royalties", "Tooling", "Total A&M" and "Total Ovhd". Hoffman has further reduced the profits amount by nearly another $10 million based on an unexplained computation purporting to "apportion" value between Design Innovation and F-P.

7. Contrary to Hoffman's analysis, however, the amount of defendant's profits that plaintiff may disgorge is not limited defendant's operating profits. While compensatory damages seek to restore the plaintiff to the position he was in prior to the defendant's wrongful act, damages based on defendant's profits seek to deprive the defendant of whatever gain or benefit was obtained from his wrongful act.[3] Disgorgement takes from the defendant the fruits of his wrongful acts and gives them to the plaintiff.[4] In effect, the defendant is forced to disgorge his ill-gotten gains and, in some instances (such as in this case) seeking defendant's profits instead of compensatory damages may result in a greater recovery.[5]

---

[3] Ross, Intellectual Property Law: Damages & Remedies (Law Journal Press 2000), at 1.03[2][b].
[4] *Id.*
[5] *Id.*

8. Thus, the result of any deductions from accused sales in arriving at defendant's profits should be a direct or incremental margin, which would be an amount different than typical accounting margins such as gross margin, operating margin or net margin contained in F-P's documents. The incremental margin takes into account direct and incremental costs that were incurred to produce the associated accused revenues. Overhead and fixed costs that would have been incurred regardless of the defendant's alleged wrongful acts should not be deducted in determining the amount of profits to be disgorged. As described above, the objective is to determine the "gain or benefit" obtained by the defendant, not the operating margin on defendant's effected business activity after deducting all conceivable expenses directly and indirectly associated with the activity.

9. Based on the cost information produced in this case by F-P, it is not possible to determine the amount of variable, fixed, direct, and/or indirect costs included in the aforementioned expense categories. Based on my experience as a CPA and in connection with toy manufacturing matters in the past, every category of expense listed by F-P includes a mixture of direct and indirect (or allocated) costs. Thus, in my opinion, F-P has failed to meet its burden of proof in establishing the amount of any deductions from accused sales and is liable for not less than $105,496,320 in damages based on defendant's profits.

10. However, even if some estimate of deductions were appropriate, deductions would be far less than all costs of goods and operating expenses deducted by Hoffman. While different operations vary, a reasonable starting point estimate for incremental or direct margin, based on my experience with toy and other consumer good manufacturing operations, is the mid-point between gross margin and operating margin. This approach basically assumes that half of all operating expenses are fixed and half are variable. This is a conservative estimate in this case given that, based other cost information produced by F-P, some of its cost of goods sold (which are deducted in arriving at the starting point above, gross margin) may also be indirect, estimated, budgeted, fixed or otherwise allocated.

11. Nonetheless, based on this approach to developing a reasonable estimate of F-P's profits for purposes of disgorgement, Mattel's and Hasbro's last three years average estimated incremental margins ranged from 26.5% to 32.4% based on their 10-K's. StoneTurn Exhibit E. I compared this to F-P's margin before overhead on the accused products between 2000 and 2005 which averaged 27.6%.

4

12. While, as I previously described, F-P's expense categories other than overhead are believed to contain non-deductible costs as well, overhead probably contains some deductible costs so, for purposes of my estimate, I have conservatively assumed these roughly offset. The F-P margin before overhead (27.6%) is within the range of estimated Mattel and Hasbro incremental margins, further corroborating the reasonableness of this approach.

13. Based on the foregoing analysis, F-P's profits for purposes of a disgorgement damages analysis is estimated to be not less than $29,152,250. StoneTurn Exhibit C. I understand that issues remain open concerning certain SKUs and whether any sales from 2000 should be included in damages. I have included those known alternative scenario computations in Exhibit C as well.

14. Separately but similarly, Hoffman's reductions in accused sales based on the assertion that the accused sales occurred for reasons other than the accused features is inappropriate. Clearly, based on Internet product searches, product and other marketing related documents produced in this case, the accused design features were what were used to differentiate the accused figures from the non-accused figures in the minds of consumers. Additionally, F-P promoted the sales of related non-figure products to be used with the accused figures.

15. Apportionment is by no means automatic as Hoffman's analysis would suggest. As a practical matter, apportionment is intended to provide relief to the tortfeasor in situations where the unauthorized use of information, secrets, inventions or other IP is more tangential to the accused sales, such as in the highly publicized Volkswagen case involving the "Angels of Mercy" promotion. In that case, reference to a copyrighted literary work was used without authorization in an advertising promotion for Volkswagen cars. While the advertising promotion featuring the infringing theme may have stimulated some increased demand for (a "nexus to") the sale of certain cars, clearly the cars themselves (which otherwise were un-modified from versions promoted through other marketing campaigns in the past) and their many features, as well as a wide variety of other past and present branding and promotional activities, pricing, market and customer experience, were the predominate contributors to the sales and related profits. In such a case, consideration of apportionment is obviously appropriate.

16. In any event, the availability of apportionment as a possible basis for reducing damages is certainly not intended to give the tortfeasor-defendant the benefit of the commercially reasonable terms entered into by willing (and presumed contractually compliant) parties to an agreement. Hoffman proposes to give F-P the benefit of the 3% rate stated in the Reiling contract in determining damages due to Design Innovation. Further, Hoffman treats his after the fact apportionment as if it was determined before the fact in some type of hypothetical, willing party profit sharing negotiation. Neither approach is appropriate in evaluating the amount of profits to be disgorged from a tortfeasor.

17. Contrary to Hoffman's approach, in reality what occurred here is that defendant made sales of products using, and resulting from sales of products using, Design Innovation's featured design without permission, resulting in net economic gain equal to such sales less incremental expenses. As a result, F-P should be required to disgorge that benefit, period. While the Hoffman approach attempts to mirror considerations that might be relevant to an apportionment or profit sharing notion under a patent infringement lost profits or reasonable royalty claim, those considerations are different in fact and theory than a disgorgement claim. Disgorgement is only available under patent law for design patent claims and, in published patent cases I have reviewed over the years, the analysis mirrors the incremental profit analysis I suggest here.

18. The Hoffman approach simply describes other characteristics of the product, its promotion, and its manufacturing that are not accused and presumes that such value must be allocated to F-P and taken out of plaintiff's recovery. That is not a generally accepted approach to computing apportionment for purposes of disgorgement of profits. In fact, I couldn't find a single leading text that discussed an approach resembling that proposed by Hoffman in the context of the claims asserted in this case, including Weil, Parr, Ross, or Glick. Also, the remedy would be of little use to a plaintiff since every defendant would be entitled some apportionment to account for even the most rudimentary aspects of the manufacturing process, sales risk, and similar considerations. It in fact would be rare that the entirety of the tortfeasor's accused product would be misappropriated. In fact, the remedy is frequently used and the amount is usually only reduced by incremental expenses and reductions in cases like Volkswagen where the nexus between the subject matter used without permission was tangential, if not remote, to the ultimate accused sales and profits of the defendant.

6

19. In addition to being conceptually inappropriate, Hoffman's computation is mechanically unsupportable as well. In sum, Hoffman multiplies the 3% contract royalty rate times the accused sales for 2001-2005 and divides that amount by the operating margin on the accused sales, reaching the conclusion that the relationship (about 22%) reflects the proportion of the profits reasonably apportioned to the plaintiff. This approach lacks both logic and precedent.

20. Aside from giving the defendant tortfeasor the advantage of agreements reached by arms-length parties to a contract, this approach attempts to connect unrelated concepts. While parties negotiating a license may consider an appropriate profit-sharing between them, such negotiations are based on a myriad of other factors besides the parties' views of the respective value of the licensor's and licensee's contribution to the ultimate product. More importantly, again, the computation, just as the foregoing conceptual approach, is disconnected from the purposes and generally accepted approach to disgorgement of defendant's profits.

21. In summary, based on the foregoing, in my opinion defendant has failed to meet its burden of proof from a financial and accounting perspective to establish appropriate deductions for use in determining profits to be disgorged, as well as failed to establish a basis for apportioning any accused sales. As a result, disgorgement damages total $105,496,320. StoneTurn Exhibit A-2. Alternatively, if the finder of fact concludes that at least some evidence of deductions has been established, disgorgement damages based on estimated incremental profits of not less than $29,152,250. StoneTurn Exhibit C.

**Responses to Hoffman Reports**

22. In addition to any issues I have addressed above through affirmative analysis that respond to or otherwise contradict the Hoffman reports, I have the following responses to the Hoffman reports. In a failed effort to discredit my work, Hoffman makes factually inaccurate statements known by all participants to this litigation to be untrue, and insinuates other purported failings and shortcomings without basis.

23. For example, on page 3 of Hoffman's initial report, he criticizes my report for failing to include a reasonable royalty or lost profits analysis, as if it that was a requirement. This, despite my own original report (par. 1) expressly stating that I was retained to focus on disgorgement of profits. Subsequently, Hoffman even acknowledges on page 4 of his own

7

report that another expert (Kipling) prepared a report addressing the reasonable royalty and Hoffman must know that since the named plaintiffs don't actually manufacture and sell toys that they would not be expected to have lost profits. These disingenuous attempts to suggest error or failure by mischaracterizing the simplest of topics, such as the parties roles and reports in this case demonstrates, an obvious bias on Hoffman's part, removing him from the role of an objective party expert attempting to assist the trier of fact, to that of a zealous advocate who complicates rather than elucidates the issues before the Court.

24. Next, on page 4 of his initial report, Hoffman attempts to criticize my work in connection with a lost profits theory of damages which, again, was not the damages theory upon which I prepared my report. In particular, Hoffman focuses on my purported failure to consider possible offsets to accused sales, but ignores the fact that such information was first produced to him by F-P <u>AFTER</u> my report was filed. So the only mistake or failure in connection with offsets was in F-P's mistaken failure to produce the information in a timely manner so that I could consider it. Moreover, though Hoffman acknowledges my March 30, 2005, letter identifying inconsistencies in the various forms of cost data produced before and after my preliminary report, he fails to acknowledge, much less explain or resolve them. He further fails to acknowledge or reconcile the mixture of standard, budgeted and actual costs contained therein and the absence of SKU by SKU information in the original cost data produced.

25. Again, the foregoing described statements were simply another disingenuous attempt to discredit me serving as a thinly veiled disguise for Hoffman's obvious lack of objectivity. The only mistakes and failures in this instance were those of Hoffman in failing to resolve serious issues in his own client's data and to understand the sequence of events as they occurred. Given that the offsets are F-P's burden of proof, I simply followed the customary and generally accepted practice of asserting accused sales as damages in anticipation that F-P would provide information to support any offsets claimed.

26. Hoffman next asserts my reliance on December 2004 accused sales data for 2000-2004 is "misplaced" simply because, purportedly, the data he used was more recently updated for the same time period as the data produced by F-P and used in my report. In fact, it is Hoffman's confidence that is misplaced where the updated data reflects unexplained reductions in accused sales of selected accused products that total more than $5.5 million (Exhibit A-2). I

raised this concern on March 30, 2005, and neither Hoffman nor F-P h ever responded. The subsequent Hoffman reports fail to acknowledge the issue, much less reflect an explanation or effort to obtain an explanation from F-P. Thus, while I wasn't mistaken, perhaps a more fair characterization of what happened is that I was sandbagged, handicapped or disadvantaged by F-P's delayed and unexplained production of new accused sales figures for periods of time for which information was already produced, after my report due date. In any event, I relied upon the December 2004 data at the time (and still make reference to it) because it was the best and most complete data available.

27. On page 4 of his preliminary report, Hoffman incorrectly describes disgorgement as a remedy based on "operating profits"; to my knowledge, this is not a correct statement of the remedy under any prevailing or generally accepted standard of law, accounting or economics. Rather, as I describe elsewhere herein, the prevailing approach is an incremental profits approach. Hoffman has it wrong in theory and practice.

28. On page 5, Hoffman also accuses me of failing to recognize that no accused sales occurred until 2001. Not only did his client produce information responsive to a request for accused sales data that starts in 2000, but Hoffman has no explanation or stated basis for his assertion and assumption. Again, simply relying on a client's statement that there are no accused sales is not the type of information that a practitioner in the field of accounting or economics would ordinarily rely upon in the real world in conducting such an analysis.

29. In sum, much of Hoffman's analysis is based on unsupported assumptions and assertions, ignores significant inconsistencies and gaps in data without explanation, fails to apply generally accepted methodologies, applies methods without logic or precedent, and mis-characterizes analyses using best available information at the time as mistake and error based on the existence of questionable "revised" data produced at a later date. Hoffman's reports reflect such a bias and absence of objectivity as to render his analysis, in my opinion, not helpful to the trier of fact.



**ALAN RATLIFF, CPA-JD**
Partner
Houston, Texas
StoneTurn Group LLP
Damages, Valuation, Fraud & Forensic Accounting
aratliff@stoneturn.com

### Curriculum Vitae

Alan serves as an accountant, consulting and testifying expert in IP and other complex business litigations, business valuations, and fraud and forensic accounting investigations. Alan has served as an arbitrator, mediator and Special Master, and has been qualified as an expert in federal (district and bankruptcy) and state court on a wide-range of issues including accounting, auditing and royalty auditing, business valuation, damages, economics, customary industry and business practices, due diligence, and discovery issues. Alan has more than 15 years of combined experience in law, accounting and consulting.

### Professional experience

Alan's recent engagements include matters in the automotive, biotech, computer, construction, energy, healthcare, Internet, retail, semiconductor, software, telecom, and toy industries, among others. In those matters, he served as an accounting expert in purchase price and joint venture disputes, conducted fraud and accounting investigations, served as an economic damages or valuation expert in medical malpractice, patent infringement, trade secret, copyright, trademark, automotive franchise, toxic tort, contract and business tort disputes, and he served as a business custom and practice expert in multiple disputes. In addition, Alan has served as an arbitrator and special master on accounting, licensing and damages issues, and has recently served as an arbitrator in multiple commercial disputes.

### Select Testimony Experience

- *West Teleservices* (Texas state court, San Antonio, 1999). Testimony used at deposition and class certification hearing for defendant telecommunication company in multi-million dollar class action dispute in Texas state court on industry custom and practice. Class not certified.
- *Frost Bank* (Texas state court, Houston, 1999). Testimony used at deposition and injunction hearing for defendant bank in debtor-creditor and tax dispute in Texas state court. Injunction denied.
- *Great Lakes Chemical Co.* (N.D. Il., 2000). Testifying business and accounting expert for defendant chemical company at deposition and trial in $15 million acquisition dispute relating to $100 million+ transaction in Illinois federal court. No damages awarded.
- *Informix* (N.D. Cal., 2000). Testifying expert at deposition and trial defendant software company in software patent, copyright, license and trade secret dispute. No damages awarded.
- *Gulf Coast Holdings* (Houston 2000). Arbitrator in energy M&A dispute.
- *Compaq* (Argentenian trial court, 2001). Testifying expert at deposition for defendant technology company in $10 million customer contract dispute in Argentina concerning damages and accounting issues. Case settled.
- *IGEN/Roche* (D. Md., 2001). Special Master in multi-million dollar, multinational licensing dispute. Provided testimony for use at deposition and trial. Case settled post-appeal.
- *Alenco/Reliant Holdings* (N.D. Tex. 2002). Testifying business and accounting expert at deposition and hearing for seller-plaintiff in connection with post-acquisition dispute in construction industry. Court granted a new accounting.
- *International Rectifier/IXYS* (C.D.CA., 2002). Testifying damages expert in deposition and at trial for plaintiff semi-conductor manufacturer in patent infringement dispute. Multi-million dollar jury and court award in my client's favor.
- *UCS/ADP* (Texas State District Court 2003). Testifying damages rebuttal expert for successful defendant ADP in $70-$90 million automobile dealership management software copyright and trade secret misappropriation case. Testified in deposition and trial; no damages awarded.
- *Storage Computer/VERITAS* (N.D. Tex. 2003). Testifying damages expert for defendant VERITAS in storage software patent case. Deposition given, case terminated favorably on summary judgment.
- *Positive Software/New Century* (N.D. Tex. 2004). Testifying damages expert at deposition and trial for plaintiff in Digital Millenium Copyright Act, copyright infringement, fraud and breach of contract action. Case pending.
- *Soil Controls/Martin Marietta* (W.D.Tex. 2004). Testifying damages expert for defendant in Lanham Act trademark infringement dispute relating to sale of Dustbuster business line. Deposition taken, case settled.
- *Metro Ford and Graff v. Freightliner, Sterling Truck and Ford* (Austin, 2004). Testifying financial expert for defendants Sterling Truck and Freightliner in franchise dealership termination dispute. Testified in deposition and administrative proceeding. Decision pending.

- *Cameron/St. Luke's* (Houston 2004): Testifying damages expert for defendant hospital in multi-million dollar medical malpractice dispute. Case pending.
- *Syngenta/Dow, Monsanto & Pioneer* (Delaware 2004): Testifying damages expert for defendant in multi-million dollar biotech patent infringement dispute. Complex lost profits and royalty issues. Testified in deposition. Case resolved on liability issues in client's favor in December 2004.
- *Avocent/ClearCube* (Alabama 2004): Testifying damages expert for defendant thin-client computer system provider in multi-million dollar patent infringement dispute. Testified in deposition. Case pending.
- *Williams/ Kuhlman Corporation, Borg-Warner.* (Mississippi 2005): Testifying business and accounting expert for plaintiff in connection with toxic tort litigation. Testified in deposition. Case pending.
- *PAZ Gas/Kinder Morgan, Coral & InterGen* (Houston 2005): Testifying damages expert for defendant in connection with energy joint venture and M&A dispute. Testified in deposition. Case settled during jury deliberations.
- *iValue/M&A Tech* (Austin 2005). Testifying damages expert for plaintiff in connection with e-commerce business interruption dispute. Testified in deposition. Case pending.
- *Design Innovations/Fisher-Price* (Connecticut 2005). Testifying accounting and lost profits damages expert for plaintiff toy designer in connection with breach of contract and theft of idea dispute. Testified in deposition. Case pending.
- *Dell/Ditzik* (Michigan 2005). Testifying damages expert for defendant PC manufacturer in connection with alleged flat panel monitor patent infringement. Testified in deposition. Case settled.
- *IR/XYS* (CA 2005). Testifying damages expert for plaintiff semiconductor manufacturer in connection with alleged infringement against competitor. Testified in deposition and trial. Multi-million dollar jury award in my client's favor.
- *AmPro v. ENE Trak* (Houston 2005). Arbitrator in copyright and software dispute. Case settled.
- *ACIC/Shaw* (Arizona 2005). Defendant's damages expert insurance agency and broker dispute. Testified in deposition. Case pending.

Types of Matters

| | | |
|---|---|---|
| Antitrust | Environmental | Regulatory |
| Bankruptcy | Fiduciary | Securities |
| Business Interruption | Franchise | Tax |
| Class Action | Fraud | Theft |
| Consumer | Labor | Toxic Tort |
| Contract | Lost Profits | Trade Secret |
| Copyright | M&A/other transactions | Trademark |
| Derivatives | Patent | Valuation |

Other professional experience includes intangible asset management, tangible and intangible asset and business valuations, licensing consulting, forensic accounting investigations, auditing, restructuring advisory services, transaction and due diligence services, tax and investment planning.

Industries

| | | |
|---|---|---|
| Automotive | Insurance | Retail |
| Chemical | Medical Devices | Securities |
| Computer | Military Contractor | Semiconductor |
| Construction | Pharma & Biotech | Software |
| Energy and Utility | Professional Services | Systems Consulting |
| Financial Services | Publishing | Technology |
| Gaming | Real Estate | Telecom |
| Healthcare | Recreation Equipment | Web |

**Education & certifications**

- J.D. *cum laude*, Southern Methodist University, full tuition and fee scholarship, Law Review (Mg. Ed.), Order of the Coif, Who's Who
- Master of Accounting (Taxation), *summa cum laude*, Baylor University, full tuition and fee scholarship, teaching fellowship
- BBA in Accounting, *magna cum laude*, Baylor University (Cumulative Hours: Accounting 54; Eco/Stat 30; Tax 30), Alpha Chi, Beta Gamma Sigma (Phi Beta Kappa for Business School graduates), Who's Who
- Past Adjunct Professor at South Texas College of Law, and the University of Houston Law Center; Lecturer, Baylor University, University of Houston, *Conviser CPA Review*
- Licensed attorney in Texas. Member of the bars of the US Supreme Court, Fifth and Eighth Circuits. AV-rated by Martindale-Hubbell
- Licensed CPA, Texas

**Publications and speeches**

- Speaker, approximately 100 client seminar presentations since 1992.
- Co-Author, "Opinion Testimony," Texas Evidence Treatise, Chapter 7 (Aspen Legal Publishing pending Winter 2005) (PEER REVIEWED).
- Co-Author & Co-Presenter, "The Care & Feeding of Experts," University of Houston Law Foundation, Expert Institute (Dallas & Houston 2005).
- Co-Author, "Accountants, Lawyers, Investment Bankers, and Other Non-Scientific Experts: Applying *Daubert* to Non-Science Expert Opinions," Fifth Circuit Reporter (September 2005).
- Co-Author & Co-Presenter, "Panel: Applying *Daubert* to Non-Science Expert Opinions," Annual Meeting of the National Association of Women Judges (Houston 2005).
- Author & Presenter, "IA&T Damage Trends & Update," 20th Annual Institute for IA & T Law (Dallas 2005).
- Author & Presenter, "The Care & Feeding of Experts," University of Houston Expert Institute (Houston & Dallas 2005).
- Author & Presenter, "Accountants, Lawyers, Investment Bankers & Other Non-Scientific Experts," Annual Meeting, National Association of Women Judges (Houston 2005).
- Author & Presenter, "Update on Intellectual Asset & Technology Law Damages," 20th Annual IA&T Law Conference (Dallas 2005).
- Presenter, "What All Lawyers Should Know About IP Damages," Houston Bar Association (July 2005).
- Author & Presenter, "Care & Feeding of Experts," University of Houston Law Foundation, Advanced Civil Litigation, Houston & Dallas (May 2005) (PEER REVIEWED)
- Presenter, "Forensic Accounting," TSCPA Accounting Expo 2005, Reliant Center, Houston (April 2005)
- Planning Committee, Presenter & Panelist, "Expert Witness Update," Advance Civil Trial Institute, South Texas College of Law (February 2005).
- Presenter, "Financial Expert Update," Texas Society of CPAs, Houston (January 2005).
- Institute Co-Chair & Presenter, "Accounting & Valuation Experts," The Law of Accounting and Valuation," Univ. of Houston Law Center, Houston (November 2004).
- Presenter, "Using Experts in IP Litigation," City Bar of New York (September 2004).
- Co-presenter, "Valuing Business Method Patents," Financial Services IP Conference, New York (July 2004).
- Co-presenter, "Expert Update," University of Houston Law Center, Dallas and Houston (June 2004).
- Co-presenter, "Financial Damages Update," Houston Bar Association Litigation Section, Houston (May 2004).
- Panelist, "IP as a Core Asset," Entrepreneurship in the New Economy, Boston (June 2004).
- Co-presenter, "Kicking the Tires After *Kumho*: 2004 Expert Update," Federal Bar Association, Houston (May 2004).
- Author, "*Daubert* in the States, " American Bar Association Tort & Insurance Section (April 2004).
- Presenter, "Profits, Damages and Statutory Damages in Trademark Infringement Cases, " American Bar Association, Section of Litigation, IP Committee, Dallas, Houston, Tampa, New Orleans (March 2004).
- Presenter, "IP Valuation: Real World Licenses v. The Reasonable Royalty in Litigation," Louisiana Bar Association and New Orleans Bar IP Sections (January 2004).
- Co-presenter, "*Robinson* and Texas Expert Update," Houston Bar Association, Section of Litigation (January 2004).
- Co-presenter, "Accounting Hot Topics for Computer & Information Lawyers," 18th Annual Computer & Information Law Conference, Dallas (October 2003).
- Author, "*Kumho* Wrestling: Are Your IP Experts in Shape? - 2003 Update," ABA IPL Quarterly (October 2003) (PEER REVIEWED).
- Author, "Biotech and Pharma R&D and Licensing Trends," 10 Journal of Biotechnology 1 (pending September 2003).
- Co-Author, "The Independent Expert Evolution," 34 Texas Tech Law Review 4 (pending Summer 2003) (PEER REVIEWED).
- Co-presenter, "Kicking The Tires After Kumho: 2003 Commercial Litigation Expert Update," Association of Women Attorneys, Houston (August 2003).
- Speaker, "Global Licensing & Litigation Risk Update," Going Global Conference (Boston University, June 2003)

- Speaker, "IP Valuation: Real World Licensing Royalty Rates v. The Reasonable Royalty in Litigation," Fourth Annual IP Institute, Austin (February 2002).
- Speaker, "Expert Update," Advanced Expert Witness III, State Bar of Texas, Houston (December 2002).
- Speaker, "IP Expert Update," US IP Owner's Association Annual Meeting, Los Angeles (November 2002).
- Author, "Kicking The Tires After Kumho: The Bottom Line on Admitting Financial Expert Testimony 2002 Update," *Trial Lawyer* (Aspen Legal Publishing, 3 parts beginning October 2002) (PEER REVIEWED).
- Author, "*Daubert*-proofing Your IP Experts: 2002 Update," *IP Litigator* (Aspen Legal Publishing, August 2002) (PEER REVIEWED).
- Speaker, "Antitrust Implications of Patent Settlements," State Bar of Texas Annual Meeting, IP Section (June 2002).
- Lecturer, "IP Damages," University of Houston, School of Business (March 2002).
- Speaker, "Daubert-proofing Your Expert Reports: A View from the Chair," Advanced Litigation Institute, South Texas College of Law (February 2002).
- Panelist, "Protecting Your IP and Preventing it from Walking Out the Door," *LegalTech*, London (November 2001).
- Panelist, "Managing IP Litigation," *ACCA Annual Meeting* (October 2001).
- Moderator, "International IP Update," *15th Annual Computer & Information Law Institute*, Dallas (October 2001).
- Moderator, "Expert's Shoot-out," *Ultimate Trial Advocacy Institute*, Houston (September 2001).
- Co-author, "Kicking the Tires After Kumho: 2001 Update," 24 *Trial Lawyer* Vols. 4-5 (Aspen 2001) (PEER REVIEWED).
- Moderator, "Intellectual Property Protection Strategies," *LegalTech*, San Francisco (August 2001).
- Moderator, "IP Management Panel," *Annual Convention of the State Bar of Texas, IP Section*, Austin (June 2001).
- Speaker, "Daubert Panel," *Advanced Economics & Valuation Institute*, CA Society of CPAs, Palm Springs (May 2001).
- Author, "It's Not Just About Injunctions Anymore: An Overview of Money Damages in IP Litigation," 7 *IP Litigator* Nos. 3-4 at 1, 14 (Mar-Apr 2001) (Aspen).
- Co-author, "Increasing Shareholder Value in the New Economy," American Corporate Counsel Association's *ACCA Docket*, Vol. 18 No. 10 at 60 (Nov/Dec 2000) (PEER REVIEWED).
- Author, "*Kumho* Wrestling: Are Your IP Experts in Shape?" 23 *Trial Lawyer* 6 at 457 (Nov/Dec 2000) (Aspen).
- Speaker, "Financial Expert Witness Update," *Annual Litigation Services Conference*, sponsored by State Bar of Texas Litigation Section and TSCPA Litigation Services Committee (Houston, November 2000).
- Speaker, "Kicking The Tires After *Kumho*: Implications of *Daubert* for IP Experts," *Institute on Intellectual Property* (Galveston, October 2000).
- Speaker, "Expert Witness Update," Federal Bar Association's *Federal Practice Workshop* (Houston, September 2000).
- Co-author, "Kicking the Tires After Kumho: The Bottom Line on Admitting Financial Experts," 37 HOU. LAW REVIEW 431 (Summer 2000) (PEER REVIEWED).
- Author, "Damages in Intellectual Property Litigation," *The American Lawyer's* CORPORATE COUNSEL MAGAZINE A18 (February 2000).
- Speaker, "*Kumho* Wrestling: Are Your Financial Experts in Shape," *Business Torts Institute* (Houston, January 2000).
- Speaker, "Expert Discovery: Discovery Rules & Expert Techniques," *Litigation Services Conference* (Houston, November 1999).
- Co-author, "*Kumho* Wrestling: Are Your Experts in Shape?" TEXAS LAWYER 32 (October 25, 1999).
- Speaker, "It's Not Just About Injunctions Anymore: Money Damages in IP Cases," *Intellectual Property Institute* (Houston, September 1999).
- Speaker, "Y2K Update," *ABA Section of Litigation Annual Meeting*, Dallas (3/99).
- Speaker, "No More or Know More? Imputation and Adverse Interests/Limitations in Professional Malpractice Cases," *Litigation Services Symposium*, Houston (10/95).
- Author, "There's More to (and behind) the Recent Amendments to the Federal Rules of Civil Procedure," 41 FEDERAL BAR JOURNAL 433 (July 1994) (also reprinted by the Oregon Bar Association) (PEER REVIEWED).
- Author, "Businesses Must Sometimes Decide: To Litigate or Not to Litigate", 12 BAYLOR BUSINESS REVIEW 9 (Spring 1994).
- Speaker, "Ethical Issues for a CPA That May Arise In Connection with a Criminal Tax Investigation of a Client," *Client Representation in Criminal Tax Investigations*, Houston (2/94).
- Co-Author," Collateral Effects of a Bank Fraud Indictment or Conviction of Professional," *1992 ABA Business Crimes Seminar C1*, Dallas (3/92).
- Author, "Congress Deals Aviation Another Bad Hand," Southern Methodist University's *Law Review*, 55 J. AIR L. COMM. 1159 (Summer 1990).

Professional associations

- Current Chair, ABA IP Section's technical advisor, special master and other expert's sub-committee
- ABA Section of Litigation IP Experts sub-committee past co-chair, 1999-2002 (past co-chair pre-trial and discovery sub-committee)
- Board, American Corporate Counsel Association (Houston Chapter), 2001-2003
- Barrister, American Inns of Court
- American Institute of CPAs
- American Intellectual Property Law Association (Spec. Comm. On Experts)
- Steering Committee, Computer & Information Law Institute (Dallas 2000-)
- Board, Past President and Past National Delegate, Federal Bar Association (Houston Chapter)
- Houston Bar Association, Litigation Section Council (past chair or co-chair CLE Seminars, Internet CLE, Lawyers in Public Schools, Legal Lines; committee member Fee Disputes, Professionalism, Law Day)
- Licensing Executives Society
- Life Fellow, Houston and Texas Bar Foundations
- Houston Intellectual Property Law Association (Audit and Program committees)
- Intellectual Property Owner's Association (Damage Theories Committee)
- International Trademark Association
- State Bar of Texas (Chair & Vice-Chair, Coordination With Other Professions Committee, 1996-98; Litigation, IP sections)
- Texas Society of CPAs (Houston Chapter)

Civic & community

- President and Chairman of the Board of Trustees, Girls, Inc. of Greater Houston (2003-)
- Board of Trustees, Chinquapin School (2002-)
- Development Council, Baylor University (1996-)
- Athletic Director's Council, Baylor University (2000-)
- Host Committee, Houston Museum of Fine Arts Gala (2005)
- Host Committee, Houston Downtown Alliance Gala (2004)
- Chair, Mayor's Jazz Brunch benefiting Jazz Education, Inc. (2002)
- Chair, Houston International Jazz Festival (2002)
- Houston Steering Committee, Baylor Alumni Association Network (2001-2003)
- Board of Advisors, Texas Accountants & Lawyer's for the Arts (past officer, 1995-)
- Habitat For Humanity Partner & Houston 100 Coordinator (1998)
- Lawyer's in Public Schools Volunteer Substitute Teacher (1997-)
- Pro Bono College, State Bar of Texas (1995-)
- Life Fellow, Texas, Austin and Houston Bar Foundations
- Weil, Gotshal & Manges Outstanding Pro Bono Service Award (Houston 1996)
- Weil, Gotshal & Manges Partner's Award (Houston 1995)
- AMI Sports Chaplain, 2002, 2004 Olympic Games

Supplemental Exhibit 2

**Bates Labeled Documents**

| Starting Bates # | Ending Bates # | Document Description |
|---|---|---|
| FP 00250 | FP 03669 | Meeting Cover Sheets, Cost Sheet Reports, Quotation, Forecasts, Product Cost Reports for various products and internal projects. |
| FP 03670 | FP 04220 | Cost Summary for RH Figures and Components |
| FP 04200 | FP 04830 | Production and cost information for Product 78361 - Voice Tech Police Cruiser |
| FP 04229 | FP 04231 | Cost Summary for RH Demo Backpack |
| FP 04968 | FP 05600 | Product cost report estimate for Product 77455 - Voice Tech Fire Truck |
| FP 05310 | FP 05530 | Production and cost information for Product 77473 - Voice Tech Rescue Jet |
| FP 06400 | FP 06612 | Product cost report estimate for Product 78157 - Voice Tech Aquatic Rescue Command Center |
| FP 06836 | FP 06904 | Production and cost information for Product 77457 (77547 also listed) - Voice Tech Billy Blazes (Restage) |
| FP 06905 | FP 06945 | Production and cost information for Product 77460 - Rescue Heroes / Voice Tech Wendy Waters (Restage) |
| FP 06946 | FP 06972 | Production and cost information for Product 77547 - Rescue Heroes / Voice Tech Billy Blazes |
| FP 06973 | FP 07009 | Production and cost information for Product 77458 - Rescue Heroes / Voice Tech Jack Hammer (Restage) |
| FP 07010 | FP 07054 | Production and cost information for Product 77459 - Rescue Heroes Jake Justice (Restage) |
| FP 07055 | FP 07112 | Production and cost information for Product 77545 - Voice Tech Rocky Canyon |
| FP 07113 | FP 07175 | Program Information Sheet and Product Cost Report for Product 77546 - Voice Tech Roger Houston |
| FP 07187 | FP 07219 | Program Information Sheet and Mattel In-Line Commitment / Quotation for Product 77547 - Voice Tech Figure Restage |
| FP 07220 | FP 07499 | Production and cost information for Product 77460 - Rescue Heroes / Voice Tech Wendy Waters |
| FP 07500 | FP 07682 | Production and cost information for Product 77459 - Rescue Heroes Jake Justice |
| FP 07683 | FP 07763 | Product cost report and production specifications for Product 77545 - Voice Tech Rocky Canyon |
| FP 07786 | FP 07827 | Product Information and cost report for Product 77546 - Voice Tech Roger Houston |
| FP 07880 | FP 08197 | Program Information Sheet and cost information for Product 77456 - Mission Command with Voice Tech Restage |
| FP 08198 | FP 08384 | Production and cost information for Product 77458 - Rescue Heroes / Voice Tech Jack Hammer |
| FP 09200 | FP 09450 | Mattel In-Line Commitment / Quotation for Product B9612 - Mission Select Team - Spanish |
| FP 09444 | FP 09465 | Production and cost information for Product B2099 - Mission Select Matt Medic |
| FP 09666 | FP 09600 | Production and cost information for Product B2100 - Mission Select Ariel Flyer |
| FP 09869 | FP 09900 | Production and cost information for Product B2102 - Mission Select Al Pine |
| FP 09975 | FP 09994 | Production and cost information for Product B2101 - Mission Select Wendy Waters |
| FP 10081 | FP 10100 | Production and cost information for Product B2098 - Mission Select Gil Gripper |
| FP 10293 | FP 10314 | Production and cost information for Product B2097 - Mission Select Rocky Canyon |
| FP 10331 | FP 10412 | Production and cost information for Product B2096 - Mission Select Roger Houston |
| FP 10491 | FP 10511 | Production and cost information for Product B2095 - Mission Select Jake Justice |
| FP 10592 | FP 10614 | Production and cost information for Product B2094 - Mission Select Jack Hammer |
| FP 10687 | FP 10812 | Production and cost information for Product B2093 - Mission Select Billy Blazes |
| FP 10829 | FP 11650 | Product cost report estimate for Product B2497 - Mission Select Mountain Command Center |
| FP 11645 | FP 11664 | Production and cost information for Product B7686 - Optic Force Telly Photo |
| FP 11889 | FP 11908 | Production and cost information for Product B7687 - Optic Force Rock Miner |
| FP 12056 | FP 12121 | Production and cost information for Product B7689 - Optic Force Matt Medic |
| FP 12180 | FP 12234 | Product specification and cost estimates for Optic Force characters |
| FP 12300 | FP 12475 | Production and cost information for Product B7685 - Optic Force Maureen Biologist |
| FP 12474 | FP 12549 | Production and cost information for Product B7688 - Optic Force Jake Justice |
| FP 12650 | FP 12979 | Product cost report estimate for Product B3056 - Mission Select Police Cruiser |
| FP 12978 | FP 13130 | Production and cost information for Product B5732 - Mission Select Firetruck Restage |
| FP 13990 | FP 14000 | License Agreement signed 2/7/2003 between Nelvana Limited and Mattel Inc. regarding Rescue Heroes Feature Film |
| FP 14922 | FP 14922 | Fisher-Price Rescue Heroes Worldwide Sales 2000-2004 |
| FP 15306 | FP 15313 | Fisher-Price Rescue Heroes Worldwide P&L 2000 Actuals |

Supplemental Exhibit 2

| Starting Bates # | Ending Bates # | Document Description |
|---|---|---|
| FP 15691 | FP 15713 | Bang Zoom Payments for SKU B8106 3rd Qtr 2003 through 3rd Qtr 2005 and afflate royalty payable summary report information |
| FP 15714 | FP 15734 | Bang Zoom Design April - June 2004 Royalty payable reports |
| FP 15735 | FP 15757 | Bang Zoom Design October - December 2004 Royalty payable reports |
| FP 15758 | FP 15779 | Bang Zoom Design April - June 2004 Royalty payable reports |
| FP 15786 | FP 15786 | Letter with attachment of Fisher-Price Rescue Heroes Worldwide sales 2000-2004 dated December 15, 2005 |
| FP 15787 | FP 15788 | Letter with attachment of Fisher-Price Rescue Heroes Worldwide P&L 2001 Actuals and Adjusted dated December 17, 2005 |

**Legal Filings**

Fisher-Price's Responses and Objections to Plaintiffs' Third Set of Interrogatories dated March 14, 2005
Plaintiffs Responses to Defendant's Fourth Set of Interrogatories dated March 30, 2005
Second Supplement to Expert Report of James Kipling On Behalf of Plaintiffs Victor G. Reiling Associates and Design Innovations, Inc.
Amended Notice of Deposition for Alan Ratliff dated February 18, 2005

**Other**

Initial Expert Report of Abram E. Hoffman, DBA dated May 11, 2005
Update to Expert Report of Abram E. Hoffman, DBA dated December 17, 2005
Operating Profits - Exhibit 5A Corrected for 2001 - 2005 from defendant's expert
Transmittal Letter and Exhibits dated March 30, 2005
Intellectual Property Damages - Guidelines and Analysis written by Glick, Reymann and Hoffman - John Wiley & Sons, Inc.

In the Matter of
Victor G. Reiling, et al. v. Fisher-Price, Inc.

Exhibit A-2
Fisher-Price Estimated Accused Sales

| TYPE | SKU | Description | 2000 Net Sales | 2001 Net Sales | 2002 Net Sales | 2003 Net Sales | 2004 Net Sales | 2005 Net Sales | Total [2] Net Sales |
|---|---|---|---|---|---|---|---|---|---|
| Rescue Heroes | 77455 | Voice Tech Rescue Firetruck | $3,850,300 | $5,499,800 | $1,880,800 | $142,700 | | | $11,173,400 |
| Rescue Heroes | 77456 | Voice Tech Mission Command | $3,497,000 | $6,676,400 | $55,300 | | | | $10,228,700 |
| Rescue Heroes | 77457 | Voice Tech Billy Blazes | $32,200 | $39,200 | | | | | $71,400 |
| Rescue Heroes | 77459 | Voice Tech Jake Justice | | $37,200 | | | | | $37,200 |
| Rescue Heroes | 77473 | Voice Tech Rescue Jet | $6,359,000 | $4,846,700 | $2,457,000 | $149,900 | | | $13,812,600 |
| Rescue Heroes | 78157 | Voice Tech Aquatic Rescue | | $20,588,200 | $8,403,300 | $813,900 | | | $29,806,400 |
| Rescue Heroes | 78361 | Voice Tech Police Cruiser | | | $8,574,200 | $592,200 | | | $9,166,400 |
| Rescue Heroes | B2092 | Mission Select Figures | | | | $3,145,200 | $1,794,400 | $300 | $4,939,900 |
| Rescue Heroes | B2497 | Mission Select Mountain Command Center | | | | $10,034,000 | $1,109,500 | | $11,143,500 |
| Rescue Heroes | B3056 | Mission Select Police Cruiser | | | | $2,883,200 | $44,300 | | $2,927,500 |
| Rescue Heroes | B5732 | Mission Select Firetruck | | | | $2,611,500 | $25,000 | | $2,636,500 |
| Rescue Heroes | B7684 | TRU: Opic Team | | | | $161,500 | $331,900 | | $493,400 |
| Rescue Heroes | B8106 | OPTIC/FIGURE-ANIMAL ASSORT. | | | | $362,800 | $837,100 | $3,400 | $1,203,400 |
| Rescue Heroes Video Mission | 78177 | Video Mission | | $391,200 | $6,753,100 | $776,900 | | | $7,921,200 |
| Rescue Heroes Video Mission | 78178 | Video Mission | | | | | | | |
| Rescue Heroes Video Mission | 78182 | Rocky Video Mission | | | | | | | |
| Rescue Heroes Video Mission | 78183 | Video Mission | | | | | | | |
| **Subtotal** | | | $13,738,500 | $38,079,500 | $27,923,700 | $21,773,900 | $4,142,200 | $3,700 | $105,661,600 |
| **Adjustments:** | | | | | | | | | |
| American Girl [3] | | | $0 | $485,400 | $361,000 | $310,500 | $19,000 | $0 | $1,176,800 |
| Mattel F-P Toy Store [3] | | | $0 | $57,300 | $33,500 | $110,500 | $11,900 | $0 | $213,200 |
| Mattel Toy Club [3] | | | $0 | $31,900 | $29,600 | $35,300 | $12,800 | $0 | $109,600 |
| American Girl, Toy Store and Toy Club (2004 Q4 and 2005 only) [4] | | | $0 | $0 | $0 | $0 | $49,000 | $100 | $49,000 |
| Sales of SKU 77455 [4] | | | $0 | ($1,713,760) | $0 | $0 | $0 | $0 | ($1,713,760) |
| **Adjustment Subtotal** | | | $0 | ($1,139,180) | $425,000 | $456,300 | $92,700 | $100 | ($166,180) |
| **Minimum Estimated Accused Sales** | | | $13,738,500 | $36,940,320 | $28,348,700 | $22,230,200 | $4,234,900 | $3,800 | $105,495,320 |

Notes:

1) Source for all Net Sales - FP 15786 and FP 15308-15313.

2) The net difference between accused sales on Exhibit A ($104,310,246) and accused sales in revised Exhibit A (i.e., Exhibit A-1, $105,657,800, produced with a transmittal letter on March 30, 2005, after documents were supplemented by F-P) is $1,347,554, and purportedly reflects updated data for the same period of time (2000 through 2004). An explanation for the changed data was requested but never received. While total accused sales increase, several product lines reflect lower sales in the updated data totaling ($5,585,979). Separately, the difference between Exhibits A-1 and A-2 (produced with our supplemental report as of December 30, 2005) before adjustments(reflecting accused sales of $105,661,500) is $3,700. The difference appears to be attributable to a small amount of accused sales in 2005.

3) According to F-P's consultant, Hoffman, amounts reflect sales made by Mattel's American Girl division, Toy Store at a Fisher-Price facility and Mattel Toy Club, not previously included in the sales figures.

4) Deduction purportedly reflects non-accused Voice Tech figures sold domestically based on Hoffman report, page 4.

In the Matter of
Victor G. Reiling, et. al. v. Fisher-Price, Inc.

## Exhibit C
## Damages Summary

### Primary Computation

| | |
|---|---|
| Net Sales [1] | $105,661,500 |
| Adjustments [2] | ($165,180) |
| Subtotal | $105,496,320 |
| Incremental Profit Margin [3] | 27.6% |
| PROFITS | $29,152,250 |

*Alternate Computations*

| | |
|---|---|
| *Net Sales [4]* | *$80,675,500* |
| *Adjustments [2]* | *($165,180)* |
| *Subtotal* | *$80,510,320* |
| *Incremental Profit Margin [3]* | *27.6%* |
| *PROFITS* | *$22,247,762* |

| | |
|---|---|
| *Net Sales [5]* | *$91,923,000* |
| *Adjustments [2]* | *($165,180)* |
| *Subtotal* | *$91,757,820* |
| *Incremental Profit Margin [3]* | *27.6%* |
| *PROFITS* | *$25,355,831* |

| | |
|---|---|
| *Net Sales [6]* | *$77,146,300* |
| *Adjustments [2]* | *($165,180)* |
| *Subtotal* | *$76,981,120* |
| *Incremental Profit Margin [3]* | *27.6%* |
| *PROFITS* | *$21,272,523* |

Notes:
1) Exhibit A-2. From 2000 through September 30, 2005.
2) Exhibit A-2.
3) Exhibit D.
4) Exhibit A-2. From 2000 through September 30, 2005. These sales exclude SKU 77455 and SKU 77473.
5) Exhibit A-2. From 2001 through September 30, 2005.
6) Exhibit A-2. From 2001 through September 30, 2005. These sales exclude SKU 77455 and SKU 77473.

**In the Matter of**
**Victor G. Reiling, et. al. v. Fisher-Price, Inc.**

## Exhibit D
### F-P's Estimated Profits for Disgorgement
*(Based on Incremental/Direct Profit Margin)*

| | 2000 | 2001 | 2002 | 2003 | 2004 | Total |
|---|---|---|---|---|---|---|
| Net Sales | $13,738,500 | $38,079,500 | $27,923,700 | $21,773,900 | $4,142,300 | $105,657,900 |
| Mktg Contrib | 7,054,600 | 16,469,800 | 13,072,400 | 9,431,100 | 1,160,000 | 47,187,900 |
| Tooling | 705,200 | 928,900 | 755,100 | 983,500 | 131,700 | 3,504,400 |
| Advert & Merch | 2,909,300 | 4,368,300 | 2,680,200 | 4,426,000 | 102,800 | 14,486,600 |
| Est. Incremental Profit | $3,440,100 | $11,172,600 | $9,637,100 | $4,021,600 | $925,500 | $29,196,900 |
| % | 25.0% | 29.3% | 34.5% | 18.5% | 22.3% | 27.6% |
| Comparable % | | | | | | 29.6% |
| | | | | | | |
| Overhead | 1,981,300 | 5,213,600 | 4,046,800 | 3,388,200 | 611,900 | 15,241,800 |
| Operating Profit | 1,458,800 | 5,959,000 | 5,590,300 | 633,400 | 313,600 | 13,955,100 |
| % | 10.6% | 15.6% | 20.0% | 2.9% | 7.6% | 13.2% |

Notes:
Amounts based on FP 15308-15313.
Italicized amounts include a mixture of fixed and/or non-direct costs, as well as variable and direct costs, based on cost documents produced.
F-P is only entitled to offsets for unavoidable costs incurred to produce the accused sales.
An estimate is used based on exclusion of overhead and company/competitor estimated comparable data.
Comparable % from Exhibit E.

In the Matter of
Victor G. Reiling, et. al. v. Fisher-Price, Inc.

Exhibit E
Company & Competitor Estimated Incremental/Direct Margin

| | 2002 | 2003 | 2004 |
|---|---|---|---|
| **Hasbro, Inc.** [1] | | | |
| Gross Profit | 61.0% | 59.0% | 58.2% |
| Net Profit | -6.1% | 5.0% | 6.5% |
| Incremental Profit [3] | 27.5% | 32.0% | 32.4% |
| **Mattel, Inc.** [2] | | | |
| Gross Profit | 48.3% | 49.0% | 47.2% |
| Net Profit | 4.7% | 10.8% | 11.2% |
| Incremental Profit [3] | 26.5% | 29.9% | 29.2% |
| | | | |
| **Average** | 29.6% | | |
| Range | 26.5 - 32.4% | | |

Notes:
1) Hasbro 10-K, December 2004. Figures based on year ended December 31.
2) Mattel 10-K, March 2005. Figures based on fiscal year ended March 30.
3) Midpoint between Net/Gross Profit based on past experience suggesting operating expenses are roughly 50/50 fixed and variable.

# Fisher-Price Sales Adjustments

In the matter of

Victor G. Reiling, et. al. v. Fisher-Price, Inc.

Sales for American Girl, Toy Store and Toy Club[1]

| TYPE | SKU | Description | 2000 Net Sales | 2001 Net Sales | 2002 Net Sales | 2003 Net Sales | 2004 Net Sales | 2005 Net Sales | Total Net Sales |
|---|---|---|---|---|---|---|---|---|---|
| Rescue Heroes | 77455 | Voice Tech Rescue Firetruck | | $88,200 | $49,900 | $10,500 | $600 | | $149,200 |
| Rescue Heroes | 77456 | Voice Tech Mission Command | | $144,300 | $800 | | | | $145,100 |
| Rescue Heroes | 77457 | Voice Tech Billy Blazes | | | | | | | $0 |
| Rescue Heroes | 77459 | Voice Tech Jake Justice | | | | | | | $0 |
| Rescue Heroes | 77473 | Voice Tech Rescue Jet | | $54,000 | $29,000 | $8,000 | $1,100 | | $92,100 |
| Rescue Heroes | 78157 | Voice Tech Aquatic Rescue | | $198,900 | $66,300 | $14,300 | $1,300 | | $280,800 |
| Rescue Heroes | 78361 | Voice Tech Police Cruiser | | | $49,600 | $6,500 | $200 | | $56,300 |
| Rescue Heroes | B2092 | Mission Select Figures | | | | $84,800 | $5,200 | | $90,000 |
| Rescue Heroes | B2497 | Mission Select Mountain Com Center | | | | $59,000 | $200 | | $59,200 |
| Rescue Heroes | B3056 | Mission Select Police Cruiser | | | | $28,300 | $1,400 | | $29,700 |
| Rescue Heroes | B5732 | Mission Select Firetruck | | | | $66,700 | $4,500 | | $71,200 |
| Rescue Heroes | B7684 | TRU: Optic Team | | | | $12,200 | $700 | | $12,900 |
| Rescue Heroes | B8105 | OPTIC/FIGURE-ANIMAL ASSORT. | | | | | | | $0 |
| Rescue Heroes Video Mission | 78177 | Video Mission | | | $166,300 | $20,200 | $3,800 | | $190,300 |
| Rescue Heroes Video Mission | 78178 | Video Mission | | | | | | | $0 |
| Rescue Heroes Video Mission | 78182 | Rocky Video Mission | | | | | | | $0 |
| Rescue Heroes Video Mission | 78183 | Video Mission | | | | | | | $0 |
| **Subtotal - American Girl** | | | $0 | $485,400 | $361,900 | $310,500 | $19,000 | $0 | $1,176,800 |
| Mattel F-P Toy Store | | | | $57,300 | $33,500 | $110,500 | $11,900 | | $213,200 |
| Mattel Toy Club | | | | $31,900 | $29,600 | $35,300 | $12,800 | | $109,600 |
| Am Girl, Toy Store & Toy Club (2004 Q4 and 2005 only) | | | | | | | $49,000 | $100 | $49,000 |
| **Total** | | | $0 | $574,600 | $425,000 | $456,300 | $92,700 | $100 | $1,548,600 |

Sales SKU 77456

| TYPE | SKU | Description | 2000 Net Sales | 2001 Net Sales | 2002 Net Sales | 2003 Net Sales | 2004 Net Sales | 2005 Net Sales | Total Net Sales |
|---|---|---|---|---|---|---|---|---|---|
| Rescue Heroes | 77456 | Voice Tech Mission Command | | ($1,713,780) | | | | | ($1,713,780) |
| **Total** | | | $0 | ($1,713,780) | $0 | $0 | $0 | | ($1,713,780) |

| Grand Total Adjustments | | | $0 | ($1,139,180) | $425,000 | $456,300 | $92,700 | $100 | ($165,180) |

Notes:
1) Source for American Girl, Toy Store and Toy Club Units and Net Sales - Hoffman updated report - Exhibit 4A (AG Selling Method) and Exhibit 7. Differences due to rounding.

**In the Matter of**
**Victor G. Reiling, et. al. v. Fisher-Price, Inc.**

HASBRO, INC. AND SUBSIDIARIES
Consolidated Statements of Operations
(Thousands of Dollars)

| | For the year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2004 | 2003 | 2002 | 2004 | 2003 | 2002 |
| Net revenues | 2,997,510 | 3,138,657 | 2,816,230 | 100.0% | 100.0% | 100.0% |
| Cost of sales | 1,251,657 | 1,287,962 | 1,099,162 | 41.8% | 41.0% | 39.0% |
| Gross profit | 1,745,853 | 1,850,695 | 1,717,068 | 58.2% | 59.0% | 61.0% |
| Expenses | | | | | | |
| Amortization | 70,562 | 76,053 | 94,576 | 2.4% | 2.4% | 3.4% |
| Royalties | 223,193 | 248,423 | 296,152 | 7.4% | 7.9% | 10.5% |
| Research and product development | 157,162 | 143,183 | 153,775 | 5.2% | 4.6% | 5.5% |
| Advertising | 387,523 | 363,876 | 296,549 | 12.9% | 11.6% | 10.5% |
| Selling, distribution and administration | 614,401 | 674,544 | 656,725 | 20.5% | 21.5% | 23.3% |
| Total expenses | 1,452,841 | 1,506,079 | 1,497,777 | 48.5% | 48.0% | 53.2% |
| Operating profit | 293,012 | 344,616 | 219,291 | 9.8% | 11.0% | 7.8% |
| Nonoperating (income) expense | | | | | | |
| Interest expense | 31,698 | 52,462 | 77,499 | 1.1% | 1.7% | 2.8% |
| Other expense, net | 1,226 | 48,090 | 37,704 | 0.0% | 1.5% | 1.3% |
| Total nonoperating (income) expense | 32,924 | 100,552 | 115,203 | 1.1% | 3.2% | 4.1% |
| Earnings before income taxes and cumulative effect of accounting change | 260,088 | 244,064 | 104,088 | 8.7% | 7.8% | 3.7% |
| Income taxes | 64,111 | 69,049 | 29,030 | 2.1% | 2.2% | 1.0% |
| Net earnings before cumulative effect of accounting change | 195,977 | 175,015 | 75,058 | 6.5% | 5.6% | 2.7% |
| Cumulative effect of accounting change, net of tax | — | -17,351 | -245,732 | N/A | -0.6% | -8.7% |
| Net earnings (loss) | 195,977 | 157,664 | -170,674 | 6.5% | 5.0% | -6.1% |

In the Matter of
Victor G. Reiling, et. al. v. Fisher-Price, Inc.

MATTEL, INC. AND SUBSIDIARIES
Consolidated Statements of Income
(Thousands of Dollars)

| | For the year Ended March 8, | | | | | |
|---|---|---|---|---|---|---|
| | 2004 | 2003 | 2002 | 2004 | 2003 | 2002 |
| Net Sales | 5,102,786 | 4,960,100 | 4,885,340 | 100.0% | 100.0% | 100.0% |
| Cost of sales | 2,692,061 | 2,530,617 | 2,524,353 | 52.8% | 51.0% | 51.7% |
| Gross Profit | 2,410,725 | 2,429,483 | 2,360,987 | 47.2% | 49.0% | 48.3% |
| Advertising and promotion expenses | 642,967 | 636,105 | 552,502 | 12.6% | 12.8% | 11.3% |
| Other selling and administrative expenses | 1,036,941 | 1,002,899 | 1,050,344 | 20.3% | 20.2% | 21.5% |
| Restructuring and other charges | — | 4,769 | 24,600 | N/A | 0.1% | 0.5% |
| Operating Income | 730,817 | 785,710 | 733,541 | 14.3% | 15.8% | 15.0% |
| Interest expense | 77,764 | 80,577 | 113,897 | 1.5% | 1.6% | 2.3% |
| Interest (income) | -19,683 | -18,966 | -17,724 | -0.4% | -0.4% | -0.4% |
| Other non-operating (income) expense, net | -23,518 | -16,755 | 15,871 | -0.5% | -0.3% | 0.3% |
| Income From Continuing Operations Before Income Taxes | 696,254 | 740,854 | 621,497 | 13.6% | 14.9% | 12.7% |
| Provision for income taxes | 123,531 | 203,222 | 166,455 | 2.4% | 4.1% | 3.4% |
| Income From Continuing Operations | 572,723 | 537,632 | 455,042 | 11.2% | 10.8% | 9.3% |
| Discontinued Operations | | | | | | |
| Gain from discontinued operations, net of tax | — | — | 27,253 | N/A | N/A | 0.6% |
| Income Before Cumulative Effect of Change in Accounting Principle | 572,723 | 537,632 | 482,295 | 11.2% | 10.8% | 9.9% |
| Cumulative effect of change in accounting principle, net of tax | — | — | -252,194 | N/A | N/A | -5.2% |
| Net Income | 572,723 | 537,632 | 230,101 | 11.2% | 10.8% | 4.7% |

**In the Matter of**
**Victor G. Reiling, et. al. v. Fisher-Price, Inc.**

Summary of Sales Reconciliation

    $95,043,800 Hoffman Net Sales, Exhibit 5A Corrected
    (3,286,000) Less: Closeout sales, Hoffman Exhibit 6
    $91,757,800 Total

    $105,496,320 Net Sales, Exhibit A-2
    (13,738,500) Less: 2000 Net Sales, Exhibit A-2
    $91,757,820 Total

    $91,757,820 Exhibit C, 2nd Alternate Computation Net Sales less adjustments

    -$20 Difference