UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| VICTOR G. REILING ASSOCIATES and<br>DESIGN INNOVATION, INC.,<br><br>　　　　　　　　　Plaintiffs,<br><br>　- against -<br><br>FISHER-PRICE, INC.,<br><br>　　　　　　　　　Defendant. | Index No.: 3:03 CV 222 (JBA)<br><br>January 12, 2006 |

**PLAINTIFF'S SUPPLEMENTAL CHARGE
ON CONFIDENTIAL RELATIONSHIP**

In light of the Court's ruling on Defendant's Motion for Reconsideration, dated January 10, 2006, and in particular the Court's focus on the required element of the existence of a confidential relationship between Design Innovation and Fisher-Price, Design Innovation respectfully submits the following supplemental request to charge to clarify New York law on this subject.

**I(C)  Confidential Relationship**

Third, Design Innovation must prove that it disclosed its concept to Fisher-Price in the context of a confidential relationship. "Under New York law, a confidential relationship is synonymous with [a] fiduciary relationship and ... [exists] generally where the parties do not deal on equal terms and one trusts and relies on the other . . . Such a [confidential] relationship may arise either explicitly by contract, or implicitly by the actions of the parties or other circumstances." *Stewart v. World Wrestling Fed'n Entm't,*

*Inc.*, 2004 U.S. Dist. LEXIS 26533, at *13, 14, 74 U.S.P.Q. 2d 1024 (S.D.N.Y. Jan. 11, 2005) (internal quotations and citations omitted).

"A relationship of trust and confidence may naturally result from the circumstances surrounding the dealings between the parties." *Heyman v. A.R. Winarick, Inc.*, 325 F.2d 584, 587 (2d Cir. 1964) (analyzing the standard for the existence of a confidential relationship under New York law and finding such a relationship to exist as a result of the parties' negotiations).

A confidential relationship may be created if the idea was submitted for negotiations in which one party sought to sell or license his or her concept to the other. (*Id.*); *Speedry Chemical Products, Inc. v. The Carter's Ink Co.*, 306 F.2d 328, 332 (2d Cir. 1962) (confidential relationship existed as a result of negotiations for license agreement); *Schreyer v. Casco Products Corp.*, 190 F.2d 921, 924 (2d Cir. 1951) (confidential relationship existed as a result of negotiations and disclosure of confidential know-how; judgment on unfair competition claim affirmed on appeal).

To determine the existence of a confidential relationship you may also consider the course of the parties' negotiations after the initial disclosure of the idea. *Matarese v. Moore-McCormack Lines, Inc.*, 158 F.3d 631, 634 (2d Cir. 1946) (confidential relationship created in a misappropriation of an idea case due to the "relationship of the parties before and after the disclosure . . ."); *Heyman*, 325 F.2d at 587; *Speedry Chemical*, 306 F.2d at 332; *Schreyer*, 190 F.2d at 924; *Julie Research Labs., Inc. v. Select Photographic Engineering, Inc.*, 810 F. Supp. 513, 520-21 (S.D.N.Y. 1992) ("The circumstances may suffice to show a relationship of trust and confidence based on the

dealings of the parties."), *aff'd in part, rev'd on other grounds*, 998 F.2d 65 (2d Cir. 1993).

The law holds that "the standard custom and practice in the toy industry calls for companies to treat the submission of an idea as confidential." *Nadel v. Play-By-Play Toys*, 208 F.3d 368, 371 (2d Cir. 2000).

Accordingly, it is for you to determine from the evidence of the conduct of the parties throughout the submission process -- including the entire period when Fisher-Price evaluated and considered Design Innovation's concept -- whether a confidential relationship existed between Design Innovation and Fisher-Price in relation to the concept submitted to Fisher-Price. *Those Characters From Cleveland, Inc. v. J.J. Gams, Inc.*, 1992 U.S. Dist. LEXIS 8424, 23 U.S.P.Q.2d 1109 (S.D.N.Y. 1992) ("a confidential relationship can be implied from conduct").

Dated: Norwalk, Connecticut
      January 12, 2006

                Respectfully Submitted,

                GRIMES & BATTERSBY, LLP

                By: _____
                Gregory J. Battersby (Bar No. 7386)
                Edmund J. Ferdinand, III (Bar No. 21287)
                Russell D. Dize (Bar No. 23064)
                Susan Schlesinger (Bar No. 26625)
                488 Main Avenue, Third Floor
                Norwalk, Connecticut 06851-1008
                (p) (203) 849-8300
                (f) (203) 849-9300

                SANDAK HENNESSEY & GRECO, LLP
                Jay H. Sandak, Esq.
                Peter M. Nolin, Esq.
                707 Summer Street

Stamford, Connecticut 06901-1026
(p) (203) 425-4200
(f) (203) 325-8608

Attorneys for Plaintiff
Design Innovation, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on January 12, 2006 a copy of the foregoing Supplemental Charge was served on all counsel of record below by U.S. Mail, First Class, postage prepaid, with a courtesy copy sent via electronic means to:.

Jacqueline Bucar Esq.
Robert Allen, Esq.
Tyler Cooper & Alcorn, LLP
205 Church Street
New Haven, Connecticut 06510

Bradford S. Babbitt, Esq.
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103-3597

Robert J. Lane, Jr., Esq.
Jodyann Galvin, Esq.
HODGSON RUSS LLP
One M&T Plaza, Suite 2000
Buffalo, New York 14203-2391

William Wallace, Esq.
Milbank, Tweed, Hadley & McCoy-DC
1825 Eye St., N.W., Suite 900
Washington, DC 20006

_____
Edmund J. Ferdinand, III

LEXSEE 325 F.2D 584

Everett HEYMAN d/b/a Pleasure Products Co., Plaintiff-Appellant, v. AR.
WINARICK, INC., AR. Winarick, Inc., Dura-Gloss Division, jules Winarick and
Hugo L. Bell, Defendants-Appellees

No. 50, Docket 27856

UNITED STATES COURT OF APPEALS SECOND CIRCUIT

325 F.2d 584; 1963 U.S. App. LEXIS 3352; 140 U.S.P.Q. (BNA) 403; 9 A.L.R.3d 652

October 14, 1963, Argued
December 24, 1963, Decided

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff product inventor sought review of an order of the trial court which dismissed plaintiff's case, holding defendant corporation did not misappropriate plaintiff's trade secrets where plaintiff revealed in part to defendant the chemical composition of its product and customer lists.

**OVERVIEW:** Plaintiff was an inventor of a fingernail hardener which it presented to defendant corporation in connection with the sale of plaintiff's business. Defendant failed to buy plaintiff's business and subsequently began marketing its own nail hardener. Plaintiff brought suit claiming defendant wrongfully appropriated plaintiff's trade secrets. The trial court dismissed plaintiff's action. The reviewing court affirmed, holding the trial court determined plaintiff did not reveal the ingredients in the product through assessing the credibility of trial witnesses, the court's findings were not clearly erroneous and did not warrant reversal. Where the trial court determined plaintiff's limited disclosure of the chemical composition of the product did not reveal a trade secret, the reviewing court agreed, finding plaintiff did not disclose enough information to aid in the development of defendant's product. Where defendant gained knowledge of plaintiff's customer lists, but plaintiff failed to prove defendant used such knowledge, no violations occurred.

**OUTCOME:** The reviewing court affirmed the trial court's judgment dismissing plaintiff's suit, holding where plaintiff failed to disclose sufficient information to aid defendant in the manufacture of a product similar to plaintiff's, and where plaintiff failed to prove defendant's use of plaintiff's customer lists, no trade secret violations occurred.

**CORE TERMS:** customer, formula, disclosure, confidential relationship, trade secret, ingredient, fingernail, negotiations, hardener, quaternary, purchasing, marketing, trade secrets, cosmetic, liquid, non-toxic, disclose, chemist, water, chemical analysis, confidence, discover, secret, seller, manufacture, divulged, compound, surface, substantial evidence, prospective buyer

**LexisNexis(R) Headnotes**

*Labor & Employment Law > Trade Secrets & Unfair Competition > Trade Secrets*
*Trade Secrets Law > Misappropriation Actions > Elements > Confidentiality*
*Trade Secrets Law > Misappropriation Actions > Elements > Disclosure*
[HN1] A plaintiff in a misappropriation of trade secrets action must show that a confidential relationship existed between plaintiff and defendant, that disclosures of what amounted to trade secrets

325 F.2d 584, *; 1963 U.S. App. LEXIS 3352, **;
140 U.S.P.Q. (BNA) 403; 9 A.L.R.3d 652

were made by plaintiff to defendant, and that defendant made use of those disclosures.

***Labor & Employment Law > Trade Secrets & Unfair Competition > Trade Secrets***
***Trade Secrets Law > Breach of Contract > Breach of Confidence > Confidential Relationships***
[HN2] The determination of the existence of a confidential relationship is the starting point in a trade secrets case.

***Labor & Employment Law > Trade Secrets & Unfair Competition > Trade Secrets***
[HN3] While there may be no indication that a plaintiff in a trade secrets action extracted from defendants a promise of trust with respect to information disclosed during their negotiations, an express agreement is not a prerequisite to the establishment of a confidential relationship.

***Labor & Employment Law > Trade Secrets & Unfair Competition > Trade Secrets***
***Trade Secrets Law > Misappropriation Actions > Elements > Disclosure***
[HN4] Where the parties in a misappropriation of trade secrets case are a seller and prospective purchaser, certain disclosures will usually be made about the thing which is for sale so that the purchaser may rationally assess the merits of concluding the bargain. If the information disclosed is of such a nature as to otherwise qualify as a trade secret, the prospective buyer is bound to receive the information in confidence. As the prospective buyer is given the information for the limited purpose of aiding him in deciding whether to buy, he is bound to receive the information for use within the ambit of this limitation. He may not in good conscience accept the information; terminate negotiations for the sale; and then, using vital data secured from the would-be seller, set out on a venture of his own. Whatever conduct courts should countenance when parties bargain at arm's length, parties should be expected to comply with these essentials of fair dealing.

***Civil Procedure > Appeals > Standards of Review > Substantial Evidence***
***Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review***
[HN5] The appellate court is not disposed to overturn conclusions of the trier of facts which are based upon substantial evidence and upon a determination of the credibility of witnesses who have given conflicting versions of the facts. Moreover, where a trial has been had by a judge without a jury, the judge's findings must stand unless clearly erroneous. Fed. R. Civ. P. 52(a). A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and rim conviction that a mistake has been committed.

***Labor & Employment Law > Trade Secrets & Unfair Competition > Trade Secrets***
***Trade Secrets Law > Protected Information > Customer Lists***
***Trade Secrets Law > Misappropriation Actions > Independent Development***
[HN6] A customer list may be a trade secret. The names of the customers of a business concern are deemed just as sacred and entitled to the same protection as a secret of compounding some article of manufacture and commerce. All that is required is that the information or knowledge represents in some considerable degree the independent efforts of its claimant.

**COUNSEL:** [**1]

Bass & Friend, New York City (Solomon H. Friend, New York City, of counsel), for plaintiff-appellant.

Blackman & Willner, New York City (Harold J. Blackman, New York City, of counsel), for defendants-appellees.

**JUDGES:**

Before WATERMAN, HAYS and MARSHALL, Circuit Judges.

**OPINIONBY:**

WATERMAN

**OPINION:**

[*585]

In this case plaintiff seeks damages, an injunction, and an accounting of profits. He claims an alleged wrongful appropriation of trade secrets obtained in the course of a confidential relationship and joins as defendants AR. Winarick, Inc., Jules Winarick, the defendant corporation's president, and Hugo Bell, its sales manager. Plaintiff alleges that during negotiations with defendants over the possible purchase by defendant corporation of a business owned by plaintiff, he revealed to defendants confidential information about the business which defendants ultimately used for [*586] their own benefit. The case was tried below by a court without a jury. n1 After a full trial of the issues the United States District Court for the Southern District of New York, Cooper, J., dismissed the complaint. The opinion below is reported at *207 F.Supp. 78*. We affirm. [**2]

In 1956, plaintiff organized in California a business called Pleasure Products Company, devoted to the manufacture and marketing of a non-patented liquid fingernail hardener called 'It's a Pleasure.' The product, designed to strengthen fingernails through daily immersion in a prepared solution of the product with water, was sold at drugstores, beauty shops, and cosmetic counters throughout the country. The business resulted from plaintiff's accidental discovery, in 1955, that a chemical compound he was then testing at home for detergent properties had the remarkable effect of hardening fingernails. Unfortunately the compound, so discovered, which plaintiff referred to below as a 'quaternary' or 'surface active agent,' was toxic. Consequently plaintiff devoted much time in succeeding months to the testing of various chemical compounds in an attempt to find a non-toxic substitute. At last he discovered a satisfactory substitute and combined it with water and coloring to form his product. Apparently marketing efforts proved successful and plaintiff's business began to grow.

In September of 1957, plaintiff placed an advertisement in the West Coast edition of the Wall Street Journal [**3] offering his business for sale at $ 80,000. A broker for defendant AR. Winarick, Inc., a large cosmetics firm with a multi-million dollar annual volume of business, contacted plaintiff and indicated that his client might be interested in purchasing.

Plaintiff thereafter met with the defendant corporation's representatives on three separate occasions in Los Angeles. On October 18 and November 7 or 8 plaintiff met with the corporation's sales manager, Hugo Bell, one of the individual defendants in the case, and on November 8 or 9 he met with Bell and the other individual defendant, Jules Winarick, the corporation's president. The testimony below was in sharp conflict as to just what information plaintiff divulged during the meetings. Plaintiff claimed that he disclosed to defendants certain trade secrets, both the formula for his product and important information as to the marketing of it. On November 13 defendants sent plaintiff a telegram indicating that they were no longer interested in purchasing his business and five months later defendant AR. Winarick, Inc. began marketing its own liquid fingernail hardener under the name of 'Dura-Gloss Finger-Nail Hardener,' the purchase [**4] price of which was approximately one third that of plaintiff's. Plaintiff then commenced this suit.

In a case such as [HN1] this the plaintiff must show that a confidential relationship existed between plaintiff and defendant, that disclosures of what amounted to trade secrets were made by plaintiff to defendant, and that defendant made use of those disclosures. *Speedry Chemical Prods., Inc. v. Carter's Ink Co., 306 F.2d 328, 331 (2 Cir. 1962)*; Restatement, Torts, § 757 (1938).

Mindful of Justice Holmes's statement that [HN2] the determination of the existence of a confidential relationship is the 'starting point' in a case like this, *E.I. Du Pont de Nemours Powder Co. v. Masland, 244 U.S. 100, 102, 37 S.Ct. 575, 61 L.Ed. 1016 (1917)*, we begin by examining the relationship which developed between the parties in the case at bar. [HN3] While there is no indication that plaintiff extracted from defendants [**5] a promise of trust with respect to information disclosed during their negotiations, an express agreement is not a prerequisite to the establishment of a confidential relationship. [*587] *Speedry Chemical Prods., Inc. v. Carter's Ink Co., supra; Underhill v. Schenck, 238 N.Y. 7, 143 N.E. 773, 33 A.L.R. 303 (1924); Biltmore Publishing Co. v. Grayson Publishing Corp., 272 App.Div. 504, 71 N.Y.S.2d 337* (1st Dep't

1947). A relationship of trust and confidence may naturally result from the circumstances surrounding the dealings between the parties.

[HN4] Where, as here, the parties are a seller and a prospective purchaser, certain disclosures will usually be made about the thing which is for sale so that the purchaser may rationally assess the merits of concluding the bargain. If the information disclosed is of such a nature as to otherwise qualify as a trade secret, we think the prospective buyer is bound to receive the information in confidence. Speedry Chemical Prods., Inc. v. Carter's Ink Co., supra; *Smith v. Dravo Corp., 203 F.2d 369 (7 Cir. 1953);* [**6] *Schreyer v. Casco Prods. Corp., 190 F.2d 921 (2 Cir. 1951),* cert. denied, *342 U.S. 913, 72 S.Ct. 360, 96 L.Ed. 683 (1952); Hoeltke v. C.M. Kemp Mfg. Co., 80 F.2d 912 (4 Cir. 1935).* As the prospective buyer is given the information for the limited purpose of aiding him in deciding whether to buy, he is bound to receive the information for use within the ambit of this limitation. He may not in good conscience accept the information; terminate negotiations for the sale; and then, using vital data secured from the would-be seller, set out on a venture of his own. Whatever conduct courts should countenance when parties bargain at arm's length, we think parties should be expected to comply with these essentials of fair dealing.

The view that a confidential relationship arises when a seller and buyer negotiate for a sale is not new to this Circuit. In Schreyer v. Casco Prods. Corp., supra, the plaintiffs, developers of an electric steam iron, had entered into negotiations looking toward the manufacture and sale of their product by the defendant under a license. During negotiations plaintiffs turned over to defendant blue prints and other detailed [**7] information, and revealed the 'know-how' of the product's manufacture. Apart from the seller-buyer relationship which called for the finding that a confidential relationship had been established, no special facts were said to exist. Nevertheless, the court found that although there was 'no express agreement to hold the information in confidence and not to use it if the negotiations for a license were not successful, there was a confidential relationship created between the parties by the disclosures which restricted the right of Casco to use them to the purposes for which the disclosures were made. *Hoeltke v. C.M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912.* The breach of this confidential relationship, enabling Casco to invade the plaintiffs' market, was unfair competition.' *190 F.2d at 924.* More recently, in Speedry Chemical Prods., Inc. v. Carter's Ink Co., supra, this court, citing the Schreyer case, also found a confidential relationship where the parties bargained at arm's length with respect to a licensing agreement. See also *Matarese v. Moore-McCormack Lines, Inc., 158 F.2d 631, 170 A.L.R. 440 (2 Cir. 1946).* Therefore, we conclude that the [**8] parties here, in their negotiations looking toward defendant's purchase of plaintiff's business, entered into a confidential relationship with respect to disclosures which plaintiff may have made about that business. n2

[*588] The next problem, that of determining whether plaintiff actually disclosed to defendants trade secret information, raises questions of both fact and law. There is the initial question, purely factual, of what information was revealed to defendants; and there is also the question whether whatever information that was divulged should be entitled to protection under the law of trade secrets.

At the trial, a sharp conflict in testimony developed relative to what plaintiff disclosed to defendants during negotiations. The testimony was particularly conflicting with respect to whether plaintiff had revealed the ingredients of his product. Plaintiff testified that during his first meeting with defendant Bell he explained to Bell the details of the discovery of his product, and had revealed that the active ingredient in his fingernail hardener was a 'quaternary' or a 'non-toxic surface agent.' n3 Plaintiff also testified that in his final meeting with both Bell [**9] and Winarick he had reiterated this, and had spelled out the product's composition in more detail. n4 Defendants, on the other hand, both testified that plaintiff had not revealed the ingredients of his product, n5 though Bell [*589] did admit on cross-examination that he could not definitely remember whether plaintiff had recounted his story of how the product had been discovered. Moreover, defendants put on the stand one Kaye, a chemist, who testified that during a period of several months subsequent to the California conferences he had worked for defendant corporation on the laboratory development of a liquid fingernail hardener. He testified that he had received from defendants no information whatsoever as to the in-

gredients such a product should contain. n6 Thus, the determination of the issue depended largely upon an evaluation of the credibility of the witnesses who testified.

[HN5] Our court is not disposed to overturn conclusions of the trier of facts which are based upon substantial evidence and upon a determination of the credibility of witnesses who have given conflicting versions [**10] of the facts. *N.L.R.B. v. Chain Service Restaurant Employees*, 302 F.2d 167, 171 (2 Cir. 1962); *Wilson v. United States*, 229 F.2d 277, 279 (2 Cir. 1956); *Phelan v. Middle States Oil Corp.*, 220 F.2d 593, 598 (2 Cir.), cert. denied sub nom. *Cohen v. Glass*, 349 U.S. 929, 75 S.Ct. 772, 99 L.Ed. 1260 (1955). Moreover, where a trial has been had by a judge without a jury, the judge's findings must stand unless 'clearly erroneous.' *Fed.R.Civ.P. 52(a)*, 28 U.S.C. 'A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

Here, the district judge made the following findings of fact with respect to the disclosure of formula information:

13. That the plaintiff has failed to prove by a fair preponderance of the evidence any disclosures to the defendants of the formula of his product or of its ingredients.

14. Having observed the various witnesses and heard the sworn testimony [**11] and having considered all of the evidence, I believe the testimony of defendants BELL and WINARICK with respect to the absence of any disclosure of the formula or secret ingredients of plaintiff's product; and I disbelieve the testimony of plaintiff in connection with the alleged disclosure of the formula or ingredients.

[*590] 15. That plaintiff's casual reference to a quaternary was not the disclosure of a trade secret and was not regarded by the parties as a disclosure of a trade secret.

After having carefully examined the record in this case, and paying due regard to the trial court's opportunity to observe and consider the demeanor of the witnesses, we are of the opinion that the above findings were based upon substantial evidence, and that no clear error was committed. To the extent that Finding No. 15 involves a conclusion of law that plaintiff's reference to a 'quaternary' did not amount to the divulging of a trade secret, we are in agreement with the trial court. Of course, if plaintiff had disclosed the actual formula for his product, or if he had informed defendants with more particularity of its ingredients, there would have been a disclosure of a trade secret. [**12] Restatement Torts 757; *Extrin Foods, Inc. v. Leighton*, 202 Misc. 592, 115 N.Y.S.2d 429 (Sup.Ct.1952). But it is our view that plaintiff's casual reference to a 'quaternary' was so vague and indefinite as not to be entitled to protection under the law of trade secrets. At any rate, plaintiff's evidence failed to establish that whatever knowledge may have been communicated to defendants by the mention of a 'quaternary' defendants were thereby aided in any way in the development of a liquid fingernail hardener of their own.

In determining whether plaintiff disclosed to defendants information dealing with the marketing of his product, the district judge found more favorably for plaintiff. He found that plaintiff had supplied defendant Bell with information regarding the periods when he had advertised his product and the extent of that advertising; and had supplied data covering the monthly orders of three or four of his customers in each of eight trading areas throughout the country. Bell admitted that he had received and recorded this information, and that he had discussed it with defendant Winarick. The trial judge concluded, however, that this information could not [**13] be classified as trade secret information. He reasoned that defendants could have obtained the names of these customers by examining a classified directory or by utilizing defendants' own knowledge of likely customers in the cosmetics trade.

We are of the view that this customer information should have been classified as a trade secret. In Comment (b) to § 757 of the Restatement of Torts, where the general factors are set forth which should be considered in determining whether information is a trade secret, it is stated that [HN6] a customer list may be a trade secret.

'The names of the customers of a business concern * * * should be deemed just as sacred and entitled to the same protection as a secret of compound-

ing some article of manufacture and commerce.' *W. Walley, Inc. v. Saks & Co.*, 266 App.Div. 193, 41 N.Y.S.2d 739, 743 (1st Dep't 1943). 'All that is required is that the information or knowledge represent in some considerable degree the independent efforts of its claimant. Clearly plaintiffs' plans and customer lists fall within this broad field of knowledge and may properly [**14] be the subject matter of a trade secret.' *Smith v. Dravo Corp., supra*, 203 F.2d at 373. The fact that defendants could have secured the names of likely customers for a fingernail hardener through alternative methods should not preclude denominating the information which was disclosed as a trade secret. While the names of potential customers may have been obtainable from a simple examination of a classified directory, information as to the retailers who were actually purchasing plaintiff's product could not have been so secured. Moreover, the data concerning the amount of the product each customer purchased, compiled on a monthly basis, was certainly not obtainable in this way. Finally, as we have had occasion to note before, resolution of the issue in a case like this depends not upon how a defendant could have acquired the information, but rather upon how he did in fact actually acquire it. 'It matters not that defendants could have gained [*591] their knowledge from a study of the expired patent and plaintiffs' publicly marketed product. The fact is that they did not. Instead they gained it from plaintiffs via their confidential relationship, and in so doing [**15] incurred a duty not to use it to plaintiffs' detriment.' *Franke v. Wiltschek*, 209 F.2d 493, 495 (2 Cir. 1953). Accord: *Tabor v. Hoffman*, 118 N.Y. 30, 37, 23 N.E. 12 (1889); *Extrin Foods, Inc. v. Leighton, supra*. Thus, plaintiff established that his disclosure to defendants of trade secret information in the form of customer data was disclosed to them in the course of a confidential relationship.

Having established this, however, plaintiff had to prove that defendants utilized the customer information and thereby damaged plaintiff. On this issue the finding of the trial judge was squarely against plaintiff:

18. Plaintiff has failed to prove how he was damaged in his business as a consequence of the disclosure of the names of some of his customers and the related information referred to. to.

An examination of the record satisfies us that plaintiff failed to establish that defendants used the customer information given them by plaintiff and that this finding below should be upheld. Plaintiff introduced no direct evidence of use. Defendant Winarick testified that samples of his firm's product, in its promotional campaign conducted in New [**16] York, were sent to every drug store in Manhattan, and that inasmuch as the promotion was handled by a wholesaler rather than by the defendant corporation he did not know whether plaintiff's customers were included. He also testified that he had discarded the customer information obtained from the plaintiff after he and his firm had lost interest in purchasing plaintiff's business. Also, plaintiff stipulated that in the year 1958 defendant corporation was selling cosmetics other than its fingernail hardener to the identical firms and outlets to which plaintiff was selling its product. This would tend to indicate that if defendant corporation did promote its own fingernail hardener to customers who were then purchasing the plaintiff's product, this could well have been due to the fact that defendant corporation was but following the natural course of promoting its own products to its own customers. Finally, though the sequence of events here could support an inference that the marketing information secured from plaintiff influenced defendants' decision to market a competing product, the trial judge was not required to draw that inference. Plaintiff's success was reason enough for [**17] other manufacturers of cosmetics to seek to market competitive nail-hardening liquids.

Affirmed.

n1. Plaintiff is a citizen of California. Defendant Bell is a citizen of Connecticut. Defendant Winarick is a citizen of New York. Defendant AR. Winarick, Inc. is a corporation organized under the laws of New York. Jurisdiction is therefore based on diversity of citizenship. *28 U.S.C. § 1332*.

n2. The court in Matarese v. Moore-McCormack Lines, while finding for the plaintiff, noted that, 'Courts have justly been assiduous in defeating attempts to delve into the pockets of business firms through spurious claims for compensation for the use of

ideas.' *158 F.2d at 634*. The situations where the court felt such caution needed to be exercised were made clear by the further statement that, 'Thus to be rejected are attempts made by telephoning or writing vague ideas to business corporations and then seizing upon some later general similarity between their products and the notions propounded as a basis for damages.' Ibid. Recovery was permitted in the Matarese case where plaintiff, a stevedore who had worked on defendant company's pier, had disclosed an idea for facilitating the loading and unloading of cargo in the course of negotiations with defendant's agent and the idea was later appropriated by defendant company.

The case at bar is clearly not one involving claims which the court in Matarese would have regarded as involving too high a probability of spuriousness to accept. Here plaintiff, the owner of a going business, advertised for its sale in a financial journal. Defendant corporation's broker approached plaintiff and indicated that his client might be interested in purchasing the business. Defendant's agents thereafter made contact with plaintiff and engaged in a series of meetings with him looking toward the purchase of the business.

The cautionary advice in Matarese did not prevent the court, in the two later cases of Speedry Chemical Prods., Inc. v. Carter's Ink Co., and Schreyer v. Casco Prods. Corp., cited in the text, from finding that a confidential relationship existed when the parties bargained at arm's length for the concluding of licensing agreements.

[\*\*18]

n3. Plaintiff testified in this connection as follows:

'Again Mr. Bell seemed impressed with the success of our company. He asked, 'Well what did you have in this thing to make it work?"

'He says, 'Are you a chemist?"

'I said, 'No I am not a chemist. I have always dabbled in the kitchen. I am not a chemist."

"Well, how does it work?"

'I said, 'Basically, it is a very simple product."

'I said, 'I tell you we had a quaternary, and that initially it was toxic, and I discovered the substitute, the non-toxic surface agent."

n4. In testifying as a what he had said to Winarick during the meeting, plaintiff stated:

'I told him -- he asked about the ease of manufacturing, which I told him. I told him our price breakdown, the cost of the ingredients, and what was in it, that it consists of water, certified food coloring, and a non-toxic active surface agent, quaternary, which was the prime, only ingredient in there which affected the nails, made them hard. I gave them the costs, bottles, caps, printing.'

n5. Defendant Bell testified on direct examination that plaintiff had disclosed to him no formula information during either of his two meetings with plaintiff:

'Q. Did you request the plaintiff to disclose his formula to you?'

'A. No, sir.'

'Q. At that conversation was there anything said about any formula?'

'A. No, sir.'

'Q. Did you request the plaintiff at that visit to disclose the formula to you?'

'A. No, sir.'

'Q. Did he disclose his formula to you?'

'A. No, sir.'

'The Court: May I suggest, Mr. Blackman, 'disclose' is a pretty general term. Would you mind putting your question in a much more all-inclusive fashion, because that really is the heart of the matter.'

'Q. At that visit what if anything was said concerning the plaintiff's formula?'

'A. The only thing I asked him about the product itself was whether he had any complaints of women being allergic to it, and he said he had none. We never discussed what was in it. I presume there was water in it.'

Defendant Winarick denied that during the third meeting, in which he and defendant Bell met jointly with plaintiff, any formula information had been divulged:

'Q. Now, what did he answer in reference to these various matters that you put to him?'

'A. * * *

As far as formula, he refused to give me any information on that.'

'Q. Did he give you any information concerning the ingredients of his product?'

'A. Absolutely not.'

[**19]

n6. It appears from the record that much of Kaye's laboratory work was chemical analysis of plaintiff's product in an attempt to discover its formula. Plaintiff on this appeal has made much of this, evidently in the belief that such conduct was somehow actionable. It is clear, however, that defendants were free to attempt to discover plaintiff's formula by having his product subjected to chemical analysis. *Speedry Chemical Prods., Inc. v. Carter's Ink Co., supra, 306 P.2d at 330; Franke v. Wilstchek, 209 F.2d 493, 496 (2 Cir. 1953); Tabor v. Hoffman, 118 N.Y. 30, 23 N.E. 12 (1889); Extrin Foods, Inc. v. Leighton, 202 Misc. 592, 115 N.Y.S.2d 429, 433-434 (S.Ct.1952).* As the court said in *Tabor v. Hoffman, supra, 118 N.Y. at 36, 23 N.E. at 13:* 'If a valuable medicine, not protect by patent, is put upon the market, anyone may, if he can by chemical analysis and a series of experiments, or by any other use of the medicine itself, aided by his own resources only, discover the ingredients and their proportions. If he thus finds out the secret of the proprietor, he may use it to any extent that he desires without danger of interference by the courts.'

[**20]