UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| VICTOR G. REILING ASSOCIATES and DESIGN INNOVATION, INC.,<br><br>Plaintiffs,<br><br>- against -<br><br>FISHER-PRICE, INC.,<br><br>Defendant. | Index No.: 3:03 CV 222 (JBA)<br><br><br><br>January 16, 2006 |

**PLAINTIFF'S MEMORANDUM ON THE PROPER STANDARD
TO DETERMINE "USE" IN A MISAPPROPRATION OF IDEA CASE**

During the final Pre-Trial Conference on January 13, 2006, the Court considered the proper legal standard to determine the element of "use" in a misappropriation of an idea case. The Court also considered what types of evidence Design Innovation, Inc. ("DI") may rely upon at trial to prove that Fisher-Price used its concept.

DI submits the following memorandum to clarify the proper legal standard for the element of "use" and to address two related evidentiary issues: (1) whether any opinion testimony from the parties' witnesses (either lay or expert) is permissible on the issue of similarity, or whether the jury makes that determination by comparing DI's concept with the accused products without regard to lay or expert opinion testimony on that issue; and (2) whether evidence showing that Fisher-Price and other toy companies have traditionally licensed concepts, and have made substantial changes to the submitted concepts prior to marketing finished products, is relevant to determine "use" by Fisher-Price in this case.

## I. Legal Standard for the "Use" Element of a Misappropriation of an Idea Claim

To prevail on its misappropriation claim, Design Innovation must prove that Fisher-Price used its concept. *AEB & Associates Design Group v. Tonka Corp.*, 853 F. Supp. 724, 734 (S.D.N.Y. 1994). A showing of use may be inferred by: (1) a showing of a substantial similarity between Design Innovation's concept and each accused Fisher-Price product; and, (2) Fisher-Price's access to Design Innovation's concept. (S.J. Ruling at 42, *citing Ball v. Hershey Foods Corp.*, 842 F. Supp. 44, 48 (D. Conn. 1993), *aff'd* 14 F.3d 591 (2d Cir. 1993); *Ed Graham Prods., Inc. v. Nat'l Broad. Co.*, 347 N.Y.S.2d 766, 768 (N.Y. Sup. Ct. 1973)). *See also Merritt Forbes & Co. v. Newman Inv. Secur, Inc.*, 604 F. Supp. 943 (S.D.N.Y. 1985).

> To determine the element of substantial similarity:
>
> Similarities between the submission and the ultimate product may justify the factual inference that one was copied from the other....If the concept submitted is unique, or if there are many points of likeness, the inference is strengthened. On the other hand, a lack of novelty or the existence of many dissimilar features will support a denial that the idea was used by the recipient.

*Ball*, 842 F. Supp. at 48 (*quoting In re Elsinore Shore Associates*, 102 B.R. 958, 971 (D.N.J. 1989) (*ellipses in original*); *Duffy v. Charles Schwab & Co., Inc.*, 2001 U.S. Dist. Lexis 14070 at *13 (D.N.J. Sept. 4, 2001). In *Ball,* the court found that while plaintiff's advertising concept and defendant's accused advertisement both concerned a little girl having a tea party, "the theme of the plaintiff's idea is children, enjoying candy bars," whereas "the theme of the defendant's commercial is [that] Hershey Miniatures can satisfy a variety of individual tastes." 842 F. Supp. at 48. Following *Ball* and *Ed Graham Productions,* the jury must determine whether the "theme" of DI's concept (*i.e.* adding an

image component to the backpack of each Rescue Heroes figure to depict that character's mission so as to enhance play value . . .), is substantially similar to the "theme" of the accused Rescue Heroes products. (S.J. Ruling at 47). Indeed, for purposes of Fisher-Price's motion for summary judgment, the Court compared DI's <u>concept</u> with the accused Rescue Heroes products, and found that questions of material fact existed as to similarity for all of accused Rescue Heroes products except for the Optic Force line.[1] (S.J. Ruling at 41-50).

Importantly, because this is a misappropriation of an idea case, and not a copyright or patent case, it is critical that the jury compare the <u>concept</u> and the accused products – not just the prototype/written submissions and the accused products. This is consistent with the governing law in misappropriation of idea cases set forth above which compare the "theme" of the concept with that of the accused products. It is also consistent with the fact that misappropriation of idea cases deal with the protection of ideas, while copyright and patent law protect the tangible work or invention (*i.e.*, the manifestation of the idea).[2] Hence, if this were a copyright or design patent case, it

---

[1] For all of the Optic Force characters except for Telly Photo, the Court found that the characters did not embody DI's concept "because they do not include a visual depiction of any sort to cue play, on a backpack or elsewhere, and their means of enhancing play value is in real-time, by what the child actually sees through the optical device, as opposed to being cued by an artificial visual depiction." (S.J. Ruling at 49).

[2] For example, it is well settled that copyright law protects the expression of an idea (*i.e.*, the actual artwork, three-dimensional sculpture, etc.), not the ideas themselves. Section 102(a) of the Copyright Act, 17 U.S.C. § 102(a), provides that "Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression . . .," and Section 102(b) confirms that "In no case does copyright protection for an original work of authorship extend to any idea . . . concept . . . regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b). For this reason, to establish the element of "substantial similarity" in the copyright context, courts typically employ a visual side-by-side comparison of the "total concept and feel" of the copyrighted work and the accused material that focuses on the aesthetic similarity between the two. *See, e.g., Boisson v. Banian, Ltd.*, 273 F.3d 262 (2d Cir. 2001); *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101 (2d Cir. 2001).

3

would be proper for the jury to compare only the written submissions/prototype with the accused products to determine similarity. But since this is a misappropriation of idea case, and not a misappropriation of a "prototype" case, it is crucial that the comparison be between Design Innovation's concept and the accused Rescue Heroes products.

## II. Lay and Expert Opinion Testimony on the Issue of Similarity

DI intends to elicit testimony from its principals and its expert witness on the points of similarity between the concept and the accused Rescue Heroes products. DI also intends to elicit opinion testimony from these same witnesses that Fisher-Price has "used" DI's concept for each of the accused action figure lines because of the points of similarity. Fisher-Price does not challenge the testimony from any witness regarding the points of similarity between the concept and the accused products, nor could they because such testimony as to foundational facts -- such as which Rescue Heroes products are accused and why -- are surely within the province of the witnesses. *See generally* Fed. R. Evid. 701, 702.[3]

Rather, Fisher-Price objects to any opinion testimony from DI's principals or Victor Reiling on the element of use. (*See* Fisher-Price's Supplemental Objections to the Inventors' Testimony Regarding Use/Infringement, dated January 13, 2006). During the final Pre-Trial Conference on January 13, 2006, Fisher-Price argued that the parties' experts should be the exclusive source of opinion testimony on the issue of use. In support, Fisher-Price argues that inventors in patent infringement cases are not permitted

---

[3] By analogy, in the patent context inventors are competent to explain the invention and what was intended to be conveyed by the specifications and conveyed by the claims. *Voice Techs Group, Inc v. VMS Sys, Inc.*, 164 F.3d 605, 615 (Fed. Cir. 1999).

4

to provide opinion testimony unless the inventor has been disclosed as an expert witness. (Fisher-Price Supplemental Obj. at 1).

As a threshold matter, prior misappropriation of an idea cases are silent as to the admissibility of opinion testimony from a lay witness on the issue of "use."[4] Fisher-Price's attempt to preclude opinion testimony of DI's principals on the issue of "use" based on patent law is distinguishable because the cited authority merely stand for the proposition that lay witnesses cannot provide opinion testimony about highly technical and specialized matters in patent cases, which is consistent with Rules 701 and 702. *See Freedom Wireless, Inc. v. Boston Communications Group, Inc.*, 369 F. Supp.2d 155 (D. Mass. 2005) (witness' proposed testimony on issues of obviousness and triviality were improper because of his "highly technical and specialized knowledge of telecommunications"); *J&M Corp. v. Harley Davidson*, 2000 U.S. Dist. LEXIS at *60-62 (D. Ariz. Feb. 10, 2000) (lay witness not qualified to render an opinion on technical aspects of doctrine of equivalents), *aff'd*, 269 F.3d 1360 (Fed. Cir. 2001).

Thus, any requirement in patent cases to prevent inventors from providing opinion testimony regarding infringement, no doubt, comes from the somewhat complicated nature of patent terminology and claim construction and interpretation, a problem that is absent in a misappropriation of an idea case. In such cases, the designers or inventors are a competent source of such evidence since they can describe what the misappropriated concept was and why they believe that it was misappropriated.

---

[4] Misappropriation of an idea cases are also silent on the admissibility of expert testimony. Notably, the Second Circuit does not permit expert testimony to determine substantial similarity in copyright cases. *See Shine v. Childs*, 382 F. Supp.2d 602, 614 (S.D.N.Y. 2005). Expert testimony on the issue of infringement is routine in complex patent cases, although the Federal Circuit has not adopted a *per se* rule requiring expert testimony in such cases. *See Centricut, LLC v. The ESAB Group*, 390 F.3d 1361, 1369-70 (Fed. Cir. 2004), cert denied, 126 S. Ct. 337 (U.S. 2005).

5

DI submits that opinion testimony from its witnesses on the issue of use meets the standard of Fed. R. Evid. 701 because the testimony is not based on technical or specialized knowledge. Rather, the testimony is based on the perceptions of the witnesses in light of their work experience. *Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.*, 290 F.3d 98, 110-111 (2d Cir. 2002).

Accordingly, DI submits that the Court should permit testimony from both lay and expert witnesses on the issue of similarity because such testimony will assist the jury to determine facts in issue and understand the evidence.

### III. Relevance of Industry Custom and Practice on Changes to Concepts

DI intends to elicit testimony from its own principals and from Victor Reiling regarding their dealings with Fisher-Price to establish Fisher-Price's practice of making substantial changes to licensed concepts prior to marketing finished toy products. DI also intends to elicit testimony from its expert, James Kipling, to establish toy industry custom and practice on this issue. This evidence is consistent with case law and other secondary sources which confirm that toy companies have historically operated in this manner. *See Learning Curve Toys, Inc. v. Playwood Toys, Inc.*, 342 F.3d 714, 727 (7th Cir. 2003) (testimony of industry expert Michael Kennedy, former counsel at Tyco Toys (now part of Mattel), confirming "You don't see a final product when you meet with an inventor. You see a preliminary product or a prototype kind of product"); Levy and Weingartner, THE TOY AND GAME INVENTOR'S HANDBOOK AT 92-93, 185 (confirming toy industry practice of licensing rough concepts and providing example of "Tickle Me Elmo"

6

concept that came in as a "Tickles the Chimp" without the vibration feature that became central to the finished product).[5]

Fisher-Price objects to any testimony relating to a concept submission other than the submission at issue in this case on relevance grounds. DI submits that such evidence is highly relevant to many issues in the case, including the issue of use. Indeed, DI must first explain its concept for the jury, and the explanation of DI's concept is relevant to the required elements of concreteness, novelty and use. The evidence of changes to concept submissions is highly relevant to DI's explanation of the concept, because it serves to rebut Fisher-Price's defense that the scope of DI's concept should be limited only to the words contained in the submission documents and the Option Agreement.

In the Summary Judgment Ruling, the Court credited DI's evidence regarding changes to concept submissions when it sought to define DI's concept for purposes of evaluating use. (*See* S.J. Ruling at 43). Following the Court's reference to DI's evidence that: (1) concepts submitted by outside inventors are broadly construed; (2) the performance of the concept could be achieved in many different ways; and (3) the toy company may ultimately change the concept (S.J. Ruling at 43), the Court adopted DI's definition of the concept as consistent with the submissions. (*Id.* at 44).

Accordingly, evidence of how a toy company ultimately uses a submitted concept and the degree to which it might change such concept in order to create the final commercial product (while still being obligated to compensate the designer or inventor appropriately) is highly significant so that the jury can properly understand the concept and compare it with the final product. Such evidence will permit the jury to properly

---

[5] Importantly, Stan Clutton, Fisher-Price's Vice President of Inventor Relations, was responsible for developing "Tickle Me Elmo" at Tyco. DI intends to call Mr. Clutton at trial.

7

evaluate such concept and final product in the commercial context of the toy industry, not in a vacuum with no frame of reference.

Moreover, DI contends that evidence of Fisher-Price's prior experience with changing concept submissions is directly relevant to the issue of use. This is because Fisher-Price intends to argue to the jury that it did not "use" DI's concept because the accused products do not contain all of the features (*i.e.* mechanical mechanisms) disclosed in DI's written submissions to Fisher-Price.

DI submits that because this is a misappropriation of an idea (a/k/a "concept") case, evidence that Fisher-Price and other toy companies routinely license concepts and make substantial changes to them prior to marketing finished products is highly relevant to rebut Fisher-Price's defense that it did not "use" DI's concept in this case. It should be appreciated that the reason why companies such as Fisher-Price enter into license agreements with inventors in the first place is not because they are paternalistic by nature but, instead, to protect themselves from misappropriation claims by inventors. The best evidence of the degree to which a toy company can change a concept and still feel the need to "license" it (*i.e.*, because they feel that they would otherwise be misappropriating the concept), is to compare other concept submissions received by that toy company against the final licensed product. DI submits that such a comparison will not only permit the jury to consider the issue within the proper context of the toy industry but, moreover, will demonstrate to the jury that Fisher-Price's legal argument is directly contrary to its own business practice. The jury should have the benefit of this evidence to evaluate Fisher-Price's legal defense of non-use.

Dated: Norwalk, Connecticut
January 16, 2006

        Respectfully Submitted,

        GRIMES & BATTERSBY, LLP

By: _____
Gregory J. Battersby (Bar No. 7386)
Edmund J. Ferdinand, III (Bar No. 21287)
Russell D. Dize (Bar No. 23064)
Susan Schlesinger (Bar No. 26625)
488 Main Avenue, Third Floor
Norwalk, Connecticut 06851-1008
(p) (203) 849-8300
(f) (203) 849-9300

SANDAK HENNESSEY & GRECO, LLP
Jay H. Sandak, Esq.
Peter M. Nolin, Esq.
707 Summer Street
Stamford, Connecticut 06901-1026
(p) (203) 425-4200
(f) (203) 325-8608

Attorneys for Plaintiff
Design Innovation, Inc.

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 16, 2006, a copy of the foregoing Memorandum was provided to all counsel of record below by electronic means:

Jacqueline Bucar Esq.
Tyler Cooper & Alcorn, LLP
205 Church Street
New Haven, Connecticut 06510

Bradford S. Babbitt, Esq.
Michael J. Kolosky, Esq.
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103-3597

Robert J. Lane, Jr., Esq.
Jodyann Galvin, Esq.
HODGSON RUSS LLP
One M&T Plaza, Suite 2000
Buffalo, New York 14203-2391

William Wallace, Esq.
Milbank, Tweed, Hadley & McCoy-DC
1825 Eye St., N.W.
Suite 900
Washington, DC 20006

_____
Edmund J. Ferdinand, III

From the co-developer of Furby® and the former vice president of product acquisition at Hasbro® Games

# The Toy and Game Inventor's Handbook

Everything You Need to Know to Pitch, License, and Cash-In on Your Ideas

Richard C. Levy and
Ronald O. Weingartner



Case 3:03-cv-00222-JBA    Document 218    Filed 01/23/2006    Page 12 of 15

Monopoly was the biggest thing that had ever hit Parker Brothers. Sales of the game skyrocketed, and by mid-February 1935, the plant was producing 20,000 sets a week, a great number even by today's standards. Before Christmas that first year, so many telegraphed orders poured in that they were filed in oversize laundry baskets and stacked in the hallways. With an ever-increasing backlog of requests, a bookkeeping firm in Boston was summoned to help keep things in order. As Parker Brothers tells the story, the firm's representatives took one look and refused the job, no matter what the price.

Despite the public's initial reaction, the company viewed Monopoly as an adult fad game that would sell for about three years. Certainly, it was too complicated for children. And just as expected, sales soon began to level off. On December 19, 1936, instructions came from George Parker himself to "cease absolutely to make any more boards or utensil boxes .... We will stop making Monopoly against the possibility of a very early slump." But then, as is often the case in the fickle game business, sales went up again and the upward spiral has never stopped.

## Tickle Me Mania

"What are you doing here?" Walter Cronkite, the legendary *CBS Evening News* anchor, asked inventor Ron Dubren, as both men made small talk waiting for their segments on the CBS Morning News. Cronkite was there to promote a new book he had written; Dubren was promoting a toy he conceived.

"Have you heard of the toy Tickle Me Elmo?" Dubren asked.

"Sure. My grandkids are asking for it."

"I'm one of its inventors."

"Don't suppose you could get me one?" Cronkite asked, sensing Dubren could be the key to satisfying his grandchildren's wish at the height of the craze.

Dubren couldn't.

Tickle Me Elmo mania swept across America during the Christmas season of 1996. The toy was in such demand that even Ron and his co-inventor, Greg Hyman, had trouble getting one. What was it about this cute, giggling *Sesame Street* Muppet monster that won the hearts of Americans everywhere?

"Tickle him for the first time, and that great giggle already has you laughing out loud," says Dubren, a former research scientist with a Ph.D. in psychology. "Tickle Me Elmo not only appeals to preschoolers; it brings the three-year-old out in kids of

all ages. That may be the simple answer to its amazing success, the eager tyke with the joyful laugh makes us all laugh."

Dubren calls what happened Elmo's Law: Anything that could go right, went right. The inspiration came from Ron, who engaged Greg Hyman, one of America's most successful toy inventors, as a partner to help him develop it. Hyman, an electronics wizard, knew how to bring Dubren's idea to life.

Greg and Ron started out with the rough concept of a tickling animal puppet. That core concept evolved into a plush character they named Tickles the Chimp. The essential idea was that of a tickling jag. The more someone tickled the doll, the greater the laughter.

The inventors presented a rough prototype to Tyco Playtime, which at that time did not have the rights to *Sesame Street* plush. Stan Clutton, the company's vice president of marketing and R&D, saw the concept's potential and directed the guys to work with his colleague, Gene Murtha, who anointed Tickles the Chimp, Tickle Me Taz (tied to their Looney Tunes license, the Tazmanian Devil). Greg and Ron licensed their invention to Tyco and it became Tickle Me Taz.

Months later, an amazing thing happened. Tyco wrangled away from Hasbro the plush rights to *Sesame Street* characters. Suddenly Clutton told Murtha to forget Taz and make the concept Tickle Me Elmo. Clutton added. "While we were getting the *Sesame Street* plush rights, we gave up our rights to Looney Tunes. So the product concept would have been without a home in our line had we not gotten *Sesame Street* rights."

And what about the vibration feature? This was not in the inventor prototype. Clutton explains that the vibration element was the result of a preproduction meeting for the commercial shoot. During the meeting, Bob Moehl from the ad agency said that he really liked the product, but since television is a visual medium, it would be much better if it did something visually.

"After that meeting, Marty Scheman, then president of Tyco Preschool, brought in a competitive product that shook, and it was decided that this was the perfect mechanism to represent that out-of-control laughter that was so important to the concept," said Clutton.

Tickle Me Elmo was born.

While the media called it an overnight sensation, the PR campaign had started a year ahead of the toy's retail introduction by systematic cultivation of key print and television media. The toy may have been an overnight sensation, but the public relations campaign devised was so successful that Tyco had trouble keeping up with the demand it generated for the toy.

ed Don
sident of
, an hour
ewing a

ssed up.
ought us
ow what the

what

miles back to
he inventor.
*Wired* maga-
irate Kings-
rted to move,
s, Osterhout
ch he was

called the
seconds, he
in the menu."
ack and forth

sked Radin to

it 4 feet down
rplane on it.
, flying out

The line was called Air Vectors. Ralph Osterhout shows that sometimes your style of selling is as important to closing the deal as what you are selling.

This dramatic presentation shows excitement, personal and conceptual; the importance of relationships; the quality of prototyping that's required; and the technical savvy inventors need to establish to get the commitment to a significant next step. Few new ideas are bought on the spot anymore. Few execs swing at the first pitch. And just because your item looks good does not mean it will get looked at. How many people do you know who are impeccably groomed but dull?

## Once Upon a Time ...

In the decades of the 1950s through the 1980s and into the very early 1990s, it was often enough for an inventor to plant the seed of an idea with a company to qualify for a royalty. An inventor might present a basic breadboard, a marker rendering, or a partially developed idea (or, believe it or not, just whisper a concept in an executive's ear), and then sign a deal and qualify for a royalty.

In those years, it was not uncommon for an inventor to sell a concept and not see it again until it was unveiled at the next New York Toy Fair. Frequently, in such instances, an inventor did not even recognize his or her brainchild when it came out the other end of the development chute.

But for pro Charlie Phillips, whose inventing career has spanned 20-plus years, selling ideas has never been a walk in the park. He remembers coming to New York City in 1974 with four games to sell. "My wife's farewell assurance was, 'It's okay if you sell only three,'" he fondly recalls. "They are still on the shelf, unsold."

Phillips, who conceives about 200 ideas annually and owns New England R&D, continues, "I sold my first game to Hasbro. It was called I Vant to Bite Your Finger. It became a modest hit in 1978–79." After that meeting, Phillips told his wife, Ellie, that the game business could be easy. "I have never been more wrong in my life," says the highly successful inventor of a string of licensed games, including Clue, Jr. (Parker Bros.)

A former R&D director at a now defunct Twin Cities toymaker tells a story about when Marvin Glass, a legendary toy inventor, came in with a concept. Glass presented it with his signature showmanship and energy. Everyone loved it. Then someone from R&D piped up, "How do we make it?"

"That's your job," Glass said. The CEO agreed with Glass. They shook hands on the deal and went out for lunch, leaving the R&D team to figure out all the details.