UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| VICTOR G. REILING ASSOCIATES and DESIGN INNOVATION, INC., <br><br> Plaintiffs, <br><br> - against - <br><br> FISHER-PRICE, INC., <br><br> Defendant. | Index No.: 3:03 CV 222 (JBA) <br><br><br> January 29, 2006 |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO DEFENDANT'S DIRECTED VERDICT MOTION
ON THE ELEMENT OF CONFIDENTIAL RELATIONSHIP**

Pursuant to the Court's request, Plaintiff, Design Innovation, Inc. ("DI"), submits the following memorandum to identify the evidence admitted during the Plaintiff's case from which a reasonable jury could find that DI disclosed its concept to Fisher-Price in the context of a confidential relationship.

Fisher-Price carries an exceedingly heavy burden to prevail on its Rule 50 motion for a judgment as a matter of law. To defeat the motion, DI need only present some evidence from which a reasonable jury could find in its favor. *See Powell v. Gardner*, 891 F.2d 1039, 1043 (2d Cir. 1989). As set forth below, the following evidence was presented during DI's case in chief:

1. DI disclosed its concept to Fisher-Price in the context of a business relationship involving a prospective license or acquisition of the concept by Fisher-Price. Fisher-Price accepted the concept submission, expended time, money and effort to evaluate the concept submission -- including entering into an option agreement for the concept -- before finally rejecting it and returning it to DI.

2. The nature of the relationship between DI and Fisher-Price was one where DI trusted and relied upon Fisher-Price to treat them fairly. The evidence showing that Fisher-Price repeatedly assured outside inventors that it would treat them fairly reinforces the reasonableness of DI's belief.

3. The nature of the relationship between DI and Fisher-Price was one of unequal bargaining power. Messrs. Reiling and Popek both testified that submissions of ideas to Fisher-Price were made by them only upon Fisher-Price's specified terms and conditions.

4. Custom and practice in the toy industry regarding how toy companies deal with the issue of confidential relationships with outside inventors provides that some companies have no agreements, while others have agreements that clarify the existence of a confidential relationship. From this evidence the jury could reasonably infer that where there was no agreement, such as in this case between DI and Fisher-Price, a confidential relationship existed between them.

5. The evidence confirms that there is no agreement in which DI disclaimed the existence of a confidential relationship between itself and Fisher-Price for purposes of the idea at issue. Given Fisher-Price's customary practice, the reasonable jury could infer that Fisher-Price's failure to obtain such a disclaimer from DI in this case confirmed that a confidential relationship was intended by the parties.

6. Messrs. Reiling and Popek testified that they maintained the submission in strict confidence. Based on their prior dealings and conversations with Fisher-Price, DI and Reiling expected Fisher-Price to do so as well, and they were not aware of, and the evidence does not suggest, that Fisher-Price had ever previously undertaken any act to breach the confidentiality of their submissions. In addition, the testimony of Fisher-Price's witnesses -- Paul Snyder, Ken

Morton and Chris Pardi -- each confirmed through their offered deposition testimony that it was their practice to maintain the confidentiality of outside inventor submissions.

Drawing all inferences in DI's favor and applying the legal standard set forth by New York law to construe the existence of a confidential relationship, from these facts a reasonable jury could find that the conduct of the parties implicitly gave rise to a confidential relationship between DI and Fisher-Price.

Fisher-Price's arguments purporting to show the absence of a confidential relationship chiefly relate to the effect of Mr. Reiling's Policy and Agreement on DI. The Court previously rejected these same arguments in ruling on Defendant's summary judgment motion and Defendant's motion for reconsideration on the issue of confidential relationship. As such, DI respectfully asks the Court to deny Fisher-Price's Rule 50 motion and to allow the case to proceed to the jury for a determination of DI's claims on the evidence introduced at trial.

## I. Legal Standard for Establishing the Existence of a Confidential Relationship Under New York Law

For a claim of misappropriation to proceed, "plaintiff must show: (1) the existence of a confidential or fiduciary relationship between the parties[1]; and (2) that the idea is novel and concrete." *Stewart v. World Wrestling Fed'n Entm't, Inc.*, 74 U.S.P.Q. 2d 1024, *13-14, 2005 WL 66890 (S.D.N.Y. Jan. 11, 2005), *citing McGhan v. Ebersol*, 608 F.Supp. 277, 284 (S.D.N.Y. 1985). At the beginning of trial, the Court gave the jury a preliminary instruction on

---

[1] During oral argument the Court inquired whether the issue turned on whether Plaintiff's idea was kept confidential or whether there was a confidential relationship between the parties. Plaintiff believes that the issue turns entirely on the relationship because a duty to keep an idea in confidence arises if there is a confidential or fiduciary relationship established between the parties. *Stewart v. World Wrestling Fed'n Entm't, Inc.*, 74 U.S.P.Q. 2d 1024, *4, 2005 WL 66890 (S.D.N.Y. Jan. 11, 2005).

the legal standard to determine whether DI disclosed its concept to Fisher-Price in the context of a confidential relationship, as follows:

> A confidential relationship may be found to exist where the parties do not deal on equal terms and one trusts and relies on the other, but such a relationship can only be found to exist where the recipient has accepted the confidential relationship. A confidential relationship may arise either explicitly by contract, or implicitly by the actions and course of dealing of the parties or other circumstances.

(1/17/2006 Tr. at 14-15). The Court's preliminary charge to the jury accurately sets forth New York law to determine the existence of a confidential relationship between the parties.

### A.     Confidential Relationships Based on Business Dealings

It is firmly established in the Second Circuit interpreting New York law that a confidential relationship is implied where disclosures have been made in business relationships involving buyers and sellers and prospective licensors and licensees. *Heyman v. A.R. Winarick, Inc.*, 325 F.2d 584, 587 (2d Cir. 1964); *Speedry Chemical Products, Inc. v. The Carter's Ink Co.*, 306 F.2d 328, 332 (2d Cir. 1962); *Schreyer v. Casco Products Corp.*, 190 F.2d 921, 924 (2d Cir. 1951); *Matarese v. Moore-McCormack Lines, Inc.*, 158 F.3d 631, 634 (2d Cir. 1946).[2] In *Heyman*, plaintiff disclosed to defendant the formula for his proprietary nail hardening product during the course of negotiations for the sale of his entire business to the defendant. After defendant ceased negotiations and came out with a lower-cost, competitive product, plaintiff brought suit alleging misappropriation of trade secrets. On appeal, the Second Circuit clarified the standard for proving a confidential relationship under New York law. As a threshold matter, the court held that "an express agreement is not a prerequisite to the establishment of a

---

[2] The First Circuit is in accord. In *Burten v. Milton Bradley Co.*, 763 F.2d 461 (1st Cir. 1985), a case involving the alleged misappropriation of a toy concept, the First Circuit stated that: "[a] confidential relationship generally arises by operation of law from the affiliations of the parties and the context in which the disclosures are offered." 763 F.2d at 463, *quoting*, Milgrim, TRADE SECRETS § 4.03 at 4-12.

4

confidential relationship." 325 F.2d at 586. Rather, "a relationship of trust and confidence may naturally result from the circumstances surrounding the dealings between the parties." *Id.* at 587. The *Heyman* court then examined the dealings between the parties:

> Where, as here, the parties are a seller and a prospective purchaser, certain disclosures will usually be made about the thing which is for sale so that the purchaser may rationally assess the merits of concluding the bargain. If the information disclosed is of such a nature as to otherwise qualify as a trade secret, we think the prospective buyer is bound to receive the information in confidence. As the prospective buyer is given the information for the limited purpose of aiding him in deciding whether to buy, he is bound to receive the information for use within the ambit of this limitation. He may not in good conscience accept the information; terminate negotiations for the sale; and then, using vital data secured from the would-be seller, set out on a venture of his own. Whatever conduct courts should countenance when parties bargain at arm's length, we think parties should be expected to comply with these essentials of fair dealing.

*Id.* As a result, the Court concluded that "the parties here, in their negotiations looking toward defendant's purchase of plaintiff's business, entered into a confidential relationship with respect to disclosures which plaintiff may have made about that business." *Id. See also Klein v. Ecko Products Co.*, 135 N.Y.S.2d 391 (Sup. Ct. Kings Cty 1954) (confidential relationship established by conduct of the parties where plaintiff had disclosed to defendant-manufacturer an idea for a novel utensil and manufacturer subsequently used that idea without compensating the plaintiff).

Similarly, an implied confidential relationship is created where, as here, the idea was submitted for negotiations in which one party sought to sell or license his or her concept to the other. *Speedry Chemical Products, Inc. v. The Carter's Ink Co.*, 306 F.2d 328, 332 (2d Cir. 1962) (confidential relationship existed as a result of negotiations for license agreement); *Schreyer v. Casco Products Corp.*, 190 F.2d 921, 924 (2d Cir. 1951) (confidential relationship existed as a result of negotiations and disclosure of confidential know-how).

5

To determine the existence of a confidential relationship it is appropriate to view the evidence of the course of the parties' negotiations both before and after the initial disclosure of the idea. *Matarese v. Moore-McCormack Lines, Inc.*, 158 F.3d 631, 634 (2d Cir. 1946) (confidential relationship created in a misappropriation of an idea case where employee disclosed to employer an idea to facilitate the loading and unloading of cargo, due to the "relationship of the parties before and after the disclosure . . ."); *Heyman*, 325 F.2d at 587; *Speedry Chemical*, 306 F.2d at 332; *Schreyer*, 190 F.2d at 924; *Julie Research Labs., Inc. v. Select Photographic Engineering, Inc.*, 810 F. Supp. 513, 520-21 (S.D.N.Y. 1992) ("The circumstances may suffice to show a relationship of trust and confidence based on the dealings of the parties."), *aff'd in part, rev'd on other grounds*, 998 F.2d 65 (2d Cir. 1993).

### B. Confidential Relationships Based on Unequal Bargaining Power and Trust

"Under New York law, a confidential relationship ... [exists] generally where the parties do not deal on equal terms and one trusts and relies on the other . . . ." *Stewart v. World Wrestling Fed'n Entm't, Inc.*, 74 U.S.P.Q. 2d 1024, *13-14 (S.D.N.Y. Jan. 11, 2005), *quoting Sachs v. Cluett Peabody & Co.*, 39 N.Y.S.2d 853, 856 (App. Div. 1943). A confidential relationship based on unequal bargaining power or trust also may arise "implicitly by the actions of the parties or other circumstances." *Id.*, *quoting Klein*, 135 N.Y.S.2d at 395-96. In *Stewart*, plaintiff disclosed to defendant, the World Wresting Federation, an idea for new marketing strategies based on lingerie designs and a fashion show. Following plaintiff's disclosure of his ideas and a lengthy period of negotiations, defendant rejected the proposal. After defendant aired a television show featuring a lingerie line, plaintiff brought suit alleging breach of confidential relationship and misappropriation. Plaintiff argued that a confidential relationship

6

existed because he and defendant were on unequal bargaining power. In rejecting defendant's motion to dismiss, the court agreed with plaintiff and held that the parties' negotiations and efforts to develop the idea were sufficient to allege the existence of a confidential relationship under New York law.

### C.   Toy Industry Custom and Practice

To determine the existence of a confidential relationship between DI and Fisher-Price in this case, the fact finder may also consider that "the standard custom and practice in the toy industry calls for companies to treat the submission of an idea as confidential." *Nadel v. Play-By-Play Toys*, 208 F.3d 368, 371 (2d Cir. 2000). In *Burten*, the First Circuit also credited evidence showing "an industry wide custom among reputable game and toy companies to maintain the secrecy of ideas submitted by outside inventors and to use innovations only if royalties were paid to the inventor." *Burten*, 763 F.2d at 466, n.5. Here plaintiff offered some evidence from its expert establishing that a confidential relationship exists between toy companies and outside inventors in the absence of a written agreement modifying the relationship.[3] Mr. Kipling did testify that the industry practice was that toy companies make themselves available to inventors in the expectation of receiving the next great idea and the "toy submitter makes the submission in anticipation that if the company decides to use the submission, the idea, that the toy company will recognize and compensate the inventor." (1/25/06 Tr. at 185).

---

[3] DI's toy industry expert, Mr. Kipling, was prepared to go farther and Plaintiff offered proof that a confidential relationship existed between toy companies and outside inventors on new concept submissions in the absence of a written agreement between the parties disclaiming confidentiality. Ultimately, the Court ruled against Mr. Kipling offering such testimony as to a "default rule." (1/25/2006 Tr. at 159). The Court should also note that Defendant's own expert seems to adopt a similar view of the industry in his reports. "The expectation is that a toy company will not utilize the novel features of the submission or the novel combination of features of the submission without a compensation agreement." Report of Howard N. Bolinger, p.1 (February 3, 2004).

7

## II.   The Evidence Admitted by DI at Trial Establishes a Confidential Relationship

According to the Second Circuit:

> The trial judge may grant a directed verdict only if, viewing the evidence in the light most favorable to the nonmoving party, '(1) there is a complete absence of probative evidence to support a verdict for the non-movant or (2) the evidence is so strongly and overwhelmingly in favor of the movant that reasonable and fair minded men in the exercise of impartial judgment could not arrive at a verdict against him.' 'A directed verdict is proper only if the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.'

*Powell v. Gardner*, 891 F.2d 1039, 1043 (2d Cir. 1989) (citations omitted); *Sir Speedy, Inc. v. L&P Graphics, Inc.*, 957 F.2d 1033, 1039 (2d Cir. 1992). Fisher-Price's directed verdict motion should be denied because the evidence admitted during DI's case in chief shows not only that a reasonable jury could find in its favor, but that DI is likely to prevail at trial as to the existence of a confidential relationship.

### A.   Confidential Relationship Based on Prospective License of Concept

1.   The evidence at trial showed that DI disclosed its idea to Fisher-Price in the context of a business relationship involving a prospective license or acquisition of the concept by Fisher-Price.

-Mr. Reiling testified that he and DI held a brainstorming session in 1998, the purpose of which was to come up with an idea for the Rescue Heroes line that would "excite Fisher-Price." (1/17/2006 Tr. at 113). DI and Mr. Reiling intended to license the idea to Fisher-Price for a royalty, which is the way he had traditionally structured prior deals with Fisher-Price. (*Id.* at 112). Mr. Popek testified that based on his prior experience in dealing with Fisher-Price, when he submitted a concept to them, Fisher-Price either returned it, went to option or went to contract (meaning that they licensed the concept from him in exchange for monetary consideration). (1/23/2006 Tr. at 803-04).

-Mr. Reiling and DI agreed that Mr. Reiling would present the submission to Fisher-Price on behalf of Reiling and DI. (1/23/2006 Tr. at 809-811). DI thought that it would

be advantageous for Mr. Reiling to disclose to Mr. Snyder that the Reel Heroes concept was jointly owned by Reiling and DI because of DI's credibility with Fisher-Price. (*Id.* at 812).

-Following the 1998 brainstorming session, Mr. Reiling testified that he called Paul Snyder at Fisher-Price to "tell him I had an idea I wanted to show him" and to schedule an appointment to meet in person. (1/17/2006 Tr. at 119).

-Mr. Reiling, acting on behalf of himself and DI, met with Paul Snyder of Fisher-Price at Fisher-Price's New York City offices on October 29, 1998. During that meeting, Mr. Reiling disclosed the Reel Heroes idea with tangible demonstratives including the prototype and storyboard. (*Id.* at 120 -124, 126; Joint Exhibits 4, 7).

-Mr. Snyder "liked the concept very much" and asked Mr. Reiling to submit the idea to Fisher-Price. (*Id.* at 123, 125; Joint Exhibit 2).

        2.       Fisher-Price accepted the idea, expended time, money and effort to evaluate the idea -- including entering into an Option Agreement for the idea -- before finally rejecting it and returning it to DI.

-In November 1998, DI submitted the idea to Fisher-Price by sending to Mr. Snyder the prototype, written description and drawings. (*Id.* at 128-133; 1/23/2006 Tr. at 816); Joint Exhibits 3-7).

-Fisher-Price accepted the Reiling/DI idea submission. By letter dated December 8, 1998, Fisher-Price informed Mr. Reiling that there was a "genuine excitement level for the product" and that Fisher-Price was holding for "further evaluation." (*Id.* at 133-34; Joint Exhibit 8).

-On January 30, 1999, Mr. Reiling spoke with Paul Snyder, who informed him that Fisher-Price wished to enter into an Option Agreement for the concept, for which Mr. Reiling and DI would be paid $2,500 per month for a period of three months. Mr. Snyder asked for DI's contact information and federal tax i.d. number for purposes of the option agreement. (*Id.* at 136-39; Joint Exhibit 9).

-After learning of DI's involvement in the idea submission, Fisher-Price did not seek any form of Policy and Agreement from DI and did not otherwise ask DI to release or waive the existence of a confidential relationship. (1/23/2006 Tr. at 824).

-The parties entered into an Option Agreement, dated February 16, 1999. (Joint Exhibit 10). Fisher-Price prepared the agreement and sent it to Mr. Reiling who forwarded it to DI. (1/23/2006 Tr. at 823-824). Along with the Option Agreement, Fisher-Price's legal counsel sent a letter stating "[w]e look forward to the potential introduction of a successful extension to our Real Heroes product line." (Joint Exhibit 10).

-In the Option Agreement the parties confirmed their mutual understanding. (Joint Exhibit 10 at page 1). Fisher-Price thereby acknowledged and accepted that if it did not purchase the idea from Reiling and DI by exercising the Option and entering into license agreement, it would return all prototypes to Reiling/DI and "all rights in the CONCEPT shall belong solely to INVENTORS." (Joint Exhibit 10 ¶¶ 4 and 3). That understanding confirms the essence of a confidential relationship that the potential purchaser will return the idea to the seller if purchase agreement is not reached.

-In the Option Agreement, Reiling and DI were required to maintain the confidentiality of the submitted concept, any information provided by Fisher-Price and even the existence of the option agreement itself. (Joint Exhibit 10, ¶¶ 5, 8). Reiling and DI confirmed their understanding "that FISHER-PRICE INC.'s ability to successfully market the LICENSED PRODUCTS requires that any information regarding FISHER-PRICE INC.'s products or plans for marketing products must be regarded as a secret of FISHER-PRICE, INC. DI acted in accordance with this provision and to DI's understanding so did Fisher-Price. (1/23/2006 Tr. at 831-832).

-By letter dated March 23, 1999, Fisher-Price returned the prototype, description and drawings to Mr. Reiling. Fisher-Price stated that "after very careful consideration and evaluation, from design, costing, engineering and marketing perspectives," they were returning the submission for reasons that "boiled down to cost." (1/17/2006 Tr. at 153; Joint Exhibit 12).

-In May 1999, Reiling and DI resubmitted their idea to Fisher-Price by demonstrating an embodiment of the concept that would address Fisher-Price's concerns about costs. (1/17/2006 Tr. at 157-159; Joint Exhibits 13-14). Fisher-Price rejected the idea and returned the submission to Reiling/DI. (*Id.* at 160).

- In December 2000, Reiling and DI resubmitted their idea to Fisher-Price by demonstrating another embodiment of the concept that would address Fisher-Price's concerns about costs. (*Id.* at 161; Joint Exhibit 15, Pl. Exhibits 230-31). By letter dated January 5, 2001, Fisher-Price returned the concept to Reiling/DI. (*Id.* at 167; Joint Exhibit 20). Fisher-Price indicated that the concept was reviewed by "senior management," but that it did not fit in the Rescue Heroes line. (*Id.*)

-Reiling testified that it was his understanding that when Fisher-Price returned the concepts to himself and DI that they could do anything they wanted with it. (*Id.* at 187-88)

Following the Second Circuit's decisions in *Heyman, Speedry Chemical Products, Schreyer* and *Matarese*, a reasonable jury could infer that a confidential relationship between DI and Fisher-Price was established by virtue of the facts that: (1) DI disclosed its idea to Fisher-Price in the context of seeking a prospective license; (2) Fisher-Price accepted the disclosure and

10

then devoted time, money and effort to evaluating the concept, before returning it to Reiling and DI; and (3) Fisher Price confirmed in writing that it understood that if no license was agreed upon all rights to the idea belonged solely to DI and Reiling and that the idea would be held confidential while it evaluated the idea.   As the court explained in *Heyman*, a party "may not in good conscience accept the information; terminate negotiations for the sale; and then, using vital data secured from the would-be seller, set out on a venture of his own. Whatever conduct courts should countenance when parties bargain at arm's length, we think parties should be expected to comply with these essentials of fair dealing." 325 F.2d at 587.

### B.      Confidential Relationship Based Unequal Bargaining Power and Trust

1. The nature of the relationship between DI and Fisher-Price was one where DI trusted and relied upon Fisher-Price to treat it fairly.

-Both Messrs. Popek and Reiling testified that based on their prior dealings with Fisher-Price they believed the company would treat them fairly with respect to concept submissions. (1/23/2006 Tr. at 800, 803, 855; 864; 1/17/2006 Tr. at 95).

-Mr. Popek testified that in his prior dealings with Fisher-Price, Fisher-Price had always returned any submitted concept and never used them without paying for them. (*Id.* at 804).

-Reiling's testimony was similar.  (1/17/2006 Tr. at 98).

-Fisher-Price assured outside inventors and DI in particular that "We intend to deal fairly with you in connection with your disclosure." (1/23/2006 Tr. at 803; Joint Exhibit 202).

2. The nature of the relationship between Reiling/DI and Fisher-Price was one of unequal bargaining power.  Messrs. Reiling and Popek both testified that they had no power to alter any submission documents.

11

-Fisher-Price is owned by Mattel, one of the largest toy companies in the world with revenues in the billions of dollars, compared with DI, with annual revenues of $ 1.5 million. (1/23/2006 Tr. at 787, 800).

-Mr. Popek testified that he believed he had "little bargaining power" to negotiation or to change any Fisher-Price submission document. (*Id*. at 786). He also testified that there was no negotiation of the option agreement. (*Id*. at 825-26; 830).

Based on the evidence showing that Reiling and DI trusted Fisher-Price to treat them fairly throughout the submission process – including the fact that Fisher-Price assures inventors that it will treat them fairly – coupled with the unequal bargaining power between the parties, a reasonable jury could infer that a confidential relationship was formed by Reiling/DI's disclosure to Fisher-Price of their concept, and Fisher-Price's acceptance of that disclosure.

### C. **Evidence of Toy Industry Custom and Practice**

Mr. Kipling testified that toy industry custom and practice demonstrates that toy companies treat the issue of confidential relationships with outside inventors in three ways. In two of the ways -- companies who have no agreements or companies that clarify the existence of a confidential relationship -- toy companies recognize the existence of a confidential relationship with outside inventors. (1/25/2006 Tr. at 184). While Mr. Kipling testified that some companies seek to disclaim the existence of a confidential relationship through a written waiver agreement, there is no agreement in which DI disclaimed the existence of a confidential relationship between itself and Fisher-Price for purposes of the concept submissions at issue. Indeed, Mr. Popek testified that at no time during the concept submission process, either prior to the first submission, prior to the option agreement or prior to the second and third submissions, did Fisher-Price ask DI to sign a Policy & Agreement form. (1/23/2006 Tr. at 825, 842-43, 851-52). Mr. Kipling did testify that the industry practice was that toy companies make themselves

12

available to inventors in the expectation of receiving the next great idea and the "toy submitter makes the submission in anticipation that if the company decides to use the submission, the idea, that the toy company will recognize and compensate the inventor." (1/25/06 Tr. at 185).

Accordingly, a reasonable jury could conclude from the absence of a written waiver[4] of a confidential relationship by DI in this case and the industry practice that both sides expect that the inventor will be paid if his idea is used and that DI had a confidential relationship with Fisher-Price pursuant to toy industry custom and practice.

### D.   Evidence of the Parties' Efforts to Maintain Confidentiality of the Concept

To the extent the actions of the parties to maintain the confidentiality of the concept are relevant to establishing the existence of a confidential relationship, Messrs. Reiling and Popek testified that they treated the concept in strict confidence. Based on their prior dealings and conversations with Fisher-price they expected Fisher-Price to do so as well and were not aware that Fisher-Price had undertaken any act to breach the confidentiality of the submission. (1/23/2006 Tr. at 832-33; 1/17/2006 Tr. at 101).

Moreover, Fisher-Price's witnesses -- whose depositions were read into the record -- each confirmed that it was their practice to maintain the confidentiality of outside inventor submissions.

-Paul Snyder testified that he kept outside inventor submissions "as confidential as possible." He also testified that inventors expected Fisher-Price to keep the submissions confidential, and **that he sought do so because his job "was a relationship job" and he wanted to treat the inventors fairly.** (1/23/2006 Tr. at 715).

---

[4] As the Court recognized in its Ruling denying Fisher-Price's motion for reconsideration of the Court's summary judgment decision, to the extent the 1994 Policy and Agreement can be read as a waiver of Reiling's claims against Fisher-Price, that does not mean that a confidential relationship cannot and does not exist between Reiling and Fisher-Price. Rather, the effect of the agreement is to waive (or "release") any claim Reiling might have against Fisher-Price that depends upon the existence of a confidential relationship. (*See* Ruling at 5-6).

13

      -Ken Morton testified that he was "very careful" about maintaining the confidentiality of outside inventor submissions and would personally seek to treat the disclosures as confidential. (1/25/2006 Tr. at 25).

      -Chris Pardi was adamant that he always maintained the confidentiality of submissions: "I never talk to outside people about inventor submissions, no, never have. Everything we do is confidential in the team center." (1/25/2006 Tr. at 65-66).

Accordingly, based on the testimony of the parties' witnesses, a reasonable jury could conclude that the parties treated DI's concept disclosure in a confidential manner, which is further evidence of the existence of a confidential relationship between DI and Fisher-Price.

## **CONCLUSION**

For the reasons stated, DI respectfully requests that the Court find that there is sufficient evidence in the record from which a reasonable jury could find the existence of a confidential relationship between DI and Fisher-Price and, therefore, deny Fisher-Price's Rule 50 motion for judgment as a matter of law. This case should be allowed to proceed to the jury.

Dated: Norwalk, Connecticut
       January 29, 2006

                         Respectfully Submitted,

                         GRIMES & BATTERSBY, LLP

                         By: _____
                              Gregory J. Battersby (Bar No. 7386)
                              Edmund J. Ferdinand, III (Bar No. 21287)
                              Russell D. Dize (Bar No. 23064)
                              Susan Schlesinger (Bar No. 26625)
                              488 Main Avenue, Third Floor
                              Norwalk, Connecticut 06851-1008
                              (p) (203) 849-8300
                              (f) (203) 849-9300

SANDAK HENNESSEY & GRECO, LLP

Jay H. Sandak, Esq.
Peter M. Nolin, Esq.
707 Summer Street
Stamford, Connecticut 06901-1026
(p) (203) 425-4200
(f) (203) 325-8608

Attorneys for Plaintiff
Design Innovation, Inc.

### CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2006 a copy of the foregoing Memorandum was served on all counsel of record below by electronic means:

Jacqueline Bucar Esq.
Robert Allen, Esq.
Tyler Cooper & Alcorn, LLP
205 Church Street
New Haven, Connecticut 06510

Robert J. Lane, Jr., Esq.
Jodyann Galvin, Esq.
HODGSON RUSS LLP
One M&T Plaza, Suite 2000
Buffalo, New York  14203-2391

William Wallace, Esq.
Milbank, Tweed, Hadley & McCoy-DC
1825 Eye St., N.W. , Suite 900
Washington, DC 20006

_____
Edmund J. Ferdinand, III