### 3.    DI introduced no evidence that Fisher-Price
### ever accepted a confidential relationship.

As the Court instructed the jury: "A confidential relationship can only be found

to exist where the recipient has demonstrated acceptance of the relationship." Jury Instructions

at 25. There is not a single sentence of testimony from a three-week trial that Fisher-Price

"accepted" a confidential relationship with DI or Reiling prior to or in connection with the

October 1998 disclosure of the Reel Heroes concept.[18]  In fact, both parties' witnesses made

clear that Fisher-Price did everything possible to communicate consistently to inventors that it

did *not* accept the formation of any confidential relationship.  DI admitted that Fisher-Price had

an express, written policy disclaiming any confidential relationships with inventors *and DI was*

*aware of this policy prior to the October 1998 disclosure*.  Neither Popek nor Reiling were able

to identify *even one* submission with respect to which Fisher-Price had agreed to confidentiality

or a confidential relationship. (Popek: Tr. 998:20-1000:18; Reiling: 302:24-307:15, 312:8-19,

315:10-16, 316:12-24, 611:7-24).

The only DI witness to testify in DI's case was Popek, even though he had no

personal contact with Fisher-Price relating to the Reel Heroes concept. (Tr. 940:1-941:10,

968:15-969:10, 1028:12-15, 1030:3-12). Popek's testimony establishes that no reasonable juror

could conclude that Fisher-Price accepted a confidential relationship with DI at any time:

- Popek admitted that "Fisher-Price never communicated in writing to
  Design Innovation that it would keep any inventor submission
  confidential." (Tr. 999:13-21).

---

[18]    "The confidential relationship must predate the reposal of trust or confidence and thereby provide the context — if not the impetus — for such disclosures.  Frequently, it is said that the relationship must inspire the disclosure, and that the relationship cannot merely emerge from the revelation's wake." *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb, Inc.*, 767 F. Supp. 1220, 1232 (S.D.N.Y. 1991), *rev'd on other grounds*, 967 F.2d 742 (2d Cir. 1992).

- Popek admitted that "Fisher-Price never told [DI] orally that they would keep any inventor submission confidential." (Tr. 999:22-25).

Of course, the only ways to accept a confidential relationship are orally or in writing. Popek's testimony is clear that Fisher-Price never made any commitment of confidentiality to DI, and that DI nevertheless authorized Reiling to voluntarily disclose its ideas to Fisher-Price and DI itself voluntarily disclosed other concepts to Fisher-Price on a non-confidential basis. (Tr. 785:16-786:9, 800:11-801:14, 998:20-1000:18, 1003:4-1004:3).

Popek made a number of other admissions that establish that DI never had any confidential relationship with Fisher-Price:

- Popek admitted that he knew Fisher-Price's policy that inventors could only submit ideas to Fisher-Price by signing a P&A form. (Tr. 785:2-15, 786:21-25, 992:6-9 & 15-25). He further testified that he was aware of Fisher-Price's policy that inventor submissions are not treated as confidential, and that he knew it throughout the 1990s. (Tr. 992:20-993:6, 994:16-995:25). He also admitted that DI was willing to continue to submit concepts *on a non-confidential basis* during the time period when the Reel Heroes submissions were taking place (1999 and 2000). (Tr. 996:1-20).

- DI had never asked Fisher-Price to sign any written confidentiality agreements. (Tr. 1003:25-1004:3).[19]

- DI never stamped any of the documents it submitted to Fisher-Price as "confidential" nor did it state in any cover letter that material being enclosed to Fisher-Price was confidential. (Tr. 999:5-12).

- Popek never signed a document with Fisher-Price in which Fisher-Price agreed to hold a submission in confidence. (Tr. 998:20-24).

- DI never indicated in writing that any submission it made to Fisher-Price was confidential. (Tr. 998:25-999:4).

- DI has "no documents of any type showing that Fisher-Price ever agreed to treat any of [DI's] submissions confidential." (Tr. 1000:1-5).

---

[19]     Although the Option Agreement provides that DI must keep the submission confidential for the limited period in which the option is in effect, no similar duty is imposed on Fisher-Price. (JX 10 at ¶ 8; Tr. 1028:20-1029:5).

The facts of this case are directly analogous to *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1549 (11th Cir. 1996), where the Eleventh Circuit reversed a district court and directed judgment as a matter of law in favor of a defendant in a misappropriation case. In language equally applicable here, the court stated:

> [I]t is not the lack of a written confidentiality agreement that is fatal to the [plaintiffs'] trade secret claim; rather it is the lack of any substantial evidence that [defendant] was ever made aware of any obligation of confidentiality to [plaintiffs] regarding the engineering materials at issue.

DI presented no evidence at trial "that [Fisher-Price] was ever made aware of any obligation of confidentiality to [DI] regarding the" Reel Heroes concept. DI made no effort of any type even to communicate *a request* that Fisher-Price maintain the Reel Heroes concept confidential. To the contrary, Popek was well aware of Fisher-Price's long-standing policy that it would not treat inventor submissions as confidential. (Tr. 997:12-15). DI, through Benedetto and Popek, had completed at least four Fisher-Price submission forms that stated that inventor submissions were not made in confidence and that no confidential relationship was formed. (*See* JX 201, Tr. 994:16-995:25; JX 202, Tr. 985:11-15, 991:14-993:20; JX 203, Tr. 1000:19-1001:15; DX 837, Tr. 996:1-997:15).

The testimony of Bruce Popek, DI's only fact witness on confidentiality, can be summarized by his admission that: "We *assume[d]* that they knew [the Reel Heroes submission] was confidential." Popek was then asked: "You *assumed* it, but you never said it, did you?" and he responded, "That is correct" (*i.e.*, that DI never said to Fisher-Price that the Reel Heroes concept was confidential). (Tr. 1003:16-20 (emphasis added)). Popek also admitted that he had "no idea how Fisher-Price treated the Reel Heroes concept" from a confidentiality point of view — admitting, "I just *hoped* that they held it with confidence." (Tr. 1029:14-18 emphasis

- 18 -

added)). These three statements summarize DI's entire showing on confidential relationship —

DI *assumed* it and *hoped* it — but never communicated to Fisher-Price either a request or an

expectation of confidentiality and never received any communication from Fisher-Price

indicating that a confidential relationship had been accepted.

>This Court instructed the jury:

>>[t]he standard for determining the existence of a confidential
>>relationship is an objective standard *and such a relationship*
>>*"does not arise from the subjective expectations of one party*
>>*that are not communicated to or accepted by the other party*."
>>(Jury Instructions at 25 (emphasis added)).

>DI does not even contend that it ever communicated its alleged expectations of

confidentiality to Fisher-Price. Instead, DI relies solely on what Popek "assumed" and "hoped"

— words that clearly indicate the type of subjective, uncommunicated expectation which this

Court instructed the jury was insufficient as a matter of law.

### D.    Testimony by Reiling and Other Witnesses <br> Confirmed the Absence of a Confidential Relationship

>Reiling did not assist DI in establishing that Fisher-Price accepted any type of

confidential relationship with DI. To the contrary, Reiling acknowledged that his disclosure of

the concept to Fisher-Price was governed by the 1994 P&A form he had signed. (Tr. 289:6-23,

292:9-18). That agreement provides expressly that:

>>The disclosure must be understood to be purely voluntary and no
>>confidential relationship is to be established by such disclosure or
>>implied from our consideration of the submitted material, and the
>>material is not to be considered submitted "in confidence."

(JX 1 ¶ 1). In its ruling denying Fisher-Price's motion to reconsider, the Court indicated that

"Reiling may testify as to any expectations of confidentiality that were communicated to Fisher-

Price — either expressly or implicitly by the course of dealing between the parties. . . ." [Docket

- 19 -

No. 189 at 8 n.5]. At trial, Reiling offered *no* testimony of *any* "expectations of confidentiality that were communicated to Fisher-Price" in *any* form. As to course of dealing, Reiling testified unequivocally that his course of dealing in submitting over 100 concepts to Fisher-Price throughout the 1980s and 1990s was that they were *all* submitted on a non-confidential basis pursuant to P&A forms that made clear there was no confidential relationship between the parties. (Tr. 302:8-307:15, 312:8-19, 316:3-24, 611:7-24).

The only thing Reiling could say supporting any claim of confidentiality was the following conclusory exchange with his counsel during direct examination:

> Q.    What was *your understanding* about how Fisher-
>       Price was going to handle your submissions?
>
> A.    They were going to keep it confidential.
>       (Tr. 102:24-103:1 (emphasis added)).

This testimony is directly contrary to the Court's jury instruction that "[t]he standard for determining the existence of a confidential relationship is an objective standard and such a relationship does not arise from the subjective expectations of one party that are not communicated to or accepted by the other party." Jury Instructions at 25. Reiling did not explain his basis for his "understanding" regarding confidentiality — which was contrary to the 27 P&A forms he signed during the 1980s and 1990s. (Tr. 292:19-296:11, 298:4-299:7). He did not even claim that his alleged "understanding" was based on any objectively reasonable manifestation of a confidential relationship by Fisher-Price. It is therefore insufficient as a matter of law to establish the confidentiality element of DI's misappropriation claim.

In contrast, on cross-examination, Reiling acknowledged that Fisher-Price told him in the 1994 P&A form that his submissions were not made in confidence. (Tr. 316:3-11). Reiling also admitted that he had signed a series of such forms with Fisher-Price over a span of

- 20 -

many years. (Tr. 288:8-19, 292:19-296:11, 312:8-19). Reiling admitted that he was familiar with Fisher-Price's policy of not holding inventor submissions in confidence. (Tr. 302:8-307:15, 312:13-19, 316:12-24, 611:7-24).

Thus, Reiling's testimony failed to provide evidence supporting either of the two showings DI was required to make on the issue of confidential relationship: (1) he provided no evidence that he or DI objectively communicated (either implicitly or expressly) any request for or expectation of a confidential relationship,[20] and (2) he provided no evidence that Fisher-Price ever accepted any confidential relationship.

Finally, other witnesses who testified on the subject of confidentiality made clear that Fisher-Price would not, could not, and did not agree or commit to maintain inventor submissions confidential. Paul Snyder, Fisher-Price's former Vice President of Inventor Relations, testified that "we could never promise that [inventor submissions] would be kept confidential. It was impossible to make that promise." (Tr. 714:25-715:8). Peter Pook, who was Vice President of Inventor Relations when the third Reel Heroes submission was made, was asked: "when an inventor made a submission to you, was there an expectation that you would keep that information confidential"? He responded: "No. No. I mean, our form states that." (Tr. 2270:13-20). Finally Tina Zinter, Fisher-Price's Senior Vice President of Research and Development, was asked whether Fisher-Price treated inventor submissions confidentially during her 25 years with the company. She testified that Fisher-Price will not "accept submissions without [its] policy and agreement form" (Tr. 1607:24-1608:20), and that Fisher-Price has never

---

[20]    To the contrary, Reiling made clear that he did not ask for or seek confidentiality with respect to the Reel Heroes concept because he was aware that Fisher-Price's policy was not to grant it. (Tr. 292:9-18, 296:3-8, 312:13-18, 333:21-25).

treated inventor submissions confidentially during her 25 years with the company because "we can't make that promise" (Tr. 1623:24-1624:18).

No other witness presented by DI had anything of substance to say about confidentiality. DI's expert, Mr. Kipling, testified only that there is no specific custom and practice as to how inventor submissions are treated. Instead, he testified that there are three alternatives for dealing with confidentiality: (1) that the inventor and toy company have no agreement; (2) that they agree to hold the submission in confidence; or (3) that they agree the submission will not be held in confidence. (Tr. 1321:14-1327:12). Kipling acknowledged his unequivocal deposition testimony that there is no toy industry custom and practice relating to the confidential treatment of inventor submissions. (Tr. 1320:8-1334:16).

E.    **The Evidence on Other Elements of the Court's Confidentiality Instruction Further Established the Absence of a Confidential Relationship**

The Court instructed the jury, in accordance with well-established caselaw, that "[a] conventional or 'arm's-length' business relationship alone cannot constitute a confidential relationship."[21] Jury Instructions at 25. DI never presented any evidence at trial that it ever had

---

[21]    *See, e.g., Sachs v. Cluett Peabody & Co.*, 265 A.D. 497, 39 N.Y.S.2d 853, 856 (lst Dep't 1943), *aff'd*, 291 N.Y. 772 (1944) ("Parties dealing at arm's length, each seeking for itself the best advantage to be derived from a transaction, are not in confidential relationship"); *Oursler v. Women's Interart Ctr., Inc.*, 170 A.D.2d 407, 566 N.Y.S.2d 295, 297 (1st Dep't 1991) ("A conventional business relationship, without more, does not become a fiduciary relationship by mere allegation."); *United Magazine Co. v. Murdoch Magazines Distrib.*, 2001 U.S. Dist. LEXIS 20878, at *32 (S.D.N.Y. 2001) ("[A]n arms-length contract between two parties does not by itself give rise to fiduciary duties between them; something more is required.") (applying New York law); *Holloway v. King*, 361 F. Supp.2d 351, 360 (S.D.N.Y. 2005) (rejecting "conclusory allegations of a special relationship" [and] "complete trust and confidence" and holding no fiduciary relationship); *Atkins Nutritionals, Inc. v. Ernst & Young, LLP*, 301 A.D.2d 547, 549, 754 N.Y.S.2d 320, 322 (2d Dep't 2003) ("[A] n arm's-length business relationship does not give rise to a fiduciary duty."); *Moy v. Adelphi Inst.*, 866 F. Supp. 696, 708 (E.D.N.Y. 1994) (finding that the defendant owed no fiduciary obligation to the plaintiffs where "[p]laintiffs merely describe a business relationship, albeit dishonest and one-sided, that does not give rise to fiduciary responsibilities") (citation omitted); *Feigen v. Advance Capital Mgmt. Corp.*, 150 A.D.2d 281, 283, 541 N.Y.S.2d 797, 799 (1st Dep't 1989) (recognizing that "[a] conventional business relationship does not create a fiduciary relationship in the absence of additional factors"). As the Court charged, "[a] confidential relationship is synonymous with a

- 22 -

anything other than a conventional arm's-length business relationship with Fisher-Price. DI's own witnesses testified that its main relationship with Fisher-Price was as a vendor of work-for-hire design services. (Popek: Tr. 785:16-21, 950:20-951:14; Benedetto: 2162:7-17). Moreover, *every document* exchanged between the parties relating to inventor submissions or design services — both before and after the initial Reel Heroes submission — made clear that the parties' business relationship was arms-length and stated expressly that no confidential relationship was formed between the parties. *See* JX 201, 202, 203 & DX 837. In these circumstances, no reasonable juror could find a confidential relationship existed as of the October 1998 disclosure of the Reel Heroes concept. Indeed, DI never even argued at trial that a confidential relationship existed as of that date.

The Court also charged that a showing that "the parties do not deal on equal terms" may be considered in determining whether a confidential relationship exists. Jury Instructions at 25. However, caselaw is clear that unequal bargaining power cannot itself establish a confidential relationship.[22] Moreover, while Popek testified that he subjectively believed DI had "little bargaining power" dealing with Fisher-Price (Tr. 786:10-25), his testimony was legally insufficient in two respects.

---

fiduciary relationship." Jury Instructions at 25. Thus, caselaw relating to the formation of a fiduciary relationship is applicable here.

[22] *See, e.g., Sony Music Entm't Inc. v. Robison*, 2002 U.S. Dist. LEXIS 3100, at *9 (S.D.N.Y. Feb. 26, 2002) ("Generally, an arm's length business transaction, *even those where one party has superior bargaining power* is not enough to give rise to fiduciary relationship."); *National Westminster Bank v. Ross*, 130 B. R. 656, 679 (S.D.N.Y. 1991), *aff'd, Yaeger v. National Westminster*, 962 F.2d 1 (2d Cir. 1992) ("Where parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances."); *Pommier v. Peoples Bank Marycrest*, 967 F.2d 1115, 1119 (7th Cir. 1992) (stating that "[a] slightly dominant business position . . . [does] not operate to turn a formal contractual relationship into a confidential or fiduciary relationship").

First, he admitted that DI never requested any changes or alterations in Fisher-Price's terms for reviewing inventor submissions. (Tr. 1000:6-18).[23] It cannot be assumed that there was unequal bargaining power when DI never even asked to bargain. Second, Popek admitted that he was not the person at DI who dealt with Fisher-Price; Bruce Benedetto was. (Tr. 952:2-8). Popek offered no personal knowledge or facts supporting his conclusory and subjective belief that DI had "little bargaining power" in dealing with Fisher-Price.[24] Benedetto agreed that, if DI did not like Fisher-Price's terms, it had the choice of dealing with other toy companies on different terms. (Tr. 2174:8-15). Popek testified that, by the mid-1990s, DI had sold 30 to 40 product ideas to toy companies on a speculative basis, showing that DI had numerous alternatives to dealing with Fisher-Price. (Tr. 778:9-11). This testimony is supported by Kipling's view that there are "a variety" of different practices in the toy industry as to confidentiality — confirming that if DI was dissatisfied with Fisher-Price's practices regarding confidentiality, it had alternatives. (Tr. 1321:14-23). Kipling further testified that there are at least 250 toy companies that an inventor could deal with (Tr. 1411:15-25), confirming that DI was under no compulsion to submit ideas to Fisher-Price.

The Court also charged that whether "one [party] trusts and relies on the other" may be considered in determining whether a confidential relationship is formed. Jury

---

[23]    Tina Zinter testified that Fisher-Price *will* consider, and on occasion grant, inventor requests for changes to Fisher-Price's terms. (Tr. 1624:19-1625:13).

[24]    In fact, he testified to the contrary. DI's business is a $2 million per year business with 18 employees. (Tr. 772:14-22, 187:9-14). The law will not imply a fiduciary relationship where the plaintiff is a sophisticated business person or entity. *See, e.g., WIT Holding Corp. v. Klein*, 282 A.D.2d 527, 529, 724 N.Y.S.2d 66, 68 (2d Dep't 2001) (holding that the plaintiff's cause of action for breach of fiduciary duty should have been dismissed "where the parties were involved in an arm's-length business transaction . . . *and where all were sophisticated business people*") (emphasis added); *Pommier*, 967 F.2d at 1119 (refusing to find a breach of fiduciary duty by defendant-bank to its customer-plaintiff because even though "the bank officers may have had more business experience than [the plaintiff], he was not a novice in the business world" given that he owned his own company and "conducted his own business affairs").

- 24 -

Instructions at 25. However, a unilateral decision to "trust" the other party in a business transaction does not support a finding of a confidential relationship. [25] As the Court instructed the jury, there must be some objective manifestation that the other party *accepted* the trust relationship (Jury Instructions at 25)[26] — and none is alleged here or supported by the record.

Finally, the Court instructed that the "course of dealing of the parties" and "industry customs and practices" may be considered in determining whether a confidential relationship exists. Jury Instructions at 25. As discussed above, DI's own expert testified that there is no custom and practice in the toy industry as to confidentiality. As to course of dealing, the only one supported in the record is that Fisher-Price does not accept submissions in confidence and disclaims confidential relationships. More specifically, Reiling testified that his course of dealing with Fisher-Price was that inventor submissions were *not* confidential, and no confidential relationship was formed. (Tr. 610:18-611:24). Popek testified that DI was aware of Fisher-Price's policy of non-confidentiality, and *all* of the documents introduced into evidence

---

[25]     *See, e.g., Pommier*, 967 F.2d at 1119 (stating that "[t]he essence of a fiduciary relationship is that one party is *dominated* by another. The fact that one party *trusts* another is insufficient. We trust most people with whom we choose to do business") (emphasis added); *Holloway*, 361 F. Supp. at 360 (allegations of "complete trust" insufficient to create fiduciary relationship).

[26]     *United States v. Chestman*, 947 F.2d 551, 566-67 (2d Cir. 1991) ("[A] fiduciary duty cannot be imposed unilaterally by entrusting a person with confidential information" and "[r]eposing confidential information in another, then, does not by itself create a fiduciary relationship."); *United States v. Cassese*, 273 F. Supp. 2d 481, 485-86 (S.D.N.Y. 2003) ("A fiduciary duty cannot be imposed unilaterally by entrusting a person with confidential information, and . . . a fiduciary relationship, or its functional equivalent, exists only where there is explicit acceptance of a duty of confidentiality or where such acceptance may be implied from a similar relationship of trust and confidence between the parties.") (internal quotation marks and citation omitted); *Smith v. Weinstein*, 578 F. Supp. 1297, 1306 (S.D.N.Y. 1984), *aff'd,* 738 F.2d 419 (2d Cir. 1984)(finding that a breach of confidence claim "rests on an obligation not to disclose to third parties ideas revealed in confidence, which obligation is judicially imposed only upon a party that accepts the relationship . . . ."); *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb, Inc.*, 767 F. Supp. 1220, 1230 (S.D.N.Y. 1991), *rev'd on other grounds,* 967 F.2d 742 (2d Cir. 1992) ("[T]he mere reposal of confidential information in and of itself will not give rise to a fiduciary relationship under New York law. . . . The confidence reposed by one party must be accepted by the other party. . . . In the absence of such mutuality, the mere unilateral investment of confidence by one party in the other ordinarily will not suffice to saddle the parties with the obligations and duties of a confidential relationship.").

established that Fisher-Price communicated that policy to DI in connection with its inventor

submissions. (*See* Tr. 992:6-993:6, 994:16-995:25; JX 201, 202, 203 & DX 837). Moreover,

Popek admitted that the only contract in force between Fisher-Price and DI at the time of the

initial Reel Heroes submission in October 1998 was the Design Services Agreement — which

disclaims any confidential relationship. (Tr. 961:5-963:4 & JX 206 ¶ 10.3). Thus, the course of

dealing between the parties was one of *non*-confidentiality. No evidence of any dealings

between Fisher-Price and DI on a confidential basis was offered.

## F.    DI's Arguments for a Confidential
## Relationship Are Legally Insufficient

Because DI apparently recognizes that it has no competent proof of a confidential

relationship, and it offered three legally insufficient arguments in support of its position that a

reasonable jury could find in its favor on this element.[27]  These are discussed below.

### 1.    The absence of a P&A signed by DI.

Perhaps the clearest indication that DI has no competent evidence to support a

confidential relationship is its argument that the absence of a written disclaimer of a confidential

relationship signed by DI with respect to the Reel Heroes concept somehow created an otherwise

non-existent confidential relationship. This argument is nonsense. The essence of this argument

is that a person impliedly accepts every legal obligation he has not expressly disclaimed. Such a

rule turns on its head the entire body of law governing formation of contracts and improperly

shifts the burden to Fisher-Price to show that it obtained a disclaimer of a confidential

relationship that never existed in the first place. As this Court's charge made clear, it is ***DI's***

---

[27]     These arguments are set forth in "Plaintiff's Memorandum in Opposition to Defendant's Directed Verdict
Motion on the Element of Confidential Relationship, dated January 29, 2006 [Docket No. 254] (the "DI
1/29/06 Memo.") at page 2.

burden to prove a confidential relationship **and** to show that Fisher-Price demonstrated acceptance of it. Jury Instructions at 25. A finding that failure to obtain a confidentiality disclaimer is evidence of a confidential relationship would essentially create a new rule of law that the **defendant** has the burden of establishing that no confidential relationship existed.

Moreover, this argument is an effort to draw an inference of a confidential relationship from the fact that Reiling and DI kept DI's involvement out of the original disclosure of the Reel Heroes concept. Popek acknowledged his deposition testimony that DI tried to keep its work-for-hire separate from its speculative inventor submissions. (Tr. 969:11-971:10). He also admitted that he had no knowledge of what Reiling communicated to Fisher-Price at the October 1998 meeting where Reiling disclosed the Reel Heroes concept. (Tr. 940:22-941:10). No witness testified that DI's involvement with the Reel Heroes concept was communicated to Fisher-Price at the time of the first transmission. The 10/29/98 Concept Submission Form Reiling prepared listed Reiling as the sole inventor. (Tr. 287:7-288:3 & JX 2). In essence, Reiling and DI induced Fisher-Price to accept the Reel Heroes with only Reiling (and not DI) filling out the required submission documentation.

In the context of these undisputed facts, no reasonable juror could infer that either DI intended to form a confidential relationship or that Fisher-Price accepted one. Indeed, Popek testified on direct exam that DI was aware that Fisher-Price required a P&A form in connection with inventor submissions (with its confidential relationship disclaimer) and that DI was willing to sign a P&A form making submissions on a non-confidential basis. (Tr. 785:22-786:25). In essence, Popek testified DI **would have signed** a P&A form in connection with the Reel Heroes submissions if Fisher-Price had known of its involvement and asked for one. This is entirely inconsistent with an inference that DI believed that it had established a confidential relationship

- 27 -

in connection with the Reel Heroes submission by Reiling in October 1998. Indeed, a careful review of Popek's testimony reflects that he never testified that DI had a confidential relationship with Fisher-Price at the time of the October 1998 Reel Heroes submission.

Finally, DI never offered any evidence or explanation as to how it could be possible that Reiling — the only person who had any contact with Fisher-Price relating to the Reel Heroes concept — had no confidential relationship with Fisher-Price, while DI could somehow have formed a confidential relationship without any communication or contact whatsoever. The reason DI has not addressed this paradox is clear — it has no answer to it. It is simply impossible as a matter of law that DI could have formed a confidential relationship with Fisher-Price relating to the Reel Heroes concept in the absence of any contact or communication, when the person who did have contact with Fisher-Price (Reiling) had disclaimed any confidential relationship. Fisher-Price is entitled to judgment as a matter of law on this basis.

## 2.    **The Option Agreement.**

DI relies on the February 16, 1999 Option Agreement (JX 10) as evidence of a confidential relationship at the time of the October 29, 1998 disclosure of the concept by Reiling.[28]  DI does not rely on any negotiations or discussions relating to the Option Agreement — nor could it, since its only witness on the topic (Popek) testified that, to his knowledge, DI had no communication with Fisher-Price relating to the Option Agreement.  (Tr. 1028:12-15).[29]

---

[28]    As the Court noted at the charge conference on February 2006, DI must show that it had a confidential relationship at the time of the initial October 29, 1998 disclosure; evidence of a later relationship is irrelevant. The Court's jury instruction on confidentiality confirmed this, stating: "Design Innovation must prove that it submitted its concept to Fisher-Price in the context of a confidential relationship." Jury Instructions at 25.

[29]    In his closing argument, DI's counsel admitted that there was no evidence or testimony of any contact by DI with Fisher-Price and that DI was relying solely on the Option Agreement and the documents submitted by Reiling. (Tr. 2626:4-2627:17).

Instead, DI cites paragraphs 3, 4, 5, and 8 in the Option Agreement as supporting a confidential relationship. DI 1/29/06 Memo. at 10.

Paragraphs 5 and 8 of the Option Agreement impose *on DI* an obligation to keep the Reel Heroes concept, and any Fisher-Price marketing or product plans, confidential — *but only during the term of the Option Agreement.* While DI seems to argue that these paragraphs impose a *mutual* obligation of confidentiality, their clear language is to the contrary; only DI accepts a confidentiality obligation (for which it is paid). Popek admitted at trial that those paragraphs did not impose any confidentiality obligation on Fisher-Price — only on DI.[30] Thus, DI recognizes that these paragraphs did not establish a confidential relationship.

Moreover, Popek testified that even DI's confidentiality obligation was extinguished when the Option Agreement terminated. Thus, to the extent the Option Agreement created any confidential relationship (which it did not), it did so only for the term of the Option Agreement in February-April 1999 and did not apply to the Reel Heroes submissions, which were made either well before or after the time when the Option Agreement was in effect. Indeed, this Court expressly recognized this in its ruling on the parties' motions to reconsider.[31]

DI's argument that the unilateral confidentiality obligation imposed upon it by the Option Agreement should be interpreted as implicitly imposing a confidentiality obligation binding on Fisher-Price is contrary to well-established canons of contract construction. New

---

[30]  "Q. And you pointed out the provisions here that indicate that the inventor will treat the information confidential. Do you recall that? A. Yes, I do. Q. This paragraph does not state that Fisher-Price will keep the information confidential, does it, Mr. Popek? A. Not that I see." (Tr. 1028:20-1029:5).

[31]  *See* the 1/10/06 Ruling [Docket No. 189] at 4 n.2 (ruling that the Reel Heroes "concept was not submitted *in the context of* [the Option Agreement]" because "the term of the Option Agreement ran from February 1, 1999 through May 1, 1999" and the Reel Heroes submissions were all made either before or after that term) at 12-13 (recognizing that the obligations set forth in the Option Agreement existed only "for the duration of the contract [*i.e.,* the Option Agreement]").

- 29 -

York law is clear that an implied agreement may not be found when there is an express agreement governing the same subject matter.[32] Here, the Option Agreement expressly addressed the obligations of the parties with respect to the Reel Heroes concept and particularly addressed the party's confidentiality obligations. The agreement imposed no confidentiality obligation on Fisher-Price. As a matter of law, it is presumed that the Option Agreement contained all terms the parties intended with respect to confidentiality and that any terms not included were left out intentionally.[33]

DI also relies on paragraph 3 of the Option Agreement, which states that, if the Option Agreement is "cancelled" prior to the end of its term, "all rights to the Concept will belong solely to Inventors." DI 1/29/06 Memo. at 10. First, there is no evidence in the record that the Option Agreement was ever "cancelled." Second, to the extent that DI is arguing that Fisher-Price acted contrary to the statement that "the Concept shall belong solely to Inventors," it is an unpleaded breach of contract argument. That argument is barred by DI's representation, reflected in the Court's jury charge, that "[n]either party is claiming that the other breached any of its contractual obligations." Jury Instructions at 20.

In any event, all of DI's arguments relating to the Option Agreement are legally insufficient because the agreement was not in existence until 4 months after the initial disclosure to Fisher-Price. This Court's jury charge makes clear that the confidential relationship must

---

[32]     *AEB & Assocs. Design Group v. Tonka Corp.,* 853 F. Supp. 724, 731 (S.D.N.Y. 1994); *Julien J. Studley, Inc. v. N.Y. News, Inc.,* 70 N.Y.2d 628, 629, 518 N.Y.S.2d 779, 780 (1987). *See also* Ruling on Defendant's Motion for Summary Judgment [Docket No. 145] at 20-21.

[33]     *See Radio Today, Inc. v. Westwood One, Inc.,* 684 F. Supp. 68, 71 (S.D.N.Y. 1988) ("If the parties have an express contract that deals with a subject, it makes little sense to conclude that they in fact agreed to additional terms, but left them out of the express contract").

exist at the time of the original disclosure of the concept. Jury Instructions at 25.[34]  A subsequent confidentiality agreement cannot retroactively create a confidential relationship to revive a property right that was lost when an idea was originally disclosed on a non-confidential basis.  In *Kublan v. Hasbro,* 1999 U.S. Dist. LEXIS 3226 (S.D.N.Y. Mar. 22, 1999), an inventor submitted an idea to Hasbro under a 1992 submission agreement that waived confidentiality.  In 1994, he submitted the same idea under an agreement that expressly provided that the idea would be held confidential by Hasbro.[35]  The court ruled that, because the idea had been first disclosed to Hasbro on a non-confidential basis, the 1994 confidentiality agreement was without effect and any misappropriation claim was barred.  Similarly, in *AEB,* 853 F. Supp. at 735 & n.8, an inventor had presented an idea to Fisher-Price under the same P&A form at issue in this case, with its express waiver of confidentiality.  Shortly thereafter, the inventor presented the idea to Kenner Toys under a confidentiality agreement.  The court ruled that the non-confidential disclosure ***to a single party*** (Fisher-Price) negated any possible misappropriation claim against Kenner, even though the disclosure to Kenner was made on a nominally confidential basis.

Thus, DI's argument that the Option Agreement — entered into ***after*** Reiling's non-confidential submission of the concept — somehow made the submission retroactively confidential fails as a matter of law.

---

[34]  Moreover, DI does not argue that it was understood, expected or known at the time of the initial disclosure that the parties would enter into an Option Agreement.  Thus, the Option Agreement is not reflective of what the parties may have agreed or expected at the time of initial disclosure.  This is especially true because DI was not present at the initial disclosure meeting and, as Popek testified, had no knowledge of what happened at that meeting.  ("Q.  The meeting that Mr. Reiling had with Fisher-Price, you weren't present at that, correct?  A.  That's correct.  Q.  You have no knowledge of what was said, right, sir?  A. No, I don't."  (Tr. 940:22-941:2).  Again, this makes clear that it is not possible that any confidential relationship between DI and Fisher-Price was formed in connection with the initial disclosure of the Reel Heroes concept.

[35]  Here, of course, the Option Agreement did not provide that Fisher-Price would hold the Reel Heroes concept confidential.

### 3.   License negotiations.

DI's final argument that there is evidence in the record supporting the existence of

a confidential relationship is that "an implied confidential relationship is created where, as here,

the idea was submitted for negotiations in which one party sought to sell or license his or her

concept to the other." DI 1/29/06 Memo. at 5.

New York caselaw (which the parties agree governs) provides that a typical

licensee/licensor negotiation or relationship is an arm's-length business transaction and does *not*

give rise to a confidential relationship.[36] DI's claim here is that, in the face of Fisher-Price's

known policy that it would not treat information received from inventors as confidential, DI

nevertheless provided allegedly confidential information to Fisher-Price (through Reiling).

Under New York law, the unilateral decision to disclose allegedly confidential information to

another party cannot create a fiduciary or confidential relationship.[37]

---

[36]   *See, e.g., Basquiat v. Sakura Int'l,* 2005 U.S. Dist. LEXIS 13989, *19 (S.D.N.Y. July 5, 2005) ("New York law does not extend the scope of informal fiduciary relationships to parties participating in an arms-length transaction, *such as the licensing agreement negotiation at issue here.*"); *King v. Edward B. Marks Music Corp.,* 45 N.Y.S.2d 630, 632-33 (Sup. Ct. N.Y. Co. 1943) (license negotiation "creates a debtor and creditor relationship and not a fiduciary one"). *See also Lane v. Mercury Record Corp.,* 21 A.D.2d 602, 603, 252 N.Y.S.2d 1011, 1012 (1st Dep't 1964), *aff'd* 18 N.Y.2d 889, 276 N.Y.S.2d 626 (1966) (recognizing that "[a] royalty or percentage arrangement [does] not, in and of itself, establish a fiduciary relationship"); *Surge Licensing, Inc. v. Copyright Promotions Ltd.,* 258 A.D.2d 257, 258, 685 N.Y.S.2d 175, 176 (1st Dep't 1999) (holding that the trial court properly dismissed plaintiff's cause of action for breach of fiduciary duty because "[t]he parties' agreement, premised as it was upon a conventional business relationship and establishing at arm's length *no more than routine licensing and royalties rights and obligations,* did not implicate or give rise to a fiduciary relationship") (internal citations omitted) (emphasis added); *Liebowitz v. Elsevier Sci., Inc.,* 927 F. Supp. 688, 711 (S.D.N.Y. 1996) ("New York law . . . does not regard the relationship between . . . a licensor receiving royalty payments from a licensee, as establishing a fiduciary duty. . . . Instead, any duty owed in such a context normally is no more than the usual implied-in-law duty of good faith and fair dealing imposed on parties to any contract."); *Sony Music Entm't Inc. v. Robison,* 2002 U.S. Dist. LEXIS 3100, *8-9 (S.D.N.Y. Feb. 26, 2002) ("Generally, an arm's length business transaction, *even those where one party has superior bargaining power* is not enough to give rise to fiduciary relationship. . . . The fact that [plaintiff] is responsible for collecting royalties and passing them on to Defendants does not create a fiduciary relationship.") (emphasis added).

[37]   *King,* 45 N.Y.S.2d at 632-33 ("merely reposing confidence in another does not itself create a trust nor make a trustee of one in whom confidence is reposed"). *See also Litton Indus.,* 767 F. Supp. at 1231-32

- 32 -

Because the Reel Heroes concept was not submitted in the context of a

confidential relationship or on a confidential basis, Fisher-Price is entitled to judgment as a

matter of law.

## II.    DI INTRODUCED NO COMPETENT EVIDENCE AND ADVANCED NO COGNIZABLE LEGAL THEORY THAT WOULD PERMIT RECOVERY OF DAMAGES ON LINE EXTENSIONS

DI sought damages relating to two Rescue Heroes playsets (the Aquatic Rescue

Command Center (JX 73) and the Mountain Action Command Center (JX 90/91)) and two toy

vehicles (the Mission Select Fire Truck (JX 92/93) and Police Cruiser (JX 95/95-A)). These

products were referred to by the Court in its charge as "line extensions and accessories" (Jury

Instructions at 37) and are referred to below as the "line extension" products. In its jury

instructions, the Court noted that DI "does not claim that these line extensions and accessories

actually misappropriated the submitted concept, but claims that Fisher-Price's misappropriation

caused [DI] to lose royalty payments it would have collected from Fisher-Price but for Fisher-

Price's misappropriation of the submitted concept." Jury Instructions at 37.

Fisher-Price seeks judgment as a matter of law dismissing DI's claim with respect

to line extensions on three grounds: (1) there is no legal authority that permits an award of

("[T]he mere reposal of confidential information in and of itself will not give rise to a fiduciary relationship under New York law. . . . The confidence reposed by one party must be accepted by the other party. . . . In the absence of such mutuality, the mere unilateral investment of confidence by one party in the other ordinarily will not suffice to saddle the parties with the obligations and duties of a confidential relationship."); *United States v. Falcone*, 257 F.3d 226, 234 (2d Cir. 2001) ("A fiduciary duty cannot be imposed unilaterally by entrusting a person with confidential information, and . . . a fiduciary relationship, or its functional equivalent, exists only where there is explicit acceptance of a duty of confidentiality or where such acceptance may be implied from a similar relationship of trust and confidence between the parties."); *Chestman*, 947 F.2d at 568 (2d Cir. 1991) (recognizing that "[r]eposing confidential information in another . . . does not by itself create a fiduciary relationship" and "entrusting confidential information to another does not, without more, create the necessary relationship and its correlative duty to maintain the confidence"); *Cassese*, 273 F. Supp. 2d at 485 ("Courts have repeatedly emphasized that *a fiduciary duty cannot be imposed unilaterally by entrusting a person with confidential information*.") (emphasis added).

- 33 -

damages in a misappropriation case with respect to products that do not themselves

misappropriate the concept at issue; (2) DI failed to introduce any proof that the sales of the line

extension products were caused by Fisher-Price's allegedly wrongful use of the concept in the

accused Rescue Heroes figures; and (3) DI never introduced any proof that it lost royalties on

sales of line extension products that it would have earned "but for" Fisher-Price's alleged

wrongful conduct.

A.    **Damages May Not Be Awarded in a
       Misappropriation Case With Respect to
       Products That Do Not Misappropriate the Concept**

Fisher-Price has located no case in any jurisdiction that permitted an award of

damages in a misappropriation of idea case with respect to products that do not themselves

misappropriate the concept. This is not surprising and allowing the jury's verdict to stand with

respect to the line extension products would create new law allowing for the recovery of

damages on products that did not use the inventor's idea. The purpose of misappropriation

damages is to compensate plaintiff for its loss. In every case Fisher-Price has reviewed, this is

computed by awarding a damages measure solely with respect to ***those products accused of***

***actually misappropriating the idea at issue.***[38]

B.    **There Was No Evidence at Trial
       Establishing That Fisher-Price's Sale of
       Line Extension Products Caused DI Any Damage**

Under New York law, a plaintiff must show that its damages were caused by the

defendant's wrongful conduct. This requires, at a minimum, a showing that the damages sought

---

[38]    *See, e.g., Vermont Microsystems Inc. v. Autodesk, Inc.,* 138 F.3d 449, (2d Cir. 1998) (ruling that plaintiff is only entitled to a royalty calculated on the ***portion*** of the value of the accused product consisting of the misappropriated feature; not on those features that were not misappropriated); *Vitro Corp. of Amer. v. Hall Chem. Co.,* 292 F.2d 678, 682-83 (6th Cir. 1961) (same); *Univ. Computing Co. v. Lykes-Youngstown Corp.,* 504 F.2d 518, 539-40 (5th Cir. 1974) (approving royalty on value of computer system that used misappropriated idea).

would not have been suffered "but for" the defendant's wrongful conduct.[39]  Under the facts of

this case, DI would be required to show at least two things to establish causation with respect to

its claim for lost royalties on line extension products:  (1) that the sales of line extension products

for which DI seeks a royalty were caused by the wrongful use of the Reel Heroes concept in the

accused Rescue Heroes figures;[40] and (2) that DI would have earned royalties on the line

extension products if not for Fisher-Price's alleged wrongful use of the Reel Heroes concept in

the accused figures.  Here, DI introduced no evidence making either showing necessary to carry

its burden on causation.

　　　　　First, it made no showing whatsoever that the sales of line extension products

were caused by the presence of the Reel Heroes concept in the accused Rescue Heroes figures;

indeed, DI made no showing that sales of the line extension playsets and vehicles were caused

even by the accused Rescue Heroes figures in their entirety (as opposed to just the features that

allegedly embody the Reel Heroes concept).  DI relied solely on testimony that the playsets and

vehicles were "sold for use with" the accused Rescue Heroes figures.  While true, this does

nothing to prove that the sales of the playsets and vehicles were caused by the alleged use of the

Rescue Heroes concept in the accused figures, for four reasons:

---

[39]　　*See generally Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 279 (2d Cir. 1992) (explaining
necessity of proof of causation between tort complained of and loss alleged); *Buggs v. Veterans Butter &
Egg Co.,* 120 A.D.2d 361, 502 N.Y.S.2d 12, 13 (1st Dep't 1986). *See also Smith v. D.A. Schulte, Inc.,* 280
A.D. 913, 116 N.Y.S.2d 212, 213 (1st Dep't 1952) (in any action to recover damages, plaintiff must show
that damage arose from the wrong complained of); *Vanguard Military Equipment Corp. v. Schulein,* 266
A.D. 912, 42 N.Y.S.2d 526, 527 (1st Dep't 1943) (same); *Sprewell v. NYP Holdings, Inc.,* 1 Misc.3d 847,
855, 772 N.Y.S.2d 188, 196 (Sup. Ct. N.Y. Co. 2003) (in pleading special damages, "actual loss must be
identified and causally related to the alleged tortious act").

[40]　　Proving that some (or even all) sales of line extensions were caused by the wrongful use of the Reel
Heroes concept would not be enough on its own to show causation. *See Seal Flex, Inc. v. W.R. Dougherty
& Assoc.,* 254 F. Supp.2d 647, 656 (E.D. Mich. 2003) (recognizing the presumption that a royalty "by its
nature incorporates the parties' expectations that licensees will derive collateral benefits through the use of
the patented method" and that a plaintiff may therefore not recover a royalty with respect to collateral
products (like line extensions) that do not incorporate the invention at issue.

- DI never addressed whether the line extension products caused sales of the accused figures, rather than the converse. In those circumstances, it would not be entitled to damages on line extension products.

- DI never introduced any proof showing that the accused Rescue Heroes figures caused sales of the line extension products. The only testimony offered at trial was testimony that the allegedly infringing Rescue Heroes figures were compatible with and could be used with the line extension products at issue. (Tr. 875:8-880:3). However, it was also undisputed that non-accused Rescue Heroes figures were used with these playsets and vehicles. (Tr. 876:12-19, 877:20-25, 878:21-879:8). The playset and vehicle line extensions were also purchased for use without any Rescue Heroes figures. (Tr. 2022:2-2026:12).

- DI never introduced any proof showing that, even if sales of the accused Rescue Heroes figures caused the sales of line extension products, it was the specific presence of the Reel Heroes concept in the accused figures (rather than some other feature) that caused these sales.

In these circumstances, the fact that a non-infringing product can be "used with" an infringing product is insufficient to establish entitlement to damages with respect to sales of the non-infringing product. DI's failure to introduce any evidence on these critical causation issues resulted in a fundamental failure of proof as to whether the sales of the line extension products were caused by Fisher-Price's allegedly wrongful use of the Reel Heroes concept.

DI also failed to introduce any competent evidence that it would have earned royalties on the line extension products if not for Fisher-Price's alleged misappropriation. DI's expert, James Kipling, testified that whether an inventor receives royalties on line extension products is a matter of negotiation with the toy company. (Tr. 1551:22-1553:1). Fisher-Price's expert, Howard Bollinger, testified to the same effect. (Tr. 2326:5-8, 2380:16-20). In these circumstances, the jury would have been required to speculate without basis to conclude that DI would have received royalties on line extension products but for Fisher-Price's allegedly wrongful use of the Reel Heroes concept.

- 36 -

Moreover, the Option Agreement executed by DI and Fisher-Price with respect to the Reel Heroes concept is dispositive — and undisputed — evidence that the parties never intended that Fisher-Price would pay royalties on line extensions. The Option Agreement (JX 10) set forth the terms of a license in the event that Fisher-Price exercised its option. The license terms agreed by the parties with respect to the Reel Heroes concept required that payment of the royalty *only* with respect to products that "incorporate the [Reel Heroes] concept." JX 10 ¶ 2.[41] As discussed above, this Court charged the jury that the line extension products do not "incorporate the [Reel Heroes] concept." Accordingly, the terms of the Option Agreement made clear that there was never any contemplation between the parties that DI would receive a royalty on line extension products.

For these reasons, Fisher-Price is entitled to judgment as a matter of law dismissing DI's claims relating to line extension products.

### III.    DI ADMITTED THAT FISHER-PRICE DID NOT "USE" THE REEL HEROES CONCEPT IN ITS ONLY CONCRETE FORM

The Court charged that DI "must prove that Fisher-Price *actually used the submitted concept* in Fisher-Price's products." Jury Instructions at 26 (emphasis added). "Use" can be shown by a comparison of the submitted concept and the product accused of incorporating the submitted concept and determining whether the two are substantially similar. Substantial similarity is often determined as a matter of law, and "differences between the two

---

[41]    Paragraph 2 of the Option Agreement defines "licensed products" as "products incorporating the [Reel Heroes] concept." Paragraph 6(c) makes clear that the royalty obligation under any license extends only to "licensed products."

- 37 -