UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DESIGN INNOVATION, INC.,

Plaintiff,

- against -

FISHER-PRICE, INC.,

Defendant.

Index No.: 3:03 CV 222 (JBA)

March 24, 2006

## PLAINTIFF'S MEMORANDUM IN OPPOSITION
## TO DEFENDANT'S MOTION FOR JUDGMENT
## AS A MATTER OF LAW OR A NEW TRIAL

GRIMES & BATTERSBY, LLP
Gregory J. Battersby, Esq.
Edmund J. Ferdinand, III, Esq.
Russell D. Dize, Esq.
Susan M. Schlesinger, Esq.
488 Main Avenue, Third Floor
Norwalk, Connecticut 06851-1008
(p) (203) 849-8300
(f) (203) 849-9300

SANDAK HENNESSEY & GRECO, LLP
Jay H. Sandak, Esq.
Peter M. Nolin, Esq.
707 Summer Street
Stamford, Connecticut 06901-1026
(p) (203) 425-4200
(f) (203) 325-8608

Attorneys for Plaintiff
Design Innovation, Inc.

## Table of Contents

                                                                                    Page

TABLE OF AUTHORITIES .......................................................................................... iii

PRELIMINARY STATEMENT ....................................................................................... 1

COUNTER-STATEMENT OF FACTS ............................................................................ 1

LEGAL STANDARD...................................................................................................... 8

ARGUMENT.................................................................................................................. 9

I.       THE JURY'S FINDING THAT DI DISCLOSED ITS CONCEPT TO FISHER-
         PRICE IN THE CONTEXT OF A CONFIDENTIAL RELATIONSHIP WAS
         REASONABLE ................................................................................................... 9

         A.   New York Law Does Not Require Proof of "Secrecy" In Submission of Idea
              Cases ..................................................................................................... 10

         B.   The 1994 P&A Signed by Reiling Does Not Preclude the Existence of a
              Confidential Relationship Between DI and Fisther-Price or Result in any
              Loss of Rights for the Concept Submission as a Matter of Law .................. 12

              1.   The 1994 P&A Merely Serves to "Release" Reiling's Claims .............. 13

              2.   The 1994 P&A Did Not Destroy any Rights in the
                   Reel Heroes Concept........................................................................ 14

         C.   DI Disclosed the Concept to Fisher-Price in the Context of a Confidential
              Relationship ........................................................................................... 18

              1.   A Confidential Relationship Arose By Virtue of
                   Status of the Parties......................................................................... 19

              2.   DI and Reiling Disclosed Their Concept in the Context of a Confidential
                   Relationship That Arose from the Parties' Course of Conduct.............. 20

              3.   Toy Industry Practice and Custom ..................................................... 26

              4.   Evidence of the Parties' Efforts to Maintian
                   Confidentiality of the Concept............................................................ 28

              5.   Fisher-Price's Arguments Do Not Undermine the Confidential
                   Relationship Between DI and Fisher-Price............................................ 28

                   a.   The Reel Heroes Concept was a Joint Submission.......................... 28

i

         b.    New York Law Does Not Require Express Communication of the
Confidential Relationship ................................................................... 29

         c.    There was Evidence in the Record to Confirm Fisher-Price's
Acceptance of the Confidential Relationship .................................. 29

II.     DAMAGES MAY BE AWARDED UNDER THEORIES OF
MISAPPROPRIATION AND UNFAIR COMPETITION FOR LINE
EXTENSIONS AND ACCESSORIES SOLD AND MARKETED WITH
PRODUCTS USING THE MISAPPROPRIATED CONCEPT ........................... 31

    A.   Sales of Line Extensions are Recoverable Under a
Misappropiation Theory ............................................................................... 32

    B.   The Evidence at Trial Supports the Jury's Award of Damages ...................... 34

III.   THE JURY'S FINDING THAT THE REEL HEROES CONCEPT WAS
CONCRETE WHEN IT WAS SUBMITTED TO FISHER-PRICE WAS
REASONABLE .................................................................................................... 37

    A.   The Evidence at Trial Established that the Reel Heroes Concept was
Concrete When It Was Submitted ........................................................................ 38

    B.   The Cases Cited by Fisher-Price Are Not on Point ........................................ 41

IV.   THE JURY'S FINDING THAT FISHER-PRICE USED THE REEL HEROES
CONCEPT WAS REASONABLE .......................................................................... 43

    A.   Legal Standard for the "Use" Element of a
Misappropriation of an Idea Claim .............................................................. 43

    B.   Trial Testimony Confirmed that DI's Concept Was
Communicated to Fisher-Price ..................................................................... 45

    C.   There is Strong Evidence of Substantial Similarity in the Record............... 47

    D.   Acces to DI's Concept Is Not Disputed....................................................... 49

V.    THE TRIAL RECORD CONTAINS SUBSTANTIAL EVIDENCE OF THE
NOVELTY OF THE REEL HEROES SUBMISSION ......................................... 50

CONCLUSION.................................................................................................................... 55

## Table of Authorities

Page

### Federal Cases

*AEB & Associates v. Tonka Corp.*, 853 F. Supp. 724 (S.D.N.Y. 1994) .................................. 43, 52

*Ball v. Hershey Foods Corp.*, 842 F. Supp. 44 (D. Conn. 1993),
    *aff'd*, 14 F.3d 591 (2d Cir. 1993) ............................................................................................... 43

*Basquiat v. Sakura Int'l*, 2005 U.S. Dist. LEXIS 13989 (S.D.N.Y. July 5, 2005) ........................ 21

*Bateman v. Mnemonics, Inc.*, 79 F.3d 1532 (11th Cir. 1996) .......................................................... 31

*Bauer v. Raymark Industries, Inc.*, 849 F.2d 790 (2d Cir. 1988) ..................................................... 9

*Boisson v. Banian, Ltd.*, 273 F.3d 262 (2d Cir. 2001) ................................................................... 44

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989) ...................................... 11, 12

*Burten v. Milton Bradley Co.*, 763 F.2d 461 (1st Cir. 1985) ................................................... 21, 26

*Diduck v. Kaszycki*, 974 F.2d 270 (2d Cir. 1992) .......................................................................... 36

*Duffy v. Charles Schwab & Co., Inc.*, 2001 U.S. Dist. LEXIS 14070 (D.N.J. Sept. 4, 2001)...... 43

*Eolas Techs. v. Microsoft Corp.*, 399 F.3d 1325 (Fed Cir. 2005) .................................................. 17

*Galanis v. Procter and Gamble Corp.*, 153 F. Supp. 34 (S.D.N.Y. 1957) ..................................... 38

*Georgia Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970) .... 35

*Haworth, Inc. v. Herman Miller, Inc.*, 162 F.R.D. 286 (W.D. Mich. 1995) ................................. 35

*Heyman v. A.R. Winarick, Inc.*, 325 F.2d 584 (2d Cir. 1964) .......................... 21, 22, 23, 26, 29, 31

*Hudson Hotels Corp.v. Choice Hotels Int'l, Inc.*, 995 F.2d 1173 (2d Cir. 1993) ......................... 11

*In re Elsinore Shore Associates*, 102 B.R. 958 (D.N.J. 1989) ....................................................... 43

*Integrated Cash Management Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171
    (2d Cir. 1990) ..................................................................................................................... 11, 53

*Intel Corp. v. U.S. Int'l Trade Comm.*, 946 F.2d 821 (Fed. Cir. 1991) ......................................... 53

*International News Service v. Associated Press*, 248 U.S. 215 (1918) .................................... 34-35

## Table of Authorities
### (Continued)

Page

*Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966 (2d Cir. 1987).......................................... 9

*Lemelson v. Carolina Enters., Inc.*, 541 F. Supp. 645 (S.D.N.Y. 1982) ...................................... 11

*Link Group Int'l v. Toymax, Inc.*, 2000 U.S. Dist. LEXIS 4567
(D. Conn. Mar. 17, 2000)............................................................................................................ 41-42

*Litton Industries, Inc. v. Lehman Bros.*, 767 F. Supp. 1220 (S.D.N.Y. 1991), *rev'd on other
grounds*, 967 F.2d 742 (2d Cir. 1992) ............................................................................................ 22, 23

*M & T Chemicals, Inc. v. International Business Machines*,
403 F. Supp. 1145 (S.D.N.Y. 1975)................................................................................................ 11

*Matarese v. Moore-McCormack Lines, Inc.*, 158 F.3d 631 (2d Cir. 1946) ................ 21, 23, 29, 31

*McGhan v. Ebersol*, 608 F. Supp. 277 (S.D.N.Y. 1985) ................................................................. 10

*Merritt Forbes & Co. v. Newman Inv. Secur, Inc.*,
604 F. Supp. 943 (S.D.N.Y. 1985) .............................................................................................. 43

*Moss v. Morgan Stanley, Inc.*, 719 F.2d 5 (2d Cir. 1983)............................................................... 12

*Murray v. National Broadcasting Co.*, 844 F.2d 988 (2d Cir. 1988) ......................................... 10, 53

*Nadel v. Play-By-Play Toys & Novelties, Inc.*,
208 F.3d 368 (2d Cir. 2000)............................................................................ 11, 26, 50-51, 52-53

*Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127 (2d Cir. 1986).......................................... 9

*Nickson Industries, Inc. v. Rol Mfg. Co.*, 847 F.2d 795 (Fed. Cir. 1988) ...................................... 33

*Pioneer Hi-Bred International v. Holden Foundation Seeds, Inc.*,
35 F.3d 1226 (8th Cir. 1994) ..................................................................................................... 37

*Powell v. Gardner*, 891 F.2d 1039 (2d Cir. 1989)............................................................................ 8

*Schering Corp. v. Roussel*, 104 F.3d 341 (Fed. Cir. 1997)............................................................. 18

*Schreyer v. Casco Products Corp.*, 190 F.2d 921 (2d Cir. 1951).......................... 21, 22, 23, 29, 31

*Sir Speedy, Inc. v. L&P Graphics, Inc.*, 957 F.2d 1033 (2d Cir. 1992)............................................ 8

## Table of Authorities
### (Continued)

Page

*Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.*, 118 F.3d 955
(2d Cir. 1997).............................................................................................................................. 53

*Speedry Chem. Prods., Inc. v. Carter's Ink Co.*,
306 F.2d 328 (2d Cir. 1962).......................................................................... 11, 21, 22, 23, 29, 31

*Stewart v. World Wrestling Federation Entertainment, Inc.*, 2004 U.S. Dist. LEXIS 26533
(S.D.N.Y. Jan. 11, 2005).............................................................................. 10, 12, 19, 22, 29, 31

*University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518 (5th Cir. 1974) ............... 34

*Vermont Microsystems, Inc. v. Autodesk*, 138 F.3d 449 (2d Cir. 1998) ........................................ 33

*Vitor Corp. of America v. Hall Chemical Company*, 292 F.2d 678 (6th Cir. 1961)..................... 33

*Walton v. Morgan Stanley & Co.*, 623 F.2d 796 (2d Cir. 1980)..................................................... 12

*Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*, 225 U.S. 604,
56 L. Ed. 1222, 32 S. Ct. 691 (1912)............................................................................................. 33

*Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101 (2d Cir. 2001).................................................... 44

### Table of Authorities
### (Continued)

Page

**State Cases**

*Adolph Gottscho, Inc. v. American Marketing Corp.*, 139 A2d 281 (N.J. 1958) ........................ 32

*American Electronics, Inc. v. Neptune Meter Co.*, 33 A.D.2d 157, N.Y.S.2d 931 (N.Y. App. 1st
Dept. 1969) ......................................................................................................................................... 32, 36

*Buggs v. Veterans Butter & Egg Co.*, 502 N.Y.S.2d 12 (1st Dep't 1986)...................................... 36

*Downey v. General Foods Corp.*, 334 N.Y.S.2d 874 (N.Y. 1972)................................................... 10

*Ed Graham Prods., Inc. v. National Broad. Co.*, 347 N.Y.S.2d 766 (N.Y. Sup. Ct. 1973) ......... 43

*Educational Sales Programs, Inc. v. Dreyfus Corp.*, 317 N.Y.S.2d 840
(Sup. Ct., N.Y. Cty. 1970) ........................................................................................................... 10, 42

*Gilroy v. American Broadcasting Co., Inc.*, 47 A.D.2d 728,
365 N.Y.S.2d 193 (1st Dept. 1977) ...........................................................................................32, 36-37

*Julius Hyman & Co. v. Velsicol Corp.*, 233 P.2d 977 (Colo. 1951) ......................................... 32, 33

*Klein v. Ecko Products Co.*, 135 N.Y.S.2d 391 (Sup. Ct. Kings Cty. 1954) .................... 19, 29, 31

*Oasis Music, Inc. v. 900 U.S.A., Inc.*, 614 N.Y.S.2d 878 (S. Ct., N.Y. Cty. 1994) ....................... 10

*Sachs v. Cluett Peabody & Co.*, 39 N.Y.S.2d 853 (N.Y. App. Div. 1943), *aff'd* 291 N.Y. 772
(1944)............................................................................................................................................ 12, 16, 19

*Smith v. D.A. Schulte, Inc.*, 116 N.Y.S.2d 212 (1st Dep't 1986) .................................................... 36

*Sprewell v. NYP Holdings, Inc.*, 772 N.Y.S.2d 188 (Sup. Ct. N.Y. Co. 2003) ............................ 36

*Suburban Graphics Supply Corp. v. Nagle*, 5 A.D. 3d 663, 774 N.Y.S.2d 160, (N.Y. App. 2d
Dept. 2004) ..................................................................................................................................... 32, 36

*Vanguard Military Equipment Corp. v. Schulein*, 42 N.Y.S.2d 526 (1st Dep't 1943)................. 36

### Table of Authorities
### (Continued)

Page

**Other Authorities**

Milgrim, TRADE SECRETS § 4.03 at 4-12 ........................................................................................... 21

## PRELIMINARY STATEMENT

Following a three-week trial, the jury returned a verdict in favor of Design Innovation ("DI") for its claims of common law misappropriation and unfair competition and awarded monetary damages to DI for lost royalty revenue in the amount of $1.7 million. Fisher-Price now seeks to have the Court resolve DI's claims as a matter of law or, in the alternative, to set aside the jury's verdict. Fisher-Price carries an exceedingly heavy burden on this motion, which it cannot meet.

Fisher-Price's motion does not accurately reflect the record at trial. In virtually all respects Fisher-Price has failed to address testimony elicited during DI's direct case and during cross-examination of Fisher-Price's own witnesses. Indeed, on each issue raised on this motion there are facts which directly undermine Fisher-Price's contention that no reasonable jury could find for the Plaintiff. When the entire evidentiary record is viewed and the governing law is properly construed, there is no question that there was a "legally sufficient evidentiary basis for a reasonable jury to find" for DI with respect to each element of its misappropriation claim. Fed. R. Civ. P. 50(a).

## COUNTER-STATEMENT OF FACTS

Fisher-Price is a subsidiary of Mattel, Inc., the world's largest toy company. (Tr. at 787, 800). Fisher-Price solicits ideas for new toy products from independent inventors and designers through "wish lists" and by other means. (Tr. at 99-100, 643-46, Pl. Exhs. 300, 303). Fisher-Price conceded that outside inventor submissions are an important part of Fisher-Price's business. (Tr. at 649-50).

Victor Reiling is an independent toy inventor who has worked in the toy industry for more than thirty years. (Tr. at 69). He was employed by Fisher-Price in the early 1970s, and for the past twenty-five years he has had a longstanding relationship with Fisher-Price as an independent toy inventor. (Tr. at 69, 97). He has submitted hundreds of ideas to toy companies on a "speculative"

1

basis, including submissions to Fisher-Price. (Tr. at 91, 102). Fisher-Price has licensed Reiling's

concept submissions in the past. (Tr. at 92). One of those submissions was "Slam Jammers," which

was notable because the finished toy product that Fisher-Price marketed and sold ("Crash Zone")

bore little resemblance to Reiling's initial prototype or the Fisher–Price form he completed

describing that submission. (Tr. at 200-02, 1372-74; Pl. Exhs. 307, 308; Def. Exh. 745). Reiling

testified that in the past, if Fisher-Price did not license Reiling's submissions and pay for the

concept, it always returned the submissions to him without using the concept. (Tr. at 189-90, 194,

566). Fisher-Price required Reiling to sign a Policy and Agreement form as a prerequisite to

submitting new toy ideas. (Tr. at 295-96). These forms originally accompanied each submission, but

as of 1994 Fisher-Price had Reiling sign a blanket form that covered all future submissions. (Tr. at

288-89, 290-91). Based upon his past experience with Fisher-Price, Reiling believed that he would

be treated fairly in connection with all of his submissions, and the 1994 P&A form Reiling signed

expressly stated that Fisher-Price intended to treat him fairly. (Tr. at 546, 548, Joint Trial Exhibit

("JX") 1). Not withstanding any P&A, Reiling expected that all submissions made to Fisher-Price

would be kept confidential and that in accordance with Fisher-Price's past practices, it would not

seek to keep and use his concepts without paying for them. (Tr. at 101-03, 114, 566).

DI is an independent toy design firm whose principals have worked in the toy industry for

more than thirty years. (Tr. at 764-70, 2157-58). In the past, DI has performed design work for

Fisher-Price on a work-for-hire basis (*i.e.*, Fisher-Price would assign a project to DI and would pay

them for the work performed). (Tr. at 785, 800). As with Reiling, DI has also submitted new toy

ideas to Fisher-Price on a speculative basis, and Fisher-Price has licensed certain of DI's prior

concept submissions. (Tr. at 785-86). If no license was entered into, Fisher-Price returned the

submissions to DI. (Tr. at 804). Bruce Popek, President of DI, testified that he believed he would be

2

treated fairly in connection with his submissions to Fisher-Price. (Tr. at 800, 803, 855). He treated the Reel Heroes submission on a confidential basis, and he expected that Fisher-Price would maintain the confidentiality of the submission as well. (Tr. at 829, 832). He is not aware that Fisher-Price ever took any action to breach the confidentiality of the Reel Heroes submission. (Tr. at 832-33). Like Reiling, Popek, on behalf of DI, confirmed his expectation, based on Fisher-Price's past practice, that when DI submitted concepts to Fisher-Price, the concept would either be paid for or returned to DI without use by Fisher-Price. (Tr. at 827-31).

In this case, Reiling and DI jointly developed an idea for adding an image component to the backpack of each Rescue Heroes action figure that enhanced role play for the child by depicting the mission of that particular Rescue Heroes character. (Tr. at 113-15, 117-22, 544, 556). It was not necessary to the Reel Heroes concept that the character actually be shown on an adventure. (*See* JX 3). Instead, the mission could be depicted by showing obstacles and dangers the character might face, as was disclosed to Fisher-Price in the original description of the concept that was part of the first submission. (*Id.*)

Reiling and DI are co-inventors and joint owners of the Reel Heroes concept. (Tr. at 784). While they have used the term "partners" to informally describe their working relationship, they did not intend to use the term in the legal sense. (Tr. at 972). Their business relationship with respect to the Reel Heroes concept was such that they shared equally in the development time and expenses, and they agreed to share equally in any monies received from the sale of the concept. (Tr. at 271). Reiling and DI did not share facilities, equipment, bank accounts or employees. (Tr. at 782-84). In addition, Popek testified that Reiling did not have the authority to bind DI in a business or legal transaction. (*Id.*) At no time was Reiling publicly held out as partner of, or agent for, DI. (Tr. at 782-84).

3

Reiling was chosen to present the concept to Fisher-Price because he had business contacts in the toy industry that DI did not have, including a relationship with Paul Snyder, Vice President of Inventor Relations for Fisher-Price. (Tr. at 781, 809-10). At the initial meeting in October 1998, Reiling showed Mr. Snyder a prototype constructed by DI and a presentation board with drawings depicting the types of images that could be used to depict missions. (*See* JX 7, 4). The presentation board was prepared by DI, and the back of the board contained a sticker that revealed DI's name and business address. (Tr. at 809, 813, JX 4). There was no agreement between Reiling and DI that DI would not be disclosed to Fisher-Price as a joint developer of the concept. (Tr. at 810-12). In fact, Popek believed that it would have been beneficial for DI to be disclosed because Fisher-Price had worked with DI in the past and knew of its business reputation. (*Id.*) At the conclusion of the initial meeting, Mr. Snyder instructed Mr. Reiling to submit the Reel Heroes concept to Fisher-Price. (Tr. at 123, 125, 127; JX 2). Contrary to Fisher-Price's contention throughout this action, there was no evidence to rebut the fact that Fisher-Price knew DI was involved in the concept submission as disclosed by DI's sticker on the back of the initial story board. (*See* JX 4). Fisher-Price offered no testimony or evidence to support in any way its claim that Fisher-Price thought that Reiling alone was making the submission.

Thereafter, Reiling and DI's initial November/December1998 submission disclosed an interchangeable battery-operated film/video monitor that would be placed on the "Rescue Heroes" characters in the form of a backpack. (*See* JX 3). This submission included a prototype, drawings and written descriptions. (Tr. at 122-135; JX 7, 4, 3 and 2, respectively). As a second part of their concept, Reiling and DI submitted the idea for a cameraman action figure for the Rescue Heroes line. (Tr. at 128-31; JX 3, 5). The character had a distinctive look and feel and was named "Filmore Schotz." (*Id.*) As Fisher-Price's own witnesses conceded, at that time Fisher-Price had no plan to

4

include a cameraman in its Rescue Heroes line and all of its characters at the time were actively engaged in some type of rescue activities. (Tr. at 1956-58, 1718).

After sending a letter in December 1998 indicating that Fisher-Price had "genuine excitement" about Reiling and DI's concept, Fisher-Price entered into an Option Agreement with Reiling and DI to hold the concept for a period of time in exchange for a monetary payment. (Tr. at 819-24; JX 8, 10). Ken Morton, who was in charge of Fisher-Price's Boys' Team at that time, was responsible for evaluating the Reel Heroes concept. (Tr. at 838, 1710-11). Morton testified that he "spoke to a lot of people about the concept and got their opinions." (Tr. at 1683). He also testified that he thought "Filmore Schotz" was "an interesting idea that [he] wanted to evaluate further." (Tr. at 1718).

Ultimately, Fisher-Price did not exercise the option and instead, rejected the concept for reasons that boiled down to cost. (Tr. at 155; JX 12). In the letter rejecting the concept, Fisher-Price stated that the Reel Heroes prototype had been given "very careful consideration and evaluation, from design, costing, engineering and marketing perspectives . . . ." (JX 12). At that time, Fisher-Price returned the Reel Heroes submission, including the prototype and drawings, to Reiling and DI. (Tr. at 155, JX 12).

After expiration of the Option Agreement, Reiling and DI re-submitted their concept on two occasions in 1999 and 2000 to show two additional executions of the concept – the use of still images, on the backpack of the figures, either by means of a wheel, drum or round disk. (JX 13, 14, 15, 230, 231). Once again, Plaintiffs sent Fisher-Price additional drawings and additional written descriptions. (*Id.*) Fisher-Price rejected the revised executions of the concept and returned all of the submission materials to Reiling and DI. (Tr. at 161). In the letter rejecting the third submission, Pat Grabianowski of Fisher-Price stated that the submission had been reviewed with Fisher-Price's

5

"Senior Management." (Tr. at 169-70; JX 20). The three submissions were entered into Fisher-Price's database of outside inventor submissions. (Tr. at 1134-36; Exhs. 376, 377, 378).

Notably, Fisher-Price did not require DI to sign a Policy and Agreement form in connection with the Reel Heroes concept, even at the time DI was asked to sign the Option Agreement. (Tr. at 824-25). DI had previously signed a Design Services Agreement that governed work DI performed for Fisher-Price on a work-for-hire basis. (*See* JX 206; Tr. at 959-62). By its express terms, the Design Services Agreement did not cover speculative projects, but rather, applied only to specific projects to be assigned by Fisher-Price. (Tr. at 1096-98, JX 206). Moreover, it is not clear the Design Services Agreement was ever operative because the copy introduced into evidence did not identify any projects to which it applied and there was no evidence offered by any witness to show if any particular projects were ever governed by that document. (*Id.*)

Fisher-Price ultimately sold three Rescue Heroes lines – Voice Tech Mission Command, Voice Tech Video Mission and Voice Tech Mission Select – that featured: (1) an image component; (2) on the backpack of each Rescue Heroes action figure; (3) that enhanced role play for the child by depicting images relating to the mission of that particular character. (Tr. at 1903, 1915, 1920, 1335; JX 55, 81, 85). Messrs. Reiling and Popek, and DI's toy industry expert, James Kipling, all testified that the accused Rescue Heroes lines had features that were substantially similar to the Reel Heroes concept. (Tr. at 173-88, 871-74, 1335-39).

In addition, Fisher-Price sold several accessories and line extensions, including the Mission Select Police Cruiser and Firetruck, the Mountain Action Command Center and the Aquatic Rescue Command Center, that were specifically sold with, and marketed for use in connection with, the accused Rescue Heroes action figure lines. (Tr. at 875-880; JX 73, 91, 93, 95). DI presented evidence in the form of testimony from its expert, Mr. Kipling, that based on toy industry custom, DI

6

was entitled to royalties for the line extensions and accessories that were sold and marketed for use with the accused Rescue Heroes action figures. (Tr. at 1478-90). Mr. Popek confirmed from his own experience that he would have negotiated a royalty for line extensions had Fisher-Price entered into a license for the Reel Heroes concept. (Tr. at 875-80). Paul Snyder, Fisher-Price's witness, also testified that inventors are paid royalties on line extensions, and that the accused accessories listed above were line extensions of the Rescue Heroes line. (Tr. at 716, 737, 740). The tangible evidence introduced by both plaintiff and defendant demonstrated that the accessory products and in particular their packaging were marketed in direct connection with the accused Rescue Heroes product lines. (Tr. at 875-80).

Reiling, Popek and James Kipling all testified as to the uniqueness of the Reel Heroes concept. (Tr. at 118-19, 1098, 1341-46). No Fisher-Price employee ever told either Reiling or DI that the Reel Heroes concept was not novel (Tr. at 723; JX 2), and the testimony of Fisher-Price's own witnesses at trial confirmed the novelty and uniqueness of it. (Tr. at 1717-18, 1732-33). To this end, both Ken Morton and Tyler Berkheiser testified that prior to the Reel Heroes submission Fisher-Price had not considered adding an image component to the backpack of the Rescue Heroes characters. (Tr. at 1745, 1767, 1969). Finally, Fisher-Price's toy industry expert, Howard Bollinger, testified that a toy inventor could take elements that are not themselves unique and synthesize them into a new idea to create a unique toy concept. (Tr. at 2399-2401). In fact, he had done so himself on many occasions, and considered each of his creations unique under the standards prevalent in the toy business. (*Id.*)

Beginning in 2003, Fisher-Price also sold a cameraman action figure named "Telly Photo" that was remarkably similar in appearance to Plaintiffs' submitted cameraman drawings. (JX 5, 111). Fisher Price tries to argue this product was independently created but the jury did not find this

7

special defense to have been supported by evidence. A wide range of people at Fisher-Price had

been exposed to the Filmore Schotz concept and drawing from 1999 to 2002, including Ken Morton,

Chris Pardi, Tyler Berkheiser and others involved in design considerations for the Fisher-Price boys

team. (Tr. at 1224-29, 1681-85, 1717, 1875-76, 1955-56). Fisher Price has argued that Brian

Manzolli, who worked on the cameraman project while at Fisher-Price, independently designed the

Telly Photo character. However, Manzolli testified to, and the jury apparently credited, the fact that

input regarding the aesthetic appearance of the character was provided in numerous brainstorming

sessions with other members of the Boys' Team, including his immediate superior, Tyler Berkheiser,

and others who had been previously exposed to the Filmore Schotz concept, including possibly Tina

Zinter. (Tr. at 2250-57).

Accordingly, Fisher-Price cannot meet its burden to show that no reasonable jury could find

for DI on the record presented at trial.

## LEGAL STANDARD

Fisher-Price has renewed its motion for a directed verdict pursuant to Fed. R. Civ. P. 50 and

has, in the alternative, moved for a new trial under Fed. R. Civ. P. 59. According to the Second

Circuit:

> The trial judge may grant a directed verdict only if, viewing the evidence
> in the light most favorable to the nonmoving party, '(1) there is a complete
> absence of probative evidence to support a verdict for the non-movant or
> (2) the evidence is so strongly and overwhelmingly in favor of the movant
> that reasonable and fair minded men in the exercise of impartial judgment
> could not arrive at a verdict against him.' 'A directed verdict is proper
> only if the evidence is such that, without weighing the credibility of the
> witnesses or otherwise considering the weight of the evidence, there can
> be but one conclusion as to the verdict that reasonable men could have
> reached.'

*Powell v. Gardner*, 891 F.2d 1039, 1043 (2d Cir. 1989) (citations omitted); *Sir Speedy, Inc. v. L&P*

*Graphics, Inc.*, 957 F.2d 1033, 1039 (2d Cir. 1992). With respect to the standard under Fed. R. Civ.

8

P. 59, "[t]he district court should grant a new trial only when '*convinced* that the jury has reached a *seriously erroneous* result or the verdict is a miscarriage of justice.'" *Bauer v. Raymark Industries, Inc.*, 849 F.2d 790, 792 (2d Cir. 1988) (quoting *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970 (2d Cir. 1987)); *see also Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 132 (2d Cir. 1986).

## ARGUMENT

Fisher-Price's combined directed verdict motion and motion for a new trial should be denied because the evidence admitted during trial shows that the jury acted reasonably in finding that DI proved each element of its misappropriation claim, as well as its entitlement to damages for sales of accessories and line extensions sold with, or marketed for use in connection with, the accused Rescue Heroes action figure lines.

## I.   THE JURY'S FINDING THAT DI DISCLOSED ITS CONCEPT TO FISHER-PRICE IN THE CONTEXT OF A CONFIDENTIAL RELATIONSHIP WAS REASONABLE

Fisher-Price contends that DI cannot prove the essential element of the existence of a confidential relationship between DI and Fisher-Price because it failed to prove that the concept was submitted on a confidential basis or that Fisher-Price ever accepted a confidential relationship with DI. (*See* Mem. in Support of Fisher-Price's Motion for Judgment as a Matter of Law or a New Trial ("F-P Mem.") at 7). Fisher-Price's arguments about the impact of Mr. Reiling's 1994 P&A on DI and the concept itself have been repeated often but remain unpersuasive. This argument is merely a reassertion of the same "un-ring the bell" argument that the Court previously rejected when it denied Fisher-Price's motion for reconsideration of the Court's summary judgment ruling. There is no authority to give the 1994 P&A the sweeping effect that Fisher-Price suggests, namely to preclude the existence of a confidential relationship between DI and Fisher-Price or to waive the confidentiality of the submitted concept. Moreover, drawing all inferences in DI's favor and

9

applying the proper legal standard set forth under New York law to construe the existence of a confidential relationship, there was ample evidence in the record such that it was reasonable for the jury to find that DI disclosed the concept to Fisher-Price in the context of a confidential relationship, and that Fisher-Price accepted the confidential relationship.

## A. New York Law Does Not Require Proof of "Secrecy" In Submission of Idea Cases

It is well settled that a plaintiff seeking to establish a claim for misappropriation of an idea in New York must prove: "(1) the existence of a confidential or fiduciary relationship between the parties; and (2) that the idea is novel and concrete," *Stewart v. World Wrestling Federation Entertainment, Inc.*, 2004 U.S. Dist. LEXIS 26533 at *17, 74 U.S.P.Q.2d 1024 (S.D.N.Y. 2005) (citing *McGhan v. Ebersol*, 608 F. Supp. 277, 284 (S.D.N.Y. 1985), and that defendant used the concept. *AEB & Assocs. Design Group, Inc. v. Tonka Corp.*, 853 F. Supp. 724, 734 (S.D.N.Y. 1994). *See also Educational Sales Programs, Inc. v. Dreyfus Corp.*, 317 N.Y.S.2d 840 (Sup. Ct. N.Y. Co. 1970); *Oasis Music, Inc. v. 900 U.S.A., Inc.*, 614 N.Y.S.2d 878 (S. Ct., N.Y. Cty., 1994); *Murray v. National Broadcasting Co.*, 844 F.2d 988 (2d Cir. 1988); *Downey v. General Foods Corp.*, 334 N.Y.S.2d 874 (N.Y. 1972).

Fisher-Price seeks to require proof of an additional element beyond the above-described test, namely that "[t]he idea itself must also be 'secret'; that is, not generally known." (F-P Mem. at 9). As set forth in Section I(B) below, the confidential nature of a concept submission might be relevant to determine the existence of a confidential relationship between the submitting and receiving entities.[1] Nevertheless, New York law does not require proof of the "secrecy" of the submission for purposes of establishing a claim for misappropriation of an idea. To this end, it is telling that the

---

[1] To that end, as set forth in Section I(B) there was evidence at trial that DI, Reiling and Fisher-Price treated the Reel Heroes submission in confidence. There was no testimony to suggest otherwise.

10

cases cited by Fisher-Price for this proposition are misappropriation of trade secret cases,[2] not misappropriation of an idea cases. While both misappropriation of an idea and misappropriation of trade secret claims each require proof of the existence of a confidential or fiduciary relationship between the parties, the element of "secrecy" is only expressly applicable to proving a misappropriation of trade secrets claim under New York law.[3] In contrast, the value of an idea lies in its novelty (*i.e.* "uniqueness"), and the proper inquiry for purposes of a claim of misappropriation of an idea is to examine whether or not the idea was in the public domain at the time of disclosure. *Nadel v. Play-By-Play Toys*, 208 F.3d 368, 378 (2d Cir. 2000).

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989), does not alter the standard for proving a claim for misappropriation of an idea under New York law. At issue in *Bonito Boats* was a Florida statute regarding prohibition of reverse engineering which is properly subject to the rights of a patent holder to enforce through the patent laws.    Here, the law in New York regarding misappropriation of ideas fits in with the Supreme Court's intentions. As the Supreme Court states in *Bonito Boats*:

> Our decisions since *Sears* and *Compco* have made it clear that the Patent and Copyright Clauses *do not, by their own force or by negative implication, deprive the States of the power to adopt rules for the promotion of intellectual creation within their own jurisdictions....* Thus, where 'Congress determines that neither federal protection nor freedom from restraint is required by the national interest,'... *the States remain free to promote originality and creativity in their own domains.*

489 U.S. at 165 (internal citations omitted) (emphasis added). The Supreme Court explained that state laws which provide protection for intellectual property under the laws of unfair competition or

---

[2] *See Lemelson v. Carolina Enters., Inc.*, 541 F. Supp. 645 (S.D.N.Y. 1982) and *M & T Chemicals, Inc. v. Int'l Business Machines*, 403 F. Supp. 1145 (S.D.N.Y. 1975).

[3] For a claim for misappropriation of trade secrets in New York the plaintiff must show "i) that it possessed a trade secret and (ii) that the defendant used that trade secret in breach of an agreement, a confidential relationship, or duty, or as a result of discovery by improper means." *Hudson Hotels Corp.v. Choice Hotels Int'l, Inc.*, 995 F.2d 1173, 1176 (2d Cir. 1993) (citing *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990); *Speedry Chem. Prods., Inc. v. Carter's Ink Co.*, 306 F.2d 328, 331 (2d Cir. 1962). A finding of "secrecy" to the outside world is a condition precedent to ownership of a trade secret under New York law. (*Id.*)

11

trade secrets co-exist with the patent laws and copyright laws. New York law governing misappropriation of an idea cases is within the rubric of unfair competition and requires as an element a confidential or fiduciary relationship showing a relationship of trust. *See Stewart v. World Wrestling Federation Entertainment, Inc.*, 2004 U.S. Dist. LEXIS 26533 at *17 (S.D.N.Y. 2005) (citing *Sachs v. Cluett Peabody & Co.*, 39 N.Y.S.2d 853, 856 (N.Y. App. Div. 1943), *aff'd* 291 N.Y. 772 (1944)). A showing of a relationship of trust between the parties comports with the Supreme Court's finding in *Bonito Boats*, because the Court explained that "consumer confusion, or *breach of trust* or secrecy" is all that is required for state laws to co-exist with federal intellectual property laws. *See* 489 U.S. at 167 (emphasis added). A showing of the secrecy of the idea is simply not required to establish a claim for misappropriation of an idea under New York law, as it would be for a claim of misappropriation of trade secrets.

**B. The 1994 P&A Signed by Reiling Does Not Preclude the Existence of a Confidential Relationship Between DI and Fisher-Price or Result in any <u>Loss of Rights for the Concept Submission as a Matter of Law</u>**

Fisher-Price contends that "even if DI established a confidential relationship with Fisher-Price (which it did not), no misappropriation claim can be brought if the concept was disclosed on a non-confidential basis." (F-P Mem. at 9). Having lost this point on summary judgment and again on reconsideration, Fisher-Price once again attempts to convince the Court that irrespective of New York law clearly establishing that the proper focus is on the "relationship" of the parties,[4] DI's

[4] The issue turns primarily on the confidential relationship because a duty to keep an idea in confidence arises if there is a confidential or fiduciary relationship established between the parties. *See Stewart v. World Wrestling Fed'n Entm't, Inc.*, 2004 U.S. Dist. 26533 at *17 (S.D.N.Y. Jan. 11, 2005). While the confidential nature of the submission may have some bearing on the existence of a confidential relationship between the parties, the Second Circuit has made clear that disclosure of confidential information, standing alone, is insufficient to transform a business relationship into a fiduciary relationship. *See Walton v. Morgan Stanley & Co.*, 623 F.2d 796 (2d Cir. 1980) ("the fact that the information was confidential did nothing, in and of itself, to change the relationship between" the parties). Later Second Circuit cases interpret *Walton* for the proposition that "an investment banker, representing an acquiring company, does not owe a fiduciary duty to the target simply because it received confidential information during the course of the tender offer negotiations." *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 14 (2d Cir. 1983). Thus, while Fisher-Price might be able to argue under this standard that no confidential

misappropriation claim must fail because "Reiling's" disclosure of the concept to Fisher-Price destroyed any confidentiality in the concept itself and precludes the formation of a confidential relationship between DI and Fisher-Price. (*Id.*)

Fisher-Price's argument should fail for the reasons stated in the Court's ruling on Fisher-Price's motion for reconsideration. As the Court recognized, the 1994 P&A form signed by Mr. Reiling does not compel a conclusion as a matter of law that property rights in the submitted concept were ever lost or that DI and Reiling cannot show a confidential relationship with Fisher-Price. (Ruling at 6, 8, dated January 11, 2006). Rather, as the Court held, the issue for trial was whether a confidential relationship existed between DI and Fisher-Price. (*Id.* at 8).

Contrary to Fisher-Price's narrow view, there was more than sufficient evidence in the record from which a jury could and did conclude that the concept was disclosed to Fisher-Price on a confidential basis. This evidence directly contravenes Fisher-Price's bald assertion that "the evidence at trial is undisputed that [the Reel Heroes concept] was disclosed non-confidentially." (F-P Mem. at 13).

### 1. The 1994 P&A Merely Serves to "Release" Reiling's Claims

Fisher-Price's argument about the sweeping effect of the 1994 P&A is built on the faulty assumptions that the agreement precludes formation of a confidential relationship between Reiling and Fisher-Price or that the scope of the agreement reaches beyond Mr. Reiling. The Court previously "interpret[ed] the P&A's confidential relationship disclaimer as a legal waiver – DI refers to it as a 'release' – by Reiling of any claim he might have had that depended on the existence of a confidential relationship between himself and Fisher-Price." (Ruling at 5). The impact of the 1994

---

relationship exists between the company and an outside inventor who merely "throws its confidential concept over the transom," as set forth below, the present situation, involving prior course of dealings between the parties for numerous submissions, actual negotiations and a lengthy evaluation by Fisher-Price for the Reel Heroes submission, presents the paradigm case for the existence of a confidential relationship.

P&A is merely "to extinguish any legal claim of an outside inventor that depends on the existence of such obligations" (*i.e.*, a confidential relationship). (*Id.*) Placed into proper context, it does not mean that Mr. Reiling (or DI) could not have formed a confidential relationship with Fisher-Price. Rather, it means only that Mr. Reiling cannot sue Fisher-Price for any claim that depends upon the existence of a confidential relationship as a required element. (*Id.* at 5, 8, n. 5).

## 2. The 1994 P&A Did Not Destroy any Rights in the Reel Heroes Concept

Despite the Court's prior ruling that the 1994 P&A cannot be read to destroy any property rights in the Reel Heroes concept as a matter of law (Ruling at 6, 8), Fisher-Price nevertheless argues once again that all rights in the property were lost as a matter of law by virtue of the 1994 P&A and, as a result, "the Reel Heroes concept was disclosed to Fisher-Price by Reiling on a non-confidential basis." (F-P Mem. at 11, 12). Fisher-Price's argument fails for a number of reasons.

First, there is evidence at trial which provides a sufficient basis for the jury to have concluded reasonably that DI disclosed its concept to Fisher-Price on a confidential basis. Fisher-Price mischaracterizes the trial record by continuing to refer to the concept as "Reiling's submission." (F-P Mem. at 9-12). The evidence at trial clearly establishes that the Reel Heroes concept was jointly created, conceived and owned by both Reiling and DI, and the parties jointly submitted the concept to Fisher-Price on a confidential basis. (Tr. at 268, 271, 784).

-Mr. Reiling testified that he and DI held a brainstorming session in 1998, the purpose of which was to come up with an idea for the Rescue Heroes line that would "excite Fisher-Price." (Tr. at 113).

-Mr. Reiling and DI agreed that Mr. Reiling would present the submission to Fisher-Price on behalf of Reiling and DI. (Tr. at 809-11). DI thought that it would be advantageous for Mr. Reiling to disclose to Mr. Snyder that the Reel Heroes concept was jointly owned by Reiling and DI because of DI's credibility with Fisher-Price. (*Id.* at 812).

-Mr. Reiling, acting on behalf of himself and DI, met with Paul Snyder of Fisher-Price at Fisher-Price's New York City offices on October 29, 1998. During that meeting, Mr. Reiling

14

disclosed the Reel Heroes idea with tangible demonstratives including the prototype and storyboard. (*Id.* at 120-24, 126; JX 4, 7).

-Mr. Snyder "liked the concept very much" and asked Mr. Reiling to submit the idea to Fisher-Price. (*Id.* at 123, 125; JX 2).

-Messrs. Reiling and Popek testified that they treated the concept in strict confidence. Based on their prior dealings and conversations with Fisher-price they expected Fisher-Price to do so as well and were not aware that Fisher-Price had undertaken any act to breach the confidentiality of the submission. (Tr. at 101, 832-33).

Moreover, Fisher-Price's witnesses confirmed that it was their practice to maintain the

confidentiality of outside inventor submissions.

-Paul Snyder testified that he kept outside inventor submissions "as confidential as possible." He also testified that inventors expected Fisher-Price to keep the submissions confidential, and **that he sought do so because his job "was a relationship job" and he wanted to treat the inventors fairly.** (Tr. at 715).

-Ken Morton testified that he was "very careful" about maintaining the confidentiality of outside inventor submissions and would personally seek to treat the disclosures as confidential. (Tr. at 1176).

-Chris Pardi was adamant that he always maintained the confidentiality of submissions: "I never talk to outside people about inventor submissions, no, never have. Everything we do is confidential in the team center." (Tr. at 1221).

-Peter Pook testified that "I personally am going to discuss it only with those individuals within the company that would have a direct interest in reviewing this for further development." (Tr. at 2271).

The parties' Option Agreement provides further evidence on the issue of confidentiality.

-The parties entered into an Option Agreement, dated February 16, 1999. (JX 10). Fisher-Price prepared the agreement and sent it to Mr. Reiling who forwarded it to DI. (Tr. at 823-24).

-In the Option Agreement, Reiling and DI were required to maintain the confidentiality of the submitted concept, any information provided by Fisher-Price and even the existence of the option agreement itself. (JX 10, ¶¶ 5, 8). Reiling and DI confirmed their understanding "that FISHER-PRICE INC.'s ability to successfully market the LICENSED PRODUCTS requires that any information regarding FISHER-PRICE INC.'s products or plans for marketing products must be regarded as a secret of FISHER-PRICE, INC. DI acted in accordance with this provision and to DI's understanding so did Fisher-Price. (Tr. at 831-32).

15

-By letter dated March 23, 1999, Fisher-Price returned the prototype, description and drawings to Mr. Reiling. (Tr. at 153; JX 12).

From this evidence, it was reasonable for the jury to conclude that DI and Reiling treated their submission as confidential, and that Fisher-Price sought to, and in fact did, maintain the confidentiality of the Reiling/DI joint submission in this case. There were no witnesses from Fisher-Price who testified that they released information on the Reel Heroes concept to the outside world or otherwise compromised the confidentiality of the concept. Indeed, there is no evidence whatsoever that Fisher-Price ever breached the confidentiality of the Reiling/DI submission, and Fisher-Price's admission at footnote 13 of its memorandum confirms that it did not.[5]

Second, Fisher-Price has failed to reference a single case that actually supports its sweeping contention that the 1994 P&A waives the confidentiality of the joint Reel Heroes submission or precludes DI's ability to prove the existence of a confidential relationship as a matter of law. Fisher-Price's continued reliance on trade secret cases, such as *Sachs v. Cluett Peabody & Co.*, 39 N.Y.S.2d 853, 856 (App. Div. 1943) and its progeny, is misplaced because as the Court previously ruled those cases "concern the broad disclosure of trade secrets to the public, operating to destroy a plaintiff's property rights in the purported trade secret, but not submission of co-owners to another entity under circumstances claimed to be confidential." (Ruling at 6).

---

[5] Fisher-Price's admission at footnote 13 of its memorandum of law that it "did not" disclose the Reel Heroes concept to the public is particularly revealing on this subject. (F-P Mem. at 12). Of course, the confirmation of non-disclosure bears directly on the issue of the confidentiality of the submission. But Fisher-Price's assertion, as written, also directly undermines its entire argument about the supposed lack of "secrecy" of the submitted concept due to "Reiling's" disclosure of the concept on a non-confidential basis. By confirming that it never disclosed the submitted concept to the public and by arguing that had it done so the property would have entered the public domain, Fisher-Price unwittingly acknowledges that the concept in fact had value as a property right during the time that Fisher-Price was evaluating it (*i.e.*, after the disclosure by DI and Mr. Reiling). Were this not the case, there would be no way that Fisher-Price's disclosure to the public could have destroyed any property right in the concept. If Fisher-Price's underlying argument about the effect of the 1994 P&A were true, any such rights in the concept would already have been lost due to Mr. Reiling's disclosure of the concept to Fisher-Price on a non-confidential basis (*i.e.*, there would have been no post-disclosure property rights to lose through Fisher-Price's disclosure of the idea to the public).

Fisher-Price's reliance on patent law is similarly misplaced. In *Eolas Techs. v. Microsoft Corp.*, 399 F.3d 1325 (Fed Cir. 2005), the defendant, Microsoft, presented evidence of prior art at trial – consisting of a web browser allegedly similar to the browser disclosed in plaintiff's patent – in an effort to invalidate plaintiff's patent. The lower court had excluded the evidence at trial based on the fact that the alleged prior art did not constitute a "public use" within the meaning of 35 U.S.C. § 102(b), because the inventor had merely demonstrated the browser to two employees of another computer company absent a confidentiality agreement. The Federal Circuit reversed the lower court's ruling, and held that the disclosure did constitute a public use under 35 U.S.C. § 102(b) because "the Sun Microsystems employees were under no limitation, restriction or obligation of secrecy to" [the inventor of the browser]. 399 F.3d at 1334. This decision is not analogous to the instant case. *Eolas Techs* merely stands for the proposition that disclosure absent a confidentiality agreement may be sufficient to constitute relevant prior art in a patent case. It does not mean that disclosure absent a confidentiality agreement to the prospective licensee or purchaser destroys the confidentiality of an idea, or precludes formation of a confidential relationship, in a misappropriation of an idea case. Indeed, had Fisher-Price disclosed DI's concept to a third party after receiving the submission, DI could have sued Fisher-Price alleging a cause of action for breach of a confidential relationship. Fisher-Price recognizes as much when it characterizes that exact scenario as a "wrongful" disclosure and confirms that it in fact never disclosed the Reel Heroes concept to the public. (F-P Mem. at 12, fn. 13).[6]

---

[6] The fallacy of Fisher-Price's argument that all rights in the property were lost because "Reiling disclosed the concept to Fisher-Price on a non-confidential basis" (F-P Mem. at 11-13) is best illustrated by the Option Agreement. If, as Fisher-Price suggests, the Reel Heroes concept was stripped of all of its value by virtue of "Reiling's" disclosure of the concept to Fisher-Price, why would Fisher-Price have decided to enter into an Option Agreement and agreed to pay money to Reiling and DI for the stated purpose of gaining additional time to evaluate the concept? The answer of course is that no rights in the Reel Heroes concept were lost by virtue of Mr. Reiling's delivery of the jointly-owned concept to Fisher-Price.

17

Further, it is not surprising that Fisher-Price is unable to locate authority for its proposition

that the 1994 P&A results in a loss of rights for either DI or in the property itself, because that

argument runs afoul of clearly established principles of intellectual property law. As DI stated in its

opposition to Fisher-Price's motion for reconsideration, the law does not permit one co-owner of

intellectual property rights to destroy the rights of its co-owner without that entity's knowledge and

consent. *See Schering Corp. v. Roussel*, 104 F.3d 341, 344 (Fed. Cir. 1997).

## C.    DI Disclosed the Concept to Fisher-Price in the Context of a Confidential Relationship

Fisher-Price argues that "the record establishes that the Reel Heroes concept was disclosed to

Fisher-Price 'in the context of Reiling's non-confidential relationship with Fisher-Price.'" (F-P

Mem. at 14) (emphasis added). Fisher-Price also places heavy reliance on the arguments that DI

never communicated a request for a confidential relationship with Fisher-Price, and that Fisher-Price

never accepted the confidential relationship. (*Id.* at 15-19). In fact, there was a significant amount

of evidence in the record from which the jury could have, and in fact did, reasonably and expressly

conclude that DI disclosed the concept to Fisher-Price in the context of a confidential relationship.

Moreover, it is well settled that a confidential relationship may arise implicitly by the actions and

course of dealing of the parties. As such, DI did not need to "communicate" its desire for a

confidential relationship through words, as Fisher-Price erroneously asserts. Such a relationship can

instead arise by conduct. Similarly, there was evidence at trial from which the jury could have found

reasonably that Fisher-Price implicitly accepted a confidential relationship by virtue of: (1) the prior

course of dealings between DI/Reiling and Fisher-Price; (2) the parties' unequal bargaining power

and relationship of trust and confidence; and (3) Fisher-Price's acceptance of the concept submission

and its subsequent conduct to evaluate it.

18

1. A Confidential Relationship Arose By Virtue of the Status of the Parties

"Under New York law, a confidential relationship is synonymous with a fiduciary

relationship and ... [exists] generally where the parties do not deal on equal terms and one trusts and

relies on the other." *Stewart v. World Wrestling Fed'n Entm't, Inc.*, 2004 U.S. Dist. LEXIS 26533 at

\*13-14, *quoting Sachs v. Cluett Peabody & Co.*, 39 N.Y.S.2d 853, 856 (App. Div. 1943). A

confidential relationship based on unequal bargaining power or trust also may arise "implicitly by

the actions of the parties or other circumstances." *Id., quoting See also Klein v. Ecko Products Co.*,

135 N.Y.S.2d 391 (Sup. Ct. Kings Cty 1954) (confidential relationship established by conduct of the

parties where plaintiff had disclosed to defendant-manufacturer an idea for a novel utensil and

manufacturer subsequently used that idea without compensating the plaintiff).

In *Stewart*, plaintiff disclosed to defendant, the World Wresting Federation, an idea for new

marketing strategies based on lingerie designs and a fashion show. Following plaintiff's disclosure

of his ideas and a lengthy period of negotiations, defendant rejected the proposal. After defendant

aired a television show featuring a lingeric line, plaintiff brought suit alleging breach of confidential

relationship and misappropriation. Plaintiff argued that a confidential relationship existed because

he and defendant had unequal bargaining power. In rejecting defendant's motion to dismiss, the

*Stewart* court agreed with plaintiff and held that the parties' negotiations and efforts to develop the

idea were sufficient to allege the existence of a confidential relationship under New York law.

*Stewart*, 2004 U.S. Dist. LEXIS 26533 at \*16.

The evidence at trial demonstrated that the nature of the relationship between DI and Fisher-

Price was one where DI trusted and relied upon Fisher-Price to treat it fairly.

-Both Messrs. Popek and Reiling testified that based on their prior dealings with
Fisher-Price they believed the company would treat them fairly with respect to concept submissions.
(Tr. at 95, 800, 803, 855; 864).

19

-Mr. Popek testified that in his prior dealings with Fisher-Price, Fisher-Price had always returned any submitted concept and never used them without paying for them. (Tr. at 804). Reiling's testimony was similar. (*Id.* at 98).

-Fisher-Price assured outside inventors and DI in particular that "We intend to deal fairly with you in connection with your disclosure." (Tr. at 803; JX 202).

-Tina Zinter, Fisher-Price's Senior Vice President, confirmed that Fisher-Price communicated to outside inventors that they would treat them fairly. Fisher-Price did so because it wanted to maintain a good relationship with outside inventors. (Tr. at 1637).

The nature of the relationship between Reiling/DI and Fisher-Price was one of unequal bargaining power. Messrs. Reiling and Popek both testified that they believed they had no power to alter any submission documents.

-Fisher-Price is owned by Mattel, Inc., one of the largest toy companies in the world with revenues in the billions of dollars, compared with DI, with annual revenues of $ 1.5 million. (Tr. at 787, 800).

-Mr. Popek testified that he believed he had "little bargaining power" to negotiate or to change any Fisher-Price submission document. (Tr. at 786). He also testified that there was no negotiation of the option agreement. (*Id.* at 825-26; 830).

Based on the evidence showing that Reiling and DI trusted Fisher-Price to treat them fairly throughout the submission process – including the fact that Fisher-Price assures inventors that it will treat them fairly – coupled with the unequal bargaining power between the parties, a reasonable jury could infer that a confidential relationship was formed by Reiling/DI's disclosure to Fisher-Price of their concept, and Fisher-Price's acceptance of that disclosure.

> 2. DI and Reiling Disclosed Their Concept in the Context of a
> Confidential Relationship That Arose from the Parties'
> Course of Conduct

The Court charged the jury that "a conventional or arm's length business relationship alone cannot constitute a confidential relationship." (Jury Instructions at 25). This is consistent with the cases cited by Fisher-Price in its memorandum of law providing that a conventional business relationship cannot be transformed into a fiduciary relationship without some additional factors to

20

demonstrate "considerable intimacy" or a "relationship of special confidence." *Basquiat v. Sakura Int'l*, 2005 U.S. Dist. LEXIS 13989, at *6 (S.D.N.Y. July 5, 2005).

The Second Circuit interpreting New York law has found additional facts establishing an implied confidential relationship to exist in the context of disclosures made in business relationships involving buyers and sellers and prospective licensors and licensees. *Heyman v. A.R. Winarick*, Inc., 325 F.2d 584, 587 (2d Cir. 1964); *Speedry Chemical Products, Inc. v. The Carter's Ink Co.*, 306 F.2d 328, 332 (2d Cir. 1962); *Schreyer v. Casco Products Corp.*, 190 F.2d 921, 924 (2d Cir. 1951); *Matarese v. Moore-McCormack Lines, Inc.*, 158 F.3d 631, 634 (2d Cir. 1946).[7] In *Heyman*, plaintiff disclosed to defendant the formula for his proprietary nail hardening product during the course of negotiations for the sale of his entire business to the defendant. After defendant ceased negotiations and came out with a lower-cost, competitive product, plaintiff brought suit alleging misappropriation of trade secrets. On appeal, the Second Circuit clarified the standard for proving a confidential relationship under New York law. As a threshold matter, the *Heyman* court held that "an express agreement is not a prerequisite to the establishment of a confidential relationship." 325 F.2d at 586. Rather, "a relationship of trust and confidence may naturally result from the circumstances surrounding the dealings between the parties." *Id.* at 587. The *Heyman* court then examined the dealings between the parties:

> Where, as here, the parties are a seller and a prospective purchaser, certain disclosures will usually be made about the thing which is for sale so that the purchaser may rationally assess the merits of concluding the bargain. If the information disclosed is of such a nature as to otherwise qualify as a trade secret,[8] we think the prospective buyer is bound to receive the information in confidence. As the prospective buyer is given the information for the

---

[7] The First Circuit is in accord. In *Burten v. Milton Bradley Co.*, 763 F.2d 461 (1st Cir. 1985), a case involving the alleged misappropriation of a toy concept, the First Circuit stated that: "[a] confidential relationship generally arises by operation of law from the affiliations of the parties and the context in which the disclosures are offered." 763 F.2d at 463, *quoting*, Milgrim, TRADE SECRETS § 4.03 at 4-12.

[8] Since this is a misappropriation of an idea case, not a misappropriation of trade secrets case, the proper inquiry would be, at most, the confidentiality of the submission, not its status as a "trade secret." As set forth above, DI elicited testimony on this point.

21

> limited purpose of aiding him in deciding whether to buy, he is bound to
> receive the information for use within the ambit of this limitation. He may
> not in good conscience accept the information; terminate negotiations for
> the sale; and then, using vital data secured from the would-be seller, set out
> on a venture of his own. Whatever conduct courts should countenance when
> parties bargain at arm's length, we think parties should be expected to
> comply with these essentials of fair dealing.

*Id.* As a result, the *Heyman* court concluded that "the parties here, in their negotiations looking

toward defendant's purchase of plaintiff's business, entered into a confidential relationship with

respect to disclosures which plaintiff may have made about that business." *Id.*

    Other New York cases are in accord. *Speedry Chemical Products, Inc. v. The Carter's Ink

Co.*, 306 F.2d 328, 332 (2d Cir. 1962) (confidential relationship existed as a result of negotiations for

license agreement); *Schreyer v. Casco Products Corp.*, 190 F.2d 921, 924 (2d Cir. 1951)

(confidential relationship existed as a result of negotiations and disclosure of confidential know-

how); *Stewart*, 2004 U.S. Dist. LEXIS 26533 at \*22 (implied confidential relationship existed from

personal contacts and cooperative efforts between the parties). As a result, while a mere arm's

length business relationship, standing alone, does not establish a confidential or fiduciary

relationship, other facts that may exist – such as a relationship of trust and confidence, unequal

bargaining power, industry custom and practice, or disclosure of confidential information – may

serve to create an implied confidential relationship in the course of a business deal involving a

prospective license or sale.

    In addition, Fisher-Price has cited *Litton Industries, Inc. v. Lehman Bros.*, 767 F. Supp. 1220,

1231(S.D.N.Y. 1991), *rev'd on other grounds*, 967 F.2d 742 (2d Cir. 1992), for the proposition that

the confidential relationship must "predate the reposal of trust or confidence and thereby 'provide

the context – if not the impetus – for such disclosures.'"[9] It makes sense that the confidential

---

[9] The Court in *Litton* also stated "although the existence of fiduciary relationships under New York law cannot be
determined by recourse to rigid formulas, New York courts typically focus on whether one person has reposed trust

22

relationship must predate the disclosure, because the standard under New York law is that the

disclosure must be made "in the context of a confidential relationship." (Jury Instructions at 25).

Nevertheless, the parties' post-disclosure conduct remains relevant to determine the existence of a

confidential relationship because, according to the Second Circuit, the parties' post-disclosure course

of conduct provides a confirmatory context that the disclosure was made in the context of a

confidential relationship.[10]  Thus, in *Matarese v. Moore-McCormack Lines, Inc.*, 158 F.3d 631, 634

(2d Cir. 1946), the Second Circuit held that to determine the existence of a confidential relationship

it is appropriate to view the evidence of the course of the parties' negotiations both before and after

the initial disclosure of the idea. *Matarese*, 158 F.3d at 634 (confidential relationship created in a

misappropriation of an idea case where employee disclosed to employer an idea to facilitate the

loading and unloading of cargo, due to the "relationship of the parties before and after the disclosure

. . ."); *see also Heyman*, 325 F.2d at 587; *Speedry Chemical*, 306 F.2d at 332; *Schreyer*, 190 F.2d at

924.

Against this backdrop, it is clear that there was adequate evidence for the jury to find as it did

that the disclosure of the Reel Heroes concept was made in the context of a confidential relationship.

DI elicited the following evidence at trial from which the jury could reasonably make a finding for a

confidential relationship:

-Both Reiling and DI had submitted numerous concepts to Fisher-Price in the past,
several of which had been licensed by Fisher-Price. (Tr. at 90-92, 786).

-Mr. Reiling testified that he and DI held a brainstorming session in 1998, the purpose
of which was to come up with an idea for the Rescue Heroes line that would "excite Fisher-Price."
(Tr. at 113). DI and Mr. Reiling intended to license the idea to Fisher-Price for a royalty, which is

---

or confidence in another who thereby gains a resulting superiority or influence over the first." 767 F. Supp. at 1231.
This lends further support to DI's argument that a confidential relationship arose by virtue of the trust and
confidence it placed in Fisher-Price.

[10] DI is not claiming that post-disclosure conduct, such as the Option Agreement, "somehow made the submission
retroactively confidential," as Fisher-Price asserts. (F-P Mem. at 31). Rather, DI contends that post-disclosure
conduct is relevant to confirm that a confidential relationship existed at the time of disclosure, as the jury so found
on the facts presented at trial.

23

the way he had traditionally structured prior deals with Fisher-Price. (*Id.* at 112). Mr. Popek testified that based on his prior experience in dealing with Fisher-Price, when he submitted a concept to them, Fisher-Price either returned it, went to option or went to contract (meaning that Fisher-Price had only used DI's concepts in exchange for monetary consideration. (*Id.* at 803-04).

-Mr. Reiling and DI agreed that Mr. Reiling would present the submission to Fisher-Price on behalf of Reiling and DI. (Tr. at 809-11). DI thought that it would be advantageous for Mr. Reiling to disclose to Mr. Snyder that the Reel Heroes concept was jointly owned by Reiling and DI because of DI's credibility with Fisher-Price. (*Id.* at 812).

-Following the 1998 brainstorming session, Mr. Reiling testified that he called Paul Snyder at Fisher-Price to "tell him I had an idea I wanted to show him" and to schedule an appointment to meet in person. (Tr. at 119).

-Mr. Reiling, acting on behalf of himself and DI, met with Paul Snyder of Fisher-Price at Fisher-Price's New York City offices on October 29, 1998. During that meeting, Mr. Reiling disclosed the Reel Heroes idea with tangible demonstratives including the prototype and storyboard. (Tr. at 120-24, 126; JX 4, 7).

-Mr. Snyder "liked the concept very much" and asked Mr. Reiling to submit the idea to Fisher-Price. (Tr. at 123, 125; JX 2).

Fisher-Price accepted the idea, expended time, money and effort to evaluate the idea --

including entering into an Option Agreement for the idea -- before finally rejecting it and returning it

to DI.

-In November 1998, DI submitted the idea to Fisher-Price, in accordance with Mr. Snyder's prior request, by sending Mr. Snyder the prototype, written description and drawings. (Tr. at 128-35, 816); JX 3-7).

-Fisher-Price accepted the Reiling/DI idea submission. By letter dated December 8, 1998, Fisher-Price informed Mr. Reiling that there was a "genuine excitement level for the product" and that Fisher-Price was holding the submission for "further evaluation." (Tr. at 133-34; JX 8).

-On January 30, 1999, Mr. Reiling spoke with Paul Snyder, who informed him that Fisher-Price wished to enter into an Option Agreement for the concept, for which Mr. Reiling and DI would be paid $2,500 per month for a period of three months. Mr. Snyder asked for DI's contact information and federal tax identification number for purposes of the option agreement. (Tr. at 136-39; JX 9).

-When it clearly had full knowledge of DI's involvement in the idea submission, Fisher-Price did not seek any form of Policy and Agreement from DI and did not otherwise ask DI to release or waive the existence of a confidential relationship. (Tr. at 824).

24

-The parties entered into an Option Agreement, dated February 16, 1999. (JX 10). Fisher-Price prepared the agreement and sent it to Mr. Reiling who forwarded it to DI. (Tr. at 823-24). Along with the Option Agreement, Fisher-Price's legal counsel sent a letter stating "[w]e look forward to the potential introduction of a successful extension to our Real Heroes product line." (JX 10).

-In the Option Agreement the parties confirmed their mutual understanding. (JX 10, page 1). Fisher-Price thereby acknowledged and accepted that if it did not purchase the idea from Reiling and DI by exercising the Option and entering into license agreement, it would return all prototypes to Reiling/DI and "all rights in the CONCEPT shall belong solely to INVENTORS." (JX 10 ¶¶ 4, 3). That understanding confirms the essence of a confidential relationship that the potential purchaser will return the idea to the seller and the seller shall still own the offered concept, if a purchase agreement is not reached.

-In the Option Agreement, Reiling and DI were required to maintain the confidentiality of the submitted concept, any information provided by Fisher-Price and even the existence of the option agreement itself. (JX 10, ¶¶ 5, 8). Reiling and DI confirmed their understanding "that FISHER-PRICE INC.'s ability to successfully market the LICENSED PRODUCTS requires that any information regarding FISHER-PRICE INC.'s products or plans for marketing products must be regarded as a secret of FISHER-PRICE, INC. DI acted in accordance with this provision and to DI's understanding so did Fisher-Price. (Tr. at 831-32).

-By letter dated March 23, 1999, Fisher-Price returned the prototype, description and drawings to Mr. Reiling. Fisher-Price stated that "after very careful consideration and evaluation, from design, costing, engineering and marketing perspectives," they were returning the submission for reasons that "boiled down to cost." (Tr. at 153; JX 12).

-In May 1999, Reiling and DI resubmitted their idea to Fisher-Price by demonstrating an embodiment of the concept that would address Fisher-Price's concerns about costs. (Tr. at 157-59; JX 13, 14). Fisher-Price rejected the idea and returned the submission to Reiling/DI. (Tr. at 160).

- In December 2000, Reiling and DI resubmitted their idea to Fisher-Price by demonstrating another embodiment of the concept that would address Fisher-Price's concerns about costs. (Tr. at 161; JX 15; Pl. Exhs. 230, 231). By letter dated January 5, 2001, Fisher-Price returned the concept to Reiling/DI. (Tr. at 167; JX 20). Fisher-Price indicated that the concept was reviewed by "senior management," but that it did not fit in the Rescue Heroes line. (*Id.*)

-Reiling testified that it was his understanding that when Fisher-Price returned the concepts to himself and DI that they could do anything they wanted with it. (Tr. at 187-88). Mr. Popek similarly confirmed DI's understanding that it had the rights to the concept upon the final return of the submissions from Fisher-Price. (Tr. at 804, 827-31). Paul Snyder also confirmed this understanding. (Tr. at 759-60).