In accordance with New York law as described above, a reasonable jury could infer that a confidential relationship between DI and Fisher-Price was established by virtue of the facts that: (1) Reiling and DI had a lengthy prior course of dealing with Fisher-Price, which included submission of concepts to Fisher-Price, several of which were licensed; (2) as set forth in Section I(B) above, there was evidence that Reiling and DI treated their concept in a confidential manner and had every reason to believe Fisher-Price would treat the concept in a confidential manner as several Fisher-Price witnesses confirmed they would try to do; (3) Fisher-Price accepted the disclosure and then devoted time, money and effort to evaluating the concept, before returning it to Reiling and DI; and (4) Fisher Price confirmed in writing that it understood that if no license was agreed upon all rights to the idea belonged solely to DI and Reiling and that the idea would be held confidential while it evaluated the idea. As the court explained in *Heyman*, a party "may not in good conscience accept the information; terminate negotiations for the sale; and then, using vital data secured from the would-be seller, set out on a venture of his own. Whatever conduct courts should countenance when parties bargain at arm's length, we think parties should be expected to comply with these essentials of fair dealing." 325 F.2d at 587.

### 3.    Toy Industry Custom and Practice

To determine the existence of a confidential relationship between DI and Fisher-Price in this case, the fact finder may also consider that "the standard custom and practice in the toy industry calls for companies to treat the submission of an idea as confidential." *Nadel v. Play-By-Play Toys*, 208 F.3d 368, 371 (2d Cir. 2000). In *Burten*, the First Circuit also credited evidence showing "an industry wide custom among reputable game and toy companies to maintain the secrecy of ideas submitted by outside inventors and to use innovations only if royalties were paid to the inventor." *Burten*, 763 F.2d at 466, n.5.

Here, Plaintiff offered some evidence from its expert establishing that a confidential relationship exists between toy companies and outside inventors in the absence of a written agreement modifying the relationship.[11] Mr. Kipling testified that toy industry custom and practice demonstrates that toy companies treat the issue of confidential relationships with outside inventors in three ways. In two of the ways -- companies who have no agreements or companies that clarify the existence of a confidential relationship -- toy companies recognize the existence of a confidential relationship with outside inventors. (Tr. at 1357-58). While Mr. Kipling testified that some companies seek to disclaim the existence of a confidential relationship through a written waiver agreement, there is no agreement in which DI disclaimed the existence of a confidential relationship between itself and Fisher-Price for purposes of the concept submissions at issue. Indeed, Mr. Popek testified that at no time during the concept submission process, prior to the first submission, prior to the Option Agreement or prior to the second and third submissions, did Fisher-Price ask DI to sign a Policy & Agreement form. (Tr. at 825, 842-43, 851-52). Further, Mr. Kipling did testify that the industry practice was that toy companies make themselves available to inventors in the expectation of receiving the next great idea and the "toy submitter makes the submission in anticipation that if the company decides to use the submission, the idea, that the toy company will recognize and compensate the inventor." (Tr. at 1358).

Accordingly, a reasonable jury could conclude from the absence of a written waiver or release[12] of a confidential relationship by DI in this case -- that the industry practice that both sides

---

[11] DI's toy industry expert, Mr. Kipling, was prepared to go farther and Plaintiff offered proof that a confidential relationship existed between toy companies and outside inventors on new concept submissions in the absence of a written agreement between the parties disclaiming confidentiality. Ultimately, the Court ruled against Mr. Kipling offering such testimony as to a "default rule." (Tr. at 1330-31).

[12] As the Court recognized in its Ruling denying Fisher-Price's motion for reconsideration of the Court's summary judgment decision, to the extent the 1994 Policy and Agreement can be read as a waiver of Reiling's claims against Fisher-Price, that does not mean that a confidential relationship cannot and does not exist between Reiling and Fisher-Price. Rather, the effect of the agreement is to waive (or "release") any claim Reiling might have against Fisher-Price that depends upon the existence of a confidential relationship. (*See* Ruling at 5-6).

27

expect that the inventor will be paid if his idea is used -- confirmed that DI had a confidential relationship with Fisher-Price pursuant to toy industry custom and practice.

4.    Evidence of the Parties' Efforts to Maintain Confidentiality of the Concept

To the extent the actions of the parties to maintain the confidentiality of the concept are relevant to establishing the existence of a confidential relationship, DI refers the Court to the evidence set forth in Section I(B) above, demonstrating that DI and Reiling treated the concept in strict confidence, and that it was the practice of Fisher-Price's employees to try to maintain the confidentiality of outside inventor submissions. There is no evidence that Fisher-Price ever breached the confidentiality of the submission, and Fisher-Price has now confirmed in its memorandum that it "did not" disclose the concept to the public. (F-P Mem. at 12, n.13).

5.    Fisher-Price's Arguments Do Not Undermine the Confidential Relationship Between DI and Fisher-Price

(a)    The Reel Heroes Concept was a Joint Submission

Fisher-Price mischaracterizes the record when it argues that only Mr. Reiling disclosed the Reel Heroes concept to Fisher-Price. (F-P Mem. at 14). The evidence at trial showed that the Reel Heroes concept was jointly created, conceived and owned by both Reiling and DI, and the parties jointly submitted the concept to Fisher-Price. (Tr. at 113-15, 117-22, 267-68, 554, 556). The fact that Mr. Reiling attended the meeting with Paul Snyder and was the person who communicated with Fisher-Price about the Reel Heroes submission is of no consequence, because the confidential relationship had already been established upon disclosure of the Reel Heroes concept to Fisher-Price by virtue of the facts that, *inter alia*, (1) Fisher-Price actively solicited outside inventor submissions through "wish lists" and through other means; (2) Reiling and DI each had submitted concepts to Fisher-Price on numerous occasions and several were licensed; (3) Reiling and DI maintained the concept in confidence and they expected Fisher-Price to do as well; (4) The original story board

28

clearly indicated DI was involved in the submission; (5) Fisher-Price accepted the concept and spent time, money and effort to evaluate it; (6) Fisher Price never objected to or expressed any surprise when the Option Agreement was negotiated that DI was involved. From these facts a jury could, and indeed, had to conclude that it was a joint submission. Fisher-Price offered no evidence to support its contention that it ever believed the submission came only from Reiling. From these facts, a jury could conclude that DI disclosed the concept to Fisher-Price, jointly with Reiling, in the context of a confidential relationship that is implied by the conduct of the parties.

       (b)   New York Law Does Not Require Express Communication of the Confidential Relationship

There is no requirement under New York law that "plaintiff must have objectively communicated its expectation of or request for a confidential relationship to the defendant such that an objective third party would have understood it." (F-P Mem. at 15). Nor could there be, because, as the Court instructed the jury, New York law clearly provides that "a confidential relationship may arise . . . implicitly by the actions and course of dealing of the parties or other circumstances, including industry customs and practices." (Jury Instructions at 25). *See Stewart*, 2004 U.S. Dist. LEXIS 26533 at *14; *Klein*, 135 N.Y.S.2d at 395-96; *Matarese*, 158 F.3d at 634; *Heyman*, 325 F.2d at 587; *Speedry Chemical*, 306 F.2d at 332; *Schreyer*, 190 F.2d at 924.

Accordingly, it is of no consequence that DI never expressly communicated confirmation of the confidential relationship because the parties' course of dealing gave rise to an implicit confidential relationship as a result of the conduct described above.

       (c)   There Is Evidence in the Record to Confirm Fisher-Price's Acceptance of the Confidential Relationship

Contrary to Fisher-Price's argument, there is evidence in the record confirming that Fisher-Price implicitly accepted the confidential relationship through its own conduct. Indeed, Fisher-

29

Price's arguments purporting to show the absence of acceptance by Fisher-Price essentially conflate two erroneous assumptions discussed above, namely, that (1) the P&A form extinguishes the underlying confidential relationship with outside inventors -- as opposed to merely preventing outside inventors from suing Fisher-Price for any claim that depends upon the existence of such a relationship; and (2) that Fisher-Price's acceptance of the confidential relationship must have been express. (F-P Mem. at 16-18).

Fisher-Price argued at trial that the P&A form should bind DI, even though they never signed a form covering the Reel Heroes concept, because they must have been "aware" of Fisher-Price's policy disclaiming a confidential relationship with outside inventors. As set forth above in Section I(B), according to the Court's prior holding, the P&A form merely prevents an outside inventor from suing Fisher-Price for a claim that depends on the existence of a confidential relationship, it does not mean that a confidential relationship cannot and does not exist between outside inventors and Fisher-Price. (Ruling at 6-8). But even if Fisher-Price's characterization of the P&A was accepted, its asserted inference still would not be the only logical conclusion. To the contrary, it is more logical to conclude that if Fisher-Price usually required a P&A agreement to extinguish any confidential relationship, its failure to get a P&A from DI constitutes an acceptance that this relationship was confidential. Indeed, Ms. Zinter acknowledged that sometimes Fisher-Price did, in fact, enter into confidential relationships with inventors. (Tr. at 1624-25). By failing to follow its own usual procedures here, Fisher-Price allowed both DI, and the jury, to reasonably infer that Fisher-Price was accepting a confidential relationship for this concept submission.

Moreover, as set forth above, Fisher-Price's acceptance of the confidential relationship need not have been expressly communicated to DI. Rather, its conduct suffices to establish an implicit confidential relationship. To that end, the evidence at trial established that:

30

- Fisher-Price encourages outside inventors to submit new ideas to the company through "wish lists" and otherwise while expressly promising in writing to treat the inventors fairly (Tr. at 99-100, 643-46; Pl. Exhs. 300, 303).

- Fisher-Price accepted the idea, expended time, money and effort to evaluate the idea -- including entering into an Option Agreement for the idea (Tr. at 710-11, 819-24, 838; JX 8, 10).

- Fisher Price confirmed in writing in the Option Agreement that it understood that if no license was agreed upon all rights to the idea belonged solely to DI and Reiling and that the idea would be held confidential while it evaluated the idea (JX 10, ¶¶ 3, 5).

- Fisher-Price returned the submissions to DI and never indicated to DI or Reiling that it had any right to make commercial use of the concept (Tr. at 155; JX 12).

To the extent that the Eleventh Circuit in *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1550 (11th Cir. 1996), interpreted Florida law to require a party to make it "clear to the parties involved that there was an expectation and obligation of confidentiality" in order to establish an implied confidential relationship for purposes of a claim of trade secret misappropriation, that holding conflicts with New York law. Indeed, New York law provides precisely the opposite – a confidential relationship can arise implicitly through conduct or otherwise, such as industry custom and practice. *See Stewart*, 2004 U.S. Dist. LEXIS 26533 at *14; *Klein*, 135 N.Y.S.2d at 395-96; *Matarese*, 158 F.3d at 634; *Heyman*, 325 F.2d at 587; *Speedry Chemical*, 306 F.2d at 332; *Schreyer*, 190 F.2d at 924. There is no requirement of an express assertion of confidentiality under New York law of concept misappropriation, as there is under Florida trade secret law. Accordingly, the holding of *Bateman* is of no value to the present case.

## II. DAMAGES MAY BE AWARDED UNDER THEORIES OF MISAPPROPRIATION AND UNFAIR COMPETITION FOR LINE EXTENSIONS AND ACCESSORIES SOLD AND MARKETED WITH PRODUCTS USING THE MISAPPROPRIATED CONCEPT

Contrary to Fisher-Price's assertions (F-P Mem. at 33-35), there is no prohibition as a matter of law for recovery of an award of damages for sales of products sold with accused products in misappropriation cases. Moreover, as a result of the evidence at trial it was reasonable for the jury to

31

award damages for such products based on a finding that such products would not have been sold as marketed by Fisher-Price "but for" Fisher-Price's misappropriation of the submitted concept.

A.    **Sales of Line Extensions are Recoverable Under a Misappropriation Theory**

Fisher-Price asserts that DI cannot recover damages for lost royalties on line extensions and accessories that do not themselves "use" (*i.e.* misappropriate) the Reel Heroes concept as a matter of law. (F-P Mem. at 34). While this appears to be an issue of first impression in the context of misappropriation of an idea cases, it is important to note that several courts have awarded damages for related products in misappropriation of trade secrets cases where the products did not themselves embody the idea. In *Adoplph Gottscho, Inc. v. American Marketing Corp.*, 139 A2d 281 (N.J. 1958), the court awarded profits on sales of certain products that did not embody plaintiff's trade secret because the ancillary goods were connected to the accused products. According to the court, plaintiff was entitled to an award of "all avails and profits" received by the defendant in the manufacture and sale of machines embodying the plaintiff's secrets, which included profits for the ancillary products. 139 A.2d at 284-85. *See also Julius Hyman & Co. v. Velsicol Corp.*, 233 P.2d 977 (Colo. 1951) (accounting for trade secret misappropriation included profits made by defendants for sales of secondary product that resulted from manufacture of accused chemical product).

The above cases are entirely consistent with New York law governing damages for misappropriation and unfair competition cases, which provide that DI is entitled to recover "the amount which [DI] would have made but for [Fisher-Price's] wrong . . ." *Suburban Graphics Supply Corp. v. Nagle*, 5 A.D. 3d 663, 666, 774 N.Y.S.2d 160, 163-64 (N.Y. App. 2d Dept. 2004); *American Electronics, Inc. v. Neptune Meter Co.*, 33 A.D.2d 157, 305 N.Y.S.2d 931, 934 (N.Y. App. 1st Dept. 1969); *Gilroy v. American Broadcasting Co., Inc.*, 47 A.D.2d 728, 365 N.Y.S.2d 193 (1st Dept. 1977).

Fisher-Price admits that, "[t]he purpose of misappropriation damages is to compensate plaintiff for its loss." (F-P Mem. at 34). However, Fisher-Price then cites several cases for the proposition that DI cannot recover damages for products that do not actually misappropriate the idea. (F-P Mem. at 34, n. 38). The cases Fisher-Price references do not, in fact, support its position.

*Vermont Microsystems, Inc. v. Autodesk*, 138 F.3d 449 (2d Cir. 1998) is inapposite. There, the Second Circuit, applying California law, analyzed the proper measure of reasonable royalty damages for a claim of misappropriation of trade secrets. Importantly, the passage Fisher-Price references deals with the issue of apportionment[13] in the context of an award of defendant's profits (*i.e.* under a disgorgement theory). *See* 138 F.3d at 450 ("If the trade secret accounts for only a portion of the profits earned on the defendant's sales, such as when the trade secret relates to a single component of a product marketable without the secret, an award to the plaintiff of defendant's entire profit may be unjust.") The case does not, therefore, stand for the proposition that damages may not be awarded for products sold with the accused products, particularly where, as here, evidence of industry custom and other testimony supported such an award.

*Vitor Corp. of America v. Hall Chemical Company*, 292 F.2d 678 (6th Cir. 1961), is similarly unhelpful to Fisher-Price. In *Vitor*, the court actually applied a reasonable royalty for damages because apportionment could not be ascertained. The Sixth Circuit explained that an award based on

---

[13] The issue of apportionment was not before the jury for purposes of determining the amount of reasonable royalties. In fact, Fisher-Price never submitted any evidence to counter DI's evidence that the range of reasonable royalties in this case was 4-6% of the gross sales of the accused action figure lines and line extensions. Fisher-Price instead chose to argue during closing argument that the jury should find no liability. Importantly, at least one court has held that the burden of proving apportionment in a misappropriation case is on the defendant. *See Julius Hyman*, 233 P.2d 977 at 1010 ("the burden of establishing the amount of the contribution was upon defendants wherein this knowledge was reposed"). This is consistent with patent and trademark law, which similarly place the burden of showing apportionment on the defendant. *See Nickson Industries, Inc. v. Rol Mfg. Co.*, 847 F.2d 795 (Fed. Cir. 1988) ("where it is 'impossible to make a mathematical or approximate apportionment' between infringing and noninfringing items, the infringer must bear the burden and the entire risk'") (quoting *Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*, 225 U.S. 604, 620, 56 L. Ed. 1222, 32 S. Ct. 691 (1912)); 15 U.S.C. § 1117(a) ("In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed").

33

the parties' "agreement in principle" was proper as a matter of equity even though it was not a firm contract because the actual value of defendant's profits and plaintiff's damages could not otherwise be measured. 292 F.2d at 682-83. Likewise, in *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518 (5th Cir. 1974), the court explained that defendant's actual profits are typically used as an appropriate measure of damages in a misappropriation case because it takes into account "'the benefits, profits or advantages gained by the defendant'" *University Computing Co.*, 292 F.2d at 536 (citing *International Industries, Inc. v. Warren Petroleum Corp.*, 248 F.2d 696, 699 (3d Cir. 1957)). As set forth below, the evidence at trial showed that Fisher-Price benefited and profited from sales of the line extensions and accessories sold with, and marketed for use with, the accused Rescue Heroes toy lines that actually embodied DI's concept.

## B.    The Evidence at Trial Supports the Jury's Award of Damages

DI presented evidence in the form of testimony from its expert, Mr. Kipling, that based on toy industry and custom DI was entitled to an award of royalties for the line extensions and accessories that were sold and marketed for use with the accused Rescue Heroes action figures. (Tr. at 1359-60, 1478-1490). Paul Snyder, Fisher-Price's former Vice-President of Inventor Relations, also testified that inventors are paid royalties on line extensions, and that the accused accessories were line extensions of the Rescue Heroes line. (Tr. at 716, 737, 740).

As Mr. Popek testified, he expected that line extensions and accessories would have been included in a license agreement with Fisher-Price had the parties negotiated such an agreement. (Tr. at 875-880). Where such an agreement was never entered into between the parties because of Fisher-Price's wrongful misappropriation, Fisher-Price has reaped all the benefit of the sales of the line extensions and accessories and should not benefit therefrom. *See International News Service v.*

34

*Associated Press*, 248 U.S. 215 (1918) (explaining that a party may not reap the benefits of another party's efforts).

Patent law provides an analogy, as it is well settled that courts will apply the theory of the "hypothetical license" transaction to fix an award of reasonable royalties where an infringer has deprived a patentee of the opportunity to negotiate a license. Several courts have applied this theory to sales of products sold in connection with the accused products:

> Under the *Georgia Pacific Corp.* theory of the hypothetical license transaction, the litigants are placed in the hypothetical position of willing parties to a transaction for a license to sell the patented product. Under this theory, the plaintiff may recover from the defendant profits the defendant obtained from sales convoyed on the sale of the infringing product -- even though those collateral sales would not necessarily have otherwise gone to the plaintiff. *Georgia Pacific Corp.*, 318 F. Supp. at 1127. This is because hypothetical negotiators would take into account convoyed profits that the purchaser may reap from the sale of the patented product, whether or not those collateral profits would otherwise have gone to the seller. *Id.* at 1132 (citations omitted).

*Haworth, Inc. v. Herman Miller, Inc.*, 162 F.R.D. 286, 287-88 (W.D. Mich. 1995) (*citing Georgia Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970)).

Accordingly, the evidence from Mr. Popek and the above authority refutes Fisher-Price's contention that the absence of any reference to line extensions in the Option Agreement is controlling. (F-P Mem. at 37). The Option Agreement was not a final agreement containing all material terms, and Mr. Popek testified that royalties for line extensions would have been included in a license agreement. The testimony of Mr. Kipling and Mr. Snyder confirms the validity of Mr. Popek's testimony.

Simply put, the accused line extensions and accessories would not have been sold as packaged "but for" sales of the accused Rescue Heroes lines which embodied DI's concept. Fisher-Price in its own marketing and packaging decisions decided to link the accessories and line

35

extensions to the misappropriated concept. Thus these products as sold benefited from the misappropriation and it is utterly speculative to try to determine how they might have been packaged, marketed and sold if they had not been linked to the misappropriation. Having made the choice to package and market these products in a way that incorporated the misappropriated concept, Fisher-Price clearly profited from the misappropriation on the sales of these accessories and line extensions.

Fisher-Price seeks to hold DI to a higher standard of proof that is not applicable in the present case. (F-P Mem. at 35). For example, Fisher-Price claims that DI had to prove what was in the minds of consumers (*i.e.* what led to their purchasing decisions) in order to recover damages for line extensions.[14] (F-P Mem. at 35-36). Importantly, Fisher-Price provides no authority for its proposition. The cases cited by Fisher-Price for its interpretation of the "but for" standard relate to other types of causation situations not applicable to this case.[15]

The Court's jury charge, which required the jury to find "that Fisher-Price's misappropriation caused [DI] to lose royalty payments it would have collected from Fisher-Price but for Fisher-Price's misappropriation of the submitted concept," (Jury Charge at 37) comports with New York's standard of proof of "but for" causation in misappropriation and unfair competition cases. *Suburban Graphics Supply Corp. v. Nagle*, 5 A.D. 3d 663, 666, 774 N.Y.S.2d 160, 163-64 (N.Y. App. 2d Dept. 2004); *American Electronics, Inc. v. Neptune Meter Co.*, 33 A.D.2d 157, 305 N.Y.S.2d 931, 934 (N.Y. App. 1st Dept. 1969); *Gilroy v. American Broadcasting Co., Inc.*, 47 A.D.2d 728, 365

---

[14] To the extent relevant, Paul Snyder testified that it would be logical to expect that some consumers who bought Rescue Heroes action figures would also purchase play sets and accessories. (Tr. at 741).

[15] *Diduck v. Kaszycki*, 974 F.2d 270 (2d Cir. 1992) (showing of causation specific element for claim of common law fraud); *Buggs v. Veterans Butter & Egg Co.*, 502 N.Y.S.2d 12,13 (1st Dep't 1986) (discussing future medical expenses to be paid for injury suffered by plaintiff); *Smith v. D.A. Schulte, Inc.*, 116 N.Y.S.2d 212 (1st Dep't 1986) (pleading insufficient as to recovery for duties to have been performed by plaintiff); *Vanguard Military Equipment Corp. v. Schulein*, 42 N.Y.S.2d 526 (1st Dep't 1943) (explaining essential contract terms insufficiently plead to determine damages); *Sprewell v. NYP Holdings, Inc.*, 772 N.Y.S.2d 188 (Sup. Ct. N.Y. Co. 2003) (discussing requirements for pleading special damages).

36

N.Y.S.2d 193 (1st Dept. 1977). *See also Pioneer Hi-Bred International v. Holden Foundation Seeds, Inc.*, 35 F.3d 1226, 1244-1245 (8th Cir. 1994) (explaining that the "but for" test is the proper method to determine lost profits damages in a misappropriation of trade secrets case).

Accordingly, it was reasonable for the jury to find based on the evidence adduced in the form of testimony of Mr. Kipling, Mr. Popek and Mr. Snyder, that DI would have collected royalties on the line extensions and accessories of the Rescue Heroes line "but for" Fisher-Price's misappropriation of the submitted concept.

## III. THE JURY'S FINDING THAT THE REEL HEROES CONCEPT WAS CONCRETE WHEN IT WAS SUBMITTED TO FISHER-PRICE WAS REASONABLE

Fisher-Price contends that no reasonable jury could have found that the Reel Heroes concept was concrete at the time it was submitted to Fisher-Price. (F-P Mem. at 48-52). To make this point Fisher-Price continues to conflate legal definitions of the concept and descriptions of the prototype with the concept or idea which was presented by DI and Reiling to Fisher-Price. However, the concept, as reflected in the documents, drawings and prototype DI and Reiling actually submitted to Fisher-Price, and the conduct of Fisher-Price's own employees and attorneys in evaluating and granting an option for the concept, reveals that DI's novel concept was concrete at the time of submission. Indeed, while the submissions may have changed to reflect different executions of the concept, the concept itself (adding an image component to the backpack of the Rescue Heroes characters to enhance role play by depicting the mission of the character), remained consistent and fixed. Significantly, not a single witness from Fisher-Price was presented to testify that they were confused by or did not understand the concept as presented by DI in the relevant time from of October 1998 to January 2002.

37

## A.    The Evidence at Trial Established that the Reel Heroes Concept Was Concrete When it Was Submitted

DI's concept, when submitted to Fisher-Price, was quite specific and particular, as opposed to being vague or abstract. (*See* Jury Instructions at 22). The concept was restricted to (i) an image; (ii) on the backpack of a "Rescue Heroes" action figure only; (iii) to enhance role play for the child by depicting the mission of that particular "Rescue Heroes" character. (Tr. at 115, 129, 807-08, 813-14). DI disclosed the concept to Fisher-Price in a series of submissions, as follows:

DI's initial 1998 submission disclosed an interchangeable battery-operated film/video monitor that would be placed on the "Rescue Heroes" characters in the form of a backpack. (JX 3). This submission included a prototype, drawings and written descriptions. (JX 7, 4, 3 and 2, respectively). After expiration of the Option Agreement, Plaintiffs re-submitted their concept on two occasions in 1999 and 2000 to show two additional executions of the concept – the use of still images either by means of a wheel, drum or round disk. (JX 13, 14, 15, 230, 231). Once again, Plaintiffs sent Fisher-Price additional drawings and additional written descriptions. (*Id.*) *See Galanis v. Procter and Gamble Corp.*, 153 F. Supp. 34, 38 (S.D.N.Y. 1957) (Plaintiff's letter describing idea that combined two other products was sufficiently concrete). From the submissions themselves, the jury could infer that the concept was concrete and understandable by Fisher-Price. Moreover, Mr. Kipling, who had seen thousands of toy product submissions in his career in the industry, also testified as to the concreteness of DI's concept. (Tr. at 1335).

The evidence of Fisher-Price's conduct in evaluating and granting an option for the concept confirms that DI's novel concept was concrete at the time of submission. Exhibit A to the Option Agreement speaks volumes. (JX 10, Exh. A). The evidence in the record establishes that Fisher-Price's own in-house attorneys drafted the Option Agreement, including Exhibit A and the description of the concept contained therein. (Tr. at 147, 150, 833, 835). Exhibit A states: "The

38

unique aspect of the concept is the combination of existing action figures with film for play pattern." (JX 10, Exh. A). There is no evidence in the record that Fisher-Price expressed to Plaintiffs any difficulty in understanding the nature or details of the concept when the Option Agreement was tendered. (Tr. at 835). The jury could have concluded reasonably on the basis of the Option Agreement that Fisher-Price understood exactly what it was optioning and therefore, the concept was concrete.

It was not necessary, however, for the jury to rely merely upon the Option Agreement. The testimony of Fisher-Price's own employees and former employees at trial established that the concept was concrete at the time it was submitted. Paul Snyder, Vice President of Inventor Relations at Fisher-Price at the time the concept was submitted, testified that after the initial meeting with Victor Reiling at which the concept was originally disclosed, he understood the concept. (Tr. at 690-91). When asked if he had an impression after the initial meeting of what was being presented, Mr. Snyder stated: "Yeah, a film of the activity, I think. If it's a fireman, maybe a film of firefighting or something like that." (Id.) Mr. Snyder also testified that the concept shown was of a sufficient nature that he asked Mr. Reiling to submit it for further review, while he did not ask Mr. Reiling to submit other concepts presented that day. (Id. at 686-88). There was no evidence nor any indication that in inviting the submission of this concept, Mr. Snyder had any doubt or confusion as to what was being presented or that he believed it lacked concreteness. Accordingly, the jury could have reasonably concluded that Paul Snyder, the Fisher-Price employee who reviewed outside inventor submissions on a day to day basis during the relevant time period, and for numerous years prior to that time, understood the concept and felt that it was sufficiently concrete to warrant further consideration.

39

In addition, Ken Morton, the Fisher-Price employee who conceived of the idea that evolved into the basic line of Rescue Heroes, testified that he thought DI's idea, including the Filmore Schotz cameraman character, was an interesting idea that he wanted to evaluate further. (Tr. at 1717-18, 1732-33). It was reasonable for the jury to find that Ken Morton also had no problem understanding the submitted concept. Indeed, there was no witness from Fisher-Price involved in the evaluation of the submissions from DI and Reiling who claimed that there was any confusion or misunderstanding about the concept or that they viewed the concept as vague. Moreover, in its rejections of the concept, Fisher-Price never gave DI or Reiling any indication that Fisher-Price was confused about the concept or thought it lacked concreteness. (JX 12, 20).

In the Court's Summary Judgment Ruling ("S.J. Ruling"), the Court found that the definition of the concept put forth by DI was "consistent with, and embodied in, the concepts presented in plaintiffs' three submissions to defendant – of an image displaying device to be used on the equipment of the Rescue Heroes action figures that enhanced role play by depicting the mission of the particular figure and/or obstacles that figure might face." (S.J. Ruling at 27). Based on that finding, the Court held that "Plaintiffs' definition coupled with their submission provide an evidentiary basis from which reasonable jurors could find plaintiffs' concept sufficiently concrete and tangible to be protectible." (*Id.* at 28). Based on the evidence of the submission, coupled with the evidence demonstrating Fisher-Price's understanding of the concept, it was reasonable for the jury to conclude that DI's concept was fixed and concrete in form when it was submitted to Fisher-Price.

Fisher-Price, after the fact and as part of its belated litigation strategy, attempted to demonstrate inconsistencies in the definitions that Plaintiffs have used to define their concept. Plaintiffs, however, have consistently asserted that their concept is adding an image component to

40

the backpack of each Rescue Heroes action figure that enhanced role play for the child by depicting

the mission of that particular Rescue Heroes character, and this definition is entirely consistent with

the testimony of Victor Reiling and Bruce Popek at trial. (Tr. at 115, 129, 807-08, 813-14).

Frankly, the descriptions of the concept that DI's attorneys used in drafting the various

Complaints in this action are not binding as a matter of law, as Fisher-Price would have the Court

believe. A legal description is not the concept. The issue for the jury was whether the concept was

concrete, not whether DI's attorneys properly described the concept in the course of the litigation.

The jury was free to consider, and reject, Fisher-Price's purported evidence on "definitions" of the

concept from pleadings and disclosures during this action. The jury had the right, instead, to credit

the substantial evidence of DI's submissions (prototype, drawings, etc.), and the evidence of Fisher-

Price's conduct to determine whether the concept was fixed and concrete in form at the time it was

submitted. (Jury Instructions at 22).

## B.    The Cases Cited By Fisher-Price Are Not on Point

The cases cited by Fisher-Price are distinguishable and do not support Fisher-Price's

assertion that DI's concept lacked concreteness as a matter of law. In *Link Group Int'l v. Toymax,*

*Inc.*, 2000 U.S. Dist. LEXIS 4567 at *13 (D. Conn. 2000) (Hall, J.), the plaintiff had developed a

concept for a laser toy in 1986-1987 that was actually marketed and sold. Plaintiff had also

developed several related concepts at that time. In 1995, the defendant toy manufacturer expressed

an interest to develop revised versions of plaintiff's ideas. While plaintiff had created a sample of

one of the concepts, sketches and marketing plans for the 1987 toy that was actually developed, it

had not provided any updated materials to the defendant in 1995. According to the Court, plaintiff

could not show that its updated concept was sufficiently concrete because it did "not dispute the fact

41

that no prototype or schematics for an updated version of Laser Combat or, for that matter, for any of the other related concepts . . . were ever submitted to [defendant]." *Id.* at \*13.

In *Educational Sales Programs, Inc. v. Dreyfus Corp.*, 317 N.Y.S.2d 840 (Sup. Ct., N.Y. Cty. 1970), Plaintiff disclosed to defendant an idea "to make tape players and monthly tape cassettes containing educational and promotional material available free of charge to independent mutual fund salesmen, with the player, cassettes and contents to be purchased from Plaintiff." *Id.* at 841. The court held that plaintiff's concept was "quite malleable and not in such a fixed and concrete form as to indicate a protectible idea." *Id.* at 845. Indeed, plaintiff's communications with defendant had been oral and there was no evidence referenced in the decision regarding any written disclosure or submission.

In contrast, as discussed above, the sketches, written materials and prototype originally submitted by Plaintiffs to Fisher-Price in 1998, as well as the written materials and sketches that Plaintiffs submitted on two later occasions, were certainly in a "fixed and concrete form" so as to warrant legal protection. Indeed, as part of their original submission, DI and Reiling described the idea as including a video monitor on a back pack. Fisher-Price actually picked up that very characterization in marketing the accused products which amply demonstrates it understood the concept. The cases cited by Fisher-Price are, therefore, not helpful to its cause. Based on the totality of the evidence, including the jury's own ability to perceive what was conveyed of the concept in DI's three submissions including the prototype, drawings, and written descriptions, there was more than sufficient evidence to reasonably find that the concept was concrete and definite.

## IV.   THE JURY'S FINDING THAT FISHER-PRICE USED THE REEL HEROES CONCEPT WAS REASONABLE

### A.   Legal Standard for the "Use" Element of a Misappropriation of an Idea Claim

To prevail on its misappropriation claim, DI must prove that Fisher-Price used its concept.

*AEB & Associates Design Group v. Tonka Corp.*, 853 F. Supp. 724, 734 (S.D.N.Y. 1994). A

showing of use may be inferred by: (1) a showing of a substantial similarity between DI's concept

and each accused Fisher-Price product; and, (2) Fisher-Price's access to DI's concept. (S.J. Ruling at

42, citing *Ball v. Hershey Foods Corp.*, 842 F. Supp. 44, 48 (D. Conn. 1993), *aff'd* 14 F.3d 591 (2d

Cir. 1993); *Ed Graham Prods., Inc. v. Nat'l Broad. Co.*, 347 N.Y.S.2d 766, 768 (N.Y. Sup. Ct.

1973)). *See also Merritt Forbes & Co. v. Newman Inv. Secur, Inc.*, 604 F. Supp. 943 (S.D.N.Y.

1985).

To determine the element of substantial similarity:

> Similarities between the submission and the ultimate product may justify the factual
> inference that one was copied from the other....If the concept submitted is unique, or
> if there are many points of likeness, the inference is strengthened. On the other hand,
> a lack of novelty or the existence of many dissimilar features will support a denial
> that the idea was used by the recipient.

*Ball*, 842 F. Supp. at 48 (quoting *In re Elsinore Shore Associates*, 102 B.R. 958, 971 (D.N.J. 1989)

(*ellipses in original*); *Duffy v. Charles Schwab & Co., Inc.*, 2001 U.S. Dist. Lexis 14070 at *13

(D.N.J. Sept. 4, 2001). In *Ball*, the court found that while plaintiff's advertising concept and

defendant's accused advertisement both concerned a little girl having a tea party, "the theme of the

plaintiff's idea is children, enjoying candy bars," whereas "the theme of the defendant's commercial

is [that] Hershey Miniatures can satisfy a variety of individual tastes." 842 F. Supp. at 48. Following

*Ball* and *Ed Graham Productions*, the jury must determine whether the "theme" of DI's concept (*i.e.*

adding an image component to the backpack of each Rescue Heroes figure to depict that character's

mission so as to enhance play value . . .), is substantially similar to the "theme" of the accused

43

Rescue Heroes products. (S.J. Ruling at 47). Indeed, for purposes of Fisher-Price's motion for summary judgment, the Court compared DI's concept with the accused Rescue Heroes products, and found that questions of material fact existed as to similarity for all of accused Rescue Heroes products except for the Optic Force line.[16] (S.J. Ruling at 41-50).

Because this is a misappropriation of an idea case, and not a copyright or patent case, it is critical that the jury compare the concept and the accused products – not just the prototype/written submissions and the accused products. This is consistent with the governing law in misappropriation of idea cases set forth above which compare the "theme" of the concept with that of the accused products. It is also consistent with the fact that misappropriation of idea cases deal with the protection of ideas, while copyright and patent law protect the tangible work or invention (*i.e.*, the manifestation of the idea).[17] Hence, if this were a copyright or design patent case, it would be proper for the jury to compare only the written submissions/prototype with the accused products to determine similarity. But since this is a misappropriation of idea case, and not a misappropriation of a "prototype" case, it is crucial that the comparison be between DI's concept and the accused Rescue Heroes products.

At trial, the Court properly instructed the jury that because there is often no direct evidence of use, the jury could reasonably infer that Fisher-Price used the concept based upon two factors: (1)

---

[16] For all of the Optic Force characters except for Telly Photo, the Court found that the characters did not embody DI's concept "because they do not include a visual depiction of any sort to cue play, on a backpack or elsewhere, and their means of enhancing play value is in real-time, by what the child actually sees through the optical device, as opposed to being cued by an artificial visual depiction." (S.J. Ruling at 49).

[17] For example, it is well settled that copyright law protects the expression of an idea (*i.e.*, the actual artwork, three-dimensional sculpture, etc.), not the ideas themselves. Section 102(a) of the Copyright Act, 17 U.S.C. § 102(a), provides that "Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression . . .," and Section 102(b) confirms that "In no case does copyright protection for an original work of authorship extend to any idea . . . concept . . . regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b). For this reason, to establish the element of "substantial similarity" in the copyright context, courts typically employ a visual side-by-side comparison of the "total concept and feel" of the copyrighted work and the accused material that focuses on the aesthetic similarity between the two. *See, e.g., Boisson v. Banian, Ltd.*, 273 F.3d 262 (2d Cir. 2001); *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101 (2d Cir. 2001).

44

a substantial similarity between the submitted concept and Fisher-Price's later products; and (2) Fisher-Price's access to the submitted concept. (Jury Instructions at 26-27). In considering whether there is a substantial similarity, the jury was instructed to focus on the similarities and differences between particular aspects of the submitted concept, and the design of the products actually sold later by Fisher-Price. (*Id.*)

B.   Trial Testimony Revealed that DI's Concept Was Communicated to Fisher-Price

Fisher-Price contends that no reasonable jury could have found that Fisher-Price used the Reel Heroes concept because the concept was never communicated to Fisher-Price. (F-P Mem. at 37-48). The exhibits and trial testimony clearly reveal that DI's concept was communicated to Fisher-Price in the form of written descriptions, drawings and the prototype, all of which were submitted. Moreover, there is overwhelming evidence in the record of substantial similarity between DI's submissions and the products Fisher-Price ultimately sold, as well as Fisher-Price's access to DI's submissions. On the basis of this evidence, the jury could reasonably infer that Fisher-Price used DI's concept.

Victor Reiling and Bruce Popek both testified at trial that the concept submitted to Fisher-Price was adding an image component to the backpack of each Rescue Heroes action figure that enhanced role play for the child by depicting the mission of that particular Rescue Heroes character. (Tr. at 115, 129, 807-808, 813-814). James Kipling, DI's expert, testified that based upon three submissions made to Fisher-Price from 1998-2001, DI's concept was:

> "an image component carried on or in the backpack of Rescue Heroes figure, the images being of rescue opportunities, scenes of potential disaster and other situations in which the assistance of the Rescue Heroes figure might be required. The scenes are multiple and interchangeable, and each one . . . triggers . . . the role playing pretending by the little boy or little girl . . . to play out the rescue sequence initiated as a result of seeing that image." (Tr. at 1335).

45

The evidence at trial established that DI's concept was submitted to Fisher-Price on three occasions showing three different executions. DI's initial 1998 submission disclosed an interchangeable battery-operated film/video monitor that would be placed on the "Rescue Heroes" characters in the form of a backpack. (JX 3; Tr. at 132-135). This submission included a prototype, drawings and written descriptions. (JX 7, 4, 3 and 2, respectively). DI and Reiling re-submitted their concept on two occasions in 1999 and 2000 to show two additional executions of the concept – the use of still images either by means of a wheel, drum or round disk. (Tr. at 158-162, 163-168). Once again, DI and Reiling sent Fisher-Price additional drawings and additional written descriptions. (JX 13, 14, 15, 230, 231). The written descriptions, drawings and prototype submitted to Fisher-Price, when viewed together, disclose exactly the concept that DI claims was submitted – adding an image component to the backpack of each Rescue Heroes action figure that enhanced role play for the child by depicting the mission of that particular Rescue Heroes character.

The evidence adduced at trial established that toy industry custom and practice provides that: (1) concepts submitted by outside inventors are typically broadly construed, without regard to the limited definition provided on written submission forms; (2) the performance of the concept by Fisher-Price could be achieved in many different ways (and by means of many different engineering mechanisms) and Fisher-Price would still owe a royalty regardless of the particular device used; and (3) the embodiment of the concept may ultimately be changed in the final product because the toy company has expended substantial resources to refine and embellish the concept into a "finished" licensed product, but a royalty would still be owed nonetheless. In fact, the evidence at trial revealed one significant example of a concept disclosed to Fisher-Price where the finished toy product bore little resemblance to the original concept submission, namely Victor Reiling's submission of a

46

concept called "Slam Jammers" that was ultimately sold by Fisher-Price as "Crash Zone." (*See* Pl.

Exhs. 307, 308).

C.   There is Strong Evidence of Substantial Similarity in the Record

Bruce Popek and DI's expert, James Kipling, testified regarding the similarities between DI's

submissions and the accused products sold by Fisher-Price.[18]

- Mr. Popek testified that DI immediately believed that Fisher-Price had used its concept when shown a Voice Tech Video Mission Gil Gripper character in 2002 which included a video image on the back. (Tr. at 865-866). Mr. Popek testified that the Video Mission line of figures uses the Reel Heroes concept because it includes images on the backpack that are interchangeable and depict missions, disasters and obstacles that the child uses to play. (Tr. at 872-873; JX 117(28)). Mr. Popek also testified that the backpack is designed to look like a video monitor. (*Id.*)

- Mr. Popek testified that the Voice Tech Mission Command line of figures uses the Reel Heroes concept because it includes interchangeable images on cards that are viewed through the backpack, which would help enhance role play and start the child on his adventure. (Tr. at 871-872; JX 54). Mr. Popek also testified that the Mission Command backpacks are designed to look like a monitor screen or TV screen, and DI had suggested a TV movie monitor or video monitor in its original written description. (*Id.*; JX 3).

- Mr. Popek testified that the Voice Tech Mission Select line of figures uses the Reel Heroes concept because it incorporates images on the backpack that promote enhanced role playing by showing missions, disasters and obstacles. (Tr. at 873-874; JX 85). The images are both multiple and interchangeable. (*Id.*)

- Mr. Kipling testified that the Voice Tech Mission Command line of figures is substantially similar to the idea submitted by DI and Reiling to Fisher-Price because it contains interchangeable cards carrying images of rescue situations that are viewable through a backpack that is in the form of a TV monitor. (Tr. at 1336-1337). The child uses the images to address the character's mission. (*Id.*)

- Mr. Kipling testified that the Voice Tech Video Mission line of figures is substantially similar to DI's submissions in that it contains a visual component in the backpack of the figure which is viewable through a TV or video monitor that depicts mission assignments that the child will resolve. (Tr. at 1337-38).

---

[18] Mr. Popek testified that the Optic Force Telly Photo character uses the Reel Heroes concept because it is an additional or new character to the Rescue Heroes line that is a cameraman. (Tr. at 869-871; JX 117(4)). Mr. Popek also testified that it is a 3-D replica of what DI had presented as the Filmore Scholz character. (*Id.*)

47

- Mr. Kipling testified that the Voice Tech Mission Select line of figures is substantially similar to DI's submissions in that it contains a visual component carried on or in the backpack that is visible through a view plate in the back of the figure in order to communicate to the child a rescue scenario. (Tr. at 1335-39).

Perhaps the best evidence that Fisher-Price used DI's concept for adding an image component to the backpack of the accused Rescue Heroes figures is Fisher-Price's own words. On the packaging for the accused products, Fisher-Price touts the enhanced play value provided by the image component on the backpack:

### "SEE MY MISSION ON MY VIDEO BACKPACK."

**"Now Rescue Heroes figures come to life with voices, sound effects and video images!"**

**"Press the video screen button and you can see the moving video image on the backpack."**

(*See* JX 117(70)). Prior to DI's submission, Fisher-Price had no version of Rescue Heroes which offered children an image on the backpack enhancing role play by depicting the character's mission. The backpacks had no play value at all and were actually referred to as "equipment packs," not backpacks. After DI's submission, which referred to the packs as "backpacks," Fisher-Price introduced three separate product lines which touted the visual images on the "backpacks." This is hardly a coincidence.

Finally, the jurors themselves could evaluate the similarities of the three accused product lines to DI's concept, as evidenced by the submissions, using their own powers of observations. In this regard, it is telling that Fisher-Price had no convincing explanation for why the Mission Command line and the Video Mission line had backpacks which are designed to look like video monitors, when the first submission from DI expressly suggested that the concept could be implemented with a video monitor on the backpack of each Rescue Hero figure. The Jury could

reasonably conclude that the use of the misappropriated concept was proved by the very nature of
the accused products themselves.

D.    Access to DI's Concept is Not Disputed

Fisher-Price does not dispute access to DI's concept, as it clearly cannot do so based upon

the overwhelming evidence. The testimony at trial established that at least six Fisher-Price

employees had access to DI's initial submission, including the prototype. The paper record also

suggests that multiple Fisher-Price departments or groups reviewed the submissions. In addition,

the Fisher-Price inventor submission records clearly establish that *all three* of DI's submissions were

received by Fisher-Price.

- Paul Snyder testified that he saw the prototype at the initial meeting with Mr.
  Reiling. (Tr. at 689-691; JX 7). Mr. Snyder was the employee at Fisher-Price in
  charge of evaluating outside inventor submissions. (Tr. at 640-642).

- Ken Morton testified that he evaluated the prototype and drawings, including the
  drawing of the "Filmore Schotz" cameraman. (Tr. at 1681-1685; 1717). He
  testified that he had possession of the prototype for more than two weeks, that he
  met with Tyler Berkheiser, a designer who ultimately became responsible for the
  Rescue Heroes line, regarding the submission. (*Id.*) He testified that he "spoke to a
  lot of people about the concept and got their opinions." (*Id.* at 1683). He testified
  that he gave the prototype to Henry Schmidt, a designer, with instructions to run a
  cost analysis on the submission. (*Id.* at 1684). He also testified that he thought
  "Filmore Schotz" was "an interesting idea that [he] wanted to evaluate further." (Tr.
  at 1718). At the time, Mr. Morton was responsible for the development of the
  Rescue Heroes line. (*Id.* at 1682).

- Tyler Berkheiser, a member of the Fisher-Price design team at the time, testified that
  he saw the prototype and the drawing of "Filmore Schotz" in approximately 1998-99
  in a meeting with Ken Morton. (Tr. at 1875-1876, 1955-1956).

- Chris Pardi, a member of the Fisher-Price marketing team at the time, testified that
  he saw the prototype and the drawing of "Filmore Schotz" in a meeting with Ken
  Morton and Tyler Berkheiser. (Tr. at 1224-1229).

- Pat Grabianowski, the Fisher-Price Inventor Relations Administrator, sent a letter to
  Reiling on 12/08/98 that indicated that Fisher-Price had "genuine excitement" about
  the concept. (JX 8).

49

- Fisher-Price entered into an Option Agreement with Reiling and DI to hold the concept for a period of time in exchange for a monetary payment. (JX 10).

- The Fisher-Price database of outside inventor submissions clearly establishes that *all three* of DI's submissions were received by Fisher-Price, entered into the database, and that a Fisher-Price employee was assigned responsibility for each submission. (Pl. Exhs. 376, 377, 378).

Based upon the foregoing evidence, a reasonable jury could conclude that there is a substantial similarity between DI's submitted concept and Fisher-Price's later products and that Fisher-Price had access to the submitted concept. On that basis, a reasonable jury could also properly infer that Fisher-Price used DI's submitted concept.

## V.    THE TRIAL RECORD CONTAINS SUBSTANTIAL EVIDENCE OF THE NOVELTY OF THE REEL HEROES SUBMISSION

Fisher-Price's argument that "no competent evidence was submitted" at trial to establish the novelty of DI's concept submission represents a complete and utter mischaracterization of the trial record. (F-P Mem. at 52). In making this argument, Fisher-Price ignores the testimony of its own expert regarding the novelty of combined elements and the evidence in the Option Agreement confirming that Fisher-Price believed the unique feature of the concept was the "combination of existing action figures with film for play pattern." (Tr. at 2399-2401; JX 10, Exh. A). Because the record contained substantial evidence regarding the novelty of DI's submission, Fisher-Price's argument should be rejected.

Novelty is no longer "often decided by the court as a matter of law," as Fisher-Price asserts. (F-P Mem. at 52). As the Court recognized in its Summary Judgment Ruling, since the Second Circuit's *Nadel* decision in 2000 only three courts have ruled on the issue of novelty as a matter of law. (S.J. Ruling at 36, n. 27) (citing cases). Of importance, the Court held that those cases were "readily distinguished" from the instant case because they "involve[ed] concepts that [were] so clearly merely variations on ideas already existing in the public domain, and thus devoid of novelty .

50

. . ." (*Id.*) This is consistent with the fact that in *Nadel* the Second Circuit characterized the issue of novelty as a "fact-specific inquiry" and provided that it would only be appropriate to resolve the issue of novelty as a matter of law where an idea is "so unoriginal or lacking in novelty that its obviousness bespeaks widespread and public knowledge of the idea . . ." *Nadel*, 208 F.3d at 378-79. Thus, following the Second Circuit's decision in *Nadel*, resolution of the issue of novelty is now the rare exception, limited only to extreme cases of ideas that were clearly in the public domain at the time of disclosure.

At trial, DI elicited testimony regarding all four of the *Nadel* novelty factors including, in particular, the uniqueness of the Reel Heroes concept over the alleged prior art introduced by Fisher-Price, such as "Secret Wars" and the Toy Biz "Projector" figures. Reiling, Popek and DI's expert, James Kipling, all testified that in their more than thirty years of experience in the toy industry, they had never seen an action figure having a backpack that contained an image component that enhanced role play for the child by depicting images relating to the mission of that particular character. (Tr. at 118-19, 1098, 1341-46). Each witness also distinguished the Reel Heroes concept from the alleged prior art, by pointing out key points of dissimilarity. (Tr. at 550-56, 855-62, 1341-46). Of greatest importance, none of the prior art included interchangeable images on the backpack of an action hero, designed to enhance the child's play by depicting adventures or obstacles faced by the figure.

No Fisher-Price employee ever told either Reiling or DI that the Reel Heroes concept was not novel (Tr. at 723; JX 12), and the testimony of Fisher-Price's own witnesses at trial confirmed the novelty and uniqueness of it: (1) Paul Snyder, Fisher-Price's Vice President of Inventor Relations, who was responsible for reviewing concepts for Fisher-Price on a day-to-day basis, testified that he had never seen such an action figure before (Tr. at 743-44); (2) Tyler Berkheiser, a member of Fisher-Price's Boys' Team who evaluated the Reel Heroes submission and later developed each of

the accused Rescue Heroes action figure lines, testified that at the time he reviewed the Reel Heroes

submission Fisher-Price had not thought to put an image on the backpack of the Rescue Heroes

characters (Tr. at 1969); (3) Chris Pardi, Director of Marketing for Fisher-Price, testified that he had

likewise never seen such an action figure (Tr. at 1232-34); and, (4) Ken Morton, the Fisher-Price

designer who conceived of the basic Rescue Heroes line, testified that Fisher-Price had no plans to

add images to the backpacks when he worked on the line (Tr. at 1767). From this evidence, the jury

reasonably concluded that DI's concept was novel under the standard set forth by the Second Circuit

in *Nadel*.

Finally, the Court's charge accurately reflected New York law on whether a combination of

known elements may be novel. New York law provides that:

> To establish novelty, a plaintiff's idea 'need not reflect the 'flash of genius,' but it
> must show [] genuine novelty and invention, and not merely a clever or useful
> adaptation of existing knowledge. <u>While even original ideas combine elements that
> are themselves not novel</u>, novelty cannot be found where the idea consists of nothing
> more than a variation on a basic theme.

*AEB & Associates v. Tonka Corp.*, 853 F. Supp. 724, 734 (S.D.N.Y. 1994) (citations omitted)

(emphasis added). Fisher-Price argues that the Court's failure to charge the jury "that a combination

of known elements is not novel" was error. (F-P Mem. at 54). Fisher-Price's position -- that a

combination of known elements cannot be novel as a matter of law -- is belied by the Second

Circuit's decision in *Nadel*, evidence of toy industry custom and practice from Fisher-Price's <u>own</u>

<u>expert witness</u> and Fisher-Price's own words in the Option Agreement.

In *Nadel*, the court addressed the novelty of plaintiff's concept for purposes of the

misappropriation claim in two ways. The court reversed the district court's grant of summary

judgment on the ground that plaintiff's concept lacked novelty because of other similar

commercially available toys. 208 F.3d at 380-81. The court also raised the issue of whether

plaintiff's concept was "inherently lacking in originality,"[19] but did not address it because the lower court did not rule on that ground. In remanding the case to the lower court, the Second Circuit made clear that the proper inquiry was whether the concept exhibited "genuine novelty or invention' or whether it was 'a merely clever or useful adaptation of existing knowledge." *Nadel*, 208 F.3d at 380. The court never stated that a combination of known elements cannot themselves be novel.[20] Moreover, by remanding to the district court for a determination of whether plaintiff's concept exhibited "genuine novelty or invention," the court left open the possibility that plaintiff's concept -- which consisted of a "plush toy that sits upright, emits sounds, and spins on a flat surface by means of an internal eccentric motor" (*i.e.* a combination of "known" elements) -- could, in fact, be novel. *Id.*

In addition, the *Nadel* court's reference to the Second Circuit's prior decision in *Murray v. National Broadcast Co.*, 844 F.2d 988, 991-92 (2d Cir. 1988), in which the Second Circuit held that merely combining two ideas which had been "circulating in the industry" for years did not suffice to show that the plaintiff's idea for a new television series was novel, is also telling because the court in *Nadel* cited the *Murray* decision as an example of "a once original or novel idea" becoming "so widely disseminated over the course of time that it enters the body of common knowledge." 208 F.3d at 378. It is apparent that the court in *Nadel* did not cite the *Murray* decision for the proposition that a combination of non-novel elements cannot themselves be novel as a matter of law, but rather,

---

[19] It is unclear whether the "originality" inquiry is a wholly separate consideration, or is instead subsumed within the "uniqueness" prong of the four-part test to determine novelty set forth by the Court. 208 F.3d at 378-80.

[20] Such a conclusion would be inconsistent with protections afforded under other intellectual property laws, because a combination of non-novel elements can be sufficient to show novelty for purposes of patent law and trade secret law. *See, e.g., Intel Corp. v. U.S. Int'l Trade Comm.*, 946 F.2d 821, 842 (Fed. Cir. 1991) ("That all elements of an invention may have been old . . . is however, simply irrelevant. Virtually all inventions are combinations and virtually all are combinations of old elements"); *Integrated Cash Management Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 ("a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage"). It is also significant that the Second Circuit has explained that the standard for novelty is used in a "weaker" sense in submission of idea cases than in patent law. *See Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.*, 118 F.3d 955, 968-969 (2d Cir. 1997). This confirms that a combination of non-novel elements may constitute "genuine novelty or invention" in certain cases.

53

as an example of how a combination of two well-known, unoriginal ideas cannot be combined to create a novel idea. Given the evidence at trial in this case, including the evidence discussed above from Fisher-Price's own witnesses, it was reasonable for the jury to conclude that the Reel Heroes concept exhibited "genuine novelty and invention," and not merely a "variation on a basic theme." (Jury Charge at 23).

The testimony of Fisher-Price's toy industry expert, Howard Bollinger, is sufficient, standing alone, to defeat Fisher-Price's challenge to the jury's verdict on novelty. Mr. Bollinger testified as to a number of his own toy ideas that resulted in commercialized products, including the "Bat Cave" playset, an item he licensed to Mattel. (Tr. at 2394-99). Mr. Bollinger testified that in his opinion each of the toy concepts was "unique" even though each item consisted merely of a combination of known elements (and in certain cases well-known elements). (Tr. at 2399-2400). The following exchange then occurred:

> Q: Okay. Just so we're clear, you're basically agreeing with us. You agree that you can take things that, to the average eye, appear not to be unique, and using your skill and expertise as a toy inventor, you synthesize those together in a new idea and it becomes a unique toy concept, right?
>
> A: Yes.

(Tr. at 2400-01). In addition, the evidence of the Option Agreement, prepared by Fisher-Price's own attorneys, is also significant. The agreement provides that "The unique aspect of the concept is the combination of existing action figures with film for play pattern." (JX 10, Exh. A). This confirms that Fisher-Price considered the Reel Heroes concept to be unique, even though in Fisher-Price's belief, it was a combination of known existing elements.

Thus, to the extent Fisher-Price claims to have elicited testimony demonstrating that the Reel Heroes concept was simply a combination of existing toy products, it was still reasonable for the jury to conclude that it was unique and exhibited "genuine novelty and invention" based on the

54

testimony of Mr. Bollinger, the language of the Option Agreement and testimony of the witnesses regarding the unique nature of the concept.

## CONCLUSION

For the reasons stated herein, DI requests that Fisher-Price's motion be denied in all respects, and for such other and further relief as the Court deems just and proper.

Dated: Norwalk, Connecticut
      March 24, 2006

Respectfully Submitted,

GRIMES & BATTERSBY, LLP

By: _____

Gregory J. Battersby (Bar No. 7386)
Edmund J. Ferdinand, III (Bar No. 21287)
Russell D. Dize (Bar No. 23064)
Susan M. Schlesinger (Bar No. 26625)
488 Main Avenue, Third Floor
Norwalk, Connecticut 06851-1008
(p) (203) 849-8300
(f) (203) 849-9300

SANDAK HENNESSEY & GRECO, LLP

Jay H. Sandak, Esq.
Peter M. Nolin, Esq.
707 Summer Street
Stamford, Connecticut 06901-1026
(p) (203) 425-4200
(f) (203) 325-8608

Attorneys for Plaintiff
Design Innovation, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2006 a copy of the foregoing Memorandum was served

on all counsel of record below by electronic means and by U.S. mail, first-class delivery, in an

envelope addressed to:

Jacqueline Bucar Esq.
Robert Allen, Esq.
Tyler Cooper & Alcorn, LLP
205 Church Street
New Haven, Connecticut 06510

Robert J. Lane, Jr., Esq.
Jodyann Galvin, Esq.
HODGSON RUSS LLP
One M&T Plaza, Suite 2000
Buffalo, New York 14203-2391

William Wallace, Esq.
Milbank, Tweed, Hadley & McCoy-DC
1825 Eye St., N.W. , Suite 900
Washington, DC 20006

Bradford S. Babbitt, Esq.
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103-3597

Edmund J. Ferdinand, III