Case 3:03-cv-00222-JBA    Document 289-3    Filed 04/10/2006    Page 1 of 12

Page 2
2001 U.S. Dist. LEXIS 24653, *; Copy. L. Rep. (CCH) P28,516

ready made to the Court. The parties' prior submissions are set forth in this Court's Decision (Docket no. 310) at page 1, n. 1.

[*3]

## DISCUSSION

### I. SUMMARY JUDGMENT STANDARD

*Rule 56 of the Federal Rules of Civil Procedure* provides that summary judgment is warranted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(c)*. A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. A fact is "material" if it "might affect the outcome of the suit under governing law." *Id.*

Under Rule 56, "the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994)*. A party moving for summary judgment can meet its burden by producing evidence showing the absence of a genuine issue of material fact or by pointing out to the court that there is an absence of evidence supporting one or more [*4] essential elements of the non-moving party's case. *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. A party opposing summary judgment "must set forth specific facts showing that there is a genuine issue for trial," *Fed.R.Civ.P. 56(e)*, and must come forward with significant probative evidence in support of its factual allegations. *Capital Imaging v. Mohawk Valley Medical Assoc., 996 F.2d 537, 542 (2d Cir. 1993), cert. denied, 510 U.S. 947, 114 S. Ct. 388, 126 L. Ed. 2d 337 (1993)*.

The court's function in deciding a summary judgment motion "is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial." *Anderson, 477 U.S. at 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202.* "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." *Bryant v. Maffucci, 923 F.2d 979, 982 (2nd Cir. 1991)*. The evidence and inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." *Adickes v. S.H. Kress and Co., 398 U.S. 144, 158-159, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)*. [*5] However, summary judgment will not be denied merely on the basis of a "metaphysical doubt" about the facts, *Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*, "or on the basis of conjecture or surmise." *Bryant, 923 F.2d at 982*.

Rule 56 also provides that the Court, upon denying summary judgment:

> shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy ... Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

*Fed.R.Civ.P. 56(d)*. Thus, the Court can identify issues on which there is no true controversy, to assure that the trial focuses on contested issues.

### II. "PROFITS" UNDER THE COPYRIGHT ACT

The Copyright Act provides that a copyright owner is entitled to recover "actual damages suffered by him ... as a result of [an] infringement, and any profits of the infringer that is attributable to the infringement. [*6] " *17 U.S.C. § 504(b)*. Plaintiffs have opted to seek profits attributable to infringement as the basis for damages.

> In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

*17 U.S.C. § 504(b)*. Three questions must be answered to determine profits, and the questions are as follows.

(1) How much gross revenue was generated from *Backdraft?*

(2) What expenses can Defendants deduct from their gross revenue?

(3) What part of the profit comes from factors other than Plaintiffs' infringed work?

### III. GROSS REVENUE FROM *BACKDRAFT*

Case 3:03-cv-00222-JBA    Document 289-3    Filed 04/10/2006    Page 2 of 12

Page 3

2001 U.S. Dist. LEXIS 24653, *; Copy. L. Rep. (CCH) P28,516

Defendants contend that calculation of gross revenue under § 504(b) should not include (A.) revenue from foreign exhibition of *Backdraft*, (B.) revenue from the "*Backdraft* attraction" at Universal Studio's theme park or (C.) projected future revenue.

### A. Revenue from Foreign Exhibition

Plaintiffs seek a share of all profits from *Backdraft*, including [*7] profits from exhibition of the film outside the United States. Defendants argue that Plaintiffs are not entitled to foreign profits since "copyright laws do not have extraterritorial operation," quoting *Stigwood Group Ltd. v. O'Reilly*, 530 F.2d 1096, 1101 (2nd Cir. 1976). *Stigwood* held that the holder of the copyright to "Jesus Christ Superstar" was not entitled to profits from a Canadian production of the musical. The Second Circuit reasoned that each live performance of the play was a separate infringement, which occurred entirely on foreign soil.

However, the Second Circuit has consistently applied a different analysis to recorded works such as motion pictures. In *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45 (2nd Cir. 1939), aff'd 309 U.S. 390, 60 S. Ct. 681, 84 L. Ed. 825 (1940), the defendants made negatives of an infringing motion picture in the United States in order to exhibit the film outside the country. Judge Learned Hand noted that the Copyright Act gives a copyright holder the exclusive right to make a "record" of his work so that it may be "reproduced." *Sheldon*, 106 F.2d at 52. Reasoning [*8] that negatives were records which made it possible to reproduce and exhibit the infringing film, the court held that Plaintiffs had an equitable interest in the negatives "which attached to any profits from their exploitation," either domestically or overseas. *Id.*

In the present case, Plaintiffs' claim for foreign profits is based on the allegation that those profits derived from master prints of *Backdraft* which were made in the United States, i.e. from a domestic infringement of their copyright. Plaintiffs are not seeking extraterritorial application of the Copyright Law, and they are not precluded from seeking foreign profits.

Defendants argue in the alternative that Plaintiffs' Amended Complaint did not include a claim for foreign profits. They note that the Amended Complaint alleges: "*Backdraft* was released and distributed for exhibition and performance throughout the United States." (Docket no. 7 P18.) However, Plaintiffs also allege that Defendants infringed their copyrights by reproducing *Backdraft (Id.* P20), an allegation that supports a claim for foreign profits under *Sheldon;* and the prayer for relief seeks profits and does not limit the request to domestic [*9] profits. (*Id.,* Prayer for Relief.)

The Federal Rules provide for "notice pleading." *Leatherman v. Tarrant Cy. Narcotics Unit.* 507 U.S. 163, 168, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993). A complaint must include "a short and plain statement of the claim showing that the [plaintiff] is entitled to relief," and must specify the relief that the plaintiff requests from the court. *Fed.R.Civ.P. 8(a)(2),* (3). Although it could have been pled more artfully, a straightforward reading of the Amended Complaint is that Defendants allegedly infringed Plaintiffs' copyright by reproducing *Backdraft* in the United States, that Defendants profited from their infringement, and that Plaintiffs seek a portion of the profits attributable to that infringement. Contrary to Defendants' reading, the Amended Complaint does not limit Plaintiffs' request to domestic profits.

Plaintiffs also note that Defendants have been on notice since early in the litigation that Plaintiffs were seeking foreign profits. Plaintiffs sought and obtained extensive documentation regarding profits from foreign exhibition of *Backdraft*. Defendants contested that discovery, as they opposed disclosure [*10] of all financial information related to *Backdraft*. It is much too late in the process for Defendants to contend that they were led to believe that Plaintiffs sought only domestic profits.

At trial, it will be Plaintiffs' burden to prove that Defendants committed an infringing act in the United States that enabled them to garner foreign profits. In the present motion, Defendants have the burden of showing that the undisputed facts entitle them to dismissal of the claim for foreign profits. Defendants have not met that burden. Indeed, they have not presented evidence contradicting Plaintiffs' allegation that prints of *Backdraft* made in the United States were exhibited overseas.

### B. "*Backdraft* Attraction"

Plaintiffs also seek a portion of the profit from Universal Studio's theme park attributable to the "*Backdraft* attraction." A prior Decision found that "the *Backdraft* attraction itself contains no infringing materials," *Burns v. Imagine Films,* 164 F.R.D. 589, 592 (W.D.N.Y. 1996), and Plaintiffs concede that point.

> The statutory term "infringer's gross revenue" should not be construed so broadly as to include revenue from lines [*11] of business that were unrelated to the act of infringement.

*On Davis v. The Gap, Inc.,* 246 F.3d 152, 160 (2nd Cir. 2001).

Case 3:03-cv-00222-JBA    Document 289-3    Filed 04/10/2006    Page 3 of 12

Page 4
2001 U.S. Dist. LEXIS 24653, *; Copy. L. Rep. (CCH) P28,516

There are rare instances in which a copyright holder can recover profits from a non-infringing enterprise based on its "enhanced good will or market recognition." However, recovery of such indirect profits must be "based on a factual basis, rather than undue speculation." *Business Trends Analysts v. Freedonia Group, Inc., 887 F.2d 399, 404 (2nd Cir. 1989)* (Internal quotation omitted.) To recover profits from a non-infringing enterprise, a copyright holder must prove a causal nexus between infringement of his work and the profits, and must accurately calculate the portion of the profits attributable to infringement. *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 886 F.2d 1545, 1553-54 (9th Cir. 1989), cert. denied, 494 U.S. 1017, 110 S. Ct. 1321, 108 L. Ed. 2d 496 (1990).*

The plaintiff in *Frank Music* held a copyright for music in the film *Kismet*. The MGM Grand Hotel staged a show entitled *Hallelujah Hollywood* which included music from *Kismet*. Frank Music sought a percentage [*12] of MGM's film profits on the theory that *Hallelujah Hollywood* created good will for the studio's films. The Ninth Circuit held:

> although [MGM films] may have reaped some marginal benefit from the infringement, for example from a slight increase in movie revenue as a result of the advertising value of MGM Grand ... the percentage of such profits attributable to the infringing material in ... *Hallelujah Hollywood* is too speculative and the relationship between such profits and the infringement too attenuated to justify the award of additional damages based on any profits received by [MGM films.]

*Frank Music, 886 F.2d at 1554.*

Plaintiffs have not offered any reasonably accurate method of calculating profits from the theme park that are attributable to infringements in the film. Plaintiffs concede that the appeal of the "*Backdraft* attraction" is largely due to recreation of the film's special effects and not to the screenplay. Also, "*Backdraft*" is only one of several attractions at the theme park. As Defendants point out, if there were no "*Backdraft* attraction," there likely would be an attraction based on another Universal film [*13] in its place. Plaintiffs would have to accurately calculate how many people (a) went to the park because of "*Backdraft*" and (b) would not have gone if it had a different attraction. They have presented no viable method of making this calculation. Thus, although the theme park may have reaped some "marginal benefit" from infringing elements in the film *Backdraft*, the percentage of such profits attributable to Plaintiffs "is too speculative and the relationship between such profits and infringement is too attenuated" to justify an award of indirect damages from theme park profits. *Frank Music, 886 F.2d at 1554.*

Defendants are entitled to summary judgment on Plaintiffs' copyright claims to the extent Plaintiffs seek profits from the "*Backdraft* attraction."

### C. Projected Future Profits

*Walker v. Forbes, Inc., 28 F.3d 409, 414 n. 5 (4th Cir. 1994)* observed in *dicta* that profits under § 504(b) could "in the abstract" include future revenue. However, the Fourth Circuit noted that it was not required to address the issue of future profits because the plaintiff "conceded the proof difficulty that such a calculation faces under the [*14] causation analysis of § 504(b)." *Id.* Certainly, the term "any profits" in § 504(b) can be read as encompassing future profits. However, Plaintiffs bear the burden of proving that such profits derive from infringement and of calculating future revenue with reasonable accuracy.

That the revenues have not yet been received is not, in itself, a bar to arriving at a reasonably accurate calculation. Indeed, when a copyright plaintiff seeks lost profits, calculations are often based on sales that have not occurred. Thus, *Mary Ellen Enterprises, Inc. v. Camex, Inc., 68 F.3d 1065, 1070 (8th Cir. 1995)* affirmed a verdict for lost profits, noting that plaintiffs presented credible expert testimony that defendants' infringement substantially diminished the future value of the book.

Plaintiffs have submitted calculations based on "Ultimates" which they describe as "lifetime projections" of revenue that Universal uses to amortize expenses related to *Backdraft*. (Zuydhoek "Ultimates Affidavit" P3.) They argue that the "Ultimates" provide a reasonably accurate calculation of future profits from *Backdraft*. *(Id. P21.)*

However, Plaintiffs are entitled only to profits [*15] attributable to infringement. Defendants argue that "future profits should not exist because defendants will not violate copyright law in the future." (Docket no. 363, at 2.) If the jury finds that particular portions of *Backdraft* infringed Plaintiffs' work, Defendants assert that they will edit out those segments. Therefore, future profits will derive from a non-infringing version of the film. *(Id.)*

At this point it is impossible to project if or how the film will be edited. Depending on the degree of infringement found by the jury, such a task could prove formidable, and it is conceivable that extensive editing would so disrupt the continuity of the story as to make

Case 3:03-cv-00222-JBA    Document 289-3    Filed 04/10/2006    Page 4 of 12

Page 5

2001 U.S. Dist. LEXIS 24653, *; Copy. L. Rep. (CCH) P28,516

*Backdraft* unmarketable. However, Defendants are correct in asserting that calculation of future profits under § 504(b) must be deemed speculative since it is premised on the assumption that Defendants will opt to distribute a version of *Backdraft* that includes segments that a jury has found to infringe Plaintiffs' copyright.

It is important to clarify the meaning of the term "future profits" in this context. Since Defendants' most current financial summaries do not include recent revenues and expenses [*16] from *Backdraft*, Plaintiffs are entitled to project profits up to the date of trial, provided their projection is reasonably accurate. However, they may not seek an apportionment of profits that Defendants have not yet earned.

If Defendants were to distribute an infringing version of *Backdraft* following the trial, Plaintiffs certainly could reapply to this Court for an award of the profits that Defendants made on that version. At that point the profits would be actual, and not "future" profits. Also, at that point the assertion that Defendants may intentionally distribute an infringing version of the film would no longer be speculative.

## IV. DEDUCTIBLE EXPENSES

Expenses relate to the production of *Backdraft* and to distribution of the film. Both production and distribution expenses can be further divided into expenses that are attributed directly to *Backdraft* and indirect expenses, sometimes termed "overhead," which are common expenditures that are not tied to a particular film.

The parties' submissions suggest that there is no significant dispute with regard to many of the direct expenses, particularly direct production expenses. n3 However, Plaintiffs vigorously [*17] dispute the deductibility of indirect expenses related to the distribution of *Backdraft*. Plaintiffs raise three arguments. (1) Generally accepted accounting principles do not provide for deduction of shared distribution expenses. (2) Some of the indirect expenses listed by defendants are "of a general corporate nature" and had nothing to do with distributing *Backdraft*. (3) Universal Studios is a part owner of the companies it pays to distribute its films outside the United States, and in effect is seeking a deduction for payments that it makes to itself. Plaintiff also contests the formula that Defendants use to calculate taxes attributable to *Backdraft*.

n3 In a prior Order this Court directed that counsel for Plaintiffs and Defendants identify expenses on which there is no dispute. The Order also provided that either side may apply for a supplemental ruling under *Fed.R.Civ.P. 56(d)* upon a showing that the opposing side unreasonably refused to stipulate regarding facts on which there is no good faith dispute. (Docket no. 358.)

[*18]

### A. Rules Governing Deductibility of Indirect Expenses

A film studio can deduct indirect expenses to the extent that it can show that they are attributable to the infringing film. *Sheldon, 106 F.2d at 54*. This rule is based on the common sense observation that certain shared expenses are a *sine qua non* for any work done by the studio.

> Supervising staff and organization ... had to be maintained if the business was to go on at all. Without them no picture could have been produced; they were as much a condition upon the production of the infringing picture as the scenery, or the plaintiffs' play itself.

*Id.* The Second Circuit employs a two step procedure to calculate overhead.

> The first step is to determine what overhead expense categories (such as rent, business, entertainment, personnel and public relations) are actually implicated by the production of the infringing product ... The second step is to arrive at a fair, accurate, and practical method of allocating the implicated overhead to the infringement.

*Hamil America, Inc. v. GFI, 193 F.3d 92, 105 (2nd Cir. 1999)*. Under this approach, "a court need [*19] not scrutinize for inclusion or exclusion particular items within [an] overhead category" as long as "a sufficient nexus is shown between [the category] and the production or sale of the infringing product." *Id.*

There are a variety of ways of apportioning shared expenses to particular films. The simplest way is simply to divide total overhead by the number of films made. Other formulas apportion overhead based on the relative costs of the various films or the relative revenues that the

Case 3:03-cv-00222-JBA    Document 289-3    Filed 04/10/2006    Page 5 of 12

Page 6
2001 U.S. Dist. LEXIS 24653, *; Copy. L. Rep. (CCH) P28,516

films generated. *Sheldon* acknowledged that none of these methods is "theoretically accurate" since

> to make a perfect allocation one would have to examine what part of the time of all the employees whose pay went into the 'overhead', was given to each picture; and so of the other expenses. That was obviously impossible.

*Sheldon*, at 52. Consequently, defendants must be given some leeway in calculating indirect expenses. As a later decision noted, Sheldon's "pragmatic" approach to apportionment is a proper alternative to "a detailed analysis of an infringer's ledger." *Hamil America, 193 F.3d at 105.*

*Sheldon* approved the trial court's use of a cost-based [*20] formula, reasoning that it was "more likely to conform to the facts" in that case than the method proposed by defendants, dividing total overhead by the number of films. *Sheldon, 106 F.2d at 51-52.* However, the Second Circuit has never required that a particular approach be applied, and in other contexts it has approved a revenue-based approach, *see In Design v. K-Mart Apparel Corp., 13 F.3d 559, 566 (2nd Cir. 1994);* or an "equal distribution" formula. *See Wilkie v. Santly Bros., 139 F.2d 264, 265 (2nd Cir. 1943), cert. denied, 322 U.S. 740, 64 S. Ct. 1058, 88 L. Ed. 1574 (1944).* "The reasonableness of the proffered overhead allocation formula is a question of fact in all cases," *Hamil America, 193 F.3d at 105,* and the relative fairness and accuracy of competing formulae will depend on the specific circumstances in a given case. *Id.*

### B. GAAP and Deductibility of General Distribution Expenses

In the present case, Plaintiffs do not contest the general principle that indirect expenses can be deducted. They also do not contest the propriety of the cost-based formula that defendants employ to calculate indirect production expenses. [*21] However, Plaintiffs argue that deduction of indirect distribution costs is contrary to Financial Accounting Standards Bulletin 53 ("FASB-53"), which defines generally accepted accounting principles ("GAAP") applicable to the motion picture industry.

Defendants note that the Second Circuit has consistently held that indirect expenses are deductible under *17 U.S.C. § 504*(b), and argue that the critical question is whether expenses attributable to *Backdraft* can be calculated with reasonable accuracy, not whether the method of calculation accords with GAAP. They reason that GAAP standards are relevant only as an aid in determining whether a particular methodology is likely to yield accurate results. n4

   n4 Defendants also argue that Plaintiffs misinterpret FASB-53 in that the cited provision relates to amortization of investments and not to deductibility. Since this Court holds that FASB-53 is not determinative of Defendants' right to deduct indirect expenses, it offers no opinion as to the validity of Plaintiffs' and Defendants' competing interpretations of the bulletin. FASB-53 was recently superceded; however, both sides agree that it was the relevant protocol at the time the disputed *Backdraft* proceeds were calculated.

[*22]

The court should not "apply[] a blanket prohibition of all overhead deductions" where it is clear that some deduction is appropriate. *Hamil America, 193 F.3d at 107.* Plaintiffs are entitled to contest the propriety of Defendants' method of calculating indirect distribution expenses and they certainly can cite FASB-53 or any other authority setting forth GAAP in support of their argument. However, it would be manifestly unfair to deny Defendants any deduction for expenses that they indisputably incurred. The Copyright Law must "trump" GAAP if their respective provisions are inconsistent. *See Shalala v. Guernsey Memorial Hosp., 514 U.S. 87, 94-96, 115 S. Ct. 1232, 131 L. Ed. 2d 106 (1995)* (Secretary of Health and Human Services is not required follow GAAP in calculating Medicare reimbursement.)

### C. Exclusion of Expenses Unrelated to *Backdraft*

Plaintiffs also argue that some expenses listed by Defendants are of a "general corporate nature" and had nothing to do with distributing *Backdraft*. Universal terms its distribution overhead "selling, general and administrative" expenses, or "SG&A". In her affidavit, Susan Ball, financial officer [*23] for Universal, states that she calculated SG&A for each of the studio's business units. (Ball Aff. P17.) The business units correspond to formats in which the studio's films are marketed - "theatrical," "home video," "pay tv," "free television" - plus a unit for "consumer products." *(Id.)*

Plaintiffs' expert, Philip J. Hacker, CPA, contends that Ball's inclusion of SG&A for each of the units means that the studio "include[s] indirect expenses of a general corporate nature not directly related to the distribution function." (Hacker aff. P12.)

As discussed above, the court must determine which overhead categories involved the infringing product. The court "need not scrutinize ... particular items" in a cate-

Case 3:03-cv-00222-JBA    Document 289-3    Filed 04/10/2006    Page 6 of 12

Page 7
2001 U.S. Dist. LEXIS 24653, *; Copy. L. Rep. (CCH) P28,516

gory as long as there is a nexus between the category and "production or sale of the infringing product." *Hamil America, 193 F.3d at 105.*

Exhibits to Ball's affidavit indicate that *Backdraft* was distributed in a format corresponding to each of Universal's business units (movie theatres, videotape, pay television and free television.) This suggests that there is a nexus between those units and *Backdraft*. That Universal can prove a nexus between its distribution [*24] units and *Backdraft* is not in itself dispositive. It is certainly possible that some general categories of SG&A within these units are unrelated to the distribution of *Backdraft*. However, Plaintiffs do not identify any unrelated category.

Based on the submissions before this Court, there is no basis for excluding any general category from Defendants' calculation of indirect distribution expenses.

### D. Payments to Subsidiaries

Universal contracts with two corporations, United International Pictures (UIP) and CIC n5 for much of the foreign distribution of its films and video products. Plaintiffs allege that Universal had a part ownership interest in UIP and CIC, and that a portion of the fees paid to UIP and CIC came back to the studio as "equity income." Plaintiffs contend that Universal should not be permitted to deduct, as an expense, money that ultimately returns as income to the studio. (Hacker aff P17.)

---

n5 Neither side has indicated whether "CIC" is an acronym or, if so, what it stands for.

---

[*25]

Defendants contend that Plaintiffs have offered "no proof that there were equity distributions" from UIP or CIC. (Docket no. 350, at 4.) They argue that Plaintiffs have the burden of proving that Universal derived revenue from fees paid to UIP and CIC, since § 504(b) puts the burden of Plaintiff to prove Defendants' gross revenue.

Plaintiffs assert that calculation of the financial benefit that Universal derived from fees that it paid to UIP and CIC is part the process of determining Defendants' deductible expenses under § 504(b), and therefore Defendants bear the burden of proof. Plaintiffs reason that Defendants have not met that burden since they have not demonstrated that the amounts paid to UIP and CIC accurately reflect the true cost to Universal for distribution of *Backdraft*.

Regardless of which party bears the burden of proof on this issue, it is clear that deductible expenses under § 504(b) should not include money that ultimately returns to Defendants' coffers. Defendants are entitled to deduct fees paid to the two distribution companies to the extent that they can prove that such fees are true costs attributable to *Backdraft*. However, money paid to UIP and [*26] CIC that recycled to Universal by virtue of its part ownership in those companies is not a deductible "expense" under § 504(b). This Court need not and does not determine, at this point, which side has the burden of proof on this question.

### E. Taxes

Income tax is not deductible where infringement was deliberate. *L.P. Larson, Jr., Co. v. Wm. Wrigley, Jr., Co., 277 U.S. 97, 100, 48 S. Ct. 449, 72 L. Ed. 800, 1928 Dec. Comm'r Pat. 273 (1928)*. However, a non-wilful infringer may deduct income tax expenses in determining its net profit. *In Design, 13 F.3d at 566.*

In exhibits setting forth their expenses, Defendants calculate their taxes at a "stand alone rate" rate of 41% of their net profits. (Ball ex. A, at [1].) At oral argument, Defendants' counsel explained that Universal is a subsidiary of Matsushita, which is the corporate entity that paid taxes on the earnings from Universal's films. Universal's earnings were not taxed separately, and the studio did not earmark a specific amount of taxes that it paid on earnings from *Backdraft*. Therefore, the studio estimated taxes for *Backdraft* based on Federal and state corporate tax rates.

Plaintiffs contend that [*27] the 41% rate is not a true reflection of the taxes that were actually paid on profits from *Backdraft*. Plaintiffs note that other films made by Imagine and Universal lost money and reason that profits from *Backdraft* were likely taxed at a lower rate for at least some of the relevant tax years. Plaintiffs also argue that use of a "stand alone" rate in this context is inherently inaccurate and is not a reasonable method of calculating taxes attributable to profit from *Backdraft*.

In approving deductibility of tax expenses for non-wilful infringers, the Second Circuit reasoned that

> a ... profit of a dollar is not a profit actually made when from the dollar the government takes twenty cents as the price for the right to make any profit at all. Hypothetical discussions of possible indirect tax ramifications do not change this basic fact.

*In Design, 13 F.3d at 567* (Internal citation omitted.) The Second Circuit rejected a "hypothetical" approach to

Case 3:03-cv-00222-JBA    Document 289-3    Filed 04/10/2006    Page 7 of 12

Page 8
2001 U.S. Dist. LEXIS 24653, *; Copy. L. Rep. (CCH) P28,516

calculating profits that would have ignored the taxes that the defendants actually paid. *Id.* By the same token, a defendant cannot deduct taxes calculated at a hypothetical rate that may, or may [*28] not accurately reflect the portion of taxes actually attributable to the infringing item.

A defendant can only deduct taxes that it "actually paid." *Three Boys Music Corp. v. Bolton, 212 F.3d 477, 488 (9th Cir. 2000), cert. denied, 531 U.S. 1126, 121 S. Ct. 881, 148 L. Ed. 2d 790 (2001).* In *Three Boys*, two defendants deducted income taxes that they paid on the infringing song. A third defendant, Sony Music deducted a "net operating loss" (NOL) based on a calculation of its tax liability under the applicable corporate tax rate. The district court disallowed Sony's deduction because the NOL did not have a "concrete financial impact." The Ninth Circuit affirmed, reasoning:

> Sony Music ... never actually paid income taxes on its infringing profits. Rather, Sony Music claimed it offset nearly $ 1.7 million in taxes on the infringing profits against its parent company's NOL. No court has ever found that NOL is a deductible expense under § 504(b). Furthermore, we find that the district court's distinction[] between taxes actually paid and taxes not actually paid was a fair one.

*Three Boys Music, 212 F.3d at 488.* [*29]

As discussed above, Defendants are not precluded from attributing a portion of their shared expenses to *Backdraft*, so long as they can arrive at a reasonable method of apportioning those expenses. Defendants have the burden of proving that their calculation is reasonably accurate. *Hamil America, 193 F.3d at 105.* Defendants have not shown that attributing taxes at a "stand alone" rate of 41% of net profits results in an accurate calculation of the taxes actually paid on profits from *Backdraft*.

Defendants note that the studio did pay some taxes that were directly attributable to *Backdraft. (See* Ball ex A, at 2-3, Gordon aff. P3). Defendants clearly are entitled to deduct for those tax expenses.

## V. PROFITS ATTRIBUTABLE TO NON-INFRINGING ELEMENTS IN *BACKDRAFT*

In determining profits under *17 U.S.C. § 504*(b), the fact-finder must deduct expenses from gross revenue to calculate net profit, and must decide what proportion of the profit is attributable to non-infringing elements. In the present case, the latter issue breaks down into two questions. (1) What portion of the profit is attributed to contributions other than the [*30] screenplay? (2) What portion of the screenplay is not attributable to Plaintiffs? Before addressing those question, this Court must address Plaintiffs' argument that Defendants are not entitled to any apportionment of profits.

### A. Defendants' Right to Prove that Profits Derived from Non-infringing Elements

Plaintiffs note that "independent creation" is an affirmative defense. *Repp v. Webber, 132 F.3d 882, 889 (2nd Cir. 1997); Proctor & Gamble Co. v. Colgate Palmolive Co., 199 F.3d 74, 77 (2nd Cir. 1999).* They argue that Defendants are precluded from raising any affirmative defense since this Court struck the Answer.

*Repp* and *Proctor & Gamble* dealt with the question of whether the defendant infringed plaintiff's copyright, not with apportionment of profits. In its prior Decision, this Court held:

> proof of deductible expenses, and proof that profits are attributed to factors other than the copyrighted work are inherent components in calculating the portion of profits, if any, that should be attributed to an infringed work. They are not affirmative defenses. Therefore, Defendants are not precluded from offering proof on these [*31] issues.

*Burns, 198 F.R.D. at 604.*

The distinction between the affirmative defense of independent creation and apportionment of profits from non-infringing factors was highlighted in *Abend v. MCA, Inc., 863 F.2d 1465 (9th Cir. 1988), affd. sub nom. Stewart v. Abend, 495 U.S. 207, 110 S. Ct. 1750, 109 L. Ed. 2d 184 (1990).* Abend involved the film *Rear Window*, which was based on a short story by Cornell Woolrich. Defendants raised affirmative defenses to the infringement claim, and in the alternative sought apportionment of profits. The Ninth Circuit noted that "factors other than Woolrich's story clearly contributed to '*Rear Window's*' success," and remanded the case with the following instructions:

> should the district court find that the defendants have failed to establish any affirmative defense to the infringement, the district court should award [plaintiff] ac-

Page 9

2001 U.S. Dist. LEXIS 24653, *; Copy. L. Rep. (CCH) P28,516

tual damages and apportion profits between [plaintiff] and the defendants.

*Abend, 863 F.2d at 1480.* In other words, apportionment is not an affirmative defense. If the court rejects independent creation as an affirmative [*32] defense it still must apportion profits based on defendants' non-infringing contributions.

Accepting Plaintiff's interpretation would virtually guarantee an award of "windfall" damages in this case. Plaintiffs concede that their contribution to *Backdraft* was limited to the screenplay and acknowledge that some story elements in *Backdraft* are not in either of Plaintiffs' screenplays. It would be inequitable and illogical to award damages without any consideration of the non-infringing elements of the film. As the Seventh Circuit observed,

> if General Motors were to steal your copyright and put it in a sales brochure, you could not just put a copy of General Motors' corporate income tax return in the record and rest your case for an award of infringer's profits.

*Taylor v. Meirick, 712 F.2d 1112, 1122 (7th Cir. 1983).* Nor can Plaintiffs claim that they are entitled to all net profits from *Backdraft* with no consideration of Defendants' contribution to the film's profitability.

Defendants are entitled to show that profits from *Backdraft* derived from non-infringing elements in the film, as part of the calculation of profits under § 504(b). [*33]

### B. Contributions Other Than the Screenplay

The screenplay is only one component of a motion picture. The director, cast, set and costume design, cinematography, special effects and other factors also contribute to a film's financial success and must be considered in apportioning profits. *Sheldon, 106 F.2d at 50-51.* Defendants state that two witnesses, David Brown and Kathy Jones, will offer expert opinions on the percentage of profits attributable to the *Backdraft* screenplay and to other factors such as the cast and special effects. (Docket no. 350, at 15.) *Sheldon* approved the use of such expert testimony despite the court's reservations regarding its reliability.

> We are aware that ... it would be absurd to treat the estimates of the experts as being more than expressions of very decided opinions that the play should count for very little. But we are resolved to avoid the one certainly unjust course of giving the plaintiffs everything, because the defendants cannot with certainty compute their own share.

*Sheldon, 106 F.2d at 51.* If expert's estimates were nothing more that "expressions of very decided opinions" [*34] they would arguably be inadmissible under *Fed.R.Evidence 702*, which provides that an expert's opinion must be based upon sufficient facts or data and must be the product of reliable principles and methods. *See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589-95, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-58, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).* However, with that *proviso*, it is clear that Defendants may offer expert testimony to quantify the portion of profits of *Backdraft* attributable to factors other than the screenplay.

It is undisputed that elements other than the screenplay contributed to the commercial success of *Backdraft*. It is also clear that quantifying those contributions is an issue that the parties vigorously dispute. Indeed Defendants' own experts offer differing estimates of the percentage of profits attributable to the various factors. This Court cannot determine, as an undisputed fact, the proportion of the profits from *Backdraft* that are attributable to elements other than the screenplay, and that issue is properly one for the jury to decide.

### [*35] C. Non-Infringing Portions of the Screenplay

Defendants argue that much of the *Backdraft* screenplay does not infringe Plaintiffs' copyrighted work. This argument breaks down into three sub-arguments. (1) Some key components of the plot do not correspond to anything in either of the Burns-Zoll screenplays. (2) A good deal of the *Backdraft* story was created before Defendants had access to Plaintiffs' screenplays. (3) Many of the elements common to *Backdraft* and the Burns-Zoll works are not protectable by copyright.

#### 1. Elements Not in the Burns-Zoll Screenplays

Some elements of the *Backdraft* plot are not in either of Plaintiffs' screenplays, for example the arson investigation that discloses that the arsonist is a fireman. Clearly, if a story element was not in Plaintiffs' copyrighted works, it is non-infringing. *Love v. Kwitny, 772 F. Supp. 1367, 1370 (S.D.N.Y. 1991), affd. 963 F.2d*

Case 3:03-cv-00222-JBA    Document 289-3    Filed 04/10/2006    Page 9 of 12

Page 10
2001 U.S. Dist. LEXIS 24653, *; Copy. L. Rep. (CCH) P28,516

*1521, cert. denied 506 U.S. 862, 113 S. Ct. 181, 121 L. Ed. 2d 127 (1992).*

### 2. Elements That Pre-Date Defendants' Access to Plaintiffs' Work

The screenplay for *Backdraft* went through numerous revisions. Defendants [*36] argue that some of the drafts pre-dated any possible access to Plaintiffs' copyrighted works, and that the story elements and dialogue in those early drafts must have been independently created since the authors could not have drawn from Plaintiffs' works.

Plaintiffs contend that the Defendants have no credible proof of the dates the screenplays were completed. Defendants state that they can prove completion dates through testimony of the authors and documentary evidence, notably registration receipts from the Writers' Guild of America. The record before this Court does not permit it to find, as uncontested facts, the dates of completion of the various drafts. Courts have treated registration of an item with the Writers' Guild as *prima facie* evidence of the date it was completed, *See, Whitfield v. Lear, 751 F.2d 90, 91 (2nd Cir. 1984)*. However, the Court cannot determine that specific drafts of *Backdraft* correspond to items deposited with the Writers' Guild.

It is quite possible that Defendants will establish, at trial, the dates that drafts of *Backdraft* were completed. Therefore, this Court offers the following analysis of the issue. Plaintiffs allege [*37] that they sent their screenplays *Down to Gehenna* and *Baptism of Fire* to Anthony Yerkovich on or about June 30, 1988, and May 30, 1989. (Amended Complaint P13.) They allege that Yerkovich forwarded one or both of their screenplays to Mike Marcus of Creative Artists' Agency during the summer of 1989; and that Imagine contacted Marcus in May, 1990, to ask whether Yerkovich would work on the *Backdraft* screenplay. (*Id.* P15-17.)

The parties dispute the significance of these dates. Defendants argue that, under the theory of access pled in the Amended Complaint, May, 1990, was the earliest access date. Plaintiffs state that they never linked access specifically to the studio's May, 1990, contact with Marcus. They note that Marcus had one and maybe both Burns-Zoll works by Summer, 1989, that Ron Howard had already evinced an interest in *Backdraft* and hired a screenwriter to work on the screenplay, and that a number of Creative Artists's clients were involved in the creative process.

Since Plaintiffs do not claim that Defendants obtained their work directly from Yerkovich, Defendants could not have accessed the screenplays until Yerkovich sent them to Marcus. It is possible [*38] that a later access date will be determined at trial. However, it is undisputed that any screenplays completed before Summer, 1989 predated Defendants' access.

Defendants identify the following versions of the *Backdraft* screenplay.

(1) Widen draft 1983
(2) Widen draft September 29, 1987
(3) Widen draft December 26, 1987
(4) Widen draft August 22, 1988
(5) Widen draft October 11, 1988
(6) Bortman draft February 18, 1989
(7) Gould draft August 1989
(8) DeSouza outline November 18, 1989
(9) DeSouza draft February 17, 1990
(10) Widen 50-page rewrite February 21, 1990

(Docket no. 331, at 2-3.) If Defendants can establish the above dates at trial, the first six screenplays (five drafts by Widen and one by Bortman) would pre-date Defendants' access to Plaintiffs' work.

Defendants also seek a determination that certain elements in the early drafts of *Backdraft* are undisputably non-infringing. Plaintiffs respond that the Court cannot usurp the role of the fact-finder. If a story element appears in both Plaintiffs' work and in the early *Backdraft* screenplays, Plaintiffs contend that the jury must decide which source the film drew on. One might presume that episodes [*39] in the early Widen screenplays were the source for identical episodes in the film. However, that presumption is not an adequate basis for a finding by this Court that every element in the film that corresponds to a scene in the early *Backdraft* screenplays necessarily derived from that source. It is conceivable that the film drew on Plaintiffs' work for some of those scenes and Plaintiff should be permitted to argue that point to the jury.

Defendants are entitled to prove at trial that drafts of the *Backdraft* screenplay predated their access to Plaintiffs' work, and to argue that story elements in those early drafts are non-infringing. However, a scene-by-scene analysis of the competing screenplays is beyond the scope of the present Motion.

### 3. Elements of a Work That Are Not Protected by Copyright

"The *sine qua non* of copyright is originality." *Feist Publications, Inc. v. Rural Telephone Co, Inc., 499 U.S. 340, 345, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991)*, citing *Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 547-49, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985)*. An author cannot obtain a copyright on facts. [*40] *Feist, 499 U.S. at 344-45, 111 S. Ct. 1282, 113 L. Ed. 2d 358*, or copyright a generalized theme for a

Case 3:03-cv-00222-JBA    Document 289-3    Filed 04/10/2006    Page 10 of 12

Page 11
2001 U.S. Dist. LEXIS 24653, *; Copy. L. Rep. (CCH) P28,516

story. *Warner Bros., Inc. v. American Broadcasting Cos., Inc.* 654 F.2d 204, 211 (2nd Cir. 1981). Certain forms of expression are considered so lacking in originality as to be outside the scope of copyright protection, for example, *scenes a faire,* i.e., "scenes that necessarily result from the choice of a setting or situation," *Walker v. Time Life Films,* 784 F.2d 44, 50 (2nd Cir.) *cert. denied* 476 U.S. 1159, 106 S. Ct. 2278, 90 L. Ed. 2d 721 (1986).

In support of their Summary Judgment Motion, Defendants have submitted a detailed analysis by their expert, Carl Gottlieb, of scenes in *Backdraft* that Plaintiffs contend were drawn from their work. (Gottlieb aff. and ex. C.) Gottlieb opines that many of the alleged similarities are not protectible since they are *scenes a faire,* are based on actual historic events or describe facts such as the way firemen do their work. (See Gottlieb ex. C, at 1-3, 5-19, 21, 24.)

Plaintiffs do not contest the underlying notion that facts, *scenes a faire* and generalized themes are not protected by copyright. [*41] However, they argue that Defendants' expert misuses the concept of originality by breaking down Plaintiffs' works into component parts and then deeming virtually every component unoriginal.

In the context of copyright, originality "means only that [a] work ... possesses at least some minimal degree of creativity." *Feist,* 499 U.S. at 345, 111 S. Ct. 1282, 113 L. Ed. 2d 358. The "requisite level of creativity is extremely low; even a slight amount will suffice." *Id.* Thus, although historic events, news stories, and *scenes a faire* are not themselves subject to copyright protection, original use of those elements is protected.

Virtually any creative work includes some unoriginal elements, and it would be unfair to require that profits be linked to portions of the work that are deemed truly "original." For example, an infringer that pirated *The Godfather* and marketed the film *in toto* certainly could not argue that it was entitled to keep some profits because the motion picture included elements that were fact-based (New York crime families) or *scenes a faire* (gangland "hits"). It is by no means a simple task to identify original and unoriginal elements of a creative work. The [*42] Second Circuit offered the following interpretation of the issue.

> Though a cliche ... by itself will frequently fail to demonstrate even the minimum level of creativity necessary for copyright protection, such protection is available for the association, presentation, and combination of the ideas and thought which go to make up the author's ... composition ... What is protected is the manner of expression, the author's analysis or interpretation of events, the way he structures his material and marshals facts, his choice of words and the emphasis he gives to particular developments. The "ordinary" phrase may enjoy no protection as such, but its use in a sequence of expressive words does not cause the entire passage to lose protection.

*Salinger v. Random House, Inc.,* 811 F.2d 90, 98 (2nd Cir.), *cert. denied* 484 U.S. 890, 108 S. Ct. 213, 98 L. Ed. 2d 177 (1987). (Internal citations omitted.)

It is not necessary in the present Decision to delineate the precise ground rules that apply to deciding this issue at trial. It suffices that Defendants have failed to show that uncontradicted evidence supports a finding that any specific percentage [*43] of profits from *Backdraft* are based on unoriginal elements in Plaintiffs' work. Indeed, a purely quantitative approach, such as counting lines in the screenplay or running time of the film, is not necessarily the most accurate or fair way to assess the portion of profits from *Backdraft* attributable to non-infringing factors in the screenplay.

By the same token, Plaintiffs are not automatically entitled to all profits attributable to the screenplay. At oral argument, Plaintiffs' counsel contended that there should be no apportionment based on non-infringing elements of the screenplay because the Default Judgment established that "the motion picture infringed" and that *Backdraft* must be treated as an indivisible unit. (Docket no. 363, at 4.) That argument is contrary to the unequivocal language of § 504(b), and to the Supreme Court's dictate that "apportionment may be had as the evidence justifies it." *Sheldon,* 309 U.S. at 406, 60 S. Ct. 681. Assuming that Defendants offer proof that portions of the screenplay are non-infringing, the issue is properly one for the jury to decide.

## IV. WILFUL INFRINGEMENT

A Plaintiff can prove wilful infringement [*44] by showing that defendant knew or recklessly disregarded the possibility that its action was an infringement. *Fitzgerald Publishing Co. v. Baylor Publishing Co.,* 807 F.2d 1110, 1115 (2nd Cir. 1986); *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.,* 996 F.2d 1366, 1382 (2d Cir.1993). n6

---

n6 Defendants in this action are corporations. To prove wilfulness, Plaintiffs must show that an employee or agent of the Defendant knew of or disregarded the infringement. Submissions in the

Case 3:03-cv-00222-JBA   Document 289-3   Filed 04/10/2006   Page 11 of 12

Page 12
2001 U.S. Dist. LEXIS 24653, *; Copy. L. Rep. (CCH) P28,516

present Motion do not address the standard for determining which employees' or agents' actions will be deemed the actions of the corporation, and this Decision does not decide that issue.

A default judgment does not *per se* establish wilful infringement. *Deshmukh v. Cook*, 630 F. Supp. 956, 959-60 (S.D.N.Y. 1986) citing *Flaks v. Koegel*, 504 F.2d 702, 707 (2nd Cir. 1974). Thus, *Bambu Sales, Inc. v. Ozak Trading, Inc.*, 58 F.3d 849, 854 (2nd Cir. 1995) held [*45] that entry of a default judgment as a discovery sanction established the defendant's liability, but that trial court's finding of wilful infringement was reviewable under a "clear error" standard. *Id.*

Defendants contend that there is no credible evidence to support a finding that they wilfully infringed Plaintiffs' copyright. Plaintiffs argue that wilfulness can be inferred from the fact that the copies of *Down to Gehenna* and *Baptism of Fire* that they sent to Yerkovich bore a copyright notice. n7 However, Defendants deny that anyone from the studios ever saw either of the screenplays. Defendants certainly could have infringed Plaintiffs' work without actually reading Plaintiffs' screenplays. Given the number of people involved in developing *Backdraft*, ideas from Plaintiffs' work may have worked their way into the story in any number of ways, and it is possible that decision-makers at the studio employed ideas from Plaintiffs' screenplays without any awareness of their source.

---

n7 Plaintiffs also argue that Defendants' experts concede wilfulness in their reports. That argument misconstrues the submissions. There is a qualitative difference between the statement: "if A is true, then ..." and the statement: "A is true." Defendants have not conceded wilfulness.

---

[*46]

On the other hand, although Plaintiffs do not have unequivocal evidence that anyone from Imagine, Universal or MCA read their screenplays, Defendants' denials are not dispositive of the issue. As the Second Circuit noted in a recent case, although the defendant "testified that it was unaware of [the plaintiff's] copyrights ... the jury was free to discredit that testimony or to find that [defendant's] ignorance was due to recklessness." *Yurman Design Inc. v. PAJ, Inc.*, 262 F.3d 101, 113 (2nd Cir. 2001). The *Yurman* decision emphasized that the court must give "'particular deference to [juries'] determinations regarding witness credibility' when reviewing a wilfulness determination." *Id.* (quoting *Hamil America*, 193 F.3d at 97.)

Plaintiffs are entitled to put on proof on the issue of wilful infringement. Defendants may, of course, move for a directed verdict at the close of Plaintiffs' case if they feel that Plaintiffs have not introduced sufficient evidence to support an inference that infringement was wilful. However, Defendants have not met their burden in the present motion of showing that wilfulness is an uncontested issue.

[*47] **CONCLUSION**

For the reasons set forth above, Defendants' Motion for Summary Judgement is GRANTED in that Plaintiffs' claims are dismissed to the extent that they seek estimated future profits and profits from the "*Backdraft* Attraction" at Universal Studios theme park.

Defendants' Motion for Summary Judgment with regard to the remainder of Plaintiffs' claims is DENIED.

The present Decision rules on a number of contested issues of law, and it also identifies material facts that are in dispute and that are undisputed. To assist counsel in preparing for trial, the Court gleans the following "ground rules" from its Decision.

**1.** Plaintiffs may seek foreign profits from *Backdraft* to the extent that such profits derived from an infringement of their copyright occurring in the United States.

**2.** Although they cannot seek projected future profits from *Backdraft*, Plaintiffs may seek actual profits attributable to infringement up to the date of trial.

**3.** Defendants can deduct production and distribution expenses directly attributable to *Backdraft* from their gross revenue. Defendants can also deduct indirect expenses to the extent that they [*48] can prove that such expenses are attributable to *Backdraft*.

**4.** Defendants may employ a "cost based" methodology in calculating indirect production expenses attributable to *Backdraft*.

**5.** Defendants are entitled to deduct indirect distribution expenses attributable to *Backdraft*. The parties may introduce proof including expert opinion testimony on the method of calculating indirect distribution expenses attributable to *Backdraft*. Whether a particular method is reasonably accurate is a jury question.

**6.** Fees paid to United International Pictures (UIP) and CIC for distributing *Backdraft* are deductible expenses. However, that deduction must exclude any financial benefit that Defendants obtained by virtue of their partial ownership in UIP and CIC.

Case 3:03-cv-00222-JBA    Document 289-3    Filed 04/10/2006    Page 12 of 12

Page 13
2001 U.S. Dist. LEXIS 24653, *; Copy. L. Rep. (CCH) P28,516

7. Defendants may deduct taxes that they actually paid which are attributable to *Backdraft* except that a Defendant found to have wilfully infringed Plaintiffs' copyright may not deduct taxes.

8. Defendants are entitled to prove that profits from *Backdraft* are attributable to non-infringing elements in the film.

9. In particular, Defendants are entitled [*49] to prove that profits are attributable to elements other than the screenplay, for example the cast and special effects. The percentage of profits attributable to such elements is a disputed material fact.

10. Defendants also are entitled to prove that profits derived from non-infringing portions of the *Backdraft* screenplay.

11. A scene or plot component that does not appear in either of Plaintiffs' copyrighted works is non-infringing.

12. Defendants also can argue to the jury that certain elements of *Backdraft* story were non-infringing in that they derive from drafts of the *Backdraft* screenplay that were written before Defendants had any access to Plaintiffs' works.

13. Plaintiffs cannot claim copyright protection for facts, *scenes a faire* or other unoriginal components of their work. However, Plaintiffs' original use of such unoriginal components is protected by Copyright.

14. Whether any of the Defendants intentionally infringed Plaintiffs' copyright is a disputed material fact, provided that Plaintiffs introduce some credible evidence tending to support their allegation that infringement was wilful.

**ORDER** [*50]

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgement is GRANTED in that Plaintiffs' claims are dismissed to the extent that they seek future profits and profits from the "*Backdraft* Attraction" at Universal Studio's theme park.

FURTHER, Defendants' Motion for Summary Judgment with regard to the remainder of Plaintiffs' claims is DENIED.

FURTHER, the parties are to appear for a status conference with this Court on Monday, August 27, 2001, at 9:00 a.m.

Dated: August 23, 2001

Buffalo, New York

WILLIAM M. SKRETNY

United States District Judge