UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

VICTOR G. REILING ASSOCIATES and          :
DESIGN INNOVATION, INC.,                   :
                                           :
                      Plaintiffs           :
                                           :          Civil No. 303CV222(JBA)
        v.                                 :
                                           :          April 17, 2006
FISHER-PRICE, INC.                         :
                                           :
                      Defendant.           :
                                           :


**REPLY MEMORANDUM IN SUPPORT OF FISHER-PRICE'S
MOTION FOR JUDGMENT AS A MATTER OF LAW**


**TYLER COOPER & ALCORN, LLP**
Jacqueline D. Bucar
205 Church Street
P.O. Box 1936
New Haven, CT  06509-0906


**HODGSON RUSS LLP**
Robert J. Lane, Jr.
Jodyann Galvin
One M&T Plaza, Suite 2000
Buffalo, NY  14203-2398

**MILBANK, TWEED, HADLEY &
MCCLOY LLP**
William E. Wallace III
Jay I. Alexander
International Square Building
1850 K Street, N.W., Suite 1100
Washington, D.C.  20006

## TABLE OF CONTENTS

Page

Preliminary Statement ........................................................................................................ 1

Argument ............................................................................................................................ 4

    I.     NO REASONABLE JURY COULD HAVE FOUND THAT
          DI DISCLOSED THE REEL HEROES CONCEPT IN THE
          CONTEXT OF A CONFIDENTIAL RELATIONSHIP ........................................ 4

         A.    DI Did Not Disclose the Reel Heroes
               Concept on a Confidential Basis .................................................................. 4

         B.    The Reel Heroes Concept Was Not Disclosed "In
               the Context of" *Any* Relationship With Fisher-Price ................................... 6

         C.    DI Proffered No Evidence That Fisher-Price Ever
               Accepted Any Confidential Relationship With DI ...................................... 6

              1.    Fisher-Price affirmatively disclaimed any
                     confidential relationship ................................................................ 7

              2.    DI's evidence is insufficient as a matter
                     of law to support the jury's verdict. ............................................... 9

              3.    DI's other arguments lack merit. .................................................. 15

    II.    DI CITES NEITHER LEGAL AUTHORITY NOR SUFFICIENT
          EVIDENCE TO SUPPORT THE JURY'S DAMAGES AWARD
          FOR THE LINE EXTENSION PRODUCTS ...................................................... 17

         A.    DI Cites No Authority Supporting an Award
               of Damages Based on Products That Do Not
               Embody the Allegedly Misappropriated Idea ........................................... 17

         B.    DI's Evidence is Insufficient as a Matter of Law
               to Recover Under Its Proposed Patent Law Analogy ................................. 18

          C.    DI's Evidence is Insufficient to Show That Fisher-Price
               Would Have Paid Royalties on Line Extensions Had
               the Parties Negotiated a License Agreement ............................................. 21

    III.   DI'S EVIDENCE WAS LEGALLY INSUFFICIENT TO
          SHOW USE OF A NOVEL AND CONCRETE CONCEPT ............................... 22

Conclusion ........................................................................................................................ 25

### Preliminary Statement

In opposing Fisher-Price's motion for judgment as a matter of law, Design Innovation ("DI") begrudgingly admits that it is obliged to prove the following facts: (1) that it submitted to Fisher-Price a legally protectible concept to Fisher-Price; (2) that it submitted the concept to Fisher-Price in the context of a confidential relationship; and (3) that Fisher-Price accepted the confidential relationship asserted by DI. Confronted with the unenviable task of garnering record evidence for each of those facts from a factual record that is to the contrary, DI instead relies on an unabashed distortion of the trial record and a consistent misrepresentation of case holdings.

DI cannot bring itself to accept the obvious, and ultimately determinative, fact that DI simply did *not* disclose the concept at issue to Fisher-Price. In fact, Victor Reiling Associates submitted the concept to Fisher-Price. No amount of creative advocacy or argumentative sleight of hand can change the record on this point. Not only is it admitted that Reiling submitted the concept, both Reiling and DI have admitted that Reiling signed a binding concept disclosure agreement with Fisher-Price that affirmed in writing that Reiling was the inventor of the submitted concept and Reiling submitted the concept (and there was not a single reference or mention of DI).

While tempted mightily to argue that the concept was owned and submitted by Reiling and DI as partners and agents (as DI and Reiling repeatedly admitted before "refining" their litigation "positions") so that DI can argue that DI made the submission, albeit in the guise of its partner and agent, DI recognizes that to advance this argument would put a swift end to its claim because Reiling's submission was, as a matter of law, not made in the context of a confidential relationship. With no safe factual argument available, DI attempts to jettison its judicially binding, but very inconvenient, admissions of partnership and agency in favor of a more desperate hope that a sticker on the back of one of the concept boards can save the day for DI. DI's plea that the possible existence of a sticker that said "Design Innovation" on the back of one of the concept submission boards given to Fisher-Price by

Victor Reiling is more than sufficient proof that DI was submitting the concept directly contradicts Victor Reiling's signed statement and stretches the principle of reasonable inference well beyond the breaking point.

Undaunted by the insurmountable challenge posed by the first requirement, DI proceeds to argue that the submission (which it did not make) was made in the context of a confidential relationship. The fact that at the time Reiling submitted the concept there was a written contract in effect between DI and Fisher-Price that defined the relationship between DI and Fisher-Price as one that was **not** a confidential relationship is little more than a minor inconvenience to DI. Likewise, DI pleads that the contract between Reiling and Fisher-Price which expressly disavowed a confidential relationship is irrelevant.

While DI rejects in summary fashion the relevancy of the written contract defining its own non-confidential relationship with Fisher-Price, DI never points to any evidence that would support the creation of any other agreement or relationship between Fisher-Price and DI. In DI's world, it makes perfect sense that Fisher-Price would tacitly agree to accept a confidential relationship, notwithstanding the disavowal of such a relationship in every writing and contract in this case and notwithstanding DI's knowledge that such a confidential relationship was against Fisher-Price's policy and has been against Fisher-Price's policy for many years.

In the end, DI surrenders to the inevitable. It can cite to no relevant fact from the record to support the creation and acceptance of a confidential relationship between itself and Fisher-Price. Indeed, the record reveals without contradiction that there was no contact of any kind between Fisher-Price and DI at the time the concept was submitted. Moreover, any contact between DI and Fisher-Price for the years leading up to the submission was on a non-confidential work-for-hire basis.

Without any factual support in the record or legal support in the case law, DI also argues

it lost "royalty" income from so-called line extensions that do not incorporate the concept at issue. To advance its fanciful claim, DI simply ignores the Option Agreement between the parties that clearly states that Fisher-Price would have to pay and DI would receive a royalty only on products that incorporate the concept. Though undermined by the factual record and abandoned by the case law, DI remains undeterred. It finds unwarranted solace in the fact that the packaging of the line extensions shows pictures of action figures, some of which allegedly use plaintiff's concept and some admittedly do not. As this Court already has recognized, the Option Agreement does not require the payment of a royalty based on a graphical depiction on the packaging. Moreover, DI has not identified a scintilla of evidence that sales of line extensions were caused by Fisher-Price's alleged use of the Reel Heroes concept on the figures depicted on the packaging.

Finally, with respect to concreteness, novelty and use, DI continues to use different definitions of its concept in discussing each of these elements. DI admits, as it must, that Fisher-Price did not use the only concrete descriptions of the concept which were communicated to Fisher-Price. Nor does it dispute the admissions at trial that Fisher-Price did not use the concept which is alleged in every one of DI's complaints filed in this case. The legally preclusive effect of these binding judicial admissions is not even a minor distraction for DI. Whatever rights DI might have had in and to the concept that Reiling submitted to Fisher-Price on a non-confidential basis were destroyed by the time DI surfaced. Reiling had the right to submit the concept to Fisher-Price on a non-confidential basis, and that is exactly what Reiling did. The legal effect of Reiling's non-confidential submission eliminated any rights DI might have had in the concept with respect to Fisher-Price. This cannot be contested. Indeed, it is supported by the very case law relied upon by DI in its memorandum in opposition, most notably, the *Schering v. Rousch* decision.

- 4 -

## Argument

### I.    NO REASONABLE JURY COULD HAVE FOUND THAT DI DISCLOSED THE REEL HEROES CONCEPT IN THE CONTEXT OF A CONFIDENTIAL RELATIONSHIP

DI's opposition brief reveals that it has no evidence on at least three of the showings required to support the confidential relationship element of its misappropriation claim: (1) that DI disclosed the Reel Heroes concept (expressly or impliedly) on a confidential basis; (2) that the Reel Heroes concept was disclosed "in the context of" *any* relationship between DI and Fisher-Price; and (3) that Fisher-Price ever *accepted* (by words or conduct) the formation of a confidential relationship. These issues are discussed below.

### A.    DI Did Not Disclose the Reel Heroes Concept on a Confidential Basis

A plaintiff seeking to establish the "confidential relationship" element of a misappropriation claim must show that it disclosed the idea to the defendant on a confidential basis. In this regard, submission of an idea on a non-confidential basis negates the formation of a confidential relationship as a matter of law.[1]

DI admits that it did not submit the Reel Heroes concept to Fisher-Price at all; Reiling did. DI Memo. at 4.[2] The evidence at trial *from Reiling* established that the submission was made on a non-confidential basis. FP Memo. at 10-11. Popek admitted at trial that DI *never even asked* Fisher-Price to treat the submission confidentially and that DI had no objective reason to expect that it would. (Tr. 1033:16-20 ("We *assumed*" it would be treated as confidential); Tr. 1029:14-18 ("I just *hoped* that

---

1   *See AEB & Assocs. Design Group, Inc. v. Tonka Corp.*, 853 F. Supp. 724, 733 n.7 (S.D.N.Y. 1994) (noting that "[a] cause of action may arise with respect to information that does not qualify as a trade secret if the information *is disclosed in confidence*") (quotation marks and citation omitted); *M.H. Segan Ltd. P'ship v. Hasbro, Inc.*, 924 F. Supp. 512, 526 (S.D.N.Y. 1996) (holding that the parties' waiver, which specifically disclaimed the existence of a confidential relationship, or that plaintiff's submission was received in confidence, "expressly eliminates the plaintiff's ability to claim the existence of a fiduciary relationship — an essential element of a misappropriation claim").

2   DI's opposition memorandum on this motion is cited as the "DI Memo." and Fisher-Price's initial memorandum is cited as the "FP Memo."

- 5 -

they held it with confidence")).

Recognizing that the evidence at trial was uncontroverted that Reiling submitted the Reel

Heroes concept to Fisher-Price on a non-confidential basis, DI still argues that even where a submission

is made on a non-confidential basis, a court may find that the submission was nevertheless made in the

context of a confidential relationship. DI Memo. at 18-31. Not only is this contrary to common sense, it

is directly contradicted by applicable law. *See* cases cited in footnote 1.

Reiling's disclosure of the Reel Heroes concept to Fisher-Price under the terms of the

P&A Agreement not only negated the "confidential relationship" element of the tort of

misappropriation, it also negated the "novelty" and "use" elements of that tort. Because Fisher-Price

was rightfully in possession of the Reel Heroes concept (and was free to use it) by virtue of Reiling's

disclosure of it under the terms of the P&A Agreement, the concept was not novel as to Fisher-Price and

the "novelty" element of the tort of misappropriation is absent from DI's case.

Under New York law, property rights can exist only in ideas that are novel, and for this

reason novelty is an element of the tort of misappropriation of idea. *See Downey v. General Foods

Corp.*, 31 N.Y.2d 56, 61, 334 N.Y.S.2d 874, 877 (1972); *Nadel v. Play-By-Play Toys & Novelties, Inc.*,

208 F.3d 368, 378 (2d Cir. 2000). The trial testimony established that Fisher-Price received the Reel

Heroes concept from Reiling in October 1998 under the terms of the P&A, which expressly provided

that any disclosures made by Reiling to Fisher-Price were non-confidential. JX 1 ¶ 1. Thus, regardless

of whether a separate confidential relationship existed between DI and Fisher-Price, Fisher-Price's

receipt of the Reel Heroes concept from Reiling rendered that concept not novel as to Fisher-Price, and

Fisher-Price can therefore not be liable for misappropriating the idea from DI (or anyone else). *Ferber

v. Sterndent Corp.*, 51 N.Y.2d 782, 784, 433 N.Y.S.2d 85, 86 (1980); *Platzman v. Am. Totalisator Co.*,

45 N.Y.2d 910, 411 N.Y.S.2d 230 (1978)

**B.    The Reel Heroes Concept Was Not Disclosed "In the
         Context of" *Any* Relationship With Fisher-Price**

DI acknowledges that it is required to show that it disclosed the Reel Heroes concept "in

the context of" a confidential relationship between itself and Fisher-Price. DI Memo. at 9-10. *See also*

Jury Instructions at 25. The evidence at trial established that DI failed to meet this burden because DI

had no relationship of *any* type with Fisher-Price relating to concept at the time of disclosure.

At the time of the October 1998 disclosure of the concept, the only relationship in

existence between DI and Fisher-Price was DI's work-for-hire pursuant to the Design Services

Agreement (JX 206), which disclaimed any confidential relationship (¶ 10.3). (Tr. 961:5-963:4). Popek

admitted that DI never had any contact with Fisher-Price regarding the Reel Heroes concept. (Tr. 940:1-

941:10; 968:15-969:10; 1028:12-15; 1030:3-12). As this Court recently recognized in *A Slice of Pie*

*Productions, LLC v. Wayans Bros. Entertainment*, 392 F. Supp. 2d 297 (D. Conn. 2005), it is not

possible as a matter of law for DI to establish that the concept was disclosed to Fisher-Price "in the

context of" an alleged confidential relationship when DI had no communication whatsoever with Fisher-

Price in connection with the disclosure. *See* 392 F. Supp. 2d at 314 (finding no confidential relationship

created where "[defendant movie producer's] only contact with plaintiff was to solicit its script through

[defendant talent agent] and there is no allegation from which [defendant movie producer's] voluntary

acceptance of [defendant talent agent's] trust can be inferred. [Defendant movie producer] and

[plaintiff] stood in the roles of two independent entities who might potentially mutually exploit a film

idea for profit. No further relationship existed between them.").

**C.    DI Proffered No Evidence That Fisher-Price
         Ever Accepted Any Confidential Relationship With DI**

As this Court recently recognized in *A Slice of Pie*, 392 F. Supp. 2d at 310-11, a

confidential relationship may arise by mutual agreement of the parties.[3]  However, to show the

agreement, as with all agreements, plaintiff must show that the recipient of the idea *agreed to accept* a

duty of confidence.  *Id.  See also* FP Memo. at 16-19.

Here, DI claims that agreement to a confidential relationship should be implied from the

parties' conduct.  DI Memo. at 18, 21, 29.  To prevail, DI had to prove that Fisher-Price accepted

(implicitly, by its conduct) both the duty to keep in confidence the Reel Heroes idea and a confidential

relationship with DI.  The record is wholly devoid of such proof.  To the contrary, the record shows that

the Reel Heroes concept was disclosed on terms under which Fisher-Price expressly *disclaimed* any

obligations of confidentiality.  The evidence on which DI attempts to rely simply cannot support a

reasonable inference that Fisher-Price ever affirmatively assented to a confidential relationship.

1.  **Fisher-Price affirmatively disclaimed any confidential relationship.**

Fisher-Price's disclaimer of a confidential relationship could not have been more clear:

> The disclosure must be understood to be purely voluntary and no
> confidential relationship is to be established by such disclosure or implied
> from our consideration of the submitted material, and the material is not to
> be considered submitted "in confidence."  Confidential relationships have
> been held to create obligations which are beyond those that the company is
> willing to assume.  (JX 1).

The Court's ruling that Reiling's 1994 Policy & Agreement ("P&A") with Fisher-Price

acted only as a release of claims and not as a bar to the formation of a confidential relationship is not

consistent with the plain meaning of paragraph 1 of the P&A or controlling authority.  *See* FP Memo. at

11-13.  While paragraph 3 of the P&A operates as a release ("You must understand and agree that . . .

we are released from any liability in connection with the receipt and examination of your disclosure"),

paragraph 1 constitutes an express contractual disclaimer of a confidential relationship.  Numerous

courts have reviewed language nearly identical to the confidentiality disclaimer in Fisher-Price's P&A.

---

[3]  *A Slice of Pie* was decided under California law, but New York law is the same on this issue.  *G5 Techs., Inc. v. IBM,*
2005 U.S. Dist. LEXIS 20311, at *42 (S.D.N.Y. Sept. 19, 2005).  Unpublished cases are attached to this memorandum in
alphabetical order.

Every one of them ruled that confidentiality disclaimers like Fisher-Price's prohibit any confidential relationship *from coming into existence* — they are not mere waivers of a right to sue.[4] The language of Fisher-Price's P&A is to the same effect — it prohibits any "confidential relationship" from being *"established."* Thus, paragraph 1 of the P&A *defined the relationship* within which toy concepts — including the Reel Heroes concept — were submitted to Fisher-Price and within which Fisher-Price would agree to review those concepts. That relationship was unequivocally defined in the document as non-confidential, a fact that both Mr. Reiling and Mr. Popek acknowledged. (Tr. 316:3-11; 993:1-20; 997:12-15; JX 201).

Popek testified that he was aware of Fisher-Price's policy that inventors could submit ideas only by signing a P&A form containing these terms. (Tr. 785:2-15, 786:21-25, 992:6-9 & 15-25). Popek testified that he was aware of Fisher-Price's policy that inventor submissions are not treated as confidential and that he knew about the policy throughout the 1990s. (Tr. 992:20-993:6, 994:16-995:25). Popek admitted that DI was willing to continue to submit concepts to Fisher-Price on a non-confidential basis during the time period when the Reel Heroes submission was taking place. (Tr. 996:1-20). In the 1990s, DI signed at least four Fisher-Price P&A or similar forms, each of which set forth Fisher-Price's policy refusing confidential relationships. (*See* JX 201, 202, 203 & DX 837.)

---

[4]    *See M.H. Segan Ltd. P'ship*, 924 F. Supp. at 526 (Agreement which included language nearly identical to Fisher-Price's "*negates the existence* of a legal relationship based on the presence of a fiduciary or confidential relationship"). *See also Burten v. Milton Bradley Co.*, 763 F.2d 461, 464 (1st Cir. 1985) ("[A] disclosure expressly received in confidence may create a confidential relationship. Conversely, [an] express disclaimer by the disclosee [sic] of a confidential relationship from the outset will *dispel the existence* of such a relationship") (citation omitted) (emphasis added); *Zaidan v. Borg-Warner Corp.*, 228 F. Supp. 669, 670-71 (E.D. Pa. 1964) ("Under the various agreements executed by the parties giving rise to this litigation, it has been unequivocally established that [plaintiff] specifically contracted against the creation of any confidential relationship between himself and Borg-Warner. The effect of such an agreement is to *negate the existence* of any possible confidential relationship, thereby precluding liability as a matter of law.") (emphasis added), *aff'd*, 341 F.2d 391 (3d Cir. 1965); *Van Rensselaer v. Gen. Motors Corp.*, 223 F. Supp. 323, 325, 331 (E.D. Mich. 1962) (noting that defendant's disclaimer, signed by the plaintiff, which stated that "'[n]o device, plan, idea or suggestion may be received 'in confidence' and no 'confidential relation' may be established with a submitter,'" precluded plaintiff from establishing the existence of a confidential relationship, the "starting point" of plaintiff's misappropriation of property claim); *Hisel v. Chrysler Corp.*, 94 F. Supp. 996, 1002 (W.D. Mo. 1951) (stating that the parties' agreement, which released defendant from "any liability" in connection with plaintiff's disclosure, was "repugnant to any implication of [a] confidential relationship existing between plaintiff and Chrysler Corporation"). DI cites no contrary authority.

Similarly, Reiling testified that he had signed more than 25 separate P&A forms over the years, and that in each one Fisher-Price expressly communicated to him that Fisher-Price would not agree to hold inventor submissions in confidence and that no confidential relationship was established between the parties. (Tr. 288:8-19; DX 126-28, 740-58, 848-49, 919-21). (*See also* Tr. 302:24-307:15, 316:3-24). *See also* FP Memo. at 16-17.[5]

Against this backdrop of Fisher-Price's manifest refusal to accept a confidential relationship in connection with the submission of the Reel Heroes concept — and DI's and Reiling's admitted knowledge of this long-standing corporate policy — DI had to prove that some other conduct by Fisher-Price negated this disclaimer and manifested a contrary intention to be bound to an obligation of confidentiality. No amount of creative advocacy can make this evidence suddenly rise like a Phoenix from the factual record; the evidence simply does not exist.

### 2.     DI's evidence is insufficient as a matter of law to support the jury's verdict.

The "evidence" that DI marshals in its favor is summarized below. No reasonable jury could find that the evidence, considered singularly or in combination, establishes that Fisher-Price undertook a confidential relationship with respect to the Reel Heroes concept in the face of its express disclaimer of confidentiality:

1.     Fisher-Price invited submissions from outside inventors. DI Memo. at 31. *That Fisher-Price solicited ideas from inventors does not mean or even begin to suggest that Fisher-Price promised to accept those ideas on a confidential basis;*

---

[5]     Fisher-Price's witnesses testified consistently with the written agreements and without challenge that Fisher-Price does not promise confidentiality to inventors who submit toy concepts. The Fisher-Price Vice President/Inventor Relations who received the Reel Heroes submission, Paul Snyder, stated categorically that Fisher-Price "could never promise" confidentiality to outside inventors. (Tr. 714:25-715:8). Tina Zinter explained why:

> We can't make that promise. We have many, many groups we call upon to develop our product. We show moms, you know, we work with engineers in Asia and with vendors to figure out how to make things. We have research and advertising agency people that are in our building and work with us from time to time that we show it to. We have at some point the opportunity and the need to show it to the sales team, and they'll show it, along with us, to people like Wal-Mart and, you know, none of these people that we engage to develop and advance the product sign confidentiality agreements. So we can't promise we would hold a submission confidential to do the job that we need to do to bring it to market. (Tr. 1624:4-18)

2.  The Reel Heroes idea was jointly created by DI and Reiling. DI Memo. at 14-15, 23-24. *The joint development of the idea implies nothing about a confidential relationship between DI and Fisher-Price;*

3.  Reiling and Popek treated the idea as confidential and expected Fisher-Price to do so. DI Memo. at 15. *Reiling and Popek's subjective, unilateral expectations do not establish Fisher-Price's assent. Furthermore, DI points to no evidence that these expectations were ever communicated to Fisher-Price (see FP Memo. at 19-22). Its expectation is contrary to the submission agreements it signed and its admitted knowledge of Fisher-Price policy;*

4.  Reiling and Popek believed that Fisher-Price would treat them "fairly" (DI Memo. at 19); Mr. Snyder and others at Fisher-Price wanted to treat inventors "fairly." DI Memo. at 15, 20. *An obligation to treat an inventor "fairly" does not equate to a confidential relationship;*[6]

5.  Messrs. Morton, Pardi and Pook generally did not share submitted ideas outside of Fisher-Price in the course of their work. DI Memo. at 15. *The fact that three individual Fisher-Price employees did not generally disclose submitted ideas outside the company does not establish that Fisher-Price undertook a legal obligation not to do so and the unrebutted testimony was directly to the contrary;*[7]

6.  Mr. Snyder "liked the idea very much" after he was shown the prototype and a letter followed from Fisher-Price stating there was a "genuine excitement level for the product." DI Memo. at 24. *The fact that Fisher-Price initially looked with favor upon the idea does not mean that it agreed to keep it confidential or that any confidential relationship was established;*

7.  Fisher-Price spent time evaluating the idea and the parties executed an Option Agreement which imposed confidentiality obligations during its term on Reiling and DI. DI Memo. at 15, 25, 31. *The fact that the subsequently executed Option Agreement imposed confidentiality obligations on Reiling and DI for the brief term of that agreement did not retrospectively impose a confidential relationship on Fisher-Price as of the time of the original disclosure;*[8]

---

[6]  Consistent with many of DI's arguments this is another have my cake and eat it too proposition. Although DI wants nothing to do with Reiling's P&A Agreement and the legal poison that comes with it, it is without embarrassment that it argues the applicability or relevancy of the "fairness" provision from the same agreement.

[7]  DI makes much of the absence of evidence that the Reel Heroes concept was ever shown outside the company, going so far as to characterize this as evidence of the parties' "efforts" to maintain the confidentiality of the concept. DI Memo. at 16, 28. No evidence adduced at trial showed that the parties made any "efforts" to keep the concept confidential. Popek testified that he had "no idea" if Fisher-Price did so. (Tr. 1029:14-18). That no proof exists whether this particular concept was (or was not) ever disclosed outside of Fisher-Price does not equate to a legal undertaking by Fisher-Price not to do so, especially in the face of its express disclaimer of such an obligation. DI brazenly mischaracterizes footnote 13 in Fisher-Price's initial memorandum as an "admission" that Fisher-Price kept the Reel Heroes concept confidential. In fact, the language cited from footnote 13 is simply a denial that the accused Rescue Heroes figures used or included the concept.

[8]  In fact, the Option Agreement granted Fisher-Price the authority to disclose the Reel Heroes concept publicly. Paragraphs 5 and 8 (which impose a confidentiality obligation on DI) expressly provide that the obligation lapses if "approved in writing by Fisher-Price" and if "*the information is made public by Fisher-Price.*" JX 10 ¶¶ 5 & 8.

8.  Reiling and DI had submitted ideas to Fisher-Price in the past and been paid for some. DI Memo. at 23. *This does not establish that Fisher-Price ever kept any of those ideas confidential or accepted them in the context of a confidential relationship in the past; to the contrary, both Reiling and Popek admitted that they were aware during their prior course of dealing that Fisher-Price does not accept submissions on a confidential basis (see* note 2, *supra)*;

9.  Fisher-Price did not require that DI submit a P&A form for the Reel Heroes concept. DI Memo. at 24. *But this does not negate the fact that Fisher-Price had already received the idea under the terms of Reiling's P&A which disclaimed confidentiality and a confidential relationship*; *nor does it negate the fact that DI admits that it knew for a long time Fisher-Price's policy of non-confidentiality.*

10. Fisher-Price returned the prototype and drawings to Mr. Reiling as they normally do when they do not use an idea. DI Memo. at 16, 20, 23-24, 25, 31. *The fact that Fisher-Price returned the prototype and drawings does not imply that Fisher-Price had obligated itself to confidentiality during the time it possessed these objects or that it agreed to a confidential relationship*; and

11. Fisher-Price is owned by Mattel, one of the largest toy companies in the world. DI Memo. at 20. *This fact, which DI apparently raises to show "unequal bargaining power" does not convert the parties' otherwise arms-length business relationship into a confidential relationship tantamount to a fiduciary relationship.*[9]

Although "a confidential relationship may be implied in a proper case" by the parties'

conduct, *G5 Techs., Inc. v. IBM*, 2005 U.S. Dist. LEXIS 20311, at *42 (S.D.N.Y. Sept. 19, 2005), an

obligation may be implied by the parties' conduct only where an ***objective observer*** would reasonably

conclude that ***both*** parties had assented to such a relationship. *Leibowitz v. Cornell Univ.*, 2005 U.S.

Dist. LEXIS 1529, at *21 (S.D.N.Y. Feb. 3, 2005); *Maas v. Cornell Univ.*, 94 N.Y.2d 87, 93-94, 699

N.Y.S.2d 716, 719-20 (1999). The facts DI relies on do not meet this standard; they would not indicate

to an objective observer that Fisher-Price had affirmatively agreed to accept a confidential relationship.

For example, DI's argument that Fisher-Price accepted a confidential relationship because DI did not

sign a P&A specific to the Reel Heroes concept (DI Memo. at 30) improperly shifts the burden of proof

by assuming that a legal obligation exists in the absence of Fisher-Price's affirmative action to obtain a

---

[9] New York courts have stated that the type of confidential relationship necessary for the protection of an idea is "synonymous with [a] fiduciary relationship." *Stewart v. World Wrestling Fed'n Entm't, Inc.*, 2004 U.S. Dist. LEXIS 26533, at *14 (S.D.N.Y. Jan. 11, 2005). "Generally, an arm's length business transaction, even those where one party has superior bargaining power is not enough to give rise to a fiduciary relationship." *Sony Music Entm't, Inc. v. Robison*, 2002 U.S. Dist. LEXIS 3100, at *9 (S.D.N.Y. Feb. 26, 2002).

written disclaimer of the obligation. DI is asking this Court to accept that the parties' conduct in failing to enter into a P&A covering the Reel Heroes concept should be interpreted as manifesting their mutual assent to the formation of a confidential relationship. The evidence at trial did not support this conclusion. Given that DI had no contact with Fisher-Price relating to the Reel Heroes concept until 3 to 4 months after the initial submission, no inference can be drawn from the fact that DI did not sign a P&A specifically relating to the submission, especially since Fisher-Price's policy of non-confidentiality was known to, and included in every agreement signed by, DI and Fisher-Price.

DI's claim that Fisher-Price agreed to treat it "fairly" is also insufficient to objectively support an inference that Fisher-Price accepted a confidential relationship. DI Memo. at 19-20. Ironically, the language DI cites to is contained in the P&A (JX 1) — which DI denies has any effect as to it. More important, that language is immediately contiguous to the provision expressly disclaiming any confidential relationship or duty to treat inventor submissions as confidential. (JX 1 ¶¶ 1 & 3). This language cannot support the formation of a confidential relationship that is expressly disclaimed on the same page of the same document.[10]

An implied-in-fact obligation may not be found merely because it would be "reasonable" or even "fair." An implied obligation may be found only where the party charged with the obligation intended and manifested *actual agreement*. *See, e.g., Ramada Franchise Sys., Inc. v. Boychuk*, 283 F. Supp. 2d 777, 793 (N.D.N.Y. 2003), *aff'd*, 2005 U.S. App. LEXIS 1318 (2d Cir. Jan. 25, 2005); *Nadel v. Play-by-Play Toys & Novelties, Inc.*, 208 F.3d 368, 377 n.5 (2d Cir. 2000); *Maas*, 94 N.Y.2d 87, 93-94, 699 N.Y.S.2d 716 (1999). In such a case, the implied-in-fact obligation is based on the "presumed intention of the parties as indicated by their conduct." *Ramada*, 293 F. Supp. 2d at 793. That is, the

---

[10]  Moreover, this is not a case for breach of an agreement to treat DI "fairly." The Court made clear in its instructions that this was not a breach of contract case. (*See* Jury Instructions at 20: "Neither party is claiming that the other breached any of its contractual obligations."). All of the plaintiffs' breach of contract claims were dismissed prior to trial.

- 13 -

court must be able to "justifiably infer that the promise would have been explicitly made, had attention

been drawn to it." *Nadel*, 208 F.3d at 377 n.5 (citing *Maas*, 94 N.Y.2d at 94). In this case, such an

inference is impossible, because Fisher-Price expressly refused to accept any confidential relationship in

the P&A *and* in all its prior dealings with DI. Not surprisingly, courts applying New York law have

granted summary judgment dismissing claims of an implied obligation where, as here, the defendant has

expressly indicated an unwillingness to accept the obligation. *See, e.g., Leibowitz*, 2005 U.S. Dist.

LEXIS 1529, at *20-21 (dismissing breach of implied employment agreement claim where alleged

implied agreement was contrary to employer's written policy); *Germano v. Cornell Univ.*, 2005 U.S.

Dist. LEXIS 17759, at *21-22 (S.D.N.Y. Aug. 17, 2005) (same). Here, where Fisher-Price had an

express written policy barring the formation of a confidential relationship — which was known by both

Reiling and DI — the rule set forth in *Leibowitz* and *Germano* precludes any finding that a confidential

relationship could be implied.

   Two additional legal principles mandate rejection of DI's claim of an implied

confidential relationship as a matter of law. First, any implied obligation of confidentiality must precede

the disclosure of the idea. *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb, Inc.*, 767 F. Supp. 1220, 1232

(S.D.N.Y. 1991) ("[T]he confidential relationship must predate the reposal of trust or confidence and

thereby provide the context — if not the impetus — for such disclosures. Frequently, it is said that the

relationship must inspire the disclosure, and that the relationship cannot emerge from the revelation's

wake.") (citation omitted), *rev'd on other grounds*, 967 F.2d 742 (2d Cir. 1992); *Thermal Imaging Inc.*

*v. Sandgrain Sec., Inc.*, 158 F. Supp. 2d 335, 343 (S.D.N.Y. 2001) (same).[11] In this case, the evidence

---

[11] DI cites only one case in support of its contention that the conduct of the parties *after* a disclosure is relevant to whether
the disclosure was made in the context of a confidential relationship: *Matarese v. Moore-McCormack Lines*, 158 F.2d
631 (2d Cir. 1946). DI Memo. at 23. *Matarese* was a quasi-contract case; it did not involve claims of misappropriation
of idea or a confidential relationship. DI's representation at page 23 of its memorandum to the contrary is simply untrue.
The *Matarese* court stated that "recovery in quasi-contract obviously does not deal with situations in which the party to be
charged has by word or deed legally consented to assume a duty toward the party seeking to charge him." 158 F.2d at

was undisputed that the only dealings that DI had with Fisher-Price prior to the submission of the Reel Heroes concept were on a non-confidential basis. *See* note 2, *supra.* DI never identifies *a single fact* that occurred *prior to* the initial Reel Heroes disclosure that could show a pre-existing confidential relationship with Fisher-Price. Moreover, DI admits that it had no contact of any type relating to disclosure or submission of the Reel Heroes concept. Indeed, the Concept Submission Form for the Reel Heroes concept listed only Reiling as "inventor" (JX 2). There was no evidence at trial that DI's status as co-inventor was disclosed at the time of the original submission.[12] Coupled with the unchallenged absence of evidence of a confidential relationship prior to the initial Reel Heroes submission, this amounts to a dispositive failure of proof of a confidential relationship between DI and Fisher-Price, requiring judgment as a matter of law for Fisher-Price.

Second, in *G5 Techs., Inc.,* 2005 U.S. Dist. LEXIS 20311, at *42, a misappropriation case, the court dismissed a claim of an implied confidential relationship, noting that "[a]lthough a confidential relationship may be implied in a proper case, where there is an express agreement between the parties covering the subject matter, the law will not create another by inference" (citation omitted). Here, this Court has already ruled (in its summary judgment and reconsideration decisions) that the Option Agreement reflected whatever agreement existed between DI and Fisher-Price relating to the Reel Heroes concept, barring any alleged implied agreements. As the *G5 Technologies, Inc.* court ruled, this bars any claim that Fisher-Price impliedly agreed to a confidential relationship as a matter of law.

---

634. A misappropriation of idea claim *does* require that the defendant "assumed a duty" (*i.e.,* a confidential relationship) to the plaintiff.

[12] DI argues that there was sufficient evidence in the record from which the jury could conclude that Fisher-Price was aware in October 1998 that DI was a co-inventor on the Reel Heroes concept. DI Memo.at 28-29. This is fanciful at best. No witness testified that DI's involvement with the Reel Heroes concept was communicated to Fisher-Price at the time of the first submission. Popek admitted that DI had no contact of any type relating to the Reel Heroes submissions with Fisher-Price. (Tr. 940:1-941:10, 982:21-983:3, 1028:12-15). The only evidence DI can come up with is that there was a sticker identifying DI on the back of the board that Mr. Reiling submitted to Mr. Snyder in October 1998. DI Memo. at 4. There was no testimony about that sticker at trial — or whether it was even on the board in October 1998. Moreover, that sticker does not indicate that DI was anything more than a work-for-hire contractor doing art work for Reiling, at most. In any event, disclosure of DI's co-owner status would not establish Fisher-Price had accepted a confidential relationship.

### 3.     DI's other arguments lack merit.

In the face of Fisher-Price's express statements and policy that it was unwilling to accept inventor submissions on a confidential basis or to enter into confidential relationships with inventors, DI is unable as a matter of law to show that a confidential relationship should be implied. None of the contrary arguments made by DI has merit. First, DI argues that its evidence of the "custom and practice" in the industry somehow created an obligation of confidentiality. DI Memo. at 26-28. However, the evidence at trial — including testimony of DI's expert — was undisputed that there is no custom and practice in the toy industry relating to whether toy companies will agree to maintain the confidentiality of inventor submissions.[13]

DI also argues that, as a matter of law, parties negotiating a license agreement are in a confidential relationship, mainly citing cases from fifty years ago. DI Memo. at 20-23. DI never addresses any of the numerous and more recent cases cited by Fisher-Price in its initial memorandum which hold expressly that license negotiations are arm's-length transactions and neither license negotiations nor consummated licenses give rise to a fiduciary or confidential relationship. FP Memo. at 32, n.36.

In any event, the cases cited by DI are distinguishable and inapplicable to the facts at issue here. *Heyman v. AR Winarick, Inc.*, 325 F.2d 584 (2d Cir. 1963), *Schreyer v. Casco Products Corp.*, 190 F.2d 921 (2d Cir. 1951), and *Speedry Chemical Products, Inc. v. Carter's Ink Co.*, 306 F.2d

---

[13]   DI's expert, James Kipling, admitted that rather than there being a uniform custom and practice, there are actually three different ways in which toy companies interact with inventors on the subject of confidentiality:  no agreement, an agreement "clarifying" the confidential relationship, or a disclaimer of a confidential relationship. (Tr. 1357:11-1358:1). Indeed, the Court actually prohibited Kipling from testifying that there was any uniform custom relating to confidentiality, because he had disclosed no such opinion. (Tr. 1320:8-1327:12).  DI cites to *Nadel*, 208 F.3d at 371, and *Burten*, 763 F.2d at 466 n.5, for the extraordinary proposition that there is, *as a matter of law*, a custom in the toy industry that inventor submissions are confidential. DI Memo. at 26. Both of these cases were appeals from summary judgment decisions and both courts were interpreting the records in the manner most favorable to the appealing party. Neither court was establishing a rule of law as to custom in the toy industry. Here, the undisputed factual record is different — that there is no custom in the toy industry relating to confidentiality.

328 (2d Cir. 1962), each concerned an offer to sell or license information considered by the seller or licensor to be a trade secret. None of these courts ruled that sale or license negotiations give rise to a confidential relationship as a matter of law.[14] Instead, each court ruled only that a confidential relationship could be inferred from the specific conduct of the parties on the facts of the particular case. None of those cases involved disclosure of the information at issue by a person (Reiling) who had an admitted course of dealing that involved submitting more than 100 concepts to the defendant on a non-confidential basis and who had entered into a binding agreement with the defendant providing that the information at issue was disclosed on a non-confidential basis and that its disclosure would not create a confidential relationship. None of these cases was brought by a plaintiff (like DI) who itself had a course of dealing submitting concepts to the defendant on a non-confidential basis and in the context of a disclaimer of confidential relationships. None of the plaintiffs in these cases admitted (as DI has) that it was aware of the defendant's policy that it would review information only on a non-confidential basis in the context of a disclaimer of any confidential relationship. In addition, none of these cases involved facts where the plaintiff had no contact or communication with the defendant in connection with the disclosure of the allegedly confidential information. Here, the Reel Heroes concept was disclosed to Fisher-Price by Reiling — who had agreed that anything he disclosed was non-confidential and not in the context of a confidential relationship—without any involvement or participation by DI.

---

[14] More recent Second Circuit caselaw is clear that disclosure of confidential information in the context of buyer/seller negotiations, or other sensitive business negotiations, does *not* give rise to a confidential or fiduciary relationship. *See, e.g., Walton v. Morgan Stanley & Co.*, 623 F.2d 796, 799 (2d Cir. 1980) (plaintiff failed to state a claim for breach of fiduciary duty in the context of a corporate acquisition because "the fact that the information [disclosed to defendant] was confidential did nothing, in and of itself, to change the relationship between [the parties]" from an arm's length relationship to a fiduciary one); *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5 (2d Cir. 1983) (refusing to find a fiduciary duty where the parties did not have a pre-existing relationship of trust and confidence but were engaged only in an arm's length business transaction); *United States v. Cassese*, 273 F. Supp. 2d 481, 486 (S.D.N.Y. 2003) (rejecting claim of a fiduciary relationship where parties were "engaged in negotiations for a possible business combination involving their respective companies" because parties were "not inherent fiduciaries, but rather potential arms-length business partners."), *aff'd*, 428 F.3d 92 (2d Cir. 2005).