UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DESIGN INNOVATION, INC., <br><br> Plaintiff, <br><br> - against - <br><br> FISHER-PRICE, INC., <br><br> Defendant. | Index No.: 3:03 CV 222 (JBA) <br><br><br> April 17, 2006 |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
TRIAL MEMORANDUM REGARDING DISGORGEMENT DAMAGES**

Plaintiff, Design Innovation, Inc. ("DI"), respectfully submits this brief in response to Fisher-Price's Trial Memorandum Regarding Disgorgement Damages.[1] Contrary to Fisher-Price's arguments, disgorgement is an available remedy under New York law for misappropriation and unfair competition cases, and it is the appropriate remedy in this case given the jury's finding that Fisher-Price misappropriated DI's novel concept in bad faith. Moreover, there is no basis to exclude any testimony of DI's damages expert, Alan Ratliff, because his opinions meet the standards of New York law in all respects. All of Fisher-Price's remaining arguments will be addressed in turn.

**I.  RATLIFF'S JANUARY 2006 REPORT IS RELIABLE AND SHOULD NOT BE EXCLUDED**

---

[1] Fisher-Price has filed a separate Motion to Cancel the Disgorgement Hearing on the ground that DI cannot recover disgorgement damages for misappropriation and unfair competition claims under New York law as a matter of law. Fisher-Price makes this motion notwithstanding its express agreement that the Court could hold a separate hearing on this issue and despite the fact that the Court previously rejected this same argument in connection with Fisher-Price's Motion in Limine No. 8(1), which the Court denied on January 12, 2006. Accordingly, it is DI's position that both Fisher-Price's agreement and the law of the case doctrine bar Fisher-Price's re-argument of the same issue at this stage of the proceeding. Moreover, Fisher-Price remarkably filed the motion despite the fact that it has been on notice of controlling authority clearly demonstrating that New York law permits a plaintiff to seek disgorgement of defendant's profits in misappropriation and unfair competition cases since DI filed its jury instructions in December 2005. DI's Trial Brief, filed with the Court on April 10, 2006, contains a further discussion of the same issue. Although DI is not required by the Local Rules to submit a response to Fisher-Price's Motion to Cancel the Disgorgement Hearing until May 1, 2006 – the same day the Bench Trial is set to begin – DI will file its opposition papers on April 25, 2006 so that the Court has sufficient time to review DI's position in advance of the bench trial.

A.  **Fisher-Price's *Daubert* Challenge Is Untimely**

Fisher-Price contends that Ratliff's January 2006 supplemental expert report is unreliable and should be excluded. (Fisher-Price's Trial Brief ("Def. Tr. Mem.") at 6-15). As a preliminary matter, Fisher-Price's *Daubert* challenge is untimely and should not be considered by the Court.[2] Plaintiff served Mr. Ratliff's supplemental expert report on January 5, 2006. On January 13, 2006, Fisher-Price filed a motion seeking to strike portions of Mr. Ratliff's supplemental report. The sole issue raised by Fisher-Price at that time was the lack of timeliness of the supplemental report. (*See* Memorandum in Support of Fisher-Price, Inc.'s Motion to Strike Portions of Ratliff's Supplemental Report, dated January 13, 2006). A *Daubert* challenge was never raised. *Id.* In its memorandum of law, Fisher-Price argued that it would be prejudiced by the supplemental report because it had not had an opportunity to depose Mr. Ratliff regarding his supplemental opinions, nor had it had an opportunity to review the report with its own damages expert, as he was out of town from January 9-13, 2006. *Id.* at 4. Since that time, Mr. Ratliff has been deposed regarding his supplemental report, and there has been ample time for Fisher-Price to confer with its damages expert.

No objections were raised as to the substance of Mr. Ratliff's supplemental report in January 2006, nor have any been raised in the three months that have ensued. Instead, Fisher-Price brings this issue to the Court's attention for the first time only three weeks before the disgorgement phase of trial is scheduled to commence. Had Fisher-Price wanted to make a *Daubert* challenge, it needed to do so before now. Accordingly, Fisher-Price's *Daubert* challenge is untimely, and its efforts to exclude Mr. Ratliff's supplemental report should be rejected by this Court.[3]

---

[2] Notably, Fisher-Price has not filed a motion with respect to its *Daubert* challenge. Instead, Fisher-Price has merely raised this issue as part of its Trial Memorandum for the disgorgement phase. Accordingly, there is no motion before the Court seeking the relief that Fisher-Price has requested. Further this Court has previously rejected such untimely attacks upon expert testimony that were not raised before the start of trial.

[3] Fisher-Price argues that Ratliff's opinions regarding unjust enrichment are inadmissible because there has never been a claim for unjust enrichment asserted in this case. (Def. Mem. at 8, n.3). However, Mr. Ratliff clarified at his deposition that the term "unjust enrichment" is used interchangeably with "disgorgement." (*See* Declaration of Russell D. Dize, dated April 17, 2006 ("Dize Dec.") Exh. B at 131-133).

### B. Ratliff's Opinions Regarding General Overhead Are Consistent With New York Law

Fisher-Price contends that overhead expenses not directly attributable to the production of the accused products are deductible from net sales, and that Ratliff's opinions in this regard are contrary to law and should be excluded. (Def. Mem. at 8). This is not the prevailing opinion of New York Court's which have addressed the issue. New York cases have held that general overhead is only deductible if directly attributable to production of the accused products, or if the defendant can adequately approximate the expenses in relation to the accused products. *See e.g., McNamara v. Powell*, 52 N.Y.S.2d 515, 526-27 (Sup. Ct., Oneida Cty. 1944) ("The defendant is entitled to deduct all costs including such commercial and other expenses as can be shown to be properly attributable to the sale of [accused products]").

In *McNamara*, the Court recognized that commercial and other general business expenses that could not be directly attributed to the cost of production of the accused products would not be disallowed so long as it was possible to make a mathematical or approximate apportionment or separation of the expenses. *Id.* The Court further recognized that defendant carries the burden of keeping accurate records to permit such separation, and in the absence of such records, becomes liable for the full amount. *Id.* In this case, Fisher-Price has not provided any documentary evidence that would permit separation of general expenses attributable to the accused products. Any effort to present such evidence from oral testimony of its witnesses would be objectionable as either non-disclosed expert testimony or being based upon non-disclosed hearsay.

Indeed, Mr. Ratliff testified at his deposition in response to questions from Fisher-Price's counsel that Fisher-Price did not produce sufficient data to enable determination of which expenses were variable (i.e., attributable to the production of the accused products), as opposed to fixed (i.e., incurred regardless of the production of accused products). (Dize Dec.; Exh. B at 48-49). In estimating Fisher-Price's profit margin for disgorgement purposes, Mr. Ratliff deducted 100% of

Fisher-Price's expenses for "Marketing Contribution," "Tooling," and "Advertising and Merchandising" because those categories typically contain more variable costs than fixed costs. *Id.* at 50-51. He did not deduct "Overhead" because typically that category has more fixed costs than variable costs, and in doing so, he was attempting to offset the inclusion of non-deductible expenses in the Marketing Contribution, Tooling and Advertising and Merchandising categories. *Id.* Therefore, Mr. Ratliff did not assume that overhead was not deductible, as Fisher-Price suggests. Rather, he attempted to estimate profit margin based upon the data produced by Fisher-Price, which was not sufficient to allow for separation of the various categories of expenses. Indeed, Mr. Ratliff specifically acknowledged in his supplemental report that portions of Fisher-Price's overhead would be deductible upon a proper showing by Fisher-Price. (Ratliff Supplemental Report ¶ 12).

It is well settled that the Second Circuit has adopted a two-step process for calculating defendant's profits in copyright infringement cases, an analogous situation:

> "The first step is to determine what overhead expense categories (such as rent, business, entertainment, personnel and public relations) are implicated by the production of the infringing product. Once a sufficient nexus is shown between a category of overhead and the production or sale of the infringing product, a court need not scrutinize for inclusion or exclusion particular items within the overhead category . . . The second step is to arrive at a fair, accurate, and practical method of allocating the implicated overhead to the infringement. The infringer has the burden of 'offering a fair and acceptable formula for allocating a given portion of overhead to the particular infringing items in issue.'"

*See Hamil Am., Inc. v. GFI*, 193 F.3d 92, 104-06 (2d Cir. 1999). The Second Circuit has also instructed that this two-step process:

> "must be applied with particular rigor in the case of willful infringement. . . When infringement is found to be willful, the district court should give extra scrutiny to the categories of overhead expenses claimed by the infringer to insure that each category is directly and validly connected to the sale and production of the infringing product. Unless a strong nexus is established, the court should not permit a deduction for the overhead category."

*Id.* at 107. In this case, certainly, there was no suggestion at the liability trial before the jury that Fisher-Price's misappropriation was accidental, inadvertent or merely negligent. Indeed, the jury

found that Fisher-Price misappropriated Plaintiff's idea in bad faith, which is tantamount to a finding of willfulness. Because Fisher-Price has not established any nexus between categories of overhead expense and sales of the accused products, no deductions for general overhead should be allowed.

### C. The Reported Profit Margins of Hasbro and Mattel Were Used To Verify Estimated Profit Margin Calculated From Fisher-Price's Documents

Fisher-Price impermissibly seeks to place the burden on Plaintiff to prove deductions from net sales. (Def. Mem. at 10). As discussed more fully in Plaintiff's Trial Brief, Fisher-Price has the burden to prove deductions from the misappropriation sales. (*See* Plaintiff's Trial Brief on Disgorgement Damages, dated April 10, 2006, at 7-8).

In his preliminary expert report dated January 31, 2005, Mr. Ratliff used Fisher-Price's data and documents to establish that net sales on the accused products were $104.3 million. With Plaintiff dropping claims to certain products and limiting its claims to certain years that figure was further reduced to $66,282,800 based on Fisher-Price's own records and in particular Joint Exhibit ("JX") 170 (which bears the Fisher Price bates stamp FP15786). This figure was presented to and used by the jury in reaching its verdict for DI.

On March 30, 2005, Plaintiff served a letter from Mr. Ratliff with two supplemental exhibits, which attempted to reconcile profit margin data contained in various documents produced by Fisher-Price during discovery with an Interrogatory response provided by Fisher-Price that purportedly disclosed profit margin on the accused products. The conclusion reached by Mr. Ratliff, which was expressed in his March 30, 2005 letter, was that the cost and expense data provided by Fisher-Price's documents could not be reconciled against the profit margin data asserted in its Interrogatory response:

> "the information on profit margin varies greatly, both within and between sources. It appears from the discovery answers that the margins provided therein are not the profit margins as reflected in the previously produced historical cost documents, and have been burdened by deductions other than avoided costs. In any event, at this point, given the inconsistencies within the information provided by Fisher-Price and the lack of explanation of the information provided, Fisher-Price has not established the amount of deductions, if any, to which it is entitled in arriving at the amount of profits for purposes of unjust enrichment or disgorgement damages." (*See* Dize Dec., Exh. A).

5

Therefore, as of March 30, 2005, Fisher-Price was on notice that insufficient cost documentation had been produced, and there was no basis for deduction of costs from net sales in calculating disgorgement damages. After that date, Fisher-Price served two reports from its damages expert, Abram Hoffman, on May 11, 2005 and December 17, 2005. Neither of those reports provided specific cost information from which one could accurately calculate disgorgement of profits.

Accordingly, in the total absence of reliable information from Fisher-Price, Mr. Ratliff attempted to approximate its costs in his January 2006 supplemental report, realizing that although Fisher-Price had the burden of proof on this issue, it would likely be entitled to some deductions. (Ratliff Supplemental Report ¶ 12). However, Mr. Ratliff did not rely solely upon the profit margins of Mattel and Hasbro, as Fisher-Price suggests. Instead, he estimated Fisher-Price's costs using documents that were produced by Fisher-Price during discovery. He calculated an estimated 28% profit margin by using Fisher-Price's own documents relating to the accused products, and Mr. Ratliff has used this profit margin in estimating disgorgement damages. (Dize Dec., Exh. B at 24-29). Mr. Ratliff used the average profit margin of Mattel and Hasbro as a check against the data that was provided by Fisher-Price. *Id.* The average profit margin of Mattel and Hasbro was 29.6%. *Id.* Mr. Ratliff concluded that the 28% profit margin calculated by using Fisher-Price's data was a reasonable estimate of profit margin in this case. *Id.*

Therefore, Mr. Ratliff has not "ignored the only specific profit margin data he was provided by Fisher-Price in favor of speculating," as Fisher-Price suggests. (Def. Tr. Mem. at 12). Instead, he has used Fisher-Price's actual financial data to calculate an estimated profit margin in the absence of complete financial data from Fisher-Price. To make sure his estimate was reasonable, he simply compared the actual number with the average profit margin of Mattel and Hasbro, and he found that the two numbers were within 1.6% of each other. (Dize Dec., Exh. B at 24-29). This is certainly not speculation that would warrant the exclusion of Mr. Ratliff's supplemental report. To the contrary it

shows a prudent financial analysis which confirms Mr. Ratliff's calculation based on an independent comparison.

### D. Ratliff is Not Required to Provide Proof of Apportionment

"In situations, 'where an infringer's profits are not entirely due to the infringement, and the evidence suggests some division which may rationally be used as a springboard,'" apportionment may be proper. *Caffey v. Cook*, 409 F. Supp.2d 484, 506 (S.D.N.Y. 2006) (quoting *Orgel v. Clark Boardman Co.*, 301 F.2d 119, 121 (2d Cir. 1962); *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 886 F.2d 1545, 1549 (9th Cir. 1989)).

As discussed in more detail *infra* at section IV. B., the burden of proof for showing such apportionment is on the defendant and not on the plaintiff. *See Business Trends Analysts, Inc. v. The Freedonia Group, Inc.*, 887 F.2d 399, 407 (2d Cir. 1989) (explaining that once plaintiff provides evidence of defendant's profits the burden to prove apportionment falls on the infringer). Accordingly, Ratliff's analysis did not need to show apportionment and his disgorgement calculations should not, therefore, be excluded. Profit calculations are all that are required to be shown by plaintiff's expert. *See e.g., Caffey v. Cook*, 409 F. Supp.2d at 503 (S.D.N.Y. 2006) (discussing that in establishing infringer's profits for purposes of disgorgement, "the [intellectual property] owner must 'present proof *only* of the infringer's gross revenue'" and citing 17 *U.S.C.* §504(b)) (emphasis added).

Moreover, Fisher-Price has not met its burden in showing apportionment. (*See* Ratliff's Report ¶ 21). Fisher-Price's damages expert, Mr. Hoffman, makes, conclusive statements about what Fisher-Price may have contributed to the value of the infringed products. (*See* Hoffman's Report, p. 10). While elements such as Fisher-Price's brand name and position in the marketplace may be elements subject to apportionment, if they are shown to have contributed directly to the profits made on the misappropriated products, Hoffman provides no evidence to support how much of those elements contribute to the overall infringed products to make an apportionment determination reasonable. (*Id.*). In addition, costs involved with "tooling, manufacturing, advertising and promotion" are not the types

of costs which are used in an apportionment analysis. (*Id.*). Rather, only elements within the infringing work that are not part of the infringed concept go to apportionment, the costs of doing business are not considered. *See Caffey v. Cook*, 409 F. Supp.2d at 507 (quoting *Twentieth Century Fox Film Corp. v. Stonesifer*, 140 F.2d 579 (9th Cir. 1944) that apportionment goes to that portion of work "'where the infringer's [creative] labor and artistry have also to an extent contributed to the ultimate result.'").

Fisher-Price cites to *Santa's Workshop, Inc. v. Sterling*, 153 N.Y.S.2d 839 (3d Dep't 1956), for the proposition of declining an award of defendant's profits where factors other than what was infringed were attributable to the profits made. (Def. Tr. Mem. at 13). However, *Santa's Workshop* involved two totally different businesses -- a theme park called "Santa's Workshop" and a fur farm. The fur farm ultimately used advertising elements similar to that of Santa's Workshop. Inasmuch as the advertising elements used were "Santa Claus" related terms and themes, which are part of the public domain and could be used freely by anyone, it was questionable that there should even be an award of profits. The only reason of awarding relief in *Santa's Workshop, Inc.*, was due to the somewhat close proximity of the two businesses, and injunctive relief was the primary remedy.

Fisher-Price also cites to *Alcatel USA, Inc. v. Cisco Systems, Inc.*, 239 F. Supp.2d 660 (E.D. Tex. 2002), for the proposition that a plaintiff's expert is to present evidence on apportionment. However, *Alcatel* is likewise not applicable to the facts of this case. In *Alcatel*, the plaintiff incorrectly relied on the acquisition price of the company who had the infringing product. In fact, because the trade secret had not been destroyed, the plaintiff had not lost profits and the defendant had not gained any profits, a hypothetical value of the intellectual property had to be determined and using an acquisition price as evidence of the value of the intellectual property was incorrect. *See Alcatel U.S.A., Inc.*, 239 F. Supp.2d 671-73.

Here, because Fisher-Price's own records and Mr. Ratliff's analysis provide evidence of profits, the burden of proving any apportionment has shifted to Fisher-Price.

### E. The Jury Determined That Plaintiff Was Entitled to Damages Due To Fisher-Price's Misappropriation of Plaintiff's Idea

Fisher-Price contends that there has been and will be no evidence in this case that any profits that Fisher-Price earned from the accused products were caused by the alleged use of Plaintiff's idea. (Def. Tr. Mem. at 15). However, Fisher-Price ignores the fact that the jury has already returned a finding of liability as to Fisher-Price for its misappropriation of Plaintiff's idea. The jury concluded that Plaintiff was entitled to damages for such misappropriation, based upon charges from this Court which specifically directed the jury to consider the issue of proximate cause. (Jury Instructions at 37-38). On that basis alone, Mr. Ratliff could properly conclude that Fisher-Price's wrongful conduct caused Plaintiff to be damaged.

## II. THE EQUITIES FAVOR DISGORGEMENT OF FISHER-PRICE'S PROFITS

While the Supreme Court has "characterized damages as equitable where they are restitutionary, such as in "action[s] for disgorgement of improper profits," *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 570 (1990) (*quoting Tull v. United States*, 481 U.S. 412, 424 (1987), the designation of disgorgement as a damages remedy that may be equitable in nature in no way serves to undermine the Court's ability to disgorge Fisher-Price's profits in this case.[4] Indeed, Fisher-Price seizes upon the "equitable" designation and argues that it would be "unjust" to disgorge Fisher-Price's profits in this case. (Def. Tr. Mem. at 15). As set forth below, none of the cases Fisher-Price references actually support Fisher-Price's argument, and to the extent the Court considers the equities, the facts established at trial confirm that an award of Fisher-Price's profits is appropriate in this case where the jury already found that Fisher-Price acted in bad faith. To find

---

[4] The issue of whether a damages remedy is characterized as legal or equitable typically arises in the context of a court's determination of a plaintiff's right to a jury trial under the Seventh Amendment. (*Id.*) Despite the characterization of disgorgement of profits as a remedy that is equitable in nature in certain contexts, the Supreme Court and lower courts have held that a party seeking disgorgement of profits is entitled to a jury trial where the damages sought are compensatory in nature. *See Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477-78 (1962); *Daisy Group v. Newport News*, 999 F. Supp. 548, 551 (S.D.N.Y. 1998) (claims for damages based on the defendant's profits may be viewed as a "proxy" for direct damages or the incalculable lost profits of the plaintiff).

9

otherwise would effectively reward Fisher-Price for its misconduct, which this Court should not condone.

As a threshold matter, *Sands, Taylor & Wood Co., v. The Quaker Oats Co.*, 978 F.2d 947, 963 (7th Cir. 1992) ("*Sands I*") does not stand for the broad proposition that "disgorgement may be ordered only when just and equitable under the circumstances." (Def. Tr. Mem. at 15). In *Sands I*, the Seventh Circuit reversed and remanded an award of a defendant's profits in a federal trademark infringement case involving alleged reverse trademark confusion. According to the lone judge who joined the applicable portion of the opinion, the award of $24 million in defendant's profits to the plaintiff represented an inequitable "windfall" because the evidence of bad faith was "marginal at best" and plaintiff had made virtually no use of its purported trademark. 978 F.2d at 963. A two-judge majority of the court voted to reverse and remand not because of the size of the award or the evidence of bad faith, but because the lower court had failed to consider an award of reasonable royalties as an option. The majority held that on remand the district court should start with reasonable royalties as a baseline, and then consider "the possible need for deterrence, which may involve consideration of the amount of Quaker's profits." (*Id.* at n. 19).

On remand, the district court awarded approximately $10 million in reasonable royalties and then doubled the award to $20 million as an enhancement under the Lanham Act. In considering the issue of enhancement, the court explained that reasonable royalties often are insufficient to ensure that the defendant has been divested of his ill-gotten gain and fail to adequately address the Lanham Act's "policy concern of deterrence." *Sands, Taylor & Wood v. The Quaker Oats Company*, 34 F.3d 1340, 1350 (7th Cir. 1994) ("*Sands II*"). According to the court:

> All of these ambiguities require that in fashioning relief based on royalty payments, a court take special care to ensure that the royalty payment has not under-compensated the victim. Enhancement of the damages attributable to a lost royalty in order to ensure that the malefactor, and not the victim, bears the burden of any uncertainty in its calculation is a permissible way of achieving that goal.

10

*Id.* at 1351. While the court agreed that enhancement was appropriate in light of evidence in the record, the court, with "regret," remanded the case to the district court for a more precise explanation of the basis for the enhancement. (*Id.* at 1352).

*Sands I and Sands II* cannot be read to preclude or limit an award of Fisher-Price's profits in this case. The portion of *Sands I* that addressed equitable considerations in the context of an award of the defendant's profits – supported by a single judge - is far-outweighed by the majority's decision in *Sands II* that emphasizes the need to fully compensate the plaintiff and to deter further conduct from the defendant under the Lanham Act. Rewarding an infringer by allowing it to retain some of its profits on the misappropriation certainly does not serve that purpose. Since enhancement of the reasonable royalties award is not permitted under New York common law as it is under the Lanham Act, disgorgement of profits is the only means to serve the policy of deterrence and New York's strong policy that the malefactor should not retain ill-gotten gains. *See McNamara v. Powell*, 52 N.Y.S.2d 515, 533 (Sup. Ct., Oneida Cty. 1944), *citing, Riggs v. Palmer*, 115 N.Y. 506, 511, 22 N.E. 188 (N.Y. 1889) (under New York law, "[i]t is axiomatic that the defendant must not be permitted to derive a profit from his own wrongdoing").

Moreover, to the extent equitable considerations are relevant and considered by the Court to determine whether (or in what amount) to award disgorgement damages to DI, the trial record contained clear evidence of Fisher-Price's bad faith activities, which confirm that the equities favor DI, not Fisher-Price. The evidence at trial included:

-DI's Reel Heroes concept was seen by numerous employees of Fisher-Price over a lengthy period of time prior to Fisher-Price's rejection and return of the concept to DI. (DI Rule 50 Opp. Mem. at 49-50). Ken Morton, head of the Boys Team and responsible for the development of the Rescue Heroes line at that time, thought the concept was "interesting" and "spoke to a lot of people about the concept and got their opinions." Fisher-Price then came out with three lines of products and a cameraman figure that the jury found to be substantially similar to the Reel Heroes concept.

-In 2002, DI put Fisher-Price on notice of its claims. *See* Def. Exh. 864 (A copy of the demand letter is attached as an exhibit to Plaintiffs Second Amended Complaint which was offered into evidence by Fisher-Price). After the notice letter, Fisher-Price came out with two additional Rescue

Heroes action figure lines that used DI's concept by incorporating an image component on the backpack and a cameraman figure with a remarkable resemblance to DI's cameraman figure. Based on this evidence, it was reasonable for the jury to conclude that Fisher-Price's misappropriation of DI's concept was in bad faith, (Verdict Form at 2), and it would be a reasonable basis for the Court to order disgorgement of Fisher-Price's profits.

Fisher-Price's remaining arguments require brief consideration. The passage Fisher-Price references in *Vermont Microsystems, Inc. v. Autodesk*, 138 F.3d 449, 450 (2d Cir. 1998) (applying California law), merely recites the standard for apportionment – "if the trade secret accounts for only a portion of the profits earned on the defendant's sales, such as when the trade secret relates to a single component of a product marketable without the secret, an award to the plaintiff of defendant's entire profit may be unjust." *Id.* at 450. The case does not, therefore, stand for the proposition that disgorgement of profits is an improper remedy. Rather, it simply explains that in certain circumstances not present here, apportioning profits may be appropriate. In this case the evidence established that the video component was added to the Fisher Price line to extend the products marketability and to make it a premium product distinguished from the base line of Rescue Heroes. Thus, the misappropriated concept accounts for all of the sales of these particular products. Had the public wanted to buy a Rescue Heroes character without the misappropriated concept they certainly could because Fisher-Price continued to market such products. Indeed, as Fisher-Price's own witnesses testified, Fisher-Price had many other lines of these products available for the public to buy that did not include the misappropriated image components.

Finally, Fisher-Price's argument that disgorgement is an improper remedy because DI "lacked the capacity to market its device" (Def Tr. Mem. at 15) is untenable in light of the clear line of New York cases awarding disgorgement damages in cases involving misappropriation of a trade secret, without regard to whether or not the inventor had the capacity to market the product. (*See* Section III, *infra*).

### III. THE JURY'S REASONABLE ROYALTY AWARD DOES NOT PRECLUDE AN AWARD OF DISGORGEMENT DAMAGES

Fisher-Price argues that: (1) DI is not entitled to disgorgement damages because the jury's verdict for reasonable royalties represented an adequate "remedy at law"; (2) disgorgement of profits is not available under New York law for misappropriation and unfair competition claims; and (3) DI should be limited to the 3% royalty rate in the parties' Option Agreement. (Def. Tr. Mem. at 17).

First, there is no question that disgorgement of profits is an available remedy under New York law for misappropriation and unfair competition claims. *See Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 380 F. Supp.2d 250, 270 (S.D.N.Y. 2005); *Electro-Minatures Corp. v. Wenden Co.*, 771 F.2d 23, 27 (2d. Cir. 1985); *Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.*, 118 F.3d 955 (2nd Cir. 1997); *Dad's Root Beer v. Doc's Beverages*, 94 F. Supp. 121 (1950); *Miss Susan v. Enterprise & Century Undergarment, Co., Inc.*, 62 N.Y.S.2d 250 (Sup. Ct., App. Div. 1st Dept. 1946); *McNamara v. Powell*, 52 N.Y.S.2d 515, 533 (Sup. Ct., Oneida Cty. 1944). In *Georgia-Pacific Corp. v. United States Plywood Corp.*, 243 F. Supp. 500, 531 (S.D.N.Y. 1965), the Court stated:

> The doctrine of unjust enrichment is most dramatically exemplified in those cases dealing with the misappropriation of <u>inventive ideas</u> and trade secrets; that is, cases of nonpatent torts. In this particular area, common-law principles control. Illustratively, the measure of damages has been either quantum meruit for the use value of the property (*Strubbe v. Sonnenschein*, 299 F.2d 185, 97 A.L.R.2d 1386 (2d Cir. 1962)) or the <u>malefactor's profits</u> (*Franke v. Wiltschek*, 209 F.2d 493 (2d Cir. 1953)).

243 F. Supp. at 531 (emphasis added). This analysis confirms that disgorgement of profits is available for misappropriation claims, and it also highlights the similarity of claims for misappropriation of trade secrets and misappropriation of ideas.

In fact, as *Linko, Inc. v. Fujitsu Ltd.*, 232 F. Supp. 2d 182 (S.D.N.Y. 2002), makes clear, there are three alternative forms of relief available on a misappropriation claim: defendant's profits, plaintiff's lost profits or a reasonable royalty analysis. But a reasonable royalty calculation is in fact