# EXHIBIT A



March 30, 2005

Mr. Russell D. Dize
Mr. Edmund J. Ferdinand, III
Grimes & Battersby, LLP
488 Main Avenue, Third Floor
Norwalk, Connecticut 06851-1008

Re:   Victor G. Reiling Associates, et. al. v. Fisher-Price, Inc.

Dear Mr. Dize and Mr. Ferdinand:

Please find enclosed Huron Exhibit A-1 and Huron Exhibit B. These additional exhibits are based upon Fisher-Price cost and revenue information (documents and discovery responses) produced to you after the filing of our report.

Huron Exhibit A-1 compares the accused sales based on FP14922, to those accused sales originally reported in the documents we summarized and referenced in Huron Exhibit A. While the total amount of accused sales are higher in Exhibit A-1 ($105,657,800 vs. $104,310,246), accused sales of several individual products were lower based on the supplemental information. You should probably make inquiry into these differences.

Huron Exhibit B reflects a summary of the Fisher-Price accused product cost data from the various documents produced and discovery answers provided in this litigation. As you can see, the information on profit margin varies greatly, both within and between sources. It appears from the discovery answers that the margins provided therein are not the profit margins as reflected in the previously produced historical cost documents, and have been burdened by deductions other than avoided costs. In any event, at this point, given the inconsistencies within the information provided by Fisher-Price and the lack of explanation of the information provided, Fisher-Price has not established the amount of deductions, if any, to which it is entitled in arriving at the amount of profits for purposes of unjust enrichment or disgorgement damages.

Please let me know if you have any questions.

Best Regards,

By: *Alan Ratliff*
Alan Ratliff, CPA-JD
Managing Director

In the Matter of
Victor G. Reiling, et. al. v. Fisher-Price, Inc.

**Exhibit A-1**
**Fisher-Price Accused Sales**

| TYPE | SKU | Description | 2000 Net Sales | 2001 Net Sales | 2002 Net Sales | 2003 Net Sales | 2004 Net Sales | Total Net Sales | Total Net Sales Exhibit A |
|---|---|---|---|---|---|---|---|---|---|
| Rescue Heroes | 77455 | Voice Tech Rescue Firetruck | $3,850,300 | $5,499,600 | $1,680,800 | $142,700 | | | |
| Rescue Heroes | 77456 | Voice Tech Mission Command | $3,497,000 | $6,576,400 | $55,300 | | | | |
| Rescue Heroes | 77457 | Voice Tech Billy Blazes | $32,200 | $39,200 | | | | | |
| Rescue Heroes | 77459 | Voice Tech Jake Justice | | $37,200 | | | | | |
| Rescue Heroes | 77473 | Voice Tech Rescue Jet | $6,359,000 | $4,846,700 | $2,457,000 | $149,900 | | | |
| Rescue Heroes | 78157 | Voice Tech Aquatic Rescue | | $20,589,200 | $8,403,300 | $913,900 | | | |
| Rescue Heroes | 78361 | Voice Tech Police Cruiser | | | $8,574,200 | $592,200 | | | |
| Rescue Heroes | B2092 | Mission Select Figures | | | | $3,145,200 | $1,794,400 | | |
| Rescue Heroes | B2497 | Mission Select Mountain Command Center | | | | $10,034,000 | $1,109,500 | | |
| Rescue Heroes | B3056 | Mission Select Police Cruiser | | | | $2,883,200 | $44,300 | | |
| Rescue Heroes | B6732 | Mission Select Firetruck | | | | $2,611,500 | $25,000 | | |
| Rescue Heroes | B7684 | TRU: Optic Team | | | | $161,500 | $331,900 | | |
| Rescue Heroes | B8106 | OPTIC/FIGURE-ANIMAL ASSORT. | | | | $362,900 | $637,100 | | |
| Rescue Heroes Video Mission | 78177 | Video Mission | | $391,200 | $6,753,100 | $776,800 | | | |
| Rescue Heroes Video Mission | 78178 | Video Mission | | | | | | | |
| Rescue Heroes Video Mission | 78182 | Rocky Video Mission | | | | | | | |
| Rescue Heroes Video Mission | 78183 | Video Mission | | | | | | | |
| **TOTALS** | | | $13,738,500 | $38,079,500 | $27,923,700 | $21,773,900 | $4,142,200 | | |

Exhibit B
Fisher-Price Accused Sales

| TYPE | SKU | Description | Average Price[A] | Average Cost[A] | Profit Margin %[A] | Computed Profit Margin %[c] | 2000[b] | 2001[b] | 2002[b] | 2003[b] | 2004[b] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Rescue Heroes | 77455 | Voice Tech Rescue Firetruck (1) | $23.21 | 13,714 | 51.00% | 40.79% | -2.5% | 17.3% | 11.6% | -49.1% | n/a |
| Rescue Heroes | 77450, 77545, 77548, 77460, 77458, 77541 | Voice Tech Mission Command, Roger Houston (2), Rocky Canyon (3), Jake Justice (4), Wendy Waters (5), Jack Hammer (6), Billy Blazes (7) | $7.37 | 3,492, 3,481, 3,439, 3,528, 3,573, 3,365 | 44.55%, 44.70%, 51.40%, 49.83%, 49.04%, 44.60% | 49.27%, 49.41%, 55.31%, 54.03%, 53.42%, 49.22% | 13.8% | 27.2% | 10.0% | n/a | n/a |
| Rescue Heroes | 77473 | Voice Tech. Rescue Jet (8) | $15.74 | 6,459 | 54.50% | 58.43% | 18.0% | 31.9% | 35.2% | 36.8% | n/a |
| Rescue Heroes | 78157 | Voice Tech Aquatic Rescue (9) | $52.25 | N/A | N/A | N/A | N/A | 7.4% | 2.0% | -26.7% | n/a |
| Rescue Heroes | 78361 | Voice Tech Police Cruiser (10) | $19.02 | 8,152 | 53.20% | 57.15% | n/a | n/a | 33.0% | 33.7% | n/a |
| Rescue Heroes | 82692, 82693, 82694, 82695, 82102, 82101, 82099, 82098, 82097, 82096 | Mission Select Figures, Billy Blazes (11), Jack Hammer (12), Jake Justice (13), Al Pine (14), Wendy Waters (15), Ariel Flyer (16), Matt Medic (17), Roger Houston (18), Rocky Canyon (19), Gil Gripper (20) | $7.77 | 3,461, 3,430, 3,426, 3,383, 3,400, 3,400, 3,421, 3,447, 3,421, 3,458 | 52.70%, 53.10%, 53.20%, 53.60%, 53.50%, 53.50%, 53.30%, 52.90%, 53.30%, 52.70% | 55.45%, 55.85%, 55.90%, 56.40%, 56.24%, 56.24%, 55.87%, 55.80%, 55.87%, 55.48% | n/a | n/a | n/a | -3.4% | -27.5% |
| Rescue Heroes | 82497 | Mission Select Mountain Command Center (21) | $51.17 | 12,042 | 76.10% | 76.47% | n/a | n/a | n/a | -0.5% | -23.5% |
| Rescue Heroes | 83258 | Mission Select Police Cruiser (22) | $16.92 | 7,592 | 57.50% | 55.13% | n/a | n/a | n/a | 29.2% | -44.5% |
| Rescue Heroes | 85732 | Mission Select Firetruck (23) | $21.16 | 13,003 | 42.00% | 36.11% | n/a | n/a | n/a | -11.0% | 25.4% |
| Rescue Heroes | B6195, B7688, B7659, B7686, B7687, B7685 | OP'ED/FIGURE-ANIMAL ASSORT., Toby Photo (24), Matt Medic (25), Jake Justice (26), Rock Miner (27), Maureen Biologist (28) | $5.56 | 2,616, 2,657, 2,686, 2,697, 2,653 | 52.30%, 51.00%, 51.40%, 48.80%, 51.50% | 55.35%, 54.66%, 54.95%, 52.12%, 54.58% | n/a | n/a | n/a | 27.3% | 15.5% |
| Rescue Heroes Video Mission | 78177, 78167, 78164, 78163, 78152, 78176, 78151, 78170, 78165 | Video Mission, Ariel Flyer (29), Matt Medic (30), Roger Houston (31), Rocky Canyon (32), Gil Gripper (33), Billy Blazes (34), Jack Hammer (35), Jake Justice (36), Wendy Waters (37) | $7.68 | 3,517, 3,512, 3,558, 3,550, 3,558, 3,700, 3,517, 3,526, 3,518, 3,572 | 52.40%, 51.15%, 52.20%, 53.20%, 50.30%, 52.20%, 52.50%, 52.60%, 52.00% | 54.21%, 52.96%, 54.31%, 54.96%, 51.83%, 54.21%, 54.07%, 54.20%, 53.46% | n/a | 29.4% | 22.5% | 18.3% | n/a |
| Rescue Heroes Video Mission | 78176 | Video Mission (38) | $3.00 | N/A | N/A | N/A | | | | | |
| Rescue Heroes Video Mission | 78162 | Rocky Video Mission (39) | $3.00 | N/A | N/A | N/A | | | | | |
| Rescue Heroes Video Mission | 78180 | Video Mission (39) | $3.00 | N/A | N/A | N/A | | | | | |

[A] Average Price and Profit Margin % for each respective item is based upon: (1) FP5577 (Estimate – No Actuals Provided) (2) FP7300 – FP7303, FP7115 (Since more than one actual provided, average cost and profit margin is utilized) (3) FP7714 - FP7715, FP0654 (Since more than one actual provided, average cost and profit margin is utilized) (4) FP7260 - FP7281, FP7285, FP7022 (Since more than one actual provided, average cost and profit margin is utilized) FP7577 - FP7578, FP7022 (Since more than one actual provided, average cost and profit margin is utilized) (5) FP7260 - FP7264 - FP7295, FP8909 (Since more than one actual provided, average cost and profit margin is utilized) (6) FP8355 - FP8357, FP 8234 - FP8235, FP 8247 - FP8240, FP8301 - FP8302, FP8325 - FP8324, FP8975 (Since more than one actual provided, average cost and profit margin is utilized) (7) FP8655 - FP8350 (8) FP4274 - FP4276 (10) FP8705 - FP8707 (12) FP8905 FP10602 (13) FP10493 - FP10500 (14) FP9691 - FP9692, (15) FP8950 - FP8994 (15) FP9975 -FP9977 (17) FP4453 - FP4454 (18) FP10401 (19) FP11697 - FP11584 (23) FP12458 - FP12457 (20) FP2268 - FP11609 (23) FP13034 - FP13035 (24) FP11653 - FP11654 (25) FP12074 - FP12076 (26) FP12408 - FP12469 (27) FP2310 (35) FP2320 (37) FP2330 (36) Average price information was inconsistent with cost information.

[b] Computed Profit Margin is calculated as (Average Price - Cost) / Average Price.

[c] Fisher-Price's Responses and Objections to Plaintiff's Third Set of Interrogatories.

# EXHIBIT B

ALAN   RATLIFF   -   ROUGH   DRAFT

Page 1

REALTIME ROUGH DRAFT

The stenographic notes taken in the within proceeding have been translated instantaneously into their English equivalents through a computerized process called realtime translation.

A realtime rough draft, in ASCII format, is available to all counsel on a diskette. The realtime text as seen on the computer monitor at the site of these proceedings, as well as the rough draft ASCII transferred onto a diskette, is unedited and uncertified and may contain untranslated stenotype, misspelled proper names and technical words, occasional reporter's notes, and/or nonsensical English word combinations.

These will be corrected on the final certified transcript upon its delivery to you in accordance with our standard delivery terms, or on an expedited basis, as requested.

The realtime rough draft is intended only for the purpose of augmenting counsel's notes and is not intended to be used or cited in any court proceeding as representing a final edited and proofread transcript.                DAVID RATLIFF,
having been first duly sworn, testified as follows:

EXAMINATION

BY MR. ALEXANDER:


Draft Copy

UNCERTIFIED   ROUGH   DRAFT   TRANSCRIPT

1   correct numbers to use for Fisher-Price's revenue? Is
2   that fair?
3            MR. DIZE: Objection.
4       A.   I have used those numbers. It's my
5   understanding that those -- that number was lower than
6   any of the numbers that have been put forth prior to
7   that point.
8            So, my original number was bigger. My updated
9   number was bigger. All of Hoffman's numbers were
10  bigger. And then the jury reached its verdict, and so I
11  used the sales they used as my starting point for these
12  updated schedules.
13      Q.   (BY MR. ALEXANDER) Do you have any plans to
14  make any adjustments to these numbers before you testify
15  at the hearing, if there is such a hearing?
16      A.   No.
17      Q.   All right. I think on your Exhibit C-2, what
18  you did is you essentially took the total revenues in
19  Schedule A-4, and multiplied it by a 28 percent
20  incremental profit margin; is that what you did?
21      A.   That's correct.
22      Q.   Okay. And that 28 percent, you said, came
23  from Exhibit D-1, which is the next page?
24      A.   Correct.
25      Q.   Okay. Now, can you kind of walk me through

ALAN RATLIFF - ROUGH DRAFT

1  how you arrived at your 28 percent number on Schedule
2  D-1?
3      A.   Sure.  If you look at footnote one.
4      Q.   Uh-huh.
5      A.   We basically pulled sales from Exhibit A-4,
6  and then there were percentages that appeared on
7  Fisher-Price documents FP 15309 through 312 for each of
8  the categories of expenses.
9           Now, as you may recall, those FP documents
10 contained all products that fell into a given reporting
11 unit for a given year, and the accused products were
12 only a subset of that.
13     Q.   Uh-huh.
14     A.   So, I used the percentage to the total as the
15 percentage for the subset.
16          So -- so, if the total was 100, and let's just
17 take line one, marketing contribution, if on a
18 particular year's report, the total sales were 100, and
19 the market and contribution was 43,000 -- or 43.3, then
20 I said, okay, so the marketing contribution percentage
21 is 43.3 percent.
22          If the subset of that, which is accused, is
23 only 50.
24     Q.   Uh-huh.
25     A.   Then I'd use the percent, assuming it, you

1  know, stayed consistent for the subset just like it was
2  for the population.
3       Q.    Okay.
4       A.    I didn't have information sufficient to ferret
5  it out on a SKU-by-SKU basis.
6            So, I basically did that for each year.
7       Q.    Uh-huh.
8       A.    And originally, this calculation was really
9  meant to give me a bit of a test of whether or not a 28,
10 29, 30 percent incremental margin was reasonable.  I had
11 already looked at Mattel and Hasbro financial statements
12 to see what their gross margins and operating margins
13 were, based on my experience, used a midpoint as an
14 approximate estimate of incremental versus
15 nonincremental, that came out to 29.6 percent.
16           I said, okay, I don't really have the
17 information presented that way for these Fisher-Price
18 products, but I do have these other cost categories that
19 are set up by subject matter rather than by whether it's
20 a cost of goods sold or an operating expense like it
21 appears in a financial statement.
22           So, doing that analysis, if I stopped,
23 deductions before overhead, that left me with a 28
24 percent cumulative margin from 2001 through 2004.
25           I compared that to the 29.6 estimated

ALAN   RATLIFF   -   ROUGH   DRAFT

Page 27

1  incremental margin for Mattel and Hasbro, and said, it's
2  in the same ballpark, even though it's a little lower,
3  that seems like a reasonable estimate of Fisher-Price's
4  incremental margin.
5          So, that's how I came to use the 28 percent.
6      Q.  Okay.  So, if I understand you correctly, you
7  first concluded that an incremental margin should be
8  about 29 percent based on Mattel and Hasbro's
9  companywide financial statements?
10     A.  Correct.
11     Q.  Okay.  And then you -- and then you tried to
12 verify that using the data you had from Fisher-Price?
13     A.  That's correct.
14     Q.  Is that what you're testifying to?  Okay.
15         And then when you say "incremental margin,"
16 can you define exactly what you're talking about?
17     A.  I can try.
18     Q.  Okay.
19     A.  The idea is, it's a normal -- it's the normal
20 margin on the next unit.  So, if you've already got
21 everything in place, you're already making products, and
22 you say, I'm going to make one more accused product,
23 what is the margin -- profit margin -- on that next
24 unit.
25     Q.  So, the increment is the next unit sold --

ALAN   RATLIFF   -   ROUGH   DRAFT

Page 28

1    A.    Yes.
2    Q.    -- in your view?
3    A.    So, you take another sale, that triggers
4  another dollar of revenue.  Speaking hypothetically
5  here.  And then there are certain costs that had to be
6  incurred to produce that dollar of revenue.  The
7  difference between that revenue and those costs is the
8  incremental margin.
9    Q.    Why do you assume that the incremental margin
10 is the correct measure to use for disgorgement damages?
11   A.    It's consistent with my experience with this
12 issue in prior cases, both toy and nontoy related.  I
13 believe it is the approach most commonly described in
14 the various damages, textbooks and treatises, when they
15 talk about taking defendants' profits.
16         I'm not testifying as to the law, but it's
17 certainly my view, in reading cases over the years, that
18 this is the reasoned majority view on the amount that's
19 taken.
20         And, again, I'm not a policy expert either,
21 but just as a -- a matter of policy, if the cases
22 describe the purpose of disgorgement, which is to take
23 back the economic benefit gained by the defendant, that
24 would have to be a comprehensive measure of that
25 benefit.

Draft Copy

UNCERTIFIED   ROUGH   DRAFT   TRANSCRIPT

f0e913a4-0c06-484b-b618-9d2aa3502d4f

ALAN   RATLIFF   -   ROUGH   DRAFT

1    So, the benefit is going to be how much better
2    they are off after the act they've done compared to
3    where they would have been had they not done the act.
4    And as a result, things that don't vary with sales
5    really aren't part of the equation because they would
6    have been there anyway.
7        But if they should be part of the equation,
8    it's the burden of that party to demonstrate that those
9    expenses did increase as a result of the sale, in order
10   for them to assert a claim for a deduction for that.
11       Q.   Well, does a defendant have to demonstrate
12   that the cost increased, or just that they were
13   necessary costs to make the incremental sales?
14            MR. DIZE:   Objection.
15       A.   I'm not sure practically how those would
16   differ.
17       Q.   (BY MR. ALEXANDER)  Uh-huh.
18       A.   So, if we just take an example, and we're
19   making toy A, and we've got a cost structure in place,
20   even if everything about that cost structure is
21   necessary to make product B, if it's already in place,
22   and you make product B, and product B is accused --
23       Q.   Uh-huh.
24       A.   -- your benefit is the difference between the
25   revenue and the cost that was actually incurred

ALAN   RATLIFF   -   ROUGH   DRAFT

Page 48

1   Q.   Okay.  Well, how do you know that -- well,
2   first of all, let's back up.
3       What -- what do you understand Mr. Hoffman to
4   have done with the total overhead --
5   A.   Deducted it.
6   Q.   -- data?  He deducted it.  And he deducted it
7   100 percent?
8   A.   Yeah.
9   Q.   Is that your understanding?  Okay.
10      Now, how do you know that's not reasonable?
11  A.   Well, again, first of all, I think it was
12  Fisher-Price's burden to explain the deductions.  As the
13  mouthpiece for that position, he didn't do that.  He
14  didn't say that these were necessary to produce the
15  product, or anything like that.  He just said, here are
16  their expenses, so their net operating margin is, and if
17  I allocate part of that, the lost of profits are.
18      So, there wasn't any explanation.  There was
19  just an assumption that all deductions were appropriate
20  in arriving at the amount to be disgorged.
21      The second thing is, again, in my experience
22  in accounting, generally, with manufacturing entities,
23  and specifically, in other situations involving toys,
24  there are a mix of costs that vary with the production
25  and costs that do not.

Page 49

1    Q.    Uh-huh.

2    A.    Costs that necessarily -- I mean, even using
3    your words, that necessarily must be incurred to make
4    the next units. There are those mixed in, and there are
5    others that are not.

6    Q.    Okay. And how do you sort them out?

7    A.    I don't normally sort them out, unless I'm
8    working for the party that has the burden of proof.

9    Q.    Okay.

10    A.    And then when I do, I usually have to sit down
11    with somebody in finance, at the company, and have them
12    explain which costs, within the ones they track, will
13    vary by product, and which ones won't.

14    And then you accumulate those, that you can.
15    Others, you may not know. Others, the people involved
16    may not know if they truly vary or to what extent they
17    vary. Some of what we call semi-variable. They vary
18    within ranges, but between groups, they don't vary. And
19    then you ultimately come up with an estimate that's a
20    fair and reasonable estimate.

21    Q.    Uh-huh.

22    A.    And without having either the burden, or all
23    the data to do it, that's what I attempted to do, was
24    come up with an estimate, for what I thought was the
25    amount of margin that Fisher-Price got for each

ALAN   RATLIFF   -   ROUGH   DRAFT

Page 50

1   additional accused sale.
2      Q.   Okay.  And when you made that estimate you've
3   excluded -- you exceeded 100 percent of the overhead
4   that was reflected on Exhibit 344, didn't you?
5      A.   Oh, you know, not really.  That's just -- as I
6   told you, originally I set out the calculation to arrive
7   at the same operating profit that Fisher-Price did.
8   That was the calculation I was doing.
9           My question was, were there any categories
10  that, in my opinion, would more likely be predominantly
11  fixed as opposed to variable, or nonincremental as
12  opposed to incremental.
13          The overhead category was the one, in my view,
14  most likely contained more fixed costs being allocated
15  as opposed to incremental or variable costs being
16  incurred with the production.
17          So, as a subtotal, that's all I did, I just
18  subtotaled right before overhead, to see about where I
19  came up.
20          Having seen the standard cost sheets with, you
21  know, some 30 percent, 30 plus percent, little less than
22  30 percent, sort of product margins, having seen
23  industry data for Hasbro and Mattel, and using my
24  estimate of midpoint between operating and gross, all
25  these numbers fell into about the same range.  The

ALAN   RATLIFF   -   ROUGH   DRAFT

Page 51

1   lowest number was the 28 percent.  And so, that's what I
2   used.
3          So, it wouldn't be correct to say that the way
4   I computed incremental profit was to exclude any
5   deduction for overhead.  Because that's not really what
6   that calculation is meant to exhibit.
7          What would be fair to say is that accepting
8   that there are certain categories, like marketing
9   contribution, tooling, and A & M, which probably
10  includes some fixed, mostly variable costs, and then
11  there's overhead, which probably includes a lot of
12  fixed, some variable costs, I treated either side of
13  that line as sort of washing each other out, and said, I
14  don't know, but if I leave overhead out, the one most
15  likely to have nonincremental costs, I come up with a
16  margin pretty close to what I would estimate would be an
17  incremental margin based on the industry, and based on
18  the standard cost reports.
19       Q.   And when you say "based on the industry," do
20  you mean Hasbro and Mattel's financial statements?
21       A.   Yes.
22       Q.   Okay.  And the standard cost reports, have you
23  referred to those in your reports anywhere?
24       A.   In my original report, and in that March
25  letter, I don't know that we ever prepared an exhibit --

1    A.   Those should be some element of damages,
2 generally.
3          MR. ALEXANDER:  Why don't we take a quick
4 five-minute break here.
5          (A break was taken from 1:54 to 1:59.)
6    Q.   (BY MR. ALEXANDER)  Mr. Ratliff, I noticed on
7 your -- couple of the schedules on the latest
8 supplement --
9    A.   Uh-huh.
10   Q.   -- which is Exhibit 342, the heading is unjust
11 enrichment, FP's estimated unjust enrichment.  That
12 reference appears a couple of times.
13   A.   Where are we at?  A?  Which one is A-4?
14   Q.   Yeah.  On C-2 and D-1 is where I saw it.
15   A.   Uh-huh.  Okay.
16   Q.   And I didn't see that reference in the earlier
17 versions of the schedules.  And I'm wondering what the
18 significance of that is.
19   A.   I'm not aware of any significance.
20   Q.   Was that --
21   A.   I think we sort of interchangeably used the
22 phrase.  And so, I think by the time I got to this,
23 maybe all I was doing was -- at this stage, I knew -- by
24 the time I did this one, the jury trial was over.  And
25 so I knew the judge was doing the bench trial, on an

Page 132

1  equity issue, so, I probably just tried to make this
2  easier descriptionwise for her to understand what I was
3  doing.
4      Q.   Okay.  So in your view, unjust enrichment is
5  interchangeable with disgorgement?
6      A.   I mean, I use that for purposes of damages.
7  It appears in the literature that way pretty
8  interchangeably.  So I'm not really commenting on that
9  as a legal description.
10     Q.   Okay.  And -- but both unjust enrichment and
11 disgorgement are equitable remedies?
12     A.   Again, the way it shows up in most of my, you
13 know, economic textbook literature, you'll see some
14 chapters, and it will say, defendant's profits.  Other
15 times you'll see a chapter called unjust enrichment, and
16 it will say, you know, the remedies include, and it
17 includes defendant's profits.
18          So, sometimes they -- it seems to me that
19 sometimes the books organize it by remedy scheme; other
20 times they organize it by type of damage.
21          So, you know, again, I didn't have any
22 particular -- that I can recall, any particular thing in
23 mind, other than maybe that was just what was on my mind
24 at the time we were summarizing it for use at trial.
25     Q.   Okay.  But that -- those words came from you,

1  they weren't suggested to you --
2     A.   Right.
3     Q.   -- by your counsel?
4     A.   Right.  Yeah.  I -- I had recalled -- I don't
5  remember when this was.  Maybe -- some question had come
6  up between the lawyers, about, you know, what the texts,
7  or the books, or treatises said about all of this, and
8  I had gone to sort of look up some chapters in some of
9  the books in my office, and I probably had pulled that
10 stuff sometime in January, early February, and then the
11 trial was over, and I was asked to update things, and
12 that was probably in my little folder, and so, that was
13 probably on my mind.
14    Q.   Do you remember what texts and treatises you
15 looked at in connection with this case?
16    A.   Well, there's the one cited in the
17 supplemental report.  Then, there was a John Wiley
18 publication on commercial damages.  There was the Weil,
19 whatever, and Wagner, on litigation support handbook,
20 which is -- you know, that's Wiley, too.
21         And then there's -- seemed like a little book
22 by Russell Parr, sort of his updated Parr, Gordon Smith
23 book.
24         So, those are the ones that I had handy that
25 had either incremental profit analyses, or some kind of