UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Victor G. Reiling Associates<br>and Design Innovation, Inc.,<br>　　　　　Plaintiffs, | :<br>:<br>:　Case. No. 3:03cv222 (JBA)<br>: |
| v. | :<br>: |
| Fisher-Price, Inc.,<br>　　　　　Defendant. | :<br>: |

**RULING ON DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW
OR FOR A NEW TRIAL [Doc. # 273]**

On February 6, 2006, after a three-week trial, the jury returned a verdict for plaintiff Design Innovation ("DI") on its claims of misappropriation and unfair competition against defendant Fisher-Price ("FP") for using the Reel Heroes toy concept submitted by DI and co-plaintiff Victor Reiling without compensation, awarding damages to DI in the form of reasonable royalties in the amount of $1.7 million.[1]  Familiarity with the facts of this case, as fully described in the Court's Ruling on Defendant's Motion for Summary Judgment [Doc. # 145], is assumed.

FP now moves for judgment as a matter of law or for a new trial [Doc. # 273] on the following grounds: "(1) the undisputed evidence at trial was that the Reel Heroes submission was not made to [FP] on a confidential basis or in the context of a

---

[1] Mr. Reiling's claims were dismissed at the summary judgment stage on the basis of a Policy & Agreement ("P&A") he signed with FP in 1994, which released the claims he asserted in this action.

confidential relationship; (2) there was no factual or legal basis presented at trial for DI's claim for damages on "line extension" products; (3) DI offered no competent evidence showing that [FP] 'used' its Reel Heroes submissions and DI's own witnesses admitted that [FP] did not; (4) the definition of the Reel Heroes concept DI argued to the jury was not concrete as a matter of law; and (5) DI offered no competent evidence showing that its submissions were absolutely novel and its witnesses admitted they were not."  Def. Mem. [Doc. # 275] at 6.  For the reasons that follow, FP's motion will be granted in part, as to the jury's verdict on line extensions, and denied on all other grounds.

## I.   Standard

A District Court may only grant a motion for judgment as a matter of law under Fed. R. Civ. P. 50 "where there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or . . . [there is] such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." Cross v. N.Y. City Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005) (internal quotation and citation omitted).  "In other words, a Rule 50 motion must be denied unless the evidence is such that, without weighing the credibility of the witnesses or

otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." Id. Similarly, a new trial should only be granted under Fed. R. Civ. P. 59 where "the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice." Farrior v. Waterford Bd. of Educ., 277 F.3d 633, 634 (2d Cir. 2002).

## II.  Discussion

To prove its misappropriation claim, DI had the burden of proving: (1) that the Reel Heroes concept is concrete; (2) that the Reel Heroes concept is novel in absolute terms; (3) that the Reel Heroes concept was disclosed in the context of a confidential relationship; and (4) that FP actually used the Reel Heroes concept. See M.H. Segan Ltd. P'Ship v. Hasbro, Inc., 924 F. Supp. 512, 526 (S.D.N.Y. 1996); AEB & Assoc. Design Group v. Tonka Corp., 853 F. Supp. 724, 734 (S.D.N.Y. 1994).[2] DI's unfair competition claim was also premised on FP's misappropriation of the Reel Heroes concept, and thus DI also had the burden of proving these elements to succeed on that claim. FP now contests the jury's verdict on all four of these elements.

### A.  Concreteness

The jury was instructed, in accordance with New York law,

_____

[2]  As agreed by the parties, New York law is applicable to this case.

3

that DI was required to prove "that the concept that was submitted to [FP] that it claims [FP] misappropriated was fixed and concrete in form." Jury Instructions at 22. In its motion, FP conflates the concrete or fixed nature of "the concept that was submitted" with DI's allegedly shifting legal definitions of its concept in its pleadings, expert reports, and briefing. The legal requirement is that DI must prove that the former (the concept actually submitted) was concrete, such that what was submitted is protectible. See Estate of Hemingway v. Random House, Inc., 296 N.Y.S.2d 771, 776 (N.Y. 1968) ("[A]n author has no property right in his ideas unless [they are] given embodiment in a tangible form.") (internal quotation and citation omitted); see also Educ. Sales Programs, Inc. v. Dreyfus Corp., 65 Misc.2d 412, 417, 317 N.Y.S.2d 840, 845 (N.Y. Sup. Ct. 1970). Thus, DI's description of the concept in the course of legal proceedings is not the focus of the inquiry, rather the focus is on the submissions actually made and other extrinsic evidence of the concept as submitted.

As the Court found in its Ruling on Defendant's Motion for Summary Judgment, the materials in the three submissions – including the concept submission form, sketches, written material, and a prototype – reflected an idea for adding an image component to the backpack of a Rescue Heroes figure to enhance role play for the child by depicting the mission of that Rescue

Heroes character.  The Court concluded that this idea was
sufficiently concrete so as to be protectible.  At trial, the
concrete nature of the concept as expressed in the three
submissions was bolstered by expert testimony describing the
concept from which a jury could conclude the concept was
concrete, <u>see</u> Trial Tr. at 1335 (Kipling),[3] and testimony from FP
witnesses suggesting that they considered the concept to be fixed
and understandable, as opposed to vague or intangible, <u>id</u>. at
690-91 (Snyder); 1717-18, 1732-33 (Morton).  Reiling also
testified that he believed the three "embodiments" of the Reel
Heroes concept submitted to FP contained a "common thread" of "a
backpack with an image component on the back of each Rescue Hero
figure and being able to visualize an image-enhanced role play
for the child."  <u>Id</u>. at 556.  As DI notes, no FP witness claimed
that he or she did not understand the submitted concept.
Additionally, FP found the concept sufficiently concrete to
justify execution of the Option Agreement, and FP never raised

_____

    [3]  Kipling testified that his "understanding of what [DI's]
idea was that was presented to [FP] in the three submissions that
spanned the period from the fall of 1998 through January 2001"
was "an image component carried on or in the backpack of [a]
Rescue Heroes figure, the images being of rescue opportunities,
scenes of potential disaster and other situations in which the
assistance of the Rescue Heroes figure might be required.  The
scenes are multiple and interchangeable, and each one is –
triggers the pretend – excuse me, the role playing pretending by
the little boy or little girl playing with the Action Heroes
figure to play out the rescue sequence initiated as a result of
seeing that image."  <u>Id</u>.

the issue of concreteness when rejecting the concept.  See JX 12, 20.

The cases cited by FP are distinguishable from these circumstances.  In Educational Sales Programs, Inc. v. Dreyfus Corp., 65 Misc.2d 412, 317 N.Y.S.2d 840 (N.Y. Sup. Ct. 1970), the court concluded that plaintiff's idea was "quite malleable and not in such fixed and concrete form as to indicate a protectible idea," where plaintiff initially proposed "mak[ing] tape players and monthly tape cassettes containing educational and promotional material available free of charge to independent mutual fund salesmen, with the players, cassettes and contents to be purchased from plaintiff," but where over the course of several months of negotiations, "the plan was changed to sell the program – players and one cassette a month on a technical aspect of fund sales – for $60 a year, with defendant bearing the cost of the players and the cassettes in part, and having the responsibility for advertising and promoting the program."  65 Misc.2d at 413, 317 N.Y.S.2d at 844.  The court concluded that it was "apparent that to plaintiff the purveying of the idea was an incidental part of its program to sell the cassettes and players one of its principals manufactured," and that "the idea alone [was] too flimsy a craft on which to base any recovery."  Id. at 417, 845.  Similarly, in Link Group Int'l v. Toymax, Inc., 97cv670 (JCH), 2000 U.S. Dist. Lexis 4567 (D. Conn. Mar. 17, 2000), the court

concluded that plaintiff's concepts were not sufficiently concrete where defendant sought to revise a concept that plaintiff had submitted in 1987, which defendant had manufactured and sold, and related concepts, where plaintiff admitted that it did not submit any prototype or schematics for updated versions of any of the concepts.  2000 U.S. Dist. Lexis 4567, at *38.

By contrast, plaintiff's submissions all presented the same idea of adding an image component to a Rescue Heroes figure's backpack to enhance role play by depicting the mission of the character, embodied in different forms to address FP's cost concerns.  As discussed in the Court's summary judgment ruling and above, based on this evidence a jury would be justified in concluding that this idea was sufficiently concrete and fixed to be protectible, and FP's motion as to concreteness is thus DENIED.

**B.  Novelty**

The Court's Charge on Novelty

The Court instructed the jury on novelty as follows:

Design Innovation must prove that the submitted concept
was novel in the industry, not just novel to Fisher-
Price.  To be novel, a concept need not reflect a
"flash of genius," but it must show genuine novelty of
invention and not merely clever or useful adaptation of
existing knowledge.  A novel concept can be a
combination of elements that are not themselves novel,
but a concept that combines known elements must itself
be a novel idea.  A concept cannot be found to be novel
if it is merely a variation on a basic theme, or is an
idea already in use in the industry at the time of
submission, because ideas in the public domain may be

used freely by anyone.  In determining whether a
concept is "novel," you may consider the following
factors:
> (1)   The concept's specificity or generality (A
>        generic concept is less likely to be novel
>        than a concept of specific application);
>
> (2)   The concept's commonality (The more people
>        that are aware of the concept, the less
>        likely it is to be novel, even if Fisher-
>        Price was unaware of it);
>
> (3)   The concept's uniqueness (A concept that is
>        different from generally known ideas is more
>        likely to be novel than a concept similar to
>        generally known ideas); and
>
> (4)   The concept's commercial availability (A
>        concept already in use in the industry and
>        commercially available at the time of
>        submission is not a novel concept).

Jury Instructions at 23-24.  FP argues that this charge was in
error because "the law is clear that a combination of known
elements is not novel.  A combination of non-novel elements –
even if never before found together in the same product – is
nothing more than 'a variation on a [known] basic theme' and is
non-novel as a matter of law."  Def. Mem. at 54.

The Second Circuit in Nadel v. Play-By-Play Toys &
Novelties, Inc., 208 F.3d 368 (2d Cir. 2000), articulated the
rationale behind the novelty requirement, explaining that "the
law of property does not protect against the misappropriation or
theft of that which is free and available to all."  208 F.3d at
378.  The Nadel court held that determining whether an idea is
novel depends on the consideration of several factors:

> [T]he idea's specificity or generality (is it a generic
> concept or one of specific application?), its
> commonality (how many people know of this idea?), its

uniqueness (how different is this idea from generally
known ideas?), and its commercial availability (how
widespread is the idea's use in the industry?).

Id. The inquiry is whether the idea in question "exhibited
genuine novelty or invention or whether it was a merely clever or
useful adaptation of existing knowledge." Id. at 380 (internal
quotation and citation omitted).

Significantly, in articulating this standard, the Second
Circuit did not endorse the legal proposition urged by FP that no
combination of existing elements could ever be novel.  In fact,
the Second Circuit noted that the District Court had concluded
that based on its finding that similar toys were already
commercially available, it did not need to reach "'the issue of
whether combining elements of two commercially available toys to
make another toy may be novel or is, as a matter of law, merely a
clever adaption of existing technology,'" and the Circuit
remanded for determination of whether the plaintiff's idea
"exhibited genuine novelty or invention or whether it was a
merely clever or use adaption of existing knowledge." Id.
(citing 34 F. Supp. 2d 180, 185 (S.D.N.Y. 1999)).  By declining
to comment on the District Court's discussion of the combination
of existing elements, and remanding for consideration based on
the novelty standard articulated, the Second Circuit suggested
that it would be legally permissible for the district court to
conclude that such a combination was in fact novel.  This

comports with the purpose of the novelty requirement as described in Nadel – while there is no protection for that which is "free and available to all," an innovative idea to combine certain existing elements may be novel because that idea may not be in the public domain.

This conclusion is bolstered by the acknowledgment by other courts that "[t]o establish novelty, a plaintiff's idea 'need not reflect the flash of genius, but it must show[] genuine novelty and invention, and not a merely clever or useful adaption of existing knowledge,'" and that "even original ideas combine elements that are themselves not novel" although "novelty cannot be found where the idea consists of nothing more than a variation on a basic theme." AEB, 853 F. Supp. at 734 (citing Educ. Sales, 65 Misc.2d at 416, 317 N.Y.S. 2d at 844); Kavanau v. Courtroom Tel. Network, 23 U.S.P.Q.2d 1938, 1943 (S.D.N.Y. 1992) ("While the embodiment of elements long in use does not of itself negate the novelty of an idea, a protectible idea must: show genuine novelty and invention, and not merely clever or useful adaption of existing knowledge. . . ."); McGhan v. Ebersol, 608 F. Supp. 277, 286 (S.D.N.Y. 1985) (same).

The distinction is thus one between "novelty of an idea" and "novelty of its execution," the former being protectible and the latter being only "the judicious use of existing means, or the mixture of known ingredients in somewhat different propositions –

10

all the variations on a basic theme – [which] partake more of the
nature of elaboration and renovation than innovation" and as
such, non-protectible.  Kavanau, 23 U.S.P.Q.2d at 1942-43 (citing
Educ. Sales, 65 Misc.2d at 416, 317 N.Y.S. 2d at 844); accord,
e.g., AEB, 853 F. Supp. at 734 (idea consisting of "nothing more
than a variation on a basic theme" cannot be novel).[4]  To hold
otherwise would largely eviscerate the tort of misappropriation
as most new ideas incorporate as building blocks elements or
assumptions that are in the public domain, but if the idea itself
is original, rather than just a new way of executing an old idea,
it is protectible.  The Court's instruction reflected this

---

[4]  The balance of the cases cited by defendant do not hold
otherwise as they provide this same novelty standard and conclude
that in the particular case, plaintiff's combination of existing
elements constituted "nothing more than a variation on a basic
theme," and thus do not support the conclusion that an idea
combining existing elements is per se non-novel.  While the court
in Brandwynne v. Combe Int'l, Ltd., 74 F. Supp. 2d 364, 376
(S.D.N.Y. 1999), advanced the broad proposition that "a
combination of pre-existing elements is not considered 'novel,'"
as discussed above that rule does not comport with the realities
of invention or the majority of case law on misappropriation.
Moreover, the facts of that case belie its more general claim, as
the court assessed plaintiff's idea and determined that the
particular combination of existing elements presented by
plaintiff was non-novel.  Id. at 377 ("Brandwynne's combination
does not constitute a 'novel idea' meriting protection.")
(emphasis added).  Additionally, Murray v. Nat'l Broad. Co., 844
F.2d 988 (2d Cir. 1988), the pre-Nadel case on which Brandwynne
relies, in fact noted "[w]e recognize of course that even novel
and original ideas to a greater or lesser extent combine elements
that are themselves not novel.  Originality does not exist in a
vacuum.  Nevertheless, where . . . an idea consists in essence of
nothing more than a variation on a basic theme . . . novelty
cannot be found to exist."  844 F.2d at 993.

reality.

<u>Evidence at Trial</u>

FP also argues that even under the Court's instruction, the jury's novelty conclusion was not supported by the evidence at trial.  FP claims that Popek and Reiling admitted at trial "that the Reel Heroes concept was a mere combination of ideas that were already known and in use in the toy industry" and that "[s]imply taking a feature (such as [FP's] own products, the Toy Biz projector film disk mechanism or the Secret Wars lenticular shield) and moving it from a pre-existing action figure on to the backpack of a pre-existing Rescue Heroes figure is clearly 'a variation on a theme' or 'an idea already in use in the public domain."  Def. Mem. at 54.

The Court instructed the jury, based on the factors articulated in <u>Nadel</u>, that in determining whether the Reel Heroes concept was novel it should consider:

> (1)  The concept's specificity or generality (A generic concept is less likely to be novel than a concept of specific application);
> (2)  The concept's commonality (The more people that are aware of the concept, the less likely it is to be novel, even if Fisher-Price was unaware of it);
> (3)  The concept's uniqueness (A concept that is different from generally known ideas is more likely to be novel than a concept similar to generally known ideas); and
> (4)  The concept's commercial availability (A concept already in use in the industry and commercially available at the time of submission is not a novel concept).

Jury Instructions at 23-24.  On the basis of the Court's

12

instruction and the evidence in the record, it was reasonable for the jury to conclude that the Reel Heroes concept was novel.

First, the jury was presented with the claimed prior art from which, as the Court determined on summary judgment, it was reasonable to conclude that plaintiff's concept was more than just a variation on a basic theme because the prior art did not involve incorporating an image component in the equipment of a figure in order to enhance play value and prompt role play by making the child feel as though he or she was viewing what the figure was viewing.  Trial testimony supported this conclusion. See Trial Tr. at 118-19, 551-55 (Reiling was not aware of "any other action figure in which there was a backpack with an image of a mission of the action figure" and distinguished the concept from alleged prior art); id. at 855-62 (Popek distinguishing the concept from claimed prior art); id. at 1098 (Popek stated that he could not recall "[a]s of the fall of '98 . . . a product on the toy market for an action figure that used a backpack in the way that [DI] proposed in the idea [given] to [FP]" and described the idea as "unique to the toy industry"); id. at 1341 (in Kipling's opinion, the idea presented to FP in 1998-2001 was "not substantially similar to any preceding product . . . [he] never saw anything like [it] either in [Kenner's] products or third-party products"); id. at 1342-46 (Kipling distinguishing the concept from claimed prior art).  FP witnesses also testified

13

that they had never seen or considered such an idea before, <u>see</u>
<u>id</u>. at 743-44 (Synder), 1233 (Pardi), 1767 (Morton), 1969
(Berkheiser), and in rejecting the concept, FP never mentioned
that it thought the concept was non-novel, <u>id</u>. at 723 (Snyder);
JX 12, 20.

Based on this evidence, it was reasonable for the jury to
conclude that consideration of the <u>Nadel</u> factors weighed in favor
of a finding that the concept was a novel idea, rather than
merely a variation on an existing theme, <u>i.e.</u>, a new way of
executing an old idea, <u>see</u> <u>Kavanau</u>, 23 U.S.P.Q.2d at 1942.  The
evidence suggested that, regardless of whether projection or
other image devices had been used before, the idea of an image-
displaying device on the backpack of an action figure for the
purpose of enhancing play value by making the child feel as
though he or she was viewing what the figure was viewing had not
been previously used.  This distinguishes DI's concept from those
in the cases cited by FP, which appear to be the poster-children
of elaboration or improvement on an existing idea, rather than
true innovation.[5]  Thus, FP's motion as to novelty is DENIED.

_____

[5] <u>See</u> <u>Khreativity Unlimited v. Mattel, Inc.</u>, 101 F. Supp. 2d
177, 186-87 (S.D.N.Y. 2000) (idea for a doll dressed in an NBA
uniform was "nothing more than a variation on concepts already
employed by Mattel, dressing dolls in sports uniforms and, more
specifically, dressing dolls in uniforms connected to a sporting
event"); <u>Link</u>, 2000 U.S. Dist. Lexis 4567, at *36-37 (idea for
laser toy that "included a randomly moving target . . . so that a
single player could play the game without a partner [and] used
white light [or] infrared light" was "more on the order of an

## C.   Confidential Relationship

<u>Fisher-Price's Proposed "Secret" Requirement</u>

In order to succeed on its misappropriation claim, DI also had to prove at trial that the Reel Heroes concept was submitted to FP in the context of a confidential relationship.  <u>See</u> <u>Stewart v. World Wrestling Fed'n Entm't, Inc.</u>, No. 03 CV 2468 (RLC), 2005 WL 66890, at *5 (S.D.N.Y. Jan. 11, 2005) (citing, <u>inter</u> <u>alia</u>, <u>Sachs v. Cluett Peabody & Co.</u>, 39 N.Y.S.2d 853, 856 (N.Y. App. Div. 1943), <u>aff'd</u> 291 N.Y. 772 (N.Y. 1944)).  New York law provides that "a confidential relationship is 'synonymous with a fiduciary relationship and . . . [exists] generally when the parties do not deal on equal terms and one trusts and relies on the other.'" <u>Stewart</u>, 2005 WL 66890, at *4 (citing, <u>inter</u> <u>alia</u> <u>Sachs v. Cluett Peabody & Co.</u>, 265 F.A. 497, 39 N.Y.S.2d 853 (N.Y. App. Div. 1943), <u>aff'd</u> 291 N.Y. 772 (1944)).  A confidential relationship may arise implicitly, "from the circumstances surrounding the dealings between the parties,"

---

improvement in technology, insufficient to render it an innovation rather than an elaboration or renovation" where "numerous toys involving either white or infra-red light guns shooting at moving robot targets existed prior to [plaintiff's submission]"); <u>Educ. Sales</u>, 17 U.S.P.Q.2d at 1879 (plaintiff's idea of "a play quilt with a soft-toy puppy, some play activities, a bolster, and a sleeping-bag type roll-up feature, using a carry handle" "embodie[d] no more originality than a mixture of existing elements in the toy industry [and] evidence[d] elaboration and revision rather than innovation" where a play quilt to which "toys, squeekers [sic], rattles, mirrors, and other play activities" had already been marketed).

rather than by explicit agreement, <u>Heyman v. Winarick, Inc.</u>, 325 F.2d 584, 587 (2d Cir. 1963), although such a relationship can only exist where the recipient has accepted it, <u>Stewart</u>, 2005 WL 66890, at *4.

The Court instructed the jury in accordance with this law at trial and the jury found that DI had proved this misappropriation element.  Now, post-trial, FP continues to press its theory, previewed in its motion for reconsideration of the Court's summary judgment ruling, that a successful misappropriation claim must prove that the idea allegedly misappropriated was "secret," a position that neither resonates in New York misappropriation law nor reflects the realities of the toy industry.

FP argues that "New York's common law of misappropriation has developed in harmony with" intellectual property law principles and that "ownership of an idea is not a traditional property right; the law protects a truly secret idea against use only by those to whom the idea has been disclosed in confidence and who have accepted the confidential nature of the disclosure. No further protection may be provided by any state's common law without violating the principal [sic] that 'patent-like' protect for unpatented ideas is barred by federal pre-emption."  Def. Mem. at 8 (citing, <u>inter</u> <u>alia</u>, <u>Bonito Boats, Inc. v. Thunder Craft Boats</u>, 489 U.S. 141, 154-55 (1989)).  Thus, FP argues, in order to prove misappropriation, a plaintiff must not only prove

16

that it submitted its concept in the context of a confidential relationship, but "[t]he idea itself must also be 'secret;' that is, not generally known." Id. at 9 & n.8.  A requirement that the idea be "secret," however, does not appear in New York misappropriation law.  The requirements of novelty, concreteness, and confidential relationship ensure that an obligation is not wrongly imposed on a defendant for either a non-protectible idea or an idea which the defendant had no duty not to use without compensation, but the secrecy requirement urged by defendant is inapplicable.[6]

FP advances its secrecy argument because that argument is a stepping stone to its contention that because Reiling's relationship with FP was governed by the 1994 P&A, providing, inter alia, "no confidential relationship is to be established by

---

[6]  FP's reference to patent law and Bonito Boats (and others) do not suggest otherwise because such case law allows for causes of action where a "breach of trust" is implicated – such as in the New York tort of misappropriation, which involves misappropriation of an idea submitted in the context of a confidential (or fiduciary) relationship. See Bonito Boats, 489 U.S. at 167; see also Du Pont De Nemours Powder Co. v. Masland, 244 U.S. 100, 102 (1917) ("Whether the plaintiffs have any valuable secret or not the defendant knows the facts, whatever they are, through a special confidence that he accepted.  The property may be denied, but the confidence cannot be.  Therefore the starting point for the present matter is not property or due process of law, but that the defendant stood in confidential relations with the plaintiffs, or one of them.  These have given place to hostility, and the first thing to be made sure of is that the defendant shall not fraudulently abuse the trust reposed in him. It is the usual incident of confidential relations. If there is any disadvantage in the fact that he knew the plaintiffs' secrets, he must take the burden with the good.").

17

such disclosure or implied from our consideration of the
submitted material, and the material is not to be considered
submitted 'in confidence,'" JX 1 ¶ 1, DI (a non-signatory to that
agreement) also has no misappropriation claim against FP.[7]
However, as the Court held in its ruling on motions for
reconsideration at the summary judgment stage, that Reiling
"release[d]" his misappropriation claim against FP by signing the
P&A does not "dictate the conclusion that as a factual matter,
the circumstances of plaintiffs' submissions constituted
relinquishment of their property right or the non-existence of a
confidential relationship," such as is necessary for DI to
succeed on its misappropriation claim.  Recon. Ruling [Doc. #
154] at 5-6, 8 ("[T]he enforceability of the confidential

---

[7] This is FP's "cat out of the bag" theory that because
Reiling relationship with FP at the time of the Reel Heroes
submissions was governed by the 1994 P&A, "any rights to utilize
the general concept or idea [once disclosed,] were lost as a
matter of law."  Def. Mem. 11 at 12.  In addition to being
legally flawed, as the Court already concluded in its ruling on
the reconsideration motions, it is belied by the circumstances of
the case, given that after the first Reel Heroes submission, the
parties entered into the Option Agreement (JX 10), which sold to
FP the option of licensing the "rights to make, have made, use,
advertise and/or sell products incorporating the CONCEPT . . . or
at FISHER-PRICE, INC,'s sole choice, an assignment of all rights
including all intellectual property rights in the CONCEPT,"  JX
10 ¶ 2, and which provided that if FP chose to cancel or not
exercise the option, it would return the prototype and "all
rights in the CONCEPT shall belong solely to INVENTORS," id. ¶¶
3-4.  This language suggests that, even after disclosure of the
concept to FP in the fall of 1998, both FP and DI and Reiling
still considered the idea to be of value and the rights to use
the concept to be protectible and assignable.

18

relationship disclaimer in Reiling's 1994 P&A does not compel a conclusion as a matter of law that such a relationship between DI and [FP] cannot be proved.").[8]

Thus, the Court concludes that its instruction – that a confidential relationship, akin to a fiduciary relationship, can arise when the parties deal on unequal terms and one trusts and relies on the other, and may be implied on the basis of the

---

[8] FP contends that the phrase disclaiming any confidential relationship in the P&A must be read as separate and distinct from the phrase providing that the submission is not considered to be made "in confidence," so as to give meaning to both provisions. While the Court recognizes the general rule of contract interpretation that contract language should not be construed as duplicative, Nat'l Union Fire Ins. Co. v. Williams, 223 A.D.2d 396, 397, 637 N.Y.S.2d 36, 38 (N.Y. App. Div. 1996), the Court cannot allow the language of the P&A to contradict the Court's finding that, as a matter of law, a misappropriation claim does not require proof that the idea was "secret," and the Court's legal conclusion that Reiling's P&A does not constitute a waiver of DI's claims. Additionally, the Court assumes that the "in confidence" language in the P&A may also have implications for intellectual property claims asserted by an inventor, and thus that phrase is not rendered duplicative by the Court's construction of paragraph 1 in any event.

FP also appears to conflate the requirement in misappropriation of trade secret cases that the item claimed to have been misappropriated actually be a trade secret, and the requirement that it must have been disclosed in the context of a confidential relationship. The former requirement is obviously applicable only to trade secret cases, and not in an idea case where the novelty and concreteness requirements play an analogous role in ensuring the idea disclosed is protectible. Further, the latter requirement for disclosure in the context of a confidential relationship would be rendered redundant in the trade secret context if confidential relationship was equated to a requirement for secrecy. Rather, an interpretation requiring disclosure in the context of a trust- or confidence-based relationship, so as to impose an implied obligation on the recipient to compensate for any use, makes sense in both the trade secret misappropriation and idea misappropriation contexts.

conduct and circumstances of the parties, including industry custom and practice – comports with New York's misappropriation law.  This reflects the requirement that the parties had the sort of trust- or confidence-based relationship that implies an obligation not to use a disclosed idea without compensating the inventor (assuming the idea is novel and concrete).  This construction of the law also comports with the realities of the toy industry where inventors almost always stand on unequal footing with enormous toy companies and there is a self-interested dynamic that the toy companies who seek out new toy ideas will deal fairly with the inventors and will provide compensation for ideas that are used.[9]

<u>Confidential Relationship</u>

The jury was instructed on the confidential relationship requirement in accordance with New York law as follows:

---

[9] See also, e.g., Nadel, 208 F.3d at 371-72 ("To facilitate the exchange of ideas, the standard custom and practice in the toy industry calls for companies to treat the submission of an idea as confidential.  If the company subsequently uses the disclosed idea, industry custom provides that the company shall compensate the inventor, unless, of course, the disclosed idea was already known to the company."); cf. Heyman, 325 F.2d 587 (trade secret case) ("As the prospective buyer is given the information for the limited purpose of aiding him in deciding whether to buy, he is bound to receive the information for use within the ambit of this limitation.  He may not in good conscience accept the information; terminate negotiations for the sale; and then, using vital data secured from the would-be seller, set out on a venture of his own.  Whatever conduct courts should countenance when parties bargain at arm's length, we think parties should be expected to comply with these essentials of fair dealing.").

> A confidential relationship is synonymous with a
> fiduciary relationship and may be found to exist where
> the parties do not deal on equal terms and one trusts
> and relies on the other.  A confidential relationship
> can only be found to exist where the recipient has
> demonstrated acceptance of the relationship.  A
> conventional or "arm's length" business relationship
> alone cannot constitute a confidential relationship.
> A confidential relationship may arise explicitly by
> agreement of the parties as in a contract, or
> implicitly by the actions and course of dealing of the
> parties or other circumstances, including industry
> customs and practices.  The standard for determining
> the existence of a confidential relationship is an
> objective standard and such a relationship does not
> arise from the subjective expectations of one party
> that are not communicated to or accepted by the other
> party.

Jury Instructions at 25; accord Holloway v. King, 361 F. Supp. 2d

351, 360 (S.D.N.Y. 2005) ("Under New York law, a fiduciary

relationship exists from the assumption of control and

responsibility, and is founded upon trust reposed by one party in

the integrity and fidelity of another.  A fiduciary relationship

cannot arise between parties to an arms length commercial

transaction absent extraordinary circumstances."), aff'd 161 Fed.

Appx. 122 (2d Cir. 2005).[10]

There was sufficient evidence at trial to support the jury's

conclusion that DI met this standard.  First, there was evidence

in the record that FP solicited and relied on ideas from outside

---

[10]  The charge thus reflected that, as FP contends, neither a
typical arm's length business transaction nor unequal bargaining
power alone will give rise to a confidential relationship, and
that, while it can be implied from the circumstances and the
conduct of the parties, in order for a confidential relationship
to exist, it must be accepted by the recipient.

inventors and promised it would treat such inventors "fairly."
Trial Tr. at 99-100 (Reiling), 643-46 (Snyder), 1347 (Kipling
testimony concerning the practice of toy companies soliciting
ideas from outside inventors); Pl. Exs. 300, 304-06 (FP "wish
lists").  This evidence comports with the testimony about the
ongoing relationship between DI and FP in which FP had solicited
toy ideas from DI, and FP always either used and compensated DI
for those ideas, or returned them unused.  Trial Tr. at 786, 800,
803-05, 864 (Popek) ("[FP] was a company that [DI] trusted, had a
relationship with and felt [it] [was] going to be treated fairly
by them").  FP's Christine Zinter also testified that FP
"communicated to outside inventors that they would always be
treated fairly" and that FP has a "good . . . relationship with
outside inventors."  Id. at 1637.  This is in keeping with the
Nadel court's observations concerning the custom and practice in
the toy industry, 208 F.3d 368 ("If the company . . . uses the
disclosed idea, industry custom provides that the company shall
compensate the inventor, unless, of course, the disclosed idea
was already known to the company"), and Kipling's testimony that
the practice in the toy industry includes that "[a] toy inventor
to whom the company has made itself accessible for this very
purpose [of idea submissions] makes presentations of toy ideas.
The company participates in this process in the expectation of
receiving the next great idea.  The toy submitter makes the

submission <u>in anticipation that if the company decides to use the</u> <u>submission, the idea, that the toy company will recognize and</u> <u>compensate the inventor</u>," Trial Tr. at 1358 (emphasis added). From this evidence, the jury could infer a relationship between FP and DI where DI "reposed trust . . . in the integrity and fidelity [of FP]," and FP accepted that trust.  See <u>Holloway</u>, 361 F. Supp. 2d at 360.

Next, while insufficient standing alone as a basis for a confidential relationship finding, the evidence also showed that the parties had unequal bargaining power.  The evidence provided that FP is one of the largest toy companies in the world, grossing (with its parent, Mattel), billions of dollars per year. <u>Id</u>. at 787, 800.  By contrast, Reiling is an individual and DI is a small Connecticut-based company grossing, in 1998, approximately $1.5 million.  <u>Id</u>. at 787.  Neither inventor was represented by a lawyer at any stage of the submission or Option Agreement negotiation process (FP drafted the Option Agreement) and they "felt [they] had little power to change those forms." <u>Id</u>. at 786, 825-26, 830.  Additionally, because these inventors relied on submissions to companies such as FP to make a living, it was reasonable for the jury to conclude that they reposed trust and confidence that FP would, as it promised, treat them fairly and pay them for any concepts used.  See <u>also</u> <u>McGhan v.</u> <u>Ebersol</u>, 608 F. Supp. at 285 (where there was no evidence that

23

plaintiff was represented by counsel when he disclosed his idea, "and the circumstances and nature of [plaintiff] and [defendant's] dealings during that time might support the conclusion that [plaintiff] relied upon [defendant] to protect his interests," the question of relationship was left to the jury).

Further, while FP contends that it did not know that DI was involved in the Reel Heroes submission and thus could not have entered into a confidential relationship with DI at the time of the submission, there is evidence in the trial record from which the jury would have been justified in concluding to the contrary. For example, the storyboard presented to FP at the first meeting in 1998 had been prepared by DI and bore a DI logo, and DI sent "the package of drawing boards, description and the prototype to [FP]." Trial Tr. at 809, 813, 816. Additionally, there was no evidence suggesting that either the FP inventor-relations representatives dealing with the submission or the FP lawyers drafting the Option Agreement were surprised at any point to learn that DI was involved. From this, the jury could conclude that FP was aware that DI was involved at the time of the first submission and accepted the relationship with DI, even though DI had not signed a P&A in connection the Reel Heroes

submission.[11]  See also id. at 824-25, 842-43, 851-52 (Popek) (FP
never asked DI to sign any P&A or waiver agreement in connection
with the Reel Heroes submissions and did not raise "any issue
about whether [DI] had a policy agreement on file"); id. at 1624-
25 (FP's Zinter testified that FP does enter into confidential
relationships with inventors in some circumstances).  Such a
conclusion would also be supported by Kipling's testimony
concerning the three ways that toy companies deal with
confidential relationships with inventors, from which it would be
reasonable to infer that where a company has a general policy of
requiring inventors to sign an express agreement disclaiming any
confidential relationship, as FP had, the absence of such an
agreement in a particular case is significant.  Id. at 1357-58.[12]

    Acceptance of the trust and confidence DI reposed in FP
could also be reasonably inferred by the efforts made to keep the

_____

[11]  While FP is correct, as DI acknowledges, that a
confidential relationship must be found to exist at the time of
the first Reel Heroes submission, evidence of ongoing relations
and circumstances may shed light on that relationship.

[12]  See also Burten v. Milton Bradley Co., 763 F.2d 461, 466
n.5 (1st Cir. 1985) (noting the District Court's conclusion that
the evidence at trial showed "an industry-wide custom among
reputable game and toy companies to maintain the secrecy of ideas
submitted by outside inventors and to use innovations only if
royalties were paid to the inventor.  The evidence further showed
that not only did [Milton Bradley] adhere to this custom, but it
fostered such an understanding with outside inventors. High-level
[Milton Bradley] executives testified that the industry, as well
as virtually all the independent professionals, shared this
expectation.").

concept confidential.  While FP representatives testified that they could not promise confidentiality (and, presumably accordingly, the P&A signed by Reiling also released FP from any liability "in connection with the receipt and examination of [the] disclosure," P&A (JX 1) ¶ 3), both pursuant to industry custom and FP's own best interests, FP did all it could to keep submissions, including the Reel Heroes submission, confidential. Id. at 715 (Snyder tried to keep submissions "as confidential as possible" and thought that inventors expected FP would try to keep it confidential, although they knew "what level confidential is.  You got to show a product to a costing engineer.  Who knows if he is going home to tell his wife and their wife tells someone else and says they're working on this neat product.  <u>But generally, you try to, certainly.  It's a relationship job.  You want to try to make sure that you treat the inventor as correctly as possible</u>.") (emphasis added); id. at 1176 (when asked whether Morton kept submission information confidential, Morton testified he "was very careful about it" and would attempt to keep the information "inside Fisher-Price"); id. at 1221 (Pardi testified that he "never talk[s] to outside people about inventor submissions, no, never have.  Everything we do is confidential in the team center"); id. at 2271 (Pook "would never share anything that [he] had with an inventor at all. . . . [he] judge[s] what [an inventor] is showing [him] to be of interest to [FP], and

26

[he] personally [is] going to discuss it only with those individuals within the company that would have a direct interest in reviewing [it] for further development").[13]   Indeed, FP confirmed in its post-trial briefing that it never disclosed the Reel Heroes concept to the public.  See Def. Mem. at 12 n.13. FP's concern for confidentiality is also illustrated by the provisions in the Option Agreement requiring DI and Reiling to keep the concept confidential. JX 10 ¶¶ 5, 8.

Lastly, in accordance with the evidence presented about industry custom and practice and FP's own practices concerning the treatment of outside inventors, the Option Agreement provided that FP could either choose to license or buy the concept, and pay royalties, or choose not to exercise the option and return the prototype, in which case all rights in the concept would remain with DI and Reiling.  JX 10 ¶¶ 2-3; Trial Tr. at 759-60 (Snyder); id. at 829 (Popek).  In fact, FP chose not to exercise the option and returned the submission materials.  JX 12; JX 20.

Thus, based on the above evidence, from which a jury could reasonably conclude that FP solicited and relied upon submissions by outside inventors (including DI), that DI and FP had an ongoing relationship pursuant to which DI would submit toy ideas

---

[13]   See also Nadel ("To facilitate the exchange of ideas, the standard custom and practice in the toy industry calls for companies to treat the submission of an idea as confidential."); Burten, 763 F.2d at 466 n.5 (observing toy industry custom to maintain secrecy of ideas submitted).

and FP would either return them or use them and pay royalties,
that FP had a practice of treating inventors fairly and paying
royalties for use of a submitted idea, that FP received the Reel
Heroes submission and knew of DI's involvement and did not ask DI
to sign a P&A, and that FP drafted and executed the Option
Agreement providing that if it did not use the Reel Heroes
concept it would return the prototype and all rights to the
concept would remain with DI and Reiling, the Court concludes
that the jury's verdict was justified and FP's motion on this
ground is DENIED.

### D.   Use

The jury was instructed that use by FP of the Reel Heroes
concept could be inferred based on findings of substantial
similarity between the concept and FP's accused products, and a
finding of FP's access to the concept.  The Court charged the
jury to "focus on both the similarities and the differences
between particular aspects of the submitted concept, and the
design of the products actually sold later by [FP]."  Jury
Instructions at 26.  FP now argues that the evidence at trial did
not support the jury's use conclusion because "Reiling and [DI]
admitted that what was actually communicated to [FP] as the Reel
Heroes concept was never used by [FP]."  Def. Mem. at 39.

First, FP is again conflating the concept presented to it,
in the form of the three submissions, with the concept as

28

described by the plaintiff in the course of litigation.  It is the former that DI had to prove FP used in its products, and thus any definitions offered by plaintiffs during litigation that are inconsistent with what was actually submitted are irrelevant.  As determined above in the Court's discussion of concreteness, the three submissions, coupled with testimony and other evidence at trial, reflect an idea for adding an image component to the backpack of a Rescue Heroes figure to enhance role play for the child by depicting the mission of that Rescue Heroes character.

The evidence supported the jury's conclusion that this concept was substantially similar to the accused products, giving rise to an inference of use.  First, the jury was able to perform its own comparison between the concept submissions and the accused products and, as the Court did on summary judgment, identify similarities and dissimilarities.  Additionally, trial testimony – including expert testimony – supported a finding of substantial similarity.  Trial Tr. at 865-66, 871-74 (Popek identifying embodiment of DI's concept in FP's figures); id. at 1335-39 (Kipling doing the same); see also, e.g., JX 117(70) (packaging for Voice Tech Video Mission figure stating "Now! Seek my mission on my video backpack!").  Further, Kipling offered expert testimony describing the evolution of a concept in the toy industry into a final product, based on which a jury could infer substantial similarity and use, notwithstanding differences

between the submitted concept and the accused products.  Id. at
1348-49, 1350-55.  Lastly, the second element of use – access –
was not disputed.  Id. at 689-91 (Snyder); 1224-29 (Pardi); 1681-
85, 1718 (Morton); 18756-78, 1955-56 (Berkheiser); Pl. Exs. 376-
78 (each of the submissions catalogued in FP's database).  Thus,
based on the Court's instruction and the evidence in the record,
the jury was not unreasonable in its finding of use and FP's
motion on this ground is DENIED.

   **E.  Line Extensions**

   At trial, DI sought to recover damages relating to four so-
called "line extensions and accessories" sold in conjunction with
the Rescue Heroes line and for which the jury awarded DI more
than $900,000.  As DI acknowledged during trial, "the basis for
[its] claim of damages for line extensions and accessories is the
purported industry custom and practice of compensating inventors
for such line extensions related to . . . submitted concepts."
Pl. Opp. To Def. Mots. In Limine Nos. 1 & 5 [Doc. # 188] at 10-
12.[14]  On this basis, the Court charged the jury that DI "does
not claim that these line extensions and accessories actually
misappropriated the submitted concept, but claims that [FP's]

---

[14]   DI noted that "certain of the accused [line extensions]
embody certain features of [the Reel Heroes] concept, not the
concept in its entirety," and conceded that "the [line
extensions] cannot embody the concept in its entirety because the
concept, by its very definition, requires adding the image
component to the 'backpack.'" Pl. Opp. To Def. Mots. In Limine
Nos. 1 & 5 at 12.

misappropriation caused [DI] to lose royalty payments it would have collected from [FP] but for [FP's] misappropriation of the submitted concept."  Jury Instructions [Doc. # 238] at 37.  FP now seeks judgment as a matter of law on DI's line extension claim on the following grounds: "(1) there is no legal authority that permits an award of damages in a misappropriation case with respect to products that do not themselves misappropriate the concept at issue; (2) DI failed to introduce any proof that the sales of the line extension products were caused by [FP's] allegedly wrongful use of the concept in the accused Rescue Heroes figures; and (3) DI never introduced any proof that it lost royalties on sales of line extension products that it would have earned 'but for' [FP's] alleged wrongful conduct."  Def. Mem. at 33-34.

As to FP's first argument, this was considered by the Court at the charge conference and in evaluating FP's Rule 50(a) motion and was rejected, and the Court rejects the argument again here. Although it is accurate that under New York law a party must demonstrate use in order to prove misappropriation, see AEB, 853 F. Supp. at 734, FP has not identified, and the Court's research has not uncovered, any New York misappropriation or unfair competition case limiting a successful plaintiff from recovering compensatory damages flowing from the proved misappropriation or unfair competition.

31

As plaintiff notes, "[t]he measure of damages in a case of unfair competition is the amount which the plaintiff would have made but for the defendant's wrong," see Suburban Graphics Supply Corp. v. Nagle, 5 A.D.3d 663, 666, 774 N.Y.S.2d 160, 163-64 (N.Y. App. Div. 2004), and the Court sees no basis for limiting this recovery to loss of royalties on the sales of products that actually use plaintiff's concept where a plaintiff can prove that it also lost profits on other products as a result of the misappropriation.  See also Adolph Gattscho, Inc. v. Am. Marking Corp., 26 N.J. 229, 236, 139 A.2d 281, 284-85 (N.J. 1958) (finding that defendant was required to "account for all avails or profits received by it in the manufacture and sale of machines embodying the plaintiff's secrets" and also including "the sales of type, ink, and solvents," which, while "not found by the court to be an infringement of plaintiff's rights, . . . were so intimately connected with the defendant's illegal activities and ancillary thereto").  This finding is in keeping with the general rule of compensatory damages.  See Sand et al., Modern Fed. Jury Instructions Civil , Instruction 77-3 (2005 ed.) ("The purpose of the law of damages is to award, as far as possible, just and fair compensation for the loss, if any, which resulted from the defendant's violations of the plaintiff's rights.  If you find that the defendant is liable on the claims, as I have explained them, then you must award the plaintiff sufficient damages to

compensate him or her for any injury proximately caused by the defendant's conduct.").

In accordance with this understanding of the law of damages on theories of misappropriation and/or unfair competition, the Court instructed the jury that it must determine "whether [DI] proved that [FP] caused [DI's] loss of royalty payments for these line extensions and accessories and if so, in what amount."  Jury Instructions at 37-38.  While the Court expects that FP's first contention – that in order for a jury to award compensatory damages for line extensions it would have to find that the sales of line extensions were caused by FP's wrongful use of the Reel Heroes concept in the accused Rescue Heroes figures – would be more appropriately raised in the context of the Phase II trial concerning DI's entitlement to a disgorgement of FP's profits, DI did not meet even the lower bar of proving by a preponderance that but for FP's misappropriation/unfair competition, DI would have received royalties on line extension sales.

There is simply no basis in the trial record from which a jury could reasonably find that DI proved causation.  Plaintiff identifies Kipling, Popek, and Snyder testimony, but as will be discussed, this evidence does not justify the jury's conclusion.  The only evidence arguably supporting DI's position is Mr. Kipling's testimony that in his opinion, based on his experience in the toy industry, royalties should be paid to DI on the

33

accused line extensions.  However, this testimony was offered in
a vacuum, in the context of Kipling's theory that line extension
royalties are typically paid on one of two bases: (1) for line
extensions that incorporate an inventor's concept, and (2) for
line extensions that are marketed with figures that use the
concept,  see Trial Tr. at 1478-90, and Kipling also testified
that with respect to royalty obligations, "[n]othing should be
assumed by either side," and "these are all issues to be
considered and negotiated" between the inventor and the company,
id. at 1551-53.  FP's Howard Bollinger concurred.  Id. at 2326,
2380 ("Line extensions in the toy industry are totally a subject
of negotiation.").  And, in fact, the Option Agreement, which was
negotiated and signed by DI, Reiling, and FP, provided the
material terms that would be included in any license agreement
and did not contain a provision for the payment of line extension
royalties that did not incorporate the Reel Heroes concept.  See
Option Agreement (JX 10) ¶¶ 2, 6(c).[15]  Further, while plaintiff
cites testimony of FP's Paul Snyder, Mr. Snyder testified that

_____

[15] While DI's Bruce Popek testified that "[i]f [DI] had gone
to contract, [it] would have more than likely written a contract,
a licensing contract, with [FP] that would have stated the
characters with the backpack, also line extensions such as
playsets and vehicles," id. 875-76, the expert testimony in the
case does not support this conclusion that the parties would have
"more than likely" agreed to payment of royalties on line
extensions that did not incorporate the Reel Heroes concept, only
that this would be a matter for negotiation.  Additionally, Popek
characterized DI's claims on the line accessories as based on
their use of DI's concept.  See id. at 877-79.

royalties on line extensions would only be paid for products that incorporated an inventor's concept.  <u>See</u> Trial Tr. at 716, 742 (Snyder) (typical in toy industry for inventor to receive royalties on sales of line extensions "[o]nly if th[e] extension encompassed the original idea").

Thus, in view of the evidence in the trial record that royalties on line extensions are typically negotiated, that in this instance when negotiating the Option Agreement no royalties on line extensions were agreed to, and that FP's practice was that line extension royalties were paid only for extensions that actually incorporated an inventor's concept, and given the Court's instruction that DI was not claiming "that these line extensions and accessories actually misappropriated the submitted concept," Jury Instructions at 37, there is an absence of evidence to support the jury's verdict that more likely than not, but for FP's wrongful use of the Reel Heroes concept, DI would have recovered royalties on such line extensions, leading the Court to conclude that the jury's findings "could only have been the result of sheer surmise and conjecture."  Accordingly, FP's motion for judgment as a matter of law on DI's line extensions claim is GRANTED.

## III. Conclusion

For the foregoing reasons, defendant's Motion For Judgment as a Matter of Law Or For a New Trial [Doc. # 273] is GRANTED in

part as to line extensions and DENIED on all other grounds.  An
amended judgment shall enter.

                    IT IS SO ORDERED.

                    _____/s/_____
                    Janet Bond Arterton
                    United States District Judge

**Dated at New Haven, Connecticut this 14th day of September, 2006.**